**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*[1] | ) | Case No. 23-90088 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF ERIC KOZA,**
**CHIEF RESTRUCTURING OFFICER OF**
**AVAYA HOLDINGS CORP. AND CERTAIN OF ITS**
**AFFILIATES AND SUBSIDIARIES, IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Eric Koza, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      For more than two decades, Avaya's products and technologies have helped shape the working world.  Since becoming a separate standalone company in 2000, Avaya's world-class physical communications devices and call center technologies brought professionals together.  The world has changed dramatically since 2000, and what once seemed unimaginable—working from somewhere other than the office—is now commonplace.  To address the changing needs of its customers, Avaya has emerged as a leader in digital—no longer just physical—communications products, solutions, and services for businesses of all sizes.  Now, Avaya delivers its technology predominantly through software and services, both on-premise and through the cloud, to more than 90,000 customers worldwide in a diverse range of industries, including financial services,

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/avaya.  The location of Debtor Avaya Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 350 Mount Kemble Avenue, Morristown, New Jersey 07960.

"Avaya" or the "Company" refers to Avaya Holdings Corp. and its direct and indirect subsidiaries.

manufacturing, retail, transportation, energy, media and communications, healthcare, education, and government.

2.      With partners and customers worldwide, more than 6,500 employees in almost sixty countries, an established and well-respected iconic brand-name, and a renewed focus on a cutting-edge business model focused on subscription and cloud-delivered services, Avaya files these chapter 11 cases (the "Chapter 11 Cases") to complete the final step in its transformation—right-sizing its capital structure for long-term success.

3.      The path forward from Avaya's last restructuring in 2017 has been difficult to say the least.  The Company's revenues from capex-based purchases (software license and support and hardware) have continued to decline over the past several years, consistent with industry trends and customers preference to shift towards cloud-based solutions.  In an effort to transform the business and shift to cloud-based solutions, the Company invested across R&D, sales, and service.  However, these investments failed to quickly generate revenues due to the long sales cycle times of larger, more complex deals.  While the Company has been successful in growing its subscription-based business since 2020, this growth ultimately could not mitigate the profitability and cash flow pressures exerted by the continued capex business decline and delayed revenue generation from the cloud investments.  Exacerbating the situation, the Company's subscription business growth began to decelerate in the second half of 2022.

4.      Against the backdrop of these headwinds, several critical developments occurred in rapid succession.  In mid-June 2022, Avaya announced a new financing effort, ultimately closing a $600 million raise of new capital on July 12, 2022.  Then, after self-reporting a potential earnings miss of more than 15% with respect to revenue and 60% with respect to adjusted EBITDA to the U.S. Securities and Exchange Commission (the "SEC") and notifying its auditor,

PricewaterhouseCoopers LLP ("PwC"), Avaya launched an investigation, under the direction of the Audit Committee (as defined below), into the circumstances giving rise to the preliminary Q3 2022 results that Avaya announced in late July 2022.  Throughout the third and fourth fiscal quarters of 2022, Avaya's leadership team experienced several changes.  On August 1, 2022, Avaya appointed a new Chief Executive Officer, Alan Masarek.

5.      Avaya's management team and board quickly refocused their efforts on three primary goals.  ***First***, in conjunction with its investigation at the direction of the Audit Committee into the Q3 2022 earnings miss, Avaya has focused on developing a remediation plan, while also working collaboratively with the SEC.  ***Second***, Avaya worked to identify changes to its operations, capital structure, and liquidity balance that will put it on the path to long-term success while also limiting near-term impact to the business.  ***Third***, Avaya actively focused on reducing disruption to its business, world-wide operations, customer relationships, and employee attrition (which is challenging because Avaya operates in a particularly competitive industry, and the shadow of Avaya's first bankruptcy filing still lingers).

6.      With creditors having organized into several groups, collectively representing a super majority in every class of impaired indebtedness (each a "Creditor Group" and collectively, the "Creditor Groups"), Avaya began discussions in earnest with each Creditor Group in pursuit of a holistic solution.

7.      In December 2022, it became clear that an out-of-court solution was not actionable. Certain risks to executing an out-of-court restructuring, combined with Avaya's substantial debt service obligations, liquidity constraints, and the views of the majority of the Creditor Groups, made clear that longer-term success would require an in-court process.  Having lived through a "free-fall" chapter 11, however, Avaya has been singularly focused on a process that has high

levels of support and execution certainty, with low impact on business and operations.  Avaya believes it has achieved just that.

8.      Today, the Debtors filed a Plan[2] that achieves those twin goals.  **The Plan reflects a fully consensual deal with all the Creditor Groups and unimpairs all general unsecured creditors at Avaya, Inc. and its subsidiaries,**[3] **encompassing all trade, customer, employee, vendor, and suppliers across the entire enterprise,** on the terms set forth in that certain restructuring support agreement, dated February 14, 2023 (the "RSA," and the transactions contemplated thereby, the "Restructuring Transactions").  The Restructuring Transactions have been memorialized in the Plan filed contemporaneously herewith on which solicitation commenced prior to the Petition Date.

9.      Allowing all vendors, employees, and trade partners to recover in full will allow the Debtors to minimize disruptions to their go-forward operations while effectuating a value-maximizing transaction through the chapter 11 process.  The central aims of the Plan are speed and, to the greatest degree possible, certainty.

10.     The Debtors expect to continue operating normally throughout the court-supervised process and remain focused on serving their customers.  With the full support of their lenders, the Debtors seek authority to move through the chapter 11 process on an expedited basis: confirmation in 60 days and emergence in 90 days.  Although the Plan does not provide value for equity, it is

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the contemporaneously filed *Joint Prepackaged Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") or the *Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), as applicable.

[3]   The Debtors do not believe there are any unsecured claims at Avaya Holdings Corp., outside of the unsecured claims held by the HoldCo Convertible Notes, but out of an abundance of caution, the Plan separately classifies such claims.

structured to support Avaya's strategy shift, employee engagement, and stakeholder relationships. Avaya will emerge a stronger company because of it.

## Background and Qualifications

11.     I am the Chief Restructuring Officer ("CRO") of Avaya Holdings Corp. ("HoldCo") and its affiliated debtors and debtors in possession (collectively, the "Debtors").  I have served as the Debtors' CRO since January 4, 2023,[4] and previously served as chief restructuring officer in connection with the Debtors' chapter 11 cases in 2017.  I have personally been involved in recent comparable chapter 11 reorganizations such as *In Riverbed Technology, Inc et al.*, Case No, 21-11503 (Bankr. Del.  Nov. 16, 2021), in which I served as financial advisor to Riverbed Technologies Inc and certain of its affiliates; *In re NPC international Inc.*, Case No. 20-33353 (Bankr. S.D.TX. July 1, 2020), in which I served as CRO of NPC International Inc.; *In re Chino Holdings, Inc.*, Case No. 20-32181 (Bankr. E.D. Va. May 4, 2020), in which I served as financial advisor to J. Crew Group Inc. and certain of its affiliates; *In re Avaya, Inc.*, Case No. 17-10089 (Bankr. S.D.N.Y. Jan. 19, 2017), in which I served as CRO of Avaya Inc.; *In re Deluxe Entm't Servs. Grp. Inc.*, Case No. 19-23774 (Bankr. S.D.N.Y. Oct. 3, 2019), in which I served as financial advisor to Deluxe Entertainment Services Group Inc.; *In re Sungard Availability Servs. Capital, Inc.*, Case No. 19-22915 (Bankr. S.D.N.Y. May 1, 2019), in which I served as CRO to Sungard Availability Services Capital, Inc.; *In re Fullbeauty Brands Holdings Corp.*, Case No. 19-22185 (Bankr. S.D.N.Y. Feb. 3, 2019), in which I served as financial advisor to Fullbeauty Brands Holdings Corp.; and *In re Cenveo Inc.*, Case No. 18-22178 (Bankr. S.D.N.Y. Feb. 2, 2018), in which I served as financial advisor to Cenveo Inc.  I specialize in advising senior executives, boards of directors, and creditors in distressed situations.  I was named one of the

---

[4]     AlixPartners has advised the Debtors in connection with a potential restructuring since the fall of 2022.

industry's top "People to Watch" by Turnarounds & Workouts 2018.  My combination of restructuring, operating, and transaction experience spans multiple countries and a variety of industries.

12.    I have more than 20 years of experience serving in a variety of roles, including in senior management positions, as a financial advisor, a principal investor, and director of public and private companies.  I have served as a Partner & Managing Director of AlixPartners since 2018, when AlixPartners acquired my previous financial advisory firm, Zolfo Cooper.  I held several roles at Zolfo Cooper from 2009 to 2011 and from 2013 until its acquisition in 2018, including Managing Director from 2015 to 2018.  Prior to that, I held a variety of roles, including Senior Vice President, Corporate Development and Financial Strategy at Comverse Technology, Inc. from 2011 to 2013; Founding Partner of private equity firm Verax Capital LLC from 2006 to 2009; and Partner in various investment funds at investment manager W.R. Huff Asset Management Co. LLC from 1999 to 2006.  I received a B.S. from Boston College in 1996, and an M.B.A. from Boston University in 1999.  I have been a CFA® charterholder since 2003.  In my capacity as CRO, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am above 18 years of age, and I am competent to testify.

13.    I submit this declaration (this "Declaration") to assist this court (the "Court") and parties in interest in understanding the Debtors, their operations, their capital structure, the circumstances related to the commencement of the chapter 11 cases, and in support of (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (b) the relief requested by the Debtors pursuant to the pleadings described herein (collectively, the "First Day Motions").

14.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

15.     To better familiarize the Court with the Debtors, their business, and the circumstances leading to these Chapter 11 Cases, this Declaration is organized into four sections as follows:

- **Part I** provides a general overview of the Debtors' corporate history and business operations;

- **Part II** offers detailed information on the Debtors' prepetition organization and capital structure;

- **Part III** describes the circumstances leading to the commencement of these Chapter 11 Cases and an overview of the Debtors' prepetition restructuring efforts; and

- **Part IV** addresses the First Day Motions and the proposed path forward in chapter 11.

### Part I: Corporate History and Operations

I.     **Corporate History.**

A.     **Avaya Is Formed Through a Public Offering in 2000.**

16.     Avaya has a storied past, beginning nearly thirty years ago as part of AT&T.  In the mid-nineties, AT&T began spinning off business units, one of which included Lucent Technologies, Inc. ("Lucent").  At the time, Avaya's business was a part of Lucent and remained so until 2000, when Avaya spun-off and established an independent existence via a public offering. For the next seven years, Avaya's equity remained publicly held until October 26, 2007, at which

time Avaya was taken private through a transaction that valued Avaya's then-current operations at approximately $8.2 billion and through which Avaya incurred approximately $5.3 billion of funded debt.

17.    Shortly after the take-private transaction, the "Great Recession" hit, and the global economy collapsed.  This economic downturn, together with a market shift from hardware-based business communications towards software and services offerings, had a substantial effect on Avaya's operations.  In the following years, Avaya experienced significant revenue decline resulting from these impacts and ongoing competition from numerous competitors.

**B.    The First Bankruptcy Proceeding.**

18.    In response to its material revenue contraction and increased annual cash interest expenses, Avaya undertook a number of business initiatives to improve operating performance with the intent to reinvent itself as a software and services company.  Despite these business initiatives, changes in market consumption and macroeconomic conditions negatively impacted Avaya's top line revenue.  Combined with Avaya's significant ongoing interest expense and pension obligations, among other headwinds, it was impossible for Avaya to incrementally reduce and continue to service its funded debt load.  Consequently, on January 19, 2017, Avaya Inc. and seventeen of its affiliates filed for chapter 11 protection in the United States Bankruptcy Court for the Southern District of New York.  Less than a year later, Avaya Inc. and its affiliated debtors confirmed a chapter 11 plan of reorganization on November 28, 2017, and emerged on December 15, 2017, as a publicly traded company.  In total, Avaya's 2017 chapter 11 process eliminated more than $3 billion in debt and provided over $300 million in annual cash interest savings.

19.    Although the Company greatly benefitted from this significant deleveraging, in the years following Avaya's emergence from chapter 11, new challenges took root.  As the

communications and collaboration industry continued its rapid shift toward cloud-based solutions, Avaya still needed to implement the changes necessary to meet customer demand. As discussed more fully below, Avaya has experienced a meaningful revenue decline in the last twelve months, in particular as a result of its slow move to align its business with industry trends. Relatedly, the industry's concerns regarding Avaya's financial health have only exacerbated these challenges. In response, Avaya has refocused and refined its strategy around a more transformative business plan, which has brought Avaya to its current position—ready to make productive use of the restructuring process and to emerge a stronger, more focused business.

## II.   Business Operations.

20.   Today, Avaya consists of 125 operating entities and maintains operations across Asia, the Middle East, Europe, South America, and North America. Avaya serves over 90,000 direct and indirect customers in more than 190 countries throughout the world. Such customers consist of multinational enterprises, small- and medium-sized businesses, as well as government organizations, Avaya customers operate in a diverse range of industries, including financial services, manufacturing, retail, transportation, energy, media and communications, healthcare, education, and all branches of government. Avaya serves forty-four of the top fifty global banks, all ten of the top ten global airlines, all seven of the top seven U.S. health insurance providers, twelve of the top thirteen U.S. hotels, casinos, and resorts, nine of the top ten U.S. retailers, and approximately ninety percent of the U.S. Fortune 100 companies. Indeed, Avaya is critical to supporting and maintaining these businesses' and institutions' daily operations. To market its products and services across the globe, Avaya relies on approximately 4,600 channel partners for indirect sales, which generate a substantial portion of its total revenue. As a result of Avaya's

operations, the Company reported consolidated LTM EBITDA ("Adjusted EBITDA") of approximately $500 million on a worldwide basis for the twelve months ended June 30, 2022.[5]

21.     Avaya leverages its global presence to offer a comprehensive set of product and service solutions for its customers.  Indeed, Avaya believes that its global presence is a key selling point to its customers, particularly customers operating on a multinational scale, as the Company's geographic footprint enables customers to receive around-the-clock support from highly qualified and trained employees located in multiple jurisdictions.  Avaya's business operations are divided into three distinct revenue categories:  (a) Software and Support (the "Software and Support Segment"); (b) Avaya Professional Services (the "Professional Services Segment"); and (c) Hardware (the "Hardware Segment").  The Software and Support Segment is the largest segment, representing more than 75% of the Debtors' revenue in fiscal year 2022.

22.     The Software and Support Segment includes unified communications and contact center software solutions, applications, and associated support (collectively, the "Products and Solutions").  The Software and Support Segment primarily develops, markets, and sells unified communications and contact center software solutions, offered on-premise, in the cloud, or as a hybrid solution for customers.  The Software and Support Segment's customers operate in a broad range of industries, including financial services, healthcare, hospitality, education, government, manufacturing, retail, transportation, energy, media, and communications.  In fact, the contact center solutions are utilized by multiple major universities and over 1,100 health institutions. Client software resides on both Avaya-branded and third-party devices—including desk phones,

---

[5]     EBITDA is defined as net income (loss) before income taxes, interest expense, interest income and depreciation and amortization and excludes the results of discontinued operations.  Under the Avaya's debt agreements, Adjusted EBITDA is defined as EBITDA further adjusted to exclude certain charges and other adjustments, such as certain one-time charges and pension-related expenses.

tablets, laptops, and smartphones—and provides end-users with access to unified communications capabilities, including voice and video calling, audio conferencing, instant messaging, and contact directories.

23.     The Professional Services Segment provides customers with award-winning customer service, delivered by Avaya and its extensive partner ecosystem.  Avaya offers a comprehensive range of services designed to meet the needs of its customers spanning across a wide range of industries.  Such services include technical support and installation services for Products and Solutions purchased by end-users, as well as project-based deployment, design, and optimization services (the "Professional Services"), enabling customers to evaluate, plan, design, implement, monitor, manage, and optimize complex enterprise communications networks.  As described more fully below, Avaya's Products and Solutions and Professional Services offerings are ultimately sold to end-users through a combination of direct sales by Avaya and indirect sales through the Company's channel partners.

24.     Through its Hardware Segment, Avaya also offers one of the broadest portfolios of hardware products in the industry, including a wide range of business devices such as handsets, video conferencing units, servers, and gateways.  Like almost every company in the technology industry, Avaya's Hardware Segment has experienced a secular decline as the industry has shifted to cloud-based solutions and digital applications.  However, the Hardware Segment is still an important part of Avaya's corporate strategy, supporting the revenue from the Software and Support Segment and Professional Services Segment.

**B.     Software and Support Segment.**

25.     Software & Support includes premise and cloud-based subscription revenue, managed services, perpetual-based software license revenues and associated maintenance support. The central feature of the Software and Support Segment is the Avaya Cloud Products—a suite of

software that enables organizations to reimagine collaborative work environments (the "<u>Avaya Cloud Products</u>").  As customers shifted towards remote work and education, Avaya adapted by developing this comprehensive suite of software-as-a-service ("<u>SaaS</u>") products that allow organizations to select and pay only for the capabilities they need.  As such, the Avaya Cloud Products provide customers with options to access all of Avaya's software and solutions and customize them based on the needs of the organization.  Avaya Cloud Products' subscription models differ from Avaya's legacy commercial model, which centered on ownership with an existing on-premise solution, in that it is built on a usage model with monthly or annual subscription payments.  In total, the Software and Support Segment generated approximately $1.9 billion in revenue for Avaya in fiscal year 2022.

### C.    Professional Services Segment.

26.    Complementing Avaya's Products and Solutions portfolio is a global, award-winning Professional Services portfolio, delivered by Avaya and its extensive partner ecosystem.  Avaya offers a wide variety of Professional Services, which help customers minimize the risk of outages, drive employee productivity, and offer a differentiated customer experience. The Professional Services offered fall into two buckets:  (a) professional services, which allow customers to take advantage of their information technology and communications solution investments by providing side-by-side business transformation capabilities; and (b) learning services, pursuant to which Avaya provides tailored, in-depth training to its customers.  For each, customers can choose the level of support that is best suited for their needs, which may include deployment, training, monitoring, solution management, and optimization, among other capabilities.  This extensive range of services is offered through a worldwide network comprised of over 4,900 service and technical experts, both employees and third-party contractors, that provide twenty-four-seven services in sixteen languages and forty-two countries.  In total, the

Professional Services Segment generated approximately $230 million in revenue for Avaya in fiscal year 2022.

### D. Hardware Segment.

27.     Through the Hardware Segment, Avaya's product offerings predominately consist of telephone products, which include phones, video conferencing equipment, and headsets, as well as associated maintenance support.  Hardware is sold directly to customers or through partners, and revenue is recognized at the point-in-time at which control of the product is transferred to the buyer.  In total, the Hardware Segment generated approximately $350 million in revenue for Avaya in fiscal year 2022.

### E. Direct and Indirect Sales Channels.

28.     Avaya has a direct or indirect presence in over 190 countries, operating a sales model that recognizes revenue through both direct sales by Avaya and indirect sales by more than approximately 4,600 third-party channel partners and agents.  Avaya generates most of its revenues, approximately 65%, indirectly through collaboration with a broad-based network of channel partners that deliver its Products and Solutions to end-users.

29.     Avaya's direct sales are made directly by Avaya to its end-users.  Avaya's Indirect Sales are accomplished through:  (a) sales to channel partners, who subsequently sell Products and Solutions to end-user customers; and (b) sales to intermediaries who subsequently sell Products and Solutions to channel partners who then sell Products and Solutions to end-users.

### F. Avaya's Intellectual Property.

30.     Avaya owns a significant number of patents and files new patent applications to protect its research and development investments in new products and services, as necessary.  As of December 2022, Avaya held approximately 4,300 patents and pending patent applications, including foreign counterpart patents and foreign applications.  Avaya's patents and pending patent

applications cover a wide range of products and services involving a variety of technologies, including, but not limited to, unified communications technology (including video, social media, telephony, and messaging), contact center technology, and wireless communications.  In addition to its patents and patent applications, Avaya also holds licenses to intellectual property for the manufacture, use, and sale of its products and various trademarks and copyrights.

**G.    Avaya's Employees.**

31.    As of the Petition Date, the Company has more than 6,500 employees and close to sixty countries around the globe.  The Debtors, in turn, employ approximately 2,000 individuals in the United States, as well as approximately 70 individuals in a number of foreign branches around the world.  While the substantial majority of the Debtors' employees are not represented by a labor union, the Debtors are party to two collective bargaining agreements with respect to approximately 275 union employees (collectively, the "Represented Employees").   Of the Debtors' Represented Employees, approximately 250 are employed under a collective bargaining agreement with the Communication Workers of America, and the remaining Represented Employees are covered by a collective bargaining agreement with various bargaining units of the International Brotherhood of Electrical Workers.

**Part II: The Debtors' Prepetition Corporate and Capital Structure**

**III.    Corporate Structure.**

32.    As set forth on the structure chart attached hereto as **Exhibit A**, Debtor HoldCo is Avaya Inc.'s ultimate parent through its 100% ownership of Avaya Inc.  Avaya Inc. owns, directly or indirectly, each of Avaya's remaining 123 subsidiaries.  Avaya's U.S. entities include HoldCo, Avaya Inc., and nineteen subsidiaries.  Of these U.S. entities, eighteen are guarantors on all of the

Debtors' approximately $3.4 billion of prepetition debt.[6]   The substantial majority of Avaya's international subsidiaries, in turn, are direct or indirect subsidiaries of Debtor Sierra, a non-operating holding company, which, in turn, is a direct subsidiary of Avaya Inc.[7]   Avaya's international entities are not obligors on Avaya's funded debt balance other than with respect to the foreign tranche of the Prepetition ABL Facility (defined below) and are not debtors in these chapter 11 proceedings.[8]

## IV.   Capital Structure.

33.     Avaya's prepetition capital structure includes approximately $3.4 billion in funded debt as of the Petition Date, consisting of:  (a) the Prepetition ABL Facility; (b) three tranches of Prepetition Term Loans; (c) one series of Legacy Notes; (d) one series of Secured Exchangeable Notes; and (e) one series of HoldCo Convertible Notes (each as defined below).

34.     Avaya's prepetition indebtedness is also subject to two intercreditor agreements: (i) the ABL Intercreditor Agreement, dated as of December 15, 2017 (as amended, restated, amended and restated, modified, or supplemented from time to time) by and among Citibank, N.A., as Representative for the ABL Credit Agreement Secured Parties (as defined therein), Goldman Sachs Bank USA, as First Lien Term Collateral Representative (as defined therein) and as First Lien Term Credit Agreement Administrative Agent, and acknowledged and agreed to by Avaya Inc., HoldCo and the other subsidiaries party thereto (the "ABL Intercreditor Agreement"), and (ii) the First Lien Pari Intercreditor Agreement, dated as of September 25, 2020, (as amended,

---

[6]     The following U.S. subsidiaries are not guarantors with respect to Avaya's prepetition debt:  (a) Knoahsoft, Inc.; (b) Sierra Communication International LLC ("Sierra"); and (c) CTIntegrations, LLC.

[7]     In fiscal 2022, international operations accounted for approximately $1 billion of Avaya's $2.48 billion in total revenue.

[8]     Avaya does not presently expect to commence restructuring proceedings (whether in the United States or otherwise) for those entities.  Avaya's international affiliates and operations are discussed more fully below.

restated, amended and restated, modified, or supplemented from time to time) by and among Goldman Sachs Bank USA, as Credit Agreement Collateral Agent and Authorized Representative for the Credit Agreement Secured Parties (as defined therein), Wilmington Trust National Association, as Initial Additional Pari Collateral Agent and Initial Additional Authorized Representative, Avaya Inc., HoldCo and the other subsidiaries party thereto (the "Notes Intercreditor Agreement", and together with the ABL Intercreditor Agreement, the "Intercreditor Agreements"). The ABL Intercreditor Agreement governs the relative contractual rights of lenders under the Prepetition ABL Facility, on the one hand, and the Prepetition Term Loan Credit Facility, on the other hand. The Notes Intercreditor Agreement governs the relative contractual rights of lenders under the Prepetition Term Loan Credit Facility, on the one hand, and holders of the Legacy Notes and the Senior Exchangeable Secured Notes, on the other hand.

**B.      Avaya's Prepetition Indebtedness.**

35.      As of the Petition Date, Avaya's prepetition funded indebtedness can be summarized as follows:

| Indebtedness | Balance Outstanding ($ millions)[9] |
|---|---:|
| Prepetition ABL Facility[10] | **$56** |
| B-1 Term Loans | **$800** |
| B-2 Term Loans | **$743** |
| B-3 Term Loans | **$350** |
| Legacy Notes | **$1,000** |
| Senior Exchangeable Secured Notes | **$250** |
| HoldCo Convertible Notes | **$221** |
| **Total** | **$3,420** |

| Legacy Liabilities | Balance Outstanding ($ millions)[11] |
|---|---:|
| US Pension (underfunded liability) | **$111** |
| International Pension (underfunded liability) | **$319** |
| OPEB (underfunded liability) | **$115** |
| **Total** | **$545** |

These obligations are discussed below:

**1.      Prepetition ABL Facility.**

36.      Avaya Inc., as the parent borrower, HoldCo, as holdings, foreign borrowers, and Citibank, N.A., Inc., as administrative agent (in such capacity, the "Prepetition ABL Agent"), entered into that certain credit agreement, dated as of December 15, 2017, and amended and restated as of September 25, 2020 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "Prepetition ABL Credit Agreement").  Under the

---

[9]      Denotes balance outstanding, and not including accrued interest amounts, as of February 14, 2023.

[10]      Excludes approximately $40 million of LCs issued under the Prepetition ABL Facility.

[11]      Denotes balance outstanding as of September 30, 2022.

Prepetition ABL Credit Agreement, consisting of a $150 million U.S. tranche and a $50 million foreign tranche, the borrowers may borrow under a $200 million revolving credit facility (the "Prepetition ABL Facility").

37.     As of the Petition Date, an aggregate balance of approximately $56 million remains outstanding under the U.S. tranche of the Prepetition ABL Facility, in addition to letters of credit issued and outstanding thereunder with face value of approximately $40 million in the aggregate. Obligations under the Prepetition ABL Facility are secured by substantially all assets of the U.S. borrower and guarantors under the Prepetition ABL Credit Agreement, and solely with respect to the foreign tranche, by certain foreign subsidiaries, subject to certain limitations and exclusions.

38.     Pursuant to the ABL Intercreditor Agreement, the Prepetition ABL Facility holds a first priority lien versus the Debtors' other debt obligations with respect to ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) which includes, among other things, cash, accounts receivable, and inventory.  As of January 23, 2023, the Debtors estimate their aggregate balance of accounts receivable and inventory available to support borrowing under the Prepetition ABL Facility totaled approximately $151 million, and the Debtors believe those values have not materially changed since that date.  The Prepetition ABL Facility holds a second priority position versus the Debtors' obligations with respect to term loan collateral (the "Prepetition Term Loan Priority Collateral"), generally consisting of assets, such as equipment, fixtures, and stock pledges, except to the extent constituting ABL Priority Collateral.[12]  In addition, the foreign tranche of the Prepetition ABL Facility is secured by certain assets of foreign borrowers and guarantors.

---

[12]   For the avoidance of doubt, the Prepetition ABL Facility is senior to the Debtors' Prepetition Term Loans.

2.      **Prepetition Term Loans.**

39.      Avaya Inc., as borrower, HoldCo, as holdings, Goldman Sachs Bank USA, as administrative agent and collateral agent (in such capacity, the "Prepetition Term Loan Agent"), and the lenders that are party thereto from time to time (the "Prepetition Term Loan Lenders") are parties to that certain first lien term loan credit agreement (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "Prepetition Term Loan Credit Agreement," or the "Prepetition Term Loan Credit Facility").

40.      The Prepetition Term Loan Credit Agreement provides three tranches of the term loan credit facility.  An aggregate principal amount of $1.9 billion is outstanding as of the Petition Date under the Prepetition Term Loan Credit Agreement, consisting of approximately: (a) $800 million outstanding in term B-1 loans maturing December 15, 2027; (b) $743 million outstanding in term B-2 loans maturing December 15, 2027; and (c) as discussed in greater detail below, $350 million outstanding in term B-3 loans maturing December 15, 2027 (the "B-3 Term Loans," and collectively, the "Prepetition Term Loan Credit Facility").  Obligations under the Prepetition Term Loan Credit Facility are secured by a first priority lien on substantially all the U.S. borrowers' and guarantors' assets, subject to certain limitations and exclusions.  As noted above, obligations outstanding under the Prepetition Term Loan Credit Facility are senior in priority versus the Prepetition ABL Facility with respect to Prepetition Term Loan Priority Collateral and are junior in priority versus the Prepetition ABL Facility with respect to ABL Priority Collateral.

41.      On July 12, 2022, Avaya Inc. entered into Amendment No. 4 to the Prepetition Term Loan Credit Agreement pursuant to which Avaya incurred the B-3 Term Loans in an aggregate principal amount of $350 million (the "Prepetition Term Loan Amendment").  Avaya used a portion of the proceeds from the B-3 Term Loans to make a distribution to HoldCo, which

used the dividend proceeds to repurchase certain of the HoldCo Convertible Notes, with the remaining funds received from the B-3 Term Loans placed in an account maintained by Goldman Sachs Bank USA (the "Escrow Account"), resulting in approximately $221 million being held in the Escrow Account (the "Escrow Cash").  As of the Petition Date, the Escrow Cash remains in the Escrow Account.

### 3.   Legacy Notes.

42.     Avaya Inc., as issuer, HoldCo and the Subsidiary Guarantors, as guarantors, and Wilmington Trust, National Association, as indenture trustee and collateral agent (the "Legacy Notes Trustee"), issued senior first lien notes (the "Legacy Notes") pursuant to that certain indenture dated September 25, 2020 (the "Legacy Notes Indenture").  The Legacy Notes mature on September 15, 2028, and approximately $1 billion in principal amount remains outstanding as of the Petition Date.  Obligations under the Legacy Notes are secured by substantially all assets of each Debtor other than Sierra, Knoahsoft, Inc., and CTIntegrations, LLC, subject to certain limitations and exclusions.

### 4.   Secured Exchangeable Notes.

43.     Avaya Inc., as issuer, HoldCo and the Subsidiary Guarantors, as guarantors, and Wilmington Trust, National Association, as trustee (the "Secured Exchangeable Notes Trustee"), issued exchangeable secured notes (the "Secured Exchangeable Notes") pursuant to that certain indenture dated July 12, 2022 (the "Secured Exchangeable Notes Indenture").  The Secured Exchangeable Notes mature on December 15, 2027, and approximately $250 million in principal amount remains outstanding as of the Petition Date.  The indenture and the Senior Exchangeable Secured Notes provide, among other things, that the Secured Exchangeable Notes are Avaya Inc.'s senior secured obligations.  Obligations under the Secured Exchangeable Notes are secured by

substantially all assets of each Debtor other than Sierra, Knoahsoft, Inc., and CTIntegrations, LLC, subject to certain limitations and exclusions.

### 5.  HoldCo Convertible Notes.

44.     HoldCo, as issuer, and The Bank of New York Mellon Trust Company N.A., as trustee (the "HoldCo Convertible Notes Trustee"), issued HoldCo convertible notes (the "HoldCo Convertible Notes") pursuant to that certain indenture dated June 11, 2018 (the "HoldCo Convertible Notes Indenture").  The HoldCo Convertible Notes mature on June 15, 2023, and approximately $221 million in principal amount remains outstanding as of the Petition Date. Approximately $129 million of HoldCo Convertible Notes were repurchased by HoldCo in July 2022.  The indenture and the HoldCo Convertible Notes provide, among other things, that the HoldCo Convertible Notes are unsecured obligations of HoldCo only.

### C.    The Debtors' Legacy Liabilities.

### 6.    U.S. Pension Liabilities.

45.     The Debtors maintain one qualified defined benefit pension plan under the Internal Revenue Code (the "IRC") and the Employee Retirement Income Security Act of 1974 ("ERISA") for their Employees and Retirees.  The Avaya Inc. Pension Plan (the "Qualified Pension Plan") currently provides pension benefits to approximately 325 active employees and approximately 4,100 retirees and other separated participants and beneficiaries (collectively, the "Pension Recipients").  Under the IRC and ERISA, the Debtors make minimum funding contributions to the Qualified Pension Plan based on annual actuarial calculations.  In addition, the Qualified Pension Plan makes annual premium payments to the Pension Benefit Guaranty Corporation.  The Pension Recipients receive approximately $20 million per quarter under the Qualified Pension Plan (collectively, the "Pension Benefit Payments"), consisting of payments

per-participant of approximately $4,800. The Pension Benefit Payments are paid out of the corpus of trusts established for the plan (collectively, the "Pension Plan Trusts").

46. As part of its 2017 restructuring, Avaya Inc. entered into a settlement with the Pension Benefit Guaranty Corporation (the "PBGC") whereby Avaya Inc. and the PBGC agreed to, among other key terms: (a) the assumption of the hourly pension plan; (b) the termination of the pension plan for salaried employees; (c) certain excess contributions that would be triggered by the occurrence of future, material, transactions; and (d) the plan recovery for the PBGC (collectively, the "2017 PBGC Settlement").[13]

47. Over the past few months, the Company has re-engaged in discussions with the PBGC regarding the terms of the hourly pension plan. Prior to the Petition Date, after a series of negotiations and discussions, Avaya and the PBGC entered into an agreement (called the "2023 PBGC Settlement" in the Plan), effective upon the Debtors' emergence from chapter 11, that provides for the assumption of the hourly pension plan and the consensual termination of the 2017 PBGC Settlement, including the excess contribution obligations thereunder.

**D. Intercompany Relationships.**

48. As is customary for a global company of Avaya's size and scale, in the ordinary course of business, the Debtors maintain business relationships with each other and their non-Debtor affiliates and regularly engage in transactions through various intercompany service agreements or intercompany notes (the "Intercompany Transactions"). Such Intercompany Transactions include: (a) intercompany loans pursuant to certain intercompany loan agreements; (b) licensing fees and royalties paid to Avaya Inc. by various international non-Debtor affiliates

---

[13]  *See In re Avaya Inc., et al.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 27, 2017) [Docket Nos. 1305, 1567].

for the use of Avaya Inc.-owned marks or other intellectual property; (c) the payment of various obligations to non-Debtor affiliates in the ordinary course pursuant to intercompany arrangements that provide a certain minimum, market-based return for the sale of Avaya Inc. products and services; (d) the provision of various services to various Debtors and non-Debtor affiliates pursuant to intercompany service agreements; and (e) other expenses on account of ordinary course business expenses or operational restructuring initiatives.   These Intercompany Transactions are structured in several different ways, including through account receivables and payables, fulfillment of contractual obligations, payment pursuant to intercompany loans, and capital contributions.

49.   In addition, a substantial number of non-Debtor entities are parties to a "Cash Pooling Agreement,"[14] which memorializes a cash management arrangement among the Cash Pooling Bank and the Group Companies (which are comprised entirely of non-Debtor entities) (the "Cash Pooling Arrangement").[15]   Under the Cash Pooling Arrangement, the Group Companies' accounts of the same currency are consolidated and notionally treated by the Cash Pooling Bank as an aggregate amount on deposit, allowing each of the Group Companies to maintain positive and negative individual balances at various times.   As of March 31, 2023, the Cash Pooling Arrangement will transition from notional balances to physical balances,

---

[14]   "Cash Pooling Agreement" means that certain cash pooling agreement between Citibank N.A., as cash pooling bank (the "Cash Pooling Bank"), AISL (as defined herein), as agent, and various Avaya entities as signatories to the Cash Pooling Agreement via separate Accession Agreement (as defined therein) (such entities, collectively with AISL, the "Group Companies"), dated March 20, 2002.  The Group Companies include: (a) Avaya UK; (b) Avaya Switzerland GMBH; (c)  Avaya Communicaiones Espana S.L.U.; (d) Avaya Singapore Pte Ltd.; (e) Avaya Nederland BV; (f) Kontfel A.B.; (g) Avaya Japan Ltd.; (h) Avaya Italia SpA; (i) Avaya Hong Kong Ltd.; (j) Avaya Germany GmbH; (k) Avaya France S.A.S.; (l) Avaya ECS Ltd.; (m) Avaya Canada Corporation; (n) Avaya Belgium SPRL BVBA; (o) Avaya Austria GmbH; (p) Avaya Australia Pty. Ltd.; (q) Avaya International Enterprises Ltd.; and (r) Avaya Cyprus Ltd.

[15]   The Cash Pooling Bank maintains three separate cash pools under the Cash Pooling Arrangement—a U.S. dollar pool ("USD Pool"), a Euro pool ("EUR Pool"), and a British pound pool ("GBP Pool").

necessitating the actual transfer of funds among the Group Companies to reconcile the balances. As of February 5, 2023, each of the U.S. Dollar-, Euro-, and British Pound-denominated cash pools had U.S. Dollar equivalent net positive balances of $12.7 million, $5.0 million, and $3.9 million, respectively. International operations, including those of the Group Companies, have historically accounted, and are expected to continue to account, for approximately forty percent of Avaya's revenue.

## Part III:  Events Leading to These Chapter 11 Cases

### V.      Prepetition Challenges.

50.     Beginning in early fiscal 2022, Avaya's revenue began to decrease. The decrease was driven by the continued decline in the capex business and the delayed revenue generation from the cloud investments, which was compounded in the second half of fiscal 2022 by a deceleration in the growth of the Company's subscription revenue. These challenges, coupled with customers' related concerns regarding Avaya's financial health, have had a detrimental impact on Avaya's revenue and cash flow.

51.     The Company's announcement of its preliminary third quarter results for fiscal year 2022 further exacerbated these concerns. In an 8-K filing and associated press release issued on July 28, 2022, HoldCo announced that its preliminary third quarter results were significantly below prior guidance. Pursuant to the press release, HoldCo disclosed that for the third quarter of fiscal year 2022, the Company's (a) revenue was expected to be between $575 million and $580 million, compared to prior guidance of $685 million and $700 million, respectively, and (b) adjusted EBITDA was expected to be between $50 million and $55 million, compared to prior guidance of $140 million and $150 million, respectively. This unexpected decline in revenue, adjusted EBITDA, and the Company's resultant material cash balance reduction due to significant

operating losses combined with debt maturities within one year, led to substantial doubts that the Company could continue as a going concern.

52.     On July 25, 2022, Avaya engaged Kirkland & Ellis LLP to conduct an internal investigation at the direction of the audit committee ("Audit Committee") of HoldCo's board of directors (the "Board") regarding the circumstances surrounding the unexpected financial results. Separately, Avaya, at the direction of the Nomination and Governance Committee of the Board, engaged Cravath, Swaine & Moore LLP on or about July 15, 2022, to investigate and review matters at the direction of the Audit Committee related to a whistleblower letter that had been submitted to the Company.  The Company notified the SEC and its external auditor, PwC, of the investigations.

53.     While substantial progress has been made, those investigations remain on-going. Over the last several months, Avaya has worked to identify additional safeguards and continues to cooperate with the SEC.  Among other things, the Company has worked to pinpoint and implement certain remediation efforts, including, but not limited to, the following:  (a) re-establishing a receptive environment from the top down that allows employees to comfortably raise concerns; (b) conducting executive-level training on disclosure standards, open and effective communication, and related responsibilities; (c) enhancing financial forecasting processes; (d) reorganizing the sales and finance functions to support information flow with respect to financial forecasting; and (e) making certain critical leadership changes, which, have been completed and are discussed in greater detail below.  As the SEC's investigation is ongoing, Avaya will continue to cooperate with the SEC and implement corrective actions as necessary.

54.     In light of the foregoing financial challenges and circumstances, HoldCo was unable to file its Form 10-K by the date required and, on November 30, 2022, filed a Form 12b-25

Notification of Late Filing for its Annual Report on Form 10-K for the Fiscal Year Ended on September 30, 2022.  In addition, HoldCo was unable to file its Form 10-Q for the period ended December 31, 2022, by the date required and, on February 10, 2023, filed a Form 12b-25 Notification of Late Filling for the Quarterly Report on Form 10-Q for the fiscal quarter ended December 31, 2022.

55.     The Prepetition Term Loan Credit Facility and the Prepetition ABL Facility each contain a covenant that require HoldCo or Avaya Inc., as applicable, to provide audited financial statements to the appropriate lenders on or before December 29, 2022.  The covenants stipulate that the audited financial statements are to be audited by an independent registered public accounting firm of recognized national standing whose opinion was not to be qualified as to (a) the scope of the audit, or (b) the status of the audit entity and its consolidated subsidiaries as a going concern (other than an exception with respect to a current maturity date of any indebtedness or any actual or prospective default of a financial maintenance covenant).  Neither HoldCo nor Avaya Inc. have provided their audited financial statements to the applicable lenders as of the Petition Date.

## VI.     Prepetition Initiatives.

56.     Over the last several months, Avaya has undertaken a number of initiatives in an effort to improve operating efficiency, performance, streamline costs, and improve its overall balance sheet profile, including:  (a) implementing certain cost-cutting measures; (b) appointing a new President and Chief Executive Officer; (c) appointing additional, independent and disinterested directors; (d) analyzing multiple strategic alternatives, including one or more potential financings, refinancings, recapitalizations, reorganizations, restructurings or investment transactions; and (e) engaging with key creditor constituencies regarding the terms of a potential

transaction.  In connection with the foregoing, Avaya has engaged experienced advisors to assist the Company in its evaluation and review of various strategic alternatives.

### A.      Cost Cutting Initiatives.

57.      On July 28, 2022, the Company announced certain cost-cutting measures that targeted between $225 million and $250 million in annual cost reductions, expected to primarily impact the Company's overall sales expenses, general and administrative expenses, and discretionary spending.  More recently, as the Company continued to evaluate its longer-range operating and financial objectives, management increased its longer-term cost reduction target to greater than $500 million.  As of the Petition Date, the Company has already begun operationalizing these initiatives and expects the efforts to yield meaningful savings beginning in the second quarter of fiscal year 2023.

### B.      New Management.

58.      On July 28, 2022, HoldCo announced that it had appointed Alan Masarek to serve as its Chief Executive Officer, effective as of August 1, 2022.  Mr. Masarek is well known in the communications and collaborative technology industries, having over thirty years of software and cloud-based business experience, including serving as the Chief Executive Officer of Vonage Holdings Corp.  During his tenure as CEO of Vonage Holdings Corp., Mr. Masarek led the company through an era of transformation from a residential phone provider into a global enterprise cloud communications company.

59.      In late 2022 and early 2023, the Company appointed officers to two critical leadership positions.  First, on November 9, 2022, HoldCo named Becky Roof as the Interim Chief Financial Officer while the Company works to identify a permanent replacement.  Ms. Roof has extensive experience in providing advisory and C-suite interim management services for companies.  Thereafter, on January 4, 2023, I was appointed CRO.  I came to this position with

more than twenty years of experience serving in a variety of roles, including in senior management positions (including as CRO in Avaya's prior restructuring), as a financial advisor, as a principal investor, and as a director of public and private companies.

### C.   Enhanced Corporate Governance.

60.   In connection with its contingency planning efforts and in consultation with its advisors, Avaya reviewed its existing corporate governance infrastructure.  Prior to the Petition Date, the Company determined that it was advisable and in the best interests of the Company and its stakeholders to appoint two experienced independent and disinterested directors—Carrie Teffner and David Barse—as directors of HoldCo and Avaya Inc., respectively.

### D.   RingCentral Deal.

61.   As part of the Company's prepetition initiative to take aggressive action to right-size its cost structure, the Company renegotiated its agreements with RingCentral, Inc. ("RingCentral"), extending and expanding the parties' strategic commercial arrangement.

### E.   Out-of-Court Efforts.

62.   In October, November, and December of 2022, the Company executed confidentiality agreements (collectively, the "Confidentiality Agreements") with members of the Creditor Groups, each represented by independent and sophisticated advisors.   These Confidentiality Agreements facilitated the Company's engagement with the Creditor Groups regarding one or more potential financings, refinancings, recapitalizations, reorganizations, restructurings or investment transactions involving the Company.  Following months of extensive discussions with the Creditor Groups regarding potential out-of-court transactions, in mid-December, the Company and its advisors shifted their focus to an in-court restructuring when

certain of the Creditor Groups advised the Company that the groups were supportive of a capital structure deleveraging that could only be achieved through a chapter 11 process.

**F.      Entry into the RSA.**

63.     Following months of arm's-length negotiations between the Company and its Creditor Groups regarding the optimal path forward for the Company, on February 14, 2023, the Company entered into the RSA.

64.     The RSA provides for a comprehensive in-court restructuring with the following key pillars:

- ***Unimpairment of Vast Majority of Unsecured Claims***.  All allowed general unsecured claims, including employee and vendor claims, at Avaya Inc. and its subsidiaries will be unimpaired.

- ***Support of All Funded Debt Classes***.  Overwhelming support from every funded debt constituency.

- ***Holistic Agreement With PBGC***.  Agreement with the PBGC that on the Effective Date, the Reorganized Debtors will not be bound by the 2017 PBGC Settlement Agreement and will assume the Hourly Pension Plan.

- ***Meaningful Deleveraging and Access to Exit Facilities***.  The Restructuring Transactions will deleverage Avaya's balance sheet by over $2.6 billion and provide a DIP Term Loan Facility that will provide the Debtors with $500 million to bolster the Debtors' liquidity during the course of these Chapter 11 Cases.  In conjunction with a $150 million rights offering available to all holders of First Lien Claims, at emergence, Avaya will have received $650 million of incremental liquidity via the Restructuring Transactions.

- ***Repayment of the Escrow Cash to the B-3 Lenders***. The Restructuring Transactions provide that the Escrow Cash will be returned to the B-3 Lenders in all circumstances, and the Debtors will seek authority to return this cash to the B-3 Lenders pursuant to the Interim DIP Order.

- ***Renegotiated Deal Terms with Partner RingCentral, Inc***. Agreement that Avaya will assume the renegotiated RingCentral contracts, which will extending and expanding the parties' strategic commercial arrangement on terms more favorable to the Company.

65.     Importantly, I believe that the deleveraging and liquidity-enhancing Restructuring Transactions set forth in the Plan represent a value-maximizing path forward.  Consummation of the Restructuring Transactions will position the Debtors to capitalize on their core strengths—including their digital communications products, solutions, and services—to achieve long-term success.  The Plan is in the best interests of the Debtors' estates and represents the best available alternative at this time.

**G.     Proposed Timeline for These Chapter 11 Cases.**

66.     Under the RSA, the Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions.  In my opinion, it is imperative that the Debtors proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs.  I believe that expeditious confirmation of the Plan and consummation of the Restructuring Transactions is in the best interests of the Debtors, their estates, and their stakeholders.

67.     Furthermore, pursuant to the milestones in the RSA, the Debtors must obtain confirmation of the Plan within sixty days of the Petition Date.  Accordingly, the Debtors have proposed the following key case dates, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | February 9, 2023 |
| Petition Date | February 14, 2023 |
| Service of Combined Hearing Notice | February 17, 2023 |
| Voting Deadline | March 17, 2023, at 4:00 p.m., prevailing Central Time |
| Objection Deadline | March 17, 2023, at 4:00 p.m., prevailing Central Time |
| Combined Hearing | March 21, 2023, or such other date as the Court may direct |

**H.      Debtor-in-Possession Financing and Use of Cash Collateral.**

68.     During these Chapter 11 Cases, the Debtors will need to use the cash generated from their operations, as well as their current cash on hand, to (a) satisfy payroll obligations, (b) honor all obligations under their customer contracts, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business.  Such cash, however, is likely insufficient to meet the Debtors' liquidity needs.  Accordingly, the Debtors seek access to the liquidity provided by the following during the pendency of these chapter 11 proceedings:  (a) $500 million super-priority senior secured debtor-in-possession facility in the form of term loans (the "DIP Term Loan Facility") that converts into an Exit Term Facility upon emergence, and (b) commitments for an asset-backed loan facility of approximately $128 million with a $100 million letter of credit sub-facility (the "DIP ABL Facility") that also converts into an Exit ABL Facility.  The DIP Term Loan Facility provides $500 million of liquidity, to be drawn as $400 million on an interim basis and an additional $100 million on a final basis in exchange for a first priority, perfected lien on substantially all unencumbered assets.  The Debtors intend to return to the Bankruptcy Court in the very near term to seek approval of the DIP ABL Facility, and upon entry of an interim order, are seeking limited relief to enter into certain commitment and fee letters to "lock in" the DIP ABL Facility while the applicable parties finalize the terms and documentation of such facility.

69.     As laid out more fully in the *Declaration of Eric Koza, Chief Restructuring Officer of Avaya Holdings Corp. and Certain of Its Affiliates and Subsidiaries, in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* and the *Declaration*

*of Roopesh Shah in Support of the Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, the DIP Term Loan Facility, in conjunction with the commitments for the DIP ABL Facility, are the culmination of extensive prepetition negotiations between the Debtors, on the one hand, and the Holders of Prepetition ABL Claims, the PW Ad Hoc Group, and the Akin Ad Hoc Group, on the other hand, and are by far the best (and only) proposal that the Debtors received.  I believe that the terms of the DIP Term Loan Facility and the DIP Documents, including the DIP Budget (as defined therein), and the form and amount of adequate protection provided to the prepetition secured parties, are fair and appropriate under the circumstances and in the best interests of the Debtors' estates.

70.    The transactions contemplated by the RSA and the Plan will position Avaya for long-term success and will ensure that its customers and vendors have a financially sound go-forward business partner.  After an extensive review process, the Debtors have determined that the transactions set forth in the RSA and Plan present the Debtors with a viable path forward to maximize value for all stakeholders.

## Part IV:  First Day Motions

71.    Concurrently with this Declaration, the Debtors have filed a number of First Day Motions[16] seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and minimize

---

[16]    Any capitalized terms used but not defined within Part IV shall have the meanings ascribed to them in the First Day Motions, as applicable.

disruption.  I understand the Debtors intend to seek the entry of court orders approving each of the First Day Motions as soon as possible in accordance with chapter 11 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").  If the Court does not grant the relief requested by the Debtors in the First Day Motions on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

72.     The First Day Motions seek authority to, among other things, enter into the DIP Facilities on an interim basis, honor employee-related wages and benefits obligations, pay trade vendors, and ensure the continuation of the Debtors' insurance, cash management systems, and other business operations without interruption.  The relief requested in the First Day Motions is necessary and appropriate to maximize the value of the Debtors' assets and business operations.  I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to afford the Debtors the opportunity to maximize the value of their estates.

73.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable value-destructive harm to the Debtors and

their estates, to the detriment of all stakeholders.  Other relief will be deferred for consideration at

a later hearing.

74.     The First Day Motions include:

- *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

- *Debtors' Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Claims, Noticing, and Solicitation Agent* (the "KCC 156(c) Retention Application");

- *Debtors' Emergency Motion for Entry of an Order (I) Waiving the Requirement to File a List of Equity Security Holders, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information, and (III) Granting Related Relief* (the "Creditor Matrix Motion");

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms and Books and Records, and (C) Continue Using the Investment Account and the Investment Policy, (II) Authorizing Continued Intercompany Transactions, (III) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (IV) Granting Related Relief* (the "Cash Management Motion");

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "DIP Motion");[17]

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer and Partner Programs and Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing Assumption of Certain Customer Agreements, and (III) Granting Related Relief* (the "Customer Programs Motion");

---

[17]   Evidentiary support for the DIP Motion is included in the *Declaration of Eric Koza, Chief Restructuring Officer of Avaya Holdings Corp. and Certain of Its Affiliates and Subsidiaries, in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* and *Declaration of Roopesh Shah in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, filed contemporaneously herewith.

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain the Surety Bond Program, and (II) Granting Related Relief (the "Insurance and Surety Motion");*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief (the "Taxes Motion");*

- *Debtors' Emergency Motion for Entry of an Order Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock (the "NOL Motion");*

- *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion");*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue Their Prepetition Business Operations, Policies, and Practices and Pay Related Claims in the Ordinary Course of Business on a Postpetition Basis, (II) Granting Administrative Expense Priority to All Outstanding Orders and Authorizing the Debtors to Satisfy Such Obligations in the Ordinary Course, and (III) Granting Related Relief (the "All Trade Motion");*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion"); and*

- *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (IV) Approving the Solicitation Procedures, (V) Approving the Combined Notice, (VI) Extending the Time by which the U.S. Trustee Convene a Meeting of Creditors and the Debtors File (A) Schedules and SOFAs and (B) Rule 2015.3 Financial Reports, and (VII) Granting Related Relief (the "Scheduling Motion").*

**A.    Joint Administration Motion.**

75.    Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of these Chapter 11 Cases. Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will

provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each Debtor entity. The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration will also allow the United States Trustee for the Southern District of Texas and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency. Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates. I believe that parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of these Chapter 11 Cases. Accordingly, I believe that the joint administration of these Chapter 11 Cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### B. KCC 156(c) Retention Application.

76.     Pursuant to the KCC 156(c) Retention Application, the Debtors seek entry of an order appointing Kurtzman Carson Consultants LLC ("KCC") as claims, noticing, and solicitation agent (the "Agent") for the Debtors in their Chapter 11 Cases, effective as of the Petition Date. As the Agent, KCC would assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.

77.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of KCC to act as the Agent is appropriate under the circumstances and in the best interests of the estates. Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and comparable to the rates charged by their competitors for similar services.

78.     The Debtors anticipate that there will be thousands of persons and entities to be noticed in these Chapter 11 Cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is in the best interests of the Debtors' estates, their creditors, and all other parties in interest because it will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim.

### C.     Creditor Matrix Motion.

79.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) waiving the requirement to file a list of, and to provide notice directly to, the equity security holders of Debtor Avaya Holdings Corp., (b) authorizing the Debtors to redact certain personally identifiable information, and (c) granting related relief.

80.     The Debtors submit that the proposed maintenance of the Creditor Matrix by the Debtors' proposed Agent, KCC, is consistent with applicable Bankruptcy Local Rules.  Pursuant to the Procedures for Complex Cases in the Southern District of Texas, the lead debtor in a jointly administered "Complex Case" is required to file a single, consolidated list of unsecured creditors on Official Form 204 consisting of the thirty largest unsecured creditors of all jointly administered debtors.  Filing a single consolidated list of the thirty largest unsecured creditors in these Chapter 11 Cases is appropriate for these reasons.

81.     The requirements to file a list of, and to provide notice directly to, equity holders should be waived as to Debtor entity Avaya Holdings Corp. in this case.  Debtor Avaya Holdings Corp.'s common stock is publicly-traded on the New York Stock Exchange, with approximately 86,846,958 outstanding shares of common stock as of the Petition Date, and cannot be readily traced to specific individual holders.  Debtor Avaya Holdings Corp. only maintains a list of its registered equity security holders and therefore must obtain the names and addresses of its

beneficial shareholders from a securities agent. Thus, preparing and submitting such a list with last known addresses for each equity security holder and sending notices to all such parties will create undue expense and administrative burden with limited corresponding benefit to the estates or parties in interest.

82.     The Debtors seek to redact certain personally identifiable information due to the privacy and safety concerns that would arise if such information were disclosed in the Debtors' court filings and to help the Debtors comply with privacy law.

83.     Accordingly, I believe that the relief sought in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### D.     Cash Management Motion.

84.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders, (a) authorizing the Debtors to (i) continue using the Cash Management System, including honoring certain prepetition obligations related thereto, (ii) maintain existing Bank Accounts, Business Forms, and Books and Records, and (iii) continue using the Investment Account and the Investment Policy, (b) authorizing the Debtors to continue Intercompany Transactions, (c) granting administrative expense status to all Postpetition Intercompany Transactions, and (d) granting related relief.

85.     To facilitate the efficient operation of their businesses, the Debtors and their non-Debtor affiliates use an integrated, centralized Cash Management System to collect, transfer, and disburse funds generated by their operations. The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of approximately thirty-seven Bank Accounts and one Investment Account owned by the Debtors and maintained with multiple Cash Management Banks. The Debtors' finance

department oversees the Cash Management System and implements cash management controls for entering, processing, and releasing funds.

86.     The Debtors' Bank Accounts and Investment Account are held by the following Debtors:  (a) twenty Bank Accounts and one Investment Account owned by Avaya Inc.; (b) two Bank Accounts owned by Avaya Management L.P.; (c) two Bank Accounts owned by Avaya Federal; (d) one Bank Account owned by Avaya Holdings Corp.; (e) one Bank Account owned by Intellisist; (f) one Bank Account owned by Avaya Cloud; (g) seven Bank Accounts owned by Avaya EMEA; (h) two Bank Accounts owned by Sierra AP; and (i) one Bank Account owned by Sierra Communication.

87.     The Debtors' primary Cash Management Bank is JPMorgan, where the Debtors maintain twenty of the Bank Accounts.  In addition to accounts maintained at JPMorgan, the Debtors also maintain:  (a) four Bank Accounts at BOA; (b) one Bank Account at Delaware Trust; (c) eleven Bank Accounts at Citibank; (d) one Bank Account at Saudi British Bank; and (e) the Investment Account at Goldman Sachs.

88.     The Debtors' cash on-hand is largely comprised of proceeds from the Debtors' ongoing business operations.  As of the Petition Date, the aggregate balance of funds held in the Bank Accounts and the Investment Account is approximately $45 million.

89.     The Debtors' receipts and revenues are deposited into their various Deposit and Operating Accounts.  With respect to zero balance accounts, funds received are swept to the Main Concentration Account on a daily basis.  If such accounts are not zero balance accounts, the funds received are then either:  (a) processed and deposited into the Main Concentration Account, the BOA Master Account, and/or the Deposit Accounts on a daily or discretionary basis; or (b) held

separately from the Main Concentration Account for use by certain of the Company's subsidiaries and affiliates such as Avaya Cloud, Avaya Management, Intellisist, and Avaya Holdings Corp.

90.     With respect to the zero balance Disbursement and Payroll Accounts tied to the Main Concentration Account, such accounts are funded, as needed, by the Main Concentration Account with cash sufficient to satisfy the Debtors' obligations on a given day.   Other non-zero-balance Bank Accounts are manually funded by the Main Concentration Account.  The Debtors' Disbursement and Operating Accounts, which are not connected to the Main Concentration Account, but are nonetheless utilized to pay the Debtors' obligations, are either self-funded or funded via separate Deposit or Master Accounts such as the BOA Master Account.

91.     The Debtors evaluate ongoing liquidity needs each week and sweep excess cash from business operations from the Main Concentration Account into the Investment Account through the Investment Transfer Account.  These funds are then invested pursuant to the Debtors' Investment Policy in an effort to maximize the return on the Debtors' excess liquidity.   The Debtors' various positions are then liquidated on an as needed basis and transferred to the Main Concentration Account through the Investment Transfer Account to fund the Debtors' ongoing business operations.

92.     The Debtors incur periodic Banks Fees in connection with the maintenance of the Cash Management System.[18]  Bank Fees for each month are paid in arrears between the 15th and 22nd day of the following month and are automatically deducted from the Debtors' Bank Accounts as they are assessed by their respective Cash Management Banks.  I believe that authority to make

---

[18]   The average gross Bank Fees for the past three months was approximately $105,000.  The average gross Bank Fees for the same period in 2021 was approximately $84,000.  The average net Bank Fees for the past three months was approximately $22,000.  The average net Bank Fees for the same period in 2021 was approximately $83,000.  The credits received, which reduced the gross Bank Fees, were earned based on the average cash balance in the Debtors' various Bank Accounts.

such payments is necessary to the Debtors' operations, which are predicated on an uninterrupted flow of funds between Bank Accounts. I also believe that if the Debtors do not pay their Bank Fees, then their relationships with the Cash Management Banks, which are crucial to their ongoing business operations, may be materially damaged. Further, I believe that the Debtors' management and advisors may be forced to spend time and resources on unnecessary disputes with the Cash Management Banks.

93.     On a weekly basis, the Debtors, after evaluating their upcoming liquidity needs, sweep excess cash from business operations from the Main Concentration Account into the Investment Account. The Debtors invest this excess cash pursuant to the Investment Policy. In accordance with the Investment Policy, the Debtors invest cash in money market funds with a maximum tenor from trade date to effective maturity of thirteen months, including: (a) Money Market Funds, including (x) funds that invest in cash and United States Treasury securities, (y) funds that invest their assets in government securities or cash, or (z) funds that invest in Euro, Sterling, United States Dollar, and Australian Dollar denominated government and non-government money market instruments, securitizations and asset-backed commercial paper, cash deposits, repurchase agreements and reverse repurchase agreements, money market funds, debt securities, and corporate and sovereign variable and fixed rate bonds; (b) United States government sponsored entities with at least the same credit rating as the United States government; (c) bank deposits; and (d) United States Treasury Bills, Notes, and Bonds. With respect to positions taken in the Money Market Funds pursuant to the Investment Policy, such positions are generally capable of being liquidated immediately, allowing the Debtors to effectively treat the Investment Account as an ordinary deposit account. As of the Petition Date, the Debtors had no cash in the Investment Account.

94.     I understand that the primary objectives of the Investment Policy are the preservation of principal, liquidity, diversification of risk, and the maximization of taxable or after-tax total rate of return without compromising safety and liquidity.  I believe that the Investment Policy is a disciplined strategy, permitting the Debtors to balance the need to maximize returns on excess cash while ensuring that such excess cash is readily available for use in the Debtors' business operations.  Further, I believe that the Money Market Funds utilized by the Debtors pursuant to the Investment Policy carry similar credit risks to direct investments in obligations insured or guaranteed by the United States or by departments, agencies, or instrumentalities of the United States, or backed by the full faith and credit of the United States. Moreover, the various positions taken by the Debtors in the Money Market Funds allow for funds to be made immediately available, effectively permitting the Debtors to utilize the Investment Account as a regular deposit account.  I believe that requiring the Debtors to abandon such practices would hamper the Debtors' liquidity needs.

95.     Further, I believe that requiring the Debtors to modify the Investment Policy will only serve to distract the Debtors' management, slow the Debtors' momentum, and cause the Debtors' estates to incur potentially substantial costs to the detriment of all stakeholders.  I believe that the Investment Policy is likely to result in net benefit to the Debtors' estates.  Moreover, I believe that a bond secured by the undertaking of a corporate surety would likely be unduly expensive, assuming such a bond were available, and could offset much of the financial gain derived from the Investment Policy.

96.     The U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee.  As of the Petition Date, the Debtors maintained the vast

majority of their Bank Accounts at JPMorgan, Citibank, and BOA, each of which are designated as authorized depositories by the U.S. Trustee pursuant to the U.S. Trustee Guidelines.  Delaware Trust, Saudi British Bank, and Goldman Sachs are the only Cash Management Banks that are not designated as authorized depositories pursuant to the U.S. Trustee Guidelines.  Nevertheless, I believe that Delaware Trust, Saudi British Bank, and Goldman Sachs are well-capitalized, financially stable, and reputable institutions.  Further, I believe that the principal basis for the exclusion of Saudi British Bank from the U.S. Trustee Guidelines is location, not financial soundness or stability.  Indeed, I understand that Saudi British Bank is based outside of the United States and is thus less likely to be identified by the U.S. Trustee as an authorized depository.

97.     The Cash Management System is complex and critical to the ongoing stability of the Debtors' businesses and smooth transition into chapter 11.  I believe that requiring the Debtors to transfer any of the Bank Accounts or the Investment Account to a designated authorized depository would place a needless and excessive administrative burden on the Debtors and impose significant, value-destructive costs to the Debtors' estates.  Further, I believe that relocating the Debtors' Cash Management System to U.S.-only accounts could have potentially significant tax or regulatory impacts.  Considering the breadth and complexity of the Debtors' international businesses and financial affairs and the sheer volume of collections, disbursements, and movement of funds through the Cash Management System on a daily basis, I believe that enforcement of these provisions of the U.S. Trustee Guidelines during these Chapter 11 Cases would severely disrupt the ordinary financial operations of the Debtors by reducing efficiencies and causing unnecessary expense.

98.     As part of the Cash Management System, the Debtors use a variety of preprinted Business Forms in the ordinary course of business.  The Debtors also maintain Books and Records

to document their financial results and a wide array of operating information.  I believe that allowing the Debtors to continue using all of the Business Forms and Books and Records in a manner consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession would avoid a significant disruption to the Debtors' business operations and to minimize administrative expense to their estates.

99.     In the ordinary course of business, the Debtors maintain business relationships with each other and their non-Debtor affiliates and regularly engage Intercompany Transactions.  Such Intercompany Transactions include: (a) intercompany loans pursuant to certain intercompany loan agreements; (b) licensing fees and royalties paid to certain Debtors by various international non-Debtor affiliates for the use of Debtor-owned marks or other intellectual property; (c) the payment of various obligations to non-Debtor affiliates in the ordinary course pursuant to intercompany arrangements that provide a certain minimum, market-based return for the sale of Avaya Inc. products and services; (d) the provision of various services to various Debtors and non-Debtor affiliates pursuant to intercompany service agreements; and (e) other expenses on account of ordinary course business expenses or operational restructuring initiatives.  These Intercompany Transactions are structured in several different ways, including through account receivables and payables, fulfillment of contractual obligations, payment pursuant to intercompany loans, and capital contributions.

100.    At any given time, as a result of the Intercompany Transactions, there may be claims owing by one Debtor to another Debtor or non-Debtor affiliate.  For example, by the operation of the Cash Management System, the Debtors transfer funds out of the Main Concentration Account into various Disbursement Accounts and create intercompany balances among the Debtors.  Each payment from a Debtor and each bookkeeping entry between Debtors

and between Debtors and non-Debtor affiliates on account of a Postpetition Intercompany Transaction is an essential component of the Cash Management System.  The Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis, and can ascertain, trace, and account for Postpetition Intercompany Transactions.

101.    In certain instances, Intercompany Transactions between Debtors and between Debtors and non-Debtor affiliates are "netted" to allocate outstanding amounts due and owing.[19] The Debtors have implemented internal mechanisms that will permit them, with the assistance of their advisors, to accurately track the balance of all prepetition and Postpetition Intercompany Transactions.

102.    Pursuant to the Initial Intercompany Transaction, the Debtors will loan $50 million to the Group Companies that are parties to that certain cash pooling agreement with the Cash Pooling Bank, which memorializes the Cash Pooling Arrangement.   Under the Cash Pooling Arrangement, the Group Companies' accounts of the same currency are consolidated and notionally treated by the Cash Pooling Bank as an aggregate amount on deposit, allowing each of the Group Companies to maintain positive and negative individual balances at various times.[20]  As of March 31, 2023, the Cash Pooling Arrangement will transition from notional balances to physical balances, necessitating the actual transfer of funds among the Group Companies to

---

[19]    Pursuant to the DIP Financing, the Debtors have requested approval to use proceeds of the DIP Term Loan Facility to:  (a) fund the Initial Intercompany Transaction in the form of an intercompany loan in an amount not to exceed $50 million by Sierra Communication to NFA Avaya International Sales Ltd and subsequently to certain NFAs to be used for working capital and the general corporate purposes of Sierra Communication's foreign subsidiaries, including to fund certain cash pool accounts under the Cash Pooling Arrangement; and (b) to fund a deposit of up to $40 million to the Foreign Reserve Account for purposes of backstopping the liquidity of certain NFAs to the extent necessary to preserve the value of the Debtors' international business, as described in the DIP Motion and subject to the Foreign Reserve Protocol and the Intercompany Transfer Mechanic.

[20]    The Cash Pooling Bank maintains three separate cash pools under the Cash Pooling Arrangement—a U.S. dollar pool, a Euro pool, and a British pound pool.

reconcile the balances.  As of February 5, 2023, each of the U.S. Dollar-, Euro-, and British Pound-denominated cash pools had U.S. Dollar equivalent net positive balances of $12.7 million, $5.0 million, and $3.9 million, respectively.  International operations, including those of the Group Companies, have historically accounted for approximately forty percent of Avaya's revenue.

103.   I believe that the Debtors' ability to engage in Postpetition Intercompany Transactions is critical to ensure the uninterrupted operation and preserve the value of their international business and effectuate an operational restructuring that was initiated prepetition to realize cost savings and efficiencies that will inure to the benefit of the Debtors' estates and their stakeholders.[21]  Further, I believe that the Intercompany Transactions are essential for the Debtors to process payroll, remit payments to vendors, effectuate their operational restructuring, and otherwise operate their business in a value-maximizing way.  In my opinion, the ability to conduct Postpetition Intercompany Transactions is critical to the Debtors' successful restructuring efforts.

104.   I believe that the Cash Management System provides significant benefits to the Debtors including, among other things, the ability to control corporate funds, ensure the availability of funds when necessary, and reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information.  Thus, to ensure the stable operation of the Debtors' businesses and realize the benefits of the Cash Management System, I believe that the Debtors should be allowed to continue using the Cash Management System and should not be required to open new bank accounts.

---

[21]   On January 11, 2023, a reduction in Avaya's workforce was authorized with respect to its employees in Europe in connection with cost-reduction actions.  The reduction is aimed at aligning the size of the Debtors' workforce with its operational strategy and cost structure.  Approximately $45 million to $51 million in expected cash-based expenditures, substantially all of which are expected to be related to employee severance and other termination benefits are anticipated as a result of these cost-reduction actions.

105.    I also believe that requiring the Debtors to adopt a new cash management system during these Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  The Cash Management System provides the Debtors with the ability to, among other things, quickly assess the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds. However, I believe that maintaining the current Cash Management System will facilitate the Debtors' smooth transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in paying postpetition debts.  Finally, I believe that maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities as opposed to reconstructing the Cash Management System.

106.    I further believe that parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including the Bank Accounts and continuing Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that Debtor entities will not make unauthorized payments on account of prepetition obligations.  Specifically, with the assistance of their advisors, I understand that the Debtors have implemented internal protocols that prohibit payments on account of prepetition debts, including prepetition accounts payable payments, without prior approval of the Debtors' treasury department.  In light of such protective measures, I believe that maintaining the Cash Management System is in the best interests of the Debtors' estates and creditors.

107.     Thus, I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### E.     Customer Programs Motion.

108.     Pursuant to the Customer Programs Motion, the Debtors seek entry of an order authorizing the Debtors to: (a) maintain and administer their Customer and Partner Programs and honor prepetition obligations related thereto, (b) assume certain Customer Agreements, and (c) granting related relief.   The Debtors realize a majority of their revenue by working with approximately 4,600 third-party partners who make sales of the Debtors' products and services to end-users.   In exchange, such partners are compensated via one or more of the Debtors' Customer and Partner Programs, which are designed to incentivize the growth and adoption of their Products and services.   I believe that maintaining the goodwill of their Customers and Partners is critical to the Debtors' ongoing operations in these Chapter 11 Cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

109.     Specifically, the Debtors' Partner Programs fall into several buckets:  (a) the Edge Incentive Program, which is made up of several components that provide incentives, rebates, and commissions to Channel Partners who achieve certain predefined sales performance targets, (b) the Back-End Credits Program, whereby the Debtors offer credits to their Partners to incentivize sales, and (c) the RingCentral Commission Programs, which support the partnership between Avaya and RingCentral with regard to sales of the ACO.   In addition, the Debtors have certain Warranty Programs and must credit customer or partner accounts on account of prepayments or other credit obligations.

110.     Furthermore, certain of the Debtors' Customers have expressed concern about whether the Company will continue to honor their existing agreements.   Given that the proposed

48

Plan provides for the assumption of each Customer Agreement, the Debtors also seek authority to assume the Customer Agreements at this time.  The Debtors' Customers and Partners are critical to the Company's business.

111.    As of the Petition Date, the Debtors estimate that there are approximately $65 million of prepetition obligations outstanding related to their customer and partner programs. I believe that continuing to administer the customer and partner programs without interruption during the pendency of these chapter 11 cases is critical to preserving the value of the Debtors' estates.  Avaya's customers and partners expect and rely on these programs and may not continue supporting the Debtors' businesses if they are discontinued.  Continued support from the Debtors' customers and partners is essential for go-forward operations and value maximization. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

### F.    Insurance and Surety Motion.

112.    Pursuant to the Insurance and Surety Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business, (ii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis, (iii) satisfy payment of prepetition obligations on account of, and continue to pay, Brokerage Fees in the ordinary course, (iv) maintain the Surety Bond Program on an uninterrupted basis and satisfy related prepetition obligations in the ordinary course of business; and (b) granting related relief.

113.    I believe that continuation of the Insurance Policies and entry into new insurance policies is essential to the preservation of the value of the Debtors' businesses and operations.  In many instances, the coverage provided by the Insurance Policies is required by the regulations,

laws, credit documents, customer contracts, and other arrangements that govern the Debtors' operations, as well as the Bankruptcy Code.

114.    In the ordinary course of business, the Debtors maintain approximately sixty-eight insurance policies with approximately forty Insurance Carriers.  These policies provide the Debtors coverage for both general and commercial business risks, including, but not limited to, coverage for the Debtors' directors' and officers' liability, errors and omissions liability, commercial crime, fiduciary liability, general liability, business automobile, umbrella liability, foreign commercial liability, employment practices liability, and global property liability.  The aggregate annual premium for the Insurance Policies is approximately $7.5 million, not including applicable taxes and surcharges, deductibles, brokerage and consulting fees, or commissions.  As of the Petition Date, the Debtors do not believe they owe any outstanding amounts on account of the Insurance Premiums and certain third-party administration fees related to the Insurance Policies.

115.    Certain of the Insurance Policies require the Debtors to pay a per-incident Deductible.  Generally, if a claim is made against the Debtors' Insurance Policies, the Debtors' third-party administrator or applicable Insurance Carrier will administer the claim and make any payments in connection therewith.  The Debtors then pay the Deductible Fees on a monthly basis.

116.    Alternatively, certain of the Debtors' policies use a combination of the Deductibles and SIRs.  Under such combined policies, the Debtors make payments to the applicable Insurance Carrier up to the limit of the Deductible and the SIR, and once the claim value is above the Deductible and the SIR amount, the Insurance Carrier will cover remaining costs up to an excess liability limit of $100 million.  If a claim is made against such combined policies, the Insurance Carrier will administer the claim and make payments in connection therewith.  The applicable

Insurance Carrier conducts a "true-up" at the end of every month and refunds any prepayment overage or bills the Debtors for any shortage.  Conversely, any claimant settlements below the Deductible or SIR are treated as an exception and are billed to the Debtors at the time of settlement.

117.    Additionally, the Debtors obtain their Insurance Policies through their Insurance Broker.  The Insurance Broker assists the Debtors in obtaining comprehensive insurance coverage and evaluating benefit plan offerings and advises the Debtors with respect to accounting and actuarial methodology.  It also helps the Debtors with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates.  The Debtors pay the Insurance Broker an annual Brokerage Fee of $530,000, payable in installments.  As of the Petition Date, the Debtors estimate that they owe approximately $910,000 in Brokerage Fees on account of a three-year service agreement with the Insurance Broker.

118.    In the ordinary course of business, the Debtors are required by certain applicable statutes, rules, and regulations to provide surety bonds to certain third parties, often governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations.  These obligations include, among other things:  (a) contractors' license and permit obligations; (b) contractors' performance and payment obligations; and (c) customs and excise tax obligations.  I believe that failure to provide, maintain, or timely replace the Surety Bonds may prevent the Debtors from undertaking essential functions related to their operations.

119.    The Sureties have issued the Debtors' current outstanding surety bonds.  As of the Petition Date, the Debtors maintain approximately twenty-four Surety Bonds in an aggregate bond amount of approximately $4.7 million.  The Debtors' outstanding Surety Bonds are currently arranged the Surety Broker.

120.     In the ordinary course of business, the Debtors make premium payments to their Surety Broker on account of the Surety Bonds on an annual basis on or about the renewal date of each Surety Bond.  The Debtors pay such Surety Premiums directly to the Surety Broker.  The Debtors have paid approximately $152,000 on account of the Surety Premiums for the existing Surety Bonds.  As of the Petition Date, the Debtors do not believe they owe any outstanding amounts on account of the Surety Premiums.  I believe that continuing the Surety Bond Program is necessary to maintain the Debtors' current business operations.  As described above, the Debtors are required to provide surety bonds or other forms of credit support to certain third parties, often governmental units or other public agencies, to secure the payment or performance of certain obligations.

121.     In total, the Debtors owe approximately $910,000 in prepetition Insurance Premiums, Deductible Fees, Brokerage Fees, and Surety Premiums.

122.     I believe that failure to timely honor any outstanding prepetition obligations on account of the Insurance Policies and the Surety Bond Program could negatively affect the Debtors' ability to enter into such amendments, supplements, extensions, or new policies and coverage.  Therefore, I believe that the continuation of the Insurance Policies and the Surety Bond Program is essential to preserving the value of the Debtors' assets and minimizing exposure to risk during the pendency of these Chapter 11 Cases.

123.     Accordingly, I believe the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

### G.     Taxes Motion.

124.     Pursuant to the Taxes Motion, the Debtors seek entry of an order (a) authorizing the Debtors to remit and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of

business that are payable or become payable during these chapter 11 cases (including any obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date); and (b) granting related relief.

125.    In the ordinary course of business, the Debtors collect, withhold, and incur income, sales and use, foreign, property, business licensure, and regulatory taxes, as well as other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").  The Debtors pay or remit, as applicable, the Taxes and Fees to various governmental authorities (each, an "Authority," and collectively, the "Authorities") on a periodic basis (monthly, quarterly, semi-annually, or annually) depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.  The Debtors generally pay and remit Taxes and Fees through their payment service providers, such as Anybill Financial Services, Inc., or through checks and electronic transfers that are processed through their banks and other financial institutions or service providers.  From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes or Fees.  The Debtors generally use these credits in the ordinary course of business to offset against future Taxes or Fees, or have the amount of such credits refunded to the Debtors.

126.    Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to):  (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the

Debtors' restructuring; and (d) key government customers may cease purchasing products from the Debtors. Taxes and Fees not timely paid as required by law may result in fines and penalties, the accrual of interest, or both. The Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

127. The Debtors are subject to, and may become subject to further routine audit investigations on account of tax returns and/or tax obligations ("Audits") during these chapter 11 cases. Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors. The Debtors seek authority to pay or remit tax obligations on account of any Assessments as they arise in the ordinary course of the Debtors' businesses, including as a result of any resolutions of issues addressed in an Audit.

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date |
|---|---|---|
| Income Taxes | Local, state, and federal taxes imposed on income earned in the ordinary course of business, generally payable on a quarterly basis. | $400,000 |
| Sales and Use Taxes | Taxes on goods and services sold or used, assessed based on the value of such goods and services, generally payable on a monthly basis. | $2,900,000 |
| Foreign Taxes | Taxes due to Authorities in foreign jurisdictions, including foreign corporate income taxes and value added taxes. | $300,000 |
| Property Taxes | Taxes related to real and personal property holdings, payable as such taxes come due in the ordinary course, at least on an annual basis. | $1,700,000 |

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date |
|---|---|---|
| Business License Fees | Fees related to compliance with state licensing, permits, reporting, and other fees paid to state agencies. | $300,000 |
| Environmental Fees | Fees related to compliance with environmental and conservation laws and regulations. | N/A |
| Regulatory and Other Taxes and Fees | Taxes and Fees related to compliance with regulatory requirements, including periodic licensing, permitting, reporting, and similar requirements, payable on a monthly, quarterly, or annual basis, depending on the specific Tax or Fee. | $200,000 |
| **Total** | | $5,800,000 |

128.     For all of these reasons, the Debtors would suffer immediate and irreparable harm to their businesses without the relief sought in the Taxes Motion.  Accordingly, I believe such relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**H.     NOL Motion.**

129.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to, Debtor Avaya Holdings Corp.'s existing classes (or series) of common stock or any Beneficial Ownership therein and existing classes (or series) of preferred stock or any Beneficial Ownership therein; (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock or Preferred Stock in violation of the Procedures shall be null and void *ab initio*; and (c) granting related relief.

130.     Companies generate various Tax Attributes through the course of their operations. Generally, a company generates net operating losses if the operating expenses it has incurred exceed the revenues it has earned during a single tax year.  A company may apply or "carry forward" NOLs to reduce future tax payments (subject to certain conditions discussed below).  *See* IRC § 172.  Generally, a company's deduction for net business interest expense is limited to 30% of its adjusted taxable income plus certain other amounts.  Any business interest expense disallowed is carried forward and treated as business interest expense in the following tax year ("163(j) Carryforwards").  *See* IRC § 163.  Other Tax Attributes have other sources.

131.     The Debtors currently estimate that, as of September 30, 2022, they had approximately $220 million of federal NOLs, approximately $200 million of 163(j) Carryforwards, and $8.6 million of federal tax credits (together with the NOLs, "net realized built-in losses", 163(j) Carryforwards, and certain other tax attributes, collectively, the "Tax Attributes").[22]  The Debtors may generate additional Tax Attributes in the current tax year, including during the pendency of these chapter 11 cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Tax Attributes may offset future federal taxable income or federal tax liability in future years.

132.     Because the Tax Attributes are of significant value to the Debtors and their estates, an ownership change of Common Stock or Preferred Stock may negatively impact the Debtors' utilization of the Tax Attributes.  Accordingly, it is necessary to closely monitor certain transfers of Beneficial Ownership of Common Stock or Preferred Stock and certain worthless stock deductions with respect to Beneficial Ownership of Common Stock or Preferred Stock so as to be

---

[22]     Amounts are estimates and are subject to change.

in a position to act expeditiously to prevent such transfers or worthlessness deductions, if necessary, with the purpose of preserving the Tax Attributes.

133.     The Debtors propose certain notification and hearing Procedures related to certain transfers of, or declarations of worthlessness with respect to, Avaya Holdings Corp.'s, Common Stock or Preferred Stock or any related Beneficial Ownership.  the Debtors will utilize the Procedures to monitor and, if necessary, object to certain transfers of Beneficial Ownership of Common Stock or Preferred Stock and declarations of worthlessness with respect to Beneficial Ownership of Common Stock or Preferred Stock to ensure preservation of the Tax Attributes.  The Debtors also propose that the Court direct that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock or Preferred Stock in violation of the Procedures be null and void *ab initio*.

134.     For all of these reasons, I believe the relief in the NOL Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest.

### I.     Utilities Motion.

135.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) determining that the Adequate Assurance Procedures provide the Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services; (c) approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance; and (d) granting related relief.

136.     In connection with the operation of their businesses, the Debtors obtain, either directly or indirectly, electricity, natural gas, water and sewage, telephone, internet, garbage, recycling, cable, and other similar Utility Services from several Utility Providers.  The Debtors obtain certain Utility Services, such as water, sewer, power, and janitorial services, indirectly

through the Debtors' property manager, Cushman, and several of the Debtors' landlords.  For several of the Debtors' properties, the Debtors' landlords obtain Utility Services for the Debtors directly from the Utility Providers pursuant to various lease agreements and subsequently seek reimbursement from the Debtors through Cushman.  Cushman draws funds as necessary from the Debtors' bank accounts to pay the Utility Providers and landlords.  The Debtors fund the bank accounts approximately twice monthly based on Cushman's estimated charges.

137.    On average, the Debtors pay approximately $900,000 each month for the Utility Services.  The Debtors estimate that their cost for Utility Services during the thirty days following the Petition Date will be approximately $1,000,000.  To the best of the Debtors' knowledge, none of the Utility Providers hold deposits from the Debtors, and the Debtors are not in possession of any funds allocated for any prepayments for the Utility Services.

138.    The Debtors intend to timely pay postpetition obligations owed to the Utility Providers in the ordinary course of business.  The Debtors believe that the cash held by the Debtors, the cash generated in the ordinary course of business, and the cash available to the Debtors under their proposed debtor in possession financing facility will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with their prepetition practices during the pendency of these Chapter 11 Cases.

139.    To provide additional assurance of payment, the Debtors propose to deposit $500,000 (the "Adequate Assurance Deposit") into a newly created, segregated account (the "Adequate Assurance Account") as soon as reasonably practicable, but no later than fifteen (15) business days after entry of the proposed Order.  The Adequate Assurance Deposit represents an amount equal to approximately half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses for the twelve-month

period preceding the Petition Date, excluding Utility Services billed directly to Cushman and the Debtors' landlords. The Adequate Assurance Deposit will be held in the Adequate Assurance Account for the benefit of the Utility Providers for the duration of these Chapter 11 Cases and may be applied to any postpetition defaults in payment to the Utility Providers.

140.    Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each, an "Adequate Assurance Request") pursuant to the adequate assurance procedures set forth in the Order (the "Adequate Assurance Procedures"). The Adequate Assurance Procedures will implement a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their business operations uninterrupted. The Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by serving an Adequate Assurance Request upon certain Notice Parties. The Debtors, in their discretion, and upon consultation with each of the advisors to the Akin Ad Hoc Group and the PW Ad Hoc Group, may then resolve any Adequate Assurance Request by mutual agreement with the Utility Provider without further order of the Court. If the Debtors determine that the Adequate Assurance Request cannot be resolved by mutual agreement, the Debtors may seek Court resolution of the Adequate Assurance Request.

141.    I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these Chapter 11 Cases. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations and safety procedures could be severely disrupted, and any such disruption would jeopardize the Debtors' reorganization efforts. I believe this disruption also would adversely impact customer relationships and could result in a decline in the Debtors' revenues and profits. For all of these

reasons, I believe such relief sought in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

### J.    All Trade Motion.

142.    The Debtors seek entry of an order, (a) authorizing the Debtors to continue their prepetition business operations, policies, and practices and to pay Ordinary Course Claims on a postpetition basis in the ordinary course of business, (b) granting administrative expense priority to all Outstanding Orders and authorizing the Debtors to satisfy such obligations in the ordinary course of business, and (c) granting related relief.

143.    In the ordinary course of business, the Debtors incur numerous fixed, liquidated, and undisputed obligations to the Ordinary Course Claimants.  The global reach of the Debtors' businesses requires seamless collaboration with these Ordinary Course Claimants to maintain the Debtors' continued operations.  For example, the Debtors have outsourced substantially all of their foreign manufacturing operations to several foreign contract manufacturers located primarily in China, Mexico, Taiwan, Germany, and Ireland.  The Debtors also rely on components suppliers and partners for the purchase of certain hardware components, the licensing of certain software components, and the resale of such components, either independently, or as part of the Debtors' products under the Avaya brand.  In some cases, certain components are available only from a single source or from a limited source of suppliers.

144.    Additionally, the Debtors have outsourced substantially all of their warehousing and distribution logistics operations to several providers of such services on a global basis, and any delays or material changes in such services due these Chapter 11 Cases could cause significant disruption to the Debtors' operations.

145.     Lastly, the Debtors rely on third parties to provide certain services to the Debtors or their customers, including hosting partners and providers of other cloud-based services.  If these third-party providers do not perform as expected, the Debtors' customers could be adversely affected, resulting in potential liability and reputational damage to the Debtors' brand.  Further, migrating these services to other providers would be time-consuming, could cause the Debtors to incur significant additional expenses, and could lead to service disruptions.

146.     The Vendor Claimants supply Vendor Products and Services that are vital to the Debtors' operations.  The Debtors rely on a range of Vendor Products and Services, without which they would not be able to operate their businesses.  Certain of the Vendor Claimants supply operational goods and services that are vital to the Debtors' ability to effectively and efficiently serve their customers and generate revenue.  The Debtors also rely on certain of the Vendor Claimants to maintain the flow of the Debtors' global supply chain to fulfill their business obligations.  The Debtors' business operations require certain industrial supplies, equipment, and software, and rely on certain Vendor Claimants that produce goods in accordance with specifications and product designs furnished or approved by the Debtors.  Specifically, the Vendor Claimants supply certain hardware and software components that ultimately become the tools the Debtors use to conduct business operations efficiently and effectively.  These goods are integral to the Debtors' ability to offer their products and services.  The Debtors' day-to-day operations also rely on certain daily, third-party services provided by the Vendor Claimants, such as business and professional services, information technology services, financial services, third-party client services, telecommunications services, and outsourced research and development.  If the Vendor Claimants cease to provide these goods and services, the Debtors would be unable to continue their business operations and would suffer significant revenue loss.

147.    On average, the Debtors pay approximately $34 million each month to the Vendor Claimants, calculated based on a historical monthly average of payments to the Vendor Claimants.  As of the Petition Date, the Debtors estimate that they owe approximately $74 million on account of the Vendor Claims.

148.    Prior to the Petition Date, Debtors took measures to avoid the significant operational instability that would likely result from even a short-term interruption in the Vendor Products and Services, including continued conversations and negotiations with the Vendor Claimants over the past months.  In certain instances, Vendor Claimants have imposed onerous requirements on the Debtors as a condition of continued business.  The Debtors have complied, under duress, with certain of these conditions to maintain their ability to serve their customers.  In addition, many of the Vendor Claimants have expressed hesitation to continue supplying the Debtors without assurance of payment on account of accounts due.

149.    A critical component of the Debtors' businesses involves transacting with the Foreign Vendors located in India, Vietnam, Finland, France, and Mexico, amongst others.  The Foreign Vendors supply goods and services to the Debtors that are crucial to the Debtors' ongoing international operations and for the continuation of their businesses in the ordinary course during these Chapter 11 Cases.  Due to the broad international reach of the Debtors' businesses, it is often logistically impracticable—and significantly more cost prohibitive—for the Debtors to purchase goods and services from a U.S.-based vendor rather than Foreign Vendors.  Moreover, many of the Debtors' Foreign Vendors are irreplaceable due to the specialized and customized nature of their products and services specific to the Debtors' international operations.  Failure to pay the Foreign Claims could cause such Foreign Vendors to refuse to provide the goods and services

necessary for the Debtors to continue business operations, including potentially forcing closure of operations at foreign branch offices essential for preserving ongoing business.

150.    On average, the Debtors pay approximately $7 million each month to the Foreign Vendors, calculated based on a historical monthly average of payments to the Foreign Vendors.  As of the Petition Date, the Debtors estimate that they owe approximately $16 million on account of the Foreign Claims.

151.    The Debtors depend on certain warehousing and distribution logistics operations providers to transport the Carrier and Warehouse Products.  These Carrier and Warehouse Products are delivered to sales points where the Debtors complete sales transactions with customers.  The Debtors engage the Carriers to transport and deliver the Carrier and Warehouse Products from the Debtors to the sales points where such products are sold.  The Carriers regularly possess the Carrier and Warehouse Products belonging to the Debtors and certain of the Debtors' partners while transporting and delivering the Carrier and Warehouse Products from the Debtors to the sales points where the products are sold.  In the ordinary course of business, the Debtors also use the Warehousemen to store various products, such as servers, control circuits, telephone sets and accessories, computers, and other products prior to shipment to customers and to store certain equipment when not being used.  The Debtors pay certain of the Warehousemen in arrears, and expect that, as of the Petition Date, certain Carriers and Warehousemen have outstanding invoices for services provided to the Debtors before the Petition Date.

152.    Under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on the goods in their possession or on the property they improved (as applicable) to secure payment of the Lien Claims.  In the event these claims remain unpaid, the Lien Claimants could attempt to assert such liens and refuse to deliver or release goods in their possession or otherwise impede the

Debtors' use of property until their claims are satisfied and their liens redeemed.  I believe that the Lien Claimants' possession (and retention) of the Debtors' goods and supplies or enforcement of a mechanic's lien would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these Chapter 11 Cases.  I understand that, in many instances, the cost of such disruption to the Debtors' estates would likely be greater than the applicable Lien Claims. Pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would result in the diminution of estate assets.

153.    On average, the Debtors pay approximately $5 million each month to the Lien Claimants, calculated based on a historical monthly average of payments to the Lien Claimants.  As of the Petition Date, the Debtors estimate that they owe approximately $14 million on account of the Lien Claims.

154.    The Debtors may have received certain goods and/or other materials from the 503(b)(9) Claimants within the twenty days immediately preceding the Petition Date, thereby giving rise to the 503(b)(9) Claims.  I believe that certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited liquidity.  Certain of the 503(b)(9) Claimants supply goods that are critical to the Debtors' ongoing operations.  Even though the manufacture of certain goods, such as certain hardware components, may be completed, the 503(b)(9) Claimants may refuse to ship goods postpetition unless the Debtors pay some or all of the prepetition claims owing to such vendors.  I believe that any interruption in the flow of these goods would be highly disruptive to the Debtors' operations and would be value-destructive for the Debtors' businesses.

155.    The Debtors believe that all of the 503(b)(9) Claims are also Lien Claims, Foreign Claims, or Vendor Claims and have been characterized as such for purposes of the

All Trade Motion.  As such, the Debtors do not believe there exist any amounts due and owing on account of 503(b)(9) Claims that are separate and distinct from the Lien Claims, the Foreign Claims, or the Vendor Claims.

156.    I believe that the Debtors require a steady stream of goods and services from their Ordinary Course Claimants to maintain operational stability while simultaneously transitioning into chapter 11.  Without the goods and services provided by the Ordinary Course Claimants, I believe that the Debtors could be forced to halt operations immediately while they search for substitute vendors and service providers and may have to forego existing favorable trade terms in their haste to find new vendors.  Importantly, any disruption to the provision of good and services could result in a significant loss of operational efficiency, decreasing the value of these businesses, which could impair stakeholder value at this critical juncture in these Chapter 11 Cases.  I also believe that having the authority to pay the Ordinary Course Claims will signal clearly to their business partners and clients that it is "business as usual."  Thus, I believe that the payment of the Ordinary Course Claims affords the Debtors the greatest likelihood of post-emergence success and that the relief requested in the All Trade Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.

### K.    Wages Motion.

157.    Pursuant to the Wages Motion, the Debtors seek entry of an order, (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain related prepetition obligations; and (b) granting related relief.

158.    As of the Petition Date, Avaya Inc. and its affiliated Debtor and non-Debtor entities have more than 6,500 employees in fifty-seven countries around the globe.  The Debtors currently

employ approximately 2,000 individuals in the United States, as well as approximately seventy individuals in a number of Foreign Branches around the world.

159.     While the substantial majority of their Employees are not represented by a labor union (such non-represented Employees, collectively, the "Salaried Employees"), the Debtors are party to two collective bargaining agreements (the "CBAs") with respect to approximately 275 union Employees (collectively, the "Represented Employees").  Of the Debtors' Represented Employees, approximately 250 are employed under a CBA with the Communication Workers of America (the "CWA"), and the remaining twenty-five Represented Employees are covered by a CBA with various bargaining units of the International Brotherhood of Electrical Workers (the "IBEW").  As discussed in greater detail below, by this Motion the Debtors seek authority, but not direction, to continue to provide compensation and benefits to their Represented Employees in compliance with the CBAs to which they are party.[23]  In addition to their domestic and foreign Employees, the Debtors also rely on approximately 3,400 independent contractors (collectively, the "Contractors"), who fulfill duties similar to Employees in furtherance of the Debtors' business.

160.     The Employees and Contractors perform a wide variety of functions crucial to the Debtors' operations.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  The Employees and Contractors include highly trained personnel who cannot easily be replaced.  Accordingly, without the continued, uninterrupted services of the Employees and Contractors, the Debtors' reorganization will be materially impaired.

---

[23]     By requesting authorization to honor obligations relating to any CBA in this Motion, the Debtors are not assuming or affirming any contracts, agreements, programs, or applicability of any law related to the CBAs, and the Debtors reserve all of their rights with respect thereto.

161.    At the same time, the vast majority of Employees and Contractors rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families. Thus, Employees and Contractors will be exposed to significant financial constraints if the Debtors are not permitted to continue paying wages and salaries, providing employee benefits, and maintaining certain programs benefiting Employees and Contractors in the ordinary course of business.  Consequently, I believe that the relief requested in the Wages Motion is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

162.    To minimize the personal hardship Employees and Contractors would suffer if prepetition Employee- or Contractor-related obligations are not paid or remitted when due or as expected, the Debtors seek authority, but not direction, to pay and honor certain prepetition claims and continue to honor obligations on a postpetition basis, as applicable, relating to, among other things:  (a) Compensation and Withholding Obligations; (b) Active Employee Health and Welfare Benefits; (c) Other Employee Benefits; (d) Former Employee Health and Welfare Benefits; and (e) Administrator Fees (each as defined below and collectively, the "Compensation and Benefits"), as summarized in the following chart:

| Relief Sought | Amount |
|---|---|
| *Compensation and Withholding Obligations* | *$59,843,000* |
| Employee Wages | $8,600,000 |
| Employee Sales Compensation | $1,300,000 |
| Contractor Fees | $46,000,000 |
| Foreign Branch Obligations | $450,000 |
| Avaya Argentina Payroll Election | $100,000 |
| Time-Off Benefits | $1,375,000 |
| Withholding Obligations | $0 |
| Reimbursable Expenses | $650,000 |
| Corporate Card Expenses | $1,350,000 |
| Additional Non-Insider Compensation Opportunities | $18,000 |
| *Active Employee Health and Welfare Benefits* | *$11,700,500* |
| Health Benefits | $6,200,000 |
| Health Savings Accounts | $850,000 |
| Flexible Spending Accounts | $500 |
| Life and AD&D Insurance Benefits | $70,000 |
| Disability Benefits | $575,000 |
| Business Travel Insurance | $30,000 |
| Worker's Compensation Programs | $3,975,000 |
| 401(k) Plans | $0 |
| *Other Employee Benefits* | *$3,375,000* |
| Optional Employee-Paid Benefits | $365,000 |
| Wellness Programs | $10,000 |
| Tuition Assistance Program | $0 |
| Academic Awards Program | $0 |
| Non-Insider Severance Programs | $3,000,000 |
| *Former Employee Health and Welfare Benefits* | *$230,000* |
| Retiree Benefits Program | $230,000 |
| COBRA Benefits | $0 |
| *Administrator Fees* | *$600,000* |
| Payroll and Benefits Processing Services | $45,000 |
| Benefits Administration Services | $395,000 |
| Relocation Programs | $0 |
| Pension Administration Expenses | $95,000 |
| Other Administration Services | $65,000 |
| **TOTAL** | $75,748,500 |

163.   Pursuant to the Wages Motion, the Debtors seek authority to make the payments related to prepetition amounts owed on account of the Compensation and Benefits and continue to honor these obligations on a postpetition basis in the ordinary course of business.

164.    For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Wages Motion. The Debtors' Employees are critical to their operations and restructuring efforts. Accordingly, I believe such relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 14, 2023

*/s/ Eric Koza*

Name:  Eric Koza
Chief Restructuring Officer

## Exhibit A

**Entity and Capital Structure Chart**

