## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*,[1] | ) | Case No. 23-90088 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

### DEBTORS' EMERGENCY
### MOTION FOR ENTRY OF AN ORDER
### (I) AUTHORIZING THE DEBTORS TO CONTINUE
### THEIR PREPETITION BUSINESS OPERATIONS,
### POLICIES, AND PRACTICES AND PAY RELATED
### CLAIMS IN THE ORDINARY COURSE OF BUSINESS ON A
### POSTPETITION BASIS, (II) GRANTING ADMINISTRATIVE
### EXPENSE PRIORITY TO ALL OUTSTANDING ORDERS AND
### AUTHORIZING THE DEBTORS TO SATISFY SUCH OBLIGATIONS
### IN THE ORDINARY COURSE, AND (III) GRANTING RELATED RELIEF

> **Emergency relief has been requested. Relief is requested not later than 9:00 a.m. (prevailing Central Time) on February 15, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on February 15, 2023, at 9:00 a.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Jones's homepage. The meeting code is "Judge Jones". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/avaya. The location of Debtor Avaya Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 350 Mount Kemble Avenue, Morristown, New Jersey 07960.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Jones's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

## Relief Requested

1.    The Debtors seek entry of an order, substantially in the attached form (the "Order"), (a) authorizing the Debtors to continue their prepetition business operations, policies, and practices and to pay Ordinary Course Claims on a postpetition basis in the ordinary course of business, (b) granting administrative expense priority to all Outstanding Orders and authorizing the Debtors to satisfy such obligations in the ordinary course of business, and (c) granting related relief.[3]

## Jurisdiction and Venue

2.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.

---

[2]    The Debtors, together with their non-Debtor affiliates (collectively, "Avaya" or the "Company"), are a leading provider of mission-critical, real-time communication applications.  The facts and circumstances supporting this Motion are set forth in the *Declaration of Eric Koza, Chief Restructuring Officer of Avaya Holdings Corp. and Certain of its Affiliates and Subsidiaries, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the filing of this Motion and incorporated by reference herein.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

[3]    By this Motion, the Debtors seek authorization to pay in the ordinary course of business the prepetition claims of such vendors that provide materials, services, and maintenance required to operate the Debtors' businesses, as further described below.  Contemporaneously with the filing of this Motion, the Debtors have filed certain other "first day" motions seeking authority to satisfy certain prepetition claims.  This Motion is not duplicative of any such motion.  As used herein, the term "Ordinary Course Claims" includes no obligation the Debtors seek to pay under separate motion.  Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any asserted claim.

3.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.        The bases for the relief requested herein are sections 105(a), 363, 503(b), 1107(a), 1108, and 1129 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5.        On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

6.        The Debtors have filed a motion requesting joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and no official committees have been appointed or designated.

## Overview of the Debtors' Prepetition Claims

7.        In the ordinary course of business, the Debtors incur numerous fixed, liquidated, and undisputed obligations to a variety of foreign and domestic creditors, including ordinary course goods and services providers, lien claimants, and numerous other vendors and unsecured creditors (collectively, the "Ordinary Course Claimants").  The global reach of the Debtors' businesses requires seamless collaboration with these Ordinary Course Claimants to maintain the Debtors' continued operations.  For example, the Debtors have outsourced substantially all of their foreign manufacturing operations to several foreign contract manufacturers located primarily in China, Mexico, Taiwan, Germany, and Ireland.  The Debtors also rely on components suppliers and partners for the purchase of certain hardware components, the licensing of certain software

components, and the resale of such components, either independently, or as part of the Debtors' products under the Avaya brand.  In some cases, certain components are available only from a single source or from a limited source of suppliers.

8.     Additionally, the Debtors have outsourced substantially all of their warehousing and distribution logistics operations to several providers of such services on a global basis, and any delays or material changes in such services due these Chapter 11 Cases could cause significant disruption to the Debtors' operations.

9.     Lastly, the Debtors rely on third parties to provide certain services to the Debtors or their customers, including hosting partners and providers of other cloud-based services.  If these third-party providers do not perform as expected, the Debtors' customers could be adversely affected, resulting in potential liability and reputational damage to the Debtors' brand.  Further, migrating these services to other providers would be time-consuming, could cause the Debtors to incur significant additional expenses, and could lead to service disruptions.

10.     The Debtors are making every effort to avoid interruptions to their operations and supply chain in connection with the commencement of these Chapter 11 Cases.  Because of the nature of the Debtors' businesses, the Debtors believe that many Ordinary Course Claimants will make credible and actionable threats that, unless paid on account of their prepetition debt, they will cease to supply the Debtors with the specialized goods and services necessary to maintain the smooth operation of the Debtors' businesses while in chapter 11 or may otherwise impair the Debtors' ability to operate their businesses.

11.     The Debtors therefore request authorization to pay undisputed prepetition claims held by certain Ordinary Course Claimants and accrued in the ordinary course of business (collectively, the "Ordinary Course Claims") as such claims become due and payable in the

ordinary course of business.  The relief requested herein will minimize any disruption to the Debtors' businesses, allow for a smooth and expeditious reorganization in these Chapter 11 Cases, and lay the groundwork for an essential element of the Plan—the unimpairment of Ordinary Course Claims.  The following table summarizes the categories of Ordinary Course Claims that the Debtors request authority to pay pursuant to this Motion and the estimated prepetition amounts outstanding within each such category:

| Category | Description of Claims | Estimated Approximate Amount Outstanding as of the Petition Date |
|---|---|---|
| Vendor Claimants | Suppliers of goods and services that are provided to the Debtors in the ordinary course of business. | $74,000,000 |
| Foreign Vendors | Suppliers of goods or services that are based outside of the United States. | $16,000,000 |
| Lien Claimants | Suppliers of goods or services utilized or provided to the Debtors that may assert mechanic's, possessory, or other similar liens. | $14,000,000 |
| 503(b)(9) Claimants[4] | Suppliers that provided goods to the Debtors that were received within twenty days before the Petition Date. | N/A |
| **Total approximate amount of Ordinary Course Claims** | | $104,000,000 |

## I.    The Vendor Claimants.

12.    The Debtors have identified certain vendors, the majority of which are under contract (collectively, the "Vendor Claimants") that supply products and services in the ordinary course of business (collectively, the "Vendor Products and Services") that are vital to the Debtors' operations.  The Debtors rely on a range of Vendor Products and Services, without which they

---

[4]    The estimated amounts outstanding under this category of claims as of the Petition Date exclude those amounts that qualify as Vendor Claims, Lien Claims, or Foreign Vendors (each as defined below) and amounts owed on account of 503(b)(9) claims are captured in the three other categories.  As further explained below, this category of claims is included in the Motion out of an abundance of caution.

would not be able to operate their businesses.  Certain of the Vendor Claimants supply operational goods and services that are vital to the Debtors' ability to effectively and efficiently serve their customers and generate revenue.  The Debtors also rely on certain of the Vendor Claimants to maintain the flow of the Debtors' global supply chain to fulfill their business obligations.

13.     The Debtors' business operations require certain industrial supplies, equipment, and software, and rely on certain Vendor Claimants that produce goods in accordance with specifications and product designs furnished or approved by the Debtors.  Specifically, the Vendor Claimants supply certain hardware and software components that ultimately become the tools the Debtors use to conduct business operations efficiently and effectively.  These goods are integral to the Debtors' ability to offer their products and services.  The Debtors' day-to-day operations also rely on certain daily, third-party services provided by the Vendor Claimants, such as business and professional services, information technology services, financial services, third-party client services, telecommunications services, and outsourced research and development.  If the Vendor Claimants cease to provide these goods and services, the Debtors would be unable to continue their business operations and would suffer significant revenue loss.

14.     The Debtors do not believe that alternative Vendor Claimants are readily available to be substituted into their supply chain given the "real-time" nature of the Debtors' operations. The Vendor Claimants are integral to the Debtors' ability to support their business operations and develop products for, and provide services to, their customers.  Many of the business units supported by these Vendor Claimants require the uninterrupted provision of service from the Vendor Claimants, and thus, even a temporary halt would significantly jeopardize the Debtors' operations and could cause irreparable damage to the Debtors' go-forward business.  Any new systems would require the revamping and replacement of all of the Debtors' day-to-day services

that they receive, including hiring and training replacement employees to fulfill these tasks, and would materially affect the Debtors' ability to serve their customers' needs.

15.     In many cases, the Vendor Products and Services are available from only a limited number of vendors, and in some cases, only one vendor.  Even where alternative vendors exist, the costs associated with switching from one vendor to another are often significant and would be detrimental to the Debtors' estates.  Specifically, certain of the Vendor Products and Services require extensive vendor specialization and a long production lead-time, primarily due to the Vendor Claimants' need to order component parts.  A halt in production of only a few days, therefore, would be sufficient to cause an immediate and irreparable impact to the Debtors' ability to supply products to their customers in the future, as restarting the production could take weeks or even months.  Re-entering the market for such Vendor Products and Services at this time could subject the Debtors to significant and unpredictable price volatility.

16.     Ultimately, the Debtors believe that jeopardizing their relationships with any of the Vendor Claimants and attempting to procure the Vendor Products and Services from replacement vendors, even if possible, would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss.  Even a temporary interruption of the provision of Vendor Products and Services would impede the Debtors' operations, and the cumulative impact of such events could have a catastrophic adverse effect on the Debtors' businesses and, in turn, these Chapter 11 Cases.

17.     On average, the Debtors pay approximately $34 million each month to the Vendor Claimants, calculated based on a historical monthly average of payments to the Vendor Claimants.  As of the Petition Date, the Debtors estimate that they owe approximately $74 million on account of obligations to the Vendor Claimants (the "Vendor Claims").

18.     Prior to the Petition Date, Debtors took measures to avoid the significant operational instability that would likely result from even a short-term interruption in the Vendor Products and Services, including continued conversations and negotiations with the Vendor Claimants over the past months.  In certain instances, Vendor Claimants have imposed onerous requirements on the Debtors as a condition of continued business.  The Debtors have complied, under duress, with certain of these conditions to maintain their ability to serve their customers.  In addition, many of the Vendor Claimants have expressed hesitation to continue supplying the Debtors without assurance of payment on account of accounts due.[5]

19.     The interruption of business with, or the absence of, the Vendor Claimants would reduce the efficiency and success of the Debtors' operations.  Any material interruption in the provision of the Vendor Products and Services—however brief—would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' go-forward businesses, goodwill, employees, customer base, and market share.  Such harm would likely far outweigh the cost of payment of the Vendor Claims.[6]

20.     In light of the potential for immediate irreparable consequences if the Vendor Claimants do not continue to provide uninterrupted and timely deliveries of goods and services, to maintain stability during this critical stage of these Chapter 11 Cases and to avoid jeopardizing the Debtors' sales and business operations going forward, the Debtors request authority, but not direction, to pay the Vendor Claims as they become due and to continue paying the Vendor Claims in the ordinary course of business, including on account of prepetition claims.

---

[5]    For the avoidance of doubt, Debtors do not seek to amend prepetition trade terms with any Vendor Claimant or pay more for the Vendor Products and Services due to the commencement of these Chapter 11 Cases.

[6]    Notwithstanding the relief requested herein, the Debtors reserve all of their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Vendor Claimants on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

21.     No party in interest will be prejudiced by the relief requested herein because the Vendor Claims are classified as General Unsecured Claims (as defined in the Plan) and are unimpaired under the Plan.  In addition, holders of ninety percent of the Company's First Lien Debt (collectively, the "Consenting Stakeholders"), as well as RingCentral, have consented to and support the relief requested herein.  Thus, the relief requested herein seeks to alter only the timing, not the amount or priority, of the payment of such claims.

## II.     The Foreign Vendors.

22.     A critical component of the Debtors' businesses involves transacting with certain foreign vendors (the "Foreign Vendors") located in India, Vietnam, Finland, France, and Mexico, amongst others.  The Foreign Vendors supply goods and services to the Debtors that are crucial to the Debtors' ongoing international operations and for the continuation of their businesses in the ordinary course during these Chapter 11 Cases.  Due to the broad international reach of the Debtors' businesses, it is often logistically impracticable—and significantly more cost prohibitive—for the Debtors to purchase goods and services from a U.S.-based vendor rather than Foreign Vendors.  Moreover, many of the Debtors' Foreign Vendors are irreplaceable due to the specialized and customized nature of their products and services specific to the Debtors' international operations.  Failure to pay prepetition claims held by certain Foreign Vendors and accrued in the ordinary course of business (the "Foreign Claims") could cause such Foreign Vendors to refuse to provide the goods and services necessary for the Debtors to continue business operations, including potentially forcing closure of operations at foreign branch offices essential for preserving ongoing business.

23.     Many of the Foreign Vendors lack meaningful, if any, contacts with the United States.  Thus, the Foreign Vendors may consider themselves beyond the jurisdiction of the

Court, and therefore, may disregard the automatic stay, notwithstanding the automatic stay's global effect.  Lawsuits in non-U.S. courts and efforts to exercise other remedies in non-U.S. jurisdictions, including the assertion of liens by the Foreign Vendors, could result from a failure to make payment to such parties in the ordinary course, including on account of prepetition claims.  In many instances, it would be unduly time-consuming and burdensome for the Debtors to seek to enforce an order of the Court in the Foreign Vendor's home country, thereby compounding the loss and disruption in services.

24.     On average, the Debtors pay approximately $7 million each month to the Foreign Vendors, calculated based on a historical monthly average of payments to the Foreign Vendors.  As of the Petition Date, the Debtors estimate that they owe approximately $16 million on account of the Foreign Claims.  To maintain access to the critical goods and services provided by the Foreign Vendors, the Debtors request authority, but not direction, to pay the prepetition Foreign Claims as they become due and payable and to continue paying the Foreign Claims in the ordinary course of business.  For the avoidance of doubt, the Debtors intend to pay prepetition Foreign Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs, and the Debtors do not intend to pay Foreign Claims held against the Debtors' foreign non-Debtor affiliates.

### III.    Lien Claimants.

25.     The Debtors' ability to deliver their products in a timely manner is critically important to their financial performance and depends on a seamless interaction with various third-party service providers.  Thus, the Debtors depend on certain warehousing and distribution logistics operations providers to transport:  (a) networking products (*e.g.*, software defined networking products, Ethernet switches, access control products, wireless network products, and

network management products); and (b) unified communications and collaboration products (*e.g.*, communications and messaging products, platform and infrastructure products, and video and conferencing products) (collectively, the "Carrier and Warehouse Products").  These Carrier and Warehouse Products are delivered to sales points where the Debtors complete sales transactions with customers.

26.     The Debtors engage certain vendors to transport and deliver the Carrier and Warehouse Products from the Debtors to the sales points where such products are sold (collectively, the "Carriers").  The Carriers regularly possess the Carrier and Warehouse Products belonging to the Debtors and certain of the Debtors' partners while transporting and delivering the Carrier and Warehouse Products from the Debtors to the sales points where the products are sold. In the ordinary course of business, the Debtors also use several warehouses to store various products, such as servers, control circuits, telephone sets and accessories, computers, and other products prior to shipment to customers and to store certain equipment when not being used (collectively, the "Warehousemen").  The Debtors pay certain of the Warehousemen in arrears, and expect that, as of the Petition Date, certain Carriers and Warehousemen have outstanding invoices for services provided to the Debtors before the Petition Date.

27.     Under certain non-bankruptcy laws, the Carriers and Warehousemen (collectively, the "Lien Claimants") may be able to assert liens on the goods in their possession or on the property they improved (as applicable) to secure payment of the charges or expenses incurred in connection with these prepetition obligations (the "Lien Claims").  In the event these claims remain unpaid, the Lien Claimants could attempt to assert such liens and refuse to deliver or release goods in their possession or otherwise impede the Debtors' use of property until their claims are satisfied and their liens redeemed.  The Lien Claimants' possession (and retention) of the Debtors' goods and

supplies or enforcement of a mechanic's lien would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these Chapter 11 Cases.  In many instances, the cost of such disruption to the Debtors' estates would likely be greater than the applicable Lien Claims. Pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would result in the diminution of estate assets.

28.     The refusal of Lien Claimants to deliver or return the Debtors' goods because of a failure to be paid would severely disrupt the Debtors' operations and potentially cost the Debtors a substantial amount of revenue and future business.  The Debtors' ability to maintain access to materials, goods, equipment, and services is critical to the continued viability of the Debtors' business operations.

29.     On average, the Debtors pay approximately $5 million each month to the Lien Claimants, calculated based on a historical monthly average of payments to the Lien Claimants.  As of the Petition Date, the Debtors estimate that they owe approximately $14 million on account of the Lien Claims.  To continue using the Lien Claimants' goods and services, the Debtors request authority, but not direction, to pay the prepetition Lien Claims as they become due and payable and to continue paying the Lien Claims in the ordinary course of business, including on account of prepetition claims.

## IV.     The 503(b)(9) Claimants.

30.     The Debtors may have received certain goods and/or other materials from various vendors (the "503(b)(9) Claimants") within the twenty days immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").  The Debtors believe certain

503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited liquidity.

31.     Certain of the 503(b)(9) Claimants supply goods that are critical to the Debtors' ongoing operations.  Even though the manufacture of certain goods, such as certain hardware components, may be completed, the 503(b)(9) Claimants may refuse to ship goods postpetition unless the Debtors pay some or all of the prepetition claims owing to such vendors.  Any interruption in the flow of these goods would be highly disruptive to the Debtors' operations and would be value-destructive for the Debtors' businesses.  In light of these consequences, the Debtors believe that payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.

32.     The Debtors believe that all of the 503(b)(9) Claims are also Lien Claims, Foreign Claims, or Vendor Claims and have been characterized as such for purposes of this motion.  As such, the Debtors do not believe there exist any amounts due and owing on account of 503(b)(9) Claims that are separate and distinct from the Lien Claims, the Foreign Claims, or the Vendor Claims.  However, out of an abundance of caution, to the extent a 503(b)(9) Claim is not otherwise classified as a Lien Claim, Foreign Claim, or Vendor Claim, the Debtors seek authority, but not direction, to pay any undisputed 503(b)(9) Claims.  The Debtors do not seek to accelerate or modify existing payment terms with respect to 503(b)(9) Claims (if any).  Rather, the Debtors will pay the applicable 503(b)(9) Claims (if any) as they come due and in the ordinary course of business.

## V.     The Outstanding Orders.

33.     Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively,

13

the "Outstanding Orders").   To avoid the risk of becoming general unsecured claims of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders, and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

## VI.    Proposed Conditions to Payment of the Ordinary Course Claims.

34.    Subject to the Court's approval, the Debtors intend to pay prepetition Ordinary Course Claims only to the extent necessary to preserve their businesses.   In order to avoid disruption of the Debtors' operations, the Debtors seek authority, but not direction, to condition payment of an Ordinary Course Claim on the Ordinary Course Claimant's written agreement (an email being sufficient) to continue supplying goods and services to the Debtors on terms that are acceptable to the Debtors in light of customary industry and historical practices and at least as favorable to the Debtors as the most favorable terms in place during the twelve months prior to the Petition Date (the "Customary Trade Terms").  The Debtors reserve the right to require, at their discretion, that an Ordinary Course Claimant's agreement regarding the Customary Trade Terms be made in writing (an email being sufficient).

35.    In addition, the Debtors request that if any Ordinary Course Claimant accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide

goods or services to the Debtors on Customary Trade Terms, then:  (a) the Debtors may then take any and all appropriate steps to cause such Ordinary Course Claimant to repay payments made to it pursuant to this Motion on account of its prepetition Ordinary Course Claim to the extent that such payments exceed the postpetition amounts then owing to such Ordinary Course Claimant; (b) upon recovery by the Debtors, any prepetition claim held by such Ordinary Course Claimant shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such Ordinary Course Claimant, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested in this Motion to such outstanding postpetition balance and such Ordinary Course Claimant will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

### Basis for Relief

36.     The Debtors commenced these Chapter 11 Cases to implement a comprehensive balance sheet restructuring through the Plan.  The Plan enjoys significant stakeholder support: approximately holders of ninety percent of the Company's First Lien Debt (collectively, the "Consenting Stakeholders"), as well as RingCentral, have signed the Restructuring Support Agreement in support of the Plan.  Notably, the Plan leaves General Unsecured Claims unimpaired and will allow the Debtors to minimize disruptions to their go-forward operations while effectuating a value-maximizing transaction through the chapter 11 process.  The relief requested herein will only affect the timing of payment, not whether such payments will ultimately be made to creditors.

37.     The Debtors' business relies on the flow of products and services provided by domestic and foreign vendors to fulfill their business obligations.  Without strong vendor relationships, the Debtors' ability to continue to provide quality service to their customers would be impacted.  The Debtors are making every effort to avoid interruptions in their operations in

connection with the commencement of these Chapter 11 Cases.  The Debtors seek the relief requested herein to maintain stability during the opening days of these Chapter 11 Cases and to avoid jeopardizing the Debtors' ability to service their vendors and customers going forward.

## I.   Payment of the Ordinary Course Claims Is Warranted Under 363(b)(1) of the Bankruptcy Code.

38.   Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See*, *e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("Cases cited by Debtors that refer to necessity of payment to preserve going concern value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); *see also In re Scotia Dev., LLC*, No. 07-20027, 2007 WL 2788840, at *2 (Bankr. S.D. Tex. Sept. 21, 2007) (outlining the factors for when a critical vendor payment is necessary); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

39.   Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so.  *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  Under section 1107(a) of the Bankruptcy Code, a debtor in possession is given the same rights and powers as a trustee appointed in a bankruptcy case, including the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"

16

*In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. at 497); *see also* 11 U.S.C. § 1108 ("[T]he trustee may operate the debtor's business.").  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

40.     There are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim."  *In re CoServ*, 273 B.R. at 497.  The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id*. at 498.  Courts in the Fifth Circuit, including the Bankruptcy Court for the Southern District of Texas, have followed the *CoServ* court's three-part test to determine whether a prepetition claim of a "critical vendor" may be paid outside of the plan process on a postpetition basis:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*In re CoServ*, 273 B.R. at 498; *see also In re Scotia Dev., LLC*, No. 07-20027, 2007 WL 2788840, at *2 (applying *CoServ* factors); *Mirant Corp.*, 296 B.R. at 429–30 (same).

41.     The Debtors require a steady stream of goods and services from their Ordinary Course Claimants to maintain operational stability while simultaneously transitioning into chapter 11.  Without the goods and services provided by the Ordinary Course Claimants, the Debtors could be forced to halt operations immediately while they search for substitute vendors and service providers and may have to forego existing favorable trade terms in their haste to find

new vendors.  Importantly, any disruption to the provision of good and services could result in a significant loss of operational efficiency, decreasing the value of these businesses, which could impair stakeholder value at this critical juncture in these Chapter 11 Cases.  Having the authority to pay the Ordinary Course Claims will signal clearly to their business partners and clients that it is "business as usual."  Payment of the Ordinary Course Claims, subject to Ordinary Course Claimants performing their obligations in accordance with Customary Trade Terms, affords the Debtors the greatest likelihood of post-emergence success.  In light of the broad support for the Plan and the fact that all Ordinary Course Claims will be paid in full under the Plan, such payment does not upset the Bankruptcy Code's priority scheme or trigger concerns regarding unfair discrimination among unsecured creditors.  *See Equalnet Commc'ns*, 258 B.R. at 370 ("[O]ne very important set of factors . . . is the level of sophistication of the parties, the sophistication of their representation, the sufficiency of notice, the extent to which there is unanimous support or strong disagreement, and whether or not there exists potential harm to any sort of 'silent' or unrepresented constituencies").

42.     For the reasons set forth herein, the Debtors submit that the Court should authorize, but not direct, the Debtors to satisfy the Ordinary Course Claims as set forth herein.

**A.     The Court Should Authorize the Payment of the Lien Claims.**

43.     Certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  *See* 11 U.S.C. § 546(b)(1)(A) (providing that a

debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").  The Debtors anticipate that, absent payment of their prepetition debts, certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien, to the extent certain Lien Claimants have possession of the Debtors' goods, equipment, or products, mere possession or retention could disrupt the Debtors' operations.

44.     Paying the Lien Claims will not impair unsecured creditor recoveries in these Chapter 11 Cases because the Debtors' proposed Plan, which is highly supported by the holders of the Debtors' prepetition funded indebtedness and equity interests, provides for the payment of General Unsecured Claims in full in the ordinary course of business or upon the effective date of the Plan.  In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claimant's claim, such party may be a fully-secured creditor of the Debtors' estates.  In such instances, payment now only provides such party with what they might be entitled to receive under a plan of reorganization, without any interest costs that might otherwise accrue during these Chapter 11 Cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy and the ultimate delivery and sale of Debtors' Carrier and Warehouse Products.

**B.      The Court Should Authorize the Payment of 503(b)(9) Claims.**

45.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within twenty days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  The 503(b)(9) Claims must be paid in full for the Debtors to confirm a

chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan unless they consented otherwise.  The timing of such payments also lies squarely within the Court's discretion.  *See In re Global Home Prods., LLC*, No. 06-10340, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").  The Debtors' ongoing ability to obtain certain hardware components and other goods as provided herein is key to their survival and necessary to preserve the value of their estates.  Absent payment of the 503(b)(9) Claims at the outset of these Chapter 11 Cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the goods necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

**C.     The Court Should Authorize the Payment of the Foreign Claims.**

46.     Each of the Foreign Claimants are based outside the United States. The Foreign Claimants may, and likely do, lack minimum contacts with the United States.  Thus, there is significant risk that the Foreign Claimants consider themselves beyond the jurisdiction of the Court and therefore may disregard the automatic stay, notwithstanding the automatic stay's global effect.  Failure to make payment to such parties in the ordinary course could lead to a proliferation of lawsuits in foreign courts and efforts to exercise other remedies against the Debtors overseas.  In many instances, it would be unduly time-consuming and expensive to seek to enforce an order of the Court in the Foreign Vendor's home country.

47.     Non-payment of any claims owing to Foreign Claimants could lead to immediate and significant disruption to the Debtors' business that would heavily outweigh the cost of paying such parties in connection with their prepetition claims, and continuing to pay them on a

postpetition basis, in the ordinary course of business.  The Debtors believe that paying prepetition claims of Foreign Claimants is necessary to protect the Debtors' business and ensure that the Debtors are able to maximize the value of their estates during these Chapter 11 Cases.

### D.     The Court Should Authorize the Payment of the Vendor Claims.

48.     The Debtors require a steady provision of the Vendor Products and Services to maintain operational stability.  Without the Vendor Products and Services, the Debtors could be forced to unexpectedly halt operations while they search for substitute vendors and service providers and may have to forego existing favorable trade terms as a result in their haste to find new vendors, thereby preventing the Debtors from capturing revenue.  Importantly, any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency, decreasing the value of the Debtors' business, which could impair stakeholder value at the outset of these Chapter 11 Cases.

### II.     The Court Should Confirm that the Outstanding Orders Give Rise to Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized.

49.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the Debtors' estates postpetition.  *See* 11 U.S.C. § 503(b)(1).  The granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.

50.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority status.  The disruption to the continuous and timely flow of critical

goods to the Debtors would force the Debtors to potentially halt operations and production, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors.  Given the foregoing, the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize, but not direct, the Debtors to pay the Outstanding Orders in the ordinary course of business.

**III.    Payment of the Ordinary Course Claims and the Relief Sought Herein is a Sound Exercise of the Debtors' Business Judgment and Necessary to Preserve the Value of the Estates.**

51.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").

52.    Section 105(a) of the Bankruptcy Code provides that a court "may issue any order process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).  Courts apply section 105(a) pursuant to the "doctrine of necessity," which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the

Bankruptcy Code and further supports the relief requested herein.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 496–97 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity").

53.     The doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).  Every segment of the Debtors' supply chain is indispensable to the safe and economic operation of the Debtors' assets.  To ensure that the Debtors continue to maintain their excellent operational standards, it is imperative that the Debtors have the authority to pay all of the Ordinary Course Claimants if determined necessary to preserve the Debtors' operations, reputation, and the go-forward success of the Debtors' businesses.  The relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is there justified under sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

## Emergency Consideration

54.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief during the first twenty-one days of these Chapter 11 Cases would imperil the Debtors' restructuring and cause irreparable harm.  The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

55.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and debtor in possession financing.  Under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. The Debtors request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

56.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

57.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the

validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

58.     The Debtors have provided notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Akin Ad Hoc Group; (d) counsel to the PW Ad Hoc Group; (e) the Prepetition ABL Agent and counsel thereto; (f) the Prepetition Term Loan Agent and counsel thereto; (g) the 6.125% Senior Secured First Lien Notes Trustee and counsel thereto; (h) the 8.00% Exchangeable Senior Secured Notes Trustee and counsel thereto; (i) the 2.25% Convertible Notes Trustee and counsel thereto; (j) counsel to the DIP Term Loan Agent; (k) the proposed DIP ABL Agent and counsel thereto; (l) the Office of the United States Attorney for the Southern District of Texas; (m) the state attorneys general for states in which the Debtors conduct business; (n) the Internal Revenue Service; (o) the Securities and Exchange Commission; (p) the Environmental Protection Agency; (q) other governmental agencies having a regulatory or statutory interest in these cases; and (r)  any

party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice is required.

The Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated:  February 14, 2023

/s/ Genevieve M. Graham

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve M. Graham (TX Bar No. 24085340)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Emily Meraia (TX Bar No. 24129307)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:            mcavenaugh@jw.com
                     rchaikin@jw.com
                     ggraham@jw.com
                     emeraia@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Rachael M. Bentley (*pro hac vice* pending)
Andrew Townsell (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com
                     aparna.yenamandra@kirkland.com
                     rachael.bentley@kirkland.com
                     andrew.townsell@kirkland.com

-and-

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Accuracy**

     I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Genevieve M. Graham*
Genevieve M. Graham

## **Certificate of Service**

     I certify that on February 14, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Genevieve M. Graham*
Genevieve M. Graham

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*,[1] | ) Case No. 23-90088 (DRJ) |
| | ) |
| | ) (Joint Administration Requested) |
| Debtors. | ) |
| | ) **Re: Docket No. _____** |

**ORDER (I) AUTHORIZING
THE DEBTORS TO CONTINUE
THEIR PREPETITION BUSINESS OPERATIONS,
POLICIES, AND PRACTICES AND PAY RELATED
CLAIMS IN THE ORDINARY COURSE OF BUSINESS ON A
POSTPETITION BASIS, (II) GRANTING ADMINISTRATIVE
EXPENSE PRIORITY TO ALL OUTSTANDING ORDERS AND
AUTHORIZING THE DEBTORS TO SATISFY SUCH OBLIGATIONS
IN THE ORDINARY COURSE, AND (III) GRANTING RELATED RELIEF**

Upon the emergency motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order (this "Order"), (a) authorizing the Debtors to continue their prepetition business operations, policies, and practices and to pay Ordinary Course Claims on a postpetition basis in the ordinary course of business; (b) granting administrative expense priority to all Outstanding Orders and authorizing the Debtors to satisfy such obligations in the ordinary course of business; and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/avaya.  The location of Debtor Avaya Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 350 Mount Kemble Avenue, Morristown, New Jersey 07960.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.     The Debtors are authorized, but not directed, to pay the prepetition Ordinary Course Claims described in the Motion in the ordinary course of business and consistent with their prepetition practices on a final basis as set forth in the Motion and as the Debtors deem necessary in their reasonable business discretion.  The Debtors are authorized, but not directed, to pay all undisputed amounts related to the Outstanding Orders in the ordinary course of business consistent with the parties' customary practices in effect prior to the Petition Date.

2.     The Debtors shall maintain a matrix/schedule of payments made pursuant to this Order, including the following information: (a) the names of the payee; (b) the nature of the payment; (c) the amount of the payment; (d) the category or type of payment; (e) the Debtor or Debtors that made the payment; (f) the payment date; (g) the purpose of such payment (the "Vendor Matrix").  Beginning upon entry of this Order, the Debtors shall provide a copy of the Vendor Matrix on a monthly basis to (i) the United States Trustee for the Southern District of

2

Texas; (ii) counsel to each of the Akin Ad Hoc Group and the PW Ad Hoc Group; and (iii) counsel to any statutory committee appointed in the chapter 11 cases within ten (10) calendar days following the conclusion of each calendar month.

3.      Nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority, validity, or amounts of the Ordinary Course Claims. The Debtors do not concede that any claims satisfied pursuant to this Order are valid, and the Debtors expressly reserve all rights to contest the extent, validity, or perfection or to seek the avoidance of all such liens or the priority of such claims.

4.      For the avoidance of doubt, this Order does not authorize payments to insiders (as such term is defined in section 101(31) of the Bankruptcy Code) of the Debtors.

5.      As a condition to receiving any payment under this Order (a) any Ordinary Course Claimant that accepts any payment pursuant to the authority granted in this Order shall agree to continue—or recommence—supplying goods and services to the Debtors in accordance with trade terms at least as favorable to the Debtors as the most favorable terms in place during the twelve months prior to the Petition Date, or such other trade terms that are acceptable to the Debtors (the "Customary Trade Terms") and (b) any Lien Claimant who has obtained a Lien on the Debtors' or their customers' assets that accepts any payment pursuant to the authority granted in this Order shall further agree to take whatever action is necessary to remove the Lien at the Lien Claimant's sole cost and expense.  The Debtors have the right to adjust Customary Trade Terms with any Ordinary Course Claimant according to the facts and circumstances to the extent such adjustment is in the ordinary course of business and consistent with prepetition practices and the Debtors determine such adjustment is in the best interest of their estates.  The Debtors reserve the

right to require additional favorable trade terms with any Ordinary Course Claimant as a condition to payment of any Ordinary Course Claim.

6.      If any Ordinary Course Claimant that accepts payment from the Debtors pursuant to the authority granted in this Order does not continue to provide goods or services on Customary Trade Terms, then: (a) the Debtors may then take any and all appropriate steps to cause such Ordinary Course Claimant to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Ordinary Course Claimant; (b) upon recovery by the Debtors, any prepetition claim of such Ordinary Course Claimant shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the authority granted in this Order to such outstanding postpetition balance and such Ordinary Course Claimant will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

7.      Notwithstanding anything to the contrary herein, prior to making any payment pursuant to this Order to an Ordinary Course Claimant or on account of an Outstanding Order, the Debtors shall provide such Ordinary Course Claimant with a copy of this Order (unless previously provided to such Ordinary Course Claimant).

8.      Notwithstanding the relief granted herein and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or

admission that any particular claim is of a type specified or defined in the Motion or any order granting the relief requested by the Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

9.      Notwithstanding anything to the contrary in this Order, any payment made or to be made hereunder, and any authorization herein, shall be subject to the requirements (if any) imposed on the Debtors under any order(s) of this Court approving the postpetition secured debtor in possession financing facility and the use of cash collateral (any such order, a "Financing Order"), including any documentation with respect to such financing and any budget in connection with such Financing Order.  In the event of any conflict between the terms of this Order and a Financing Order, the terms of the applicable Financing Order shall control (solely to the extent of such conflict).

10.      The banks and financial institutions on which checks were drawn or electronic funds transfer requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on

the Debtors' designation of any particular check or electronic payment request as approved by this Order.

11.      The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these Chapter 11 Cases with respect to prepetition amounts owed in connection with the relief granted herein.

12.      The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

13.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

14.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

15.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

16.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____, 2023

_____
UNITED STATES BANKRUPTCY JUDGE