*Solicitation Version*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*,[1] | ) | Case No. 23-90088 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF AVAYA INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126.  THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Genevieve M. Graham (TX Bar No. 24085340)
Emily Meraia (TX Bar No. 24129307)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:  (713) 752-4200
Facsimile:  (713) 752-4221
Email:  mcavenaugh@jw.com
  rchaikin@jw.com
  ggraham@jw.com
  emeraia@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Rachael M. Bentley (*pro hac vice* pending)
Andrew Townsell (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:  joshua.sussberg@kirkland.com
  aparna.yenamandra@kirkland.com
  rachael.bentley@kirkland.com
  andrew.townsell@kirkland.com

-and-

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:  patrick.nash@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  February 14, 2023

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/avaya.  The location of Debtor Avaya Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 350 Mount Kemble Avenue, Morristown, New Jersey 07960.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW................................................................................................................1
    A.    Defined Terms. .......................................................................................................................1
    B.    Rules of Interpretation. .........................................................................................................17
    C.    Computation of Time. ...........................................................................................................17
    D.    Governing Law. ....................................................................................................................17
    E.    Reference to Monetary Figures. ...........................................................................................18
    F.    Reference to the Debtors or the Reorganized Debtors. ........................................................18
    G.    Controlling Document...........................................................................................................18
    H.    Consent Rights. ....................................................................................................................18

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING
      EXPENSES .........................................................................................................................18
    A.    Administrative Claims. .........................................................................................................18
    B.    DIP Claims............................................................................................................................19
    C.    Professional Fee Claims........................................................................................................19
    D.    Priority Tax Claims...............................................................................................................20
    E.    Payment of Restructuring Expenses......................................................................................20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ......................................20
    A.    Classification of Claims and Interests...................................................................................20
    B.    Treatment of Claims and Interests. .......................................................................................21
    C.    Special Provision Governing Unimpaired Claims. ...............................................................25
    D.    Elimination of Vacant Classes ..............................................................................................25
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes ...........................................25
    F.    Intercompany Interests..........................................................................................................25
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................26
    H.    Controversy Concerning Impairment.....................................................................................26
    I.    Subordinated Claims. ............................................................................................................26

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN.......................................................................26
    A.    General Settlement of Claims and Interests. .........................................................................26
    B.    HoldCo Convertible Notes Settlement...................................................................................26
    C.    Restructuring Transactions....................................................................................................27
    D.    The Reorganized Debtors......................................................................................................27
    E.    Sources of Consideration for Plan Distributions...................................................................27
    F.    Corporate Existence. .............................................................................................................29
    G.    Vesting of Assets in the Reorganized Debtors......................................................................29
    H.    Cancellation of Existing Agreements and Interests. .............................................................30
    I.    Corporate Action...................................................................................................................30
    J.    Governance Documents. .......................................................................................................31
    K.    Directors and Officers of the Reorganized Debtors. .............................................................31
    L.    Effectuating Documents; Further Transactions.....................................................................31
    M.    Certain Securities Law Matters .............................................................................................31
    N.    Section 1146 Exemption. ......................................................................................................32
    O.    Employment Obligations. .....................................................................................................33
    P.    Management Incentive Plan...................................................................................................33
    Q.    Preservation of Causes of Action..........................................................................................33
    R.    DTC Eligibility .....................................................................................................................34
    S.    Closing the Chapter 11 Cases. ..............................................................................................34

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................34
    A.    Assumption of Executory Contracts and Unexpired Leases. ................................................34

| | | |
|---|---|---|
| B. | Indemnification Obligations. | 34 |
| C. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 35 |
| D. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 35 |
| E. | Insurance Policies. | 36 |
| F. | Reservation of Rights. | 36 |
| G. | Nonoccurrence of Effective Date. | 36 |
| H. | Contracts and Leases Entered Into After the Petition Date. | 36 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ... 36
| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed. | 36 |
| B. | Disbursing Agent. | 37 |
| C. | Rights and Powers of Disbursing Agent. | 37 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 37 |
| E. | Manner of Payment. | 38 |
| F. | Compliance with Tax Requirements. | 38 |
| G. | Allocations. | 38 |
| H. | No Postpetition Interest on Claims. | 38 |
| I. | Foreign Currency Exchange Rate. | 39 |
| J. | Setoffs and Recoupment. | 39 |
| K. | Claims Paid or Payable by Third Parties. | 39 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS** ... 40
| | | |
|---|---|---|
| A. | Disputed Claims Process. | 40 |
| B. | Allowance of Claims. | 40 |
| C. | Claims Administration Responsibilities. | 40 |
| D. | Adjustment to Claims or Interests without Objection. | 41 |
| E. | Disallowance of Claims or Interests. | 41 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ... 41
| | | |
|---|---|---|
| A. | Discharge of Claims and Termination of Interests. | 41 |
| **B.** | **Release of Liens.** | 42 |
| **C.** | **Releases by the Debtors.** | 42 |
| **D.** | **Releases by Third Parties Other than the Settlement Group Releasing Parties.** | 43 |
| **E.** | **Releases by the Settlement Group Releasing Parties.** | 44 |
| **F.** | **Exculpation.** | 45 |
| **G.** | **Injunction.** | 45 |
| H. | Protections Against Discriminatory Treatment. | 46 |
| I. | Document Retention. | 46 |
| J. | Reimbursement or Contribution. | 46 |

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** ... 47
| | | |
|---|---|---|
| A. | Conditions Precedent to the Effective Date. | 47 |
| B. | Waiver of Conditions. | 47 |
| C. | Effect of Failure of Conditions. | 48 |

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ... 48
| | | |
|---|---|---|
| A. | Modification and Amendments. | 48 |
| B. | Effect of Confirmation on Modifications. | 48 |
| C. | Revocation or Withdrawal of Plan. | 48 |

**ARTICLE XI. RETENTION OF JURISDICTION** ... 49

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ... 50
| | | |
|---|---|---|
| A. | Immediate Binding Effect. | 50 |
| B. | Additional Documents. | 51 |

| C. | Payment of Statutory Fees. | 51 |
|---|---|---|
| D. | Statutory Committee and Cessation of Fee and Expense Payment. | 51 |
| E. | Reservation of Rights. | 51 |
| F. | Successors and Assigns. | 51 |
| G. | Notices. | 51 |
| H. | Term of Injunctions or Stays. | 52 |
| I. | Entire Agreement. | 53 |
| J. | Exhibits. | 53 |
| K. | Nonseverability of Plan Provisions. | 53 |
| L. | Votes Solicited in Good Faith. | 53 |
| M. | Closing of Chapter 11 Cases. | 53 |
| N. | Waiver or Estoppel. | 53 |

**INTRODUCTION**

The Debtors propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

*A.*     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.     "*2023 PBGC Settlement Agreement*" means that certain Settlement Agreement between the Debtors and Pension Benefit Guaranty Corporation dated February 14, 2023 and attached to the Disclosure Statement as Exhibit I.

2.     "*Ad Hoc Groups*" means the PW Ad Hoc Group and the Akin Ad Hoc Group.

3.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) Adequate Protection Claims (as defined in the DIP Orders); (e) Restructuring Expenses; and (f) the RO Backstop Premium (if paid in cash).

4.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the reference Entity was a debtor in a case under the Bankruptcy Code.

5.     "*Agents/Trustees*" means, collectively, the DIP Agents, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Escrow Agent, the Legacy Notes Trustee, the Secured Exchangeable Notes Trustee, the HoldCo Convertible Notes Trustee, and the Exit Facilities Agents, including any successors thereto.

6.     "*Akin Ad Hoc Group*" means that certain ad hoc group of Holders of First Lien Claims represented by the Akin Ad Hoc Group Advisors.

7.     "*Akin Ad Hoc Group Advisors*" means (i) Akin Gump Strauss Hauer & Feld, as counsel to the Akin Ad Hoc Group, (ii) Alvarez and Marsal LLC, as financial advisor to the Akin Ad Hoc Group, (iii) Centerview Partners LP, as investment banker to the Akin Ad Hoc Group, and (iv) Korn Ferry, as board search consultant.

8.     "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors, with the consent of the Required Consenting Stakeholders, which shall not be unreasonably withheld, delayed, or conditioned, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such

Claims would be allowed under applicable nonbankruptcy law; *provided*, *however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

9. "*Audit Committee*" means the audit committee of the board of directors of HoldCo.

10. "*B-1 Term Loans*" means the Tranche B-1 Term Loans outstanding under the Prepetition Term Loan Credit Agreement in the principal amount of $800,000,000 as of the Petition Date.

11. "*B-2 Term Loans*" means the Tranche B-2 Term Loans outstanding under the Prepetition Term Loan Credit Agreement in the principal amount of $743,000,000 as of the Petition Date.

12. "*B-3 Term Loans*" means the Tranche B-3 Term Loans outstanding under the Prepetition Term Loan Credit Agreement in the principal amount of $350,000,000 as of the Petition Date.

13. "*B-3 Escrow Claim*" means a Claim on account of B-3 Term Loans arising out of or in connection with the Escrow Cash.

14. "*B-3 Term Loan Claim*" means any Claim on account of the B-3 Term Loans actually funded, less the amount of the B-3 Escrow Claims, plus accretion on account of the B-3 Term Loans (including on account of the B-3 Escrow Claims) from the date of funding of the B-3 Term Loans to the Petition Date, plus 30% of the B-3 Special Premium (as defined in the Prepetition Term Loan Credit Agreement) that would otherwise be due in respect of the resulting B-3 Term Loan Claim amount as of the Petition Date. The calculation of the B-3 Special Premium for the B-3 Term Loan Claims will be based on average treasury rates published in the Federal Reserve Statistical Release H.15 for the five business days through and including February 9, 2023, and the CME Term SOFR 3 Month Index for February 10, 2023.

15. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

16. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

17. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

18. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

19. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

20. "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

21. "*Cause of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). Causes of Action include: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim.

2

22.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

23.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

24.     "*Claims and Noticing Agent*" means Kurtzman Carson Consultants LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

25.     "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

26.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

27.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

28.     "*Company Parties*" means HoldCo and each of its direct and indirect subsidiaries that are or become parties to the RSA, solely in their capacity as such.

29.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

30.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

31.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

32.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

33.     "*Consenting Stakeholders*" means, collectively, the Holders of First Lien Claims that are signatories to the RSA or any subsequent Holder of First Lien Claims that becomes party thereto in accordance with the terms of the RSA, each solely in their capacity as such.

34.     "*Consummation*" means the occurrence of the Effective Date.

35.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

36.     "*Debtor Related Party*" means each of, and in each case in its capacity as such, current directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current director or manager in his or her capacity as director or manager of an Entity), current accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

37.     "*Debtor Release*" means the release set forth in Article VIII.C of this Plan.

38.     "*Debtors*" means, collectively, each of the following:  Avaya Inc., Avaya CALA Inc., Avaya Cloud Inc., Avaya EMEA LTD., Avaya Federal Solutions, Inc., Avaya Holdings Corp., Avaya Holdings LLC, Avaya Integrated Cabinet Solutions LLC, Avaya Management L.P., Avaya Management Services Inc., Avaya World Services Inc., CAAS Technologies, LLC, CTIntegrations, LLC, HyperQuality, Inc., HyperQuality II, LLC, Intellisist, Inc., dba Spoken Communications, KnoahSoft, Inc., Sierra Asia Pacific Inc., Sierra Communication International LLC, Ubiquity Software Corporation, and VPNet Technologies, Inc. upon their filing of voluntary petitions for relief under chapter 11 of title 11 of the United States Code.

39.     "*Definitive Documents*" means, collectively, (a) the Disclosure Statement; (b) the Solicitation Materials; (c) the Governance Documents; (d) the DIP Commitment Letter; (e) the DIP Orders (and motion(s) seeking approval thereof);  (f) the DIP Facilities Documents; (g) the Exit Facilities Documents, (h) the RO Documents; (i) the Plan (and all exhibits thereto); (j) the Confirmation Order; (k) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials (and motion(s) seeking approval thereof); (l) all material pleadings filed by the Debtors in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings and all orders sought pursuant thereto; (m) the 2023 PBGC Settlement Agreement; (n) the Plan Supplement; (o) the MIP Pre-Emergence Allocation Pool, as applicable; (p) the Escrow Direction Letter and, to the extent not covered by any above-mentioned items, any and all agreements, documents, and filings in connection with the release of the Escrow Cash; (q) any and all filings with or requests for regulatory or other approvals from any governmental entity or unit, other than ordinary course filings and requests, necessary or desirable to implement the Restructuring Transactions; (r) the Renegotiated RingCentral Contracts; and (s) such other agreements, instruments, and documentation as may be necessary to consummate and document the transactions contemplated by the RSA or the Plan.

40.     "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

41.     "*DIP ABL Agent*" means the administrative agent, collateral agent, or similar Entity under the DIP ABL Credit Agreement.

42.     "*DIP ABL Facility Claim*" means any Claim held by the DIP ABL Lenders or the DIP ABL Agent arising under or relating to the DIP ABL Credit Agreement or the DIP Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP ABL Credit Agreement.

43.     "*DIP ABL Credit Agreement*" means the credit agreement with respect to the DIP ABL Facility, as may be amended, supplemented, or otherwise modified from to time.

44.     "*DIP ABL Facility*" means a superiority secured first lien asset based debtor in possession financing facility for the DIP ABL Loans, in an aggregate amount of up to $128.125 million, including a letter of credit sub-facility, which DIP ABL Facility may be converted into the Exit ABL Facility on the Effective Date, to be entered into on the terms and conditions set forth in the DIP ABL Facility Documents and the DIP Orders.

45.     "*DIP ABL Facility Documents*" means any documents governing the DIP ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith

46.     "*DIP ABL Lenders*" means the lenders providing the DIP ABL Facility under the DIP ABL Facility Documents.

47.     "*DIP ABL Loans*" means the loans provided under the DIP ABL Facility.

48.     "*DIP Agents*" means, collectively, the DIP ABL Agent and the DIP Term Loan Agent.

49.     "*DIP Claims*" means, collectively, the DIP ABL Facility Claims and the DIP Term Loan Claims.

50.    "*DIP Commitment Letter*" means one or more commitment letters, each as may be amended, supplemented, or otherwise modified from to time in accordance with each of its terms, entered into between the Debtors and the DIP ABL Lenders and DIP Term Loan Lenders, pursuant to which the DIP ABL Lenders commit to fund the DIP ABL Facility and the DIP Term Loan Lenders commit to fund the DIP Term Loan Facility, as applicable.

51.    "*DIP Commitment Party*" means any Person that commits to fund the DIP ABL Facility or DIP Term Loan Facility, as applicable, under the DIP Commitment Letter.

52.    "*DIP Commitment Shares*" means, collectively, New Equity Interests to be issued to the DIP Term Loan Lenders in satisfaction of the put option premium under the DIP Term Loan Facility, which New Equity Interests will be issued at a 37.5% discount to the implied equity value of $538.8125 million after giving effect to the Rights Offering.

53.    "*DIP Facilities Documents*" means, collectively, the DIP ABL Facility Documents and the DIP Term Loan Facility Documents.

54.    "*DIP Lenders*" means the DIP ABL Lenders and the DIP Term Loan Lenders.

55.    "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order and any other Bankruptcy Court order approving entry into the DIP Facilities Documents.

56.    "*DIP Professional Fees*" means, as of the Effective Date, all accrued and unpaid professional fees and expenses payable under the DIP Orders to the professionals for the DIP Agents and the DIP Lenders.

57.    "*DIP Term Loan Agent*" means the administrative agent, collateral agent, or similar Entity under the DIP Term Loan Credit Agreement.

58.    "*DIP Term Loan Claim*" means any Claim held by the DIP Term Loan Lenders or the DIP Term Loan Agent arising under or relating to the DIP Term Loan Credit Agreement or the DIP Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Term Loan Credit Agreement.

59.    "*DIP Term Loan Credit Agreement*" means the credit agreement with respect to the DIP Term Loan Facility, as may be amended, supplemented, or otherwise modified from to time.

60.    "*DIP Term Loan Facility*" means the senior secured debtor in possession financing facility for the DIP Term Loans, in an aggregate amount of $500 million, which DIP Term Loan Facility shall be converted into the DIP-to-Exit Term Loans on the Effective Date, entered into on the terms and conditions set forth in the DIP Term Loan Facility Documents and the DIP Orders.

61.    "*DIP Term Loan Facility Documents*" means any documents governing the DIP Term Loan Facility that are entered into in accordance with the DIP Term Loan Credit Agreement, DIP Term Loan Term Sheet and the DIP Orders and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the DIP Term Loan Term Sheet.

62.    "*DIP Term Loan Lenders*" means the lenders providing the DIP Term Loan Facility under the DIP Term Loan Facility Documents.

63.    "*DIP Term Loans*" means the multiple draw term loans provided under the DIP Term Loan Facility.

64.    "*DIP Term Loan Term Sheet*" means the DIP Term Loan Term Sheet attached as <u>Exhibit C</u> to the Restructuring Support Agreement.

5

65.   "*DIP-to-Exit Term Loans*" means the DIP Term Loans in an aggregate amount of $500 million after such DIP Term Loans are converted on a dollar-for-dollar basis into Exit Term Loans on the Effective Date pursuant to the DIP Term Loan Credit Agreement, Exit Term Loan Facility Credit Agreement and the Plan.

66.   "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select, in consultation with the Ad Hoc Groups, to make or to facilitate distributions in accordance with the Plan, which Entity may include the Claims and Noticing Agent.

67.   "*Disclosure Statement*" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

68.   "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

69.   "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing or such other date agreed to by the Debtors and the Required Consenting Stakeholders.

70.   "*DTC*" means The Depository Trust Company.

71.   "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

72.   "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with Article IV.O of the Plan.

73.   "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

74.   "*Equity Security*" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

75.   "*Escrow Account*" has the meaning set forth in the Escrow Agreement.

76.   "*Escrow Agent*" means Goldman, in its capacity as escrow agent under the Escrow Agreement.

77.   "*Escrow Agreement*" means the Escrow Agreement dated as of July 12, 2022 by and among Avaya Inc., Goldman, in its capacity as the Prepetition Term Loan Agent, and Goldman, in its capacity as the Escrow Agent.

78.   "*Escrow Cash*" means all Cash held by the Escrow Agent in the Escrow Account pursuant to the Escrow Agreement.

79.   "*Escrow Direction Letter*" means a direction letter to be executed by Avaya Inc., the Prepetition Term Loan Agent, and the Consenting Stakeholders that are B-3 Term Loan Lenders (and if necessary, other Term Loan Lenders that are Consenting Stakeholders), in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

80.   "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

81.   "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors, and (b) the directors or managers of any Debtor.

6

82.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

83.     "*Existing Avaya Interests*" means the Interests in HoldCo immediately prior to the consummation of the transactions contemplated in this Plan.

84.     "*Exit ABL Facility*" means the first lien asset based lending facility, to be incurred on the Effective Date by the Reorganized Debtors pursuant to the Exit ABL Facility Credit Agreement.

85.     "*Exit ABL Facility Agent*" means the administrative agent, collateral agent, or similar Entity under the Exit ABL Facility Credit Agreement.

86.     "*Exit ABL Facility Credit Agreement*" means the credit agreement with respect to the Exit ABL Facility, as may be amended, supplemented, or otherwise modified from to time.

87.     "*Exit ABL Facility Documents*" means, collectively, the Exit ABL Facility Credit Agreement and any other agreements or documents memorializing the Exit ABL Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Exit ABL Facility, as may be amended, restated, supplemented, or otherwise modified from time to time.

88.     "*Exit ABL Facility Lenders*" means those lenders party to the Exit ABL Facility Credit Agreement.

89.     "*Exit Facilities*" means, collectively, the Exit ABL Facility and the Exit Term Loan Facility.

90.     "*Exit Facilities Agents*" means, collectively, the Exit ABL Facility Agent and the Exit Term Loan Facility Agent.

91.     "*Exit Facilities Documents*" means, collectively, the Exit ABL Facility Documents and the Exit Term Loan Facility Documents.

92.     "*Exit Term Loan Facility*" means the first lien term loan facility to be incurred by the Reorganized Debtors and applicable guarantors on the Effective Date in the aggregate principal amount of $810 million pursuant to the Exit Term Loan Facility Credit Agreement, on the terms and conditions substantially set forth in the Exit Term Loan Facility Term Sheet.

93.     "*Exit Term Loan Facility Agent*" means the administrative agent, collateral agent, or similar Entity under the Exit Term Loan Facility Credit Agreement.

94.     "*Exit Term Loan Facility Credit Agreement*" means the credit agreement with respect to the Exit Term Loan Facility, as may be amended, supplemented, or otherwise modified from to time.

95.     "*Exit Term Loan Facility Documents*" means, collectively, the Exit Term Loan Facility Credit Agreement and any other agreements or documents memorializing the Exit Term Loan Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Exit ABL Facility, as may be amended, restated, supplemented, or otherwise modified from time to time.

96.     "*Exit Term Loan Facility Lenders*" means those lenders party to the Exit Term Loan Facility Credit Agreement.

97.     "*Exit Term Loan Facility Term Sheet*" means the Exit Term Loan Facility Term Sheet attached as Exhibit D to the Disclosure Statement.

98.     "*Exit Term Loans*" means the term loans provided under the Exit Term Loan Facility on the terms and conditions set forth in the Exit Term Loan Facility Credit Agreement, which shall include the DIP-to-Exit Term Loans, the Takeback Term Loans, the RO Term Loans, and the RO Backstop Term Loans.

99.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

100.    "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

101.    "*Final DIP Order*" means one or more Final Orders entered approving the DIP ABL Facility, the DIP Term Loan Facility, and the DIP Facilities Documents, and authorizing the Debtors' use of Cash Collateral.

102.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari , or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorarishall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

103.    "*First Lien Claims*" means, collectively, the Prepetition Term Loan Claims, the Legacy Note Claims, and the Secured Exchangeable Note Claims.

104.    "*General Unsecured Claim*" means any Claim that is not (a) an Administrative Claim, (b) a Professional Fee Claim, (c) a Priority Tax Claim, (d) a Secured Tax Claim, (e) a DIP Claim, (f) an Other Secured Claim, (g) an Other Priority Claim, (h) a Prepetition ABL Claim, (i) a First Lien Claim, (j) a B-3 Escrow Claim, (k) a HoldCo Convertible Notes Claim, (l) an Intercompany Claim, or (m) a Section 510 Claim with respect to HoldCo.

105.    "*Goldman*" means Goldman Sachs Bank USA.

106.    "*Governance Documents*" means, as applicable, the organizational and governance documents for the Reorganized Debtors, which will give effect to the Restructuring Transactions, including, without limitation, New Stockholders' Agreement, Registration Rights Agreement, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or equivalent governing documents), and the identities of proposed members of the board of directors of Reorganized Avaya which documents shall be consistent with the Governance Term Sheet.

107.    "*Governance Term Sheet*" means the governance term sheet attached to the Restructuring Term Sheet.

108.    "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

109.    "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

110.    "*HoldCo*" means Avaya Holdings Corp.

111.    "*HoldCo Convertible Notes*" means the unsecured notes issued under the HoldCo Convertible Notes Indenture.

112.    "*HoldCo Convertible Notes Claims*" means any Claim on account of the HoldCo Convertible Notes.

113.    "*HoldCo Convertible Notes Indenture*" means the indenture dated as of June 11, 2018, between HoldCo, as issuer, and the Bank of New York Mellon Trust Company, N.A., as trustee, including all amendments, modifications, and supplements thereto.

114.    "*HoldCo Convertible Notes Notice*" shall mean the notice of non-voting status notice solely for Holders of Convertible Notes Claims attached to the order conditionally approving the Disclosure Statement.

115.    "*HoldCo Convertible Notes Settlement Consideration*" shall mean $24 million of total consideration comprising (i) an aggregate of $10.4 million of Cash, plus (ii) an aggregate of $10 million of Exit Term Loans; plus (iii) the payment of reasonable and documented professional fees and expenses incurred by the S&C Ad Hoc Group (including such fees and expenses of Sullivan & Cromwell, LLP, as counsel, Bracewell LLP, as local counsel, MoloLamken LLP, as special counsel, and Houlihan Lokey, as financial advisor) in an aggregate amount not to exceed $3.6 million (provided that if such reasonable and documented fees are less than $3.6 million, any excess amount shall increase the Cash recovery set forth in prong (i)).

116.    "*HoldCo Convertible Notes Settlement Trigger*" shall mean (i) the representation, at the first hearing in the Chapter 11 Cases on the record before the Bankruptcy Court,  by Holders of at least 67% of HoldCo Convertible Notes Claims in Class 7 in the aggregate as of the Petition Date, by and through counsel for the S&C Ad Hoc Group and counsel for the PW Ad Hoc Group,  of their support of the settlement set forth in Article IV.B of the Plan, and (ii) the delivery of written confirmation of such representation by counsel to the S&C Ad Hoc Group and counsel to the PW Ad Hoc Group within two (2) business days of such hearing setting forth the exact amount of HoldCo Convertible Notes Claims in Class 7 held by the members of the S&C Ad Hoc Group and the PW Ad Hoc Group as of the Petition Date which amount shall be at least equal to the HoldCo Convertible Notes Threshold to counsel to the Debtors, counsel to the Akin Ad Hoc Group, counsel to the PW Ad Hoc Group and counsel to the S&C Ad Hoc Group, in each case which shall be confirmed in writing to counsel to the S&C Ad Hoc Group and counsel to the PW Ad Hoc Group by counsel to the Debtors promptly upon satisfaction of each such condition.

117.    "*HoldCo Convertible Notes Threshold*" shall mean the amount of HoldCo Convertible Notes Claims held by the members of the PW Ad Hoc Group and the S&C Ad Hoc Group as of the Petition Date which amount shall be at least 67% of the HoldCo Convertible Notes Claims in Class 7 in the aggregate

118.    "*HoldCo Convertible Notes Trustee*" means the Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under the HoldCo Convertible Notes Indenture, or any indenture trustee as permitted by the terms set forth in the HoldCo Convertible Notes Indenture.

119.    "*HoldCo General Unsecured Claim*" means any General Unsecured Claim against HoldCo.

120.    "*Holder*" means an Entity that is the record owner of a Claim or Interest.  For the avoidance of doubt, affiliated record owners of Claims or Interests managed or advised by the same institution shall constitute separate Holders.

121.    "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

122.    "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

123.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

124.    "*Interest*" means, collectively, (a) any Equity Security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

125.    "*Interim DIP Order*" means one or more orders entered on an interim basis approving the DIP ABL Facility, the DIP Term Loan Facility, and the DIP Facilities Documents and authorizing the Debtors' use of Cash Collateral.

126.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

127.    "*Legacy Notes*" means the senior secured notes issued under the Legacy Notes Indenture.

128.    "*Legacy Notes Claim*" means any Claim on account of the Legacy Notes.

129.    "*Legacy Notes Indenture*" means the indenture dated as of September 25, 2020, between Avaya Inc., as issuer, and Wilmington Trust, National Association, as trustee and notes collateral agent, including all amendments, modifications, and supplements thereto.

130.    "*Legacy Notes Trustee*" means Wilmington Trust, National Association, in its capacity as indenture trustee and notes collateral agent under the Legacy Notes Indenture, or any indenture trustee as permitted by the terms set forth in the Legacy Notes Indenture.

131.    "*Legacy Term Loan Claim*" means any Claim on account of the Legacy Term Loans.

132.    "*Legacy Term Loans*" means, collectively, the B-1 Term Loans and the B-2 Term Loans.

133.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

134.    "*Management Incentive Plan*" means a post-Effective Date equity incentive plan providing for the issuance from time to time, of equity and equity-based awards with respect to New Equity Interests, as approved by the New Board.

135.    "*Management Incentive Plan Pool*" means a pool of up to 10% (inclusive of the MIP Pre-Emergence Allocation Pool) of the New Equity Interests, on a fully-diluted basis, as of the Effective Date, reserved for issuance pursuant to the Management Incentive Plan.

136.    "*MIP Pre-Emergence Allocation Pool*" means a percentage to be agreed upon by the Required Consenting Stakeholders and the Debtors of the Management Incentive Plan Pool that may be allocated prior to the Effective Date as emergence grants to recruit new executives to be hired to serve in key senior management positions after the Effective Date, and subject to such terms and conditions (including with respect to form, structure, and vesting) determined by, in each case, the Required Consenting Stakeholders, in consultation with the CEO.

137.    "*New Board*" means the board of directors or similar governing body of Reorganized Avaya.

138.    "*New Equity Interests*" means equity or membership interests in Reorganized Avaya after consummation of the Restructuring Transactions.

139.    "*New Stockholders' Agreement*" means that certain stockholders agreement that will govern certain matters related to the governance of the Reorganized Debtors and which shall be consistent with the Governance Term Sheet.

140.    "*Non-HoldCo General Unsecured Claim*" means any General Unsecured Claim against a Debtor other than HoldCo.

141.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

142.    "*Other Secured Claim*" means any Secured Claim against the Debtors other than the DIP Claims, the Priority Tax Claims, the Prepetition ABL Claims, or the First Lien Claims.

143.   "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

144.   "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

145.   "*Plan*" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, the RSA, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules hereto and thereto.

146.   "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with the Plan.

147.   "*Plan Supplement*"  means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors, to the extent reasonably practicable, no later than seven (7) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable:  (a) the Governance Documents; (b) the identity and members of the New Board; (c) the Schedule of Retained Causes of Action; (d) the Exit Facilities Documents; (e) the Description of Transaction Steps (which shall, for the avoidance of doubt, remain subject to modification until the Effective Date and may provide for certain actions to occur prior to the Effective Date, subject to the consent of the Required Consenting Stakeholders); (f) the Rejected Executory Contract and Unexpired Lease List, if any; and (g) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

148.   "*Prepetition ABL Agent*" means the administrative agent, collateral agent, or similar Entity under the Prepetition ABL Credit Agreement.

149.   "*Prepetition ABL Claims*" means any Claim on account of the Prepetition ABL Credit Agreement.

150.   "*Prepetition ABL Credit Agreement*" means that certain ABL Credit Agreement dated as of December 15, 2017, between HoldCo, as holdings, and Avaya Inc., as borrower, the lenders party thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent, including all amendments, modifications, and supplements thereto.

151.   "*Prepetition ABL Facility*" means the revolving credit facility under the Prepetition ABL Credit Agreement.

152.   "*Prepetition Term Loan Agent*" means Goldman, in its capacity as the administrative agent and collateral agent under the Prepetition Term Loan Credit Agreement.

153.   "*Prepetition Term Loan Claims*" means, collectively, the Legacy Term Loan Claims and the B-3 Term Loan Claims.

154.   "*Prepetition Term Loan Credit Agreement*" means the credit agreement dated as of December 15, 2017, between HoldCo, as holdings, and Avaya Inc., as borrower, the other guarantors party thereto, the lenders party thereto, and Goldman, as administrative agent and collateral agent, including all amendments, modifications, and supplements thereto.

155.   "*Preserved Claims*" means (a) Claims or Causes of Action against any Entity that was the beneficiary of the repurchase, redemption or other satisfaction by any Debtor Entity of the HoldCo Convertible Notes prior to the Petition Date or (b) Preserved Tranche B-3 Claims.

156.   "*Preserved Tranche B-3 Claim*" means an Estate claim or Cause of Action with respect to B-3 Term Loans, including the obligations, guarantees, and security interests granted in connection with the B-3 Term Loans.

157.     *Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

158.     "*Pro Rata*" means, unless otherwise specified, the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

159.     "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

160.     "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

161.     "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

162.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

163.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

164.     "*PW Ad Hoc Group*" means that certain ad hoc group of Holders of First Lien Claims represented by the PW Ad Hoc Group Advisors.

165.     "*PW Ad Hoc Group Advisors*" means (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the PW Ad Hoc Group, (ii) Glenn Agre Bergman & Fuentes LLP, as counsel to the PW Ad Hoc Group, (iii) FTI Consulting, Inc., as financial advisor to the PW Ad Hoc Group, (iv) [●], as local counsel to the PW Ad Hoc Group, and (v) Korn Ferry, as board search consultant.

166.     "*Registration Rights Agreement*" means that certain registration rights agreement that will provide certain registration rights to holder of New Equity Interests and which shall be consistent with the Governance Term Sheet.

167.     "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

168.     "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors and reasonably satisfactory to the Required Consenting Stakeholders, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, which list, as may be amended from time to time, with the consent of the Debtors and the Required Consenting Stakeholders, shall be included in the Plan Supplement.

169.     "*Related Party*" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

170. "*Released Party*" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) each Settlement Group Releasing Party; (e) RingCentral; (f) each Agent/Trustee; (g) each DIP Commitment Party and each DIP Lender; (h) each RO Backstop Party; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); (j) each Related Party of each Entity in clause (c) through this clause (j); (k) each Debtor Related Party of each Entity in clause (a) and (b); *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in Article VIII.D or Article VIII.E of the Plan; (y) timely objects to the releases contained in Article VIII.D or Article VIII.E of the Plan and such objection is not resolved before Confirmation; or (z) was the beneficiary of the repurchase, redemption, or other satisfaction of HoldCo Convertible Notes prior to the Petition Date.

171. "*Releasing Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Company Party; (d) RingCentral; (e) each DIP Lender; (f) each Agent/Trustee; (g) each Consenting Stakeholder; (h) all Holders of Claims that vote to accept the Plan; (i) all Holders of Claims that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (j) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (k) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each Entity in clause (a) through (l) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided* that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in Article VIII.D of the Plan; or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation. Notwithstanding the foregoing, any Entity that is a Settlement Group Releasing Party shall not be a Releasing Party unless such Entity is a member of the PW Ad Hoc Group as of the Petition Date, in which case such Entity shall not be a Releasing Party solely with respect to any HoldCo Convertible Notes Claims.

172. "*Renegotiated RingCentral Agreements*" means, collectively, (a) the Second Amended and Restated Framework Agreement, by and between Avaya Inc. and RingCentral, (b) the First Amended and Restated Development Agreement, by and between Avaya Inc., Avaya Management L.P., and RingCentral, (c) the First Amended and Restated Super Master Agent Agreement, by and between Avaya Inc. and RingCentral, and (d) the Reseller Agreement, by and between Avaya Cloud Inc. and RingCentral.

173. "*Reorganized Avaya*" means Avaya Holdings Corp., or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

174. "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

175. "*Required Akin Ad Hoc Group Members*" means, as of the relevant date, Consenting Stakeholders holding, collectively, in excess of 50% of the aggregate principal amount of First Lien Claims held by Consenting Stakeholders that are members of the Akin Ad Hoc Group.

176. "*Required Consenting Stakeholders*" means, as of the relevant date, (a) the Required PW Ad Hoc Group Members and (b) the Required Akin Ad Hoc Group Members.

177. "*Required PW Ad Hoc Group Members*" means, as of the relevant date, Consenting Stakeholders holding, collectively, in excess of 50% of the aggregate principal amount of First Lien Claims held by the Consenting Stakeholders that are members of the PW Ad Hoc Group.

178. "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of: (a) the PW Ad Hoc Group Advisors; (b) the Akin Ad Hoc Group

Advisors; (c) the Secured Exchangeable Notes Advisors; and (d) any consultants or other professionals retained by the PW Ad Hoc Group or the Akin Ad Hoc Group in connection with the Debtors or the Restructuring Transactions with the consent of the Debtors (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Debtors, and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals.

179.    "*Restructuring Term Sheet*" means the term sheet attached to the RSA as <u>Exhibit B</u> thereto.

180.    "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

181.    "*Rights*" means the non-certificated rights that will enable the holders thereof to purchase RO Term Loans at par.

182.    "*Rights Offering*" means the offering of the RO Term Loans for the RO Amount to be consummated by the Debtors on the Effective Date in accordance with the RO Procedures.

183.    "*RingCentral*" means RingCentral, Inc. and its Affiliates.

184.    "*RO Amount*" means $150 million.

185.    "*RO Backstop*" means the several obligations and not joint nor joint and several obligations to backstop in full of the Rights Offering by the RO Backstop Parties pursuant to the RO Backstop Agreement.

186.    "*RO Backstop Agreement*" means the backstop agreement entered into between the Debtors and the RO Backstop Parties.

187.    "*RO Backstop Agreement Approval Order*" means the Final Order authorizing entry into the RO Backstop Agreement and approving the payment of fees and expenses related thereto, which Final Order may be the Confirmation Order.

188.    "*RO Backstop Commitment*" means the principle amount of RO Backstop Term Loans a RO Backstop Party commits to fund in connection with the Rights Offering and in accordance with the RO Backstop Agreement.

189.    "*RO Backstop Parties*" means, collectively, certain members of the PW Ad Hoc Group and the Akin Ad Hoc Group that are party to the RO Backstop Agreement.  For the avoidance of doubt, each RO Backstop Party must be either (A) a "qualified institutional buyer", as such term is defined in Rule 144A under the Securities Act, (B) a non-U.S. person as defined under Regulation S under the Securities Act, or (C) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) under the Securities Act.

190.    "*RO Backstop Premium*" means a, non-refundable aggregate premium equal to 12.5% of the RO Amount, at a 37.5% discount to an implied equity value of $538.8125 million after giving effect to the Rights Offering, fully earned upon execution of the RO Backstop Agreement, payable on the Effective Date to the RO Backstop Parties in RO Premium Shares or payable on the termination date of the RO Backstop Agreement to the non-breaching RO Backstop Parties in Cash.

191.    "*RO Backstop Share Amount*" means the amount of RO Common Shares that would have been issued to a RO Participant that funded RO Term Loans in the Rights Offering in an amount equivalent to the amount of RO Backstop Term Loans funded by such RO Backstop Party.

192.    "*RO Backstop Shares*" means, collectively, New Equity Interests issued to each RO Backstop Party in the RO Backstop Share Amount.

193.    "*RO Backstop Term Loans*" means the Exit Term Loans not subscribed for in the Rights Offering that the RO Backstop Parties commit to fund in accordance with their respective RO Backstop Commitments.

14

194.  "*RO Common Share Amount*" means the amount of New Equity Interests that would have been issued to a RO Participant if the Rights Offering were an offering of New Equity Interests in an amount equal to the RO Amount at a 37.5% discount to the implied equity value of $538.8125 million after giving effect to the Rights Offering.

195.  "*RO Common Shares*" means, collectively, the New Equity Interests issued to each RO Participant in the RO Common Share Amount.

196.  "*RO Documents*" means, collectively, the RO Backstop Agreement, the RO Backstop Agreement Approval Order, the RO Procedures, and any other agreements or documents memorializing the Rights Offering, as may be amended, restated, supplemented, or otherwise modified from time to time according to their respective terms.

197.  "*RO Eligible Offerees*" means, collectively, the Holders of First Lien Claims (exclusive of B-3 Escrow Claims).

198.  "*RO Non-Participant Takeback Term Loan Allocation*" means a dollar principal amount of Takeback Term Loans equal to the result of the following formula:  (a) a fraction (expressed as a percentage), the numerator of which is the First Lien Claims (exclusive of any B-3 Escrow Claims) held by such Holder and the denominator of which is all First Lien Claims (exclusive of the B-3 Escrow Claims) multiplied by (b) 300 million; *provided* that on the Effective Date, a RO Backstop Party's RO Non-Participant Takeback Term Loan Allocation, if applicable, shall be reduced dollar-for-dollar by the amount of RO Backstop Term Loans that such RO Backstop Party funds.

199.  "*RO Participant Takeback Term Loan Allocation*" means a dollar principal amount of Takeback Term Loans equal to the result of the following formula:  (a) a fraction (expressed as a percentage), the numerator of which is the First Lien Claims (exclusive of any B-3 Escrow Claims) held by such Holder, and the denominator of which is all First Lien Claims (exclusive of the B-3 Escrow Claims) multiplied by (b) 150 million; *provided* that on the Effective Date, a RO Backstop Party's RO Participant Takeback Loan Allocation, if applicable, shall be reduced dollar-for-dollar by the amount of RO Backstop Term Loans that such RO Backstop Party funds.

200.  "*RO Participants*" means, collectively, the RO Eligible Offerees that exercise their respective Rights and agree to fund the RO Term Loans.

201.  "*RO Premium Share Amount*" means an amount equal to 12.5% of the RO Amount, at a 37.5% discount to the implied equity value of $538.8125 million after giving effect to the Rights Offering.

202.  "*RO Premium Shares*" means, collectively, the New Equity Interests issued to each RO Backstop Party in satisfaction of the RO Backstop Premium.

203.  "*RO Procedures*" means the procedures governing the Rights Offering attached as an exhibit to the Disclosure Statement Order.

204.  "*RO Term Loans*" means Exit Term Loans offered in the Rights Offering.

205.  "*RSA*" means that certain Restructuring Support Agreement, entered into as of February 14, 2023, by and among the Debtors and the other parties thereto, including all exhibits thereto (including the Restructuring Term Sheet), as may be amended, modified, or supplemented from time to time, in accordance with its terms, attached to the Disclosure Statement as Exhibit B.

206.  "*S&C Ad Hoc Group*" means that certain ad hoc group of Holders of Claims represented by Sullivan & Cromwell and Houlihan Lokey.

207.  "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time, which schedule shall be deemed to include the Preserved Claims.

208. "*Section 510 Claim*" means any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of a Security of any Debtor or an affiliate of any Debtor; (b) for damages arising from the purchase or sale of such a Security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim; *provided* that a Section 510 Claim shall not include any Claims subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest; and (d) any other claim determined to be subordinated under section 510 of the Bankruptcy Code.

209. "*Secured Claim*" means a Claim: (a) secured by a valid, perfected and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

210. "*Secured Exchangeable Notes*" means the senior secured exchangeable notes issued under the Secured Exchangeable Notes Indenture.

211. "*Secured Exchangeable Notes Advisors*" means Debevoise & Plimpton LLP and [●], as local counsel.

212. "*Secured Exchangeable Notes Claims*" means any Claim on account of the Secured Exchangeable Notes.

213. "*Secured Exchangeable Notes Indenture*" means the indenture dated as of July 12, 2022, between Avaya Inc., as issuer, and Wilmington Trust, National Association, as trustee, exchange agent, and notes collateral agent, including all amendments, modifications, and supplements thereto.

214. "*Secured Exchangeable Notes Trustee*" means Wilmington Trust, National Association, in its capacity as indenture trustee, exchange agent, and notes collateral agent under the Secured Exchangeable Notes Indenture, or any indenture trustee as permitted by the terms set forth in the Secured Exchangeable Notes Indenture.

215. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

216. "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

217. "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

218. "*Settlement Group Release*" means the release set forth in Article VIII.E of this Plan.

219. "**Settlement Group Releasing Party**" means a holder of HoldCo Convertible Notes Claims, solely in its capacity as such, that does not (x) elect to opt out of the releases contained in Article VIII.E of the Plan; or (y) object to, challenge, or impede in any manner, formally or informally, any action taken by the Debtors or any Consenting Stakeholders in the Chapter 11 Cases, the transactions contemplated by the RSA, the Plan, the Restructuring Transactions or the entry of any order consistent with, or contemplated by, the terms of the RSA.

220. "*Takeback Term Loan Recovery*" means either an RO Non-Participant Takeback Term Loan Allocation of Takeback Term Loans or an RO Participant Takeback Term Loan Allocation of Takeback Term Loans.

221. "*Takeback Term Loans*" means Exit Term Loans issued in satisfaction of a Holder's RO Non-Participant Takeback Term Loan Allocation or RO Participant Takeback Term Loan Allocation, as applicable.

222. "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

223. "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

16

224.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

B.    *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto (both as that term is defined herein and as it is defined in the RSA); (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the RSA set forth in the RSA and of the parties to the RO Backstop Parties set forth in the RO Backstop Agreement with respect to the form and substance of this Plan, any Definitive Document, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and be fully enforceable as if stated in full herein until such time as the RSA or the RO Backstop Agreement, as applicable, is terminated in accordance with its terms. Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the RSA or the RO Backstop Agreement, as applicable, shall not impair such rights and obligations. In case of a conflict between the consent rights of the parties to the RSA that are set forth in the RSA or of the parties to the RO Backstop Agreement that are set forth in the RO Backstop Agreement, as applicable, with those parties' consent rights that are set forth in the Plan or the Plan Supplement, the consent rights in the RSA or the RO Backstop Agreement, as applicable, shall control.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Stakeholders, which consent shall not be unreasonably withheld) or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary

18

course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *DIP Claims.*

    1.   DIP ABL Facility Claims

On the Effective Date, the DIP ABL Facility shall be refinanced by the Exit ABL Facility, and, in full and final satisfaction of the Allowed DIP ABL Facility Claims, such Claims shall either (i) be repaid in full and in Cash from the proceeds of the Exit ABL Facility or (ii) shall be refinanced by means of a cashless settlement.  To the extent the DIP ABL Facility is refinanced by means of a cashless settlement, (i) all principal amount of DIP ABL Loans shall be on a one-to-one basis automatically converted to and deemed to be Exit ABL Loans, (ii) the letters of credit issued and outstanding under the DIP ABL Credit Agreement shall be converted to letters of credit deemed to be issued and outstanding under the Exit ABL Facility Documents, (iii) all Collateral that secures the Obligations (each as defined in the DIP ABL Credit Agreement) under the DIP ABL Credit Agreement shall be reaffirmed, ratified and shall automatically secure all Obligations (as defined in the Exit ABL Facility Documents) under the Exit ABL Facility Documents, subject to the priorities of liens set forth in the Exit Facilities Documents, and (iv) each Holder of a DIP ABL Facility Claim shall receive its *Pro Rata* share of Cash on account of any interest, fees, or expenses outstanding with respect to such Holder's DIP ABL Loans as of the Effective Date.  For the avoidance of doubt, DIP Professional Fees shall be paid in accordance with the terms of the DIP Orders.

    2.   DIP Term Loan Claims

On the Effective Date, in full and final satisfaction of the Allowed DIP Term Loan Claims (i) all principal amount of DIP Term Loans shall be on a one-to-one-basis automatically converted to and deemed to be Exit Term Loans, and (ii) each Holder of the DIP Term Loan Claim shall receive its *pro rata* portion of Cash on account of any interest, fees, or expenses outstanding with respect to such Holder's DIP Term Loan Claims as of the Effective Date. For the avoidance of doubt, DIP Professional Fees shall be paid in accordance with the terms of the DIP Orders.

C.      *Professional Fee Claims.*

    1.   Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

    2.   Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

19

3.     <u>Professional Fee Amount.</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.     <u>Post-Confirmation Fees and Expenses.</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.     *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.     *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the RSA, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided, however,* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.     *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Prepetition ABL Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | First Lien Claims | Impaired | Entitled to Vote |
| Class 5 | B-3 Escrow Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Non-HoldCo General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | HoldCo Convertible Notes Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | HoldCo General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510 Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Existing Avaya Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.  Class 1 - Other Secured Claims

   (a)  *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

   (b)  *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the option of the applicable Debtor or Reorganized Debtor, either:

      (i)    payment in full in Cash of its Allowed Other Secured Claim;

      (ii)   the collateral securing its Allowed Other Secured Claim;

      (iii)  Reinstatement of its Allowed Other Secured Claim; or

      (iv)   such other treatment rendering its Allowed Other Secured Claim Unimpaired in

21

accordance with section 1124 of the Bankruptcy Code.

    (c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 - Other Priority Claims</u>

    (a)    *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Prepetition ABL Claims</u>

    (a)    *Classification*:  Class 3 consists of any Prepetition ABL Claims against any Debtor, to the extent not paid in full pursuant to the DIP Orders prior to the Effective Date.

    (b)    *Allowance*:  To the extent not paid in full pursuant to the DIP Orders prior to the Effective Date, on the Effective Date, the Prepetition ABL Claims shall be deemed Allowed in the aggregate principal amount of $$56,444,894.61, plus accrued and unpaid interest on such principal amount through the Effective Date, and any fees and other expenses arising under or in connection with the Prepetition ABL Credit Agreement.

    (c)    *Treatment*:  On the Effective Date, each Holder of a Prepetition ABL Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Prepetition ABL Claim.

    (d)    *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 3 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – First Lien Claims</u>

    (a)    *Classification*:  Class 4 consists of any First Lien Claims (for the avoidance of doubt, exclusive of the B-3 Escrow Claims) against any Debtor.

    (b)    *Allowance*:  The First Lien Claims shall be deemed Allowed in the following amounts:

        (i)    Legacy Term Loan Claims: $1,552,939,177.75

        (ii)    B-3 Term Loan Claims (for the avoidance of doubt, exclusive of the B-3 Escrow

22

Claims): $112,359,733.62

    (iii)    Legacy Notes Claims: $1,059,754,868.76

    (iv)    Secured Exchangeable Notes Claims: $280,654,582.43

  (c)    *Treatment*:  Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction of such Claim, on the Effective Date, (i) its applicable Takeback Term Loan Recovery, (ii) its *Pro Rata* share of 100% of the New Equity Interests, subject to dilution on account of the Management Incentive Plan Pool, the RO Common Shares, the RO Backstop Shares, the RO Premium Shares, and the DIP Commitment Shares, and (iii) its *Pro Rata* share of the Rights (which Rights must have been exercised in accordance with the RO Procedures).

  (d)    *Voting*:  Class 4 is Impaired under the Plan and Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

5.   Class 5 - B-3 Escrow Claims

  (a)    *Classification*:  Class 5 consists of any B-3 Escrow Claims against any Debtor.

  (b)    *Allowance*:  To the extent not paid in full pursuant to the DIP Orders prior to the Effective Date, the B-3 Escrow Claims shall be deemed Allowed in the aggregate amount of $221,000,000.

  (c)    *Treatment*:  To the extent not paid in full pursuant to the DIP Orders prior to the Effective Date, on the Effective Date, each Holder of a B-3 Escrow Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction of such Claim, its *Pro Rata* share of the Escrow Cash.

  (d)    *Voting*:  Class 5 is unimpaired under the Plan.   Holders of Allowed Claims in Class 5 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6.   Class 6 – Non-HoldCo General Unsecured Claims

  (a)    *Classification*:  Class 6 consists of Non-HoldCo General Unsecured Claims.

  (b)    *Treatment*:  Each Holder of an Allowed Non-HoldCo General Unsecured Claim shall receive, in full and final satisfaction of such Claim, either:

    (i)    Reinstatement of such Allowed Non-HoldCo General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or

    (ii)    payment in full in Cash on (A) the Effective Date or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Non-HoldCo General Unsecured Claim.

  (c)    *Voting:*  Class 6 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 6 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

23

7.    Class 7 – HoldCo Convertible Notes Claims

    (a)    *Classification*:  Class 7 consists of HoldCo Convertible Notes Claims.

    (b)    *Treatment*:  On the Effective Date, all HoldCo Convertible Notes Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of HoldCo Convertible Notes Claims will not receive any distribution on account of such HoldCo Convertible Notes Claims.

    (c)    *Voting:*  The Debtors have not solicited the votes of Holders of Class 7 Claims because rejection of the Plan by Class 7 has been assumed by the Debtors solely for purposes of Confirmation.

8.    Class 8 - HoldCo General Unsecured Claims

    (a)    *Classification*:  Class 8 consists of HoldCo General Unsecured Claims.

    (b)    *Treatment*:  On the Effective Date, all HoldCo General Unsecured Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of HoldCo General Unsecured Claims will not receive any distribution on account of such HoldCo General Unsecured Claims.

    (c)    *Voting:*  Class 8 is Impaired under the Plan.  Holders of Allowed Claims in Class 8 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.    Class 9 - Intercompany Claims

    (a)    *Classification:*  Class 9 consists of all Intercompany Claims.

    (b)    *Treatment:*  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Stakeholders, which consent shall not be unreasonably withheld), either Reinstated, converted to equity, otherwise set off, settled, distributed, contributed, canceled, or released, in each case, in accordance with the Description of Transaction Steps.

    (c)    *Voting:*  Holders of Class 9 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 9 Claims are not entitled to vote to accept or reject the Plan.

10.   Class 10 - Section 510 Claims

    (a)    *Classification*:  Class 10 consists of all Section 510 Claims.

    (b)    *Treatment*:  On the Effective Date, all Section 510 Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510 Claims will not receive any distribution on account of such Section 510 Claims.

    (c)    *Voting*:  Class 10 is Impaired under the Plan.  Holders of Allowed Claims in Class 10 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

11. Class 11 - Intercompany Interests

   (a) *Classification:*  Class 11 consists of all Intercompany Interests.

   (b) *Treatment:*  On the Effective Date, Intercompany Interests shall, at the election of the applicable Debtor (with the consent of the Required Consenting Stakeholders, which consent shall not be unreasonably withheld), be (i) Reinstated or (ii) set off, settled, addressed, distributed, contributed, merged, canceled, or released, in each case, in accordance with the Description of Transaction Steps.

   (c) *Voting*:  Class 11 is Unimpaired if the Class 11 Interests are Reinstated or Impaired if the Class 11 Interests are cancelled.  Holders of Class 11 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

12. Class 12 - Existing Avaya Interests

   (a) *Classification*:  Class 12 consists of all Existing Avaya Interests.

   (b) *Treatment*:  On the Effective Date, all Existing Avaya Interests will be cancelled, released, and extinguished and will be of no further force and effect, and Holders of Existing Avaya Interests will not receive any distribution on account thereof.

   (c) *Voting*:  Class 12 is Impaired under the Plan.  Holders of Interests in Class 12 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 12 Interests are not entitled to vote to accept or reject the Plan.

C.   *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.   *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.   *Voting Classes, Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.   *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Equity Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the RSA, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *HoldCo Convertible Notes Settlement.*

On or as soon as reasonably practicable after the Effective Date, provided the HoldCo Convertible Notes Settlement Trigger has been satisfied and the Settlement Group Releasing Parties hold HoldCo Convertible Notes Claims in Class 7 in an amount equal to or greater than the HoldCo Convertible Notes Threshold, each Settlement Group Releasing Party, in consideration for granting the voluntary releases set forth in Article VIII.E of the Plan,  shall receive its pro rata share of the HoldCo Convertible Notes Settlement Consideration, *provided, however*, that any Holder of a HoldCo Convertible Notes Claim in Class 7 that fails to satisfy the standards to be a Settlement Group Releasing Party shall not be entitled to receive any HoldCo Convertible Notes Settlement Consideration.

For the avoidance of doubt, any Holder of a HoldCo Convertible Notes Claim in Class 7 that is also a Holder of a First Lien Claim may participate in the Rights Offering in its capacity as a Holder of a First Lien Claim.

26

C.      *Restructuring Transactions.*

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and the RSA; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable Governance Documents; (4) the execution and delivery of the Exit Facilities Documents and entry into the Exit Facilities; (5) pursuant to the RO Documents, the implementation of the Rights Offering, the distribution of the Rights to the RO Eligible Offerees, and the issuance of the RO Term Loans, RO Backstop Term Loans, RO Common Shares, RO Backstop Shares, and RO Premium Shares in connection therewith; (6) the issuance and distribution of the New Equity Interests as set forth in the Plan; (7) the reservation of the Management Incentive Plan Pool; (8) the issuance and distribution of the DIP Commitment Shares; (9) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Description of Restructuring Steps; and (10) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The terms of the Restructuring Transactions will be structured to maximize tax efficiencies for each of the Debtors and the Consenting Stakeholders, as agreed to by the Debtors and the Required Consenting Stakeholders and in accordance with the Plan and the Plan Supplement.

D.      *The Reorganized Debtors.*

On the Effective Date, the New Board shall be established in accordance with the terms of the Governance Term Sheet, and each Reorganized Debtor shall adopt its Governance Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

E.      *Sources of Consideration for Plan Distributions.*

The Debtors shall fund distributions under the Plan, as applicable, with: (1) the proceeds from the Exit Facilities, (2) proceeds from the Rights Offering, (3) the New Equity Interests, and (4) the Debtors' Cash on hand. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Equity Interests will be exempt from SEC registration, as described more fully in Article IV.L below.

1.   Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents.  Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the

27

Reorganized Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities.  Execution of the Exit Term Loan Facility Credit Agreement by the Exit Term Loan Facility Agent shall be deemed to bind all Holders of First Lien Claims and all Exit Term Loan Facility Lenders as if each such Holder or Exit Term Loan Facility Lender had executed the Exit Term Loan Facility Credit Agreement with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

       2.    <u>Rights Offering</u>.

The Debtors shall distribute the Rights to the RO Eligible Offerees on behalf of the Reorganized Debtors as set forth in the Plan and the RO Documents.  Pursuant to the RO Procedures, the Rights Offering shall be open to all RO Eligible Offerees, and RO Eligible Offerees shall be entitled to participate in the Rights Offering up to a maximum amount of each such RO Eligible Offeree's Pro Rata share of the Rights. Each RO Eligible Offeree may exercise either all or none of its Rights.  Each RO Eligible Offeree who chooses not to participate in the Rights Offering will receive the RO Non-Participant Takeback Term Loan Allocation.  The Rights with respect to the Rights Offering are not separately transferrable or detachable from the First Lien Claims and may only be transferred together with the First Lien Claims.

Each RO Participant shall be committed to participate for its full amount of Rights and to fund RO Term Loans in accordance with the RO Procedures.  Each RO Participant will receive (i) the RO Participant Takeback Term Loan Allocation and (ii) the RO Common Shares.  Upon exercise of the Rights by the RO Participants pursuant to the terms of the RO Procedures, Reorganized Avaya shall be authorized to issue the RO Term Loans and the RO Common Shares issuable pursuant to such exercise.

In exchange for consideration consisting of the RO Backstop Premium and in accordance with the RO Backstop Agreement and their respective RO Backstop Commitments, the RO Backstop Parties have committed to fully backstop, severally and not jointly, nor jointly and severally, the RO Amount and to fund the RO Backstop Term Loans.  Each RO Backstop Party shall fund up to its commitment amount of RO Term Loans and/or RO Backstop Term Loans and receive its share of the RO Backstop Shares and RO Premium Shares.  The RO Backstop Premium shall be paid, in accordance with the RO Backstop Agreement and RO Backstop Agreement Approval Order, in (i) RO Premium Shares or (ii) upon the termination of the RO Backstop Agreement (except as specifically provided in the RO Backstop Agreement), in cash (as opposed to RO Premium Shares) as an Administrative Claim *pari passu* in priority with Claims arising under section 507(b) of the Bankruptcy Code by Avaya or Reorganized Avaya.

Prior to the Petition Date, the RO Common Shares, the RO Backstop Shares and the RO Premium Shares will be offered pursuant to an exemption from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act.

After the Petition Date, the RO Common Shares will be offered, issued and distributed under the Plan without registration under the Securities Act, or any state or local law requiring registration for offer and sale of a security, in reliance upon the exemption provided in section 1145(a) of the Bankruptcy Code to the maximum extent permitted

28

by law, and to the extent such exemption is not available, then the RO Common Shares will be issued and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws.

All RO Backstop Shares and RO Premium Shares will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act and will be "restricted securities" subject to transfer restrictions under the U.S. federal securities laws, as further described in the RO Procedures, the RO Backstop Agreement, and the Plan. Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Avaya in connection therewith). On the Effective Date, the rights and obligations of the Debtors under the RO Backstop Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering shall be used by the Reorganized Debtors for working capital and general corporate purposes.

3.   New Equity Interests.

Reorganized Avaya shall be authorized to issue a certain number of shares of New Equity Interests pursuant to its Governance Documents. The issuance of the New Equity Interests shall be authorized without the need for any further corporate action. On the Effective Date, the New Equity Interests shall be issued and distributed as provided for in the Description of Transaction Steps to the Entities entitled to receive the New Equity Interests pursuant to, and in accordance with, the Plan.

All of the shares of New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New Equity Interests will not be registered on any exchange as of the Effective Date.

4.   Use of Cash.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the Exit Facilities to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan.

F.      *Corporate Existence.*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

G.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in

29

the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Cancellation of Existing Agreements and Interests.*

On the Effective Date, except with respect to the Exit Facilities or to the extent otherwise provided in the Plan, including in Article V.A hereof, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; *provided*, *however*, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agents shall continue in effect solely for purposes of allowing the DIP Agents to (i) enforce its rights against any Person other than any of the Released Parties, pursuant and subject to the terms of the DIP Orders and the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement, (ii) receive distributions under the Plan and to distribute them to the Holders of the Allowed DIP Claims, in accordance with the terms of DIP Orders and the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement, (iii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed DIP Claims, in accordance with the terms of DIP Orders and the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement, and (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to either of the DIP Agents or Holders of the DIP Claims under the Plan, as applicable.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.

Any credit agreement or other instrument that governs the rights, claims, and remedies of the Holder of a Claim shall continue in full force and effect for purposes of allowing Holders of Allowed Claims to receive distributions under the Plan.

If the record holder of the Notes is DTC or its nominee or another securities depository or custodian thereof, and such Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

I.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the Governance Term Sheet; (3) the issuance and distribution of the New Equity Interests; (4) implementation of the Restructuring Transactions, including the Rights Offering; (5) entry into the Exit Facilities Documents; (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (7) adoption of the Governance Documents; (8) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (9) the reservation of the Management Incentive Plan Pool; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Governance Documents, the Exit Facilities, and the Exit Facilities Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments

30

relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

*J.        Governance Documents.*

On or immediately prior to the Effective Date, the Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Governance Term Sheet, as may be necessary to effectuate the transactions contemplated by the Plan.  Each of the Reorganized Debtors will file its Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The Governance Documents will prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the Governance Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

On the Effective Date, Reorganized Avaya shall enter into and deliver the New Stockholders Agreement and the Registration Rights Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Holders of New Equity Interests shall be deemed to have executed the New Stockholders Agreement and Registration Rights Agreement and be parties thereto, without the need to deliver signature pages thereto.

*K.        Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of Avaya and HoldCo shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the Governance Documents.  The New Board shall consist of members as designated in accordance with the Governance Term Sheet.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Governance Documents and other constituent documents of the Reorganized Debtors.

*L.        Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

*M.        Certain Securities Law Matters*

The offering of any New Equity Interests (including the RO Common Shares, the Backstop Shares, the RO Premium Shares, and the DIP Commitment Shares) before the Petition Date shall be exempt from the registration requirements of the Securities Act in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

The offering, issuance, and distribution of the New Equity Interests (other than the RO Backstop Shares, RO Premium Shares, DIP Commitment Shares and any New Equity Interests underlying the Management Incentive Plan), as contemplated by Article III of this Plan, after the Petition Date, shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S., state, or local law requiring registration prior to the offering, issuance, distribution, or sale of securities in accordance with, and pursuant to, section

1145 of the Bankruptcy Code, and to the extent such exemption is not available, then such New Equity Interests will be offered, issued and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws. Such New Equity Interests, to the extent offered, issued and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely tradeable and transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments.

The RO Backstop Shares, RO Premium Shares and DIP Commitment Shares will be offered, issued and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or reliance on Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. The New Equity Interests underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and will be considered "restricted securities."

The New Equity Interests will be subject to any restrictions in the Governance Documents to the extent applicable. Recipients of the New Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New Equity Interests.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including DTC and any transfer agent for the New Equity Interests) with respect to the treatment of the New Equity Interests to be issued under the Plan under applicable securities laws. DTC and any transfer agent for the New Equity Interests shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including DTC and any transfer agent for the New Equity Interests) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity Interests to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

*N.     Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego

the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      *Employment Obligations.*

Unless otherwise provided herein, and subject to Article V of the Plan, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date; *provided* that, it is agreed and understood that the consummation of the Restructuring Transactions and the Plan and any associated organization changes shall not constitute a "change in control" or "change of control" or other similar event under any such agreement, arrangement, program, plan, or policy.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. On the Effective Date, the Reorganized Debtors shall (a) assume all employment agreements, indemnification agreements, or other agreements entered into with current employees; *provided* that it is agreed to and understood that the consummation of the Restructuring Transactions and the Plan and any associated organization changes shall not constitute a "change in control" or "change of control" or other similar event under any such agreement, arrangement, program, plan, or policy; or (b) enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employee.

P.      *Management Incentive Plan.*

As soon as reasonably practicable following the Effective Date, the New Board shall adopt the Management Incentive Plan, which will be on the terms and conditions (including any and all awards granted thereunder) determined by the New Board (including, without limitation, with respect to participants, allocations, duration, timing, and the form and structure of the equity and compensation thereunder); *provided* that, if applicable, the MIP Pre-Emergence Allocation Pool may be allocated prior to the Effective Date to recruit new executives to be hired to serve in key senior management positions after the Effective Date, subject to such terms and conditions (including, without limitation, with respect to form, allocation, structure, duration, timing, and extent of issuance and vesting) determined by, in each case, the Required Consenting Stakeholders in consultation with the Chief Executive Offer.

Q.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including the Preserved Claims (other than the Preserved Tranche B-3 Claims, which shall be released upon the Effective Date), whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

R.      *DTC Eligibility*

The Debtors and the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to promptly make the New Equity Interests eligible for deposit with DTC.

S.      *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption of Executory Contracts and Unexpired Leases.*

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.      *Indemnification Obligations.*

Subject to section 510 of the Bankruptcy Code, the treatment of Section 510 Claims under this Plan and to the fullest extent permitted under applicable law (including being subject to the limitations of the Delaware General Corporation Law, including the limitations contained therein on a corporation's ability to indemnify officers and directors), all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment

34

bankers, and other professionals of, or acting on behalf of, the Company Parties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties than the indemnification provisions in place prior to the Effective Date; *provided* that nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.  For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

C.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Claims and Noticing Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary. All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a Non-HoldCo General Unsecured Claim or HoldCo General Unsecured Claim, as applicable, pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

D.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or Reorganized Debtors, for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

35

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.D shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable

thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date (or of a designee designated by a Holder of First Lien Claims); (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

37

For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, which shall receive distributions in accordance with the applicable procedures of DTC.

3.   Minimum Distributions.

No fractional shares of New Equity Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual distribution of shares of New Equity Interests shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Equity Interests to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.

4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property shall be discharged and forever barred.

E.   *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.   *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

G.   *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.   *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.  Additionally, and without limiting the foregoing, interest shall not

accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.       *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

J.       *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.       *Claims Paid or Payable by Third Parties.*

1.   Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is fully repaid.

2.   Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein

39

(including Article III of the Plan), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process*.

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed Non-HoldCo General Unsecured Claims under the Plan and as otherwise required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.  All Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with Article Article V.C.  Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.D of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

Any objections to Claims and Interests other than Non-HoldCo General Unsecured Claims shall be served and Filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.

All Claims and Interests other than Non-HoldCo General Unsecured Claims not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any Non-HoldCo General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any Non-HoldCo General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any Non-HoldCo General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such Non-HoldCo General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

41

Nothing in this Plan or the Chapter 11 Cases shall in any way be construed to discharge, release, limit, or relieve any party for any fiduciary breach related to the hourly pension plan. PBGC and the hourly pension plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of this Plan.

**B.      *Release of Liens.***

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**C.      *Releases by the Debtors.***

**As of the Effective Date and subject to (i) the settlement set forth in Article IV.B of the Plan, as applicable, (ii) the Preserved Claims (other than the Preserved Tranche B-3 Claims), which shall not be included in this Release, and (iii) the completion of that certain investigation commenced by, and under the direction and authority of, the Audit Committee, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors and the Estates, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan (including the Preserved Tranche B-3 Claims), the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the RSA, the Restructuring Transactions, the Renegotiated RingCentral Contracts, the Governance Documents, the RO Backstop Agreement, the RO Documents, the DIP Facilities, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

42

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (i) other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date, from any claim or Cause of Action with respect to (a) the repurchase, redemption, or other satisfaction by any Company Party of HoldCo Convertible Notes previously held by such Released Party prior to the Petition Date or (b) the marketing, arrangement, syndication, issuance, or other action or inaction with respect to the incurrence of the B-3 Term Loans or the Secured Exchangeable Notes) or (ii) from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release (including the release of the Preserved Tranche B-3 Claims), which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      *Releases by Third Parties Other than the Settlement Group Releasing Parties.*

As of the Effective Date and subject to (i) the Preserved Claims (other than the Preserved Tranche B-3 Claims), which shall not be included in this release, and (ii) the completion of that certain investigation commenced by, and under the direction and authority of, the Audit Committee, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the RSA, the Restructuring Transactions, the Renegotiated RingCentral Contracts, the Governance Documents, the RO Backstop Agreement, the RO Documents, the DIP Facilities, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Facilities Documents and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

43

**Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (i) other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date, from any claim or Cause of Action with respect to (a) the repurchase, redemption, or other satisfaction by any Company Party of HoldCo Convertible Notes previously held by such Released Party prior to the Petition Date or (b) the marketing, arrangement, syndication, issuance, or other action or inaction with respect to the incurrence of the B-3 Term Loans or the Secured Exchangeable Notes) or (ii) from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.**

*E.      Releases by the Settlement Group Releasing Parties.*

**As of the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Settlement Group Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Settlement Group Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the RSA, the Restructuring Transactions, the Renegotiated RingCentral Contracts, the Governance Documents, the RO Backstop Agreement, the RO Documents, the DIP Facilities, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Facilities Documents and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained in the Plan to the contrary, but subject in all respects to the immediately following sentence, the Settlement Group Release shall include any and all claims and Causes of Action alleged in, or related to, that certain Summons with Notice filed in the Supreme Court of the State of New York, New York County, Index Number: 650626/2023, which shall be deemed released with prejudice by the Settlement Releasing Parties, in their capacity as such, and withdrawn upon the occurrence of the Effective Date. Notwithstanding the foregoing, (a) to the extent the largest Holder of Secured Exchangeable Notes Claims in the Akin Ad Hoc Group as of the Petition Date commences a lawsuit against any Entity that is not otherwise released under the Plan on account of, or related to, a Secured Exchangeable Notes Claim, a Settlement Group Releasing Party that is also a Holder**

of a Secured Exchangeable Notes Claim as of the Petition Date shall be permitted to commence a lawsuit seeking the same relief, solely in its capacity as such with respect to such Secured Exchangeable Notes Claim, (b) to the extent a Holder or group of Holders holding at least 25% of the amount of B-3 Term Loan Claims as of the Petition Date commences a lawsuit against any Entity that is not otherwise released under the Plan on account of, or related to, a B-3 Term Loan Claim, a Settlement Group Releasing Party that is also a Holder of a B-3 Term Loan Claim as of the Petition Date shall be permitted to commence a lawsuit seeking the same relief, solely in its capacity as such with respect to such B-3 Term Loan Claim, and (c) to the extent a Holder or group of Holders holding at least 50% of the amount of Legacy Term Loan Claims or Legacy Notes Claims, as applicable, in the aggregate as of the Petition Date commences a lawsuit against any Entity that is not otherwise released under the Plan on account of, or related to, a Legacy Term Loan Claim or a Legacy Notes Claim, as applicable, a Settlement Group Releasing Party that is also a Holder of Legacy Term Loan Claims or Legacy Notes Claim, as applicable, as of the Petition Date shall be permitted to commence a lawsuit seeking the same relief, solely in its capacity as such with respect to such Legacy Term Loan Claim or Legacy Notes Claim, as applicable; provided, for the avoidance of doubt, no Settlement Group Releasing Party shall bring any claims or Causes of Action against any Entity in respect of any HoldCo Convertible Notes Claims or in respect of any Claims previously owned by such Settlement Group Releasing Party prior to the Petition Date but not owned as of the Petition Date.  Notwithstanding anything in this Settlement Party Release, any member of the PW Ad Hoc Group as of the Petition Date shall only be a Settlement Group Releasing Party with respect to its HoldCo Convertible Notes Claims.

### F.    Exculpation.

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Restructuring Transactions, the Renegotiated RingCentral Contracts, the Governance Documents, the RO Backstop Agreement, the RO Documents, the DIP Facilities, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, and all other Definitive Documents, the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action (including, for the avoidance of doubt, any Claim or Cause of Action with respect to (i) the repurchase, redemption, or other satisfaction by any Company Party of HoldCo Convertible Notes previously held by such Released Party prior to the Petition Date or (ii) the marketing, arrangement, syndication, issuance, or other action or inaction with respect to the incurrence of the B-3 Term Loans or the Secured Exchangeable Notes) in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

### G.    Injunction.

Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or

continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, Article VIII.E, and Article VIII.F hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

*H.*     *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*I.*     *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

*J.*     *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.   the RSA shall not have been terminated as to all parties thereto and shall be in full force and effect;

2.   the Bankruptcy Court shall have entered the DIP Orders and the Final DIP Order shall be in full force and effect;

3.   the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the RSA, and the Confirmation Order shall have become a Final Order;

4.   the Renegotiated RingCentral Contracts shall be in full force and effect and shall be assumed prior to or contemporaneously with the occurrence of the Effective Date;

5.   the 2023 PBGC Settlement shall have been approved by the Bankruptcy Court (including pursuant to the Confirmation Order) and be in full force and effect;

6.   the RO Backstop Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and be in full force and effect;

7.   the Rights Offering (including the RO Procedures) shall have been approved by the Bankruptcy Court and shall have been consummated in accordance with its terms;

8.   the Definitive Documents shall (i) be consistent with the RSA and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the RSA, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent with the RSA and the Restructuring Term Sheet;

9.   all authorizations, consents, regulatory approvals, rulings, actions, documents, and agreements necessary to implement and consummate the Plan shall have been obtained, effected, and executed;

10.  the Exit Facilities Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Required Consenting Stakeholders), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

11.  the New Equity Interests shall have been issued;

12.  all Restructuring Expenses shall have been paid in full; and

13.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring.

B.      *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX may be waived in whole or in part at any time by the Debtors only with the prior written consent of the Required Consenting Stakeholders (email shall suffice),

47

without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan and to the extent permitted by the RSA, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the RSA, and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Notwithstanding anything to the contrary herein, the Debtors shall not amend or modify the Plan in a manner inconsistent with the RSA, the RO Backstop Agreement, the consent rights (if any) set forth in the DIP Facilities Documents, or for so long as the RSA has not been terminated as to all parties to the RSA, the settlement set forth in Article IV.B as in effect on the date hereof.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the RSA (including the consent, approval, and consultation rights set forth therein), the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

48

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

49

12.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.  enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.  determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

15.  enter an order concluding or closing the Chapter 11 Cases;

16.  adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.  hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22.  hear and determine all disputes involving the obligations or terms of the Rights Offering and the RO Backstop Agreement;

23.  enforce all orders previously entered by the Bankruptcy Court; and

24.  hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the Exit Facilities Documents shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.*  *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

50

B.      *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the RSA, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.  <u>if to the Debtors, to</u>:

        Avaya Holdings Corp.
        2605 Meridian Parkway
        Durham, NC 27713
        Attention:  Shefali Shah, Chief Administrative Officer and Vito Carnevale, General Counsel and
        Email address:  sashah@avaya.com; vcarnevale@avaya.com;

        with copies to:

51

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua Sussberg, P.C., Aparna Yenamandra, and Rachael M. Bentley
E-mail address:  joshua.sussberg@kirkland.com; aparna.yenamandra@kirkland.com;
rachael.bentley@kirkland.com;

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Patrick J. Nash
E-mail address:  patrick.nash@kirkland.com

2.   if to a member of the PW Ad Hoc Group, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 6th Avenue
New York, NY 10019
Attention: Andrew N. Rosenberg; Brian Hermann; Brian Bolin; Joe Graham; Douglas Keeton; Xu Pang
E-mail address:  arosenberg@paulweiss.com; bhermann@paulweiss.com; bbolin@paulweiss.com; jgraham@paulweiss.com; dkeeton@paulweiss.com; xpang@paulweiss.com

3.   if to a member of the Akin Ad Hoc Group, to:

Akin Gump Strauss Hauer & Feld
One Bryant Park
New York, NY 10036
Attention:  Ira Dizengoff; Philip Dublin; Naomi Moss
Email address:  idizengoff@akingump.com; pdublin@akingump.com; nmoss@akingump.com

4.   if to a Holder of Secured Exchangeable Notes, to:

Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
Attention: Sidney P. Levinson; Emily MacKay
E-mail address:  slevinson@debevoise.com; efmackay@debevoise.com

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

52

I.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://www.kccllc.net/avaya or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, subject to the terms of the RSA, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, *provided* that any such deletion or modification must be consistent with the RSA and the RO Backstop Agreement and the consent rights contained in each of them; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement

54

was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*Remainder of page intentionally left blank.*]

Dated:  February 14, 2023

AVAYA INC.
on behalf of itself and all other Debtors


By: /s/ *Eric Koza*
    Name:  Eric Koza
    Title: Chief Restructuring Officer