**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AVAYA INC., *et al.*,[1] | ) | Case No. 23-90088 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF FIRST AMENDED PLAN
SUPPLEMENT FOR THE DEBTORS' JOINT PREPACKAGED PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

On March 15, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Plan Supplement for the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 300] (the "Plan Supplement") with the United States Bankruptcy Court for the Southern District of Texas (the "Court") in support of the *Joint Prepackaged Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 325] (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "Plan").[2]

On March 22, 2023, the Court entered the *Order Approving the Debtors' Disclosure Statement for, and Confirming, the Joint Prepackaged Plan of Reorganization of Avaya Inc. and Its Debtor Affiliate*s [Docket No. 350] (the "Confirmation Order").

The Debtors hereby file this amendment to the Plan Supplement (this "First Amended Plan Supplement") in support of the Plan.

The First Amended Plan Supplement includes the following documents, as may be modified, amended, or supplemented at any time on or before the Effective Date of the Plan:

| | |
|---|---|
| **Exhibit A** | Governance Documents |
| **Exhibit A-1** | Redline to Previously Filed Form of Governance Documents |
| **Exhibit B** | Members of the New Board |
| **Exhibit B-1** | Redline to Previously Filed Members of the New Board |
| **Exhibit D** | Exit Facilities Documents |

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/avaya.  The location of Debtor Avaya Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 350 Mount Kemble Avenue, Morristown, New Jersey 07960.

[2]   Capitalized terms used but not defined in herein have the meanings given to them in the Plan.

| | |
|---|---|
| **Exhibit D-1** | Redline to Previously Filed Form of Exit Facilities Documents |
| **Exhibit E** | Description of Transaction Steps |
| **Exhibit E-1** | Redline to Previously Filed Draft Description of Transaction Steps |
| **Exhibit F** | Rejected Executory Contract and Unexpired Lease List |
| **Exhibit F-1** | Redline to Previously Filed Draft Rejected Executory Contract and Unexpired Lease List |

The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan and/or the RSA, to alter, amend, modify, or supplement the First Amended Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan; *provided* that if any document in this First Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Effective Date, the Debtors will file a redline of such document with the Court.

The documents contained in the First Amended Plan Supplement are integral to, and are considered part of, the Plan.

Copies of the Plan and Disclosure Statement are accessible now, free of charge, on the Debtors' restructuring website, http://www.kccllc.net/avaya.   Copies of the Plan and the Disclosure Statement may also be obtained upon request of the Debtors' co-counsel, Kirkland & Ellis LLP and Jackson Walker LLP, at the respective addresses specified herein.  The Plan and Disclosure Statement are also available for inspection for a fee on PACER at www.pacer.gov (account required) and will be on file with the Clerk of the Court, 5th Floor, 515 Rusk Street, Houston, Texas 77002, where they will be available for review between the hours of 8:00 a.m. to 5:00 p.m., prevailing Central Time.

Copies of all documents filed in these chapter 11 cases are available free of charge by visiting http://www.kccllc.net/avaya.  You may also obtain copies of any pleadings by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

Houston, Texas
Dated:  April 28, 2023

*/s/  Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Genevieve M. Graham (TX Bar No. 24085340)
Emily Meraia (TX Bar No. 24129307)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:         mcavenaugh@jw.com
               rchaikin@jw.com
               ggraham@jw.com
               emeraia@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra P.C. (admitted *pro hac vice*)
Rachael M. Bentley (admitted *pro hac vice*)
Andrew Townsell (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com
               aparna.yenamandra@kirkland.com
               rachael.bentley@kirkland.com
               andrew.townsell@kirkland.com

-and-

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          patrick.nash@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Service**

I certify that on April 28, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh

Matthew D. Cavenaugh

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AVAYA INC., *et al.*,[1] | ) | Case No. 23-90088 (DRJ) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) |  |

**FIRST AMENDED PLAN SUPPLEMENT FOR
THE DEBTORS' JOINT PREPACKAGED PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**Table of Contents**[2]

| | |
|---|---|
| **Exhibit A** | Governance Documents |
| **Exhibit A-1** | Redline to Previously Filed Form of Governance Documents |
| **Exhibit B** | Members of the New Board |
| **Exhibit B-1** | Redline to Previously Filed Members of the New Board |
| **Exhibit D** | Exit Facilities Documents |
| **Exhibit D-1** | Redline to Previously Filed Form of Exit Facilities Documents |
| **Exhibit E** | Description of Transaction Steps |
| **Exhibit E-1** | Redline to Previously Filed Draft Description of Transaction Steps |
| **Exhibit F** | Rejected Executory Contract and Unexpired Lease List |
| **Exhibit F-1** | Redline to Previously Filed Draft Rejected Executory Contract and Unexpired Lease List |

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/avaya.  The location of Debtor Avaya Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 350 Mount Kemble Avenue, Morristown, New Jersey 07960.

[2]  Capitalized terms used but not defined in herein have the meanings given to them in the Plan.

## Exhibit A

### Governance Documents

Certain documents, or portions thereof, contained in this **Exhibit A** and the First Amended Plan Supplement remain subject to continued review by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Required Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the First Amended Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this First Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Effective Date, the Debtors will file a redline of such document with the Bankruptcy Court.

**Exhibit A(i)**

**Stockholders' Agreement**

**STOCKHOLDERS' AGREEMENT**

dated as of

May 1, 2023

by and among

**AVAYA HOLDINGS CORP.**

and

**CERTAIN OTHER PERSONS NAMED HEREIN**

**TABLE OF CONTENTS**

PAGE

ARTICLE 1 Definitions.................................................................................................... 5
    Section 1.01.  *Definitions* .......................................................................................... 5
    Section 1.02.  *Other Definitional and Interpretative Provisions* ................................... 14

ARTICLE 2 Governance ................................................................................................ 14
    Section 2.01.  *Board of Directors* ........................................................................... 14
    Section 2.02.  *Board Expenses*................................................................................. 17
    Section 2.03.  *Board Meetings* ................................................................................. 18
    Section 2.04.  *Notice of Meeting; Agenda* ............................................................... 18
    Section 2.05.  *Other Governing Document Provisions*............................................... 18
    Section 2.06.  *Directors' and Officers' Insurance* .................................................... 19
    Section 2.07.  *No Liability for Board Designees* ...................................................... 19
    Section 2.08.  *Board Committees*............................................................................. 19
    Section 2.09.  *Related Party Transactions*............................................................... 19
    Section 2.10.  *Actions Requiring Stockholder Consent* ........................................... 19
    Section 2.11.  *Actions Requiring Special Board Consent*.......................................... 20

ARTICLE 3 Initial Public Offering; Strategic Alternatives ............................................. 21
    Section 3.01.  *Initial Public Offering*...................................................................... 21
    Section 3.02.  *Strategic Alternatives* ....................................................................... 21

ARTICLE 4 Tag-Along Rights......................................................................................... 21
    Section 4.01.  *Tag-Along Rights* ............................................................................. 21

ARTICLE 5 Preemptive Rights ....................................................................................... 25
    Section 5.01.  *Preemptive Rights* ............................................................................ 25
    Section 5.02.  *Excluded Issuances* .......................................................................... 27

ARTICLE 6 Information Rights; Delivery of Information.................................................. 28
    Section 6.01.  *Information Rights* ........................................................................... 28
    Section 6.02.  *Delivery of Information; Confidentiality* ............................................ 28

ARTICLE 7 Certain Covenants and Agreements.............................................................. 29
    Section 7.01.  *Confidentiality*................................................................................. 29
    Section 7.02.  *Irrevocable Proxy and Power of Attorney* ........................................ 31
    Section 7.03.  *Transfer Restrictions; Permitted Transferees*.................................... 31
    Section 7.04.  *Compliance with Law; Policies and Procedures*.................................. 35

i

ARTICLE 8 Miscellaneous..................................................................................... 35

Section 8.01.   *Binding Effect; Assignability; No Third Party Beneficiaries* ................... 35

Section 8.02.   *Notices*.................................................................................... 36

Section 8.03.   *Waiver; Amendment*................................................................ 36

Section 8.04.   *Effectiveness; Termination; Survival* ........................................ 38

Section 8.05.   *Governing Law*........................................................................ 38

Section 8.06.   *Jurisdiction; Service of Process*................................................ 38

Section 8.07.   *WAIVER OF JURY TRIAL*......................................................... 38

Section 8.08.   *Specific Performance* .............................................................. 39

Section 8.09.   *Counterparts* .......................................................................... 39

Section 8.10.   *Entire Agreement* ................................................................... 39

Section 8.11.   *Severability* ........................................................................... 39

Section 8.12.   *Further Assurances* ................................................................ 39

Section 8.13.   *Aggregation of Shares*............................................................. 39

Section 8.14.   *Calculation of Ownership* ....................................................... 40

Section 8.15.   *Independent Agreement by the Stockholders* ............................ 40

Schedule 1     Initial Directors
Exhibit A       Joinder Agreement
Exhibit B       Form of Transfer Certificate

## STOCKHOLDERS' AGREEMENT

This STOCKHOLDERS' AGREEMENT, dated as of May 1, 2023 (this "**Agreement**"), is adopted and entered into by and among (i) Avaya Holdings Corp., a Delaware corporation (the "**Corporation**"), (ii) each of the holders of Common Stock (as defined below) as of the date hereof and (iii) any other Person (as defined below) who shall at any time be a party to or bound by this Agreement as a result of the execution and delivery to the Corporation of a Joinder, substantially in the form attached hereto as Exhibit A (a "**Joinder**"), in accordance with the terms hereof (the Persons described in clauses (ii) and (iii), collectively, the "**Stockholders**").

## RECITALS

WHEREAS, the Corporation and certain of its direct and indirect Subsidiaries agreed to implement the transactions contemplated by that certain Restructuring Support Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms), dated as of February 14, 2023 by commencing voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, pursuant to that certain *Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to chapter 11 of the Bankruptcy Code* (the "**Plan**") confirmed by the Bankruptcy Court in the jointly administered cases captioned *In re Avaya Inc., et al.,* Case No. 23-90088 (DRJ), pursuant to an order dated March 22, 2023, Docket No. 350 (the "**Confirmation Order**"), the Corporation has agreed as of the Plan Effective Date (as defined below) to, among other things, issue shares of Common Stock to certain providers of financing to and certain creditors of the Corporation, including the issuance of shares of Common Stock pursuant to a one hundred and fifty million dollar ($150,000,000) debt rights offering offered to and backstopped by certain creditors of the Corporation;

WHEREAS, the Plan and/or the Confirmation Order provides that this Agreement shall be effective and binding in accordance with its terms and conditions upon all holders of Common Stock as of the date hereof, who shall be deemed to have executed this Agreement; and

WHEREAS, pursuant to the Plan, the Corporation and the Stockholders are authorized to enter into this Agreement to establish certain rights and obligations with respect to the composition of the Corporation's Board of Directors (the "**Board**" and, each director on such Board, a "**Director**") and other matters relating to the Common Stock and the corporate governance of the Corporation.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and intending to be legally bound, the Corporation and each of the other parties hereby agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.  *Definitions*.

(a)  As used in this Agreement, the following terms have the following meanings:

"**Affiliate**" means, when used with reference to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person, or where such Person owns twenty percent (20%) or more of the voting control of such specified Person. For purposes of this definition, an "Affiliate" of a Stockholder shall include any investment fund, alternative investment vehicle, special purpose vehicle or holding company that (i) is directly or indirectly managed, advised, sub-advised or controlled by such Stockholder or any Affiliate of such Stockholder, (ii) is managed, advised or sub-advised by the same investment adviser as, or an Affiliate of the investment adviser of, such Stockholder or (iii) is a party to a derivative or participation transaction with such Stockholder pursuant to which there is a transfer of the economics of ownership of securities to or from such Stockholder; *provided*, *however*, that (x) other than for purposes of Section 2.09, an Affiliate shall not include any portfolio company of any Person (including any Stockholder) nor any Corporate Entity, (y) limited partners, non-managing members or other similar direct or indirect investors in a Stockholder (in their capacities as such) shall not be deemed to be Affiliates of such Stockholder and (z) neither the Corporation nor any of its controlled Affiliates shall be deemed an Affiliate of any of the Stockholders (and vice versa). The term "**Affiliated**" shall have a correlative meaning.

"**Anti-Corruption Laws**" means the Foreign Corrupt Practices Act of 1977, and the rules and regulations thereunder, the UK Bribery Act 2010 and the Canadian Corruption of Foreign Public Officials Act, in each case, as amended, and, with respect to a Person, any other Laws, rules, and regulations of any jurisdiction applicable to such Person or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"**Anti-Money Laundering Laws**" means all applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the money laundering statutes of all jurisdictions in which the Corporation and its Subsidiaries operate (and the rules and regulations promulgated thereunder) and any related or similar Law.

"**Apollo**" means Apollo Global Management, Inc. and/or certain of its Affiliates, including, but not limited to, Apollo Capital Management X, LLC, Apollo Management X, L.P., Apollo Investment Management Europe S.á r.l., Apollo Advisors X, L.P., Blackcomb Debt Holdings, L.P. and AP Avenue Holdings, L.P.

"**beneficial ownership**" or "**beneficially own**" means beneficial ownership as determined pursuant to Rule 13d-3 and Rule 13d-5 under the Exchange Act.

"**Brigade**" means Brigade Capital Management, L.P. together with its Affiliates and Related Funds.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Bylaws**" means the Third Amended and Restated Bylaws of the Corporation, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with their terms.

"**Capital Stock**" means the capital stock of the Corporation.

"**Certificate of Incorporation**" means the Second Amended and Restated Certificate of Incorporation of the Corporation, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

"**Common Stock**" means the shares of common stock, par value $0.01 per share, of the Corporation.

"**Competitor**" means any Person that is a direct competitor of the Corporation, as determined by the Board acting in good faith (and the Board may determine that any Person that would otherwise be a Competitor is not a "Competitor"); *provided*, *however*, that, with respect to any Stockholder, the ownership of Securities of or involvement with a portfolio company engaged in competitive activities shall not be deemed to result in such Stockholder being deemed a Competitor.

"**Convertible Securities**" means any Securities that are convertible or exercisable into, or exchangeable for, Common Stock.

"**Corporate Entity**" means the Corporation and any of the Corporation's Subsidiaries.

"**Corporation Securities**" means any Capital Stock (including Common Stock) or equity interests of the Corporation, including the Common Stock, and any other security exercisable or convertible into or exchangeable for such Capital Stock or equity interests of the Corporation, including any security, bond, note, indebtedness, warrant, option or other right or instrument exercisable for or exchangeable or convertible into such Capital Stock or equity interests.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Exit ABL Facility Credit Agreement**" means that certain ABL Facility Credit Agreement, dated as of May 1, 2023, by and among the Corporation, the lending institutions from time to time parties thereto, the lending institutions named therein as L/C Issuers and Swing Line Lenders and Citibank, N.A.

"**Exit Term Loan Facility Credit Agreement**" means that certain Term Loan Facility Credit Agreement, dated as of May 1, 2023, by and among the Corporation, Avaya LLC, a Delaware limited liability company, the lending institutions from time to time parties thereto and Wilmington Savings Fund Society, FSB.

"**GAAP**" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession that are in effect from time to time, applied on a consistent basis for the periods involved.

"**Governing Documents**" means this Agreement, the Certificate of Incorporation and the Bylaws and, except with respect to Section 8.03 of this Agreement, any similar organizational documents of Subsidiaries of the Corporation.

"**Governmental Approval**" means the approval of any Governmental Authority, or the completion of required prior notice filings with any Governmental Authority.

"**Governmental Authority**" means any government of any nation, state, city, locality or other political subdivision thereof, whether federal, national, international, regional, provincial, state, tribal, local, foreign or multinational, entity or official exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any of the foregoing, or corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"**Indebtedness**" means with respect to any Person, without duplication, any liability of such Person (a) for borrowed money, whether current or funded, secured or unsecured, or with respect to deposits or advances of any kind, (b) incurred or assumed as the deferred purchase price of assets, property or services (but excluding trade accounts payable arising in the ordinary course of business), (c) evidenced by notes, bonds, debentures or other similar instruments, (d) for the reimbursement of any obligor on any banker's acceptance, letter of credit, performance bond or similar credit transaction, (e) for indebtedness of others guaranteed by such Person to the extent of such guarantee or arrangement and (f) for indebtedness of any other Person of the type referred to in clauses (a), (b), (c), (d) and (e) of this definition which is secured by any lien on any property or asset of such first referred to Person, the amount of such indebtedness referred to in this clause (f) being deemed to be the lesser of the value of such property or asset or the amount of the indebtedness so secured to the extent of such security interest. Except as otherwise provided in this definition of "Indebtedness", the amount of Indebtedness of any Person at any date shall be (i) the outstanding principal amount of all unconditional obligations described above and interest, as such amount would be reflected on a balance sheet prepared in accordance with GAAP, and (ii) with respect to all contingent obligations described above, the maximum liability as of such date of such Person for any guarantees of Indebtedness for borrowed money of any other Person and the amount required under GAAP to be accrued with respect to any other contingent obligation.

"**Independent Director**" means a Director who (a) shall not be (i) an employee of any Stockholder, (ii) an employee of any Corporate Entity or (iii) a "professional director" whose primary occupation is to serve on boards of directors, and (b) shall be determined to be "independent" (as such term is defined by the corporate governance standards of the New York Stock Exchange) and to have relevant industry experience (or be an audit committee financial expert as such term is defined in Item 407 of Regulation S-K issued by the SEC or any applicable successor provision), in each case, as determined in good faith by the Board.

"**Initial Public Offering**" means any of (i) an initial Public Offering of shares of Common Stock pursuant to an effective registration statement under the Securities Act, (ii) a single transaction or series of related transactions by a merger, acquisition or other business combination involving the Corporation and a publicly traded special purpose acquisition company or other similar entity in which a class of capital stock of the special purpose acquisition company or other similar entity (or its successor) is publicly traded on a National Securities Exchange or (iii) any other transaction or series of related transactions following consummation of which the shares of Common Stock are listed and traded on a National Securities Exchange or an established non-United States securities exchange; *provided* that an Initial Public Offering shall not include any issuance of shares of Common Stock solely to existing holders of Corporation Securities or employees or consultants of any Corporate Entity on Form S-4, Form F-4 or Form S-8 (or any successor form adopted by the SEC or any comparable form adopted by any foreign securities regulators).

"**Investment Company Act**" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"**Law**" means any applicable statute, law, rule, regulation, ordinance, code, policy or rule of common law issued, administered or enforced by any Governmental Authority, or any judicial or administrative interpretation thereof including the rules of any stock exchange.

"**Majority Stockholder Approval**" means an affirmative vote by any Stockholder or group of Stockholders with an aggregate Ownership Percentage of greater than fifty percent (50%); *provided*, *that*, for the avoidance of doubt, unless expressly provided for otherwise in this Agreement, "Stockholders" as used in this definition of "Majority Stockholder Approval" shall be defined as "each of the holders of Common Stock as of the date hereof and any other holder of Common Stock who shall at any time be a party to or bound by this Agreement as a result of the execution and delivery to the Corporation of a Joinder".

"**Management Incentive Plan**" means a management incentive plan adopted and approved by the Board.

"**National Securities Exchange**" means the New York Stock Exchange, NYSE American, the Nasdaq Global Select Market, the Nasdaq Global Market, the Nasdaq Capital Market or another U.S. national securities exchange registered with the SEC.

"**Nuveen**" means Nuveen Asset Management, LLC together with its Affiliates, including but not limited to Teachers Advisors, LLC.

"**Ownership Percentage**" means, with respect to any Stockholder or group of Stockholders, a fraction (a) the numerator of which is the total number of shares of outstanding Common Stock beneficially owned by such Stockholder or group of Stockholders (together with their respective Affiliates and Related Funds) at such time (without duplication) and (b) the denominator of which is the total number of shares of outstanding Common Stock held by all Stockholders at such time, in each case, excluding, for purposes of this calculation, (i) any shares of Common Stock issuable upon the exercise, conversion or exchange of Convertible Securities, (ii) any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan and

8

held by an employee or Director of the Corporation, and (iii) any shares that constitute an Excluded Issuance (as defined below) pursuant to clauses (b), (d) and (e) under the definition of Excluded Issuances.

"**Person**" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Plan Effective Date**" shall mean the Effective Date (as defined in the Plan).

"**Public Offering**" means any sale or distribution to the public of a Corporation Security or other equity Security of any of the Corporation's Subsidiaries pursuant to an offering registered under the Securities Act, whether by the Corporation, by a Subsidiary, by Stockholders and/or by any other holders of such Corporation Security or other equity Security of any of the Corporation's Subsidiaries.

"**Qualified IPO**" means a firm commitment underwritten Initial Public Offering of Common Stock that provides for at least an aggregate of three hundred seventy-five million dollars ($375,000,000) in gross proceeds to the Corporation and/or any selling stockholders and, immediately after such Initial Public Offering, the Common Stock is quoted or listed for trading on a National Securities Exchange.

"**Registration Rights Agreement**" means that certain registration rights agreement, dated as of the date hereof, by and among the Corporation and the Stockholders party thereto, as the same may be amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time in accordance with its terms.

"**Related Fund**" means with respect to any Person, any fund, account or investment vehicle that is controlled, managed, sub-managed, advised or sub-advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, sub-investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, sub-investment manager, advisor or sub-advisor.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated February 14, 2023, by and among the Company Parties (as defined therein) and the other signature parties thereto.

"**Rights Holder**" means, at the time of determination, a Stockholder (together with its Affiliates and Related Funds) whose Ownership Percentage equals or exceeds two percent (2.0%).

"**Sale Transaction**" means the occurrence of any of the following: (a) the direct or indirect sale, lease, transfer, exclusive license, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation, whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Corporation and its Subsidiaries (taken as a whole) or (b) the consummation of any transaction or series of transactions (including any merger or consolidation, whether by operation of law or otherwise), the result of which is that any Person or "group" (as defined under Section 13 of the Exchange Act) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Corporation

9

Securities or of the membership or other equity interests of any surviving entity of any such merger or consolidation; *provided*, *however*, that, a Sale Transaction shall not be deemed to have occurred in the case of clause (a), if such Sale Transaction is completed in connection with the internal restructuring of the Corporation and the resulting owner(s) of the assets of the Corporation are, directly or indirectly, the same Stockholders who owned such assets prior to such Sale Transaction.

"**Sanctions**" means any sanctions administered or enforced by the U.S. government (including, without limitation, the U.S. Department of the Treasury's Office of Foreign Assets Control or the U.S. Department of State), the United Nations Security Council, the European Union, His Majesty's Treasury or other applicable jurisdiction.

"**Sculptor**" means Sculptor Capital LP, solely on behalf of its and its Affiliates' Related Funds.

"**SEC**" means the United States Securities and Exchange Commission or any successor governmental agency.

"**Securities**" means "securities" as defined in Section 2(a)(1) of the Securities Act and includes, with respect to any Person, capital stock or other equity interests issued by such Person or any options, warrants or other Securities that are directly or indirectly convertible into, or exercisable or exchangeable for, capital stock or other equity interests issued by such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Selection Committee**" means the selection committee of the Board, initially consisting of one representative from each of Apollo, Brigade, Nuveen and Sculptor, subject to adjustment pursuant to Section 2.01(a)(iv).

"**Significant Holder**" means, at the time of determination, a Stockholder (together with its Affiliates and Related Funds) whose Ownership Percentage equals or exceeds five percent (5%).

"**Subsidiary**" means, with respect to a Person, any entity required to be consolidated with such Person in such Person's books and records pursuant to GAAP, or any corporation, general or limited partnership, limited liability company, joint venture or other entity in which such Person (a) owns, directly or indirectly, fifty percent (50%) or more of its outstanding voting securities, equity interests, profits interest or capital interest, (b) is entitled to elect at least one-half of the board of directors or similar governing body or (c) in the case of a limited partnership or limited liability company, is a general partner or managing member and has the power to direct the policies, management and affairs of such entity, respectively.

"**Tag-Along Pro Rata Portion**" means with respect to any Tag-Along Offeree, a number of shares of Common Stock determined by multiplying (a) the number of shares of outstanding Common Stock beneficially owned by the applicable Tag-Along Offeree immediately prior to the Tag-Along Transfer by (b) a fraction, (i) the numerator of which is the number of shares of outstanding Common Stock proposed to be Transferred by the Tag-Along Seller in connection with the Tag-Along Transfer and (ii) the denominator of which is the aggregate number of shares of outstanding Common Stock beneficially owned by all Stockholders immediately prior to the

10

Tag-Along Transfer, excluding, for purposes of this calculation, (x) any shares of Common Stock issuable upon the exercise, conversion or exchange of Convertible Securities, (y) any shares of Common Stock not beneficially owned by such Tag-Along Offeree (together with its Affiliates and Related Funds) at such time, and (z) any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan.

"**Third Party**" means a prospective purchaser(s) of the Corporation, Corporation Securities, or any of the Corporation's direct or indirect assets, in each case, other than any Significant Holder or Affiliate or Related Fund thereof.

"**Trade Control Laws**" means applicable Laws related to (a) export controls, including the U.S. Export Administration Act of 1979, as amended, the U.S. Export Administration Regulations, the Arms Export Control Act, the U.S. International Traffic In Arms Regulations, and (b) customs or import controls, including those administered by U.S. Customs and Border Protection.

"**Transfer**" means any direct or indirect, transfer, sale, assignment, pledge, hypothecation or other disposition of any Corporation Securities, whether voluntary or involuntary, or any agreement to transfer, sell, assign, pledge, hypothecate or otherwise dispose of any Corporation Securities, including (a) any such transfer, sale, assignment, pledge, hypothecation, disposition by operation of law or otherwise to an heir, successor or assign, (b) a derivative transaction or the transfer of any equity interests in any direct or indirect holding company holding Corporation Securities or the issuance and redemption by any such holding company of its securities, or (c) any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Corporation Securities, whether any such transaction described in clause (a), (b) or (c) above is to be settled by delivery of Capital Stock or such other securities, in cash or otherwise; *provided*, *however*, that, (i) subject to customary pledge requirements, a grant of or existence of a security interest or encumbrance over any Corporation Securities that is required by any bank or financial institution shall not be deemed to be a Transfer unless and until any enforcement of remedies in respect of such security interest or encumbrance that results in any Person other than such Stockholder becoming the beneficial owner of such Corporation Securities; (ii) with respect to any Stockholder that is a widely held "investment company" as defined in the Investment Company Act or any publicly traded company whose Securities are registered under the Exchange Act, a transfer, sale, assignment, pledge, hypothecation, or other disposition of ownership interests in such investment company or publicly traded company shall not be deemed to be a Transfer; and (iii) with respect to any Stockholder that is a private equity fund, hedge fund or similar vehicle, any transfer of limited partnership or other similar non-control interest in any entity which is a pooled investment vehicle holding other material investments and which is an equityholder (directly or indirectly) of a Stockholder, or the change in control of any general partner, manager or similar person of such entity, shall not be deemed to be a Transfer for purposes hereof, so long as any such transfer pursuant to clause (i), (ii) or (iii) above (x) is not with the purpose of circumventing the Transfer provisions of this Agreement and (y) does not impact the Stockholder's control of the applicable Corporation Securities. The terms "**Transferee**", "**Transferor**", "**Transferred**", "**Transferring**" and other forms of the word "**Transfer**" shall have correlative meanings.

"**Voting Power**" means the total number of votes of the applicable Voting Shares.

11

"**Voting Shares**" means any outstanding shares of Capital Stock entitled to vote for the election of Directors to the Board.

(b)      Each of the following terms is defined in the page set forth opposite such term:

Accelerated Acquirer ................................................................................................ 26
Accelerated Issuance Notice ..................................................................................... 26
Accredited Investor ................................................................................................... 26
Affiliate ...................................................................................................................... 5
Agreement .................................................................................................................. 4
Anti-Corruption Laws ................................................................................................ 5
Anti-Money Laundering Laws ................................................................................... 5
Apollo ........................................................................................................................ 5
Apollo Director ........................................................................................................ 15
Bankruptcy Code ....................................................................................................... 4
Bankruptcy Court ....................................................................................................... 4
beneficial ownership .................................................................................................. 5
beneficially own ......................................................................................................... 5
Board .......................................................................................................................... 4
Brigade ....................................................................................................................... 5
Brigade Director ....................................................................................................... 16
Business Day .............................................................................................................. 6
Bylaws ........................................................................................................................ 6
Capital Stock .............................................................................................................. 6
CEO Director ........................................................................................................... 16
Certificate of Incorporation ....................................................................................... 6
Chairperson .............................................................................................................. 17
Common Stock ........................................................................................................... 6
Competitor .................................................................................................................. 6
Confidential Information .......................................................................................... 29
Confirmation Order .................................................................................................... 4
Convertible Securities ................................................................................................ 6
Corporate Entity ........................................................................................................ 6
Corporation ................................................................................................................ 4
Corporation Securities ............................................................................................... 6
Data Site ................................................................................................................... 28
Director ...................................................................................................................... 4
Exchange Act ............................................................................................................. 6
Excluded Issuance .................................................................................................... 27
Exit ABL Facility Credit Agreement ........................................................................ 6
Exit Term Loan Facility Credit Agreement ............................................................... 6
GAAP .......................................................................................................................... 7
Governing Documents ................................................................................................ 7
Governmental Approval .............................................................................................. 7
Indebtedness ............................................................................................................... 7
Independent Director .................................................................................................. 7
Initial Public Offering ................................................................................................ 8

12

Investment Company Act ............................................................................................ 8
Issuance Notice ........................................................................................................ 25
Joinder ........................................................................................................................ 4
Law ............................................................................................................................. 8
Majority Stockholder Approval ................................................................................. 8
Management Incentive Plan ....................................................................................... 8
National Securities Exchange ..................................................................................... 8
Nuveen ........................................................................................................................ 8
Nuveen Director ....................................................................................................... 16
Ownership Percentage ................................................................................................ 8
Person ......................................................................................................................... 9
Plan ............................................................................................................................. 4
Plan Effective Date ..................................................................................................... 9
Preemptive Shares .................................................................................................... 25
Prohibited Transfer ................................................................................................... 24
Public Offering ........................................................................................................... 9
Qualified IPO ............................................................................................................. 9
Related Fund ............................................................................................................... 9
Related Party ............................................................................................................ 19
Related Party Agreement .......................................................................................... 19
Representatives ......................................................................................................... 29
Restructuring Support Agreement .............................................................................. 9
Rights Holder ............................................................................................................. 9
Sale Transaction ......................................................................................................... 9
Sanctions .................................................................................................................. 10
Sculptor .................................................................................................................... 10
SEC ........................................................................................................................... 10
Securities .................................................................................................................. 10
Securities Act ........................................................................................................... 10
Selection Committee ................................................................................................ 10
Selection Committee Director ................................................................................... 15
Significant Holder .................................................................................................... 10
Stockholders ............................................................................................................... 4
Strategic Alternatives ............................................................................................... 21
Subsidiary ................................................................................................................ 10
Tag-Along Notice ..................................................................................................... 22
Tag-Along Offeree .................................................................................................... 21
Tag-Along Per Share Consideration ......................................................................... 22
Tag-Along Pro Rata Portion ..................................................................................... 10
Tag-Along Sellers ..................................................................................................... 21
Tag-Along Transfer ................................................................................................... 21
Tagging Stockholder ................................................................................................. 22
Termination Event ..................................................................................................... 38
Third Party ................................................................................................................ 11
Trade Control Laws ................................................................................................... 11
Transfer ..................................................................................................................... 11

Unexercised Tag-Along Portion ................................................................................................. 22
Voting Power ............................................................................................................................ 11
Voting Shares........................................................................................................................... 12

Section 1.02.  *Other Definitional and Interpretative Provisions.* The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized term used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof; *provided* that with respect to any agreement or contract listed on any Schedules hereto, all such amendments, modifications or supplements must also be listed in the appropriate Schedule. References to any Law include all rules and regulations promulgated thereunder. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent and no rule of strict construction shall be applied against any party hereto. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto to express their mutual intent and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement, nor shall any rule of strict construction be applied against any party hereto. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action may be deferred until the next Business Day.

## ARTICLE 2
### GOVERNANCE

Section 2.01.  *Board of Directors.*

(a)      From and after the date hereof, the Board shall consist of nine (9) Directors, who for the initial term beginning on the Plan Effective Date are the Directors set forth on Schedule 1 hereto.  From and after the date hereof, and subject to modification pursuant to this Section 2.01(a), the term for each Director shall be two (2) years for the initial term beginning on the Plan Effective Date and one (1) year for each term thereafter.  At each meeting of Stockholders at which Directors

14

are to be elected, and whenever the Stockholders act by written consent with respect to the election of Directors, each Stockholder agrees to vote, or cause to be voted, all Voting Shares beneficially owned by such Stockholder, or over which such Stockholder otherwise has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of Stockholders at which an election of Directors is held or pursuant to any written consent of the Stockholders:

    (i)    Apollo Directors; Selection Committee Directors.

    A.    If at any time following the date which is twelve (12) months after the Plan Effective Date, Apollo's Ownership Percentage is at least fifty percent (50%), five (5) Directors designated by Apollo shall be elected to the Board (any such Director designated by Apollo, an "**Apollo Director**"), one of whom shall be an Independent Director, and one (1) Director designated by the Selection Committee shall be elected to the Board (any such Director designated by the Selection Committee, a "**Selection Committee Director**").

    B.    If at any time following the date which is twelve (12) months after the Plan Effective Date, Apollo's Ownership Percentage is at least thirty-five percent (35%) but less than fifty percent (50%), four (4) Apollo Directors shall be elected to the Board, one of whom shall be an Independent Director, and two (2) Selection Committee Directors shall be elected to the Board.

    C.    If at any time Apollo's Ownership Percentage is at least seventeen and five-tenths percent (17.5%) but less than thirty-five percent (35%), three (3) Apollo Directors shall be elected to the Board, one of whom shall be an Independent Director, and three (3) Selection Committee Directors shall be elected to the Board.

    D.    If at any time Apollo's Ownership Percentage is at least ten percent (10%) but less than seventeen and five-tenths percent (17.5%), two (2) Apollo Directors shall be elected to the Board, and four (4) Selection Committee Directors shall be elected to the Board.

    E.    If at any time Apollo's Ownership Percentage is at least five percent (5%) but less than ten percent (10%), one (1) Apollo Director shall be elected to the Board, and five (5) Selection Committee Directors shall be elected to the Board.

    F.    If at any time the Ownership Percentage of Apollo is less than five percent (5%), (i) there shall be no Apollo Directors, and one director seat shall be elected by either Majority Stockholder Approval or by a majority of the remaining Directors and (ii) five (5) Selection Committee Directors shall be elected to the Board.

    (ii)    Brigade Director; Nuveen Director.

    A.    If at any time following the date which is twelve (12) months after the Plan Effective Date, Brigade's Ownership Percentage is at least five percent (5%), one (1) Director designated by Brigade shall be elected to the Board (any

15

such Director designated by Brigade, a "**Brigade Director**"). If at any time the Ownership Percentage of Brigade is less than five percent (5%), there shall cease to be a Brigade Director, and such director seat shall be elected by either Majority Stockholder Approval or by a majority of the remaining Directors.

B. If at any time following the date which is twelve (12) months after the Plan Effective Date, Nuveen's Ownership Percentage is at least five percent (5%), one (1) Director designated by Nuveen shall be elected to the Board (any such Director designated by Nuveen, a "**Nuveen Director**"). If at any time the Ownership Percentage of Nuveen is less than five percent (5%), there shall cease to be a Nuveen Director, and such director seat shall be elected by either Majority Stockholder Approval or by a majority of the remaining Directors.

(iii)    CEO Director. At all times, the then-serving Chief Executive Officer of the Corporation shall be elected to the Board, so long as such Person is employed as the Chief Executive Officer of the Corporation (the "**CEO Director**").

(iv)    If at any time the Ownership Percentage of any of Apollo, Brigade, Nuveen or Sculptor is less than four and one-half percent (4.5%), then the member of the Selection Committee selected by such Stockholder shall no longer be a member of the Selection Committee and such Stockholder shall no longer have the right to appoint a member of the Selection Committee.

(v)    Each of Apollo, Brigade, Nuveen and the Selection Committee shall endeavor to (A) select Directors with an appropriate skillset and (B) consider diversity guidelines and corporate governance best practices when exercising their respective designation rights set forth in this Section 2.01(a). For the avoidance of doubt, in no event shall the foregoing sentence limit any of Apollo, Brigade, Nuveen and the Selection Committee's right to select any individual as a Director.

(vi)    For the avoidance of doubt, each of Apollo, Brigade and Nuveen shall be entitled to its respective Director appointment rights set forth in this Section 2.01(a) regardless of the ownership levels of the other parties.

(b)    Upon any vacancy on the Board arising as a result of the death, disability, retirement, resignation or removal of a Director designated by any of the Stockholders pursuant to Section 2.01(a), the first order of business at any meeting of the Board shall be to hold a vote with respect to the election of the replacement Director designated by such Stockholder or Stockholders, as applicable, in accordance with Section 2.01(a) and for so long as such designating Stockholder or Stockholders, as applicable, maintains its Director designation rights in accordance with Section 2.01(a). In the event that such designating Stockholder or Stockholders, as applicable, no longer has such a right to designate a Director pursuant to Section 2.01(a), then such replacement Director shall be appointed by a majority of the remaining Directors.

(c)    If for any reason the CEO Director shall cease to serve as the CEO, then a majority of the other Directors shall convene a meeting of the Board or take action by written consent on the removal of the former CEO from the Board and/or the appointment of a new Director. Each of

16

the Directors (excluding the CEO Director) shall, furthermore, at any meeting of the Board or by written consent if requested: (i) if the CEO Director does not resign from the Board, vote to remove the former CEO from the Board; and (ii) vote to elect such Person's replacement as CEO as the new CEO Director. For the avoidance of doubt, the removal or election of the CEO Director is determined by a majority of the Board.

(d)      In furtherance of the foregoing, the Corporation and the Board shall, subject to and consistent with the Board's fiduciary duties and applicable Law, take such actions as necessary to cause the foregoing Directors to be nominated and submitted to the Stockholders for election to the Board, or appointed to the Board by the remaining members of the Board, or removed from the Board as the case may be, in any annual or special meeting of the Stockholders or by any action by written consent to elect Directors in lieu thereof, or to remove them as the case may be.

(e)      For the initial Board, any Selection Committee Director shall be designated by unanimous approval by the Selection Committee.  Following the initial Board, the Selection Committee Directors appointed pursuant to this Section 2.01 shall be designated by agreement of at least three of the four members of the Selection Committee.  In the event that a member of the Selection Committee ceases to be a member of the Selection Committee pursuant to Section 2.01(a)(iv), then the appointment of Selection Committee Directors shall be by agreement of at least two of the three members of the Selection Committee.  On the earliest to occur of (x) the fourth anniversary of the Plan Effective Date and (y) such time the Selection Committee consists of only two members, the Selection Committee shall be disbanded, and the Selection Committee Directors shall be elected by vote of holders of a majority of the Voting Power.

(f)      The Chairperson of the Board (the "**Chairperson**") shall be determined by a majority vote of the Board; *provided*, that following the initial Board term, the Chairperson of the Board shall neither be the CEO Director nor be an employee of a Stockholder.

(g)      After the date of an Initial Public Offering and subject to the relevant rules of a National Securities Exchange (or an established non-U.S. securities exchange on which the Common Stock is listed following an Initial Public Offering), the parties hereto shall work together in good faith and in consultation with the underwriters of the Initial Public Offering, if any, to enter into a customary nomination or other similar agreement with Apollo, Brigade, Nuveen and Sculptor to memorialize the Director designation rights set forth herein.

(h)      Notwithstanding anything to the contrary set forth herein, none of Apollo, Brigade, Nuveen or Sculptor shall have the right to veto or object to the appointment or removal of any Directors, except for with respect to their own appointed Director(s) and voting "no" with respect to a proposed Selection Committee Director in accordance with the terms and conditions applicable to Selection Committee Directors.

Section 2.02.  *Board Expenses*. Any Director who is not an employee of the Corporation shall be entitled to be paid such reasonable fees to be determined by a majority vote of the Board in connection with such Director's membership on the Board and, if approved by the Board, any committee of the Board. In addition, each Director shall be entitled to reimbursement of his or her reasonable and documented out-of-pocket expenses incurred by such Director in connection with

17

his or her attendance at meetings of the Board or any committees thereof, and any such meetings of the board of directors of any Corporate Entity and any committee thereof.

Section 2.03.   *Board Meetings.*

(a)      Regular meetings of the Board shall be held at such dates, times and places as the Board shall from time to time determine. From and after the date hereof, attendance by a majority of the total number of Directors then in office shall constitute a quorum for any meeting of the Board, which majority shall include at least one (1) Apollo Director for so long as Apollo has the right to appoint a Director. If a quorum is not present within an hour of the time appointed for the Board meeting, the Directors present may adjourn the Board meeting to a specified place and time not less than two (2) Business Days or more than five (5) Business Days after the original date. Notice of any adjourned meeting shall be given to all Directors. At any such adjourned meeting, a majority of the total number of Directors then in office shall constitute a quorum. Special meetings of the Board may be called at any time by the Board, the Chairperson or by Stockholders that beneficially own at least twenty-five percent (25%) of the Voting Power then outstanding by delivering, or causing the Corporation to deliver, the notice required by Section 2.04. Each special meeting shall be held at such date, time and place, as shall be fixed by the Board, the Chairperson or Stockholders calling the meeting.

(b)      In the event that any Apollo Director entitled to vote is absent from a meeting of the Board or if there is a vacancy in the Apollo Directors entitled to vote at any time when there is at least one (1) Apollo Director entitled to vote (for example, if Apollo has only designated two (2) of four (4) Apollo Directors entitled to vote), then the vote of each of the absent and/or vacant Apollo Directors entitled to vote may be voted by the Apollo Director that is entitled to vote and present at the applicable meeting (in a manner acceptable to the Apollo Director that is entitled to vote and present at the applicable meeting), and in such event any such absent and/or vacant Apollo Director entitled to vote shall be counted as present in the determination of whether a quorum of the Board exists.

Section 2.04.   *Notice of Meeting; Agenda.* Each Director (by email or otherwise) shall be given notice of the time, date and place of and the agenda for each meeting of the Board or any committee thereof at least two (2) Business Days prior to such meeting, which required notice may be waived by any Director in writing (which may be by email) before or after the meeting, and shall be deemed to be waived by a Director's attendance at a meeting (unless solely for the purpose of objecting to the lack of required notice). Where exigent circumstances are deemed by the Chairperson to exist, he or she may call a special meeting of the Board by notice given at least twenty-four (24) hours prior to the meeting. The agenda for any meeting of the Board or committee thereof shall include any matter requested to be included therein by any Director in advance of circulation of such agenda or at the relevant meeting itself.

Section 2.05.   *Other Governing Document Provisions.* Each Stockholder agrees to vote all of its Voting Shares or execute proxies or written consents, as the case may be, and to take all other actions necessary, to ensure that the other Governing Documents (a) do not at any time conflict with any provision of this Agreement and (b) permit each Stockholder to exercise the express rights to which each such Stockholder is entitled under this Agreement.

Section 2.06.   *Directors' and Officers' Insurance.* The Corporation will purchase and will use its reasonable best efforts to maintain director and officer liability insurance in such amounts and such limits as reasonably determined by the Board on behalf of any Person who is or was a member of the Board against any claims asserted against him or her or incurred by him or her in any capacity as such, whether or not the Corporation would have the power to indemnify him or her against that liability under any of the Governing Documents.

Section 2.07.   *No Liability for Board Designees.* No Stockholder, nor any Affiliate of any Stockholder, shall have any liability as a result of nominating or designating a Director for any act or omission by such Director in his or her capacity as a Director.

Section 2.08.   *Board Committees.* Composition of the committees of the Board shall be determined by the Board; *provided*, *however*, that for so long as Apollo maintains its Director designation rights in accordance with Section 2.01(a), Apollo shall have the right to appoint one Director as a member of any committees established by the Board; *provided, further*, that no committee established pursuant to this Section 2.08 shall consist of a majority of Apollo Directors that are employed by Apollo. Notwithstanding anything to the contrary set forth herein, if the purpose of such committee is to review and approve a Related Party Agreement (as defined below) involving one of the nominating or designating parties, such nominating or designating party's Director shall not be represented on such committee.

Section 2.09.   *Related Party Transactions*.   The Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, enter, amend or renew an agreement, arrangement or transaction with (a) any Affiliate of the Corporation (other than a wholly-owned direct or indirect Subsidiary of the Corporation) or (b) any Person that constitutes a Significant Holder or an Affiliate of such Person (each of the Persons described in clauses (a) and (b), a "**Related Party**" and any such agreement or transaction, a "**Related Party Agreement**"), excluding (i) a transaction or series of related transactions involving less than two million dollars ($2,000,000) in aggregate payments if made in the ordinary course of business and consistent with past practice with a portfolio company of such Stockholder or its Affiliates and on an arm's-length basis and (ii) debt financings with respect to which all holders of Common Stock are offered the opportunity to participate on a pro rata basis on the same terms, and equity or equity-linked financings offered in accordance with Section 5.01 hereof and Article XII of the Certificate of Incorporation, in each case, unless such Related Party Agreement is (x) on an arm's-length basis and (y) approved by a majority of the disinterested Directors that are not affiliated with, or designated by, the Related Party or any of its Affiliates or Related Funds (including, for the avoidance of doubt, any fund employee Directors); *provided*, *however*, (I) that any issuance of Corporation Securities in accordance with the terms of Article 5, other than any Excluded Issuance pursuant to clause (b), (d) or (e) under the definition of Excluded Issuances, shall be deemed not to be a Related Party Agreement and (II) with respect to a Sale Transaction to a Related Party (the "**Acquiring Related Party**"), any Related Party Agreement with the Acquiring Related Party in connection with such Sale Transaction shall be approved by the affirmative vote of Stockholders with aggregate Voting Shares of greater than fifty percent (50%) of the total issued and outstanding shares of Common Stock, exclusive of Voting Shares held by the Acquiring Related Party and its Affiliates.

Section 2.10.   *Actions Requiring Stockholder Consent*.

19

(a)    As long as Apollo's Ownership Percentage is at least twenty-five percent (25%), and prior to the consummation of a Qualified IPO, the Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions without the approval of Apollo, in its capacity as a Stockholder:

(i)    create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to any Indebtedness in excess of one hundred million dollars ($100,000,000);

(ii)    make distributions or pay dividends (whether in cash or in-kind) on any outstanding Corporation Securities;

(iii)    consummate a Sale Transaction; or

(iv)    consummate any acquisition or disposition (whether of a sale of stock or assets, disposition of assets, merger or consolidation) of the Corporation or any of its Subsidiaries, in each case, in a transaction or series of related transactions involving total consideration in excess of one hundred million dollars ($100,000,000).

(b)    As long as Apollo's Ownership Percentage is at least twenty-five percent (25%), and prior to the consummation of a Qualified IPO, the Board shall in good faith consult with Apollo reasonably in advance of the termination or hiring of a Chief Executive Officer, and Apollo shall be entitled to recommend candidates to the Board for consideration in connection with any hiring process for a replacement Chief Executive Officer during such consultation period.

(c)    Prior to the consummation of an Initial Public Offering, the Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions without the approval of Stockholders holding at least seventy-five percent (75%) of the issued and outstanding shares of Common Stock (excluding Excluded Issuances):

(i)    non-pro rata redemptions or reclassifications of the Capital Stock (other than any redemptions or repurchases made by departing employees or other services providers); or

(ii)    the declaration of distributions or dividends on the Capital Stock other than on a pro rata basis based on ownership of the Capital Stock.

(d)    None of Apollo, Brigade, Nuveen or Sculptor shall have any veto or approval right with respect to the Corporation's budget, business plan or strategic investments. Notwithstanding the foregoing, the provisions of this Section 2.10(d) shall not limit the rights of Apollo, Brigade, Nuveen or Sculptor with respect to any Director designation rights or any rights of their respective Director designees to vote on the Corporation's budget, business plan or strategic investments.

Section 2.11.  *Actions Requiring Special Board Consent*.  During the eighteen (18) month period following the Plan Effective Date, if the liquidity (including any lines of credit) of the Corporation is greater than $450,000,000, subject to the terms and conditions of this Agreement, including without limitation, Section 2.09 and Section 5.01, the Corporation may issue Common Stock or any other Corporation Security only upon the approval of a majority of the Independent

20

Directors, except for issuances or sales of any Corporation Securities pursuant to a Management Incentive Plan and any other employee benefits or similar employee or management equity incentive plans or arrangements of the Corporation or any other Corporate Entity.

## ARTICLE 3
### INITIAL PUBLIC OFFERING; STRATEGIC ALTERNATIVES

Section 3.01.  *Initial Public Offering*.  Following the twenty-four (24) month anniversary of the Plan Effective Date, the Board shall take commercially reasonable efforts to commence a process to confidentially evaluate and consider the undertaking of an Initial Public Offering.

Section 3.02.  *Strategic Alternatives*.  At any time following the fourth anniversary of the Plan Effective Date, one or more Stockholders collectively holding at least a majority of the total issued and outstanding shares of Common Stock (excluding Excluded Issuances) shall have the right to elect to cause the Board to undertake a process to confidentially consider strategic alternatives for the business of the Corporation that would provide liquidity to the holders of Common Stock, including retaining financial, legal and other advisors to evaluate such alternatives ("**Strategic Alternatives**"), subject to the following exceptions:

(a)     In no event shall any Stockholder in connection with any such Strategic Alternative be required to sell its shares of Common Stock in a secondary offering (if the Strategic Alternative is an IPO).

(b)     In the event such Strategic Alternative is structured as a direct listing or primary offering Initial Public Offering, such Strategic Alternative shall be subject to approval by the Board.

(c)     In the event such election occurs after the fourth anniversary of the Plan Effective Date but prior to the fifth anniversary of the Plan Effective Date, the Board may elect to delay an Initial Public Offering in its business judgment during such period.

## ARTICLE 4
### TAG-ALONG RIGHTS

Section 4.01.  *Tag-Along Rights*.

(a)     Subject to the other provisions of this Section 4.01 (including Section 4.01(j)), if any Stockholder (together with any of its Affiliates and Related Funds) proposes to Transfer to a Third Party shares of Common Stock (excluding, for purposes of this calculation, any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan) representing twenty percent (20%) or more of the then-outstanding shares of Common Stock (i) in a single transaction or series of related transactions or (ii) as part of the same disposition plan (including if acting in concert with other holders) (such holder or holders acting together, collectively, the "**Tag-Along Sellers**" and such Transfer, the "**Tag-Along Transfer**"), then each Significant Holder shall have the right to exercise tag-along rights in accordance with the terms and conditions set forth herein (any such Stockholder, a "**Tag-Along Offeree**").

21

(b)     The Tag-Along Sellers shall promptly give notice to the Corporation, and the Corporation shall, to the extent reasonably practicable, promptly give or cause to give notice pursuant to Section 8.02 (the "**Tag-Along Notice**") to each Tag-Along Offeree, at least ten (10) Business Days prior to the consummation of the proposed Tag-Along Transfer. The Tag-Along Notice shall set forth the number of shares of Common Stock proposed to be Transferred, the name of the proposed Transferees, the proposed purchase price for each share of Common Stock (the "**Tag-Along Per Share Consideration**"), and any other material terms and conditions of the Tag-Along Transfer, including an acknowledgment that any required prior approvals of the Tag-Along Transfer must be sought and obtained prior to the closing of the Tag-Along Transfer and the form of the proposed transfer agreement, if any.

(c)     Each Tag-Along Offeree shall have a period of ten (10) Business Days from the date of delivery of the Tag-Along Notice within which to elect to sell up to its Tag-Along Pro Rata Portion of shares of Common Stock for the same form and amount of consideration per share as the Tag-Along Per Share Consideration in connection with such Tag-Along Transfer. Any Tag-Along Offeree may exercise such right by delivery of an irrevocable written notice to the Tag-Along Sellers and the Corporation specifying the number of shares of Common Stock such Tag-Along Offeree desires to include in the Tag-Along Transfer (any such Tag-Along Offeree exercising such rights, a "**Tagging Stockholder**") and wire transfer or other instructions for payment of any consideration for the shares of Common Stock. Unless the proposed Transferee agrees to purchase all of the shares of Common Stock proposed to be Transferred by the Tag-Along Sellers and the Tagging Stockholders, then the total number of shares of Common Stock proposed to be Transferred by the Tag-Along Sellers and Tagging Stockholders in such Tag-Along Transfer shall be reduced by recalculating the allocation on a *pro rata* basis set forth in this paragraph assuming such smaller number of shares of Common Stock is to be Transferred.

(d)     If (i) any Stockholder other than the Tag-Along Sellers declines to exercise its tag-along rights or (ii) any Tagging Stockholder elects to exercise its tag-along rights with respect to less than such Tagging Stockholder's Tag-Along Pro Rata Portion (the number of shares of Common Stock underlying any such unexercised Tag-Along Pro Rata Portion in (i) and (ii), an "**Unexercised Tag-Along Portion**"), the Tag-Along Sellers shall promptly notify those Tagging Stockholders who have exercised their tag-along rights with respect to their full Tag-Along Pro Rata Portion. Each such Tagging Stockholder and Tag-Along Seller shall then be entitled to Transfer an additional number of its shares of Common Stock equal in aggregate to the Unexercised Tag-Along Portion and shall have a period of two (2) Business Days from the date of delivery of such notice within which to elect to exercise such Transfer. The Unexercised Tag-Along Portion shall be allocated, if necessary, among each such Tagging Stockholder and Tag-Along Seller, by multiplying the Unexercised Tag-Along Portion by a fraction the numerator of which is the number of shares of Common Stock owned by such Tagging Stockholder (or Tag-Along Seller, as the case may be), and the denominator of which is the aggregate number of shares of Common Stock owned by the Tag-Along Sellers and all such Tagging Stockholders that exercise their tag-along rights with respect to the Unexercised Tag-Along Portion. The Tag-Along Sellers shall continue to offer and allocate any such Unexercised Tag-Along Portions in accordance with the procedure set forth in the preceding sentence, until the time at which one or more Stockholders have exercised their tag-along rights with respect to the entirety of such Unexercised Tag-Along Portions. For each such successive notice, such Tagging Stockholder and Tag-Along Seller shall have a period of two (2) Business Days from the date of delivery of such

22

notice within which to elect to exercise such right to Transfer. If, after following such procedure, any Unexercised Tag-Along Portion remains outstanding and no Tagging Stockholder wishes to further exercise its tag-along rights in respect thereof, then the Tag-Along Seller shall be entitled to Transfer a further number of its shares of Common Stock equal to the Unexercised Tag-Along Portion.

(e)     Each Tagging Stockholder shall agree:

(i)     to make the same representations and warranties to the Transferees with respect to itself and related items as the Tag-Along Sellers make with respect to themselves and related items in connection with the Tag-Along Transfer;

(ii)     to the same covenants, indemnities and agreements with respect to itself and related items as agreed by the Tag-Along Sellers with respect to themselves and related items in connection with the Tag-Along Transfer; and

(iii)     to the same terms and conditions to the Transfer of shares of Common Stock as the Tag-Along Sellers agree (including bearing their proportionate share of any escrows, holdbacks or adjustments in purchase price);

*provided*, *however*, that with respect to the immediately preceding clauses (i), (ii) and (iii), all such representations, warranties, covenants, indemnities, agreements, terms and conditions must be customary for Transfers of such kind unless otherwise agreed to by Tagging Stockholders holding a majority of the Voting Power then held by all Tagging Stockholders. Such representations, warranties, covenants, indemnities, agreements, terms and conditions shall not include (i) any non-compete obligations on a Tagging Stockholder or (ii) any non-solicit obligations on a Tagging Stockholder unless such non-solicit obligation is required to consummate the Tag-Along Transfer. Such non-solicit obligations shall only apply to the Tagging Stockholder and shall in no event obligate any other parties, including such Tagging Stockholder's Affiliates and Related Funds. All such representations, warranties, covenants, indemnities, agreements, terms and conditions shall be made by each Tagging Stockholder and Tag-Along Seller severally and neither jointly nor jointly and severally.

(f)     If at the end of a 45-day period after delivery of such Tag-Along Notice (which 45-day period shall be extended if any of the transactions contemplated by the Tag-Along Notice are subject to required Governmental Approvals until the expiration of five (5) Business Days after all such Governmental Approvals have been received, but in no event later than one hundred twenty (120) days following receipt of the Tag-Along Notice by the Tag-Along Sellers), the Tag-Along Sellers have not completed the Transfer of all shares of Common Stock proposed to be sold by the Tag-Along Sellers and all Tagging Stockholders on substantially the same terms and conditions set forth in the Tag-Along Notice, then the Tag-Along Sellers shall (i) return to each Tagging Stockholder the instruments of transfer, limited power-of-attorney and all certificates and other applicable instruments representing the shares of Common Stock that such Tagging Stockholder delivered for Transfer pursuant to this Section 4.01 and any other documents in the possession of the Tag-Along Sellers executed by the Tagging Stockholders in connection with the proposed Tag-

23

Along Transfer and (ii) all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such shares of Common Stock shall continue in effect.

(g)      Promptly after the consummation of the Tag-Along Transfer, the Tag-Along Sellers shall (i) notify each Tagging Stockholder thereof, (ii) remit to each Tagging Stockholder the total consideration for the shares of Common Stock that such Tagging Stockholder Transferred pursuant thereto less such Tagging Stockholder's *pro rata* share of any escrows, holdbacks or adjustments in purchase price and any transaction expenses as determined in accordance with this Section 4.01, with the cash portion of the purchase price paid by wire transfer of immediately available funds in accordance with the wire transfer instructions provided by such Tagging Stockholder and (iii) furnish such other evidence of the completion and the date of completion of such Transfer and the terms thereof as may be reasonably requested by such Tagging Stockholder. The Tag-Along Sellers shall promptly remit to each Tagging Stockholder any additional consideration payable upon the release of any escrows, holdbacks or adjustments in purchase price.

(h)      Upon the consummation of such Tag-Along Transfer, (i) all of the Tagging Stockholders participating therein will receive the same form and amount of consideration in respect of each share of Common Stock sold by them in such Tag-Along Transfer; *provided*, *however*, that in no event shall any consideration for any financial services, such as placement or transaction fees, investment banking or investment advisory fees payable to the Tag-Along Sellers, as the case may be, or any related Person in connection with such transaction (provided that any such agreement shall have been approved as provided in Section 2.09), be included in the amount of consideration and (ii) if any Tagging Stockholders are given an option as to the form and amount of consideration to be received, all Tagging Stockholders participating therein will be given the same option.

(i)      If a Stockholder purports to sell any shares of Common Stock in contravention of this Section 4.01 (a "**Prohibited Transfer**"), each other Stockholder who desires to exercise tag-along rights in accordance with the terms and conditions set forth in this Section 4.01 may, in addition to such remedies as may be available by Law, in equity or hereunder, require the selling Stockholder to purchase from such Stockholder the type and number of shares of Common Stock that such Stockholder would have been entitled to sell in a Tag-Along Transfer had the Prohibited Transfer been effected in compliance with the terms of this Section 4.01. The sale will be made on the same terms, including, without limitation, as provided in Section 4.01(h), as applicable, and subject to the same conditions as would have applied had the selling Stockholder not made the Prohibited Transfer. Such sale (including, without limitation, the delivery of the purchase price) must be made within ninety (90) days after such Stockholder learns of the Prohibited Transfer. The selling Stockholder shall also reimburse each participating Stockholder for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the participating Stockholder's rights under this Section 4.01.

(j)      The Corporation shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Tag-Along Transfer and not to take any action which might impede, be prejudicial to or be inconsistent with, any such Tag-Along Transfer.

(k)       Except as set forth in <u>Section 4.01</u>(i), each Tagging Stockholder shall be responsible for its pro rata share (based on proceeds received in the proposed Tag-Along Transfer) of the costs and expenses incurred by the Tag-Along Sellers in connection with the Tag-Along Transfer for the benefit of all Tagging Stockholders to the extent not paid or reimbursed by the Corporation or the Third Party purchaser, unless otherwise mutually agreed by the Tag-Along Sellers.

(l)       The provisions of this <u>Section 4.01</u> shall not apply to Transfers by Stockholders to their Affiliates and Related Funds.

ARTICLE 5<br>PREEMPTIVE RIGHTS

Section 5.01.  *Preemptive Rights*.

(a)       On the terms and subject to the conditions of this <u>Article 5</u> and applicable Law, prior to an Initial Public Offering, if the Corporation or any other Corporate Entity proposes to offer, sell or issue any Corporation Securities, in each case, except for any Excluded Issuance (collectively, the "**Preemptive Shares**"), then the Corporation shall, or shall cause such Corporate Entity to, give each Rights Holder pursuant to <u>Section 8.02</u>, written notice of such proposed issuance at least ten (10) Business Days prior to the proposed issuance date (an "**Issuance Notice**"). The Issuance Notice shall specify the number of Preemptive Shares and the price (or a good faith estimate or range of estimates of the price if the final price is not then determinable) at which such Preemptive Shares are proposed to be issued and the other material terms and conditions of such Preemptive Shares and of the issuance, including the proposed issuance date. Each Rights Holder shall be entitled to purchase, at the price and on the other terms and conditions specified in the Issuance Notice, up to a number of Preemptive Shares equal to its *pro rata* portion which shall be calculated as (i) the number of Preemptive Shares proposed to be issued by the Corporation multiplied by (ii) the Ownership Percentage of such Rights Holder as of immediately prior to the proposed issuance; *provided* that if a range is provided in the Issuance Notice then each Rights Holder shall be entitled to condition such participation upon the final price being within such specified price range. A Rights Holder may, in its sole discretion, allocate its right to purchase its portion of the Preemptive Shares among its Affiliates and Related Funds, including any funds managed by such Rights Holder or its Affiliates.

(b)       A Rights Holder may exercise its right to purchase its *pro rata* portion of the Preemptive Shares by delivering written notice of its election to purchase such Preemptive Shares at the price and on the terms and conditions specified in the Issuance Notice to the Corporation within five (5) Business Days after receipt of the Issuance Notice. If, at the end of such five (5) Business Day period, any Rights Holder has not exercised its right to purchase any of its *pro rata* portion of such Preemptive Shares by delivering such notice, such Rights Holder shall be deemed to have waived all of its rights under this <u>Article 5</u> with respect to the purchase of such Preemptive Shares specified in the applicable Issuance Notice.

(c)       If any of the Rights Holders fails to exercise its right to purchase its *pro rata* portion of the Preemptive Shares, or elects to exercise such rights with respect to less than such Rights Holder's *pro rata* portion of the Preemptive Shares, the Corporation shall offer to sell to the Rights

25

Holders that have elected to purchase all of their *pro rata* portion of the Preemptive Shares any Preemptive Shares not purchased by other Rights Holders *pro rata* and at the same price and on the same terms as those specified in the Issuance Notice. Such Rights Holders shall have the right to acquire all or any portion of such additional Preemptive Shares within five (5) Business Days following the Corporation's notice of such additional Preemptive Shares.

(d)      Subject to compliance with this Article 5, the Corporation shall have ninety (90) days after the date of the Issuance Notice to consummate the proposed issuance of any or all of such Preemptive Shares that the applicable Rights Holders have elected not to purchase at the same (or higher) price and upon such other terms and conditions that, taken as a whole, are not materially less favorable to the Corporation than those specified in the Issuance Notice; *provided* that, if such issuance is subject to Governmental Approvals, such 90-day period shall be extended until the expiration of five (5) Business Days after all such Governmental Approvals have been received, but in no event to later than one hundred eighty (180) days after the date of the Issuance Notice. If the Board proposes to issue any Preemptive Shares after such 90-day period (or 180-day period, if applicable) or during such 90-day period (or 180-day period, if applicable) at a lower price or on such other terms that are, taken as a whole, materially less favorable to the Corporation, it shall again comply with the procedures set forth in this Article 5.

(e)      The closing of any issuance of Preemptive Shares to the Rights Holders pursuant to this Article 5 shall take place at the time and in the manner provided in the Issuance Notice; *provided*, *however*, that any required Governmental Approvals have first been obtained.

(f)      Notwithstanding anything to the contrary set forth herein, a Rights Holder shall not be entitled to purchase Preemptive Shares unless (i) such Rights Holder is an "accredited investor" as defined in Regulation D promulgated under the Securities Act (each, an "**Accredited Investor**") and (ii) an exemption from registration or qualification under any state Securities Laws or foreign Securities Laws applicable to the issuance of the Preemptive Shares would be available.

(g)      Notwithstanding anything to the contrary contained herein, but subject to compliance with Section 2.09, if the Board, acting in good faith, determines, whose determination shall be conclusive, that it would be in the best interests of the Corporation to issue Preemptive Shares that would otherwise be required to be offered in compliance with the provisions of this Article 5, the Corporation may, in order to expedite the issuance of the Preemptive Shares, issue all of the Preemptive Shares to one or more prospective buyers (the "**Accelerated Acquirer**"), without complying with the provisions of this Article 5, *provided* that within sixty (60) days after the occurrence of such issuance, the Corporation shall provide to each Rights Holder: (i) written notice of such issuance (an "**Accelerated Issuance Notice**") and (ii) the right to purchase such Rights Holder's *pro rata* portion of the Preemptive Shares that such Rights Holder would have been entitled to purchase, pursuant to the procedures set forth in this Article 5, had this Section 5.01(g) not been invoked.  A Rights Holder may exercise its right to purchase its *pro rata* portion of the Preemptive Shares offered pursuant to this Section 5.01(g) by delivering written notice of its election to purchase such Preemptive Shares at the price and on the terms and conditions specified in the Accelerated Issuance Notice to the Corporation within ten (10) Business Days after receipt of the Accelerated Issuance Notice.  If one or more Rights Holders exercises its right to make a purchase under this Section 5.01(g), the Corporation shall give effect to each such exercise by (x) requiring that the Accelerated Acquirer (in which case the Accelerated Acquirer hereby

26

agrees to) Transfer a portion of its Preemptive Shares to such Rights Holders, (y) issuing additional Preemptive Shares to such Rights Holders or (z) a combination of (x) and (y), so long as such action effectively provides such Rights Holders with the same amount of Preemptive Shares and resulting Ownership Percentage, on the same terms and conditions as such Preemptive Shares were issued to the Accelerated Acquirer, that such Rights Holders would have been entitled to purchase, pursuant to the procedures set forth in this Article 5, had this Section 5.01(g) not been invoked.

Section 5.02. *Excluded Issuances.* The preemptive rights under this Article 5 shall not apply to the following (each of the following, an "**Excluded Issuance**"):

(a)      (i) issuances or sales of any Corporation Securities to employees, officers, directors, managers or consultants of the Corporation or any other Corporate Entity pursuant to a Management Incentive Plan and (ii) any other employee benefits or similar employee or management equity incentive plans or arrangements of the Corporation or any other Corporate Entity, including offer letters, employment agreements, consulting agreements or appointment letters that in the case of this clause (ii) have been approved in accordance with Article 2 hereof;

(b)      issuances or sales in a bona fide joint venture, merger or reorganization of the Corporation or any other Corporate Entity with or into another Person or a bona fide acquisition by the Corporation or any other Corporate Entity of another Person or substantially all of the assets of another Person or a strategic partnership or other similar relationship (in each case, other than with a Stockholder or any of its Affiliates);

(c)      issuances to a Person or such Person's Affiliate in exchange of debt or debt Securities for previously existing Securities of the Corporation held by such Person or such Person's Affiliate;

(d)      issuances pursuant to any syndication or offering of debt, or any financing, refinancing, amendment or modification of debt (so long as not directed toward existing Stockholders or any of their Affiliates);

(e)      issuances pursuant to any private placement of warrants or other Security to purchase any form of equity interests in the Corporation on an arm's-length basis as part of a debt financing to the Corporation or its Subsidiaries by non-Affiliated (to the Company or any of its Subsidiaries) third party lenders to the extent that any of the following conditions are satisfied: (i) any participation by a Stockholder or Affiliate of any such Stockholder is through an ordinary course syndication or offering process, (ii) the issuance of Securities of the Corporation to all participants in such debt financings (including any series of debt financings) is less than, in the aggregate of all such debt financings, twenty percent (20%) of the issued and outstanding Capital Stock of the Corporation as of the date hereof or (iii) the debt financing is offered to all holders of Common Stock to participate on a pro rata basis on the same financing terms in accordance with the procedures of Section 5.01 as if such procedures applied to offerings of debt;

(f)      issuances by the Corporation or a direct or indirect wholly-owned Subsidiary of the Corporation to another direct or indirect wholly-owned Subsidiary of the Corporation;

27

(g)      issuances as a dividend or upon any stock split, reclassification, recapitalization, exchange or readjustment of Corporation Securities, or other similar transaction (in each case, on a *pro rata* basis);

(h)      issuances or sales of any Corporation Securities or other equity Security of any of the Corporation's Subsidiaries in a Qualified IPO and pursuant to any Public Offering following a Qualified IPO;

(i)      issuances upon the conversion or exercise of any Corporation Securities which Corporation Securities were (i) outstanding on the date hereof or (ii) issued in compliance with the terms and conditions of this Article 5; or

(j)      the issuances of the shares of Common Stock to the Stockholders contemplated by the Plan and the Definitive Documents (as defined in the Restructuring Support Agreement) on the Plan Effective Date.

ARTICLE 6
INFORMATION RIGHTS; DELIVERY OF INFORMATION

Section 6.01.   *Information Rights*. At all times when the Corporation is not required to file reports under Section 13 or Section 15(d) of the Exchange Act, then, subject to Section 7.01, the Corporation shall provide the following information (1) to each Stockholder that is not a Competitor and (2) to any bona fide prospective purchasers of shares of Common Stock that is not a Competitor, requests such information, and acknowledges its confidentiality obligations in respect of such information and agrees to abide by the terms of this Agreement related to Confidential Information (as defined below):

(a)      all financial information provided to, or that is required to be provided to, lenders under the Exit ABL Facility Credit Agreement in effect on the date of this Agreement and the Exit Term Loan Facility Credit Agreement in effect on the date of this Agreement, with such information rights surviving the repayment, refinancing or termination of such debt facilities; and

(b)      the information required pursuant to Rule 144(c)(2), Rule 144A(d)(4) and Section 4(d)(3) under the Securities Act, or such other information necessary to allow Stockholders to rely on Rule 144, Rule 144A and Section 4(a)(7) of the Securities Act (or any applicable successor provisions).

Notwithstanding anything to the contrary in this Section 6.01, any Stockholder may elect not to receive the information described in this Section 6.01 by written notice to the Corporation at any time, and such election shall remain in effect until such Stockholder elects to again receive the information described in this Section 6.01.

Section 6.02.   *Delivery of Information; Confidentiality*.

(a)      Documents and information required to be delivered pursuant to Section 6.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on Intralinks or another similar password-protected data site (the "**Data Site**") to which each Person that is entitled to information pursuant to Section 6.01(a)

28

shall have access; *provided*, *however*, for the avoidance of doubt, no Competitor shall be given access to the Data Site. As a condition to gaining access to the information posted on the Data Site, Persons shall be required to "click through" or take other affirmative action pursuant to which such Persons shall either (i) confirm and ratify that it is a party to, and bound by all of the terms and provisions of, this Agreement or (ii) if it is not a holder of Common Stock, acknowledge its confidentiality obligations in respect of such information.

(b)     Each Stockholder shall at all times, except as otherwise required by applicable Law, keep confidential all information provided under this Article 6 pursuant to the confidentiality provisions contained in Section 7.01 and all such information shall be deemed to be Confidential Information.

ARTICLE 7

CERTAIN COVENANTS AND AGREEMENTS

Section 7.01.  *Confidentiality*.

(a)     Each Stockholder acknowledges and agrees that without the prior written consent of the Corporation:

(i)     any information (A) provided to any Stockholder by the Corporation pursuant to this Agreement, including, pursuant to an employee serving as a Director or any information rights under Article 6, (B) disclosed by the Corporation pursuant to Article 6 and (C) regarding each of the Corporation and the other Corporate Entities, including their business, affairs, financial information, operating practices and methods, customers, suppliers, expansion plans, strategic plans, marketing plans, contracts and other business documents obtained by a Stockholder from or on behalf of the Corporation or the other Corporate Entities (collectively, "**Confidential Information**") will be kept confidential, and will not be disclosed to any Person, except that Confidential Information may be disclosed:

(1)     to such Stockholder's members, shareholders, managers, directors, officers, employees, representatives, Affiliates, advisors and agents (collectively, "**Representatives**") in the normal course of the performance of their duties or to any financial institution providing credit to such Stockholder, so long as such Person is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

(2)     to any limited partner or other investor in such Stockholder, its Affiliates or Related Funds, so long as such Person is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

(3)     to the extent required by applicable Law, rule or regulation (including complying with any oral or written questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process to which a Stockholder is subject; *provided* that such Stockholder

29

agrees to give the Corporation prompt notice of such request(s), to the extent practicable, so that the Corporation may seek an appropriate protective order or similar relief (and the Stockholder shall use its reasonable best efforts, at the Corporation's expense, to cooperate with such efforts by the Corporation));

(4)     to any Person to whom such Stockholder is contemplating a Transfer of Corporation Securities; *provided*, *however*, that such Transfer would not be in violation of the provisions of this Agreement and such potential Transferee is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

(5)     to any regulatory authority or rating agency to which the Stockholder or any of its Affiliates is subject or with which it has regular dealings; *provided* that such authority or agency is advised of the confidential nature of such information;

(6)     to the extent related to the tax treatment and tax structure of the transactions contemplated by this Agreement (including all materials of any kind, such as opinions or other tax analyses that the Corporation, its Affiliates or its Representatives have provided to such Stockholder relating to such tax treatment and tax structure); *provided* that the foregoing does not constitute an authorization to disclose the identity of any existing or future party to the transactions contemplated by this Agreement or their Affiliates or Representatives, or, except to the extent relating to such tax structure or tax treatment, any specific pricing terms or commercial or financial information; or

(7)     if the prior written consent of the Board shall have been obtained.

(b)     Notwithstanding Section 7.01(a), "Confidential Information" shall not include information that: (i) is or becomes generally available to the public other than as a result of a disclosure by the Stockholders in violation of this Section 7.01; (ii) was available to the Stockholder on a non-confidential basis prior to its disclosure by the Corporation or its Representatives; (iii) becomes available to the Stockholder on a non-confidential basis from a Person other than the Corporation and the Corporate Entities or their respective Representatives who is not known by the Stockholder to have violated a confidentiality agreement with the Corporation or the other Corporate Entities or any of their respective Representatives in respect of such information; or (iv) was independently developed by the Stockholder without reference to or use of such information;

(c)     A Stockholder shall not be required to receive Confidential Information and may decline to receive information provided pursuant to Article 6 that constitutes Confidential Information.

Section 7.02. *Irrevocable Proxy and Power of Attorney.* Each Stockholder hereby constitutes and appoints as the proxies of such Stockholder and hereby grants a power of attorney to the Board and any designee of the Board (who may be a Director or an officer of the Corporation), and hereby grants each of them with full power of substitution, not generally but only with respect to the election or removal of Persons as members of the Board in accordance with Article 2 and all matters relating to any tag-along rights pursuant to Article 4, and hereby authorizes each of them to represent and vote, if and only if the Stockholder (a) fails to vote or (b) attempts to vote (whether by proxy, in person or by written consent) in a manner that is inconsistent with the terms of this Agreement, all of such Stockholder's Voting Shares in accordance with the terms and provisions of this Agreement. Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Corporation and the Stockholders in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to Section 8.04. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Voting Shares and shall not hereafter, unless and until this Agreement terminates or expires pursuant to Section 8.04, purport to grant any other proxy or power of attorney with respect to any of the Voting Shares, deposit any of its Voting Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any other Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Voting Shares, in each case, with respect to any of the matters set forth herein. Notwithstanding the foregoing, the provisions of this Section 7.02 shall not prevent a Stockholder from Transferring its Capital Stock so long as such Transfer complies with the provisions of the Governing Documents, including Section 7.03.

Section 7.03. *Transfer Restrictions; Permitted Transferees.*

(a)     In addition to any other transfer restriction set forth in the Governing Documents, each Stockholder agrees that it shall not Transfer any of its Corporation Securities at any time if such Transfer: (i) is to a Person who is not an original party to this Agreement and has not become a party to this Agreement by executing and delivering a Joinder to this Agreement and the Registration Rights Agreement (subject to Section 7.03(e)); (ii) is to a Competitor; (iii) such Transfer does not or would not comply with U.S. federal or state Securities Laws or other applicable Securities Law, including without limitation such Securities Laws as applied to Affiliates of the Company; (iv) is prohibited pursuant to Section 7.03(b); (v) would, individually or together with other concurrently proposed Transfers, cause the Corporation to be regarded as an "investment company" under the Investment Company Act; or (vi) if applicable, would not be compliant with Article 4; *provided*, *however*, that with respect to the immediately preceding clauses (i), (ii), (iv), (v) and (vi), an otherwise prohibited Transfer shall be permitted if a majority of the disinterested members of the Board approve such Transfer. Any Transfer or attempted Transfer in violation of the provisions of this Section 7.03(a) shall be null and void *ab initio* and the Corporation (x) shall not register or effect such Transfer, (y) may institute legal proceedings to force rescission of such Transfer and (z) may seek any other remedy available to it at Law, in equity or otherwise, including an injunction prohibiting such Transfer.

(b)     Until the Corporation otherwise becomes obligated to file reports under Section 13 or Section 15(d) of the Exchange Act or upon receipt of prior written approval from the Board, no Stockholder shall Transfer any of such Stockholder's shares of Common Stock to any other Person

31

to the extent such Transfer would cause the Corporation to have, including as a result of passage of time and giving effect to the exercisable or conversion of any Corporation Securities that are convertible into or exchangeable for Common Stock, in excess of 1,950 Stockholders of record (or four-hundred-fifty (450) or more Stockholders of record who are not Accredited Investors), calculated in accordance with Section 12(g) of the Exchange Act (or fifty (50) fewer than such other numbers of Stockholders of record or shareholders as may subsequently be set forth in Section 12(g), or any successor provision, from time to time of the Exchange Act, as the minimum number of Stockholders of record or shareholders for a class of Capital Stock that would require the Company to register such class of Capital Stock under Section 12 of the Exchange Act).  The Corporation and any transfer agent for the shares of Common Stock shall be entitled to enforce this provision (including denying any requested Transfer).  The Corporation and any transfer agent for the shares of Common Stock shall determine the number of Stockholders of record from time to time in consultation with the Corporation's counsel in order to give full effect to the restriction set forth in this Section 7.03(b).  For the avoidance of doubt, any Stockholder may Transfer any or all of such Stockholder's shares of Common Stock in any Public Offering without complying with this Section 7.03(b).

(c)     In accordance with the Plan and/or the Confirmation Order, all initial holders of shares of Common Stock shall be deemed to be party to this Agreement, in privity of contract with the other parties to this Agreement, and be bound hereby, whether their ownership is recorded in a register maintained with the Corporation's transfer agent or through the facilities of DTC, without the need to execute a signature page to this Agreement. No purported Transfer of shares of Common Stock by any Stockholder to any other Person that is not a Stockholder shall be effective unless and until such Person has delivered to the Corporation an executed Joinder (it being understood that the failure of a transferee to so execute a Joinder will not invalidate any transfer occurring through DTC but the fact that such transfer occurring through DTC is not invalidated will not relieve the transferor from liability for breach for failing to require the transferee to execute a Joinder). It is acknowledged and agreed that the fact that any Stockholder is a "beneficial owner" rather than a "record holder" will not diminish its rights and obligations hereunder.

(d)     Prior to effectuating any Transfer of Corporation Securities, the Stockholder proposing to make such Transfer shall deliver to the Corporation:

(i)      the transfer certificate a form of which is attached hereto as Exhibit B;

(ii)     such information as the Corporation may reasonably request in order for the Corporation to determine in good faith that the proposed Transfer will be made in compliance with Section 7.03(a) (including information, opinions of counsel or other certifications used to determine whether any Person to whom the proposed Transfer is to be made is not a Competitor and such Transfer complies with U.S. federal or state Securities Laws or other applicable Securities Law); and

(iii)    such information as the Corporation's transfer agent may reasonably request.

(e)      Unless otherwise approved by the Board, no issuance of Capital Stock to any Person by the Corporation shall be effective unless such Person has delivered to the Corporation a Joinder, pursuant to which such Person agrees to be bound by the terms and conditions of this Agreement as if an original party hereto. Any issuance or attempted issuance in violation of this Section 7.03(e) shall be null and void *ab initio* and the Corporation (i) shall not register or effect such issuance, (ii) may institute legal proceedings to force rescission of such issuance and (iii) may seek any other remedy available to it at Law, in equity or otherwise, including an injunction prohibiting such issuance.

(f)      Notwithstanding anything contained herein to the contrary, each Stockholder may Transfer its Corporation Securities to any of its Affiliates without restriction, subject to compliance with U.S. federal or state Securities Laws or other applicable Securities Law, so long as such Transferee agrees to become a party to this Agreement by executing and delivering a Joinder (subject to Section 7.03(e)).

(g)      Legends. All certificates (if any) or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock shall conspicuously bear the applicable legends set forth below, with such changes as the Board, in its discretion, deems to be necessary and appropriate, and any other legends required by the Governing Documents. Each Stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in the Governing Documents and this Agreement (including the restrictions on Transfer set forth in this Section 7.03), whether or not any certificate or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock owned or held by such Stockholder bear the legends set forth below and whether or not any such Stockholder received a separate notice of such terms, provisions, restrictions and conditions.

(i)      Each certificate, if any, and related statements representing or otherwise evidencing shares of Common Stock issued under the Plan in reliance on the Securities Act exemption provided by Section 1145 of the Bankruptcy Code shall include a legend substantially to the following effect:

"THE SECURITIES ARE SUBJECT TO THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT OF AVAYA HOLDINGS CORP. (THE "COMPANY"), DATED AS OF MAY 1, 2023, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT, AND ALL HOLDERS OF SECURITIES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS' AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(ii)      Each certificate, if any, or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock issued in reliance on the Securities Act exemption provided by Section 4(a)(2) of the Securities Act shall include a legend substantially to the following effect:

33

"THE SECURITIES REPRESENTED BY THIS [CERTIFICATE][STATEMENT] WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT OF AVAYA HOLDINGS CORP. (THE "COMPANY"), DATED AS OF MAY 1, 2023, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT, AND ALL HOLDERS OF SECURITIES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS' AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(iii)    Each certificate, if any, or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock issued in reliance on the Securities Act exemption provided by Regulation S promulgated under the Securities Act shall include a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS [CERTIFICATE][STATEMENT] WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT OF AVAYA HOLDINGS CORP. (THE "COMPANY"), DATED AS OF MAY 1, 2023, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT, AND ALL HOLDERS OF SECURITIES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS' AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

THE HOLDER OF THE SECURITY EVIDENCED HEREBY REPRESENTS FOR THE BENEFIT OF THE ISSUER THAT IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE ACT AND IN ACCORDANCE WITH

34

THE LAWS APPLICABLE TO SUCH PURCHASER IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE."

(h)        Subject to the terms and conditions of this Agreement, including the other Sections in this Section 7.03, the Corporation shall use its commercially reasonable efforts to cooperate with any Stockholder desiring to Transfer its Corporation Securities in accordance with this Section 7.03.

(i)        For the avoidance of doubt, except (i) as otherwise provided for herein and (ii) in connection with the assignment or transfer of at least eighty percent (80%) of the respective shares of Common Stock held as of the date hereof by any of Apollo, Brigade, Nuveen or Sculptor (a "Specified Rights Transfer"), as applicable, any and all rights, privileges or preferences held by a holder of Common Stock pursuant to this Agreement, are specific to such holder of Common Stock and contained in Section 2.01 of this Agreement or any constituent definitions (the "Specified Rights") and may not be assigned or transferred and any such proposed or attempted assignment or transfer of such rights shall be null and void ab initio, and of no force or effect.  In the event of a Specified Rights Transfer, the transferee shall acquire the Specified Rights previously held by the transferor in the Specified Rights Transfer; *provided*, that the Specified Rights may be assigned or transferred under a Specified Rights Transfer only if such Stockholder has an Ownership Percentage less than fifty percent (50%) prior to consummating such Specified Rights Transfer. For the avoidance of doubt, the rights contained in Section 2.10 of this Agreement shall not constitute Specified Rights.

Section 7.04.  *Compliance with Law; Policies and Procedures*. The Corporation has implemented and maintains policies and procedures designed to ensure compliance by, and shall maintain and comply with such policies and procedures necessary in order to cause compliance by, the Corporation and its Subsidiaries and their respective Representatives, distributors, suppliers and any other Person acting for or on behalf of the Corporation or its Subsidiaries with Anti-Corruption Laws, Anti-Money Laundering Laws, Trade Control Laws and Sanctions.

ARTICLE 8

MISCELLANEOUS

Section 8.01.  *Binding Effect; Assignability; No Third Party Beneficiaries*.

(a)        This Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, successors, legal representatives and permitted assigns. Any Stockholder that ceases to beneficially own any Capital Stock shall cease to be bound by the terms hereof other than such provisions which also survive the termination of this Agreement pursuant to Section 8.04(b).

(b)        Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any party hereto pursuant to any Transfer of Capital Stock or otherwise, except that (i) any Person acquiring Capital Stock from any Stockholder in a Transfer in compliance with the transfer restrictions set forth in the Governing

35

Documents (but excluding any such Transfer made in a Public Offering, through a National Securities Exchange or through an established non-U.S. securities exchange on which the Common Stock is listed following an Initial Public Offering) and (ii) any Person, other than the Corporation or any other Corporate Entity, acquiring Capital Stock that is required or permitted by the terms of this Agreement or any employment agreement or stock purchase, option, stock option or other compensation plan of the Corporation or any other Corporate Entity to become a party hereto shall (unless already bound hereby) execute and deliver to the Corporation a Joinder and shall thenceforth be a "Stockholder" for all purposes under this Agreement.

(c)     Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 8.02.   *Notices.* All notices, consents, approvals, waivers or other communications required or permitted to be given hereunder shall be in writing and shall be: (a) delivered personally or by commercial messenger; (b) sent via a recognized overnight courier service; (c) sent by registered or certified mail, postage pre-paid and return receipt requested; (d) sent by electronic mail transmission; or (e) with respect to notices required by Article 4, Article 5, or Section 8.03, posted to the Data Site; in the case of each of clauses (a), (b), (c) and (d), so long as such notice is addressed to the intended recipient thereof as set forth below; any notice shall be deemed given upon actual receipt (or refusal of receipt):

(i)     if to the Corporation:

Avaya Holdings Corp.
350 Mt. Kemble Avenue
Morristown, NJ 07960
Attention: Vito Carnevale, General Counsel and Shefali Shah, Chief Administrative Officer
E-mail address: vcarnevale@avaya.com; sashah@avaya.com

(ii)     if to any Stockholder, at the address on file with the Corporation; *provided*, that any notice or other communications or deliveries required or permitted to be given hereunder by the Corporation to any Stockholder may be given by posting such notice, communication or delivery to the website or other digital datasite utilized by the Corporation to disseminate reports and information pursuant to Section 6.02, and shall be deemed to have been duly given on the date such posting is made, so long as such website or other digital datasite shall automatically send email notifications of new postings to any Stockholder that has complied with the applicable log-in procedures or other applicable registration requirements of such website or other digital datasite.

Any Stockholder may change its address and other notice information by notice to the Corporation given in accordance with this Section 8.02 and any other party may change its address and other notice information by notice to the other parties.

Section 8.03.   *Waiver; Amendment.*

36

(a)     Except as provided in the next sentence, no provision of this Agreement or of any other Governing Document may be amended, modified, restated or waived in any manner unless approved by (i) a majority of the Board and (ii) Stockholders holding a majority of the issued and outstanding shares of Common Stock; *provided*, *however*, that (x) any amendment, modification, restatement or waiver that has, or would have, a material and adverse effect on the rights, preferences or privileges of any holder of Common Stock in a manner that is materially disproportionate relative to the impact on one or more other Stockholders (or that disproportionately benefits one or more Stockholders relative to the rights of the other holders of Common Stock (for the avoidance of doubt, without giving effect to any Stockholder's specific holdings of Corporation Securities, specific tax or economic position or any other matters personal to a Stockholder)), shall not be effective without prior written consent of a majority of the disproportionately and adversely affected holders of Common Stock and (y) any amendment, modification, restatement or waiver of Section 2.09 (Related Party Transactions) (and any equivalent provision contained in any other Governing Document), Article 3 (Initial Public Offering; Strategic Alternatives) (and any equivalent provision contained in any other Governing Document), Section 4.01 (Tag-Along Rights) (and any equivalent provision contained in any other Governing Document), Section 5.01 (Preemptive Rights) (and any equivalent provision contained in any other Governing Document), this Section 8.03 (Waiver; Amendment) (and any equivalent provision contained in any other Governing Document), or any amendment which would impose new limitations or conditions on transferability of shares of Common Stock shall require the approval of the holders of at least seventy-five percent (75%) of the shares of Common Stock; *provided*, that any amendment to Section 2.09 (Related Party Transactions) (and any equivalent provision contained in any other Governing Document) which is favorable to Affiliates or to officers and Directors of the Corporation shall also be approved by holders of at least a majority of the issued and outstanding shares of Common Stock, excluding any such Affiliates of the Corporation. Upon any modification, amendment or restatement of this Agreement, the Corporation shall deliver to each of the Stockholders, in accordance with Section 6.02, a copy of such modification, amendment or restatement of this Agreement.

(b)     Notwithstanding Section 8.03(a), the addition of new parties to this Agreement in accordance with the terms hereof as a result of Transfers permitted in accordance with this Agreement shall not be deemed to be an amendment requiring the consent of any Stockholder.

(c)     Notwithstanding any provisions to the contrary contained herein, any party may waive any rights with respect to which such party is entitled to benefits under this Agreement; *provided* that such a waiver shall only affect the rights of the party waiving its rights.

(d)     Unless expressly specified in the terms of this Agreement, no delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any such delay, omission or waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

(e)     Any amendment or waiver effected in accordance with this Section 8.03 shall be binding upon each party to this Agreement, regardless of whether such party has signed such amendment or waiver, and each then current and future Stockholder and the Corporation.

37

Section 8.04.  *Effectiveness; Termination; Survival*.

(a)      This Agreement shall be effective as of the date hereof and shall continue in effect until the earlier of (i) the closing of a Sale Transaction in which any Significant Holder immediately prior to such Sale Transaction is no longer a Significant Holder immediately following the consummation of such Sale Transaction, (ii) an Initial Public Offering and (iii) the mutual written agreement of (A) the Corporation and (B) Stockholders holding at least seventy-five percent (75%) of the then issued and outstanding shares of Common Stock (each of clauses (i)-(iii), a "**Termination Event**"); *provided*, *however*, that in the event of any Termination Event pursuant to clause (ii) of this Section 8.04(a), the provisions of Section 2.01(a) and Section 2.10 shall survive any such Termination Event.

(b)      Upon the occurrence of a Termination Event, this Agreement shall be terminated and become void and of no force or effect without liability of any party; *provided*, *however*, no termination under this Agreement shall relieve any Person of liability for breach prior to termination. The provisions of Section 2.07 and this Article 8 shall survive any termination of this Agreement.

Section 8.05.  *Governing Law.* This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware without regard to the conflicts of laws rules of such state.

Section 8.06.  *Jurisdiction; Service of Process*. The parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the Court of Chancery of the State of Delaware, or to the extent such court does not have subject matter jurisdiction, the United States District Court for the District of Delaware, or to the extent such court also does not have subject matter jurisdiction, another court of the State of Delaware, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that notice to such party as provided in Section 8.02 shall be deemed effective service of process on such party.

Section 8.07. *WAIVER OF JURY TRIAL.* EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.08.  *Specific Performance.* The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. It is accordingly agreed that, in addition to any other applicable remedies at Law or equity, the parties shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each party hereto agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at Law or (b) an award of specific performance is not an appropriate remedy for any reason at Law or in equity. Each of the parties hereby waives (x) any defenses in any action for specific performance, including the defense that a remedy at Law would be adequate and (y) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 8.09.  *Counterparts.* This Agreement may be executed with counterparty signature pages or in any number of counterparts, each of which shall be deemed to be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by electronic mail in "portable document format" (".pdf") form or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 8.10.  *Entire Agreement.* This Agreement and the other Governing Documents constitute the entire agreement among the parties and supersede all prior and contemporaneous agreements and understandings, both oral and written, among the parties with respect to the subject matter hereof and thereof.  In the event of any conflict between this Agreement and any Governing Document, this Agreement will prevail.

Section 8.11.  *Severability.* If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 8.12.  *Further Assurances.* Each party shall cooperate and shall take such further action and shall execute and deliver such further documents as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

Section 8.13.  *Aggregation of Shares.* All Corporation Securities held by a Stockholder and its Affiliates and Related Funds shall be aggregated together for purposes of determining the availability of any rights hereunder. Notwithstanding the foregoing, in no event shall two or more Stockholders, acting separately and not on an aggregated basis, be entitled to claim beneficial ownership of the same Corporation Securities for purposes of exercising any rights hereunder, and

the Corporation shall be permitted to disregard any such claims in its good faith judgment. Upon the request of the Corporation or any transfer agent for the Corporation Securities, each Stockholder shall promptly provide to the Corporation or its transfer agent, as applicable, written confirmation (including reasonable supporting documentation) of such Stockholder's then current ownership of its Corporation Securities. In determining the ownership of such Corporation Securities for any purposes hereunder, the Corporation shall be entitled to conclusively rely in good faith on (a) the then most current ownership information provided to it by the transfer agent (including information provided by any depositary, including The Depository Trust & Clearing Corporation, or "DTC") or (b) if there is no such transfer agent, the most current ownership information then in its possession, and, in each case, any such determination made by the Corporation in reliance thereon shall be deemed final and binding on all parties.

Section 8.14.   *Calculation of Ownership.* For purposes of calculating the number of shares of Common Stock or other Corporation Securities held by a Person or group of Persons, the effects of any stock split, reclassification, recapitalization, exchange or readjustment of Corporation Securities or other similar transaction shall be disregarded to the extent occurring between the reference date and the date of measurement. For example, if a certain Stockholder is required to continue to hold fifty percent (50%) of the number of shares of Common Stock held by such Stockholder as of the date hereof in order to exercise certain rights hereunder, and a reverse stock split is consummated after the date hereof and prior to the applicable measurement date, the effects of the reverse stock split shall be disregarded in determining whether such Stockholder satisfies such ownership test.

Section 8.15.   *Independent Agreement by the Stockholders.* The obligations of each Stockholder hereunder are several and neither joint nor joint and several with the obligations of any other Stockholder, and, except as expressly set forth herein, no provision of this Agreement is intended to confer any obligations on any Stockholder vis-à-vis any other Stockholder. Nothing contained herein, and no action taken by any Stockholder pursuant hereto, shall be deemed to constitute the Stockholders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Stockholders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated herein.

[*Signature pages follow.*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date above first above written.

THE CORPORATION:

AVAYA HOLDINGS CORP.

By: _____
      Name: Rebecca A. Roof
      Title: Interim Chief Financial Officer

[*Signature Page to Stockholders' Agreement*]

STOCKHOLDER:

By:
     Name:
     Title:

[*Signature Page to Stockholders' Agreement*]

Schedule 1

Initial Directors

1.  Alan Masarek, the current CEO.

2.  Aaron Miller, as an Apollo Director.

3.  Robert Kalsow-Ramos, as an Apollo Director.

4.  Thomas Tod Nielsen, appointed by Apollo as an Independent Director.

5.  Donald E. Morgan III, as a Brigade Director.

6.  Patrick Bartels, as a Nuveen Director.

7.  Jacqueline Woods, unanimously appointed by the Selection Committee as an Independent Director.

8.  Marylou Maco, unanimously appointed by the Selection Committee as an Independent Director.

9.  Patrick Dennis, unanimously appointed by the Selection Committee as an Independent Director.

Exhibit A

Joinder Agreement

## JOINDER TO

## STOCKHOLDERS' AGREEMENT AND REGISTRATION RIGHTS AGREEMENT

This Joinder Agreement (this "**Joinder Agreement**") is made as of the date written below by the undersigned (the "**Joining Party**") in accordance with (a) that certain Stockholders' Agreement dated as of May 1, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Stockholders' Agreement**"), by and among Avaya Holdings Corp. (the "**Corporation**") and certain Stockholders party thereto from time to time and (b) that certain Registration Rights Agreement dated as of May 1, 2023 by and among the Corporation and the Persons who are deemed parties thereto pursuant to an order of the United States Bankruptcy Court (the "**Registration Rights Agreement**"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stockholders' Agreement and Registration Rights Agreement, as applicable.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Stockholders' Agreement and the Registration Rights Agreement as of the date hereof and shall have all of the rights and obligations of (a) a Stockholder under the Stockholders' Agreement as if it had executed the Stockholders' Agreement and (b) a Holder under the Registration Rights Agreement as if it had executed the Registration Rights Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Stockholders' Agreement and the Registration Rights Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

Date: _____, _____

STOCKHOLDER:

By: _____
    Name:
    Title:

Notice information pursuant to Section 8.02:

Address:

_____

_____

_____

E-mail: _____
Fax No.:

<u>Exhibit B</u>

<u>Form of Transfer Certificate</u>

## FORM OF TRANSFER CERTIFICATE

Reference is made to that certain Stockholders' Agreement dated as of May 1, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Stockholders' Agreement**"), by and among Avaya Holdings Corp. (the "**Corporation**") and certain Stockholders party thereto from time to time. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stockholders' Agreement.

The undersigned hereby notifies the Corporation of its intent to assign and Transfer [•] shares of [TYPE OF CORPORATION SECURITY] to [TRANSFEREE], a [corporation] organized under the Laws of [•], whose Social Security Number or Tax ID Number is [•] and whose record address is [•], and hereby irrevocably appoints [•] the attorney of the undersigned, subject to confirmation by the Corporation, to assign, Transfer and convey such shares of [TYPE OF CORPORATION SECURITY] with full power of substitution in this matter.

The undersigned certifies that such Transfer shall be completed in accordance with the terms of the Stockholders' Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the date written below.

Date: _____, _____

[TRANSFEROR]:

By: _____
    Name:
    Title:

**Exhibit A(i)-1**

**Redline to Previously Filed Form of Stockholders' Agreement**

# STOCKHOLDERS' AGREEMENT

dated as of

[ ]May 1, 2023

by and among

## [AVAYA HOLDINGS CORP.]

and

## CERTAIN OTHER PERSONS NAMED HEREIN

**TABLE OF CONTENTS**

P<small>AGE</small>

ARTICLE 1 Definitions .................................................................................................. 5
    Section 1.01.  *Definitions* .......................................................................................... 5
    Section 1.02.  *Other Definitional and Interpretative Provisions* ......................... 14

ARTICLE 2 Governance ................................................................................................ 15
    Section 2.01.  *Board of Directors* ............................................................................. 15
    Section 2.02.  *Board Expenses* ................................................................................. 18
    Section 2.03.  *Board Meetings* ................................................................................. 18
    Section 2.04.  *Notice of Meeting; Agenda* ............................................................. 18~~8~~9
    Section 2.05.  *Other Governing Document Provisions* ........................................ 19
    Section 2.06.  *Directors' and Officers' Insurance* ............................................... 19
    Section 2.07.  *No Liability for Board Designees* ................................................... 19
    Section 2.08.  *Board Committees* ............................................................................. 19
    Section 2.09.  *Related Party Transactions* ............................................................. 19
    Section 2.10.  *Actions Requiring Stockholder Consent* ....................................... 20
    Section 2.11.  *Actions Requiring Special Board Consent* .................................... 21

ARTICLE 3 Initial Public Offering; Strategic Alternatives ...................................... 21
    Section 3.01.  *Initial Public Offering* ..................................................................... 21
    Section 3.02.  *Strategic Alternatives* ...................................................................... 21

ARTICLE 4 Tag-Along Rights ...................................................................................... 2~~1~~2
    Section 4.01.  *Tag-Along Rights* .............................................................................. 2~~1~~2

ARTICLE 5 Preemptive Rights ..................................................................................... 25
    Section 5.01.  *Preemptive Rights* ............................................................................ 25
    Section 5.02.  *Excluded Issuances* .......................................................................... 27

ARTICLE 6 Information Rights; Delivery of Information ......................................... 28
    Section 6.01.  *Information Rights* ........................................................................... 28
    Section 6.02.  *Delivery of Information; Confidentiality* ...................................... 28~~8~~9

ARTICLE 7 Certain Covenants and Agreements ....................................................... 29
    Section 7.01.  *Confidentiality* ................................................................................. 29
    Section 7.02.  *Irrevocable Proxy and Power of Attorney* .................................... 31
    Section 7.03.  *Transfer Restrictions; Permitted Transferees* .............................. 31
    Section 7.04.  *Compliance with Law; Policies and Procedures* ......................... 3~~4~~5

ARTICLE 8 Miscellaneous ........................................................................... 3~~4~~6

Section 8.01.   *Binding Effect; Assignability; No Third Party Beneficiaries* ................ 3~~4~~6

Section 8.02.   *Notices* .......................................................................... 3~~5~~6

Section 8.03.   *Waiver; Amendment* ............................................................. 3~~6~~7

Section 8.04.   *Effectiveness; Termination; Survival* ........................................ 3~~7~~8

Section 8.05.   *Governing Law* .................................................................. 3~~7~~8

Section 8.06.   *Jurisdiction; Service of Process* ............................................. 3~~7~~8

Section 8.07.   *WAIVER OF JURY TRIAL* ........................................................... 3~~8~~9

Section 8.08.   *Specific Performance* .......................................................... 3~~8~~9

Section 8.09.   *Counterparts* ................................................................... 3~~8~~9

Section 8.10.   *Entire Agreement* ............................................................... 3~~8~~9

Section 8.11.   *Severability* ................................................................... ~~38~~40

Section 8.12.   *Further Assurances* ............................................................. ~~39~~40

Section 8.13.   *Aggregation of Shares* .......................................................... ~~39~~40

Section 8.14.   *Calculation of Ownership* ....................................................... ~~39~~40

Section 8.15.   *Independent Agreement by the Stockholders* ..................................... ~~39~~40

iii

Schedule 1    Initial Directors
Exhibit A     Joinder Agreement
Exhibit B     Form of Transfer Certificate

## STOCKHOLDERS' AGREEMENT

This STOCKHOLDERS' AGREEMENT, dated as of [—]May 1, 2023 (this "**Agreement**"), is adopted and entered into by and among (i) [Avaya Holdings Corp.], a Delaware corporation (the "**Corporation**"), (ii) each of the holders of Common Stock (as defined below) as of the date hereof and (iii) any other Person (as defined below) who shall at any time be a party to or bound by this Agreement as a result of the execution and delivery to the Corporation of a Joinder, substantially in the form attached hereto as Exhibit A (a "**Joinder**"), in accordance with the terms hereof (the Persons described in clauses (ii) and (iii), collectively, the "**Stockholders**").

## RECITALS

WHEREAS, the Corporation and certain of its direct and indirect Subsidiaries agreed to implement the transactions contemplated by that certain Restructuring Support Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms), dated as of February 14, 2023 by commencing voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, pursuant to that certain *Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to chapter 11 of the Bankruptcy Code* (the "**Plan**") confirmed by the Bankruptcy Court in the jointly administered cases captioned *In re Avaya Inc., et al.,* Case No. 23-90088 (DRJ), pursuant to an order dated [_____, ____][March 22, 2023, Docket No. —]350 (the "**Confirmation Order**"), the Corporation has agreed as of the Plan Effective Date (as defined below) to, among other things, issue shares of Common Stock to certain providers of financing to and certain creditors of the Corporation, including the issuance of shares of Common Stock pursuant to a one hundred and fifty million dollar ($150,000,000) debt rights offering offered to and backstopped by certain creditors of the Corporation;

WHEREAS, the Plan and/or the Confirmation Order provides that this Agreement shall be effective and binding in accordance with its terms and conditions upon all holders of Common Stock as of the date hereof, who shall be deemed to have executed this Agreement; and

WHEREAS, pursuant to the Plan, the Corporation and the Stockholders are authorized to enter into this Agreement to establish certain rights and obligations with respect to the composition of the Corporation's Board of Directors (the "**Board**" and, each director on such Board, a "**Director**") and other matters relating to the Common Stock and the corporate governance of the Corporation.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and intending to be legally bound, the Corporation and each of the other parties hereby agree as follows:

ARTICLE 1

DEFINITIONS

Section 1.01.   *Definitions*.

(a)      As used in this Agreement, the following terms have the following meanings:

"**Affiliate**" means, when used with reference to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person, or where such Person owns twenty percent (20%) or more of the voting control of such specified Person. For purposes of this definition, an "Affiliate" of a Stockholder shall include any investment fund, alternative investment vehicle, special purpose vehicle or holding company that (i) is directly or indirectly managed, advised, sub-advised or controlled by such Stockholder or any Affiliate of such Stockholder, (ii) is managed, advised or sub-advised by the same investment adviser as, or an Affiliate of the investment adviser of, such Stockholder or (iii) is a party to a derivative or participation transaction with such Stockholder pursuant to which there is a transfer of the economics of ownership of securities to or from such Stockholder; *provided*, *however*, that (x) other than for purposes of Section 2.09, an Affiliate shall not include any portfolio company of any Person (including any Stockholder) nor any Corporate Entity, (y) limited partners, non-managing members or other similar direct or indirect investors in a Stockholder (in their capacities as such) shall not be deemed to be Affiliates of such Stockholder and (z) neither the Corporation nor any of its controlled Affiliates shall be deemed an Affiliate of any of the Stockholders (and vice versa). The term "**Affiliated**" shall have a correlative meaning.

"**Anti-Corruption Laws**" means the Foreign Corrupt Practices Act of 1977, and the rules and regulations thereunder, the UK Bribery Act 2010 and the Canadian Corruption of Foreign Public Officials Act, in each case, as amended, and, with respect to a Person, any other Laws, rules, and regulations of any jurisdiction applicable to such Person or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"**Anti-Money Laundering Laws**" means all applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the money laundering statutes of all jurisdictions in which the Corporation and its Subsidiaries operate (and the rules and regulations promulgated thereunder) and any related or similar Law.

"**Apollo**" means Apollo Global Management, Inc. and/or certain of its Affiliates, including, but not limited to, Apollo Capital Management X, LLC, Apollo Management X, L.P., Apollo Investment Management Europe S.á r.l., Apollo Advisors X, L.P., Blackcomb Debt Holdings, L.P. and AP Avenue Holdings, L.P.

"**beneficial ownership**" or "**beneficially own**" means beneficial ownership as determined pursuant to Rule 13d-3 and Rule 13d-5 under the Exchange Act.

["**Brigade**" means Brigade Capital Management, L.P. together with its Affiliates and Related Funds.]

5

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Bylaws**" means the Third Amended and Restated Bylaws of the Corporation, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with their terms.

"**Capital Stock**" means the capital stock of the Corporation.

"**Certificate of Incorporation**" means the Second Amended and Restated Certificate of Incorporation of the Corporation, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

"**Common Stock**" means the shares of common stock, par value $0.01 per share, of the Corporation.

"**Competitor**" means any Person that is a direct competitor of the Corporation, as determined by the Board acting in good faith (and the Board may determine that any Person that would otherwise be a Competitor is not a "Competitor"); *provided*, *however*, that, with respect to any Stockholder, the ownership of Securities of or involvement with a portfolio company engaged in competitive activities shall not be deemed to result in such Stockholder being deemed a Competitor.

"**Convertible Securities**" means any Securities that are convertible or exercisable into, or exchangeable for, Common Stock.

"**Corporate Entity**" means the Corporation and any of the Corporation's Subsidiaries.

"**Corporation Securities**" means any Capital Stock (including Common Stock) or equity interests of the Corporation, including the Common Stock, and any other security exercisable or convertible into or exchangeable for such Capital Stock or equity interests of the Corporation, including any security, bond, note, indebtedness, warrant, option or other right or instrument exercisable for or exchangeable or convertible into such Capital Stock or equity interests.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Exit ABL Facility Credit Agreement**" means that certain ABL Facility Credit Agreement, dated as of [_____, _____]May 1, 2023, by and among [ ]the Corporation, the lending institutions from time to time parties thereto, the lending institutions named therein as L/C Issuers and Swing Line Lenders and Citibank, N.A.

"**Exit Term Loan Facility Credit Agreement**" means that certain Term Loan Facility Credit Agreement, dated as of [_____, _____]May 1, 2023, by and among [ ]the Corporation, Avaya LLC, a Delaware limited liability company, the lending institutions from time to time parties thereto and Wilmington Savings Fund Society, FSB.

"**GAAP**" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession that are in effect from time to time, applied on a consistent basis for the periods involved.

"**Governing Documents**" means this Agreement, the Certificate of Incorporation and the Bylaws and, except with respect to Section 8.03 of this Agreement, any similar organizational documents of Subsidiaries of the Corporation.

"**Governmental Approval**" means the approval of any Governmental Authority, or the completion of required prior notice filings with any Governmental Authority.

"**Governmental Authority**" means any government of any nation, state, city, locality or other political subdivision thereof, whether federal, national, international, regional, provincial, state, tribal, local, foreign or multinational, entity or official exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any of the foregoing, or corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"**Indebtedness**" means with respect to any Person, without duplication, any liability of such Person (a) for borrowed money, whether current or funded, secured or unsecured, or with respect to deposits or advances of any kind, (b) incurred or assumed as the deferred purchase price of assets, property or services (but excluding trade accounts payable arising in the ordinary course of business), (c) evidenced by notes, bonds, debentures or other similar instruments, (d) for the reimbursement of any obligor on any banker's acceptance, letter of credit, performance bond or similar credit transaction, (e) for indebtedness of others guaranteed by such Person to the extent of such guarantee or arrangement and (f) for indebtedness of any other Person of the type referred to in clauses (a), (b), (c), (d) and (e) of this definition which is secured by any lien on any property or asset of such first referred to Person, the amount of such indebtedness referred to in this clause (f) being deemed to be the lesser of the value of such property or asset or the amount of the indebtedness so secured to the extent of such security interest. Except as otherwise provided in this definition of "Indebtedness", the amount of Indebtedness of any Person at any date shall be (i) the outstanding principal amount of all unconditional obligations described above and interest, as such amount would be reflected on a balance sheet prepared in accordance with GAAP, and (ii) with respect to all contingent obligations described above, the maximum liability as of such date of such Person for any guarantees of Indebtedness for borrowed money of any other Person and the amount required under GAAP to be accrued with respect to any other contingent obligation.

"**Independent Director**" means a Director who (a) shall not be (i) an employee of any Stockholder, (ii) an employee of any Corporate Entity or (iii) a "professional director" whose primary occupation is to serve on boards of directors, and (b) shall be determined to be "independent" (as such term is defined by the corporate governance standards of the New York Stock Exchange) and to have relevant industry experience (or be an audit committee financial

expert as such term is defined in Item 407 of Regulation S-K issued by the SEC or any applicable successor provision), in each case, as determined in good faith by the Board.

"**Initial Public Offering**" means any of (i) an initial Public Offering of shares of Common Stock pursuant to an effective registration statement under the Securities Act, (ii) a single transaction or series of related transactions by a merger, acquisition or other business combination involving the Corporation and a publicly traded special purpose acquisition company or other similar entity in which a class of capital stock of the special purpose acquisition company or other similar entity (or its successor) is publicly traded on a National Securities Exchange or (iii) any other transaction or series of related transactions following consummation of which the shares of Common Stock are listed and traded on a National Securities Exchange or an established non-United States securities exchange; *provided* that an Initial Public Offering shall not include any issuance of shares of Common Stock solely to existing holders of Corporation Securities or employees or consultants of any Corporate Entity on Form S-4, Form F-4 or Form S-8 (or any successor form adopted by the SEC or any comparable form adopted by any foreign securities regulators).

"**Investment Company Act**" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"**Law**" means any applicable statute, law, rule, regulation, ordinance, code, policy or rule of common law issued, administered or enforced by any Governmental Authority, or any judicial or administrative interpretation thereof including the rules of any stock exchange.

"**Majority Stockholder Approval**" means an affirmative vote by any Stockholder or group of Stockholders with an aggregate Ownership Percentage of greater than fifty percent (50%); *provided*, *that*, for the avoidance of doubt, unless expressly provided for otherwise in this Agreement, "Stockholders" as used in this definition of "Majority Stockholder Approval" shall be defined as "each of the holders of Common Stock as of the date hereof and any other holder of Common Stock who shall at any time be a party to or bound by this Agreement as a result of the execution and delivery to the Corporation of a Joinder".

"**Management Incentive Plan**" means a management incentive plan adopted and approved by the Board.

"**National Securities Exchange**" means the New York Stock Exchange, NYSE American, the Nasdaq Global Select Market, the Nasdaq Global Market, the Nasdaq Capital Market or another U.S. national securities exchange registered with the SEC.

"**Nuveen**" means Nuveen Asset Management, LLC together with its Affiliates, including but not limited to Teachers Advisors, LLC.

"**Ownership Percentage**" means, with respect to any Stockholder or group of Stockholders, a fraction (a) the numerator of which is the total number of shares of outstanding Common Stock beneficially owned by such Stockholder or group of Stockholders (together with their respective Affiliates and Related Funds) at such time (without duplication) and (b) the denominator of which is the total number of shares of outstanding Common Stock held by all Stockholders at such time, in each case, excluding, for purposes of this calculation, (i) any shares

8

of Common Stock issuable upon the exercise, conversion or exchange of Convertible Securities, (ii) any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan and held by an employee or Director of the Corporation, and (iii) any shares that constitute an Excluded Issuance (as defined below) pursuant to clauses (b), (d) and (e) under the definition of Excluded Issuances.

"**Person**" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Plan Effective Date**" shall mean the Effective Date (as defined in the Plan).

"**Public Offering**" means any sale or distribution to the public of a Corporation Security or other equity Security of any of the Corporation's Subsidiaries pursuant to an offering registered under the Securities Act, whether by the Corporation, by a Subsidiary, by Stockholders and/or by any other holders of such Corporation Security or other equity Security of any of the Corporation's Subsidiaries.

"**Qualified IPO**" means a firm commitment underwritten Initial Public Offering of Common Stock that provides for at least an aggregate of three hundred seventy-five million dollars ($375,000,000) in gross proceeds to the Corporation and/or any selling stockholders and, immediately after such Initial Public Offering, the Common Stock is quoted or listed for trading on a National Securities Exchange.

"**Registration Rights Agreement**" means that certain registration rights agreement, dated as of the date hereof, by and among the Corporation and the Stockholders party thereto, as the same may be amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time in accordance with its terms.

"**Related Fund**" means with respect to any Person, any fund, account or investment vehicle that is controlled, managed, sub-managed, advised or sub-advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, sub-investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, sub-investment manager, advisor or sub-advisor.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated February 14, 2023, by and among the Company Parties (as defined therein) and the other signature parties thereto.

"**Rights Holder**" means, at the time of determination, a Stockholder (together with its Affiliates and Related Funds) whose Ownership Percentage equals or exceeds two percent (2.0%).

"**Sale Transaction**" means the occurrence of any of the following: (a) the direct or indirect sale, lease, transfer, exclusive license, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation, whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Corporation and its Subsidiaries (taken as a whole) or (b) the consummation of any transaction or series of

9

transactions (including any merger or consolidation, whether by operation of law or otherwise), the result of which is that any Person or "group" (as defined under Section 13 of the Exchange Act) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Corporation Securities or of the membership or other equity interests of any surviving entity of any such merger or consolidation; *provided*, *however*, that, a Sale Transaction shall not be deemed to have occurred in the case of clause (a), if such Sale Transaction is completed in connection with the internal restructuring of the Corporation and the resulting owner(s) of the assets of the Corporation are, directly or indirectly, the same Stockholders who owned such assets prior to such Sale Transaction.

"**Sanctions**" means any sanctions administered or enforced by the U.S. government (including, without limitation, the U.S. Department of the Treasury's Office of Foreign Assets Control or the U.S. Department of State), the United Nations Security Council, the European Union, His Majesty's Treasury or other applicable jurisdiction.

"**Sculptor**" means Sculptor Capital LP, solely on behalf of its and its Affiliates' Related Funds.

"**SEC**" means the United States Securities and Exchange Commission or any successor governmental agency.

"**Securities**" means "securities" as defined in Section 2(a)(1) of the Securities Act and includes, with respect to any Person, capital stock or other equity interests issued by such Person or any options, warrants or other Securities that are directly or indirectly convertible into, or exercisable or exchangeable for, capital stock or other equity interests issued by such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Selection Committee**" means the selection committee of the Board, initially consisting of one representative from each of Apollo, Brigade, Nuveen and Sculptor, subject to adjustment pursuant to Section 2.01(a)(iv).

"**Significant Holder**" means, at the time of determination, a Stockholder (together with its Affiliates and Related Funds) whose Ownership Percentage equals or exceeds five percent (5%).

"**Subsidiary**" means, with respect to a Person, any entity required to be consolidated with such Person in such Person's books and records pursuant to GAAP, or any corporation, general or limited partnership, limited liability company, joint venture or other entity in which such Person (a) owns, directly or indirectly, fifty percent (50%) or more of its outstanding voting securities, equity interests, profits interest or capital interest, (b) is entitled to elect at least one-half of the board of directors or similar governing body or (c) in the case of a limited partnership or limited liability company, is a general partner or managing member and has the power to direct the policies, management and affairs of such entity, respectively.

"**Tag-Along Pro Rata Portion**" means with respect to any Tag-Along Offeree, a number of shares of Common Stock determined by multiplying (a) the number of shares of outstanding

10

Common Stock beneficially owned by the applicable Tag-Along Offeree immediately prior to the Tag-Along Transfer by (b) a fraction, (i) the numerator of which is the number of shares of outstanding Common Stock proposed to be Transferred by the Tag-Along Seller in connection with the Tag-Along Transfer and (ii) the denominator of which is the aggregate number of shares of outstanding Common Stock beneficially owned by all Stockholders immediately prior to the Tag-Along Transfer, excluding, for purposes of this calculation, (x) any shares of Common Stock issuable upon the exercise, conversion or exchange of Convertible Securities, (y) any shares of Common Stock not beneficially owned by such Tag-Along Offeree (together with its Affiliates and Related Funds) at such time, and (z) any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan.

"**Third Party**" means a prospective purchaser(s) of the Corporation, Corporation Securities, or any of the Corporation's direct or indirect assets, in each case, other than any Significant Holder or Affiliate or Related Fund thereof.

"**Trade Control Laws**" means applicable Laws related to (a) export controls, including the U.S. Export Administration Act of 1979, as amended, the U.S. Export Administration Regulations, the Arms Export Control Act, the U.S. International Traffic In Arms Regulations, and (b) customs or import controls, including those administered by U.S. Customs and Border Protection.

"**Transfer**" means any direct or indirect, transfer, sale, assignment, pledge, hypothecation or other disposition of any Corporation Securities, whether voluntary or involuntary, or any agreement to transfer, sell, assign, pledge, hypothecate or otherwise dispose of any Corporation Securities, including (a) any such transfer, sale, assignment, pledge, hypothecation, disposition by operation of law or otherwise to an heir, successor or assign, (b) a derivative transaction or the transfer of any equity interests in any direct or indirect holding company holding Corporation Securities or the issuance and redemption by any such holding company of its securities, or (c) any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Corporation Securities, whether any such transaction described in clause (a), (b) or (c) above is to be settled by delivery of Capital Stock or such other securities, in cash or otherwise; *provided*, *however*, that, (i) subject to customary pledge requirements, a grant of or existence of a security interest or encumbrance over any Corporation Securities that is required by any bank or financial institution shall not be deemed to be a Transfer unless and until any enforcement of remedies in respect of such security interest or encumbrance that results in any Person other than such Stockholder becoming the beneficial owner of such Corporation Securities; (ii) with respect to any Stockholder that is a widely held "investment company" as defined in the Investment Company Act or any publicly traded company whose Securities are registered under the Exchange Act, a transfer, sale, assignment, pledge, hypothecation, or other disposition of ownership interests in such investment company or publicly traded company shall not be deemed to be a Transfer; and (iii) with respect to any Stockholder that is a private equity fund, hedge fund or similar vehicle, any transfer of limited partnership or other similar non-control interest in any entity which is a pooled investment vehicle holding other material investments and which is an equityholder (directly or indirectly) of a Stockholder, or the change in control of any general partner, manager or similar person of such entity, shall not be deemed to be a Transfer for purposes hereof, so long as any such transfer pursuant to clause (i), (ii) or (iii) above (x) is not with the purpose of

11

circumventing the Transfer provisions of this Agreement and (y) does not impact the Stockholder's control of the applicable Corporation Securities. The terms "**Transferee**", "**Transferor**", "**Transferred**", "**Transferring**" and other forms of the word "**Transfer**" shall have correlative meanings.

"**Voting Power**" means the total number of votes of the applicable Voting Shares.

"**Voting Shares**" means any outstanding shares of Capital Stock entitled to vote for the election of Directors to the Board.

(b)    Each of the following terms is defined in the page set forth opposite such term:

Accelerated Acquirer ..... 26
Accelerated Issuance Notice ..... 26
Accredited Investor ..... 26
Affiliate ..... 5
Agreement ..... 4
Anti-Corruption Laws ..... 5
Anti-Money Laundering Laws ..... 5
Apollo ..... 5
Apollo Director ..... 15
Bankruptcy Code ..... 4
Bankruptcy Court ..... 4
beneficial ownership ..... 5
beneficially own ..... 5
Board ..... 4
Brigade ..... 5
Brigade Director ..... 15~~5~~6
Business Day ..... 6
Bylaws ..... 6
Capital Stock ..... 6
CEO Director ..... 16
Certificate of Incorporation ..... 6
Chairperson ..... 17
Common Stock ..... 6
Competitor ..... 6
Confidential Information ..... 29
Confirmation Order ..... 4
Convertible Securities ..... 6
Corporate Entity ..... 6
Corporation ..... 4
Corporation Securities ..... 6
Data Site ..... 28
Director ..... 4
Exchange Act ..... 6
Excluded Issuance ..... 27
Exit ABL Facility Credit Agreement ..... 6
Exit Term Loan Facility Credit Agreement ..... 6

GAAP ........................................................................................................ 6~~7~~

Governing Documents .................................................................................. 7

Governmental Approval ............................................................................... 7

Indebtedness ............................................................................................... 7

Independent Director .................................................................................. 7

Initial Public Offering ............................................................................... 7~~8~~

Investment Company Act ............................................................................. 8

Issuance Notice ......................................................................................... 25

Joinder ........................................................................................................ 4

Law .............................................................................................................. 8

Majority Stockholder Approval ................................................................... 8

Management Incentive Plan ......................................................................... 8

National Securities Exchange ...................................................................... 8

Nuveen ........................................................................................................ 8

Nuveen Director ......................................................................................... 16

Ownership Percentage ................................................................................. 8

Person .......................................................................................................... 9

Plan .............................................................................................................. 4

Plan Effective Date ..................................................................................... 9

Preemptive Shares ...................................................................................... 25

Prohibited Transfer .................................................................................... 24

Public Offering ............................................................................................ 9

Qualified IPO .............................................................................................. 9

Related Fund ................................................................................................ 9

Related Party .............................................................................................. 19

Related Party Agreement ............................................................................ 19

Representatives ........................................................................................... 29

Restructuring Support Agreement ................................................................ 9

Rights Holder .............................................................................................. 9

Sale Transaction .......................................................................................... 9

Sanctions ................................................................................................... 10

Sculptor ..................................................................................................... 10

SEC ............................................................................................................ 10

Securities ................................................................................................... 10

Securities Act ............................................................................................ 10

Selection Committee .................................................................................. 10

Selection Committee Director ..................................................................... 15

Significant Holder ...................................................................................... 10

Stockholders ................................................................................................ 4

Strategic Alternatives ................................................................................ 21

Subsidiary .................................................................................................. 10

Tag-Along Notice ...................................................................................... 22

Tag-Along Offeree ..................................................................................... 21

Tag-Along Per Share Consideration ........................................................... 22

Tag-Along Pro Rata Portion ....................................................................... 10

Tag-Along Sellers ...................................................................................... 21

13

Tag-Along Transfer .................................................................................................... 21
Tagging Stockholder ................................................................................................... 22
Termination Event ....................................................................................................... 3~~7~~8
Third Party ................................................................................................................... 11
Trade Control Laws ..................................................................................................... 11
Transfer ....................................................................................................................... 11
Unexercised Tag-Along Portion .................................................................................. 22
Voting Power ............................................................................................................... 11
Voting Shares .............................................................................................................. 12

Section 1.02.  *Other Definitional and Interpretative Provisions.* The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized term used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof; *provided* that with respect to any agreement or contract listed on any Schedules hereto, all such amendments, modifications or supplements must also be listed in the appropriate Schedule. References to any Law include all rules and regulations promulgated thereunder. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent and no rule of strict construction shall be applied against any party hereto. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto to express their mutual intent and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement, nor shall any rule of strict construction be applied against any party hereto. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action may be deferred until the next Business Day.

14

ARTICLE 2

GOVERNANCE

Section 2.01.  *Board of Directors*.

(a)      From and after the date hereof, the Board shall consist of nine (9) Directors, who for the initial term beginning on the Plan Effective Date are the Directors set forth on Schedule 1 hereto.  TheFrom and after the date hereof, and subject to modification pursuant to this Section 2.01(a), the term for each Director shall be two (2) years for the initial term beginning on the Plan Effective Date and one (1) year for each term thereafter.  At each meeting of Stockholders at which Directors are to be elected, and whenever the Stockholders act by written consent with respect to the election of Directors, each Stockholder agrees to vote, or cause to be voted, all Voting Shares beneficially owned by such Stockholder, or over which such Stockholder otherwise has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of Stockholders at which an election of Directors is held or pursuant to any written consent of the Stockholders:

(i)      Apollo Directors; Selection Committee Directors.

A.      If at any time following the date which is twelve (12) months after the Plan Effective Date, Apollo's Ownership Percentage is at least fifty percent (50%), five (5) Directors designated by Apollo shall be elected to the Board (any such Director designated by Apollo, an "**Apollo Director**"), one of whom shall be an Independent Director, and one (1) Director designated by the Selection Committee shall be elected to the Board (any such Director designated by the Selection Committee, a "**Selection Committee Director**").

B.      If at any time following the date which is twelve (12) months after the Plan Effective Date, Apollo's Ownership Percentage is at least thirty-five percent (35%) but less than fifty percent (50%), four (4) Apollo Directors shall be elected to the Board, one of whom shall be an Independent Director, and two (2) Selection Committee Directors shall be elected to the Board.

C.      If at any time Apollo's Ownership Percentage is at least seventeen and five-tenths percent (17.5%) but less than thirty-five percent (35%), three (3) Apollo Directors shall be elected to the Board, one of whom shall be an Independent Director, and three (3) Selection Committee Directors shall be elected to the Board.

D.      If at any time Apollo's Ownership Percentage is at least ten percent (10%) but less than seventeen and five-tenths percent (17.5%), two (2) Apollo Directors shall be elected to the Board, and four (4) Selection Committee Directors shall be elected to the Board.

E.      If at any time Apollo's Ownership Percentage is at least five percent (5%) but less than ten percent (10%), one (1) Apollo Director shall be

15

elected to the Board, and five (5) Selection Committee Directors shall be elected to the Board.

F.     If at any time the Ownership Percentage of Apollo is less than five percent (5%), (i) there shall be no Apollo Directors, and one director seat shall be elected by either Majority Stockholder Approval or by a majority of the remaining Directors and (ii) five (5) Selection Committee Directors shall be elected to the Board.

(ii)     Brigade Director; Nuveen Director.

A.     If at any time following the date which is twelve (12) months after the Plan Effective Date, Brigade's Ownership Percentage is at least five percent (5%), one (1) Director designated by Brigade shall be elected to the Board (any such Director designated by Brigade, a "**Brigade Director**").  If at any time the Ownership Percentage of Brigade is less than five percent (5%), there shall cease to be a Brigade Director, and such director seat shall be elected by either Majority Stockholder Approval or by a majority of the remaining Directors.

B.     If at any time following the date which is twelve (12) months after the Plan Effective Date, Nuveen's Ownership Percentage is at least five percent (5%), one (1) Director designated by Nuveen shall be elected to the Board (any such Director designated by Nuveen, a "**Nuveen Director**"). If at any time the Ownership Percentage of Nuveen is less than five percent (5%), there shall cease to be a Nuveen Director, and such director seat shall be elected by either Majority Stockholder Approval or by a majority of the remaining Directors.

(iii)     CEO Director. At all times, the then-serving Chief Executive Officer of the Corporation shall be elected to the Board, so long as such Person is employed as the Chief Executive Officer of the Corporation (the "**CEO Director**").

(iv)     If at any time the Ownership Percentage of any of Apollo, Brigade, Nuveen or Sculptor is less than four and one-half percent (4.5%), then the member of the Selection Committee selected by such Stockholder shall no longer be a member of the Selection Committee and such Stockholder shall no longer have the right to appoint a member of the Selection Committee.

(v)     Each of Apollo, Brigade, Nuveen and the Selection Committee shall endeavor to (A) select Directors with an appropriate skillset and (B) consider diversity guidelines and corporate governance best practices when exercising their respective designation rights set forth in this Section 2.01(a).  For the avoidance of doubt, in no event shall the foregoing sentence limit any of Apollo, Brigade, Nuveen and the Selection Committee's right to select any individual as a Director.

(vi)     For the avoidance of doubt, each of Apollo, Brigade and Nuveen shall be entitled to its respective Director appointment rights set forth in this Section 2.01(a) regardless of the ownership levels of the other parties.

16

(b)      Upon any vacancy on the Board arising as a result of the death, disability, retirement, resignation or removal of a Director designated by any of the Stockholders pursuant to Section 2.01(a), the first order of business at any meeting of the Board shall be to hold a vote with respect to the election of the replacement Director designated by such Stockholder or Stockholders, as applicable, in accordance with Section 2.01(a) and for so long as such designating Stockholder or Stockholders, as applicable, maintains its Director designation rights in accordance with Section 2.01(a).   In the event that such designating Stockholder or Stockholders, as applicable, no longer has such a right to designate a Director pursuant to Section 2.01(a), then such replacement Director shall be appointed by a majority of the remaining Directors.

(c)      If for any reason the CEO Director shall cease to serve as the CEO, then a majority of the other Directors shall convene a meeting of the Board or take action by written consent on the removal of the former CEO from the Board and/or the appointment of a new Director. Each of the Directors (excluding the CEO Director) shall, furthermore, at any meeting of the Board or by written consent if requested: (i) if the CEO Director does not resign from the Board, vote to remove the former CEO from the Board; and (ii) vote to elect such Person's replacement as CEO as the new CEO Director. For the avoidance of doubt, the removal or election of the CEO Director is determined by a majority of the Board.

(d)      In furtherance of the foregoing, the Corporation and the Board shall, subject to and consistent with the Board's fiduciary duties and applicable Law, take such actions as necessary to cause the foregoing Directors to be nominated and submitted to the Stockholders for election to the Board, or appointed to the Board by the remaining members of the Board, or removed from the Board as the case may be, in any annual or special meeting of the Stockholders or by any action by written consent to elect Directors in lieu thereof, or to remove them as the case may be.

(e)      For the initial Board, any Selection Committee Director shall be designated by unanimous approval by the Selection Committee.  Following the initial Board, the Selection Committee Directors appointed pursuant to this Section 2.01 shall be designated by agreement of at least three of the four members of the Selection Committee.  In the event that a member of the Selection Committee ceases to be a member of the Selection Committee pursuant to Section 2.01(a)(iv), then the appointment of Selection Committee Directors shall be by agreement of at least two of the three members of the Selection Committee.  On the earliest to occur of (x) the fourth anniversary of the Plan Effective Date and (y) such time the Selection Committee consists of only two members, the Selection Committee shall be disbanded, and the Selection Committee Directors shall be elected by vote of holders of a majority of the Voting Power.

(f)      The ~~initial~~ Chairperson of the Board (the "**Chairperson**") ~~shall be [___] [NTD: determined unanimously by the Selection Committee (and shall not be the CEO Director)]. Following the initial Board term, the Chairperson~~ shall be determined by a majority vote of the Board; *provided*, that following the initial Board term, the Chairperson of the Board shall neither be the CEO Director nor be an employee of a Stockholder.

(g)      After the date of an Initial Public Offering and subject to the relevant rules of a National Securities Exchange (or an established non-U.S. securities exchange on which the

17

Common Stock is listed following an Initial Public Offering), the parties hereto shall work together in good faith and in consultation with the underwriters of the Initial Public Offering, if any, to enter into a customary nomination or other similar agreement with Apollo, Brigade, Nuveen and Sculptor to memorialize the Director designation rights set forth herein.

(h)     Notwithstanding anything to the contrary set forth herein, none of Apollo, Brigade, Nuveen or Sculptor shall have the right to veto or object to the appointment or removal of any Directors, except for with respect to their own appointed Director(s) and voting "no" with respect to a proposed Selection Committee Director in accordance with the terms and conditions applicable to Selection Committee Directors.

Section 2.02.   *Board Expenses*. Any ~~Independent~~ Director who is not an employee of the Corporation shall be entitled to be paid such reasonable fees to be determined by a majority vote of the Board in connection with such ~~Independent~~ Director's membership on the Board and, if approved by the Board, any committee of the Board. In addition, each Director shall be entitled to reimbursement of his or her reasonable and documented out-of-pocket expenses incurred by such Director in connection with his or her attendance at meetings of the Board or any committees thereof, and any such meetings of the board of directors of any Corporate Entity and any committee thereof.

Section 2.03.   *Board Meetings.*

(a)     Regular meetings of the Board shall be held at such dates, times and places as the Board shall from time to time determine. From and after the date hereof, attendance by a majority of the total number of Directors then in office shall constitute a quorum for any meeting of the Board, which majority shall include at least one (1) Apollo Director for so long as Apollo has the right to appoint a Director. If a quorum is not present within an hour of the time appointed for the Board meeting, the Directors present may adjourn the Board meeting to a specified place and time not less than two (2) Business Days or more than five (5) Business Days after the original date. Notice of any adjourned meeting shall be given to all Directors. At any such adjourned meeting, a majority of the total number of Directors then in office shall constitute a quorum. Special meetings of the Board may be called at any time by the Board, the Chairperson or by Stockholders that beneficially own at least twenty-five percent (25%) of the Voting Power then outstanding by delivering, or causing the Corporation to deliver, the notice required by Section 2.04. Each special meeting shall be held at such date, time and place, as shall be fixed by the ~~Director, Directors~~Board, the Chairperson or Stockholders calling the meeting.

(b)     In the event that any Apollo Director entitled to vote is absent from a meeting of the Board or if there is a vacancy in the Apollo Directors entitled to vote at any time when there is at least one (1) Apollo Director entitled to vote (for example, if Apollo has only designated two (2) of four (4) Apollo Directors entitled to vote), then the vote of each of the absent and/or vacant Apollo Directors entitled to vote may be voted by the Apollo Director that is entitled to vote and present at the applicable meeting (in a manner acceptable to the Apollo Director that is entitled to vote and present at the applicable meeting), and in such event any such absent and/or vacant Apollo Director entitled to vote shall be counted as present in the determination of whether a quorum of the Board exists.

18

Section 2.04.  *Notice of Meeting; Agenda.* Each Director (by email or otherwise) shall be given notice of the time, date and place of and the agenda for each meeting of the Board or any committee thereof at least two (2) Business Days prior to such meeting, which required notice may be waived by any Director in writing (which may be by email) before or after the meeting, and shall be deemed to be waived by a Director's attendance at a meeting (unless solely for the purpose of objecting to the lack of required notice). Where exigent circumstances are deemed by the Chairperson to exist, he or she may call a special meeting of the Board by notice given at least twenty-four (24) hours prior to the meeting. The agenda for any meeting of the Board or committee thereof shall include any matter requested to be included therein by any Director in advance of circulation of such agenda or at the relevant meeting itself.

Section 2.05.  *Other Governing Document Provisions.* Each Stockholder agrees to vote all of its Voting Shares or execute proxies or written consents, as the case may be, and to take all other actions necessary, to ensure that the other Governing Documents (a) do not at any time conflict with any provision of this Agreement and (b) permit each Stockholder to exercise the express rights to which each such Stockholder is entitled under this Agreement.

Section 2.06.  *Directors' and Officers' Insurance.* The Corporation will purchase and will use its reasonable best efforts to maintain director and officer liability insurance in such amounts and such limits as reasonably determined by the Board on behalf of any Person who is or was a member of the Board against any claims asserted against him or her or incurred by him or her in any capacity as such, whether or not the Corporation would have the power to indemnify him or her against that liability under any of the Governing Documents.

Section 2.07.  *No Liability for Board Designees.* No Stockholder, nor any Affiliate of any Stockholder, shall have any liability as a result of nominating or designating a Director for any act or omission by such Director in his or her capacity as a Director.

Section 2.08.  *Board Committees.* Composition of the committees of the Board shall be determined by the Board; *provided, however*, that for so long as Apollo maintains its Director designation rights in accordance with Section 2.01(a), Apollo shall have the right to appoint one Director as a member of any committees established by the Board; *provided, further*, that no committee established pursuant to this Section 2.08 shall consist of a majority of Apollo Directors that are employed by Apollo. Notwithstanding anything to the contrary set forth herein, if the purpose of such committee is to review and approve a Related Party Agreement (as defined below) involving one of the nominating or designating parties, such nominating or designating party's Director shall not be represented on such committee.

Section 2.09.  *Related Party Transactions.*  The Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, enter, amend or renew an agreement, arrangement or transaction with (a) any Affiliate of the Corporation (other than a wholly-owned direct or indirect Subsidiary of the Corporation) or (b) any Person that constitutes a Significant Holder or an Affiliate of such Person (each of the Persons described in clauses (a) and (b), a "**Related Party**" and any such agreement or transaction, a "**Related Party Agreement**"), excluding (i) a transaction or series of related transactions involving less than two million dollars ($2,000,000) in aggregate payments if made in the ordinary course of business and consistent with past practice with a portfolio company of such Stockholder or its Affiliates and on an

19

arm's-length basis and (ii) debt financings with respect to which all holders of Common Stock are offered the opportunity to participate on a pro rata basis on the same terms, and equity or equity-linked financings offered in accordance with Section 5.01 hereof and Article XII of the Certificate of Incorporation, in each case, unless such Related Party Agreement is (x) on an arm's-length basis and (y) approved by a majority of the disinterested Directors that are not affiliated with, or designated by, the Related Party or any of its Affiliates or Related Funds (including, for the avoidance of doubt, any fund employee Directors); *provided*, *however*, (I) that any issuance of Corporation Securities in accordance with the terms of Article 5, other than any Excluded Issuance pursuant to clause (b), (d) or (e) under the definition of Excluded Issuances, shall be deemed not to be a Related Party Agreement and (II) with respect to a Sale Transaction to a Related Party (the "**Acquiring Related Party**"), any Related Party Agreement with the Acquiring Related Party in connection with such Sale Transaction shall be approved by the affirmative vote of Stockholders with aggregate Voting Shares of greater than fifty percent (50%) of the total issued and outstanding shares of Common Stock, exclusive of Voting Shares held by the Acquiring Related Party and its Affiliates.

Section 2.10.   *Actions Requiring Stockholder Consent*.

(a)      As long as Apollo's Ownership Percentage is at least twenty-five percent (25%), and prior to the consummation of a Qualified IPO, the Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions without the approval of Apollo, in its capacity as a Stockholder:

(i)      create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to any Indebtedness in excess of one hundred million dollars ($100,000,000);

(ii)      make distributions or pay dividends (whether in cash or in-kind) on any outstanding Corporation Securities;

(iii)      consummate a Sale Transaction; or

(iv)      consummate any acquisition or disposition (whether of a sale of stock or assets, disposition of assets, merger or consolidation) of the Corporation or any of its Subsidiaries, in each case, in a transaction or series of related transactions involving total consideration in excess of one hundred million dollars ($100,000,000).

(b)      As long as Apollo's Ownership Percentage is at least twenty-five percent (25%), and prior to the consummation of a Qualified IPO, the Board shall in good faith consult with Apollo reasonably in advance of the termination or hiring of a Chief Executive Officer, and Apollo shall be entitled to recommend candidates to the Board for consideration in connection with any hiring process for a replacement Chief Executive Officer during such consultation period.

(c)      Prior to the consummation of an Initial Public Offering, the Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following

actions without the approval of Stockholders holding at least seventy-five percent (75%) of the issued and outstanding shares of Common Stock (excluding Excluded Issuances):

(i)　non-pro rata redemptions or reclassifications of the Capital Stock (other than any redemptions or repurchases made by departing employees or other services providers); or

(ii)　the declaration of distributions or dividends on the Capital Stock other than on a pro rata basis based on ownership of the Capital Stock.

(d)　None of Apollo, Brigade, Nuveen or Sculptor shall have any veto or approval right with respect to the Corporation's budget, business plan or strategic investments. Notwithstanding the foregoing, the provisions of this Section 2.10(d) shall not limit the rights of Apollo, Brigade, Nuveen or Sculptor with respect to any Director designation rights or any rights of their respective Director designees to vote on the Corporation's budget, business plan or strategic investments.

Section 2.11.　*Actions Requiring Special Board Consent*.　During the eighteen (18) month period following the Plan Effective Date, if the liquidity (including any lines of credit) of the Corporation is greater than $450,000,000, subject to the terms and conditions of this Agreement, including without limitation, Section 2.09 and Section 5.01, the Corporation may issue Common Stock or any other Corporation Security only upon the approval of a majority of the Independent Directors, except for issuances or sales of any Corporation Securities pursuant to a Management Incentive Plan and any other employee benefits or similar employee or management equity incentive plans or arrangements of the Corporation or any other Corporate Entity.

ARTICLE 3
INITIAL PUBLIC OFFERING; STRATEGIC ALTERNATIVES

Section 3.01.　*Initial Public Offering*.　Following the twenty-four (24) month anniversary of the Plan Effective Date, the Board shall take commercially reasonable efforts to commence a process to confidentially evaluate and consider the undertaking of an Initial Public Offering.

Section 3.02.　*Strategic Alternatives*.　At any time following the fourth anniversary of the Plan Effective Date, one or more Stockholders collectively holding at least a majority of the total issued and outstanding shares of Common Stock (excluding Excluded Issuances) shall have the right to elect to cause the Board to undertake a process to confidentially consider strategic alternatives for the business of the Corporation that would provide liquidity to the holders of Common Stock, including retaining financial, legal and other advisors to evaluate such alternatives ("**Strategic Alternatives**"), subject to the following exceptions:

(a)　In no event shall any Stockholder in connection with any such Strategic Alternative be required to sell its shares of Common Stock in a secondary offering (if the Strategic Alternative is an IPO).

21

(b)  In the event such Strategic Alternative is structured as a direct listing or primary offering Initial Public Offering, such Strategic Alternative shall be subject to approval by the Board.

(c)  In the event such election occurs after the fourth anniversary of the Plan Effective Date but prior to the fifth anniversary of the Plan Effective Date, the Board may elect to delay an Initial Public Offering in its business judgment during such period.

ARTICLE 4

TAG-ALONG RIGHTS

Section 4.01.  *Tag-Along Rights.*

(a)  Subject to the other provisions of this <u>Section 4.01</u> (including <u>Section 4.01(j)</u>), if any Stockholder (together with any of its Affiliates and Related Funds) proposes to Transfer to a Third Party shares of Common Stock (excluding, for purposes of this calculation, any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan) representing twenty percent (20%) or more of the then-outstanding shares of Common Stock (i) in a single transaction or series of related transactions or (ii) as part of the same disposition plan (including if acting in concert with other holders) (such holder or holders acting together, collectively, the "**Tag-Along Sellers**" and such Transfer, the "**Tag-Along Transfer**"), then each Significant Holder shall have the right to exercise tag-along rights in accordance with the terms and conditions set forth herein (any such Stockholder, a "**Tag-Along Offeree**").

(b)  The Tag-Along Sellers shall promptly give notice to the Corporation, and the Corporation shall, to the extent reasonably practicable, promptly give or cause to give notice pursuant to <u>Section 8.02</u> (the "**Tag-Along Notice**") to each Tag-Along Offeree, at least ten (10) Business Days prior to the consummation of the proposed Tag-Along Transfer. The Tag-Along Notice shall set forth the number of shares of Common Stock proposed to be Transferred, the name of the proposed Transferees, the proposed purchase price for each share of Common Stock (the "**Tag-Along Per Share Consideration**"), and any other material terms and conditions of the Tag-Along Transfer, including an acknowledgment that any required prior approvals of the Tag-Along Transfer must be sought and obtained prior to the closing of the Tag-Along Transfer and the form of the proposed transfer agreement, if any.

(c)  Each Tag-Along Offeree shall have a period of ten (10) Business Days from the date of delivery of the Tag-Along Notice within which to elect to sell up to its Tag-Along Pro Rata Portion of shares of Common Stock for the same form and amount of consideration per share as the Tag-Along Per Share Consideration in connection with such Tag-Along Transfer. Any Tag-Along Offeree may exercise such right by delivery of an irrevocable written notice to the Tag-Along Sellers and the Corporation specifying the number of shares of Common Stock such Tag-Along Offeree desires to include in the Tag-Along Transfer (any such Tag-Along Offeree exercising such rights, a "**Tagging Stockholder**") and wire transfer or other instructions for payment of any consideration for the shares of Common Stock. Unless the proposed Transferee agrees to purchase all of the shares of Common Stock proposed to be Transferred by the Tag-Along Sellers and the Tagging Stockholders, then the total number of shares of Common Stock proposed to be Transferred by the Tag-Along Sellers and Tagging Stockholders in such

22

Tag-Along Transfer shall be reduced by recalculating the allocation on a *pro rata* basis set forth in this paragraph assuming such smaller number of shares of Common Stock is to be Transferred.

(d)      If (i) any Stockholder other than the Tag-Along Sellers declines to exercise its tag-along rights or (ii) any Tagging Stockholder elects to exercise its tag-along rights with respect to less than such Tagging Stockholder's Tag-Along Pro Rata Portion (the number of shares of Common Stock underlying any such unexercised Tag-Along Pro Rata Portion in (i) and (ii), an "**Unexercised Tag-Along Portion**"), the Tag-Along Sellers shall promptly notify those Tagging Stockholders who have exercised their tag-along rights with respect to their full Tag-Along Pro Rata Portion. Each such Tagging Stockholder and Tag-Along Seller shall then be entitled to Transfer an additional number of its shares of Common Stock equal in aggregate to the Unexercised Tag-Along Portion and shall have a period of two (2) Business Days from the date of delivery of such notice within which to elect to exercise such Transfer. The Unexercised Tag-Along Portion shall be allocated, if necessary, among each such Tagging Stockholder and Tag-Along Seller, by multiplying the Unexercised Tag-Along Portion by a fraction the numerator of which is the number of shares of Common Stock owned by such Tagging Stockholder (or Tag-Along Seller, as the case may be), and the denominator of which is the aggregate number of shares of Common Stock owned by the Tag-Along Sellers and all such Tagging Stockholders that exercise their tag-along rights with respect to the Unexercised Tag-Along Portion. The Tag-Along Sellers shall continue to offer and allocate any such Unexercised Tag-Along Portions in accordance with the procedure set forth in the preceding sentence, until the time at which one or more Stockholders have exercised their tag-along rights with respect to the entirety of such Unexercised Tag-Along Portions. For each such successive notice, such Tagging Stockholder and Tag-Along Seller shall have a period of two (2) Business Days from the date of delivery of such notice within which to elect to exercise such right to Transfer. If, after following such procedure, any Unexercised Tag-Along Portion remains outstanding and no Tagging Stockholder wishes to further exercise its tag-along rights in respect thereof, then the Tag-Along Seller shall be entitled to Transfer a further number of its shares of Common Stock equal to the Unexercised Tag-Along Portion.

(e)      Each Tagging Stockholder shall agree:

(i)      to make the same representations and warranties to the Transferees with respect to itself and related items as the Tag-Along Sellers make with respect to themselves and related items in connection with the Tag-Along Transfer;

(ii)      to the same covenants, indemnities and agreements with respect to itself and related items as agreed by the Tag-Along Sellers with respect to themselves and related items in connection with the Tag-Along Transfer; and

(iii)      to the same terms and conditions to the Transfer of shares of Common Stock as the Tag-Along Sellers agree (including bearing their proportionate share of any escrows, holdbacks or adjustments in purchase price);

*provided*, *however*, that with respect to the immediately preceding clauses (i), (ii) and (iii), all such representations, warranties, covenants, indemnities, agreements, terms and

23

conditions must be customary for Transfers of such kind unless otherwise agreed to by Tagging Stockholders holding a majority of the Voting Power then held by all Tagging Stockholders. Such representations, warranties, covenants, indemnities, agreements, terms and conditions shall not include (i) any non-compete obligations on a Tagging Stockholder or (ii) any non-solicit obligations on a Tagging Stockholder unless such non-solicit obligation is required to consummate the Tag-Along Transfer. Such non-solicit obligations shall only apply to the Tagging Stockholder and shall in no event obligate any other parties, including such Tagging Stockholder's Affiliates and Related Funds. All such representations, warranties, covenants, indemnities, agreements, terms and conditions shall be made by each Tagging Stockholder and Tag-Along Seller severally and neither jointly nor jointly and severally.

(f)     If at the end of a 45-day period after delivery of such Tag-Along Notice (which 45-day period shall be extended if any of the transactions contemplated by the Tag-Along Notice are subject to required Governmental Approvals until the expiration of five (5) Business Days after all such Governmental Approvals have been received, but in no event later than one hundred twenty (120) days following receipt of the Tag-Along Notice by the Tag-Along Sellers), the Tag-Along Sellers have not completed the Transfer of all shares of Common Stock proposed to be sold by the Tag-Along Sellers and all Tagging Stockholders on substantially the same terms and conditions set forth in the Tag-Along Notice, then the Tag-Along Sellers shall (i) return to each Tagging Stockholder the instruments of transfer, limited power-of-attorney and all certificates and other applicable instruments representing the shares of Common Stock that such Tagging Stockholder delivered for Transfer pursuant to this Section 4.01 and any other documents in the possession of the Tag-Along Sellers executed by the Tagging Stockholders in connection with the proposed Tag-Along Transfer and (ii) all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such shares of Common Stock shall continue in effect.

(g)     Promptly after the consummation of the Tag-Along Transfer, the Tag-Along Sellers shall (i) notify each Tagging Stockholder thereof, (ii) remit to each Tagging Stockholder the total consideration for the shares of Common Stock that such Tagging Stockholder Transferred pursuant thereto less such Tagging Stockholder's *pro rata* share of any escrows, holdbacks or adjustments in purchase price and any transaction expenses as determined in accordance with this Section 4.01, with the cash portion of the purchase price paid by wire transfer of immediately available funds in accordance with the wire transfer instructions provided by such Tagging Stockholder and (iii) furnish such other evidence of the completion and the date of completion of such Transfer and the terms thereof as may be reasonably requested by such Tagging Stockholder. The Tag-Along Sellers shall promptly remit to each Tagging Stockholder any additional consideration payable upon the release of any escrows, holdbacks or adjustments in purchase price.

(h)     Upon the consummation of such Tag-Along Transfer, (i) all of the Tagging Stockholders participating therein will receive the same form and amount of consideration in respect of each share of Common Stock sold by them in such Tag-Along Transfer; *provided*, *however*, that in no event shall any consideration for any financial services, such as placement or transaction fees, investment banking or investment advisory fees payable to the Tag-Along Sellers, as the case may be, or any related Person in connection with such transaction (provided

24

that any such agreement shall have been approved as provided in Section 2.09), be included in the amount of consideration and (ii) if any Tagging Stockholders are given an option as to the form and amount of consideration to be received, all Tagging Stockholders participating therein will be given the same option.

(i)        If a Stockholder purports to sell any shares of Common Stock in contravention of this Section 4.01 (a "**Prohibited Transfer**"), each other Stockholder who desires to exercise tag-along rights in accordance with the terms and conditions set forth in this Section 4.01 may, in addition to such remedies as may be available by Law, in equity or hereunder, require the selling Stockholder to purchase from such Stockholder the type and number of shares of Common Stock that such Stockholder would have been entitled to sell in a Tag-Along Transfer had the Prohibited Transfer been effected in compliance with the terms of this Section 4.01. The sale will be made on the same terms, including, without limitation, as provided in Section 4.01(h), as applicable, and subject to the same conditions as would have applied had the selling Stockholder not made the Prohibited Transfer. Such sale (including, without limitation, the delivery of the purchase price) must be made within ninety (90) days after such Stockholder learns of the Prohibited Transfer. The selling Stockholder shall also reimburse each participating Stockholder for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the participating Stockholder's rights under this Section 4.01.

(j)        The Corporation shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Tag-Along Transfer and not to take any action which might impede, be prejudicial to or be inconsistent with, any such Tag-Along Transfer.

(k)        Except as set forth in Section 4.01(i), each Tagging Stockholder shall be responsible for its pro rata share (based on proceeds received in the proposed Tag-Along Transfer) of the costs and expenses incurred by the Tag-Along Sellers in connection with the Tag-Along Transfer for the benefit of all Tagging Stockholders to the extent not paid or reimbursed by the Corporation or the Third Party purchaser, unless otherwise mutually agreed by the Tag-Along Sellers.

(l)        The provisions of this Section 4.01 shall not apply to Transfers by Stockholders to their Affiliates and Related Funds.

ARTICLE 5
PREEMPTIVE RIGHTS

Section 5.01.  *Preemptive Rights*.

(a)        On the terms and subject to the conditions of this Article 5 and applicable Law, prior to an Initial Public Offering, if the Corporation or any other Corporate Entity proposes to offer, sell or issue any Corporation Securities, in each case, except for any Excluded Issuance (collectively, the "**Preemptive Shares**"), then the Corporation shall, or shall cause such Corporate Entity to, give each Rights Holder pursuant to Section 8.02, written notice of such proposed issuance at least ten (10) Business Days prior to the proposed issuance date (an

25

"**Issuance Notice**"). The Issuance Notice shall specify the number of Preemptive Shares and the price (or a good faith estimate or range of estimates of the price if the final price is not then determinable) at which such Preemptive Shares are proposed to be issued and the other material terms and conditions of such Preemptive Shares and of the issuance, including the proposed issuance date. Each Rights Holder shall be entitled to purchase, at the price and on the other terms and conditions specified in the Issuance Notice, up to a number of Preemptive Shares equal to its *pro rata* portion which shall be calculated as (i) the number of Preemptive Shares proposed to be issued by the Corporation multiplied by (ii) the Ownership Percentage of such Rights Holder as of immediately prior to the proposed issuance; *provided* that if a range is provided in the Issuance Notice then each Rights Holder shall be entitled to condition such participation upon the final price being within such specified price range. A Rights Holder may, in its sole discretion, allocate its right to purchase its portion of the Preemptive Shares among its Affiliates and Related Funds, including any funds managed by such Rights Holder or its Affiliates.

(b)      A Rights Holder may exercise its right to purchase its *pro rata* portion of the Preemptive Shares by delivering written notice of its election to purchase such Preemptive Shares at the price and on the terms and conditions specified in the Issuance Notice to the Corporation within five (5) Business Days after receipt of the Issuance Notice. If, at the end of such five (5) Business Day period, any Rights Holder has not exercised its right to purchase any of its *pro rata* portion of such Preemptive Shares by delivering such notice, such Rights Holder shall be deemed to have waived all of its rights under this Article 5 with respect to the purchase of such Preemptive Shares specified in the applicable Issuance Notice.

(c)      If any of the Rights Holders fails to exercise its right to purchase its *pro rata* portion of the Preemptive Shares, or elects to exercise such rights with respect to less than such Rights Holder's *pro rata* portion of the Preemptive Shares, the Corporation shall offer to sell to the Rights Holders that have elected to purchase all of their *pro rata* portion of the Preemptive Shares any Preemptive Shares not purchased by other Rights Holders *pro rata* and at the same price and on the same terms as those specified in the Issuance Notice. Such Rights Holders shall have the right to acquire all or any portion of such additional Preemptive Shares within five (5) Business Days following the Corporation's notice of such additional Preemptive Shares.

(d)      Subject to compliance with this Article 5, the Corporation shall have ninety (90) days after the date of the Issuance Notice to consummate the proposed issuance of any or all of such Preemptive Shares that the applicable Rights Holders have elected not to purchase at the same (or higher) price and upon such other terms and conditions that, taken as a whole, are not materially less favorable to the Corporation than those specified in the Issuance Notice; *provided* that, if such issuance is subject to Governmental Approvals, such 90-day period shall be extended until the expiration of five (5) Business Days after all such Governmental Approvals have been received, but in no event to later than one hundred eighty (180) days after the date of the Issuance Notice. If the Board proposes to issue any Preemptive Shares after such 90-day period (or 180-day period, if applicable) or during such 90-day period (or 180-day period, if applicable) at a lower price or on such other terms that are, taken as a whole, materially less favorable to the Corporation, it shall again comply with the procedures set forth in this Article 5.

26

(e)      The closing of any issuance of Preemptive Shares to the Rights Holders pursuant to this Article 5 shall take place at the time and in the manner provided in the Issuance Notice; *provided*, *however*, that any required Governmental Approvals have first been obtained.

(f)      Notwithstanding anything to the contrary set forth herein, a Rights Holder shall not be entitled to purchase Preemptive Shares unless (i) such Rights Holder is an "accredited investor" as defined in Regulation D promulgated under the Securities Act (each, an "**Accredited Investor**") and (ii) an exemption from registration or qualification under any state Securities Laws or foreign Securities Laws applicable to the issuance of the Preemptive Shares would be available.

(g)      Notwithstanding anything to the contrary contained herein, but subject to compliance with Section 2.09, if the Board, acting in good faith, determines, whose determination shall be conclusive, that it would be in the best interests of the Corporation to issue Preemptive Shares that would otherwise be required to be offered in compliance with the provisions of this Article 5, the Corporation may, in order to expedite the issuance of the Preemptive Shares, issue all of the Preemptive Shares to one or more prospective buyers (the "**Accelerated Acquirer**"), without complying with the provisions of this Article 5, *provided* that within sixty (60) days after the occurrence of such issuance, the Corporation shall provide to each Rights Holder: (i) written notice of such issuance (an "**Accelerated Issuance Notice**") and (ii) the right to purchase such Rights Holder's *pro rata* portion of the Preemptive Shares that such Rights Holder would have been entitled to purchase, pursuant to the procedures set forth in this Article 5, had this Section 5.01(g) not been invoked.  A Rights Holder may exercise its right to purchase its *pro rata* portion of the Preemptive Shares offered pursuant to this Section 5.01(g) by delivering written notice of its election to purchase such Preemptive Shares at the price and on the terms and conditions specified in the Accelerated Issuance Notice to the Corporation within ten (10) Business Days after receipt of the Accelerated Issuance Notice.  If one or more Rights Holders exercises its right to make a purchase under this Section 5.01(g), the Corporation shall give effect to each such exercise by (x) requiring that the Accelerated Acquirer (in which case the Accelerated Acquirer hereby agrees to) Transfer a portion of its Preemptive Shares to such Rights Holders, (y) issuing additional Preemptive Shares to such Rights Holders or (z) a combination of (x) and (y), so long as such action effectively provides such Rights Holders with the same amount of Preemptive Shares and resulting Ownership Percentage, on the same terms and conditions as such Preemptive Shares were issued to the Accelerated Acquirer, that such Rights Holders would have been entitled to purchase, pursuant to the procedures set forth in this Article 5, had this Section 5.01(g) not been invoked.

Section 5.02.  *Excluded Issuances.* The preemptive rights under this Article 5 shall not apply to the following (each of the following, an "**Excluded Issuance**"):

(a)      (i) issuances or sales of any Corporation Securities to employees, officers, directors, managers or consultants of the Corporation or any other Corporate Entity pursuant to a Management Incentive Plan and (ii) any other employee benefits or similar employee or management equity incentive plans or arrangements of the Corporation or any other Corporate Entity, including offer letters, employment agreements, consulting agreements or appointment letters that in the case of this clause (ii) have been approved in accordance with Article 2 hereof;

27

(b)      issuances or sales in a bona fide joint venture, merger or reorganization of the Corporation or any other Corporate Entity with or into another Person or a bona fide acquisition by the Corporation or any other Corporate Entity of another Person or substantially all of the assets of another Person or a strategic partnership or other similar relationship (in each case, other than with a Stockholder or any of its Affiliates);

(c)      issuances to a Person or such Person's Affiliate in exchange of debt or debt Securities for previously existing Securities of the Corporation held by such Person or such Person's Affiliate;

(d)      issuances pursuant to any syndication or offering of debt, or any financing, refinancing, amendment or modification of debt (so long as not directed toward existing Stockholders or any of their Affiliates);

(e)      issuances pursuant to any private placement of warrants or other Security to purchase any form of equity interests in the Corporation on an arm's-length basis as part of a debt financing to the Corporation or its Subsidiaries by non-Affiliated (to the Company or any of its Subsidiaries) third party lenders to the extent that any of the following conditions are satisfied: (i) any participation by a Stockholder or Affiliate of any such Stockholder is through an ordinary course syndication or offering process, (ii) the issuance of Securities of the Corporation to all participants in such debt financings (including any series of debt financings) is less than, in the aggregate of all such debt financings, twenty percent (20%) of the issued and outstanding Capital Stock of the Corporation as of the date hereof or (iii) the debt financing is offered to all holders of Common Stock to participate on a pro rata basis on the same financing terms in accordance with the procedures of Section 5.01 as if such procedures applied to offerings of debt;

(f)      issuances by the Corporation or a direct or indirect wholly-owned Subsidiary of the Corporation to another direct or indirect wholly-owned Subsidiary of the Corporation;

(g)      issuances as a dividend or upon any stock split, reclassification, recapitalization, exchange or readjustment of Corporation Securities, or other similar transaction (in each case, on a *pro rata* basis);

(h)      issuances or sales of any Corporation Securities or other equity Security of any of the Corporation's Subsidiaries in a Qualified IPO and pursuant to any Public Offering following a Qualified IPO;

(i)      issuances upon the conversion or exercise of any Corporation Securities which Corporation Securities were (i) outstanding on the date hereof or (ii) issued in compliance with the terms and conditions of this Article 5; or

(j)      the issuances of the shares of Common Stock to the Stockholders contemplated by the Plan and the Definitive Documents (as defined in the Restructuring Support Agreement) on the Plan Effective Date.

28

ARTICLE 6

INFORMATION RIGHTS; DELIVERY OF INFORMATION

Section 6.01.  *Information Rights*. At all times when the Corporation is not required to file reports under Section 13 or Section 15(d) of the Exchange Act, then, subject to Section 7.01, the Corporation shall provide the following information (1) to each Stockholder that is not a Competitor and (2) to any bona fide prospective purchasers of shares of Common Stock that is not a Competitor, requests such information, and acknowledges its confidentiality obligations in respect of such information and agrees to abide by the terms of this Agreement related to Confidential Information (as defined below):

(a)       all financial information provided to, or that is required to be provided to, lenders under the Exit ABL Facility Credit Agreement in effect on the date of this Agreement and the Exit Term Loan Facility Credit Agreement in effect on the date of this Agreement, with such information rights surviving the repayment, refinancing or termination of such debt facilities; and[1]

(b)       the information required pursuant to Rule 144(c)(2), Rule 144A(d)(4) and Section 4(d)(3) under the Securities Act, or such other information necessary to allow Stockholders to rely on Rule 144, Rule 144A and Section 4(a)(7) of the Securities Act (or any applicable successor provisions).

Notwithstanding anything to the contrary in this Section 6.01, any Stockholder may elect not to receive the information described in this Section 6.01 by written notice to the Corporation at any time, and such election shall remain in effect until such Stockholder elects to again receive the information described in this Section 6.01.

Section 6.02.  *Delivery of Information; Confidentiality*.

(a)       Documents and information required to be delivered pursuant to Section 6.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on Intralinks or another similar password-protected data site (the "**Data Site**") to which each Person that is entitled to information pursuant to Section 6.01(a) shall have access; *provided*, *however*, for the avoidance of doubt, no Competitor shall be given access to the Data Site. As a condition to gaining access to the information posted on the Data Site, Persons shall be required to "click through" or take other affirmative action pursuant to which such Persons shall either (i) confirm and ratify that it is a party to, and bound by all of the terms and provisions of, this Agreement or (ii) if it is not a holder of Common Stock, acknowledge its confidentiality obligations in respect of such information and agree to abide by the terms of this Agreement related to Confidential Information.

(b)       Each Stockholder shall at all times, except as otherwise required by applicable Law, keep confidential all information provided under this Article 6 pursuant to the

---

[1] Note to Draft: Parties to include list of items required to be provided pursuant to the Exit ABL Facility Credit Agreement and the Exit Term Loan Facility Credit Agreement.

confidentiality provisions contained in Section 7.01 and all such information shall be deemed to be Confidential Information.

ARTICLE 7
CERTAIN COVENANTS AND AGREEMENTS

Section 7.01.  *Confidentiality*.

(a)  Each Stockholder acknowledges and agrees that without the prior written consent of the Corporation:

(i)  any information (A) provided to any Stockholder by the Corporation pursuant to this Agreement, including, pursuant to an employee serving as a Director or any information rights under Article 6, (B) disclosed by the Corporation pursuant to Article 6 and (C) regarding each of the Corporation and the other Corporate Entities, including their business, affairs, financial information, operating practices and methods, customers, suppliers, expansion plans, strategic plans, marketing plans, contracts and other business documents obtained by a Stockholder from or on behalf of the Corporation or the other Corporate Entities (collectively, "**Confidential Information**") will be kept confidential, and will not be disclosed to any Person, except that Confidential Information may be disclosed:

(1)  to such Stockholder's members, shareholders, managers, directors, officers, employees, representatives, Affiliates, advisors and agents (collectively, "**Representatives**") in the normal course of the performance of their duties or to any financial institution providing credit to such Stockholder, so long as such Person is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

(2)  to any limited partner or other investor in such Stockholder, its Affiliates or Related Funds, so long as such Person is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

(3)  to the extent required by applicable Law, rule or regulation (including complying with any oral or written questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process to which a Stockholder is subject; *provided* that such Stockholder agrees to give the Corporation prompt notice of such request(s), to the extent practicable, so that the Corporation may seek an appropriate protective order or similar relief (and the Stockholder shall use its reasonable best efforts, at the Corporation's expense, to cooperate with such efforts by the Corporation));

(4)  to any Person to whom such Stockholder is contemplating a Transfer of Corporation Securities; *provided*, *however*, that such Transfer would not

30

be in violation of the provisions of this Agreement and such potential Transferee is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

(5)   to any regulatory authority or rating agency to which the Stockholder or any of its Affiliates is subject or with which it has regular dealings; *provided* that such authority or agency is advised of the confidential nature of such information;

(6)   to the extent related to the tax treatment and tax structure of the transactions contemplated by this Agreement (including all materials of any kind, such as opinions or other tax analyses that the Corporation, its Affiliates or its Representatives have provided to such Stockholder relating to such tax treatment and tax structure); *provided* that the foregoing does not constitute an authorization to disclose the identity of any existing or future party to the transactions contemplated by this Agreement or their Affiliates or Representatives, or, except to the extent relating to such tax structure or tax treatment, any specific pricing terms or commercial or financial information; or

(7)   if the prior written consent of the Board shall have been obtained.

(b)   Notwithstanding Section 7.01(a), "Confidential Information" shall not include information that: (i) is or becomes generally available to the public other than as a result of a disclosure by the Stockholders in violation of this Section 7.01; (ii) was available to the Stockholder on a non-confidential basis prior to its disclosure by the Corporation or its Representatives; (iii) becomes available to the Stockholder on a non-confidential basis from a Person other than the Corporation and the Corporate Entities or their respective Representatives who is not known by the Stockholder to have violated a confidentiality agreement with the Corporation or the other Corporate Entities or any of their respective Representatives in respect of such information; or (iv) was independently developed by the Stockholder without reference to or use of such information;

(c)   A Stockholder shall not be required to receive Confidential Information and may decline to receive information provided pursuant to Article 6 that constitutes Confidential Information.

Section 7.02. *Irrevocable Proxy and Power of Attorney.* Each Stockholder hereby constitutes and appoints as the proxies of such Stockholder and hereby grants a power of attorney to the Board and any designee of the Board (who may be a Director or an officer of the Corporation), and hereby grants each of them with full power of substitution, not generally but only with respect to the election or removal of Persons as members of the Board in accordance with Article 2 and all matters relating to any tag-along rights pursuant to Article 4, and hereby authorizes each of them to represent and vote, if and only if the Stockholder (a) fails to vote or (b) attempts to vote (whether by proxy, in person or by written consent) in a manner that is inconsistent with the terms of this Agreement, all of such Stockholder's Voting Shares in

31

accordance with the terms and provisions of this Agreement. Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Corporation and the Stockholders in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to Section 8.04. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Voting Shares and shall not hereafter, unless and until this Agreement terminates or expires pursuant to Section 8.04, purport to grant any other proxy or power of attorney with respect to any of the Voting Shares, deposit any of its Voting Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any other Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Voting Shares, in each case, with respect to any of the matters set forth herein. Notwithstanding the foregoing, the provisions of this Section 7.02 shall not prevent a Stockholder from Transferring its Capital Stock so long as such Transfer complies with the provisions of the Governing Documents, including Section 7.03.

Section 7.03.   *Transfer Restrictions; Permitted Transferees.*[2]

(a)      In addition to any other transfer restriction set forth in the Governing Documents, each Stockholder agrees that it shall not Transfer any of its Corporation Securities at any time if such Transfer: (i) is to a Person who is not an original party to this Agreement and has not become a party to this Agreement by executing and delivering a Joinder to this Agreement and the Registration Rights Agreement (subject to Section 7.03(e)); (ii) is to a Competitor; (iii) is determined by the Board to~~such Transfer does not or would~~ not comply with U.S. federal or state Securities Laws or other applicable Securities Law, including without limitation such Securities Laws as applied to Affiliates of the Company; (iv) is prohibited pursuant to Section 7.03(b); (v) would, individually or together with other concurrently proposed Transfers, cause the Corporation to be regarded as an "investment company" under the Investment Company Act; or (vi) if applicable, would not be compliant with Article 4; *provided*, *however*, that with respect to the immediately preceding clauses (i), (ii), (iv), (v) and (vi), an otherwise prohibited Transfer shall be permitted if a majority of the disinterested members of the Board approve such Transfer. Any Transfer or attempted Transfer in violation of the provisions of this Section 7.03(a) shall be null and void *ab initio* and the Corporation (x) shall not register or effect such Transfer, (y) may institute legal proceedings to force rescission of such Transfer and (z) may seek any other remedy available to it at Law, in equity or otherwise, including an injunction prohibiting such Transfer.

(b)      Until the Corporation otherwise becomes obligated to file reports under Section 13 or Section 15(d) of the Exchange Act or upon receipt of prior written approval from the Board, no Stockholder shall Transfer any of such Stockholder's shares of Common Stock to any other Person to the extent such Transfer would cause the Corporation to have, including as a result of passage of time and giving effect to the exercisable or conversion of any Corporation Securities that are convertible into or exchangeable for Common Stock, in excess of 1,950

---

[2] ~~Note to Draft: The parties may consider including additional planning under Section 382(l)(5) of the United States Internal Revenue Code of 1986, as amended.~~

32

Stockholders of record (or four-hundred-fifty (450) or more Stockholders of record who are not Accredited Investors), calculated in accordance with Section 12(g) of the Exchange Act (or fifty (50) fewer than such other numbers of Stockholders of record or shareholders as may subsequently be set forth in Section 12(g), or any successor provision, from time to time of the Exchange Act, as the minimum number of Stockholders of record or shareholders for a class of Capital Stock that would require the Company to register such class of Capital Stock under Section 12 of the Exchange Act).  The Corporation and any transfer agent for the shares of Common Stock shall be entitled to enforce this provision (including denying any requested Transfer).  The Corporation and any transfer agent for the shares of Common Stock shall determine the number of Stockholders of record from time to time in consultation with the Corporation's counsel in order to give full effect to the restriction set forth in this Section 7.03(b).  For the avoidance of doubt, any Stockholder may Transfer any or all of such Stockholder's shares of Common Stock in any Public Offering without complying with this Section 7.03(b).

(c)     In accordance with the Plan and/or the Confirmation Order, all initial holders of shares of Common Stock shall be deemed to be party to this Agreement, in privity of contract with the other parties to this Agreement, and be bound hereby, whether their ownership is recorded in a register maintained with the Corporation's transfer agent or through the facilities of DTC, without the need to execute a signature page to this Agreement. No purported Transfer of shares of Common Stock by any Stockholder to any other Person that is not a Stockholder shall be effective unless and until such Person has delivered to the Corporation an executed Joinder (it being understood that the failure of a transferee to so execute a Joinder will not invalidate any transfer occurring through DTC but the fact that such transfer occurring through DTC is not invalidated will not relieve the transferor from liability for breach for failing to require the transferee to execute a Joinder). It is acknowledged and agreed that the fact that any Stockholder is a "beneficial owner" rather than a "record holder" will not diminish its rights and obligations hereunder.

(d)     Prior to effectuating any Transfer of Corporation Securities, the Stockholder proposing to make such Transfer shall deliver to the Corporation:

(i)     the transfer certificate a form of which is attached hereto as Exhibit B;

(ii)     such information as the Corporation may reasonably request in order for the Corporation to determine in good faith that the proposed Transfer will be made in compliance with Section 7.03(a) (including information, opinions of counsel or other certifications used to determine whether any Person to whom the proposed Transfer is to be made is ~~an Accredited Investor and~~ not a Competitor and such Transfer complies with U.S. federal or state Securities Laws or other applicable Securities Law); and

(iii)     such information as the Corporation's transfer agent may reasonably request.

(e)     Unless otherwise approved by the Board, no issuance of Capital Stock to any Person by the Corporation shall be effective unless such Person has delivered to the Corporation a Joinder, pursuant to which such Person agrees to be bound by the terms and conditions of this

33

Agreement as if an original party hereto. Any issuance or attempted issuance in violation of this Section 7.03(e) shall be null and void *ab initio* and the Corporation (i) shall not register or effect such issuance, (ii) may institute legal proceedings to force rescission of such issuance and (iii) may seek any other remedy available to it at Law, in equity or otherwise, including an injunction prohibiting such issuance.

(f)     Notwithstanding anything contained herein to the contrary, each Stockholder may Transfer its Corporation Securities to any of its Affiliates without restriction, subject to compliance with U.S. federal or state Securities Laws or other applicable Securities Law, so long as such Transferee agrees to become a party to this Agreement by executing and delivering a Joinder (subject to Section 7.03(e)).

(g)     Legends. All certificates (if any) or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock shall conspicuously bear the applicable legends set forth below, with such changes as the Board, in its discretion, deems to be necessary and appropriate, and any other legends required by the Governing Documents. Each Stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in the Governing Documents and this Agreement (including the restrictions on Transfer set forth in this Section 7.03), whether or not any certificate or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock owned or held by such Stockholder bear the legends set forth below and whether or not any such Stockholder received a separate notice of such terms, provisions, restrictions and conditions.

(i)     Each certificate, if any, or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock issued under the Plan in reliance on the Securities Act exemption provided by Section 1145 of the Bankruptcy Code shall include a legend substantially to the following effect:

"THE SECURITIES ARE SUBJECT TO THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT OF [AVAYA HOLDINGS CORP.] (THE "COMPANY"), DATED AS OF [ ]MAY 1, 2023, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT, AND ALL HOLDERS OF SECURITIES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS' AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(ii)     Each certificate, if any, or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock issued in reliance on the Securities Act exemption provided by Section 4(a)(2) of the Securities Act or Regulation S promulgated thereunder shall include a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS [CERTIFICATE][STATEMENT] WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS

34

AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT OF [AVAYA HOLDINGS CORP.]― (THE "COMPANY"), DATED AS OF [ ]MAY 1, 2023, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT, AND ALL HOLDERS OF SECURITIES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS' AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(iii)     Each certificate, if any, or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock issued in reliance on the Securities Act exemption provided by Regulation S promulgated under the Securities Act shall include a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS [CERTIFICATE][STATEMENT] WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT OF AVAYA HOLDINGS CORP. (THE "COMPANY"), DATED AS OF MAY 1, 2023, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT, AND ALL HOLDERS OF SECURITIES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS' AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

THE HOLDER OF THE SECURITY EVIDENCED HEREBY REPRESENTS FOR THE BENEFIT OF THE ISSUER THAT IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE ACT AND IN ACCORDANCE WITH THE LAWS APPLICABLE TO SUCH PURCHASER IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE."

(h)      Subject to the terms and conditions of this Agreement, including the other Sections in this Section 7.03, the Corporation shall use its commercially reasonable efforts to cooperate with any Stockholder desiring to Transfer its Corporation Securities in accordance with this Section 7.03.

(i)      For the avoidance of doubt, except (i) as otherwise provided for herein and (ii) in connection with the assignment or transfer of at least eighty percent (80%) of the respective shares of Common Stock held as of the date hereof by any of Apollo, Brigade, Nuveen or Sculptor (a "Specified Rights Transfer"), as applicable, any and all rights, privileges or preferences held by a holder of Common Stock pursuant to this Agreement, are specific to such holder of Common Stock and contained in Section 2.01 of this Agreement or any constituent definitions (the "Specified Rights") and may not be assigned or transferred and any such proposed or attempted assignment or transfer of such rights shall be null and void ab initio, and of no force or effect.  In the event of a Specified Rights Transfer, the transferee shall acquire the Specified Rights previously held by the transferor in the Specified Rights Transfer; *provided*, that the Specified Rights may be assigned or transferred under a Specified Rights Transfer only if such Stockholder has an Ownership Percentage less than fifty percent (50%) prior to consummating such Specified Rights Transfer.  For the avoidance of doubt, the rights contained in Section 2.10 of this Agreement shall not constitute Specified Rights.

Section 7.04.  *Compliance with Law; Policies and Procedures*. The Corporation has implemented and maintains policies and procedures designed to ensure compliance by, and shall maintain and comply with such policies and procedures necessary in order to cause compliance by, the Corporation and its Subsidiaries and their respective Representatives, distributors, suppliers and any other Person acting for or on behalf of the Corporation or its Subsidiaries with Anti-Corruption Laws, Anti-Money Laundering Laws, Trade Control Laws and Sanctions.

## ARTICLE 8
### MISCELLANEOUS

Section 8.01.  *Binding Effect; Assignability; No Third Party Beneficiaries*.

(a)      This Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, successors, legal representatives and permitted assigns. Any Stockholder that ceases to beneficially own any Capital Stock shall cease to be bound by the terms hereof other than such provisions which also survive the termination of this Agreement pursuant to Section 8.04(b).

(b)      Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any party hereto pursuant to any Transfer of Capital Stock or otherwise, except that (i) any Person acquiring Capital Stock from any Stockholder in a Transfer in compliance with the transfer restrictions set forth in the Governing Documents (but excluding any such Transfer made in a Public Offering, through a National Securities Exchange or through an established non-U.S. securities exchange on which the

36

Common Stock is listed following an Initial Public Offering) and (ii) any Person, other than the Corporation or any other Corporate Entity, acquiring Capital Stock that is required or permitted by the terms of this Agreement or any employment agreement or stock purchase, option, stock option or other compensation plan of the Corporation or any other Corporate Entity to become a party hereto shall (unless already bound hereby) execute and deliver to the Corporation a Joinder and shall thenceforth be a "Stockholder" for all purposes under this Agreement.

(c)       Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 8.02. *Notices.* All notices, consents, approvals, waivers or other communications required or permitted to be given hereunder shall be in writing and shall be: (a) delivered personally or by commercial messenger; (b) sent via a recognized overnight courier service; (c) sent by registered or certified mail, postage pre-paid and return receipt requested; (d) sent by electronic mail transmission; or (e) with respect to notices required by Article 4, Article 5, or Section 8.03, posted to the Data Site; in the case of each of clauses (a), (b), (c) and (d), so long as such notice is addressed to the intended recipient thereof as set forth below; any notice shall be deemed given upon actual receipt (or refusal of receipt):

(i)       if to the Corporation:

[Avaya Holdings Corp.]
350 Mt. Kemble Avenue
Morristown, NJ 07960
Attention: Vito Carnevale, General Counsel and Shefali Shah, Chief Administrative Officer
E-mail address: vcarnevale@avaya.com; sashah@avaya.com

(ii)      if to any Stockholder*,* at the address ~~as set forth on such Stockholder's signature page hereto or~~ on file with the Corporation; *provided*, that any notice or other communications or deliveries required or permitted to be given hereunder by the Corporation to any Stockholder may be given by posting such notice, communication or delivery to the website or other digital datasite utilized by the Corporation to disseminate reports and information pursuant to Section 6.02, and shall be deemed to have been duly given on the date such posting is made, so long as such website or other digital datasite shall automatically send email notifications of new postings to any Stockholder that has complied with the applicable log-in procedures or other applicable registration requirements of such website or other digital datasite.

Any Stockholder may change its address and other notice information by notice to the Corporation given in accordance with this Section 8.02 and any other party may change its address and other notice information by notice to the other parties.

Section 8.03.  *Waiver; Amendment.*

37

(a)     Except as provided in the next sentence, no provision of this Agreement or of any other Governing Document may be amended, modified, restated or waived in any manner unless approved by (i) a majority of the Board and (ii) Stockholders holding a majority of the issued and outstanding shares of Common Stock; *provided*, *however*, that (x) any amendment, modification, restatement or waiver that has, or would have, a material and adverse effect on the rights, preferences or privileges of any holder of Common Stock in a manner that is materially disproportionate relative to the impact on one or more other Stockholders (or that disproportionately benefits one or more Stockholders relative to the rights of the other holders of Common Stock (for the avoidance of doubt, without giving effect to any Stockholder's specific holdings of Corporation Securities, specific tax or economic position or any other matters personal to a Stockholder)), shall not be effective without prior written consent of a majority of the disproportionately and adversely affected holders of Common Stock and (y) any amendment, modification, restatement or waiver of Section 2.09 (Related Party Transactions) (and any equivalent provision contained in any other Governing Document), Article 3 (Initial Public Offering; Strategic Alternatives) (and any equivalent provision contained in any other Governing Document), Section 4.01 (Tag-Along Rights) (and any equivalent provision contained in any other Governing Document), Section 5.01 (Preemptive Rights) (and any equivalent provision contained in any other Governing Document), this Section 8.03 (Waiver; Amendment) (and any equivalent provision contained in any other Governing Document), or any amendment which would impose new limitations or conditions on transferability of shares of Common Stock shall require the approval of the holders of at least seventy-five percent (75%) of the shares of Common Stock; *provided*, that any amendment to Section 2.09 (Related Party Transactions) (and any equivalent provision contained in any other Governing Document) which is favorable to Affiliates or to officers and Directors of the Corporation shall also be approved by holders of at least a majority of the issued and outstanding shares of Common Stock, excluding any such Affiliates of the Corporation. Upon any modification, amendment or restatement of this Agreement, the Corporation shall deliver to each of the Stockholders, in accordance with Section 6.02, a copy of such modification, amendment or restatement of this Agreement.

(b)     Notwithstanding Section 8.03(a), the addition of new parties to this Agreement in accordance with the terms hereof as a result of Transfers permitted in accordance with this Agreement shall not be deemed to be an amendment requiring the consent of any Stockholder.

(c)     Notwithstanding any provisions to the contrary contained herein, any party may waive any rights with respect to which such party is entitled to benefits under this Agreement; *provided* that such a waiver shall only affect the rights of the party waiving its rights.

(d)     Unless expressly specified in the terms of this Agreement, no delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any such delay, omission or waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

38

(e)      Any amendment or waiver effected in accordance with this Section 8.03 shall be binding upon each party to this Agreement, regardless of whether such party has signed such amendment or waiver, and each then current and future Stockholder and the Corporation.

Section 8.04.   *Effectiveness; Termination; Survival.*

(a)      This Agreement shall be effective as of the date hereof and shall continue in effect until the earlier of (i) the closing of a Sale Transaction in which any Significant Holder immediately prior to such Sale Transaction is no longer a Significant Holder immediately following the consummation of such Sale Transaction, (ii) an Initial Public Offering and (iii) the mutual written agreement of (A) the Corporation and (B) Stockholders holding at least seventy-five percent (75%) of the then issued and outstanding shares of Common Stock (each of clauses (i)-(iii), a "**Termination Event**"); *provided*, *however*, that in the event of any Termination Event pursuant to clause (ii) of this Section 8.04(a), the provisions of Section 2.01(a) and Section 2.10 shall survive any such Termination Event.

(b)      Upon the occurrence of a Termination Event, this Agreement shall be terminated and become void and of no force or effect without liability of any party; *provided*, *however*, no termination under this Agreement shall relieve any Person of liability for breach prior to termination. The provisions of Section 2.07 and this Article 8 shall survive any termination of this Agreement.

Section 8.05.   *Governing Law.* This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware without regard to the conflicts of laws rules of such state.

Section 8.06.   *Jurisdiction; Service of Process.* The parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the Court of Chancery of the State of Delaware, or to the extent such court does not have subject matter jurisdiction, the United States District Court for the District of Delaware, or to the extent such court also does not have subject matter jurisdiction, another court of the State of Delaware, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that notice to such party as provided in Section 8.02 shall be deemed effective service of process on such party.

39

Section 8.07.  *WAIVER OF JURY TRIAL.* EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.08.  *Specific Performance.* The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. It is accordingly agreed that, in addition to any other applicable remedies at Law or equity, the parties shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each party hereto agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at Law or (b) an award of specific performance is not an appropriate remedy for any reason at Law or in equity. Each of the parties hereby waives (x) any defenses in any action for specific performance, including the defense that a remedy at Law would be adequate and (y) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 8.09.  *Counterparts.* This Agreement may be executed with counterparty signature pages or in any number of counterparts, each of which shall be deemed to be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by electronic mail in "portable document format" (".pdf") form or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 8.10.  *Entire Agreement.* This Agreement and the other Governing Documents constitute the entire agreement among the parties and supersede all prior and contemporaneous agreements and understandings, both oral and written, among the parties with respect to the subject matter hereof and thereof.  In the event of any conflict between this Agreement and any Governing Document, this Agreement will prevail.

Section 8.11.  *Severability.* If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 8.12.  *Further Assurances.* Each party shall cooperate and shall take such further action and shall execute and deliver such further documents as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

Section 8.13.  *Aggregation of Shares.* All Corporation Securities held by a Stockholder and its Affiliates and Related Funds shall be aggregated together for purposes of determining the availability of any rights hereunder. Notwithstanding the foregoing, in no event shall two or more Stockholders, acting separately and not on an aggregated basis, be entitled to claim beneficial ownership of the same Corporation Securities for purposes of exercising any rights hereunder, and the Corporation shall be permitted to disregard any such claims in its good faith judgment. Upon the request of the Corporation or any transfer agent for the Corporation Securities, each Stockholder shall promptly provide to the Corporation or its transfer agent, as applicable, written confirmation (including reasonable supporting documentation) of such Stockholder's then current ownership of its Corporation Securities. In determining the ownership of such Corporation Securities for any purposes hereunder, the Corporation shall be entitled to conclusively rely in good faith on (a) the then most current ownership information provided to it by the transfer agent (including information provided by any depositary, including The Depository Trust & Clearing Corporation, or "DTC") or (b) if there is no such transfer agent, the most current ownership information then in its possession, and, in each case, any such determination made by the Corporation in reliance thereon shall be deemed final and binding on all parties.

Section 8.14.  *Calculation of Ownership.* For purposes of calculating the number of shares of Common Stock or other Corporation Securities held by a Person or group of Persons, the effects of any stock split, reclassification, recapitalization, exchange or readjustment of Corporation Securities or other similar transaction shall be disregarded to the extent occurring between the reference date and the date of measurement. For example, if a certain Stockholder is required to continue to hold fifty percent (50%) of the number of shares of Common Stock held by such Stockholder as of the date hereof in order to exercise certain rights hereunder, and a reverse stock split is consummated after the date hereof and prior to the applicable measurement date, the effects of the reverse stock split shall be disregarded in determining whether such Stockholder satisfies such ownership test.

Section 8.15.  *Independent Agreement by the Stockholders.* The obligations of each Stockholder hereunder are several and neither joint nor joint and several with the obligations of any other Stockholder, and, except as expressly set forth herein, no provision of this Agreement is intended to confer any obligations on any Stockholder vis-à-vis any other Stockholder. Nothing contained herein, and no action taken by any Stockholder pursuant hereto, shall be deemed to constitute the Stockholders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Stockholders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated herein.

[*Signature pages follow.*]

41

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date above first above written.

THE CORPORATION:

[AVAYA HOLDINGS CORP.]

By: _____
    Name: Rebecca A. Roof
    Title: Interim Chief Financial Officer

[*Signature Page to Stockholders' Agreement*]

STOCKHOLDER:

By: _____

    Name:

    Title:

~~Notice information pursuant to Section 8.02:~~

~~Address:~~ _____

        _____

        _____

        _____

~~E-mail:~~ _____

~~Fax No.:~~ _____

[*Signature Page to Stockholders' Agreement*]

Schedule 1

Initial Directors

1.  Alan Masarek, the current CEO.

2.  Aaron Miller, as an Apollo Director.

3.  Robert Kalsow-Ramos, as an Apollo Director.

4.  Thomas Tod Nielsen, appointed by Apollo as an Independent Director.

5.  Donald E. Morgan III, as a Brigade Director.

6.  Patrick Bartels, as a Nuveen Director.

7.  Jacqueline Woods, unanimously appointed by the Selection Committee as an Independent Director.

8.  Marylou Maco, unanimously appointed by the Selection Committee as an Independent Director.

9.  Patrick Dennis, unanimously appointed by the Selection Committee as an Independent Director.

<u>Exhibit A</u>
<u>Joinder Agreement</u>

## JOINDER TO

## STOCKHOLDERS' AGREEMENT AND REGISTRATION RIGHTS AGREEMENT

This Joinder Agreement (this "**Joinder Agreement**") is made as of the date written below by the undersigned (the "**Joining Party**") in accordance with (a) that certain Stockholders' Agreement dated as of May 1, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Stockholders' Agreement**"), by and among Avaya Holdings Corp. (the "**Corporation**") and certain Stockholders party thereto from time to time and (b) that certain Registration Rights Agreement dated as of May 1, 2023 by and among the Corporation and the Persons who are deemed parties thereto pursuant to an order of the United States Bankruptcy Court (the "**Registration Rights Agreement**"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stockholders' Agreement and Registration Rights Agreement, as applicable.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Stockholders' Agreement and the Registration Rights Agreement as of the date hereof and shall have all of the rights and obligations of (a) a Stockholder under the Stockholders' Agreement as if it had executed the Stockholders' Agreement and (b) a Holder under the Registration Rights Agreement as if it had executed the Registration Rights Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Stockholders' Agreement and the Registration Rights Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

Date: _____, _____

STOCKHOLDER:

By: _____
    Name:
    Title:

Notice information pursuant to Section 8.02:

Address:

_____
_____
_____

E-mail: _____
Fax No.:

Exhibit B
Form of Transfer Certificate

## FORM OF TRANSFER CERTIFICATE

Reference is made to that certain Stockholders' Agreement dated as of [—]May 1, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Stockholders' Agreement**"), by and among [Avaya Holdings Corp.] (the "**Corporation**") and certain Stockholders party thereto from time to time. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stockholders' Agreement.

The undersigned hereby notifies the Corporation of its intent to assign and Transfer [•] shares of [TYPE OF CORPORATION SECURITY] to [TRANSFEREE], a [corporation] organized under the Laws of [•], whose Social Security Number or Tax ID Number is [•] and whose record address is [•], and hereby irrevocably appoints [•] the attorney of the undersigned, subject to confirmation by the Corporation, to assign, Transfer and convey such shares of [TYPE OF CORPORATION SECURITY] with full power of substitution in this matter.

The undersigned certifies that such Transfer shall be completed in accordance with the terms of the Stockholders' Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the date written below.

Date: _____, _____

[TRANSFEROR]:

_____

By: _
    Name:
    Title:

**Exhibit A(ii)**

**Certificate of Incorporation**

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**AVAYA HOLDINGS CORP.**

AVAYA HOLDINGS CORP. (formerly known as Sierra Holdings Corp.), a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

FIRST: The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware (the "Secretary of State") on June 1, 2007.

SECOND: An Amended and Restated Certificate of Incorporation (the "Original Amended and Restated Certificate of Incorporation") was filed in the office of the Secretary of State on October 26, 2007.

THIRD: The Original Amended and Restated Certificate of Incorporation was amended on December 17, 2009 and on June 6, 2011.

FOURTH: An Amended and Restated Certificate of Incorporation (the "2017 Amended and Restated Certificate of Incorporation") was duly adopted, without the need for approval of the Board of Directors (the "Board") or the stockholders of the Corporation, in accordance with Sections 242, 245 and 303 of the Delaware General Corporation Law, as amended (the "DGCL"), in accordance with the Second Amended Joint Chapter 11 Plan of Reorganization of the Debtors confirmed by order, dated November 28, 2017, of the United States Bankruptcy Court for the Southern District of New York, jointly administered under the caption "In re: AVAYA INC., et al.," Case No. 17-10089 (SMB).

FIFTH: This Amended and Restated Certificate of Incorporation was duly adopted on May 1, 2023 (the "Plan Effective Date"), without the need for approval of the Board of Directors of the Corporation or the stockholders of the Corporation, in accordance with Sections 242, 245 and 303 of the DGCL, in accordance with the Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") confirmed by order, dated March 22, 2023 (the "Confirmation Order"), of the United States Bankruptcy Court for the Southern District of Texas, jointly administered under the caption "In re: AVAYA INC., et al.," Case No. 23-90088 (DRJ).

SIXTH: This Amended and Restated Certificate of Incorporation shall become effective upon filing with the Secretary of State.

SEVENTH: The 2017 Amended and Restated Certificate of Incorporation is hereby amended and restated in full to read as follows:

**ARTICLE I**

The name of the Corporation is Avaya Holdings Corp.

## ARTICLE II

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, County of New Castle, City of Wilmington, Delaware 19801. The name of the Corporation's registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV

4.1     Authorized Capital Stock.  The total number of shares of capital stock that the Corporation is authorized to issue is one hundred million (100,000,000) shares, consisting of (a) twenty million (20,000,000) shares of preferred stock, par value $0.01 per share ("Preferred Stock"), and (b) eighty million (80,000,000) shares of common stock, par value $0.01 per share ("Common Stock").

4.2     Preferred Stock.  Subject to the terms of the Stockholders' Agreement (as defined below), the Board is hereby expressly authorized to provide out of the unissued shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board providing for the issuance of such series and included in a certificate of designation (a "Preferred Stock Designation") filed pursuant to the DGCL, and the Board is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions (subject to any limitations that may be contained in any Preferred Stock Designation and the Stockholders' Agreement).

4.3     Common Stock.  Except as otherwise required by law, the Stockholders' Agreement or this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation), the holders of Common Stock (each, a "Holder") will be entitled to one vote on each matter submitted to a vote at a meeting of stockholders for each share of Common Stock held of record by such Holder as of the record date for such meeting provided, however, that, subject to Section 13.1 herein, except as otherwise required by law or the Stockholders' Agreement, Holders shall not be entitled to vote on any amendment to this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together as a class with the holders of one or more other such series, to vote thereon pursuant to this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation relating to any series of Preferred Stock).

4.4     Nonvoting Equity Securities.  The Corporation shall not issue nonvoting equity securities (as such term is defined in Section 101(16) of the Bankruptcy Code) (which shall be

2

deemed not to include warrants or options or similar instruments to purchase equity of the Corporation or any equity security pursuant to the Plan (all of which constitute voting equity securities)); provided, however, the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of nonvoting equity securities is included in this Amended and Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code.

4.5     Stockholders' Agreement and Registration Rights Agreement.  To the fullest extent permitted by law, each holder of Common Stock shall be subject to, shall be required to enter into, shall be deemed to have entered into, and shall be deemed to be bound by, that certain Stockholders' Agreement, dated as of May 1, 2023 (the "Stockholders' Agreement Effective Date"), by and among the Corporation and the equityholders of the Corporation party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Stockholders' Agreement"), that certain Registration Rights Agreement, dated as of May 1, 2023, by and among the Corporation and the equityholders of the Corporation party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Registration Rights Agreement"), regardless of whether any such Holder has executed the Stockholders' Agreement and Registration Rights Agreement, and the Stockholders' Agreement and Registration Rights Agreement shall each be deemed to be a valid, binding and enforceable obligation of such Holder (including any obligation set forth therein to waive or refrain from exercising any appraisal, dissenters or similar rights), even if such Holder has not actually executed and delivered a counterpart of the Stockholders' Agreement and Registration Rights Agreement. Except in connection with a transfer of Corporation Securities in a Public Offering (as such term is defined in Article XII), or until such time as no longer required pursuant to the terms of the Stockholders' Agreement, the Corporation shall not issue any shares of Preferred Stock or Common Stock (including on exercise of any purchase, exchange or conversion right in any option, warrant or other convertible security) to, and no stockholder shall transfer any shares of Preferred Stock or Common Stock (whether by sale, gift, inheritance or other transfer or through the exercise or conversion of warrants, options or other convertible securities, by operation of law or otherwise) to, any person who does not as a precondition to such issuance or transfer execute and deliver a joinder to the Stockholders' Agreement and Registration Rights Agreement, in compliance with their terms unless such person is already party thereto, and any such proposed issuance or transfer in violation hereof or thereof will be null and void ab initio.  For the avoidance of doubt, except (i) as otherwise provided for in the Stockholders' Agreement and (ii) in connection with the assignment or transfer of at least eighty percent (80%) of the respective shares of Common Stock held as of the Stockholders' Agreement Effective Date by any of Apollo, Brigade, Nuveen or Sculptor (a "Specified Rights Transfer"), as applicable, any and all rights, privileges or preferences held by a Holder pursuant to the Stockholders' Agreement, are specific to such Holder and contained in Section 2.01 of the Stockholders' Agreement or any constituent definitions (the "Specified Rights") and may not be assigned or transferred and any such proposed or attempted assignment or transfer of such rights shall be null and void ab initio, and of no force or effect.  In the event of a Specified Rights Transfer, the transferee shall acquire the Specified Rights previously held by the transferor in the Specified Rights Transfer; provided, that the Specified Rights may be assigned or transferred under

3

a Specified Rights Transfer only if such Stockholder has an Ownership Percentage (as such term is defined in Article XII) less than fifty percent (50%) prior to consummating such Specified Rights Transfer.  For the avoidance of doubt, the rights contained in Section 2.10 of the Stockholders' Agreement shall not constitute Specified Rights.  The Corporation shall furnish without charge to each holder of record of shares of Common Stock a copy of the Stockholders' Agreement and Registration Rights Agreement upon written request to the Corporation at its principal place of business. This Article IV will automatically terminate and have no further force or effect at the time the Stockholders' Agreement terminates in accordance with its terms (and after such time any other reference in this Amended and Restated Certificate of Incorporation to the Stockholders' Agreement will be disregarded) provided, however, that, upon the termination of the Stockholders' Agreement in accordance with its terms, (i) the provisions of Section 2.07 and Article 8 of the Stockholders' Agreement and (ii) the Registration Rights Agreement, including Section 2.6 thereof, shall each remain in effect with respect to each Holder party thereto; provided, further, that no termination of the Stockholders' Agreement or of this Article IV shall relieve any Person of liability for breach of this Article IV prior to such termination.

## ARTICLE V

5.1    Powers of the Board.  Subject to the terms of the Stockholders' Agreement, the Board may make, amend, and repeal the bylaws of the Corporation (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Bylaws"); provided, however, that, except as set forth in the Stockholders' Agreement, nothing herein will limit the power of the Holders of a majority of the issued and outstanding shares of Common Stock to make, amend and repeal Bylaws.  Any Bylaw made by the Board under the powers conferred hereby may be amended or repealed by the Board (subject to the Stockholders' Agreement) or by the stockholders, in each case as provided in the Bylaws and in accordance with applicable law.

5.2    Special Meetings.  Subject to the terms of the Stockholders' Agreement, special meetings of stockholders of the Corporation may be called only (a) by the Chairperson of the Board (the "Chairperson"), (b) by the Chief Executive Officer of the Corporation (the "Chief Executive Officer"), (c) by the Secretary of the Corporation (the "Secretary") acting at the request of the Chairperson, the Chief Executive Officer or a majority of the total number of directors of the Corporation (the "Directors") that the Corporation would have if there were no vacancies on the Board (the "Whole Board"), or (d) by the Secretary acting at the request of stockholders of the Corporation holding at least a majority of the voting power of the outstanding Common Stock, voting together as a single class; *provided* that in the case of clause (d), any such request shall be in writing and state the purpose or purposes of the special meeting.

5.3    Purpose of Meetings.  At any annual meeting or special meeting of stockholders of the Corporation, only such business will be conducted or considered as has been brought before such meeting in the manner provided in the Stockholders' Agreement and the Bylaws.

5.4    Action by Consent.  Any action required or permitted to be taken at any annual meeting or special meeting of stockholders may, except as otherwise required by the DGCL or the Stockholders' Agreement, be taken without a meeting, and without a vote, only if a consent, setting forth the action so taken, shall be signed by the holders of record of the issued and outstanding

4

capital stock of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action (such minimum number of votes to be in accordance with any applicable terms of the Stockholders' Agreement, this Amended and Restated Certificate of Incorporation, the Bylaws, and the DGCL) at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation in accordance with applicable law.

## ARTICLE VI

6.1     <u>Number, Election and Terms of Directors</u>.   Effective as of the date that this Amended and Restated Certificate of Incorporation has become effective, the number of Directors is fixed at nine, the initial composition of which shall be determined pursuant to the Plan (including any supplements thereto) and the Stockholders' Agreement.  Thereafter, the number of Directors of the Corporation may be changed from time to time by, or in the manner provided in the Bylaws (subject to the terms of the Stockholders' Agreement and any Preferred Stock Designation). Election of Directors need not be by written ballot unless requested by the presiding officer or by the holders of a majority of the issued and outstanding shares of Common Stock present in person or represented by proxy at a meeting of the stockholders at which Directors are to be elected.  If authorized by the Board, such requirement of a written ballot shall be satisfied by a ballot submitted by electronic transmission, <u>provided</u>, <u>however</u>, that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder or proxy holder.

6.2     <u>Quorum; Action by the Board</u>.  Subject to any additional requirements set forth in the Stockholders' Agreement, a quorum of the Board shall consist of at least a majority of the Whole Board.  Except as otherwise provided for in the Stockholders' Agreement and subject to any additional requirements set forth in the Stockholders' Agreement, all actions of the Board shall require the affirmative vote of at least a majority of the Directors present at a duly-convened meeting of the Board at which a quorum is present.  For the avoidance of doubt, except as otherwise provided for in the Stockholders' Agreement, each Director shall be entitled to one vote on each matter presented to the Board.

6.3     <u>Newly Created Directorships and Vacancies</u>.   Subject to the terms of the Stockholders' Agreement and the terms of any Preferred Stock Designation adopted in the manner provided for in <u>Section 4.2</u> herein, newly created directorships resulting from any increase in the number of Directors and any vacancies on the Board resulting from death, resignation, disqualification, incapacitation, removal or other cause may be filled by the affirmative vote of a majority of the remaining Directors then in office, even if less than a quorum of the Board, or by a sole remaining Director.  Any Director elected in accordance with the preceding sentence will hold office for the remainder of the full term of the Director whose seat is being filled and until such Director's successor has been elected and qualified.  No decrease in the number of Directors constituting the Board may shorten the term of any incumbent Director.  If there are no Directors in office, then an election of Directors may be held in accordance with the Stockholders' Agreement and in the manner provided by law.

6.4     <u>Director Liability</u>.  To the fullest extent permitted by the DGCL and any other applicable law currently or hereafter in effect, no Director will be personally liable to the

Corporation or its stockholders for or with respect to any breach of fiduciary duty or other act or omission as a Director.  No repeal or modification of this Article VI will adversely affect the protection of any Director provided hereby in relation to any breach of fiduciary duty or other act or omission as a Director occurring prior to the effectiveness of such repeal or modification.

## ARTICLE VII

7.1    State Law Business Combination.  The Corporation expressly elects not to be governed by Section 203 of the DGCL.  No amendment, repeal or modification (including any amendment by operation of law or otherwise that was, directly or indirectly, intended to circumvent the restrictions in this Article VII) shall be made to this Article VII without (i) the affirmative consent of each Holder that may be impacted by such amendment, repeal or modification and (ii) any applicable consent required pursuant to (A) Article XIII herein or (B) the Stockholders' Agreement.

## ARTICLE VIII

8.1    Right to Indemnification.  Each person who was or is made a party or is threatened to be made a party to or is otherwise subject to or involved in any claim, demand, action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she is or was a Director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (an "Indemnitee"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified by the Corporation to the fullest extent permitted or required by the DGCL and any other applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such Indemnitee in connection therewith ("Indemnifiable Losses"); provided, however, that, except as provided in Section 8.4 of this Article VII with respect to Proceedings to enforce rights to indemnification, the Corporation shall indemnify any such Indemnitee pursuant to this Section 8.1 in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board.

8.2    Right to Advancement of Expenses.  The right to indemnification conferred in Section 8.1 of this Article VIII shall include the right to advancement by the Corporation of any and all expenses (including, without limitation, attorneys' fees and expenses) incurred in defending any such Proceeding in advance of its final disposition (an "Advancement of Expenses"); provided, however, that, if the DGCL so requires, an Advancement of Expenses incurred by an Indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such Indemnitee, including without limitation service to an employee benefit plan) shall be made pursuant to this Section 8.2 only upon delivery to the Corporation of an undertaking (an "Undertaking"), by or on behalf of such Indemnitee, to repay, without interest,

6

all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a "Final Adjudication") that such Indemnitee is not entitled to be indemnified for such expenses under this Section 8.2.  An Indemnitee's right to an Advancement of Expenses pursuant to this Section 8.2 is not subject to the satisfaction of any standard of conduct and is not conditioned upon any prior determination that Indemnitee is entitled to indemnification under Section 8.1 of this Article VIII with respect to the related Proceeding or the absence of any prior determination to the contrary.

8.3     Contract Rights.  The rights to indemnification and to the Advancement of Expenses conferred in Sections 8.1 and 8.2 of this Article VII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

8.4     Right of Indemnitee to Bring Suit.  If a claim under Section 8.1 or Section 8.2 of this Article VIII is not paid in full by the Corporation within sixty (60) calendar days after a written claim has been received by the Corporation, except in the case of a claim for an Advancement of Expenses, in which case the applicable period shall be twenty (20) calendar days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Indemnitee shall be entitled to the fullest extent permitted or required by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader reimbursements of prosecution or defense expenses than such law permitted the Corporation to provide prior to such amendment), to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right to an Advancement of Expenses) a Final Adjudication that the Indemnitee has not met any applicable standard of indemnification set forth in the DGCL shall be a defense to such suit, and (ii) any suit brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Corporation shall be entitled to recover such expenses, without interest, upon a Final Adjudication that the Indemnitee has not met any applicable standard of indemnification set forth in the DGCL.  Neither the failure of the Corporation (including its Board or a committee thereof, its stockholders or independent legal counsel) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board or a committee thereof, its stockholders or independent legal counsel) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, be a defense to such suit.  In any suit brought by an Indemnitee to enforce a right to indemnification or to an Advancement of Expenses hereunder, or brought by the Corporation to recover an Advancement of Expenses hereunder pursuant to the terms of an Undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such Advancement of Expenses, shall be on the Corporation.

8.5     Non-Exclusivity of Rights.  The rights to indemnification and to the Advancement of Expenses conferred in this Article VIII shall not be exclusive of any other right that any person

7

may have or hereafter acquire under any statute, this Amended and Restated Certificate of Incorporation, the Bylaws, agreement, vote of stockholders or disinterested Directors or otherwise. Nothing contained in this Article VIII shall limit or otherwise affect any such other right or the Corporation's power to confer any such other right.

8.6     Indemnitor of First Resort.  The Corporation hereby acknowledges that the Directors may have certain rights to indemnification, Advancement of Expenses and/or insurance provided by a holder of Preferred Stock or Common Stock or its Affiliates (collectively, the "Institutional Indemnitors").  The Corporation hereby agrees (a) that it is the indemnitor of first resort (i.e., its obligations to such persons are primary and any obligation of the Institutional Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such persons are secondary), (b) that it shall be required to advance the full amount of expenses incurred by such persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Amended and Restated Certificate of Incorporation or the Bylaws (or any other agreement between the Corporation and such persons), without regard to any rights such persons may have against the Institutional Indemnitors, and (c) that it irrevocably waives, relinquishes and releases the Institutional Indemnitors from any and all claims against the Institutional Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Corporation further agrees that no advancement or payment by the Institutional Indemnitors on behalf of such persons with respect to any claim for which such persons have sought indemnification from the Corporation shall affect the foregoing and the Institutional Indemnitors shall be subrogated to the extent of such advancement or payment to all of the rights of recovery of such persons against the Corporation.  The Corporation and each such person agree that the Institutional Indemnitors are express third-party beneficiaries of the terms of this paragraph.

8.7     Insurance.  The Corporation shall maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise (each, an "Insured Person") against any expense, liability or loss, in such amounts, as the Board reasonably determines from time to time is customary for similarly-situated businesses such as the Corporation and its subsidiaries, whether or not the Corporation would have the power to indemnify any Insured Person against such expense, liability or loss under the provisions of this Amended and Restated Certificate of Incorporation or the DGCL.

8.8     No Duplication or Payments.  The Corporation shall not be liable under this Article VIII to make any payment to an Indemnitee in respect of any Indemnifiable Losses to the extent that the Indemnitee has otherwise actually received payment (net of any expenses incurred in connection therewith and any repayment by the Indemnitee made with respect thereto) under any insurance policy or from any other source in respect of such Indemnifiable Losses.

8.9     Severability. If any provision or provisions of this Article VIII shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Article VIII shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Article VIII (including, without limitation, each such portion of this Article VIII containing any such provision

held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

## ARTICLE IX

9.1     Forum Selection.  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if such court does not have jurisdiction, the Superior Court of the State of Delaware, or, if such other court does not have jurisdiction, the United States District Court for the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (a) any derivative action or Proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any current or former Director, officer, other employee or stockholder of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the DGCL, this Amended and Restated Certificate of Incorporation or the Bylaws or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware, or (d) any action asserting a claim governed by the internal affairs doctrine.  Any person purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 9.1.

9.2     Federal Forum Selection. Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. Any person purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 9.2.

## ARTICLE X

10.1     Waiver of Corporate Opportunity Doctrine.  To the extent allowed by law, the doctrine of corporate opportunity, or any other analogous doctrine, shall not apply with respect to the Corporation or any of its directors or stockholders and the Corporation renounces any expectancy that any of the directors or stockholders of the Corporation will offer any such corporate opportunity of which he or she may become aware to the Corporation, except, the doctrine of corporate opportunity shall apply with respect to any of the directors or stockholders of the Corporation that are employees, consultants or officers of the Corporation.  For the avoidance of doubt, (i) the doctrine of corporate opportunity shall apply to any Chairperson of the Board that is not otherwise an employee, consultant or officer of the Corporation, and (ii) the waiver contained in this Article X shall not limit the confidentiality obligations in Section 6.02 of the Stockholders' Agreement.

## ARTICLE XI

11.1     References.  When the terms of this Amended and Restated Certificate of Incorporation refer to a specific agreement (including, for the avoidance of doubt, the Stockholders' Agreement) or other document (including, for the avoidance of doubt, the Bylaws) or a decision by any person that determines the meaning or operation of a provision hereof, the Secretary shall maintain a copy of such agreement, document or decision at the principal executive

offices of the Corporation and a copy thereof shall be provided free of charge to any stockholder who makes a request therefor.  Unless otherwise expressly provided in this Amended and Restated Certificate of Incorporation (including, for the avoidance of doubt, any Preferred Stock Designation), a reference to any specific agreement (including, for the avoidance of doubt, the Stockholders' Agreement) or other document (including, for the avoidance of doubt, the Bylaws), shall be deemed a reference to such agreement or document as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms of such agreement or document.

## ARTICLE XII

12.1    Definitions.  For purposes of this Article XII, the following terms shall have the following meanings:

"Affiliate" means, when used with reference to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person, or where such Person owns twenty percent (20%) or more of the voting control of such specified Person.  For purposes of this definition, an "Affiliate" of a Stockholder shall include any investment fund, alternative investment vehicle, special purpose vehicle or holding company that (i) is directly or indirectly managed, advised, sub-advised or controlled by such Stockholder or any Affiliate of such Stockholder, (ii) is managed, advised or sub-advised by the same investment adviser as, or an Affiliate of the investment adviser of, such Stockholder or (iii) is a party to a derivative or participation transaction with such Stockholder pursuant to which there is a transfer of the economics of ownership of securities to or from such Stockholder; *provided*, *however*, that (x) an Affiliate shall not include any portfolio company of any Person (including any Stockholder) nor any Corporate Entity, (y) limited partners, non-managing members or other similar direct or indirect investors in a Stockholder (in their capacities as such) shall not be deemed to be Affiliates of such Stockholder and (z) neither the Corporation nor any of its controlled Affiliates shall be deemed an Affiliate of any of the Stockholders (and vice versa).  The term "Affiliated" shall have a correlative meaning.

"Apollo" means Apollo Global Management, Inc. and/or certain of its Affiliates, including, but not limited to, Apollo Capital Management X, LLC, Apollo Management X, L.P., Apollo Investment Management Europe S.á r.l., Apollo Advisors X, L.P., Blackcomb Debt Holdings, L.P. and AP Avenue Holdings, L.P.

"Brigade" means Brigade Capital Management, L.P. together with its Affiliates and Related Funds.

"Capital Stock" means the capital stock of the Corporation.

"Corporate Entity" means the Corporation and any of the Corporation's Subsidiaries.

"Corporation Securities" means any Capital Stock (including Common Stock) or equity interests of the Corporation, including the Common Stock, and any other security exercisable or convertible into or exchangeable for such Capital Stock or equity interests of the Corporation, including any security, bond, note, indebtedness, warrant, option or other right or instrument exercisable for or exchangeable or convertible into such Capital Stock or equity interests.

10

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Issuance" means each of the following, which do not apply to the preemptive rights under Article 5 of the Stockholders' Agreement:

(a)     (i) issuances or sales of any Corporation Securities to employees, officers, directors, managers or consultants of the Corporation or any other Corporate Entity pursuant to a Management Incentive Plan and (ii) any other employee benefits or similar employee or management equity incentive plans or arrangements of the Corporation or any other Corporate Entity, including offer letters, employment agreements, consulting agreements or appointment letters that in the case of this clause (ii) have been approved in accordance with Article 2 of the Stockholders' Agreement;

(b)     issuances or sales in a bona fide joint venture, merger or reorganization of the Corporation or any other Corporate Entity with or into another Person or a bona fide acquisition by the Corporation or any other Corporate Entity of another Person or substantially all of the assets of another Person or a strategic partnership or other similar relationship (in each case, other than with a Stockholder or any of its Affiliates);

(c)     issuances to a Person or such Person's Affiliate in exchange of debt or debt Securities for previously existing Securities of the Corporation held by such Person or such Person's Affiliate;

(d)     issuances pursuant to any syndication or offering of debt, or any financing, refinancing, amendment or modification of debt (so long as not directed toward existing Stockholders or any of their Affiliates);

(e)     issuances pursuant to any private placement of warrants or other Security to purchase any form of equity interests in the Corporation on an arm's-length basis as part of a debt financing to the Corporation or its Subsidiaries by non-Affiliated (to the Corporation or any of its Subsidiaries) third party lenders to the extent that any of the following conditions are satisfied: (i) any participation by a Stockholder or Affiliate of any such Stockholder is through an ordinary course syndication or offering process, (ii) the issuance of Securities of the Corporation to all participants in such debt financings (including any series of debt financings) is less than, in the aggregate of all such debt financings, twenty percent (20%) of the issued and outstanding Capital Stock of the Corporation as of the date hereof or (iii) the debt financing is offered to all holders of Common Stock to participate on a pro rata basis on the same financing terms in accordance with the procedures of Section 5.01 of the Stockholders' Agreement as if such procedures applied to offerings of debt;

(f)     issuances by the Corporation or a direct or indirect wholly-owned Subsidiary of the Corporation to another direct or indirect wholly-owned Subsidiary of the Corporation;

(g)     issuances as a dividend or upon any stock split, reclassification, recapitalization, exchange or readjustment of Corporation Securities, or other similar transaction (in each case, on a *pro rata* basis);

11

(h)      issuances or sales of any Corporation Securities or other equity Security of any of the Corporation's Subsidiaries in a Qualified IPO and pursuant to any Public Offering following a Qualified IPO;

(i)      issuances upon the conversion or exercise of any Corporation Securities which Corporation Securities were (i) outstanding on the date hereof or (ii) issued in compliance with the terms and conditions of Article 5 of the Stockholders' Agreement; or

(j)      the issuances of the shares of Common Stock to the Stockholders contemplated by the Plan and the Definitive Documents (as defined in the Restructuring Support Agreement) on the Plan Effective Date.

"Indebtedness" means with respect to any Person, without duplication, any liability of such Person (a) for borrowed money, whether current or funded, secured or unsecured, or with respect to deposits or advances of any kind, (b) incurred or assumed as the deferred purchase price of assets, property or services (but excluding trade accounts payable arising in the ordinary course of business), (c) evidenced by notes, bonds, debentures or other similar instruments, (d) for the reimbursement of any obligor on any banker's acceptance, letter of credit, performance bond or similar credit transaction, (e) for indebtedness of others guaranteed by such Person to the extent of such guarantee or arrangement and (f) for indebtedness of any other Person of the type referred to in clauses (a), (b), (c), (d) and (e) of this definition which is secured by any lien on any property or asset of such first referred to Person, the amount of such indebtedness referred to in this clause (f) being deemed to be the lesser of the value of such property or asset or the amount of the indebtedness so secured to the extent of such security interest.  Except as otherwise provided in this definition of "Indebtedness," the amount of Indebtedness of any Person at any date shall be (i) the outstanding principal amount of all unconditional obligations described above and interest, as such amount would be reflected on a balance sheet prepared in accordance with GAAP, and (ii) with respect to all contingent obligations described above, the maximum liability as of such date of such Person for any guarantees of Indebtedness for borrowed money of any other Person and the amount required under GAAP to be accrued with respect to any other contingent obligation.

"Initial Public Offering" means any of (i) an initial Public Offering of shares of Common Stock pursuant to an effective registration statement under the Securities Act, (ii) a single transaction or series of related transactions by a merger, acquisition or other business combination involving the Corporation and a publicly traded special purpose acquisition company or other similar entity in which a class of capital stock of the special purpose acquisition company or other similar entity (or its successor) is publicly traded on a National Securities Exchange or (iii) any other transaction or series of related transactions following consummation of which the shares of Common Stock are listed and traded on a National Securities Exchange or an established non-United States securities exchange; *provided* that an Initial Public Offering shall not include any issuance of shares of Common Stock solely to existing holders of Corporation Securities or employees or consultants of any Corporate Entity on Form S-4, Form F-4 or Form S-8 (or any successor form adopted by the U.S. Securities and Exchange Commission (the "SEC") or any comparable form adopted by any foreign securities regulators).

"Management Incentive Plan" means a management incentive plan adopted and approved by the Board.

"National Securities Exchange" means the New York Stock Exchange, NYSE American, the Nasdaq Global Select Market, the Nasdaq Global Market, the Nasdaq Capital Market or another U.S. national securities exchange registered with the SEC.

"Nuveen" means Nuveen Asset Management, LLC together with its Affiliates, including but not limited to Teachers Advisors, LLC.

"Ownership Percentage" means, with respect to any Stockholder or group of Stockholders, a fraction (a) the numerator of which is the total number of shares of outstanding Common Stock beneficially owned by such Stockholder or group of Stockholders (together with their respective Affiliates and Related Funds) at such time (without duplication) and (b) the denominator of which is the total number of shares of outstanding Common Stock held by all Stockholders at such time, in each case, excluding, for purposes of this calculation, (i) any shares of Common Stock issuable upon the exercise, conversion or exchange of convertible securities, (ii) any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan and held by an employee or Director of the Corporation, and (iii) any shares that constitute an Excluded Issuance pursuant to clauses (b), (d) and (e) under the definition of Excluded Issuances.

"Person" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Public Offering" means any sale or distribution to the public of a Corporation Security or other equity Security of any of the Corporation's Subsidiaries pursuant to an offering registered under the Securities Act, whether by the Corporation, by a Subsidiary, by Stockholders and/or by any other holders of such Corporation Security or other equity Security of any of the Corporation's Subsidiaries.

"Qualified IPO" means a firm commitment underwritten Initial Public Offering of Common Stock that provides for at least an aggregate of three hundred seventy-five million dollars ($375,000,000) in gross proceeds to the Corporation and/or any selling Stockholders and, immediately after such Initial Public Offering, the Common Stock is quoted or listed for trading on a National Securities Exchange.

"Related Fund" means with respect to any Person, any fund, account or investment vehicle that is controlled, managed, sub-managed, advised or sub-advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, sub-investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, sub-investment manager, advisor or sub-advisor.

"Sale Transaction" means the occurrence of any of the following: (a) the direct or indirect sale, lease, transfer, exclusive license, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation, whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Corporation and its Subsidiaries (taken as a whole); or (b) the consummation of any transaction or series of transactions (including any merger or consolidation, whether by operation of law or otherwise), the result of which is that any Person or "group" (as defined under Section 13 of the Exchange Act) becomes the beneficial

owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Corporation Securities or of the membership or other equity interests of any surviving entity of any such merger or consolidation; provided, however, that, a Sale Transaction shall not be deemed to have occurred in the case of clause (a), if such Sale Transaction is completed in connection with the internal restructuring of the Corporation and the resulting owner(s) of the assets of the Corporation are, directly or indirectly, the same Stockholders who owned such assets prior to such Sale Transaction.

"Sculptor" means Sculptor Capital LP, solely on behalf of its and its Affiliates' Related Funds.

"Securities" means "securities" as defined in Section 2(a)(1) of the Securities Act and includes, with respect to any Person, capital stock or other equity interests issued by such Person or any options, warrants or other Securities that are directly or indirectly convertible into, or exercisable or exchangeable for, capital stock or other equity interests issued by such Person.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Significant Holder" means, at the time of determination, a Stockholder (together with its Affiliates and Related Funds) whose Ownership Percentage equals or exceeds five percent (5%).

"Stockholder" or "Stockholders" means those Persons listed on Schedule 1 of the Stockholders' Agreement and any other Person who shall at any time be a party to or bound by the Stockholders' Agreement as a result of the execution and delivery to the Corporation of a Joinder.

"Subsidiary" means, with respect to a Person, any entity required to be consolidated with such Person in such Person's books and records pursuant to GAAP, or any corporation, general or limited partnership, limited liability company, joint venture or other entity in which such Person (a) owns, directly or indirectly, fifty percent (50%) or more of its outstanding voting securities, equity interests, profits interest or capital interest, (b) is entitled to elect at least one-half of the board of directors or similar governing body or (c) in the case of a limited partnership or limited liability company, is a general partner or managing member and has the power to direct the policies, management and affairs of such entity, respectively.

12.2    Consent Rights.  The Corporation shall not, and shall cause its Subsidiaries not to, either directly or indirectly by amendment, merger, consolidation or otherwise, take any of the actions referred to in Section 12.2(a), 12.2(b), 12.2(c) or 12.2(d) without (in addition to any other vote required by law) the written consent or affirmative vote required by Section 12.2(a), 12.2(b), 12.2(c) or 12.2(d), respectively, for such action and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

(a)    The Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, enter, amend or renew an agreement, arrangement or transaction with (i) any Affiliate of the Corporation (other than a wholly-owned direct or indirect Subsidiary of the Corporation) or (ii) any Person that constitutes a Significant Holder or an Affiliate of such Person (each of the Persons described in clauses (i) and (ii), a "Related Party" and any such agreement or transaction, a "Related Party Agreement"), excluding (x) a transaction or series of related transactions involving less than two million dollars ($2,000,000) in aggregate payments if made

14

in the ordinary course of business and consistent with past practice with a portfolio company of such Stockholder or its Affiliates and on an arm's-length basis and (y) debt financings with respect to which all Stockholders are offered the opportunity to participate on a pro rata basis on the same terms, and equity or equity-linked financings offered in accordance with Section 5.01 of the Stockholders' Agreement and this Section 12.2(a), in each case, unless such Related Party Agreement is on an arm's-length basis and approved by a majority of the disinterested Directors that are not Affiliated with, or designated by, the Related Party or any of its Affiliates or Related Funds (including, for the avoidance of doubt, any fund employee Directors); provided, however, that any issuance of Corporation Securities in accordance with the terms of Article 5 of the Stockholders' Agreement shall be deemed not to be a Related Party Agreement.

(b) As long as Apollo's Ownership Percentage is at least twenty-five percent (25%), and prior to the consummation of a Qualified IPO, the Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions without the approval of Apollo, in its capacity as a Stockholder:

i. create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to any Indebtedness in excess of one hundred million dollars ($100,000,000);

ii. make distributions or pay dividends (whether in cash or in-kind) on any outstanding Corporation Securities;

iii. consummate a Sale Transaction; or

iv. consummate any acquisition or disposition (whether of a sale of stock or assets, disposition of assets, merger or consolidation) of the Corporation or any of its Subsidiaries, in each case, in a transaction or series of related transactions involving total consideration in excess of one hundred million dollars ($100,000,000).

(c) As long as Apollo's Ownership Percentage is at least twenty-five percent (25%), and prior to the consummation of a Qualified IPO, the Board shall in good faith consult with Apollo reasonably in advance of the termination or hiring of a Chief Executive Officer, and Apollo shall be entitled to recommend candidates to the Board for consideration in connection with any hiring process for a replacement Chief Executive Officer during such consultation period.

(d) Prior to the consummation of an Initial Public Offering, the Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions without the approval of Stockholders holding at least seventy-five percent (75%) of the issued and outstanding shares of Common Stock (excluding Excluded Issuances):

i. non-pro rata redemptions or reclassifications of the Capital Stock or any other equity in the Corporation (other than any redemptions or repurchases made by departing employees or other services providers); or

ii. the declaration of distributions or dividends on the Capital Stock other than on a pro rata basis based on ownership of the Capital Stock.

15

**ARTICLE XIII**

13.1     Amendment.     From time to time, subject to the terms of the Stockholders' Agreement, any of the provisions of this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation) may be amended, altered, or repealed by the approval of a majority of the Directors of the Board and approval of Holders of a majority of the issued and outstanding shares of Common Stock and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted by the approval of a majority of the Directors of the Board and approval of Holders of a majority of the issued and outstanding shares of Common Stock and in the manner and at the time prescribed by said laws provided, however, that (a) any amendments (i) to this Section 13.1, (ii) that seek to waive or alter any corporate fiduciary duty owed by any current or former Director or officer of the Corporation under the Delaware law or (iii) any amendments pertaining to Related Party Transactions or (b) any amendments which would impose new limitations or conditions on transferability of Common Stock (other than contractual lock-up agreements) shall require the approval of the Holders of seventy-five percent (75%) of the issued and outstanding shares of Common Stock and (solely in the case of any amendments described in clauses (a)(ii) or (a)(iii) in this Section 13.1 that are favorable to the Corporation's Affiliates, any current or former officer of the Corporation or any current or former Director of the Corporation, approval of Holders of a majority of the issued and outstanding shares of Common Stock, excluding Affiliates at such time); provided, further, that any amendments that materially disproportionately and adversely affect rights specified in this Amended and Restated Certificate of Incorporation of one or more Holders relative to the impact on one or more other Holders (or that disproportionately benefit one or more Holders relative to the rights of other Holders), shall require approval of a majority of the disproportionately adversely affected Holders.  All rights at any time conferred upon the stockholders or the Corporation by this Amended and Restated Certificate of Incorporation are granted subject to the provisions of this Article XIII.

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Incorporation.

AVAYA HOLDINGS CORP.

By:_____

Name:  Alan Masarek

Title:   Chief Executive Officer

Dated: May 1, 2023

17

**Exhibit A(ii)-1**

**Redline to Previously Filed Form of Certificate of Incorporation**

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**AVAYA HOLDINGS CORP.[1]**

AVAYA HOLDINGS CORP. (formerly known as Sierra Holdings Corp.), a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

FIRST: The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware (the "Secretary of State") on June 1, 2007.

SECOND: An Amended and Restated Certificate of Incorporation (the "Original Amended and Restated Certificate of Incorporation") was filed in the office of the Secretary of State on October 26, 2007.

THIRD: The Original Amended and Restated Certificate of Incorporation was amended on December 17, 2009 and on June 6, 2011.

FOURTH: An Amended and Restated Certificate of Incorporation (the "2017 Amended and Restated Certificate of Incorporation") was duly adopted, without the need for approval of the Board of Directors (the "Board") or the stockholders of the Corporation, in accordance with Sections 242, 245 and 303 of the Delaware General Corporation Law, as amended (the "DGCL"), in accordance with the Second Amended Joint Chapter 11 Plan of Reorganization of the Debtors confirmed by order, dated November 28, 2017, of the United States Bankruptcy Court for the Southern District of New York, jointly administered under the caption "In re: AVAYA INC., et al.," Case No. 17-10089 (SMB).

FIFTH: This Amended and Restated Certificate of Incorporation was duly adopted, on May 1, 2023 (the "Plan Effective Date"), without the need for approval of the Board of Directors of the Corporation or the stockholders of the Corporation, in accordance with Sections 242, 245 and 303 of the DGCL, in accordance with the Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") confirmed by order, dated March 22, 2023 (the "Confirmation Order"), dated [●] (the "Plan Effective Date"), of the United States Bankruptcy Court for the Southern District of Texas, jointly administered under the caption "In re: AVAYA INC., et al.," Case No. 23-90088 (DRJ).

SIXTH: This Amended and Restated Certificate of Incorporation shall become effective upon filing with the Secretary of State.

SEVENTH: The 2017 Amended and Restated Certificate of Incorporation is hereby amended and restated in full to read as follows:

---

[1] Note to Draft: The parties may consider including additional planning under Section 382(l)(5) of the United States Internal Revenue Code of 1986, as amended.

## ARTICLE I

The name of the Corporation is Avaya Holdings Corp.

## ARTICLE II

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, County of New Castle, City of Wilmington, Delaware 19801. The name of the Corporation's registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV

4.1     Authorized Capital Stock.  The total number of shares of capital stock that the Corporation is authorized to issue is [ ] ([ ]one hundred million (100,000,000) shares, consisting of (a) [ ] ([ ]twenty million (20,000,000) shares of preferred stock, par value $[ ]0.01 per share ("Preferred Stock"), and (b) [ ] ([ ]eighty million (80,000,000) shares of common stock, par value $0.01 per share ("Common Stock").

4.2     Preferred Stock.  Subject to the terms of the Stockholders' Agreement (as defined below), the Board is hereby expressly authorized to provide out of the unissued shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board providing for the issuance of such series and included in a certificate of designation (a "Preferred Stock Designation") filed pursuant to the DGCL, and the Board is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions (subject to any limitations that may be contained in any Preferred Stock Designation and the Stockholders' Agreement).

4.3     Common Stock.  Except as otherwise required by law, the Stockholders' Agreement or this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation), the holders of Common Stock (each, a "Holder") will be entitled to one vote on each matter submitted to a vote at a meeting of stockholders for each share of Common Stock held of record by such hHolder as of the record date for such meeting provided, however, that, subject to Section 13.1 herein, except as otherwise required by law or the Stockholders' Agreement, Holders shall not be entitled to vote on any amendment to this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together as a class with the holders of one or more other such series, to vote thereon pursuant to this

2

Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation relating to any series of Preferred Stock).

4.4    <u>Nonvoting Equity Securities</u>.  The Corporation shall not issue nonvoting equity securities (as such term is defined in Section 101(16) of the Bankruptcy Code) (which shall be deemed not to include warrants or options or similar instruments to purchase equity of the Corporation or any equity security pursuant to the Plan (all of which constitute voting equity securities)); <u>provided</u>, <u>however</u>, the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of nonvoting equity securities is included in this Amended and Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code.

4.5    <u>Stockholders' Agreement and Registration Rights Agreement</u>.  To the fullest extent permitted by law, each holder of Common Stock shall be subject to, shall be required to enter into, shall be deemed to have entered into, and shall be deemed to be bound by, that certain Stockholders' Agreement, dated as of [—]May 1, 2023 (the "<u>Stockholders' Agreement Effective Date</u>"), by and among the Corporation and the equityholders of the Corporation party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "<u>Stockholders' Agreement</u>"), that certain Registration Rights Agreement, dated as of [—]May 1, 2023, by and among the Corporation and the equityholders of the Corporation party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "<u>Registration Rights Agreement</u>"), regardless of whether any such hHolder has executed the Stockholders' Agreement and Registration Rights Agreement, and the Stockholders' Agreement and Registration Rights Agreement shall each be deemed to be a valid, binding and enforceable obligation of such hHolder (including any obligation set forth therein to waive or refrain from exercising any appraisal, dissenters or similar rights), even if such hHolder has not actually executed and delivered a counterpart of the Stockholders' Agreement and Registration Rights Agreement. Except in connection with a Ttransfer of Corporation Securities in a Public Offering (as such term is defined in <u>Article XII</u>), or until such time as no longer required pursuant to the terms of the Stockholders' Agreement, the Corporation shall not issue any shares of Preferred Stock or Common Stock (including on exercise of any purchase, exchange or conversion right in any option, warrant or other convertible security) to, and no stockholder shall transfer any shares of Preferred Stock or Common Stock (whether by sale, gift, inheritance or other transfer or through the exercise or conversion of warrants, options or other convertible securities, by operation of law or otherwise) to, any person who does not as a precondition to such issuance or transfer execute and deliver a joinder to the Stockholders' Agreement and Registration Rights Agreement, in compliance with their terms unless such person is already party thereto, and any such proposed issuance or transfer in violation hereof or thereof will be null and void ab initio. For the avoidance of doubt, except (i) as otherwise provided for in the Stockholders' Agreement and (ii) in connection with the assignment or transfer of at least eighty percent (80%) of the respective shares of Common Stock held as of the Stockholders' Agreement Effective Date by <u>any of</u> Apollo, Brigade, Nuveen or Sculptor (a "<u>Specified Rights Transfer</u>"), as applicable, any and all rights, privileges or preferences held by a Holder pursuant to the Stockholders'

3

Agreement, are specific to such Holder and contained in Section 2.01 of the Stockholders' Agreement or any constituent definitions (the "Specified Rights") and may not be assigned or transferred and any such proposed or attempted assignment or transfer of such rights shall be null and void ab initio, and of no force or effect.  In the event of a Specified Rights Transfer, the transferee shall acquire the Specified Rights previously held by the transferor in the Specified Rights Transfer; *provided*, that the Specified Rights may be assigned or transferred under a Specified Rights Transfer only if such Stockholder has an Ownership Percentage (as such term is defined in Article XII) less than fifty percent (50%) prior to consummating such Specified Rights Transfer.  For the avoidance of doubt, the rights contained in Section 2.10 of the Stockholders' Agreement shall not constitute Specified Rights.  The Corporation shall furnish without charge to each holder of record of shares of Common Stock a copy of the Stockholders' Agreement and Registration Rights Agreement upon written request to the Corporation at its principal place of business. This Article IV will automatically terminate and have no further force or effect at the time the Stockholders' Agreement terminates in accordance with its terms (and after such time any other reference in this Amended and Restated Certificate of Incorporation to the Stockholders' Agreement will be disregarded) provided, however, that, upon the termination of the Stockholders' Agreement in accordance with its terms, (i) the provisions of Section 2.07 and Article 8 of the Stockholders' Agreement and (ii) the Registration Rights Agreement, including Section 2.6 thereof, shall each remain in effect with respect to each Holder party thereto; provided, further, that no termination of the Stockholders' Agreement or of this Article IV shall relieve any Person of liability for breach of this Article IV prior to such termination.

## ARTICLE V

5.1     Powers of the Board.  Subject to the terms of the Stockholders' Agreement, the Board may make, amend, and repeal the bylaws of the Corporation (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Bylaws"); provided, however, that, except as set forth in the Stockholders' Agreement, nothing herein will limit the power of the Holders of a majority of the issued and outstanding shares of Common Stock to make, amend and repeal Bylaws.  Any Bylaw made by the Board under the powers conferred hereby may be amended or repealed by the Board (subject to the Stockholders' Agreement) or by the stockholders, in each case as provided in the Bylaws and in accordance with applicable law.

5.2     Special Meetings.  Subject to the terms of the Stockholders' Agreement, special meetings of stockholders of the Corporation may be called only (a) by the Chairperson of the Board (the "Chairperson"), (b) by the Chief Executive Officer of the Corporation (the "Chief Executive Officer"), (c) by the Secretary of the Corporation (the "Secretary") acting at the request of the Chairperson, the Chief Executive Officer or a majority of the total number of directors of the Corporation (the "Directors") that the Corporation would have if there were no vacancies on the Board (the "Whole Board"), or (d) by the Secretary acting at the request of stockholders of the Corporation holding at least a majority of the voting power of the outstanding Common Stock, voting together as a single class; *provided* that in the case of clause (d), any such request shall be in writing and state the purpose or purposes of the special meeting.

5.3     Purpose of Meetings.  At any annual meeting or special meeting of stockholders of the Corporation, only such business will be conducted or considered as has been brought before such meeting in the manner provided in the Stockholders' Agreement and the Bylaws.

5.4     Action by Consent.  Any action required or permitted to be taken at any annual meeting or special meeting of stockholders may, except as otherwise required by the DGCL or the Stockholders' Agreement, be taken without a meeting, and without a vote, only if a consent, setting forth the action so taken, shall be signed by the holders of record of the issued and outstanding capital stock of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action (such minimum number of votes to be in accordance with any applicable terms of the Stockholders' Agreement, this Amended and Restated Certificate of Incorporation, the Bylaws, and the DGCL) at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation in accordance with applicable law.

## ARTICLE VI

6.1     Number, Election and Terms of Directors.  Effective as of the date that this Amended and Restated Certificate of Incorporation has become effective, the number of Directors is fixed at nine, the initial composition of which shall be determined pursuant to the Plan (including any supplements thereto) and the Stockholders' Agreement.  Thereafter, the number of Directors of the Corporation may be changed from time to time by, or in the manner provided in the Bylaws (subject to the terms of the Stockholders' Agreement and any Preferred Stock Designation).  Election of Directors need not be by written ballot unless requested by the presiding officer or by the holders of a majority of the issued and outstanding shares of Common Stock present in person or represented by proxy at a meeting of the stockholders at which Directors are to be elected.  If authorized by the Board, such requirement of a written ballot shall be satisfied by a ballot submitted by electronic transmission, provided, however, that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder or proxy holder.

6.2     Quorum; Action by the Board.  Subject to any additional requirements set forth in the Stockholders' Agreement, a quorum of the Board shall consist of at least a majority of the Whole Board.  Except as otherwise provided for in the Stockholders' Agreement and subject to any additional requirements set forth in the Stockholders' Agreement, all actions of the Board shall require the affirmative vote of at least a majority of the Directors present at a duly-convened meeting of the Board at which a quorum is present.  For the avoidance of doubt, except as otherwise provided for in the Stockholders' Agreement, each Director shall be entitled to one vote on each matter presented to the Board.

6.3     Newly Created Directorships and Vacancies.  Subject to the terms of the Stockholders' Agreement and the terms of any Preferred Stock Designation adopted in the manner provided for in Section 4.2 herein, newly created directorships resulting from any increase in the number of Directors and any vacancies on the Board resulting from death, resignation, disqualification, incapacitation, removal or other cause may be filled by the affirmative vote of a majority of the remaining Directors then in office, even if less than a

5

quorum of the Board, or by a sole remaining Director. Any Director elected in accordance with the preceding sentence will hold office for the remainder of the full term of the Director whose seat is being filled and until such Director's successor has been elected and qualified. No decrease in the number of Directors constituting the Board may shorten the term of any incumbent Director. If there are no Directors in office, then an election of Directors may be held in accordance with the Stockholders' Agreement and in the manner provided by law.

6.4     Director Liability. To the fullest extent permitted by the DGCL and any other applicable law currently or hereafter in effect, no Director will be personally liable to the Corporation or its stockholders for or with respect to any breach of fiduciary duty or other act or omission as a Director. No repeal or modification of this Article VI will adversely affect the protection of any Director provided hereby in relation to any breach of fiduciary duty or other act or omission as a Director occurring prior to the effectiveness of such repeal or modification.

## ARTICLE VII

7.1     State Law Business Combination. The Corporation expressly elects not to be governed by Section 203 of the DGCL. No amendment, repeal or modification (including any amendment by operation of law or otherwise that was, directly or indirectly, intended to circumvent the restrictions in this Article VII) shall be made to this Article VII without (i) the affirmative consent of each Holder that may be impacted by such amendment, repeal or modification and (ii) any applicable consent required pursuant to (A) Article XIII herein or (B) the Stockholders' Agreement.

## ARTICLE VIII

8.1     Right to Indemnification. Each person who was or is made a party or is threatened to be made a party to or is otherwise subject to or involved in any claim, demand, action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she is or was a Director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (an "Indemnitee"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified by the Corporation to the fullest extent permitted or required by the DGCL and any other applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such Indemnitee in connection therewith ("Indemnifiable Losses"); provided, however, that, except as provided in Section 8.4 of this Article VIII with respect to Proceedings to enforce rights to indemnification, the Corporation shall indemnify any such Indemnitee pursuant to this Section 8.1 in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board.

6

8.2     Right to Advancement of Expenses. The right to indemnification conferred in Section 8.1 of this Article VIII shall include the right to advancement by the Corporation of any and all expenses (including, without limitation, attorneys' fees and expenses) incurred in defending any such Proceeding in advance of its final disposition (an "Advancement of Expenses"); provided, however, that, if the DGCL so requires, an Advancement of Expenses incurred by an Indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such Indemnitee, including without limitation service to an employee benefit plan) shall be made pursuant to this Section 8.2 only upon delivery to the Corporation of an undertaking (an "Undertaking"), by or on behalf of such Indemnitee, to repay, without interest, all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a "Final Adjudication") that such Indemnitee is not entitled to be indemnified for such expenses under this Section 8.2. An Indemnitee's right to an Advancement of Expenses pursuant to this Section 8.2 is not subject to the satisfaction of any standard of conduct and is not conditioned upon any prior determination that Indemnitee is entitled to indemnification under Section 8.1 of this Article VIII with respect to the related Proceeding or the absence of any prior determination to the contrary.

8.3     Contract Rights. The rights to indemnification and to the Advancement of Expenses conferred in Sections 8.1 and 8.2 of this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

8.4     Right of Indemnitee to Bring Suit. If a claim under Section 8.1 or Section 8.2 of this Article VIII is not paid in full by the Corporation within sixty (60) calendar days after a written claim has been received by the Corporation, except in the case of a claim for an Advancement of Expenses, in which case the applicable period shall be twenty (20) calendar days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Indemnitee shall be entitled to the fullest extent permitted or required by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader reimbursements of prosecution or defense expenses than such law permitted the Corporation to provide prior to such amendment), to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right to an Advancement of Expenses) a Final Adjudication that the Indemnitee has not met any applicable standard of indemnification set forth in the DGCL shall be a defense to such suit, and (ii) any suit brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Corporation shall be entitled to recover such expenses, without interest, upon a Final Adjudication that the Indemnitee has not met any applicable standard of indemnification set forth in the DGCL. Neither the failure of the Corporation (including its Board or a committee thereof, its stockholders or independent legal counsel) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board or a committee

7

thereof, its stockholders or independent legal counsel) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, be a defense to such suit.  In any suit brought by an Indemnitee to enforce a right to indemnification or to an Advancement of Expenses hereunder, or brought by the Corporation to recover an Advancement of Expenses hereunder pursuant to the terms of an Undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such Advancement of Expenses, shall be on the Corporation.

8.5     <u>Non-Exclusivity of Rights</u>.   The rights to indemnification and to the Advancement of Expenses conferred in this <u>Article VIII</u> shall not be exclusive of any other right that any person may have or hereafter acquire under any statute, this Amended and Restated Certificate of Incorporation, the Bylaws, agreement, vote of stockholders or disinterested Directors or otherwise.  Nothing contained in this <u>Article VIII</u> shall limit or otherwise affect any such other right or the Corporation's power to confer any such other right.

8.6     <u>Indemnitor of First Resort</u>.   The Corporation hereby acknowledges that the Directors may have certain rights to indemnification, Advancement of Expenses and/or insurance provided by a holder of Preferred Stock or Common Stock or its Affiliates (collectively, the "<u>Institutional Indemnitors</u>").  The Corporation hereby agrees (a) that it is the indemnitor of first resort (<u>i.e.</u>, its obligations to such persons are primary and any obligation of the Institutional Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such persons are secondary), (b) that it shall be required to advance the full amount of expenses incurred by such persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Amended and Restated Certificate of Incorporation or the Bylaws (or any other agreement between the Corporation and such persons), without regard to any rights such persons may have against the Institutional Indemnitors, and (c) that it irrevocably waives, relinquishes and releases the Institutional Indemnitors from any and all claims against the Institutional Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Corporation further agrees that no advancement or payment by the Institutional Indemnitors on behalf of such persons with respect to any claim for which such persons have sought indemnification from the Corporation shall affect the foregoing and the Institutional Indemnitors shall be subrogated to the extent of such advancement or payment to all of the rights of recovery of such persons against the Corporation.  The Corporation and each such person agree that the Institutional Indemnitors are express third-party beneficiaries of the terms of this paragraph.

8.7     <u>Insurance</u>.  The Corporation shall maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise (each, an "<u>Insured Person</u>") against any expense, liability or loss, in such amounts, as the Board reasonably determines from time to time is customary for similarly-situated businesses such as the Corporation and its subsidiaries, whether or not the Corporation would have the power to indemnify any Insured Person against such expense, liability or loss under the provisions of this Amended and Restated Certificate of Incorporation or the DGCL.

8.8     No Duplication or Payments.  The Corporation shall not be liable under this Article VIII to make any payment to an Indemnitee in respect of any Indemnifiable Losses to the extent that the Indemnitee has otherwise actually received payment (net of any expenses incurred in connection therewith and any repayment by the Indemnitee made with respect thereto) under any insurance policy or from any other source in respect of such Indemnifiable Losses.

8.9     Severability. If any provision or provisions of this Article VIII shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Article VIII shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Article VIII (including, without limitation, each such portion of this Article VIII containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

## ARTICLE IX

9.1     Forum Selection.  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if such court does not have jurisdiction, the Superior Court of the State of Delaware, or, if such other court does not have jurisdiction, the United States District Court for the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (a) any derivative action or Proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any current or former Director, officer, other employee or stockholder of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the DGCL, this Amended and Restated Certificate of Incorporation or the Bylaws or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware, or (d) any action asserting a claim governed by the internal affairs doctrine.  Any person purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 9.1.

9.2     Federal Forum Selection. Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. Any person purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 9.2.

## ARTICLE X

10.1     Waiver of Corporate Opportunity Doctrine.  To the extent allowed by law, the doctrine of corporate opportunity, or any other analogous doctrine, shall not apply with respect to the Corporation or any of its directors or stockholders and the Corporation renounces any expectancy that any of the directors or stockholders of the Corporation will offer any such corporate opportunity of which he or she may become aware to the Corporation, except, the doctrine of corporate opportunity shall apply with respect to any of the directors or stockholders of the Corporation that are employees, consultants or officers of the Corporation.  For the

avoidance of doubt, (i) the doctrine of corporate opportunity shall apply to any Chairperson of the Board that is not otherwise an employee, consultant or officer of the Corporation, and (ii) the waiver contained in this Article X shall not limit the confidentiality obligations in Section 6.02 of the Stockholders' Agreement.

<strong>ARTICLE XI</strong>

11.1   References.   When the terms of this Amended and Restated Certificate of Incorporation refer to a specific agreement (including, for the avoidance of doubt, the Stockholders' Agreement) or other document (including, for the avoidance of doubt, the Bylaws) or a decision by any person that determines the meaning or operation of a provision hereof, the Secretary shall maintain a copy of such agreement, document or decision at the principal executive offices of the Corporation and a copy thereof shall be provided free of charge to any stockholder who makes a request therefor.   Unless otherwise expressly provided in this Amended and Restated Certificate of Incorporation (including, for the avoidance of doubt, any Preferred Stock Designation), a reference to any specific agreement (including, for the avoidance of doubt, the Stockholders' Agreement) or other document (including, for the avoidance of doubt, the Bylaws), shall be deemed a reference to such agreement or document as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms of such agreement or document.

<strong>ARTICLE XII</strong>

12.1   Definitions.   For purposes of this Article XII, the following terms shall have the following meanings:

"Affiliate" means, when used with reference to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person, or where such Person owns twenty percent (20%) or more of the voting control of such specified Person.   For purposes of this definition, an "Affiliate" of a Stockholder shall include any investment fund, alternative investment vehicle, special purpose vehicle or holding company that (i) is directly or indirectly managed, advised, sub-advised or controlled by such Stockholder or any Affiliate of such Stockholder, (ii) is managed, advised or sub-advised by the same investment adviser as, or an Affiliate of the investment adviser of, such Stockholder or (iii) is a party to a derivative or participation transaction with such Stockholder pursuant to which there is a transfer of the economics of ownership of securities to or from such Stockholder; *provided*, *however*, that (x) an Affiliate shall not include any portfolio company of any Person (including any Stockholder) nor any Corporate Entity, (y) limited partners, non-managing members or other similar direct or indirect investors in a Stockholder (in their capacities as such) shall not be deemed to be Affiliates of such Stockholder and (z) neither the Corporation nor any of its controlled Affiliates shall be deemed an Affiliate of any of the Stockholders (and vice versa).   The term "Affiliated" shall have a correlative meaning.

"Apollo" means Apollo Global Management, Inc. and/or certain of its Affiliates, including, but not limited to, Apollo Capital Management X, LLC, Apollo Management X, L.P.,

10

Apollo Investment Management Europe S.á r.l., Apollo Advisors X, L.P., Blackcomb Debt Holdings, L.P. and AP Avenue Holdings, L.P.

{"Brigade" means Brigade Capital Management, L.P. together with its Affiliates and Related Funds.}

"Capital Stock" means the capital stock of the Corporation.

"Corporate Entity" means the Corporation and any of the Corporation's Subsidiaries.

"Corporation Securities" means any Capital Stock (including Common Stock) or equity interests of the Corporation, including the Common Stock, and any other security exercisable or convertible into or exchangeable for such Capital Stock or equity interests of the Corporation, including any security, bond, note, indebtedness, warrant, option or other right or instrument exercisable for or exchangeable or convertible into such Capital Stock or equity interests.

~~"Corporate Entity" means the Corporation and any of the Corporation's Subsidiaries.~~

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Issuance" means each of the following, which do not apply to the preemptive rights under Article 5 of the Stockholders' Agreement:

(a)      (i) issuances or sales of any Corporation Securities to employees, officers, directors, managers or consultants of the Corporation or any other Corporate Entity pursuant to a Management Incentive Plan and (ii) any other employee benefits or similar employee or management equity incentive plans or arrangements of the Corporation or any other Corporate Entity, including offer letters, employment agreements, consulting agreements or appointment letters that in the case of this clause (ii) have been approved in accordance with Article 2 of the Stockholders' Agreement;

(b)      issuances or sales in a bona fide joint venture, merger or reorganization of the Corporation or any other Corporate Entity with or into another Person or a bona fide acquisition by the Corporation or any other Corporate Entity of another Person or substantially all of the assets of another Person or a strategic partnership or other similar relationship (in each case, other than with a Stockholder or any of its Affiliates);

(c)      issuances to a Person or such Person's Affiliate in exchange of debt or debt Securities for previously existing Securities of the Corporation held by such Person or such Person's Affiliate;

(d)      issuances pursuant to any syndication or offering of debt, or any financing, refinancing, amendment or modification of debt (so long as not directed toward existing Stockholders or any of their Affiliates);

(e)      issuances pursuant to any private placement of warrants or other Security to purchase any form of equity interests in the Corporation on an arm's-length basis as part of a

11

debt financing to the Corporation or its Subsidiaries by non-Affiliated (to the ~~Company~~Corporation or any of its Subsidiaries) third party lenders to the extent that any of the following conditions are satisfied: (i) any participation by a Stockholder or Affiliate of any such Stockholder is through an ordinary course syndication or offering process, (ii) the issuance of Securities of the Corporation to all participants in such debt financings (including any series of debt financings) is less than, in the aggregate of all such debt financings, twenty percent (20%) of the issued and outstanding Capital Stock of the Corporation as of the date hereof or (iii) the debt financing is offered to all holders of Common Stock to participate on a pro rata basis on the same financing terms in accordance with the procedures of Section 5.01 of the Stockholders' Agreement as if such procedures applied to offerings of debt;

(f)     issuances by the Corporation or a direct or indirect wholly-owned Subsidiary of the Corporation to another direct or indirect wholly-owned Subsidiary of the Corporation;

(g)     issuances as a dividend or upon any stock split, reclassification, recapitalization, exchange or readjustment of Corporation Securities, or other similar transaction (in each case, on a *pro rata* basis);

(h)     issuances or sales of any Corporation Securities or other equity Security of any of the Corporation's Subsidiaries in a Qualified IPO and pursuant to any Public Offering following a Qualified IPO;

(i)     issuances upon the conversion or exercise of any Corporation Securities which Corporation Securities were (i) outstanding on the date hereof or (ii) issued in compliance with the terms and conditions of Article 5 of the Stockholders' Agreement; or

(j)     the issuances of the shares of Common Stock to the Stockholders contemplated by the Plan and the Definitive Documents (as defined in the Restructuring Support Agreement) on the Plan Effective Date.

"Indebtedness" means with respect to any Person, without duplication, any liability of such Person (a) for borrowed money, whether current or funded, secured or unsecured, or with respect to deposits or advances of any kind, (b) incurred or assumed as the deferred purchase price of assets, property or services (but excluding trade accounts payable arising in the ordinary course of business), (c) evidenced by notes, bonds, debentures or other similar instruments, (d) for the reimbursement of any obligor on any banker's acceptance, letter of credit, performance bond or similar credit transaction, (e) for indebtedness of others guaranteed by such Person to the extent of such guarantee or arrangement and (f) for indebtedness of any other Person of the type referred to in clauses (a), (b), (c), (d) and (e) of this definition which is secured by any lien on any property or asset of such first referred to Person, the amount of such indebtedness referred to in this clause (f) being deemed to be the lesser of the value of such property or asset or the amount of the indebtedness so secured to the extent of such security interest.  Except as otherwise provided in this definition of "Indebtedness~~"~~," the amount of Indebtedness of any Person at any date shall be (i) the outstanding principal amount of all unconditional obligations described above and interest, as such amount would be reflected on a balance sheet prepared in accordance with GAAP, and (ii) with respect to all contingent obligations described above, the maximum liability as of such date of such Person for any guarantees of Indebtedness for

12

borrowed money of any other Person and the amount required under GAAP to be accrued with respect to any other contingent obligation.

"Initial Public Offering" means any of (i) an initial Public Offering of shares of Common Stock pursuant to an effective registration statement under the Securities Act, (ii) a single transaction or series of related transactions by a merger, acquisition or other business combination involving the Corporation and a publicly traded special purpose acquisition company or other similar entity in which a class of capital stock of the special purpose acquisition company or other similar entity (or its successor) is publicly traded on a National Securities Exchange or (iii) any other transaction or series of related transactions following consummation of which the shares of Common Stock are listed and traded on a National Securities Exchange or an established non-United States securities exchange; *provided* that an Initial Public Offering shall not include any issuance of shares of Common Stock solely to existing holders of Corporation Securities or employees or consultants of any Corporate Entity on Form S-4, Form F-4 or Form S-8 (or any successor form adopted by the U.S. Securities and Exchange Commission (the "SEC") or any comparable form adopted by any foreign securities regulators).

"Management Incentive Plan" means a management incentive plan adopted and approved by the Board.

"National Securities Exchange" means the New York Stock Exchange, NYSE American, the Nasdaq Global Select Market, the Nasdaq Global Market, the Nasdaq Capital Market or another U.S. national securities exchange registered with the SEC.

"Nuveen" means Nuveen Asset Management, LLC together with its Affiliates, including but not limited to Teachers Advisors, LLC.

"Ownership Percentage" means, with respect to any Stockholder or group of Stockholders, a fraction (a) the numerator of which is the total number of shares of outstanding Common Stock beneficially owned by such Stockholder or group of Stockholders (together with their respective Affiliates and Related Funds) at such time (without duplication) and (b) the denominator of which is the total number of shares of outstanding Common Stock held by all Stockholders at such time, in each case, excluding, for purposes of this calculation, (i) any shares of Common Stock issuable upon the exercise, conversion or exchange of Cconvertible Ssecurities, (ii) any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan and held by an employee or Director of the Corporation, and (iii) any shares that constitute an Excluded Issuance pursuant to clauses (b), (d) and (e) under the definition of Excluded Issuances.

"Person" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Public Offering" means any sale or distribution to the public of a Corporation Security or other equity Security of any of the Corporation's Subsidiaries pursuant to an offering registered under the Securities Act, whether by the Corporation, by a Subsidiary, by Stockholders

13

and/or by any other holders of such Corporation Security or other equity Security of any of the Corporation's Subsidiaries.

"Qualified IPO" means a firm commitment underwritten Initial Public Offering of Common Stock that provides for at least an aggregate of three hundred seventy-five million dollars ($375,000,000) in gross proceeds to the Corporation and/or any selling Stockholders and, immediately after such Initial Public Offering, the Common Stock is quoted or listed for trading on a National Securities Exchange.

"Related Fund" means with respect to any Person, any fund, account or investment vehicle that is controlled, managed, sub-managed, advised or sub-advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, sub-investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, sub-investment manager, advisor or sub-advisor.

"Sale Transaction" means the occurrence of any of the following: (a) the direct or indirect sale, lease, transfer, exclusive license, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation, whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Corporation and its Subsidiaries (taken as a whole); or (b) the consummation of any transaction or series of transactions (including any merger or consolidation, whether by operation of law or otherwise), the result of which is that any Person or "group" (as defined under Section 13 of the Exchange Act) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Corporation Securities or of the membership or other equity interests of any surviving entity of any such merger or consolidation; provided, however, that, a Sale Transaction shall not be deemed to have occurred in the case of clause (a), if such Sale Transaction is completed in connection with the internal restructuring of the Corporation and the resulting owner(s) of the assets of the Corporation are, directly or indirectly, the same Stockholders who owned such assets prior to such Sale Transaction.

"Sculptor" means Sculptor Capital LP, solely on behalf of its and its Affiliates' Related Funds.

"Securities" means "securities" as defined in Section 2(a)(1) of the Securities Act and includes, with respect to any Person, capital stock or other equity interests issued by such Person or any options, warrants or other Securities that are directly or indirectly convertible into, or exercisable or exchangeable for, capital stock or other equity interests issued by such Person.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Significant Holder" means, at the time of determination, a Stockholder (together with its Affiliates and Related Funds) whose Ownership Percentage equals or exceeds five percent (5%).

"Stockholder" or "Stockholders" means those Persons listed on Schedule 1 of the Stockholders' Agreement and any other Person who shall at any time be a party to or bound by

14

the Stockholders' Agreement as a result of the execution and delivery to the Corporation of a Joinder.

"Subsidiary" means, with respect to a Person, any entity required to be consolidated with such Person in such Person's books and records pursuant to GAAP, or any corporation, general or limited partnership, limited liability company, joint venture or other entity in which such Person (a) owns, directly or indirectly, fifty percent (50%) or more of its outstanding voting securities, equity interests, profits interest or capital interest, (b) is entitled to elect at least one-half of the board of directors or similar governing body or (c) in the case of a limited partnership or limited liability company, is a general partner or managing member and has the power to direct the policies, management and affairs of such entity, respectively.

12.2    Consent Rights.  The Corporation shall not, and shall cause its Subsidiaries not to, either directly or indirectly by amendment, merger, consolidation or otherwise, take any of the actions referred to in Sections 12.2(a), 12.2(b), 12.2(c) or 12.2(d) without (in addition to any other vote required by law) the written consent or affirmative vote required by Sections 12.2(a), 12.2(b), 12.2(c) or 12.2(d), respectively, for such action and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

(a)    The Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, enter, amend or renew an agreement, arrangement or transaction with (i) any Affiliate of the Corporation (other than a wholly-owned direct or indirect Subsidiary of the Corporation) or (ii) any Person that constitutes a Significant Holder or an Affiliate of such Person (each of the Persons described in clauses (i) and (ii), a "Related Party" and any such agreement or transaction, a "Related Party Agreement"), excluding (x) a transaction or series of related transactions involving less than two million dollars ($2,000,000) in aggregate payments if made in the ordinary course of business and consistent with past practice with a portfolio company of such Stockholder or its Affiliates and on an arm's-length basis and (y) debt financings with respect to which all Stockholders are offered the opportunity to participate on a pro rata basis on the same terms, and equity or equity-linked financings offered in accordance with Section 5.01 of the Stockholders' Agreement and this Section 12.2(a), in each case, unless such Related Party Agreement is on an arm's-length basis and approved by a majority of the disinterested Directors that are not Affiliated with, or designated by, the Related Party or any of its Affiliates or Related Funds (including, for the avoidance of doubt, any fund employee Directors); provided, however, that any issuance of Corporation Securities in accordance with the terms of Article 5 of the Stockholders' Agreement shall be deemed not to be a Related Party Agreement.

(b)    As long as Apollo's Ownership Percentage is at least twenty-five percent (25%), and prior to the consummation of a Qualified IPO, the Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions without the approval of Apollo, in its capacity as a Stockholder:

i.    create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to any Indebtedness in excess of one hundred million dollars ($100,000,000);

15

ii. make distributions or pay dividends (whether in cash or in-kind) on any outstanding Corporation Securities;

iii. consummate a Sale Transaction; or

iv. consummate any acquisition or disposition (whether of a sale of stock or assets, disposition of assets, merger or consolidation) of the Corporation or any of its Subsidiaries, in each case, in a transaction or series of related transactions involving total consideration in excess of one hundred million dollars ($100,000,000).

(c) As long as Apollo's Ownership Percentage is at least twenty-five percent (25%), and prior to the consummation of a Qualified IPO, the Board shall in good faith consult with Apollo reasonably in advance of the termination or hiring of a Chief Executive Officer, and Apollo shall be entitled to recommend candidates to the Board for consideration in connection with any hiring process for a replacement Chief Executive Officer during such consultation period.

(d) Prior to the consummation of an Initial Public Offering, the Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions without the approval of Stockholders holding at least seventy-five percent (75%) of the issued and outstanding shares of Common Stock (excluding Excluded Issuances):

i. non-pro rata redemptions or reclassifications of the Capital Stock or any other equity in the Corporation (other than any redemptions or repurchases made by departing employees or other services providers); or

ii. the declaration of distributions or dividends on the Capital Stock other than on a pro rata basis based on ownership of the Capital Stock.

## ARTICLE XIII

13.1 <u>Amendment</u>. From time to time, subject to the terms of the Stockholders' Agreement, any of the provisions of this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation) may be amended, altered, or repealed by the approval of a majority of the Directors of the Board and approval of Holders of a majority of the issued and outstanding shares of Common Stock and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted by the approval of a majority of the Directors of the Board and approval of Holders of a majority of the issued and outstanding shares of Common Stock and in the manner and at the time prescribed by said laws <u>provided</u>, <u>however</u>, that (a) any amendments (i) to this <u>Section 13.1</u>, (ii) that seek to waive or alter any corporate fiduciary duty owed by any current or former Director or officer of the Corporation under the Delaware law or (iii) any amendments pertaining to Related Party Transactions or (b) any amendments which would impose new limitations or conditions on transferability of Common Stock (other than contractual lock-up agreements) shall require the approval of the Holders of seventy-five percent (75%) of the issued and outstanding shares of Common Stock and (solely in the case of any amendments described in clauses (a)(ii) or (a)(iii) in this <u>Section 13.1</u> that are favorable to the Corporation's Affiliates, any current or former officer of the

16

Corporation or any current or former Director of the Corporation, approval of Holders of a majority of the issued and outstanding shares of Common Stock, excluding Affiliates at such time); provided, further, that any amendments that materially disproportionately and adversely affect rights specified in this Amended and Restated Certificate of Incorporation of one or more Holders relative to the impact on one or more other Holders (or that disproportionately benefit one or more Holders relative to the rights of other Holders), shall require approval of a majority of the disproportionately adversely affected Holders.  All rights at any time conferred upon the stockholders or the Corporation by this Amended and Restated Certificate of Incorporation are granted subject to the provisions of this Article XIII.

17

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Incorporation.

AVAYA HOLDINGS CORP.

By:_____

Name: Alan Masarek

Title: Chief Executive Officer

Dated: May 1, 2023

17

**Exhibit A(iii)**

**Bylaws**

**THIRD AMENDED AND RESTATED**

**BYLAWS**

**OF**

**AVAYA HOLDINGS CORP.**

**ARTICLE I**
**Offices**

SECTION 1.01.  Registered Office.  The registered office and registered agent of Avaya Holdings Corp. (the "Corporation") in the State of Delaware shall be as set forth in the Certificate of Incorporation (as defined below).  The Corporation may also have offices in such other places in the United States or elsewhere (and may change the Corporation's registered agent) as the Board of Directors of the Corporation (the "Board") may, from time to time, determine or as the business of the Corporation may require as determined by any officer of the Corporation.

**ARTICLE II**
**Meetings of Stockholders**

SECTION 2.01.  Annual Meetings.  Unless directors are elected by written consent of the stockholders in lieu of an annual meeting as permitted by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended (the "DGCL"), annual meetings of stockholders may be held at such place, if any, either within or without the State of Delaware, and at such time and date as the Board shall determine and state in the notice of meeting.  The Board may, in its sole discretion, determine that meetings of the stockholders shall not be held at any place, but may instead be held solely by means of remote communication as described in Section 2.11 of this Article II in accordance with Section 211(a)(2) of the DGCL.  The Board may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board.

SECTION 2.02.  Special Meetings.  Special meetings of the stockholders for any purpose or purposes, may be called at any time by the Board or by stockholders holding a majority of the issued and outstanding shares of common stock of the Corporation, and may not be called by any other person or persons, unless otherwise prescribed by law, the Corporation's certificate of incorporation as then in effect (including any Preferred Stock Designation (as defined therein)) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Certificate of Incorporation") and the Stockholders' Agreement, dated as of May 1, 2023, by and among the Corporation and the stockholders of the Corporation party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Stockholders' Agreement"), and may be held at such place, if any, either within or without the State of Delaware, and at such time and date as the Board, the Chairperson of the Board (the "Chairperson") or the Chief Executive Officer of the Corporation (the "Chief Executive Officer") shall determine and shall be stated in the notice of such meeting.  The Board may postpone, reschedule or cancel any special meeting of stockholders previously scheduled by the Board, the Chairperson or the Chief Executive Officer. Stockholders

1

may act by written consent with respect to any matter that may be acted upon by such stockholders at a special meeting of the stockholders.

SECTION 2.03.   Notice of Stockholder Business and Nominations.

(a)      Annual Meetings of Stockholders.   Subject to the terms of the Stockholders' Agreement, at annual meetings of stockholders, the stockholders shall elect directors to the Board and transact such other business as may properly be brought before the meeting.

(b)      Special Meetings of Stockholders.   Only such business (including the election of specific individuals to fill vacancies or newly created directorships on the Board) shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting.   At any time that stockholders are not prohibited from filling vacancies or newly created directorships on the Board, nominations of persons for election to the Board to fill any vacancy or unfilled newly created directorship may be made at a special meeting of stockholders at which any proposal to fill any vacancy or unfilled newly created directorship is to be presented to the stockholders (i) as provided in the Stockholders' Agreement or (ii) by or at the direction of the Board or any committee thereof.

SECTION 2.04.   Notice of Meetings.   Whenever stockholders are required or permitted to take any action at a meeting, a timely notice in writing or by electronic transmission, in the manner provided in Section 232 of the DGCL, of the meeting, which shall state the place, if any, date and time of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purposes for which the meeting is called, shall be mailed to or transmitted electronically by the Secretary (as defined below) to each stockholder of record entitled to vote thereat as of the record date for determining the stockholders entitled to notice of the meeting. Unless otherwise provided by law, the Certificate of Incorporation or these Bylaws, the notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting.

SECTION 2.05.   Quorum.   Unless otherwise required by law and except as provided in the Stockholders' Agreement, the Certificate of Incorporation or the rules of any stock exchange upon which the Corporation's securities are listed, the holders of record of a majority of the voting power of the issued and outstanding shares of stock of the Corporation entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of stockholders.   Notwithstanding the foregoing, where a separate vote by a class or series or classes or series is required, the holders of record of a majority of the voting power of the issued and outstanding shares of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to the vote on that matter.   Once a quorum is present to organize a meeting, it shall not be broken by the subsequent withdrawal of any stockholders.

2

SECTION 2.06.  <u>Voting</u>.  Except as otherwise provided by or pursuant to the provisions of the Certificate of Incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of stock held by such stockholder that has voting power upon the matter in question.  Each stockholder entitled to vote at a meeting of stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy in any manner provided by applicable law, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.  A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary a revocation of the proxy or a new proxy bearing a later date.  Unless required by the Certificate of Incorporation, the Stockholders' Agreement or applicable law, or determined by the chairperson of the meeting to be advisable, the vote on any question need not be by ballot.  On a vote by ballot, each ballot shall be signed by the stockholder voting, or by such stockholder's proxy, if there be such proxy.  When a quorum is present or represented at any meeting, the vote of the holders of a majority of the voting power of the shares of stock present in person or represented by proxy and entitled to vote on the subject matter shall decide any question brought before such meeting, unless the matter is one upon which, by express provision of applicable law, of the rules or regulations of any stock exchange applicable to the Corporation, of any regulation applicable to the Corporation or its securities, of the Certificate of Incorporation, of the Stockholders' Agreement or of these Bylaws, a minimum or different vote is required, in which case such minimum or different vote shall be the applicable vote on such matter.  Notwithstanding the foregoing sentence and subject to the Certificate of Incorporation, unless the Stockholders' Agreement requires a different standard, all elections of directors shall be determined by a plurality of the votes cast in respect of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

SECTION 2.07.  <u>Chairperson of Meetings</u>.  The Chairperson, if one is elected (or appointed by the Selection Committee (as defined in the Stockholders' Agreement) in accordance with the Stockholders' Agreement), or, in his or her absence or disability, the Vice Chairperson of the Board (the "<u>Vice Chairperson</u>"), if one is appointed, or in his or her absence of disability, the Chief Executive Officer, or in the absence of the Chairperson, the Vice Chairperson and the Chief Executive Officer, a person designated by the Board shall be the chairperson of the meeting and, as such, preside at all meetings of the stockholders.  The order of business at each meeting of the stockholders shall be determined by the chairperson of such meeting, but such order of business may be changed by a majority in voting interest of those present in person or by proxy at such meeting and entitled to vote thereat.

SECTION 2.08.  <u>Secretary of Meetings</u>.  The Secretary of the Corporation (the "<u>Secretary</u>") shall act as secretary at all meetings of the stockholders.  In the absence or disability of the Secretary, an Assistant Secretary of the Corporation (an "<u>Assistant Secretary</u>") shall act as secretary at all meetings of the stockholders.  In the absence of the Secretary and all Assistant Secretaries, the Chairperson, the Vice Chairperson or the Chief Executive Officer shall appoint a person to act as secretary at such meetings.

SECTION 2.09.  <u>Consent of Stockholders in Lieu of Meeting</u>.  Subject to the terms of the Stockholders' Agreement, any action required or permitted to be taken at any annual or special

3

meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, only if a consent, setting forth the action so taken, is signed by the holders of record of the issued and outstanding stock of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action (such minimum number of votes to be in accordance with any applicable terms of the Stockholders' Agreement and the DGCL) at a meeting at which all shares entitled to vote thereon were present and voted and is delivered to the Corporation in accordance with the DGCL. Prompt, written notice of the action taken by means of any such consent that is other than unanimous shall be given to those stockholders who have not consented in writing.

SECTION 2.10.  Adjournment.  At any meeting of stockholders of the Corporation, if less than a quorum be present, the chairperson of the meeting or stockholders upon the vote of a majority of the votes cast, shall have the power to adjourn the meeting from time to time without notice, other than the announcement (which can displayed during the time scheduled for the meeting on the same electronic network used to enable stockholders and proxy holders to participate in the meeting by means of remote communication) at the meeting at which the adjournment is taken of the date and time of the adjourned meeting; provided, that the chairperson of the meeting or stockholders upon the vote of a majority of the votes cast shall also have the power to adjourn the meeting from time to time to address a technical failure to convene or continue a meeting using remote communication, which adjournment can be done without notice (other than the announcement (which can displayed during the time scheduled for the meeting on the same electronic network used to enable stockholders and proxy holders to participate in the meeting by means of remote communication) at the meeting at which the adjournment is taken of the date and time of the adjourned meeting).  Any business may be transacted at the adjourned meeting that might have been transacted at the meeting originally noticed.  If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for determination of stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix as the record date for determining stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date so fixed for notice of such adjourned meeting.

SECTION 2.11.  Remote Communication.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(a)      participate in a meeting of stockholders; and

(b)      be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication; provided, however, that:

(i)     the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder;

(ii)     the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings; and

(iii)     if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

SECTION 2.12.  Inspectors of Election.  The Corporation may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more inspectors of election, who may be employees of the Corporation, to act at the meeting or any adjournment or postponement thereof and to make a written report thereof.  The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  In the event that no inspector so appointed or designated is able to act at a meeting of stockholders, the chairperson of the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath to execute faithfully the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspector or inspectors so appointed or designated shall (a) ascertain the number of shares of stock of the Corporation outstanding and the voting power of each such share, (b) determine the shares of stock of the Corporation represented at the meeting and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (e) certify his or her determination of the number of shares of stock of the Corporation represented at the meeting and such inspectors' count of all votes and ballots.  Such certification and report shall specify such other information as may be required by law.  In determining the validity and counting of proxies and ballots cast at any meeting of stockholders of the Corporation, the inspectors may consider such information as is permitted by applicable law.  No person who is a candidate for an office at an election may serve as an inspector at such election.

## ARTICLE III
### Board of Directors

SECTION 3.01.  Powers.     Except as otherwise provided by the Certificate of Incorporation, the Stockholders' Agreement or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of its Board.  The Board may exercise all such authority and powers of the Corporation and do all such lawful acts and things as are not by the DGCL, the Stockholders' Agreement or the Certificate of Incorporation directed or required to be exercised or done by the stockholders.

SECTION 3.02.  Number and Term; Chairperson.   Subject to the provisions of the Certificate of Incorporation and the Stockholders' Agreement, the number of Directors shall be fixed from time to time by resolution of the Board.  Initially, the Board shall consist of nine (9)

Directors.   Except as otherwise provided in the Stockholders' Agreement or these Bylaws, Directors shall be elected by the stockholders at each annual meeting of stockholders. The term for each Director shall be two (2) years for the initial term beginning on the Plan Effective Date (as defined in the Stockholders' Agreement) and one (1) year for each term thereafter. Directors need not be stockholders.  Subject to the terms of the Stockholders' Agreement, the Board shall, by majority vote, elect a Chairperson, who shall have such powers and perform such duties as provided in these Bylaws and as the Board may from time to time prescribe, from among the directors by resolution passed by a majority of the Board; provided, however, subject to the terms of the Stockholders' Agreement, the Chairperson of the Board shall not contemporaneously serve as the Chief Executive Officer of the Corporation nor be an employee of a stockholder of the Corporation; provided, further, that the Chairperson of the Board for the initial term shall be determined unanimously by the Selection Committee and shall not contemporaneously serve as the Chief Executive Officer of the Corporation.  The Chairperson shall preside at all meetings of the Board at which he or she is present.  The Board may also appoint a Vice Chairperson.  If the Chairperson is not present at a meeting of the Board, the Vice Chairperson, if one has been appointed, shall preside at such meeting.  If neither the Chairperson nor the Vice Chairperson is present at a meeting of the Board, the Chief Executive Officer shall preside at such meeting, and, if the Chief Executive Officer is not present at such meeting or is not a director, a majority of the directors present at such meeting shall elect one (1) of their members to preside.  Subject to the terms of the Stockholders' Agreement, the Board may remove and/or replace the Chairperson or the Vice Chairperson at any time; provided, that, during the initial term, only the Selection Committee acting by unanimous written consent may remove and/or replace the Chairperson.

SECTION 3.03.   Resignations.  Any director may resign at any time upon notice given in writing or by electronic transmission to the Board, the Chairperson, the Chief Executive Officer or the Secretary or, in the case of the resignation from a committee, the chairperson of the applicable committee.  The resignation shall take effect at the time specified therein, and if no time is specified, at the time of its receipt.  The acceptance of a resignation shall not be necessary to make it effective unless otherwise expressly provided in the resignation.

SECTION 3.04.   Removal.  Subject to the terms of the Stockholders' Agreement, directors of the Corporation may be removed in the manner provided by applicable law.

SECTION 3.05.   Vacancies and Newly Created Directorships.  Subject to the terms of the Stockholders' Agreement (including the requirement that certain stockholders may designate directors for election to the Board so long as such stockholders meet certain Ownership Percentage (as defined in the Stockholders' Agreement) thresholds) and these Bylaws, newly created directorships resulting from any increase in the number of directors and any vacancies on the Board resulting from death, resignation, disqualification, removal or other cause may be filled by the affirmative vote of a majority of the remaining directors then in office, even if less than a quorum of the Board, or by a sole remaining director.  Any director elected in accordance with the preceding sentence will hold office for the remainder of the full term of the director whose seat is being filled and until such director's successor has been elected and qualified.  No decrease in the number of directors constituting the Board may shorten the term of any incumbent director. If there are no directors in office, then an election of directors may be held in accordance with the Stockholders' Agreement and in the manner provided by law.

SECTION 3.06.  <u>Meetings</u>.  Regular meetings of the Board may be held at such places and times as shall be determined from time to time by the Board.  Subject to the terms of the Stockholders' Agreement, special meetings of the Board may be called by the Board, the Chairperson or by Stockholders that beneficially own at least twenty-five percent (25%) of the voting power of the issued and outstanding shares of stock of the Corporation and shall be at such places and times as they or he or she shall fix.  Notice need not be given of regular meetings of the Board.  At least twenty-four (24) hours before each special meeting of the Board, written notice, notice by electronic transmission or oral notice (either in person or by telephone) of the time, date and place of the meeting shall be given to each director, which required notice shall be deemed to be waived by a director's attendance at a meeting (unless solely for the purpose of objecting to the lack of required notice).  Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting.

SECTION 3.07.  <u>Quorum, Voting and Adjournment</u>.  Subject to the terms of the Stockholders' Agreement, at least a majority of the total number of directors that the Corporation would have if there were no vacancies on the Board shall constitute a quorum for the transaction of business.  Except as otherwise provided by law, the Certificate of Incorporation, the Stockholders' Agreement or these Bylaws, the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board.  In the absence of a quorum, a majority of the directors present thereat may adjourn such meeting to another time and place.  Notice of such adjourned meeting need not be given if the time and place of such adjourned meeting are announced at the meeting so adjourned.

SECTION 3.08.  <u>Committees; Committee Rules</u>.  Subject to the terms of the Stockholders' Agreement, the Board may designate one or more committees, including, but not limited to, an Audit Committee and a Compensation Committee, each such committee to consist of one or more of the directors of the Corporation.  Subject to the terms of the Stockholders' Agreement, the Board may designate one or more directors as alternate members of any committee (for the avoidance of doubt, other than the Selection Committee) to replace any absent or disqualified member at any meeting of any such committee.  Subject to the terms of the Stockholders' Agreement, any such committee, to the extent provided in the resolution of the Board establishing such committee or to the extent provided in the Stockholders' Agreement, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority in reference to the following matters: (a) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval, (b) adopting, amending or repealing these Bylaws or (c) adopting any action requiring the consent of a stockholder or stockholders, pursuant to the terms of the Stockholders' Agreement, without such consent. For the avoidance of doubt, none of Apollo, Brigade, Nuveen or Sculptor (each such term as defined in the Certificate of Incorporation) will have a veto over adoption of the business plan, budget and/or strategic investments of the Corporation in any way, including as a result of any committee membership, for so long as none of Apollo, Brigade, Nuveen or Sculptor have an individual right to appoint a majority of the Board.  All committees of the Board shall keep minutes of their meetings and shall report their proceedings to the Board when requested or required by the Board.  Each committee of the Board may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be

provided by a resolution of the Board designating such committee.  Unless otherwise provided in such a resolution, the presence of at least a majority of the members of the committee shall be necessary to constitute a quorum unless the committee shall consist of one or two members, in which event one member shall constitute a quorum; and all matters shall be determined by a majority vote of the members present at a meeting of the committee at which a quorum is present. Subject to the terms of the Stockholders' Agreement, unless otherwise provided in such a resolution, in the event that a member and that member's alternate, if alternates are designated by the Board, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in place of any such absent or disqualified member.

SECTION 3.09.  <u>Action Without a Meeting</u>.  Unless otherwise restricted by the Certificate of Incorporation or the Stockholders' Agreement, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all members of the Board or any committee thereof, as the case may be, consent thereto in writing or by electronic transmission.  The writing or writings or electronic transmission or transmissions shall be filed in the minutes of proceedings of the Board or committee, as applicable.  Such filing shall be in paper form if the minutes are maintained in paper form or shall be in electronic form if the minutes are maintained in electronic form.

SECTION 3.10.  <u>Remote Meeting</u>.  Unless otherwise restricted by the Certificate of Incorporation or applicable law, members of the Board, or any committee designated by the Board, may participate in a meeting by means of conference telephone or other communications equipment in which all persons participating in the meeting can hear each other.  Participation in a meeting by means of conference telephone or other communications equipment shall constitute presence in person at such meeting.

SECTION 3.11.  <u>Compensation</u>.  Subject to the Stockholders' Agreement, the Board shall have the authority to fix the compensation, including fees and reimbursement of expenses, of directors and Board observers for services to the Corporation in any capacity.

SECTION 3.12.  <u>Reliance on Books and Records</u>.  A member of the Board, or a member of any committee designated by the Board shall, in the performance of such person's duties, be fully protected in relying in good faith upon records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees of the Board, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

## ARTICLE IV
## Officers

SECTION 4.01.  <u>Number</u>.  The officers of the Corporation shall include a Chief Executive Officer and a Secretary, each of whom shall be elected by the Board, subject to the provisions of the Stockholders' Agreement, and who shall hold office for such terms as shall be determined by the Board and until such officer's successor is elected and qualified or until such officer's earlier

8

resignation or removal.  In addition, the Board may elect a President and one or more Vice Presidents, including one or more Executive Vice Presidents, Senior Vice Presidents, a Chief Operating Officer, a Chief Financial Officer, a Controller, a Treasurer and one or more Assistant Treasurers and one or more Assistant Secretaries, who shall hold their office for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.  Subject to the provisions of the Certificate of Incorporation and the Stockholders' Agreement, any number of offices may be held by the same person.  Officers need not be stockholders or residents of the State of Delaware.

SECTION 4.02.  <u>Other Officers and Agents</u>.  The Board may appoint or delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove the same, as it deems advisable, who shall hold their office for such terms and shall exercise and perform such powers and duties as shall be determined from time to time by the Board; <u>provided</u>, <u>however</u>, that any officer possessing authority over or responsibility for any functions of the Board shall be an elected officer. Each appointed officer shall hold office until such officer's successor has been appointed and qualified or until such officer's earlier resignation or removal.

SECTION 4.03.  <u>Chief Executive Officer</u>.  The Chief Executive Officer, subject to the control and oversight of the Board, shall have general responsibility for the day-to-day business and affairs of the Corporation and shall be the chief policy making officer of the Corporation.  In the absence of the Chairperson and the Vice Chairperson, the Chief Executive Officer shall preside at all meetings of the stockholders and the Board, and he or she shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board or these Bylaws.

SECTION 4.04.  <u>President</u>.  The President, subject to the powers and oversight of the Board and the Chief Executive Officer, shall have the general powers and duties incident to the office of the president of a corporation, shall perform such duties and services and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.05.  <u>Chief Operating Officer</u>.  The Chief Operating Officer, subject to the powers and oversight of the Board and the Chief Executive Officer, shall have direct responsibility for the business and affairs of the Corporation, including supervisory responsibility for the officers, agents, employees and properties of the Corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.06.  <u>Vice Presidents</u>.  Each Vice President, including any Executive Vice President and any Senior Vice President, shall have such powers and perform such duties incident to the office of the vice president of a corporation, and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.07.  <u>Controller</u>.  The Controller shall be the chief accounting officer of the Corporation.  The Controller shall report to the Chief Financial Officer and, when requested,

counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer or the Chief Financial Officer or as the Board may from time to time determine.

SECTION 4.08.  Chief Financial Officer.   The Chief Financial Officer shall have responsibility for all financial and accounting matters, including supervisory responsibilities for the Treasurer, any Assistant Treasurer or any Vice President of Finance of the Corporation.  The Chief Financial Officer shall have the general powers and duties incident to the office of the chief financial officer of a corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.09.  Treasurer.  The Treasurer shall have custody of the corporate funds, securities, evidences of indebtedness and other valuables of the Corporation and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation.  The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Corporation in such depositories as may be designated by the Board or its designees selected for such purposes.  The Treasurer shall disburse the funds of the Corporation, taking proper vouchers therefor.  The Treasurer shall render to the Chief Executive Officer, the Chief Financial Officer and the Board, upon their request, a report of the financial condition of the Corporation.  The Treasurer shall, in the absence or disability of the Chief Financial Officer, act with all of the powers and have the responsibilities assigned to the Chief Financial Officer. In addition, the Treasurer shall have the general powers and duties incident to the office of the treasurer of a corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer, the Chief Financial Officer or these Bylaws.  If required by the Board, the Treasurer shall give the Corporation a bond for the faithful discharge of his or her duties in such amount and with such surety as the Board shall prescribe.

SECTION 4.10.  Secretary.   The Secretary shall: (a) record the proceedings of the meetings of the stockholders and the Board in a minute book to be kept for that purpose; (b) cause notices to be duly given in accordance with the provisions of these Bylaws and as required by law; (c) be the custodian of the records and the seal of the Corporation and affix and attest the seal to any stock certificates of the Corporation (unless the seal of the Corporation on such certificates shall be a facsimile, as hereinafter provided) and affix and attest the seal to all other documents to be executed on behalf of the Corporation under its seal; (d) cause the books, reports, statements, certificates and other documents and records required by law to be kept and filed to be properly kept and filed; and (e) in general, have all the powers and perform all the duties incident to the office of the secretary of a corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.11.  Assistant Treasurers and Assistant Secretaries. Each Assistant Treasurer and each Assistant Secretary, if any are elected, shall be vested with all the powers and shall perform all the duties of the Treasurer and Secretary, respectively, in the absence or disability of such officer, unless or until the Chief Executive Officer or the Board shall otherwise determine. The Board may appoint or delegate the power to appoint any such Assistant Treasurer and Assistant Secretary as it deems advisable. In addition, Assistant Treasurers and Assistant

10

Secretaries shall have such other powers and duties as may be assigned to, or required of, them from time to time by the Board, the Chief Executive Officer, the President or these Bylaws.

SECTION 4.12.   Corporate Funds and Checks.  The funds of the Corporation shall be kept in such depositories as shall from time to time be prescribed by the Board or its designees selected for such purposes.  All checks or other orders for the payment of money shall be signed by the Chief Executive Officer, the Chief Financial Officer and such other persons as may from time to time be authorized by the Board.

SECTION 4.13.   Contracts and Other Documents.   The Chief Executive Officer, the President, the Chief Operating Officer and any such other officer or officers as may from time to time be authorized by the Board, shall have the power to sign and execute on behalf of the Corporation deeds, conveyances and contracts, and any and all other documents requiring execution by the Corporation.

SECTION 4.14.   Ownership of Stock of Another Corporation.  Unless otherwise directed by the Board, the Chief Executive Officer, the President, the Chief Operating Officer, and any such other person as shall be authorized by the Board, shall have the power and authority, on behalf of the Corporation, to attend and to vote at any meeting of security holders of any entity in which the Corporation holds securities or equity interests and may exercise, on behalf of the Corporation, any and all of the rights and powers incident to the ownership of such securities or equity interests at any such meeting, including the authority to execute and deliver proxies and consents on behalf of the Corporation.

SECTION 4.15.   Delegation of Duties.  In the absence, disability or refusal of any officer to exercise and perform his or her duties, the Board may delegate to another officer such powers or duties.

SECTION 4.16.   Resignation and Removal.   Any officer of the Corporation may be removed from office for or without cause at any time by the Board.  Any officer may resign at any time in the same manner prescribed under Section 3.03 of Article III of these Bylaws.

SECTION 4.17.       Compensation; Vacancies.  The compensation of elected officers shall be set by the Board or delegated by the Board to the same extent as permitted by these Bylaws. The Board shall have the power to fill vacancies occurring in any office.  The compensation of appointed officers and the filling of vacancies in appointed offices shall be set and filled, respectively, by the Board or delegated by the Board to the same extent as permitted by these Bylaws for the initial filling of such offices.

**ARTICLE V**
**Stock**

SECTION 5.01.   Uncertificated Shares.  The shares of stock of the Corporation shall be uncertificated and shall be represented by book entries on the Corporation's securities transfer books and records; provided, however, that, subject to the Stockholders' Agreement, the Board may provide by resolution or resolutions that some or all of any or all classes or series of the Corporation's stock shall be represented by certificates.  Notice of the information required by the DGCL shall be furnished in accordance with the DGCL within a reasonable time after the issue or

11

transfer of uncertificated shares.  Every holder of stock in the Corporation represented by certificates shall be entitled to have a certificate signed by or in the name of the Corporation by any two authorized officers of the Corporation, certifying the number and class of shares of stock of the Corporation owned by such holder.  Any or all of the signatures on the certificate may be a facsimile.  The Board shall have the power to appoint one or more transfer agents and/or registrars for the transfer or registration of certificates of stock of any class, and may require stock certificates to be countersigned or registered by one or more of such transfer agents and/or registrars.  The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.  The Corporation shall not have power to issue a certificate in bearer form.

SECTION 5.02.  Transfer; Resales.  Upon compliance with the provisions restricting the transfer or registration of transfer of shares of stock, if any, contained in the Certificate of Incorporation and the Stockholders' Agreement, shares of stock of the Corporation shall be transferable upon its books, which may be maintained by a third-party registrar or transfer agent, by the holders thereof, in person or by their duly authorized attorneys or legal representatives, upon surrender to the Corporation by delivery thereof (to the extent evidenced by a physical stock certificate) to the person in charge of the stock and transfer books and ledgers.  Certificates representing such shares, if any, shall be cancelled and new certificates, if the shares are to be certificated, shall thereupon be issued.  Shares of stock of the Corporation that are not represented by a certificate shall be transferred in accordance with the Stockholders' Agreement and applicable law.  A record shall be made of each transfer.  Whenever any transfer of shares shall be made for collateral security, and not absolutely, it shall be so expressed in the entry of the transfer if, when the certificates are presented, both the transferor and transferee request the Corporation to do so.  Nothing herein is intended to prevent shares of stock of the Corporation from being DTC-eligible and shall not preclude the settlement of any transaction in shares of stock of the Corporation entered into through the facilities of a national securities exchange or trading on the OTC Markets Group Inc. electronic inter-dealer quotation system, including OTCQX, OTCQB and OTC Pink.

SECTION 5.03.  Lost, Stolen, Destroyed or Mutilated Certificates.  A new certificate of stock or uncertificated shares may be issued in the place of any certificate previously issued by the Corporation alleged to have been lost, stolen or destroyed, and the Corporation may, in its discretion, require the owner of such lost, stolen or destroyed certificate, or his or her legal representative, to give the Corporation a bond or an agreement of indemnity, in such sum as the Corporation may direct, in order to indemnify the Corporation against any claims that may be made against it in connection therewith.  A new certificate or uncertificated shares of stock may be issued in the place of any certificate previously issued by the Corporation that has become mutilated upon the surrender by such owner of such mutilated certificate and, if required by the Corporation, the posting of a bond or delivering of an agreement of indemnity by such owner to indemnify the Corporation against any claims that may be made against it in connection therewith.

SECTION 5.04.  List of Stockholders Entitled to Vote.  The Corporation shall prepare, no later than the tenth day before each meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting (provided, however, if the record date for determining the stockholders entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in

alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of ten (10) days ending on the day before the meeting date (a) on a reasonably accessible electronic network; provided, however, that the information required to gain access to such list is provided with the notice of meeting or (b) during ordinary business hours at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this Section 5.04 or to vote in person or by proxy at any meeting of stockholders.

SECTION 5.05.   Fixing Date for Determination of Stockholders of Record.

(a)      In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall, unless otherwise required by law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

(b)      In order that the Corporation may determine, in accordance with the provisions of the Stockholders' Agreement, that the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall not be more than sixty (60) days prior to such action.  If no such record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(c)      Unless otherwise restricted by the Certificate of Incorporation or the Stockholders' Agreement, in order that the Corporation may determine the stockholders entitled to express consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than ten (10) days after the date upon which

13

the resolution fixing the record date is adopted by the Board.  If no record date for determining the stockholders entitled to express consent to corporate action in writing without a meeting is fixed by the Board, (i) when no prior action of the Board is required by law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law or (ii) when prior action by the Board is required by law, the record date for such purpose shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

SECTION 5.06.  Registered Stockholders.  Prior to the surrender to the Corporation of the certificate or certificates for a share or shares of stock or notification to the Corporation of the transfer of uncertificated shares with a request to record the transfer of such share or shares, the Corporation may treat the registered owner of such share or shares as the person entitled to receive dividends, to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner of such share or shares.  To the fullest extent permitted by law, the Corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

## ARTICLE VI
## Notice and Waiver of Notice

SECTION 6.01.  Notice.  Notice may be given in any manner permitted by law.  If mailed, notice to stockholders shall be deemed given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation.  Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the DGCL.

SECTION 6.02.  Waiver of Notice.   A written waiver of any notice, signed by a stockholder or director, or waiver by electronic transmission by such person, whether given before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such person.  Neither the business nor the purpose of any meeting need be specified in such a waiver.   Attendance at any meeting (in person or by remote communication) shall constitute waiver of notice except attendance for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE VII
## Indemnification and Advancement

SECTION 7.01.  Right to Indemnification.   The rights, if any, of directors, officers, employees and agents of the Corporation with respect to indemnification shall be as set forth in the Certificate of Incorporation.

SECTION 7.02.  Right to Advancement of Expenses.   The rights, if any, of directors, officers, employees and agents of the Corporation with respect to advancement of expenses shall be as set forth in the Certificate of Incorporation.

14

# ARTICLE VIII
## Miscellaneous

SECTION 8.01.  Electronic Transmission.  For purposes of these Bylaws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

SECTION 8.02.  Dividends.  Dividends on the stock of the Corporation, paid in cash, property, or securities of the Corporation and as may be limited by the DGCL and applicable provisions of the Certificate of Incorporation and Stockholders' Agreement (if any), may be declared by the Board at any regular or special meeting.

SECTION 8.03.  Corporate Seal.  The Board may provide a suitable seal, containing the name of the Corporation, which seal shall be in the charge of the Secretary.  If and when so directed by the Board or a committee thereof, duplicates of the seal may be kept and used by the Chief Financial Officer or by an Assistant Secretary or Assistant Treasurer.

SECTION 8.04.   Fiscal Year.  The fiscal year of the Corporation shall end on September 30, or such other day as the Board may designate.

SECTION 8.05.  Section Headings; Interpretation.  In these Bylaws, (a) section headings are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein and (b) the meaning of defined terms shall be equally applicable to both the singular and plural forms of the terms defined.

SECTION 8.06.  Inconsistent Provisions.  In the event that any provision of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL, any other applicable law, or the Stockholders' Agreement, such provision of these Bylaws shall not be given effect to the extent of such inconsistency but shall otherwise be given full force and effect.

SECTION 8.07.  Stockholders' Agreement.  Any reference herein to the Stockholders' Agreement will be disregarded upon termination of the Stockholders' Agreement in accordance with its terms. In the event that the Corporation and the stockholders of the Corporation enter into a new stockholders' agreement, subject to the terms of such new stockholders' agreement, any reference herein to the Stockholder's Agreement may be interpreted as reference to such new stockholders' agreement.

# ARTICLE IX
## Amendments

SECTION 9.01.  Amendments.

(a)       Subject to the provisions of the Certificate of Incorporation and the Stockholders' Agreement, these Bylaws may be altered, amended or repealed, or new Bylaws adopted or enacted, by the Board by the affirmative vote of a majority of Directors and by the holders of a majority of

the issued and outstanding common stock of the Corporation; provided, however, amendments to this Section 9.01 of the Bylaws, or any amendments which would impose new limitations or conditions on transferability of shares of common stock of the Corporation (other than contractual lock-up agreements) shall require the affirmative vote of holders of at least 75% of the issued and outstanding shares of common stock of the Corporation.

(b)     Any amendment, supplement, modification, or waiver to the terms of these Bylaws that is materially disproportionate and adverse to one or more stockholders (the "Adversely Affected Stockholders") (as compared to another stockholder or that disproportionately benefits one or more stockholders relative to the rights of the other stockholders) shall require the affirmative consent of Adversely Affected Stockholders holding a majority of the issued and outstanding shares of common stock of the Corporation held by all Adversely Affected Stockholders; provided that if the adverse effect on any given Adversely Affected Stockholder or group of Adversely Affected Stockholders is materially different from the effect on any other Adversely Affected Stockholder or group of Adversely Affected Stockholders then each such Adversely Affected Stockholder or group of Adversely Affected Stockholders, as applicable, will have its own separate consent right based on a majority of the shares of stock they hold.

Dated: [●]

16

**Exhibit A(iii)-1**

**Redline to Previously Filed Form of Bylaws**

**THIRD AMENDED AND RESTATED**

**BYLAWS**

**OF**

**AVAYA HOLDINGS CORP.**

**ARTICLE I**
**Offices**

SECTION 1.01. <u>Registered Office</u>. The registered office and registered agent of Avaya Holdings Corp. (the "<u>Corporation</u>") in the State of Delaware shall be as set forth in the Certificate of Incorporation (as defined below). The Corporation may also have offices in such other places in the United States or elsewhere (and may change the Corporation's registered agent) as the Board of Directors of the Corporation (the "<u>Board</u>") may, from time to time, determine or as the business of the Corporation may require as determined by any officer of the Corporation.

**ARTICLE II**
**Meetings of Stockholders**

SECTION 2.01. <u>Annual Meetings</u>. Unless directors are elected by written consent of the stockholders in lieu of an annual meeting as permitted by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended (the "<u>DGCL</u>"), annual meetings of stockholders may be held at such place, if any, either within or without the State of Delaware, and at such time and date as the Board shall determine and state in the notice of meeting. The Board may, in its sole discretion, determine that meetings of the stockholders shall not be held at any place, but may instead be held solely by means of remote communication as described in <u>Section 2.11</u> of this <u>Article II</u> in accordance with Section 211(a)(2) of the DGCL. The Board may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board.

SECTION 2.02 <u>Special Meetings</u>. Special meetings of the stockholders for any purpose or purposes, may be called at any time by the Board or by stockholders holding a majority of the issued and outstanding shares of common stock of the Corporation, and may not be called by any other person or persons, unless otherwise prescribed by law, the Corporation's certificate of incorporation as then in effect [(including any Preferred Stock Designation (as defined therein))] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "<u>Certificate of Incorporation</u>") and the Stockholders' Agreement, dated as of [•]May 1, 2023, by and among the Corporation and the stockholders of the Corporation party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "<u>Stockholders' Agreement</u>"), and may be held at such place, if any, either within or without the State of Delaware, and at such time and date as the Board, the Chairperson of the Board (the "<u>Chairperson</u>") or the Chief Executive Officer of the Corporation (the "<u>Chief Executive Officer</u>") shall determine and shall be stated in the notice of such meeting. The Board may

1

postpone, reschedule or cancel any special meeting of stockholders previously scheduled by the Board, the Chairperson or the Chief Executive Officer. Stockholders may act by written consent with respect to any matter that may be acted upon by such stockholders at a special meeting of the stockholders.

SECTION 2.03.   Notice of Stockholder Business and Nominations.

(a)      Annual Meetings of Stockholders.   Subject to the terms of the Stockholders' Agreement, at annual meetings of stockholders, the stockholders shall elect directors to the Board and transact such other business as may properly be brought before the meeting.

(b)      Special Meetings of Stockholders.   Only such business (including the election of specific individuals to fill vacancies or newly created directorships on the Board) shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting.   At any time that stockholders are not prohibited from filling vacancies or newly created directorships on the Board, nominations of persons for election to the Board to fill any vacancy or unfilled newly created directorship may be made at a special meeting of stockholders at which any proposal to fill any vacancy or unfilled newly created directorship is to be presented to the stockholders (i) as provided in the Stockholders' Agreement or (ii) by or at the direction of the Board or any committee thereof.

SECTION 2.04.   Notice of Meetings.   Whenever stockholders are required or permitted to take any action at a meeting, a timely notice in writing or by electronic transmission, in the manner provided in Section 232 of the DGCL, of the meeting, which shall state the place, if any, date and time of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purposes for which the meeting is called, shall be mailed to or transmitted electronically by the Secretary (as defined below) to each stockholder of record entitled to vote thereat as of the record date for determining the stockholders entitled to notice of the meeting.   Unless otherwise provided by law, the Certificate of Incorporation or these Bylaws, the notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting.

SECTION 2.05.   Quorum.   Unless otherwise required by law and except as provided in the Stockholders' Agreement, the Certificate of Incorporation or the rules of any stock exchange upon which the Corporation's securities are listed, the holders of record of a majority of the voting power of the issued and outstanding shares of stock of the Corporation entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of stockholders.   Notwithstanding the foregoing, where a separate vote by a class or series or classes or series is required, the holders of record of a majority of the voting power of the issued and outstanding shares of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum entitled to take action with

2

respect to the vote on that matter.  Once a quorum is present to organize a meeting, it shall not be broken by the subsequent withdrawal of any stockholders.

SECTION 2.06.  <u>Voting</u>.  Except as otherwise provided by or pursuant to the provisions of the Certificate of Incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of stock held by such stockholder that has voting power upon the matter in question.  Each stockholder entitled to vote at a meeting of stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy in any manner provided by applicable law, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.  A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary a revocation of the proxy or a new proxy bearing a later date.  Unless required by the Certificate of Incorporation, the Stockholders' Agreement or applicable law, or determined by the chairperson of the meeting to be advisable, the vote on any question need not be by ballot.  On a vote by ballot, each ballot shall be signed by the stockholder voting, or by such stockholder's proxy, if there be such proxy.  When a quorum is present or represented at any meeting, the vote of the holders of a majority of the voting power of the shares of stock present in person or represented by proxy and entitled to vote on the subject matter shall decide any question brought before such meeting, unless the matter is one upon which, by express provision of applicable law, of the rules or regulations of any stock exchange applicable to the Corporation, of any regulation applicable to the Corporation or its securities, of the Certificate of Incorporation, of the Stockholders' Agreement or of these Bylaws, a minimum or different vote is required, in which case such minimum or different vote shall be the applicable vote on such matter.  Notwithstanding the foregoing sentence and subject to the Certificate of Incorporation, unless the Stockholders' Agreement requires a different standard, all elections of directors shall be determined by a plurality of the votes cast in respect of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

SECTION 2.07.  <u>Chairperson of Meetings</u>.  The Chairperson, if one is elected (or appointed by the Selection Committee (as defined in the Stockholders' Agreement) in accordance with the Stockholders' Agreement), or, in his or her absence or disability, the Vice Chairperson of the Board (the "<u>Vice Chairperson</u>"), if one is appointed, or in his or her absence of disability, the Chief Executive Officer, or in the absence of the Chairperson, the Vice Chairperson and the Chief Executive Officer, a person designated by the Board shall be the chairperson of the meeting and, as such, preside at all meetings of the stockholders.  The order of business at each meeting of the stockholders shall be determined by the chairperson of such meeting, but such order of business may be changed by a majority in voting interest of those present in person or by proxy at such meeting and entitled to vote thereat.

SECTION 2.08.  <u>Secretary of Meetings</u>.  The Secretary of the Corporation (the "<u>Secretary</u>") shall act as secretary at all meetings of the stockholders.  In the absence or disability of the Secretary, an Assistant Secretary of the Corporation (an "<u>Assistant Secretary</u>") shall act as secretary at all meetings of the stockholders.  In the absence of the Secretary and all Assistant

3

Secretaries, the Chairperson, the Vice Chairperson or the Chief Executive Officer shall appoint a person to act as secretary at such meetings.

SECTION 2.09.  Consent of Stockholders in Lieu of Meeting.  Subject to the terms of the Stockholders' Agreement, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, only if a consent, setting forth the action so taken, is signed by the holders of record of the issued and outstanding stock of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action (such minimum number of votes to be in accordance with any applicable terms of the Stockholders' Agreement and the DGCL) at a meeting at which all shares entitled to vote thereon were present and voted and is delivered to the Corporation in accordance with the DGCL. Prompt, written notice of the action taken by means of any such consent that is other than unanimous shall be given to those stockholders who have not consented in writing.

SECTION 2.10.  Adjournment.  At any meeting of stockholders of the Corporation, if less than a quorum be present, the chairperson of the meeting or stockholders upon the vote of a majority of the votes cast, shall have the power to adjourn the meeting from time to time without notice, other than the announcement ~~at the meeting, until a quorum shall be present~~(which can displayed during the time scheduled for the meeting on the same electronic network used to enable stockholders and proxy holders to participate in the meeting by means of remote communication) at the meeting at which the adjournment is taken of the date and time of the adjourned meeting; provided, that the chairperson of the meeting or stockholders upon the vote of a majority of the votes cast shall also have the power to adjourn the meeting from time to time to address a technical failure to convene or continue a meeting using remote communication, which adjournment can be done without notice (other than the announcement (which can displayed during the time scheduled for the meeting on the same electronic network used to enable stockholders and proxy holders to participate in the meeting by means of remote communication) at the meeting at which the adjournment is taken of the date and time of the adjourned meeting).  Any business may be transacted at the adjourned meeting that might have been transacted at the meeting originally noticed.  If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for determination of stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix as the record date for determining stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date so fixed for notice of such adjourned meeting.

SECTION 2.11.  Remote Communication.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(a)      participate in a meeting of stockholders; and

4

(b)      be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication; provided, however, that:

(i)      the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder;

(ii)      the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings; and

(iii)      if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

SECTION 2.12   Inspectors of Election.   The Corporation may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more inspectors of election, who may be employees of the Corporation, to act at the meeting or any adjournment or postponement thereof and to make a written report thereof.   The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act.   In the event that no inspector so appointed or designated is able to act at a meeting of stockholders, the chairperson of the meeting shall appoint one or more inspectors to act at the meeting.   Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath to execute faithfully the duties of inspector with strict impartiality and according to the best of his or her ability.   The inspector or inspectors so appointed or designated shall (a) ascertain the number of shares of stock of the Corporation outstanding and the voting power of each such share, (b) determine the shares of stock of the Corporation represented at the meeting and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (e) certify his or her determination of the number of shares of stock of the Corporation represented at the meeting and such inspectors' count of all votes and ballots.   Such certification and report shall specify such other information as may be required by law.   In determining the validity and counting of proxies and ballots cast at any meeting of stockholders of the Corporation, the inspectors may consider such information as is permitted by applicable law.   No person who is a candidate for an office at an election may serve as an inspector at such election.

### ARTICLE III
### Board of Directors

SECTION 3.01.   Powers.      Except   as   otherwise   provided   by   the   Certificate   of Incorporation, the Stockholders' Agreement or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of its Board.   The Board may exercise all such authority and powers of the Corporation and do all such lawful acts and things as are not by

5

the DGCL, the Stockholders' Agreement or the Certificate of Incorporation directed or required to be exercised or done by the stockholders.

SECTION 3.02.  Number and Term; Chairperson.  Subject to the provisions of the Certificate of Incorporation and the Stockholders' Agreement, the number of Directors shall be fixed from time to time by resolution of the Board.  Initially, the Board shall consist of nine (9) Directors.  Except as otherwise provided in the Stockholders' Agreement or these Bylaws, Directors shall be elected by the stockholders at each annual meeting of stockholders. The term for each Director shall be two (2) years for the initial term beginning on the Plan Effective Date (as defined in the Stockholders' Agreement) and one (1) year for each term thereafter. Directors need not be stockholders.  Subject to the terms of the Stockholders' Agreement, the Board shall, by majority vote, elect a Chairperson, who shall have such powers and perform such duties as provided in these Bylaws and as the Board may from time to time prescribe, from among the directors by resolution passed by a majority of the Board; provided, however, subject to the terms of the Stockholders' Agreement, the Chairperson of the Board shall not contemporaneously serve as the Chief Executive Officer of the Corporation nor be an employee of a stockholder of the Corporation; provided, further, that the Chairperson of the Board for the initial term shall be determined unanimously by the Selection Committee (as defined in the Stockholders' Agreement) and shall not contemporaneously serve as the Chief Executive Officer of the Corporation.  The Chairperson shall preside at all meetings of the Board at which he or she is present.  The Board may also appoint a Vice Chairperson.  If the Chairperson is not present at a meeting of the Board, the Vice Chairperson, if one has been appointed, shall preside at such meeting.  If neither the Chairperson nor the Vice Chairperson is present at a meeting of the Board, the Chief Executive Officer shall preside at such meeting, and, if the Chief Executive Officer is not present at such meeting or is not a director, a majority of the directors present at such meeting shall elect one (1) of their members to preside.  Subject to the terms of the Stockholders' Agreement, the Board may remove and/or replace the Chairperson or the Vice Chairperson at any time; provided, that, during the initial term, only the Selection Committee acting by unanimous written consent may remove and/or replace the Chairperson.

SECTION 3.03.  Resignations.  Any director may resign at any time upon notice given in writing or by electronic transmission to the Board, the Chairperson, the Chief Executive Officer or the Secretary or, in the case of the resignation from a committee, the chairperson of the applicable committee.  The resignation shall take effect at the time specified therein, and if no time is specified, at the time of its receipt. The acceptance of a resignation shall not be necessary to make it effective unless otherwise expressly provided in the resignation.

SECTION 3.04.  Removal.  Subject to the terms of the Stockholders' Agreement, directors of the Corporation may be removed in the manner provided by applicable law.

SECTION 3.05.  Vacancies and Newly Created Directorships.  Subject to the terms of the Stockholders' Agreement (including the requirement that certain stockholders may designate directors for election to the Board so long as such stockholders meet certain Ownership Percentage (as defined in the Stockholders' Agreement) thresholds) and these Bylaws, newly created directorships resulting from any increase in the number of directors and any vacancies on the Board resulting from death, resignation, disqualification, removal or other cause may be filled by the affirmative vote of a majority of the remaining directors then in office, even if less

6

than a quorum of the Board, or by a sole remaining director. Any director elected in accordance with the preceding sentence will hold office for the remainder of the full term of the director whose seat is being filled and until such director's successor has been elected and qualified. No decrease in the number of directors constituting the Board may shorten the term of any incumbent director. If there are no directors in office, then an election of directors may be held in accordance with the Stockholders' Agreement and in the manner provided by law.

SECTION 3.06. Meetings. Regular meetings of the Board may be held at such places and times as shall be determined from time to time by the Board. Subject to the terms of the Stockholders' Agreement, special meetings of the Board may be called by the ~~Chief Executive Officer or~~Board, the Chairperson or ~~Vice Chairperson, and shall be called by the Chief Executive Officer or the Secretary if directed by the Board and shall~~by Stockholders that beneficially own at least twenty-five percent (25%) of the voting power of the issued and outstanding shares of stock of the Corporation and shall be at such places and times as they or he or she shall fix. Notice need not be given of regular meetings of the Board. At least twenty-four (24) hours before each special meeting of the Board, written notice, notice by electronic transmission or oral notice (either in person or by telephone) of the time, date and place of the meeting shall be given to each director, which required notice shall be deemed to be waived by a director's attendance at a meeting (unless solely for the purpose of objecting to the lack of required notice). Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting.

SECTION 3.07. Quorum, Voting and Adjournment. Subject to the terms of the Stockholders' Agreement, at least a majority of the total number of directors that the Corporation would have if there were no vacancies on the Board shall constitute a quorum for the transaction of business. Except as otherwise provided by law, the Certificate of Incorporation, the Stockholders' Agreement or these Bylaws, the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board. In the absence of a quorum, a majority of the directors present thereat may adjourn such meeting to another time and place. Notice of such adjourned meeting need not be given if the time and place of such adjourned meeting are announced at the meeting so adjourned.

SECTION 3.08. Committees; Committee Rules. Subject to the terms of the Stockholders' Agreement, the Board may designate one or more committees, including, but not limited to, an Audit Committee and a Compensation Committee, each such committee to consist of one or more of the directors of the Corporation. Subject to the terms of the Stockholders' Agreement, the Board may designate one or more directors as alternate members of any committee (for the avoidance of doubt, other than the Selection Committee) to replace any absent or disqualified member at any meeting of any such committee. Subject to the terms of the Stockholders' Agreement, any such committee, to the extent provided in the resolution of the Board establishing such committee or to the extent provided in the Stockholders' Agreement, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority in reference to the following matters: (a) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval, (b) adopting, amending or

7

repealing these Bylaws or (c) adopting any action requiring the consent of a stockholder or stockholders, pursuant to the terms of the Stockholders' Agreement, without such consent. For the avoidance of doubt, none of Apollo, Brigade, Nuveen or Sculptor (each such term as defined in the Certificate of Incorporation) will have a veto over adoption of the business plan, budget and/or strategic investments of the Corporation in any way, including as a result of any committee membership, for so long as none of Apollo, Brigade, Nuveen or Sculptor have an individual right to appoint a majority of the Board.  All committees of the Board shall keep minutes of their meetings and shall report their proceedings to the Board when requested or required by the Board.  Each committee of the Board may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the Board designating such committee.  Unless otherwise provided in such a resolution, the presence of at least a majority of the members of the committee shall be necessary to constitute a quorum unless the committee shall consist of one or two members, in which event one member shall constitute a quorum; and all matters shall be determined by a majority vote of the members present at a meeting of the committee at which a quorum is present.  Subject to the terms of the Stockholders' Agreement, unless otherwise provided in such a resolution, in the event that a member and that member's alternate, if alternates are designated by the Board, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in place of any such absent or disqualified member.

SECTION 3.09.  Action Without a Meeting.  Unless otherwise restricted by the Certificate of Incorporation or the Stockholders' Agreement, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all members of the Board or any committee thereof, as the case may be, consent thereto in writing or by electronic transmission.  The writing or writings or electronic transmission or transmissions shall be filed in the minutes of proceedings of the Board or committee, as applicable.  Such filing shall be in paper form if the minutes are maintained in paper form or shall be in electronic form if the minutes are maintained in electronic form.

SECTION 3.10.  Remote Meeting.  Unless otherwise restricted by the Certificate of Incorporation or applicable law, members of the Board, or any committee designated by the Board, may participate in a meeting by means of conference telephone or other communications equipment in which all persons participating in the meeting can hear each other.  Participation in a meeting by means of conference telephone or other communications equipment shall constitute presence in person at such meeting.

SECTION 3.11.  Compensation.  Subject to the Stockholders' Agreement, the Board shall have the authority to fix the compensation, including fees and reimbursement of expenses, of directors and Board observers for services to the Corporation in any capacity.

SECTION 3.12.  Reliance on Books and Records.  A member of the Board, or a member of any committee designated by the Board shall, in the performance of such person's duties, be fully protected in relying in good faith upon records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees of the Board, or by any other person as to

8

matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

## ARTICLE IV
### Officers

SECTION 4.01. Number.   The officers of the Corporation shall include a Chief Executive Officer and a Secretary, each of whom shall be elected by the Board, subject to the provisions of the Stockholders' Agreement, and who shall hold office for such terms as shall be determined by the Board and until such officer's successor is elected and qualified or until such officer's earlier resignation or removal.  In addition, the Board may elect a President and one or more Vice Presidents, including one or more Executive Vice Presidents, Senior Vice Presidents, a Chief Operating Officer, a Chief Financial Officer, a Controller, a Treasurer and one or more Assistant Treasurers and one or more Assistant Secretaries, who shall hold their office for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.  Subject to the provisions of the Certificate of Incorporation and the Stockholders' Agreement, any number of offices may be held by the same person.  Officers need not be stockholders or residents of the State of Delaware.

SECTION 4.02. Other Officers and Agents.   The Board may appoint or delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove the same, as it deems advisable, who shall hold their office for such terms and shall exercise and perform such powers and duties as shall be determined from time to time by the Board; provided, however, that any officer possessing authority over or responsibility for any functions of the Board shall be an elected officer. Each appointed officer shall hold office until such officer's successor has been appointed and qualified or until such officer's earlier resignation or removal.

SECTION 4.03. Chief Executive Officer.   The Chief Executive Officer, subject to the control and oversight of the Board, shall have general responsibility for the day-to-day business and affairs of the Corporation and shall be the chief policy making officer of the Corporation.  In the absence of the Chairperson and the Vice Chairperson, the Chief Executive Officer shall preside at all meetings of the stockholders and the Board, and he or she shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board or these Bylaws.

SECTION 4.04. President.   The President, subject to the powers and oversight of the Board and the Chief Executive Officer, shall have the general powers and duties incident to the office of the president of a corporation, shall perform such duties and services and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.05. Chief Operating Officer.   The Chief Operating Officer, subject to the powers and oversight of the Board and the Chief Executive Officer, shall have direct responsibility for the business and affairs of the Corporation, including supervisory responsibility for the officers, agents, employees and properties of the Corporation and shall have such other

9

powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.06.  Vice Presidents.  Each Vice President, including any Executive Vice President and any Senior Vice President, shall have such powers and perform such duties incident to the office of the vice president of a corporation, and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.07.  Controller.  The Controller shall be the chief accounting officer of the Corporation.  The Controller shall report to the Chief Financial Officer and, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer or the Chief Financial Officer or as the Board may from time to time determine.

SECTION 4.08.  Chief Financial Officer.  The Chief Financial Officer shall have responsibility for all financial and accounting matters, including supervisory responsibilities for the Treasurer, any Assistant Treasurer or any Vice President of Finance of the Corporation.  The Chief Financial Officer shall have the general powers and duties incident to the office of the chief financial officer of a corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.09.  Treasurer.  The Treasurer shall have custody of the corporate funds, securities, evidences of indebtedness and other valuables of the Corporation and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation.  The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Corporation in such depositories as may be designated by the Board or its designees selected for such purposes.  The Treasurer shall disburse the funds of the Corporation, taking proper vouchers therefor.  The Treasurer shall render to the Chief Executive Officer, the Chief Financial Officer and the Board, upon their request, a report of the financial condition of the Corporation.  The Treasurer shall, in the absence or disability of the Chief Financial Officer, act with all of the powers and have the responsibilities assigned to the Chief Financial Officer. In addition, the Treasurer shall have the general powers and duties incident to the office of the treasurer of a corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer, the Chief Financial Officer or these Bylaws.  If required by the Board, the Treasurer shall give the Corporation a bond for the faithful discharge of his or her duties in such amount and with such surety as the Board shall prescribe.

SECTION 4.10.  Secretary.  The Secretary shall: (a) record the proceedings of the meetings of the stockholders and the Board in a minute book to be kept for that purpose; (b) cause notices to be duly given in accordance with the provisions of these Bylaws and as required by law; (c) be the custodian of the records and the seal of the Corporation and affix and attest the seal to any stock certificates of the Corporation (unless the seal of the Corporation on such certificates shall be a facsimile, as hereinafter provided) and affix and attest the seal to all other documents to be executed on behalf of the Corporation under its seal; (d) cause the books,

10

reports, statements, certificates and other documents and records required by law to be kept and filed to be properly kept and filed; and (e) in general, have all the powers and perform all the duties incident to the office of the secretary of a corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.11.  Assistant Treasurers and Assistant Secretaries.   Each Assistant Treasurer and each Assistant Secretary, if any are elected, shall be vested with all the powers and shall perform all the duties of the Treasurer and Secretary, respectively, in the absence or disability of such officer, unless or until the Chief Executive Officer or the Board shall otherwise determine.   The Board may appoint or delegate the power to appoint any such Assistant Treasurer and Assistant Secretary as it deems advisable. In addition, Assistant Treasurers and Assistant Secretaries shall have such other powers and duties as may be assigned to, or required of, them from time to time by the Board, the Chief Executive Officer, the President or these Bylaws.

SECTION 4.12.  Corporate Funds and Checks.  The funds of the Corporation shall be kept in such depositories as shall from time to time be prescribed by the Board or its designees selected for such purposes.  All checks or other orders for the payment of money shall be signed by the Chief Executive Officer, the Chief Financial Officer and such other persons as may from time to time be authorized by the Board.

SECTION 4.13.  Contracts and Other Documents.  The Chief Executive Officer, the President, the Chief Operating Officer and any such other officer or officers as may from time to time be authorized by the Board, shall have the power to sign and execute on behalf of the Corporation deeds, conveyances and contracts, and any and all other documents requiring execution by the Corporation.

SECTION 4.14.  Ownership of Stock of Another Corporation.  Unless otherwise directed by the Board, the Chief Executive Officer, the President, the Chief Operating Officer, and any such other person as shall be authorized by the Board, shall have the power and authority, on behalf of the Corporation, to attend and to vote at any meeting of security holders of any entity in which the Corporation holds securities or equity interests and may exercise, on behalf of the Corporation, any and all of the rights and powers incident to the ownership of such securities or equity interests at any such meeting, including the authority to execute and deliver proxies and consents on behalf of the Corporation.

SECTION 4.15.  Delegation of Duties.  In the absence, disability or refusal of any officer to exercise and perform his or her duties, the Board may delegate to another officer such powers or duties.

SECTION 4.16.  Resignation and Removal.  Any officer of the Corporation may be removed from office for or without cause at any time by the Board.  Any officer may resign at any time in the same manner prescribed under Section 3.03 of Article III of these Bylaws.

SECTION 4.17.  Compensation; Vacancies.  The compensation of elected officers shall be set by the Board or delegated by the Board to the same extent as permitted by these

11

Bylaws.  The Board shall have the power to fill vacancies occurring in any office.  The compensation of appointed officers and the filling of vacancies in appointed offices shall be set and filled, respectively, by the Board or delegated by the Board to the same extent as permitted by these Bylaws for the initial filling of such offices.

## ARTICLE V
### Stock

SECTION 5.01.  <u>Uncertificated Shares</u>.  The shares of stock of the Corporation shall be uncertificated and shall be represented by book entries on the Corporation's securities transfer books and records; <u>provided</u>, <u>however</u>, that, subject to the Stockholders' Agreement, the Board may provide by resolution or resolutions that some or all of any or all classes or series of the Corporation's stock shall be represented by certificates.  Notice of the information required by the DGCL shall be furnished in accordance with the DGCL within a reasonable time after the issue or transfer of uncertificated shares.  Every holder of stock in the Corporation represented by certificates shall be entitled to have a certificate signed by or in the name of the Corporation by any two authorized officers of the Corporation, certifying the number and class of shares of stock of the Corporation owned by such holder.  Any or all of the signatures on the certificate may be a facsimile.  The Board shall have the power to appoint one or more transfer agents and/or registrars for the transfer or registration of certificates of stock of any class, and may require stock certificates to be countersigned or registered by one or more of such transfer agents and/or registrars.  The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.  The Corporation shall not have power to issue a certificate in bearer form.

SECTION 5.02.  <u>Transfer; Resales</u>.  Upon compliance with the provisions restricting the transfer or registration of transfer of shares of stock, if any, contained in the Certificate of Incorporation and the Stockholders' Agreement, shares of stock of the Corporation shall be transferable upon its books, which may be maintained by a third-party registrar or transfer agent, by the holders thereof, in person or by their duly authorized attorneys or legal representatives, upon surrender to the Corporation by delivery thereof (to the extent evidenced by a physical stock certificate) to the person in charge of the stock and transfer books and ledgers.  Certificates representing such shares, if any, shall be cancelled and new certificates, if the shares are to be certificated, shall thereupon be issued.  Shares of stock of the Corporation that are not represented by a certificate shall be transferred in accordance with the Stockholders' Agreement and applicable law.  A record shall be made of each transfer.  Whenever any transfer of shares shall be made for collateral security, and not absolutely, it shall be so expressed in the entry of the transfer if, when the certificates are presented, both the transferor and transferee request the Corporation to do so.  Nothing herein is intended to prevent shares of stock of the Corporation from being DTC-eligible and shall not preclude the settlement of any transaction in shares of stock of the Corporation entered into through the facilities of a national securities exchange or trading on the OTC Markets Group Inc. electronic inter-dealer quotation system, including OTCQX, OTCQB and OTC Pink.

SECTION 5.03.  <u>Lost, Stolen, Destroyed or Mutilated Certificates</u>.  A new certificate of stock or uncertificated shares may be issued in the place of any certificate previously issued by

12

the Corporation alleged to have been lost, stolen or destroyed, and the Corporation may, in its discretion, require the owner of such lost, stolen or destroyed certificate, or his or her legal representative, to give the Corporation a bond or an agreement of indemnity, in such sum as the Corporation may direct, in order to indemnify the Corporation against any claims that may be made against it in connection therewith.  A new certificate or uncertificated shares of stock may be issued in the place of any certificate previously issued by the Corporation that has become mutilated upon the surrender by such owner of such mutilated certificate and, if required by the Corporation, the posting of a bond or delivering of an agreement of indemnity by such owner to indemnify the Corporation against any claims that may be made against it in connection therewith.

SECTION 5.04.  List of Stockholders Entitled to Vote.  The Corporation shall prepare, at leastno later than then (10)tenth days before everyeach meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting (provided, however, if the record date for determining the stockholders entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting at leastfor a period of ten (10) days prior toending on the day before the meeting date (a) on a reasonably accessible electronic network; provided, however, that the information required to gain access to such list is provided with the notice of meeting or (b) during ordinary business hours at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then a list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.  Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this Section 5.04 or to vote in person or by proxy at any meeting of stockholders.

SECTION 5.05.  Fixing Date for Determination of Stockholders of Record.

(a)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall, unless otherwise required by law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next

13

preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

(b)　　In order that the Corporation may determine, in accordance with the provisions of the Stockholders' Agreement, that the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall not be more than sixty (60) days prior to such action.  If no such record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(c)　　Unless otherwise restricted by the Certificate of Incorporation or the Stockholders' Agreement, in order that the Corporation may determine the stockholders entitled to express consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board.  If no record date for determining the stockholders entitled to express consent to corporate action in writing without a meeting is fixed by the Board, (i) when no prior action of the Board is required by law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law or (ii) when prior action by the Board is required by law, the record date for such purpose shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

SECTION 5.06　Registered Stockholders.  Prior to the surrender to the Corporation of the certificate or certificates for a share or shares of stock or notification to the Corporation of the transfer of uncertificated shares with a request to record the transfer of such share or shares, the Corporation may treat the registered owner of such share or shares as the person entitled to receive dividends, to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner of such share or shares.  To the fullest extent permitted by law, the Corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

14

**ARTICLE VI**
**Notice and Waiver of Notice**

SECTION 6.01. <u>Notice</u>.  Notice may be given in any manner permitted by law.  If mailed, notice to stockholders shall be deemed given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation.  Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the DGCL.

SECTION 6.02.  <u>Waiver of Notice</u>.  A written waiver of any notice, signed by a stockholder or director, or waiver by electronic transmission by such person, whether given before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such person.  Neither the business nor the purpose of any meeting need be specified in such a waiver.  Attendance at any meeting (in person or by remote communication) shall constitute waiver of notice except attendance for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

**ARTICLE VII**
**Indemnification and Advancement**

SECTION 7.01.  <u>Right to Indemnification</u>.  The rights, if any, of directors, officers, employees and agents of the Corporation with respect to indemnification shall be as set forth in the Certificate of Incorporation.

SECTION 7.02.  <u>Right to Advancement of Expenses</u>.  The rights, if any, of directors, officers, employees and agents of the Corporation with respect to advancement of expenses shall be as set forth in the Certificate of Incorporation.

**ARTICLE VIII**
**Miscellaneous**

SECTION 8.01.  <u>Electronic Transmission</u>.  For purposes of these Bylaws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

SECTION 8.02.  <u>Dividends</u>.  Dividends on the stock of the Corporation, paid in cash, property, or securities of the Corporation and as may be limited by the DGCL and applicable provisions of the Certificate of Incorporation and Stockholders' Agreement (if any), may be declared by the Board at any regular or special meeting.

SECTION 8.03.  <u>Corporate Seal</u>.  The Board may provide a suitable seal, containing the name of the Corporation, which seal shall be in the charge of the Secretary.  If and when so

15

directed by the Board or a committee thereof, duplicates of the seal may be kept and used by the Chief Financial Officer or by an Assistant Secretary or Assistant Treasurer.

SECTION 8.04.   Fiscal Year.   The fiscal year of the Corporation shall end on September 30, or such other day as the Board may designate.

SECTION 8.05.   Section Headings; Interpretation.   In these Bylaws, (a) section headings are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein and (b) the meaning of defined terms shall be equally applicable to both the singular and plural forms of the terms defined.

SECTION 8.06.   Inconsistent Provisions.   In the event that any provision of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL, any other applicable law, or the Stockholders' Agreement, such provision of these Bylaws shall not be given effect to the extent of such inconsistency but shall otherwise be given full force and effect.

SECTION 8.07.   Stockholders' Agreement.   Any reference herein to the Stockholders' Agreement will be disregarded upon termination of the Stockholders' Agreement in accordance with its terms. In the event that the Corporation and the stockholders of the Corporation enter into a new stockholders' agreement, subject to the terms of such new stockholders' agreement, any reference herein to the Stockholder's Agreement may be interpreted as reference to such new stockholders' agreement.

## ARTICLE IX
### Amendments

SECTION 9.01.   Amendments.

(a)     Subject to the provisions of the Certificate of Incorporation and the Stockholders' Agreement, these Bylaws may be altered, amended or repealed, or new Bylaws adopted or enacted, by the Board by the affirmative vote of a majority of Directors and by the holders of a majority of the issued and outstanding common stock of the Corporation; provided, however, amendments to this Section 9.01 of the Bylaws, or any amendments which would impose new limitations or conditions on transferability of shares of common stock of the Corporation (other than contractual lock-up agreements) shall require the affirmative vote of holders of at least 75% of the issued and outstanding shares of common stock of the Corporation.

(b)     Any amendment, supplement, modification, or waiver to the terms of these Bylaws that is materially disproportionate and adverse to one or more stockholders (the "Adversely Affected Stockholders") (as compared to another stockholder or that disproportionately benefits one or more stockholders relative to the rights of the other stockholders) shall require the affirmative consent of Adversely Affected Stockholders holding a majority of the issued and outstanding shares of common stock of the Corporation held by all Adversely Affected Stockholders; provided that if the adverse effect on any given Adversely Affected Stockholder or group of Adversely Affected Stockholders is materially different from the effect on any other Adversely Affected Stockholder or group of Adversely Affected

16

Stockholders then each such Adversely Affected Stockholder or group of Adversely Affected Stockholders, as applicable, will have its own separate consent right based on a majority of the shares of stock they hold.

Dated: [•], 2023

17

## Exhibit A(iv)

**Registration Rights Agreement**

**REGISTRATION RIGHTS AGREEMENT**

This REGISTRATION RIGHTS AGREEMENT (this "Agreement"), dated as of May 1, 2023, is entered into by and among Avaya Holdings Corp., a Delaware corporation (the "Company"), the beneficial and record holders of Common Stock (as defined below) as of the date hereof, who are deemed parties hereto pursuant to an order of the United States Bankruptcy Court for the Southern District of Texas confirming the Plan (as hereinafter defined) pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1542, and the other Persons who become signatories hereto following the date hereof (collectively, "Holders").

WHEREAS, in accordance with the Plan (as hereinafter defined), the Company has agreed to grant to the Holders the registration rights set forth herein.

NOW, THEREFORE, pursuant to the obligations of the Company and the Holders under the Plan and in consideration of the premises, mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

SECTION 1.1 Definitions.  In addition to the definitions set forth above, the following terms, as used herein, have the following meanings:

"Affiliate" means, when used with reference to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. For purposes of this definition, an "Affiliate" of a Holder shall include any investment fund, alternative investment vehicle, special purpose vehicle or holding company that (i) is directly or indirectly managed, advised, sub-advised or controlled by such Holder or any Affiliate of such Holder, (ii) is managed, advised or sub-advised by the same investment adviser as, or an Affiliate of the investment adviser of, such Holder or (iii) is a party to a derivative or participation transaction with such Holder pursuant to which there is a transfer of the economics of ownership of securities to or from such Holder; provided, however, that neither the Company nor any of its Subsidiaries shall be deemed an Affiliate of any of the Holders (and vice versa).

"Agreement" shall have the meaning set forth in the introductory paragraph hereof.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day other than a Saturday, Sunday or a day on which state or federally chartered banking institutions in New York City, New York are not required to be opened.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means the common stock, par value $0.01 per share, of the Company, and any shares or capital stock for or into which such common stock hereafter is exchanged,

1

converted, reclassified or recapitalized by the Company or pursuant to an agreement to which the Company is a party.

"Common Stock Equivalents" means, without duplication, Common Stock and any rights, warrants, options, convertible securities or indebtedness, exchangeable securities or indebtedness, or other rights, exercisable for or convertible or exchangeable into, directly or indirectly, Common Stock and securities convertible or exchangeable into Common Stock, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"Company Initiated Resale Registration" shall have the meaning set forth in SECTION 2.1(a).

"Company Underwriter" shall have the meaning set forth in SECTION 2.1(c).

"Contracting Parties" shall have meaning set forth in SECTION 4.10.

"Demand Registration" shall have the meaning set forth in SECTION 2.1(a).

"Effective Date" shall have the meaning set forth in the Plan.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FINRA" means Financial Industry Regulatory Authority, Inc.

"Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Holder" shall have the meaning set forth in the introductory paragraph hereof, and "Holders" means all Holders, collectively.

"Holders' Counsel" shall have meaning set forth in SECTION 2.7(a)(i).

"IM Underwriter" shall have meaning set forth in SECTION 2.1(c).

"Incidental Registration" shall have the meaning set forth in SECTION 2.2(a).

"Indemnified Party" shall have meaning set forth in SECTION 2.11(c).

"Indemnifying Party" shall have meaning set forth in SECTION 2.11(c).

"Initiating Demand Holders" shall have the meaning set forth in SECTION 2.1(a).

"IPO" means any of (i) an initial public offering of shares of Common Stock pursuant to an effective registration statement under the Securities Act, (ii) a single transaction or series of related transactions by a merger, acquisition or other business combination involving the Company and a publicly traded special purpose acquisition company or other similar entity in which a class

of capital stock of the special purpose acquisition company or other similar entity (or its successor) is publicly traded on a National Securities Exchange or (iii) any other transaction or series of related transactions following consummation of which the Common Stock is listed and traded on a National Securities Exchange or an established non-U.S. securities exchange; provided that an IPO shall not include any issuance of Common Stock solely to existing security holders or employees or consultants of the Company or its Subsidiaries on Form S-4, Form F-4 or Form S-8 (or any successor form adopted by the Commission or any comparable form adopted by any foreign securities regulators).

"Liability" shall have the meaning set forth in SECTION 2.11(a).

"National Securities Exchange" shall mean the New York Stock Exchange, NYSE American, the Nasdaq Global Select Market, the Nasdaq Global Market, the Nasdaq Capital Market or another U.S. national securities exchange registered with the Commission.

"Non-Initiating Holders" shall have the meaning set forth in SECTION 2.2(a).

"Non-party Affiliates" shall have meaning set forth in SECTION 4.10.

"Person" means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, estate, unincorporated organization, Governmental Authority or other entity and shall include any "group" within the meaning of the regulations promulgated by the Commission under Section 13(d) of the Exchange Act.

"Plan" means the Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, Case No. 23-90088 (DRJ).

"Prospectus" means the prospectus or prospectuses included in any Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance on Rule 430A under the Securities Act or any successor rule thereto), as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the Common Stock Equivalents covered by such Registration Statement and by all other amendments and supplements to the prospectus, including post-effective amendments and all material incorporated by reference in such prospectus or prospectuses.

"Records" shall have the meaning set forth in SECTION 2.7(a)(vii).

"Registrable Securities" means any Common Stock (including any issuable or issued upon exercise, exchange or conversion of any Common Stock Equivalents) at any time owned, either of record or beneficially, by any Holder and any additional securities that may be issued or distributed or be issuable in respect of any Common Stock by way of conversion, dividend, stock-split, distribution or exchange, merger, consolidation, exchange, recapitalization or reclassification or similar transactions; provided that such securities shall cease to be (or shall not be, as applicable) Registrable Securities if and when (i) the Commission has declared a Registration Statement covering such securities effective and such securities have been disposed of pursuant to such effective Registration Statement, (ii) such securities are sold under circumstances in which all of the applicable conditions of Rule 144 under the Securities Act are met, (iii) such securities become

3

(or are, as applicable) eligible for sale by the applicable Holder without registration and without time restrictions, volume restrictions, manner-of-sale restrictions or a current public information requirement under Rule 144 or (iv) such securities have ceased to be outstanding.

"Registration Statement" means any registration statement of the Company, including the Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all material incorporated by reference in such registration statement.

"Resale Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(d).

"Rule 144" means Rule 144 promulgated under the Securities Act, as amended from time to time, or any similar successor rule thereto that may be promulgated by the Commission.

"S-1 Initiating Take-Down Holders" shall have the meaning set forth in SECTION 2.5(b).

"S-1 Resale Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(b).

"S-1 Shelf Initiating Holders" shall have the meaning set forth in SECTION 2.5(a).

"S-1 Shelf Registration" shall have the meaning set forth in SECTION 2.5(a).

"S-1 Shelf Registration Statement" shall have the meaning set forth in SECTION 2.5(a).

"S-1 Underwritten Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(b).

"S-3 Initiating Holders" shall have the meaning set forth in SECTION 2.5(c).

"S-3 Initiating Take-Down Holders" shall have the meaning set forth in SECTION 2.5(d).

"S-3 Resale Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(d).

"S-3 Shelf Registration Statement" shall have the meaning set forth in SECTION 2.5(c).

"S-3 Underwritten Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(d).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder.

"Shelf Registration Statement" shall have the meaning set forth in SECTION 2.5(c).

"Stockholders' Agreement" means that certain agreement entered into as of May 1, 2023 by and among Avaya Holdings Corp. and Holders of Common Stock.

"Subsidiary" means, with respect to any Person, any other Person, whether incorporated or unincorporated, in which the Company or any one or more of its other Subsidiaries, directly or indirectly, owns or controls:  (i) fifty percent (50%) or more of the securities or other ownership interests, including profits, equity or beneficial interests; or (ii) securities or other interests having by their terms ordinary voting power to elect more than fifty percent (50%) of the board of directors or others performing similar functions with respect to such other Person that is not a corporation.

4

"Underwritten Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(d).

"Valid Business Reason" shall have the meaning set forth in SECTION 2.1(b).

## ARTICLE II
## REGISTRATION RIGHTS

SECTION 2.1 Demand Registration Right.

(a)     From and after the date of an IPO, at any time the Company does not qualify for the use of Form S-3 promulgated under the Securities Act (or any successor form to Form S-3, or any similar short-form Registration Statement), (i) each Holder or group of Holders of Registrable Securities, which collectively hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at least ten percent (10%) of the outstanding Common Stock (collectively, the "Initiating Demand Holders"), may make a written request (specifying the intended method of disposition, such as an underwritten offering or a block trade, and the amount of Registrable Securities proposed to be sold) that the Company effect, and the Company shall use its reasonable best efforts to effect, a registration of its Common Stock under the Securities Act (a "Demand Registration") of all or any requested portion of the Registrable Securities collectively held by such Holders (subject to SECTION 2.4(a)), *provided that* the Company shall not be obligated to effect such registration until after the expiration of any lock-up agreements entered into by the Initiating Demand Holders in connection with the IPO or (ii) the Board of Directors may determine to commence a registration of Registrable Securities held by Holders under the Securities Act (a "Company Initiated Resale Registration"), and the Company shall use its reasonable best efforts to effect a registration of Registrable Securities for all Holders that exercise piggyback registration rights under SECTION 2.2 (subject to SECTION 2.4(a)).

(b)     If the Board of Directors, in its good faith judgment, determines that any registration of the Registrable Securities pursuant to a Demand Registration or a Company Initiated Resale Registration should not be made or continued because it would materially interfere with any material financing, acquisition, corporate reorganization or merger or other material transaction involving the Company (a "Valid Business Reason"), the Company may (i) postpone filing a Registration Statement relating to a Demand Registration or a Company Initiated Resale Registration until such Valid Business Reason no longer exists, but in no event for more than ninety (90) days, and (ii) in case a Registration Statement has been filed relating to a Demand Registration or a Company Initiated Resale Registration, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board of Directors, acting in good faith, (x) may cause such Registration Statement to be withdrawn and its effectiveness terminated, *provided*, *however*, that a new Registration Statement is filed within ninety (90) days thereafter, or (y) may postpone amending or supplementing such Registration Statement, but in no event for more than ninety (90) days; *provided*, *however*, that if the registration of Registrable Securities is postponed or withdrawn pursuant to this SECTION 2.1(b), the Company shall not be permitted to register under the Securities Act any Common Stock, other than Common Stock or other equity securities to be issued in connection with an acquisition, during any such postponement or during the period from such withdrawal to the filing of such new Registration Statement.  The Company shall give written notice of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such

postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof. Notwithstanding anything to the contrary contained herein, the Company may not postpone or withdraw a filing or filings under this SECTION 2.1 (i) more than twice in any twelve (12) month period (except that the Company shall be able to use this right more than twice in any twelve (12) month period if the Company is exercising such right during the fifteen (15) day period prior to the Company's regularly scheduled quarterly earnings announcement date and the total number of days of postponement in such twelve (12) month period does not exceed one hundred and five (105) days), or (ii) except as contemplated in the parenthetical in (i) immediately above, for more than ninety (90) days, in the aggregate for all such postponements or withdrawals, in any twelve (12) month period.  For the avoidance of doubt, any postponement or withdrawal of a Registration Statement for a Demand Registration shall result in the related registration of Registrable Securities not constituting a Demand Registration for purposes of SECTION 2.3 hereof.

(c)     At the request of the Initiating Demand Holders, the Company shall use its reasonable best efforts to cause a Demand Registration to be in the form of a firm commitment underwritten offering, provided that the aggregate offering price of the Common Stock to be sold by the Holders in the applicable offering (before deduction of underwriter discounts and commissions) is reasonably expected to exceed, in the aggregate, $35.0 million. The managing underwriter or underwriter selected for such offering shall be selected by the Initiating Demand Holders (the "IM Underwriter"), which must be reasonably acceptable to the Company; provided that the Initiating Demand Holders may delegate their rights under this sentence to the Board of Directors.  In connection with any Demand Registration under this SECTION 2.1 involving an underwritten offering, none of the Registrable Securities held by an Initiating Demand Holder making a request for inclusion of such Registrable Securities shall be included in such underwritten offering unless such Initiating Demand Holder accepts the terms of the offering as agreed upon by the Company and the IM Underwriter, such terms to be in an underwriting agreement in customary form; provided, that the obligation of such Person to indemnify pursuant to any such underwriting arrangements shall be several, not joint and several, among such Persons selling Registrable Securities, and the liability of each such Person will be in proportion thereto, and provided, further, that such liability will be limited to the net proceeds received by such Person from the sale of his, her or its Registrable Securities pursuant to such registration.  In the event that any Company Initiated Resale Registration is in the form of a firm commitment underwritten offering, the managing underwriter or underwriter selected for such offering shall be selected by the Company (such managing underwriter or underwriter, or any other managing underwriter or underwriter selected by the Company pursuant to SECTION 2.2(b), the "Company Underwriter").

SECTION 2.2 Piggyback Registration Right.

(a)     Within ten (10) Business Days following receipt by the Company of a request from the Initiating Demand Holders to effect a Demand Registration, the Company shall give written notice of such request to each other Holder of Registrable Securities which is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock (the "Non-Initiating Holders") which shall describe the anticipated filing date, the proposed registration and plan of distribution, and offer the Non-Initiating Holders the opportunity to register their Registrable Securities (an "Incidental Registration") in such registration. Following the receipt of such notice, each Non-Initiating Holder shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) Business Days following receipt

6

of notice from the Company, to include all or any portion of their Registrable Securities in such Demand Registration (subject to SECTION 2.4(a)).  If the Demand Registration is in the form of an underwritten offering, the right of each Non-Initiating Holder to have Registrable Securities included in such Demand Registration pursuant to this SECTION 2.2(a) shall be conditioned upon each Non-Initiating Holder entering into (together with the Initiating Demand Holders) an underwriting agreement in customary form with the IM Underwriter on the same terms as the Initiating Demand Holders.  Subject to SECTION 2.4, the Company shall use its reasonable best efforts (within ten (10) Business Days of the notice provided for above) to cause the IM Underwriter to permit the Non-Initiating Holders to participate in the Incidental Registration to include their Registrable Securities in such offering on the same terms and conditions as the Registrable Securities being sold for the account of the Initiating Demand Holders.

(b)      In connection with any Company Initiated Resale Registration or any other registration by the Company after the IPO, whether for its own account or for the benefit of any Holders or both (other than a registration statement on Form S-4 or S-8 or any successor thereto), the Company shall give written notice to each Holder of Registrable Securities which is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock, at least twenty (20) Business Days prior to the proposed filing date of the Registration Statement.  Following the receipt of such notice, each Holder shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) Business Days following receipt of notice from the Company, to include all or any portion of its Registrable Securities in such offering (subject to SECTION 2.4(b)).  The right of each Holder to have Registrable Securities included in an offering pursuant to this SECTION 2.2(b) shall be conditioned (if an underwritten offering) upon each Holder entering into (together with the Company) an underwriting agreement in customary form with the Company Underwriter.  Subject to SECTION 2.4, the Company shall use its reasonable best efforts (within ten (10) Business Days of the notice provided for above) to cause the Company Underwriter to permit the Holders to participate in a registration pursuant to this SECTION 2.2(b) to include their Registrable Securities in such offering on the same terms and conditions as the Common Stock Equivalents being sold for the account of the Company or any other Holder; provided, that the obligation of such Person to indemnify pursuant to any such underwriting arrangements shall be several, not joint and several, among such Persons selling Registrable Securities, and the liability of each such Person will be in proportion thereto, and provided, further, that such liability will be limited to the net proceeds received by such Person from the sale of his, her or its Registrable Securities pursuant to such registration.

SECTION 2.3 Effective Demand Registration.  The Company shall use its reasonable best efforts to file a Registration Statement relating to a Demand Registration or a Company Initiated Resale Registration as soon as practicable and, in any event, within sixty (60) days after receiving a request under SECTION 2.1(a) hereof or the Board of Directors making a determination under SECTION 2.1(a) and the Company shall use reasonable best efforts to cause the same to be declared effective by the Commission as promptly as practicable after such filing and to remain effective for the lesser of (i) the period during which all Registrable Securities registered in the Demand Registration are sold and (ii) one hundred and eighty (180) days, *provided*, *however*, that a registration shall not constitute a Demand Registration if (x) after such Demand Registration has become effective, such registration or the related offer, sale or distribution of Registrable Securities thereunder is interfered with by any stop order, injunction or other order or requirement of the

7

Commission or other Governmental Authority for any reason not materially attributable to any of the Initiating Demand Holders and such interference is not thereafter eliminated or (y) the conditions specified in the underwriting agreement, if any, entered into in connection with such Demand Registration are not satisfied or waived, other than by reason of a failure by the Initiating Demand Holders.  Subject to the exceptions described in SECTION 2.1, SECTION 2.5 and this SECTION 2.3, the Company shall not be required to effect more than an aggregate of three (3) Demand Registrations or S-1 Shelf Registrations in any twelve (12) month period; provided, however, that a Demand Registration shall not be counted for such purpose unless the applicable Registration Statement has become effective and at least fifty percent (50%) of the Registrable Securities requested by the Initiating Demand Holders and Non-Initiating Holders (if any) to be registered in such Demand Registration (and Incidental Registration, if applicable) have been sold.

SECTION 2.4  Cutback.

(a)

(i)      With respect to any Demand Registration for an underwritten offering, any Company Initiated Resale Registration for an underwritten offering, any Underwritten Shelf Take-Down, in each case that does not include Common Stock Equivalents being sold for the account of the Company, or any other registration for an underwritten offering that does not include Common Stock Equivalents being sold for the account of the Company, if the IM Underwriter or Company Underwriter, as applicable, advises the Company in its good faith opinion that the amount of Registrable Securities requested to be included in such registration, including Registrable Securities requested to be included pursuant to SECTION 2.2, exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Registrable Securities being offered, then the Company will reduce the Registrable Securities to be included in such offering *pro rata* based on the amount of Common Stock owned by each Holder requesting to include Registrable Securities in such registration under any of SECTION 2.1, SECTION 2.2 or SECTION 2.5.

(ii)      With respect to any Demand Registration for an underwritten offering, any Company Initiated Resale Registration for an underwritten offering or any Underwritten Shelf Take-Down that does include Common Stock Equivalents being sold for the account of the Company, if the IM Underwriter or Company Underwriter, as applicable, advises the Company in its good faith opinion that the amount of Common Stock Equivalents being sold for the account of the Company together with the Registrable Securities requested by the Holders to be included in such registration, including Registrable Securities requested to be included pursuant to SECTION 2.2, exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Common Stock Equivalents and Registrable Securities being offered, then the Company will reduce the Common Stock Equivalents and Registrable Securities to be included in such offering by (i) first only including the total number of Registrable Securities of the Holders in such offering with each such Holder entitled to include its *pro rata* share based on the number of shares of Common Stock that are owned by such Holder

8

and constitute Registrable Securities and (ii) second, to the extent that all Registrable Securities of the Holders can be included, then only including the total number of Common Stock Equivalents being sold for the account of the Company (in addition to all such Registrable Securities being sold by Holders) that the Company so determines can be included.

(b)　　If the Company Underwriter advises the Company in its good faith opinion that the amount of Common Stock Equivalents being sold for the account of the Company together with the Registrable Securities requested to be included in an underwritten offering contemplated by SECTION 2.2(b) (other than a registration subject to SECTION 2.4(a)) exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Common Stock Equivalents and Registrable Securities being offered, then the Company will reduce the Common Stock Equivalents and Registrable Securities to be included in such offering by (i) first only including the Common Stock Equivalents (or portion thereof) being sold for the account of the Company that the Company so determines can be included and (ii) second, to the extent that all Common Stock Equivalents being sold for the account of the Company can be included, then only including the total number of Registrable Securities of the Holders in such offering as the Company so determines can be included (in addition to all such Common Stock Equivalents being sold for the account of the Company) with each such Holder entitled to include its *pro rata* share based on the number of shares of Common Stock that are owned by such Holder and constitute Registrable Securities.

SECTION 2.5 Shelf Registration.

(a)　　S-1 Shelf Registrations.  From and after the date of an IPO, at any time the Company does not qualify for the use of Form S-3 promulgated under the Securities Act (or any successor form to Form S-3, or any similar short-form Registration Statement), upon receipt of a written request from any Holder or group of Holders of Registrable Securities, which collectively hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at least ten percent (10%) of the outstanding Common Stock (the "S-1 Shelf Initiating Holders") that the Company file a Shelf Registration Statement on Form S-1 for an offering on a delayed or continuous basis pursuant to Rule 415 under the Securities Act (an "S-1 Shelf Registration Statement") covering the resale of all or a portion of the Registrable Securities owned by such S-1 Shelf Initiating Holders (an "S-1 Shelf Registration"), the Company shall give written notice of such request to each other Holder of Registrable Securities which is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock at least twenty (20) Business Days before the anticipated filing date of such Form S-1, and such notice shall describe the proposed registration and offer such other Holders the opportunity to register all or any portion of their Registrable Securities as each other Holder may elect, by written notice given to the Company within ten (10) Business Days after their receipt from the Company of the written notice of such S-1 Shelf Registration, *provided that* the Company shall not be obligated to effect such registration until after the expiration of any lock-up agreements entered into by the S-1 Shelf Initiating Holders in connection with the IPO.  The Company shall include in such registration all Registrable Securities that the S-1 Shelf Initiating Holders requested to include, and shall use its reasonable best efforts to (x) file such S-1 Shelf Registration Statement as soon as practicable and, in any event, within sixty (60) days after receiving a request under this SECTION 2.5(a) and cause such S-1 Shelf Registration Statement to become effective as soon as

9

practicable after such filing and remain effective for the earlier of (i) the time at which all Registrable Securities registered in such S-1 Shelf Registration Statement are sold and (ii) the effectiveness of an S-3 Shelf Registration Statement that includes all Registrable Securities that had previously been registered under such S-1 Shelf Registration Statement and remain unsold, and (y) include in such registration all Registrable Securities requested to be included by the other Holders (other than the S-1 Shelf Initiating Holders) who have timely elected to participate in such Shelf Registration Statement, on the same terms and conditions as the Registrable Securities of the S-1 Shelf Initiating Holders.

(b)    S-1 Shelf Take-Downs.  Following the effectiveness of an S-1 Shelf Registration Statement, any Holder or group of Holders whose Registrable Securities are included on such Shelf Registration Statement and which collectively hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at least ten percent (10%) of the outstanding Common Stock (the "S-1 Initiating Take-Down Holders") may request that the Company engage in an underwritten resale of Registrable Securities pursuant to such S-1 Shelf Registration Statement (an "S-1 Underwritten Shelf Take-Down") or prepare a prospectus supplement for a non-underwritten resale pursuant to such S-1 Shelf Registration Statement (an "S-1 Resale Shelf Take-Down"); provided that any "block trade" under an S-1 Shelf Registration Statement shall be considered an S-1 Resale Shelf Take-Down.  The Company shall give prompt notice to each non-initiating Holder of Registrable Securities that is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock (if such Holder's Registrable Securities are included in the S-1 Shelf Registration Statement) of the receipt of a request from the S-1 Initiating Take-Down Holders of a proposed S-1 Underwritten Shelf Take-Down under and pursuant to the S-1 Shelf Registration Statement and, notwithstanding anything to the contrary contained herein, will provide such other Holders a period of five (5) Business Days to participate in such S-1 Underwritten Shelf Take-Down, subject to the terms negotiated by and applicable to the S-1 Initiating Take-Down Holders and subject to "cutback" limitations set forth in SECTION 2.4.  All such Holders electing to be included in an S-1 Underwritten Shelf Take-Down must sell their Registrable Securities on the same terms and conditions as the Registrable Securities being sold for the account of the S-1 Initiating Take-Down Holders; provided that the obligation of such Person to indemnify pursuant to any such underwriting arrangements shall be several, not joint and several, among such Persons selling Registrable Securities, and the liability of each such Person will be in proportion thereto, and provided, further, that such liability will be limited to the net proceeds (after deducting for underwriting discounts and commissions) received by such Person from the sale of his, her or its Registrable Securities pursuant to such registration. The Company shall not be required to effect more than three (3) S-1 Underwritten Shelf Take-Downs in any twelve (12) month period; provided, however, that an S-1 Underwritten Shelf Take-Down shall not be counted for such purpose unless at least fifty percent (50%) of the Registrable Securities requested by the S-1 Initiating Take-Down Holders and all other Holders timely and validly requesting to include Registrable Securities in such S-1 Underwritten Shelf Take-Down have been sold.

(c)    S-3 Shelf Registrations.  If at such time the Company qualifies for the use of Form S-3 promulgated under the Securities Act (or any successor form to Form S-3, or any similar short-form Registration Statement) (an "S-3 Shelf Registration Statement," and together with an S-1 Shelf Registration Statement, a "Shelf Registration Statement"), upon receipt of a written request from any Holder or group of Holders of Registrable Securities, which collectively

10

hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at least five percent (5%) of the outstanding Common Stock (the "S-3 Initiating Holders") that the Company file a Shelf Registration Statement covering the resale of all or a portion of the Registrable Securities owned by such S-3 Initiating Holder, the Company shall give written notice of such request to each other Holder of Registrable Securities which is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock at least twenty (20) Business Days before the anticipated filing date of such Form S-3, and such notice shall describe the proposed registration and offer such other Holders the opportunity to register all or any portion of their Registrable Securities as each other Holder may request in writing to the Company, given within ten (10) Business Days after their receipt from the Company of the written notice of such registration.  If requested by the S-3 Initiating Holders, such S-3 Shelf Registration Statement shall be for an offering on a delayed or continuous basis pursuant to Rule 415 under the Securities Act.  The Company shall use its reasonable best efforts to (x) file such S-3 Shelf Registration Statement as soon as practicable and, in any event, within forty five (45) days after receiving a request under this SECTION 2.5(c) and cause such S-3 Shelf Registration Statement to become effective and remain effective until such time at which all Registrable Securities registered in such S-3 Shelf Registration Statement are sold, and (y) include in such registration the Registrable Securities of the other Holders (other than the S-3 Initiating Holders) who have requested in writing to participate in such S-3 Shelf Registration Statement on the same terms and conditions as the Registrable Securities of the S-3 Initiating Holders.

(d)     S-3 Shelf Take-Downs.  Following the effectiveness of an S-3 Shelf Registration Statement, any Holder or group of Holders whose Registrable Securities are included on such S-3 Shelf Registration Statement and which collectively hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at least five percent (5%) of the outstanding Common Stock (the "S-3 Initiating Take-Down Holders") may request that the Company engage in an underwritten resale of Registrable Securities pursuant to such S-3 Shelf Registration Statement (an "S-3 Underwritten Shelf Take-Down," and together with an S-1 Underwritten Shelf Take-Down, an "Underwritten Shelf Take-Down") or prepare a prospectus supplement for a non-underwritten resale pursuant to such S-3 Shelf Registration Statement (an "S-3 Resale Shelf Take-Down," and together with an "S-1 Resale Shelf Take-Down," a "Resale Shelf Take-Down"); provided that any "block trade" under an S-3 Shelf Registration Statement shall be considered an S-3 Resale Shelf Take-Down.  The Company shall give prompt notice to each non-initiating Holder of Registrable Securities that is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock (if such Holder's Registrable Securities are included in the S-3 Shelf Registration Statement) of the receipt of a request from the S-3 Initiating Take-Down Holders of a proposed S-3 Underwritten Shelf Take-Down under and pursuant to the S-3 Shelf Registration Statement and, notwithstanding anything to the contrary contained herein, will provide such other Holders a period of five (5) Business Days to participate in such S-3 Underwritten Shelf Take-Down, subject to the terms negotiated by and applicable to the S-3 Initiating Take-Down Holders and subject to "cutback" limitations set forth in SECTION 2.4.  All such Holders electing to be included in an S-3 Underwritten Shelf Take-Down must sell their Registrable Securities on the same terms and conditions as the Registrable Securities being sold for the accounts of the S-3 Initiating Take-Down Holders; provided that the obligation of such Person to indemnify pursuant to any such underwriting arrangements shall be several, not joint and several, among such Persons selling Registrable Securities, and the liability of each such Person will be in proportion thereto, and provided, further, that such liability will be

11

limited to the net proceeds (after deducting for underwriting discounts and commissions) received by such Person from the sale of his, her or its Registrable Securities pursuant to such registration. The Company shall not be required to effect more than three (3) S-3 Underwritten Shelf Take-Downs in any twelve (12) month period; provided, however, that an S-3 Underwritten Shelf Take-Down shall not be counted for such purpose unless at least fifty percent (50%) of the Registrable Securities requested by the S-3 Initiating Take-Down Holders and all other Holders timely and validly requesting to include Registrable Securities in such S-3 Underwritten Shelf Take-Down have been sold.

(e)       Delay of Shelf Registration or Shelf Take-Down.  If the Board of Directors has a Valid Business Reason, the Company may (x) postpone filing a Registration Statement or prospectus supplement relating to a Shelf Registration Statement, Underwritten Shelf Take-Down or Resale Shelf Take-Down until such Valid Business Reason no longer exists, but in no event for more than seventy five (75) days, and (y) in case a Registration Statement or prospectus supplement has been filed relating to a Shelf Registration Statement, Underwritten Shelf Take-Down or Resale Shelf Take-Down, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board of Directors acting in good faith, may cause the applicable Registration Statement to be withdrawn and its effectiveness terminated, *provided*, *however*, that a new Registration Statement (and prospectus supplement, if applicable) is filed within seventy five (75) days thereafter, or may postpone amending or supplementing such Registration Statement or prospectus supplement, but in no event for more than seventy five (75) days; *provided*, *however*, that if the registration of Registrable Securities is postponed or withdrawn pursuant to this SECTION 2.5(e), the Company shall not be permitted to register under the Securities Act any Common Stock, other than shares of Common Stock or other equity securities to be issued in connection with an acquisition, during any such postponement or during the period from such withdrawal to the filing of such new Registration Statement.  The Company shall give written notice to the Holders of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof.  Notwithstanding anything to the contrary contained herein, the Company may not postpone or withdraw a filing due to a Valid Business Reason (i) more than twice in any twelve (12) month period (except that the Company shall be able to use this right more than twice in any twelve (12) month period if the Company is exercising such right during the fifteen (15) day period prior to the Company's regularly scheduled quarterly earnings announcement date and the total number of days of postponement in such twelve (12) month period does not exceed ninety (90) days), or (ii) except as contemplated in the parenthetical in (i) immediately above, for more than seventy five (75) days, in the aggregate for all such postponements or withdrawals, in any twelve (12) month period. The Company shall not be required to effect any registration pursuant to SECTION 2.5, (i) during a period which the Company is restricted from effecting any public sale or distribution of any of its securities, or any securities convertible into or exchangeable or exercisable for such securities pursuant to SECTION 2.6(b) hereto, solely if and to the extent requested by the managing underwriter in the applicable offering, (ii) if Form S-1 is not available for such offering by the S-1 Shelf Initiating Holders or the S-1 Initiating Take-Down Holders, as applicable or (iii) if Form S-3 is not available for such offering by the S-3 Initiating Holders or the S-3 Initiating Take-Down Holders, as applicable.

12

SECTION 2.6 Lock-Up Agreement.

(a)  (i) In connection with an IPO, and upon the request of the managing underwriter in such offering, each Holder agrees; and (ii) in connection with any underwritten public offering of Registrable Securities (including an Underwritten Shelf Take-Down) pursuant to this Agreement after the IPO, and upon the request of the managing underwriter in such offering, each Holder who is participating in such offering agrees that: such Holder shall not, without the prior written consent of such managing underwriter, during (A) in the case of the IPO, the one hundred and eighty (180) day period beginning on the effective date of the Registration Statement for the IPO or (B) in the case of such underwritten public offering of Registrable Securities after the IPO, the ninety (90) day period or such lesser period as the managing underwriter may agree, beginning on the effective date of the applicable Registration Statement, (I) offer, pledge, sell, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, hedge the beneficial ownership of or otherwise dispose of, directly or indirectly, any Registrable Securities or of any securities convertible into or exchangeable or exercisable for such Registrable Securities, or (II) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (I) or (II) above is to be settled by delivery of Registrable Securities, in cash or otherwise. The foregoing provisions of this SECTION 2.6(a) shall be applicable to the Holders only if all officers and directors of the Company are subject to the same restrictions. Each Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the managing underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. Notwithstanding anything to the contrary contained in this SECTION 2.6(a), each Holder shall be released, pro rata, from any lock-up agreement entered into pursuant to this SECTION 2.6(a) in the event and to the extent that the managing underwriter or the Company permit any discretionary waiver or termination of the restrictions of any lock-up agreement pertaining to any officer or director.

(b)  The Company agrees not to effect any public sale or distribution of any of its securities, or any securities convertible into or exchangeable or exercisable for such securities (except (i) pursuant to registrations on Form S-4 or S-8 or any successor thereto, or (ii) in connection with any dividend or distribution reinvestment or similar plan), if and to the extent requested by the managing underwriter in the applicable offering, (A) in the case of the IPO, during the one hundred and eighty (180) day period beginning on the effective date of the Registration Statement for the IPO or (B) in the case of any underwritten public offering of Registrable Securities after the IPO, during the ninety (90) day period beginning on the effective date of the applicable Registration Statement, in each case except as part of such registration.

SECTION 2.7 Registration Procedures

(a)  Whenever registration of Registrable Securities has been requested pursuant to SECTION 2.1, SECTION 2.2 or SECTION 2.5, the Company shall use its reasonable best efforts to effect the registration and sale of such Registrable Securities in accordance with the intended method of distribution thereof as quickly as practicable, and in connection with any such request, the Company shall, as expeditiously as possible:

13

(i)  prepare and file with the Commission a Registration Statement on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate and which form shall be available for the sale of such Registrable Securities in accordance with the intended method of distribution thereof, and cause such Registration Statement to become effective; provided, however, that (x) before filing a Registration Statement or prospectus or any amendments or supplements thereto, the Company shall provide one legal counsel selected by Holders of a majority of the Common Stock to be included in such Registration Statement ("Holders' Counsel") with an adequate and appropriate opportunity to review and comment on such Registration Statement and each prospectus included therein (and each amendment or supplement thereto) to be filed with the Commission, subject to such documents being under the Company's control, and (y) the Company shall promptly notify the Holders' Counsel and each seller of Registrable Securities of any stop order issued or threatened by the Commission and promptly take all action required to prevent the entry of such stop order or to remove it if entered;

(ii)  prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for the lesser of (x) one hundred and eighty (180) days and (y) such shorter period which will terminate when all Registrable Securities covered by such Registration Statement have been sold; *provided*, *however*, that if the S-1 Shelf Initiating Holders or S-3 Initiating Holders, as applicable, have requested that a Shelf Registration Statement be for an offering on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, then the Company shall keep such Shelf Registration Statement effective until all Registrable Securities covered by such Shelf Registration Statement have been sold; and shall comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Shelf Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Shelf Registration Statement;

(iii)  furnish to each seller of Registrable Securities, prior to filing a Registration Statement, a reasonable number of copies of such Registration Statement as is proposed to be filed, and thereafter such number of copies of such Registration Statement, each amendment and supplement thereto (in each case, including all exhibits thereto), and the prospectus included in such Registration Statement (including each preliminary prospectus) and any prospectus filed under Rule 424 under the Securities Act as each such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(iv)  register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as any seller of Registrable Securities may request, and to continue such qualification in effect in such jurisdiction for as long as permissible pursuant to the laws of such jurisdiction, or for as long as any such seller requests or until all of such Registrable Securities are

14

sold, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable any such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller; *provided*, *however*, that the Company shall not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this SECTION 2.7(a)(iv), (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process in any such jurisdiction;

(v)     notify each seller of Registrable Securities at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such Registration Statement contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and the Company shall promptly prepare a supplement or amendment to such prospectus and furnish to each seller of Registrable Securities a reasonable number of copies of such supplement to or an amendment of such prospectus as may be necessary so that, after delivery to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vi)     enter into and perform customary agreements (including an underwriting agreement in customary form with the relevant underwriter) and take such other actions as are prudent and reasonably required in order to expedite or facilitate the disposition of such Registrable Securities, including causing its officers to participate in "road shows" and other information meetings organized by the relevant underwriter, with all out-of-pocket costs and expenses incurred by the Company or such officers in connection with such attendance to be paid by the Company;

(vii)     upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, which shall be consistent with the due diligence and disclosure obligations under securities laws applicable to the Company and the Holders, make available at reasonable times for inspection by any managing underwriter participating in any disposition of such Registrable Securities pursuant to a Registration Statement, Holders' Counsel and any attorney, accountant or other agent retained by any managing underwriter, all financial and other records, pertinent corporate documents and properties of the Company and its Subsidiaries (collectively, the "Records") as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Company's and its Subsidiaries' officers, directors and employees, and the independent public accountants of the Company, to supply all information reasonably requested by any such Person in connection with such Registration Statement;

15

(viii)    if such sale is pursuant to an underwritten offering, obtain comfort letters dated the effective date of the Registration Statement and the date of the closing under the underwriting agreement from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by comfort letters as Holders' Counsel or the managing underwriter reasonably requests;

(ix)    furnish, at the request of any seller of Registrable Securities on the date such securities are delivered to the underwriters for sale pursuant to such registration or, if such securities are not being sold through underwriters, on the date the Registration Statement with respect to such securities becomes effective, opinion letters and (in the case of an underwritten offering) negative assurance letters, dated such date, of counsel representing the Company for the purposes of such registration, addressed to the underwriters, if any, to the seller making such request, or the transfer agent, as applicable, covering such legal matters with respect to the registration in respect of which such opinion letters and negative assurance letters are being given as the underwriters, if any, such seller or the transfer agent may reasonably request and are customarily included in opinion letters or negative assurance letters in offerings of that type;

(x)    comply with all applicable rules and regulations of the Commission, and make generally available to its security holders, as soon as reasonably practicable but no later than fifteen (15) months after the effective date of the Registration Statement, an earnings statement covering a period of twelve (12) months beginning after the effective date of the Registration Statement, in a manner which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(xi)    cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed provided that the applicable listing requirements are satisfied;

(xii)    keep Holders' Counsel advised as to the initiation and progress of any registration under SECTION 2.1, SECTION 2.2 or SECTION 2.5 hereunder;

(xiii)    cooperate, in a commercially reasonable manner, with each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA; and

(xiv)    take all other steps reasonably necessary to effect the registration of the Registrable Securities contemplated hereby.

SECTION 2.8 Seller Information. The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish, and such seller shall furnish, to the Company such information regarding the distribution of such securities as the Company may

16

from time to time reasonably request in writing, as a condition to including such Registrable Securities in such Registration Statement.

SECTION 2.9 <u>Notice to Discontinue</u>.  Each Holder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in <u>SECTION 2.7(a)(v)</u>, such Holder shall forthwith discontinue disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities until such Holders' receipt of the copies of the supplemented or amended prospectus contemplated by <u>SECTION 2.7(a)(v)</u> and, if so directed by the Company, such Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Holders' possession, of the prospectus covering such Registrable Securities which is current at the time of receipt of such notice.  If the Company shall give any such notice, the Company shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement (including the period referred to in <u>SECTION 2.7(a)(ii)</u>) by the number of days during the period from and including the date of the giving of such notice pursuant to <u>SECTION 2.7(a)(v)</u> to and including the date when sellers of such Registrable Securities under such Registration Statement shall have received the copies of the supplemented or amended prospectus contemplated by and meeting the requirements of <u>SECTION 2.7(a)(v)</u>.

SECTION 2.10      <u>Registration Expenses</u>.  The Company shall pay all expenses arising from or incident to its performance of, or compliance with, this Agreement, including (i) Commission, stock exchange and FINRA registration and filing fees, (ii) all fees and expenses incurred in complying with securities or "blue sky" laws (including reasonable fees, charges and disbursements of counsel to any underwriter incurred in connection with "blue sky" qualifications of the Registrable Securities as may be set forth in any underwriting agreement), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and expenses of counsel to the Company and of its independent public accountants and any other accounting fees, charges and expenses incurred by the Company (including any expenses arising from any comfort letters or any special audits incident to or required by any registration or qualification) and the reasonable legal fees, charges and expenses of Holders' Counsel, (v) all fees and disbursements of underwriters customarily paid by the issuer of securities (excluding brokers' commissions or underwriting discounts and commissions and transfer taxes, if any), and fees and disbursements of counsel to underwriters, (vi) all fees and expenses incurred in connection with the listing of the shares of Common Stock on any securities exchange and all rating agency fees, (vii) for any Holders participating in any registration, any other reasonable expenses customarily paid by the issuers of securities, including reasonable and documented legal fees and expenses for such necessary local counsels for such Holders and (viii) any liability insurance or other premiums for insurance obtained in connection with any registration pursuant to the terms of this Agreement, regardless of whether any Registration Statement is declared effective.  The holder of Registrable Securities sold pursuant to a Registration Statement shall bear the expense of any brokers' commissions or underwriting discounts or commissions and transfer taxes relating to registration and sale of such Holders' Registrable Securities.

SECTION 2.11      <u>Indemnification; Contribution</u>.

(a)      <u>Indemnification by the Company.</u>  The Company shall indemnify and hold harmless each Holder, its partners, directors, officers, Affiliates and each Person who controls

17

(within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) the Holder from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) (each, a "Liability" and collectively, "Liabilities"), arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made), except insofar as such Liability arises out of or is based upon any untrue statement or alleged untrue statement or omission or alleged omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning any Holder furnished in writing to the Company by such Holder expressly for use therein, including the information furnished to the Company pursuant to SECTION 2.11(b).  The Company shall also provide customary indemnities to any underwriters of the Registrable Securities, their officers, directors and employees and each Person who controls such underwriters (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the same extent as provided above with respect to the indemnification of the Holders.

(b)      Indemnification by the Holders.   In connection with any Registration Statement in which any Holder is participating pursuant to SECTION 2.1, SECTION 2.2 or SECTION 2.5 hereof, each Holder shall promptly furnish to the Company in writing such information with respect to such Holder as the Company may reasonably request or as may be required by law for use in connection with any such Registration Statement or prospectus and all information required to be disclosed in order to make the information previously furnished to the Company by such Holder not materially misleading or necessary to cause such Registration Statement not to omit a material fact with respect to such Holder necessary in order to make the statements therein not misleading.  Each Holder agrees to indemnify and hold harmless the Company, its partners, directors, officers, Affiliates, any underwriter retained by the Company and each Person who controls the Company or such underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) from and against any and all Liabilities arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made), but if and only to the extent that such Liability arises out of or is based upon any untrue statement or omission or alleged untrue statement or alleged omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning such Holder furnished in writing (including by email) by such Holder expressly for use therein and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting such loss, claim, damage, liability or expense, *provided*, *however*, that the total amount to be indemnified by each Holder pursuant to this SECTION 2.11(b) shall be limited to such Holders' pro rata portion of the net proceeds (after deducting the underwriters' discounts and

18

commissions) received by such Holder in the offering to which the Registration Statement or prospectus relates.

(c)     Conduct of Indemnification Proceedings.   Any Person entitled to indemnification under this SECTION 2.11 (the "Indemnified Party") agrees to give prompt (but in any event within 30 days after such Person has actual knowledge of the facts constituting the basis for indemnification) written notice to the indemnifying party (the "Indemnifying Party") after the receipt by the Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; *provided*, *however*, that the failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to the Indemnified Party hereunder (except to the extent that the Indemnifying Party is prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure).  If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party.  The Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Indemnified Party unless (i) the Indemnifying Party agrees to pay the same, (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably satisfactory to the Indemnified Party or (iii) the named parties to any such action (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and the Indemnified Party has been advised by such counsel that either (x) representation of such Indemnified Party and the Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (y) there may be one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party.  In any of such cases, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all Indemnified Parties.  No Indemnifying Party shall be liable for any settlement entered into without its written consent (such consent not to be unreasonably withheld or delayed).  No Indemnifying Party shall, without the consent of such Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is a party and indemnity has been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability for claims that are the subject matter of such proceeding.

(d)     Contribution.  If the indemnification provided for in this SECTION 2.11 from the Indemnifying Party is held by a court of competent jurisdiction to be unavailable to an Indemnified Party hereunder in respect of any Liabilities referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and Indemnified Party on the other in connection with the statements or omissions which resulted in such Liabilities, as well as other relevant equitable considerations.  The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any untrue

19

or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such Indemnifying Party or Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in SECTION 2.11(a), SECTION 2.11(b) and SECTION 2.11(c), any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; *provided*, *however*, that the total amount to be contributed by any Holder shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by the Holder in the offering.

(e)      Fraud.  The parties hereto agree that it would not be just and equitable if contribution pursuant to SECTION 2.11(d) were determined by *pro rata* allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

## ARTICLE III
## EXCHANGE ACT COMPLIANCE

SECTION 3.1 Exchange Act Compliance.  So long as the Company (a) has registered a class of securities under Section 12 of the Exchange Act and/or (b) files reports under Section 13 or Section 15 of the Exchange Act, then the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144, including, without limiting the generality of the foregoing, (i) making and keeping public information available, as those terms are understood and defined in Rule 144, (ii) filing with the Commission in a timely manner all reports and other documents required of the Company under the Exchange Act and (iii) at the request of any Holder if such Holder proposes to sell securities in compliance with Rule 144, forthwith furnish to such Holder, as applicable, a written statement of compliance with the reporting requirements of the Commission as set forth in Rule 144 and make available to such Holder such information as will enable the Holder to make sales pursuant to Rule 144.

## ARTICLE IV
## MISCELLANEOUS

SECTION 4.1 Specific Performance.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, including if the parties hereto fail to take any action required of them hereunder to consummate this Agreement.  It is accordingly agreed that, in addition to any other applicable remedies at law or equity, the parties to this Agreement shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.  Each party hereto agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (i) the other party has an adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or in equity.  Each of

20

the parties hereto hereby waives (x) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate and (y) any requirement under any law to post a bond or other security as a prerequisite to obtaining equitable relief; provided that such waiver shall not limit, in any respect, the availability of any defense(s) that a party might otherwise have with respect to the alleged breach or obligation for which specific performance is sought.

SECTION 4.2 Term and Termination. This Agreement shall terminate at such time as there are no Registrable Securities outstanding; provided, however, that the provisions of Sections 2.10 and 2.11 shall survive any termination of this Agreement.

SECTION 4.3 Amendments and Waivers.

(a) No failure or delay on the part of the Company or any Holder in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the Company or any Holder at law or in equity or otherwise.

(b) The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, in each case without the written consent of the Company and the Holders of 75% of the outstanding shares of Common Stock that constitute Registrable Securities; provided, that any amendment that has the effect of materially and disproportionately adversely affecting any Holder or group of Holders differently than any other Holder or group of Holders shall only be effective against such materially and disproportionately adversely affected Holder(s) with the written consent of a majority of such Holder(s).

SECTION 4.4 Notices. Any notices or other communications required or permitted hereunder shall be in writing, and shall be sufficiently given if made by hand delivery, by electronic mail, by facsimile, by reputable overnight courier service (charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested), addressed as follows (or at such other address as may be substituted by notice given as herein provided):

If to the Company:

> Avaya Holdings Corp.
> 350 Mt. Kemble Avenue
> Morristown, NJ 07960
> Attention: Vito Carnevale, General Counsel and Shefali Shah, Chief Administrative Officer
> E-mail address: vcarnevale@avaya.com; sashah@avaya.com

If to any Holder, at its address and the address of its representative, if any, which in each case may be an email address, as provided to the Company by such Holder or otherwise listed in the books of the Company. If such Holder has not provided to the Company its address or the

21

address of its representative, if any, or if such address is not otherwise listed in the books of the Company, the Company shall not be obligated to comply with the notice provisions of this Agreement with respect to such Holder.

Any notice or communication hereunder shall be deemed to have been given or made as of the date so delivered if personally delivered; when receipt is acknowledged, if emailed or telecopied; and on receipt if sent by overnight courier service or registered or certified mail.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

SECTION 4.5 Successors and Assigns.  The rights and obligations of the Holders under this Agreement shall not be assignable by any Holder to any Person that is not a Holder; provided, that (i) in the event of a valid transfer of Common Stock by a Holder prior to an IPO, the rights and obligations of the transferor under this Agreement (solely with respect to the Common Stock so transferred) must be transferred to the transferee and such transferee must execute a joinder to the Stockholders' Agreement and this Agreement, in the form attached as Exhibit A to the Stockholders' Agreement, and (ii) in the event of a valid transfer of Registrable Securities by a Holder after an IPO, the rights and obligations of the transferor under this Agreement (solely with respect to the Registrable Securities so transferred) may be transferred to the transferee provided such transferee executes a joinder to this Agreement, in the form attached hereto as Exhibit A; provided, further, for the avoidance of doubt, that the transferor in such transaction shall retain its rights and obligations under this Agreement with respect to any Common Stock not so transferred. This Agreement shall be binding upon the parties hereto and their respective successors, assigns and transferees.

SECTION 4.6 Counterparts.   This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile, by electronic mail in "portable document format" (".pdf") form, or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

SECTION 4.7 Governing Law: Venue: Jurisdiction. THIS AGREEMENT AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.  Each party hereby agrees that any action based upon, arising out of or relating to this Agreement (including any action concerning the violation or threatened violation of this Agreement) shall be heard and determined in any state or federal court sitting in the Court of Chancery of the State of Delaware (or, if the Chancery Court of the State of Delaware declines

22

to accept jurisdiction over a particular matter, in the United States District Court for the District of Delaware), and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts (and, in the case of appeals, appropriate appellate courts therefrom) in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.  In addition, each party consents to process being served in any such lawsuit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address in effect for notices hereunder, and agrees that such services shall constitute good and sufficient service of process and notice thereof.  The consents to jurisdiction set forth in this paragraph shall not constitute general consents to service of process in the State of Delaware and shall have no effect for any purpose except as provided in this SECTION 4.7 and shall not be deemed to confer rights on any Person other than the parties hereto.  Nothing in this SECTION 4.7 shall affect or limit any right to serve process in any other manner permitted by law.

SECTION 4.8 WAIVER OF JURY TRIAL.  **EACH PARTY HEREBY WAIVES ITS RESPECTIVE RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT WHETHER BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH PARTY RECOGNIZES AND AGREES THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS AGREEMENT.  EACH PARTY REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

SECTION 4.9 Severability.  Any provision of this Agreement which is prohibited, unenforceable or not authorized in any jurisdiction is, as to such jurisdiction, ineffective to the extent of any such prohibition, unenforceability or nonauthorization without invalidating the remaining provisions hereof, or affecting the validity, enforceability or legality of such provision in any other jurisdiction, unless the ineffectiveness of such provision would result in such a material change as to cause completion of the transactions contemplated hereby to be unreasonable.  Upon a determination that any provision of this Agreement is prohibited, unenforceable or not authorized, the parties hereto agree to negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby are consummated as originally contemplated to the fullest extent possible.

SECTION 4.10      Non-Recourse.  All claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties in the preamble to this Agreement ("Contracting Parties").  No Person who is not a Contracting Party, including without limitation any director, officer, employee, incorporator,

member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing ("Non-party Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach; and, to the maximum extent permitted by law, each Contracting Party hereby waives and releases all such liabilities, claims, causes of action, and obligations against any such Non-party Affiliates.

SECTION 4.11      Recapitalization, Exchanges Etc., Affecting Securities.   The provisions of this Agreement shall apply, to the full extent set forth herein with respect to the Common Stock and to any and all Common Stock of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise, including shares issued by a parent company in connection with a triangular merger) which may be issued in respect of, in exchange for, or in substitution of Common Stock, appropriately adjusted for any stock dividends, splits, reverse splits, combinations, reclassifications and the like occurring after the date hereof.

SECTION 4.12      Entire Agreement.   This Agreement (including all schedules and exhibits hereto) contains the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters.

SECTION 4.13      Aggregation of Common Stock.   All Common Stock held by a Holder and its Affiliates shall be aggregated together for purposes of determining the availability of any rights under this Agreement.

SECTION 4.14      Headings.   The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed to be part of this Agreement or otherwise affect the interpretation of this Agreement.

SECTION 4.15      No Third Party Beneficiaries.   Except as provided in SECTION 4.5, nothing express or implied herein is intended or shall be construed to confer upon any person or entity, other than the parties hereto and their respective successors and assigns and all Indemnified Parties, any rights, remedies or other benefits under or by reason of this Agreement.

\* \* \* \* \* \* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**COMPANY**

AVAYA HOLDINGS CORP.

By: _____
Name: Rebecca A. Roof
Title: Interim Chief Financial Officer

*Signature Page to Registration Rights Agreement*

**EXHIBIT A**

**JOINDER AGREEMENT**

This Joinder Agreement ("Joinder") is executed pursuant to the terms of the Registration Rights Agreement, dated as of May 1, 2023 a copy of which is attached hereto (as amended, the "Registration Rights Agreement"), by the undersigned (the "Undersigned") executing this Joinder. By the execution of this Joinder, the Undersigned agrees as follows:

1.      Acknowledgment.   The Undersigned acknowledges that the Undersigned is acquiring certain Registrable Securities of Avaya Holdings Corp., a Delaware corporation (the "Company"), subject to the terms and conditions of the Registration Rights Agreement. Capitalized terms used herein without definition are defined in the Registration Rights Agreement and are used herein with the same meanings set forth therein.

2.      Agreement.  The Undersigned (i) agrees that the Registrable Securities acquired by the Undersigned shall be bound by and subject to the terms of the Registration Rights Agreement, pursuant to the terms thereof, and (ii) hereby agrees to be bound by the Registration Rights Agreement as a Holder thereunder, with the same force and effect as if the Undersigned were originally a party thereto.

3.      Notice.  Any notice required as permitted by the Registration Rights Agreement shall be given to the Undersigned at the address listed beside the Undersigned's signature below.

[NAME OF HOLDER]                          Address for Notices:

By: _____              [●]
Name:                                    [●]
Title:                                   Telephone:        [●]
Date:                                    Email:            [●]

*Joinder Agreement*

<u>**Exhibit A(iv)-1**</u>

**Redline to Previously Filed Form of Registration Rights Agreement**

**REGISTRATION RIGHTS AGREEMENT**

This REGISTRATION RIGHTS AGREEMENT (this "Agreement"), dated as of [•]May 1, 2023, is entered into by and among [Avaya Holdings Corp.], a Delaware corporation (the "Company"), the beneficial and record holders of Common Stock (as defined below) as of the date hereof, who are deemed parties hereto pursuant to an order of the United States Bankruptcy Court for the Southern District of Texas confirming the Plan (as hereinafter defined) pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1542, and the other Persons who become signatories hereto following the date hereof (collectively, "Holders").

WHEREAS, in accordance with the Plan (as hereinafter defined), the Company has agreed to grant to the Holders the registration rights set forth herein.

NOW, THEREFORE, pursuant to the obligations of the Company and the Holders under the Plan and in consideration of the premises, mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

SECTION 1.1 <u>Definitions</u>.  In addition to the definitions set forth above, the following terms, as used herein, have the following meanings:

"<u>Affiliate</u>" means, when used with reference to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. For purposes of this definition, an "Affiliate" of a Holder shall include any investment fund, alternative investment vehicle, special purpose vehicle or holding company that (i) is directly or indirectly managed, advised, sub-advised or controlled by such Holder or any Affiliate of such Holder, (ii) is managed, advised or sub-advised by the same investment adviser as, or an Affiliate of the investment adviser of, such Holder or (iii) is a party to a derivative or participation transaction with such Holder pursuant to which there is a transfer of the economics of ownership of securities to or from such Holder; provided, however, that neither the Company nor any of its Subsidiaries shall be deemed an Affiliate of any of the Holders (and vice versa).

"<u>Agreement</u>" shall have the meaning set forth in the introductory paragraph hereof.

"<u>Board of Directors</u>" means the board of directors of the Company.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or a day on which state or federally chartered banking institutions in New York City, New York are not required to be opened.

"<u>Commission</u>" means the United States Securities and Exchange Commission.

"<u>Common Stock</u>" means the common stock, par value $0.01 per share, of the Company, and any shares or capital stock for or into which such common stock hereafter is exchanged,

converted, reclassified or recapitalized by the Company or pursuant to an agreement to which the Company is a party.

"Common Stock Equivalents" means, without duplication, Common Stock and any rights, warrants, options, convertible securities or indebtedness, exchangeable securities or indebtedness, or other rights, exercisable for or convertible or exchangeable into, directly or indirectly, Common Stock and securities convertible or exchangeable into Common Stock, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"Company Initiated Resale Registration" shall have the meaning set forth in SECTION 2.1(a).

"Company Underwriter" shall have the meaning set forth in SECTION 2.1(c).

"Contracting Parties" shall have meaning set forth in SECTION 4.10.

"Demand Registration" shall have the meaning set forth in SECTION 2.1(a).

"Effective Date" shall have the meaning set forth in the Plan.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FINRA" means Financial Industry Regulatory Authority, Inc.

"Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Holder" shall have the meaning set forth in the introductory paragraph hereof, and "Holders" means all Holders, collectively.

"Holders' Counsel" shall have meaning set forth in SECTION 2.7(a)(i).

"IM Underwriter" shall have meaning set forth in SECTION 2.1(c).

"Incidental Registration" shall have the meaning set forth in SECTION 2.2(a).

"Indemnified Party" shall have meaning set forth in SECTION 2.11(c).

"Indemnifying Party" shall have meaning set forth in SECTION 2.11(c).

"Initiating Demand Holders" shall have the meaning set forth in SECTION 2.1(a).

"IPO" means any of (i) an initial public offering of shares of Common Stock pursuant to an effective registration statement under the Securities Act, (ii) a single transaction or series of

2

related transactions by a merger, acquisition or other business combination involving the Company and a publicly traded special purpose acquisition company or other similar entity in which a class of capital stock of the special purpose acquisition company or other similar entity (or its successor) is publicly traded on a National Securities Exchange or (iii) any other transaction or series of related transactions following consummation of which the Common Stock is listed and traded on a National Securities Exchange or an established non-U.S. securities exchange; provided that an IPO shall not include any issuance of Common Stock solely to existing security holders or employees or consultants of the Company or its Subsidiaries on Form S-4, Form F-4 or Form S-8 (or any successor form adopted by the Commission or any comparable form adopted by any foreign securities regulators).

"Liability" shall have the meaning set forth in SECTION 2.11(a).

"National Securities Exchange" shall mean the New York Stock Exchange, NYSE American, the Nasdaq Global Select Market, the Nasdaq Global Market, the Nasdaq Capital Market or another U.S. national securities exchange registered with the ~~SEC~~Commission.

"Non-Initiating Holders" shall have the meaning set forth in SECTION 2.2(a).

"Non-party Affiliates" shall have meaning set forth in SECTION 4.10.

"Person" means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, estate, unincorporated organization, Governmental Authority or other entity and shall include any "group" within the meaning of the regulations promulgated by the Commission under Section 13(d) of the Exchange Act.

"Plan" means the Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, Case No. 23-90088 (DRJ).

"Prospectus" means the prospectus or prospectuses included in any Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance on Rule 430A under the Securities Act or any successor rule thereto), as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the Common Stock Equivalents covered by such Registration Statement and by all other amendments and supplements to the prospectus, including post-effective amendments and all material incorporated by reference in such prospectus or prospectuses.

"Records" shall have the meaning set forth in SECTION 2.7(a)(vii).

"Registrable Securities" means any Common Stock (including any issuable or issued upon exercise, exchange or conversion of any Common Stock Equivalents) at any time owned, either of record or beneficially, by any Holder and any additional securities that may be issued or distributed or be issuable in respect of any Common Stock by way of conversion, dividend, stock-split, distribution or exchange, merger, consolidation, exchange, recapitalization or reclassification or similar transactions; provided that such securities shall cease to be (or shall not be, as applicable) Registrable Securities if and when (i) the Commission has declared a Registration Statement covering such securities effective and such securities have been disposed

of pursuant to such effective Registration Statement, (ii) such securities are sold under circumstances in which all of the applicable conditions of Rule 144 under the Securities Act are met, (iii) such securities become (or are, as applicable) eligible for sale by the applicable Holder without registration and without time restrictions, volume restrictions, manner-of-sale restrictions or a current public information requirement under Rule 144 or (iv) such securities have ceased to be outstanding.

"Registration Statement" means any registration statement of the Company, including the Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all material incorporated by reference in such registration statement.

"Resale Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(d).

"Rule 144" means Rule 144 promulgated under the Securities Act, as amended from time to time, or any similar successor rule thereto that may be promulgated by the Commission.

"S-1 Initiating Take-Down Holders" shall have the meaning set forth in SECTION 2.5(b).

"S-1 Resale Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(b).

"S-1 Shelf Initiating Holders" shall have the meaning set forth in SECTION 2.5(a).

"S-1 Shelf Registration" shall have the meaning set forth in SECTION 2.5(a).

"S-1 Shelf Registration Statement" shall have the meaning set forth in SECTION 2.5(a).

"S-1 Underwritten Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(b).

"S-3 Initiating Holders" shall have the meaning set forth in SECTION 2.5(c).

"S-3 Initiating Take-Down Holders" shall have the meaning set forth in SECTION 2.5(d).

"S-3 Resale Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(d).

 "S-3 Shelf Registration Statement" shall have the meaning set forth in SECTION 2.5(c).

"S-3 Underwritten Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(d).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder.

"Shelf Registration Statement" shall have the meaning set forth in SECTION 2.5(c).

4

"Stockholders' Agreement" means that certain agreement entered into as of [ ]May 1, 2023 by and among [Avaya Holdings Corp.] and hHolders of Common Stock.

"Subsidiary" means, with respect to any Person, any other Person, whether incorporated or unincorporated, in which the Company or any one or more of its other Subsidiaries, directly or indirectly, owns or controls:  (i) fifty percent (50%) or more of the securities or other ownership interests, including profits, equity or beneficial interests; or (ii) securities or other interests having by their terms ordinary voting power to elect more than fifty percent (50%) of the board of directors or others performing similar functions with respect to such other Person that is not a corporation.

"Underwritten Shelf Take-Down" shall have the meaning set forth in SECTION 2.5(d).

"Valid Business Reason" shall have the meaning set forth in SECTION 2.1(b).

## ARTICLE II
## REGISTRATION RIGHTS

SECTION 2.1 Demand Registration Right.

(a)     From and after the date of an IPO, at any time the Company does not qualify for the use of Form S-3 promulgated under the Securities Act (or any successor form to Form S-3, or any similar short-form Registration Statement), (i) each Holder or group of Holders of Registrable Securities, which collectively hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at least ten percent (10%) of the outstanding Common Stock (collectively, the "Initiating Demand Holders"), may make a written request (specifying the intended method of disposition, such as an underwritten offering or a block trade, and the amount of Registrable Securities proposed to be sold) that the Company effect, and the Company shall use its reasonable best efforts to effect, a registration of its Common Stock under the Securities Act (a "Demand Registration") of all or any requested portion of the Registrable Securities collectively held by such Holders (subject to SECTION 2.4(a)), *provided that* the Company shall not be obligated to effect such registration until after the expiration of any lock-up agreements entered into by the Initiating Demand Holders in connection with the IPO or (ii) the Board of Directors may determine to commence a registration of Registrable Securities held by Holders under the Securities Act (a "Company Initiated Resale Registration"), and the Company shall use its reasonable best efforts to effect a registration of Registrable Securities for all Holders that exercise piggyback registration rights under SECTION 2.2 (subject to SECTION 2.4(a)).

(b)     If the Board of Directors, in its good faith judgment, determines that any registration of the Registrable Securities pursuant to a Demand Registration or a Company Initiated Resale Registration should not be made or continued because it would materially interfere with any material financing, acquisition, corporate reorganization or merger or other material transaction involving the Company (a "Valid Business Reason"), the Company may (i) postpone filing a Registration Statement relating to a Demand Registration or a Company Initiated Resale Registration until such Valid Business Reason no longer exists, but in no event for more than ninety (90) days, and (ii) in case a Registration Statement has been filed relating to

a Demand Registration or a Company Initiated Resale Registration, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board of Directors, acting in good faith, (x) may cause such Registration Statement to be withdrawn and its effectiveness terminated, *provided*, *however*, that a new Registration Statement is filed within ninety (90) days thereafter, or (y) may postpone amending or supplementing such Registration Statement, but in no event for more than ninety (90) days; *provided*, *however*, that if the registration of Registrable Securities is postponed or withdrawn pursuant to this <u>SECTION 2.1(b)</u>, the Company shall not be permitted to register under the Securities Act any Common Stock, other than Common Stock or other equity securities to be issued in connection with an acquisition, during any such postponement or during the period from such withdrawal to the filing of such new Registration Statement.  The Company shall give written notice of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof.  Notwithstanding anything to the contrary contained herein, the Company may not postpone or withdraw a filing or filings under this <u>SECTION 2.1</u> (i) more than twice in any twelve (12) month period (except that the Company shall be able to use this right more than twice in any twelve (12) month period if the Company is exercising such right during the fifteen (15) day period prior to the Company's regularly scheduled quarterly earnings announcement date and the total number of days of postponement in such twelve (12) month period does not exceed one hundred and five (105) days), or (ii) except as contemplated in the parenthetical in (i) immediately above, for more than ninety (90) days, in the aggregate for all such postponements or withdrawals, in any twelve (12) month period.  For the avoidance of doubt, any postponement or withdrawal of a Registration Statement for a Demand Registration shall result in the related registration of Registrable Securities not constituting a Demand Registration for purposes of <u>SECTION 2.3</u> hereof.

(c)     At the request of the Initiating Demand Holders, the Company shall use its reasonable best efforts to cause a Demand Registration to be in the form of a firm commitment underwritten offering, provided that the aggregate offering price of the Common Stock to be sold by the Holders in the applicable offering (before deduction of underwriter discounts and commissions) is reasonably expected to exceed, in the aggregate, $35.0 million. The managing underwriter or underwriter selected for such offering shall be selected by the Initiating Demand Holders (the "<u>IM Underwriter</u>"), which must be reasonably acceptable to the Company; provided that the Initiating Demand Holders may delegate their rights under this sentence to the Board of Directors.  In connection with any Demand Registration under this <u>SECTION 2.1</u> involving an underwritten offering, none of the Registrable Securities held by an Initiating Demand Holder making a request for inclusion of such Registrable Securities shall be included in such underwritten offering unless such Initiating Demand Holder accepts the terms of the offering as agreed upon by the Company and the IM Underwriter, such terms to be in an underwriting agreement in customary form; provided, that the obligation of such Person to indemnify pursuant to any such underwriting arrangements shall be several, not joint and several, among such Persons selling Registrable Securities, and the liability of each such Person will be in proportion thereto, and provided, further, that such liability will be limited to the net proceeds received by such Person from the sale of his, her or its Registrable Securities pursuant to such registration. In the event that any Company Initiated Resale Registration is in the form of a firm commitment underwritten offering, the managing underwriter or underwriter selected for such offering shall be selected by the Company (such managing underwriter or underwriter, or any other managing

6

underwriter or underwriter selected by the Company pursuant to SECTION 2.2(b), the "Company Underwriter").

SECTION 2.2 Piggyback Registration Right.

(a)    Within ten (10) Business Days following receipt by the Company of a request from the Initiating Demand Holders to effect a Demand Registration, the Company shall give written notice of such request to each other Holder of Registrable Securities which is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock (the "Non-Initiating Holders") which shall describe the anticipated filing date, the proposed registration and plan of distribution, and offer the Non-Initiating Holders the opportunity to register their Registrable Securities (an "Incidental Registration") in such registration. Following the receipt of such notice, each Non-Initiating Holder shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) Business Days following receipt of notice from the Company, to include all or any portion of their Registrable Securities in such Demand Registration (subject to SECTION 2.4(a)). If the Demand Registration is in the form of an underwritten offering, the right of each Non-Initiating Holder to have Registrable Securities included in such Demand Registration pursuant to this SECTION 2.2(a) shall be conditioned upon each Non-Initiating Holder entering into (together with the Initiating Demand Holders) an underwriting agreement in customary form with the IM Underwriter on the same terms as the Initiating Demand Holders. Subject to SECTION 2.4, the Company shall use its reasonable best efforts (within ten (10) Business Days of the notice provided for above) to cause the IM Underwriter to permit the Non-Initiating Holders to participate in the Incidental Registration to include their Registrable Securities in such offering on the same terms and conditions as the Registrable Securities being sold for the account of the Initiating Demand Holders.

(b)    In connection with any Company Initiated Resale Registration or any other registration by the Company after the IPO, whether for its own account or for the benefit of any Holders or both (other than a registration statement on Form S-4 or S-8 or any successor thereto), the Company shall give written notice to each Holder of Registrable Securities which is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock, at least twenty (20) Business Days prior to the proposed filing date of the Registration Statement. Following the receipt of such notice, each Holder shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) Business Days following receipt of notice from the Company, to include all or any portion of its Registrable Securities in such offering (subject to SECTION 2.4(b)). The right of each Holder to have Registrable Securities included in an offering pursuant to this SECTION 2.2(b) shall be conditioned (if an underwritten offering) upon each Holder entering into (together with the Company) an underwriting agreement in customary form with the Company Underwriter. Subject to SECTION 2.4, the Company shall use its reasonable best efforts (within ten (10) Business Days of the notice provided for above) to cause the Company Underwriter to permit the Holders to participate in a registration pursuant to this SECTION 2.2(b) to include their Registrable Securities in such offering on the same terms and conditions as the Common Stock Equivalents being sold for the account of the Company or any other Holder; provided, that the obligation of such Person to indemnify pursuant to any such underwriting arrangements shall be several, not joint and several, among such Persons selling Registrable Securities, and the liability

7

of each such Person will be in proportion thereto, and provided, further, that such liability will be limited to the net proceeds received by such Person from the sale of his, her or its Registrable Securities pursuant to such registration.

SECTION 2.3 Effective Demand Registration.  The Company shall use its reasonable best efforts to file a Registration Statement relating to a Demand Registration or a Company Initiated Resale Registration as soon as practicable and, in any event, within sixty (60) days after receiving a request under SECTION 2.1(a) hereof or the Board of Directors making a determination under SECTION 2.1(a) and the Company shall use reasonable best efforts to cause the same to be declared effective by the Commission as promptly as practicable after such filing and to remain effective for the lesser of (i) the period during which all Registrable Securities registered in the Demand Registration are sold and (ii) one hundred and eighty (180) days, *provided*, *however*, that a registration shall not constitute a Demand Registration if (x) after such Demand Registration has become effective, such registration or the related offer, sale or distribution of Registrable Securities thereunder is interfered with by any stop order, injunction or other order or requirement of the Commission or other Governmental Authority for any reason not materially attributable to any of the Initiating Demand Holders and such interference is not thereafter eliminated or (y) the conditions specified in the underwriting agreement, if any, entered into in connection with such Demand Registration are not satisfied or waived, other than by reason of a failure by the Initiating Demand Holders.  Subject to the exceptions described in SECTION 2.1, SECTION 2.5 and this SECTION 2.3, the Company shall not be required to effect more than an aggregate of three (3) Demand Registrations or S-1 Shelf Registrations in any twelve (12) month period; provided, however, that a Demand Registration shall not be counted for such purpose unless the applicable Registration Statement has become effective and at least fifty percent (50%) of the Registrable Securities requested by the Initiating Demand Holders and Non-Initiating Holders (if any) to be registered in such Demand Registration (and Incidental Registration, if applicable) have been sold.

SECTION 2.4 Cutback.

(a)

(i)      With respect to any Demand Registration for an underwritten offering, any Company Initiated Resale Registration for an underwritten offering, any Underwritten Shelf Take-Down, in each case that does not include Common Stock Equivalents being sold for the account of the Company, or any other registration for an underwritten offering that does not include Common Stock Equivalents being sold for the account of the Company, if the IM Underwriter or Company Underwriter, as applicable, advises the Company in its good faith opinion that the amount of Registrable Securities requested to be included in such registration, including Registrable Securities requested to be included pursuant to SECTION 2.2, exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Registrable Securities being offered, then the Company will reduce the Registrable Securities to be included in such offering *pro rata* based on the amount of Common Stock owned by each Holder

8

requesting to include Registrable Securities in such registration under any of SECTION 2.1, SECTION 2.2 or SECTION 2.5.

(ii)    With respect to any Demand Registration for an underwritten offering, any Company Initiated Resale Registration for an underwritten offering or any Underwritten Shelf Take-Down that does include Common Stock Equivalents being sold for the account of the Company, if the IM Underwriter or Company Underwriter, as applicable, advises the Company in its good faith opinion that the amount of Common Stock Equivalents being sold for the account of the Company together with the Registrable Securities requested by the Holders to be included in such registration, including Registrable Securities requested to be included pursuant to SECTION 2.2, exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Common Stock Equivalents and Registrable Securities being offered, then the Company will reduce the Common Stock Equivalents and Registrable Securities to be included in such offering by (i) first only including the total number of Registrable Securities of the Holders in such offering with each such Holder entitled to include its *pro rata* share based on the number of shares of Common Stock that are owned by such Holder and constitute Registrable Securities and (ii) second, to the extent that all Registrable Securities of the Holders can be included, then only including the total number of Common Stock Equivalents being sold for the account of the Company (in addition to all such Registrable Securities being sold by Holders) that the Company so determines can be included.

(b)    If the Company Underwriter advises the Company in its good faith opinion that the amount of Common Stock Equivalents being sold for the account of the Company together with the Registrable Securities requested to be included in an underwritten offering contemplated by SECTION 2.2(b) (other than a registration subject to SECTION 2.4(a)) exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Common Stock Equivalents and Registrable Securities being offered, then the Company will reduce the Common Stock Equivalents and Registrable Securities to be included in such offering by (i) first only including the Common Stock Equivalents (or portion thereof) being sold for the account of the Company that the Company so determines can be included and (ii) second, to the extent that all Common Stock Equivalents being sold for the account of the Company can be included, then only including the total number of Registrable Securities of the Holders in such offering as the Company so determines can be included (in addition to all such Common Stock Equivalents being sold for the account of the Company) with each such Holder entitled to include its *pro rata* share based on the number of shares of Common Stock that are owned by such Holder and constitute Registrable Securities.

SECTION 2.5 Shelf Registration.

(a)    S-1 Shelf Registrations. From and after the date of an IPO, at any time the Company does not qualify for the use of Form S-3 promulgated under the Securities Act (or any successor form to Form S-3, or any similar short-form Registration Statement), upon receipt of a written request from any Holder or group of Holders of Registrable Securities, which collectively hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at

9

least ten percent (10%) of the outstanding Common Stock (the "S-1 Shelf Initiating Holders") that the Company file a Shelf Registration Statement on Form S-1 for an offering on a delayed or continuous basis pursuant to Rule 415 under the Securities Act (an "S-1 Shelf Registration Statement") covering the resale of all or a portion of the Registrable Securities owned by such S-1 Shelf Initiating Holders (an "S-1 Shelf Registration"), the Company shall give written notice of such request to each other Holder of Registrable Securities which is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock at least twenty (20) Business Days before the anticipated filing date of such Form S-1, and such notice shall describe the proposed registration and offer such other Holders the opportunity to register all or any portion of their Registrable Securities as each other Holder may elect, by written notice given to the Company within ten (10) Business Days after their receipt from the Company of the written notice of such S-1 Shelf Registration, *provided that* the Company shall not be obligated to effect such registration until after the expiration of any lock-up agreements entered into by the S-1 Shelf Initiating Holders in connection with the IPO.  The Company shall include in such registration all Registrable Securities that the S-1 Shelf Initiating Holders requested to include, and shall use its reasonable best efforts to (x) file such S-1 Shelf Registration Statement as soon as practicable and, in any event, within sixty (60) days after receiving a request under this SECTION 2.5(a) and cause such S-1 Shelf Registration Statement to become effective as soon as practicable after such filing and remain effective for the earlier of (i) the time at which all Registrable Securities registered in such S-1 Shelf Registration Statement are sold and (ii) the effectiveness of an S-3 Shelf Registration Statement that includes all Registrable Securities that had previously been registered under such S-1 Shelf Registration Statement and remain unsold, and (y) include in such registration all Registrable Securities requested to be included by the other Holders (other than the S-1 Shelf Initiating Holders) who have timely elected to participate in such Shelf Registration Statement, on the same terms and conditions as the Registrable Securities of the S-1 Shelf Initiating Holders.

(b)     S-1 Shelf Take-Downs.  Following the effectiveness of an S-1 Shelf Registration Statement, any Holder or group of Holders whose Registrable Securities are included on such Shelf Registration Statement and which collectively hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at least ten percent (10%) of the outstanding Common Stock (the "S-1 Initiating Take-Down Holders") may request that the Company engage in an underwritten resale of Registrable Securities pursuant to such S-1 Shelf Registration Statement (an "S-1 Underwritten Shelf Take-Down") or prepare a prospectus supplement for a non-underwritten resale pursuant to such S-1 Shelf Registration Statement (an "S-1 Resale Shelf Take-Down"); provided that any "block trade" under an S-1 Shelf Registration Statement shall be considered an S-1 Resale Shelf Take-Down.  The Company shall give prompt notice to each non-initiating Holder of Registrable Securities that is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock (if such Holder's Registrable Securities are included in the S-1 Shelf Registration Statement) of the receipt of a request from the S-1 Initiating Take-Down Holders of a proposed S-1 Underwritten Shelf Take-Down under and pursuant to the S-1 Shelf Registration Statement and, notwithstanding anything to the contrary contained herein, will provide such other Holders a period of five (5) Business Days to participate in such S-1 Underwritten Shelf Take-Down, subject to the terms negotiated by and applicable to the S-1 Initiating Take-Down Holders and subject to "cutback" limitations set forth in SECTION 2.4.  All such Holders electing to be included in an S-1 Underwritten Shelf Take-Down must sell their Registrable Securities on the

10

same terms and conditions as the Registrable Securities being sold for the account of the S-1 Initiating Take-Down Holders; provided that the obligation of such Person to indemnify pursuant to any such underwriting arrangements shall be several, not joint and several, among such Persons selling Registrable Securities, and the liability of each such Person will be in proportion thereto, and provided, further, that such liability will be limited to the net proceeds (after deducting for underwriting discounts and commissions) received by such Person from the sale of his, her or its Registrable Securities pursuant to such registration. The Company shall not be required to effect more than three (3) S-1 Underwritten Shelf Take-Downs in any twelve (12) month period; provided, however, that an S-1 Underwritten Shelf Take-Down shall not be counted for such purpose unless at least fifty percent (50%) of the Registrable Securities requested by the S-1 Initiating Take-Down Holders and all other Holders timely and validly requesting to include Registrable Securities in such S-1 Underwritten Shelf Take-Down have been sold.

(c)     S-3 Shelf Registrations.  If at such time the Company qualifies for the use of Form S-3 promulgated under the Securities Act (or any successor form to Form S-3, or any similar short-form Registration Statement) (an "S-3 Shelf Registration Statement," and together with an S-1 Shelf Registration Statement, a "Shelf Registration Statement"), upon receipt of a written request from any Holder or group of Holders of Registrable Securities, which collectively hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at least five percent (5%) of the outstanding Common Stock (the "S-3 Initiating Holders") that the Company file a Shelf Registration Statement covering the resale of all or a portion of the Registrable Securities owned by such S-3 Initiating Holder, the Company shall give written notice of such request to each other Holder of Registrable Securities which is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock at least twenty (20) Business Days before the anticipated filing date of such Form S-3, and such notice shall describe the proposed registration and offer such other Holders the opportunity to register all or any portion of their Registrable Securities as each other Holder may request in writing to the Company, given within ten (10) Business Days after their receipt from the Company of the written notice of such registration.  If requested by the S-3 Initiating Holders, such S-3 Shelf Registration Statement shall be for an offering on a delayed or continuous basis pursuant to Rule 415 under the Securities Act.  The Company shall use its reasonable best efforts to (x) file such S-3 Shelf Registration Statement as soon as practicable and, in any event, within forty five (45) days after receiving a request under this SECTION 2.5(c) and cause such S-3 Shelf Registration Statement to become effective and remain effective until such time at which all Registrable Securities registered in such S-3 Shelf Registration Statement are sold, and (y) include in such registration the Registrable Securities of the other Holders (other than the S-3 Initiating Holders) who have requested in writing to participate in such S-3 Shelf Registration Statement on the same terms and conditions as the Registrable Securities of the S-3 Initiating Holders.

(d)     S-3 Shelf Take-Downs.  Following the effectiveness of an S-3 Shelf Registration Statement, any Holder or group of Holders whose Registrable Securities are included on such S-3 Shelf Registration Statement and which collectively hold (together with their Affiliates) Registrable Securities that constitute, in the aggregate, at least five percent (5%) of the outstanding Common Stock (the "S-3 Initiating Take-Down Holders") may request that the Company engage in an underwritten resale of Registrable Securities pursuant to such S-3

11

Shelf Registration Statement (an "S-3 Underwritten Shelf Take-Down," and together with an S-1 Underwritten Shelf Take-Down, an "Underwritten Shelf Take-Down") or prepare a prospectus supplement for a non-underwritten resale pursuant to such S-3 Shelf Registration Statement (an "S-3 Resale Shelf Take-Down," and together with an "S-1 Resale Shelf Take-Down," a "Resale Shelf Take-Down"); provided that any "block trade" under an S-3 Shelf Registration Statement shall be considered an S-3 Resale Shelf Take-Down.  The Company shall give prompt notice to each non-initiating Holder of Registrable Securities that is known to the Company to hold (together with its Affiliates) at least one percent (1%) of the outstanding Common Stock (if such Holder's Registrable Securities are included in the S-3 Shelf Registration Statement) of the receipt of a request from the S-3 Initiating Take-Down Holders of a proposed S-3 Underwritten Shelf Take-Down under and pursuant to the S-3 Shelf Registration Statement and, notwithstanding anything to the contrary contained herein, will provide such other Holders a period of five (5) Business Days to participate in such S-3 Underwritten Shelf Take-Down, subject to the terms negotiated by and applicable to the S-3 Initiating Take-Down Holders and subject to "cutback" limitations set forth in SECTION 2.4.  All such Holders electing to be included in an S-3 Underwritten Shelf Take-Down must sell their Registrable Securities on the same terms and conditions as the Registrable Securities being sold for the accounts of the S-3 Initiating Take-Down Holders; provided that the obligation of such Person to indemnify pursuant to any such underwriting arrangements shall be several, not joint and several, among such Persons selling Registrable Securities, and the liability of each such Person will be in proportion thereto, and provided, further, that such liability will be limited to the net proceeds (after deducting for underwriting discounts and commissions) received by such Person from the sale of his, her or its Registrable Securities pursuant to such registration. The Company shall not be required to effect more than three (3) S-3 Underwritten Shelf Take-Downs in any twelve (12) month period; provided, however, that an S-3 Underwritten Shelf Take-Down shall not be counted for such purpose unless at least fifty percent (50%) of the Registrable Securities requested by the S-3 Initiating Take-Down Holders and all other Holders timely and validly requesting to include Registrable Securities in such S-3 Underwritten Shelf Take-Down have been sold.

(e)     Delay of Shelf Registration or Shelf Take-Down.  If the Board of Directors has a Valid Business Reason, the Company may (x) postpone filing a Registration Statement or prospectus supplement relating to a Shelf Registration Statement, Underwritten Shelf Take-Down or Resale Shelf Take-Down until such Valid Business Reason no longer exists, but in no event for more than seventy five (75) days, and (y) in case a Registration Statement or prospectus supplement has been filed relating to a Shelf Registration Statement, Underwritten Shelf Take-Down or Resale Shelf Take-Down, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board of Directors acting in good faith, may cause the applicable Registration Statement to be withdrawn and its effectiveness terminated, *provided*, *however*, that a new Registration Statement (and prospectus supplement, if applicable) is filed within seventy five (75) days thereafter, or may postpone amending or supplementing such Registration Statement or prospectus supplement, but in no event for more than seventy five (75) days; *provided*, *however*, that if the registration of Registrable Securities is postponed or withdrawn pursuant to this SECTION 2.5(e), the Company shall not be permitted to register under the Securities Act any Common Stock, other than shares of Common Stock or other equity securities to be issued in connection with an acquisition, during any such postponement or during the period from such

12

withdrawal to the filing of such new Registration Statement.  The Company shall give written notice to the Holders of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof.  Notwithstanding anything to the contrary contained herein, the Company may not postpone or withdraw a filing due to a Valid Business Reason (i) more than twice in any twelve (12) month period (except that the Company shall be able to use this right more than twice in any twelve (12) month period if the Company is exercising such right during the fifteen (15) day period prior to the Company's regularly scheduled quarterly earnings announcement date and the total number of days of postponement in such twelve (12) month period does not exceed ninety (90) days), or (ii) except as contemplated in the parenthetical in (i) immediately above, for more than seventy five (75) days, in the aggregate for all such postponements or withdrawals, in any twelve (12) month period. The Company shall not be required to effect any registration pursuant to SECTION 2.5, (i) during a period which the Company is restricted from effecting any public sale or distribution of any of its securities, or any securities convertible into or exchangeable or exercisable for such securities pursuant to SECTION 2.6(b) hereto, solely if and to the extent requested by the managing underwriter in the applicable offering, (ii) if Form S-1 is not available for such offering by the S-1 Shelf Initiating Holders or the S-1 Initiating Take-Down Holders, as applicable or (iii) if Form S-3 is not available for such offering by the S-3 Initiating Holders or the S-3 Initiating Take-Down Holders, as applicable.

SECTION 2.6 Lock-Up Agreement.

(a)      (i) In connection with an IPO, and upon the request of the managing underwriter in such offering, each Holder agrees; and (ii) in connection with any underwritten public offering of Registrable Securities (including an Underwritten Shelf Take-Down) pursuant to this Agreement after the IPO, and upon the request of the managing underwriter in such offering, each Holder who is participating in such offering agrees that: such hHolder shall not, without the prior written consent of such managing underwriter, during (A) in the case of the IPO, the one hundred and eighty (180) day period beginning on the effective date of the Registration Statement for the IPO or (B) in the case of such underwritten public offering of Registrable Securities after the IPO, the ninety (90) day period or such lesser period as the managing underwriter may agree, beginning on the effective date of the applicable Registration Statement, (I) offer, pledge, sell, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, hedge the beneficial ownership of or otherwise dispose of, directly or indirectly, any Registrable Securities or of any securities convertible into or exchangeable or exercisable for such Registrable Securities, or (II) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (I) or (II) above is to be settled by delivery of Registrable Securities, in cash or otherwise. The foregoing provisions of this SECTION 2.6(a) shall be applicable to the Holders only if all officers and directors of the Company are subject to the same restrictions. Each Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the managing underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. Notwithstanding anything to the contrary contained in this SECTION 2.6(a), each Holder shall be released, pro rata, from any lock-up agreement entered into pursuant to this SECTION 2.6(a) in the event and to the extent that the managing underwriter or the Company permit any

13

discretionary waiver or termination of the restrictions of any lock-up agreement pertaining to any officer or director.

(b)     The Company agrees not to effect any public sale or distribution of any of its securities, or any securities convertible into or exchangeable or exercisable for such securities (except (i) pursuant to registrations on Form S-4 or S-8 or any successor thereto, or (ii) in connection with any dividend or distribution reinvestment or similar plan), if and to the extent requested by the managing underwriter in the applicable offering, (A) in the case of the IPO, during the one hundred and eighty (180) day period beginning on the effective date of the Registration Statement for the IPO or (B) in the case of any underwritten public offering of Registrable Securities after the IPO, during the ninety (90) day period beginning on the effective date of the applicable Registration Statement, in each case except as part of such registration.

SECTION 2.7 <u>Registration Procedures</u>

(a)     Whenever registration of Registrable Securities has been requested pursuant to <u>SECTION 2.1</u>, <u>SECTION 2.2</u> or <u>SECTION 2.5</u>, the Company shall use its reasonable best efforts to effect the registration and sale of such Registrable Securities in accordance with the intended method of distribution thereof as quickly as practicable, and in connection with any such request, the Company shall, as expeditiously as possible:

(i)     prepare and file with the Commission a Registration Statement on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate and which form shall be available for the sale of such Registrable Securities in accordance with the intended method of distribution thereof, and cause such Registration Statement to become effective; provided, however, that (x) before filing a Registration Statement or prospectus or any amendments or supplements thereto, the Company shall provide one legal counsel selected by hHolders of a majority of the Common Stock to be included in such Registration Statement ("<u>Holders' Counsel</u>") with an adequate and appropriate opportunity to review and comment on such Registration Statement and each prospectus included therein (and each amendment or supplement thereto) to be filed with the Commission, subject to such documents being under the Company's control, and (y) the Company shall promptly notify the Holders' Counsel and each seller of Registrable Securities of any stop order issued or threatened by the Commission and promptly take all action required to prevent the entry of such stop order or to remove it if entered;

(ii)     prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for the lesser of (x) one hundred and eighty (180) days and (y) such shorter period which will terminate when all Registrable Securities covered by such Registration Statement have been sold; *provided*, *however*, that if the S-1 Shelf Initiating Holders or S-3 Initiating Holders, as applicable, have requested that a Shelf Registration Statement be for an offering on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, then the Company shall keep

14

such Shelf Registration Statement effective until all Registrable Securities covered by such Shelf Registration Statement have been sold; and shall comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Shelf Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Shelf Registration Statement;

(iii)   furnish to each seller of Registrable Securities, prior to filing a Registration Statement, a reasonable number of copies of such Registration Statement as is proposed to be filed, and thereafter such number of copies of such Registration Statement, each amendment and supplement thereto (in each case, including all exhibits thereto), and the prospectus included in such Registration Statement (including each preliminary prospectus) and any prospectus filed under Rule 424 under the Securities Act as each such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(iv)   register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as any seller of Registrable Securities may request, and to continue such qualification in effect in such jurisdiction for as long as permissible pursuant to the laws of such jurisdiction, or for as long as any such seller requests or until all of such Registrable Securities are sold, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable any such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller; *provided*, *however*, that the Company shall not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this SECTION 2.7(a)(iv), (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process in any such jurisdiction;

(v)   notify each seller of Registrable Securities at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such Registration Statement contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and the Company shall promptly prepare a supplement or amendment to such prospectus and furnish to each seller of Registrable Securities a reasonable number of copies of such supplement to or an amendment of such prospectus as may be necessary so that, after delivery to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

15

(vi)     enter into and perform customary agreements (including an underwriting agreement in customary form with the relevant underwriter) and take such other actions as are prudent and reasonably required in order to expedite or facilitate the disposition of such Registrable Securities, including causing its officers to participate in "road shows" and other information meetings organized by the relevant underwriter, with all out-of-pocket costs and expenses incurred by the Company or such officers in connection with such attendance to be paid by the Company;

(vii)     upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, which shall be consistent with the due diligence and disclosure obligations under securities laws applicable to the Company and the Holders, make available at reasonable times for inspection by any managing underwriter participating in any disposition of such Registrable Securities pursuant to a Registration Statement, Holders' Counsel and any attorney, accountant or other agent retained by any managing underwriter, all financial and other records, pertinent corporate documents and properties of the Company and its Subsidiaries (collectively, the "Records") as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Company's and its Subsidiaries' officers, directors and employees, and the independent public accountants of the Company, to supply all information reasonably requested by any such Person in connection with such Registration Statement;

(viii)    if such sale is pursuant to an underwritten offering, obtain comfort letters dated the effective date of the Registration Statement and the date of the closing under the underwriting agreement from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by comfort letters as Holders' Counsel or the managing underwriter reasonably requests;

(ix)     furnish, at the request of any seller of Registrable Securities on the date such securities are delivered to the underwriters for sale pursuant to such registration or, if such securities are not being sold through underwriters, on the date the Registration Statement with respect to such securities becomes effective, opinion letters and (in the case of an underwritten offering) negative assurance letters, dated such date, of counsel representing the Company for the purposes of such registration, addressed to the underwriters, if any, to the seller making such request, or the transfer agent, as applicable, covering such legal matters with respect to the registration in respect of which such opinion letters and negative assurance letters are being given as the underwriters, if any, such seller or the transfer agent may reasonably request and are customarily included in opinion letters or negative assurance letters in offerings of that type;

(x)     comply with all applicable rules and regulations of the Commission, and make generally available to its security holders, as soon as reasonably practicable but no later than fifteen (15) months after the effective date

16

of the Registration Statement, an earnings statement covering a period of twelve (12) months beginning after the effective date of the Registration Statement, in a manner which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(xi) cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed provided that the applicable listing requirements are satisfied;

(xii) keep Holders' Counsel advised as to the initiation and progress of any registration under SECTION 2.1, SECTION 2.2 or SECTION 2.5 hereunder;

(xiii) cooperate, in a commercially reasonable manner, with each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA; and

(xiv) take all other steps reasonably necessary to effect the registration of the Registrable Securities contemplated hereby.

SECTION 2.8 Seller Information. The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish, and such seller shall furnish, to the Company such information regarding the distribution of such securities as the Company may from time to time reasonably request in writing, as a condition to including such Registrable Securities in such Registration Statement.

SECTION 2.9 Notice to Discontinue. Each Holder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in SECTION 2.7(a)(v), such Holder shall forthwith discontinue disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities until such Holders' receipt of the copies of the supplemented or amended prospectus contemplated by SECTION 2.7(a)(v) and, if so directed by the Company, such Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Holders' possession, of the prospectus covering such Registrable Securities which is current at the time of receipt of such notice. If the Company shall give any such notice, the Company shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement (including the period referred to in SECTION 2.7(a)(ii)) by the number of days during the period from and including the date of the giving of such notice pursuant to SECTION 2.7(a)(v) to and including the date when sellers of such Registrable Securities under such Registration Statement shall have received the copies of the supplemented or amended prospectus contemplated by and meeting the requirements of SECTION 2.7(a)(v).

SECTION 2.10 Registration Expenses. The Company shall pay all expenses arising from or incident to its performance of, or compliance with, this Agreement, including (i) Commission, stock exchange and FINRA registration and filing fees, (ii) all fees and expenses incurred in complying with securities or "blue sky" laws (including reasonable fees, charges and disbursements of counsel to any underwriter incurred in connection with "blue sky"

qualifications of the Registrable Securities as may be set forth in any underwriting agreement), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and expenses of counsel to the Company and of its independent public accountants and any other accounting fees, charges and expenses incurred by the Company (including any expenses arising from any comfort letters or any special audits incident to or required by any registration or qualification) and the reasonable legal fees, charges and expenses of Holders' Counsel, (v) all fees and disbursements of underwriters customarily paid by the issuer of securities (excluding brokers' commissions or underwriting discounts and commissions and transfer taxes, if any), and fees and disbursements of counsel to underwriters, (vi) all fees and expenses incurred in connection with the listing of the shares of Common Stock on any securities exchange and all rating agency fees, (vii) for any Holders participating in any registration, any other reasonable expenses customarily paid by the issuers of securities, including reasonable and documented legal fees and expenses for such necessary local counsels for such Holders and (viii) any liability insurance or other premiums for insurance obtained in connection with any registration pursuant to the terms of this Agreement, regardless of whether any Registration Statement is declared effective.  The holder of Registrable Securities sold pursuant to a Registration Statement shall bear the expense of any brokers' commissions or underwriting discounts or commissions and transfer taxes relating to registration and sale of such Holders' Registrable Securities.

SECTION 2.11          Indemnification; Contribution.

(a)          Indemnification by the Company.  The Company shall indemnify and hold harmless each Holder, its partners, directors, officers, Affiliates and each Person who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) the Holder from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) (each, a "Liability" and collectively, "Liabilities"), arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made), except insofar as such Liability arises out of or is based upon any untrue statement or alleged untrue statement or omission or alleged omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning any Holder furnished in writing to the Company by such Holder expressly for use therein, including the information furnished to the Company pursuant to SECTION 2.11(b).  The Company shall also provide customary indemnities to any underwriters of the Registrable Securities, their officers, directors and employees and each Person who controls such underwriters (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the same extent as provided above with respect to the indemnification of the Holders.

(b)          Indemnification by the Holders.  In connection with any Registration Statement in which any Holder is participating pursuant to SECTION 2.1, SECTION 2.2 or SECTION 2.5 hereof, each Holder shall promptly furnish to the Company in writing such

18

information with respect to such Holder as the Company may reasonably request or as may be required by law for use in connection with any such Registration Statement or prospectus and all information required to be disclosed in order to make the information previously furnished to the Company by such Holder not materially misleading or necessary to cause such Registration Statement not to omit a material fact with respect to such Holder necessary in order to make the statements therein not misleading.  Each Holder agrees to indemnify and hold harmless the Company, its partners, directors, officers, Affiliates, any underwriter retained by the Company and each Person who controls the Company or such underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) from and against any and all Liabilities arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made), but if and only to the extent that such Liability arises out of or is based upon any untrue statement or omission or alleged untrue statement or alleged omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning such Holder furnished in writing (including by email) by such Holder expressly for use therein and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting such loss, claim, damage, liability or expense, *provided*, *however*, that the total amount to be indemnified by each Holder pursuant to this <u>SECTION 2.11(b)</u> shall be limited to such Holders' <u>pro rata</u> portion of the net proceeds (after deducting the underwriters' discounts and commissions) received by such Holder in the offering to which the Registration Statement or prospectus relates.

(c)     <u>Conduct of Indemnification Proceedings</u>.     Any Person entitled to indemnification under this <u>SECTION 2.11</u> (the "<u>Indemnified Party</u>") agrees to give prompt (but in any event within 30 days after such Person has actual knowledge of the facts constituting the basis for indemnification) written notice to the indemnifying party (the "<u>Indemnifying Party</u>") after the receipt by the Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; *provided*, *however*, that the failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to the Indemnified Party hereunder (except to the extent that the Indemnifying Party is prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure).  If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party.  The Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Indemnified Party unless (i) the Indemnifying Party agrees to pay the same, (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably satisfactory to the Indemnified Party or (iii) the named parties to any such action (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and the Indemnified Party has been advised by such counsel that either (x)

19

representation of such Indemnified Party and the Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (y) there may be one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party.  In any of such cases, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all Indemnified Parties.  No Indemnifying Party shall be liable for any settlement entered into without its written consent (such consent not to be unreasonably withheld or delayed).  No Indemnifying Party shall, without the consent of such Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is a party and indemnity has been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability for claims that are the subject matter of such proceeding.

(d)     Contribution.  If the indemnification provided for in this SECTION 2.11 from the Indemnifying Party is held by a court of competent jurisdiction to be unavailable to an Indemnified Party hereunder in respect of any Liabilities referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and Indemnified Party on the other in connection with the statements or omissions which resulted in such Liabilities, as well as other relevant equitable considerations.  The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such Indemnifying Party or Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in SECTION 2.11(a), SECTION 2.11(b) and SECTION 2.11(c), any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; *provided*, *however*, that the total amount to be contributed by any Holder shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by the Holder in the offering.

(e)     Fraud.  The parties hereto agree that it would not be just and equitable if contribution pursuant to SECTION 2.11(d) were determined by *pro rata* allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

## ARTICLE III
## EXCHANGE ACT COMPLIANCE

SECTION 3.1 Exchange Act Compliance.  So long as the Company (a) has registered a class of securities under Section 12 of the Exchange Act and/or (b) files reports under Section 13

or Section 15 of the Exchange Act, then the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144, including, without limiting the generality of the foregoing, (i) making and keeping public information available, as those terms are understood and defined in Rule 144, (ii) filing with the Commission in a timely manner all reports and other documents required of the Company under the Exchange Act and (iii) at the request of any Holder if such Holder proposes to sell securities in compliance with Rule 144, forthwith furnish to such Holder, as applicable, a written statement of compliance with the reporting requirements of the Commission as set forth in Rule 144 and make available to such Holder such information as will enable the Holder to make sales pursuant to Rule 144.

## ARTICLE IV
## MISCELLANEOUS

SECTION 4.1 Specific Performance.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, including if the parties hereto fail to take any action required of them hereunder to consummate this Agreement.  It is accordingly agreed that, in addition to any other applicable remedies at law or equity, the parties to this Agreement shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.  Each party hereto agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (i) the other party has an adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or in equity.  Each of the parties hereto hereby waives (x) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate and (y) any requirement under any law to post a bond or other security as a prerequisite to obtaining equitable relief; provided that such waiver shall not limit, in any respect, the availability of any defense(s) that a party might otherwise have with respect to the alleged breach or obligation for which specific performance is sought.

SECTION 4.2 Term and Termination.  This Agreement shall terminate at such time as there are no Registrable Securities outstanding; provided, however, that the provisions of Sections 2.10 and 2.11 shall survive any termination of this Agreement.

SECTION 4.3 Amendments and Waivers.

(a)     No failure or delay on the part of the Company or any Holder in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the Company or any Holder at law or in equity or otherwise.

(b)     The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, in each case without the written consent of the

21

Company and the Holders of 75% of the outstanding shares of Common Stock that constitute Registrable Securities; provided, that any amendment that has the effect of materially and disproportionately adversely affecting any Holder or group of Holders differently than any other Holder or group of Holders shall only be effective against such materially and disproportionately adversely affected Holder(s) with the written consent of a majority of such Holder(s).

SECTION 4.4 Notices.  Any notices or other communications required or permitted hereunder shall be in writing, and shall be sufficiently given if made by hand delivery, by electronic mail, by facsimile, by reputable overnight courier service (charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested), addressed as follows (or at such other address as may be substituted by notice given as herein provided):

If to the Company:

[Avaya Holdings Corp.]

Attn:
Address:

Facsimile No.:
Email:

Avaya Holdings Corp.
350 Mt. Kemble Avenue
Morristown, NJ 07960
Attention: Vito Carnevale, General Counsel and Shefali Shah, Chief Administrative Officer
E-mail address: vcarnevale@avaya.com; sashah@avaya.com

If to any Holder, at its address and the address of its representative, if any, which in each case may be an email address, as provided to the Company by such Holder or otherwise listed in the books of the Company.  If such Holder has not provided to the Company its address or the address of its representative, if any, or if such address is not otherwise listed in the books of the Company, the Company shall not be obligated to comply with the notice provisions of this Agreement with respect to such Holder.

Any notice or communication hereunder shall be deemed to have been given or made as of the date so delivered if personally delivered; when receipt is acknowledged, if emailed or telecopied; and on receipt if sent by overnight courier service or registered or certified mail.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

SECTION 4.5 Successors and Assigns.  The rights and obligations of the Holders under this Agreement shall not be assignable by any Holder to any Person that is not a Holder; provided, that (i) in the event of a valid transfer of Common Stock by a Holder prior to an IPO,

22

the rights and obligations of the transferor under this Agreement (solely with respect to the Common Stock so transferred) must be transferred to the transferee and such transferee must execute a joinder to the Stockholders' Agreement and this Agreement, in the form attached as Exhibit A to the Stockholders' Agreement, and (ii) in the event of a valid transfer of Registrable Securities by a Holder after an IPO, the rights and obligations of the transferor under this Agreement (solely with respect to the Registrable Securities so transferred) may be transferred to the transferee provided such transferee executes a joinder to this Agreement, in the form attached hereto as Exhibit A; provided, further, for the avoidance of doubt, that the transferor in such transaction shall retain its rights and obligations under this Agreement with respect to any Common Stock not so transferred.  This Agreement shall be binding upon the parties hereto and their respective successors, assigns and transferees.

SECTION 4.6 Counterparts.   This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile, by electronic mail in "portable document format" (".pdf") form, or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

SECTION 4.7 Governing Law:  Venue:  Jurisdiction.  THIS AGREEMENT AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.  Each party hereby agrees that any action based upon, arising out of or relating to this Agreement (including any action concerning the violation or threatened violation of this Agreement) shall be heard and determined in any state or federal court sitting in the Court of Chancery of the State of Delaware (or, if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, in the United States District Court for the District of Delaware), and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts (and, in the case of appeals, appropriate appellate courts therefrom) in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.  In addition, each party consents to process being served in any such lawsuit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address in effect for notices hereunder, and agrees that such services shall constitute good and sufficient service of process and notice thereof.  The consents to jurisdiction set forth in this paragraph shall not constitute general consents to service of process in the State of Delaware and shall have no effect for any purpose except as provided in this SECTION 4.7 and shall not be deemed to confer rights on any

23

Person other than the parties hereto.  Nothing in this SECTION 4.7 shall affect or limit any right to serve process in any other manner permitted by law.

SECTION 4.8 WAIVER OF JURY TRIAL.  **EACH PARTY HEREBY WAIVES ITS RESPECTIVE RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT WHETHER BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH PARTY RECOGNIZES AND AGREES THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS AGREEMENT.  EACH PARTY REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

SECTION 4.9 Severability.  Any provision of this Agreement which is prohibited, unenforceable or not authorized in any jurisdiction is, as to such jurisdiction, ineffective to the extent of any such prohibition, unenforceability or nonauthorization without invalidating the remaining provisions hereof, or affecting the validity, enforceability or legality of such provision in any other jurisdiction, unless the ineffectiveness of such provision would result in such a material change as to cause completion of the transactions contemplated hereby to be unreasonable.  Upon a determination that any provision of this Agreement is prohibited, unenforceable or not authorized, the parties hereto agree to negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby are consummated as originally contemplated to the fullest extent possible.

SECTION 4.10        Non-Recourse.  All claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties in the preamble to this Agreement ("Contracting Parties").  No Person who is not a Contracting Party, including without limitation any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing ("Non-party Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach; and, to the maximum extent

24

permitted by law, each Contracting Party hereby waives and releases all such liabilities, claims, causes of action, and obligations against any such Non-party Affiliates.

SECTION 4.11    Recapitalization, Exchanges Etc., Affecting Securities.   The provisions of this Agreement shall apply, to the full extent set forth herein with respect to the Common Stock and to any and all Common Stock of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise, including shares issued by a parent company in connection with a triangular merger) which may be issued in respect of, in exchange for, or in substitution of Common Stock, appropriately adjusted for any stock dividends, splits, reverse splits, combinations, reclassifications and the like occurring after the date hereof.

SECTION 4.12    Entire Agreement.   This Agreement (including all schedules and exhibits hereto) contains the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters.

SECTION 4.13    Aggregation of Common Stock.   All Common Stock held by a Holder and its Affiliates shall be aggregated together for purposes of determining the availability of any rights under this Agreement.

SECTION 4.14    Headings.   The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed to be part of this Agreement or otherwise affect the interpretation of this Agreement.

SECTION 4.15    No Third Party Beneficiaries.   Except as provided in SECTION 4.5, nothing express or implied herein is intended or shall be construed to confer upon any person or entity, other than the parties hereto and their respective successors and assigns and all Indemnified Parties, any rights, remedies or other benefits under or by reason of this Agreement.

* * * * * * * * * *

25

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**COMPANY**

[AVAYA HOLDINGS CORP.]

By: _____
Name: Rebecca A. Roof
Title: Interim Chief Financial Officer

*Signature Page to Registration Rights Agreement*

**EXHIBIT A**

**JOINDER AGREEMENT**

This Joinder Agreement ("Joinder") is executed pursuant to the terms of the Registration Rights Agreement, dated as of ~~[ ]~~May 1, 2023 a copy of which is attached hereto (as amended, the "Registration Rights Agreement"), by the undersigned (the "Undersigned") executing this Joinder.  By the execution of this Joinder, the Undersigned agrees as follows:

1.      Acknowledgment.   The Undersigned acknowledges that the Undersigned is acquiring certain Registrable Securities of ~~[~~Avaya Holdings Corp.~~]~~, a Delaware corporation (the "Company"), subject to the terms and conditions of the Registration Rights Agreement. Capitalized terms used herein without definition are defined in the Registration Rights Agreement and are used herein with the same meanings set forth therein.

2.      Agreement.   The Undersigned (i) agrees that the Registrable Securities acquired by the Undersigned shall be bound by and subject to the terms of the Registration Rights Agreement, pursuant to the terms thereof, and (ii) hereby agrees to be bound by the Registration Rights Agreement as a Holder thereunder, with the same force and effect as if the ~~u~~Undersigned were originally a party thereto.

3.      Notice.   Any notice required as permitted by the Registration Rights Agreement shall be given to the Undersigned at the address listed beside the Undersigned's signature below.

[NAME OF HOLDER]                                    Address for Notices:

By:  _____                        [ ]
Name:                                               [ ]
Title:                                              Telephone:        [ ]
Date:                                               Email:            [ ]

*Joinder Agreement*

## **Exhibit B**

### **Members of the New Board**

Certain documents, or portions thereof, contained in this **Exhibit B** and the First Amended Plan Supplement remain subject to continued review by the Debtors and the Consenting Stakeholders. The respective rights of the Debtors and the Required Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the First Amended Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this First Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Effective Date, the Debtors will file a redline of such document with the Bankruptcy Court.

As of the Effective Date, the New Board shall be appointed in accordance with the Governance Documents, the other constituent documents of each Reorganized Debtor, and the Plan. On the Effective Date, the New Board shall consist of the following nine members:

- **Patrick Bartels**: Patrick is the Managing Member of Redan Advisors LLC, a firm that provides fiduciary services, including board of director representation and strategic planning advisory services for domestic and international public and private business entities. Prior to founding Redan Advisors LLC, Patrick served as a senior investor in complex financial restructurings and process-intensive situations in North America, Asia and Europe, and in a broad universe of industries. He has more than 20 years of industry experience and served as a Managing Principal at Monarch Alternative Capital LP, a private investment firm that focused primarily on event-driven credit opportunities, from 2002 to December 2018. Prior to Monarch, he served as Research Analyst for high yield investments at INVESCO, where he analyzed primary and secondary debt offerings of companies in various industries. Patrick began his career at Pricewaterhouse Coopers LLP, where he was a Certified Public Accountant. He holds the Chartered Financial Analyst designation. Mr. Bartels received a B.S. in Accounting and Finance from Bucknell University.

- **Patrick Dennis**: Patrick currently serves as the Chief Executive Officer of ExtraHop, where he is responsible for driving company-wide strategy and priorities with a focus on customer success, innovation, and rapid, scalable growth. Prior to ExtraHop, Patrick gained more than two decades of experience leading both public and private high-growth technology and cybersecurity companies. Patrick has previously served as the Chief Executive Officer of Alvaria Software, Aspect Software, and Guidance Software, as well as in leadership roles at EMC and Oracle. He has also served as an operating executive at Vector Capital, where he consulted with founders, boards, and private equity partners on a number of issues, including strategic planning, growth, and capital requirements. He holds a B.S. in Information Technology from the Rochester Institute of Technology.

- **Robert Kalsow-Ramos**: Robert is Partner, Private Equity, at Apollo, where he primarily focuses on investments in the technology and services sectors. He serves on the board of directors of TD Synnex (NYSE:SNX), West Technology Group,

EmployBridge and Ingenico.  Robert previously served on the board of directors of Alorica, Hexion, Momentive Performance Materials, Tech Data and Noranda Aluminum and was also involved in the firm's investment in Evertec.  Prior to joining Apollo in 2010, he was a member of the Investment Banking group at Morgan Stanley.  Robert received his B.B.A. from the Stephen M. Ross School of Business at the University of Michigan, where he graduated with high distinction. He is co-chair of the board of directors of The TEAK Fellowship, a non-profit organization based in New York City, and is a member of the Apollo Opportunity Foundation grants council.

- **Marylou Maco**:  Marylou brings over 25 years' experience driving Go–to–Market strategy, sales, channels, customer success and field operations at high-growth software and cloud companies.  Marylou recently served as the Executive Vice President of Worldwide Sales and Field Operations at Genesys where she was responsible for leading the GTM SaaS transformation over consecutive years of high growth.  Under her leadership the company grew revenues to greater than $1.9 billion with year over year growth more than double the rate of prior fiscal years as the company completed its transition to becoming a cloud company.  Prior to Genesys, she served in several sales executive leadership positions, including at Anaplan, CogntiveScale, Hewlett Packard Enterprise, Oracle and held roles of increasing responsibility at Cisco Systems for 19 years.  Marylou attended Penn State University majoring in Management and Related Support Services.

- **Alan B. Masarek**:  Alan has over thirty years of software and cloud-based business experience.  He has been the President and Chief Executive Officer and a member of the board of directors of Avaya Holdings Corp. since August 1, 2022. Prior to Avaya, Alan most recently served as Chief Executive Officer and a member of the board of directors of Vonage Holdings Corp., where he led the company through an era of transformation from a VoIP-based residential phone provider into a global business cloud communications company.  Prior to Vonage, Alan served as Director, Chrome & Apps at Google, Inc. and Co-founder and CEO of Quickoffice, Inc., among other positions.  Alan earned his M.B.A., with Distinction, from Harvard Business School and his B.B.A., *magna cum laude*, from the University of Georgia.

- **Aaron Miller**:  Aaron is a Partner in Apollo's Private Equity business and Head of Apollo Portfolio Performance Solutions.  Aaron has served on the boards of several Apollo portfolio companies, including McGraw-Hill Education and Tech Data Corporation.  Prior to joining Apollo, Aaron was Chief Operating Officer of Catalina Marketing, where he was responsible for Innovation & Customer Delivery.  Previously, he served as Operating Director at Berkshire Partners and was a Partner with Bain & Company.  Earlier in his career, Aaron also held key product and operations leadership roles with General Mills and Cereal Partners Worldwide.  He received an M.B.A. from The Wharton School of the University of Pennsylvania and a B.S. in Chemical Engineering from Northwestern University.

- **Donald E. Morgan III**:  Donald is the Brigade Capital Management's Managing Partner and Chief Investment Officer.  Prior to forming Brigade in 2006, Donald was a Senior Managing Director and Co-Head of Fixed Income at MacKay Shields, LLC.  Donald previously served on the board of directors of NII Holdings, Inc.  He began his career in money management as a Research Associate, then High Yield Analyst, at Fidelity Management and Research Company.  He received a B.S. in Finance, *magna cum laude*, from New York University.  Additionally, he is a CFA charterholder.

- **Tod Nielsen**:  Tod has extensive cloud platform and revenue growth experience.  Most recently, Tod served as the President and Chief Executive Officer of FinancialForce.  Prior to leading FinancialForce, he held a number of strategic roles, including as the Executive Vice President of Platform at Salesforce, as the Chief Executive Officer of Heroku, as the Co-President of Applications Platform Group and Chief Operating Officer at VMware, and as the Chief Executive Officer of Borland Corporation, in addition to other roles at Oracle, BEA Systems, and Microsoft.  He received a B.S. in Business Administration from Central Washington University.

- **Jacqueline Woods**:  Jacqueline currently serves as Chief Marketing Officer of Teradata Corporation, where she is a member of the company's executive leadership team.  Previously, Jacqueline served in several Chief Marketing Officer positions, including at NielsenIQ, at IBM's Global Partner Ecosystem Division, and at IBM Global Financing.  Before that, she served as Global Head of Customer Segmentation & Customer Experience at General Electric and held roles of increasing responsibility at Oracle for 10 years.  Jacqueline holds a B.S. in Managerial Economics from the University of California, Davis, and an M.B.A. from the University of Southern California Marshall School of Business.

Each such director shall serve from and after the Effective Date pursuant to the terms of the Governance Documents.

<u>**Exhibit B-1**</u>

**Redline to Previously Filed Members of the New Board**

## Exhibit B

### Members of the New Board

Certain documents, or portions thereof, contained in this **Exhibit B** and the First Amended Plan Supplement remain subject to continued review by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Required Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the First Amended Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this First Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation HearingEffective Date, the Debtors will file a redline of such document with the Bankruptcy Court.

As of the Effective Date, the New Board shall be appointed in accordance with the Governance Documents, the other constituent documents of each Reorganized Debtor, and the Plan.  On the Effective Date, the New Board shall consist of the following nine members:

- **Alan B. Masarek**:  Alan has over thirty years of software and cloud-based business experience.  He has been the President and Chief Executive Officer and a member of the board of directors of Avaya Holdings Corp. since August 1, 2022. Prior to Avaya, Alan most recently served as Chief Executive Officer and a member of the board of directors of Vonage Holdings Corp., where he led the company through an era of transformation from a VoIP-based residential phone provider into a global business cloud communications company.  Prior to Vonage, Alan served as Director, Chrome & Apps at Google, Inc. and Co-founder and CEO of Quickoffice, Inc., among other positions.  Alan earned his M.B.A., with Distinction, from Harvard Business School and his B.B.A., *magna cum laude*, from the University of Georgia.

- **Patrick Bartels**:  Patrick is the Managing Member of Redan Advisors LLC, a firm that provides fiduciary services, including board of director representation and strategic planning advisory services for domestic and international public and private business entities.  Prior to founding Redan Advisors LLC, Patrick served as a senior investor in complex financial restructurings and process-intensive situations in North America, Asia and Europe, and in a broad universe of industries.  He has more than 20 years of industry experience and served as a Managing Principal at Monarch Alternative Capital LP, a private investment firm that focused primarily on event-driven credit opportunities, from 2002 to December 2018.  Prior to Monarch, he served as Research Analyst for high yield investments at INVESCO, where he analyzed primary and secondary debt offerings of companies in various industries.  Patrick began his career at Pricewaterhouse Coopers LLP, where he was a Certified Public Accountant.  He holds the Chartered Financial Analyst designation.  Mr. Bartels received a B.S. in Accounting and Finance from Bucknell University.

- **Patrick Dennis**:  Patrick currently serves as the Chief Executive Officer of ExtraHop, where he is responsible for driving company-wide strategy and priorities with a focus on customer success, innovation, and rapid, scalable growth.  Prior to ExtraHop, Patrick gained more than two decades of experience leading both public and private high-growth technology and cybersecurity companies.  Patrick has previously served as the Chief Executive Officer of Alvaria Software, Aspect Software, and Guidance Software, as well as in leadership roles at EMC and Oracle.  He has also served as an operating executive at Vector Capital, where he consulted with founders, boards, and private equity partners on a number of issues, including strategic planning, growth, and capital requirements.  He holds a B.S. in Information Technology from the Rochester Institute of Technology.

- **Robert Kalsow-Ramos**:  Robert is Partner, Private Equity, at Apollo, where he primarily focuses on investments in the technology and services sectors.  He serves on the board of directors of TD Synnex (NYSE:SNX), West Technology Group, EmployBridge and Ingenico.  Robert previously served on the board of directors of Alorica, Hexion, Momentive Performance Materials, Tech Data and Noranda Aluminum and was also involved in the firm's investment in Evertec.  Prior to joining Apollo in 2010, he was a member of the Investment Banking group at Morgan Stanley.  Robert received his B.B.A. from the Stephen M. Ross School of Business at the University of Michigan, where he graduated with high distinction.  He is co-chair of the board of directors of The TEAK Fellowship, a non-profit organization based in New York City, and is a member of the Apollo Opportunity Foundation grants council.

- **Marylou Maco**:  Marylou brings over 25 years' experience driving Go–to–Market strategy, sales, channels, customer success and field operations at high-growth software and cloud companies.  Marylou recently served as the Executive Vice President of Worldwide Sales and Field Operations at Genesys where she was responsible for leading the GTM SaaS transformation over consecutive years of high growth.  Under her leadership the company grew revenues to greater than $1.9 billion with year over year growth more than double the rate of prior fiscal years as the company completed its transition to becoming a cloud company.  Prior to Genesys, she served in several sales executive leadership positions, including at Anaplan, CogntiveScale, Hewlett Packard Enterprise, Oracle and held roles of increasing responsibility at Cisco Systems for 19 years.  Marylou attended Penn State University majoring in Management and Related Support Services.

- **Alan B. Masarek**:  Alan has over thirty years of software and cloud-based business experience.  He has been the President and Chief Executive Officer and a member of the board of directors of Avaya Holdings Corp. since August 1, 2022. Prior to Avaya, Alan most recently served as Chief Executive Officer and a member of the board of directors of Vonage Holdings Corp., where he led the company through an era of transformation from a VoIP-based residential phone provider into a global business cloud communications company.  Prior to Vonage,

Alan served as Director, Chrome & Apps at Google, Inc. and Co-founder and CEO of Quickoffice, Inc., among other positions.  Alan earned his M.B.A., with Distinction, from Harvard Business School and his B.B.A., *magna cum laude*, from the University of Georgia.

- **Aaron Miller**:  Aaron is a Partner in Apollo's Private Equity business and Head of Apollo Portfolio Performance Solutions.  Aaron has served on the boards of several Apollo portfolio companies, including McGraw-Hill Education and Tech Data Corporation.  Prior to joining Apollo, Aaron was Chief Operating Officer of Catalina Marketing, where he was responsible for Innovation & Customer Delivery.  Previously, he served as Operating Director at Berkshire Partners and was a Partner with Bain & Company.  Earlier in his career, Aaron also held key product and operations leadership roles with General Mills and Cereal Partners Worldwide.  He received an M.B.A. from The Wharton School of the University of Pennsylvania and a B.S. in Chemical Engineering from Northwestern University.

- **Donald E. Morgan III**:  Donald is the Brigade Capital Management's Managing Partner and Chief Investment Officer.  Prior to forming Brigade in 2006, Donald was a Senior Managing Director and Co-Head of Fixed Income at MacKay Shields, LLC.  Donald previously served on the board of directors of NII Holdings, Inc.  He began his career in money management as a Research Associate, then High Yield Analyst, at Fidelity Management and Research Company.  He received a B.S. in Finance, *magna cum laude*, from New York University.  Additionally, he is a CFA charterholder.

- **Patrick Bartels**:  Patrick is the Managing Member of Redan Advisors LLC, a firm that provides fiduciary services, including board of director representation and strategic planning advisory services for domestic and international public and private business entities.  Prior to founding Redan Advisors LLC, Patrick served as a senior investor in complex financial restructurings and process-intensive situations in North America, Asia and Europe, and in a broad universe of industries.  He has more than 20 years of industry experience and served as a Managing Principal at Monarch Alternative Capital LP, a private investment firm that focused primarily on event-driven credit opportunities, from 2002 to December 2018.  Prior to Monarch, he served as Research Analyst for high yield investments at INVESCO, where he analyzed primary and secondary debt offerings of companies in various industries.  Patrick began his career at Pricewaterhouse Coopers LLP, where he was a Certified Public Accountant.  He holds the Chartered Financial Analyst designation.  Mr. Bartels received a B.S. in Accounting and Finance from Bucknell University.

- **Tod Nielsen**:  Tod has extensive cloud platform and revenue growth experience.  Most recently, Tod served as the President and Chief Executive Officer of FinancialForce.  Prior to leading FinancialForce, he held a number of strategic roles, including as the Executive Vice President of Platform at Salesforce, as the Chief Executive Officer of Heroku, as the Co-President of Applications Platform

3

-4

Group and Chief Operating Officer at VMware, and as the Chief Executive Officer of Borland Corporation, in addition to other roles at Oracle, BEA Systems, and Microsoft.  He received a B.S. in Business Administration from Central Washington University.

- **Jacqueline Woods**:  Jacqueline currently serves as Chief Marketing Officer of Teradata Corporation, where she is a member of the company's executive leadership team.  Previously, Jacqueline served in several Chief Marketing Officer positions, including at NielsenIQ, at IBM's Global Partner Ecosystem Division, and at IBM Global Financing.  Before that, she served as Global Head of Customer Segmentation & Customer Experience at General Electric and held roles of increasing responsibility at Oracle for 10 years.  Jacqueline holds a B.S. in Managerial Economics from the University of California, Davis, and an M.B.A. from the University of Southern California Marshall School of Business.

Each such director shall serve from and after the Effective Date pursuant to the terms of the Governance Documents.

**Exhibit D**

**Exit Facilities Documents**

Certain documents, or portions thereof, contained in this **Exhibit D** and the First Amended Plan Supplement remain subject to continued review by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Required Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the First Amended Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this First Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Effective Date, the Debtors will file a redline of such document with the Bankruptcy Court.

**<u>Exhibit D(i)</u>**

**Exit ABL Facility Documents**

# AMENDED AND RESTATED ABL CREDIT AGREEMENT

Dated as of May 1, 2023

among

**AVAYA HOLDINGS CORP.,**
as Holdings,

**AVAYA INC.,**
as the Borrower,

**CITIBANK, N.A.,**
as Administrative Agent and Collateral Agent,

The Several Lenders
From Time to Time Parties Hereto

**CITIBANK, N.A.**,
as Global Coordinator,

**CITIBANK, N.A.,**
**RBC CAPITAL MARKETS,**[1]
**BANK OF AMERICA, N.A.** and
**DEUTSCHE BANK SECURITIES INC.**

as Joint Lead Arrangers and Joint Bookrunners

---

[1] RBC Capital Markets is a brand name for the capital markets activities of Royal Bank of Canada and its affiliates.

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **SECTION 1** | **Definitions** | **2** |
| 1.1 | Defined Terms | 2 |
| 1.2 | Other Interpretive Provisions | 91 |
| 1.3 | Accounting Terms | 93 |
| 1.4 | Rounding | 93 |
| 1.5 | References to Agreements, Laws, Etc. | 94 |
| 1.6 | Times of Day | 94 |
| 1.7 | Timing of Payment or Performance | 94 |
| 1.8 | [Reserved] | 94 |
| 1.9 | Currency Equivalents Generally | 94 |
| 1.10 | Classification of Loans and Borrowings | 95 |
| 1.11 | Unrestricted Escrow Subsidiary | 95 |
| 1.12 | Limited Condition Transactions | 95 |
| 1.13 | Rates | 96 |
| 1.14 | Divisions. | 97 |
| | | |
| **SECTION 2** | **Amount and Terms of Credit** | **97** |
| 2.1 | Revolving Credit Borrowing | 97 |
| 2.2 | Minimum Amount of Each Borrowing; Maximum Number of Borrowings | 99 |
| 2.3 | Borrowings, Conversions and Continuations | 99 |
| 2.4 | Disbursement of Funds | 100 |
| 2.5 | Repayment of Loans; Evidence of Debt | 101 |
| 2.6 | [Reserved] | 102 |
| 2.7 | [Reserved] | 102 |
| 2.8 | Interest | 102 |
| 2.9 | Interest Periods | 103 |
| 2.10 | Increased Costs, Illegality, Etc. | 103 |
| 2.11 | Compensation | 105 |
| 2.12 | Change of Lending Office | 106 |
| 2.13 | Notice of Certain Costs | 106 |
| 2.14 | Incremental Credit Extensions | 106 |
| 2.15 | Extension of Revolving Credit Commitments | 109 |
| 2.16 | Defaulting Lender | 111 |
| 2.17 | Reserves | 113 |
| 2.18 | Benchmark Replacement Setting | 113 |
| 2.19 | [Reserved] | 115 |
| 2.20 | [Reserved] | 115 |
| 2.21 | [Reserved] | 115 |
| 2.22 | Reports on Cash Management Obligations and Secured Hedging Obligations | 115 |
| | | |
| **SECTION 3** | **Letters of Credit and Swing Line Loans** | **116** |
| 3.1 | Letters of Credit | 116 |

i

| | | | |
|---|---|---|---|
| | 3.2 | Swing Line Loans | 126 |
| **SECTION 4** | | **Fees; Commitments** | **129** |
| | 4.1 | Fees | 129 |
| | 4.2 | Termination or Reduction of Revolving Credit Commitments, L/C Sublimit or Swing Line Sublimit | 129 |
| **SECTION 5** | | **Payments** | **130** |
| | 5.1 | Voluntary Prepayments | 130 |
| | 5.2 | Mandatory Prepayments | 131 |
| | 5.3 | Method and Place of Payment | 131 |
| | 5.4 | Net Payments | 132 |
| | 5.5 | Computations of Interest and Fees | 136 |
| | 5.6 | Limit on Rate of Interest | 136 |
| **SECTION 6** | | **Conditions Precedent to the Closing Date** | **137** |
| | 6.1 | Credit Documents | 137 |
| | 6.2 | [Reserved] | 137 |
| | 6.3 | Legal Opinion | 137 |
| | 6.4 | Closing Certificates | 137 |
| | 6.5 | Secretary's Certificate; Authorization of Proceedings of Each Credit Party | 138 |
| | 6.6 | Fees | 138 |
| | 6.7 | Representations and Warranties | 138 |
| | 6.8 | Material Adverse Effect | 138 |
| | 6.9 | Solvency Certificate | 138 |
| | 6.10 | Financial Statements | 139 |
| | 6.11 | Plan Confirmation | 139 |
| | 6.12 | No Default | 139 |
| | 6.13 | Evidence of Insurance | 139 |
| | 6.14 | Patriot Act; Beneficial Ownership Regulation | 139 |
| | 6.15 | Indebtedness as of the Closing Date | 140 |
| | 6.16 | Cash Management | 140 |
| **SECTION 7** | | **Conditions Precedent to All Credit Extensions After the Closing Date** | **140** |
| | 7.1 | Representations and Warranties | 140 |
| | 7.2 | No Default or Event of Default | 141 |
| | 7.3 | Request for Borrowing; Availability | 141 |
| **SECTION 8** | | **Representations and Warranties** | **141** |
| | 8.1 | Corporate Status; Compliance with Laws | 141 |
| | 8.2 | Corporate Power and Authority | 141 |
| | 8.3 | No Violation | 142 |
| | 8.4 | Litigation | 142 |
| | 8.5 | Margin Regulations | 142 |
| | 8.6 | Governmental Approvals | 142 |
| | 8.7 | Investment Company Act | 143 |
| | 8.8 | True and Complete Disclosure | 143 |

ii

| | | |
|---|---|---|
| 8.9 | Financial Condition; Financial Statements | 143 |
| 8.10 | Tax Matters | 144 |
| 8.11 | Compliance with ERISA | 144 |
| 8.12 | Subsidiaries | 144 |
| 8.13 | Intellectual Property | 144 |
| 8.14 | Environmental Laws | 145 |
| 8.15 | Properties | 145 |
| 8.16 | Solvency | 145 |
| 8.17 | Security Interests | 145 |
| 8.18 | Labor Matters | 146 |
| 8.19 | Sanctioned Persons; Anti-Corruption Laws; Patriot Act | 146 |
| 8.20 | Use of Proceeds | 147 |
| 8.21 | Insurance | 147 |
| **SECTION 9** | **Affirmative Covenants** | **147** |
| 9.1 | Information Covenants | 147 |
| 9.2 | Books, Records and Inspections | 152 |
| 9.3 | Maintenance of Insurance | 152 |
| 9.4 | Payment of Taxes | 153 |
| 9.5 | Consolidated Corporate Franchises | 153 |
| 9.6 | Compliance with Statutes, Regulations, Etc. | 154 |
| 9.7 | Lender Calls | 154 |
| 9.8 | Maintenance of Properties | 154 |
| 9.9 | Transactions with Affiliates | 154 |
| 9.10 | End of Fiscal Years | 156 |
| 9.11 | Additional Guarantors and Grantors | 156 |
| 9.12 | Further Assurances | 156 |
| 9.13 | Use of Proceeds | 158 |
| 9.14 | [Reserved] | 159 |
| 9.15 | Changes in Business | 159 |
| 9.16 | [Reserved] | 159 |
| 9.17 | [Reserved] | 159 |
| 9.18 | Cash Management Systems | 159 |
| 9.19 | Appraisals and Field Examinations | 162 |
| 9.20 | Post-Closing Obligations | 162 |
| **SECTION 10** | **Negative Covenants** | **163** |
| 10.1 | Limitation on Indebtedness | 163 |
| 10.2 | Limitation on Liens | 167 |
| 10.3 | Limitation on Fundamental Changes | 170 |
| 10.4 | Limitation on Disposition | 172 |
| 10.5 | Limitation on Investments | 176 |
| 10.6 | Limitation on Restricted Payments | 180 |
| 10.7 | Limitations on Debt Prepayments and Amendments | 185 |
| 10.8 | Limitation on Subsidiary Distributions | 185 |
| 10.9 | Amendment of Organizational Documents | 188 |
| 10.10 | Permitted Activities | 188 |

iii

| | | | |
|---|---|---|---|
| | 10.11 | Financial Covenant | 189 |
| **SECTION 11** | | **Events of Default** | **189** |
| | 11.1 | Payments | 189 |
| | 11.2 | Representations, Etc. | 189 |
| | 11.3 | Covenants | 189 |
| | 11.4 | Default Under Other Agreements | 190 |
| | 11.5 | Bankruptcy | 191 |
| | 11.6 | ERISA | 191 |
| | 11.7 | Guarantee | 191 |
| | 11.8 | Security Agreement | 191 |
| | 11.9 | Judgments | 192 |
| | 11.10 | Change of Control | 192 |
| | 11.11 | Indemnity Payments to Former Officers | 192 |
| | 11.12 | Application of Proceeds | 193 |
| **SECTION 12** | | **The Agents** | **195** |
| | 12.1 | Appointment | 195 |
| | 12.2 | Delegation of Duties | 195 |
| | 12.3 | Exculpatory Provisions | 196 |
| | 12.4 | Reliance by Agents | 197 |
| | 12.5 | Notice of Default | 198 |
| | 12.6 | Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders | 198 |
| | 12.7 | Indemnification | 199 |
| | 12.8 | Agents in their Individual Capacities | 200 |
| | 12.9 | Successor Agents | 200 |
| | 12.10 | Withholding Tax | 201 |
| | 12.11 | Administrative Agent May File Proofs of Claim | 201 |
| | 12.12 | Intercreditor Agreements | 202 |
| | 12.13 | Security Documents and Guarantee; Agents under Security Documents and Guarantee | 202 |
| **SECTION 13** | | **Miscellaneous** | **204** |
| | 13.1 | Amendments, Waivers and Releases | 204 |
| | 13.2 | Notices | 208 |
| | 13.3 | No Waiver; Cumulative Remedies | 209 |
| | 13.4 | Survival of Representations and Warranties | 209 |
| | 13.5 | Payment of Expenses; Indemnification | 209 |
| | 13.6 | Successors and Assigns; Participations and Assignments | 211 |
| | 13.7 | Replacements of Lenders under Certain Circumstances | 216 |
| | 13.8 | Adjustments; Set-off | 217 |
| | 13.9 | Counterparts; Electronic Execution | 218 |
| | 13.10 | Severability | 218 |
| | 13.11 | INTEGRATION | 218 |
| | 13.12 | GOVERNING LAW | 218 |
| | 13.13 | Submission to Jurisdiction; Waivers | 219 |

iv

13.14   Acknowledgments................................................................................................ 219
13.15   WAIVERS OF JURY TRIAL ............................................................................. 220
13.16   Confidentiality ................................................................................................... 221
13.17   Direct Website Communications ....................................................................... 222
13.18   USA PATRIOT Act; Beneficial Ownership Regulation .................................... 224
13.19   Payments Set Aside............................................................................................ 224
13.20   Judgment Currency ............................................................................................ 224
13.21   Cashless Rollovers ............................................................................................. 225
13.22   Acknowledgement and Consent to Bail-In of Affected Financial Institutions
.............................................................................................................................. 225
13.23   Acknowledgement Regarding Any Supported QFCs......................................... 225
13.24   Limitations on Sanctions Provisions.................................................................. 227
13.25   Amendment and Restatement of Existing DIP Agreement; No Novation ......... 227
13.26   Lender ERISA Representations .......................................................................... 227
13.27   Erroneous Payments........................................................................................... 228

SCHEDULES

Schedule 1.1(a)      Commitments of Lenders
Schedule 1.1(b)      Letters of Credit
Schedule 1.1(c)      Specified Cash Management Agreements
Schedule 1.1(d)      Customers
Schedule 1.1(e)      Mortgaged Properties
Schedule 8.4         Litigation
Schedule 8.12        Subsidiaries
Schedule 8.14        Environmental Matters
Schedule 8.15        Property Matters
Schedule 9.9         Closing Date Affiliate Transactions
Schedule 9.18        DDAs
Schedule 9.18(a)     Excluded Accounts
Schedule 10.1        Closing Date Indebtedness
Schedule 10.2        Closing Date Liens
Schedule 10.4        Scheduled Dispositions
Schedule 10.5        Closing Date Investments
Schedule 13.2        Notice Addresses

EXHIBITS

Exhibit A      Form of Notice of Borrowing/Notice of Conversion or Continuation/Form
               of Swing Line Loan Notice
Exhibit B      Form of Promissory Note
Exhibit C      Form of Guarantee
Exhibit D      Form of Security Agreement
Exhibit E      Form of Solvency Certificate
Exhibit F      Form of ABL Intercreditor Agreement
Exhibit G      [Reserved]
Exhibit H      [Reserved]
Exhibit I      Form of Assignment and Assumption
Exhibit J 1-4  Form of Non-U.S. Lender Certification
Exhibit K      Form of Borrowing Base Certificate

AMENDED AND RESTATED ABL CREDIT AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"), dated as of May [1], 2023, among AVAYA HOLDINGS CORP., a Delaware corporation ("**Avaya Holdings**"), in its capacity as Holdings, AVAYA INC. (to be converted to a Delaware limited liability company in the name of Avaya LLC), a Delaware corporation (the "**Borrower**"), the Lenders from time to time parties hereto, the lending institutions named herein as L/C Issuers and Swing Line Lender, and CITIBANK, N.A., as Administrative Agent and Collateral Agent.

## RECITALS:

WHEREAS, capitalized terms used and not defined in the preamble and these recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, on February 14, 2023 (the "**Petition Date**"), Holdings, the Borrower and certain of the Borrower's Domestic Subsidiaries (collectively, the "**Avaya Debtors**") filed voluntary petitions for relief under Chapter 11 in the United States Bankruptcy Court for the Southern District of Texas (such court, together with any other court having exclusive jurisdiction over the Case from time to time and any Federal appellate court thereof, the "**Bankruptcy Court**") and commenced cases, jointly administered under Case No. 23-90088 (collectively, the "**Case**"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Avaya Debtors are parties to the certain Superpriority Secured Debtor-In-Possession ABL Credit Agreement, dated as of February 24, 2023 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Existing DIP Agreement**"), by and among Avaya Holdings, the Borrower, the lenders from time to time parties thereto, the lending institutions named therein as letter of credit issuers and swing line lenders, and CITIBANK, N.A., as administrative agent and collateral agent;

WHEREAS, the Avaya Debtors filed the Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code in the Bankruptcy Court on February 14, 2023 [Docket No. 50] (together with all schedules, documents and exhibits contained therein, as amended, supplemented, modified or waived from time to time, the "**Plan**");

WHEREAS, on March 22, 2023, the Bankruptcy Court entered an order confirming the Plan with respect to the Avaya Debtors (the "**Confirmation Order**") [Docket No. 350];

WHEREAS, in connection with the Case, the Borrower has requested that the Lenders amend and restate the Existing DIP Agreement to provide it with an asset-based revolving credit facility on the Closing Date in an aggregate committed amount equal to $128,125,000 (the "**ABL Facility**"), with a letter of credit subfacility in an aggregate

amount equal to $100,000,000, in each case upon the satisfaction (or waiver) of certain conditions precedent set forth in Section 6 on the terms and subject to the conditions set forth herein;

WHEREAS, the Lenders are willing to amend and restate the Existing DIP Agreement upon the satisfaction (or waiver) of certain conditions precedent set forth in Section 6 on the terms and subject to the conditions set forth herein; and

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

**SECTION 1   Definitions**

1.1     Defined Terms

As used herein, the following terms shall have the meanings specified in this Section 1.1 unless the context otherwise requires:

"**ABL Facility**" shall have the meaning provided in the Recitals to this Agreement.

"**ABL Intercreditor Agreement**" shall mean the ABL Intercreditor Agreement substantially in the form of Exhibit F, among the Collateral Agent, the Term Loan Administrative Agent and the representatives for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**ABL Priority Collateral**" shall mean the "ABL Priority Collateral" under and as defined in the ABL Intercreditor Agreement.

"**ABR**" shall mean for any day a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Effective Rate *plus* 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its "prime rate" and (c) Adjusted Term SOFR for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) *plus* 1.00%; *provided* that, if at any time any rate described in clause (a) or (b) above is less than the Floor then such rate in clause (a) or (b) shall be deemed to be the Floor.  Any change in the ABR due to a change in such rate announced by the Administrative Agent or in the Federal Funds Effective Rate shall take effect at the opening of business on the day specified in the public announcement of such change or on the effective date of such change in the Federal Funds Effective Rate or Adjusted Term SOFR, as applicable.

"**ABR Loan**" shall mean each Loan denominated in Dollars bearing interest based on the ABR.

2

"**ABR Term SOFR Determination Day**" shall have the meaning specified in the definition of "Term SOFR".

"**Account**" shall mean (a) any right to payment of a monetary obligation arising from the provision of goods or services by any Person and (b) without duplication, any "Account" (as such term is defined in the UCC or PPSA, as applicable), any "Payment Intangibles" (as such term is defined in the UCC) and any accounts receivable, any rights to payment and/or reimbursement of every kind and description, in each case, whether or not earned by performance, in each case arising in the course of such Person's operations.

"**Account Debtor**" shall mean any Person obligated on an Account.

"**Acquired EBITDA**" shall mean, with respect to any Acquired Entity or Business or any Converted Restricted Subsidiary (any of the foregoing, a "**Pro Forma Entity**") for any period, the amount for such period of Consolidated EBITDA of such Pro Forma Entity (determined using such definitions as if references to the Borrower and the Restricted Subsidiaries therein were to such Pro Forma Entity and its Restricted Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity in a manner not inconsistent with GAAP.

"**Acquired Entity or Business**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Additional Lender**" shall mean any Person (other than (w) Holdings, the Borrower or any of its Subsidiaries, (x) a natural person, (y) any investment vehicle established primarily for the benefit of a natural person or (z) a Disqualified Institution) that is not an existing Lender and that has agreed to provide Incremental Commitments pursuant to Section 2.14.

"**Adjusted Term SOFR**" shall mean, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation *plus* (b) the Term SOFR Adjustment; *provided* that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"**Administrative Agent**" shall mean Citibank, N.A., as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent pursuant to Section 12.9.

"**Administrative Agent's Office**" shall mean, the Administrative Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"**Administrative Questionnaire**" shall mean an administrative questionnaire in a form supplied by or acceptable to the Administrative Agent.

"**Advisors**" shall mean legal counsel, financial advisors and third-party appraisers and consultants advising the Agents, the L/C Issuers, the Lenders and their

3

Related Parties in connection with this Agreement, the other Credit Documents and the consummation of the Transactions, limited in the case of legal counsel to one primary counsel for the Agents (as of the Closing Date, Davis Polk & Wardwell LLP) and, if necessary, one firm of local counsel in each appropriate jurisdiction (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for all such affected Persons (taken as a whole)).

"**Affected Financial Institution**" shall mean (a) any EEA Financial Institution or (b) any U.K. Financial Institution.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities or by contract.  The terms "controlling" and "controlled" shall have meanings correlative thereto.

"**Aggregate Quarterly Subscription Contract ARR Revenue**" shall mean, with respect to each fiscal quarter of the Borrower, (a) the arithmetic average of the sum of (i) the Aggregate Subscription Contract ARR with respect to all Subscription Contracts in effect on the last day of the previous fiscal quarter and (ii) the Aggregate Subscription Contract ARR with respect to all Subscription Contracts in effect on the last day of such fiscal quarter divided by (b) four (4).

"**Aggregate Quarterly Subscription Contract GAAP Revenue**" shall mean, with respect to each fiscal quarter of the Borrower, the revenue generated by all Subscription Contracts during such fiscal quarter as determined pursuant to GAAP, including the provisions of ASC 606, Contracts with Customers.

"**Aggregate Subscription Contract ARR**" shall mean, at any time, the aggregate Subscription Contract ARR for all Subscription Contracts then in effect at such time.

"**Aggregate Revolving Credit Commitments**" shall mean the sum of the Revolving Credit Commitments of all Lenders.

"**Aggregate Revolving Credit Exposure**" shall mean the sum of the aggregate Revolving Credit Exposure of all Lenders.

"**Agent Parties**" shall have the meaning provided in Section 13.17(d).

"**Agents**" shall mean the Administrative Agent, the Collateral Agent and each Joint Lead Arranger.

"**Agreement**" shall have the meaning provided in the introductory paragraph hereto.

4

"**Agreement Currency**" shall have the meaning provided in Section 13.20.

"**AHYDO Catch-Up Payment**" shall mean any payment or redemption of Indebtedness, including any Junior Indebtedness, to avoid the application of Code Section 163(e)(5) thereto or that are necessary to prevent any such Indebtedness from being treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code.

"**Alternative Currency**" shall mean each currency (other than Dollars) that is approved by the Administrative Agent and the applicable L/C Issuer with respect to the issuance of a Letter of Credit.

"**Anti-Corruption Laws**" shall have the meaning provided in Section 8.19.

"**Applicable Intercreditor Agreements**" shall mean (a) to the extent executed in connection with the incurrence of any Indebtedness secured by Liens on the Collateral that (i) are intended to rank junior in priority to the Liens on the ABL Priority Collateral securing the Obligations and (ii) are intended to rank senior in priority to the Liens on the Term Priority Collateral securing the Obligations, the ABL Intercreditor Agreement, (b) to the extent executed in connection with the incurrence of any Indebtedness secured by Liens on the Collateral that are intended to rank junior in priority to the Liens on the Collateral securing the Obligations, the Junior Lien Intercreditor Agreement and (c) any other intercreditor agreement entered into to implement the intercreditor arrangements set forth in Section 10.2 in form and substance reasonably acceptable to the Borrower and the Collateral Agent.

"**Applicable Laws**" shall mean, as to any Person, any law (including common law), statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding on such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"**Applicable Rate**" shall mean a percentage per annum equal to (i) for Term SOFR Loans, 3.00%, (ii) for ABR Loans, 2.00% and (iii) for Letter of Credit Fees, 3.00%.

"**Applicable Time**" shall mean, with respect to any payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Administrative Agent or the relevant L/C Issuer, as the case may be, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"**Appropriate Lender**" shall mean, at any time, (a) with respect to Revolving Credit Loans, the Revolving Credit Lenders, (b) [reserved], (c) with respect to any Letter of Credit, (i) the relevant L/C Issuer and (ii) the Revolving Credit Lenders, (d) [reserved], (e) with respect to any Swing Line Loan, the Swing Line Lender and if any Swing Line Loans are outstanding pursuant to Section 3.2(a), the Revolving Credit

Lenders, (f) [reserved] and (g) with respect to any Protective Advance, the Administrative Agent and the Revolving Credit Lenders.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Assignment and Assumption**" shall mean an assignment and assumption substantially in the form of Exhibit I, or such other form as may be approved by the Administrative Agent and the Borrower.

"**Authorized Officer**" shall mean the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, any Assistant Treasurer, the Controller, any Vice President, with respect to certain limited liability companies or partnerships that do not have officers, any manager, managing member or general partner thereof, any other senior officer of Holdings, the Borrower or any other Credit Party designated as such in writing to the Administrative Agent by Holdings, the Borrower or such other Credit Party, as applicable from time to time, and, with respect to any document delivered on the Closing Date, the Secretary or any Assistant Secretary of any Credit Party.  Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of Holdings, the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.  Notwithstanding the foregoing, the solvency certificate required to be delivered on the Closing Date shall be delivered by the Chief Financial Officer (or other financial officer) of Holdings.

"**Auto-Renewal Letter of Credit**" shall have the meaning provided in Section 3.1(b)(iii).

"**Availability Requirements**" shall mean, at any time, that (a) the Revolving Credit Exposure of each Revolving Credit Lender shall not exceed its Revolving Credit Commitments, (b) [reserved] and (c) the Aggregate Revolving Credit Exposure shall not exceed the Line Cap.

"**Availability Reserves**" shall mean, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves, subject to Section 2.17, as the Administrative Agent, in its Permitted Discretion, determines as being appropriate to reflect any impediments to the realization upon the Collateral consisting of Eligible Accounts or Eligible Inventory included in the Borrowing Base (including claims that the Administrative Agent determines will need to be satisfied in connection with the realization upon such Collateral).

"**Available Equity Amount**" shall mean, at any time (the "**Available Equity Amount Reference Time**"), an amount equal to, without duplication, (a) the amount of any capital contributions made in cash, marketable securities or other property to, or any proceeds of an equity issuance received by the Borrower during the period from

6

and including the Business Day immediately following the Closing Date through and including the Available Equity Amount Reference Time (in the case of any marketable securities or property, up to its fair market value as determined by the Borrower in good faith), including proceeds from the issuance of Stock or Stock Equivalents of Holdings or any direct or indirect parent of Holdings (to the extent the proceeds of any such issuance are contributed to the Borrower), but excluding all proceeds from the issuance of Disqualified Stock,

*minus* (b) the sum, without duplication, of:

(i)     the aggregate amount of Investments made pursuant to Section 10.5(v)(x) following the Closing Date and prior to the Available Equity Amount Reference Time;

(ii)     the aggregate amount of Restricted Payments pursuant to Section 10.6(c)(x) following the Closing Date and prior to the Available Equity Amount Reference Time;

(iii)     the aggregate amount of prepayments, repurchases, redemptions and defeasances pursuant to Section 10.7(a)(iii)(2) following the Closing Date and prior to the Available Equity Amount Reference Time; and

(iv)     the aggregate amount of Indebtedness incurred pursuant to Section 10.1(x) and outstanding at the Available Equity Amount Reference Time;

*provided* that issuances and contributions pursuant to Sections 10.5(f)(ii), 10.6(a) and 10.6(b)(i) shall not increase the Available Equity Amount.

"**Available Equity Amount Reference Time**" shall have the meaning provided in the definition of "Available Equity Amount".

"**Available Tenor**" shall mean, as of any date of determination and with respect to the then-current Benchmark, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.18(d).

"**Avaya Debtors**" shall have the meaning provided in the Recitals to this Agreement.

"**Avaya Holdings**" shall have the meaning provided in the introductory paragraph to this Agreement.

7

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" shall mean (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation administration or other insolvency proceedings).

"**Bank Product Reserves**" shall mean such reserves as the Administrative Agent, from time to time, determines in its Permitted Discretion to reflect the reasonably anticipated liabilities and obligations of the Credit Parties with respect to applicable Cash Management Obligations under Secured Cash Management Agreements then provided or outstanding, to the extent secured by the applicable Collateral included in the Borrowing Base.  The parties hereto agree that no Bank Product Reserves shall be taken with respect to Secured Cash Management Agreements that constitute Secured Specified Cash Management Agreements.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy".

"**Bankruptcy Court**" shall have the meaning provided in the preamble to this Agreement.

"**Benchmark**" shall mean, initially, with respect to amounts denominated in Dollars, Term SOFR; *provided* that if a replacement of an initial or subsequent Benchmark has occurred pursuant to this Section titled "Benchmark Replacement Setting", then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate. Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"**Benchmark Replacement**" shall mean the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)   the sum of (i) Daily Simple SOFR and (ii) 0.00%; and

(b)   the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for such Benchmark giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for

8

determining a benchmark rate as a replacement for such Benchmark for syndicated credit facilities denominated in the applicable currency at such time and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"**Benchmark Replacement Adjustment**" shall mean, with respect to any replacement of any then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for syndicated credit facilities denominated in the applicable currency at such time.

"**Benchmark Replacement Date**" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

9

"**Benchmark Transition Event**" shall mean, with respect to the then-current Benchmark, the occurrence of one or more of the following events with respect to such Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" shall mean, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (a) or (b) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.18 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.18.

"**Beneficial Ownership Certification**" shall mean a certification regarding individual beneficial ownership to the extent expressly required by 31 C.F.R. §1010.230.

10

"**Beneficial Ownership Regulation**" shall mean 31 C.F.R. §1010.230.

"**Benefited Lender**" shall have the meaning provided in Section 13.8(a).

"**Benefit Plan**" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**BHC Act Affiliate**" shall have the meaning provided in Section 13.23(b).

"**Blocked Account Agreement**" shall have the meaning provided in Section 9.18(b).

"**Blocked Accounts**" shall have the meaning provided in Section 9.18(b).

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" shall have the meaning provided in the introductory paragraph to this Agreement.

"**Borrowing**" shall mean a Revolving Credit Borrowing, a Swing Line Borrowing or a Protective Advance, as the context may require.

"**Borrowing Base**" shall mean, on any date, an amount equal to (a) the sum of (i) 85% *multiplied* by the book value of the Eligible Accounts, *plus* (ii) 90% *multiplied* by the book value of the Eligible Investment Grade Accounts, *plus* (iii) 85% *multiplied* by the Net Orderly Liquidation Value of Eligible Inventory *plus* (iv) 100% of Eligible Borrowing Base Cash, in each case of clauses (i) - (iv), owned by the Borrower or any Subsidiary Guarantor *minus* (b) any Reserves.  The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 9.1(k).

"**Borrowing Base Certificate**" shall mean a certificate, duly executed by an Authorized Officer of the Borrower, appropriately completed and substantially in the form of Exhibit K or another form that is reasonably acceptable to the Administrative Agent.

"**Broker-Dealer Subsidiary**" shall mean any Subsidiary that is registered as a broker-dealer under the Exchange Act or any other Applicable Law requiring similar registration.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Applicable Laws of, or are in fact closed in, New York City or in the jurisdiction where the Administrative Agent's Office with respect to Obligations denominated in Dollars is located and if such day relates

11

to any interest rate settings as to a Term SOFR Loan denominated in Dollars, any fundings, disbursements, settlements and payments in Dollars in respect of any such Term SOFR Loan, or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such Term SOFR Loan, means such day is a U.S. Government Securities Business Day.

"**Capital Lease**" shall mean, as applied to the Borrower and the Restricted Subsidiaries, any lease of any property (whether real, personal or mixed) by the Borrower or any Restricted Subsidiary as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of the Borrower; *provided*, *however*, that notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any leases that were not capital leases when entered into but are recharacterized as capital leases due to a change in accounting rules that becomes effective after the Closing Date shall for all purposes of this agreement not be treated as Capital Leases.

"**Capitalized Lease Obligations**" shall mean, as applied to the Borrower and the Restricted Subsidiaries at the time any determination is to be made, the amount of the liability in respect of a Capital Lease that would at such time be required to be capitalized and reflected as a liability on the balance sheet (excluding the footnotes thereto) of the Borrower or the Restricted Subsidiaries in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such Capital Lease prior to the first date upon which such Capital Lease may be prepaid by the lessee without payment of a penalty; *provided*, *however*, that notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any obligations that were not required to be included on the balance sheet of the Borrower or the Restricted Subsidiaries as capital lease obligations when incurred but are recharacterized as capital lease obligations due to a change in accounting rules that becomes effective after the Closing Date shall for all purposes of this Agreement not be treated as Capitalized Lease Obligations.

"**Capitalized Software Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and the Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrower.

"**Captive Insurance Subsidiary**" shall mean a Subsidiary of the Borrower established for the purpose of, and to be engaged solely in the business of, insuring the businesses or facilities owned or operated by the Borrower or any of its Subsidiaries or joint ventures or to insure related or unrelated businesses.

"**Case**" shall have the meaning provided in the preamble to this Agreement.

"**Cash Collateralize**" shall mean, in respect of an obligation, to provide and pledge cash collateral in Dollars ("**Cash Collateral**"), at a location and pursuant to

12

documentation in form and substance reasonably satisfactory to the Administrative Agent and (as applicable) the relevant L/C Issuer (and "**Cash Collateralization**" has a corresponding meaning), which documentation is hereby consented to by the Appropriate Lenders.

"**Cash Dominion Period**" shall mean, each period commencing on the delivery of written notice from the Administrative Agent to the Borrower notifying the Borrower that (a) the Specified Excess Availability has been less than the greater of (x) $10,250,000 and (y) 10.0% of the Line Cap for five (5) consecutive Business Days and/or (b) a Specified Event of Default has occurred and is continuing (*provided* that solely with respect to clause (iv) of the definition of "Specified Event of Default", after expiration of the cure period unless the Cash Dominion Period otherwise commences or is ongoing) and ending on the first date that (a) the Specified Excess Availability has been at least the greater of (x) $10,250,000 and (y) 10.0% of the Line Cap for twenty consecutive calendar days and (b) no Specified Event of Default has occurred and is then continuing.

"**Cash Equivalent**" shall mean:

(a)     Dollars and cash in such foreign currencies held by the Borrower or any Restricted Subsidiary from time to time in the ordinary course of business;

(b)     securities issued or unconditionally guaranteed by the United States government or any agency or instrumentality thereof, in each case having maturities and/or reset dates of not more than 24 months from the date of acquisition thereof;

(c)     securities issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof or any political subdivision of any such state or any public instrumentality thereof having maturities of not more than 24 months from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from another nationally recognized rating service);

(d)     commercial paper or variable or fixed rate notes maturing no more than 12 months after the date of creation thereof and, at the time of acquisition, having a rating of at least A-3 or P-3 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(e)     time deposits with, or domestic and LIBOR certificates of deposit or bankers' acceptances maturing no more than two years after the date of acquisition thereof issued by, the Administrative Agent (or any Affiliate thereof), any Lender or any other bank having combined capital and surplus of not less than $500,000,000 in the case of domestic banks and $100,000,000 (or the dollar equivalent thereof) in the case of foreign banks;

13

(f)     repurchase agreements with a term of not more than 90 days for underlying securities of the type described in clauses (b), (c) and (e) above entered into with any bank meeting the qualifications specified in clause (e) above or securities dealers of recognized national standing;

(g)     marketable short-term money market and similar funds (x) either having assets in excess of $500,000,000 or (y) having a rating of at least A-3 or P-3 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(h)     shares of investment companies that are registered under the Investment Company Act of 1940 and substantially all the investments of which are one or more of the types of securities described in clauses (a) through (g) above; and

(i)     in the case of Investments by any Restricted Foreign Subsidiary or Investments made in a country outside the United States of America, other customarily utilized high-quality Investments in the country where such Restricted Foreign Subsidiary is located or in which such Investment is made.

"**Cash Income Taxes**" shall mean, with respect to any period, all taxes based on income paid in cash by the Borrower and its Restricted Subsidiaries during such period.

"**Cash Management Agreement**" shall mean any agreement or arrangement to provide Cash Management Services.

"**Cash Management Bank**" shall mean any Person (other than Holdings, the Borrower or any Subsidiary of the Borrower) that enters into a Cash Management Agreement with the Borrower or any Restricted Subsidiary in its capacity as a provider of Cash Management Services and, in each case, at the time it enters into such Cash Management Agreement or on the Closing Date, is a Joint Lead Arranger, a Lender or an Affiliate of a Lender or a Joint Lead Arranger.  The Specified Cash Management Bank shall also be a "Cash Management Bank" for the time period specified in such definition.

"**Cash Management Obligations**" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank or any other provider of Cash Management Services in connection with, or in respect of, any Cash Management Services or under any Cash Management Agreement.

"**Cash Management Services**" shall mean treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer (including automated clearing house fund transfer services), merchant services (other than those constituting a line of credit) and other cash management services.

14

"**Cash Management Systems**" shall mean the cash management systems described in Section 9.16.

"**Certificated Securities**" shall have the meaning provided in Section 8.17.

"**CFC**" shall mean a Subsidiary of the Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holding Company**" shall mean a Subsidiary of the Borrower that has no material assets other than (a) the equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in (x) one or more Foreign Subsidiaries that are CFCs or (y) one or more other CFC Holding Companies and (b) cash and Cash Equivalents and other assets that are, in each case, being held on a temporary basis incidental to the holding of assets described in clause (a) of this definition.

"**Change in Law**" shall mean (a) the adoption of any Applicable Law after the Closing Date, (b) any change in any Applicable Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any party with any guideline, request, directive or order issued or made after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" shall mean and be deemed to have occurred if (a) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Closing Date), other than one or more Permitted Holders, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 of the Exchange Act as in effect on Closing Date) of more than 50% of the total voting power of the Voting Stock of Avaya Holdings; *provided* that (x) so long as Avaya Holdings is a Subsidiary of any Parent Entity, no Person shall be deemed to be or become a beneficial owner of more than 50% of the total voting power of the Voting Stock of Avaya Holdings unless such Person shall be or become a beneficial owner of more than 50% of the total voting power of the Voting Stock of such Parent Entity (other than a Parent Entity that is a Subsidiary of another Parent Entity) and (y) any Voting Stock of which any Permitted Holder is the beneficial owner shall not in any case be included in any Voting Stock of which any such Person is the beneficial owner; (b) Holdings shall at any time cease to own, directly or indirectly, beneficial ownership of 100% of the Stock and Stock Equivalents of the Borrower.

Notwithstanding the preceding or any provision of Section 13d-3 of the Exchange Act, (i) a Person or group shall not be deemed to beneficially own Voting Stock

15

subject to a stock or asset purchase agreement, merger agreement, option agreement, warrant agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the acquisition of the Voting Stock in connection with the transactions contemplated by such agreement, (ii) if any group includes one or more Permitted Holders, the issued and outstanding Voting Stock of Avaya Holdings owned, directly or indirectly, by any Permitted Holders that are part of such group shall not be treated as being beneficially owned by such group or any other member of such group for purposes of determining whether a Change of Control has occurred, (iii) a Person or group will not be deemed to beneficially own the Voting Stock of another Person as a result of its ownership of Voting Stock or other securities of such other Person's parent entity (or related contractual rights) unless it owns 50% or more of the total voting power of the Voting Stock entitled to vote for the election of directors of such parent entity having a majority of the aggregate votes on the board of directors (or similar body) of such parent entity and (iv) the right to acquire Voting Stock (so long as such Person does not have the right to direct the voting of the Voting Stock subject to such right) or any veto power in connection with the acquisition or disposition of Voting Stock will not cause a party to be a beneficial owner.

"**Claim**" shall have the meaning provided in the definition of "Environmental Claims".

"**Closing Date**" shall mean May [1], 2023, on which the conditions set forth in Section 6 are first satisfied.

"**Closing Date Existing Letters of Credit**" shall mean all letters of credit issued by an L/C Issuer to any Credit Party prior to the Closing Date and listed on Schedule 1.1(b).

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.  Section references to the Code are to the Code, as in effect on the Closing Date, and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"**Collateral**" shall mean all property pledged, mortgaged or purported to be pledged or mortgaged pursuant to the Security Documents (excluding, for the avoidance of doubt, all Excluded Collateral).

"**Collateral Access Agreement**" shall mean a landlord waiver, bailee letter, or acknowledgment agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of or having a Lien upon, Inventory or other Collateral (or books and records relating thereto), in each case, in form and substance reasonably satisfactory to Administrative Agent and the Borrower.

"**Collateral Agent**" shall mean Citibank, N.A., in its capacity as collateral agent (or collateral trustee) for the Secured Parties under this Agreement and the Security Documents, or any successor collateral agent appointed pursuant hereto, it being understood that Citibank, N.A. may designate any of its Affiliates as the collateral agent

16

(or collateral trustee) and that such Affiliate shall be considered a Collateral Agent for all purposes hereunder.

"**Commercial Letter of Credit**" shall mean any letter of credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Person in the ordinary course of business of such Person.

"**Commitment Letter**" shall mean that certain DIP-to-Exit ABL Facility Commitment Letter, dated as of February 13, 2023, by and among the Joint Lead Arrangers and certain of their Affiliates, on the one hand, and the Borrower on the other hand.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"**Communications**" shall have the meaning provided in Section 13.17(a).

"**Concentration Account**" shall have the meaning provided in Section 9.16(c).

"**Confidential Information**" shall have the meaning provided in Section 13.16.

"**Confirmation Order**" shall have the meaning provided in the Recitals to this Agreement.

"**Conforming Changes**" shall mean, with respect to either the use or administration of an initial Benchmark or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR" (if applicable), the definition of "Business Day," the definition of "U.S. Government Securities Business Day", the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.11 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"**Consolidated Depreciation and Amortization Expense**" shall mean, with respect to the Borrower and the Restricted Subsidiaries for any period, the total amount of depreciation and amortization expense, including the amortization of deferred

financing fees or costs, debt issuance costs, commissions, fees and expenses, capitalized expenditures, Capitalized Software Expenditures, amortization of expenditures relating to software, license and intellectual property payments, amortization of any lease related assets recorded in purchase accounting, customer acquisition costs, unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, amortization of original issue discount resulting from the issuance of Indebtedness at less than par and incentive payments, conversion costs, and contract acquisition costs of the Borrower and the Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income for such period, *plus*:

(a)     without duplication and (except in the case of the add-backs set forth in clauses (vii) and (xi) below) to the extent deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for the Borrower and the Restricted Subsidiaries for such period:

(i)     Fixed Charges (including (x) net losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk and (y) costs of surety bonds in connection with financing activities in each case to the extent included in Consolidated Interest Expense, together with items excluded from Consolidated Interest Expense pursuant to clause (1)(o) - (z) of the definition thereof),

(ii)     provision for taxes based on income or profits or capital gains, including federal, foreign, state, franchise, excise, value-added and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) paid or accrued during such period, including any penalties and interest related to such taxes or arising from any tax examination, to the extent the same were deducted (and not added back) in computing such Consolidated Net Income and the net tax expense associated with any adjustments made pursuant to clauses (a) through (t) of the definition of "Consolidated Net Income",

(iii)     Consolidated Depreciation and Amortization Expense for such period,

(iv)     the amount of any cost, charge, accrual, reserve or expense with respect to any restructuring, business optimization, transformation and/or cost-saving initiatives (whether or not classified as restructuring expense on the consolidated financial statements and adjustments to existing reserves) (including any costs, accruals, payments, fees, charges and expenses related to the Case, the Transactions and the other transactions contemplated by the Plan or in connection with obtaining ratings, consulting or professional fees, tax, structuring, transition) and any costs incurred in connection with acquisitions, investments or dispositions after the Closing Date, non-recurring product and intellectual property development (including travel and out-of-pocket costs, human resources costs (including relocation bonuses), litigation and arbitration costs, charges, fees and expenses

18

(including settlements), management transition costs, advertising costs, losses associated with temporary decreases in work volume and expenses related to maintain underutilized personnel), any severance, retention, signing bonuses, relocation, recruiting and other employee related costs (including (x) management bonus pools and (y) charges or expenses in respect of incentive plans), recruiting costs, costs, charges or expenses incurred in connection with any strategic or cost savings initiatives, one-time charges (including compensation charges), payments made pursuant to the terms of "change in control" agreements that the Borrower or a Subsidiary or a Parent Entity had entered into with employees of the Borrower, a Subsidiary or a Parent Entity, costs in respect of strategic initiatives, integration and facilities' or bases' opening costs, losses, costs or cost inefficiencies related to project terminations, facility or property disruptions or shutdowns (including due to work stoppages, natural disasters and epidemics), systems development, establishment and implementation costs, operational and reporting systems, technology initiatives, contract termination costs, future lease commitments and costs related to the closure and/or consolidation of facilities (including severance, rent termination, moving and legal costs) and to exiting lines of business, transition costs, contract terminations, litigation and arbitration fees, costs and charges, expenses, any one time expense relating to enhanced accounting function or other transaction costs, public company costs, costs and expenses in connection with the implementation of fresh start accounting, and costs related to the implementation of operational and reporting systems and technology initiatives,

(v)    any other non-cash charges, expenses or losses, including any non-cash asset retirement costs, non-cash increase in expenses resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments or due to purchase accounting, or any other acquisition, non-cash compensation charges, non-cash expense relating to the vesting of warrants, write-offs or write-downs for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vi)    the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary,

(vii)    the amount of net cost savings projected by the Borrower in good faith to be realizable as a result of specified actions, operational changes and operational initiatives (including, to the extent applicable, resulting from the Transactions) taken or to be taken prior to or during such period, including any "run-rate" synergies, operating expense reductions and improvements and cost savings that are reasonably identifiable and determined in good faith by the Borrower in connection with the Transactions, acquisitions, Dispositions, other customary specified transactions or other cost saving initiatives and other initiatives to result

19

from actions which have been taken or with respect to which substantial steps have been taken or are expected to be taken no later than 24 months following the consummation of the Transactions, any such specified actions, operational changes and operational initiatives (which "run-rate" synergies, operating expense reductions and improvements and cost savings shall be added to Consolidated EBITDA until fully realized, shall be subject to certification by management of the Borrower and shall be calculated on a Pro Forma Basis as though such "run-rate" synergies, operating expense reductions and improvements and cost savings had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that no "run-rate" synergies, operating expense reductions and improvements and cost savings shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clause (iv) above with respect to such period; *provided* further that the aggregate amount added back to and in computing Consolidated EBITDA for any measurement period pursuant to this clause (vii) (other than that resulting from the Transactions, any Permitted Acquisitions or similar Investments and other than, for the avoidance of doubt, the adjustments pursuant to clauses (xv) and/or (xvi) below) shall not exceed 35% of Consolidated EBITDA (determined after giving effect to the adjustments set forth in this clause (vii)),

(viii)   the amount of losses on Dispositions of receivables and related assets in connection with any Permitted Receivables Financing or Qualified Securitization Financing and any losses, costs, fees and expenses in connection with the early repayment, accelerated amortization, repayment, termination or other payoff (including as a result of the exercise of remedies) of any Permitted Receivables Financing or any Qualified Securitization Financing,

(ix)   contract termination costs and any costs, charges or expenses incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement or other equity-based compensation, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Borrower or Net Cash Proceeds of an issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) solely to the extent that such Net Cash Proceeds are excluded from the calculation of the Available Equity Amount,

(x)   an amount (which, for the avoidance of doubt, if positive, increases Consolidated EBITDA or, if negative, reduces Consolidated EBITDA) equal to, for each fiscal quarter in such period, (x) the Aggregate Quarterly Subscription Contract ARR Revenue for such fiscal quarter minus (y) the Aggregate Quarterly Subscription Contract GAAP Revenue for such fiscal quarter,

(xi)   the proceeds of any business interruption insurance,

20

(xii)    extraordinary, unusual or non-recurring charges, expenses or losses (including unusual or non-recurring expenses), transaction fees and expenses and consulting and advisory fees, indemnities and expenses, severance, integration costs, costs of strategic initiatives, relocation costs, consolidation and closing costs, facility opening and pre-opening costs, business optimization expenses or costs, transition costs, restructuring costs, signing, retention, recruiting, relocation, signing, stay or completion bonuses and expenses (including payments made to employees who are subject to non-compete agreements), costs in respect of curtailments or modifications to pension and post-retirement employment benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments),

(xiii)    any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets and Investments in debt and equity securities, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP,

(xiv)    cash receipts (or any netting arrangements resulting in increased cash receipts) not added in arriving at Consolidated EBITDA or Consolidated Net Income in any period to the extent the non-cash gains relating to such receipts were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added,

(xv)    adjustments identified in connection with the calculation of the "Credit EBITDA Calculation" as set forth in, the Company Model,

(xvi)    anticipated run-rate Consolidated EBITDA reasonably expected to be achieved (as determined in good faith by the Borrower) from New Projects (and the achievement of related operating expense reduction and other operating improvements, synergies or cost savings associated therewith) so long as such New Project is then under development or is otherwise in process, *less*

(b)    without duplication and to the extent included in arriving at such Consolidated Net Income for the Borrower and the Restricted Subsidiaries, the sum of the following amounts for such period:

(i)    non-cash gains increasing Consolidated Net Income for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period),

(ii)    extraordinary, unusual or non-recurring gains,

(iii)    cash expenditures (or any netting arrangements resulting in increased cash expenditures) not deducted in arriving at Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash losses relating to such expenditures were added in the calculation of Consolidated EBITDA pursuant to paragraph (a) above for any previous period and not deducted, and

21

(iv)    the amount of any minority interest income consisting of Subsidiary losses attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary,

in each case, as determined on a consolidated basis for the Borrower and the Restricted Subsidiaries in accordance with GAAP; *provided* that

(i)    there shall be included in determining Consolidated EBITDA for any period, without duplication, (A) the Acquired EBITDA of any Person or business, or attributable to any property, assets, division or line of business acquired by the Borrower or any Restricted Subsidiary during such period (or any property, assets, division or line of business subject to a letter of intent or purchase agreement at such time) (but not the Acquired EBITDA of any related Person or business or any Acquired EBITDA attributable to any property, assets, division or line of business, in each case to the extent not so acquired) to the extent not subsequently sold, transferred, abandoned or otherwise disposed by the Borrower or such Restricted Subsidiary (each such Person, property, assets, division or line of business acquired and not subsequently so disposed of, an "**Acquired Entity or Business**") and the Acquired EBITDA of any Unrestricted Subsidiary that is converted into a Restricted Subsidiary during such period (each, a "**Converted Restricted Subsidiary**"), in each case based on the actual Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) and (B) an adjustment in respect of each Pro Forma Entity equal to the amount of the Pro Forma Adjustment with respect to such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition), and

(ii)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset (other than an Unrestricted Subsidiary) sold, transferred, abandoned or otherwise disposed of, closed or classified as discontinued operations by the Borrower or any Restricted Subsidiary during such period (each such Person, property, business or asset so sold, transferred, abandoned or otherwise disposed of, or closed or so classified, a "**Sold Entity or Business**"), and the Disposed EBITDA of any Restricted Subsidiary that is converted into an Unrestricted Subsidiary during such period (each, a "**Converted Unrestricted Subsidiary**"), in each case based on the actual Disposed EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary for such period (including the portion thereof occurring prior to such sale, transfer or disposition, closure, classification or conversion).

Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated EBITDA under this Agreement for any period that includes the four fiscal quarters as set forth below, the Consolidated EBITDA for such fiscal quarters shall be deemed to be $167,000,000 for the fiscal quarter ended March 31, 2022, $136,000,000 for the fiscal quarter ended June 30, 2022, $68,000,000 for the fiscal quarter ended September 30, 2022 and $90,000,000 for the fiscal quarter ended December 31, 2022.

22

"**Consolidated Interest Expense**" shall mean, with respect to any period, without duplication, the sum of:

(1)      consolidated interest expense of the Borrower and the Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptances or collateral posting facilities, (c) non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments pursuant to GAAP), (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate Hedging Obligations with respect to Indebtedness, and excluding (o) annual agency fees paid to the administrative agents and collateral agents under this Agreement, the Term Loan Credit Agreement and the other credit facilities, (p) additional interest with respect to failure to comply with any registration rights agreement owing to holders of any securities, (q) costs associated with obtaining Hedging Obligations, (r) accretion of asset retirement obligations and accretion or accrual of discounted liabilities not constituting Indebtedness, (s) any expense resulting from the discounting of any Indebtedness in connection with the application of fresh start accounting or purchase accounting, (t) penalties and interest relating to taxes (u) amortization of reacquired Indebtedness, deferred financing fees, debt issuance costs, commissions, fees and expenses, (v) any expensing of bridge, commitment and other financing fees, (w) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Permitted Receivables Financing, (x) any prepayment premium or penalty, (x) any prepayment premium or penalty, (y) any interest expense attributable to a parent entity resulting from push-down accounting and (z) any lease, rental or other expenses from operating leases); *plus*

(2)      consolidated capitalized interest of the Borrower and the Restricted Subsidiaries, in each case for such period, whether paid or accrued; *less*

(3)      interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" shall mean, for any period, the net income (loss) of the Borrower and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication, the net after-tax effect of,

(a)      any extraordinary, unusual or nonrecurring losses, gains, fees, costs, charges or expenses for such period,

23

(b)     Transaction Expenses,

(c)     the cumulative effect of a change in accounting principles and changes as a result of adoption or modification of accounting policies during such period,

(d)     any income (or loss) from disposed, abandoned or discontinued operations and any gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations,

(e)     any gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments other than in the ordinary course of business, as determined in good faith by the Borrower,

(f)     any income (or loss) during such period of any Person that is an Unrestricted Subsidiary, and any income (or loss) during such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; *provided* that the Consolidated Net Income of the Borrower and the Restricted Subsidiaries shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents) by any Unrestricted Subsidiary or such other Person from its income to the Borrower or any Restricted Subsidiary during such period,

(g)     [reserved],

(h)     all adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in the Borrower's consolidated financial statements pursuant to GAAP, resulting from (i) the application of fresh start accounting principles as a result of the Avaya Debtors' emergence from bankruptcy or (ii) the application of purchase accounting in relation to the Transactions or any consummated acquisition, in each case, including the amortization, write-off or write-down of any assets, any deferred revenue and any other amounts and other similar adjustments and, whether consummated before or after the Closing Date,

(i)     any income (or loss) for such period attributable to the early extinguishment of Indebtedness (other than Hedging Obligations, but including, for the avoidance of doubt, debt exchange transactions and the extinguishment of pre-petition indebtedness in connection with the Transactions),

(j)     any unrealized income (or loss) for such period attributable to Hedging Obligations or other derivative instruments,

(k)     any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets and investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP,

(l)     any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and any cash charges

24

associated with the rollover, acceleration or payout of Stock or Stock Equivalents by management of the Borrower or any of its direct or indirect parent companies in connection with the Transactions,

(m)      accruals and reserves established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP or changes as a result of adoption of or modification of accounting policies during such period,

(n)      any accruals, payments, fees, expenses or charges (including rationalization, legal, tax, structuring, and other costs and expenses, but excluding depreciation or amortization expense) related to, or incurred in connection with, the Transactions (including letter of credit fees), the Plan, any offering of Stock or Stock Equivalents (including any equity offering), Investment, acquisition, Disposition, Restricted Payment, recapitalization or the issuance or incurrence of Indebtedness permitted to be incurred by the Borrower and the Restricted Subsidiaries pursuant hereto (including any refinancing transaction or amendment, waiver, or other modification of any debt instrument), any public or private offer of the Stock or Stock Equivalents of any Parent Entity, Holdings, Borrower or Restricted Subsidiary, in each case whether or not consummated, including (A) such fees, expenses or charges related to the negotiation, execution and delivery and other transactions contemplated by this Agreement and the other Credit Documents, (B) any amendment or other modification of this Agreement and the other Credit Documents and any Permitted Receivables Financing, (C) any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed, (D) any charges or non-recurring merger costs as a result of any such transaction, and (E) earnout obligations paid or accrued during such period with respect to any acquisition or other Investment,

(o)      the amount of management, monitoring, consulting and advisory fees and related indemnities and expenses paid in such period to the extent otherwise permitted pursuant to Section 9.9,

(p)      restructuring-related or other similar charges, fees, costs, commissions and expenses or other charges incurred during such period in connection with this Agreement, the other Credit Documents, the Credit Facilities, the Case, any reorganization plan in connection with the Case, and any and all transactions contemplated by the foregoing, including the write-off of any receivables, the termination or settlement of executory contracts, professional and accounting costs fees and expenses, management incentive, employee retention or similar plans (in each case to the extent such plan is approved by the Bankruptcy Court to the extent required), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization of the Avaya Debtors;

(q)      any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets

25

permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days),

(r)     to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption,

(s)     any net unrealized gain or loss (after any offset) resulting from currency translation gains or losses relating to currency remeasurements of Indebtedness (including any gain or loss resulting from obligations under any Hedging Obligation for currency exchange risk) and any foreign currency translation gains or losses, and

(t)     to the extent non-cash and deducted in calculating net income (or loss), any net pension, post-employment benefit or long-term disability costs, including interest cost, service cost, actuarial expected return on plan assets, amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of unrecognized net obligations (and loss or cost) existing at the date of initial application of FASB Standard 87, 106 and 112 (or their equivalents under the ASC), and any other items of a similar nature and any gain or loss attributable to mark-to-market adjustments in the valuation of pension liabilities, including actuarial gain or loss on pension and post-retirement plans, curtailments and settlements and prior service cost adjustment.

"**Consolidated Secured Debt**" shall mean, as of any date of determination, Consolidated Total Debt at such date which either (i) is secured by a Lien on the Collateral (and other assets of the Borrower or any Restricted Subsidiary pledged to secure the Obligations pursuant to Section 10.2(i)) or (ii) constitutes Capitalized Lease Obligations or purchase money Indebtedness of the Borrower or any Restricted Subsidiary (and excluding, for the avoidance of doubt for both clauses (i) and (ii), any Qualified Securitization Financing, Permitted Receivables Financing, Hedging Obligations and Cash Management Obligations).

"**Consolidated Secured Net Leverage Ratio**" shall mean, as of any date of determination, the ratio of (a) Consolidated Secured Debt as of the most recent four fiscal quarter period for which financial statements described in Section 9.1(a) or (b) are available to (b) Consolidated EBITDA for such four fiscal quarter period.

"**Consolidated Total Assets**" shall mean, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total

26

assets" (or any like caption), after intercompany eliminations, on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries at such date (or, if such date of determination is a date prior to the first date on which such consolidated balance sheet has been (or is required to have been) delivered pursuant to Section 9.1, on the pro forma financial statements delivered pursuant to Section 6.10 (and, in the case of any determination relating to any Specified Transaction, on a Pro Forma Basis including any property or assets being acquired in connection therewith)).

"**Consolidated Total Debt**" shall mean, as of any date of determination, (a)(i) all Indebtedness of the types described in clauses (a) and (b) (solely to the extent such Indebtedness matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the sole option of the Borrower or any Restricted Subsidiary, to a date more than one year from the date of its creation), clause (d) (but, in the case of clause (d), only to the extent of any unreimbursed drawings under any letter of credit which are not cash collateralized or backstopped) and clause (f) of the definition thereof, in each case actually owing by the Borrower and the Restricted Subsidiaries on such date and to the extent appearing on the balance sheet of the Borrower determined on a consolidated basis in accordance with GAAP (*provided* that the amount of any Capitalized Lease Obligations or any such Indebtedness issued at a discount to its face value shall be determined in accordance with GAAP; *provided*, *further*, that the effects of push-down accounting shall be excluded) and (ii) purchase money Indebtedness (and excluding, for the avoidance of doubt, Qualified Securitization Financing, Permitted Receivables Financing, Hedging Obligations and Cash Management Obligations) *minus* (b) the aggregate amount of all Unrestricted Cash.

"**Consolidated Total Net Leverage Ratio**" shall mean, as of any date of determination, the ratio of (a) Consolidated Total Debt as of the most recent four fiscal quarter period for which financial statements described in Section 9.1(a) or (b) are available to (b) Consolidated EBITDA for such four fiscal quarter period.

"**Contingent Obligation**" shall mean indemnification Obligations and other similar contingent Obligations for which no claim has been made in writing (but excluding, for the avoidance of doubt, amounts available to be drawn under Letters of Credit).

"**Contractual Requirement**" shall have the meaning provided in Section 8.3.

"**Converted Restricted Subsidiary**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Converted Unrestricted Subsidiary**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Cost**" shall mean the coast of purchases of Inventory determined according to the accounting policies used in the preparation of the Borrower's financial statements.

"**Covenant Trigger Period**" shall mean any period (a) commencing on the date upon which Specified Excess Availability is less than the greater of (i) 10.0% of the Line Cap and (ii) $10,250,000 and (b) ending on the date upon which the Specified Excess Availability shall have been at least the greater of (i) 10.0% of the Line Cap and (ii) $10,250,000 for a period of at least twenty consecutive calendar days.

"**Covered Entity**" shall have the meaning provided in Section 13.23(b).

"**Covered Party**" shall have the meaning provided in Section 13.23(a).

"**Credit Card Receivables**" shall have the meaning provided in the definition of "Eligible Credit Card Receivables".

"**Credit Documents**" shall mean this Agreement, the Guarantee, the Security Documents, the Fee Letter, the Issuer Documents, the Commitment Letter and any promissory notes issued by the Borrower hereunder, any Incremental Amendment, any Extension Amendment and any other document jointly identified by the Borrower and the Administrative Agent as a "Credit Document", *provided* that, for the avoidance of doubt, Secured Cash Management Agreements, Secured Specified Cash Management Agreements, Secured Hedging Agreements and Secured Specified Hedging Agreements shall not constitute Credit Documents.

"**Credit Extension**" shall mean each of the following (i) a Borrowing and (ii) an L/C Credit Extension.

"**Credit Facility**" shall mean any category of Revolving Credit Commitments and extensions of credit thereunder.

"**Credit Insurance**" shall mean credit insurance arrangements and related documentation (including security) in form and substance, and with a creditworthy insurer, satisfactory to the Administrative Agent in its Permitted Discretion.

"**Credit Parties**" shall mean Holdings, the Borrower and the Subsidiary Guarantors.

"**Daily Simple SOFR**" shall mean, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; *provided*, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"**DDAs**" shall mean the primary checking or other demand deposit accounts maintained by the Borrower or a Subsidiary Guarantor, and including any such account into which the proceeds of any sale of Inventory or collection of Accounts are deposited. All funds in such DDAs shall be conclusively presumed to be Collateral and proceeds of

Collateral and the Administrative Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the DDAs, subject to the Security Documents.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, arrangement, rearrangement, readjustment, composition, liquidation, receivership, administration, insolvency, reorganization, examinership, or similar debtor relief or debt adjustment Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally, including any corporate law of any jurisdiction permitting a debtor to compromise the claims of its creditors against it and including any rules and regulations pursuant thereto.

"**Debtors**" shall have the meaning provided in the Recitals to this Agreement.

"**Default**" shall mean any event, act or condition that with notice or lapse of time hereunder, or both, would constitute an Event of Default.

"**Default Rate**" shall have the meaning provided in Section 2.8(b).

"**Default Right**" shall have the meaning provided in Section 13.23(b).

"**Defaulting Lender**" shall mean any Lender with respect to which a Lender Default is in effect.

"**Designated Non-Cash Consideration**" shall mean the fair market value of non-cash consideration received by the Borrower or any Restricted Subsidiary in connection with a Disposition pursuant to Section 10.4(b) that is designated as Designated Non-Cash Consideration pursuant to a certificate of an Authorized Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash or Cash Equivalent within 180 days following the consummation of the applicable Disposition). A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 10.4.

"**Dilution Percentage**" shall mean, at any time, with respect to the Credit Parties, taken as a whole, an amount (expressed as a percentage) equal to (a) the sum (without duplication) of all deductions, credit memos, returns, adjustments, allowances, bad-debt write-offs and other non-cash credits which are recorded (or should have been recorded) in accordance with their standard policies, by them to reduce their respective accounts receivable, divided by (b) the sum of aggregate Eligible Accounts generated by the Credit Parties, taken as a whole, in the case of each of clauses (a) and (b) for the 12 fiscal months of the Borrower then most recently ended as shown in the Monthly Borrowing Base Certificate most recently delivered pursuant to Section 9.1(i).

"**Dilution Reserve**" shall mean, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, with respect

29

to the Credit Parties, taken as a whole, an amount equal to the product of (a) the positive result, if any, of the Dilution Percentage for such Persons, taken as a whole, at such time *minus* (i) in the case of Eligible Investment Grade Accounts, 2.5% or (ii) otherwise, 5%, *multiplied* by (b) the Eligible Accounts of such Persons, taken as a whole, at such time; *provided*, that, the Dilution Reserve shall not exceed 1% per each full percentage point by which the result calculated in clause (a) is positive; *provided further* that Dilution Reserve may reflect fractional percentages in dilution.

"**DIP Proceeds Account**" shall have the meaning set forth in the Existing DIP Agreement as in effect immediately prior to the Closing Date.

"**DIP Term Loan Agent**" shall mean Wilmington Savings Fund Society, FSB or any successor administrative agent.

"**DIP Term Loans**" shall mean the term loans extended to the Borrower under the DIP Term Loan Credit Agreement.

"**DIP Term Loan Credit Agreement**" shall mean that certain Superpriority Secured Debtor in Possession Credit Agreement, dated as of February 15, 2023, among Holdings, the Borrower, the several lenders from time to time parties thereto and the DIP Term Loan Agent.

"**Disposed EBITDA**" shall mean, with respect to any Sold Entity or Business or any Converted Unrestricted Subsidiary for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity or Business or Converted Unrestricted Subsidiary, as applicable, and its respective Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business or Converted Unrestricted Subsidiary, as the case may be.

"**Disposition**" or "**Dispose**" shall mean (i) the conveyance, sale, lease, assignment, transfer or other disposition of any of property, business or assets (including receivables and leasehold interests), whether owned on the Closing Date or hereafter acquired or (ii) the sale to any Person (other than to the Borrower or a Subsidiary Guarantor) any shares owned by it of any Subsidiary's Stock and Stock Equivalents.

"**Disqualified Institutions**" shall mean (a) those banks, financial institutions or other Persons separately identified in writing by the Borrower to the Administrative Agent on or prior to the Closing Date, or any Affiliates of such banks, financial institutions or other persons identified in writing by the Borrower to the Administrative Agent on or prior to the Closing Date, or that are readily identifiable as Affiliates on the basis of their name and (b) competitors identified in writing by the Borrower to the Administrative Agent from time to time (or Affiliates thereof identified in writing by the Borrower to the Administrative Agent or that are readily identifiable as Affiliates on the basis of their name) of the Borrower or any of its Subsidiaries (other than such Affiliate that is a bona fide debt fund or a fixed-income only investment vehicle that

30

is engaged in the making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of business and whose managers have fiduciary duties to the third-party investors in such fund or investment vehicle independent from their duties owed to such competitor); *provided* that no such identification after the date of a relevant assignment shall apply retroactively to disqualify any Person that has previously acquired an assignment or participation of an interest in any of the Credit Facilities with respect to amounts previously acquired. The Borrower shall provide the list of all Disqualified Institutions set forth in clauses (a) and (b) to the Administrative Agent on or prior to the Closing Date and may update such list from time to time with respect to clause (b) only by delivering such updated list to the Administrative Agent. The Administrative Agent shall be permitted, upon request of any Lender, to make available the list of Disqualified Institutions to such inquiring Lender.

"**Disqualified Stock**" shall mean, with respect to any Person, any Stock or Stock Equivalents of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Stock or Stock Equivalents that is not Disqualified Stock), other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the termination of the Aggregate Revolving Credit Commitments and all Letters of Credit (unless such Letters of Credit have been Cash Collateralized, backstopped or otherwise collateralized on terms and conditions reasonably satisfactory to the applicable L/C Issuer) and the repayment in full of the Loans, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements or Secured Specified Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Secured Specified Cash Management Agreements, or Contingent Obligations), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the termination of the Aggregate Revolving Credit Commitments and all Letters of Credit (unless such Letters of Credit have been Cash Collateralized, backstopped or otherwise collateralized on terms and conditions reasonably satisfactory to the applicable L/C Issuer)) and the repayment in full of the Loans, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements or Secured Specified Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Secured Specified Cash Management Agreements, or Contingent Obligations), in whole or in part, in each case prior to the date that is ninety-one (91) days after the Maturity Date as determined at the time of the issuance; *provided* that if such Stock or Stock Equivalents are issued to any plan for the benefit of employees of the Borrower or any of its Subsidiaries or by any such plan to such employees, such Stock or Stock Equivalents shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower (or any direct or indirect parent company thereof) or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; *provided*, *further*, that any Stock or Stock Equivalents held by any present or former employee, officer, director, manager or consultant, of the Borrower, any of its Subsidiaries

31

or any of its direct or indirect parent companies or any other entity in which the Borrower or any Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower, in each case pursuant to any stockholders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement or otherwise in order to satisfy applicable statutory or regulatory obligations or as a result of the termination, death or disability of such employee, officer, director, manager or consultant shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any of its Subsidiaries.

"**Dollar Amount**" shall mean, at any time:

(a)     with respect to an amount denominated in Dollars, such amount; and

(b)     with respect to an amount denominated in an Alternative Currency, an equivalent amount thereof in Dollars as determined by the Administrative Agent or the relevant L/C Issuer or Swing Line Lender, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

"**Dollars**" and "**$**" shall mean dollars in lawful currency of the United States of America.

"**Domestic Subsidiary**" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"**EEA Financial Institution**" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Accounts**" shall mean, with respect to any Person, as of any date of determination thereof, the aggregate amount of all Accounts due to any such Person (other than all Accounts constituting Eligible Investment Grade Accounts), except to the extent that (determined without duplication):

32

(a)     except as provided in clause (v) of this definition, such Account does not arise from the sale of goods or the performance of services by such Person in the ordinary course of its business;

(b)     (i) such Person's right to receive payment is contingent upon the fulfillment of any condition whatsoever (other than the preparation and delivery of an invoice) or (ii) as to which such Person is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(c)     any defense, counterclaim, setoff or dispute exists as to such Account, but only to the extent of such defense, counterclaim, setoff or dispute;

(d)     such Account is not a true and correct statement of bona fide indebtedness incurred in the amount of the Account for the sale of goods to or services rendered for the applicable Account Debtor;

(e)     an invoice, in form and substance consistent with such Person's credit and collection policies, or otherwise reasonably acceptable to the Administrative Agent (it being understood that the forms used by the Borrower on the Closing Date are satisfactory to the Administrative Agent), has not been sent to the applicable Account Debtor in respect of such Account on or before the date as of which such Account is first included in a Borrowing Base Certificate or otherwise reported to the Administrative Agent (including Accounts identified as inactive, warranty or otherwise not attributable to an Account Debtor);

(f)     such Account (i) is not owned by such Person or (ii) is subject to any Lien other than Liens permitted under Section 10.2(a), 10.2(b), 10.2(f), 10.2(g), 10.2(j), 10.2(k) (solely with respect to any lien securing Indebtedness for borrowed money) or 10.2(m);

(g)     such Account is the obligation of an Account Debtor that is (i) a director, officer, other employee or Affiliate of a Credit Party (other than Accounts arising from the sale of goods or provision of services delivered to such Account Debtor in the ordinary course of business), (ii) a natural person or (iii) only if such Account obligation has not been incurred in the ordinary course or on arms' length terms, to any entity that has any common officer or director with a Credit Party;

(h)     Accounts subject to a partial payment plan;

(i)     such Person is liable for goods sold or services rendered by the applicable Account Debtor to such Person but only to the extent of the potential offset;

(j)     upon the occurrence of any of the following with respect to such Account:

        (i)     the Account is not paid within 90 days of the original due date or 120 days following the original invoice date (or 150 days following the original

33

invoice date with respect to customers listed on Schedule 1.1(d)); *provided* that up to $10,000,000 of Accounts not paid within 120 days following the original invoice date (or 150 days following the original invoice date with respect to customers listed on Schedule 1.1(d)) shall not be deemed ineligible pursuant to this clause (j)(i) for such reason, unless any such Account is not paid within 180 days following the original invoice date; *provided further*, that in calculating delinquent portions of Accounts under this clause, unapplied credit balances more than 90 days past their original due date or 120 days following the original invoice date (or 150 days following the original invoice date with respect to customers listed on Schedule 1.1(d)) will be excluded; *provided further*, that upon the written request of the Borrower, the Administrative Agent may from time to time in its Permitted Discretion add additional customers to Schedule 1.1(d);

(ii)    the Account Debtor obligated upon such Account suspends its business, makes a general assignment for the benefit of creditors or fails to pay its debts generally as they come due;

(iii)    the Account Debtor obligated upon such Account is a debtor or a debtor in possession under any bankruptcy law or any other federal, state or foreign (including any provincial or territorial) receivership, insolvency relief or other law or laws for the relief of debtors or other Debtor Relief Law; or

(iv)    with respect to which Account (or any other Account due from the applicable Account Debtor), in whole or in part, a check, promissory note, draft, trade acceptance, or other instrument for the payment of money has been received, presented for payment, and returned uncollected for any reason;

(k)    such Account is the obligation of an Account Debtor from whom 50% or more of the Dollar Amount of all Accounts owing by that Account Debtor are ineligible under clause (j)(i) of this definition;

(l)    such Account, together with all other Accounts owing by such Account Debtor and its Affiliates as of any date of determination, exceeds 20% (or, solely for Accounts owing by Westcon Group, a division of Datatec Limited, 35%) of all Eligible Accounts, but, in each case, only to the extent of such excess;

(m)    such Account is one as to which the Administrative Agent's Lien thereon, on behalf of itself and the applicable Secured Parties, is not a first priority perfected Lien, subject in priority only to Permitted Encumbrances (other than Permitted Encumbrances of the type described in clauses (d), (e), (f), (g), (h), (j), (l), (m), (r), (s), (t), (u), (w), (x), (y), (z), (aa), (bb), (cc), (dd), (ee) or (ff));

(n)    any of the representations or warranties in the Credit Documents with respect to such Account are untrue in any material respect with respect to such Account (or, with respect to representations or warranties that are

qualified by materiality, any of such representations and warranties are untrue);

(o)     such Account is evidenced by a judgment, Instrument or Chattel Paper (each such term as defined in the Uniform Commercial Code) (other than Instruments or Chattel Paper that are held by the Borrower or that have been delivered to the Administrative Agent);

(p)     such Account is payable in any currency other than Dollars;

(q)     such Account is an Account with respect to which the Account Debtor is a Person other than a Governmental Authority unless (i) the Account Debtor's billing address is in an Eligible Jurisdiction, (ii) the Account Debtor is organized or incorporated under the Applicable Laws of an Eligible Jurisdiction or any state, province, territory or subdivision of an Eligible Jurisdiction or (iii) such Account is supported by an irrevocable letter of credit satisfactory to the Administrative Agent, in its Permitted Discretion (as to form, substance, and issuer or confirming bank), that has been delivered to the Administrative Agent, or covered by Credit Insurance;

(r)     such Account is the obligation of an Account Debtor that is the United States government or a political subdivision thereof, or department, agency or instrumentality thereof if and to the extent that such Account together with all other Accounts owing by such Account Debtors as of any date of determination (collectively with Accounts referred to in the corresponding provision of clause (s) below), exceeds 10% of all Eligible Accounts; *provided* that if all Accounts owing by such Account Debtors as of any date of determination (collectively with Accounts referred to in the corresponding provision of clause (s) below) equals or exceeds in the aggregate 10% of all Eligible Accounts, then the excess of such aggregate Accounts over 10% of all Eligible Accounts shall not be Eligible Accounts unless the Administrative Agent, in its Permitted Discretion, has agreed to the contrary in writing and the Borrower, if necessary or desirable, has complied with respect to such obligation with the Federal Assignment of Claims Act of 1940, or any applicable state, county or municipal law restricting assignment thereof;

(s)     such Accounts are Accounts with respect to which the Account Debtor is the government of any country or sovereign state other than the United States, or of any state, province, territory, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof (other than any such Account (i) is supported by an irrevocable letter of credit satisfactory to the Administrative Agent, in its Permitted Discretion (as to form, substance, and issuer or confirming bank), that has been delivered to the Administrative Agent, or (ii) is covered by Credit Insurance), if and to the extent that such Accounts together with all other Accounts owing by such Account Debtors as of any date of

35

determination (collectively with Accounts referred to in the corresponding provision of clause (r) above), exceeds in the aggregate 10% of all Eligible Accounts; *provided* that if all Accounts owing by such Account Debtors as of any date of determination (collectively with Accounts referred to in the corresponding provision of clause (r) above) equals or exceeds in the aggregate 10% of all Eligible Accounts, then the excess of such aggregate Accounts over 10% of all Eligible Accounts shall not be Eligible Accounts;

(t)     such Account has been redated, extended, compromised, settled, adjusted or otherwise modified or discounted, except discounts or modifications that are granted by such Person in the ordinary course of business and that are reflected in the calculation of the Borrowing Base;

(u)     such Account is of an Account Debtor that is located in a state of the United States of America requiring the filing of a notice of business activities report or similar report in order to permit the Borrower to seek judicial enforcement in such state of payment of such Account, unless such Person has qualified to do business in such state or has filed a notice of business activities report or equivalent report for the then-current year or if such failure to file and inability to seek judicial enforcement is capable of being remedied without any material delay or material cost;

(v)     such Accounts were acquired or originated by a Person acquired in a Permitted Acquisition (until such time as the Administrative Agent has completed a customary due diligence investigation as to such Accounts and such Person, which investigation may, at the sole discretion of the Administrative Agent, include a field examination, and the Administrative Agent is reasonably satisfied with the results thereof);

(w)     Credit Card Receivables (other than Eligible Credit Card Receivables);

(x)     Accounts which are subject to adjustment for (i) coupons, rebates, "buy one, get one free", bundled offers, stock balancing, manufacture discontinued, price protection, dead-on-arrival, special bids, or similar sales incentives and promotional programs or (ii) miscellaneous marketing allowances other than non-cash reductions, in each case to the extent of such adjustment;

(y)     Accounts that represent a sale on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or other repurchase or return basis;

(z)     Accounts that are the obligation of an Account Debtor that is, to the knowledge of the Borrower or the Administrative Agent, a Sanctioned Person;

(aa)    Accounts that are subject to a restriction on assignment that is enforceable against third parties and that impairs the Administrative Agent's Lien on such Account or the Administrative Agent's ability to enforce the Account,

36

after giving effect to any anti-assignment provisions in the Uniform Commercial Code or similar provisions under other Applicable Laws;

(bb)    Accounts with respect to which the agreement evidencing such Accounts is not governed by the Applicable Laws of the United States; or

(cc)    such Account is otherwise unacceptable to the Administrative Agent in its Permitted Discretion.

"**Eligible Borrowing Base Cash**" shall mean the amount of cash and Cash Equivalents of a Credit Party at such time (to the extent held in an identified segregated account of the Administrative Agent that is (x) in the name of the Administrative Agent or (y) subject to a Blocked Account Agreement).

"**Eligible Credit Card Receivables**" shall mean, as of any date of determination, Accounts due to any Person from major credit card and debit card processors (including, but not limited to, VISA, Mastercard, American Express, Diners Club, DiscoverCard, Interlink, NYCE, Star/Mac, Tyme, Pulse, Accel, AFF, Shazam, CU244, Alaska Option and Maestro) that arise in the ordinary course of business and that have been earned by performance ("**Credit Card Receivables**") and that are not excluded as ineligible by virtue of one or more of the criteria set forth below, except that none of the following (determined without duplication) shall be deemed to be Eligible Credit Card Receivables:

(a)    Accounts that have been outstanding for more than five (5) Business Days from the date of sale, or for such longer period(s) as may be approved by the Administrative Agent in its Permitted Discretion;

(b)    Accounts with respect to which a Person does not have good and valid title, free and clear of any Lien (other than Liens permitted hereunder pursuant to Section 10.2(a), 10.2(b), 10.2(f), 10.2(g), 10.2(j), 10.2(k) (solely with respect Lien securing Indebtedness for borrowed money) or 10.2(m));

(c)    Accounts as to which the Administrative Agent's Lien attached thereon on behalf of the applicable Secured Parties, is not a first priority perfected Lien, subject to Liens permitted hereunder pursuant to Section 10.2(m);

(d)    Accounts that are disputed, or with respect to which a claim, counterclaim, offset or chargeback (other than chargebacks in the ordinary course by the credit card processors) has been asserted, by the related credit card processor (but only to the extent of such dispute, claim, counterclaim, offset or chargeback);

(e)    Except as otherwise approved by the Administrative Agent, Accounts as to which the credit card processor has the right under certain circumstances to require such Person to repurchase the Accounts from such credit card or debit card processor;

37

(f) Except as otherwise approved by the Administrative Agent, Accounts arising from any private label credit card program of such Person; and

(g) Accounts due from major credit card and debit card processors (other than JCB, Visa, Mastercard, American Express, Diners Club, DiscoverCard, Interlink, NYCE, Star/Mac, Tyme, Pulse, Accel, AFF, Shazam, CU244, Alaska Option and Maestro) that the Administrative Agent in its Permitted Discretion determines to be unlikely to be collected.

"**Eligible In-Transit Inventory**" shall mean, as of any date of determination, without duplication of other Eligible Inventory, Inventory (a) which has been shipped from any location for receipt by a Person within fourteen days of the date of determination but which has not yet been received by such Person, (b) for which the purchase order is in the name of such Person and title has passed to such Person, (c) for which the document of title, to the extent applicable, reflects such Person as consignee (along with delivery to such Person of the documents of title, to the extent applicable, with respect thereto), (d) as to which the Collateral Agent has control over the documents of title, to the extent applicable, which evidence ownership of the subject Inventory, and (e) which otherwise is not excluded from the definition of Eligible Inventory. Eligible In-Transit Inventory shall not include Inventory accounted for as "in transit" by a Person by virtue of such Inventory's being in transit between such Person's locations within the same legal jurisdiction or in storage trailers at such Person's locations; rather such Inventory shall be treated as "Eligible Inventory" if it satisfies the conditions therefor.

"**Eligible Inventory**" shall mean, as of any date of determination thereof, the aggregate amount of all Inventory of a Person, except that none of the following (determined without duplication) shall be deemed to be Eligible Inventory:

(a) Inventory with respect to which such Person does not have good, and valid title, free and clear of any Lien (other than Liens permitted hereunder pursuant to Section 10.2(a), 10.2(b), 10.2(f), 10.2(g), 10.2(j), 10.2(k) (solely with respect to Lien securing Indebtedness for borrowed money) or 10.2(m));

(b) Inventory as to which the Administrative Agent's Lien attached thereon on behalf of the Secured Parties, is not a first priority perfected Lien, subject in priority only to Permitted Encumbrances (other than Permitted Encumbrances of the type described in clauses (d), (e), (f), (g), (h), (j), (l), (m), (r), (s), (t), (u), (w), (x), (y), (z), (aa), (bb), (cc), (dd), (ee) or (ff));

(c) Inventory as to which any of the representations or warranties in the Credit Documents with respect to such Inventory are untrue in any material respect with respect to such Inventory (or, with respect to representations or warranties that are qualified by materiality, any of such representations and warranties are untrue);

38

(d)     Inventory that is either not finished goods or which constitutes work-in-process, raw materials, packaging and shipping material, supplies, samples, prototypes, displays or display items, bill-and-hold goods, goods that are returned or marked for return (but not held for resale or undergoing maintenance) or repossessed, or which constitutes goods held on consignment or goods which are not of a type held for sale in the ordinary course of business;

(e)     Inventory that is not located in the U.S.;

(f)     Inventory that is located at any location leased by such Person, unless (i) (x) the lessor has delivered to the Administrative Agent a Collateral Access Agreement (or with respect to any location outside the U.S., such other documentation as the Administrative Agent may reasonably require as to such location) or (y) a Reserve equal to two months base rent *plus*, without duplication, all other rent, charges and other amounts due with respect to such location has been established by the Administrative Agent in its Permitted Discretion (measured as of the most recent practicable date) and (ii) the aggregate Cost of the Inventory located at such leased facility is at least $2,000,000;

(g)     Inventory that is located in any third party storage facility or is otherwise in the possession of a bailee (including any repairman) and is not evidenced by a Document, unless (i) (x) such warehouseman or other bailee has delivered to the Administrative Agent a Collateral Access Agreement and such other documentation as the Administrative Agent may reasonably require or (y) an appropriate Reserve (which shall be an amount not greater than the lesser of (1) the aggregate of all amounts owed by the Borrower to such warehouseman or other bailee (measured as of the last day of the calendar month most recently then ended) and (2) the Cost of the aggregate amount of all Inventory at such location; *provided* that if the Borrower cannot calculate the amount in clause (1) with reasonable accuracy, then only clause (2) shall apply) has been established by the Administrative Agent in its Permitted Discretion and (ii) the aggregate Cost of the Inventory located at such third party storage facility or otherwise in possession of such bailee is at least $5,000,000;

(h)     Inventory that is being processed offsite at an Avaya contract manufacturer (unless such Avaya contract manufacturer has delivered to the Administrative Agent a Collateral Access Agreement and such other documentation as the Administrative Agent may reasonably require), or is in-transit to or from a customer location or Avaya contract manufacturer (other than (x) Eligible In-Transit Inventory and (y) Inventory with respect to which there is an outstanding Eligible Letter of Credit);

(i)     Inventory acquired or originated by a Person acquired in a Permitted Acquisition (until such time as the Administrative Agent has completed a

39

customary due diligence investigation as to such Inventory and such Person, which investigation may, at the sole discretion of the Administrative Agent, include an appraisal or field examination, and the Administrative Agent is reasonably satisfied with the results thereof subject to its Permitted Discretion);

(j)     Inventory that is not reflected in the details of a current perpetual inventory report;

(k)     [reserved]; or

(l)     such Inventory is otherwise unacceptable to the Administrative Agent in its Permitted Discretion.

"**Eligible Investment Grade Accounts**" shall mean, as of any date of determination, the aggregate amount of all Accounts due to any Person that otherwise satisfy the criteria set forth in the definition of "Eligible Accounts" and, in addition, the Account Debtor receives an Investment Grade Rating.

"**Eligible Jurisdiction**" shall mean Canada and the United States.

"**Eligible Letter of Credit**" shall mean, as of any date of determination thereof, with respect to the Inventory of a Person, a Commercial Letter of Credit which supports the purchase of such Inventory, (i) for which no documents of title have then been issued; (ii) which Inventory when completed would otherwise constitute Eligible Inventory, and (iii) which Commercial Letter of Credit provides that it may be drawn only after the Inventory is completed and after documents of title have been issued for such Inventory, if applicable, reflecting such Person or the Collateral Agent as consignee of such Inventory.

"**Employee Benefit Plan**" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA), other than a Foreign Plan, that is maintained or contributed to by Holdings, the Borrower or any Subsidiary (or, with respect to an employee benefit plan subject to Title IV of ERISA, any ERISA Affiliate).

"**Environmental Claims**" shall mean any and all actions, suits, proceedings, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, violation or potential responsibility or investigation (other than reports prepared by or on behalf of Holdings, the Borrower or any other Subsidiary of Holdings (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of Real Estate) or proceedings in each case relating in any way to any applicable Environmental Law or any permit issued, or any approval given, under any applicable Environmental Law (hereinafter, "**Claims**"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief relating to the presence, release or threatened release into the environment of Hazardous Materials or

40

arising from alleged injury or threat of injury to human health or safety (to the extent relating to human exposure to Hazardous Materials), or to the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"**Environmental Law**" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or, with respect to any post-Closing Date requirements of the Credit Documents, hereafter in effect, and in each case as amended, and any legally binding judicial or administrative interpretation thereof, including any legally binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or to human health or safety (to the extent relating to human exposure to Hazardous Materials), or Hazardous Materials.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.  Section references to ERISA are to ERISA as in effect on the Closing Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Borrower or any Subsidiary of the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (i) the failure of any Employee Benefit Plan to comply with any provisions of ERISA and/or the Code or with the terms of such Employee Benefit Plan; (ii) any Reportable Event; (iii) the existence with respect to any Employee Benefit Plan of a non-exempt Prohibited Transaction; (iv) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (v) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (vi) the occurrence of any event or condition which would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or the incurrence by any Credit Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (vii) the receipt by any Credit Party or any of its ERISA Affiliates from the PBGC or a plan administrator of any written notice to terminate any Pension Plan under Section 4042(a) of ERISA or to appoint a trustee to administer any Pension Plan under Section 4042(b)(1) of ERISA; (viii) the incurrence by any Credit Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan (or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA) or Multiemployer Plan; (ix) the receipt by any Credit Party or any of its ERISA Affiliates of any notice concerning the imposition on

41

it of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA), (x) a determination that any Pension Plan is or is expected to be in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); or (xi) any other event or condition with respect to a Pension Plan or Multiemployer Plan that could result in liability to the Borrower or any Subsidiary.

"**Erroneous Payment**" shall have the meaning provided in Section 13.27(a).

"**Erroneous Payment Deficiency Assignment**" shall have the meaning provided in Section 13.27(d)(i).

"**Erroneous Payment Impacted Class**" shall have the meaning provided in Section 13.27(d)(i).

"**Erroneous Payment Return Deficiency**" shall have the meaning provided in Section 13.27(d)(i).

"**Erroneous Payment Subrogation Rights**" shall have the meaning provided in Section 13.27(e).

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" shall have the meaning provided in Section 11.

"**Excess Availability**" shall mean, at any time of determination, the difference of (a) the Line Cap at such time *minus* (b) the Aggregate Revolving Credit Exposure.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, and rules and regulations promulgated thereunder.

"**Excluded Accounts**" shall mean (i) petty cash and minimum daily working capital accounts funded in the ordinary course of business, the deposits in which shall not aggregate more than $15,000,000 (or such greater amounts to which the Administrative Agent may agree), (ii) payroll, trust, employees' wages and benefits and tax withholding accounts funded in the ordinary course of business, (iii) any account that is otherwise expressly agreed by the Administrative Agent to be excluded from the requirement to be subject to a Blocked Account Agreement under Section 9.18, including, for the avoidance of doubt, those accounts listed on Schedule 9.18(a) as of the Closing Date that are not identified as Blocked Accounts, (iv) zero balance disbursement accounts, (v) disbursement accounts (other than the Borrower's primary operating or disbursement account) where solely proceeds of Indebtedness, including proceeds of the Revolving Credit Loans, are deposited, (vi) trust accounts, (vii) escrow accounts and (viii) accounts

42

maintained solely for the benefit of third parties as cash collateral for obligations owing to such third parties.

"**Excluded Collateral**" shall mean (i) [reserved], (ii) any vehicles and other assets subject to certificates of title; (iii) letter-of-credit rights to the extent a security interest therein cannot be perfected by a UCC filing (other than supporting obligations); (iv) any property subject to a Lien permitted under Section 10.2 securing a purchase money agreement, Capital Lease or similar arrangement permitted hereunder in each case after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or other Applicable Law, excluding the proceeds and receivables thereof (to the extent not otherwise constituting Excluded Collateral), to the extent, and for so long as, the creation of a security interest therein is prohibited thereby (or otherwise requires consent, *provided* that there shall be no obligation to seek such consent) or creates a right of termination or favor of a third party, in each case, excluding the proceeds and receivables thereof to the extent not otherwise constituting Excluded Collateral; (v) (x) all leasehold interests in Real Estate (and there shall not be any requirement to obtain any landlord or other third party waivers, estoppels, consents or collateral access letters in respect of such leasehold interests) and (y) any parcel of Real Estate located in the United States and the improvements thereto owned in fee by a Credit Party with a fair market value of $10,000,000 or less (at the time of acquisition) (but not any Collateral located thereon) or any parcel of Real Estate and the improvements thereto owned in fee by a Credit Party outside the United States; (vi) any "intent to use" trademark application filed and accepted in the United States Patent and Trademark Office unless and until an amendment to allege use or a statement of use has been filed and accepted by the United States Patent and Trademark Office to the extent, if any, that, and solely during the period, if any, in which the grant of security interest therein could impair the validity or enforceability of such "intent to use" trademark application under federal law; (vii) any charter, permit, franchise, authorization, lease, license or agreement, in each case, only to the extent and for so long as the grant of a security interest therein (or the assets subject thereto) by the applicable Credit Party (x) would violate invalidate such charter, permit, franchise, authorization, lease, license, or agreement or (y) would give any party (other than a Credit Party) to any such charter, permit, franchise, authorization, lease, license or agreement the right to terminate its obligations thereunder or (z) is permitted under such charter, permit, franchise, lease, license or agreement only with consent of the parties thereto (other than consent of a Credit Party) and such necessary consents to such grant of a security interest have not been obtained (it being understood and agreed that no Credit Party or Restricted Subsidiary has any obligation to obtain such consents) other than, in each case referred to in clauses (x) and (y) and (z), as would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction, in each case excluding the proceeds and receivables thereof which are not otherwise Excluded Collateral; (viii) any Commercial Tort Claim (as defined in the Security Agreement) for which no claim has been made or with a value of less than $10,000,000 for which a claim has been made; (ix) any Excluded Stock and Stock Equivalents; (x) any assets with respect to which, the Borrower and the Collateral Agent reasonably determine, the cost or other consequences of granting a security interest or obtaining title insurance in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom; (xi)

43

any assets with respect to which granting a security interest in such assets in favor of the Secured Parties under the Security Documents could reasonably be expected to result in a material adverse tax consequence to Holdings or any Subsidiary thereof as reasonably determined by the Borrower in good faith (and, in the case of Stock or Stock Equivalents of any Subsidiary, with prompt notice to the Collateral Agent and not objected to by the Collateral Agent within five Business Days of the receipt of such notice; provided that Borrower will not, and will not permit the Restricted Subsidiaries to create or incur any Lien on such Stock or Stock Equivalents to secure any Indebtedness for borrowed money); (xii) any margin stock; (xiii) [reserved]; and (xiv) any assets with respect to which granting a security interest in such assets is prohibited by or would violate law, treaty, rule, or regulation or determination of an arbitrator or a court or other Governmental Authority or which would require obtaining the consent, approval, license or authorization of any Governmental Authority (unless such consent, approval, license or authorization has been received; *provided* that there shall be no obligation to obtain such consent) or create a right of termination in favor of any governmental or regulatory third party, in each case after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or other Applicable Law, excluding the proceeds and receivables thereof (to the extent not otherwise constituting Excluded Collateral); *provided* that with respect to clauses (iv), (vii) and (xiv), such property shall be Excluded Collateral only to the extent and for so long as such prohibition, violation, invalidation or consent right, as applicable, is in effect and in the case of any such agreement or consent, was not created in contemplation thereof or of the creation of a security interest therein. Notwithstanding anything set forth herein, Excluded Collateral shall not include any assets owned by the Credit Parties that constitute collateral securing the Term Loans.

"**Excluded Stock and Stock Equivalents**" shall mean (i) any Stock or Stock Equivalents with respect to which, in the reasonable judgment of the Collateral Agent and the Borrower, the burden or cost of pledging such Stock or Stock Equivalents in favor of the Collateral Agent under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (ii) (A) solely in the case of any pledge of Voting Stock of (x) any Foreign Subsidiary that is a CFC or (y) any CFC Holding Company, in each case, owned directly by a Credit Party, any Voting Stock in excess of 65% of each outstanding class of Voting Stock of such Foreign Subsidiary that is a CFC or such CFC Holding Company and (B) any Stock or Stock Equivalents of (x) any Foreign Subsidiary that is a CFC or (y) any CFC Holding Company, in each case, not owned directly by a Credit Party, (iii) any Stock or Stock Equivalents to the extent the pledge thereof would violate any Applicable Law or any Contractual Requirement (including any legally effective requirement to obtain the consent or approval of, or a license from, any Governmental Authority or any other regulatory third party unless such consent, approval or license has been obtained (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary of the Borrower to obtain any such consent, approval or license)), (iv) any Stock or Stock Equivalents of each Subsidiary to the extent that a pledge thereof to secure the Obligations is prohibited by any applicable Organizational Document of such Subsidiary or requires third party consent (other than the consent of a Credit Party), unless consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary to obtain any such consent), in each case after giving effect to Sections 9-406,

9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or other Applicable Law, excluding the proceeds and receivables thereof (to the extent not otherwise constituting Excluded Collateral), (v) Stock or Stock Equivalents of any non-Wholly Owned Subsidiary, (vi) any Stock or Stock Equivalents of any Subsidiary to the extent that the pledge of such Stock or Stock Equivalents could reasonably be expected to result in material adverse tax or accounting consequences to Holdings or any Subsidiary thereof as reasonably determined by the Borrower in good faith (and, in the case of Stock or Stock Equivalents of any Subsidiary, with prompt notice to the Collateral Agent and not objected to by the Collateral Agent within five Business Days of the receipt of such notice; provided that Borrower will not, and will not permit the Restricted Subsidiaries to create or incur any Lien on such Stock or Stock Equivalents to secure any Indebtedness for borrowed money), (vii) any Stock or Stock Equivalents that are margin stock, (viii) any Stock or Stock Equivalents owned by a CFC, and (ix) any Stock and Stock Equivalents of any Unrestricted Subsidiary or of any Restricted Subsidiary that does not constitute a Material Subsidiary (other than (A) to the extent a perfected security interest therein can be obtained by filing a UCC-1 financing statement or (B) as otherwise agreed to by the Borrower in its sole discretion), any Person not constituting a Subsidiary, any Captive Insurance Subsidiary, any Broker-Dealer Subsidiary, any not-for-profit Subsidiary and any special purpose entity (including any Receivables Entity and any Securitization Subsidiary); *provided* that Excluded Stock and Stock Equivalents shall not include proceeds of the foregoing property to the extent otherwise constituting Collateral.

"**Excluded Subsidiary**" shall mean (a) each Domestic Subsidiary of the Borrower designated by the Borrower for the purpose of this clause (a) from time to time, for so long as any such Domestic Subsidiary does not constitute a Material Subsidiary as of the most recently ended Test Period; *provided* that if such Domestic Subsidiary would constitute a Material Subsidiary as of the end of such Test Period, the Borrower shall cause such Domestic Subsidiary to become a Guarantor pursuant to Section 9.11, (b) each Domestic Subsidiary that is not a Wholly Owned Subsidiary or otherwise constitutes a joint venture (for so long as such Subsidiary remains a non-Wholly Owned Restricted Subsidiary or joint venture), (c) any CFC, (d) each Domestic Subsidiary that is (i) prohibited by any applicable (x) Contractual Requirement, (y) Applicable Law (including without limitation as a result of applicable financial assistance, directors' duties or corporate benefit requirements) or (z) Organizational Document (in the case of clauses (x) and (z), in effect on the Closing Date or any date of acquisition of such Subsidiary (to the extent such prohibition was not entered into in contemplation of the Guarantee)) from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such restriction or any replacement or renewal thereof is in effect), or (ii) required to obtain consent, approval, license or authorization of a Governmental Authority for such guarantee or grant (unless such consent, approval, license or authorization has already been received); *provided* that there shall be no obligation to obtain such consent, (e) each Domestic Subsidiary that is a Subsidiary of a CFC, (f) any other Domestic Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences (including any material adverse tax consequences to Holdings or any Subsidiary thereof) of guaranteeing the Obligations shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (g) each Unrestricted Subsidiary,

45

(h) any Foreign Subsidiary, (i) any special purpose entity, including any Receivables Entity and any Securitization Subsidiary, (j) any Captive Insurance Subsidiary, (k) any non-profit Subsidiary or (l) any Broker-Dealer Subsidiary; *provided* that Excluded Subsidiary shall not include any Domestic Subsidiary of the Borrower to the extent such Domestic Subsidiary guarantees the Term Loans.

"**Excluded Swap Obligation**" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time any Guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"**Excluded Taxes**" shall mean, any of the following Taxes imposed on or with respect to any Agent or any Lender or required to be deducted or withheld from a payment to any Agent or Lender, (a) net income Taxes and franchise and excise Taxes (imposed in lieu of net income Taxes) and any branch profits Taxes imposed on such Agent or Lender as a result of such Agent or Lender being organized or incorporated under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in the jurisdiction imposing such Tax (or any political subdivision thereof), (b) any Taxes imposed on any Agent or any Lender as a result of any current or former connection between such Agent or Lender and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent or Lender having executed, delivered or performed its obligations or received a payment under, received or perfected a security interest under, or having been a party to or having enforced, or sold or assigned an interest in this Agreement or any other Credit Document), (c) any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of any Agent or Lender under the law in effect at the time such Agent or Lender becomes a party to this Agreement (or designates a new Lending Office other than a new Lending Office designated at the request of the Borrower pursuant to Section 2.12); *provided* that this clause (c) shall not apply to the extent that the indemnity payments or additional amounts any Lender would be entitled to receive (without regard to this clause (c)) do not exceed the indemnity payment or additional amounts that the person making the assignment, participation or transfer to such Lender (or designation of a new Lending Office by such Lender) would have been entitled to receive pursuant to Section 5.4 immediately before such assignment, participation, transfer or change in Lending Office in the absence of such assignment, participation, transfer or change in Lending Office (it being understood and agreed, for the avoidance of doubt, that any withholding Tax imposed on a Lender as a result of a Change in Law occurring after the time such Lender became a party to this Agreement (or designates a new Lending Office) shall not be an Excluded Tax under this clause (c)), (d) any Tax to the extent attributable to such Agent's or Lender's failure to

46

comply with Sections 5.4(e), (f) (in the case of any Non-U.S. Lender), (i) (in the case of a U.S. Lender) or (j) and (e) any Taxes imposed by FATCA.

"**Existing DIP Agreement**" shall have the meaning provided in the Recitals to this Agreement.

"**Existing Revolving Credit Commitment**" shall have the meaning provided in Section 2.15(a).

"**Existing Revolving Credit Loans**" shall have the meaning provided in Section 2.15(a).

"**Extended Revolving Credit Commitments**" shall have the meaning provided in Section 2.15(a).

"**Extended Revolving Credit Loans**" shall have the meaning provided in Section 2.15(a).

"**Extending Lender**" shall have the meaning provided in Section 2.15(b).

"**Extension Amendment**" shall have the meaning provided in Section 2.15(c).

"**Extension Election**" shall have the meaning provided in Section 2.15(b).

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and intergovernmental agreement (together with any Applicable Law implementing such agreement) entered into in connection with any of the foregoing.

"**Federal Funds Effective Rate**" shall mean, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided that if the Federal Funds Rate as so determined would be less than the Floor, such rate shall be deemed to be the Floor for purposes of this Agreement.

"**Fee Letter**" shall mean the Agency Fee Letter, dated as of February 13, 2023, between Citibank, N.A. and the Borrower.

"**FILO Tranche**" shall have the meaning provided in Section 2.14(h).

47

"**Financial Covenant**" shall mean the financial covenant set forth in Section 10.11.

"**Fiscal Year**" shall have the meaning provided in Section 9.10.

"**Fixed Charge Coverage Ratio**" shall mean, with respect to any Test Period, the ratio of (a) (i) Consolidated EBITDA of the Borrower *minus* (ii) Unfinanced Capital Expenditures *minus* (iii) Cash Income Taxes, in each case for such Test Period, to (b) the sum of, without duplication, (i) consolidated cash interest expense (net of cash interest income to the extent excluded from Consolidated EBITDA), calculated for such period for the Borrower and its Restricted Subsidiaries on a consolidated basis, for such Test Period *plus* (ii) any dividend or distribution (other than return of capital) paid in cash in respect of preferred stock or Disqualified Stock *plus* (iii) scheduled principal amortization paid in cash in respect of Indebtedness for borrowed money (other than any intercompany Indebtedness among the Borrower and its Restricted Subsidiaries), in each case, for such Test Period.

"**Fixed Charges**" shall mean, the sum of, without duplication:

(1)     Consolidated Interest Expense; *plus*

(2)     all cash dividends or cash distributions (other than return of capital) paid (excluding items eliminated in consolidation) on any series of preferred stock during such period; *plus*

(3)     all cash dividends or cash distributions (other than return of capital) paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during such period.

"**Flood Laws**" shall mean (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.) and (iv) the Flood Insurance Reform Act of 2004, and any regulations promulgated thereunder.

"**Floor**" shall mean a rate of interest equal to 0.00% per annum.

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Borrower or any of its Subsidiaries with respect to employees employed outside the United States.

"**Foreign Reserve Account**" shall have the meaning set forth in the Existing DIP Agreement as in effect immediately prior to the Closing Date.

"**Foreign Subsidiary**" shall mean each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Fund**" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent in writing that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange and any supra-national bodies such as the European Union or the European Central Bank.

"**Granting Lender**" shall have the meaning provided in Section 13.6(f).

"**Guarantee**" shall mean the Guarantee, dated as of the Closing Date, made by each Guarantor in favor of the Administrative Agent for the benefit of the Secured Parties, substantially in the form of Exhibit C.

"**Guarantee Obligations**" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; *provided*, *however*, that the term "**Guarantee Obligations**" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum

49

reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Guarantors**" shall mean (a) Holdings, (b) each Domestic Subsidiary (other than an Excluded Subsidiary) that provides the Guarantee on the Closing Date or becomes a party to the Guarantee after the Closing Date pursuant to Section 9.11 or otherwise and (c) the Borrower (other than with respect to its own Obligations).

"**Hazardous Materials**" shall mean (a) any petroleum or petroleum products spilled or released into the environment, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, for which a release into the environment is prohibited, limited or regulated by any Environmental Law.

"**Hedge Bank**" shall mean any Person (other than Holdings, the Borrower or any Subsidiary of the Borrower) that is a party to any Hedging Agreement and, in each case, at the time it enters into such Hedging Agreement or on the Closing Date, is a Joint Lead Arranger, a Lender or an Affiliate of a Lender or a Joint Lead Arranger.

"**Hedging Agreements**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedging Obligations**" shall mean, with respect to any Person, the obligations of such Person under Hedging Agreements.

"**Hedging Reserves**" shall mean such reserves as the Administrative Agent, from time to time, determines in its Permitted Discretion to reflect the reasonably anticipated liabilities and obligations of the Credit Parties with respect to applicable Hedging Obligations under Secured Hedging Agreements then provided or outstanding, to

50

the extent secured by the applicable Collateral included in the applicable Borrowing Base. The parties hereto agree that no Hedging Reserves shall be taken with respect to Secured Specified Hedging Agreements.

"**Holdings**" shall mean, (a) Avaya Holdings or (b) any other partnership, limited partnership, corporation, limited liability company, or business trust or any successor thereto organized under the laws of the United States or any state thereof or the District of Columbia (the "**New Holdings**") that is a direct or indirect Wholly Owned Subsidiary of Avaya Holdings or that has merged, amalgamated or consolidated with Avaya Holdings (or, in either case, the previous New Holdings, as the case may be) (the "**Previous Holdings**"); provided that (i) such New Holdings owns directly or indirectly 100% of the Stock and Stock Equivalents of the Borrower, (ii) the New Holdings shall expressly assume all the obligations of the Previous Holdings under this Agreement and the other Credit Documents to which it is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (iii) such substitution and any supplements to the Credit Documents shall preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the Security Documents, and New Holdings shall have delivered to the Administrative Agent an officer's certificate to that effect, (iv) all assets of the Previous Holdings are contributed or otherwise transferred to such New Holdings, and (v) New Holdings shall have provided to the Administrative Agent and the Lenders all documentation and information reasonably requested by the Administrative Agent and such Lenders that is necessary and is required by United States regulatory authorities to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; *provided, further*, that if the foregoing are satisfied, the Previous Holdings shall be automatically released from all of its obligations under the Credit Documents and any reference to "Holdings" in the Credit Documents shall be meant to refer to the "New Holdings".  Notwithstanding anything to the contrary contained in this Agreement, Holdings or any New Holdings may change its jurisdiction of organization or location for purposes of the UCC or its identity or type of organization or corporate structure, subject to compliance with the terms and provisions of the Security Documents.

"**Honor Date**" shall have the meaning provided in Section 3.1(c)(i).

"**Incremental Amendment**" shall have the meaning provided in Section 2.14(d).

"**Incremental Commitments**" shall have the meaning provided in Section 2.14(a).

"**Incremental Foreign Commitments**" shall have the meaning provided in Section 2.14(k).

"**Indebtedness**" of any Person shall mean (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be included as a liability

51

on the balance sheet of such Person, (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) all Indebtedness of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (f) the principal component of all Capitalized Lease Obligations of such Person, (g) the Swap Termination Value of Hedging Obligations of such Person, (h) without duplication, all Guarantee Obligations of such Person, (i) Disqualified Stock of such Person and (j) Receivables Indebtedness of such Person; *provided* that Indebtedness shall not include (i) trade and other ordinary course payables and accrued expenses arising in the ordinary course of business, (ii) deferred or prepaid revenue, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) any Indebtedness defeased by such Person or by any Subsidiary of such Person, (v) contingent obligations incurred in the ordinary course of business and (vi) earnouts or similar obligation until earned, due and payable and not paid for a period of thirty (30) days.

For all purposes hereof, (a) the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venture, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness constitutes Indebtedness for borrowed money, obligations in respect of Capitalized Lease Obligations and obligations evidenced by bonds, debentures, notes, loan agreement or other similar instruments, (b) the Indebtedness of the Borrower and the Restricted Subsidiaries shall exclude all intercompany Indebtedness among the Borrower and its Subsidiaries having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (c) the amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid principal amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**indemnified liabilities**" shall have the meaning provided in Section 13.5.

"**Indemnified Taxes**" shall mean (a) all Taxes imposed on or with respect to any payment made on account of any obligation of any Credit Party under any Credit Document other than Excluded Taxes and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Independent Financial Advisor**" shall mean an accounting firm, appraisal firm, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is disinterested with respect to the applicable transaction.

"**Initial Maturity Date**" shall mean the earlier of (i) May [1], 2026 and (ii) 91 days before the earliest maturity date of any Indebtedness incurred under (x) the Initial Term Loans and any Refinancing Indebtedness in respect thereof or (y) any Indebtedness of the Borrower in an aggregate committed or principal amount in excess of $100,000,000

and any Refinancing Indebtedness in respect thereof, unless, in the case of this clause (ii), on such date and each subsequent day until such Indebtedness (the "**Maturing Indebtedness**") is paid in full, (1) the Borrower is in compliance with the Liquidity Threshold and (2) no Loans are outstanding.

"**Initial Term Loans**" shall mean the "Initial Term Loans" under and as defined in the Term Loan Credit Agreement as in effect on the Closing Date.

"**Insolvent**" shall mean, with respect to any Multiemployer Plan, the condition that such Multiemployer Plan is insolvent within the meaning of Section 4245 of ERISA.

"**Intercompany Subordinated Note**" shall mean the Intercompany Note, dated as of the Closing Date, executed by Holdings, the Borrower and each Restricted Subsidiary, as supplemented from time to time.

"**Interest Period**" shall mean, with respect to any Revolving Credit Loan, the interest period applicable thereto, as determined pursuant to Section 2.9.

"**Inventory**" shall mean (a) all goods intended for sale or lease by a Person, or for display or demonstration, all work in process, all raw materials and other materials and supplies of every nature and description used or which might be used in connection with the manufacturing, printing, packaging, shipping, advertising, selling, leasing or furnishing such goods or otherwise used or consumed in such Person's business and (b) without duplication, all "Inventory" as defined in the UCC.

"**Inventory Reserves**" shall mean such reserves as may be established from time to time by the Administrative Agent, in its Permitted Discretion, (a) with respect to changes in the determination of the saleability of the Eligible Inventory or which reflect such other factors as negatively affect the market value of the Eligible Inventory; (b) to reflect amounts owed to any supplier with retention of title rights and (c) Shrink Reserves.

"**Investment**" shall mean, for any Person: (a) the acquisition (whether for cash, property, services or securities or otherwise) of Stock, Stock Equivalents, bonds, notes, debentures, partnership, limited liability company membership or other ownership interests or other securities of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale); (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such other Person) (including any partnership or joint venture); (c) the entering into of any Guarantee Obligation with respect to Indebtedness; or (d) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; *provided* that, in the event that any Investment is made by the Borrower or any Restricted Subsidiary in any Person through substantially concurrent interim transfers of any amount through one or more other Restricted Subsidiaries, then

53

such other substantially concurrent interim transfers shall be disregarded for purposes of Section 10.5 (excluding, in the case of the Borrower and the Restricted Subsidiaries, intercompany loans, advances and Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business).  The amount of any Investment outstanding at any time shall be the original cost of such Investment reduced by any Returns of the Borrower or a Restricted Subsidiary in respect of such Investment (*provided* that, with respect to amounts received other than in the form of cash or Cash Equivalents, such amount shall be equal to the fair market value of such consideration).

"**Investment Grade Rating**" shall mean a rating equal to or higher than Baa3 (or the equivalent) by Moody's or BBB- (or the equivalent) by S&P.

"**Ireland**" shall mean the island of Ireland, exclusive of Northern Ireland.

"**ISP**" shall mean, with respect to any Letter of Credit, the "International Standby Practices 1998", International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the time of issuance).

"**Issuer Documents**" shall mean with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by an L/C Issuer and Holdings, the Borrower or any of its Subsidiaries or in favor of an L/C Issuer and relating to such Letter of Credit.

"**Joint Lead Arrangers**" shall mean each of Citibank, N.A., RBC Capital Markets, Bank of America, N.A. and Deutsche Bank Securities Inc.

"**Judgment Currency**" shall have the meaning provided in Section 13.20.

"**Junior Indebtedness**" shall have the meaning provided in Section 10.7(a).

"**Junior Lien Intercreditor Agreement**" shall mean, with respect to the incurrence of any Indebtedness that is secured by a Lien on all or part of the Collateral that is junior to the Lien on the Collateral securing the Obligations, a junior lien intercreditor agreement (which intercreditor agreement, with respect to the control of remedies, shall be subject to the ABL Intercreditor Agreement in all respects), with terms that are in substance substantially consistent with the form of Junior Lien Intercreditor Agreement attached to the Term Loan Credit Agreement as Exhibit H as in effect on the Closing Date, or such other form as reasonably agreed between the Borrower and the Administrative Agent.

"**L/C Advance**" shall mean, with respect to each Appropriate Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Pro Rata Share.

"**L/C Borrowing**" shall mean an extension of credit resulting from a drawing under any Letter of Credit that has not been reimbursed on the applicable Honor Date or refinanced as a Revolving Credit Borrowing.

54

"**L/C Credit Extension**" shall mean, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"**L/C Issuer**" shall mean, individually or collectively, as the context may require, Citibank, N.A. and each other Lender listed on Schedule 1.1(a) or that becomes an L/C Issuer in accordance with Section 3.1(l) or 13.6, in each case, in its capacity as an issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder. Any L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such L/C Issuer, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"**L/C Obligations**" shall mean, at any time, the aggregate maximum amount then available to the drawn under all outstanding Letters of Credit (whether or not (i) such maximum amount is then in effect under any such Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Letter of Credit or (ii) the conditions to drawing can then be satisfied) *plus* the aggregate of all Unreimbursed Amounts in respect of Letter of Credit, including all L/C Borrowings in respect of Letter of Credit. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be outstanding in the amount so remaining available to be drawn.

"**L/C Sublimit**" shall mean (a) with respect to the L/C Issuers, taken as a whole, a Dollar Amount equal to $100,000,000 and (b) with respect each L/C Issuer, the amount set forth opposite such L/C Issuer's name on Schedule 1.1(a), or such other amounts as may be agreed to in writing between the Borrower and each L/C Issuer from time to time; *provided*, that neither the total L/C Sublimit under clause (a), nor the aggregate amount of the individual L/C Issuer amounts under clause (b), shall be reduced below $100,000,000 without the written consent of the Borrower; provided, further, that Citibank, N.A. may, at its sole option, elect to reduce its L/C Sublimit to no less than $29,268,293 so long as at such time the total amount of Letters of Credit issued by Citibank, N.A. shall not exceed such amount.

"**LCT Election**" shall have the meaning provided in Section 1.12.

"**LCT Test Date**" shall have the meaning provided in Section 1.12.

"**Lenders**" shall mean the Revolving Credit Lenders and, as the context requires, includes each L/C Issuer and the Swing Line Lender, and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender." "**Lender**" shall refer to any of the foregoing.

"**Lender Default**" shall mean (a) the refusal or failure (which has not been cured) of a Lender to make available its portion of any Borrowing, to fund its portion of any Unreimbursed Amounts or to purchase any participation that it is required to make or fund hereunder, (b) a Lender having notified the Administrative Agent and/or the Borrower

that it does not intend to comply with its funding obligations under this Agreement or has made a public statement to that effect with respect to its funding obligations under this Agreement, (c) a Lender has failed to confirm in a manner reasonably satisfactory to the Administrative Agent, the Borrower, each L/C Issuer and the Swing Line Lender that it will comply with its funding obligations under this Agreement, (d) a Lender being deemed insolvent or becoming the subject of a bankruptcy or insolvency proceeding or has admitted in writing that it is insolvent, *provided* that a Lender Default shall not be in effect with respect to a Lender solely by virtue of the ownership or acquisition of any Stock or Stock Equivalents in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (e) a Lender that has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action.

"**Lending Office**" shall mean, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Letter of Credit**" shall mean any (a) Commercial Letter of Credit, (b) standby letter of credit and (c) indemnity, guarantee, exposure transmittal memorandum or similar form of credit support, in each case issued (or deemed issued) or to be issued by an L/C Issuer pursuant to Section 3.1.

"**Letter of Credit Application**" shall mean an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the relevant L/C Issuer.

"**Letter of Credit Expiration Date**" shall mean the day that is five (5) Business Days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"**Letter of Credit Fee**" shall have the meaning provided in Section 3.1(i).

"**Lien**" shall mean any mortgage, pledge, security interest, hypothecation, collateral assignment, lien (statutory or other) or similar encumbrance (including any conditional sale or other title retention agreement or any Capital Lease).

"**Limited Condition Transaction**" shall mean (i) any Permitted Acquisition or other similar Investment whose consummation is not conditioned on the availability of, or on obtaining, third party financing and (ii) any redemption, repurchase, defeasance, satisfaction and discharge or repayment of Indebtedness requiring irrevocable notice in advance of such redemption, repurchase, defeasance, satisfaction and discharge or repayment.

56

"**Line Cap**" shall mean, at any time, the lesser of (a) the Borrowing Base at such time and (b) the Aggregate Revolving Credit Commitments at such time.

"**Liquidity Threshold**" shall mean Unrestricted Cash (calculated for such purpose to include all such Unrestricted Cash of Holdings) *less* the amount of L/C Obligations outstanding in excess of the aggregate principal amount required to pay in full all obligations outstanding under the applicable Maturing Indebtedness.

"**Loan**" shall mean an extension of credit by a Lender or the Administrative Agent to the Borrower in the form of a Revolving Credit Loan, a Swing Line Loan or a Protective Advance.

"**Management Stockholders**" shall mean the members of management of Avaya Holdings (or any Parent Entity) or its Subsidiaries who are holders of Stock and Stock Equivalents of Avaya Holdings or of any Parent Entity on the Closing Date.

"**Marketable Security**" means any common stock of a Person which is (or will, upon distribution thereof, be) listed on the NYSE, the American Stock Exchange, NASDAQ, any other national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended, or approved for quotation in any system of automated dissemination of quotations of securities prices in the United States or for which there is a recognized market maker or trading market provided any such security or any Designated Offshore Securities Market (as such term is defined in Rule 902(b) under the Securities Act) that (i) is not subject to a contractual lock up or similar agreement restricting transferability, (ii) may be distributed or resold without volume limitation or other restrictions on transfer under Rule 144 under the Securities Act of 1933, as amended (or any successor provision thereof), including without application of paragraphs (c), (e), (f) and (h) of such Rule 144, and (iii) is not subject to any other prohibitions or material restrictions on transfer under applicable securities laws.

"**Master Agreement**" shall have the meaning provided in the definition of the term "Hedging Agreement".

"**Material Adverse Effect**" shall mean a material adverse effect on (a) the business, assets, operations, properties or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, (b) the ability of the Credit Parties, taken as a whole, to perform their payment obligations under the Credit Facilities, taken as a whole or (c) material rights or remedies (taken as a whole) of the Administrative Agent and the Lenders under the Credit Documents, excluding any matters (i) publicly disclosed prior to February 14, 2023, including in any first day pleadings or declarations, in each case in connection with the Case and the events and conditions related and/or leading up to the Case and the effects thereof and (ii) publicly disclosed prior to February 14, 2023 in the annual report of the Borrower and/or any subsequent quarterly or periodic report of the Borrower.

"**Material Subsidiary**" shall mean, at any date of determination, each Restricted Subsidiary (a) whose total assets (when combined with the assets of such

57

Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of the most recent Test Period for which Section 9.1 Financials have been delivered were equal to or greater than 5.0% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (b) whose total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period were equal to or greater than 5.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that at any date of determination, Restricted Subsidiaries that are not Material Subsidiaries shall not, in the aggregate, have (x) total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of such Test Period equal to or greater than 10.0% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (y) total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period equal to or greater than 10.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided,* however, if the Restricted Subsidiary does not meet the conditions in clauses (a) and (b) but meets the condition in clause (x) or (y), then such Restricted Subsidiary (i) shall still constitute a "Material Subsidiary" under Sections 8.1, 9.3, 9.5, 11.5 and 11.7 and (ii) shall not constitute a "Material Subsidiary" under any other section or subsection of this Agreement unless and until the Borrower, on or prior to the next date on which an officer's certificate is due to be delivered pursuant to Section 9.1(c) of this Agreement, designate in writing to the Administrative Agent such Restricted Subsidiary as a "Material Subsidiary". It is agreed and understood that neither Receivables Entity nor Securitization Subsidiary shall be a Material Subsidiary and they shall be excluded from the Consolidated Total Assets and total revenue of the Borrower and its Restricted Subsidiaries.

"**Maturing Indebtedness**" shall have the meaning provided in the definition of the term "Initial Maturity Date".

"**Maturity Date**" shall mean (a) with respect to any Loans or Revolving Credit Commitments, the Initial Maturity Date, (b) with respect to any Swing Line Loan, the Initial Maturity Date and (c) with respect to any FILO Tranche, the maturity date applicable to such FILO Tranche in accordance with the terms hereof, *provided* that in each case, if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

"**Minority Investment**" shall mean any Person (other than a Subsidiary) in which the Borrower or any Restricted Subsidiary owns Stock or Stock Equivalents, including any joint venture (regardless of form of legal entity).

"**Monthly Booking Value**" shall mean, with respect to a Subscription Contract, the total contract value divided by the term of the contract (in number of months).

"**Monthly Borrowing Base Certificate**" shall have the meaning provided in Section 9.1(k).

58

"**Moody's**" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"**Mortgage**" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in respect of that Mortgaged Property, in a form to be mutually agreed with the Administrative Agent.

"**Mortgaged Property**" shall mean all Real Estate (i) set forth on Schedule 1.1(e) and (ii) with respect to which a Mortgage is required to be granted pursuant to Section 9.12.

"**Multiemployer Plan**" shall mean a plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA (i) to which any of the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate is then making or has an obligation to make contributions or (ii) with respect to which the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate could incur liability pursuant to Title IV of ERISA.

"**Narrative Report**" shall mean, with respect to the financial statements for which such narrative report is required, a management's discussion and analysis of the financial condition and results of operations of the Borrower and its consolidated Subsidiaries for the applicable period to which such financial statements relate.

"**Net Cash Proceeds**" shall mean, with respect to the incurrence or issuance of any Indebtedness or the issuance of any Stock or Stock Equivalent or capital contribution, the excess, if any, of (a) the sum of cash and Cash Equivalents received in connection with such incurrence or issuance over (b) reasonable and customary fees, commissions, expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums and recording charges, transfer taxes, deed or mortgage recording taxes and other customary expenses and brokerage, consultant and other customary fees), issuance costs, premiums, discounts and other costs paid by the Borrower or any Restricted Subsidiary in connection with such incurrence or issuance.

"**Net Orderly Liquidation Value**" shall mean, with respect to Inventory of any Person, the orderly liquidation value thereof, net of all costs of liquidation thereof, as based upon the most recent Inventory appraisal conducted by a qualified third-party appraisal company acceptable to the Administrative Agent in its reasonable discretion in accordance with this Agreement and expressed as a percentage of Cost of such Inventory.

"**New Holdings**" shall have the meaning provided in the definition of "Holdings".

"**New Project**" shall mean (x) each plant, facility, branch, office, business unit, data center, warehouse or distribution center which is either a new plant, facility, branch, office, business unit, modernization of an existing plant, facility, branch, office, business unit, data center, warehouse or distribution center owned or operated by the Borrower or the Subsidiaries and (y) each creation (in one or a series of related transactions) of a business unit, marketplace, e-commerce platform, channel, product line,

division, segment, class offering or service offering or each expansion (in one or a series of related transactions) of business into a new market or consumer base or through a new distribution method or channel, in each case, which is under development or otherwise in process.

"**Non-Consenting Lender**" shall have the meaning provided in Section 13.7(b).

"**Non-Defaulting Lender**" shall mean and include each Lender other than a Defaulting Lender.

"**Nonrenewal Notice Date**" shall have the meaning provided in Section 3.1(b)(iii).

"**Non-U.S. Lender**" shall mean any Agent or Lender that is not, for U.S. federal income tax purposes, (a) an individual who is a citizen or resident of the U.S., (b) a corporation, partnership or entity treated as a corporation or partnership created or organized in or under the laws of the U.S., or any political subdivision thereof, (c) an estate whose income is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the U.S. is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of such trust or a trust that has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

"**Notice of Borrowing**" shall mean a written request of the Borrower in accordance with the terms of Section 2.3 and substantially in the form of Exhibit A or such other form as shall be approved by the Administrative Agent (acting reasonably).

"**Notice of Conversion or Continuation**" shall mean a request of the Borrower in accordance with the terms of Section 2.3 and substantially in the form of Exhibit A or such other form as shall be approved by the Administrative Agent (acting reasonably).

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, the Borrower and the other Credit Parties arising under any Credit Document or otherwise with respect to any Loan to the Borrower, any L/C Obligations, or any Cash Management Obligations of the Borrower and its Subsidiaries under Secured Cash Management Agreements and Secured Specified Cash Management Agreements, or Hedging Obligations of the Borrower and its Subsidiaries under Secured Hedging Agreements and Secured Specified Hedging Agreements (and in each case including in respect of any Guarantee thereof made by a Credit Party), whether direct or indirect (including those acquired by assumption), absolute or Obligations, due or to become due, now existing or hereafter arising and including interest, premiums, and fees that accrue after the commencement by or against any Credit Party of any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest, premiums, and fees are allowed claims in such proceeding, in each case, other than Excluded Swap Obligations; *provided* that any such

60

Cash Management Obligations under Secured Specified Cash Management Agreements with any Specified Cash Management Bank described in clause (i) of the definition thereof and any such Hedging Obligations under Secured Specified Hedging Agreements with any Specified Hedge Bank described in clause (i) of the definition thereof shall constitute "Obligations" solely from the Closing Date to the date that is 90 days following the Closing Date (or such later date as may be agreed to by the Administrative Agent in its discretion). Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Credit Documents) (i) include the obligation (including Guarantee Obligations) to pay principal, interest, charges, expenses, fees, premiums, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document and (ii) exclude for any Credit Party, notwithstanding any term or condition in this Agreement or any other Credit Documents, its Excluded Swap Obligations.

"**Organizational Documents**" shall mean, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and, if applicable, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" shall mean any and all present or future stamp, registration, documentary or other similar Taxes arising from any payment made or required to be made under this Agreement or any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document except any such Taxes that are Taxes imposed on any Agent or any Lender as a result of any current or former connection between such Agent or Lender and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent or Lender having executed, delivered or performed its obligations or received a payment under, or having been a party to or having enforced, this Agreement or any other Credit Document) imposed with respect to an assignment (other than an assignment made pursuant to Section 13.7 or Section 2.12).

"**Outstanding Amount**" shall mean (a) with respect to the Revolving Credit Loans and Swing Line Loans on any date, the Dollar Amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Credit Loans (including any refinancing of outstanding Unreimbursed Amounts under Letters of Credit or L/C Credit Extensions as a Revolving Credit Borrowing) and Swing Line Loans, as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the Dollar Amount thereof on such date after giving effect to any related L/C Credit Extension occurring on such date and any other changes thereto as of such date, including

61

as a result of any reimbursements of outstanding Unreimbursed Amounts under related Letters of Credit (including any refinancing of outstanding Unreimbursed Amounts under related Letters of Credit or related L/C Credit Extensions as a Revolving Credit Borrowing) or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"**Overnight Rate**" shall mean, for any day, the greater of (i) the Federal Funds Effective Rate and (ii) an overnight rate determined by the Administrative Agent, an L/C Issuer or the Swing Line Lender, as applicable, in accordance with banking industry rules on interbank compensation.

"**Parent Entity**" shall mean any direct or indirect parent of Avaya Holdings.

"**Participant**" shall have the meaning provided in Section 13.6(c).

"**Participant Register**" shall have the meaning provided in Section 13.6(c)(iii).

"**Participating Receivables Grantor**" shall mean the Borrower or any Restricted Subsidiary that is or that becomes a participant or originator in a Permitted Receivables Financing.

"**Patriot Act**" shall have the meaning provided in Section 13.18.

"**Payment Conditions**" shall mean, at any time of determination with respect to any transaction, that:

(a)     no Specified Event of Default exists or would arise after giving effect to such transaction,

(b)     the Fixed Charge Coverage Ratio for the most recently ended Test Period shall not be less than 1.00 to 1.00 on a Pro Forma Basis after giving effect to such transaction; *provided*, that this clause (b) does not apply if the average Specified Excess Availability for 20 consecutive calendar days ending on the date of such transaction, and the Specified Excess Availability on the date of such transaction, shall be, in each case, (i) in the case of Section 10.6(p) or Section 10.7(a)(iii)(1)(II), in excess of the greater of (x) 20.0% of the Line Cap and (y) $21,140,000 and (ii) in the case of Section 10.1(ff) or 10.5(ii), in excess of the greater of (x) 17.5% of the Line Cap and (y) $17,937,500, in each case, calculated on a Pro Forma Basis immediately after giving effect to such transaction, and

(c)     the average Specified Excess Availability for 20 consecutive calendar days ending on the date of such transaction, and the Specified Excess Availability on the date of such transaction, shall be, in each case, (i) in the case of Section 10.6(p) or 10.7(a)(iii)(1)(II), in excess of the greater of (x) 15.0% of the Line Cap and (y) $15,375,000 and (ii) in the case of Section 10.1(ff) or 10.5(ii), in excess of the

62

greater of (x) 12.5% of the Line Cap and (y) $12,812,500, in each case, calculated on a Pro Forma Basis immediately after giving effect to such transaction.

"**Payment in Full**" or "**Paid in Full**" shall mean the time at which no Lender or L/C Issuer shall have (a) any Commitments, any Loan or other Obligations unpaid, unsatisfied or outstanding (other than in respect of Hedging Obligations in respect of Secured Hedging Agreements and Secured Specified Hedging Agreements, Cash Management Obligations in respect of any Secured Cash Management Agreements and Secured Specified Cash Management Obligations, and contingent obligations, indemnities and expenses related thereto that are not then payable or in existence) as a result of all such Loans and other Obligations having been paid in full in cash and (b) any Letters of Credit outstanding that (i) have not been Cash Collateralized in accordance with the terms of this Agreement or (ii) have not had other arrangements made with respect to them that are satisfactory to the L/C Issuer.

"**Payment Recipient**" shall have the meaning provided in Section 13.27(a).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Pension Plan**" shall mean any employee pension benefit plan (as defined in Section 3(2) of ERISA, but excluding any Multiemployer Plan) which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by the Borrower, any Subsidiary or ERISA Affiliate or with respect to which the Borrower, any Subsidiary or any ERISA Affiliate could incur liability pursuant to Title IV of ERISA.

"**Perfection Certificate**" shall mean a perfection certificate of the Borrower in any form approved by the Administrative Agent (acting reasonably).

"**Periodic Term SOFR Determination Day**" shall have the meaning specified in the definition of "Term SOFR".

"**Permitted Acquisition**" shall mean the acquisition, by merger, consolidation, amalgamation or otherwise, by the Borrower or any Restricted Subsidiary of assets (including assets constituting a business unit, line of business or division) or Stock or Stock Equivalents, so long as (a) if such acquisition involves any Stock or Stock Equivalents, such acquisition shall result in the issuer of such Stock or Stock Equivalents and its Subsidiaries becoming a Restricted Subsidiary and a Subsidiary Guarantor, to the extent required by Section 9.11 or designated as an Unrestricted Subsidiary pursuant to the terms hereof, (b) such acquisition shall result in the Collateral Agent, for the benefit of the applicable Secured Parties, being granted a security interest in any Stock, Stock Equivalent or any assets so acquired, to the extent required by Section 9.11, Section 9.12 and/or the Security Agreement, (c) after giving effect to such acquisition, the Borrower and the Restricted Subsidiaries shall be in compliance with Section 9.15 and (d) no Event of Default under Section 11.1 or 11.5 (solely with respect to the Borrower) shall have occurred and be continuing.

63

"**Permitted Discretion**" shall mean the Administrative Agent's reasonable credit judgment (from the perspective of an asset-based lender) in establishing reserves or additional eligibility criteria, exercised in good faith in accordance with customary business practices for similar asset based lending facilities, based upon its consideration of any factor that it reasonably believes (i) could materially adversely affect the quantity, quality, mix or value of Collateral (including any Applicable Laws that may inhibit collection of a receivable), the enforceability or priority of the Administrative Agent's Liens thereon, or the amount that the Administrative Agent and the other Secured Parties could receive in liquidation of any Collateral; (ii) indicates that any collateral report or financial information delivered by the Borrower or any Guarantor is incomplete, inaccurate or misleading in any material respect; or (iii) creates an Event of Default. In exercising such judgment, the Administrative Agent may consider any factors that could materially increase the credit risk of lending to the Borrower on the security of the Collateral. Notwithstanding anything to the contrary, the circumstances, conditions, events or contingencies existing or arising prior to the Closing Date and, in each case, disclosed in writing in any field examination or inventory appraisal delivered to the Administrative Agent in connection herewith or otherwise known to the Administrative Agent, in either case, prior to the Closing Date (other than with respect to such circumstances, conditions, events or contingencies disclosed by the Administrative Agent to the Borrower for which no Reserves have been taken on the Closing Date), shall not be the basis for any establishment of any Reserves or additional eligibility criteria after the Closing Date, unless such circumstances, conditions, events or contingencies shall have changed in a material and adverse respect since the Closing Date. Reserves shall not duplicate eligibility criteria contained in the definition of "Eligible Inventory", "Eligible Accounts", "Eligible Borrowing Base Cash" and related definitions and vice versa, or reserves or criteria deducted in computing the Net Orderly Liquidation Value of Eligible Inventory and vice versa.

"**Permitted Encumbrances**" shall mean:

(a)     Liens for taxes, assessments or governmental charges or claims (including Liens imposed by the PBGC or similar Liens) not yet delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP or that are not required to be paid pursuant to Section 9.4;

(b)     Liens in respect of property or assets of the Borrower or any Restricted Subsidiary imposed by Applicable Law, such as carriers', landlords', construction contractors', warehousemen's and mechanics' Liens and other similar Liens, arising in the ordinary course of business, in respect of amounts not more than 60 days overdue and not being contested so long as such Liens arise in the ordinary course of business and do not individually or in the aggregate have a Material Adverse Effect;

(c)     Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 11.9;

(d)      Liens incurred or deposits made in connection with workers' compensation, unemployment insurance, employee benefit and pension liability and other types of social security or similar legislation, or to secure the performance of tenders, statutory obligations, trade contracts (other than for payment of Indebtedness), leases, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, surety, performance and return-of-money bonds and other similar obligations, in each case incurred in the ordinary course of business or otherwise constituting Investments permitted by Section 10.5;

(e)      ground leases or subleases, licenses or sublicenses in respect of Real Estate on which facilities owned or leased by the Borrower or any of the Restricted Subsidiaries are located;

(f)      easements, rights-of-way, licenses, reservations, servitudes, permits, conditions, covenants, rights of others, restrictions (including zoning restrictions), royalty interests and leases, minor defects, exceptions or irregularities in title or survey, encroachments, protrusions and other similar charges or encumbrances (including those to secure health, safety and environmental obligations), which do not interfere in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(g)      with respect to any Mortgaged Property, any exception on the title policy issued and matters shown on the Survey delivered which do not in the aggregate materially adversely affect the value of said property or materially impair its use in the operation of the business of the Borrower or any of the Restricted Subsidiaries;

(h)      any interest or title of a lessor, sublessor, licensor, sublicensor or grantor of an easement or secured by a lessor's, sublessor's, licensor's, sublicensor's interest or grantor of an easement under any lease, sublease, license, sublicense or easement to be entered into by the Borrower or any Restricted Subsidiary as lessee, sublessee, licensee, grantee or sublicensee to the extent permitted or not prohibited by this Agreement;

(i)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)      leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole or constituting Disposition permitted under Section 10.4;

(k)      Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Borrower or any Restricted Subsidiary;

(l)      any zoning, land use, environmental or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any Real Estate that does not materially interfere with the ordinary conduct of the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(m)     any Lien arising by reason of deposits with or giving of any form of security to any Governmental Authority for any purpose at any time as required by Applicable Law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Borrower or any Restricted Subsidiary to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(n)     rights reserved to or vested in any Governmental Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of Applicable Law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(o)     Liens arising under any obligations or duties affecting any of the property, the Borrower or any Restricted Subsidiary to any Governmental Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(p)     rights reserved to or vested in any Governmental Authority to use, control or regulate any property of such Person, which do not materially impair the use of such property for the purposes for which it is held;

(q)     any obligations or duties, affecting the property of the Borrower or any Restricted Subsidiary, to any Governmental Authority with respect to any franchise, grant, license or permit;

(r)     a set-off or netting rights granted by the Borrower or any Restricted Subsidiary pursuant to any Hedging Agreements solely in respect of amounts owing under such agreements;

(s)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 10.5; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreement;

(t)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(u)     Liens on cash and Cash Equivalents that are earmarked to be used to satisfy or discharge Indebtedness; *provided* that (i) such cash and/or Cash Equivalents are deposited into an account from which payment is to be made, directly or indirectly, to the Person or Persons holding the Indebtedness that is to be satisfied or discharged, (ii) such Liens extend solely to the account in which such cash and/or Cash Equivalents are deposited and are solely in favor of the Person or Persons holding the Indebtedness (or any agent or trustee for such Person or Persons) that is to be satisfied or discharged, and (iii) the satisfaction or discharge of such Indebtedness is expressly permitted hereunder;

66

(v)     with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by Applicable Laws;

(w)     Liens on Stock of an Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary;

(x)     Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) or attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, and (iii) in favor of banking or other financial institutions or other electronic payment service providers arising as a matter of law or customary contract or general standards and conditions of the account banks encumbering deposits, including deposits in "pooled deposit" or "sweep" accounts (including the right of set-off) and which are within the general parameters customary in the banking or finance industry;

(y)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business permitted or not prohibited by this Agreement;

(z)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 10.5;

(aa)     any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Borrower or any Restricted Subsidiary;

(bb)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(cc)     Liens (i) on any cash earnest money deposits or cash advances made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted under this Agreement, (ii) on other cash advances in favor of the seller of any property to be acquired in an Investment or other acquisition permitted hereunder to be applied against the purchase price for such Investment or other acquisition, (iii) consisting of an agreement to Dispose of any property pursuant to a Disposition permitted hereunder (or reasonably expected to be so permitted by the Borrower at the time such Lien was granted) and (iv) on cash advances in favor of the purchaser of any property to be disposed of in a Disposition permitted hereunder to secure indemnity, fees and other seller obligations;

67

(dd)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(ee)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods in the ordinary course of business or consistent with past practice;

(ff)     any restrictions on any Stock or Stock Equivalents or other joint venture interests of the Borrower or any Restricted Subsidiary providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such Stock or Stock Equivalents or interest of such Person, if a security interest or other Lien is created on such Stock or Stock Equivalents or interest as a result thereof and other similar Liens; and

(gg)     Liens securing Indebtedness or other obligations (i) of the Borrower or any Restricted Subsidiary in favor of a Credit Party and (ii) of any other Restricted Subsidiary that is not a Credit Party in favor of any other Restricted Subsidiary that is not a Credit Party.

"**Permitted Holders**" means, collectively, (i) the Management Stockholders (including any Management Stockholders holding Stock and Stock Equivalents through an equityholding vehicle), (ii) any Person who is acting solely as an underwriter in connection with a public or private offering of Stock and Stock Equivalents of any Parent Entity or Avaya Holdings, acting in such capacity, (iii) any Person, together with its Affiliates and any accounts, funds or partnerships managed, advised, sub-advised, sub-managed by or associated with any of the foregoing or any of their respective Affiliates, holding more than 10% of the total Voting Stock of Avaya Holdings on the Closing Date and any of their respective Affiliates, (iv) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing, any Permitted Plan or any Person or group that becomes a Permitted Holder specified in the last sentence of this definition are members and any member of such group; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, Persons referred to in subclauses (i) through (iii), collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of Holdings or any Parent Entity held by such group and (v) any Permitted Plan.

"**Permitted Other Debt**" shall mean, collectively, Permitted Other Loans and Permitted Other Notes.

"**Permitted Other Loans**" shall mean senior secured or unsecured loans (which loans, if secured, may either be secured *pari passu* with the Term Loan Obligations or may be secured by a Lien ranking junior to the Lien securing the Term Loan Obligations but which in all cases shall be secured by Liens on the ABL Priority Collateral on a junior

basis relative to the Liens on such Collateral securing the Obligations), "mezzanine" loans or subordinated loans, in either case issued by the Borrower or a Guarantor (unless permitted to be incurred by a non-Credit Party under Section 10.1(k)), (a) if such Permitted Other Loans are incurred (and for the avoidance of doubt, not "assumed"), the scheduled final maturity and the Weighted Average Life to Maturity of which are no earlier than the Initial Maturity Date or, in the case of any Permitted Other Loans that are issued or incurred in exchange for, or which modify, replace, refinance, refund, renew, restructure or extend any other Indebtedness permitted by Section 10.1, no earlier than the scheduled final maturity and Weighted Average Life to Maturity of such exchanged, modified, replaced, refinanced, refunded, renewed, restructured or extended Indebtedness; *provided* that the requirements of the foregoing clause (a) shall not apply to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with such requirements, (b) the covenants (excluding, for the avoidance of doubt, any pricing, fee, prepayment premiums, optional prepayment or redemption terms) and events of default of which, taken as a whole, are not materially more restrictive to the Borrower and the Restricted Subsidiaries than the terms hereunder unless (1) Lenders hereunder also receive the benefit of such more restrictive terms, (2) such terms reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) (it being understood that to the extent that any financial maintenance covenant is included for the benefit of any Permitted Other Loans, such financial maintenance covenant shall be added for the benefit of the Lenders at the time of incurrence of such Permitted Other Loans (except for any financial maintenance covenants applicable only to periods after the Maturity Date, as determined at the time of issuance or incurrence of such Permitted Other Loans)) or (3) any such provisions apply after the Maturity Date as determined at the time of issuance or incurrence of such Permitted Other Loans, (c) unless permitted to be incurred by a non-Credit Party under Section 10.1(k), of which no Subsidiary of the Borrower (other than a Guarantor) is an obligor and (d) if secured, unless permitted to be incurred by a non- Credit Party under Section 10.1(k), are not secured by any assets of the Credit Parties other than all or any portion of the Collateral.

"**Permitted Other Notes**" shall mean senior secured or unsecured notes (which notes, if secured, may either be secured *pari passu* with the Term Loan Obligations or may be secured by a Lien ranking junior to the Lien securing the Term Loan Obligations but which in all cases shall be secured by Liens on the ABL Priority Collateral on a junior basis relative to the Liens on such Collateral securing the Obligations), mezzanine notes or subordinated notes, in either case issued by the Borrower or a Guarantor (unless permitted to be incurred by a non-Credit Party under Section 10.1(k)), (a) if such Permitted Other Notes are incurred (and for the avoidance of doubt, not "assumed"), the terms of which do not provide for any scheduled repayment, mandatory redemption or sinking fund obligations (other than customary scheduled principal amortization payments, customary offers to repurchase upon a change of control, asset sale or casualty or condemnation event, customary acceleration rights after an event of default) prior to, at the time of incurrence, the Initial Maturity Date or, in the case of any Permitted Other Notes that are issued or incurred in exchange for, or which modify, replace, refinance, refund, renew or extend any other Indebtedness permitted by Section 10.1, prior to the scheduled final maturity date of such exchanged, modified, replaced, refinanced, refunded, renewed or extended

69

Indebtedness (other than customary scheduled principal amortization payments, customary offers to repurchase upon a change of control, asset sale or casualty or condemnation event, customary acceleration rights after an event of default); *provided* that the requirements of the foregoing clause (a) shall not apply to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with such requirements, (b) the covenants (excluding, for the avoidance of doubt, any pricing, fee, prepayment premiums, optional prepayment or redemption terms) and events of default of which, taken as a whole, are not materially more restrictive to the Borrower and the Restricted Subsidiaries than the terms hereunder unless (1) Lenders also receive the benefit of such more restrictive terms, (2) such terms reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) (it being understood that to the extent that any financial maintenance covenant is included for the benefit of any Permitted Other Notes, such financial maintenance covenant shall be added for the benefit of the Lenders hereunder at the time of incurrence of such Permitted Other Notes (except for any financial maintenance covenants applicable only to periods after the Maturity Date, as determined at the time of issuance or incurrence of such Permitted Other Notes)) or (3) any such provisions apply after the Maturity Date at the time of issuance or incurrence of such Permitted Other Notes, (c) unless permitted to be incurred by a non-Credit Party under Section 10.1(k), of which no Subsidiary of the Borrower (other than a Guarantor) is an obligor and (d) if secured, unless permitted to be incurred by a non- Credit Party under Section 10.1(k), are not secured by any assets of the Credit Parties other than all or any portion of the Collateral.

"**Permitted Plan**" shall mean any employee benefits plan of Holdings or any of its Affiliates and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan.

"**Permitted Receivables Financing**" shall mean any of one or more receivables financing programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities and other customary forms of support, in each case made in connection with such facilities) to the Borrower and the Restricted Subsidiaries (other than a Receivables Entity) providing for the sale, conveyance, or contribution to capital of Receivables Facility Assets by Participating Receivables Grantors in transactions purporting to be sales of Receivables Facility Assets to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Entity that in turn funds such purchase by the direct or indirect sale, transfer, conveyance, pledge, or grant of participation or other interest in such Receivables Facility Assets to a Person that is not a Restricted Subsidiary.

"**Permitted Reorganization**" shall mean re-organizations and other activities related to tax planning and re-organization, excluding transactions described in Section 10.4(g), so long as, after giving effect thereto, the security interest of the Lenders in the Collateral or the value of the Guarantee, taken as a whole, is not impaired as determined by the Borrower and the Administrative Agent.

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"**Petition Date**" shall have the meaning specified in the Recitals to this Agreement.

"**Plan**" shall have the meaning provided in the Recitals to this Agreement.

"**Platform**" shall have the meaning provided in Section 13.17(c).

"**Post-Transaction Period**" shall mean, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the eighth full consecutive fiscal quarter immediately following the date on which such Specified Transaction is consummated.

"**Prepetition ABL Credit Agreement**" shall mean that certain ABL Credit Agreement, dated as of December 15, 2017, by and among the Borrower, Holdings, the other borrowers and guarantors party thereto, the lenders party thereto, the lending institutions party thereto as L/C Issuers and Swing Line Lenders and Citibank, N.A., as Administrative Agent and Collateral Agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to February 14, 2023.

"**Previous Holdings**" shall have the definition provided in the definition of "Holdings".

"**Pro Forma Adjustment**" shall mean, for any Test Period that includes all or any part of a fiscal quarter included in any Post-Transaction Period, with respect to the Acquired EBITDA of the applicable Pro Forma Entity or the Consolidated EBITDA of the Borrower, the pro forma increase or decrease in such Acquired EBITDA or such Consolidated EBITDA (including as the result of any "run-rate" synergies, operating expense reductions and improvements and cost savings), as the case may be, projected by the Borrower in good faith as a result of (a) actions taken or with respect to which substantial steps have been taken or are expected to be taken, prior to or during such Post-Transaction Period for the purposes of realizing cost savings or (b) any additional costs incurred prior to or during such Post-Transaction Period, in each case in connection with the combination of the operations of such Pro Forma Entity with the operations of the Borrower and the Restricted Subsidiaries; *provided* that (A) at the election of the Borrower, such Pro Forma Adjustment shall not be required to be determined for any Pro Forma Entity to the extent the aggregate consideration paid in connection with such acquisition was less than $50,000,000 or the aggregate Pro Forma Adjustment would be less than $50,000,000 and (B) so long as such actions are taken, or to be taken, prior to or during such Post-Transaction Period or such costs are incurred prior to or during such Post-Transaction Period, as applicable, it may be assumed, for purposes of projecting such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, that the applicable amount of such "run rate" synergies, operating expense reductions and improvements and cost savings and other adjustments will be realizable

71

during the entirety of such Test Period, or the applicable amount of such additional "run rate" synergies, operating expense reductions and improvements and cost savings and other adjustments, as applicable, will be incurred during the entirety of such Test Period; *provided*, *further*, that any such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, shall be without duplication for "run rate" synergies, operating expense reductions and improvements and cost savings and other adjustments or additional costs already included in such Acquired EBITDA or such Consolidated EBITDA, as the case may be, for such Test Period.

"**Pro Forma Basis**" and "**Pro Forma Effect**" shall mean, with respect to compliance with any test or covenant hereunder, that (A) to the extent applicable, the Pro Forma Adjustment shall have been made and (B) all Specified Transactions and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable period of measurement in such test or covenant: (a) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, (i) in the case of a Disposition of all or substantially all Stock in any Subsidiary of the Borrower or any division, product line, or facility used for operations of the Borrower or any Subsidiary of the Borrower, shall be excluded, and (ii) in the case of a Permitted Acquisition or Investment described in the definition of "Specified Transaction", shall be included, (b) any retirement or repayment of Indebtedness, and (c) any incurrence or assumption of Indebtedness by the Borrower or any Restricted Subsidiary in connection therewith (it being agreed that (x) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness as at the relevant date of determination, (y) interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by an Authorized Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP and (z) interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate as the Borrower or any applicable Restricted Subsidiary may designate); *provided* that, without limiting the application of the Pro Forma Adjustment pursuant to (A) above (but without duplication thereof), the foregoing pro forma adjustments may be applied to any such test or covenant solely to the extent that such adjustments are consistent with the definition of Consolidated EBITDA and give effect to events (including operating expense reductions) that are (i) (x) directly attributable to such transaction and (y) reasonably identifiable and factually supportable in the good faith judgment of the Borrower or (ii) otherwise consistent with the definition of Pro Forma Adjustment.

"**Pro Forma Entity**" shall have the meaning provided in the definition of the term "Acquired EBITDA".

"**Projections**" shall have the meaning provided in Section 9.1(g).

72

"**Pro Rata Share**" shall mean, with respect to each Lender at any time, with respect to Revolving Credit Commitments, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Revolving Credit Commitments of such Lender at such time and the denominator of which is the amount of the Aggregate Revolving Credit Commitments at such time; *provided* that, if any Revolving Credit Commitments have been terminated, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"**Prohibited Transaction**" shall have the meaning assigned to such term in Section 406 of ERISA or Section 4975(c) of the Code.

"**Protective Advance**" shall have the meaning specified in Section 2.1(c).

"**PTE**" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Reporting Entity**" shall mean an entity that (i) complies with the reporting obligations under U.S. securities laws, (ii) is designated by the Borrower as a "Public Reporting Entity" and (iii) whose consolidated financial results include the financial results of the Borrower and its consolidated subsidiaries and customary reconciliations to eliminate the financial results of entities other than the Borrower and its consolidated subsidiaries.

"**QFC**" shall have the meaning provided in Section 13.23(b).

"**QFC Credit Support**" shall have the meaning provided in Section 13.23.

"**Qualified Securitization Financing**" shall mean any Securitization Facility (and any guarantee of such Securitization Facility), that meets the following conditions:  (i) the Borrower shall have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the Restricted Subsidiaries; (ii) all sales or contribution of Securitization Assets and related assets by the Borrower or any Restricted Subsidiary to the Securitization Subsidiary or any other Person are made at fair market value (as determined in good faith by the Borrower); (iii) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Borrower) and may include Standard Securitization Undertakings; and (iv) the obligations under such Securitization Facility are nonrecourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Borrower or any Restricted Subsidiary (other than a Securitization Subsidiary).

"**Real Estate**" shall mean any interest in land, buildings and improvements owned, leased or otherwise held by any Credit Party, but excluding all operating fixtures and equipment.

73

"**Receivables Entity**" shall mean any Person formed solely for the purpose of (i) facilitating or entering into one or more Permitted Receivables Financings, and (ii) in each case, engaging in activities reasonably related or incidental thereto.

"**Receivables Facility Assets**" shall mean currently existing and hereafter arising or originated Accounts, Payment Intangibles and Chattel Paper (as each such term is defined in the UCC) owed or payable to any Participating Receivables Grantor, and to the extent related to or supporting any Accounts, Chattel Paper or Payment Intangibles, or constituting a receivable, all General Intangibles (as each such term is defined in the UCC) and other forms of obligations and receivables owed or payable to any Participating Receivables Grantor, including the right to payment of any interest, finance charges, late payment fees or other charges with respect thereto (the foregoing, collectively, being "**receivables**"), all of such Participating Receivables Grantor's rights as an unpaid vendor (including rights in any goods the sale of which gave rise to any receivables), all security interests or liens and property subject to such security interests or liens from time to time purporting to secure payment of any receivables or other items described in this definition, all guarantees, letters of credit, security agreements, insurance and other agreements or arrangements from time to time supporting or securing payment of any receivables or other items described in this definition, all customer deposits with respect thereto, all rights under any contracts giving rise to or evidencing any receivables or other items described in this definition, and all documents, books, records and information (including computer programs, tapes, disks, data processing software and related property and rights) relating to any receivables or other items described in this definition or to any obligor with respect thereto and any other assets customarily transferred together with receivables in connection with a non-recourse accounts receivable factoring arrangement and which are sold, conveyed assigned or otherwise transferred or pledge in connection with a Permitted Receivables Financing, and all proceeds of the foregoing.  Notwithstanding anything herein to the contrary, ABL Priority Collateral shall not constitute Receivables Facility Assets.

"**Receivables Indebtedness**" shall mean, at any time, with respect to any receivables, securitization or similar facility (including any Permitted Receivables Financing or any Qualified Securitization Financing but excluding any account receivable factoring facility entered into incurred in the ordinary course of business), the aggregate principal, or stated amount, of the "indebtedness", fractional undivided interests (which stated amount may be described as a "net investment" or similar term reflecting the amount invested in such undivided interest) or other securities incurred or issued pursuant to such receivables, securitization or similar facility, at such time, in each case outstanding at such time.

"**Receivables Reserves**" shall mean, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves, subject to Section 2.17 as the Administrative Agent in the Administrative Agent's Permitted Discretion determines as being appropriate with respect to the determination of the collectability in the ordinary course of business of Eligible Accounts, including, without limitation, the Dilution Reserve, reconciliation of variances between the general ledger and the receivables aging, and unapplied cash received.

74

"**Redemption Notice**" shall have the meaning provided in Section 10.7(a).

"**Refinancing Increased Amount**" shall have the meaning provided in the definition of Refinancing Indebtedness.

"**Refinancing Indebtedness**" shall mean, with respect to any Person, any modification, refinancing, refunding, renewal, replacement, exchange or extension of any Indebtedness of such Person (including in respect of any previously incurred Refinancing Indebtedness); *provided* that (a) unless incurred by utilizing another basket under Section 10.1, the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, replaced, exchanged or extended except by an amount (the "**Refinancing Increased Amount**") equal to unpaid accrued interest and premium thereon (including tender premiums) *plus* other reasonable amounts paid, and fees and expenses (including upfront fees and original issue discount) reasonably incurred, in connection with such modification, refinancing, refunding, renewal, replacement, exchange or extension *plus* an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Refinancing Indebtedness in respect of Indebtedness permitted pursuant to Section 10.1(h) or (i) or with respect to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with the requirements in this clause (b), such modification, refinancing, refunding, renewal, replacement, exchange or extension has a scheduled final maturity date and, with respect to term loans or notes, a Weighted Average Life to Maturity, as applicable, equal to or later than the scheduled final maturity date and the Weighted Average Life to Maturity, as applicable, of the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended (except by virtue of amortization or prepayment of such Indebtedness prior to the time of incurrence of such Refinancing Indebtedness), (c) with respect to a Refinancing Indebtedness in respect of Junior Indebtedness, (i) at the time thereof, no Event of Default shall have occurred and be continuing, (ii) if such Junior Indebtedness is subordinated to the Obligations in right of payment, the Refinancing Indebtedness is subordinated to the Obligations and the applicable Guarantee at least to the same extent as (and on terms that are at least as favorable to the Secured Parties as those contained in) such Junior Indebtedness so refinanced, (iii) if such Junior Indebtedness is unsecured, the Refinancing Indebtedness is unsecured, (iv) if such Indebtedness is subordinated to the Obligations with respect to lien priority with respect to any of the Collateral, the Refinancing Indebtedness is subordinated to the Obligations with respect to lien priority to the same extent (provided that if such Indebtedness is secured by Liens that are senior to the Liens over the Term Priority Collateral securing the Obligations, the Refinancing Indebtedness may be secured by Liens that are senior or junior to the Liens over the Term Priority Collateral securing the Obligations) and (v) unless incurred by utilizing another basket under Section 10.1, such modification, refinancing, refunding, renewal, replacement, exchange or extension is incurred by the Persons who are the obligors of the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended, (d) if the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended was subject to any intercreditor agreement (including any Applicable Intercreditor Agreement), to the extent the Refinancing Indebtedness is secured by any Collateral, the holders thereof (or their representative on their behalf) shall become

party to each Applicable Intercreditor Agreement, (e) [reserved] and (f) in the case of a Refinancing Indebtedness of any Indebtedness permitted pursuant to Section 10.1(c), (k), (v) or (w), such Indebtedness meets the requirements of the definition of Permitted Other Loans or Permitted Other Notes, as applicable.

"**Register**" shall have the meaning provided in Section 13.6(b)(iii).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates (or, for purposes of clauses (A) and (B) of the last proviso of Section 13.5 and the penultimate paragraph of Section 13.5, such Person's controlled Affiliates) and the partners, managers, members, directors, officers, employees, agents (including sub-agents and co-agents), representatives, trustees, attorneys, attorneys-in-fact, and advisors of such Person and of such Person's Affiliates, and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"**Relevant Governmental Body**" shall mean, with respect to a Benchmark Replacement in respect of Obligations, interest, fees, commissions or other amounts denominated in, or calculated with respect to, Dollars, the Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board or the Federal Reserve Bank of New York, or any successor thereto.

"**Reportable Event**" shall mean an event described in Section 4043 of ERISA and the regulations thereunder, other than any event as to which the thirty day notice period has been waived.

"**Required Lenders**" shall mean, at any date, Lenders holding more than 50% of the sum of (a) the Revolving Credit Exposure (with each Lender's participations in L/C Obligations, Swing Line Loans and Protective Advances being deemed "held" by such Lender) and (b) the unused Aggregate Revolving Credit Commitments; *provided* that the Revolving Credit Exposure and Revolving Credit Commitments of any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Reserves**" shall mean, with respect to the Borrowing Base, without duplication, all, if any, of the Availability Reserves, Inventory Reserves, Receivables Reserves, Bank Product Reserves, Hedging Reserves, Priority Payables Reserves and any and all other reserves, including warranty reserves, which the Administrative Agent deems necessary in its Permitted Discretion to maintain with respect to Eligible Accounts or Eligible Inventory that have been established in accordance with Section 2.17.

76

"**Resolution Authority**" shall mean an EEA Resolution Authority or, with respect to any U.K. Financial Institution, a U.K. Resolution Authority.

"**Restricted Foreign Subsidiary**" shall mean a Foreign Subsidiary that is a Restricted Subsidiary.

"**Restricted Payment**" shall mean, with respect to the Borrower or any Restricted Subsidiary, any dividend or return any capital to its stockholders or any other distribution, payment or delivery of property or cash to its stockholders on account of such Stock and Stock Equivalents, or redemption, retirement, purchase or other acquisition, directly or indirectly, for consideration, any shares of any class of its Stock or Stock Equivalents or set aside any funds for any of the foregoing purposes, other than dividends payable solely in its Stock or Stock Equivalents (other than Disqualified Stock).

"**Restricted Subsidiary**" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**Restructuring Support Agreement**" shall mean that certain Restructuring Support Agreement dated as of February 14, 2023 among Avaya Holdings, the Borrower, certain Subsidiaries of the Borrower, the Consenting Stakeholders (as defined therein) as in effect from time to time.

"**Returns**" shall mean, with respect to any Investment, any dividend, distribution, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment.

"**Revaluation Date**" shall mean (a) [reserved]; and (b) with respect to any Letter of Credit denominated in an Alternative Currency, each of the following: (i) each date of issuance of a Letter of Credit denominated in an Alternative Currency, (ii) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof (solely with respect to the increased amount), (iii) each date of any payment by an L/C Issuer under any Letter of Credit denominated in an Alternative Currency and (iv) such additional dates as the Administrative Agent or the relevant L/C Issuer shall reasonably determine or the Required Lenders shall reasonably require.

"**Revolving Credit Borrowing**" shall mean a borrowing consisting of Revolving Credit Loans to the same Borrower in the same currency and of the same Type and, in the case of Term SOFR Loans, having the same Interest Period, made by the Appropriate Lenders pursuant to Section 2.1(a).

"**Revolving Credit Commitments**" shall mean, as to each Lender, its obligation to (a) make Revolving Credit Loans to the Borrower pursuant to Section 2.1(a), (b) purchase participations in L/C Obligations in respect of Letter of Credit, (c) purchase participations in Swing Line Loans and (d) purchase participations in Protective Advances, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth, and opposite such Lender's name on Schedule 1.1(a) under the caption "Revolving Credit Commitment" or in the Assignment and Assumption pursuant to which such Lender

becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The Aggregate Revolving Credit Commitments of all Lenders is $128,125,000 on the Closing Date, as such amount may be adjusted from time to time in accordance with the terms of this Agreement, including pursuant to Section 4.2.

"**Revolving Credit Exposure**" shall mean, as to each Revolving Credit Lender at any time, the sum of the Outstanding Amount of such Lender's Revolving Credit Loans and its Pro Rata Share or other applicable share provided for under this Agreement of the L/C Obligations, the Swing Line Loans and the Protective Advances at such time.

"**Revolving Credit Extension Request**" shall have the meaning provided in Section 2.15(a).

"**Revolving Credit Lender**" shall mean, at any time, any Lender that has a Revolving Credit Commitment at such time, or if the Revolving Credit Commitments have been terminated, any Revolving Credit Exposure.

"**Revolving Credit Loan**" shall have the meaning specified in Section 2.1(a).

"**RSA Plan**" shall mean that certain *Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 50] as may be amended from time to time in a manner not materially adverse the Lenders.

"**S&P**" shall mean Standard & Poor's Financial Services LLC or any successor by merger or consolidation to its business.

"**Same Day Funds**" shall mean (a) with respect to disbursements and payments in Dollars, immediately available funds, and (b) with respect to disbursements and payments in an Alternative Currency, same day or other funds as may be determined by the Administrative Agent or the applicable L/C Issuer, as the case may be, to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

"**Sanctioned Person**" shall mean, at any time, any Person with which dealings are prohibited by Sanctions.

"**Sanctions**" shall have the meaning provided in Section 8.19.

"**Sanctions Laws**" shall have the meaning provided in Section 8.19.

"**SEC**" shall mean the Securities and Exchange Commission or any successor thereto.

"**Section 2.15 Additional Amendment**" shall have the meaning provided in Section 2.15(c).

"**Section 9.1 Financials**" shall mean the financial statements delivered, or required to be delivered, pursuant to Section 9.1(a) or (b), together with the accompanying officer's certificate delivered, or required to be delivered, pursuant to Section 9.1(c).

"**Secured Cash Management Agreement**" shall mean any Cash Management Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Cash Management Bank (other than any Specified Cash Management Bank), and that is designated by the Borrower in writing to the Administrative Agent as "Secured Cash Management Obligations" which will thereby become Obligations hereunder and under the Security Agreement.

"**Secured Hedging Agreement**" shall mean any Hedging Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank (other than any Specified Hedge Bank), and that is designated by the Borrower in writing to the Administrative Agent as "Secured Hedging Obligations" which will thereby become Obligations hereunder and under the Security Agreement.

"**Secured Parties**" shall mean the Administrative Agent, the Collateral Agent, each L/C Issuer, the Swing Line Lender, each Revolving Credit Lender, each Hedge Bank, each Cash Management Bank and each sub-agent pursuant to Section 12 appointed by the Administrative Agent with respect to matters relating to the Credit Facilities or appointed by the Collateral Agent with respect to matters relating to any Security Document, in each case, in its capacity as such.

"**Secured Specified Cash Management Agreement**" shall mean any Cash Management Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and a Specified Cash Management Bank, and that is designated by the Borrower in writing to the Administrative Agent as "Secured Specified Cash Management Obligations" which will thereby become Obligations hereunder and under the Security Agreement.

"**Secured Specified Hedging Agreement**" shall mean any Hedging Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Specified Hedge Bank, and that is designated by the Borrower in writing to the Administrative Agent as "Secured Specified Hedging Obligations" which will thereby become Obligations hereunder and under the Security Agreement.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securitization Asset**" shall mean (a) any accounts receivable, royalty or other revenue streams and other rights to payment or related assets and the proceeds thereof, in each case, subject to a Securitization Facility and (b) all collateral securing such receivable or asset, all contracts and contract rights, guaranties or other obligations in respect of such receivable or asset, lockbox accounts and records with respect to such account or asset and any other assets customarily transferred (or in respect of which security interests are customarily granted), together with accounts or assets in a

79

securitization financing and which in the case of clause (a) and (b) above are sold, conveyed, assigned or otherwise transferred or pledged in connection with a Qualified Securitization Financing.  Notwithstanding anything herein to the contrary, ABL Priority Collateral shall not constitute a Securitization Asset.

"**Securitization Facility**" shall mean any transaction or series of securitization financings that may be entered into by the Borrower or any Restricted Subsidiary pursuant to which the Borrower or any such Restricted Subsidiary may sell, convey or otherwise transfer, or may grant a security interest in, Securitization Assets to either (a) a Person that is not the Borrower or a Restricted Subsidiary or (b) a Securitization Subsidiary that in turn sells such Securitization Assets to a Person that is not the Borrower or a Restricted Subsidiary, or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries.

"**Securitization Repurchase Obligation**" shall mean any obligation of a seller (or any guaranty of such obligation) of (i) Receivables Facility Assets under a Permitted Receivables Financing to repurchase Receivables Facility Assets or (ii) Securitization Assets in a Qualified Securitization Financing to repurchase Securitization Assets, in either case, arising as a result of a breach of a representation, warranty or covenant or otherwise, including, without limitation, as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Securitization Subsidiary**" shall mean any Subsidiary of the Borrower in each case formed for the purpose of, and that solely engages in, one or more Qualified Securitization Financings and other activities reasonably related thereto or another Person formed for the purposes of engaging in a Qualified Securitization Financing in which the Borrower or any Restricted Subsidiary makes an Investment and to which the Borrower or such Restricted Subsidiary transfers Securitization Assets and related assets.

"**Security Agreement**" shall mean the Security Agreement, dated as of the Closing Date, in substantially the form attached hereto as Exhibit D (as the same may be amended, restated, amended and restated, supplemented or otherwise modified or replaced from time to time), entered into by the Borrower, the other grantors party thereto and the Collateral Agent for the benefit of the Secured Parties.

"**Security Documents**" shall mean, collectively, (a) the Security Agreement, (b) the Mortgages, (c) all Applicable Intercreditor Agreements and (d) each intellectual property security agreement and each other security agreement or other instrument or document executed and delivered pursuant to Section 9.11, 9.12 or pursuant to any other such Security Document.

"**Shrink**" shall mean Inventory identified by the Borrower as lost, misplaced, or stolen.

80

"**Shrink Reserve**" shall mean an amount reasonably estimated by the Administrative Agent to be equal to that amount which is required in order that the Shrink reflected in current general ledger of the applicable Credit Party would be reasonably equivalent to the Shrink calculated as part of the applicable Credit Party's most recent physical inventory (it being understood and agreed that no Shrink Reserve established by the Administrative Agent shall be duplicative of any Shrink as so reflected in the current general ledger of the applicable Credit Party or estimated by the applicable Credit Party for purposes of computing the Borrowing Base).

"**Similar Business**" shall mean any business conducted or proposed to be conducted by the Borrower and the Restricted Subsidiaries, taken as a whole, on the Closing Date or any other business activities which are reasonable extensions thereof or otherwise similar, incidental, corollary, complementary, synergistic, reasonably related, or ancillary to any of the foregoing (including non-core incidental businesses acquired in connection with any Permitted Acquisition or permitted Investment), in each case as determined by the Borrower in good faith.

"**SOFR**" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**Sold Entity or Business**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Solvent**" shall mean, with respect to any Person, that as of the Closing Date, (i) the present fair saleable value of the property (on a going concern basis) of such Person is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business, (ii) such Person is not engaged in, and are not about to engage in, business contemplated as of the date hereof for which they have unreasonably small capital and (iii) such Person is able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business, and (iv) the fair value of the assets (on a going concern basis) of such Person exceeds, their debts and liabilities, subordinated, contingent or otherwise. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Specified Cash Management Bank**" shall mean, (i) solely from the Closing Date to the date that is 90 days following the Closing Date (or such later date as may be agreed to by the Administrative Agent in its discretion), the providers of the Cash Management Agreements listed on Schedule 1.1(c) hereto to the extent that each such

Specified Cash Management Bank has appointed the Administrative Agent as its agent and agreed in writing to be bound by (1) Section 11.12 as if it were a party to this Agreement and (2) Section 2.22 and the provisions of Section 12 of this Agreement as if it were a Lender and (ii) any Cash Management Bank with respect to any other Cash Management Agreement that has been designated as a "last out" Cash Management Agreement and a Specified Secured Cash Management Agreement in accordance with Section 2.22.

"**Specified Existing Revolving Credit Commitment**" shall have the meaning provided in Section 2.15(a).

"**Specified Event of Default**" shall mean (i) any Event of Default under Section 11.1 or 11.5, (ii) any Event of Default under Section 11.2 with respect to the representation and warranty set forth in Section 8.8(c), (iii) any Event of Default under Section 11.3(b)(i), (iv) any Event of Default under Section 11.3(b)(ii) or (v) any Event of Default arising from failure to comply with the Financial Covenant.

"**Specified Excess Availability**" shall mean the sum of (i) Excess Availability and (ii) the amount by which the Borrowing Base at such time exceeds the Aggregate Revolving Credit Commitments, up to an amount for this clause (ii) not to exceed 2.50% of the Aggregate Revolving Credit Commitments.

"**Specified Transaction**" shall mean, with respect to any period, any Investment, any Disposition of assets, incurrence or repayment of Indebtedness, Restricted Payment, Subsidiary designation, the incurrence of any Incremental Commitments or other event that by the terms of this Agreement requires any test or covenant to be calculated on a "Pro Forma Basis".

"**Specified Hedge Bank**" shall mean any Hedge Bank with respect to any other Hedging Agreement that has been designated as a "last out" Hedging Agreement and a Specified Secured Hedging Agreement in accordance with Section 2.22.

"**Spot Rate**" for a currency shall mean the rate determined by the Administrative Agent or an L/C Issuer, as applicable, to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange computation is made; *provided* that the Administrative Agent or any L/C Issuer, as applicable, may obtain such spot rate from another financial institution designated by the Administrative Agent or such L/C Issuer, as applicable, if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency; and provided that the L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made.

"**SPV**" shall have the meaning provided in Section 13.6(f).

"**Standard Securitization Undertakings**" shall mean representations, warranties, covenants and indemnities entered into by the Borrower or any Restricted Subsidiary which the Borrower has determined in good faith to be customary in a

82

Securitization Facility, including, without limitation, those relating to the servicing of the assets of a Securitization Subsidiary, it being understood that any Securitization Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"**Stated Maturity**" shall mean, with respect to any installment of principal on any series of Indebtedness, the date on which such payment of principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for payment thereof.

"**Stock**" shall mean shares of capital stock or shares in the capital, as the case may be (whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting, *provided* that any instrument evidencing Indebtedness convertible or exchangeable for Stock shall not be deemed to be Stock unless and until such instrument is so converted or exchanged; *provided*, *further* that, solely with respect to any CFC or CFC Holding Company, Stock shall also include any instrument or security treated as stock for U.S. federal income tax purposes.

"**Stock Equivalents**" shall mean all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable, *provided* that any instrument evidencing Indebtedness convertible or exchangeable for Stock Equivalents shall not be deemed to be Stock Equivalents unless and until such instrument is so converted or exchanged.

"**Subscription Contract**" shall mean each customer subscription contract entered into by the Borrower and its Restricted Subsidiaries and reported within the Borrower's subscription product and support profit centers.

"**Subscription Contract ARR**" shall mean, with respect to each Subscription Contract, an amount equal to (i) the Monthly Booking Value thereof *times* (ii) twelve months.

"**Subsequent Transaction**" shall have the meaning provided in Section 1.11.

"**Subsidiary**" of any Person shall mean and include (a) any corporation more than 50% of whose Stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, unlimited company, partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50%

83

voting equity interest at the time or is a controlling general partner. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"**Subsidiary Guarantor**" shall mean each Guarantor that is a Subsidiary of the Borrower.

"**Successor Borrower**" shall have the meaning provided in Section 10.3(a).

"**Supermajority Lenders**" shall mean, at any date, Lenders holding more than 66.7% of the sum of (a) the Revolving Credit Exposure (with each Lender's participations in L/C Obligations, Swing Line Loans and Protective Advances being deemed "held" by such Lender) and (b) the unused Aggregate Revolving Credit Commitments; *provided* that the Revolving Credit Exposure and Revolving Credit Commitments of any Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Lenders.

"**Supported QFC**" shall have the meaning provided in Section 13.23.

"**Survey**" shall mean a survey of any Mortgaged Property (and all improvements thereon), including a survey based on aerial photography that is (a) (i) prepared by a licensed surveyor or engineer, (ii) certified by the surveyor (in a manner reasonable in light of the size, type and location of the Real Estate covered thereby) to the Administrative Agent and the Collateral Agent and (iii) sufficient, either alone or in connection with a survey (or "no change") affidavit in form and substance customary in the applicable jurisdiction, for the applicable title company to remove (to the extent permitted by Applicable Law) or amend all standard survey exceptions from the title insurance policy (or commitment) relating to such Mortgaged Property and issue such endorsements or other survey coverage, to the extent available in the applicable jurisdiction, as the Collateral Agent may reasonably request or (b) otherwise reasonably acceptable to the Collateral Agent, taking into account the size, type and location of the Real Estate covered thereby.

"**Swap Obligation**" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"**Swing Line Borrowing**" shall mean a borrowing of Swing Line Loans to the same Borrower in the same currency pursuant to Section 3.2.

"**Swing Line Lender**" shall mean Citibank, N.A., in its capacity as provider of Swing Line Loans, or any successor swing line lender to the Borrower hereunder.

"**Swing Line Loan**" shall have the meaning provided in Section 3.2(a).

"**Swing Line Loan Notice**" shall mean a notice of a Swing Line Borrowing pursuant to Section 3.2(b), which, if in writing, shall be substantially in the form of Exhibit A.

"**Swing Line Sublimit**" shall mean an amount equal to the lesser of (a) $15,000,000 and (b) the aggregate amount of the Revolving Credit Commitments.  The Swing Line Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"**Tax Distribution**" shall have the meaning provided in Section 10.6(d)(i).

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"**Term Loan Administrative Agent**" shall mean Wilmington Savings Fund Society, FSB, in its capacity as the administrative agent under the Term Loan Credit Agreement and/or any successor agent under the Term Loan Credit Documents.

"**Term Loan Collateral Agent**" shall mean Wilmington Savings Fund Society, FSB in its capacity as the collateral agent under the Term Loan Credit Agreement and/or any successor agent under the Term Loan Credit Documents.

"**Term Loan Credit Agreement**" shall mean the Term Loan Credit Agreement dated as of May [1], 2023 among Holdings, the Borrower, the Term Loan Administrative Agent and the several banks and other financial institutions from time to time party thereto, as may be otherwise amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time, in each case to the extent permitted hereunder and under the Applicable Intercreditor Agreements (unless such agreement, instrument or document expressly provides that it is not intended to be and is not the Term Loan Credit Agreement).

"**Term Loan Credit Documents**" shall mean, collectively, (a) the Term Loan Credit Agreement and (b) the security documents, intercreditor agreements, guarantees, joinders and other agreements or instruments executed in connection therewith, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time.

85

"**Term Loan Obligations**" shall mean "Obligations" under and as defined in the Term Loan Credit Agreement.

"**Term Loans**" shall mean "Term Loans" under and as defined in the Term Loan Credit Agreement.

"**Term Priority Collateral**" shall have the meaning under and as defined in the ABL Intercreditor Agreement.

"**Term SOFR**" shall mean:

(a)     for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; *provided*, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding Business Day is not more than three (3) Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**ABR Term SOFR Determination Day**") that is two (2) Business Days prior to such day, as such rate is published by the Term SOFR Administrator; *provided*, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding Business Day is not more than three (3) Business Days prior to such ABR SOFR Determination Day;

*provided*, *further*, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"**Term SOFR Adjustment**" shall mean a percentage equal to 0.00% per annum.

86

"**Term SOFR Administrator**" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Loan**" shall mean each Loan denominated in Dollars bearing interest based on Adjusted Term SOFR.

"**Term SOFR Reference Rate**" shall mean the forward-looking term rate based on SOFR.

"**Test Period**" shall mean, for any determination under this Agreement, the four consecutive fiscal quarters of the Borrower then last ended and for which Section 9.1 Financials have been or were required to have been delivered (or, for purposes of any calculation of a financial ratio under this Agreement other than the Financial Covenant, for which the financial statements described in Section 9.1(a) or (b) are otherwise available).

"**Transaction Expenses**" shall mean any fees, costs, liabilities or expenses incurred or paid by Avaya Holdings, the Borrower or any of their respective Subsidiaries in connection with the Transactions, this Agreement and the other Credit Documents and the transactions contemplated hereby and thereby including in respect of the commitments, negotiation, documentation and closing (and post-closing actions in connection with the Collateral) of the Credit Facilities.

"**Transactions**" shall mean, collectively, the (i) consummation of the Plan, (ii) the consummation of the transactions contemplated in the Restructuring Support Agreement, (iii) the execution of, and funding (or deemed funding) under, the Credit Documents and the Term Loan Credit Documents, (iv) the other transactions contemplated by the Plan, and (v) the payment of fees, costs, liabilities and expenses in connection with each of the foregoing and the consummation of any other transaction connected with the foregoing.

"**Transferee**" shall have the meaning provided in Section 13.6(e).

"**Type**" shall mean, as to any Revolving Credit Loan denominated in Dollars, its nature as an ABR Loan or a Term SOFR Loan.

"**UCC**" shall mean the Uniform Commercial Code of the State of New York, or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**U.K. Financial Institution**" shall mean any BBRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**U.K. Resolution Authority**" shall mean the Bank of England and any other public administrative authority having responsibility for the resolution of any U.K. Financial Institution.

"**Unadjusted Benchmark Replacement**" shall mean the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"**Unfinanced Capital Expenditures**" shall mean, for any period, the aggregate of all expenditures paid in cash by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of the Borrower or the Restricted Subsidiary and excluding: (i) expenditures to the extent financed with (A) insurance proceeds, (B) awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (C) proceeds from any Disposition of assets that are permitted to be re-invested or not required to be applied to prepay Term Loan Obligations, (D) any Indebtedness (other than the Loans hereunder) or (E) amounts included in the definition of "Available Equity Amount", (ii) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time, (iii) expenditures that are accounted for as capital expenditures by the Borrower or any Restricted Subsidiary and that actually are paid for, or reimbursed to the Borrower or any Restricted Subsidiary in cash or Cash Equivalents, by a Person other than the Borrower or any Restricted Subsidiary and for which neither the Borrower nor any Restricted Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation (other than rent) in respect of such expenditures to such Person or any other Person (whether before, during or after such period), (iv) the book value of any asset owned by the Borrower or any Restricted Subsidiary prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such Person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period, *provided* that (x) any expenditure necessary in order to permit such asset to be reused shall be included as a capital expenditure during the period in which such expenditure actually is made and (y) such book value shall have been included in capital expenditures when such asset was originally acquired, (v) expenditures that constitute Permitted Acquisitions, (vi) interest capitalized during such period, (vii) the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase and (B) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business or (viii) expenditures relating to the construction, acquisition, replacement, reconstruction, development, refurbishment, renovation or improvement of any property which has been transferred to a Person other than the Borrower or a Restricted Subsidiary during the same fiscal year in which such expenditures were made pursuant to a sale-leaseback transaction to the extent of the cash proceeds received by the Borrower or such Restricted Subsidiary pursuant to such sale-leaseback transaction.

"**Unfunded Current Liability**" of any Pension Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("**SFAS 87**")) under the Pension Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the fair market value of the assets allocable thereto.

"**unreallocated portion**" shall have the meaning provided in Section 2.16(a)(ii).

"**Unreimbursed Amount**" shall have the meaning provided in Section 3.1(c)(iii).

"**Unrestricted Cash**" shall mean, without duplication, all cash and Cash Equivalents included in the cash and Cash Equivalents accounts listed on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries as at such date, excluding any cash and Cash Equivalents with respect to which a Lien (other than any Lien permitted under clause (x) or (bb) of the definition of Permitted Encumbrance) senior to the Lien securing the Obligations is granted for the benefit of other Indebtedness or obligations (but may include cash and Cash Equivalents securing the Obligations along with the Term Loan Obligations pursuant to the Applicable Intercreditor Agreement).

"**Unrestricted Escrow Subsidiary**" shall have the meaning provided in Section 1.11.

"**Unrestricted Subsidiary**" shall mean (a) any Subsidiary of the Borrower that is formed or acquired after the Closing Date; *provided* that at such time (or promptly thereafter) the Borrower designates such Subsidiary an Unrestricted Subsidiary in a written notice to the Administrative Agent, (b) any Restricted Subsidiary designated as an Unrestricted Subsidiary by the Borrower after the Closing Date in a written notice to the Administrative Agent; *provided* that in each case of clauses (a) and (b), (x) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the net book value of the investment therein and such designation shall be permitted only to the extent permitted under Section 10.5 on the date of such designation, (y) subject to Section 1.12, no Event of Default exists or would result from such designation after giving Pro Forma Effect thereto and (z) such Unrestricted Subsidiary shall also be designated as an "Unrestricted Subsidiary" under any Indebtedness in a principal amount of not less than $100,000,000 (to the extent such concept exists under the definitive documentation in respect thereof) and (c) each Subsidiary of an Unrestricted Subsidiary; *provided*, *further*, that if a Subsidiary being designated as an Unrestricted Subsidiary has assets included in the Aggregate Borrowing Base before the designation of at least 5% of the Aggregate Borrowing Base, then the Borrower shall deliver an updated Borrowing Base Certificate to the Administrative Agent at the time of such designation. No Subsidiary may be designated as an Unrestricted Subsidiary if at such time of designation it holds intellectual property that is material to the operation of the business of the Borrower and its Restricted Subsidiaries, taken as a whole. No Subsidiary may be designated as an Unrestricted

89

Subsidiary if, after such designation, it would constitute a "Restricted Subsidiary" under the definitive documentation in respect of any Indebtedness in a principal amount of not less than $100,000,000 (to the extent such concept exists under the definitive documentation in respect of such Indebtedness).  The Borrower may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary, and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if, subject to Section 1.12, no Event of Default exists or would result from such re-designation.  Such redesignation of any Unrestricted Subsidiary as a Restricted Subsidiary shall be deemed to constitute the incurrence of Indebtedness and Liens of such Subsidiary (and reduction in an outstanding Investment).

"**Unused Amount**" shall mean, on any day the Aggregate Revolving Credit Commitments then in effect *minus* the aggregate Revolving Credit Loans *minus* the aggregate L/C Obligations; *provided* that the Unused Amount shall never be less than zero.

"**U.S. Government Securities Business Day**" shall mean any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"**U.S. Lender**" shall have the meaning provided in Section 5.4(i).

"**Voting Stock**" shall mean, with respect to any Person, such Person's Stock or Stock Equivalents having the right to vote for the election of directors or other governing body of such Person under ordinary circumstances; *provided* that for the purpose of the definition of "Excluded Stock and Stock Equivalents" and in each reference to the Voting Stock of any CFC or CFC Holding Company, Voting Stock shall also include any instrument treated as voting stock for U.S. federal income tax purposes.

"**Weekly Monitoring Period**" shall mean a period (a) during the occurrence and continuance of any Specified Event of Default or (b) commencing on the date on which the Specified Excess Availability shall have been less than the greater of (x) $16,000,000 and (y) 12.5% of the Line Cap for five (5) consecutive Business Days and ending on the date on which the Specified Excess Availability shall have been at least the greater of (x) $16,000,000 and (y) 12.5% of the Line Cap for twenty consecutive calendar days.

"**Weighted Average Life to Maturity**" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between each such date and the making of each such payment; by (b) the then-outstanding principal amount of such Indebtedness; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness (the "**Applicable Indebtedness**"), the effects of any

prepayments or amortization made on such Applicable Indebtedness prior to the date of the applicable determination date shall be disregarded.

"**Wholly Owned**" shall mean, with respect to the ownership by a Person of a Subsidiary, that all of the Stock of such Subsidiary (other than directors' qualifying shares or nominee or other similar shares required pursuant to Applicable Law) are owned by such Person or another Wholly Owned Subsidiary of such Person.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"**Write-Down and Conversion Powers**" shall mean, with (a) respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to any UK Resolution Authority, (i) any powers under any Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers and (ii) any similar or analogous powers under that Bail-In Legislation.

     1.2     Other Interpretive Provisions

With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)     Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)     The term "including" is by way of example and not limitation.

(e)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)     The words "asset" and "property" shall be construed to have the same meaning and effect and refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(g)     All references to "knowledge" or "awareness" of any Credit Party or a Restricted Subsidiary thereof means the actual knowledge of an Authorized Officer of a Credit Party or such Restricted Subsidiary.

(h)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(i)     Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(j)     Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(k)     For purposes of determining compliance with any one of Sections 9.9, 10.1, 10.2, 10.3, 10.4, 10.5, 10.6, 10.7 and 1.1, (i) in the event that any Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness meets the criteria of more than one of the categories of transactions permitted pursuant to any clause of such Section, such transaction (or portion thereof) at any time and from time to time shall be permitted under one or more of such clauses as determined by the Borrower (and the Borrower shall be entitled to redesignate use of any such clauses from time to time) in its sole discretion at such time; *provided* that (x) all Indebtedness outstanding under the Credit Documents will be deemed at all times to have been incurred in reliance only on the exception in clause (a) of Section 10.1 and (y) all Indebtedness outstanding under the Term Loan Credit Documents (and any Refinancing Indebtedness thereof) will be deemed at all times to have been incurred in reliance only on the exception in clause (b) of Section 10.1 and (ii) with respect to any Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness or other applicable transaction in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness or other applicable transaction is made (so long as such Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness or other applicable transaction at the time incurred or made was permitted hereunder).

(l)     All references to "in the ordinary course of business" of the Borrower or any Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an

92

objective that is in the ordinary course of business of the Borrower or such Subsidiary, as applicable, (ii) customary and usual in the industry or industries of the Borrower and its Subsidiaries in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable, or (iii) generally consistent with the past or current practice of the Borrower or such Subsidiary, as applicable, or any similarly situated businesses in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable.

1.3     Accounting Terms

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP.  Notwithstanding anything set forth herein, the financial data, financial ratios and other financial calculations shall not give effect to the impact of Accounting Standards Update 2016-12, Revenue from Contracts with Customers (Topic 606) or similar revenue recognition policies.

(b)     Notwithstanding anything to the contrary herein, (i) other than in connection with the actual testing of the Financial Covenant, for purposes of determining compliance with any test or covenant contained in this Agreement with respect to any period during which any Specified Transaction occurs (or, for purposes of determining compliance with any test or covenant governing the permissibility of any transaction hereunder, during such period and thereafter and on or prior to such date of determination), the Consolidated Total Net Leverage Ratio, the Consolidated First Lien Net Leverage Ratio, and the Consolidated Secured Net Leverage Ratio shall each be calculated with respect to such period and such Specified Transaction on a Pro Forma Basis and (ii) for purposes of determining compliance with any ratio governing the permissibility of any transaction to be consummated on a Pro Forma Basis hereunder, (A) the cash proceeds of any incurrence of debt then being incurred in connection with such transaction shall not be netted from Consolidated Total Debt and (B) Consolidated Total Debt shall be calculated after giving effect to any prepayment of Indebtedness, in each case for purposes of calculating the Consolidated First Lien Net Leverage Ratio, Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable.  If since the beginning of any applicable Test Period, any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of the Restricted Subsidiaries, in each case, since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this definition, then such financial ratio or test (or Consolidated EBITDA or Consolidated Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this definition.  Solely for purposes of the calculation of the Fixed Charge Coverage Ratio to determine whether the conditions set forth in Section 10.6(c) are satisfied, the denominator thereof shall also include the actual amount of such Restricted Payment actually being made in cash on a Pro Forma Basis.

1.4     Rounding

Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this

93

Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

        1.5      References to Agreements, Laws, Etc.

Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted or not prohibited by any Credit Document and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

        1.6      Times of Day

Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

        1.7      Timing of Payment or Performance

When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as applicable.

        1.8      [Reserved]

        1.9      Currency Equivalents Generally

(a)      The Administrative Agent shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Amounts of Credit Extensions and Outstanding Amounts denominated in Alternative Currencies.  Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur.

(b)      Wherever in this Agreement in connection with the issuance, amendment or extension of a Letter of Credit denominated in an Alternative Currency, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but Letter of Credit is denominated in an Alternative Currency, such amount shall be the relevant equivalent amount of such Dollar Amount in Alternative Currency (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the Administrative Agent or the applicable L/C Issuer, as the case may be.

(c)      In determining whether any Indebtedness, Investment, Lien, Disposition, Restricted Payment or any other amount under a "fixed amount" basket denominated in Dollars may be incurred in a currency other than Dollars, such amount shall be determined based on the currency exchange rate determined at the time of such incurrence (or, in the case of any revolving Indebtedness or any amount committed to be made, at the time it is first committed); provided that no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness, Investment, Lien, Disposition, Restricted Payment or such other amount is incurred or made; provided, further that for purpose of determining Consolidated Net Income, Consolidated EBITDA, Consolidated Total Debt or any other amount or ratio determined based on Consolidated Net Income, Consolidated EBITDA or Consolidated Total Debt, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the most recently delivered Section 9.1 Financials.

1.10    Classification of Loans and Borrowings

For purposes of this Agreement, Revolving Credit Loans may be classified and referred to by Type (e.g., a "Term SOFR Loan").  Borrowings also may be classified and referred to by Type (e.g., a "Term SOFR Borrowing").

1.11    Unrestricted Escrow Subsidiary

Any Indebtedness permitted to be incurred hereunder may be incurred, at the option of the Borrower, by a newly created and newly designated Unrestricted Subsidiary (an "**Unrestricted Escrow Subsidiary**") with no assets other than the cash proceeds of such incurred Indebtedness *plus*, subject to compliance with Section 10.5, any cash and Cash Equivalents contributed to such Unrestricted Escrow Subsidiary as deposit of interest expenses and fees, additional cash collateral or for other purposes, which Unrestricted Escrow Subsidiary will then merge with and into the Borrower or any of the Restricted Subsidiaries with the Borrower or such Restricted Subsidiary surviving the merger and assuming all obligations of the Unrestricted Escrow Subsidiary.  So long as such Indebtedness would have been permitted to be incurred directly by the Borrower or any Restricted Subsidiary upon the incurrence of such Indebtedness by the Unrestricted Escrow Subsidiary, or, with respect to any Indebtedness incurred in connection with a Limited Condition Transaction, at the option of the Borrower, at the time the LCT Election is made, the creation, designation and re-designation of the Unrestricted Escrow Subsidiary and the merger of the Unrestricted Escrow Subsidiary into the Borrower or any Restricted Subsidiary shall not be subject to any additional condition, including any condition that no Default or Event of Default shall have occurred and be continuing at such time.

1.12    Limited Condition Transactions

In connection with any action being taken in connection with a Limited Condition Transaction, for purposes of (i) determining compliance with any provision of this Agreement which requires the calculation of any financial ratio or test or (ii) testing availability under baskets set forth in this Agreement (including baskets measured as a percentage of Consolidated EBITDA or Consolidated Total Assets), in each case, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Transaction, an "**LCT Election**"; *provided* that such election may be revoked by the Borrower at any time prior to the

95

consummation or abandonment of the Limited Condition Transaction in question), the date of determination of whether any such action is permitted hereunder shall be deemed to be the date the definitive agreement for such Limited Condition Transaction is entered into (the "**LCT Test Date**"), and if, after giving Pro Forma Effect to the Limited Condition Transaction, the Borrower or any of its Restricted Subsidiaries would have been permitted to take such action on the relevant LCT Test Date in compliance with such ratio, test or basket, such ratio, test or basket shall be deemed to have been complied with.  For the avoidance of doubt, if the Borrower has made an LCT Election and, following the LCT Test Date, any of the ratios, tests or baskets for which compliance was determined or tested as of the LCT Test Date would have failed to have been satisfied as a result of fluctuations in any such ratio, test or basket, including due to fluctuations in Consolidated EBITDA, Consolidated Interest Expense or Consolidated Total Assets following the LCT Test Date but at or prior to the consummation of the relevant Limited Condition Transaction, such baskets, tests or ratios will not be deemed to have failed to have been satisfied as a result of such fluctuations.  If the Borrower has made an LCT Election for any Limited Condition Transaction, then in connection with any event or transaction occurring after the relevant LCT Test Date and prior to the earliest of the date on which (i) such Limited Condition Transaction is consummated, (ii) the LCT Election is revoked by the Borrower and (iii) the date that the definitive agreement or date for redemption, repurchase, defeasance, satisfaction and discharge or repayment specified in an irrevocable notice for such Limited Condition Transaction is terminated, expires or passes, as applicable, without consummation of such Limited Condition Transaction (a "**Subsequent Transaction**") in connection with which a ratio, test or basket availability calculation must be made on a Pro Forma Basis or giving Pro Forma Effect to such Subsequent Transaction, for purposes of determining whether such ratio, test or basket availability has been complied with under this Agreement, any such ratio, test or basket shall be required to be satisfied on a Pro Forma Basis assuming such Limited Condition Transaction and other transactions in connection therewith have been consummated.

1.13    Rates

The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to ABR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement) or any relevant adjustments thereto, including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, ABR, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its Related Parties may engage in transactions that affect the calculation of ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other Person for

96

damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

1.14    Divisions.

For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its capital stock at such time.

### SECTION 2   Amount and Terms of Credit

2.1    Revolving Credit Borrowing

(a)    The Revolving Credit Borrowings.  Subject to the terms and conditions set forth herein, each Revolving Credit Lender severally agrees to make revolving credit loans (each such loan, a "**Revolving Credit Loan**") to the Borrower from time to time, on any Business Day after the Closing Date until the Maturity Date, in an aggregate principal amount not to exceed at any time outstanding the amount of such Lender's Revolving Credit Commitment; *provided* that after giving effect to any such Revolving Credit Borrowing, each of the Availability Requirements shall be met.  Revolving Credit Loans shall be made to the Borrower in Dollars.  Revolving Credit Loans to the Borrower denominated in Dollars may be ABR Loans or Term SOFR Loans, as further provided herein.  Within the limits of each Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.1(a), prepay under Section 2.5 and reborrow under this Section 2.1(a).

(b)    Subject to the limitations set forth below (and notwithstanding anything to the contrary in Section 2.1(a) or in Section 7), the Administrative Agent is authorized by the Borrower and the Revolving Credit Lenders, from time to time in the Administrative Agent's sole discretion (but shall have absolutely no obligation), to make loans denominated in Dollars that are ABR Loans (each such loan, a "**Protective Advance**") on behalf of all Revolving Credit Lenders to the Borrower at any time that any condition precedent set forth in Section 7 has not been satisfied or waived, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable (x) to preserve or protect the Collateral, or any portion thereof or (y) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations.  Any Protective Advance may be made in a principal amount that would result in the Availability Requirements not being met; *provided* that no Protective Advance may be made to the extent that, after giving effect to such Protective Advance (together with the Outstanding Amount of any other outstanding Protective Advances) the aggregate Outstanding Amount of all Protective Advances outstanding hereunder would exceed 5% of the Borrowing Base as determined on the date of such proposed Protective Advance; *provided further* that the Aggregate Revolving Credit Exposure at such time shall not exceed the Aggregate Revolving Credit Commitments as then in effect.  Each

97

Protective Advance shall be secured by the Liens in favor of the Administrative Agent on behalf of the Secured Parties in and to the Collateral and shall constitute Obligations hereunder.  The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders.  Any such revocation must be in writing and will become effective prospectively upon the Administrative Agent's receipt thereof.  The making of a Protective Advance on any one occasion shall not obligate the Administrative Agent to make any Protective Advance on any other occasion and under no circumstance shall the Borrower have the right to require that a Protective Advance be made.  At any time that the conditions precedent set forth in Section 7 have been satisfied or waived, the Administrative Agent may request the Revolving Credit Lenders to make a Revolving Credit Loan to repay a Protective Advance.  At any other time, the Administrative Agent may require the Appropriate Lenders to fund their risk participations described in Section 2.1(c) below.

(c)        Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default or an Event of Default), each Revolving Credit Lender shall be deemed, without further action by any party hereto, unconditionally and irrevocably to have purchased from the Administrative Agent, without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Pro Rata Share.  From and after the date, if any, on which any Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender, such Lender's Pro Rata Share of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

(d)        Notwithstanding anything to the contrary in any Credit Document, but subject to Section 2.12, each Lender may, at its option, make Revolving Credit Loans, Swing Line Loans or Protective Advances, as applicable, available to the Borrower by causing its applicable Lending Office or any foreign or domestic branch or Affiliate of such Lender to make such Loans; *provided* that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement and the other Credit Documents and (ii) no Credit Party shall be obliged to make any payment pursuant to Section 2.10, 2.11, 5.4 (or the comparable provisions in Section 14) in excess of any payment that would have been due to Lender pursuant to Section 2.10, 2.11 or 5.4 (or the comparable provisions under Section 14), respectively, if the Lender had made such Loan through its Lending Office (other than (i) Loans made through any foreign or domestic branch or Affiliate of a Lender at the written request of the Borrower or (ii) payments as a result of any change after the exercise of such option in (or in the interpretation, administration, or application of) any law or treaty or any published practice or published concession of any relevant taxing authority).

(e)        The obligations of the Lenders hereunder to make Loans and to fund participations in Letters of Credit, Swing Line Loans and Protective Advances are several and not joint.  The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

98

2.2     Minimum Amount of Each Borrowing; Maximum Number of Borrowings

(a)     Each Borrowing of, conversion to or continuation of Term SOFR Loans shall be in a principal amount of $1,000,000 or a whole multiple of the amount of $500,000 in excess thereof.

(b)     Except as provided in Sections 3.1(c) and 3.2(c), and except for Protective Advances which shall be made in the amounts required by Section 2.1(b), each Borrowing of or conversion to ABR Loans shall be in a principal amount of $500,000 or a whole multiple of the amount of $100,000 in excess thereof.

(c)     After giving effect to all Revolving Credit Borrowings, all conversions of Revolving Credit Loans from one Type to the other, and all continuations of Revolving Credit Loans as the same Type, there shall not be more than 10 Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent.

2.3     Borrowings, Conversions and Continuations

(a)     Each Revolving Credit Borrowing, each conversion of Revolving Credit Loans from one Type to the other, and each continuation of Term SOFR Loans shall be made upon the Borrower's revocable notice to the Administrative Agent, which may be given by telephone. Each such notice must be received by the Administrative Agent (i) not later than 12:00 noon (New York, New York time) three (3) Business Days prior to the requested date of any Borrowing or continuation of Term SOFR Loans or any conversion of ABR Loans to Term SOFR Loans, and (ii) not later than 11:00 a.m. (New York, New York time) on the requested date of any Borrowing of ABR Loans. Each telephonic notice by the Borrower pursuant to this Section 2.3(a) must be confirmed promptly by delivery to the Administrative Agent of a written Notice of Borrowing or Notice of Conversion or Continuation, appropriately completed and signed by an Authorized Officer of the Borrower. Each Notice of Borrowing or Notice of Conversion or Continuation (whether telephonic or written) shall specify (i) whether the Borrower is requesting a Revolving Credit Borrowing, a conversion of Revolving Credit Loans from one Type to the other, or a continuation of Term SOFR Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) [reserved], (v) the Type of Loans to be borrowed or to which existing Revolving Credit Loans are to be converted, (vi) [reserved] and (vii) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Notice of Borrowing or Notice of Conversion or Continuation or fails to give a timely notice requesting a conversion or continuation, then the applicable Revolving Credit Loans shall be made as, or converted to ABR Loans. Any such automatic conversion to ABR Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Term SOFR Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Term SOFR Loans in any such Notice of Borrowing or Notice of Conversion or Continuation, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)     Following receipt of a Notice of Borrowing, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Pro Rata Share of the applicable

99

Revolving Credit Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to ABR Loans. In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than 1:00 p.m. (New York, New York time), in each case on the Business Day specified in the applicable Notice of Borrowing. Upon satisfaction of the applicable conditions set forth in Section 7, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower; *provided* that if, on the date the Notice of Borrowing with respect to a Borrowing is given by the Borrower, there are L/C Borrowings in respect of Letters of Credit outstanding, then the proceeds of such Borrowing shall be applied, first, to the payment in full of any such L/C Borrowings and second, to the Borrower as provided above.

(c)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Term SOFR Loans upon determination of such interest rate. The determination of Term SOFR by the Administrative Agent shall be conclusive in the absence of manifest error. At any time that ABR Loans are outstanding, the Administrative Agent shall notify the Borrower and the Appropriate Lenders of any change in the Administrative Agent's prime rate used in determining the ABR promptly following the public announcement of such change.

(d)     Except as otherwise provided herein, a Term SOFR Loan may be continued or converted only on the last day of an Interest Period for such Term SOFR Loan. During the existence of an Event of Default, the Administrative Agent or the Required Lenders may require that no Loans may be converted or continued as Term SOFR Loans.

2.4     Disbursement of Funds

(a)     Unless the Administrative Agent shall have received notice from an Appropriate Lender prior to the date of any Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with Section 2.3(b) above, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such Pro Rata Share available to the Administrative Agent, each of such Lender and Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Overnight Rate *plus* any administrative, processing, or similar fees customarily charged by the Administrative Agent in accordance with the foregoing. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this

100

Section 2.4(a) shall be conclusive in the absence of manifest error.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower (to the extent such amount is covered by interest paid by such Lender) the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(b)     Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5     Repayment of Loans; Evidence of Debt

(a)     Revolving Credit Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders on the Maturity Date the aggregate principal amount of all of its Revolving Credit Loans outstanding on such date.

(b)     Swing Line Loans.  The Borrower shall repay each of its Swing Line Loans on the Maturity Date.

(c)     Protective Advances.  The Borrower shall repay to the Administrative Agent the then unpaid amount of each of its Protective Advances on the Maturity Date.

(d)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate Lending Office of such Lender resulting from each Loan made by such Lending Office of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lending Office of such Lender from time to time under this Agreement.

(e)     The Administrative Agent shall maintain the Register pursuant to Section 13.6(b), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder and, if applicable, the relevant tranche thereof and the Type of each Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(f)     The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (d) and (e) of this Section 2.5 shall, to the extent permitted by Applicable Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; *provided*, *however*, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

101

(g)     The Borrower hereby agrees that, upon request of any Lender at any time and from time to time after the Borrower has made an initial Borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's expense a promissory note substantially in the form of Exhibit B, evidencing the Loans owing to such Lender.  Each Lender may attach schedules to its note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

2.6     [Reserved]

2.7     [Reserved]

2.8     Interest

(a)     Subject to the provisions of Section 2.8(b), (i) each Term SOFR Loan denominated in Dollars shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Adjusted Term SOFR for such Interest Period *plus* the Applicable Rate and (ii) each ABR Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the ABR *plus* the Applicable Rate.

(b)     If all or a portion of (i) the principal amount of any Loan or (ii) any interest payable thereon or any other amount hereunder shall not be paid when due (whether at the Stated Maturity, by acceleration or otherwise), and an Event of Default under Section 11.1 or 11.5 shall have occurred and be continuing, then, upon the giving of written notice by the Administrative Agent to the Borrower (except in the case of an Event of Default under Section 11.5, for which no notice is required), such overdue amount (other than any such amount owed to a Defaulting Lender) shall bear interest at a rate *per annum* (the "**Default Rate**") that is (x) in the case of overdue principal, the rate that would otherwise be applicable thereto *plus* 2% or (y) in the case of any overdue interest or other amounts due hereunder, to the extent permitted by Applicable Law, the rate described in Section 2.8(a)(v) *plus* 2% from the date of written notice to the date on which such amount is paid in full (after as well as before judgment) (or if an Event of Default under Section 11.5 shall have occurred and be continuing, the date of the occurrence of such Event of Default).

(c)     Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof; *provided* that any Loan that is repaid on the same date on which it is made shall bear interest for one day.  Except as provided below, interest shall be payable (i) in respect of each ABR Loan, quarterly in arrears on the first Business Day of each April, July, October and January, (ii) in respect of each Term SOFR Loan, on the last day of each Interest Period applicable thereto, and (iii) in respect of each Loan, (A) on any prepayment; *provided* that interest on ABR Loans shall only become due pursuant to this clause (A) if the aggregate principal amount of the ABR Loans then-outstanding is repaid in full, (B) at maturity (whether by acceleration or otherwise) and (C) after such maturity, on demand. Notwithstanding anything herein to the contrary, interest payable pursuant to Section 2.8(b) shall be payable on demand.

(d)     All computations of interest hereunder shall be made in accordance with Section 5.5.

2.9     Interest Periods

At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of Term SOFR Loans in accordance with Section 2.3(a), the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of the Interest Period applicable to such Borrowing, which Interest Period shall, at the option of the Borrower, be a one, three or six month period.

Notwithstanding anything to the contrary contained above:

(a)     the initial Interest Period for any Borrowing of Term SOFR Loans shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the preceding Interest Period expires;

(b)     if any Interest Period relating to a Borrowing of Term SOFR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)     if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided* that if any Interest Period in respect of a Term SOFR Loan would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d)     the Borrower shall not be entitled to elect any Interest Period in respect of any Term SOFR Loan if such Interest Period would extend beyond the Maturity Date.

2.10     Increased Costs, Illegality, Etc.

(a)     In the event that the Administrative Agent or any Lender has reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto):

(i)     on any date for determining Term SOFR for any Interest Period that (x) deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the relevant market or (y) by reason of any changes arising on or after the Closing Date affecting the market for such rate, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of Term SOFR; or

(ii)     at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Loans (other

103

than any increase or reduction attributable to (A) Indemnified Taxes, (B) net income Taxes and franchise and excise Taxes (imposed in lieu of net income Taxes) imposed on any Agent or Lender and any branch profits Taxes imposed on such Agent or Lender as a result of such Agent or Lender being organized or incorporated under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in the jurisdiction imposing such Tax (or any political subdivision thereof) or (C) Taxes included under clauses (c) through (e) of the definition of "Excluded Taxes") because of (x) any change since the Closing Date in any Applicable Law (or in the interpretation or administration thereof and including the introduction of any new Applicable Law), such as, for example, without limitation, a change in official reserve requirements, and/or (y) other circumstances affecting the market for such rate or the position of such Lender in such market; or

(iii)     at any time, that the making or continuance of any Term SOFR Loan has become unlawful as a result of compliance by any Lender in good faith with any Applicable Law (or would conflict with any such Applicable Law not having the force of law even though the failure to comply therewith would not be unlawful), or has become impracticable as a result of a contingency occurring after the Closing Date that materially and adversely affects the market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall within a reasonable time thereafter give notice (if by telephone, confirmed in writing) to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Appropriate Lenders). Thereafter (x) in the case of clause (i) above, Term SOFR Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Appropriate Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing or Notice of Conversion or Continuation given by the Borrower with respect to Term SOFR Loans that have not yet been incurred shall be deemed rescinded by the Borrower, as applicable, (y) in the case of clause (ii) above, the Borrower shall pay to such Lender, promptly after receipt of written demand therefor such additional amounts (in the form of an increased rate of or a different method of calculating, interest or otherwise, as such Lender in its reasonable discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by Applicable Law.

(b)     At any time that any Term SOFR Loan is affected by the circumstances described in Section 2.10(a)(ii) or (iii), the Borrower may (and in the case of a Term SOFR Loan affected pursuant to Section 2.10(a)(iii) shall) either (x) if the affected Term SOFR Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Section 2.10(a)(ii) or (iii) or (y) if the affected Term SOFR Loan

104

is then-outstanding, upon at least three Business Days' notice to the Administrative Agent require the affected Lender to convert each Term SOFR Loan into an ABR Loan; *provided* that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.10(b).

(c)        If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's or its Affiliates' capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent or any Affiliate thereof could have achieved but for such Change in Law (taking into consideration such Lender's or parent's policies with respect to capital adequacy or liquidity), then from time to time, promptly after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any Applicable Law as in effect on the Closing Date.  Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

(d)        Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.10 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

2.11    Compensation

If (i) any payment of principal of any Term SOFR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Term SOFR Loan as a result of a payment or conversion pursuant to Section 2.5, 2.10, 5.1, 5.2 or 13.7, as a result of acceleration of the maturity of the Loans pursuant to Section 11 or for any other reason, (ii) any Borrowing of Term SOFR Loans is not made as a result of a withdrawn Notice of Borrowing, (iii) any ABR Loan is not converted into a Term SOFR Loan as a result of a withdrawn Notice of Conversion or Continuation, (iv) any Term SOFR Loan is not continued as a Term SOFR Loan as a result of a withdrawn Notice of Conversion or Continuation or (v) any prepayment of principal of any Term SOFR Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section 5.1 or 5.2, the Borrower shall, after receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain

105

such Term SOFR Loan. Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.11 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

2.12     Change of Lending Office

Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii), 2.10(a)(iii), 2.10(c) or 5.4 (or the comparable provisions under Section 14) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another Lending Office for any Loans affected by such event; provided that such designation is made on such terms that such Lender and its Lending Office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section. Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.10 or 5.4 (or the comparable provisions under Section 14). The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with such designation.

2.13     Notice of Certain Costs

Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, 2.11 or 5.4 (or the comparable provisions in Section 14) is given by any Lender more than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.10, 2.11 or 5.4 (or the comparable provisions under Section 14), as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower (except that, if the event giving rise to such additional cost, reduction in amounts, loss, tax or other additional amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

2.14     Incremental Credit Extensions

(a)      Incremental Revolving Credit Request. The Borrower may at any time and from time to time, on one or more occasions, after the Closing Date, by notice to the Administrative Agent, request one or more increases to the aggregate principal amount of the Revolving Credit Commitments (the "**Incremental Commitments**").

(b)      Size. The aggregate principal amount of all Incremental Commitments hereunder, together with the then-existing Revolving Credit Commitments, shall not exceed $200,000,000. Each Incremental Commitment will be in an integral multiple of $1,000,000 and in an aggregate principal amount that is not less than $5,000,000 (or such lesser minimum amount approved by the Administrative Agent in its reasonable discretion); *provided* that such amount may be less than such minimum amount or integral multiple amount if such amount represents all the remaining availability under the limit set forth above.

(c)     Incremental Lenders.  Incremental Commitments may be provided by any existing Lender (it being understood that no existing Lender will have an obligation to make all or any portion of the Incremental Commitments, nor will the Borrower have any obligation to approach any existing Lender(s) to provide any Incremental Commitments) or by any Additional Lender on terms permitted by this Section 2.14; *provided* that the Administrative Agent, the Swing Line Lender and each L/C Issuer shall have consented (in each case, such consent not to be unreasonably withheld, conditioned or delayed) to any such Person's providing Incremental Commitments if such consent would be required under Section 13.6(b)(ii) for an assignment of Revolving Credit Commitments to such Person.  Final allocations of Incremental Commitments will be made by the Borrower together with the arrangers thereof, if any, in their discretion.

(d)     Incremental Amendments.  Incremental Commitments shall become Revolving Credit Commitments under this Agreement pursuant to an amendment (each, an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Credit Documents, executed by the Borrower, each Person providing such Incremental Commitments and the Administrative Agent.  The Administrative Agent will promptly notify each Lender as to the effectiveness of each Incremental Amendment.  Incremental Amendments may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent, to effect the provisions of this Section 2.14.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Amendment, this Agreement and the other Credit Documents, as applicable, will be amended to the extent necessary to reflect the existence and terms of the Incremental Commitments.

(e)     Conditions.  The availability of the Incremental Commitments under this Agreement will be subject solely to the following conditions:

(i)     No Event of Default shall have occurred and be continuing or would exist after giving effect thereto; and

(ii)     all representations and warranties set forth in Section 8 and the other Credit Documents shall be true and correct in all material respects on and as of the date of effectiveness of the Incremental Commitments except any representations and warranties which expressly relate to a given date or period shall be required only to be true and correct in all material respects as of the respective date or for the respective period, as the case may be, *provided* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(f)     Terms.  Except as set forth in clause (g) below or with respect to any FILO Tranche under Section 2.14(h) below, any Incremental Commitments shall be on the same terms (including as to maturity and guarantee and collateral) and pursuant to the same documentation applicable to the Revolving Credit Commitments; provided that if a financial covenant is added for the benefit of the Incremental Commitments, no consent from any Lender or the Administrative Agent is required to the extent that such financial covenant is also added for the benefit of the existing credit facilities.

(g)      Pricing.  Other than (x) in the case of a FILO Tranche as described below and (y) upfront fees paid upon the effectiveness of the Incremental Commitments, the pricing in respect of the Incremental Commitments shall be identical to the existing Revolving Credit Commitments.

(h)      FILO Tranche.  Notwithstanding anything set forth above, the Borrower may incur Incremental Commitments in the form of a separate "first-in, last-out" or "last-out" tranche (the "**FILO Tranche**") with interest rate margins, rate floors, upfront fees, funding discounts and original issue discounts, in each case to be agreed upon among the Borrower and the lenders providing the FILO Tranche (which, for the avoidance of doubt, shall not require any adjustment to the Applicable Rate for the existing Revolving Credit Loans) so long as (a) the final scheduled maturity of any FILO Tranche shall not occur, and no FILO Tranche shall require mandatory commitment reductions prior to, the latest then-existing Maturity Date; and (b) the other terms of the FILO Tranche shall be reasonably satisfactory to the Administrative Agent.

(i)      Reallocation of Revolving Credit Exposure.  Upon the effectiveness of the Incremental Commitments (other than pursuant to clause (h) above):

(i)      each Revolving Credit Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each Lender providing an increase to the Revolving Credit Commitments, and each such Lender will automatically and without further act be deemed to have assumed, a portion of such Revolving Credit Lender's participations hereunder in outstanding Letters of Credit and Swing Line Loans such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding participations hereunder in Letters of Credit and Swing Line Loans held by each Revolving Credit Lender will equal the percentage of the Aggregate Revolving Credit Commitments of all Revolving Credit Lenders represented by such Revolving Credit Lender's Revolving Credit Commitments;

(ii)      [reserved]; and

(iii)      if, on the date of any increase to Revolving Credit Commitments there are any Revolving Credit Loans outstanding, such Revolving Credit Loans shall on or prior to the effectiveness of such Incremental Commitments be prepaid from the proceeds of Revolving Credit Loans made hereunder (reflecting such increase in Revolving Credit Commitments), which prepayment shall be accompanied by accrued interest on the Revolving Credit Loans being prepaid and any costs incurred by any Lender in accordance with Section 2.11.

(j)      The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to this Section 2.14.

(k)      Foreign Revolving Credit Commitments.  The Borrower may at any time and from time to time, on one or more occasions, after the Closing Date, by notice to the Administrative Agent, request Incremental Commitments take the form of a separate tranche of

108

commitments available to be borrowed by Foreign Subsidiaries organized under the laws of Canada, England and Wales, Ireland and/or Germany (the "**Incremental Foreign Commitments**"). Any such Incremental Amendment incorporating the Incremental Foreign Commitments into this Agreement and the other Credit Documents shall be as negotiated between the Borrower, the applicable Foreign Subsidiaries and the Lenders providing such Incremental Foreign Commitments and shall otherwise be subject to the other terms and conditions of this Section 2.14 to the extent applicable; provided that it is understood and agreed that without the prior written consent of the Administrative Agent, each Lender, each L/C Issuer and the Swing Line Lender (each granted in its sole discretion) (i) any foreign borrowing base supporting the Incremental Foreign Commitments shall not utilize the domestic Borrowing Base and (ii) no Lender, L/C Issuer or Swing Line Lender shall be obligated to enter into any "collateral allocation mechanism" or similar arrangement vis-a-vis any foreign borrowing base supporting the Incremental Foreign Commitments.

2.15    Extension of Revolving Credit Commitments

(a)    The Borrower may at any time and from time to time request that all or a portion of the Revolving Credit Commitments existing at the time of such request (each, an "**Existing Revolving Credit Commitment**" and any related Revolving Credit Loans thereunder, "**Existing Revolving Credit Loans**") be converted to extend the Maturity Date thereof (any such Existing Revolving Credit Commitments which have been so extended, "**Extended Revolving Credit Commitments**" and any related Revolving Credit Loans, "**Extended Revolving Credit Loans**") and to provide for other terms consistent with this Section 2.15. In order to establish any Extended Revolving Credit Commitments, the Borrower shall provide a notice to the Administrative Agent (who shall provide a copy of such notice to each Lender which such request shall be offered equally to all such Lenders) (a "**Revolving Credit Extension Request**") setting forth the proposed terms of the Extended Revolving Credit Commitments to be established, which, shall either, at the option of the Borrower, (A) reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) or (B) if not consistent with the terms of the applicable Existing Revolving Credit Commitments, shall not be materially more restrictive to the Credit Parties (as determined in good faith by the Borrower), when taken as a whole, than the terms of such Existing Revolving Credit Commitments (the "**Specified Existing Revolving Credit Commitment**") unless (x) the Lenders providing Existing Revolving Credit Commitments receive the benefit of such more restrictive terms or (y) any such provisions apply after the Maturity Date of any Revolving Credit Commitments then outstanding under this Agreement, in each case, to the extent provided in the applicable Extension Amendment; *provided*, *however*, that (w) all or any of the final maturity dates of such Extended Revolving Credit Commitments may be delayed to later dates than the final maturity dates of the Specified Existing Revolving Credit Commitments, (x) (A) the interest rates, interest margins, rate floors, upfront fees, funding discounts, original issue discount and premiums with respect to the Extended Revolving Credit Commitments may be higher or lower than the interest margins rate floors, upfront fees, funding discounts, original issue discount and premiums for the Specified Existing Revolving Credit Commitments and/or (B) additional fees and premiums may be payable to the Lenders providing such Extended Revolving Credit Commitments in addition to or in lieu of any of the items contemplated by the preceding clause (A), (y) the commitment fee rate with respect to the Extended Revolving Credit Commitments may be higher or lower than the commitment fee rate for the Specified Existing Revolving Credit Commitment and (z) the amount

of the Extended Revolving Credit Commitments and the principal amount of the Extended Revolving Credit Loans shall not exceed the amount of the Specified Existing Revolving Credit Commitments being extended and the principal amount of the related Existing Revolving Credit Loans being extended, respectively, and *provided further* that, notwithstanding anything to the contrary in this Section 2.15 or otherwise, (1) the borrowing and repayment (other than in connection with a permanent repayment and termination of commitments) of the Extended Revolving Credit Loans under any Extended Revolving Credit Commitments shall be made on a *pro rata* basis with any borrowings and repayments of the Specified Existing Revolving Credit Commitment and the other Existing Revolving Credit Commitments (the mechanics for which may be implemented through the applicable Extension Amendment and may include technical changes related to the borrowing and repayment procedures of the applicable Credit Facility) and (2) assignments and participations of Extended Revolving Credit Commitments and Extended Revolving Credit Loans shall be governed by the same assignment and participation provisions applicable to Revolving Credit Commitments and the Revolving Credit Loans related to such Revolving Credit Commitments set forth in Section 13.6. No Lender shall have any obligation to agree to have any of its Revolving Credit Loans or Revolving Credit Commitments converted into Extended Revolving Credit Loans or Extended Revolving Credit Commitments pursuant to any Revolving Credit Extension Request. Any Extended Revolving Credit Commitments shall constitute a separate class of revolving credit commitments from the Specified Existing Revolving Credit Commitments and from any other Existing Revolving Credit Commitments; *provided* that any Extended Revolving Credit Commitments may, to the extent provided in the applicable Extension Amendment, be designated as an increase in any then outstanding class of Revolving Credit Commitments other than the Existing Revolving Credit Commitments from which such Extended Revolving Credit Commitments were converted.

(b)    Any Lender (an "**Extending Lender**") wishing to have all or a portion of its Revolving Credit Commitments subject to such Revolving Credit Extension Request converted into Extended Revolving Credit Commitments shall notify the Administrative Agent (an "**Extension Election**") on or prior to the date specified in such Extension Request of the amount of its Revolving Credit Commitments subject to such Extension Request that it has elected to convert into Extended Revolving Credit Commitments. In the event that the aggregate amount of Revolving Credit Commitments subject to Extension Elections exceeds the amount of Extended Revolving Credit Commitments requested pursuant to the Extension Request, Revolving Credit Commitments subject to Extension Elections shall be converted to Extended Revolving Credit Commitments on a *pro rata* basis based on the amount of Revolving Credit Commitments included in each such Extension Election. Notwithstanding the conversion of any Existing Revolving Credit Commitment into an Extended Revolving Credit Commitment, such Extended Revolving Credit Commitment shall be treated identically to all then-outstanding Revolving Credit Commitments for purposes of the obligations of a Revolving Credit Lender in respect of Letters of Credit or Swing Line Loans under Section 3, except that the applicable Extension Amendment may provide that the Letter of Credit Expiration Date may be extended and the related obligations to issue Letters of Credit may be continued so long as the applicable L/C Issuer has consented to such extensions in its sole discretion (it being understood that no consent of any other Lender shall be required in connection with any such extension).

(c)    Extended Revolving Credit Commitments shall be established pursuant to an amendment (an "**Extension Amendment**") to this Agreement (which, except to the extent

110

expressly contemplated by the last sentence of this Section 2.15(c) and notwithstanding anything to the contrary set forth in Section 13.1, shall not require the consent of any Lender other than the Extending Lenders with respect to the Extended Revolving Credit Commitments) executed by the Credit Parties, the Administrative Agent and the Extending Lenders.  No Extension Amendment shall provide for Extended Revolving Credit Commitments in an aggregate principal amount that is less than $10,000,000.  Notwithstanding anything to the contrary in this Section 2.15, and without limiting the generality or applicability of Section 13.1 to any Section 2.15 Additional Amendments, any Extension Amendment may provide for additional terms and/or additional amendments other than those referred to or contemplated above (any such additional amendment, a "**Section 2.15 Additional Amendment**") to this Agreement and the other Credit Documents; *provided* that such Section 2.15 Additional Amendments comply with the requirements of Section 2.15 and do not become effective prior to the time that such Section 2.15 Additional Amendments have been consented to (including, without limitation, consents applicable to holders of any Extended Revolving Credit Commitments provided for in any Extension Amendment) by such of the Lenders, Credit Parties and other parties (if any) as may be required in order for such Section 2.15 Additional Amendments to become effective in accordance with Section 13.1.

(d)     Notwithstanding anything to the contrary contained in this Agreement, if on any date on which any Existing Revolving Credit Commitments are converted, any Loans of any Extending Lender are outstanding under the applicable Specified Existing Revolving Credit Commitments, such Loans (and any related participations) shall be deemed to be allocated as Extended Revolving Credit Loans (and related participations) and Existing Revolving Credit Loans (and related participations) in the same proportion as such Extending Lender's Specified Existing Revolving Credit Commitments to Extended Revolving Credit Commitments.

(e)     The Administrative Agent and the Lenders hereby consent to the consummation of the transactions contemplated by this Section 2.15 (including, for the avoidance of doubt, payment of any interest, fees, or premium in respect of any Extended Revolving Credit Commitments on such terms as may be set forth in the relevant Extension Amendment) and hereby waive the requirements of any provision of this Agreement (including, without limitation, any pro rata payment or amendment section) or any other Credit Document that may otherwise prohibit or restrict any such extension or any other transaction contemplated by this Section 2.15.

(f)     No conversion of Loans or Revolving Credit Commitments pursuant to any Extension Amendment in accordance with this Section 2.15 shall constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement.

2.16    Defaulting Lender

(a)     Reallocation.  Notwithstanding anything to the contrary herein, if a Lender becomes, and during the period it remains, a Defaulting Lender, the following provisions shall apply with respect to any outstanding Protective Advance participation pursuant to Section 2.1(c), any outstanding Letter of Credit participation pursuant to Section 3.1 and Swing Line Loan participation pursuant to Section 3.2 of such Defaulting Lender:

(i)     the Protective Advance participation pursuant to Section 2.1(c), the Letter of Credit participation pursuant to Section 3.1 and the Swing Line Loan participation

111

pursuant to Section 3.2, in each case, of such Defaulting Lender will, subject to the limitation in the proviso below, automatically be reallocated (effective on the day such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders who are Revolving Credit Lenders pro rata in accordance with their respective Revolving Credit Commitments; *provided* that, in each case above, (a) the Revolving Credit Exposure of each Non-Defaulting Lender may not in any event exceed its Revolving Credit Commitment as in effect at the time of such reallocation and (b) neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Administrative Agent, the L/C Issuers, the Swing Line Lender or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender; and

(ii)      to the extent that any portion (the "**unreallocated portion**") of any Defaulting Lender's Letter of Credit participation pursuant to Section 3.1 and Swing Line Loan participation pursuant to Section 3.2 cannot be so reallocated, whether by reason of the proviso in clause (i) above or otherwise, the Borrower will, not later than two Business Days after demand by the Administrative Agent (at the direction of the relevant L/C Issuer and/or the Swing Line Lender, as the case may be), (1) Cash Collateralize the obligations of the Borrower to the relevant L/C Issuer in respect of such Letter of Credit participation pursuant to Section 3.1, in an amount equal to the aggregate amount of the unreallocated portion of such Letter of Credit participation pursuant to Section 3.1, or (2) in the case of such Swing Line Loan participation pursuant to Section 3.2, prepay and/or Cash Collateralize in full the unreallocated portion thereof, or (3) make other arrangements satisfactory to the Administrative Agent, and to the relevant L/C Issuer and the Swing Line Lender, as the case may be, in their sole discretion to protect them against the risk of non-payment by such Defaulting Lender.

(b)      Fees.  Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, such Defaulting Lender will not be entitled to any fees accruing during such period pursuant to Section 3.1(i) (without prejudice to the rights of the Lenders other than Defaulting Lenders in respect of such fees); *provided* that in the case of any such Defaulting Lender that was or is a Lender (x) to the extent that a portion of the Letter of Credit participation pursuant to Section 3.1 of such Defaulting Lender is reallocated to the applicable Non-Defaulting Lenders pursuant to Section 2.16(a) above, such fees under Section 3.1(i) that would have accrued for the benefit of such Defaulting Lender will instead accrue for the benefit of and be payable to such Non-Defaulting Lenders, pro rata in accordance with their applicable Revolving Credit Commitments and (y) to the extent any portion of such Letter of Credit participation pursuant to Section 3.1 cannot be so reallocated, such fees will instead accrue for the benefit of and be payable to the relevant L/C Issuer, as their interests appear.

(c)      Cure.  If the Borrower, the Administrative Agent, each L/C Issuer and the Swing Line Lender agree in writing in their discretion that a Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon (as of the effective date specified in such notice and subject to any conditions set forth therein), such Lender will, to the extent applicable, purchase such portion of outstanding Loans of the other Lenders and/or make such other adjustments as the Administrative Agent may determine to be necessary to cause the Aggregate Revolving Credit Commitments,

112

Revolving Credit Loans, Letter of Credit participations pursuant to Section 3.1 and Swing Line Loan participations pursuant to Section 3.2 of the Lenders to be on a pro rata basis in accordance with their respective Revolving Credit Commitments, whereupon such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender (and such Revolving Credit Commitments and Loans of each Lender will automatically be adjusted on a prospective basis to reflect the foregoing); *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

       2.17    Reserves

Notwithstanding anything to the contrary, the Administrative Agent may at any time and from time to time in the exercise of its Permitted Discretion establish and increase or decrease Reserves; *provided* that the Administrative Agent shall have provided the Borrower at least five (5) Business Days' prior written notice of any such establishment or change; *provided*, *further*, that during such five (5) Business Day period the Borrower shall not request any Credit Extension hereunder that would cause the Availability Requirements to fail to be satisfied if such proposed Reserve were in place.  Upon delivery of such notice, the Administrative Agent shall be available to discuss the proposed Reserve or change, and the Borrower may take such action as may be required so that the event, condition, circumstance or new fact that is the basis for such Reserve or change no longer exists, in a manner and to the extent reasonably satisfactory to the Administrative Agent in the exercise of its Permitted Discretion.  In no event shall such notice and opportunity limit the right of the Administrative Agent to establish or change such Reserve, unless the Administrative Agent shall have determined in its Permitted Discretion that the event, condition, other circumstance or new fact that is the basis for such new Reserve or such change no longer exists or has otherwise been adequately addressed by the Borrower.  Any Reserve established or modified by the Administrative Agent shall have a reasonable relationship to circumstances, conditions, events or contingencies which are the basis for such Reserve, as reasonably determined, without duplication, by the Administrative Agent in its Permitted Discretion.

       2.18    Benchmark Replacement Setting

    (a)    Benchmark Replacement

    (i)    Notwithstanding anything to the contrary herein or in any other Credit Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of any Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document and (y) if a Benchmark Replacement is

113

determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(ii)     No Hedging Agreement shall constitute a "Credit Document" for purposes of this Section 2.18.

(b)     Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(c)     Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.   The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.18(d) and (y) the commencement of any Benchmark Unavailability Period.   Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.18, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.18.

(d)     Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if any then-current Benchmark is a term rate (including Term SOFR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a

114

Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to a given Benchmark, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Loans, in each case, to be made, converted or continued during any Benchmark Unavailability Period with respect to the applicable Benchmark and, failing that, in the case of any request for any affected Term SOFR Borrowing, if applicable, the Borrower will be deemed to have converted any such request into a request for an ABR Borrowing or conversion to ABR Loans in the amount specified therein, and (ii) any outstanding affected Term SOFR Loans, if applicable, will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.11. During a Benchmark Unavailability Period with respect to any Benchmark or at any time that a tenor for any then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark that is the subject of such Benchmark Unavailability Period or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

2.19     [Reserved]

2.20     [Reserved]

2.21     [Reserved]

2.22     Reports on Cash Management Obligations and Secured Hedging Obligations

Each Lender or Affiliate thereof providing Cash Management Services for, or having Hedging Agreements with, any Credit Party or any Subsidiary, shall deliver to the Administrative Agent, promptly after entering into Cash Management Agreements or Hedging Agreements, written notice setting forth the aggregate amount of all Obligations under (x) Secured Cash Management Agreements and Secured Specified Cash Management Agreements (and in the case of a Secured Specified Cash Management Agreement, acknowledging and agreeing that such Obligations shall be "last out" Obligations), and (y) Secured Hedging Agreements and Secured Specified Hedging Agreements (and in the case of a Secured Specified Hedging Agreement, acknowledging and agreeing that such Obligations shall be "last out" Obligations), in each case of such Credit Party or Subsidiary to such Lender or Affiliate (whether matured or unmatured, absolute or contingent).  In addition, each such Lender or Affiliate thereof shall deliver to the Administrative Agent, from time to time after a significant change therein or upon a request therefor, but in any event not less than monthly, a summary of the amounts due or to become due in respect of such Secured Cash Management Agreements, Secured Specified Cash Management Agreements, Secured Hedging Agreements and Specified Secured Hedging Agreements.  The most recent information provided to the Administrative Agent shall be used in determining the

amount of Reserves (if any) to be taken against the Borrowing Base and the amounts to be applied in respect of such Secured Cash Management Agreements, Secured Specified Cash Management Agreements, Secured Hedging Agreements or Secured Specified Hedging Agreements pursuant to Section 11.12 and which tier of the waterfall, contained in Section 11.12, such Secured Cash Management Agreements, Secured Specified Cash Management Agreements, Secured Hedging Agreements and/or Secured Specified Hedging Agreements will be placed.

### SECTION 3   Letters of Credit and Swing Line Loans

3.1     Letters of Credit

(a)     The Letter of Credit Commitments.

(i)     Subject to the terms and conditions set forth herein, (A) each L/C Issuer agrees, in reliance upon the agreements of the Appropriate Lenders set forth in this Section 3.1, (x) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit denominated in Dollars or Alternative Currencies for the account of the Borrower (*provided* that any Letter of Credit may be for the benefit of any direct or indirect Subsidiary of the Borrower) and to amend or renew Letters of Credit previously issued by it, in accordance with Section 3.1(b), and (y) to honor drawings under the Letters of Credit and (B) the Revolving Credit Lenders severally agree to participate in Letters of Credit issued for the account of the Borrower or any of its Subsidiaries, in each case, pursuant to this Section 3.1; *provided* that after giving effect to each L/C Credit Extension, (i) the Availability Requirements shall be satisfied and (ii) the Outstanding Amount of the L/C Obligations, and the Outstanding Amount of the L/C Obligations of each L/C Issuer, shall not exceed the applicable L/C Sublimit; *provided further* that (i) notwithstanding anything herein to the contrary, no L/C Issuer shall have any obligation hereunder to issue any Letter of Credit that is in a form other than a standby letter of credit, except as may be agreed by such L/C Issuer and (ii) no L/C Issuer shall be obligated to issue a Letter of Credit denominated in an Alternative Currency without its express agreement.  Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.  All Closing Date Existing Letters of Credit shall be deemed to have been issued pursuant to this Section 3.1(a) hereto, and from and after the Closing Date shall be subject to and governed by the terms and conditions hereof.  Each L/C Issuer party hereto that is an issuer of Closing Date Existing Letters of Credit agrees to the foregoing arrangements with respect to the Closing Date Existing Letters of Credit issued by it, notwithstanding that such provisions may cause the Outstanding Amount of the L/C Obligations of such L/C Issuer to exceed its applicable L/C Sublimit; *provided* that, in such event, such L/C Issuer shall not be obligated to issue or renew any new Letters of Credit until the applicable conditions precedent in Section 3.1(a) have been satisfied.

(ii)     An L/C Issuer shall not issue any Letter of Credit if:

(A)     subject to Section 3.1(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve months after the date of issuance or last renewal, unless otherwise agreed by the applicable L/C Issuer and the Administrative Agent in their sole discretion;

(B)     the expiry date of such requested Letter of Credit would occur after the applicable Letter of Credit Expiration Date, unless (1) each Appropriate Lender shall have approved such expiry date or (2) the Outstanding Amount of the L/C Obligations in respect of such requested Letter of Credit has been Cash Collateralized or otherwise backstopped in a manner that is mutually agreeable between the Borrower and the applicable L/C Issuer; or

(C)     the beneficiary of the Letter of Credit is either resident in Ireland or, where such beneficiary is a legal person, its place of establishment to which the Letter of Credit relates is Ireland unless the L/C Issuer is either (x) authorized under the laws of Ireland to issue Letters of Credit to any such beneficiary or (y) exempted from the requirement to have any such authorization under the laws of Ireland.

(iii)    An L/C Issuer shall be under no obligation to issue any Letter of Credit if:

(A)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, or any Applicable Law or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or direct that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date (for which such L/C Issuer is not otherwise compensated hereunder);

(B)     the issuance of such Letter of Credit would violate one or more policies or procedures of such L/C Issuer applicable to letters of credit generally; or

(C)     such Letter of Credit is to be denominated in a currency other than Dollars.

(iv)    An L/C Issuer shall be under no obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(v)     Each L/C Issuer shall act on behalf of the Appropriate Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and

117

each L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Section 12 with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Section 12 included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(b)     Procedures for Issuance and Amendment of Letters of Credit; Auto-Renewal Letters of Credit.

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to an L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by an Authorized Officer of the Borrower.  Such Letter of Credit Application must be received by the relevant L/C Issuer and the Administrative Agent not later than 12:00 noon (New York, New York time) at least three Business Days prior to the proposed issuance date or date of amendment, as the case may be; or, in each case, such later date and time as the relevant L/C Issuer may agree in a particular instance in its sole discretion.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the relevant L/C Issuer: (a) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (b) the amount thereof; (c) the expiry date thereof; (d) the name and address of the beneficiary thereof, and the name of the Borrower for whose account the Letter of Credit is to be issued; (e) the documents to be presented by such beneficiary in case of any drawing thereunder; (f) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (g) the currency in which the requested Letter of Credit will be denominated; (h) [reserved] and (i) such other matters as the relevant L/C Issuer may reasonably request.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the relevant L/C Issuer (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the relevant L/C Issuer may reasonably request.

(ii)     Promptly after receipt of any Letter of Credit Application, the relevant L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof.  Unless the relevant L/C Issuer has received written notice from any Lender, the Administrative Agent or any Credit Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied, then, subject to the terms and conditions hereof, such L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower (or the applicable Subsidiary) or enter into the applicable amendment, as the case may be.  Immediately upon the issuance of each Letter of Credit, each Appropriate Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, acquire from the relevant L/C Issuer a risk participation in such

118

Letter of Credit in an amount equal to the product of such Lender's Pro Rata Share times the amount of such Letter of Credit.

(iii)    If the Borrower so requests in any applicable Letter of Credit Application, the relevant L/C Issuer shall agree to issue a Letter of Credit that has automatic renewal provisions (the maturity of which shall in no event extend beyond the Letter of Credit Expiration Date, unless such Letter of Credit has been Cash Collateralized or otherwise backstopped in a manner that is mutually agreeable between the Borrower and the applicable L/C Issuer) (each, an "**Auto-Renewal Letter of Credit**"); *provided* that any such Auto-Renewal Letter of Credit must permit the relevant L/C Issuer to prevent any such renewal at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (each, a "**Nonrenewal Notice Date**") in each such twelve-month period to be agreed upon by the relevant L/C Issuer and the Borrower at the time such Letter of Credit is issued.  Unless otherwise directed by the relevant L/C Issuer, the Borrower shall not be required to make a specific request to the relevant L/C Issuer for any such renewal.  Once an Auto-Renewal Letter of Credit has been issued, the Appropriate Lenders shall be deemed to have authorized (but may not require) the relevant L/C Issuer to permit the renewal of such Letter of Credit at any time until an expiry date not later than the applicable Letter of Credit Expiration Date unless such Letter of Credit has been Cash Collateralized or otherwise backstopped in a manner that is mutually agreeable between the Borrower and the applicable L/C Issuer; *provided* that the relevant L/C Issuer shall not permit any such renewal if (A) the relevant L/C Issuer has determined that it would not be permitted, or would have no obligation at such time to issue such Letter of Credit in its renewed form under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section 3.1(a) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five (5) Business Days before the applicable Nonrenewal Notice Date from the Administrative Agent or any Appropriate Lender, or the Borrower that one or more of the applicable conditions specified in Section 7 is not then satisfied.

(iv)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the relevant L/C Issuer will also deliver to the Borrower and the Administrative Agent a non-negotiable copy of such Letter of Credit or amendment.

(c)    Drawings and Reimbursements; Funding of Participations.

(i)    Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the relevant L/C Issuer shall examine drawing documents within the period stipulated by the terms and conditions of the Letter of Credit.  After such examination, such L/C Issuer shall notify promptly the Borrower and the Administrative Agent thereof.  In the case of a Letter of Credit denominated in an Alternative Currency, the Borrower shall reimburse the relevant L/C Issuer in such Alternative Currency, unless (A) the relevant L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars, or (B) in the absence of any such requirement for reimbursement in Dollars, the Borrower shall have notified the relevant L/C Issuer promptly following receipt of the notice of drawing that the Borrower

119

will reimburse such L/C Issuer in Dollars.  In the case of any such reimbursement in Dollars of a drawing under a Letter of Credit denominated in an Alternative Currency, the relevant L/C Issuer shall notify the Borrower of the Dollar Amount of the amount of the drawing promptly following the determination thereof.  Not later than 11:00 a.m. on the first Business Day following the date of any payment by any L/C Issuer under a Letter of Credit to be reimbursed in Dollars (including all Letters of Credit denominated in Dollars), or the Applicable Time on the first Business Day following the date of any payment by any L/C Issuer under an Alternative Currency Letter of Credit to be reimbursed in an Alternative Currency (each such date, an "**Honor Date**"), the Borrower shall reimburse the applicable L/C Issuer in an amount equal to the amount of such drawing and in the applicable currency.  If the Borrower fails to so reimburse such L/C Issuer by such time, the Administrative Agent shall promptly notify each Appropriate Lender of the Honor Date, the amount of the unreimbursed drawing (expressed in Dollars or in the Dollar Amount thereof in the case of an Alternative Currency) (the "**Unreimbursed Amount**"), and the amount of such Appropriate Lender's Pro Rata Share thereof.  In such event, the Borrower shall be deemed to have requested a Revolving Credit Borrowing of ABR Loans in Dollars to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount (or, in the case of an Unreimbursed Amount denominated in a currency other than Dollars, the Dollar Amount thereof), without regard to the minimum and multiples specified in Section 2.2 for the principal amount of ABR Loans, but subject to the amount of the unutilized portion of the Revolving Credit Commitments of the Appropriate Lenders, and subject to the conditions set forth in Section 7 (other than the delivery of a Notice of Borrowing). Any notice given by an L/C Issuer or the Administrative Agent pursuant to this Section 3.1(c)(i) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.  For the avoidance of doubt, all Revolving Credit Borrowings pursuant to this Section 3.1(c)(i) shall be in Dollars.

(ii)     Each Revolving Credit Lender (including any such Revolving Credit Lender acting as an L/C Issuer) shall upon any notice pursuant to Section 3.1(c)(i) make funds available to the Administrative Agent for the account of the relevant L/C Issuer at the Administrative Agent's Office for payments in an amount equal to its Pro Rata Share of the Dollar Amount of any Unreimbursed Amount in respect of a Letter of Credit, in each case, not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent (which may be the same Business Day such notice is provided if such notice is provided prior to 12:00 noon), whereupon, subject to the provisions of Section 3.1(c)(iii), each Lender that so makes funds available shall be deemed to have made a Revolving Credit Loan that is an ABR Loan to the Borrower in such amount.  The Administrative Agent shall remit the funds so received to the relevant L/C Issuer.

(iii)     With respect to any Unreimbursed Amount in respect of a Letter of Credit that is not fully refinanced by a Revolving Credit Borrowing because the conditions set forth in Section 7 cannot be satisfied or for any other reason, the Borrower shall be deemed to have incurred from the relevant L/C Issuer an L/C Borrowing in the Dollar Amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.  In such event, each Lender's payment to the Administrative Agent for the account

120

of the relevant L/C Issuer pursuant to Section 3.1(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 3.1.  For the avoidance of doubt, all L/C Borrowings pursuant to this Section 3.1(c)(iii) shall be in Dollars.

(iv)     Until each Appropriate Lender funds its Revolving Credit Loan or L/C Advance pursuant to this Section 3.1(c) to reimburse the relevant L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Pro Rata Share of such amount shall be solely for the account of the relevant L/C Issuer.

(v)     Each Lender's obligation to make Revolving Credit Loans or L/C Advances to reimburse an L/C Issuer for amounts drawn under the applicable Letters of Credit, as contemplated by this Section 3.1(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the relevant L/C Issuer, the Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default; or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided* that each Lender's obligation to make Revolving Credit Loans pursuant to this Section 3.1(c) is subject to the conditions set forth in Section 7 (other than delivery by the Borrower of a Notice of Borrowing).  No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrower to reimburse the relevant L/C Issuer for the amount of any payment made by such L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)     If any Lender fails to make available to the Administrative Agent for the account of the relevant L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 3.1(c) by the time specified in Section 3.1(c)(ii), such L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at a rate per annum equal to the applicable Overnight Rate from time to time in effect *plus* any administrative, processing or similar fees customarily charged by such L/C Issuer in connection with the foregoing.  A certificate of the relevant L/C Issuer submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this Section 3.1(c)(vi) shall be conclusive absent manifest error.

(d)     Repayment of Participations.

(i)     If, at any time after an L/C Issuer has made a payment under any Letter of Credit and has received from any Appropriate Lender such Lender's L/C Advance in respect of such payment in accordance with this Section 3.1(d), the Administrative Agent receives for the account of such L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Appropriate Lender its Pro Rata Share thereof (appropriately adjusted, in the case of interest payments, to reflect the period

121

of time during which such Lender's L/C Advance was outstanding) in the same funds as those received by the Administrative Agent.

(ii)    If any payment received by the Administrative Agent for the account of an L/C Issuer pursuant to Section 3.1(c)(i) is required to be returned under any of the circumstances described in Section 13.19 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each Appropriate Lender shall pay to the Administrative Agent for the account of such L/C Issuer its Pro Rata Share thereof on demand of the Administrative Agent, *plus* interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  The obligations of the Lenders under this clause (d)(ii) shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)    Obligations Absolute.  The obligation of the Borrower to reimburse the relevant L/C Issuer for each drawing under each Letter of Credit issued by it and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Credit Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that Holdings or any Credit Party may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the relevant L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    any payment by the relevant L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the relevant L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)    any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to the Borrower or any Subsidiary or in the relevant currency markets generally;

122

(vi)      any exchange, release or nonperfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guarantees or any other guarantee, for all or any of the Obligations of any Credit Party in respect of such Letter of Credit; or

(vii)      any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Credit Party;

*provided* that the foregoing shall not excuse any L/C Issuer from liability to the Borrower to the extent of any direct damages (as opposed to punitive or consequential damages or lost profits, claims in respect of which are waived by the Borrower to the extent permitted by Applicable Law) suffered by the Borrower that are caused by acts or omissions of such L/C Issuer constituting gross negligence or willful misconduct on the part of such L/C Issuer.

(f)      Role of L/C Issuers.  Each Lender and the Borrower agrees that, in paying any drawing under a Letter of Credit, the relevant L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the L/C Issuers nor any of the respective correspondents, participants or assignees of any L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) a problem with the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document.  The Borrower hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided* that this assumption is not intended to, and shall not, preclude the Borrower pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the L/C Issuers nor any of the respective correspondents, participants or assignees of any L/C Issuer, shall be liable or responsible for any of the matters described in clauses (i) through (iii) of this Section 3.1(f); *provided* that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against an L/C Issuer, and such L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to lost profits or punitive or consequential damages suffered by the Borrower that were caused by such L/C Issuer's willful misconduct or gross negligence or such L/C Issuer's willful or grossly negligent failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, each L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no L/C Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)      Cash Collateral.  If (i) any Event of Default occurs and is continuing and the Required Lenders require the Borrower to Cash Collateralize their respective L/C Obligations

123

pursuant to Section 11 or (ii) an Event of Default set forth under Section 11.5 occurs and is continuing or (iii) for any reason, any Letter of Credit is outstanding at the time of termination of the Revolving Credit Commitments and a backstop letter of credit that is satisfactory to the L/C Issuer in its sole discretion is not in place, then the Borrower shall Cash Collateralize the then Outstanding Amount of all L/C Obligations (in an amount equal to such Outstanding Amount determined as of the date of such Event of Default or such termination date), and shall do so not later than 2:00 p.m. on (x) in the case of the immediately preceding clause (i) or (iii), (1) the Business Day that the Borrower receives notice thereof, if such notice is received on such day prior to 12:00 noon or (2) if clause (1) above does not apply, the Business Day immediately following the day that the Borrower receives such notice and (y) in the case of the immediately preceding clause (ii), the Business Day on which an Event of Default set forth under Section 11.5 occurs or, if such day is not a Business Day, the Business Day immediately succeeding such day.  The Borrower hereby grant to the Administrative Agent, for the benefit of the L/C Issuers and the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Cash Collateral shall be maintained in blocked accounts at the Administrative Agent and may be invested in Cash Equivalents made available by the Administrative Agent and elected by the Borrower.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under Applicable Law, to reimburse the relevant L/C Issuer.  To the extent the amount of any Cash Collateral exceeds the then Outstanding Amount of such L/C Obligations and so long as no Event of Default has occurred and is continuing, the excess shall be refunded to the Borrower.  In the case of clause (i) or (ii) above, if such Event of Default is cured or waived and no other Event of Default is then occurring and continuing, the amount of any Cash Collateral shall be refunded to the Borrower.

(h)        Applicability of ISP and UCP.  Unless otherwise expressly agreed by the relevant L/C Issuer and the Borrower (or other Borrower) when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each Commercial Letter of Credit.

(i)        Letter of Credit Fees.  The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Pro Rata Share a letter of credit fee (the "**Letter of Credit Fee**") for each Letter of Credit issued for the account of the Borrower or its Subsidiaries pursuant to this Agreement equal to the Applicable Rate times the daily maximum Dollar Amount then available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum Dollar Amount increases periodically pursuant to the terms of such Letter of Credit).  Such Letter of Credit Fees shall be computed on a quarterly basis in arrears.  Such Letter of Credit Fees shall be due and payable in Dollars on the first Business Day of each April, July, October and January, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand.  If there is any change in the Applicable Rate during any quarter, the daily maximum amount of each Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(j)      Fronting Fee and Documentary and Processing Charges Payable to L/C Issuers.  The Borrower shall pay directly to each L/C Issuer for its own account a fronting fee with respect to each Letter of Credit issued by it for the account of the Borrower or its Subsidiaries equal to 0.125% per annum of the daily maximum Dollar Amount then available to be drawn under such Letter of Credit.  Such fronting fees shall be computed on a quarterly basis in arrears.  Such fronting fees shall be due and payable on the first Business Day of each April, July, October and January, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand.  In addition, the Borrower shall pay directly to each L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable within ten (10) Business Days of demand and are nonrefundable.

(k)      Conflict with Letter of Credit Application.  Notwithstanding anything else to the contrary in any Letter of Credit Application, in the event of any conflict between the terms hereof and the terms of any Letter of Credit Application, the terms hereof shall control.

(l)      Addition of an L/C Issuer.

(i)      A Lender may become an additional L/C Issuer hereunder pursuant to a written agreement among the Borrower, the Administrative Agent and such Lender.  The Administrative Agent shall notify the Lenders of any such additional L/C Issuer.

(ii)      On the last Business Day of each March, June, September and December (and on such other dates as the Administrative Agent may request), each L/C Issuer shall provide the Administrative Agent a list of all Letters of Credit issued by it that are outstanding at such time together with such other information as the Administrative Agent may from time to time reasonably request.

(m)      Letters of Credit Issued for Subsidiaries.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Borrower shall be obligated to reimburse the applicable L/C Issuer hereunder for any and all drawings under such Letter of Credit.  The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of the Restricted Subsidiaries of the Borrower inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

(n)      Replacement of an L/C Issuer.  Any L/C Issuer may be replaced at any time by written agreement between the Borrower, the Administrative Agent, the replaced L/C Issuer and the successor L/C Issuer.  The Administrative Agent shall notify the Lenders of any such replacement of an L/C Issuer.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced L/C Issuer pursuant to Section 3.1(i).  From and after the effective date of any such replacement, (i) the successor L/C Issuer shall have all the rights and obligations of an L/C Issuer under this Agreement with respect to Letters of Credit to be issued by it thereafter and (ii) references herein to the term "L/C Issuer" shall be deemed to include such successor or any previous L/C Issuer, or such successor and all previous L/C Issuers, as the context shall require.  After the replacement of an L/C Issuer

125

hereunder, the replaced L/C Issuer shall remain a party hereto and shall continue to have all the rights and obligations of an L/C Issuer under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit or to extend, reinstate, or otherwise amend any then existing Letter of Credit.

3.2     Swing Line Loans

(a)     The Swing Line.  Subject to the terms and conditions set forth herein, the Swing Line Lender agrees to make loans in Dollars (each such loan, a "**Swing Line Loan**") to the Borrower in an aggregate principal amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, in each case from time to time on any Business Day during the period from the Closing Date until the Maturity Date, notwithstanding the fact that (i) such Swing Line Loans, when aggregated with the Pro Rata Share of the Outstanding Amount of Revolving Credit Loans and L/C Obligations of any Lender acting as the Swing Line Lender, may exceed the amount of such Lender's Revolving Credit Commitment; *provided* that (i) after giving effect to any Swing Line Loan, each Revolving Credit Lender's Revolving Credit Exposure shall not exceed such Lender's Revolving Credit Commitment then in effect and (ii) after giving effect to each Swing Line Loan and to the application of the proceeds thereof, the Availability Requirements shall be met.  Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 3.2, prepay under Section 2.5, and re-borrow under this Section 3.2.  Each Swing Line Loan made to the Borrower shall be an ABR Loan.  Immediately upon the making of a Swing Line Loan, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Revolving Credit Lender's Pro Rata Share times the amount of such Swing Line Loan.

(b)     Borrowing Procedures.  Each Swing Line Borrowing shall be made upon the Borrower's irrevocable written notice to the Swing Line Lender and the Administrative Agent. Each such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. (New York time) on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum amount of $100,000 (and any amount in excess of $100,000 shall be an integral multiple amount of $25,000), (ii) [reserved] and (iii) the requested borrowing date, which shall be a Business Day.  Each such notice must be made by delivery to the Swing Line Lender and the Administrative Agent of a written Swing Line Loan Notice, appropriately completed and signed by an Authorized Officer of the Borrower.  Promptly after receipt by the Swing Line Lender of any Swing Line Loan Notice, the Swing Line Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Administrative Agent (by telephone or in writing) of the contents thereof.  Unless the Swing Line Lender has received notice (by telephone or in writing) from the Administrative Agent (including at the request of any Lender) prior to 2:00 p.m. (New York time) on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the proviso to the first sentence of Section 3.2(a), or (B) that one or more of the applicable conditions specified in Section 7 is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender will, not later than 3:00 p.m. (New York time) on the borrowing date specified in such Swing Line Loan Notice, make the amount of the Swing Line Loan available to the Borrower.

126

(c)      Refinancing of Swing Line Loans.

(i)      The Swing Line Lender at any time in its sole and absolute discretion may request the Borrower (and the Borrower hereby agrees to submit a Notice of Borrowing requesting) that each Revolving Credit Lender make a Revolving Credit Loan in an amount equal to such Revolving Credit Lender's Pro Rata Share of the amount of the Swing Line Loans then outstanding to the Borrower, which Revolving Credit Loan shall be an ABR Loan.  Such request shall be made in a Notice of Borrowing and in accordance with the requirements of Section 2.3, without regard to the minimum and multiples specified therein for the principal amount of Revolving Credit Loans, but subject to the unutilized portion of the Revolving Credit Commitments and the conditions set forth in Section 7.  The Borrower shall furnish the Swing Line Lender with a copy of each applicable Notice of Borrowing promptly after delivering such notice to the Administrative Agent.  Each Appropriate Lender shall make an amount equal to its Pro Rata Share of the amount specified in each such Notice of Borrowing available to the Administrative Agent in Same Day Funds for the account of the Swing Line Lender at the Administrative Agent's Office not later than the time specified in Section 2.3(b) on the date specified in such Notice of Borrowing, whereupon, subject to Section 3.2(c)(ii), each Lender that so makes funds available shall be deemed to have made Revolving Credit Loans to the Borrower in such respective amounts.  The Administrative Agent shall remit the funds so received to the Swing Line Lender.

(ii)      If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Credit Borrowing in accordance with Section 3.2(c)(i), the request for Loans submitted by the Borrower as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Appropriate Lenders fund its risk participation in the relevant Swing Line Loan and each Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to Section 3.2(c)(i) shall be deemed payment in respect of such participation.

(iii)      If any Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 3.2(c) by the time specified in Section 3.2(c)(i), the Swing Line Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the applicable Overnight Rate from time to time in effect, *plus* any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing.  If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Revolving Credit Loan included in the relevant Borrowing or funded participation in the relevant Swing Line Loan, as the case may be.  A certificate of the Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

127

(iv)     Each Lender's obligation to make Revolving Credit Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 3.2(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against any Swing Line Lender, the Borrower or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided* that each Lender's obligation to make Revolving Credit Loans pursuant to this Section 3.2(c) is subject to the conditions set forth in Section 7 (other than delivery by the Borrower of a Notice of Borrowing).  No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrower to repay Swing Line Loans, together with interest as provided herein.

(d)     Repayment of Participations.

(i)     At any time after any Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Lender its Pro Rata Share of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

(ii)     If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 13.19 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Lender with a participation in such Swing Line Loan shall pay to the Swing Line Lender its Pro Rata Share thereof on demand of the Administrative Agent, *plus* interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the applicable Overnight Rate.  The Administrative Agent will make such demand upon the request of the Swing Line Lender.  The obligations of the applicable Lenders under this clause (d)(ii) shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)     Interest for Account of Swing Line Lender.  The Swing Line Lender shall be responsible for invoicing the Borrower for interest on the applicable Swing Line Loans.  Until each applicable Lender funds its Revolving Credit Loan or risk participation pursuant to this Section 3.2 to refinance such Lender's Pro Rata Share of any Swing Line Loan, interest in respect of such Pro Rata Share shall be solely for the account of the Swing Line Lender.

(f)     Payments Directly to Swing Line Lender.  The Borrower shall make all payments of principal and interest in respect of the Swing Line Loans made to it directly to the Swing Line Lender.

**SECTION 4   Fees; Commitments**

4.1      Fees

(a)      The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender in accordance with its Pro Rata Share, a commitment fee equal to 0.50% *times* the actual daily Unused Amount; *provided* that any commitment fee accrued with respect to any of the Revolving Credit Commitments of a Defaulting Lender during the period prior to the time such Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Borrower so long as such Lender shall be a Defaulting Lender except to the extent that such commitment fee shall otherwise have been due and payable by the Borrower prior to such time; *provided further* that no commitment fee shall accrue on any of the Revolving Credit Commitments of a Defaulting Lender so long as such Lender shall be a Defaulting Lender.  The commitment fees shall accrue at all times from the Closing Date until the Maturity Date, including at any time during which one or more of the conditions in Section 7 is not met, and shall be due and payable quarterly in arrears on the first Business Day of each April, July, October and January, commencing with July 1, 2023, and on the Maturity Date.

(b)      [Reserved].

(c)      The Borrower agrees to pay directly to the Administrative Agent for its own account the administrative agent fees as set forth in the Fee Letter.

4.2      Termination or Reduction of Revolving Credit Commitments, L/C Sublimit or Swing Line Sublimit

(a)      Optional.  Upon at least one Business Day's prior revocable written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent at the Administrative Agent's Office (which notice the Administrative Agent shall promptly transmit to each of the Appropriate Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Revolving Credit Commitments, the L/C Sublimit or the Swing Line Sublimit, in each case, in whole or in part; *provided* that (i) any such termination or reduction of Revolving Credit Commitments shall apply proportionately and permanently to reduce the Revolving Credit Commitments of each of the Lenders, (ii) any partial reduction pursuant to this Section 4.2(a) shall be in an aggregate amount in principal of $500,000 or any whole multiple of the amount in principal of $100,000 in excess thereof and (iii) after giving effect to such termination or reduction and to any prepayments of the Revolving Credit Loans, the Swing Line Loans or cancellation or Cash Collateralization of Letters of Credit made on the date thereof in accordance with this Agreement (including pursuant to Section 5.2), (A) each Lender's Revolving Credit Exposure shall not exceed its Revolving Credit Commitment, (B) [reserved], (C) the L/C Sublimit with respect to the L/C Issuers, taken as a whole, shall not be greater than the Aggregate Revolving Credit Commitments, (D) the L/C Sublimit of each L/C Issuer shall not be less than the Outstanding Amount of the Letters of Credit issued by such L/C Issuer, (E) the Swing Line Sublimit shall not be greater than the Aggregate Revolving Credit Commitments, (F) [reserved] and (G) the Outstanding Amount of Swing Line Loans shall not exceed the Swing Line Sublimit.

129

(b)        Mandatory.  The Revolving Credit Commitments shall terminate on the Maturity Date.

(c)        Notice of Commitment Reductions; Payment of Fees.  The Administrative Agent will promptly notify the Appropriate Lenders of any termination or reduction of Revolving Credit Commitments, L/C Sublimit or Swing Line Sublimit pursuant to this Section 4.2.  All commitment fees accrued until the effective date of any termination of the Revolving Credit Commitments shall be paid on the effective date of such termination.

### SECTION 5   Payments

5.1        Voluntary Prepayments

(a)        The Borrower shall have the right to prepay Loans, without premium or penalty (other than amounts, if any, required to be paid pursuant to Section 2.11 with respect to prepayments of Term SOFR Loans made on any date other than the last day of the applicable Interest Period), in whole or in part, from time to time on the following terms and conditions: (a) the Borrower shall give the Administrative Agent at the Administrative Agent's Office revocable written notice (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment, the amount of such prepayment and Type(s) of Revolving Credit Loans to be prepaid, which notice shall be given by the Borrower no later than 1:00 p.m. (New York, New York time) (A) three Business Days prior to any date of prepayment of Term SOFR Loans and (B) on the date of prepayment of ABR Loans and shall be promptly transmitted by the Administrative Agent to each Appropriate Lender together with each such Lender's Pro Rata Share of such prepayment, (b)(A) each partial prepayment of Term SOFR Loans shall be in a principal amount of $1,000,000 or a whole multiple of the amount of $500,000 in excess thereof; and (B) each partial prepayment of ABR Loans (other than Swing Line Loans and Protective Advances) shall be in a principal amount of $500,000 or a whole multiple of the amount of $100,000 in excess thereof or, in each case of clauses (A) and (B), if less, the entire principal amount thereof then outstanding (it being understood that ABR Loans shall be denominated in Dollars only) and (c) any prepayment of Term SOFR Loans pursuant to this Section 5.1 on any day prior to the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of Section 2.11.  Each prepayment of principal of, and interest on, any Loan shall be made in Dollars.  Each prepayment of the Loans pursuant to this Section 5.1(a) shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares.

(b)        The Borrower may, upon notice to the Swing Line Lender (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; *provided* that (1) such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. (New York time) on the date of the prepayment and (2) any such prepayment shall be in a minimum principal amount of $100,000 or a whole multiple of the amount of $25,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(c)  The Borrower may, upon notice to the Administrative Agent, at any time or from time to time, voluntarily prepay Protective Advances in whole or in part without premium or penalty; *provided* that (1) such notice must be received by the Administrative Agent not later than 1:00 p.m. on the date of the prepayment, and (2) any such prepayment shall be in a minimum principal amount of $100,000 or a whole multiple of the amount of $25,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

5.2   Mandatory Prepayments

(a)  If at any time any of the Availability Requirements fail to be satisfied (except as the result of the making of a Protective Advance, unless requested by the Administrative Agent), then, the Borrower shall promptly prepay Loans and Cash Collateralize L/C Obligations (it being understood that any such L/C Obligations so Cash Collateralized will not be deemed to be outstanding for purposes of this Section 5.2(a)) so that the Availability Requirements will be satisfied.

(b)  At all times following the establishment of the Cash Management Systems pursuant to Section 9.16 and during the Cash Dominion Period (subject to the provisions of the Security Documents), on each Business Day, at or before 1:00 p.m. (local time), the Administrative Agent shall apply all immediately available funds credited to any Concentration Account of any Credit Party, *first* to pay any fees or expense reimbursements then due to the Administrative Agent, the Collateral Agent, each L/C Issuer, and the Revolving Credit Lenders hereunder, in each case in their capacity as such, pro rata, *second* to pay interest due and payable in respect of any Loans (including Swing Line Loans and Protective Advances) of the Borrower that may be outstanding, pro rata, *third* to prepay the principal of any Protective Advances to the Borrower that may be outstanding, pro rata and *fourth* to prepay the principal of the Revolving Credit Loans and Swing Line Loans to the Borrower and to Cash Collateralize L/C Obligations of the Borrower, pro rata.

5.3   Method and Place of Payment

(a)  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds not later than 2:00 p.m. on the date specified herein.  If, for any reason, the Borrower is prohibited by any Applicable Law from making any required payment hereunder in any Alternative Currency, the Borrower shall make such payment in Dollars in the Dollar Amount of the applicable foreign currency payment amount. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. (New York, New York time) shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

131

(b)      Unless the Borrower has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder for the account of any Lender or an L/C Issuer hereunder, that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to such Lender or L/C Issuer.  If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then such Lender or L/C Issuer shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender or L/C Issuer in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender or L/C Issuer to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect.

(c)      A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 5.3 shall be conclusive, absent manifest error.

5.4      Net Payments

(a)      Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; *provided* that if the Borrower or any Guarantor or the Administrative Agent shall be required by Applicable Law (as determined in the good faith discretion of an applicable withholding agent) to deduct or withhold any Taxes from such payments, then (i) the Borrower or such Guarantor or the Administrative Agent shall make such deductions or withholdings and (ii) the Borrower or such Guarantor or the Administrative Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with Applicable Law.  If such a Tax is an Indemnified Tax, the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after such deduction or withholding had been made (including such deductions or withholdings applicable to additional sums payable under this Section 5.4), the Administrative Agent, the Collateral Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made.  Whenever any Indemnified Taxes are payable by the Borrower or such Guarantor, as promptly as practicable thereafter, the Borrower or the Guarantor shall send to the Administrative Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt (or other evidence acceptable to the Administrative Agent or such Lender, acting reasonably) received by the Borrower or such Guarantor showing payment thereof.

(b)      The Borrower shall timely pay to the relevant Governmental Authority Other Taxes in accordance with Applicable Law, or at the option of the Administrative Agent, timely reimburse it for the payment of any Other Taxes that are paid by the Administrative Agent to the relevant Governmental Authority in accordance with Applicable Law.

(c)      The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within fifteen Business Days after written demand therefor, for the full amount of any Indemnified Taxes imposed on the Administrative Agent, the Collateral Agent or such Lender as the case may be (including Indemnified Taxes imposed or asserted on or

132

attributable to amounts payable under this Section 5.4) payable or paid by such Agent or Lender or required to be withheld or deducted from a payment to such Agent or Lender and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate setting forth reasonable detail as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)      Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.6 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with this Agreement or any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)      Any Non-U.S. Lender claiming a basis for an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or under any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Credit Document shall, to the extent it is legally able to do so, deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding or as will permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in this Section 5.4(e), the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.4(f), 5.4(i) and 5.4(j) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(f)      Without limiting the generality of Section 5.4(e), each Non-U.S. Lender with respect to any amounts payable hereunder or under any other Credit Document shall, to the extent it is legally entitled to do so:

(i)      deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two executed copies of (x) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service Form W-8BEN or W-8BEN-E (together with a certificate substantially in the form of Exhibit J-1 representing that such Non-U.S. Lender is not a bank within the meaning of Section 881(c)(3)(A) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, any interest payment received by such Non-U.S. Lender under this Agreement or any other Credit Document is not effectively connected with the conduct of a trade or business in the United States and is not a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Code)), (y) Internal Revenue Service Form W-8BEN, Form W-8-BEN-E or Form W-8ECI, in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. Federal withholding Tax on payments under any Credit Document or (z) to the extent a Non-U.S. Lender is not the beneficial owner with respect to any portion of any sums paid or payable to such Lender under any of the Credit Documents (for example, in the case of a typical participation or where Non-U.S. Lender is a pass through entity) Internal Revenue Service Form W-8IMY and all necessary attachments (including the forms described in clauses (x) and (y) above and in Section 5.4(i), Exhibit J-2, Exhibit J-3 and or other certification documents from each beneficial owner, as applicable); *provided* that if the Non-U.S. Lender is a partnership it may provide Exhibit J-4 on behalf of one or more of its direct or indirect partners that are claiming the portfolio interest exemption; and

(ii)      deliver to the Borrower and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or inaccurate in any respect and after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower or the Administrative Agent in writing.

If in any such case any Change in Law has occurred prior to the date on which any such delivery would otherwise be required that renders any such form inapplicable or would prevent such Non-U.S. Lender from duly completing and delivering any such form with respect to it, such Non-U.S. Lender shall promptly so advise the Borrower and the Administrative Agent.

(g)      If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it had received and retained a refund of an Indemnified Tax or additional sums payable under this Section 5.4 for which a payment has been made by the Borrower pursuant to this Agreement, which refund in the good faith judgment of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, is attributable to such payment made by the Borrower, then the Lender, the Administrative

134

Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower for such amount (net of all out-of-pocket expenses of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender, the Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion exercised in good faith to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any Taxes imposed on the refund) than it would have been in if the payment had not been required; *provided* that the Borrower, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority.  A Lender, the Administrative Agent or the Collateral Agent shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim.  None of any Lender, the Administrative Agent or the Collateral Agent shall be obliged to disclose any information regarding its tax affairs that it deems confidential to any Credit Party in connection with this clause (g).

(h)     Without limiting the generality of Section 5.4(e), with respect to any amounts payable hereunder or under any other Credit Document, each Lender or Agent that is a United States person under Section 7701(a)(30) of the Code (each, a "**U.S. Lender**") shall deliver to the Borrower and the Administrative Agent two copies of United States Internal Revenue Service Form W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Lender or Agent is exempt from United States backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or inaccurate in any respect, (iii) after the occurrence of a change in such Agent's or Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(i)     If a payment made to any Agent or Lender would be subject to U.S. federal withholding Tax imposed under FATCA if such Agent or Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Agent or Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or such Agent, such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such other documentation reasonably requested by the Administrative Agent and the Borrower as may be necessary for the Administrative Agent and the Borrower to comply with their obligations under FATCA, to determine whether such Agent or Lender has or has not complied with such Agent's or Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment and deliver to the Borrower and the Administrative Agent two further copies of any such documentation on or before the date that any such documentation expires or becomes obsolete or inaccurate in any respect and after the occurrence of any event requiring a change in the documentation previously delivered by it to the Borrower or the Administrative Agent.  Solely for

135

purposes of this subsection (j), "FATCA" shall include any amendments made to FATCA after the date of this Agreement and any current or future intergovernmental agreements and any Applicable Law implementing such agreement entered into in connection therewith.

(j)        The agreements in this Section 5.4 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder and under any other Credit Document.

5.5        Computations of Interest and Fees

All computations of interest for ABR Loans when the ABR is determined on the basis of the rate of interest in effect for such date as publicly announced from time to time by the Administrative Agent as its "prime rate" shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360 day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 5.3(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

5.6        Limit on Rate of Interest

(a)        No Payment Shall Exceed Lawful Rate.  Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect of the Obligations in excess of the amount or rate permitted under or consistent with any Applicable Law.

(b)        Payment at Highest Lawful Rate.  If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of Section 5.6(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with Applicable Laws.

(c)        Adjustment if Any Payment Exceeds Lawful Rate.  If any provision of this Agreement or any of the other Credit Documents would obligate the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any Applicable Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.8.

(d)        Spreading.  In determining whether the interest hereunder is in excess of the amount or rate permitted under or consistent with any Applicable Law, the total amount of interest shall be spread throughout the entire term of this Agreement until its Payment in Full.

136

(e)      Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any Applicable Law, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

### SECTION 6   Conditions Precedent to the Closing Date

The effectiveness of this Agreement and the obligation of each Lender and each L/C Issuer to make a Credit Extension hereunder after the Closing Date is subject to the satisfaction of the conditions set forth below.

6.1      Credit Documents

(a)      The Administrative Agent shall have received, in each case, as reasonably satisfactory in form and substance to the Lenders party hereto as of the Closing Date, (i) this Agreement, executed and delivered by all parties hereto, (ii) an amended and restated Guarantee, executed and delivered by an Authorized Officer of each Guarantor as of the Closing Date, (iii) an amended and restated Security Agreement, executed and delivered by an Authorized Officer of each grantor party thereto as of the Closing Date and (iv) an amended and restated ABL Intercreditor Agreement, executed and delivered by the Term Loan Administrative Agent and an Authorized Officer of each Credit Party as of the Closing Date.

(b)      If a Credit Extension is to be made on the Closing Date (other than deeming the issuance of Existing Letters of Credit as issued hereunder), the Administrative Agent and, if applicable, the relevant L/C Issuer or the Swing Lender shall have received a Notice of Borrowing or a Letter of Credit Application in accordance with the requirements hereof.

6.2      [Reserved]

6.3      Legal Opinion

The Administrative Agent and the Lenders shall have received the executed customary legal opinion of Kirkland & Ellis LLP, special New York counsel to the Credit Parties, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.  Holdings, the Borrower, the other Credit Parties and the Administrative Agent hereby instruct such counsel to deliver such legal opinion.

6.4      Closing Certificates

The Administrative Agent shall have received a certificate of the Credit Parties, dated the Closing Date, in respect of the conditions set forth in Sections 6.7, 6.8, 6.11, 6.12, 6.15 and 6.16.

137

6.5      Secretary's Certificate; Authorization of Proceedings of Each Credit Party

The Administrative Agent and the Lenders shall have received, on or prior to the Closing Date, a certificate of each Credit Party, dated the Closing Date and executed by an Authorized Officer of such Credit Party, with appropriate insertions and attachments, including (a) a copy of the resolutions of the board of directors, other managers or general partner of each Credit Party (or a duly authorized committee thereof) authorizing (i) the execution, delivery and performance of the Credit Documents referred to in Section 6.1 (and any agreements relating thereto) to which it is a party and (ii) in the case of the Borrower, the extensions of credit contemplated hereunder, (b) true and complete copies of the Organizational Documents of each Credit Party as of the Closing Date, (c) good standing certificates (to the extent such concept exists in the relevant jurisdiction of organization) of the Borrower and the Guarantors and (d) the names, titles, incumbency and signature specimens of those representatives of such Credit Party who have been authorized by such resolutions and/or written consents to execute Credit Documents on behalf of such Credit Party.

6.6      Fees

The Administrative Agent and the Joint Lead Arrangers shall have received payment of all fees and other amounts as the Borrower shall have agreed to pay on or prior to the Closing Date to the Administrative Agent or any Joint Lead Arranger in connection herewith at the time such amounts were required to be paid, including the reasonable and documented fees and expenses of Davis Polk & Wardwell LLP, special New York counsel to the Joint Lead Arrangers.

6.7      Representations and Warranties

The representations and warranties of the Borrower and each other Credit Party contained in Section 8 or any other Credit Document shall be true and correct in all material respects on and as of the Closing Date; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

6.8      Material Adverse Effect

Since February 14, 2023, there shall not have occurred any circumstances or condition, which individually or in the aggregate, constitutes or is reasonably expected to constitute, a Material Adverse Effect.

6.9      Solvency Certificate

On the Closing Date, the Administrative Agent and the Lenders (or their respective counsel) shall have received a certificate from the chief financial officer (or other financial officer) of Holdings substantially in the form attached hereto as Exhibit E.

138

6.10    Financial Statements

The Required Lenders shall have received copies of the unaudited preliminary consolidated balance sheet and the related unaudited preliminary consolidated statements of income and cash flows of the Borrower and its Subsidiaries as of and for (i) the fiscal quarter ended June 30, 2022, (ii) the fiscal year ended September 30, 2022 and (iii) the fiscal quarter ended December 31, 2022, in each case, subject to changes resulting from normal year-end adjustments and the absence of footnotes.

6.11    Plan Confirmation

(a) The RSA Plan and the Confirmation Order shall be in full force and effect and no stay thereof shall be in effect, (b) neither the RSA Plan nor the Confirmation Order shall have been amended or modified or any condition contained therein waived, (c) all conditions precedent to the effectiveness of the RSA Plan and the "effective date" under the RSA Plan shall have occurred or will occur substantially concurrently with the Closing Date, (d) the DIP Term Loans have been, or concurrently with the occurrence of the Closing Date, are converted into Exit Term Loans (as defined in the DIP Term Loan Credit Agreement in effect as of the date hereof) and (e) all HoldCo Convertible Notes Claims (as defined in the RSA Plan) shall have been discharged under the RSA Plan.

6.12    No Default

No Default or Event of Default shall exist at the time of the Closing Date, or would result from the making of the Credit Extensions (if any) or the application of the proceeds therefrom on such date.

6.13    Evidence of Insurance

The Lenders (or their respective counsel) shall have received, on or prior to the Closing Date, copies of insurance policies or certificates of insurance of the Credit Parties, together with endorsements, evidencing liability and casualty insurance meeting the requirements set forth in the Credit Documents, including, but not limited to, naming the Collateral Agent as additional insured (in the case of liability insurance) or lender loss payee (in the case of property insurance) on behalf of the Lenders.

6.14    Patriot Act; Beneficial Ownership Regulation

(a)    The Administrative Agent and each Lender who has requested the same shall have received (at least one Business Day prior to the Closing Date) all documentation and other information about the Borrower and each Guarantor as has been reasonably requested in writing prior to the Closing Date by the Administrative Agent or the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act, to the extent such request has been delivered to the Borrower at least three Business Days prior to the Closing Date.

(b)    To the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Administrative Agent shall have received (at least 3

139

Business Days prior to the Closing Date) a Beneficial Ownership Certification in relation to the Borrower.

6.15    Indebtedness as of the Closing Date

On the Closing Date, (I) no loans under the Existing DIP Agreement shall be outstanding and (II) after giving effect to any rights offering that are consummated on or before such date, (a) Indebtedness of the types described in clauses (a) and (b) of the definition of Indebtedness of the Borrower and its Subsidiaries shall not exceed $815 million and (b) the amount of cash and cash equivalents of the Borrower and its Subsidiaries that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP shall not be less than $400 million.

6.16    Cash Management

All cash and Cash Equivalents held in the DIP Proceeds Account and the Foreign Reserve Account shall have been transferred into the Borrower's cash management system, and shall be subject to Section 9.18.

For purposes of determining whether the Closing Date has occurred, each Lender that has executed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to the Administrative Agent or such Lender, as the case may be.  The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

**SECTION 7   Conditions Precedent to All Credit Extensions After the Closing Date**

The obligation of each Lender and each L/C Issuer to make a Credit Extension hereunder (other than with respect to borrowings made pursuant to Section 2.14 in connection with a Limited Condition Transaction to be funded with the proceeds of a FILO Tranche and excluding any conversion or continuation of any Term SOFR Loan) after the Closing Date is subject to the satisfaction in all material respects of the conditions set forth below.

7.1    Representations and Warranties

The representations and warranties of the Borrower and each other Credit Party contained in Section 8 or any other Credit Document shall be true and correct in all material respects on and as of the date of each Credit Extension; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

7.2     No Default or Event of Default

No Default or Event of Default shall exist at the time of, or would result from, such proposed Credit Extension or the application of the proceeds therefrom.

7.3     Request for Borrowing; Availability

(a)     The Administrative Agent and, if applicable, the relevant L/C Issuer or the Swing Lender shall have received a Notice of Borrowing or a Letter of Credit Application in accordance with the requirements hereof.

(b)     After giving effect to such Credit Extension, the Availability Requirements shall be satisfied.

Each Notice of Borrowing (but not any Notice of Conversion or Continuation) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in this Section 7 have been satisfied on and as of the date of the applicable Credit Extension.

**SECTION 8   Representations and Warranties**

In order to induce the Lenders and the L/C Issuers to enter into this Agreement and to make the Revolving Credit Loans and issue or participate in Letters of Credit as provided for herein, each of Holdings and the Borrower makes the following representations and warranties to the Agents, the Lenders and the L/C Issuers, on behalf of itself and its Subsidiaries, all of which shall survive the execution and delivery of this Agreement and the making of the Revolving Credit Loans and the issuance of the Letters of Credit:

8.1     Corporate Status; Compliance with Laws

Each of Holdings, the Borrower and each Material Subsidiary of the Borrower that is a Restricted Subsidiary (a) is a duly organized and validly existing corporation or other entity in good standing (as applicable) under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact the business in which it is engaged, except as would not reasonably be expected to result in a Material Adverse Effect, (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified would not reasonably be expected to result in a Material Adverse Effect and (c) is in compliance with all Applicable Laws, except to the extent that the failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.

8.2     Corporate Power and Authority

Each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party.  Each Credit Party has duly executed and delivered each Credit Document to which it is a party and each such

Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law) (*provided* that, with respect to the creation and perfection of security interests with respect to Indebtedness, Stock and Stock Equivalents of Foreign Subsidiaries, only to the extent the creation and perfection of such obligation is governed by the UCC).

8.3     No Violation

Neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party nor the compliance with the terms and provisions thereof nor the consummation of the financing transactions contemplated hereby and thereby will (a) contravene any applicable provision of any material Applicable Law (including material Environmental Laws) other than any contravention which would not reasonably be expected to result in a Material Adverse Effect, (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any Lien upon any of the property or assets of Holdings, the Borrower or any Restricted Subsidiary (other than Liens permitted hereunder) pursuant to the terms of any material indenture, loan agreement, lease agreement, mortgage, deed of trust or other material debt agreement or instrument to which Holdings, the Borrower or any Restricted Subsidiary is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "**Contractual Requirement**") other than any such breach, default or Lien that would not reasonably be expected to result in a Material Adverse Effect, or (c) violate any provision of the Organizational Documents of any Credit Party.

8.4     Litigation

Except as set forth on Schedule 8.4, there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened in writing with respect to Holdings, the Borrower or any of the Restricted Subsidiaries that have a reasonable likelihood of adverse determination and such determination would reasonably be expected to result in a Material Adverse Effect.

8.5     Margin Regulations

Neither the making or deemed making of any Credit Extensions hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board.

8.6     Governmental Approvals

The execution, delivery and performance of the Credit Documents does not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (i) such as have been obtained or made and are in full force and effect, (ii) filings and recordings in respect of the Liens created pursuant to the Security Documents and (iii) such licenses, authorizations, consents, approvals, registrations, filings or other actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

142

8.7     Investment Company Act

None of the Credit Parties is an "investment company" within the meaning of, and subject to registration under, the Investment Company Act of 1940, as amended.

8.8     True and Complete Disclosure

(a)     None of the written factual information and written data (taken as a whole) heretofore or contemporaneously furnished by or on behalf of Holdings, the Borrower, any of the Subsidiaries of the Borrower or any of their respective authorized representatives to the Administrative Agent, any Joint Lead Arranger and/or any Lender on or before the Closing Date (including all such information and data contained in the Credit Documents) regarding Holdings, the Borrower and its Restricted Subsidiaries in connection with the Transactions for purposes of or in connection with this Agreement or any transaction contemplated herein contained any untrue statement of any material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time in light of the circumstances under which such information or data was furnished, it being understood and agreed that for purposes of this Section 8.8(a), such factual information and data shall not include projections or estimates (including financial estimates, forecasts and other forward-looking information) and information of a general economic or general industry nature.

(b)     The projections filed with the Bankruptcy Court on February 14, 2023 are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents, Joint Lead Arrangers and the Lenders that such projections, forward-looking statements, estimates and pro forma financial information are not to be viewed as facts or a guarantee of performance, and are subject to material contingencies and assumptions, many of which are beyond the control of the Credit Parties, and that actual results during the period or periods covered by any such projections, forward-looking statements, estimates and pro forma financial information may differ materially from the projected results.

(c)     The information set forth in each Borrowing Base Certificate is true and correct in all material respects and has been prepared in all material respects in accordance with this Agreement.  The Accounts that are identified by the Borrower as Eligible Accounts and the Inventory that is identified by the Borrower as Eligible Inventory, in each Borrowing Base Certificate submitted to the Administrative Agent, at the time of submission, comply in all material respects with the criteria set forth in the definitions of Eligible Accounts and Eligible Inventory, respectively.

8.9     Financial Condition; Financial Statements

The financial statements described in Section 6.10 present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries, in each case, as of the dates thereof and for such period covered thereby in accordance with GAAP, consistently applied throughout the periods covered thereby, except as otherwise noted therein, and subject, in the case of any unaudited financial statements, to changes resulting from normal year-end adjustments and the absence of footnotes.  There has been no Material Adverse Effect since the Closing Date.

143

8.10    Tax Matters

Except where the failure of which would not be reasonably expected to have a Material Adverse Effect, (a) each of Holdings, the Borrower and each of the Restricted Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it (after giving effect to all applicable extensions) and has paid all material Taxes payable by it that have become due (whether or not shown on such Tax return), other than those (i) not yet delinquent or (ii) contested in good faith as to which adequate reserves have been provided to the extent required by law and in accordance with GAAP, (b) each of Holdings, the Borrower and each of the Restricted Subsidiaries has provided adequate reserves in accordance with GAAP for the payment of, all federal, state, provincial and foreign Taxes not yet due and payable, and (c) each of Holdings, the Borrower and each of the Restricted Subsidiaries has satisfied all of its Tax withholding obligations.

8.11    Compliance with ERISA

(a)    No ERISA Event has occurred or is reasonably expected to occur; and no Lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Borrower or any ERISA Affiliate been notified in writing that such a Lien will be imposed on the assets of Holdings, the Borrower or any ERISA Affiliate on account of any Pension Plan, except to the extent that a breach of any of the representations, warranties or agreements in this Section 8.11(a) would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect.  No Pension Plan has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.11(a), be reasonably likely to have a Material Adverse Effect.

(b)    All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and Applicable Law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to have a Material Adverse Effect.  All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except to the extent any such events would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.12    Subsidiaries

Schedule 8.12 lists each Subsidiary of Holdings (and the direct and indirect ownership interest of Holdings therein), in each case existing on the Closing Date (after giving effect to the Transactions).

8.13    Intellectual Property

Each of Holdings, the Borrower and the Restricted Subsidiaries has good and marketable title to, or a valid license or right to use, all patents, trademarks, servicemarks, trade names, copyrights and all applications therefor and licenses thereof, and all other intellectual property rights, free and clear of all Liens (other than Liens permitted hereunder), that are necessary for the operation of their respective businesses as currently conducted, except where the

144

failure to have any such title, license or rights would not reasonably be expected to have a Material Adverse Effect.

8.14    Environmental Laws

Except as would not reasonably be expected to have a Material Adverse Effect: (a) Holdings, the Borrower and the Restricted Subsidiaries and all Real Estate are in compliance with all Environmental Laws; (b) Holdings, the Borrower and the Restricted Subsidiaries have, and have timely applied for renewal of, all permits under Environmental Law to construct and operate their facilities as currently constructed; (c) except as set forth on Schedule 8.14, neither Holdings, the Borrower nor any Restricted Subsidiary is subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim or any other liability under any Environmental Law, including any such Environmental Claim, or, to the knowledge of the Borrower, any other liability under Environmental Law related to, or resulting from the business or operations of any predecessor in interest of any of them; (d) none of Holdings, the Borrower or any Restricted Subsidiary is conducting or financing or, to the knowledge of the Borrower, is required to conduct or finance, any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; (e) to the knowledge of the Borrower, no Hazardous Materials have been released into the environment at, on or under any Real Estate currently owned or leased by Holdings, the Borrower or any Restricted Subsidiary and (f) neither Holdings, the Borrower nor any Restricted Subsidiary has treated, stored, transported, released, disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or, to the knowledge of the Borrower, formerly owned or leased Real Estate or facility.  Except as provided in this Section 8.14, Holdings, the Borrower and the Restricted Subsidiaries make no other representations or warranties regarding Environmental Laws.

8.15    Properties

Except as set forth on Schedule 8.15, Holdings, the Borrower and the Restricted Subsidiaries have good title to or valid leasehold or easement interests or other license or use rights in all properties that are necessary for the operation of their respective businesses as currently conducted, free and clear of all Liens (other than any Liens permitted under this Agreement) and except where the failure to have such good title, leasehold or easement interests or other license or use rights would not reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, the Borrower and the Restricted Subsidiaries do not own in fee any Real Estate with a fair market value of $10,000,000 or more.

8.16    Solvency

On the Closing Date, after giving effect to the Transactions, immediately following the making of the Term Loans on such date and after giving effect to the application of the proceeds of such Term Loans, Holdings on a consolidated basis with its Subsidiaries will be Solvent.

8.17    Security Interests

Subject to the qualifications set forth in Section 6.2 and the terms and conditions of any Applicable Intercreditor Agreement then in effect, with respect to each Credit Party, the Security Documents, taken as a whole, are effective to create in favor of the Collateral Agent, for

145

the benefit of the Secured Parties, a legal, valid and enforceable first priority security interest (subject to Liens permitted hereunder) in the Collateral described therein, in each case, to the extent required under the Security Documents, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  In the case of (i) the Stock described in the Security Agreement that is in the form of securities represented by stock certificates or otherwise constituting certificated securities within the meaning of Section 8-102(a)(15) of the New York UCC ("**Certificated Securities**"), when certificates representing such Stock are delivered to the Collateral Agent along with instruments of transfer in blank or endorsed to the Collateral Agent, and (ii) all other Collateral constituting personal property described in the Security Agreement, when financing statements, intellectual property security agreements and other required filings, recordings, agreements and actions in appropriate form are executed and delivered, performed, recorded or filed in the appropriate offices, as the case may be, the Collateral Agent, for the benefit of the applicable Secured Parties, shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Credit Parties in all Collateral that may be perfected by filing, recording or registering a financing statement, an intellectual property security agreement or analogous document (to the extent such Liens may be perfected by possession of the Certificated Securities by the Collateral Agent or such filings, agreements or other actions or perfection is otherwise required by the terms of any Credit Document), in each case, to the extent required under the Security Documents, as security for the Obligations, in each case prior and superior in right to any other Lien (except, in the case of Liens permitted hereunder).

8.18    Labor Matters

Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against Holdings, the Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrower, threatened in writing; and (b) hours worked by and payment made for such work to employees of Holdings, the Borrower and each Restricted Subsidiary have not been in violation of the Fair Labor Standards Act or any other Applicable Law dealing with such matters.

8.19    Sanctioned Persons; Anti-Corruption Laws; Patriot Act

None of Holdings, the Borrower or any of its Subsidiaries or any of their respective directors or officers is subject to any economic embargoes or similar sanctions administered or enforced by the U.S. Department of State or the U.S. Department of the Treasury (including the Office of Foreign Assets Control) or any other applicable sanctions authority (collectively, "**Sanctions**", and the associated laws, rules, regulations and orders, collectively, "**Sanctions Laws**").  Each of Holdings, the Borrower and its Subsidiaries and their respective officers and directors is in compliance, in all material respects, with (i) all Sanctions Laws, (ii) the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "**Anti-Corruption Laws**") and (iii) the Patriot Act and any other applicable anti-terrorism and anti-money laundering laws, rules, regulations and orders.  No part of the proceeds of the Credit Extensions will be used, directly or indirectly, in violation of the Patriot Act, the Anti-Corruption Laws, Sanctions Laws and/or any other anti-terrorism or anti-money laundering laws in any material respect.

146

8.20    Use of Proceeds

The Borrower will use the proceeds of the Credit Extensions in accordance with Section 9.13 of this Agreement.

8.21    Insurance

(a)    The properties of the Credit Parties are insured with financially sound and reputable insurance companies that are not Affiliates of such Persons, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where any Credit Party operates.

(b)    The Credit Parties maintain fully paid flood hazard insurance on all real property that is located in a special flood hazard area in the United States and that constitutes Collateral on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 or as otherwise required by the Collateral Agent or the U.S. Lenders pursuant to Section 9.3.

**SECTION 9   Affirmative Covenants**

The Borrower hereby covenants and agrees that on the Closing Date (immediately after giving effect to the Transactions) and thereafter, until the Aggregate Revolving Credit Commitments and all Letters of Credit have terminated (other than Letters of Credit that have been Cash Collateralized, backstopped or otherwise collateralized on terms and conditions reasonably satisfactory to the applicable L/C Issuer) and the Loans, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and Secured Specified Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements and Secured Specified Cash Management Agreements, or Contingent Obligations), are Paid in Full:

9.1    Information Covenants

The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)    Annual Financial Statements.  As soon as available and in any event on or before the date that is 120 days after the end of each Fiscal Year (or, solely with respect to the Fiscal Year ended September 30, 2022, the Borrower shall make commercially reasonable efforts to provide within 60 days after the Closing Date), the consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of operations and cash flows for such Fiscal Year, setting forth comparative consolidated figures for the preceding Fiscal Year (commencing with the Fiscal Year ended September 30, 2024), all in reasonable detail and prepared in accordance with GAAP in all material respects and, in each case, except with respect to any such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be qualified as to the scope of audit or as to the status of the Borrower and its consolidated Subsidiaries as a going concern (other than any exception or qualification that is a result of (x) a current maturity date of any Indebtedness or (y) any actual or prospective default of a financial maintenance

147

covenant (including Section 10.11)), all of which shall be (i) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its consolidated Subsidiaries (or Holdings or an indirect parent of the Borrower and its consolidated Subsidiaries, as the case may be) in accordance with GAAP in all material respects and (ii) accompanied by a Narrative Report with respect thereto.

(b)     Quarterly Financial Statements.  As soon as available and in any event on or before the date that is 60 days after the end of each of the first three fiscal quarters of any Fiscal Year (or, with respect to the fiscal quarters ended March 31, 2023 and June 30, 2023, 90 days after the end of such fiscal quarters), the consolidated balance sheets of the Borrower and its consolidated Subsidiaries, in each case, as at the end of such quarterly period and the related consolidated statements of operations for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly period, and the related consolidated statement of cash flows for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly period, and, commencing with the fiscal quarter ended on September 30, 2024, setting forth comparative consolidated figures for the related periods in the prior Fiscal Year or, in the case of such consolidated balance sheet, for the last day of the prior Fiscal Year, all of which shall be (i) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its consolidated Subsidiaries (or Holdings or an indirect parent of the Borrower and its consolidated Subsidiaries, as the case may be) in accordance with GAAP in all material respects (except as set forth in the following proviso), subject to changes resulting from audit, normal year-end audit adjustments and absence of footnotes and (ii) accompanied by a Narrative Report with respect thereto; *provided*, that notwithstanding the foregoing, the financial statements to be delivered pursuant to this clause (b) with respect to the fiscal quarters ended March 31, 2023 and June 30, 2023 shall not be required to reflect "fresh-start" or other reorganization adjustments.

(c)     Officer's Certificates.  Within five Business Days of the delivery of the financial statements provided for in Sections 9.1(a) and (b), a certificate of an Authorized Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth with specification of any change in the identity of the Restricted Subsidiaries and Unrestricted Subsidiaries as at the end of such Fiscal Year or period, as the case may be, from the Restricted Subsidiaries and Unrestricted Subsidiaries, respectively, provided to the Lenders on the Closing Date or the most recent Fiscal Year or period, as the case may be.  Within five (5) Business Days of the delivery of the financial statements provided for in Section 9.1(a), a certificate of an Authorized Officer of the Borrower setting forth (A) in reasonable detail the Available Equity Amount as at the end of the Fiscal Year to which such financial statements relate and (B) the information required pursuant to Sections I and II of the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or the date of the most recent certificate delivered pursuant to this clause (c)(B), as the case may be.

(d)     Notice of Default; Litigation; ERISA Event.  Promptly after an Authorized Officer of the Borrower or any Restricted Subsidiary obtains knowledge thereof, written notice of (i) the occurrence of any event that constitutes a Default or Event of Default, which notice shall

specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto, (ii) any litigation, regulatory or governmental proceeding pending against the Borrower or any Restricted Subsidiary that has a reasonable likelihood of adverse determination and such determination would reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect and (iii) the occurrence of any ERISA Event or any ERISA Event that is reasonably expected to occur, that would reasonably be expected to result in a Material Adverse Effect.

(e)     Other Information.   Promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) or registration statements (other than drafts of pre-effective versions of registration statements) with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by Holdings, the Borrower or any Restricted Subsidiary (other than amendments to any registration statement (to the extent such registration statement, in the form it becomes effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statements on Form S-8) and copies of all financial statements, proxy statements, notices and reports that Holdings, the Borrower or any Restricted Subsidiary shall send to the ABL Administrative Agent or lenders under the ABL Credit Agreement or the holders of any publicly issued debt with a principal amount in excess of $300,000,000 of Holdings, the Borrower and/or any Restricted Subsidiary in their capacity as such holders (in each case to the extent not theretofore delivered to the Administrative Agent pursuant to this Agreement).

(f)     Requested Information.   With reasonable promptness, following the reasonable request of the Administrative Agent, such other information (financial or otherwise) as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time; *provided* that, notwithstanding anything to the contrary in this Section 9.1(f), none of Holdings, the Borrower or any of its Restricted Subsidiaries will be required to provide any such other information pursuant to this Section 9.1(f) to the extent that (i) the provision thereof would violate any attorney client privilege (as reasonably determined by counsel (internal or external) to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality binding on the Credit Parties or their respective Affiliates (so long as not entered into in contemplation hereof) or (ii) such information constitutes attorney work product (as reasonably determined by counsel (internal or external) to the Credit Parties).

(g)     Projections.   Within 120 days after the end of each Fiscal Year of the Borrower ended after the Closing Date, a reasonably detailed consolidated budget for the following Fiscal Year as customarily prepared by management of the Borrower for its internal use (including a projected consolidated balance sheet of the Borrower and the Restricted Subsidiaries as of the end of such Fiscal Year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**"), which Projections shall in each case be accompanied by a certificate of an Authorized Officer of the Borrower stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were based on good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time of preparation of such Projections, it being understood that such Projections and assumptions as to future events are not to be viewed as facts or a guarantee of performance, are subject to significant

uncertainties and contingencies, many of which are beyond the control of the Borrower and its Subsidiaries, and that actual results may vary from such Projections and such differences may be material.

(h)     Reconciliations.   Simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 9.1(a) and (b) above, reconciliations for such consolidated financial statements or other consolidating information reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; *provided* that the Borrower shall be under no obligation to deliver the reconciliations or other information described in this clause (h) if the Consolidated Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Subsidiaries (which Consolidated Total Assets and Consolidated EBITDA shall be calculated in accordance with the definitions of such terms, but determined based on the financial information of the Borrower and its consolidated Subsidiaries, and not the financial information of the Borrower and its Restricted Subsidiaries) do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of the Borrower and its Restricted Subsidiaries by more than 2.5%.

(i)     [Reserved]

(j)     [Reserved]

(k)     Borrowing Base Certificates.   On or prior to the 20th calendar day of each calendar month (or on a more frequent basis at the discretion of the Borrower; *provided* that once a more frequent basis is elected by the Borrower, it must be continued for no less than 60 calendar days after the date of such election), beginning with the calendar month ended [April 30], 2023 (or if such day is not a Business Day, the next succeeding Business Day), a Borrowing Base Certificate showing each of the Borrowing Base and the calculation of the Excess Availability and the Specified Excess Availability, in each case as of the close of business on the last day of the immediately preceding calendar month (the Borrowing Base Certificate delivered as of each month end, the "**Monthly Borrowing Base Certificate**") (or, at the option of the Borrower, as of a more recent date), each such Borrowing Base Certificate to be certified as complete and correct in all material respects on behalf of the Borrower by an Authorized Officer of the Borrower; *provided* that during the Weekly Monitoring Period, a Borrowing Base Certificate showing the Borrower's reasonable estimate (which shall be based on the most current accounts receivable aging reasonably available and shall be calculated in a consistent manner with the most recent Monthly Borrowing Base Certificate delivered pursuant to this Section) of each Borrowing Base and the calculation of the Excess Availability and Specified Excess Availability as of the close of business on the last day of the immediately preceding calendar week, unless the Administrative Agent otherwise agrees in its reasonably discretion, shall be furnished on Wednesday of each week (or if Wednesday is not a Business Day, on the next succeeding Business Day); *provided* that any Borrowing Base Certificate delivered pursuant to this Section 9.1(k) other than with respect to month's end may be based on such estimates by the Borrower as the Borrower may deem necessary;

(l)     at the time of the delivery of each Monthly Borrowing Base Certificate provided for in Section 9.1(k), the Borrower shall each provide Inventory reports by category and location, together with reconciliation to the corresponding Monthly Borrowing Base Certificate, a

150

reasonably detailed calculation of Eligible Inventory, and a reconciliation of the Credit Parties' respective Inventory between the amounts shown in each such Person's stock ledger and any Inventory reports delivered pursuant to this clause (l); *provided*, that any Borrowing Base Certificate delivered other than with respect to month's end may be based on such estimates by the Credit Parties of Shrink and other amounts as the Borrower may deem necessary;

(m)     at the time of the delivery of each Monthly Borrowing Base Certificate provided for in Section 9.1(k), the Borrower shall provide a current accounts receivable aging along with a reconciliation between the amounts that appear on such aging and the amount of accounts receivable presented on the concurrently delivered balance sheet; and

(n)     (i) the Borrower shall notify the Administrative Agent of a pending withdrawal of cash or Cash Equivalents constituting Eligible Borrowing Base Cash from a Blocked Account subject to a Blocked Account Agreement under Section 9.18 prior to making such withdrawal, and (ii) within one (1) Business Day of such a withdrawal, the Borrower shall provide the Administrative Agent with an updated Borrowing Base Certificate reflecting the updated Eligible Borrowing Base Cash.

Notwithstanding the foregoing, the obligations in clauses (a), (b), (e) and (g) of this Section 9.1 may be satisfied with respect to financial information of the Borrower and the Restricted Subsidiaries by furnishing (A) the applicable financial statements of Holdings or any direct or indirect parent of Holdings or (B) the Borrower's (or Holdings' or any direct or indirect parent thereof), as applicable, Form 8-K, 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of clauses (A) and (B) of this paragraph, to the extent such information relates to Holdings or a direct or indirect parent of Holdings, such information is accompanied by consolidating or other information that explains in reasonable detail the differences between the information relating to Holdings or such parent, on the one hand, and the information relating to the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other hand (*provided*, *however*, that the Borrower shall be under no obligation to deliver such consolidating or other explanatory information if the Consolidated Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Restricted Subsidiaries do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of Holdings or any direct or indirect parent of Borrower and its consolidated Subsidiaries by more than 2.5%).  Documents required to be delivered pursuant to clauses (a), (b) and (e) of this Section 9.1 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website as notified to the Administrative Agent in writing and provides to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, or filed with the SEC, and available in EDGAR (or any successor) to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

9.2     Books, Records and Inspections

(a)     The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or the Required Lenders (as accompanied by the Administrative Agent) to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the books and records of the Borrower and any such Restricted Subsidiary and discuss the affairs, finances and accounts of the Borrower and of any such Restricted Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or Required Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); *provided* that, excluding any such visits and inspections during the continuation of an Event of Default (i) only the Administrative Agent, whether on its own or in conjunction with the Required Lenders, may exercise rights of the Administrative Agent and the Lenders under this Section 9.2, (ii) the Administrative Agent shall not exercise such rights more than one time in any calendar year and (iii) only one such visit shall be at the Borrower's expense; *provided, further*, that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Required Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 9.2, neither the Borrower nor any Restricted Subsidiary will be required under this Section 9.2 to disclose or permit the inspection or discussion of any document, information or other matter to the extent that such action would violate any attorney-client privilege (as reasonably determined by counsel (internal or external) to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality (not created in contemplation thereof) binding on the Credit Parties or their respective Affiliates or constituting attorney work product (as reasonably determined by counsel (internal or external) to the Credit Parties).

(b)     The Borrower will, and will cause each Restricted Subsidiary to, maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity, in all material respects, with GAAP shall be made of all material financial transactions and matters involving the assets of the business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that any Restricted Subsidiary may maintain its individual books and records in conformity with local standards or customs and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

9.3     Maintenance of Insurance

The Borrower will, and will cause each Material Subsidiary that is a Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower, as applicable) are financially sound and responsible at the time the

152

relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business and the availability of insurance on a cost-effective basis; and will furnish to the Administrative Agent, upon written reasonable request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried, *provided*, *however*, that for so long as no Event of Default has occurred and is continuing, the Administrative Agent shall be entitled to make such request only once in any calendar year.  The Collateral Agent and its successors and/or assigns shall be named as lender loss payee or mortgagee and/or additional insured with respect to any insurance providing liability coverage or coverage in respect of any Collateral, and the Borrower will cause each provider of any such insurance to agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the Collateral Agent, that it will give the Collateral Agent thirty (30) days (or ten (10) days for non-payment or such lesser amount as the Collateral Agent may agree to in its sole direction) prior written notice before any such policy or policies shall be altered or cancelled.  With respect to each Mortgaged Property, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), the Borrower shall obtain flood insurance in such total amount as the Collateral Agent may from time to time require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

9.4     Payment of Taxes

The Borrower will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a material Lien upon any properties of the Borrower or any Restricted Subsidiary; *provided* that neither the Borrower nor any such Restricted Subsidiary shall be required to pay any such tax, assessment, charge, levy or claim (i) that is being contested in good faith and by proper proceedings if it has maintained adequate reserves (in the good faith judgment of management of the Borrower) with respect thereto in accordance with GAAP or (ii) with respect to which the failure to pay would not reasonably be expected to result in a Material Adverse Effect.

9.5     Consolidated Corporate Franchises

The Borrower will do, and will cause each Material Subsidiary that is a Restricted Subsidiary to do, or cause to be done, all things necessary to preserve and keep in full force and effect its existence, corporate rights and authority, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect; *provided*, *however*, that the Borrower and the Restricted Subsidiaries may consummate any transaction otherwise permitted hereby, including under Section 10.2, 10.3, 10.4 or 10.5.

153

9.6     Compliance with Statutes, Regulations, Etc.

The Borrower will, and will cause each Restricted Subsidiary to, comply with all Applicable Laws applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

9.7     Lender Calls

At the reasonable request of the Administrative Agent, the Borrower shall conduct a conference call that Lenders may attend to discuss the financial condition and results of operations of the Borrower and its Restricted Subsidiaries for the most recently ended measurement period for which financial statements have been delivered pursuant to Section 9.1(a) or (b) (beginning with the fiscal period of the Borrower ended September 30, 2023), at a date and time to be determined by the Borrower with reasonable advance notice to the Administrative Agent, limited to one conference call per fiscal quarter.

9.8     Maintenance of Properties

The Borrower will, and will cause the Restricted Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition (ordinary wear and tear, casualty and condemnation excepted), except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

9.9     Transactions with Affiliates

The Borrower will conduct, and will cause the Restricted Subsidiaries to conduct, all transactions with any of its or their respective Affiliates (other than (x) any transaction or series of related transactions with an aggregate value that is equal to or less than $25,000,000 or (y) transactions between or among (i) the Borrower and the Restricted Subsidiaries or any Person that becomes a Restricted Subsidiary as a result of such transactions and (ii) the Borrower, the Restricted Subsidiaries and to the extent in the ordinary course or consistent with past practice, Holdings) on terms that are, taken as a whole, not materially less favorable to the Borrower or such Restricted Subsidiary as it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate (as determined in good faith by the Borrower); *provided* that the foregoing restrictions shall not apply to:

(a)     transactions permitted by Section 10 (other than Section 10.6(m) and any provision of Section 10 permitting transactions by reference to Section 9.9),

(b)     the Transactions and the payment of the Transaction Expenses,

(c)     the issuance of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) to the management of the Borrower (or any direct or indirect parent thereof) or any Subsidiary of the Borrower in connection with the Transactions or pursuant to arrangements described in clause (e) of this Section 9.9,

(d)     loans, advances and other transactions between or among the Borrower, any Subsidiary of the Borrower or any joint venture (regardless of the form of legal entity) in which the Borrower or any Subsidiary of the Borrower has invested (and which Subsidiary or joint venture would not be an Affiliate of the Borrower but for the Borrower's or such Subsidiary's Subsidiary ownership of Stock or Stock Equivalents in such joint venture or Subsidiary) to the extent permitted under Section 10,

(e)     (i) employment, consulting and severance arrangements between the Borrower and the Restricted Subsidiaries (or any direct or indirect parent of the Borrower) and their respective officers, employees, directors or consultants in the ordinary course of business (including payments, loans and advances in connection therewith) and (ii) issuances of securities, or other payments, awards or grants in cash, securities or otherwise and other transactions pursuant to any equityholder, employee or director equity plan or stock or other equity option plan or any other management or employee benefit plan or agreement, other compensatory arrangement or any stock or other equity subscription, co-invest or equityholder agreement,

(f)     the payment of customary fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, managers, consultants, officers and employees of the Borrower (or, to the extent attributable to the ownership of the Borrower and its Restricted Subsidiaries, any direct or indirect parent thereof) and the Subsidiaries of the Borrower,

(g)     the issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) to Holdings or to any director, officer, employee or consultant,

(h)     any customary transactions with a Receivables Entity effected as part of a Permitted Receivables Financing and any customary transactions with a Securitization Subsidiary effected as part of a Qualified Securitization Financing,

(i)     transactions pursuant to permitted agreements in existence on the Closing Date and, to the extent each such transaction is valued in excess of $25,000,000, set forth on Schedule 9.9 or any amendment, modification, supplement, replacement, extension, renewal or restructuring thereto to the extent such an amendment, modification, supplement, replacement, extension renewal or restructuring (together with any other amendment or supplemental agreements) is not materially adverse, taken as a whole, to the Lenders (in the good faith determination of the Borrower),

(j)     transactions in which Holdings (or any indirect parent of the Borrower), the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of Section 9.9,

(k)     the existence and performance of agreements and transactions with any Unrestricted Subsidiary that were entered into prior to the designation of a Restricted Subsidiary as such Unrestricted Subsidiary to the extent that the transaction was permitted at the time that it was entered into with such Restricted Subsidiary and transactions entered into by an Unrestricted

155

Subsidiary with an Affiliate prior to the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that such transaction was not entered into in contemplation of such designation or redesignation, as applicable,

(l)      Affiliate repurchases of the Term Loans or commitments in respect thereof to the extent permitted under the Term Loan Credit Agreement and the payments and other transactions reasonably related thereto, and

(m)      transactions constituting any part of a Permitted Reorganization.

9.10      End of Fiscal Years

The Borrower will, for financial reporting purposes, cause its Fiscal Year to end on September 30 of each year (each a "**Fiscal Year**") and cause its Restricted Subsidiaries to maintain their fiscal years as in effect on the Closing Date; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent change the Fiscal Year or the fiscal years of its Restricted Subsidiaries with the prior written consent of the Administrative Agent (not to be unreasonably withheld, conditioned, delayed or denied), in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

9.11      Additional Guarantors and Grantors

Subject to any applicable limitations set forth in the Guarantee, the Security Documents, or any Applicable Intercreditor Agreement and this Agreement (including Section 9.12), the Borrower will cause each direct or indirect Wholly Owned Domestic Subsidiary of the Borrower (excluding any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date and each other Domestic Subsidiary of the Borrower that ceases to constitute an Excluded Subsidiary to, within sixty (60) days from the date of such formation, acquisition or cessation (which in the case of any Subsidiary ceasing to constitute an Excluded Subsidiary pursuant to clause (a) thereof, commencing on the date of delivery of the applicable compliance certificate pursuant to Section 9.1(c)), as applicable (or such longer period as the Required Lenders may agree in their reasonable discretion), execute (A) a supplement to each of the Guarantee and the Security Agreement in order to become a Guarantor under such Guarantee and a grantor/pledgor under the Security Agreement and (B) a joinder to the Intercompany Subordinated Note.

9.12      Further Assurances

(a)      Subject to the applicable limitations set forth in this Agreement (including Section 9.11) and the Security Documents and any Applicable Intercreditor Agreement, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents) that may be required under any Applicable Law, or that the Collateral Agent may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Borrower and the Restricted Subsidiaries.

156

(b)     Subject to any applicable limitations set forth in the Security Documents (including in any Mortgage), if any assets that are of the nature secured by any Security Documents (including any owned Real Estate or improvements thereto constituting Collateral with a fair market value in excess of $10,000,000) are acquired by the Borrower or any Subsidiary Guarantor after the Closing Date or are held by any Subsidiary on or after the time it becomes a Guarantor pursuant to Section 9.11 (other than assets constituting Collateral under the Security Documents that become subject to the Lien of any Security Document upon acquisition thereof or assets subject to a Lien granted pursuant to Section 10.2(d) or 10.2(g)), the Borrower will promptly notify the Collateral Agent in writing thereof and, if requested by the Collateral Agent, will cause such assets to be subjected to a Lien securing the Obligations and will take, and cause the other Credit Parties to take, such actions as shall be necessary or reasonably requested by the Collateral Agent, as soon as commercially reasonable but in no event later than 120 days, unless extended by the Collateral Agent in its reasonable discretion, to grant and perfect such Liens consistent with the applicable requirements of the Security Documents, including actions described in paragraph (a) of this Section, all at the expense of the Credit Parties; provided that such deadline for providing any Mortgage shall be automatically extended until each Lender confirms to the Administrative Agent and Collateral Agent that such Lender has completed all flood due diligence, received copies of all flood insurance documentation and confirmed flood insurance compliance as required by the Flood Laws or as otherwise satisfactory to such Lender.

(c)     Any Mortgage delivered to the Collateral Agent in accordance with the preceding clause (b) shall be accompanied by those items set forth in clause (d) that are customary for the type of assets covered by such Mortgage.  Any items that are customary for the type of assets covered by such Mortgage may be delivered within a commercially reasonable period of time after the delivery of a Mortgage if they are not reasonably available at the time the Mortgage is delivered.

(d)     With respect to any Mortgaged Property, within 120 days, unless extended by the Collateral Agent in its reasonable discretion, the Borrower will deliver, or cause to be delivered, to the Collateral Agent (i) a Mortgage with respect to each Mortgaged Property, executed by an Authorized Officer of each obligor party thereto, (ii) a policy or policies of title insurance insuring the Lien of each such Mortgage as a valid Lien on the Mortgaged Property described therein, free of any other Liens except Permitted Encumbrances or consented to in writing (including via email) by the Collateral Agent, together with such endorsements and reinsurance as the Collateral Agent may reasonably request, together with evidence reasonably acceptable to the Collateral Agent of payment of all title insurance premiums, search and examination charges, escrow charges and related charges, fees, costs and expenses required for the issuance of the title insurance policies referred to above, (iii) a Survey, to the extent reasonably necessary to satisfy the requirements of clause (ii) above, (iv) all other documents and instruments, including Uniform Commercial Code or other applicable fixture security financing statements, reasonably requested by the Collateral Agent to be filed, registered or recorded to create the Liens intended to be created by any such Mortgage and perfect such Liens to the extent required by, and with the priority required by, such Mortgage shall have been delivered to the Collateral Agent in proper form for filing, registration or recording and (v) written opinions of legal counsel in the states in which each such Mortgaged Property is located in customary form and substance. If any building or other improvement included in any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a

157

special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or as hereafter in effect or successor act thereto), then the Borrower shall, prior to delivery of the Mortgages, deliver or cause to be delivered, (i) a completed Federal Emergency Management Agency Standard Flood Determination with respect to each Mortgaged Property, in each case in form and substance reasonably satisfactory to the Collateral Agent and (ii) evidence of flood insurance with respect to each Mortgaged Property, to the extent and in amounts required by Applicable Laws, in each case in form and substance reasonably satisfactory to the Collateral Agent.

(e)     Notwithstanding anything herein to the contrary, if the Borrower and the Collateral Agent mutually agree in their reasonable judgment (confirmed in writing to the Borrower and the Administrative Agent) that the cost or other consequences (including adverse tax and accounting consequences) of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Secured Parties thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents.

(f)     Notwithstanding anything herein or in any other Credit Document to the contrary, the Borrower and the Guarantors shall not be required, nor shall the Collateral Agent be authorized, (i) to perfect the above-described pledges, security interests and mortgages by any means other than by (A) filings pursuant to the Uniform Commercial Code in the office of the secretary of state (or similar central filing office) of the relevant State(s), (B) filings in United States government offices with respect to intellectual property as expressly required herein and under the other Credit Documents, (C) delivery to the Collateral Agent (or, subject to the Applicable Intercreditor Agreements, to the Term Loan Collateral Agent or another representative acting as its gratuitous bailee), for its (or such other Person's) possession, of all Collateral consisting of material intercompany notes, stock certificates of the Borrower and its Restricted Subsidiaries or (D) Mortgages required to be delivered pursuant to this Section 9.12, (ii) to enter into any control agreement with respect to any deposit account, securities account or commodities account or contract (other than for which control agreements are required to be obtained pursuant to Section 9.18), (iii) to take any action in any non-U.S. jurisdiction or pursuant to the requirements of the laws of any non-U.S. jurisdiction in order to create any security interests or to perfect any security interests, including with respect to any intellectual property registered outside of the United States (it being understood that there shall be no security agreements or pledge agreements governed by the laws of any non-U.S. jurisdiction), (iv) except as expressly set forth above, to take any other action with respect to any Collateral to perfect through control agreements or to otherwise perfect by "control", (v) to provide any notice to obtain the consent of governmental authorities under the Federal Assignment of Claims Act (or any state equivalent thereof) or (vi) register, apply to register, or escrow any intellectual property or software.

9.13     Use of Proceeds

The Borrower will use the Letters of Credit issued on the Closing Date to backstop or replace the Closing Date Existing Letters of Credit and/or any letters of credit issued to the Borrower or any Restricted Subsidiary prior to the Closing Date.  The Borrower will, after the Closing Date, use the proceeds of the Credit Extensions for working capital and general corporate purposes (including Permitted Acquisitions and other Investments, capital expenditure, Restricted

158

Payments and all other transactions not prohibited hereunder and under the other Credit Documents).

9.14    [Reserved]

9.15    Changes in Business

The Borrower and the Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by the Borrower and the Restricted Subsidiaries, taken as a whole, on the Closing Date and other business activities which are extensions thereof or otherwise similar, incidental, complementary, synergistic, reasonably related or ancillary to any of the foregoing (and non-core incidental businesses acquired in connection with any Permitted Acquisition or permitted Investment), in each case as determined by the Borrower in good faith.

9.16    [Reserved]

9.17    [Reserved]

9.18    Cash Management Systems

(a)    Annexed hereto as Schedule 9.18 is a schedule of all DDAs that are maintained by the Borrower and the Subsidiary Guarantors that are Material Subsidiaries as of the Closing Date, which Schedule includes, with respect to each depository (i) the name and address of such depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository and (iv) identifying whether such DDA must be subject to a Blocked Account Agreement.

(b)    Within 90 days after the Closing Date, or such longer period as the Administrative Agent may agree in its reasonable discretion, the Borrower and each Subsidiary Guarantor will use commercially reasonable efforts to enter into a springing blocked account agreement (each, a "**Blocked Account Agreement**,") reasonably satisfactory to the Administrative Agent, with respect to the DDAs (other than Excluded Accounts) (such DDAs subject to Blocked Account Agreements, collectively, the "**Blocked Accounts**"). If such Blocked Account Agreements are not obtained within 90 days after the Closing Date (or such later date as the Administrative Agent shall reasonably agree), the Borrower and each Subsidiary Guarantor shall, within 60 days thereof (or such later date as the Administrative Agent may reasonably agree) to move its applicable DDAs to the Administrative Agent or another financial institution that will provide such Blocked Account Agreements. The Borrower hereby agrees that, once the Blocked Account Agreements are entered into, all cash received by the Borrower or any Subsidiary Guarantor in any DDA that is not a Blocked Account (other than amounts held in Excluded Accounts and, solely in respect of Excluded Accounts identified in clause (ii) of the definition thereof, required by Applicable Law) will be promptly transferred into a Blocked Account (other than, during a Cash Dominion Period, a Blocked Account that is a cash pooling account). After entering into the Blocked Account Agreement, there shall be at all times thereafter at least one Blocked Account that is not a cash pooling account. To the extent that any DDA is used for both collection and for other purposes (including payments and disbursements or cash pooling functions), then within 90 days after the Closing Date (or such longer period as the Administrative

159

Agent may agree in its reasonable discretion) the Borrower shall either (i) terminate such other functions (other than collections) of each such account or (ii) transition the collection function of such account to another account that is subject to a Blocked Account Agreement and dedicated solely to collections.

(c)      Each Blocked Account Agreement shall permit the Administrative Agent to instruct the depository, during a Cash Dominion Period (and delivery of notice thereof from the Administrative Agent), to transfer on each Business Day to a concentration account maintained by the Administrative Agent at Citibank, N.A. (each, a "**Concentration Account**") all available cash receipts, from:

(i)      the sale of Inventory and other Collateral (other than identifiable proceeds of Term Priority Collateral);

(ii)      all proceeds of collections of Accounts; and

(iii)      each Blocked Account (including all cash deposited therein from each DDA).

If, at any time during the Cash Dominion Period, any cash or Cash Equivalents owned by the Borrower or any Subsidiary Guarantor (other than amounts held in Excluded Accounts and, solely in respect of Excluded Accounts identified in clause (ii) of the definition thereof, required by Applicable Law) are deposited to any account, or held or invested in any manner, other than in a Blocked Account (other than a Blocked Account that is a cash pooling account) that is subject to a Blocked Account Agreement (or a DDA which is swept daily to a Blocked Account (other than a Blocked Account that is a cash pooling account)), the Administrative Agent may require the applicable Person to close such account and have all funds therein transferred to a Blocked Account (other than a cash pooling account), and all future deposits made to a Blocked Account (other than a Blocked Account that is a cash pooling account) which is subject to a Blocked Account Agreement; *provided* that, to the extent that cash or Cash Equivalents are deposited in any Blocked Account that is a cash pooling account during a Cash Dominion Period, the Borrower shall transfer such cash and Cash Equivalents to a Blocked Account that is not a cash pooling account, but, unless a Specified Event of Default has occurred and is continuing, the Administrative Agent may not require that (i) any such cash pooling account be closed or (ii) any cash and Cash Equivalents on deposit in any such cash pooling account prior to the commencement of a Cash Dominion Period be transferred to a Blocked Account that is not a cash pooling account.  In addition to the foregoing, during the Cash Dominion Period, at the request of the Administrative Agent, the Borrower shall provide the Administrative Agent with an accounting of the contents of the Blocked Accounts, which shall identify, to the reasonable satisfaction of the Administrative Agent, the proceeds from the Collateral which were deposited into a Blocked Account and swept to a Concentration Account.

(d)      The Borrower and the Subsidiary Guarantors may close DDAs or Blocked Accounts and/or open new DDAs or Blocked Accounts, subject to the execution and delivery to the Administrative Agent of appropriate Blocked Account Agreements (except with respect to any Excluded Accounts) consistent with and to the extent required by the provisions of this Section 9.18 and otherwise reasonably satisfactory to the Administrative Agent.  Each such Person shall

160

furnish the Administrative Agent with prior written notice of its intention to open or close a Blocked Account and the Administrative Agent shall promptly notify the Borrower as to whether the Administrative Agent shall require a Blocked Account Agreement with the Person with whom such account will be maintained.

(e)      The Borrower and the Subsidiary Guarantors may also maintain one or more zero balance disbursement accounts to be used by such Persons for disbursements and payments (including payroll) in the ordinary course of business or as otherwise permitted hereunder.

(f)      Each Concentration Account shall at all times be under the sole dominion and control of the Administrative Agent.  Each Credit Party hereby acknowledges and agrees that (i) such Credit Party has no right of withdrawal from any Concentration Account, (ii) the funds on deposit in each Concentration Account shall at all times continue to be collateral security for all of the Obligations pursuant to the Security Documents, and (iii) the funds on deposit in each Concentration Account shall be applied as provided in this Agreement.  In the event that, notwithstanding the provisions of this Section 9.18, during a Cash Dominion Period, any Credit Party receives or otherwise has dominion and control of any such proceeds or collections related to Collateral (other than identifiable proceeds of Term Priority Collateral), such proceeds and collections shall be held in trust by such Person for the Administrative Agent, shall not be commingled with any of such Person's other funds or deposited in any account of such Person and shall promptly be deposited into a Concentration Account or dealt with in such other fashion as such Person may be instructed by the Administrative Agent.

(g)      So long as no Cash Dominion Period is in existence, the Borrower and the Subsidiary Guarantors may direct, and shall have sole control over, the manner of disposition of funds in the Blocked Accounts (other than Blocked Accounts that are cash pooling accounts, for which the Borrower and the Subsidiary Guarantors may direct, and shall have sole control over, the manner of disposition of funds so long as no Event of Default has occurred and is continuing).

(h)      Any amounts received in any Concentration Account at any time shall be remitted to the operating account of the Borrower after the application of such amounts pursuant to Section 5.2(b).

(i)      The Administrative Agent shall promptly (but in any event within one Business Day) furnish written notice to each Person with whom a Blocked Account is maintained, upon any termination of a Cash Dominion Period or a Specified Event of Default, as applicable, in each case for which the Administrative Agent has delivered a notice pursuant to Section 9.18(c), of the termination of such notice.

(j)      The following shall apply to deposits and payments under and pursuant to this Agreement:

(i)      Funds shall be deemed to have been deposited to the applicable Concentration Account on the Business Day on which deposited, *provided* that such deposit is available to the Administrative Agent by 4:00 p.m. on that Business Day (except that if the Obligations are being paid in full, by 2:00 p.m. New York City time, on that Business Day);

161

(ii)     Funds paid to the Administrative Agent, other than by deposit to a Concentration Account, shall be deemed to have been received on the Business Day when they are good and collected funds, *provided* that such payment is available to the Administrative Agent by 4:00 p.m. on that Business Day (except that if the Obligations are being paid in full, by 2:00 p.m. New York City time, on that Business Day);

(iii)     If a deposit to a Concentration Account or payment is not available to the Administrative Agent until after 4:00 p.m. on a Business Day, such deposit or payment shall be deemed to have been made at 9:00 a.m. on the then next Business Day; and

(iv)     If any item deposited to any Concentration Account and applied in accordance with Section 5.2(b) is dishonored or returned unpaid for any reason, whether or not such return is rightful or timely, the Administrative Agent shall have the right to reverse such application and the Borrower shall indemnify the Secured Parties against all reasonable out-of-pocket claims and losses resulting from such dishonor or return.

9.19     Appraisals and Field Examinations

The Administrative Agent may carry out, at the Borrower's expense, one inventory appraisal and one field exam in any Fiscal Year; *provided*, *however*, that notwithstanding the foregoing limitations, (x) at any time after the date on which the Excess Availability has been less than the greater of $16,000,000 and 15.0% of the Line Cap for three consecutive Business Days, one additional field examination and one additional inventory appraisal may be conducted during each Fiscal Year until the Excess Availability has been at least the greater of $16,000,000 and 15.0% of the Line Cap for 20 consecutive calendar days and (y) at any time during the continuation of an Event of Default, field examinations and inventory appraisals may be conducted at the Borrower's expense as frequently as determined by the Administrative Agent in its Permitted Discretion.

9.20     Post-Closing Obligations[2]

(a)     The Borrower hereby agrees to deliver, or cause to be delivered, to the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent, the items described on Schedule 9.20 hereof, if any, on or before the dates specified with respect to such items, or such later dates as may be agreed to by, or as may be waived by, the Administrative Agent in its sole discretion.

(b)     All representations and warranties contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above and in Schedule 9.20, rather than as elsewhere provided in the Credit Documents); *provided* that to the extent any representation and warranty would not be true because the foregoing actions were not taken on the Closing Date or, following the Closing Date, prior to the date by which such action is required to be taken by Section 9.20(a), the respective representation and warranty shall

---

[2]     NTD: Insurance deliverables will likely need to be post-closing.

be required to be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 9.20 (and Schedule 9.20).

### SECTION 10 Negative Covenants

The Borrower hereby covenants and agrees that on the Closing Date (immediately after giving effect to the Transactions) and thereafter, until the Aggregate Revolving Credit Commitments, all Loans, all Letters of Credit have terminated (other than Letters of Credit that have been backstopped, Cash Collateralized or otherwise collateralized on terms and conditions reasonably satisfactory to the applicable L/C Issuer) and the Loans, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and Secured Specified Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements and Secured Specified Cash Management Agreements, or Contingent Obligations), are Paid in Full:

10.1    Limitation on Indebtedness

The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness.  Notwithstanding the foregoing, the limitations set forth in the immediately preceding sentence shall not apply to any of the following:

(a)    Indebtedness arising under the Credit Documents (including any Indebtedness incurred as permitted by Sections 2.14, 2.15 and 13.1);

(b)    Indebtedness under the Term Loan Credit Documents and any Refinancing Indebtedness thereof, in an aggregate principal amount not to exceed the sum of (i) $810,000,000 *plus* (ii) the principal amount of "Incremental Facilities" (as defined in the Term Loan Credit Agreement as in effect on the Closing Date) measured at the time of incurrence pursuant to the Term Loan Credit Agreement as in effect on the Closing Date *plus* (iii) solely in the case of any such Refinancing Indebtedness, the Refinancing Increased Amount with respect thereto;

(c)    [reserved];

(d)    subject to compliance with Section 10.5, Indebtedness of the Borrower or any Restricted Subsidiary owed to the Borrower or any Restricted Subsidiary; *provided* that all such Indebtedness of any Credit Party owed to any Person that is not a Credit Party shall be (x) evidenced by the Intercompany Subordinated Note (*provided* that any Person becoming a Restricted Subsidiary after the Closing Date may enter into the Intercompany Subordinated Note within the time period set forth in Section 9.11) or (y) otherwise be subject to subordination terms substantially identical to the subordination terms set forth in the Intercompany Subordinated Note or otherwise reasonably acceptable to the Administrative Agent;

(e)    subject to compliance with Section 10.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness of the Borrower or any other Restricted Subsidiary that is permitted to be incurred under this Agreement and (ii) the Borrower in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement;

163

*provided* that (x) if the Indebtedness being guaranteed under this Section 10.1(e) is subordinated to the Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms (taken as a whole) at least as favorable to the Agents and the Lenders as those contained in the subordination of such Indebtedness and (y) a Restricted Subsidiary that is not a Credit Party may not, by virtue of this Section 10.1(e), guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 10.1;

(f)    Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims and similar obligations);

(g)    Guarantee Obligations (i) incurred in the ordinary course of business in respect of obligations of (or to) suppliers, customers, franchisees, lessors and licensees, (ii) otherwise constituting Investments permitted by Section 10.5 (other than Investments permitted by Section 10.5(l) by reference to Section 10.1 and Section 10.5(q)); *provided* that this clause (ii) shall not be construed to limit the requirements of Section 10.1(d) and (e), or (iii) contemplated by the Plan;

(h)    Indebtedness (including Indebtedness arising under Capital Leases) incurred to finance the purchase price, cost of design, acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of fixed or capital assets or otherwise in respect of capital expenditures, so long as such Indebtedness is incurred concurrently with or within 270 days of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of such fixed or capital assets or incurrence of such capital expenditure, and any Refinancing Indebtedness thereof, in an aggregate principal amount not to exceed (i) $100,000,000 *plus* the principal amount of Capital Leases outstanding on the Closing Date, in each case at any time outstanding *plus* (ii) solely in the case of any such Refinancing Indebtedness, the Refinancing Increased Amount with respect thereto;

(i)    Indebtedness permitted to remain outstanding under the Plan, and to the extent such Indebtedness exceeds $5,000,000, set forth on Schedule 10.1 and any Refinancing Indebtedness thereof; *provided* that in the case of any Refinancing Indebtedness of any such Indebtedness, each obligor of such Refinancing Indebtedness is an obligor of such Indebtedness;

(j)    Indebtedness in respect of Hedging Agreements; *provided* that such Hedging Agreements are not entered into for speculative purposes (as determined by the Borrower in good faith);

(k)    (i) Permitted Other Debt assumed or incurred for any purpose, including to finance a Permitted Acquisition, other permitted Investments or capital expenditures; *provided* that (A) if such Indebtedness is incurred or assumed by a Restricted Subsidiary that is not a Credit Party, such Indebtedness is not guaranteed in any respect by the Borrower or any other Guarantor except as permitted under Section 10.5, (B) the aggregate principal amount of Indebtedness incurred or assumed under this Section 10.1(k)(i) shall not exceed (1) $100,000,000 *plus* (2) additional amounts if, on a Pro Forma Basis after giving effect to the incurrence or assumption of

164

such Indebtedness and the application of proceeds thereof and, if applicable, the Permitted Acquisition, permitted Investment or capital expenditure, the Consolidated Total Net Leverage Ratio is not greater than 3.30 to 1.00 or, to the extent incurred or assumed in connection with a Permitted Acquisition or similar Investment, the Consolidated Total Net Leverage Ratio (on a Pro Forma Basis for such transaction and the incurrence or assumption of such Indebtedness) is not greater than (I) 3.30 to 1.00 or (II) the Consolidated Total Net Leverage Ratio immediately prior to such Permitted Acquisition or similar Investment and (C) [reserved] and (ii) any Refinancing Indebtedness in respect of the Indebtedness under clause (i) above; *provided* that Indebtedness incurred or assumed by Restricted Subsidiaries that are not Subsidiary Guarantors under this Section 10.1(k), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 10.1(ee), shall not exceed $100,000,000, in each case at any time outstanding;

(l)     Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business or consistent with past practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business (including in respect of construction or restoration activities) or consistent with past practice;

(m)     additional Indebtedness; *provided* that the aggregate amount of Indebtedness incurred or issued pursuant to this Section 10.1(m) shall not exceed $100,000,000, in each case at any time outstanding;

(n)     Cash Management Obligations and other Indebtedness in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

(o)     (i) Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (ii) Indebtedness in respect of intercompany obligations of the Borrower or any Restricted Subsidiary with the Borrower or any Restricted Subsidiary in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(p)     Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case entered into in connection with a Permitted Acquisitions, other Investments and the Disposition of any business, assets or Stock or Stock Equivalents permitted hereunder;

(q)     Indebtedness of the Borrower or any Restricted Subsidiary consisting of (i) financing of insurance premiums or (ii) take or pay obligations contained in supply agreements, in each case arising in the ordinary course of business;

(r)    Indebtedness representing deferred compensation, or similar arrangement, to employees, consultants or independent contractors of the Borrower and the Restricted Subsidiaries incurred in the ordinary course of business;

(s)    Indebtedness consisting of promissory notes issued by the Borrower or any Restricted Subsidiary to any present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) to finance the purchase or redemption of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) permitted by Section 10.6(b);

(t)    Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions and Permitted Acquisitions, any other Investment permitted hereunder;

(u)    Indebtedness in respect of (i) Permitted Receivables Financings owed by a Receivables Entity or Qualified Securitization Financings owed by a Securitization Subsidiary and (ii) accounts receivable factoring facilities in the ordinary course of business so long as no ABL Priority Collateral is encumbered thereby; *provided* that the aggregate amount of Receivables Indebtedness pursuant to this clause (u) shall not exceed $100,000,000 at any time outstanding;

(v)    Indebtedness of Credit Parties in respect of (i) [reserved], (ii) Incremental Equivalent Debt (as defined in, and subject to the limitations set forth in, the Term Loan Credit Agreement as in effect on the date hereof; *provided* that references therein to "Permitted Other Loans" and "Permitted Other Notes" shall be deemed to be references to such terms as defined herein and references to Section 10.1(k) therein shall be deemed to be references to Section 10.1(k) hereof); and (iii) any Refinancing Indebtedness in respect thereof;

(w)    [reserved];

(x)    Indebtedness in an amount not to exceed the Available Equity Amount;

(y)    Indebtedness of any Minority Investments or Indebtedness incurred on behalf thereof or representing guarantees of such Indebtedness of any Minority Investment, in an amount not to exceed $100,000,000 at the time of incurrence or issuance, in each case at any time outstanding;

(z)    intercompany Indebtedness among the Borrower and its Subsidiaries constituting any part of any Permitted Reorganization;

(aa)    to the extent constituting Indebtedness, customer deposits and advance payments (including progress payments) received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(bb)    (i) Indebtedness of the Borrower or any Restricted Subsidiary supported by a letter of credit, in a principal amount not in excess of the stated amount of such letter of credit so long as such letter of credit is otherwise permitted to be incurred pursuant to this Section 10.1

or (ii) obligations in respect of letters of support, guarantees or similar obligations issued, made or incurred for the benefit of the Borrower or any Subsidiary of the Borrower in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than the United States;

(cc)   Indebtedness owing to the seller of any business or assets permitted to be acquired by the Borrower or any Restricted Subsidiary under this Agreement; *provided* that the aggregate amount of Indebtedness permitted under this clause (cc) shall not exceed $100,000,000 outstanding at any time;

(dd)   obligations in respect of Disqualified Stock in an amount not to exceed the greater of $25,000,000 and 3% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) outstanding at any time;

(ee)   Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors under this clause (ee), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 10.1(k), shall not exceed $100,000,000, in each case at any time outstanding;

(ff)   so long as the Payment Conditions have been satisfied at the time of incurrence and after giving effect thereto, unsecured Indebtedness of a Credit Party; *provided* that the scheduled final maturity date and the Weighted Average Life to Maturity of such Indebtedness shall not be earlier than the Initial Maturity Date; and

(gg)   all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (ff) above.

For the avoidance of doubt, any Indebtedness permitted to be incurred under any clause of this Section 10.1 may be used to modify, refinance, refund, renew, replace, exchange or extend any outstanding Indebtedness, including any such Indebtedness incurred under any other clause of this Section 10.1 and any such Indebtedness with respect to which the incurrence of Refinancing Indebtedness is expressly permitted under this Section 10.1, in each case, subject to the restrictions set forth in Section 10.7.

Accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock will not be deemed to be an incurrence or issuance of Indebtedness or Disqualified Stock for purposes of this covenant.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior lien priority with respect to the same collateral.

10.2   Limitation on Liens

The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of the Borrower or such Restricted Subsidiary, whether now owned or hereafter acquired, except:

(a) Liens arising under the Security Documents;

(b) Liens securing Indebtedness permitted to be incurred pursuant to Section 10.1(b), and Hedging Obligations and Cash Management Obligations permitted to be secured on a *pari passu* basis with the Term Loans under the Term Credit Documents; *provided* that such Lien over the Collateral shall be subject to the Applicable Intercreditor Agreements;

(c) [reserved];

(d) Liens securing Indebtedness permitted pursuant to Section 10.1(h); *provided* that except as otherwise permitted hereby, such Liens attach at all times only to the assets so financed except (1) for accessions to the property financed with the proceeds of such Indebtedness and the proceeds and the products thereof and (2) that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(e) Liens permitted to remain outstanding under the Plan; *provided* that any Lien securing Indebtedness or other obligations in excess of $5,000,000 shall only be permitted to the extent such Lien is listed on Schedule 10.2;

(f) (i) Liens on the Collateral securing Indebtedness permitted to be incurred under clause (B)(2) of the proviso to Section 10.1(k)(i) or Section 10.1(v)(ii); *provided* that (A) the representative of such Indebtedness shall have entered into the Applicable Intercreditor Agreements to the extent secured by the Collateral reflecting its junior priority status as compared with the Liens on the ABL Priority Collateral securing the Obligations and its pari passu or junior priority status as compared with the Liens on the Term Priority Collateral securing the Obligations, and (B) (I) with respect to Indebtedness incurred in reliance on clause (B)(2) of the proviso to Section 10.1(k)(i) that is secured by Liens on the Term Priority Collateral that are pari passu with the Liens on the Term Priority Collateral securing the Term Loan Obligations, immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated First Lien Net Leverage Ratio is no greater than 3.30 to 1.00 or, to the extent incurred or assumed in connection with a Permitted Acquisition or similar Investment, the Consolidated First Lien Net Leverage Ratio (on a Pro Forma Basis for such transaction and the incurrence or assumption of such Indebtedness) is not greater than (x) 3.30 to 1.00 or (y) the Consolidated First Lien Net Leverage Ratio immediately prior to such Permitted Acquisition or similar Investment and (II) with respect to Indebtedness incurred in reliance on clause (B)(2) of the proviso to Section 10.1(k)(i) that is secured by Liens on the Term Priority Collateral that are junior to the Liens on the Term Priority Collateral securing the Term Loan Obligations, immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated Secured Net Leverage Ratio is no greater than 3.30 to 1.00 or, to the extent incurred or assumed in connection with a Permitted Acquisition or similar Investment, the Consolidated Secured Net Leverage Ratio (on a Pro Forma Basis for such transaction and the incurrence or assumption of such Indebtedness) is not greater than (I) 3.30 to 1.00 or (II) the Consolidated

168

Secured Net Leverage Ratio immediately prior to such Permitted Acquisition or similar Investment, and (ii) Liens securing Refinancing Indebtedness permitted to be incurred under Section 10.1(k)(ii) or Section 10.1(v)(iii);

(g)     Liens existing on the assets of any Person that becomes a Restricted Subsidiary (or is a Restricted Subsidiary that survives a merger with such Person or any of its Subsidiaries) pursuant to a Permitted Acquisition or other permitted Investment or the designation of an Unrestricted Subsidiary as a Restricted Subsidiary or existing on assets acquired after the Closing Date, to the extent the Liens on such assets secure Indebtedness permitted by Section 10.1; *provided* that such Liens (i) are not created or incurred in connection with, or in contemplation of, such Person becoming such a Restricted Subsidiary or such assets being acquired and (ii) attach at all times only to the same assets to which such Liens attached and after-acquired property, property that is affixed or incorporated into the property covered by such Lien and accessions thereto and products and proceeds thereof, after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property, and the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment (or assets affixed or appurtenant thereto and additions and accessions) provided by any lender, other equipment financed by such lender, it being understood that such requirement to pledge such after-acquired property shall not be permitted to apply to any such after-acquired property to which such requirement would not have applied but for such acquisition except as otherwise permitted hereunder, and any Refinancing Indebtedness thereof permitted by Section 10.1;

(h)     additional Liens on assets of any Restricted Subsidiary that is not a Credit Party securing Indebtedness of such Restricted Subsidiary permitted pursuant to Section 10.1 (or other obligations of such Restricted Subsidiary not constituting Indebtedness);

(i)     additional Liens on assets that do not constitute Collateral prior to the creation of such Liens, so long as the Credit Facilities hereunder are equally and ratably secured thereby and the aggregate amount of Indebtedness secured thereby at any time outstanding does not exceed $160,000,000; *provided* that such Liens are subject to intercreditor arrangements reasonably satisfactory to the Borrower and the Collateral Agent; it being understood and agreed that intercreditor arrangements in substantially the form of the Applicable Intercreditor Agreements are satisfactory;

(j)     additional Liens on Collateral, so long as (i)(x) with respect to Indebtedness that is secured by Liens on the Term Priority Collateral that are pari passu with the Liens on the Term Priority Collateral securing the Term Loan Obligations, immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated First Lien Net Leverage Ratio is no greater than 3.30 to 1.00 and (y) with respect to Indebtedness that is secured by Liens on the Term Priority Collateral that are junior to the Liens on the Term Priority Collateral securing the Term Loan Obligations, immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated Secured Net Leverage Ratio is no greater than 3.30 to 1.00, (ii) such Liens shall be junior to the Liens over the ABL Priority Collateral securing the Obligations and (iii) the holder(s) of such Liens (or a representative thereof) shall have entered into the Applicable Intercreditor Agreements;

(k)      additional Liens, so long as the aggregate amount of obligations secured thereby at any time outstanding does not exceed $100,000,000 at the time of incurrence or issuance;

(l)      (i) Liens on accounts receivable, other Receivables Facility Assets, or accounts into which collections or proceeds of Receivables Facility Assets are deposited, in each case arising in connection with a Permitted Receivables Financing permitted under Section 10.1(u) and (ii) Liens on Securitization Assets and related assets arising in connection with a Qualified Securitization Financing permitted under Section 10.1(u); *provided* that no such Liens shall extend to any assets included in the Borrowing Base or to any Blocked Account;[3]

(m)      Permitted Encumbrances; and

(n)      the supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, extension or renewal of any Lien permitted by clause (e), clause (g) and clause (i) of this Section 10.2 upon or in the same assets theretofore subject to such Lien (or upon or in after-acquired property that is affixed or incorporated into the property covered by such Lien and accessions thereto or any proceeds or products thereof) or the Refinancing Indebtedness (without a change in any obligor, except to the extent otherwise permitted hereunder) of the Indebtedness or other obligations secured thereby (including any unused commitments), to the extent such Refinancing Indebtedness is permitted by Section 10.1; *provided* that in the case of any such supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, extension or renewal of any Lien permitted by clause (g) and clause (i) of this Section 10.2, the requirements set forth in the proviso to clause (g) or clause (i), as applicable, shall have been satisfied.

10.3      Limitation on Fundamental Changes

The Borrower will not, and will not permit the Restricted Subsidiaries to, consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise consummate the Disposition of, all or substantially all its business units, assets or other properties, except that:

(a)      so long as both before and after giving effect to such transaction, no Event of Default has occurred and is continuing or would result therefrom, any Subsidiary of the Borrower or any other Person may be merged, amalgamated or consolidated with or into the Borrower; *provided* that (A) the Borrower shall be the continuing or surviving company or (B) if the Person formed by or surviving any such merger, amalgamation or consolidation is not the Borrower (such other Person, the "**Successor Borrower**"), (1) the Successor Borrower (if other than the Borrower) shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Borrower (if other than the Borrower) shall expressly assume all the obligations of the Borrower under this Agreement and the other Credit Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (3) each Guarantor, unless it is the other party

---

[3] [NTD – Consistent with prepetition credit agreement.]

170

to such merger or consolidation, shall have by a supplement to the Guarantee confirmed that its guarantee thereunder shall apply to any Successor Borrower's obligations under this Agreement, (4) each grantor and each pledgor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement, affirmed that its obligations thereunder shall apply to its Guarantee as reaffirmed pursuant to clause (3), (5) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have affirmed that its obligations under the applicable Mortgage shall apply to its Guarantee as reaffirmed pursuant to clause (3), (6) the Successor Borrower shall have delivered to the Administrative Agent an officer's certificate stating that such merger or consolidation and such supplements preserve the enforceability of this Agreement and the Guarantee and the perfection and priority of the Liens under the applicable Security Documents, and (7) the Successor Borrower shall have provided to the Administrative Agent all documentation and information reasonably requested by the Administrative Agent and the Lenders that is necessary and is required by United States regulatory authorities to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(b)    so long as no Event of Default has occurred and is continuing, or would result therefrom, any Subsidiary of the Borrower or any other Person (in each case, other than the Borrower) may be merged, amalgamated or consolidated with or into any one or more Subsidiaries of the Borrower; provided that (i) in the case of any merger, amalgamation or consolidation involving one or more Restricted Subsidiaries, (A) a Restricted Subsidiary shall be the continuing or surviving Person or (B) the Borrower shall cause the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Restricted Subsidiary) to become a Restricted Subsidiary, (ii) in the case of any merger, amalgamation or consolidation involving one or more Guarantors, a Guarantor shall be the continuing or surviving Person or the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Guarantor) shall execute a supplement to the Guarantee and the relevant Security Documents each in form and substance reasonably satisfactory to the Administrative Agent in order to become a Guarantor and pledgor, mortgagor and grantor, as applicable, thereunder for the benefit of the Secured Parties and to acknowledge and agree to the terms of the Intercompany Subordinated Note, and (iii) Borrower shall have delivered to the Administrative Agent an officers' certificate stating that such merger, amalgamation or consolidation and any such supplements to the Guarantee and any Security Document preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the applicable Security Documents to the extent otherwise required;

(c)    any Permitted Reorganization may be consummated;

(d)    any Restricted Subsidiary that is not a Credit Party may sell, lease, transfer or otherwise Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Restricted Subsidiary;

(e)    the Borrower or any Subsidiary of the Borrower may sell, lease, transfer or otherwise Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to any Credit Party; *provided* that the consideration for any such Disposition by any Person other than a Guarantor shall not exceed the fair value of such assets;

(f)      any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Credit Party, any assets or business of such Restricted Subsidiary not otherwise disposed of or transferred in accordance with Section 10.4 or 10.5, or in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Credit Party after giving effect to such liquidation or dissolution;

(g)      the Borrower or any Restricted Subsidiary may change its legal form, so long as (i) no Event of Default has occurred and is continuing or would result therefrom and (ii) the Liens granted pursuant to any Security Documents to which such Person is a party remain perfected and in full force and effect, to the extent otherwise required hereby;

(h)      any merger, consolidation or amalgamation the purpose and only substantive effect of which is to reincorporate or reorganize the Borrower or any Restricted Subsidiary in a jurisdiction in the United States, any state thereof or the District of Columbia, so long as the Liens granted pursuant to the Security Documents to which the Borrower is a party remain perfected and in full force and effect, to the extent otherwise required hereby;

(i)      the Transactions and any transactions as contemplated by the Plan may be consummated; and

(j)      the Borrower and the Restricted Subsidiaries may consummate a merger, amalgamation dissolution, liquidation, windup, consolidation or Disposition, constituting, or otherwise resulting in, a transaction permitted by Section 10.4 (other than pursuant to (x) Section 10.4(d) and (y) the Disposition of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries, taken as a whole, to any Person other than the Borrower or any Guarantor), an Investment permitted pursuant to Section 10.5 (other than Section 10.5(l)), and any Restricted Payments permitted pursuant to Section 10.6 (other than Section 10.6(f)).

10.4    Limitation on Disposition

The Borrower will not, and will not permit the Restricted Subsidiaries to make any Disposition, except that (in each case, subject to the requirements set forth in the last sentence of this Section 10.4, if applicable):

(a)      the Borrower and the Restricted Subsidiaries may sell, transfer, license or sublicense, or otherwise Dispose of, in the reasonable business judgment of the Borrower or such Restricted Subsidiary, (i) obsolete, negligible, immaterial, worn-out, uneconomical, scrap, used, or surplus or mothballed assets (including any such equipment that has been refurbished in contemplation of such Disposition) or assets no longer used or useful in the business or no longer commercially desirable to maintain, (ii) inventory or goods (or other assets) held for sale in the ordinary course of business, (iii) cash and Cash Equivalents, (iv) immaterial assets (including allowing any registrations or any applications for registration of any intellectual property rights to lapse or go abandoned in the ordinary course of business), and (v) assets for the purposes of charitable contributions or similar gifts to the extent such assets are not material to the ability of

172

the Borrower and the Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b)      the Borrower and the Restricted Subsidiaries may make Dispositions of assets; *provided* that (i) [reserved], (ii) as of the date of signing of the definitive agreement for such Disposition, no Event of Default shall have occurred and be continuing, (iii) with respect to any Disposition pursuant to this clause (b) for a purchase price in excess of $50,000,000, the Person making such Disposition shall receive fair market value and not less than 75% of such consideration in the form of cash or Cash Equivalents; *provided* that for the purposes of this clause (iii) the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto, or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or such Restricted Subsidiary's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the payment in cash of the Obligations (other than intercompany liabilities owing to a Restricted Subsidiary being disposed of) and that are (1) assumed by the transferee (or a third party in connection with such transfer) with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing or indemnified from such liabilities or (2) otherwise cancelled or terminated in connection therewith, (B) any securities, notes or other obligations received by the Person making such Disposition from the purchaser that are converted by such Person into cash or Cash Equivalents or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, (C) consideration consisting of Indebtedness of any Credit Party (other than subordinated Indebtedness) received after the Closing Date from Persons who are not Restricted Subsidiaries (so long as such Indebtedness is not cancelled or forgiven), (D) any Marketable Security and (E) any Designated Non-Cash Consideration received by the Person making such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this Section 10.4(b) that is at that time outstanding, not in excess of $100,000,000 at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value and (iv) any non-cash proceeds received in the form of Real Estate, Indebtedness or Stock and Stock Equivalents are pledged to the Collateral Agent to the extent required under Section 9.11, 9.12 or the Security Agreement;

(c)      (i) the Borrower and the Restricted Subsidiaries may make Dispositions to the Borrower or any other Credit Party, (ii) any Restricted Subsidiary that is not a Credit Party may make Dispositions to the Borrower or any other Restricted Subsidiary of the Borrower and (iii) any Credit Party may make Dispositions to a non-Credit Party to the extent constituting an Investment permitted under Section 10.5 (other than Section 10.5(l));

(d)      the Borrower and any Restricted Subsidiary may effect any transaction permitted by Sections 10.2, 10.3 (other than Section 10.3(j)), 10.5 (other than Section 10.5(l)) or 10.6 (other than Section 10.6(f));

173

(e)        the Borrower and any Restricted Subsidiary may lease, sublease, license  or sublicense  (i) real or personal property (other than intellectual property) in the ordinary course of business or (ii) intellectual property not interfering in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole and not, in each case of (i) and (ii), in connection with any transactions undertaken in furtherance of dividends, payments or exchange of any Indebtedness or financing (other than financing among Borrower and its Restricted Subsidiaries);

(f)        Dispositions of property (including like-kind exchanges) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property (excluding any boot thereon) or (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property, in each case under Section 1031 of the Code or otherwise;

(g)        the Borrower and any other Credit Party may transfer or otherwise Dispose of any intellectual property for fair market value to any Restricted Subsidiary of the Borrower that is not a Credit Party; *provided* that (x) such transfer or Disposition is in the ordinary course of business and not in connection with any transactions undertaken in furtherance of dividends, payments or exchange of any Indebtedness or financing (other than financing among Borrower and its Restricted Subsidiaries) or (y) (i) the transferee shall be (A) a direct or indirect Wholly Owned Restricted Subsidiary or (B) a special purpose entity that does not incur any third-party Indebtedness for borrowed money (for the avoidance of doubt, such entity may have employees managing its intellectual property assets and conducting internal research and development activities), (ii) the consideration received by the Credit Party from such Disposition shall be in the form of (A) cash and Cash Equivalents, (B) intercompany notes owed to the Credit Party transferor/licensor by the non-Credit Party transferee/licensee, which intercompany notes are pledged to secure the Obligations and/or (C) Stock and Stock Equivalent of the transferee/licensee (or a parent entity of such transferee/licensee so long as such parent entity and any intermediate holding entity otherwise satisfies the requirements set forth in clause (i) above) and the Stock and Stock Equivalents of such transferee/licensee (or the parent entity) are pledged to secure the Obligations (subject to the limitation set forth in the Security Agreement) and (iii) such Disposition shall be subject to a license of such intellectual property to the Administrative Agent to be enforceable solely in connection with the exercise of the Administrative Agent's rights and remedies under the Credit Documents with respect to the ABL Priority Collateral; *provided* that in the case of this clause (ii)(C), the aggregate fair market value of any and all intellectual property so disposed of shall not exceed $100,000,000;

(h)        Dispositions of (i) Investments in joint ventures (regardless of the form of legal entity) to the extent required by, or made pursuant to, customary buy/sell arrangements or put/call arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements or (ii) to joint ventures in connection with the dissolution or termination of a joint venture to the extent required pursuant to joint venture and similar arrangements;

(i)        (i) Dispositions of Receivables Facility Assets in connection with any Permitted Receivables Financing, and any Disposition of Securitization Assets in connection with any Qualified Securitization Financing and (ii) Dispositions of assets other than ABL Priority Collateral in connection with accounts receivable factoring facilities in the ordinary course of

174

business, *provided* that the Indebtedness arising in connection therewith shall not exceed the amount of Indebtedness permitted by Section 10.1(u);

(j)      Dispositions listed on Schedule 10.4 or to consummate the Transactions, including transactions contemplated by the Plan;

(k)      transfers of property subject to any damage, destruction, other casualty or loss or in connection with any seizure, condemnation, confiscation or taking proceeding or similar events upon receipt of the net cash proceeds in connection therewith;

(l)      Dispositions or discounts of accounts receivable or notes receivable in connection with the collection or compromise thereof or the conversion of accounts receivable to notes receivable;

(m)      Dispositions (other than to an Unrestricted Subsidiary) of any assets not constituting Collateral in an aggregate amount not to exceed $100,000,000;

(n)      the execution of (or amendment to), settlement of or unwinding of any Hedging Agreement;

(o)      any issuance or sale of Stock or Stock Equivalent in, or Indebtedness or other securities of, any Unrestricted Subsidiary;

(p)      the surrender or waiver of contractual rights and settlement or waiver of contractual or litigation claims;

(q)      Dispositions of any assets (including Stock and Stock Equivalents) acquired in connection with any Permitted Acquisition or other Investment not prohibited hereunder, which assets are not used or useful to the core or principal business of the Borrower and its Restricted Subsidiaries (as determined by the Borrower in good faith); and

(r)      other Dispositions (including those of the type otherwise described herein, but excluding any Disposition to an Unrestricted Subsidiary) made for fair market value in an aggregate amount not to exceed $100,000,000;

(s)      the Borrower and any Restricted Subsidiary may (i) terminate or otherwise collapse its cost sharing agreements with the Borrower or any Subsidiary and settle any crossing payments in connection therewith, (ii) convert any intercompany Indebtedness to Stock or any Stock to intercompany Indebtedness, (iii) settle, discount, write off, forgive or cancel any intercompany Indebtedness or other obligation owing by the Borrower or any Restricted Subsidiary or (iv) settle, discount, write off, forgive or cancel any Indebtedness owing by any present or former consultants, managers, directors, officers or employees of Holdings, the Borrower, any direct or indirect parent thereof, or any Subsidiary thereof or any of their successors or assigns;

(t)      any Disposition of property to the extent that (1) such property is exchanged for credit against the purchase price of similar replacement property that is purchased within 270 days thereof or (2) the proceeds of such Disposition are promptly applied to the purchase price of

175

such replacement property (which replacement property is actually purchased within 270 days thereof);

(u)     any Disposition in connection with a Permitted Reorganization;

(v)     any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater fair market value or usefulness to the business of the Borrower and the Restricted Subsidiaries, taken as a whole, as determined in good faith by the Borrower; and

(w)     Dispositions of any asset between or among the Borrower and/or any Restricted Subsidiary as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (v) above; *provided* that after giving effect to any such Disposition, to the extent the assets subject to such Dispositions constituted Collateral, such assets shall remain subject to, or be rejoined to, the Lien of the Security Documents.

Notwithstanding the foregoing, no transfer or other Disposition of any intellectual property by a Credit Party to a Subsidiary that is not a Credit Party may be made except pursuant to Section 10.4(c)(iii) (solely in respect of Investments permitted by the proviso to Section 10.5(w)), (e) or (g).

Substantially simultaneously with the consummation of any Disposition (other than any Disposition permitted under Section 10.4(a)(ii)), if assets constituting more than 5% of the Borrowing Base are Disposed of in such Disposition, the Borrower shall deliver an updated Borrowing Base Certificate that gives Pro Forma Effect to such Disposition, together with calculations sufficient to demonstrate that the Availability Requirements shall be satisfied immediately after giving effect to such Disposition.

10.5     Limitation on Investments

The Borrower will not, and will not permit the Restricted Subsidiaries, to make any Investment except:

(a)     extensions of trade credit, asset purchases (including purchases of inventory, supplies, materials and equipment) and the licensing or contribution of intellectual property pursuant to joint marketing arrangements, original equipment manufacturer arrangements or development agreements with other Persons, in each case in the ordinary course of business;

(b)     Investments in cash or Cash Equivalents when such Investments were made;

(c)     loans and advances to officers, managers, directors, employees, consultants and independent contractors of the Borrower (or any direct or indirect parent thereof) or any Subsidiary of the Borrower (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances), (ii) in connection with such Person's purchase of Stock or Stock Equivalents of Holdings (or any direct or indirect parent thereof; *provided* that, to the extent such loans and advances are made in cash,

176

the amount of such loans and advances used to acquire such Stock or Stock Equivalents shall be contributed to the Borrower in cash) and (iii) for purposes not described in the foregoing clauses (i) and (ii); *provided* that the aggregate principal amount outstanding pursuant to clause (iii) shall not exceed $25,000,000 at any one time outstanding;

(d)     Investments (i) contemplated by the Plan or to consummate the Transactions and (ii) existing on, or made pursuant to legally binding written commitments in existence on, the Closing Date and, to the extent such Investments exceed $5,000,000, set forth on Schedule 10.5 and any supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, renewal or extension thereof, only to the extent that the amount of any Investment made pursuant to this clause (d)(ii) does not at any time exceed the amount of such Investment set forth on Schedule 10.5 (except by an amount equal to the unpaid accrued interest and premium thereon *plus* any unused commitments *plus* amounts paid in respect of fees, premiums, costs and expenses incurred in connection with such supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, renewal or extension or as otherwise permitted hereunder);

(e)     any Investment acquired by the Borrower or any Restricted Subsidiary (i) in exchange for any other Investment or accounts receivable held by the Borrower or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization, or recapitalization of, or settlement of delinquent accounts or disputes with or judgments against, the issuer, obligor or borrower of such original Investment or accounts receivable, (ii) as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default or (iii) as a result of the settlement, compromise or resolution of litigation, arbitration or other disputes with Persons who are not Affiliates or in satisfaction or judgments against other Persons;

(f)     Investments to the extent that payment for such Investments is made with (i) Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) or (ii) the proceeds from the issuance of Stock or Stock Equivalents (other than Disqualified Stock, any sale or issuance to any Subsidiary and any issuance applied pursuant to Section 10.6(a) or Section 10.6(b)(i)) of the Borrower (or any direct or indirect parent thereof); *provided* that such Stock or Stock Equivalents or proceeds of such Stock or Stock Equivalents will not increase the Available Equity Amount;

(g)     Investments (other than in the form of direct or indirect transfers or Dispositions of intellectual property from a Credit Party to a non-Credit Party) by the Borrower or any Restricted Subsidiary in the Borrower or any Restricted Subsidiary or any Person that will, upon such Investment become a Restricted Subsidiary;

(h)     Investments constituting Permitted Acquisitions;

(i)     Investments constituting (i) Minority Investments and Investments in Unrestricted Subsidiaries and (ii) Investments in joint ventures (regardless of the form of legal entity) or similar Persons that do not constitute Restricted Subsidiaries, in each case valued at the fair market value (determined by the Borrower acting in good faith) of such Investment at the time

177

each such Investment is made, in an aggregate amount at any one time outstanding pursuant to this clause (i) that, at the time each such Investment is made, would not exceed $100,000,000;

(j)  Investments constituting non-cash proceeds received from Dispositions of assets pursuant to Section 10.4;

(k)  Investments made to repurchase or retire Stock or Stock Equivalents of the Borrower or any direct or indirect parent thereof owned by any employee or any stock ownership plan or key employee stock ownership plan of the Borrower (or any direct or indirect parent thereof) in an aggregate amount, when combined with distributions made pursuant to Section 10.6(b), not to exceed the limitations set forth in such Section;

(l)  Investments consisting of or resulting from Indebtedness, Liens, Restricted Payments, fundamental changes and Dispositions permitted by Section 10.1 (other than Sections 10.1(d), 10.1(e) and 10.1(g)(ii)), 10.2, 10.3 (other than Section 10.3(j)), 10.4 (other than Section 10.4(d)), 10.6 (other than Section 10.6(f)), 10.7 or 10.8, as applicable;

(m)  loans and advances to any direct or indirect parent of the Borrower in lieu of, and not in excess of the amount of, Restricted Payments to the extent permitted to be made to such parent in accordance with Section 10.6; *provided* that the aggregate amount of such loans and advances shall reduce the ability of the Borrower and the Restricted Subsidiaries to make Restricted Payments under the applicable clauses of Section 10.6 by such amount;

(n)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(o)  Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(p)  advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(q)  Guarantee Obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(r)  Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Closing Date otherwise in accordance with this Section 10.5 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(s)  Investments in Hedging Agreements permitted by Section 10.1;

178

(t) Investments in or by a Receivables Entity or a Securitization Subsidiary arising out of, or in connection with, any Permitted Receivables Financing or Qualified Securitization Financing, as applicable; *provided* that any such Investment in a Receivables Entity or a Securitization Subsidiary is in the form of a contribution of additional Receivables Facility Assets or Securitization Assets, as applicable, or as equity;

(u) Investments consisting of deposits of cash and Cash Equivalents as collateral support permitted under Section 10.2;

(v) other Investments not to exceed an amount equal to the Available Equity Amount at the time such Investments are made;

(w) other Investments in an amount at any one time outstanding not to exceed $100,000,000; *provided* that up to $50,000,000 may be made in the form of Disposition of intellectual property by a Credit Party to a Restricted Subsidiary that is not a Credit Party;

(x) Investments consisting of purchases and acquisitions of assets and services in the ordinary course of business;

(y) Investments in the ordinary course of business consisting of Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practice;

(z) Investments made as a part of, or in connection with or to otherwise fund the Transactions;

(aa) contributions in connection with compensation arrangements to a "rabbi" trust for the benefit of employees, directors, partners, members, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Borrower or any of its Restricted Subsidiaries;

(bb) Investments relating to pension trusts;

(cc) Investments in Similar Business in an amount at any one time outstanding not to exceed $100,000,000;

(dd) Investments in connection with Permitted Reorganizations;

(ee) Investments in deposit accounts, commodities and securities accounts opened in the ordinary course of business;

(ff) Investments solely to the extent such Investments reflect an increase in the value of Investments otherwise permitted under this Agreement;

(gg) Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business;

179

(hh)    Term Loans repurchased by the Borrower or a Restricted Subsidiary pursuant to and in accordance with Section 13.6(g) of the Term Loan Credit Agreement; and

(ii)    other Investments in an unlimited amount, so long as the Payment Conditions are satisfied at the time of and after giving effect to the Investment.

Notwithstanding the foregoing, no Investment consisting of or resulting from any transfer or other Disposition of any intellectual property by a Credit Party to a Subsidiary that is not a Credit Party may be made except pursuant to (i) Section 10.5(l) (solely in respect of Dispositions permitted by Section 10.4(e) or (g)) or (ii) the proviso to Section 10.5(w).

10.6    Limitation on Restricted Payments

The Borrower will not, and will not permit the Restricted Subsidiaries to, declare or pay any Restricted Payments except that:

(a)    the Borrower may (or may make Restricted Payments to permit any direct or indirect parent thereof to) redeem in whole or in part any of its Stock or Stock Equivalents for another class of its (or such parent's) Stock or Stock Equivalents or with proceeds from substantially concurrent equity contributions or issuances of new Stock or Stock Equivalents (other than any Disqualified Stock, any sale or issuance to any Subsidiary and any contribution or issuance applied pursuant to Section 10.5(f)(ii) or Section 10.6(b)(i)); *provided* that (i) such new Stock or Stock Equivalents contain terms and provisions (taken as a whole) at least as advantageous to the Lenders, taken as a whole, in all respects material to their interests as those contained in the Stock or Stock Equivalents redeemed thereby and (ii) the cash proceeds from any such contribution or issuance shall not increase the Available Equity Amount;

(b)    the Borrower may (or may make Restricted Payments to permit any direct or indirect parent thereof to) redeem, acquire, retire or repurchase shares of its (or such parent's) Stock or Stock Equivalents held by any present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any direct or indirect parent thereof) and any Subsidiaries, so long as such repurchase is pursuant to, and in accordance with the terms of, any stock option or stock appreciation rights plan, any management, director and/or employee benefit, stock ownership or option plan, stock subscription plan or agreement, employment termination agreement or any employment agreements or stockholders' or shareholders' agreement; *provided*, *however*, that the aggregate amount of payments made under this Section 10.6(b), when combined with Investments made pursuant to Section 10.5(k), do not exceed in any Fiscal Year $20,000,000 (with unused amounts in any Fiscal Year being carried over to succeeding Fiscal Years subject to a maximum (without giving effect to the following proviso) of $30,000,000 in any Fiscal Year); *provided*, *further*, that such amount in any Fiscal Year may be increased by an amount not to exceed:

(i)    the cash proceeds from the sale of Stock (other than Disqualified Stock, any sale or issuance to any Subsidiary and any contribution or issuance applied pursuant to Section 10.5(f)(ii) or Section 10.6(a)) of the Borrower and, to the extent contributed to the Borrower, Stock of any of the Borrower's direct or indirect parent

180

companies, in each case to present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies) or any Subsidiary of the Borrower that occurs after the Closing Date; *provided* that such Stock or proceeds of such Stock will not increase the Available Equity Amount; *plus*

(ii)     the cash proceeds of key man life insurance policies received by the Borrower or any Restricted Subsidiary after the Closing Date; less

(iii)     the amount of any Restricted Payment previously made with the cash proceeds described in clauses (i) and (ii) above;

and *provided*, *further*, that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies), or any Subsidiary of the Borrower in connection with a repurchase of Stock or Stock Equivalents of the Borrower or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of this Agreement;

(c)     so long as no Event of Default under Section 11.1 or 11.5 shall have occurred and be continuing or would result therefrom, the Borrower make Restricted Payments; *provided* that the amount of all such Restricted Payments paid from the Closing Date pursuant to this clause (c) shall not exceed an amount equal to the Available Equity Amount at the time such Restricted Payments are paid;

(d)     the Borrower and its Restricted Subsidiaries may make Restricted Payments to any direct or indirect parent company of the Borrower (or otherwise as specified below) in an amount required for the Borrower, such Restricted Subsidiary or any such direct or indirect parent to pay, in each case without duplication:

(i)     foreign, federal, state and local income Taxes for any taxable period in respect of which a consolidated, combined, unitary or affiliated or similar return that includes the Borrower and/or any of its Subsidiaries (including if the Borrower or any of its Subsidiaries is disregarded as separate from a member included in such group return) is filed by such direct or indirect parent; *provided* that for purposes of this Section 10.6(d)(i), such Taxes shall be deemed no greater than the amount that the Borrower and its Subsidiaries would be required to pay in respect of foreign, federal, state and local income Taxes if the Borrower were the parent of a standalone consolidated, combined, affiliated, unitary or similar tax group including its Subsidiaries (any such Restricted Payments, "**Tax Distributions**");

(ii)     (A) such parents' general operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties) to the

181

extent such costs and expenses are attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries and (to the extent of cash actually paid by Unrestricted Subsidiaries to the Borrower or its Restricted Subsidiaries for such purposes) Unrestricted Subsidiaries, (B) any indemnification claims made by directors or officers of the Borrower or its Restricted Subsidiaries (or any parent of the foregoing) who are directors or officers of the Borrower or any Restricted Subsidiary (or any parent of the foregoing) on or after the Petition Date to the extent such claims are attributable to the ownership or operation of the Borrower or any Restricted Subsidiary and (to the extent of cash actually paid by Unrestricted Subsidiaries to the Borrower or its Restricted Subsidiaries for such purposes) Unrestricted Subsidiaries or (C) fees and expenses otherwise due and payable by the Borrower (or any parent thereof) or any Restricted Subsidiary and not prohibited to be paid by the Borrower and its Restricted Subsidiaries hereunder;

(iii)    franchise and excise Taxes and other fees, Taxes and expenses required to maintain the corporate existence of any direct or indirect parent of the Borrower;

(iv)    to any direct or indirect parent of the Borrower to finance any Investment permitted to be made by the Borrower or any Restricted Subsidiary pursuant to Section 10.5; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment, (B) such parent shall, immediately following the closing thereof, cause (1) all property acquired (whether assets, Stock or Stock Equivalents) to be contributed to the Borrower or such Restricted Subsidiary or (2) the merger, amalgamation or consolidation (to the extent permitted in Section 10.5) of the Person formed or acquired into the Borrower or any Restricted Subsidiary, (C) the Borrower or such Restricted Subsidiary shall comply with Section 9.11, Section 9.12 and the Security Agreement to the extent applicable, (D) the aggregate amount of such Restricted Payments shall reduce the ability of the Borrower and the Restricted Subsidiary to make Investments under the applicable clauses of Section 10.5 by such amount and (E) any property received by the Borrower or the Restricted Subsidiaries in connection with such transaction shall only increase the Available Equity Amount to the extent the fair market value of such property as determined in good faith by the Board of Directors of the Borrower exceeds the aggregate amount of Restricted Payments made pursuant to this clause (iv);

(v)    customary costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering or acquisition or Disposition payable by the Borrower or the Restricted Subsidiaries;

(vi)    customary salary, bonus, severance and other benefits payable to officers, employees or consultants of any direct or indirect parent company of the Borrower to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower, its Restricted Subsidiaries and (to the extent of cash actually paid by Unrestricted Subsidiaries to the Borrower or its Restricted Subsidiaries for such purposes) Unrestricted Subsidiaries;

182

(vii)    AHYDO Catch-Up Payments with respect to Indebtedness of any direct or indirect parent of the Borrower; provided that the Net Cash Proceeds of such Indebtedness have been contributed to the Borrower as a capital contribution; and

(viii)   expenses incurred by any direct or indirect parent of the Borrower in connection with any public offering or other sale of Stock or Stock Equivalents or Indebtedness (i) where the Net Cash Proceeds of such offering or sale are intended to be received by or contributed to the Borrower or a Restricted Subsidiary, (ii) in a pro-rated amount of such expenses in proportion to the amount of such Net Cash Proceeds intended to be so received or contributed or (iii) otherwise on an interim basis prior to completion of such offering so long as any direct or indirect parent of the Borrower shall cause the amount of such expenses to be repaid to the Borrower or the relevant Restricted Subsidiary out of the proceeds of such offering promptly if completed;

(e)    Restricted Payments made to dissenting equityholders in connection with their exercise of appraisal rights or the settlement of any claim or actions with respect thereto in connection with any Permitted Acquisition or similar Investment permitted under Section 10.5 (other than Section 10.5(l));

(f)    Restricted Payments consisting of or resulting from Liens, fundamental changes, Dispositions, Investments or other payments permitted by 10.2, 10.3 (other than Section 10.3(j)), 10.4 (other than Section 10.4(d)), 10.5 (other than Section 10.5(l)), 10.7 or 10.8, as applicable;

(g)    the Borrower may repurchase Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) deemed to occur upon exercise of stock options or warrants if such Stock or Stock Equivalents represents a portion of the exercise price of such options or warrants, and the Borrower may pay Restricted Payments to any direct or indirect parent thereof as and when necessary to enable such parent to effect such repurchases;

(h)    the Borrower may (i) pay cash in lieu of fractional shares in connection with any Restricted Payment, distribution, split, reverse share split, merger, consolidation, amalgamation or other combination thereof or any Permitted Acquisition, and any Restricted Payment to the Borrower's direct or indirect parent in order to effect the same and (ii) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

(i)    the Borrower may make any Restricted Payment within sixty (60) days after the date of declaration thereof or giving irrevocable notice thereof, if at the date of declaration or notice such payment would have complied with the provisions of this Agreement;

(j)    so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may make Restricted Payments, so long as the aggregate amount of all such Restricted Payments in any Fiscal Year does not exceed 6% of the market capitalization of the Public Reporting Entity calculated on a trailing twelve month average basis;

183

(k)      the Borrower may make Restricted Payments in an amount equal to withholding or similar Taxes payable or expected to be payable by present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) and any repurchases of Stock or Stock Equivalents in consideration of such payments including deemed repurchases in connection with the exercise of stock options;

(l)      so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may (or may make Restricted Payments to permit any direct or indirect parent thereof to) make Restricted Payments in an aggregate amount not to exceed $5 million per fiscal quarter;

(m)      the Borrower may make payments described in Section 9.9 (other than Section 9.9(a) and Section 9.9(d) (to the extent expressly permitted by reference to Section 10.6));

(n)      the Borrower may make Restricted Payments in connection with the Transactions or contemplated by the Plan;

(o)      so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may make Restricted Payments in amounts up to $100,000,000;

(p)      the Borrower may make Restricted Payments in an unlimited amount, *provided* that the Payment Conditions shall be satisfied at the time of the making of such Restricted Payment and after giving effect thereto;

(q)      Restricted Payments in respect of working capital adjustments or purchase price adjustments pursuant to any Permitted Acquisition or other Investment permitted hereunder and to satisfy indemnity and other similar obligations in connection with any Permitted Acquisition or other Investment permitted hereunder;

(r)      the distribution, by dividend or otherwise, of shares of Stock or Stock Equivalents of, or Indebtedness owed to the Borrower or a Restricted Subsidiary by, Unrestricted Subsidiaries or the proceeds thereof;

(s)      [reserved]; and

(t)      each Restricted Subsidiary may make Restricted Payments to the Borrower and other Restricted Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-Wholly Owned Restricted Subsidiary, to the Borrower and any other Restricted Subsidiary, as compared to the other owners of Stock in such Restricted Subsidiary, on a pro rata or more than pro rata basis based on their ownership interests of the relevant class of Stock).

Notwithstanding the foregoing, no Restricted Payment consisting of or resulting from any transfer or other Disposition of any intellectual property by a Credit Party to a Subsidiary that is not a Credit Party may be made except pursuant to Section 10.6(f) solely in respect of Dispositions permitted by Section 10.4(c)(iii) (solely in respect of Investments permitted by the proviso to Section 10.5(w)), (e) or (g).

10.7    Limitations on Debt Prepayments and Amendments

(a)    The Borrower will not, and will not permit the Restricted Subsidiaries to, voluntarily prepay, repurchase or redeem or otherwise defease prior to the scheduled maturity thereof any Indebtedness that is subordinated in right of payment or lien to the Obligations (in the case of Lien subordination, with respect to all of the Collateral) with a principal amount in excess of $50,000,000 (the "**Junior Indebtedness**"), except that the Borrower and its Restricted Subsidiaries may (i) make payments of regularly scheduled principal and interest, (ii) so long as no Event of Default shall have occurred and be continuing or would result therefrom, prepay, repurchase or redeem or otherwise defease Junior Indebtedness in an aggregate principal amount from the Closing Date not in excess of the sum of, (1) $100,000,000 and (II) additional unlimited amounts so long as the Payment Conditions are satisfied at the time of such prepayment, repurchase, renegotiation or defeasance and after giving effect thereto *plus* (2) the Available Equity Amount at the time of such prepayment, repurchase, redemption or other defeasance*,* (iv) refinance Junior Indebtedness with any Refinancing Indebtedness; (v) convert, exchange, redeem, repay or prepay such Junior Indebtedness into, for or with, as applicable, Stock or Stock Equivalents of any direct or indirect parent of the Borrower (other than Disqualified Stock except as permitted hereunder); (vi) prepay, repurchase, redeem or otherwise defease Junior Indebtedness within 60 days of the applicable Redemption Notice if, at the date of any payment, redemption, repurchase, retirement, termination or cancellation notice in respect thereof (each, a "**Redemption Notice**"), such payment, redemption, repurchase, retirement, termination or cancellation would have complied with another provision of this Section 10.7(a); *provided* that such payment, redemption, repurchase, retirement, termination or cancellation shall reduce capacity under such other provision, (vii) repay or prepay intercompany subordinated Indebtedness (including under the Intercompany Subordinated Note) owed among the Borrower and/or the Restricted Subsidiaries, in either case unless an Event of Default under Section 11.1 or 11.5 has occurred and is continuing and the Borrower has received a written notice from the Collateral Agent instructing it not to make or permit any such repayment or prepayment and (viii) transfer credit positions in connection with intercompany debt restructurings so long as such Indebtedness is permitted by Section 10.1 after giving effect to such transfer.

(b)    The Borrower will not, and will not permit the Restricted Subsidiaries to waive, amend, or modify the definitive documentation in respect of any Junior Indebtedness with a principal amount in excess of $50,000,000, to the extent that any such waiver, amendment or modification, taken as a whole, would be adverse to the Lenders in any material respect; *provided* that this Section 10.7(b) would not prohibit a refinancing or replacement of such Indebtedness with Refinancing Indebtedness so long as (1) such Refinancing Indebtedness is permitted to be incurred under Section 10.1 and (2) the prepayment of such Junior Indebtedness is permitted under Section 10.7(a) above.

10.8    Limitation on Subsidiary Distributions

The Borrower will not, and will not permit any Restricted Subsidiary that is not a Guarantor to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary to (x) (i) pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Stock or Stock Equivalents or with respect to any

185

other interest or participation in, or measured by, its profits or (ii) pay any Indebtedness owed to the Borrower or any Restricted Subsidiary that is a Guarantor, (y) make loans or advances to the Borrower or any Restricted Subsidiary that is Guarantor or (z) sell, lease or transfer any of its properties or assets to the Borrower or any Restricted Subsidiary that is a Guarantor, except (in each case) for such encumbrances or restrictions (A) which the Borrower has reasonably determined in good faith will not materially impair the Borrower's ability to make payments under this Agreement when due or (B) existing under or by reason of:

(a)     contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to this Agreement, the Term Loan Credit Documents and the related documentation and related Hedging Obligations and Cash Management Obligations;

(b)     purchase money obligations and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (x), (y) or (z) above on the property so acquired, any replacements of such property or assets and additions and accessions thereto, after-acquired property subject to such arrangement, the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment (or assets affixed or appurtenant thereto and additions and accessions) provided by any lender, other equipment (or assets affixed or appurtenant thereto and additions and accessions) financed by such lender (it being understood that such restriction shall not be permitted to apply to any property to which such restriction would not have applied but for such acquisition);

(c)     Applicable Laws or any applicable rule, regulation or order, or any request of any Governmental Authority having regulatory authority over the Borrower or any of its Subsidiaries;

(d)     any agreement or other instrument of a Person acquired by or merged or consolidated with or into the Borrower or any Restricted Subsidiary, or of an Unrestricted Subsidiary that is designated a Restricted Subsidiary, or that is assumed in connection with the acquisition of assets from such Person, in each case that is in existence at the time of such transaction (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or designated, any replacements of such property or assets and additions and accessions thereto, after-acquired property subject to such agreement or instrument, the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment (or assets affixed or appurtenant thereto and additions and accessions) provided by any lender, other equipment (or assets affixed or appurtenant thereto and additions and accessions) financed by such lender (it being understood that such encumbrance or restriction shall not be permitted to apply to any property to which such encumbrance or restriction would not have applied but for such acquisition);

(e)     contracts for the sale of assets, including customary restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or Disposition of all or substantially all of the Stock or Stock Equivalents or assets of such Subsidiary and restrictions on transfer of assets subject to Liens permitted hereunder;

(f)      (x) secured Indebtedness otherwise permitted to be incurred pursuant to Sections 10.1 and 10.2 that limit the right of the debtor to Dispose of the assets securing such Indebtedness and (y) restrictions or encumbrances on transfers of assets subject to Liens permitted hereunder (but, with respect to any such Lien, only to the extent that such transfer restrictions apply solely to the assets that are the subject of such Lien);

(g)      restrictions or encumbrances on cash or other deposits or net worth imposed by customers under, or made necessary or advisable by, contracts entered into in the ordinary course of business;

(h)      restrictions or encumbrances imposed by other Indebtedness or Disqualified Stock of Restricted Subsidiaries permitted to be incurred subsequent to the Closing Date pursuant to the provisions of Section 10.1;

(i)      customary provisions in joint venture agreements or arrangements and other similar agreements or arrangements relating solely to such joint venture (including its assets and Subsidiaries) and the Stock or Stock Equivalents issued thereby;

(j)      customary provisions contained in leases, sub-leases, licenses, sub-licenses or similar agreements, in each case, entered into in the ordinary course of business;

(k)      restrictions created in connection with any Permitted Receivables Financing or any Qualified Securitization Financing that, in the good faith determination of the Borrower, are necessary or advisable to effect such Permitted Receivables Financing or Qualified Securitization Financing, as the case may be;

(l)      customary restrictions on leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to property interest, rights or the assets subject thereto;

(m)      customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(n)      restrictions contemplated by the Plan or created in connection with the consummation of the Transaction; or

(o)      any encumbrances or restrictions of the type referred to in clauses (x), (y) and (z) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, extensions, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (n) above; *provided* that such amendments, modifications, restatements, renewals, increases, extensions, supplements, refundings, extensions, replacements, restructurings or refinancings (x) are, in the good faith judgment of the Borrower, not materially more restrictive with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, extension, restructuring, supplement, refunding, replacement or refinancing or (y) do not materially impair the Borrower's ability to pay its obligations under the Credit Documents as and when due (as determined in good faith by the Borrower);

187

*provided* that (x) the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill requirements to) loans or advances made to the Borrower or any Restricted Subsidiary that is a Guarantor to other Indebtedness incurred by the Borrower or any Restricted Subsidiary that is a Guarantor shall not be deemed to constitute such an encumbrance or restriction.

10.9    Amendment of Organizational Documents

The Borrower will not, nor will the Borrower permit any Credit Party to, amend or otherwise modify any of its Organizational Documents in a manner that is materially adverse to the Lenders, except as required by Applicable Laws.

10.10   Permitted Activities

Holdings will not engage in any material operating or business activities; *provided* that the following and any activities incidental thereto shall be permitted in any event: (i) its ownership of the Stock of the Borrower, including receipt and payment of dividends and payments in respect of Indebtedness and other amounts in respect of Stock, (ii) the maintenance of its legal existence (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance), (iii) the performance of its obligations with respect to the Transactions, the Credit Documents and any other documents governing Indebtedness permitted hereby, (iv) any public offering of its or its direct or indirect parent entity's common equity or any other issuance or sale of its or its direct or indirect parent entity's Stock, (v) financing activities, including the issuance of securities, incurrence of debt, receipt and payment of dividends and distributions, making contributions to the capital of the Borrower and guaranteeing the obligations of the Borrower and the Subsidiaries, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries, (vii) holding any cash or other property (but not operate any property), (viii) making and receiving of any dividends, payments in respect of Indebtedness or Investments permitted hereunder, (ix) providing indemnification to officers and directors, (x) activities relating to any Permitted Reorganization, (xi) activities related to the Plan and the consummation of the Transactions and activities contemplated thereby, (xii) merging, amalgamating or consolidating with or into any direct or indirect parent of Holdings (in compliance with the definition of "Holdings" in this Agreement), (xiii) repurchases of Indebtedness through open market purchases and Dutch auctions, (xiv) activities incidental to Permitted Acquisitions or similar Investments consummated by the Borrower and the Restricted Subsidiaries, including the formation of acquisition vehicle entities and intercompany loans and/or Investments incidental to such Permitted Acquisitions or similar Investments, (xv) any transaction with the Borrower or any Restricted Subsidiary to the extent expressly permitted under this Section 10, (xvi) making any AHYDO Catch-Up Payments, (xvii) paying any Taxes it is obligated to pay and (xviii) any activities incidental or reasonably related to the foregoing.

188

10.11   Financial Covenant

The Borrower shall not permit the Fixed Charge Coverage Ratio for any Test Period to be less than 1.00 to 1.00; *provided* that such Fixed Charge Coverage Ratio will only be tested (i) on the date any Covenant Trigger Period commences (as of the last day of the Test Period ending immediately prior to the date on which such Covenant Trigger Period shall have commenced) and shall continue to be tested as of the last day of each Test Period ended thereafter until such Covenant Trigger Period is no longer continuing.

### SECTION 11 Events of Default

Upon the occurrence of any of the following specified events (each an "**Event of Default**"):

11.1   Payments

The Borrower shall (a) default in the payment when due of any principal of the Loans, (b) default, and such default shall continue for more than five Business Days, in the payment when due of any interest on the Loans or (c) default, and such default shall continue for more than ten Business Days, in the payment when due of any fees or any other amounts owing hereunder or under any other Credit Document; or

11.2   Representations, Etc.

Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be materially untrue with respect to the Credit Parties, taken as a whole, on the date as of which made or deemed made, and, to the extent capable of being cured, such incorrect representation and warranty shall remain incorrect in any material respect for a period of thirty days after written notice thereof from the Administrative Agent to the Borrower, except that with respect to any representation, warranty or statement contained in a Borrowing Base Certificate, to the extent capable of being cured, such incorrect representation and warranty shall remain incorrect in any material respect for a period of three Business Days after receipt of written notice by the Borrower from the Administrative Agent; or

11.3   Covenants

Any Credit Party shall:

(a)   default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.1(d)(i) (*provided* that notice of such default at any time shall timely cure the failure to provide such notice), Section 9.5 (solely with respect to the Borrower) or Section 10; or

(b)   default in the due performance or observance by it of any term, covenant or agreement contained in (i) Section 9.1(k) and such default shall continue unremedied for a period of at least five Business Days after receipt of written notice by the Borrower from the Administrative Agent (or, if such Borrowing Base Certificate is required to be delivered during a

189

Weekly Monitoring Period, at least two Business Days after receipt of written notice by the Borrower from the Administrative Agent) or (ii) Section 9.18 (other than any such failure resulting solely from actions taken by one or more Persons not controlled directly or indirectly by the Borrower or such Person's (or Persons') failure to act in accordance with the instructions of the Borrower or the Administrative Agent) and, unless a Cash Dominion Period is ongoing, such default shall continue unremedied for a period of five Business Days after receipt of written notice by the Borrower of the Administrative Agent; or

(c)    default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in Section 11.1 or 11.2 or clause (a) or (b) of this Section 11.3) contained in this Agreement or any other Credit Document and such default shall continue unremedied for a period of at least 30 calendar days after receipt of written notice by the Borrower from the Administrative Agent; or

11.4    Default Under Other Agreements

(a)    The Borrower or any Restricted Subsidiary shall (i) default in any payment with respect to any Indebtedness (other than any Indebtedness described in Section 11.1, Hedging Obligations or Indebtedness under any Permitted Receivables Financing) with a principal amount in excess of $100,000,000 in the aggregate for the Borrower and such Restricted Subsidiaries beyond the period of grace or cure and following all required notices, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than any agreement or condition relating to, or provided in any instrument or agreement, under which such Hedging Obligations or such Permitted Receivables Financing was created) beyond the period of grace or cure and following all required notices, if any, provided in the instrument or agreement under which such Indebtedness was created, if the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its Stated Maturity; or (b) without limiting the provisions of clause (a) above, any such Indebtedness shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment (other than any Hedging Obligations or Indebtedness under any Permitted Receivables Financing) or as a mandatory prepayment, prior to the Stated Maturity thereof; *provided* that clauses (a) and (b) above shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that this Section 11.4 shall not apply to any Indebtedness if the sole remedy of the holder thereof following such event or condition is to elect to convert such Indebtedness into Stock or Stock Equivalents (other than Disqualified Stock) and cash in lieu of fractional shares or (ii) any such default that is remedied by or waived (including in the form of amendment) by the requisite holders of the applicable item of Indebtedness or contested in good faith by the Borrower or the applicable Restricted Subsidiary in either case, prior to acceleration of all Loans and termination of the Revolving Credit Commitments pursuant to this Section 11; or

190

11.5    Bankruptcy

Except as otherwise permitted under Section 10.3, (i) the Borrower or any Material Subsidiary shall commence a voluntary case, proceeding or action concerning itself under applicable Debtor Relief Laws; (ii) an involuntary case, proceeding or action is commenced against the Borrower or any Material Subsidiary and the petition is not controverted within 60 days after commencement of the case, proceeding or action; (iii) an involuntary case, proceeding or action is commenced against the Borrower or any Material Subsidiary and the petition is not dismissed or stayed within 60 consecutive days after commencement of the case, proceeding or action; (iv) a custodian (as defined in the Bankruptcy Code), judicial manager, receiver, receiver manager, trustee, administrator, examiner or similar person is appointed for, or takes charge of, all or substantially all of the property of the Borrower or any Material Subsidiary; (v) the Borrower or any Material Subsidiary commences any other voluntary proceeding or action under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, administration, examinership or liquidation or similar law or other Debtor Relief Laws of any jurisdiction whether now or hereafter in effect relating to the Borrower or any Material Subsidiary; (vi) there is commenced against the Borrower or any Material Subsidiary any such proceeding or action that remains undismissed or unstayed for a period of 60 consecutive days; (vii) the Borrower or any Material Subsidiary is adjudicated insolvent or bankrupt; (viii) any order of relief or other order approving any such case or proceeding or action is entered; (ix) the Borrower or any Material Subsidiary suffers any appointment of any custodian, receiver, receiver manager, trustee, administrator, examiner or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of 60 consecutive days; (x) the Borrower or any Material Subsidiary makes a general assignment for the benefit of creditors; (xi) any corporate action is taken by the Borrower or any Material Subsidiary for the purpose of authorizing any of the foregoing; or

11.6    ERISA

(a)    The occurrence of any ERISA Event; (b) there could result from any event or events set forth in clause (a) of this Section 11.6 the imposition of a Lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a Lien, security interest or liability; and (c) such ERISA Event, Lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect; or

11.7    Guarantee

Any Guarantee provided by Holdings, the Borrower or any Material Subsidiary or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any such Guarantor thereunder or any other Credit Party shall deny or disaffirm in writing any such Guarantor's obligations under the Guarantee; or

11.8    Security Agreement

The Security Agreement or any other material Security Document pursuant to which the assets of any Credit Party are pledged as Collateral or any material provision thereof shall cease to be in full force or effect in respect of a material portion of the Collateral (other than

pursuant to the terms hereof or thereof or any defect arising as a result of acts or omissions of the Collateral Agent or any Lender which do not result from a material breach by a Credit Party of its obligations under the Credit Documents) or any grantor thereunder or any other Credit Party shall deny or disaffirm in writing such grantor's obligations under the Security Agreement or any other such Security Document; or

11.9    Judgments

One or more final judgments or decrees shall be entered against the Borrower or any Restricted Subsidiary involving a liability requiring the payment of $100,000,000 or more in the aggregate for all such final judgments and decrees for the Borrower and the Restricted Subsidiaries (to the extent not paid or covered by indemnity or insurance provided by a carrier that has not denied coverage) and any such final judgments or decrees shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal within 60 consecutive days after the entry thereof; or

11.10   Change of Control

A Change of Control shall occur; or

11.11   Indemnity Payments to Former Officers

The Credit Parties pay in excess of $10,000,000 on account of an indemnity obligation asserted by any former officers or directors of a Credit Party who were not officers or directors of a Credit Party as of the Petition Date or thereafter.

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent shall, at the written request of the Required Lenders, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower, except as otherwise specifically provided for in this Agreement (*provided* that, if an Event of Default specified in Section 11.5 shall occur with respect to the Borrower, the result that would occur upon the giving of written notice by the Administrative Agent as specified below shall occur automatically without the giving of any such notice): (i) declare the Revolving Credit Commitments terminated, whereupon the Revolving Credit Commitment, if any, of each Lender shall forthwith terminate immediately and any fees theretofore accrued shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest and fees in respect of any or all Loans and any or all Obligations owing hereunder and under any other Credit Document to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; (iii) terminate any Letter of Credit that may be terminated in accordance with its terms; (iv) direct the Collateral Agent to enforce any and all Liens and security interests created pursuant to the Security Documents and (iii) enforce any and all of the Administrative Agent's rights under the Guarantee.

Notwithstanding anything to the contrary contained herein, any Event of Default under this Agreement or similarly defined term under any other Credit Document, other than any Event of Default which cannot be waived without the written consent of each Lender directly and adversely

192

affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist and the Borrower is in compliance with this Agreement and/or such other Credit Document.

11.12   Application of Proceeds

Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default under Section 11.5 shall be applied in accordance with any Applicable Intercreditor Agreement.  In the event that either (x) any Applicable Intercreditor Agreement directs the application with respect to such amount be made with reference to this Agreement or the other Credit Documents or (y) no Applicable Intercreditor Agreement is then in effect that is applicable to such amount, any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral), in each case, following any acceleration of the Obligations under this Agreement or any Event of Default under Section 11.5 shall be applied:

(i)    *First*, to the payment of all fees, indemnities, expenses, and other amounts payable to the Agents in their capacities as such, including, without limitation, reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization, including compensation to the Administrative Agent, Collateral Agent and their agents and counsel, and all expenses, fees, liabilities and advances made or incurred by the Administrative Agent and Collateral Agent in connection therewith and all amounts for which the Administrative Agent and Collateral Agent is entitled to indemnification pursuant to the provisions of any Credit Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid, in each case constituting Obligations, until paid in full;

(ii)    *Second*, to the repayment of all Protective Advances;

(iii)    *Third*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid, in each case constituting Obligations, until paid in full;

(iv)    *Fourth*, without duplication of amounts applied pursuant to clauses (i) - (iii) above, to the indefeasible payment in full in cash, *pro rata*, of interest and other amounts constituting Obligations (other than principal or premium or reimbursement obligations in respect of Letters of Credit and obligations to Cash Collateralize Letters of Credit) and any fees, premiums and scheduled periodic payments due under Secured Hedging Agreement (to the extent Hedging Reserves have been taken) and Secured Cash Management Agreements (to the extent Bank Product Reserves have been taken) to the extent constituting Obligations and any interest accrued thereon (excluding any breakage,

193

termination or other payments thereunder), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(v)      *Fifth*, to the payment in full in cash, *pro rata*, of principal amount of the Obligations (including in respect of Secured Hedging Agreements (to the extent Hedging Reserves have been taken) and Secured Cash Management Agreements (to the extent Bank Product Reserves have been taken)) and to Cash Collateralize all L/C Obligations and any premium thereon and any breakage, termination or other payments under Secured Hedging Agreements (to the extent Hedging Reserves have been taken) or Secured Cash Management Agreements (to the extent Bank Product Reserves have been taken), in each case to the extent constituting Obligations;

(vi)      *Sixth*, without duplication of amounts applied pursuant to clauses (i) - (v) above, to the indefeasible payment in full in cash, *pro rata*, of interest and other amounts constituting Obligations and any fees, premiums and scheduled periodic payments, in each case due under Secured Hedging Agreements (other than those described in clause (iv) above) and Secured Cash Management Agreements (other than those described in clause (iv) above) to the extent constituting Obligations and any interest accrued thereon (excluding any breakage, termination or other payments thereunder), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(vii)      *Seventh*, to the payment in full in cash, *pro rata*, of principal amount of the Obligations and any breakage, termination or other payments under Secured Hedging Agreements (other than those described in clause (v) above) or Secured Cash Management Agreements (other than those described in clause (v) above), in each case to the extent constituting Obligations;

(viii)      *Eighth*, without duplication of amounts applied pursuant to clauses (i) - (vii) above, to the indefeasible payment in full in cash, *pro rata*, of interest and other amounts constituting Obligations and any fees, premiums and scheduled periodic payments, in each case due under Secured Specified Hedging Agreements and Secured Specified Cash Management Agreements to the extent constituting Obligations and any interest accrued thereon (excluding any breakage, termination or other payments thereunder), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(ix)      *Ninth*, to the payment in full in cash, *pro rata*, of principal amount of the Obligations and any breakage, termination or other payments under Secured Specified Hedging Agreements or Secured Specified Cash Management Agreements, in each case to the extent constituting Obligations; and

(x)      *Tenth*, the balance, if any, to the person lawfully entitled thereto (including the applicable Credit Party or its successors or assigns) or as a court of competent jurisdiction may direct.

194

Notwithstanding the foregoing, amounts received from any Credit Party shall not be applied to any Excluded Swap Obligation of such Credit Party.

**SECTION 12 The Agents**

12.1    Appointment

(a)    Each Secured Party (other than the Administrative Agent) hereby irrevocably designates and appoints the Administrative Agent as the agent of such Secured Party under this Agreement and the other Credit Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto. The provisions of this Section 12 (other than this Section 12.1 and Sections 12.2, 12.9, 12.12 and 12.13, in each case, with respect to the Borrower) are solely for the benefit of the Agents and the other Secured Parties, and the Borrower shall not have any rights as a third party beneficiary of such provision.  Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein or in any other Credit Document, any fiduciary relationship with any other Secured Party or any agency or trust obligations with respect to any Credit Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against such Agent.

(b)    The Secured Parties hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Secured Parties hereby irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall have no duties or responsibilities except those expressly set forth herein or in any other Credit Document, any fiduciary relationship with any of the other Secured Parties or any agency or trust obligations with respect to any Credit Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Collateral Agent.

(c)    Each of the Global Coordinator listed on the cover page of this agreement and the Joint Lead Arrangers, in their capacities as such, shall not have any obligations, duties or responsibilities under this Agreement but shall be entitled to all benefits of this Section 12.

12.2    Delegation of Duties

The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Credit Documents by or through agents, sub-agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither the Administrative Agent nor the Collateral Agent shall be

195

responsible for the negligence or misconduct of any agents, sub-agents or attorneys-in-fact selected by it in the absence of gross negligence or willful misconduct by such agents, sub-agents or attorneys-in-fact (as determined in the final judgment of a court of competent jurisdiction).

        12.3    Exculpatory Provisions

        (a)    No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Credit Document (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (b) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of Holdings, the Borrower, any other Guarantor, any other Credit Party or any officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents, or for any failure of Holdings, the Borrower, any other Guarantor or any other Credit Party to perform its obligations hereunder or thereunder.  No Agent shall be under any obligation to any other Secured Party to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof.

        (b)    Each Lender confirms to the Administrative Agent, the Collateral Agent, each other Lender and each of their respective Related Parties that it (i) possesses (individually or through its Related Parties) such knowledge and experience in financial and business matters that it is capable, without reliance on the Administrative Agent, the Collateral Agent, any other Lender or any of their respective Related Parties, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Agreement, (y) making Loans and other Credit Extensions hereunder and under the other Credit Documents and (z) in taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risks and (iii) has determined that entering into this Agreement and making Loans and other Credit Extensions hereunder and under the other Credit Documents is suitable and appropriate for it.

        (c)    Each Lender acknowledges that (i) it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Credit Documents, (ii) that it has, independently and without reliance upon the Administrative Agent, the Collateral Agent, any other Lender or any of their respective Related Parties, made its own appraisal and investigation of all risks associated with, and its own credit analysis and decision to enter into, this Agreement based on such documents and information, as it has deemed appropriate and (iii) it will, independently and without reliance upon the Administrative Agent, the Collateral Agent, any other Lender or any of their respective Related Parties, continue to be solely responsible for making its own appraisal and investigation of all risks arising under or in connection with, and its own credit analysis and decision to take or not take

action under, this Agreement and the other Credit Documents based on such documents and information as it shall from time to time deem appropriate, which may include, in each case:

(i)      the financial condition, status and capitalization of the Borrower and each other Credit Party;

(ii)      the legality, validity, effectiveness, adequacy or enforceability of this Agreement and each other Credit Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document;

(iii)      determining compliance or non-compliance with any condition hereunder to the making of a Loan or the issuance of a Letter of Credit and the form and substance of all evidence delivered in connection with establishing the satisfaction of each such condition; and

(iv)      the adequacy, accuracy and/or completeness of any information delivered by the Administrative Agent, the Collateral Agent, any other Lender or by any of their respective Related Parties under or in connection with this Agreement or any other Credit Document, the transactions contemplated hereby and thereby or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document.

12.4    Reliance by Agents

The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex, electronic mail, or teletype message, statement, order or other document or instruction believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Holdings and/or the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent.  The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; *provided* that none of the Administrative Agent or the Collateral Agent shall be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Credit Document or Applicable Law.

12.5    Notice of Default

Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or the Collateral Agent, as applicable, has received written notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent or the Collateral Agent receives such a notice, it shall give notice thereof to the Lenders, the Administrative Agent or the Collateral Agent, as applicable.  The Administrative Agent and the Collateral Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; *provided* that unless and until the Administrative Agent or the Collateral Agent, as applicable, shall have received such directions, the Administrative Agent or the Collateral Agent, as applicable, may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as is within its authority to take under this Agreement and otherwise as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Required Lenders or each of the Lenders, as applicable.

12.6    Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders

Each Lender expressly acknowledges that none of the Administrative Agent, the Collateral Agent, the Joint Lead Arrangers or any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent, the Collateral Agent or any of the Joint Lead Arrangers hereinafter taken, including any review of the affairs of Holdings, the Borrower, any other Guarantor or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent, the Collateral Agent or any Joint Lead Arranger to any Lender or the L/C Issuer.  Each Lender and the L/C Issuer represents to Administrative Agent, the Collateral Agent and the Joint Lead Arrangers that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Holdings, the Borrower, each other Guarantor and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent, any Joint Lead Arranger or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of Holdings, the Borrower, each other Guarantor and each other Credit Party.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, none of the Administrative Agent, the Collateral Agent or any Joint Lead Arranger shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of Holdings, the

198

Borrower, any other Guarantor or any other Credit Party that may come into the possession of the Administrative Agent, the Collateral Agent, any Joint Lead Arranger or any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

12.7    Indemnification

The Lenders agree to indemnify each Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Revolving Credit Exposure in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Aggregate Revolving Credit Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Revolving Credit Exposure in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against such Agent, including all fees, disbursements and other charges of counsel to the extent required to be reimbursed by the Credit Parties pursuant to Section 13.5, in any way relating to or arising out of the Revolving Credit Commitments, the Loans and Letters of Credit, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing (**SUBJECT TO THE PROVISOS BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON**); *provided* that no Lender shall be liable to any Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; *provided*, *further*, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 12.7.  In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur, be imposed upon, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of the Revolving Credit Commitments, the Loans and Letters of Credit, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing (including at any time following the payment of the Loans), this Section 12.7 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse such Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the

Borrower; *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided* that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's *pro rata* portion thereof; and *provided*, *further*, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct (as determined by a final judgment of court of competent jurisdiction).  The agreements in this Section 12.7 shall survive the payment of the Loans and all other amounts payable hereunder.

12.8    Agents in their Individual Capacities

Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with Holdings, the Borrower, any other Guarantor, and any other Credit Party as though such Agent were not an Agent hereunder and under the other Credit Documents.  With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

12.9    Successor Agents

Each of the Administrative Agent and Collateral Agent may resign at any time by notifying the other Agent, the Lenders, the L/C Issuers and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) so long as no Event of Default under Section 11.1 or 11.5 (solely with respect to the Borrower) has occurred and is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the L/C Issuers, appoint a successor Agent meeting the qualifications set forth above (including receipt of the Borrower's consent); *provided* that if such Agent shall notify the Borrower and the Lenders that no qualifying Person (including as a result of the absence of consent of the Borrower) has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (x) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Credit Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (y) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time as the Required Lenders with (except after the occurrence and during the continuation of an Event of Default under Section 11.1 or 11.5

200

(solely with respect to the Borrower)) the consent of the Borrower (not to be unreasonably withheld) appoint successor Agents as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Section 12 (including Section 12.7) and Section 13.5 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

12.10   Withholding Tax

To the extent required by any Applicable Law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding Tax.  If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent or of a change in circumstances that rendered the exemption from, or reduction of, withholding Tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower (solely to the extent required by this Agreement) and without limiting the obligation of the Borrower to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

12.11   Administrative Agent May File Proofs of Claim

In case of the pendency of any receivership, insolvency, liquidation, administration, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the reasonable compensation, expenses, disbursements

201

and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent hereunder) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 4.1 and 13.5.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Secured Party or to authorize the Administrative Agent to vote in respect of the claim of any Secured Party in any such proceeding.

12.12    Intercreditor Agreements

Each of the Collateral Agent and the Administrative Agent is hereby authorized to enter into any Applicable Intercreditor Agreement contemplated hereby, and the parties hereto acknowledge that any such Applicable Intercreditor Agreement to which the Collateral Agent and/or the Administrative Agent is a party are each binding upon them.  Each Secured Party (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of any such Applicable Intercreditor Agreement and (b) hereby authorizes and instructs the Collateral Agent and the Administrative Agent to enter into any such Applicable Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  In addition, each Secured Party hereby authorizes the Collateral Agent and the Administrative Agent to enter into any other intercreditor arrangements to the extent required to give effect to the establishment of intercreditor rights and privileges as contemplated and required by Section 10.2 of this Agreement.

12.13    Security Documents and Guarantee; Agents under Security Documents and Guarantee

(a)    Each Secured Party hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guarantee, the Collateral and the Security Documents, as applicable.  Subject to Section 13.1, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may (or otherwise instruct the Collateral Agent to) execute any documents or instruments necessary to (x) subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Credit Document to the holder of any Lien

permitted under clauses (d), (g) and (l) of Section 10.2 or (y) enter into subordination or intercreditor agreements with respect to Indebtedness to the extent the Administrative Agent or the Collateral Agent is otherwise contemplated herein as being a party to such intercreditor or subordination agreement (including the Applicable Intercreditor Agreement).  The Secured Parties hereby irrevocably agree that the Liens granted to the Collateral Agent by the Credit Parties on any Collateral shall be automatically released (i) upon the termination of the Aggregate Revolving Credit Commitments and all Letters of Credit (other than Letters of Credit that have been Cash Collateralized, backstopped or otherwise collateralized on terms and conditions reasonably satisfactory to the applicable L/C Issuer) and the repayment in full of the Loans, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and Secured Specified Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements and Secured Specified Cash Management Agreements, or Contingent Obligations), (ii) upon the sale or other Disposition of such Collateral (including as part of or in connection with any other sale or other Disposition permitted hereunder) to any Person other than another Credit Party, to the extent such sale or other Disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Credit Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with this Section 13.1), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the applicable Guarantee, (vi) as required to effect any sale or other Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Security Documents, and (vii) if such assets constitute Excluded Collateral; *provided* that, the release of any Subsidiary Guarantor from its obligations under the Credit Documents solely as a result of such Subsidiary Guarantor becoming an Excluded Subsidiary of the type described in clause (b) of the definition thereof shall only be permitted if, at the time such Subsidiary Guarantor becomes such an Excluded Subsidiary, (A) such Subsidiary Guarantor so becomes such an Excluded Subsidiary as a result of a joint venture or other strategic transaction entered into for a bona fide business purpose (as reasonably determined by the Borrower; it being agreed that a transaction entered into solely for the purpose of releasing a Subsidiary Guarantor from its obligations as a Guarantor shall be deemed not to be a bona fide business purpose) and (B) pro forma for the relevant transaction, the non-controlling interest is not owned by an Affiliate of the Borrower.. Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents.  Additionally, the Secured Parties hereby irrevocably agree that the Guarantors (other than Holdings) shall be automatically released from the applicable Guarantee upon consummation of any transaction resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary or upon becoming a Excluded Subsidiary.  The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, and the Administrative Agent and the Collateral Agent agree to execute and deliver any instruments, documents, and agreements necessary or desirable or reasonably requested by the Borrower to evidence and confirm the release of any Guarantor or Collateral and

203

its security interest therein pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender.

(b)     *Right to Realize on Collateral and Enforce Guarantee.*  Anything contained in any of the Credit Documents to the contrary notwithstanding, Holdings, the Borrower, the Agents and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee, it being understood and agreed that all powers, rights and remedies hereunder and under any Guarantee may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent on behalf of the Secured Parties, and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other Disposition, the Collateral Agent or any Secured Party may be the purchaser or licensor of any or all of such Collateral at any such sale or other Disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other Disposition.  No holder of Hedging Obligations under Secured Hedging Agreements or Secured Specified Hedging Agreements, or Cash Management Obligations under Secured Cash Management Agreements or Secured Specified Cash Management Obligations, shall have any rights in connection with the management or release of any Collateral or of the obligations of any Credit Party under this Agreement.  No holder of Hedging Obligations under Secured Hedging Agreements or Secured Specified Hedging Agreements, or Cash Management Obligations under Secured Cash Management Agreements or Secured Specified Cash Management Agreements, that obtains the benefits of any Guarantee or any Collateral by virtue of the provisions hereof or of any other Credit Document shall have any right to notice of any action or to consent to or vote on, direct or object to any action hereunder or under any other Credit Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender, L/C Issuer or Agent and, in such case, only to the extent expressly provided in the Credit Documents.  Notwithstanding any other provision of this Agreement to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Hedging Agreements, Secured Specified Hedging Agreements, Secured Cash Management Agreements and Secured Specified Cash Management Agreements, unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

### SECTION 13 Miscellaneous

13.1     Amendments, Waivers and Releases

Except as otherwise expressly set forth in the Credit Documents (including Section 2.10(e)), neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this

Section 13.1.  The Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent and/or the Collateral Agent may, from time to time, (a) enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or (b) waive in writing, on such terms and conditions as the Required Lenders or the Administrative Agent and/or Collateral Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; *provided*, *however*, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given; and *provided*, *further*, that no such waiver and no such amendment, supplement or modification shall:

(i)     forgive or reduce any portion of any Loan or fee or extend the final scheduled maturity date of any Loan or reduce the stated rate, or forgive any portion thereof, or extend the date for the payment of any principal, any interest or fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates), or extend the final expiration date of any Lender's Revolving Credit Commitment or extend the final expiration date of any Letter of Credit beyond the Letter of Credit Expiration Date, or increase the aggregate amount of the Revolving Credit Commitments of any Lender, or modify clause (i) of the proviso to Section 4.2(a) in a manner that would alter the pro rata allocation to the Appropriate Lenders of any reduction in the Revolving Credit Commitments, or modify Section 11.12 in a manner that would alter the pro rata allocation to the Appropriate Lenders in the "waterfall", in each case without the written consent of each Lender directly and adversely affected thereby; *provided* that, in each case for purposes of this clause (i), a waiver of any condition precedent in Section 7 of this Agreement, the waiver of any Default, Event of Default, default interest, mandatory prepayment or reductions, any modification, waiver or amendment of the Financial Covenant (or any financial definitions or financial ratios or any component thereof), the making of any Protective Advance in accordance herewith or the waiver of any other covenant shall not constitute an increase of any Revolving Credit Commitment of a Lender, a reduction or forgiveness of any portion of any Loan or in the interest rates or the fees or premiums or a postponement of any date scheduled for the payment of principal or interest or an extension of the final maturity of any Loan, or the scheduled termination date of any Revolving Credit Commitment;

(ii)    (x) reduce the percentages specified in the definition of the term "Required Lenders" or "Supermajority Lenders" without the consent of each Lender, or (y) amend any other provision of this Section 13.1 that has the effect of decreasing the number of Lenders that are required to approve any amendment, modification or waiver, consent to the assignment or transfer by Holdings or the Borrower of their respective rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to Section 10.3 or as contemplated by the definition of "Holdings"), alter the order of application set forth in Section 5.2(b) during the continuance of an Event of Default or Section 11.12 or change Section 13.8 or any other provision requiring pro rata sharing among the Lenders, in each case of this clause (y) without the written consent of each Lender directly and adversely affected thereby,

(iii)    amend, modify or waive any provision of Section 12 without the written consent of the then-current Administrative Agent and Collateral Agent or any other former or current Agent to whom Section 12 then applies in a manner that directly and adversely affects such Person,

(iv)    amend, modify or waive any provision of Section 3.1 without the written consent of each L/C Issuer to whom such provision then applies in a manner that directly and adversely affects such Person,

(v)    amend, modify or waive any provision of Section 3.2 without the written consent of the Swing Line Lender to whom such provision then applies in a manner that directly and adversely affects such Person,

(vi)    release all or substantially all of the value of the Guarantors under the Guarantee (except as expressly permitted by the Guarantee or this Agreement) or release all or substantially all of the Collateral under the Security Documents (except as expressly permitted by the Security Documents or this Agreement) or subordinate any Lien or right to payment granted by any Credit Party for the benefit of the Secured Parties hereunder, in any such case without the prior written consent of each Lender, or

(vii)    increase the advance rates provided for in the Borrowing Base referenced in the definition thereof or any component definition of any of the foregoing, or modify the definitions of "Eligible Accounts", "Eligible Borrowing Base Cash", "Eligible Credit Card Receivables", "Eligible In-Transit Inventory", "Eligible Investment Grade Accounts", "Eligible Inventory" or the eligibility criteria set forth therein, if as a result thereof the amounts available to be borrowed by the Borrower would be increased, without the written consent of the Supermajority Lenders; *provided* that the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any Reserves without the consent of any Lender.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon Holdings, the Borrower, the applicable Credit Parties, such Lenders, the Administrative Agent and all future holders of the affected Loans.  In the case of any waiver, Holdings, the Borrower, the applicable Credit Parties, the Lenders, the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing, it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  In connection with the foregoing provisions, the Administrative Agent may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, modification, supplement, waiver or consent hereunder, except that the Revolving Credit Commitment of such Lender may not be increased or extended without the consent of such Lender (it being understood that any Revolving Credit Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote

206

of the Lenders hereunder requiring any consent of the Lenders, except as expressly provided for by this Agreement).

Notwithstanding anything herein to the contrary, the Credit Documents may be amended to add syndication or documentation agents and make customary changes and references related thereto, with the consent of only the Borrower and the Administrative Agent.

Notwithstanding anything in this Agreement (including, without limitation, this Section 13.1) or any other Credit Document to the contrary, (i) this Agreement and the other Credit Documents may be amended to effect any Incremental Commitments pursuant to Section 2.14 or Extension Amendments pursuant to Section 2.15 (and the Administrative Agent and the Borrower may effect such amendments to this Agreement and the other Credit Documents without the consent of any other party as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the terms of any such incremental facility or extension amendment); (ii) no Lender consent is required to effect any amendment or supplement to any Applicable Intercreditor Agreement permitted under this Agreement that is for the purpose of adding the holders of any Indebtedness as expressly contemplated by the terms of such Applicable Intercreditor Agreement permitted under this Agreement, as applicable; it being understood that any such amendment or supplement may make such other changes to such Applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent and the Borrower, are required to effectuate the foregoing; *provided* that no such agreement shall amend, modify or otherwise directly and adversely affect the rights or duties of the Administrative Agent hereunder or under any other Credit Document without the prior written consent of the Administrative Agent; (iii) any provision of this Agreement or any other Credit Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Credit Document) may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent (A) to cure any ambiguity, omission, mistake, defect or inconsistency (as reasonably determined by the Administrative Agent and the Borrower), (B) to effect administrative changes of a technical or immaterial nature (as reasonably determined by the Administrative Agent and the Borrower), (C) to correct incorrect cross-references or similar inaccuracies or (D) to add benefit to the existing Revolving Credit Commitments if adding such benefit is a condition to the incurrence of any Indebtedness permitted to be incurred under the Credit Documents; *provided* that in the case of clauses (A) and (B) above, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment; (iv) guarantees, collateral documents and related documents executed by the Credit Parties in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with any other Credit Document, entered into, amended, supplemented or waived, without the consent of any other Person, by the applicable Credit Party or Credit Parties and the Administrative Agent or the Collateral Agent in its or their respective sole discretion if applicable, (A) to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the applicable Secured Parties, (B) as required by local law or advice of counsel to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with the Applicable Law or (C) to cure ambiguities, omissions, mistakes or defects (as reasonably determined by the Administrative

Agent and the Borrower) or to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Credit Documents; and (v) the Credit Parties and the Collateral Agent, without the consent of any other Secured Party, shall be permitted to enter into amendments and/or supplements to any Security Documents in order to include customary provisions permitting the Collateral Agent to appoint sub-collateral agents or representatives to act with respect to Collateral matters thereunder in its stead.

Notwithstanding anything in this Agreement or any Security Document to the contrary, the Administrative Agent may, in its sole discretion, grant extensions of time (and direct the Collateral Agent to grant such extensions) for the satisfaction of any of the requirements under Sections 9.11, Section 9.12, Section 9.13 or any Security Documents in respect of any particular Collateral or any particular Subsidiary if it determines that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of Holdings, the Borrower and the Restricted Subsidiaries by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Security Document.

At any time that any Real Estate constitutes Collateral, no modification of a Credit Document shall add, increase, renew or extend any loan, commitment or credit line hereunder until the completion of flood due diligence, documentation and coverage as required by the Flood Laws or as otherwise satisfactory to all Lenders.

13.2   Notices

Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile or other electronic transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or e-mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)      if to Holdings, the Borrower, the Administrative Agent, the Collateral Agent, an L/C Issuer, or the Swing Line Lender to the address, facsimile number, e-mail address or telephone number specified for such Person on Schedule 13.2 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b)      if to any other Lender, to the address, facsimile number, e-mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to Holdings, the Borrower, the Administrative Agent, the Collateral Agent, the relevant L/C Issuer.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent

208

and receipt has been confirmed by telephone; and (D) if delivered by e-mail, when delivered; *provided* that notices and other communications to the Administrative Agent or the Lenders pursuant to Sections 2.3, 2.9, 4.2 and 5.1 shall not be effective until received.

13.3    No Waiver; Cumulative Remedies

No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

13.4    Survival of Representations and Warranties

All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Credit Extensions hereunder.

13.5    Payment of Expenses; Indemnification

The Borrower agrees, within thirty (30) days after written demand therefor (including documentation reasonably supporting such request), or, in the case of expenses of the type described in clause (a) below incurred prior to the Closing Date, on the Closing Date, (a) if the Closing Date occurs, to pay or reimburse the Agents and the Joint Lead Arrangers (and, in the case of the following clause (ii), the Lenders) for all their reasonable and documented out-of-pocket costs and expenses incurred (i) in connection with the syndication, preparation, execution, delivery, negotiation and administration of this Agreement and the other Credit Documents and any other documents prepared in connection herewith or therewith (including any amendment or waiver with respect thereto and for reimbursement of reasonable expenses related to appraisals, field examinations and collateral review permitted hereunder), and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable and documented fees, disbursements and other charges of Davis Polk & Wardwell LLP and to the extent reasonably necessary, one local counsel in each relevant material jurisdiction, excluding in each case allocated costs of in-house counsel and fees and solely to the extent the Borrower has consented to the retention of such other Person, expenses with respect to any other advisor or consultant, and (ii) upon the occurrence and during the continuation of an Event of Default, in connection with the enforcement or preservation of any rights under this Agreement, the other Credit Documents and any such other documents, including the reasonable and documented out-of-pocket fees, disbursements and other charges of Advisors (limited, in the case of Advisors, as set forth in the definition thereof), (b) to pay, indemnify, and hold harmless each Lender, the L/C Issuers and each Agent from, any and all recording and filing fees and (c) to pay, indemnify, and hold harmless each Lender, the L/C Issuers and each Agent and their respective Affiliates, and the directors, officers, partners, employees and agents of any of the foregoing, from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions,

209

judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented out-of-pocket fees, disbursements and other charges of Advisors related to the Transactions or, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Credit Documents and any such other documents, including, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law (other than by such indemnified person or any of its Related Parties (other than trustees and advisors)) or to any actual or alleged presence, release or threatened release into the environment of Hazardous Materials attributable to the operations of Holdings, the Borrower, any of the Borrower's Subsidiaries or any of the Real Estate (all the foregoing in this clause (c), collectively, the "**indemnified liabilities**") (**SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON**); *provided* that none of the Borrower nor any other Credit Party shall have any obligation hereunder to any Agent, any L/C Issuer or any Lender or any of their respective Related Parties with respect to indemnified liabilities to the extent they result from (A) the gross negligence, bad faith or willful misconduct of such indemnified Person or any of its Related Parties (acting on behalf of or at such indemnified Person's direction) as determined by a final non-appealable judgment of a court of competent jurisdiction, (B) a material breach of the obligations of such indemnified Person or any of its Related Parties (acting on behalf of or at such indemnified Person's direction) under the Credit Documents as determined by a final non-appealable judgment of a court of competent jurisdiction, (C) disputes not involving an act or omission of Holdings, the Borrower or any other Credit Party and that is brought by an indemnified Person against any other indemnified Person, other than any claims against any indemnified Person in its capacity or in fulfilling its role as an Agent or any similar role under the Credit Facilities or (D) any settlement effected without the Borrower's prior written consent, but if settled with the Borrower's prior written consent (not to be unreasonably withheld, delayed, conditioned or denied) or if there is a final non-appealable judgment in any such proceeding, the Borrower will indemnify and hold harmless such indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this Section 13.5. All amounts payable under this Section 13.5 shall be paid within 30 days of receipt by the Borrower of an invoice relating thereto setting forth such expense in reasonable detail. The agreements in this Section 13.5 shall survive repayment of the Loans and all other amounts payable hereunder.

No Credit Party nor any indemnified Person shall have any liability for any special, punitive, indirect or consequential damages resulting from this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (except, in the case of the Borrower's obligation hereunder to indemnify and hold harmless the indemnified Person, to the extent of any losses, claims, damages, liabilities and expenses incurred or paid by such indemnified Person to a third party unaffiliated with such indemnified Person). No indemnified Persons shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of any indemnified Person or any of its Related Parties (acting on behalf of or at

such indemnified Person's direction) (as determined by a final non-appealable judgment of a court of competent jurisdiction).  This Section 13.5 shall not apply to Taxes.

Each indemnified Person, by its acceptance of the benefits of this Section 13.5, agrees to refund and return any and all amounts paid by the Borrower (or on their behalf) to it if, pursuant to limitations on indemnification set forth in this Section 13.5, such indemnified Person was not entitled to receipt of such amounts.

13.6    Successors and Assigns; Participations and Assignments

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of an L/C Issuer that issues any Letter of Credit), except that (i) except as expressly permitted by Section 4.4 or Section 10.3 or Section 10.12, neither Holdings nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by Holdings or the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 13.6.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of a L/C Issuer that issues any Letter of Credit), Participants (to the extent provided in clause (c) of this Section 13.6), to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent, the L/C Issuers and the Lenders and each other Person entitled to indemnification under Section 13.5) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in clause (b)(ii) below, any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Credit Commitments and the Revolving Credit Loans at the time owing to it) with the prior written consent (in each case, such consent not to be unreasonably withheld, delayed, conditioned or denied) of:

(A)    the Borrower; *provided* that no consent of the Borrower shall be required for an assignment of Revolving Credit Loans (1) to a Lender, an Affiliate of a Lender or an Approved Fund or (2) if an Event of Default under Section 11.1 or 11.5 (solely with respect to the Borrower) has occurred and is continuing, to any other assignee; and

(B)    the Administrative Agent, each L/C Issuer and the Swing Line Lender; *provided* that no such shall be required for any assignment of any Revolving Credit Commitments or Revolving Credit Loan to a Lender, an Affiliate of a Lender, an Approved Fund.

Notwithstanding the foregoing, no such assignment shall be made to (x) a natural person, (y) any investment vehicle established primarily for the benefit of a natural person or (z) a Disqualified Institution (*provided* that the prohibition in clause (z) shall not apply retroactively to disqualify any entity that has previously acquired an assignment or participation interest in the Revolving Credit Loans to the extent such entity was not a Disqualified Institution at the time of

211

the applicable assignment or participation, as the case may be), and any attempted assignment in violation of clauses (x) - (z) shall be null and void.  For the avoidance of doubt, (i) the Administrative Agent shall have no obligation with respect to, and shall bear no responsibility or liability for, the ascertaining, monitoring, inquiring or enforcing of the list of Persons who are Disqualified Institutions (or any provisions relating thereto) at any time, and shall have, and shall have no liability with respect to or arising out of any assignment or participation of any Revolving Credit Commitments or Revolving Credit Loans to any Disqualified Institution and (ii) the Administrative Agent may share a list of Persons who are Disqualified Institutions with any Lender upon request.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Revolving Credit Commitments or Revolving Credit Loans, the amount of the Revolving Credit Commitments or Revolving Credit Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent), shall not be less than $5,000,000, unless each of the Borrower and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld, delayed, conditioned or denied); *provided* that no such consent of the Borrower shall be required if an Event of Default under Section 11.1 or 11.5 (solely with respect to the Borrower) has occurred and is continuing; *provided*, *further*, that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment;

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and the applicable tax forms as required under Section 5.4 (or the comparable provisions under Section 14); and

(E)     the assignee shall not be Holdings, the Borrower or any of its Subsidiaries.

(iii)     Subject to acceptance and recording thereof pursuant to clause (b)(iv) of this Section 13.6, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of

212

a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 5.4 (and the comparable provisions under Section 14) and 13.5).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 13.6 (other than attempted assignments or transfers in violation of the last paragraph of Section 13.6(b)(i) above, which shall be null and void as provided above).

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Credit Commitments of, and principal amount of the Loans and any payment made by any L/C Issuer under any Letter of Credit, Revolving Credit Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  Further, each Register shall contain the name and address of the Administrative Agent and the Lending Office through which each such Person acts under this Agreement.  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Holdings, the Borrower, the Collateral Agent, the L/C Issuers and any Lender (solely with respect to its own outstanding Loans and Revolving Credit Commitments), at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) of this Section 13.6 (unless waived) and any written consent to such assignment required by clause (b) of this Section 13.6, the Administrative Agent shall promptly accept such Assignment and Assumption and record the information contained therein in the Register.

(c)     (i) Any Lender may, without the consent of Holdings, the Borrower, the Administrative Agent or any L/C Issuer, sell participations to one or more banks or other entities that are not (x) a natural person, (y) any investment vehicle established primarily for the benefit of a natural person or (z) a Disqualified Institution (*provided* that the prohibition in clause (z) shall not apply retroactively to disqualify any entity that has previously acquired an assignment or participation interest in the Revolving Credit Loans to the extent such entity was not a Disqualified Institution at the time of the applicable assignment or participation, as the case may be) (each, a "**Participant**") (and any such attempted sales to the Persons identified in clauses (x) - (z) above shall be null and void) (*provided* that the last sentence of Section 13.6(b)(i) shall apply) in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of

213

its Revolving Credit Commitments and the Revolving Credit Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (C) Holdings, the Borrower, the Administrative Agent, the L/C Issuers and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, the Administrative Agent shall have no obligation with respect to, and shall bear no responsibility or liability for, the monitoring or enforcing of the list of Disqualified Institutions with respect to the sales of participations at any time.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any consent, amendment, modification, supplement or waiver described in clause (i) or (iv) of the second proviso of the first paragraph of Section 13.1 that directly and adversely affects such Participant.  Subject to clause (c)(ii) of this Section 13.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 5.4 (and the comparable provisions of Section 14) to the same extent as if it were a Lender, and *provided* that such Participant agrees to be subject to the requirements and limitations of those Sections and Sections 2.12 and 13.7(a) as though it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 13.6.  To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of Section 13.8(b) as though it were a Lender; *provided* that such Participant agrees to be subject to Section 13.8(a) as though it were a Lender. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 13.7 with respect to any Participant.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.10, 2.11 or 5.4 (or the comparable provisions under Section 14) than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(iii)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each Participant's interest in the Revolving Credit Loans (or other rights or obligations) held by it (the "**Participant Register**").  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

214

(d)      Any Lender may, without the consent of Holdings, the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 13.6 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)      Subject to Section 13.16, the Borrower authorize each Lender to disclose (other than to any Disqualified Institutions) to any Participant, secured creditor of such Lender or assignee (each, a "**Transferee**"), any prospective Transferee and any prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Revolving Credit Loans made hereunder any and all financial information in such Lender's possession concerning the Borrower and their Affiliates that has been delivered to such Lender by or on behalf of the Borrower and their Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and their Affiliates in connection with such Lender's credit evaluation of the Borrower and their Affiliates prior to becoming a party to this Agreement.

(f)      SPV Lender.  Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Revolving Credit Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Revolving Credit Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Revolving Credit Loan, the Granting Lender shall be obligated to make such Revolving Credit Loan pursuant to the terms hereof.  The making of a Revolving Credit Loan by an SPV hereunder shall utilize the Revolving Credit Commitment of the Granting Lender to the same extent, and as if, such Revolving Credit Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 13.6, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Revolving Credit Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and the Administrative Agent) other than a Disqualified Institution providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Revolving Credit Loans and (ii) disclose on a confidential basis any non-public information relating to its Revolving Credit Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.  This Section 13.6(f) may not be

215

amended without the written consent of the SPV. Notwithstanding anything to the contrary in this Agreement, (x) no SPV shall be entitled to any greater rights under Sections 2.10, 2.11, and 5.4 (and the comparable provisions under Section 14) than its Granting Lender would have been entitled to absent the use of such SPV and (y) each SPV agrees to be subject to the requirements of Sections 2.10, 2.11, and 5.4 (and the comparable provisions under Section 14) as though it were a Lender and has acquired its interest by assignment pursuant to clause (b) of this Section 13.6.

This Section 13.6 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 5f.103-1(c) of the United States Treasury Regulations.

13.7     Replacements of Lenders under Certain Circumstances

(a)     The Borrower shall be permitted (x) to replace any Lender with a replacement bank or institution or (y) terminate the Revolving Credit Commitment of such Lender, as the case may be, and repay all Obligations of the Borrower due and owing to such Lender relating to the Revolving Credit Loans and participations held by such Lender as of such termination date that (a) requests reimbursement for amounts owing pursuant to Section 2.10, Section 5.4 (or the comparable provisions under Section 14) (or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Agent or Lender or to any Governmental Authority on account of any Agent or Lender pursuant to Section 5.4 (or the comparable provisions under Section 14)), (b) is affected in the manner described in Section 2.10(a)(iii) and as a result thereof any of the actions described in such Section is required to be taken, (c) becomes a Defaulting Lender or (d) refuses to make an Extension Election pursuant to Section 2.15; *provided* that, solely in the case of the foregoing clause (x), (i) no Event of Default under Section 11.1 or 11.5 shall have occurred and be continuing at the time of such replacement, (ii) the Borrower shall repay (or the replacement bank or institution shall purchase, at par) all Revolving Credit Loans and other amounts (other than any disputed amounts), pursuant to Section 2.10, 2.11 or 5.4 (or the comparable provisions under Section 14), as the case may be, owing to such replaced Lender prior to the date of replacement, (iii) the replacement bank or institution, if not already a Lender, an Affiliate of a Lender or an Approved Fund, and the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent (solely to the extent such consent would be required under Section 13.6), (iv) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein unless otherwise agreed) and (v) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

(b)     If any Lender (such Lender, a "**Non-Consenting Lender**") has failed to consent to a proposed amendment, modification, supplement, waiver, discharge or termination that pursuant to the terms of Section 13.1 requires the consent of either (i) all of the Lenders directly and adversely affected or (ii) all of the Lenders, and, in each case, with respect to which the Required Lenders or a majority (in principal amount) of the directly and adversely affected Lenders shall, in each such case, have granted their consent, then so long as no Event of Default then exists, the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to (x) replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Revolving Credit Loans and its Revolving Credit Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent (to the extent such consent would be

216

required under Section 13.6) or (y) terminate the Revolving Credit Commitment of such Lender, repay all Obligations of the Borrower due and owing to such Lender relating to the Revolving Credit Loans and participations held by such Lender as of such termination date; *provided* that: (a) all Obligations of the Borrower hereunder owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment, and (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof *plus* accrued and unpaid interest thereon.  In connection with any such assignment, the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 13.6.

(c)     Nothing in this Section 13.7 shall be deemed to prejudice any right or remedy that Holdings or the Borrower may otherwise have at law or at equity.

13.8    Adjustments; Set-off

(a)     Except as contemplated in Section 13.6 or elsewhere herein or in any other Credit Document, if any Lender (a "**Benefited Lender**") shall in its capacity as a Revolving Credit Lender, at any time receive any payment of all or part of its Revolving Credit Loans, or interest thereon, or the participations in L/C Obligations and Swing Line Loans held by it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 11.5, or otherwise), in a greater proportion than its Pro Rata Share (or other applicable share contemplated hereunder) compared to any such payment to or collateral received by any other Revolving Credit Lender, if any, in respect of such other Revolving Credit Lender's Revolving Credit Loans, or interest thereon or the participations in the L/C Obligations and Swing Line Loans, in each case, such Benefited Lender shall purchase for cash from the other applicable Lenders a participating interest in such portion of each such other Lender's applicable Revolving Credit Loans, applicable participations in L/C Obligations and Swing Line Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the applicable Lenders; *provided*, *however*, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by Applicable Law, each Lender shall have the right, without prior notice to Holdings or the Borrower, any such notice being expressly waived by Holdings and the Borrower to the extent permitted by Applicable Law but with the prior written consent of the Administrative Agent, upon any amount becoming due and payable by the Borrower hereunder (whether at the Stated Maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final) (other than any Excluded Account of the type described in clause (i), (ii), (vi), (vii) and (viii) of the definition thereof), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made

by such Lender; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

13.9     Counterparts; Electronic Execution

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or any other Credit Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

13.10   Severability

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11   INTEGRATION

THIS WRITTEN AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT OF BORROWER, HOLDINGS, THE OTHER BORROWER, THE COLLATERAL AGENT, THE ADMINISTRATIVE AGENT, THE L/C ISSUERS AND THE LENDERS WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND (1) THERE ARE NO PROMISES, UNDERTAKINGS, REPRESENTATIONS OR WARRANTIES BY HOLDINGS, THE BORROWER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT, THE L/C ISSUERS OR ANY LENDER RELATIVE TO SUBJECT MATTER HEREOF NOT EXPRESSLY SET FORTH OR REFERRED TO HEREIN OR IN THE OTHER CREDIT DOCUMENTS, (2) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES AND (3) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES; *PROVIDED* THAT THE BORROWER'S CONFIDENTIALITY OBLIGATIONS IN THE COMMITMENT LETTER SHALL REMAIN IN FULL FORCE AND EFFECT PURSUANT TO THE TERMS THEREOF.

13.12   GOVERNING LAW

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND

218

INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (WHETHER IN TORT, CONTRACT OR OTHERWISE AND WHETHER AT LAW OR IN EQUITY).

13.13   Submission to Jurisdiction; Waivers

Each party hereto irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, in each case sitting in New York City in the Borough of Manhattan, and appellate courts from any thereof;

(b)      consents that any such action or proceeding shall be brought in such courts and waives (to the extent permitted by Applicable Law) any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 13.2 or at such other address of which the Administrative Agent shall have been notified pursuant to Section 13.2;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or, in the case of the Administrative Agent, the Collateral Agent, the Lenders, the L/C Issuers and the Swing Line Lender, shall limit the right to sue in any other jurisdiction;

(e)      subject to the last paragraph of Section 13.5, waives, to the maximum extent not prohibited by Applicable Law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 13.13 any special, exemplary, punitive or consequential damages; and

(f)      agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

13.14   Acknowledgments

Each of Holdings and the Borrower hereby acknowledge that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)      (i) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or

219

other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between Holdings and the Borrower, on the one hand, and the Administrative Agent, the L/C Issuer, the Lenders and the other Agents on the other hand, and Holdings, the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent and the other Agents, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of Holdings, the Borrower, any other Credit Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) neither the Administrative Agent nor any other Agent has assumed or will assume an advisory, agency or fiduciary responsibility in favor of Holdings, the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent has advised or is currently advising Holdings, the Borrower, the other Credit Parties or their respective Affiliates on other matters) and neither the Administrative Agent or other Agent has any obligation to Holdings, the Borrower, the other Credit Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent, each other Agent and each Affiliate of the foregoing may be engaged in a broad range of transactions that involve interests that differ from those of Holdings, the Borrower and their respective Affiliates, and neither the Administrative Agent nor any other Agent has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) neither the Administrative Agent nor any other Agent has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and Holdings and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Holdings and the Borrower agrees not to claim that the Administrative Agent or any other Agent has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to Holdings, the Borrower or any other Affiliates, in connection with the transactions contemplated hereby or the process leading hereto.

(c)     no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among Holdings and the Borrower, on the one hand, and any Lender, on the other hand.

13.15   WAIVERS OF JURY TRIAL

HOLDINGS, THE BORROWER, EACH AGENT AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE (TO THE EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

220

13.16   Confidentiality

The Administrative Agent, each L/C Issuer, each other Agent and each Lender shall hold all non-public information furnished by or on behalf of Holdings, the Borrower or any Subsidiary of the Borrower in connection with such Person's evaluation of whether to become an Agent or Lender hereunder or obtained by such Lender, the Administrative Agent, L/C Issuer or such other Agent pursuant to the requirements of this Agreement or in connection with any amendment, supplement, modification or waiver or proposed amendment, supplement, modification or waiver hereto (including any Incremental Amendment or Extension Amendment) or the other Credit Documents ("**Confidential Information**"), confidential; *provided* that the Administrative Agent, each L/C Issuer, each other Agent and each Lender may make disclosure (a) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by Applicable Law, regulation or compulsory legal process (in which case such Lender, the Administrative Agent, L/C Issuer or such other Agent shall use commercially reasonable efforts to inform the Borrower promptly thereof to the extent lawfully permitted to do so (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority)), (b) to such Lender's or the Administrative Agent's or such L/C Issuer's or such other Agent's attorneys, professional advisors, Advisors, independent auditors, trustees or Affiliates involved in the Transactions on a "need to know" basis and who are made aware of and agree to comply with the provisions of this Section 13.16, in each case on a confidential basis (with such Lender, the Administrative Agent, L/C Issuer or such other Agent responsible for such persons' compliance with this Section 13.16), (c) on a confidential basis to any bona fide prospective Lender, prospective participant, swap counterparty or other party in respect of any other transaction under which payments are to be made by reference to the Borrower, any of its Subsidiaries, Holdings, any of its Subsidiaries or any of their respective obligations (in each case, other than a Disqualified Institution or a Person who the Borrower has affirmatively denied assignment thereto in accordance with Section 13.6), (d) to the extent requested by any bank regulatory authority having jurisdiction over a Lender or its Affiliates (including in any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), (e) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Section 13.16 or other confidential or fiduciary obligation owed by the Administrative Agent, such other Agent or such Lender to the Borrower or its Affiliates or (ii) becomes available to the Administrative Agent, such other Agent or such Lender on a non-confidential basis from a source other than Holdings, the Borrower or any Subsidiary or on behalf of Holdings, the Borrower or any Subsidiary that, to the knowledge (after due inquiry) the Administrative Agent, such other Agent or such Lender, is not in violation of any confidentiality obligation owed to the Borrower or its Affiliates, (f) to the extent the Borrower shall have consented to such disclosure in writing (which may include through electronic means), (g) as is necessary in protecting and enforcing the rights of the Administrative Agent, such other Agent or such Lender with respect to this Agreement or any other Credit Document, (h) for purposes of establishing any defense available under Applicable Laws, including, without limitation, establishing a "due diligence" defense, (i) to the extent independently developed by the Administrative Agent, such other Agent or such Lender or any Affiliates thereof without reliance on confidential information, (j) on a confidential basis, to the rating agencies in consultation with the Borrower, (k) on a confidential basis, to the CUSIP Service Bureau or any similar agency in

221

connection with the issuance and monitoring of CUSIP numbers with respect to the Credit Facilities or market data collectors, similar services providers to the lending industry, as part of a "case study" incorporated into promotional materials and service providers to the Administrative Agent in connection with the administration and management of this Agreement and the Credit Documents, (l) to ClearPar® or any other pricing settlement provider and (m) to the extent required by a potential or actual insurer or reinsurer in connection with providing insurance, reinsurance or other credit risk mitigation coverage under which payments are to be made or may be made by reference to the Borrower, any of its Subsidiaries, Holdings, any of its Subsidiaries and any of their respective obligations, this Agreement or payments hereunder.  Each Lender, the Administrative Agent and each other Agent agrees that it will not provide to prospective Transferees or to any pledgee referred to in Section 13.6 or to prospective direct or indirect contractual counterparties to any swap, derivative transactions or other transaction under which payments are to be made by reference to the Borrower, any of its Subsidiaries, Holdings, any of its Subsidiaries or any of their respective obligations to be entered into in connection with or relating to Loans made hereunder any of the Confidential Information unless such Person is advised of and agrees to be bound by the provisions of this Section 13.16 or confidentiality provisions at least as restrictive as those set forth in this Section 13.16.

13.17   Direct Website Communications

(a)      Holdings and the Borrower may, at their option, provide to the Administrative Agent any information, documents and other materials that they are obligated to furnish to the Administrative Agent pursuant to the Credit Documents, including, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication (*provided* that such communications described in clauses (A) - (D) will be delivered pursuant to Section 13.2, including by e-mail) that (A) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or Interest Period relating thereto), (B) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under this Agreement, or (D) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit thereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at an email address separately identified by the Administrative Agent; *provided* that: (i) upon written request by the Administrative Agent, Holdings or the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) Holdings or the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.  Nothing in this Section 13.17 shall prejudice the right of Holdings, the Borrower, the Administrative Agent, any other Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

222

(b)      The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Credit Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Credit Documents.  Each Lender agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(c)      Holdings and the Borrower further agree that the Agents may make the Communications available to the Lenders by posting the Communications on Debtdomain or a substantially similar electronic transmission system (the "**Platform**"), so long as the access to such Platform is limited (i) to the Agents, the L/C Issuers, the Lenders or any bona fide potential Transferee and (ii) remains subject the confidentiality requirements set forth in Section 13.16.

(d)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  In no event shall any Agent or their Related Parties (collectively, the "**Agent Parties**" and each an "**Agent Party**") have any liability to Holdings, the Borrower, any Lender, any L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of Holdings', the Borrower's or any Agent's transmission of Communications through the internet, except to the extent the liability of any Agent Party resulted from such Agent Party's (or any of its Related Parties' (other than trustees or advisors)) gross negligence, bad faith or willful misconduct or material breach of the Credit Documents (as determined in a final non-appealable judgment of a court of competent jurisdiction).

(e)      The Borrower and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material non-public information with respect to Holdings, the Borrower, the Subsidiaries of the Borrower or their securities) and, if documents or notices required to be delivered pursuant to the Credit Documents or otherwise are being distributed through the Platform, any document or notice that Holdings or the Borrower has indicated contains only publicly available information with respect to Holdings, the Borrower and the Subsidiaries of the Borrower and their securities may be posted on that portion of the Platform designated for such public-side Lenders.  If Holdings or the Borrower has not indicated whether a document or notice delivered contains only publicly available information, the Administrative Agent shall post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material nonpublic information with respect to Holdings, the Borrower, the Subsidiaries of the Borrower and their securities.  Notwithstanding

223

the foregoing, Holdings and the Borrower shall use commercially reasonable efforts to indicate whether any document or notice contains only publicly available information.

13.18   USA PATRIOT Act; Beneficial Ownership Regulation

Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act, including, without limitation, with respect to the Borrower only, as applicable, the Beneficial Ownership Regulation (including, for the avoidance of doubt, any information that would result in a change to the list of beneficial owners identified in a Beneficial Ownership Certification).

13.19   Payments Set Aside

To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, _plus_ interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

13.20   Judgment Currency

If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Credit Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Credit Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so

224

purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under Applicable Law).

13.21   Cashless Rollovers

Notwithstanding anything to the contrary contained in this Agreement or in any other Credit Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Revolving Credit Loans by way of an Incremental Amendment or Extension Amendment or any other amendment to this Agreement, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Credit Document that such payment be made "in Dollars", "in immediately available funds", "in Same Day Funds", "in cash" or any other similar requirement.

13.22   Acknowledgement and Consent to Bail-In of Affected Financial Institutions

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

13.23   Acknowledgement Regarding Any Supported QFCs

To the extent that the Credit Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties

225

acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)     In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)     As used in this Section 13.23, the following terms have the following meanings:

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Covered Entity**" means any of the following:

(i)   a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)  a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

226

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

13.24   Limitations on Sanctions Provisions

Notwithstanding anything set forth herein or in any other Credit Document, Section 8.19 and any other provision in the Credit Documents relating to Sanctions shall not be interpreted or applied to the extent that such obligations and /or representations would violate or expose Holdings, the Borrower or any Subsidiary of the Borrower or any directors, officer or employee thereof to any liability under any anti-boycott or blocking law, regulation or statute that is in force from time to time in the European Union (and/or any of its member states) that are applicable to such Person (including EU Regulation (EC) 2271/96 and § 7 of the German Foreign Trade Ordinance (Verordnung zur Durchführung des Außenwirtschaftsgesetzes (Außenwirtschaftsverordnung – AWV))).   The representations given and undertakings assumed by any Credit Party to any other party resident in Germany (gebietsansässig) are made only to the extent that any party resident in Germany (gebietsansässig) would be permitted to receive such representations and undertakings pursuant to §7 of the AWV or any other Applicable Law applicable to such Credit Party resident in Germany.

13.25   Amendment and Restatement of Existing DIP Agreement; No Novation

The terms and conditions of the Existing DIP Agreement are amended as set forth herein, and restated in their entirety and superseded by, this Agreement.  Nothing in this Agreement shall be deemed to constitute a novation of any of the obligations under the Existing DIP Agreement.   Notwithstanding any provision of this Agreement or any other document or instrument executed in connection herewith, the execution and delivery of this Agreement and the incurrence of obligations hereunder shall be in substitution for, but not in payment of, the obligations owed by the Credit Parties under the existing Credit Documents.  From and after the date hereof, each reference to this "Agreement" or other reference originally applicable to the Existing DIP Agreement contained in any document executed and delivered in connection therewith shall be a reference to this Agreement, as amended, supplemented, restated or otherwise modified from time to time.

13.26   Lender ERISA Representations

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified

227

professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit and this Agreement,

(iii)    such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84- 14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related hereto or thereto).

13.27    Erroneous Payments

(a)    If the Administrative Agent (x) notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient (and each of their respective successors and assigns), a "**Payment Recipient**") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether  transmitted or received as a payment, prepayment or repayment of

228

principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 13.27 and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting immediately preceding clause (a), each Lender or any Person who has received funds on behalf of a Lender (and each of their respective successors and assigns) agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)    it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)    such Lender shall (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 13.27(b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this Section 13.27(b) shall not have any effect on a Payment Recipient's

229

obligations pursuant to Section 13.27(a) or on whether or not an Erroneous Payment has been made.

(c)     Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Credit Document, or otherwise payable or distributable by the Administrative Agent to such Lender under any Credit Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding clause (a).

(d)

(i)     In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "**Erroneous Payment Return Deficiency**"), upon the Administrative Agent's notice to such Lender at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (A) such Lender shall be deemed to have assigned its Loans (but not its Revolving Credit Commitments) with respect to which such Erroneous Payment was made (the "**Erroneous Payment Impacted Class**") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Revolving Credit Commitments) of the Erroneous Payment Impacted Class, the "**Erroneous Payment Deficiency Assignment**") (on a cashless basis and such amount calculated at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance)), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Acceptance (or, to the extent applicable, an agreement incorporating an Assignment and Acceptance by reference pursuant to a Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any notes evidencing such Loans to the Borrower or the Administrative Agent (but the failure of such Person to deliver any such notes shall not affect the effectiveness of the foregoing assignment), (B) the Administrative Agent as the assignee Lender shall be deemed to have acquired the Erroneous Payment Deficiency Assignment, (C) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender, (D) the Administrative Agent and the Borrower shall each be deemed to have waived any consents required under this Agreement to any such Erroneous Payment Deficiency Assignment, and (E) the Administrative Agent will reflect in the Register its ownership interest in the Advances subject to the Erroneous Payment Deficiency Assignment. For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Revolving Credit

230

Commitments of any Lender and such Revolving Credit Commitments shall remain available in accordance with the terms of this Agreement.

(ii)     Subject to Section 13.6 (but excluding, in all events, any assignment consent or approval requirements (other than the requirement to obtain the Borrower's consent, if any)), the Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loans (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf).  In addition, an Erroneous Payment Return Deficiency owing by the applicable Lender (x) shall be reduced by the proceeds of prepayments or repayments of principal and interest, or other distribution in respect of principal and interest, received by the Administrative Agent on or with respect to any such Loans acquired from such Lender pursuant to an Erroneous Payment Deficiency Assignment (to the extent that any such Advances are then owned by the Administrative Agent) and (y) may, in the sole discretion of the Administrative Agent, be reduced by any amount specified by the Administrative Agent in writing to the applicable Lender from time to time.

(e)     The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender, to the rights and interests of such Lender) under the Credit Documents with respect to such amount (the "**Erroneous Payment Subrogation Rights**") (provided that the Borrower's obligations hereunder and under the other Credit Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such obligations in respect of Loans that have been assigned to the Administrative Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any obligations owed by the Borrower hereunder or under any other Credit Document; provided that this Section 13.27 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the obligations of any of the Borrower relative to the amount (and/or timing for payment) of the obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making such Erroneous Payment.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

231

232

(g)    Each party's obligations, agreements and waivers under this Section 13.27 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Revolving Credit Commitments and/or the repayment, satisfaction or discharge of all obligations (or any portion thereof) owed by the Borrower hereunder or under any Credit Document.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**AVAYA HOLDINGS CORP.**, as Holdings

By: _____
  Name:
  Title:

**AVAYA INC.**, as the Borrower

By: _____
  Name:
  Title:

[Signature Page to Avaya Exit ABL Credit Agreement]

**CITIBANK, N.A.**, as Administrative Agent, Lender, L/C Issuer and Swing Line Lender

By: _____

    Name:

    Title:

[Signature Page to Avaya Exit ABL Credit Agreement]

**ROYAL BANK OF CANADA**, as Lender and L/C Issuer

By: _____
    Name:
    Title:

[Signature Page to Avaya Exit ABL Credit Agreement]

**BANK OF AMERICA, N.A.**, as Lender
and L/C Issuer


By: _____
    Name:
    Title:

[Signature Page to Avaya Exit ABL Credit Agreement]

**DEUTSCHE BANK AG NEW YORK BRANCH**, as Lender and L/C Issuer


By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

[Signature Page to Avaya Exit ABL Credit Agreement]

**<u>Exhibit D(ii)</u>**

**Exit Term Loan Facility Documents**

## TERM LOAN CREDIT AGREEMENT

Dated as of May 1, 2023
among

**AVAYA HOLDINGS CORP.,**
as Holdings,

**AVAYA Inc.,**
as the Borrower,

**The Several Lenders
from Time to Time Parties Hereto,**

**WILMINGTON SAVINGS FUND SOCIETY, FSB,**
as Administrative Agent and Collateral Agent,

## TABLE OF CONTENTS

**Page**

SECTION 1   DEFINITIONS ..........................................................................................2
    1.1      Defined Terms ......................................................................2
    1.2      Other Interpretive Provisions.............................................80
    1.3      Accounting Terms................................................................82
    1.4      Rounding..............................................................................82
    1.5      References to Agreements, Laws, Etc. ................................83
    1.6      Times of Day.......................................................................83
    1.7      Timing of Payment or Performance....................................83
    1.8      Currency Equivalents Generally .........................................83
    1.9      Classification of Loans and Borrowings.............................83
    1.10    Unrestricted Escrow Subsidiary.........................................84
    1.11    Limited Condition Transactions .........................................84
    1.12    Rates....................................................................................85

SECTION 2   AMOUNT AND TERMS OF CREDIT ................................................**85**
    2.1      Initial Term Loan Borrowing..............................................85
    2.2      Minimum Amount of Each Borrowing; Maximum Number of Borrowings.........86
    2.3      Notice of Borrowing; Determination of Class of Term Loans .............................86
    2.4      Disbursement of Funds .......................................................87
    2.5      Repayment of Term Loans; Evidence of Debt ....................88
    2.6      Conversions and Continuations ..........................................89
    2.7      Benchmark Replacement Setting for Term Loans...............90
    2.8      Interest.................................................................................92
    2.9      Interest Periods....................................................................94
    2.10    Increased Costs, Illegality, Etc...........................................95
    2.11    Compensation .....................................................................96
    2.12    Change of Lending Office ...................................................96
    2.13    Notice of Certain Costs.......................................................97
    2.14    Incremental Facilities.........................................................97
    2.15    Extensions of Term Loans; Refinancing Facilities...........100
    2.16    Defaulting Lenders............................................................107
    2.17    Permitted Debt Exchanges ................................................107
    2.18    Lender Claimants. ..............................................................109

SECTION 3   [RESERVED]..........................................................................................**111**

SECTION 4   FEES; COMMITMENTS .....................................................................**111**
    4.1      Fees ...................................................................................111
    4.2      Mandatory Termination or Reduction of Commitments ...................................113

SECTION 5   PAYMENTS ...........................................................................................**113**
    5.1      Voluntary Prepayments......................................................113
    5.2      Mandatory Prepayments ....................................................114

5.3     Method and Place of Payment ...............................................................................117
5.4     Net Payments .........................................................................................................118
5.5     Computations of Interest and Fees.........................................................................122
5.6     Limit on Rate of Interest ........................................................................................122

**SECTION 6   CONDITIONS PRECEDENT TO THE CLOSING DATE ...........................123**
6.1     Credit Documents ...................................................................................................123
6.2     Collateral.................................................................................................................123
6.3     Legal Opinions........................................................................................................124
6.4     Closing Certificates.................................................................................................124
6.5     Secretary's Certificate; Authorization of Proceedings of Each Credit Party.......124
6.6     Fees .........................................................................................................................124
6.7     Representations and Warranties..............................................................................125
6.8     Material Adverse Effect..........................................................................................125
6.9     Solvency Certificate ...............................................................................................125
6.10    Financial Statements ..............................................................................................125
6.11    Plan Consummation ...............................................................................................125
6.12    No Default...............................................................................................................126
6.13    Evidence of Insurance ............................................................................................126
6.14    Patriot Act ..............................................................................................................126
6.15    Letter of Direction..................................................................................................127

**SECTION 7   [RESERVED]...............................................................................................127**

**SECTION 8   REPRESENTATIONS AND WARRANTIES.................................................127**
8.1     Corporate Status; Compliance with Laws...............................................................127
8.2     Corporate Power and Authority ..............................................................................127
8.3     No Violation.............................................................................................................128
8.4     Litigation.................................................................................................................128
8.5     Margin Regulations.................................................................................................128
8.6     Governmental Approvals ........................................................................................128
8.7     Investment Company Act .......................................................................................128
8.8     True and Complete Disclosure................................................................................129
8.9     Financial Condition; Financial Statements ............................................................129
8.10    Tax Matters .............................................................................................................129
8.11    Compliance with ERISA.........................................................................................130
8.12    Subsidiaries ............................................................................................................130
8.13    Intellectual Property...............................................................................................130
8.14    Environmental Laws ...............................................................................................130
8.15    Properties ................................................................................................................131
8.16    Solvency..................................................................................................................131
8.17    Security Interests.....................................................................................................131
8.18    Labor Matters..........................................................................................................132
8.19    Sanctioned Persons; Anti-Corruption Laws; Patriot Act .......................................132
8.20    Use of Proceeds.......................................................................................................132
8.21    Insurance .................................................................................................................132

**SECTION 9   AFFIRMATIVE COVENANTS**.......................................................................**133**
    9.1     Information Covenants.............................................................................133
    9.2     Books, Records and Inspections .............................................................136
    9.3     Maintenance of Insurance .......................................................................137
    9.4     Payment of Taxes.....................................................................................138
    9.5     Consolidated Corporate Franchises .........................................................138
    9.6     Compliance with Statutes, Regulations, Etc............................................138
    9.7     Lender Calls.............................................................................................138
    9.8     Maintenance of Properties .......................................................................139
    9.9     Transactions with Affiliates ....................................................................139
    9.10    End of Fiscal Years..................................................................................141
    9.11    Additional Guarantors and Grantors........................................................141
    9.12    Further Assurances...................................................................................141
    9.13    Use of Proceeds.......................................................................................143
    9.14    Maintenance of Ratings ...........................................................................143
    9.15    Changes in Business ................................................................................144
    9.16    Post-Closing Obligations .........................................................................144

**SECTION 10 NEGATIVE COVENANTS** .................................................................................**144**
    10.1    Limitation on Indebtedness......................................................................144
    10.2    Limitation on Liens..................................................................................149
    10.3    Limitation on Fundamental Changes .......................................................152
    10.4    Limitation on Disposition ........................................................................154
    10.5    Limitation on Investments .......................................................................157
    10.6    Limitation on Restricted Payments..........................................................161
    10.7    Limitations on Debt Prepayments and Amendments................................166
    10.8    Limitation on Subsidiary Distributions....................................................167
    10.9    Amendment of Organizational Documents ..............................................169
    10.10  Permitted Activities .................................................................................169

**SECTION 11 EVENTS OF DEFAULT** .....................................................................................**170**
    11.1    Payments..................................................................................................170
    11.2    Representations, Etc.................................................................................170
    11.3    Covenants................................................................................................170
    11.4    Default Under Other Agreements .............................................................171
    11.5    Bankruptcy...............................................................................................172
    11.6    ERISA......................................................................................................172
    11.7    Guarantee.................................................................................................172
    11.8    Security Agreement .................................................................................173
    11.9    Judgments ................................................................................................173
    11.10  Change of Control....................................................................................173
    11.11  Indemnity Payments to Former Officers..................................................173
    11.12  Application of Proceeds............................................................................174

**SECTION 12 THE AGENTS**.....................................................................................................**175**
    12.1    Appointment ...........................................................................................175
    12.2    Delegation of Duties ...............................................................................176

12.3 Exculpatory Provisions .......................................................................176
12.4 Reliance by Agents ...........................................................................179
12.5 Notice of Default...............................................................................180
12.6 Non-Reliance on Administrative Agent, Collateral Agent and Other
Lenders..............................................................................................180
12.7 Indemnification .................................................................................181
12.8 Agents in their Individual Capacities.................................................182
12.9 Successor Agents ..............................................................................182
12.10 [Reserved] ........................................................................................183
12.11 Administrative Agent May File Proofs of Claim................................183
12.12 Intercreditor Agreements ..................................................................184
12.13 Security Documents and Guarantee; Agents under Security Documents
and Guarantee ...................................................................................184
12.14 Lender Direction ...............................................................................186
12.15 Erroneous Distribution......................................................................187
12.16 Survival ............................................................................................189

SECTION 13 MISCELLANEOUS ......................................................................189
13.1 Amendments, Waivers and Releases .................................................189
13.2 Notices .............................................................................................193
13.3 No Waiver; Cumulative Remedies .....................................................193
13.4 Survival of Representations and Warranties.......................................194
13.5 Payment of Expenses; Indemnification .............................................194
13.6 Successors and Assigns; Participations and Assignments ..................196
13.7 Replacements of Lenders under Certain Circumstances .....................203
13.8 Adjustments; Set-off .........................................................................204
13.9 Counterparts; Electronic Execution ..................................................205
13.10 Severability ......................................................................................205
13.11 INTEGRATION ................................................................................205
13.12 GOVERNING LAW...........................................................................205
13.13 Submission to Jurisdiction; Waivers.................................................206
13.14 Acknowledgments.............................................................................206
13.15 WAIVERS OF JURY TRIAL .............................................................207
13.16 Confidentiality .................................................................................207
13.17 Direct Website Communications .......................................................209
13.18 USA PATRIOT Act............................................................................211
13.19 Payments Set Aside...........................................................................211
13.20 Judgment Currency ..........................................................................212
13.21 Cashless Rollovers............................................................................212
13.22 Acknowledgement and Consent to Bail-In of EEA Financial Institutions..........212

SCHEDULES

Schedule 1.1(a)      Commitments of Lenders
Schedule 1.1(b)      Mortgaged Properties
Schedule 8.4         Litigation
Schedule 8.12        Subsidiaries
Schedule 8.14        Environmental Matters
Schedule 8.15        Property Matters
Schedule 9.9         Closing Date Affiliate Transactions
Schedule 10.1        Closing Date Indebtedness
Schedule 10.2        Closing Date Liens
Schedule 10.4        Scheduled Dispositions
Schedule 10.5        Closing Date Investments
Schedule 13.2        Notice Addresses


EXHIBITS

Exhibit A            Form of Notice of Borrowing/Notice of Conversion or Continuation
Exhibit B            Form of Promissory Note
Exhibit C            Form of Guarantee
Exhibit D            Form of Security Agreement
Exhibit E            Form of Cash/PIK Election Notice
Exhibit F            Form of ABL Intercreditor Agreement
Exhibit G            Form of First Lien Intercreditor Agreement
Exhibit H            Form of Junior Lien Intercreditor Agreement
Exhibit I            Form of Assignment and Assumption
Exhibit J            1-4 Form of Non-U.S. Lender Certification
Exhibit K            Dutch Auction Procedures
Exhibit L            Form of Borrower Direction to Add Lender

TERM LOAN CREDIT AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"), dated as of May 1, 2023, among AVAYA HOLDINGS CORP., a Delaware corporation ("**Avaya Holdings**"), in its capacity as Holdings, AVAYA INC., a Delaware corporation (to be converted to a limited liability company in the name of Avaya LLC, a Delaware limited liability company) (the "**Borrower**"), the lending institutions from time to time parties hereto (each a "**Lender**" and, collectively, the "**Lenders**") and WILMINGTON SAVINGS FUND SOCIETY, FSB, as Administrative Agent and Collateral Agent.

## RECITALS:

WHEREAS, capitalized terms used and not defined in the preamble and these recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, on February 14, 2023 (the "**Petition Date**"), Holdings, the Borrower and certain of the Borrower's Domestic Subsidiaries (collectively, the "**Avaya Debtors**") filed voluntary petitions for relief under Chapter 11 in the United States Bankruptcy Court for the Southern District of Texas (such court, together with any other court having exclusive jurisdiction over the Case from time to time and any Federal appellate court thereof, the "**Bankruptcy Court**") and commenced cases, jointly administered under Case No. 23-90088 (collectively, the "**Case**"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Avaya Debtors are parties to the certain Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of February 15, 2023 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Existing DIP Agreement**"), by and among the Avaya Debtors, WILMINGTON SAVINGS FUND SOCIETY, FSB, as administrative agent and collateral agent and the lending institutions from time to time parties thereto;

WHEREAS, the Avaya Debtors filed the Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code in the Bankruptcy Court on February 14, 2023 [Docket No. 50] (together with all schedules, documents and exhibits contained therein, as amended, supplemented, modified or waived from time to time, the "**Plan**");

WHEREAS, on March 22, 2023, the Bankruptcy Court entered an order confirming the Plan with respect to the Avaya Debtors (the "**Confirmation Order**") [Docket No. 350];

WHEREAS, in connection with the Case, the Borrower has requested that the Lenders provide a term loan facility on the Closing Date in an aggregate principal amount of $810,000,000, consisting of (i) an aggregate principal amount of $500,000,000 to be converted from DIP Term Loans on the Closing Date to Initial Term Loans hereunder in a like principal amount, (ii) an aggregate principal amount of $300,000,000 of Initial Term Loans issued (x) in partial satisfaction of each First Lien Claim (other than a B-3 Escrow Claim) as part of the treatment of First Lien Claims under the Plan and/or (y) pursuant to the RO Backstop Commitment and the Rights Offering and (iii) an aggregate principal amount of $10,000,000 of Initial Term

1

Loans issued to certain holders of Holdco Convertible Notes Claims as part of the treatment of Holdco Convertible Notes Claims under the Plan, upon the satisfaction (or waiver) of certain conditions precedent set forth in Section 6 on the terms and subject to the conditions set forth herein; and

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

### SECTION 1   Definitions

1.1     Defined Terms

As used herein, the following terms shall have the meanings specified in this Section 1.1 unless the context otherwise requires:

"**ABL Administrative Agent**" shall mean Citibank, N.A. in its capacity as the administrative agent under the ABL Credit Agreement and/or any successor agent under the ABL Credit Documents.

"**ABL Collateral Agent**" shall mean Citibank, N.A. in its capacity as the collateral agent under the ABL Credit Agreement and/or any successor agent under the ABL Credit Documents.

"**ABL Credit Agreement**" shall mean the ABL Credit Agreement dated as of May 1, 2023 among Holdings, the Borrower, the other borrowers party thereto, the ABL Administrative Agent and the several banks and other financial institutions from time to time parties thereto, as such agreement may be amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time, in each case to the extent permitted hereunder and under the Applicable Intercreditor Agreements (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Credit Agreement).

"**ABL Credit Documents**" shall mean, collectively, (a) the ABL Credit Agreement and (b) the security documents, intercreditor agreements (including the ABL Intercreditor Agreement and the Junior Lien Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection therewith or such other agreements, in each case to the extent permitted hereunder and under the Applicable Intercreditor Agreements, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time.

"**ABL Financial Covenant**" shall mean the financial covenant set forth in Section 10.11 of the ABL Credit Agreement.

"**ABL Intercreditor Agreement**" shall mean the ABL Intercreditor Agreement substantially in the form of Exhibit F, among the Collateral Agent, the ABL Collateral Agent and the representatives for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**ABL Loans**" shall mean "Loans" under and as defined in the ABL Credit Agreement.

"**ABL Obligations**" shall mean "Obligations" under and as defined in the ABL Credit Agreement.

"**ABL Priority Collateral**" shall mean the "ABL Priority Collateral" under and as defined in the ABL Intercreditor Agreement.

"**ABR**" shall mean for any day a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Effective Rate *plus* 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Wall Street Journal as the "U.S. prime rate" and (c) the greater of (x) Adjusted Term SOFR for a one-month tenor in effect on such day plus 1.00% and (y) 2.00%. If the Administrative Agent is unable to ascertain the Federal Funds Effective Rate due to its inability to obtain sufficient quotations in accordance with the definition thereof, after notice is provided to the Borrower, the ABR shall be determined without regard to clause (a) above until the circumstances giving rise to such inability no longer exist. Any change in the ABR due to a change in such rate publicly announced by the Wall Street Journal or in the Federal Funds Effective Rate or the Adjusted Term SOFR shall take effect at the opening of business on the day specified in the public announcement of such change or on the effective date of such change in the Federal Funds Effective Rate or the Adjusted Term SOFR, as applicable.

"**ABR Loan**" shall mean each Term Loan bearing interest based on the ABR.

"**ABR Term SOFR Determination Day**" shall have the meaning specified in the definition of "Term SOFR".

"**Acceptable Reinvestment Commitment**" shall mean a binding commitment of the Borrower or any Restricted Subsidiary entered into at any time prior to the end of the Reinvestment Period to reinvest the proceeds of an Asset Sale Prepayment Event or a Recovery Prepayment Event.

"**Acquired EBITDA**" shall mean, with respect to any Acquired Entity or Business or any Converted Restricted Subsidiary (any of the foregoing, a "**Pro Forma Entity**") for any period, the amount for such period of Consolidated EBITDA of such Pro Forma Entity (determined using such definitions as if references to the Borrower and the Restricted Subsidiaries therein were to such Pro Forma Entity and its Restricted Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity in a manner not inconsistent with GAAP.

"**Acquired Entity or Business**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Additional Lender**" shall mean any Person (other than (x) a natural person, (y) any investment vehicle established primarily for the benefit of a natural person or (z) a Disqualified Institution) that is not an existing Lender and that has agreed to provide Incremental Commitments pursuant to Section 2.14 or Refinancing Commitments pursuant to Section 2.15(b).

3

"**Adjusted Term SOFR**" shall mean, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"**Administrative Agent**" shall mean WILMINGTON SAVINGS FUND SOCIETY, FSB, as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent pursuant to Section 12.9.

"**Administrative Agent's Office**" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"**Administrative Questionnaire**" shall mean an administrative questionnaire in a form supplied by or acceptable to the Administrative Agent.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities or by contract. The terms "controlling" and "controlled" shall have meanings correlative thereto.

"**Affiliated Lender**" shall mean any Affiliated Parent Company or Subsidiary of Holdings or the Borrower (or any Lender that is a direct or indirect holding company of any Permitted Acquiror) that purchases or acquires Term Loans pursuant to Section 13.6(g).

"**Affiliated Parent Company**" shall mean a direct or indirect parent entity of Holdings and the Borrower that (a) owns, directly or indirectly, 100% of the Stock of the Borrower, and (b) operates as a "passive holding company", subject to customary exceptions of the type described in Section 10.10.

"**Agent Fee Letter**" shall mean that certain Agent Fee Letter, dated as of the Closing Date between the Agents and the Borrower, as amended, restated, supplemented, or otherwise modified from time to time.

"**Agent Parties**" shall have the meaning provided in Section 13.17(d).

"**Agents**" shall mean the Administrative Agent and the Collateral Agent.

"**Aggregate Quarterly Subscription Contract ARR Revenue**" means, with respect to each fiscal quarter of the Borrower, (a) the arithmetic average of the sum of (i) the Aggregate Subscription Contract ARR with respect to all Subscription Contracts in effect on the last day of the previous fiscal quarter and (ii) the Aggregate Subscription Contract ARR with

4

respect to all Subscription Contracts in effect on the last day of such fiscal quarter divided by (b) four (4).

"**Aggregate Quarterly Subscription Contract GAAP Revenue**" means, with respect to each fiscal quarter of the Borrower, the revenue generated by all Subscription Contracts during such fiscal quarter as determined pursuant to GAAP, including the provisions of ASC 606, Contracts with Customers.

"**Aggregate Subscription Contract ARR**" means, at any time, the aggregate Subscription Contract ARR for all Subscription Contracts then in effect at such time.

"**Agreement**" shall have the meaning provided in the introductory paragraph hereto.

"**Agreement Currency**" shall have the meaning provided in Section 13.20.

"**AHYDO Catch-Up Payment**" shall mean any payment or redemption of Indebtedness, including any Junior Indebtedness, to avoid the application of Code Section 163(e)(5) thereto or that are necessary to prevent any such Indebtedness from being treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code.

"**AHYDO Interest Payment**" shall have the meaning provided in Section 2.8(e).

"**Akin**" means Akin Gump Strauss Hauer & Feld LLP.

"**Anti-Corruption Laws**" shall have the meaning provided in Section 8.19.

"**Applicable ABR Margin**" shall mean at any date, with respect to each ABR Loan (i) for the Cash Option, 6.50% *per annum* and (ii) for the Cash/PIK Option, 7.50% *per annum*, consisting of (x) 1.00% *per annum* payable in cash (together with ABR) and (y) 6.50% *per annum* payable in kind.

"**Applicable Intercreditor Agreements**" shall mean (a) to the extent executed in connection with the incurrence of any Indebtedness secured by Liens on the Collateral that (i) are intended to rank senior in priority to the Liens on the ABL Priority Collateral securing the Obligations and (ii) are intended to rank junior in priority to the Liens on the Term Priority Collateral securing the Obligations, the ABL Intercreditor Agreement and the Junior Lien Intercreditor Agreement, (b) to the extent executed in connection with the incurrence of any Indebtedness secured by Liens on the Collateral that are intended to rank equal in priority to the Liens on the Collateral securing the Obligations (but without regard to control of remedies), each of the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement, (c) to the extent executed in connection with the incurrence of any Indebtedness secured by Liens on the Collateral which are intended to rank junior in priority to the Liens on the Collateral securing the Obligations and the ABL Obligations, an intercreditor agreement substantially consistent with the form of the Junior Lien Intercreditor Agreement and otherwise in form and substance reasonably acceptable to the Borrower, the Collateral Agent, and the Required Lenders and (d) any other intercreditor agreement entered into to implement the

intercreditor arrangements set forth in Section 10.2 in form and substance reasonably acceptable to the Borrower, the Collateral Agent, and the Required Lenders.

"**Applicable Laws**" shall mean, as to any Person, any law (including common law), statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding on such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"**Applicable SOFR Margin**" shall mean at any date, with respect to each SOFR Loan (i) for the Cash Option, 7.50% *per annum* and (ii) for the Cash/PIK Option, 8.50% per annum, consisting of (x) 1.50% *per annum* payable in cash (together with Adjusted Term SOFR) and (y) 7.00% *per annum* payable in kind.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale Prepayment Event**" shall mean any Disposition under and pursuant to Section 10.4(b).

"**Assignment and Assumption**" shall mean (a) an assignment and assumption substantially in the form of Exhibit I, or such other form as may be approved by the Administrative Agent and the Borrower and (b) in the case of any assignment of Term Loans in connection with a Permitted Debt Exchange conducted in accordance with Section 2.17, such form of assignment (if any) as may have been requested by the Administrative Agent in accordance with Section 2.17(a).

"**Auction Agent**" shall mean (a) the Administrative Agent or (b) any other financial institution or advisor designated by Holdings, the Borrower or any Subsidiary thereof (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Permitted Debt Exchange pursuant to Section 2.17 or a Dutch auction pursuant to Section 13.6(g); *provided* that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent).

"**Authorized Officer**" shall mean the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, any Assistant Treasurer, the Controller, any Vice President, with respect to certain limited liability companies or partnerships that do not have officers, any manager, managing member or general partner thereof, any other senior officer of Holdings, the Borrower or any other Credit Party designated as such in writing to the Administrative Agent by Holdings, the Borrower or such other Credit Party, as applicable from time to time, and, with respect to any document delivered on the Closing Date, the Secretary or any Assistant Secretary of any Credit Party.  Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of Holdings, the

6

Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.  Notwithstanding the foregoing, the solvency certificate required to be delivered on the Closing Date shall be delivered by the Chief Financial Officer of Holdings.

"**Available Amount**" shall mean, at any time (the "**Available Amount Reference Time**"), an amount equal to (a) the sum, without duplication, of:

(i)      $200,000,000;

(ii)      50% of Cumulative Consolidated Net Income (which amount, if less than zero, shall be deemed to be zero for such period) of the Borrower and the Restricted Subsidiaries for the period from the first day of the first fiscal quarter commencing after the Closing Date until the last day of the then-most recent fiscal quarter or Fiscal Year, as applicable, for which Section 9.1 Financials have been delivered;

(iii)      all cash repayments of principal received by the Borrower or any Restricted Subsidiary from any Minority Investments or Unrestricted Subsidiaries on account of loans made by the Borrower or any Restricted Subsidiary pursuant to Section 10.5(v)(y) to such Minority Investments or Unrestricted Subsidiaries during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time;

(iv)      100% of the aggregate amount received by the Borrower or any Restricted Subsidiary in cash and the fair market value of marketable securities or other property received by the Borrower or any Restricted Subsidiary by means of (A) the sale or other Disposition (other than to the Borrower or a Restricted Subsidiary) of Investments made pursuant to Section 10.5(v)(y) by the Borrower or any Restricted Subsidiary and repurchases and redemptions (other than by the Borrower or any Restricted Subsidiary) of such Investments from the Borrower or any Restricted Subsidiary and repayments of loans or advances, and releases of guarantees constituting such Investments made by the Borrower or any Restricted Subsidiary, in each case, after the Closing Date; and (B) the sale (other than to the Borrower or a Restricted Subsidiary) of the stock or other ownership interest of Minority Investments or any Unrestricted Subsidiary received pursuant to Section 10.5(v)(y), in each case, after the Closing Date;

(v)      in the case of the redesignation of an Unrestricted Subsidiary as, or merger, consolidation or amalgamation of an Unrestricted Subsidiary with or into, a Restricted Subsidiary after the Closing Date, the fair market value of the Investment in such Unrestricted Subsidiary at the time of the redesignation of such Unrestricted Subsidiary as, or merger, consolidation or amalgamation of such Unrestricted Subsidiary with or into, a Restricted Subsidiary;

(vi)      100% of the aggregate Net Cash Proceeds and the fair market value of marketable securities or other property received by the Borrower since immediately after the Closing Date from the issue or sale of Indebtedness or Disqualified Stock of the Borrower or a Restricted Subsidiary that has been converted into or exchanged for Stock

7

or Stock Equivalent of the Borrower or any direct or indirect parent of the Borrower; *provided* that this clause (vi) shall not include the proceeds from (A) Stock or Stock Equivalents or Indebtedness that has been converted or exchanged for Stock or Stock Equivalents of the Borrower sold to a Restricted Subsidiary, as the case may be, (B) Disqualified Stock or Indebtedness that has been converted or exchanged into Disqualified Stock or (C) any contribution or issuance that increases the Available Equity Amount;

(vii)     without duplication of any amounts above, any returns, profits, distributions and similar amounts received on account of the Investments initially made pursuant to Section 10.5(v)(y) (except to the extent increasing Consolidated Net Income); and

(viii)     the aggregate amount of Retained Declined Proceeds retained by the Borrower during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time;

*minus* (b) the sum, without duplication, of:

(i)     the aggregate amount of Investments made pursuant to Section 10.5(v)(y) following the Closing Date and prior to the Available Amount Reference Time;

(ii)     the aggregate amount of Restricted Payments pursuant to Section 10.6(c)(y) following the Closing Date and prior to the Available Amount Reference Time; and

(iii)     the aggregate amount of prepayments, repurchases, redemptions and defeasances made pursuant to Section 10.7(a)(iii)(3) following the Closing Date and prior to the Available Amount Reference Time.

Notwithstanding the foregoing, in making any calculation or other determination under this Agreement involving the Available Amount, if the Available Amount at such time is less than zero, then the Available Amount shall be deemed to be zero for purposes of such calculation or determination.

"**Available Amount Reference Time**" shall have the meaning provided in the definition of "Available Amount".

"**Available Equity Amount**" shall mean, at any time (the "**Available Equity Amount Reference Time**"), an amount equal to, without duplication, (a) the amount of any capital contributions made in cash, marketable securities or other property to, or any proceeds of an equity issuance received by the Borrower during the period from and including the Business Day immediately following the Closing Date through and including the Available Equity Amount Reference Time (in the case of any marketable securities or property, up to its fair market value as determined by the Borrower in good faith), including proceeds from the issuance of Stock or Stock Equivalents of Holdings or any direct or indirect parent of Holdings (to the extent the proceeds of any such issuance are contributed to the Borrower), but excluding all proceeds from the issuance of Disqualified Stock,

*minus* (b) the sum, without duplication, of:

8

        (i)      the aggregate amount of Investments made pursuant to Section 10.5(v)(x) following the Closing Date and prior to the Available Equity Amount Reference Time;

        (ii)      the aggregate amount of Restricted Payments pursuant to Section 10.6(c)(x) following the Closing Date and prior to the Available Equity Amount Reference Time;

        (iii)      the aggregate amount of prepayments, repurchases, redemptions and defeasances pursuant to Section 10.7(a)(iii)(2) following the Closing Date and prior to the Available Equity Amount Reference Time; and

        (iv)      the aggregate amount of Indebtedness incurred pursuant to Section 10.1(x) and outstanding at the Available Equity Amount Reference Time;

*provided* that issuances and contributions pursuant to Sections 10.5(f)(ii), 10.6(a) and 10.6(b)(i) shall not increase the Available Equity Amount.

        "**Available Equity Amount Reference Time**" shall have the meaning provided in the definition of "Available Equity Amount".

        "**Available Tenor**" shall mean, with respect to any Term Loans, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.7(d).

        "**Avaya Debtors**" shall have the meaning provided in the Recitals to this Agreement.

        "**B-3 Escrow Claims**" shall mean B-3 Escrow Claims as defined in the Plan.

        "**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

        "**Bail-In Legislation**" shall mean, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

9

"**Bankruptcy Code**" shall mean title 11 of the United States Code, as heretofore and hereafter amended, and codified in 11 U.S.C. section 101 et seq.

"**Bankruptcy Court**" shall have the meaning provided in the Recitals to this Agreement.

"**Benchmark**" shall mean, initially, the Term SOFR Reference Rate; *provided* that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.7.

"**Benchmark Replacement**" shall mean, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; *provided* that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"**Benchmark Replacement Adjustment**" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Date**" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; *provided* that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c)

and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Start Date**" shall mean, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective

11

event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" shall mean, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.7 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.7.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefited Lender**" shall have the meaning provided in Section 13.8(a).

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" shall have the meaning provided in the preamble to this Agreement.

"**Borrower Direction to Add Lender**" shall mean a written direction of the Borrower in accordance with the terms of Section 2.18 and substantially in the form of Exhibit L or such other form as shall be approved by the Administrative Agent (acting reasonably).

"**Borrowing**" shall mean the incurrence of one Class and Type of Term Loan on a given date (or resulting from conversions on a given date), and in the case of SOFR Loans, having the same Interest Period.

"**Broker-Dealer Subsidiary**" shall mean any Subsidiary that is registered as a broker-dealer under the Exchange Act or any other Applicable Law requiring similar registration.

"**Business Day**" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City are authorized by law or other governmental actions to close.

"**Capital Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of the Borrower or the Restricted Subsidiary.

"**Capital Lease**" shall mean, as applied to the Borrower and the Restricted Subsidiaries, any lease of any property (whether real, personal or mixed) by the Borrower or any Restricted Subsidiary as lessee that, in conformity with GAAP, is, or is required to be, accounted

12

for as a capital lease on the balance sheet of the Borrower; *provided*, *however*, that notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any leases that were not capital leases when entered into but are recharacterized as capital leases due to a change in accounting rules that becomes effective after the Closing Date shall for all purposes of this agreement not be treated as Capital Leases.

"**Capitalized Lease Obligations**" shall mean, as applied to the Borrower and the Restricted Subsidiaries at the time any determination is to be made, the amount of the liability in respect of a Capital Lease that would at such time be required to be capitalized and reflected as a liability on the balance sheet (excluding the footnotes thereto) of the Borrower or the Restricted Subsidiary in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such Capital Lease prior to the first date upon which such Capital Lease may be prepaid by the lessee without payment of a penalty; *provided*, *however*, that notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any obligations that were not required to be included on the balance sheet of the Borrower or the Restricted Subsidiary as capital lease obligations when incurred but are recharacterized as capital lease obligations due to a change in accounting rules that becomes effective after the Closing Date shall for all purposes of this Agreement not be treated as Capitalized Lease Obligations.

"**Capitalized Software Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and the Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrower.

"**Captive Insurance Subsidiary**" shall mean a Subsidiary of the Borrower established for the purpose of, and to be engaged solely in the business of, insuring the businesses or facilities owned or operated by the Borrower or any of its Subsidiaries or joint ventures or to insure related or unrelated businesses.

"**Case**" shall have the meaning provided in the preamble to this Agreement.

"**Cash Election Date**" shall have the meaning provided in Section 2.8(a).

"**Cash/PIK Election Notice**" shall mean a written notice substantially in the form of <u>Exhibit E</u>.

"**Cash Equivalent**" shall mean:

(a)     Dollars and cash in such foreign currencies held by the Borrower or any Restricted Subsidiary from time to time in the ordinary course of business;

(b)     securities issued or unconditionally guaranteed by the United States government or any agency or instrumentality thereof, in each case having maturities and/or reset dates of not more than 24 months from the date of acquisition thereof;

13

(c)     securities issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof or any political subdivision of any such state or any public instrumentality thereof having maturities of not more than 24 months from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from another nationally recognized rating service);

(d)     commercial paper or variable or fixed rate notes maturing no more than 12 months after the date of creation thereof and, at the time of acquisition, having a rating of at least A-3 or P-3 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(e)     time deposits with, or domestic and LIBOR certificates of deposit or bankers' acceptances maturing no more than two years after the date of acquisition thereof issued by, the Administrative Agent (or any Affiliate thereof), any lender under the ABL Credit Agreement, any Lender or any other bank having combined capital and surplus of not less than $500,000,000 in the case of domestic banks and $100,000,000 (or the dollar equivalent thereof) in the case of foreign banks;

(f)     repurchase agreements with a term of not more than 90 days for underlying securities of the type described in clauses (b), (c) and (e) above entered into with any bank meeting the qualifications specified in clause (e) above or securities dealers of recognized national standing;

(g)     marketable short-term money market and similar funds (x) either having assets in excess of $500,000,000 or (y) having a rating of at least A-3 or P-3 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(h)     shares of investment companies that are registered under the Investment Company Act of 1940 and substantially all the investments of which are one or more of the types of securities described in clauses (a) through (g) above; and

(i)     in the case of Investments by any Restricted Foreign Subsidiary or Investments made in a country outside the United States of America, other customarily utilized high-quality Investments in the country where such Restricted Foreign Subsidiary is located or in which such Investment is made.

"**Cash Management Agreement**" shall mean any agreement or arrangement to provide Cash Management Services.

"**Cash Management Bank**" shall mean any Person that enters into a Cash Management Agreement with the Borrower or any Restricted Subsidiary in its capacity as a provider of Cash Management Services and, in each case, at the time it enters into such Cash Management Agreement or on the Closing Date, is (a) a Lender or an Affiliate of a Lender or (b)

14

any other Person that delivers an accession agreement to the Security Agreement and that is specifically designated by the Borrower as a "Cash Management Bank".

"**Cash Management Obligations**" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank or any other provider of Cash Management Services in connection with, or in respect of, any Cash Management Services or under any Cash Management Agreement.

"**Cash Management Services**" shall mean treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer (including automated clearing house fund transfer services), merchant services (other than those constituting a line of credit) and other cash management services.

"**Cash Option**" shall have the meaning provided in Section 2.8(a).

"**Cash/PIK Option**" shall have the meaning provided in Section 2.8(a).

"**Certificated Securities**" shall have the meaning provided in Section 8.17.

"**CFC**" shall mean a Subsidiary of the Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holding Company**" shall mean a Subsidiary of the Borrower that has no material assets other than (a) the equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in (x) one or more Foreign Subsidiaries that are CFCs or (y) one or more other CFC Holding Companies and (b) cash and Cash Equivalents and other assets being held on a temporary basis incidental to the holding of assets described in clause (a) of this definition.

"**Change in Law**" shall mean (a) the adoption of any Applicable Law after the Closing Date, (b) any change in any Applicable Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any party with any guideline, request, directive or order issued or made after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" shall mean and be deemed to have occurred if (a) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Closing Date), other than one or more Permitted Holders, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 of the Exchange Act as in effect on Closing Date) of more than 50% of the total voting power of the Voting Stock of Avaya Holdings; *provided* that (x) so long as Avaya Holdings is a Subsidiary of any Parent Entity, no Person shall be deemed to be or become

15

a beneficial owner of more than 50% of the total voting power of the Voting Stock of Avaya Holdings unless such Person shall be or become a beneficial owner of more than 50% of the total voting power of the Voting Stock of such Parent Entity (other than a Parent Entity that is a Subsidiary of another Parent Entity) and (y) any Voting Stock of which any Permitted Holder is the beneficial owner shall not in any case be included in any Voting Stock of which any such Person is the beneficial owner; (b) Holdings shall at any time cease to own, directly or indirectly, beneficial ownership of 100% of the Stock and Stock Equivalents of the Borrower. Notwithstanding the foregoing, a Permitted Change of Control shall not constitute a Change of Control.

Notwithstanding the preceding or any provision of Section 13d-3 of the Exchange Act, (i) a Person or group shall not be deemed to beneficially own Voting Stock subject to a stock or asset purchase agreement, merger agreement, option agreement, warrant agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the acquisition of the Voting Stock in connection with the transactions contemplated by such agreement, (ii) if any group includes one or more Permitted Holders, the issued and outstanding Voting Stock of Avaya Holdings owned, directly or indirectly, by any Permitted Holders that are part of such group shall not be treated as being beneficially owned by such group or any other member of such group for purposes of determining whether a Change of Control has occurred, (iii) a Person or group will not be deemed to beneficially own the Voting Stock of another Person as a result of its ownership of Voting Stock or other securities of such other Person's parent entity (or related contractual rights) unless it owns 50% or more of the total voting power of the Voting Stock entitled to vote for the election of directors of such parent entity having a majority of the aggregate votes on the board of directors (or similar body) of such parent entity and (iv) the right to acquire Voting Stock (so long as such Person does not have the right to direct the voting of the Voting Stock subject to such right) or any veto power in connection with the acquisition or disposition of Voting Stock will not cause a party to be a beneficial owner.

"**Claim**" shall have the meaning provided in the definition of "Environmental Claims".

"**Claim Termination Date**" has the meaning specified in Section 2.18(b)(ii).

"**Class**", when used in reference to any Term Loan or Borrowing, shall refer to whether such Term Loan or the Term Loans comprising such Borrowing are Initial Term Loans, Incremental Term Loans, Extended Term Loans or Refinancing Term Loans and, when used in reference to any Commitment, refers to whether such Commitment is an Initial Term Commitment, an Incremental Term Commitment or a Refinancing Commitment.

"**Closing Date**" shall mean May 1, 2023, on which the conditions set forth in Section 6 are first satisfied.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.  Section references to the Code are to the Code, as in effect on the Closing Date, and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefore.

16

"**Collateral**" shall mean all property pledged, mortgaged or purported to be pledged or mortgaged pursuant to the Security Documents (excluding, for the avoidance of doubt, all Excluded Collateral).

"**Collateral Agent**" shall mean WILMINGTON SAVINGS FUND SOCIETY, FSB, in its capacity as collateral agent for the Secured Parties under this Agreement and the other Credit Documents, or any successor collateral agent appointed pursuant hereto.

"**Commitments**" shall mean, with respect to each Lender (to the extent applicable), such Lender's Initial Term Commitments, Incremental Term Commitments or Refinancing Commitments.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"**Communications**" shall have the meaning provided in Section 13.17(a).

"**Company Model**" shall mean the model delivered to the financial advisors for the Required Lenders on April 13, 2023

"**Confidential Information**" shall have the meaning provided in Section 13.16.

"**Confirmation Order**" shall have the meaning provided in the Recitals hereto.

"**Conforming Changes**" shall mean, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to, the definition of "ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.11 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"**Consolidated Depreciation and Amortization Expense**" shall mean, with respect to the Borrower and the Restricted Subsidiaries for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees or costs, debt issuance costs, commissions, fees and expenses, capitalized expenditures, Capitalized Software Expenditures, amortization of expenditures relating to software, license and intellectual property payments, amortization of any lease related assets recorded in purchase accounting, customer acquisition costs, unrecognized prior service costs and actuarial gains and losses related

17

to pensions and other post-employment benefits, amortization of original issue discount resulting from the issuance of Indebtedness at less than par and incentive payments, conversion costs, and contract acquisition costs of the Borrower and the Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income for such period, *plus*:

(a)    without duplication and (except in the case of the add-backs set forth in clauses (vii) and (xi) below) to the extent deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for the Borrower and the Restricted Subsidiaries for such period:

(i)    Fixed Charges (including (x) net losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk and (y) costs of surety bonds in connection with financing activities in each case to the extent included in Consolidated Interest Expense, together with items excluded from Consolidated Interest Expense pursuant to clause (1)(o) - (z) of the definition thereof),

(ii)    provision for taxes based on income or profits or capital gains, including federal, foreign, state, franchise, excise, value-added and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) paid or accrued during such period, including any penalties and interest related to such taxes or arising from any tax examination, to the extent the same were deducted (and not added back) in computing such Consolidated Net Income and the net tax expense associated with any adjustments made pursuant to clauses (a) through (t) of the definition of "Consolidated Net Income",

(iii)    Consolidated Depreciation and Amortization Expense for such period,

(iv)    the amount of any cost, charge, accrual, reserve or expense with respect to any restructuring, business optimization, transformation and/or cost-saving initiatives (whether or not classified as restructuring expense on the consolidated financial statements and adjustments to existing reserves) (including any costs, accruals, payments, fees, charges and expenses related to the Case, the Transactions and the other transactions contemplated by the Plan or in connection with obtaining ratings, consulting or professional fees, tax, structuring, transition) and any costs incurred in connection with acquisitions, investments or dispositions after the Closing Date, non-recurring product and intellectual property development (including travel and out-of-pocket costs, human resources costs (including relocation bonuses), litigation and arbitration costs, charges, fees and expenses (including settlements), management transition costs, advertising costs, losses associated with temporary decreases in work volume and expenses related to maintain underutilized personnel), any severance, retention, signing bonuses, relocation, recruiting and other employee related costs (including (x) management bonus pools and (y) charges or expenses in respect of incentive plans), recruiting costs, costs, charges or expenses incurred in connection with any strategic or cost savings initiatives, one-time charges (including compensation charges), payments made pursuant to the terms of

18

"change in control" agreements that the Borrower or a Subsidiary or a Parent Entity had entered into with employees of the Borrower, a Subsidiary or a Parent Entity, costs in respect of strategic initiatives, integration and facilities' or bases' opening costs, losses, costs or cost inefficiencies related to project terminations, facility or property disruptions or shutdowns (including due to work stoppages, natural disasters and epidemics), systems development, establishment and implementation costs, operational and reporting systems, technology initiatives, contract termination costs, future lease commitments and costs related to the closure and/or consolidation of facilities (including severance, rent termination, moving and legal costs) and to exiting lines of business, transition costs, contract terminations, litigation and arbitration fees, costs and charges, expenses, any one time expense relating to enhanced accounting function or other transaction costs, public company costs, costs and expenses in connection with the implementation of fresh start accounting, and costs related to the implementation of operational and reporting systems and technology initiatives,

(v)     any other non-cash charges, expenses or losses, including any non-cash asset retirement costs, non-cash increase in expenses resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments or due to purchase accounting, or any other acquisition, non-cash compensation charges, non-cash expense relating to the vesting of warrants, write-offs or write-downs for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vi)    the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary,

(vii)   the amount of net cost savings projected by the Borrower in good faith to be realizable as a result of specified actions, operational changes and operational initiatives (including, to the extent applicable, resulting from the Transactions) taken or to be taken prior to or during such period, including any "run-rate" synergies, operating expense reductions and improvements and cost savings that are reasonably identifiable and determined in good faith by the Borrower in connection with the Transactions, acquisitions, Dispositions, any Permitted Change of Control, other customary specified transactions or other cost saving initiatives and other initiatives to result from actions which have been taken or with respect to which substantial steps have been taken or are expected to be taken no later than 24 months following the consummation of the Transactions, any such specified actions, operational changes and operational initiatives (which "run-rate" synergies, operating expense reductions and improvements and cost savings shall be added to Consolidated EBITDA until fully realized, shall be subject to certification by management of the Borrower and shall be calculated on a Pro Forma Basis as though such "run-rate" synergies, operating expense reductions and improvements and cost savings had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that no "run-rate" synergies, operating

19

expense reductions and improvements and cost savings shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clause (iv) above with respect to such period; *provided* further that the aggregate amount added back to and in computing Consolidated EBITDA for any measurement period pursuant to this clause (vii) (other than that resulting from the Transactions, any Permitted Acquisitions or similar Investments and other than, for the avoidance of doubt, the adjustments pursuant to clauses (xv) and/or (xvi) below) shall not exceed 35% of Consolidated EBITDA (determined after giving effect to the adjustments set forth in this clause (vii)),

(viii)   the amount of losses on Dispositions of receivables and related assets in connection with any Permitted Receivables Financing or Qualified Securitization Financing and any losses, costs, fees and expenses in connection with the early repayment, accelerated amortization, repayment, termination or other payoff (including as a result of the exercise of remedies) of any Permitted Receivables Financing or any Qualified Securitization Financing,

(ix)   contract termination costs and any costs, charges or expenses incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement or other equity-based compensation, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Borrower or Net Cash Proceeds of an issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) solely to the extent that such Net Cash Proceeds are excluded from the calculation of the Available Equity Amount,

(x)   an amount (which, for the avoidance of doubt, if positive, increases Consolidated EBITDA or, if negative, reduces Consolidated EBITDA) equal to, for each fiscal quarter in such period, (x) the Aggregate Quarterly Subscription Contract ARR Revenue for such fiscal quarter minus (y) the Aggregate Quarterly Subscription Contract GAAP Revenue for such fiscal quarter,

(xi)   the proceeds of any business interruption insurance,

(xii)   extraordinary, unusual or non-recurring charges, expenses or losses (including unusual or non-recurring expenses), transaction fees and expenses and consulting and advisory fees, indemnities and expenses, severance, integration costs, costs of strategic initiatives, relocation costs, consolidation and closing costs, facility opening and pre-opening costs, business optimization expenses or costs, transition costs, restructuring costs, signing, retention, recruiting, relocation, signing, stay or completion bonuses and expenses (including payments made to employees who are subject to non-compete agreements), costs in respect of curtailments or modifications to pension and post-retirement employment benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments),

(xiii) any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-

20

lived assets and Investments in debt and equity securities, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP,

(xiv)    cash receipts (or any netting arrangements resulting in increased cash receipts) not added in arriving at Consolidated EBITDA or Consolidated Net Income in any period to the extent the non-cash gains relating to such receipts were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added,

(xv)    adjustments identified in connection with the calculation of the "Credit EBITDA Calculation" as set forth in the Company Model,

(xvi)    anticipated run-rate Consolidated EBITDA reasonably expected to be achieved (as determined in good faith by the Borrower) from New Projects (and the achievement of related operating expense reduction and other operating improvements, synergies or cost savings associated therewith) so long as such New Project is then under development or is otherwise in process, less

(b)    without duplication and to the extent included in arriving at such Consolidated Net Income for the Borrower and the Restricted Subsidiaries, the sum of the following amounts for such period:

(i)    non-cash gains increasing Consolidated Net Income for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period),

(ii)    extraordinary, unusual or non-recurring gains,

(iii)    cash expenditures (or any netting arrangements resulting in increased cash expenditures) not deducted in arriving at Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash losses relating to such expenditures were added in the calculation of Consolidated EBITDA pursuant to paragraph (a) above for any previous period and not deducted, and

(iv)    the amount of any minority interest income consisting of Subsidiary losses attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary,

in each case, as determined on a consolidated basis for the Borrower and the Restricted Subsidiaries in accordance with GAAP; *provided* that

(i)    there shall be included in determining Consolidated EBITDA for any period, without duplication, (A) the Acquired EBITDA of any Person or business, or attributable to any property, assets, division or line of business acquired by the Borrower or any Restricted Subsidiary during such period (or any property, assets, division or line of business subject to a letter of intent or purchase agreement at such time) (but not the Acquired EBITDA of any related Person or business or any Acquired EBITDA attributable

21

to any property, assets, division or line of business, in each case to the extent not so acquired) to the extent not subsequently sold, transferred, abandoned or otherwise disposed by the Borrower or such Restricted Subsidiary (each such Person, property, assets, division or line of business acquired and not subsequently so disposed of, an "**Acquired Entity or Business**") and the Acquired EBITDA of any Unrestricted Subsidiary that is converted into a Restricted Subsidiary during such period (each, a "**Converted Restricted Subsidiary**"), in each case based on the actual Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) and (B) an adjustment in respect of each Pro Forma Entity equal to the amount of the Pro Forma Adjustment with respect to such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition), and

(ii)     to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset (other than an Unrestricted Subsidiary) sold, transferred, abandoned or otherwise disposed of, closed or classified as discontinued operations by the Borrower or any Restricted Subsidiary during such period (each such Person, property, business or asset so sold, transferred, abandoned or otherwise disposed of, or closed or so classified, a "**Sold Entity or Business**"), and the Disposed EBITDA of any Restricted Subsidiary that is converted into an Unrestricted Subsidiary during such period (each, a "**Converted Unrestricted Subsidiary**"), in each case based on the actual Disposed EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary for such period (including the portion thereof occurring prior to such sale, transfer or disposition, closure, classification or conversion).

Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated EBITDA under this Agreement for any period that includes the four fiscal quarters as set forth below, the Consolidated EBITDA for such fiscal quarters shall be deemed to be $167,000,000 for the fiscal quarter ended March 31, 2022, $136,000,000 for the fiscal quarter ended June 30, 2022, $68,000,000 for the fiscal quarter ended September 30, 2022 and $90,000,000 for the fiscal quarter ended December 31, 2022.

"**Consolidated First Lien Net Leverage Ratio**" shall mean, as of any date of determination, the ratio of (a) the sum, without duplication, of (i) the Consolidated Secured Debt constituting (w) the Obligations, (x) the ABL Obligations, (y) any Indebtedness that is secured by a Lien on the Term Priority Collateral that is *pari passu* with the Lien securing the Obligations and (z) any Indebtedness that is secured by a Lien on the ABL Priority Collateral that is senior to or *pari passu* with the Lien securing the Obligations and (ii) Consolidated Secured Debt of the type described in clause (ii) of the definition thereof, in each case as of the most recent four fiscal quarter period for which financial statements described in Section 9.1(a) or (b) are available  (and excluding, for the avoidance of doubt for both clauses (i) and (ii), any Qualified Securitization Financing, Permitted Receivables Financing, Hedging Obligations and Cash Management Obligations) to (b) Consolidated EBITDA for such four fiscal quarter period.

"**Consolidated Interest Expense**" shall mean, with respect to any period, without duplication, the sum of:

22

(1) consolidated interest expense of the Borrower and the Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptances or collateral posting facilities, (c) non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments pursuant to GAAP), (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate Hedging Obligations with respect to Indebtedness, and excluding (o) annual agency fees paid to the administrative agents and collateral agents under this Agreement, the ABL Credit Agreement and the other credit facilities, (p) additional interest with respect to failure to comply with any registration rights agreement owing to holders of any securities, (q) costs associated with obtaining Hedging Obligations, (r) accretion of asset retirement obligations and accretion or accrual of discounted liabilities not constituting Indebtedness, (s) any expense resulting from the discounting of any Indebtedness in connection with the application of fresh start accounting or purchase accounting, (t) penalties and interest relating to taxes (u) amortization of reacquired Indebtedness, deferred financing fees, debt issuance costs, commissions, fees and expenses, (v) any expensing of bridge, commitment and other financing fees, (w) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Permitted Receivables Financing, (x) any prepayment premium or penalty, (y) any interest expense attributable to a parent entity resulting from push-down accounting and (z) any lease, rental or other expenses from operating leases); *plus*

(2) consolidated capitalized interest of the Borrower and the Restricted Subsidiaries, in each case for such period, whether paid or accrued; *less*

(3) interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" shall mean, for any period, the net income (loss) of the Borrower and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication, the net after-tax effect of,

(a) any extraordinary, unusual or nonrecurring losses, gains, fees, costs, charges or expenses for such period,

(b) Transaction Expenses and Permitted Change of Control Costs,

(c) the cumulative effect of a change in accounting principles and changes as a result of adoption or modification of accounting policies during such period,

23

(d)     any income (or loss) from disposed, abandoned or discontinued operations and any gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations,

(e)     any gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments other than in the ordinary course of business, as determined in good faith by the Borrower,

(f)     any income (or loss) during such period of any Person that is an Unrestricted Subsidiary, and any income (or loss) during such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; *provided* that the Consolidated Net Income of the Borrower and the Restricted Subsidiaries shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents) by any Unrestricted Subsidiary or such other Person from its income to the Borrower or any Restricted Subsidiary during such period,

(g)     solely for the purpose of determining Available Amount, any income (or loss) during such period of any Restricted Subsidiary (other than any Credit Party) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its net income is not at the date of determination wholly permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its Organizational Documents or any agreement, instrument or Applicable Law applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions (i) has been legally waived or otherwise released, (ii) is imposed pursuant to this Agreement and the other Credit Documents, the ABL Credit Documents, Permitted Debt Exchange Instruments or Permitted Other Debt, (iii) any working capital line permitted by Section 10.2 incurred by a Foreign Subsidiary or (iv) arises pursuant to an agreement or instrument if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the Lenders than the encumbrances and restrictions contained in the Credit Documents (as determined by the Borrower in good faith); *provided* that Consolidated Net Income of the Borrower and the Restricted Subsidiaries will be increased by the amount of dividends or other distributions or other payments actually paid in cash (or to the extent converted into cash) to the Borrower or any Restricted Subsidiary during such period, to the extent not already included therein,

(h)     all adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in the Borrower's consolidated financial statements pursuant to GAAP, resulting from (i) the application of fresh start accounting principles as a result of the Avaya Debtors' emergence from bankruptcy or (ii) the application of purchase accounting in relation to the Transactions or any consummated acquisition, in each case, including the amortization, write-off or write-down of any assets, any deferred revenue and any other amounts and other similar adjustments and, whether consummated before or after the Closing Date,

24

(i)     any income (or loss) for such period attributable to the early extinguishment of Indebtedness (other than Hedging Obligations, but including, for the avoidance of doubt, debt exchange transactions and the extinguishment of pre-petition indebtedness in connection with the Transactions),

(j)     any unrealized income (or loss) for such period attributable to Hedging Obligations or other derivative instruments,

(k)     any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets and investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP,

(l)     any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and any cash charges associated with the rollover, acceleration or payout of Stock or Stock Equivalents by management of the Borrower or any of its direct or indirect parent companies in connection with the Transactions,

(m)     accruals and reserves established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP (or within 12 months after the Permitted Change of Control Effective Date) or changes as a result of adoption of or modification of accounting policies during such period,

(n)     any accruals, payments, fees, expenses or charges (including rationalization, legal, tax, structuring, and other costs and expenses, but excluding depreciation or amortization expense) related to, or incurred in connection with, the Transactions (including letter of credit fees), the Plan, any offering of Stock or Stock Equivalents (including any equity offering), Investment, acquisition, Disposition, Restricted Payment, recapitalization or the issuance or incurrence of Indebtedness permitted to be incurred by the Borrower and the Restricted Subsidiaries pursuant hereto (including any refinancing transaction or amendment, waiver, or other modification of any debt instrument), any public or private offer of the Stock or Stock Equivalents of any Parent Entity, Holdings, Borrower or Restricted Subsidiary, in each case whether or not consummated, including (A) such fees, expenses or charges related to the negotiation, execution and delivery and other transactions contemplated by this Agreement, the other Credit Documents and any Permitted Receivables Financing, (B) any amendment or other modification of this Agreement and the other Credit Documents, (C) any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed, (D) any charges or non-recurring merger costs as a result of any such transaction, and (E) earnout obligations paid or accrued during such period with respect to any acquisition or other Investment,

25

(o)   the amount of management, monitoring, consulting and advisory fees and related indemnities and expenses paid in such period to the extent otherwise permitted pursuant to Section 9.9,

(p)   restructuring-related or other similar charges, fees, costs, commissions and expenses or other charges incurred during such period in connection with this Agreement, the other Credit Documents, the Credit Facilities, the Case, any reorganization plan in connection with the Case, and any and all transactions contemplated by the foregoing, including the write-off of any receivables, the termination or settlement of executory contracts, professional and accounting costs fees and expenses, management incentive, employee retention or similar plans (in each case to the extent such plan is approved by the Bankruptcy Court to the extent required), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization of the Avaya Debtors;

(q)   any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days),

(r)   to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption,

(s)   any net unrealized gain or loss (after any offset) resulting from currency translation gains or losses relating to currency remeasurements of Indebtedness (including any gain or loss resulting from obligations under any Hedging Obligation for currency exchange risk) and any foreign currency translation gains or losses, and

(t)   to the extent non-cash and deducted in calculating net income (or loss), any net pension, post-employment benefit or long-term disability costs, including interest cost, service cost, actuarial expected return on plan assets, amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of unrecognized net obligations (and loss or cost) existing at the date of initial application of FASB Standard 87, 106 and 112 (or their equivalents under the ASC), and any other items of a similar nature and any gain or loss attributable to mark-to-market adjustments in the valuation of

26

pension liabilities, including actuarial gain or loss on pension and post-retirement plans, curtailments and settlements and prior service cost adjustment.

"**Consolidated Secured Debt**" shall mean, as of any date of determination, Consolidated Total Debt at such date which either (i) is secured by a Lien on the Collateral (and other assets of the Borrower or any Restricted Subsidiary pledged to secure the Obligations pursuant to Section 10.2(i)) or (ii) constitutes Capitalized Lease Obligations or purchase money Indebtedness of the Borrower or any Restricted Subsidiary (and excluding, for the avoidance of doubt for both clauses (i) and (ii), any Qualified Securitization Financing, Permitted Receivables Financing, Hedging Obligations and Cash Management Obligations).

"**Consolidated Secured Net Leverage Ratio**" shall mean, as of any date of determination, the ratio of (a) Consolidated Secured Debt as of the most recent four fiscal quarter period for which financial statements described in Section 9.1(a) or (b) are available to (b) Consolidated EBITDA for such four fiscal quarter period.

"**Consolidated Total Assets**" shall mean, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption), after intercompany eliminations, on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries at such date (or, if such date of determination is a date prior to the first date on which such consolidated balance sheet has been (or is required to have been) delivered pursuant to Section 9.1, on the pro forma financial statements delivered pursuant to Section 6.10 (and, in the case of any determination relating to any Specified Transaction, on a Pro Forma Basis including any property or assets being acquired in connection therewith)).

"**Consolidated Total Debt**" shall mean, as of any date of determination, (a) (i) all Indebtedness of the types described in clauses (a) and (b) (solely to the extent such Indebtedness matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the sole option of the Borrower or any Restricted Subsidiary, to a date more than one year from the date of its creation), clause (d) (but, in the case of clause (d), only to the extent of any unreimbursed drawings under any letter of credit which are not cash collateralized or backstopped) and clause (f) of the definition thereof, in each case actually owing by the Borrower and the Restricted Subsidiaries on such date and to the extent appearing on the balance sheet of the Borrower determined on a consolidated basis in accordance with GAAP (*provided* that the amount of any Capitalized Lease Obligations or any such Indebtedness issued at a discount to its face value shall be determined in accordance with GAAP; *provided*, *further*, that the effects of push-down accounting shall be excluded) and (ii) purchase money Indebtedness (and excluding, for the avoidance of doubt, Qualified Securitization Financing, Permitted Receivables Financing, Hedging Obligations and Cash Management Obligations) *minus* (b) the aggregate amount of all Unrestricted Cash.

"**Consolidated Total Net Leverage Ratio**" shall mean, as of any date of determination, the ratio of (a) Consolidated Total Debt as of the most recent four fiscal quarter period for which financial statements described in Section 9.1(a) or (b) are available to (b) Consolidated EBITDA for such four fiscal quarter period.

27

"**Consolidated Working Capital**" shall mean, at any date, the excess of (i) all amounts (other than Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries on such date over (ii) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries on such date, but excluding, without duplication, (a) the current portion of any funded Indebtedness, (b) all Indebtedness consisting of revolving loans, swing line loans and letter of credit obligations (including such loan or letters of credit under the ABL Credit Agreement), in each case to the extent otherwise included therein, (c) the current portion of interest, (d) the current portion of current and deferred income taxes, (e) the current portion of any Capitalized Lease Obligations, (f) liabilities in respect of unpaid earnouts, and (g) the current portion of any other long-term liabilities, and in the case of both clauses (i) and (ii), excluding the effects of adjustments pursuant to GAAP resulting from the application of fresh start accounting or purchase accounting, as the case may be, in relation to the Transactions, any Permitted Change of Control or any consummated acquisition.

"**Contingent Obligation**" shall mean indemnification Obligations and other similar contingent Obligations for which no claim has been made in writing.

"**Contract Consideration**" shall have the meaning provided in the definition of the term "Excess Cash Flow".

"**Contractual Requirement**" shall have the meaning provided in Section 8.3.

"**Converted Restricted Subsidiary**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Converted Unrestricted Subsidiary**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Corrective Extension Amendment**" shall have the meaning provided in Section 2.15(a)(vi).

"**Credit Documents**" shall mean this Agreement, the Guarantee, the Security Documents, the Agent Fee Letter, any promissory notes issued by the Borrower hereunder, any Incremental Amendment, any Refinancing Amendment, any Extension Amendment and any other document jointly identified by the Borrower and the Administrative Agent (or the Required Lenders) as a "Credit Document", *provided* that, for the avoidance of doubt, Secured Cash Management Agreements and Secured Hedging Agreements shall not constitute Credit Documents.

"**Credit Facility**" shall mean any category of Commitments and/or Term Loans and other extensions of credit thereunder.

"**Credit Party**" shall mean each of Holdings, the Borrower and each of the Subsidiary Guarantors.

28

"**Cumulative Consolidated Net Income**" shall mean, for any period, Consolidated Net Income for such period, taken as a single accounting period.  Cumulative Consolidated Net Income may be a positive or negative amount.

"**Debt Incurrence Prepayment Event**" shall mean any issuance or incurrence by the Borrower or any of the Restricted Subsidiaries of any Indebtedness (other than as permitted to be issued or incurred under Section 10.1).

"**Declined Proceeds**" shall have the meaning provided in Section 5.2(f).

"**Default**" shall mean any event, act or condition that with notice or lapse of time hereunder, or both, would constitute an Event of Default.

"**Default Rate**" shall have the meaning provided in Section 2.8(b).

"**Defaulting Lender**" shall mean any Lender with respect to which a Lender Default is in effect.

"**Deferred Net Cash Proceeds**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Deferred Net Cash Proceeds Payment Date**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Designated Non-Cash Consideration**" shall mean the fair market value of non-cash consideration received by the Borrower or any Restricted Subsidiary in connection with a Disposition pursuant to Section 10.4(b) that is designated as Designated Non-Cash Consideration pursuant to a certificate of an Authorized Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash or Cash Equivalent within 180 days following the consummation of the applicable Disposition).  A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 10.4.

"**DIP Lenders**" shall mean the Lenders as defined in the Existing DIP Agreement.

"**DIP Lender Claimant**" shall mean a DIP Lender that is not a Lender as the result of the Administrative Agent not having received all of its Lender Claimant Onboard Documents.

"**DIP Term Loans**" shall mean the Term Loans as defined in the Existing DIP Agreement.

"**Disposed EBITDA**" shall mean, with respect to any Sold Entity or Business or any Converted Unrestricted Subsidiary for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity or Business or Converted Unrestricted Subsidiary,

29

as applicable, and its respective Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business or Converted Unrestricted Subsidiary, as the case may be.

"**Disposition**" or "**Dispose**" shall mean (i) the conveyance, sale, lease, assignment, transfer or other disposition of any of property, business or assets (including receivables and leasehold interests), whether owned on the Closing Date or hereafter acquired or (ii) the sale to any Person (other than to the Borrower or a Subsidiary Guarantor) any shares owned by it of any Subsidiary's Stock and Stock Equivalents.

"**Disqualified Institutions**" shall mean (a) those banks, financial institutions or other Persons separately identified in writing by the Borrower to the Administrative Agent on or prior to the Closing Date, or any Affiliates of such banks, financial institutions or other persons identified in writing by the Borrower to the Administrative Agent on or prior to the Closing Date, or that are readily identifiable as Affiliates on the basis of their name and (b) competitors identified in writing by the Borrower to the Administrative Agent from time to time (or Affiliates thereof identified in writing by the Borrower to the Administrative Agent or that are readily identifiable as Affiliates on the basis of their name) of the Borrower or any of its Subsidiaries (other than such Affiliate that is a bona fide debt fund or a fixed-income only investment vehicle that is engaged in the making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of business and whose managers have fiduciary duties to the third-party investors in such fund or investment vehicle independent from their duties owed to such competitor); *provided* that no such identification after the date of a relevant assignment shall apply retroactively to disqualify any Person that has previously acquired an assignment or participation of an interest in any of the Credit Facilities with respect to amounts previously acquired.  The Borrower shall provide the list of all Disqualified Institutions set forth in clauses (a) and (b) to the Administrative Agent on or prior to the Closing Date and may update such list from time to time by delivering such updated list to the Administrative Agent.  The Administrative Agent shall be permitted, upon request of any Lender, to make available the list of Disqualified Institutions to such inquiring Lender.

"**Disqualified Stock**" shall mean, with respect to any Person, any Stock or Stock Equivalents of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Stock or Stock Equivalents that is not Disqualified Stock), other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the prior repayment in full of the Term Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations) and the termination of all Commitments, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the prior repayment in full of the Term Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations) and the termination of all Commitments), in whole or in part, in each case prior to the date that is ninety-one (91) days after the Latest Maturity

30

Date as determined at the time of the issuance; *provided* that if such Stock or Stock Equivalents are issued to any plan for the benefit of employees of the Borrower or any of its Subsidiaries or by any such plan to such employees, such Stock or Stock Equivalents shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower (or any direct or indirect parent company thereof) or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; *provided*, *further*, that any Stock or Stock Equivalents held by any present or former employee, officer, director, manager or consultant, of the Borrower, any of its Subsidiaries or any of its direct or indirect parent companies or any other entity in which the Borrower or any Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower, in each case pursuant to any stockholders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement or otherwise in order to satisfy applicable statutory or regulatory obligations or as a result of the termination, death or disability of such employee, officer, director, manager or consultant shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any of its Subsidiaries.

"**Dollars**" and "**$**" shall mean dollars in lawful currency of the United States of America.

"**Domestic Subsidiary**" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"**EEA Financial Institution**" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Employee Benefit Plan**" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA), other than a Foreign Plan, that is maintained or contributed to by Holdings, Borrower or any Subsidiary (or, with respect to an employee benefit plan subject to Title IV of ERISA, any ERISA Affiliate).

"**Environmental Claims**" shall mean any and all actions, suits, proceedings, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, violation or potential responsibility or investigation (other than reports prepared by or on behalf of Holdings, the Borrower or any other Subsidiary of Holdings (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of Real Estate) or proceedings in each case relating in any way to any applicable

31

Environmental Law or any permit issued, or any approval given, under any applicable Environmental Law (hereinafter, "**Claims**"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief relating to the presence, release or threatened release into the environment of Hazardous Materials or arising from alleged injury or threat of injury to human health or safety (to the extent relating to human exposure to Hazardous Materials), or to the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"**Environmental Law**" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or, with respect to any post-Closing Date requirements of the Credit Documents, hereafter in effect, and in each case as amended, and any legally binding judicial or administrative interpretation thereof, including any legally binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or to human health or safety (to the extent relating to human exposure to Hazardous Materials), or Hazardous Materials.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.  Section references to ERISA are to ERISA as in effect on the Closing Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Borrower or any Subsidiary of the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (i) the failure of any Employee Benefit Plan to comply with any provisions of ERISA and/or the Code or with the terms of such Employee Benefit Plan; (ii) any Reportable Event; (iii) the existence with respect to any Employee Benefit Plan of a non-exempt Prohibited Transaction; (iv) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (v) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (vi) the occurrence of any event or condition which would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or the incurrence by any Credit Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (vii) the receipt by any Credit Party or any of its ERISA Affiliates from the PBGC or a plan administrator of any written notice to terminate any Pension Plan under Section 4042(a) of ERISA or to appoint a trustee to administer any Pension Plan under Section 4042(b)(1) of ERISA; (viii) the incurrence by any Credit Party or any of its

32

ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan (or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA) or Multiemployer Plan; (ix) the receipt by any Credit Party or any of its ERISA Affiliates of any notice concerning the imposition on it of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA), (x) a determination that any Pension Plan is or is expected to be in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); or (xi) any other event or condition with respect to a Pension Plan or Multiemployer Plan that could result in liability to the Borrower or any Subsidiary.

"**Erroneous Payment**" shall have the meaning provided in Section 12.15.

"**Erroneous Payment Subrogation Rights**" shall have the meaning provided in Section 12.15.

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" shall have the meaning provided in Section 11.

"**Excess Cash Flow**" shall mean, for any period, an amount (which amount shall not be less than zero) equal to the excess of:

(a)    the sum, without duplication, of:

(i)    the Consolidated Net Income for such period,

(ii)    an amount equal to the amount of all non-cash charges (including depreciation and amortization) to the extent deducted in arriving at such Consolidated Net Income, but excluding any such non-cash charges representing an accrual or reserve for potential cash items in any future period and excluding amortization of a prepaid cash item that was paid in a prior period,

(iii)    decreases in Consolidated Working Capital for such period (other than any such decreases arising from acquisitions or Dispositions by the Borrower and the Restricted Subsidiaries completed during such period or the application of purchase accounting),

(iv)    an amount equal to the aggregate net non-cash loss on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income, and

(v)    cash receipts in respect of Hedging Agreements during such Fiscal Year to the extent not otherwise included in such Consolidated Net Income; over

(b)    the sum, without duplication, of:

(i)       an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income (but excluding any non-cash credit to the extent representing the reversal of an accrual or reserve described in clause (a)(ii) above) and cash charges included in the definition of Consolidated Net Income (but excluding any cash charges described in clause (q) or (r) of the definition thereof),

(ii)       without duplication of amounts deducted pursuant to clause (xi) below in prior Fiscal Years, the amount of Capital Expenditures or acquisitions of intellectual property and Capitalized Software Expenditures accrued or made in cash during such period, except to the extent that such Capital Expenditures or acquisitions were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(iii)       the aggregate amount of all principal payments of Indebtedness of the Borrower and the Restricted Subsidiaries (including (A) the principal component of payments in respect of Capital Leases, (B) repayments made under Section 2.5(b) and (C) the amount of any mandatory prepayment of Term Loans due to an Asset Sale Prepayment Event to the extent required due to a Disposition that resulted in an increase to such Consolidated Net Income and not in excess of the amount of such increase, but excluding (X) all other prepayments or repurchases of Term Loans or Indebtedness secured on a *pari passu* basis with the Initial Term Loans, and (Y) all prepayments in respect of any revolving credit facility, except, in the case of clause (Y) only, to the extent there is an equivalent permanent reduction in commitments thereunder) made during such period, except to the extent financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(iv)       an amount equal to the aggregate net non-cash gain on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(v)       increases in Consolidated Working Capital for such period (other than any such increases arising from acquisitions or Dispositions by the Borrower and the Restricted Subsidiaries completed during such period or the application of purchase accounting),

(vi)       cash payments by the Borrower and the Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and the Restricted Subsidiaries (other than Indebtedness) to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income unless financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(vii)       without duplication of amounts deducted pursuant to clause (xi) below in prior Fiscal Years, the amount of Investments made pursuant to Section 10.5(h), (i), (v)(y), (w), (cc) and (ii) during such period unless such Investments were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

34

(viii)   the amount of Restricted Payments paid during such period pursuant to Sections 10.6(b), (d), (j), (l) and (o) during such period unless such Restricted Payments were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(ix)   the aggregate amount of expenditures actually made by the Borrower and the Restricted Subsidiaries during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period or are not deducted in calculating Consolidated Net Income unless such expenditures were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(x)   the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Borrower and the Restricted Subsidiaries during such period that are made in connection with any prepayment of Indebtedness to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income unless any such payments were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(xi)   without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate consideration required to be paid in cash by Holdings, the Borrower or any of the Restricted Subsidiaries pursuant to binding contracts (the "**Contract Consideration**") entered into prior to or during such period, relating to Permitted Acquisitions, Capital Expenditures, Investments (other than intercompany Investments) or acquisitions of intellectual property to be consummated or made, or planned to be made, during the period of four consecutive fiscal quarters of the Borrower following the end of such period; *provided* that, to the extent the aggregate amount actually utilized to finance such Permitted Acquisitions, Capital Expenditures, Investments or acquisitions of intellectual property during such period (other than any amount financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries) of four consecutive fiscal quarters is less than the Contract Consideration, the amount of such shortfall shall be added to the calculation of Excess Cash Flow at the end of such period of four consecutive fiscal quarters,

(xii)   the amount of cash taxes paid or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, and

(xiii)   cash expenditures in respect of Hedging Agreements during such Fiscal Year to the extent not deducted in arriving at such Consolidated Net Income.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, and rules and regulations promulgated thereunder.

"**Excluded Collateral**" shall mean (i) [reserved], (ii) any vehicles and other assets subject to certificates of title; (iii) letter-of-credit rights to the extent a security interest therein cannot be perfected by a UCC filing (other than supporting obligations); (iv) any property subject

to a Lien permitted under Section 10.2 securing a purchase money agreement, Capital Lease or similar arrangement permitted hereunder in each case after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or other Applicable Law, excluding the proceeds and receivables thereof (to the extent not otherwise constituting Excluded Collateral), to the extent, and for so long as, the creation of a security interest therein is prohibited thereby (or otherwise requires consent, *provided* that there shall be no obligation to seek such consent) or creates a right of termination or favor of a third party, in each case, excluding the proceeds and receivables thereof to the extent not otherwise constituting Excluded Collateral; (v) (x) all leasehold interests in Real Estate (and there shall not be any requirement to obtain any landlord or other third party waivers, estoppels, consents or collateral access letters in respect of such leasehold interests) and (y) any parcel of Real Estate located in the United States and the improvements thereto owned in fee by a Credit Party with a fair market value of $10,000,000 or less (at the time of acquisition) (but not any Collateral located thereon) or any parcel of Real Estate and the improvements thereto owned in fee by a Credit Party outside the United States; (vi) any "intent to use" trademark application filed and accepted in the United States Patent and Trademark Office unless and until an amendment to allege use or a statement of use has been filed and accepted by the United States Patent and Trademark Office to the extent, if any, that, and solely during the period, if any, in which the grant of security interest therein could impair the validity or enforceability of such "intent to use" trademark application under federal law; (vii) any charter, permit, franchise, authorization, lease, license or agreement, in each case, only to the extent and for so long as the grant of a security interest therein (or the assets subject thereto) by the applicable Credit Party (x) would violate invalidate such charter, permit, franchise, authorization, lease, license, or agreement or (y) would give any party (other than a Credit Party) to any such charter, permit, franchise, authorization, lease, license or agreement the right to terminate its obligations thereunder or (z) is permitted under such charter, permit, franchise, lease, license or agreement only with consent of the parties thereto (other than consent of a Credit Party) and such necessary consents to such grant of a security interest have not been obtained (it being understood and agreed that no Credit Party or Restricted Subsidiary has any obligation to obtain such consents) other than, in each case referred to in clauses (x) and (y) and (z), as would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction, in each case excluding the proceeds and receivables thereof which are not otherwise Excluded Collateral; (viii) any Commercial Tort Claim (as defined in the Security Agreement) for which no claim has been made or with a value of less than $10,000,000 for which a claim has been made; (ix) any Excluded Stock and Stock Equivalents; (x) any assets with respect to which, the Borrower and the Required Lenders reasonably determine, the cost or other consequences of granting a security interest or obtaining title insurance in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom; (xi) any assets with respect to which granting a security interest in such assets in favor of the Secured Parties under the Security Documents could reasonably be expected to result in a material adverse tax consequence as reasonably determined by the Borrower in good faith (and, in the case of Stock or Stock Equivalents of any Subsidiary, with prompt written notice to the Collateral Agent, which shall make such notice available to the Lenders in accordance with its customary practice, and not objected to by the Collateral Agent at the direction of the Required Lenders within five Business Days of the receipt of such notice by the Collateral Agent; provided that Borrower will not, and will not permit the Restricted Subsidiaries to create or incur any Lien on such Stock or Stock Equivalents to secure any Indebtedness for borrowed money); (xii) any

36

margin stock; (xiii) [reserved]; and (xiv) any assets with respect to which granting a security interest in such assets is prohibited by or would violate law, treaty, rule, or regulation or determination of an arbitrator or a court or other Governmental Authority or which would require obtaining the consent, approval, license or authorization of any Governmental Authority (unless such consent, approval, license or authorization has been received; *provided* that there shall be no obligation to obtain such consent) or create a right of termination in favor of any governmental or regulatory third party, in each case after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or other Applicable Law, excluding the proceeds and receivables thereof (to the extent not otherwise constituting Excluded Collateral); *provided* that with respect to clauses (iv), (vii) and (xiv), such property shall be Excluded Collateral only to the extent and for so long as such prohibition, violation, invalidation or consent right, as applicable, is in effect and in the case of any such agreement or consent, was not created in contemplation thereof or of the creation of a security interest therein.  Notwithstanding anything set forth herein, Excluded Collateral shall not include any assets owned by the Credit Parties that constitute collateral securing the ABL Loans.

"**Excluded Information**" shall have the meaning provided in Section 13.6.

"**Excluded Stock and Stock Equivalents**" shall mean (i) any Stock or Stock Equivalents with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the burden or cost of pledging such Stock or Stock Equivalents in favor of the Collateral Agent under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (ii) [reserved] and (B) any Stock or Stock Equivalents of (x) any Foreign Subsidiary that is a CFC or (y) any CFC Holding Company in each case not owned directly by a Credit Party, (iii) any Stock or Stock Equivalents to the extent the pledge thereof would violate any Applicable Law or any Contractual Requirement (including any legally effective requirement to obtain the consent or approval of, or a license from, any Governmental Authority or any other regulatory third party unless such consent, approval or license has been obtained (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary of the Borrower to obtain any such consent, approval or license)), (iv) any Stock or Stock Equivalents of each Subsidiary to the extent that a pledge thereof to secure the Obligations is prohibited by any applicable Organizational Document of such Subsidiary or requires third party consent (other than the consent of a Credit Party), unless consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary to obtain any such consent), in each case after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or other Applicable Law, excluding the proceeds and receivables thereof (to the extent not otherwise constituting Excluded Collateral), (v) Stock or Stock Equivalents of any non-Wholly Owned Subsidiary, (vi) any Stock or Stock Equivalents of any Subsidiary to the extent that the pledge of such Stock or Stock Equivalents could reasonably be expected to result in material adverse tax or accounting consequences to Holdings or any Subsidiary thereof as reasonably determined by the Borrower in good faith (and, in the case of Stock or Stock Equivalents of any Subsidiary, with prompt written notice to the Collateral Agent, which shall make such notice available to the Lenders in accordance with its customary practice, and not objected to by the Collateral Agent at the direction of the Required Lenders within five Business Days of the receipt of such notice by the Collateral Agent; provided that Borrower will not, and will not permit the Restricted Subsidiaries to create or incur any Lien on such Stock or Stock Equivalents to secure any Indebtedness for borrowed money),

37

(vii) any Stock or Stock Equivalents that are margin stock, (viii) any Stock or Stock Equivalents owned by a CFC, and (ix) any Stock and Stock Equivalents of any Unrestricted Subsidiary or of any Restricted Subsidiary that does not constitute a Material Subsidiary (other than (A) to the extent a perfected security interest therein can be obtained by filing a UCC-1 financing statement or (B) as otherwise agreed to by the Borrower in its sole discretion), any Person not constituting a Subsidiary, any Captive Insurance Subsidiary, any Broker-Dealer Subsidiary, any not-for-profit Subsidiary and any special purpose entity (including any Receivables Entity and any Securitization Subsidiary); *provided* that Excluded Stock and Stock Equivalents shall not include proceeds of the foregoing property to the extent otherwise constituting Collateral.

"**Excluded Subsidiary**" shall mean (a) each Domestic Subsidiary of the Borrower designated by the Borrower for the purpose of this clause (a) from time to time, for so long as any such Domestic Subsidiary does not constitute a Material Subsidiary as of the most recently ended Test Period; *provided* that if such Domestic Subsidiary would constitute a Material Subsidiary as of the end of such Test Period, the Borrower shall cause such Domestic Subsidiary to become a Guarantor pursuant to Section 9.11, (b) each Domestic Subsidiary that is not a Wholly Owned Subsidiary or otherwise constitutes a joint venture (for so long as such Subsidiary remains a non-Wholly Owned Restricted Subsidiary or joint venture), (c) any CFC, (d) each Domestic Subsidiary that is (i) prohibited by any applicable (x) Contractual Requirement, (y) Applicable Law (including without limitation as a result of applicable financial assistance, directors' duties or corporate benefit requirements) or (z) Organizational Document (in the case of clauses (x) and (z), in effect on the Closing Date or any date of acquisition of such Subsidiary (to the extent such prohibition was not entered into in contemplation of the Guarantee)) from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such restriction or any replacement or renewal thereof is in effect), or (ii) required to obtain consent, approval, license or authorization of a Governmental Authority for such guarantee or grant (unless such consent, approval, license or authorization has already been received); *provided* that there shall be no obligation to obtain such consent, (e) each Domestic Subsidiary that is a Subsidiary of a CFC, (f) any other Domestic Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the cost or other consequences (including any material adverse tax consequences) of guaranteeing the Obligations shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (g) each Unrestricted Subsidiary, (h) any Foreign Subsidiary, (i) any special purpose entity, including any Receivables Entity and any Securitization Subsidiary, (j) any Subsidiary to the extent that the guarantee of the Obligations by such Subsidiary could reasonably be expected to result in material adverse tax consequences (as determined by the Borrower in good faith), (k) any Captive Insurance Subsidiary, (l) any non-profit Subsidiary or (m) any Broker-Dealer Subsidiary; *provided* that Excluded Subsidiary shall not include any Domestic Subsidiary of the Borrower to the extent such Domestic Subsidiary guarantees the ABL Loans.

"**Excluded Swap Obligation**" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations

38

thereunder at the time the Guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"**Excluded Taxes**" shall mean, any of the following Taxes imposed on or with respect to any Agent or any Lender or required to be deducted or withheld from a payment to any Agent or Lender, (a) net income Taxes and franchise and excise Taxes (imposed in lieu of net income Taxes) and any branch profits Taxes imposed on such Agent or Lender imposed as a result of such Agent or Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in the jurisdiction imposing such Tax (or any political subdivision thereof), (b) any Taxes imposed on any Agent or any Lender as a result of any current or former connection between such Agent or Lender and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent or Lender having executed, delivered or performed its obligations or received a payment under, or having been a party to or having enforced, this Agreement or any other Credit Document), (c) any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of any Agent or Lender under the law in effect at the time such Agent or Lender becomes a party to this Agreement (or in the case of any Lender, designates a new lending office other than a new lending office designated at the request of the Borrower pursuant to Section 13.7(a)); *provided* that this clause (c) shall not apply to the extent that the indemnity payments or additional amounts any Lender would be entitled to receive (without regard to this clause (c)) do not exceed the indemnity payment or additional amounts that the person making the assignment, participation or transfer to such Lender (or designation of a new lending office by such Lender) would have been entitled to receive pursuant to Section 5.4 immediately before such assignment, participation, transfer or change in lending office in the absence of such assignment, participation, transfer or change in lending office (it being understood and agreed, for the avoidance of doubt, that any withholding Tax imposed on a Lender as a result of a Change in Law occurring after the time such Lender became a party to this Agreement (or designates a new lending office) shall not be an Excluded Tax under this clause (c)), (d) any Tax to the extent attributable to such Agent's or Lender's failure to comply with Sections 5.4(e), (f) (in the case of any Non-U.S. Lender) or Section 5.4(i) (in the case of a U.S. Lender) or Section 5.4(j) and (e) any Taxes imposed by FATCA.

"**Existing DIP Agreement**" shall have the meaning provided in the Recitals to this Agreement.

"**Existing Term Loan Class**" shall have the meaning provided in Section 2.15(a)(i).

"**Extended Term Loan Repayment Amount**" shall have the meaning provided in Section 2.5(c).

"**Extended Term Loans**" shall have the meaning provided in Section 2.15(a)(i).

"**Extending Lender**" shall have the meaning provided in Section 2.15(a)(iv).

"**Extension Amendment**" shall have the meaning provided in Section 2.15(a)(v).

39

"**Extension Election**" shall have the meaning provided in Section 2.15(a)(iv).

"**Extension Minimum Condition**" shall mean a condition to consummating any Extension Series that a minimum amount (to be determined and specified in the relevant Term Loan Extension Request, in the Borrower's sole discretion) of any or all applicable Classes be submitted for extension.

"**Extension Series**" shall mean all Extended Term Loans that are established pursuant to the same Extension Amendment (or any subsequent Extension Amendment to the extent such Extension Amendment expressly provides that the Extended Term Loans provided for therein are intended to be a part of any previously established Extension Series) and that provide for the same interest margins, extension fees and amortization schedule.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and intergovernmental agreement (together with any Applicable Law implementing such agreement) entered into in connection with any of the foregoing.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the *per annum* rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York; *provided* that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged on such day on such transactions as determined by the Administrative Agent.

"**Fees**" shall mean all amounts payable pursuant to, or referred to in, Section 4.1.

"**First Lien Claims**" shall mean "First Lien Claims" as defined in the Plan.

"**First Lien Intercreditor Agreement**" shall mean an intercreditor agreement substantially in the form attached hereto as Exhibit G or such as form as reasonably agreed between the Borrower, the Collateral Agent, and the Required Lenders.

"**Fiscal Year**" shall have the meaning provided in Section 9.10.

"**Fixed Charges**" shall mean, the sum of, without duplication:

(1)     Consolidated Interest Expense; *plus*

(2)     all cash dividends or cash distributions (other than return of capital) paid (excluding items eliminated in consolidation) on any series of preferred stock during such period; *plus*

40

(3)    all cash dividends or cash distributions (other than return of capital) paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during such period.

"**Floor**" shall mean a rate of interest equal to 1.00%.

"**Foreign Asset Sale**" shall have the meaning provided in Section 5.2(g).

"**Foreign Excess Cash Flow**" shall have the meaning provided in Section 5.2(g).

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Borrower or any of its Subsidiaries with respect to employees employed outside the United States.

"**Foreign Recovery Event**" shall have the meaning provided in Section 5.2(g).

"**Foreign Subsidiary**" shall mean each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Fund**" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**Funded Lender Claimant**" shall mean a Holder of First Lien Claims, or such Holder's designee that (i) is specified on (a) Item 6 (Registration Information) or Item 8 (Designee Information) of a properly completed Lender Subscription Form delivered to and accepted by KCC LLC or (b) Item 7 (Registration Information) or Item 9 (Designee Information) of a properly completed Noteholder Beneficial Owner Subscription Form delivered to and accepted by KCC LLC, (ii) has funded in cash in full such Holder's allocated portion of the principal amount of "new money" Initial Term Loans prior to the applicable funding deadline for such Holder, or such Holder's designee, in accordance with (and as may be extended in accordance with) the RO Backstop Agreement and the RO Procedures, as applicable and (iii) has not delivered all of such Holder's, or such Holder's designee's, Lender Claimant Onboard Documents to the Administrative Agent.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent in writing that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority

41

exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"**Granting Lender**" shall have the meaning provided in Section 13.6(f).

"**Guarantee**" shall mean the Guarantee made by each Guarantor in favor of the Administrative Agent for the benefit of the Secured Parties, substantially in the form of Exhibit C.

"**Guarantee Obligations**" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; *provided*, *however*, that the term "**Guarantee Obligations**" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Guarantors**" shall mean (a) Holdings, (b) each Domestic Subsidiary (other than an Excluded Subsidiary) that provides the Guarantee on the Closing Date or becomes a party to the Guarantee after the Closing Date pursuant to Section 9.11 or otherwise and (c) the Borrower (other than with respect to its own Obligations).

"**Hazardous Materials**" shall mean (a) any petroleum or petroleum products spilled or released into the environment, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, for which a release into the environment is prohibited, limited or regulated by any Environmental Law.

"**Hedge Bank**" shall mean any Person (other than Holdings, the Borrower or any other Subsidiary of the Borrower) that is (a) a party to any Hedging Agreement and, in each case, at the time it enters into such Hedging Agreement or on the Closing Date, is a Lender or an Affiliate of a Lender or (b) any other Person party to a Hedging Agreement that delivers an accession

42

agreement to the Security Agreement and that is specifically designated by the Borrower as a "Hedge Bank".

"**Hedging Agreements**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedging Obligations**" shall mean, with respect to any Person, the obligations of such Person under Hedging Agreements.

"**Holdco Convertible Notes Claims**" shall mean Holdco Convertible Notes Claims as defined in the Plan.

"**Holdco Convertible Notes Lender Claimant**" shall mean a holder of Holdco Convertible Notes Claims, who is a Settlement Group Releasing Party (as defined in the Plan), that is not a Lender as the result of the Administrative Agent not having received all of its Lender Claimant Onboard Documents.

"**Holder**" shall mean "Holder" as defined in the Plan.

"**Holdings**" shall mean, (a) Avaya Holdings or (b) any other partnership, limited partnership, corporation, limited liability company, or business trust or any successor thereto organized under the laws of the United States or any state thereof or the District of Columbia (the "**New Holdings**") that is a direct or indirect Wholly Owned Subsidiary of Avaya Holdings or that has merged, amalgamated or consolidated with Avaya Holdings (or, in either case, the previous New Holdings, as the case may be) (the "**Previous Holdings**"); provided that (i) such New Holdings owns directly or indirectly 100% of the Stock and Stock Equivalents of the Borrower, (ii) the New Holdings shall expressly assume all the obligations of the Previous Holdings under this Agreement and the other Credit Documents to which it is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Agents and the Required Lenders, (iii) such substitution and any supplements to the Credit Documents shall preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the Security Documents, and New Holdings shall have delivered to the Administrative Agent an officer's certificate to that effect, (iv) all assets of the Previous Holdings are contributed or otherwise transferred to such New Holdings, and (v) New Holdings shall have provided to each Agent all documentation and information reasonably requested by such Agent that is necessary and is required by United States

43

regulatory authorities to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; *provided, further*, that if the foregoing are satisfied, the Previous Holdings shall be automatically released from all of its obligations under the Credit Documents and any reference to "Holdings" in the Credit Documents shall be meant to refer to the "New Holdings".   Notwithstanding anything to the contrary contained in this Agreement, Holdings or any New Holdings may change its jurisdiction of organization or location for purposes of the UCC or its identity or type of organization or corporate structure, subject to compliance with the terms and provisions of the Security Documents.

"**Increased Amount Date**" shall have the meaning provided in Section 2.14(a).

"**Incremental Amendment**" shall have the meaning provided in Section 2.14(a).

"**Incremental Commitments**" shall have the meaning provided in Section 2.14(a).

"**Incremental Equivalent Debt**" shall have the meaning provided in Section 10.1(v)(ii).

"**Incremental Facilities**" shall mean the facilities represented by the Incremental Commitments and the Incremental Loans thereunder.

"**Incremental Loans**" shall have the meaning provided in Section 2.14(a).

"**Incremental Revolving Commitments**" shall have the meaning provided in Section 2.14(a).

"**Incremental Term Commitments**" shall have the meaning provided in Section 2.14(a).

"**Incremental Term Loan**" shall have the meaning provided in Section 2.14(c).

"**Incremental Term Loan Maturity Date**" shall mean, with respect to any tranche of Incremental Term Loans made pursuant to Section 2.14, the final maturity date thereof.

"**Incremental Term Loan Repayment Amount**" shall have the meaning provided in Section 2.5(c).

"**Indebtedness**" of any Person shall mean (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be included as a liability on the balance sheet of such Person, (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) all Indebtedness of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (f) the principal component of all Capitalized Lease Obligations of such Person, (g) the Swap Termination Value of Hedging Obligations of such Person, (h) without duplication, all Guarantee Obligations of such Person, (i) Disqualified Stock of such Person and (j) Receivables Indebtedness of such Person; *provided* that Indebtedness shall not include (i) trade and other

44

ordinary course payables and accrued expenses arising in the ordinary course of business, (ii) deferred or prepaid revenue, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) any Indebtedness defeased by such Person or by any Subsidiary of such Person, (v) contingent obligations incurred in the ordinary course of business and (vi) earnouts or similar obligation until earned, due and payable and not paid for a period of thirty (30) days.

For all purposes hereof, (a) the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venture, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness constitutes Indebtedness for borrowed money, obligations in respect of Capitalized Lease Obligations and obligations evidenced by bonds, debentures, notes, loan agreement or other similar instruments, (b) the Indebtedness of the Borrower and the Restricted Subsidiaries shall exclude all intercompany Indebtedness among the Borrower and its Subsidiaries having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (c) the amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid principal amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**indemnified liabilities**" shall have the meaning provided in Section 13.5.

"**Indemnified Taxes**" shall mean (a) all Taxes imposed on or with respect to any payment made on account of any obligation of any Credit Party under any Credit Document other than Excluded Taxes and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Independent Financial Advisor**" shall mean an accounting firm, appraisal firm, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is disinterested with respect to the applicable transaction.

"**Initial ABL Maturity Date**" shall mean the "Initial Maturity Date" under and as defined in the ABL Credit Agreement.

"**Initial Term Commitment**" shall mean (a) in the case of any Lender that is a Lender on the Closing Date, the amount set forth opposite such Lender's name on the "Aggregate Amount" column on Schedule 1.1(a) as such Lender's "Initial Term Commitment" and (b) in the case of any Lender that becomes a Lender after the Closing Date, the amount specified as such Lender's "Commitment" in the Assignment and Acceptance pursuant to which such Lender assumed a portion of the Initial Term Commitments, in each case as the same may be changed from time to time pursuant to the terms hereof.

"**Initial Term Loan Maturity Date**" shall mean August 1, 2028.

"**Initial Term Loan Repayment Amount**" shall have the meaning provided in Section 2.5(b).

45

"**Initial Term Loan Repayment Date**" shall have the meaning provided in Section 2.5(b).

"**Initial Term Loans**" shall mean the term loans made or deemed to have been made to Borrower pursuant to Section 2.1, which on the Closing Date shall be as set forth on the "Aggregate Amount" column on Schedule 1.01(a).  The aggregate outstanding principal amount of the Term Loans as of the Closing Date is $810,000,000.

"**Insolvent**" shall mean, with respect to any Multiemployer Plan, the condition that such Multiemployer Plan is insolvent within the meaning of Section 4245 of ERISA.

"**Intercompany Subordinated Note**" shall mean the Intercompany Note, dated as of the Closing Date, executed by Holdings, the Borrower and each Restricted Subsidiary, as supplemented from time to time.

"**Interest Period**" shall mean, with respect to any Term Loan, the interest period applicable thereto, as determined pursuant to Section 2.9.

"**Investment**" shall mean, for any Person:  (a) the acquisition (whether for cash, property, services or securities or otherwise) of Stock, Stock Equivalents, bonds, notes, debentures, partnership, limited liability company membership or other ownership interests or other securities of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale); (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such other Person) (including any partnership or joint venture); (c) the entering into of any Guarantee Obligation with respect to Indebtedness; or (d) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; *provided* that, in the event that any Investment is made by the Borrower or any Restricted Subsidiary in any Person through substantially concurrent interim transfers of any amount through one or more other Restricted Subsidiaries, then such other substantially concurrent interim transfers shall be disregarded for purposes of Section 10.5 (excluding, in the case of the Borrower and the Restricted Subsidiaries, intercompany loans, advances and Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business).  The amount of any Investment outstanding at any time shall be the original cost of such Investment reduced (except in the case of (x) Investments made using the Available Amount pursuant to Section 10.5(v)(y) and (y) Returns which increase the Available Amount pursuant to clauses (a)(iii), (iv), (v) and (vii) of the definition thereof) by any Returns of the Borrower or a Restricted Subsidiary in respect of such Investment (*provided* that, with respect to amounts received other than in the form of cash or Cash Equivalents, such amount shall be equal to the fair market value of such consideration).

"**Judgment Currency**" shall have the meaning provided in Section 13.20.

"**Junior Indebtedness**" shall have the meaning provided in Section 10.7(a).

46

"**Junior Lien Intercreditor Agreement**" shall mean the Junior Lien Intercreditor Agreement substantially in the form of Exhibit H or such other form as reasonably agreed between the Borrower, the Collateral Agent and the Required Lenders.

"**Latest Maturity Date**" shall mean, at any date of determination, the latest Maturity Date applicable to any Class of Term Loans or Commitments hereunder as of such date of determination.

"**LCT Election**" shall have the meaning provided in Section 1.11.

"**LCT Test Date**" shall have the meaning provided in Section 1.11.

"**Lender**" shall have the meaning provided in the preamble to this Agreement.

"**Lender Claimants**" shall mean, collectively, until acknowledged as a Lender in accordance with Section 2.18, (i) each DIP Lender Claimant, (ii) each Holdco Convertible Notes Lender Claimant, (iii) each Unknown First Lien Lender Claimant and (iv) each Funded Lender Claimant.  To the extent a Person is, as of any date of determination, a Lender but also a Lender Claimant that has not been declared a Lender in accordance with Section 2.18, such Person shall be deemed to be a Lender Claimant solely with respect to (a) in the case of an Unknown First Lien Lender Claimant, its ownership of First Lien Claims, (b) in the case of a DIP Lender Claimant, its DIP Term Loans, (c) in the case of a Holdco Convertible Notes Lender Claimant, its ownership of Holdco Convertible Notes Claims and (d) in the case of a Funded Lender Claimant, its allocated portion of the principal amount of "new money" Initial Term Loans which has been funded in cash in full prior to the applicable funding deadline for such Holder of First Lien Claims, or such Holder's designee, in accordance with (and as may be extended in accordance with) the RO Backstop Agreement and the RO Procedures, as applicable, and shall have all rights and obligations of a Lender hereunder with respect to any other Obligations due and owing by the Credit Parties to such Person for which it is a Lender.

"**Lender Claimant Obligation Amount**" has the meaning specified in Section 2.18(b)(ii).

"**Lender Claimant Onboard Documents**" has the meaning specified in Section 2.18(a).

"**Lender Claimant Reserve Account**" means the account to be established by the Administrative Agent or an escrow agent selected by the Borrower and reasonably satisfactory to the Administrative Agent pursuant to Section 2.18.

"**Lender Default**" shall mean (a) the refusal or failure (which has not been cured) of a Lender to make available its portion of any Borrowing that it is required to make hereunder, (b) a Lender having notified the Administrative Agent or the Borrower (provided that the Borrower shall have notified the Administrative Agent) in writing that it does not intend to comply with its funding obligations under this Agreement or has made a public statement to that effect with respect to its funding obligations under this Agreement, (c) a Lender has failed to confirm in a manner reasonably satisfactory to the Administrative Agent and the Borrower that it will comply with its funding obligations under this Agreement, (d) a Lender being deemed insolvent or becoming the

subject of a bankruptcy or insolvency proceeding or has admitted in writing that it is insolvent, *provided* that a Lender Default shall not be in effect with respect to a Lender solely by virtue of the ownership or acquisition of any Stock or Stock Equivalents in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (e) a Lender that has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action.

"**Lender Subscription Form**" shall mean "Lender Subscription Form" as defined in the RO Procedures.

"**Lien**" shall mean any mortgage, pledge, security interest, hypothecation, collateral assignment, lien (statutory or other) or similar encumbrance (including any conditional sale or other title retention agreement or any Capital Lease).

"**Limited Condition Transaction**" shall mean (i) any Permitted Acquisition or other similar Investment whose consummation is not conditioned on the availability of, or on obtaining, third party financing, (ii) any redemption, repurchase, defeasance, satisfaction and discharge or repayment of Indebtedness requiring irrevocable notice in advance of such redemption, repurchase, defeasance, satisfaction and discharge or repayment and (iii) a Permitted Change of Control.

"**Management Stockholders**" means the members of management of Avaya Holdings (or any Parent Entity) or its Subsidiaries who are holders of Stock and Stock Equivalents of Avaya Holdings or of any Parent Entity on the Closing Date.

"**Marketable Security**" means any common stock of a Person which is (or will, upon distribution thereof, be) listed on the NYSE, the American Stock Exchange, NASDAQ, any other national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended, or approved for quotation in any system of automated dissemination of quotations of securities prices in the United States or for which there is a recognized market maker or trading market provided any such security or any Designated Offshore Securities Market (as such term is defined in Rule 902(b) under the Securities Act) that (i) is not subject to a contractual lock up or similar agreement restricting transferability, (ii) may be distributed or resold without volume limitation or other restrictions on transfer under Rule 144 under the Securities Act of 1933, as amended (or any successor provision thereof), including without application of paragraphs (c), (e), (f) and (h) of such Rule 144, and (iii) is not subject to any other prohibitions or material restrictions on transfer under applicable securities laws.

"**Master Agreement**" shall have the meaning provided in the definition of the term "Hedging Agreement".

"**Material Adverse Effect**" shall mean a material adverse effect on (a) the business, assets, operations, properties or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, (b) the ability of the Credit Parties, taken as a whole, to perform their payment

48

obligations under the Credit Facilities, taken as a whole or (c) material rights or remedies (taken as a whole) of the Administrative Agent and the Lenders under the Credit Documents, excluding any matters (i) publicly disclosed prior to February 14, 2023, including in any first day pleadings or declarations, in each case in connection with the Case and the events and conditions related and/or leading up to the Case and the effects thereof and (ii) publicly disclosed prior to February 14, 2023 in the annual report of the Borrower and/or any subsequent quarterly or periodic report of the Borrower.

"**Material Subsidiary**" shall mean, at any date of determination, each Restricted Subsidiary (a) whose total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of the most recent Test Period for which Section 9.1 Financials have been delivered were equal to or greater than 5.0% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (b) whose total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period were equal to or greater than 5.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that at any date of determination, Restricted Subsidiaries that are not Material Subsidiaries shall not, in the aggregate, have (x) total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of such Test Period equal to or greater than 10.0% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (y) total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period equal to or greater than 10.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided,* however, if the Restricted Subsidiary does not meet the conditions in clauses (a) and (b) but meets the condition in clause (x) or (y), then such Restricted Subsidiary (i) shall still constitute a "Material Subsidiary" under Sections 8.1, 9.3, 9.5, 11.5 and 11.7 and (ii) shall not constitute a "Material Subsidiary" under any other section or subsection of this Agreement unless and until the Borrower, on or prior to the next date on which an officer's certificate is due to be delivered pursuant to Section 9.1(c) of this Agreement, designate in writing to the Administrative Agent such Restricted Subsidiary as a "Material Subsidiary".  It is agreed and understood that neither Receivables Entity nor Securitization Subsidiary shall be a Material Subsidiary and they shall be excluded from the Consolidated Total Assets and total revenue of the Borrower and its Restricted Subsidiaries.

"**Maturity Date**" shall mean (x) with respect to the Initial Term Loans, the Initial Term Loan Maturity Date and (y) with respect to any other Class of Term Loans, the Incremental Term Loan Maturity Date or other maturity date related to any Extension Series of Extended Term Loans or any maturity date related to any Refinancing Term Loan, as applicable.

"**Maximum Amount**" shall have the meaning provided in Section 2.8(e).

"**Maximum Incremental Facilities Amount**" shall mean (1) $450,000,000 *minus* all Incremental Facilities and Incremental Equivalent Debt incurred in reliance of this clause (1), *plus* (2) all voluntary prepayments or repurchases of the Term Loans, Incremental Equivalent Debt and any Refinancing Indebtedness in respect of any Incremental Equivalent Debt on or prior to such date (in each case except to the extent (i) funded with proceeds of long term Indebtedness or

49

(ii) the prepaid Indebtedness was originally incurred under clause (3) below (or any Refinancing Indebtedness thereof), and in the case of buybacks at discount to par, in the amount of the actual purchase price paid in cash) *minus* all Incremental Facilities and Incremental Equivalent Debt incurred in reliance of this clause (2) *plus* (3) an unlimited amount so long as, in the case of this clause (3) only, such amount at such time could be incurred without causing (x) in the case of Indebtedness secured by Liens on the Collateral that rank *pari passu* with the Liens on the Collateral securing the Initial Term Loans, the Consolidated First Lien Net Leverage Ratio (calculated on a Pro Forma Basis) to exceed (A) 3.30:1.00 or (B) if the proceeds are used to finance any Permitted Acquisition or similar Investments and the aggregate principal amount of such Indebtedness does not exceed the then-available Ratio Test Cap at such time, the higher of (I) 3.30:1.00 and (II) the Consolidated First Lien Net Leverage Ratio immediately prior to the incurrence of such Indebtedness, (y) in the case of Indebtedness secured by Liens on the Collateral that rank junior to the Liens on the Collateral securing the Initial Term Loans, the Consolidated Secured Net Leverage Ratio (calculated on a Pro Forma Basis) to exceed (A) 3.30:1.00 or (B) if the proceeds are used to finance any Permitted Acquisition or similar Investments and the aggregate principal amount of such Indebtedness does not exceed the then-available Ratio Test Cap at such time, the higher of (I) 3.30:1.00 and (II) the Consolidated Secured Net Leverage Ratio immediately prior to the incurrence of such Indebtedness, and (z) in the case of unsecured Indebtedness or Indebtedness secured only by Liens on assets that do not constitute Collateral, the Consolidated Total Net Leverage Ratio (calculated on a Pro Forma Basis) to exceed (A) 3.30:1.00 or (B) if the proceeds are used to finance any Permitted Acquisition or similar Investments and the aggregate principal amount of such Indebtedness does not exceed the then-available Ratio Test Cap at such time, the higher of (I) 3.30:1.00 and (II) the Consolidated Total Net Leverage Ratio immediately prior to the incurrence of such Indebtedness, in each case of clauses 3(x), 3(y) and 3(z) above, after giving effect to any acquisition consummated in connection therewith and all other appropriate Pro Forma Adjustments (including giving effect to the prepayment of Indebtedness in connection therewith), and assuming for purposes of this calculation that cash proceeds of any such Incremental Facility or Incremental Equivalent Debt then being incurred shall not be netted from Consolidated Total Debt Indebtedness for purposes of calculating such Consolidated First Lien Net Leverage Ratio, Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable; *provided*, *however*, that if amounts incurred under this clause (3) are incurred concurrently with the incurrence of Incremental Facilities in reliance on clause (1) and/or clause (2) above or any other Indebtedness incurred hereunder in reliance of a "dollar" basket, the Consolidated First Lien Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or the Consolidated Total Net Leverage Ratio shall be permitted to exceed the Consolidated First Lien Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable, set forth in clause (3) above to the extent of such amounts incurred in reliance on clause (1) and/or clause (2) or utilizing such other "dollar" basket solely for the purpose of determining whether such concurrently incurred amounts incurred under this clause (3) are permissible (it being understood that (A) if the Consolidated First Lien Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or the Consolidated Total Net Leverage Ratio, as applicable, incurrence test is met, then, at the election of the Borrower, any Incremental Facility or Incremental Equivalent Debt may be incurred under clause (3) above regardless of whether there is capacity under clause (1) and/or clause (2) above or utilizing such other "dollar" basket and (B) any portion of any Incremental Facility or Incremental Equivalent Debt incurred in reliance on clause (1) and/or clause (2) may be reclassified, as the Borrower may

50

elect from time to time, as incurred under clause (3) if the Borrower meets the applicable leverage ratio under clause (3) at such time on a Pro Forma Basis; *provided*, further, that any Incremental Facility or Incremental Equivalent Debt incurred in reliance on clauses (3)(x)(B)(II), (3)(y)(B)(II) and (3)(z)(B)(II) above may be reclassified, as the Borrower may elect from time to time, as incurred under clauses (3)(x)(B)(I), (3)(y)(B)(I) and (3)(z)(B)(I) above, respectively, if the Borrower meets the applicable leverage ratio at such time on a Pro Forma Basis).

"**Maximum Tender Condition**" shall have the meaning provided in Section 2.17(b).

"**Minimum Borrowing Amount**" shall mean (a) with respect to a Borrowing of SOFR Loans, $5,000,000 (or, if less, the entire remaining Commitments of any applicable Credit Facility at the time of such Borrowing), and (b) with respect to a Borrowing of ABR Loans, $1,000,000 (or, if less, the entire remaining Commitments of any applicable Credit Facility at the time of such Borrowing).

"**Minimum Tender Condition**" shall have the meaning provided in Section 2.17(b).

"**Minority Investment**" shall mean any Person (other than a Subsidiary) in which the Borrower or any Restricted Subsidiary owns Stock or Stock Equivalents, including any joint venture (regardless of form of legal entity).

"**MNPI**" shall mean, with respect to Avaya Holdings and its Subsidiaries, any information other than information that is publicly available or not material with respect to them or their respective securities for purposes of United States federal and state securities laws.

"**Monthly Booking Value**" means, with respect to a Subscription Contract, the total contract value divided by the term of the contract (in number of months).

"**Moody's**" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"**Mortgage**" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in respect of that Mortgaged Property, in a form to be mutually agreed with the Collateral Agent and the Required Lenders.

"**Mortgaged Property**" shall mean all Real Estate (i) set forth on Schedule 1.1(b) and (ii) with respect to which a Mortgage is required to be granted pursuant to Section 9.12.

"**Multiemployer Plan**" shall mean a plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA (i) to which any of the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate is then making or has an obligation to make contributions or (ii) with respect to which the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate could incur liability pursuant to Title IV of ERISA.

"**Narrative Report**" shall mean, with respect to the financial statements for which such narrative report is required, a management's discussion and analysis of the financial condition and results of operations of the Borrower and its consolidated Subsidiaries for the applicable period to which such financial statements relate.

"**Net Cash Proceeds**" shall mean,

(1) with respect to any Asset Sale Prepayment Event or any Recovery Prepayment Event, (a) the gross cash proceeds (including payments from time to time in respect of installment obligations, if applicable, but only as and when received) received by or on behalf of the Borrower or any Restricted Subsidiary in connection therewith, as the case may be, less (b) the sum of:

(i) the amount, if any, of all taxes (including in connection with any repatriation of funds) paid or estimated by the Borrower in good faith to be payable by the Borrower or any Restricted Subsidiary in connection with such Prepayment Event,

(ii) the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) associated with the assets that are the subject of such Prepayment Event and (y) retained by the Borrower or any Restricted Subsidiary (including any pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction); *provided* that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Prepayment Event occurring on the date of such reduction,

(iii) the amount of any Indebtedness (other than Indebtedness hereunder, the ABL Obligations and any other Indebtedness secured by a Lien that ranks *pari passu* with or is subordinated to the Liens securing the Obligations or the ABL Obligations) secured by a Lien on the assets that are the subject of such Prepayment Event, to the extent that the instrument creating or evidencing such Indebtedness requires that such Indebtedness be repaid upon consummation of such Prepayment Event,

(iv) the amount of any proceeds of such Prepayment Event that the Borrower or any Restricted Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period, has entered into an Acceptable Reinvestment Commitment prior to the last day of the Reinvestment Period to reinvest or, with respect to any Recovery Prepayment Event, provided an Acceptable Reinvestment Commitment or a Restoration Certification prior to the last day of the Reinvestment Period) in the business of the Borrower or any Restricted Subsidiary (subject to Section 9.15), including for the repair, restoration or replacement of an asset or assets subject to such Prepayment Event; *provided* that any portion of such proceeds that has not been so reinvested within such Reinvestment Period (with respect to such Prepayment Event, the "**Deferred Net Cash Proceeds**") shall, unless the Borrower or any Restricted Subsidiary has entered into an Acceptable Reinvestment Commitment or provided a Restoration Certification prior to the last day of such Reinvestment Period to reinvest such proceeds, (x) be deemed to be Net Cash Proceeds of such Prepayment Event

occurring on the last day of such Reinvestment Period or, if later, 180 days after the date the Borrower or such Restricted Subsidiary has entered into such Acceptable Reinvestment Commitment or provided such Restoration Certification, as applicable (such last day or 180th day, as applicable, the "**Deferred Net Cash Proceeds Payment Date**"), and (y) be applied to the repayment of Term Loans in accordance with Section 5.2(a)(i),

(v)    in the case of any Asset Sale Prepayment Event, any funded escrow established pursuant to the documents evidencing any such sale or Disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or Disposition; *provided* that the amount of any subsequent reduction of such escrow (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such a Prepayment Event occurring on the date of such reduction solely to the extent that the Borrower and/or any Restricted Subsidiaries receives cash in an amount equal to the amount of such reduction,

(vi)    in the case of any Asset Sale Prepayment Event or Recovery Prepayment Event by a non-Wholly Owned Restricted Subsidiary, the *pro rata* portion of the Net Cash Proceeds thereof (calculated without regard to this clause (vi)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a Wholly Owned Restricted Subsidiary as a result thereof, and

(vii)    reasonable and customary fees, commissions, expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums and recording charges, transfer taxes, deed or mortgage recording taxes and other customary expenses and brokerage, consultant and other customary fees), issuance costs, premiums, discounts and other costs paid by the Borrower or any Restricted Subsidiary, as applicable, in connection with such Prepayment Event, in each case only to the extent not already deducted in arriving at the amount referred to in clause (a) above; and

(2)    with respect to the incurrence or issuance of any Indebtedness or the issuance of any Stock or Stock Equivalent or capital contribution, the excess, if any, of (a) the sum of cash and Cash Equivalents received in connection with such incurrence or issuance over (b) reasonable and customary fees, commissions, expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums and recording charges, transfer taxes, deed or mortgage recording taxes and other customary expenses and brokerage, consultant and other customary fees), issuance costs, premiums, discounts and other costs paid by the Borrower or any Restricted Subsidiary in connection with such incurrence or issuance.

"**New Debt Incurrence Prepayment Event**" shall mean any issuance or incurrence by the Borrower or any Restricted Subsidiary of any Indebtedness permitted to be issued or incurred under Section 10.1(v)(i) and any Refinancing Term Loans.

"**New Holdings**" shall have the meaning provided in the definition of "Holdings".

"**New Project**" shall mean (x) each plant, facility, branch, office, business unit, data center, warehouse or distribution center which is either a new plant, facility, branch, office,

53

business unit, modernization of an existing plant, facility, branch, office, business unit, data center, warehouse or distribution center owned or operated by the Borrower or the Subsidiaries and (y) each creation (in one or a series of related transactions) of a business unit, marketplace, e-commerce platform, channel, product line, division, segment, class offering or service offering or each expansion (in one or a series of related transactions) of business into a new market or consumer base or through a new distribution method or channel, in each case, which is under development or otherwise in process.

"**New Refinancing Commitments**" shall have the meaning provided in Section 2.15(b).

"**Non-Consenting Lender**" shall have the meaning provided in Section 13.7(b).

"**Non-Defaulting Lender**" shall mean and include each Lender other than a Defaulting Lender.

"**Non-U.S. Lender**" shall mean any Lender that is not, for U.S. federal income tax purposes, (a) an individual who is a citizen or resident of the U.S., (b) a corporation, partnership or entity treated as a corporation or partnership created or organized in or under the laws of the U.S., or any political subdivision thereof, (c) an estate whose income is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the U.S. is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of such trust or a trust that has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

"**Noteholder Beneficial Owner Subscription Form**" shall mean "Noteholder Beneficial Owner Subscription Form" as defined in the RO Procedures.

"**Notice of Borrowing**" shall mean a written request of the Borrower in accordance with the terms of Section 2.3 and substantially in the form of Exhibit A or such other form as shall be approved by the Administrative Agent (acting reasonably).

"**Notice of Conversion or Continuation**" shall have the meaning provided in Section 2.6(a).

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Term Loan or under any Secured Cash Management Agreement or Secured Hedging Agreement, in each case, entered into with Holdings, the Borrower or any Restricted Subsidiary, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, premiums, and fees that accrue after the commencement by or against any Credit Party of any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest, premiums, and fees are allowed claims in such proceeding, in each case, other than Excluded Swap Obligations. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Credit Documents) (i) include the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees,

premiums, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document and (ii) exclude, notwithstanding any term or condition in this Agreement or any other Credit Documents, any Excluded Swap Obligations.

"**Organizational Documents**" shall mean, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and, if applicable, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" shall mean any and all present or future stamp, registration, documentary or other similar Taxes arising from any payment made or required to be made under this Agreement or any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document except any such Taxes that are any Taxes imposed on any Agent or any Lender as a result of any current or former connection between such Agent or Lender and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent or Lender having executed, delivered or performed its obligations or received a payment under, or having been a party to or having enforced, this Agreement or any other Credit Document) imposed with respect to an assignment (other than an assignment made pursuant to Section 13.7 or Section 2.12).

"**Overnight Rate**" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Parent Entity**" shall mean any direct or indirect parent of Avaya Holdings.

"**Participant**" shall have the meaning provided in Section 13.6(c)(i).

"**Participant Register**" shall have the meaning provided in Section 13.6(c)(iii).

"**Participating Receivables Grantor**" shall mean the Borrower or any Restricted Subsidiary that is or that becomes a participant or originator in a Permitted Receivables Financing.

"**Patriot Act**" shall have the meaning provided in Section 13.18.

"**Paul, Weiss**" means Paul, Weiss, Rifkind, Wharton & Garrison LLP.

"**Payment Recipient**" shall have the meaning provided in Section 12.15.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Pension Plan**" shall mean any employee pension benefit plan (as defined in Section 3(2) of ERISA, but excluding any Multiemployer Plan) which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by the Borrower, any Subsidiary or ERISA Affiliate or with respect to which the Borrower, any Subsidiary or any ERISA Affiliate could incur liability pursuant to Title IV of ERISA.

"**Perfection Certificate**" shall mean a perfection certificate of the Borrower in any form approved by the Required Lenders (acting reasonably).

"**Periodic Term SOFR Determination Day**" shall have the meaning specified in the definition of "Term SOFR".

"**Permitted Acquiror**" shall mean any Person or group whose acquisition of beneficial ownership constitutes a Permitted Change of Control.

"**Permitted Acquisition**" shall mean the acquisition, by merger or otherwise, by the Borrower or any Restricted Subsidiary of assets (including assets constituting a business unit, line of business or division) or Stock or Stock Equivalents, so long as (a) if such acquisition involves any Stock or Stock Equivalents, such acquisition shall result in the issuer of such Stock or Stock Equivalents and its Subsidiaries becoming a Restricted Subsidiary and a Subsidiary Guarantor, to the extent required by Section 9.11 or designated as an Unrestricted Subsidiary pursuant to the terms hereof, (b) such acquisition shall result in the Collateral Agent, for the benefit of the applicable Secured Parties, being granted a security interest in any Stock, Stock Equivalent or any assets so acquired, to the extent required by Section 9.11, Section 9.12 and/or the Security Agreement, (c) after giving effect to such acquisition, the Borrower and the Restricted Subsidiaries shall be in compliance with Section 9.15 and (d) no Specified Default shall have occurred and be continuing.

"**Permitted Change of Control**" shall mean any transaction or series of transactions that would otherwise constitute a Change of Control, so long as:

(a)     the Consolidated Secured Net Leverage Ratio after giving Pro Forma Effect thereto is not greater than 2.05 to 1.00; *provided* that, notwithstanding anything herein to the contrary, when calculating the Consolidated Secured Net Leverage Ratio for purposes of this definition, the Borrower shall be entitled at its option to make such calculations as it would if making calculations of baskets or ratios in connection with a Limited Condition Transaction;

(b)     the Borrower shall have obtained (or obtained a reaffirmation of the) public corporate credit rating and public corporate family rating of the Borrower and public ratings of the Term Loans hereunder, in each case (after giving effect to the Permitted Change of Control and all transactions related thereto) from (x) Moody's and (y) either S&P or Fitch, respectively, of at least B (outlook stable), B2 (outlook stable) and B (outlook stable), as applicable;

56

(c)     (i) at least fifteen (15) Business Days prior to the Permitted Change of Control Effective Date, the Borrower shall have delivered notice in writing to the Administrative Agent (for prompt further distribution to each Lender) of such Permitted Change of Control and of the identity of the Permitted Acquiror and (ii) not later than three (3) Business Days prior to the Permitted Change of Control Effective Date, the Permitted Acquiror and/or the Borrower, as applicable, shall have provided to each Agent (x) all documentation and information applicable to the Permitted Acquiror that shall have been reasonably requested by such Agent in writing at least ten (10) Business Days prior to the Permitted Change of Control Effective Date that is necessary and is required by United States regulatory authorities to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and (y) if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation after giving effect to such Permitted Change of Control, an updated Beneficial Ownership Certification of the Borrower; and

(d)     the Administrative Agent shall have a received an officer's certificate from the Borrower stating that the conditions described in clauses (a) through (c) above have been satisfied.

"**Permitted Change of Control Costs**" means all fees, costs and expenses incurred or payable by Holdings, any Parent Entity, the Borrower or any of its Restricted Subsidiaries in good faith in connection with a Permitted Change of Control.

"**Permitted Change of Control Effective Date**" shall mean the date of consummation of a Permitted Change of Control.

"**Permitted Debt Exchange**" shall have the meaning provided in Section 2.17(a).

"**Permitted Debt Exchange Instruments**" shall have the meaning provided in Section 2.17(a).

"**Permitted Debt Exchange Offer**" shall have the meaning provided in Section 2.17(a).

"**Permitted Encumbrances**" shall mean:

(a)     Liens for taxes, assessments or governmental charges or claims (including Liens imposed by the PBGC or similar Liens) not yet delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP or that are not required to be paid pursuant to Section 9.4;

(b)     Liens in respect of property or assets of the Borrower or any Restricted Subsidiary imposed by Applicable Law, such as carriers', landlords', construction contractors', warehousemen's and mechanics' Liens and other similar Liens, arising in the ordinary course of business, in respect of amounts not more than 60 days overdue and not being contested so long as such Liens arise in the ordinary

57

course of business and do not individually or in the aggregate have a Material Adverse Effect;

(c)     Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 11.9;

(d)     Liens incurred or deposits made in connection with workers' compensation, unemployment insurance, employee benefit and pension liability and other types of social security or similar legislation, or to secure the performance of tenders, statutory obligations, trade contracts (other than for payment of Indebtedness), leases, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, surety, performance and return-of-money bonds and other similar obligations, in each case incurred in the ordinary course of business or otherwise constituting Investments permitted by Section 10.5;

(e)     ground leases or subleases, licenses or sublicenses in respect of Real Estate on which facilities owned or leased by the Borrower or any of the Restricted Subsidiaries are located;

(f)     easements, rights-of-way, licenses, reservations, servitudes, permits, conditions, covenants, rights of others, restrictions (including zoning restrictions), royalty interests and leases, minor defects, exceptions or irregularities in title or survey, encroachments, protrusions and other similar charges or encumbrances (including those to secure health, safety and environmental obligations), which do not interfere in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(g)     with respect to any Mortgaged Property, any exception on the title policy issued and matters shown on the Survey delivered which do not in the aggregate materially adversely affect the value of said property or materially impair its use in the operation of the business of the Borrower or any of the Restricted Subsidiaries;

(h)     any interest or title of a lessor, sublessor, licensor, sublicensor or grantor of an easement or secured by a lessor's, sublessor's, licensor's, sublicensor's interest or grantor of an easement under any lease, sublease, license, sublicense or easement to be entered into by the Borrower or any Restricted Subsidiary as lessee, sublessee, licensee, grantee or sublicensee to the extent permitted or not prohibited by this Agreement;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole or constituting Disposition permitted under Section 10.4;

58

(k)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Borrower or any Restricted Subsidiary;

(l)     any zoning, land use, environmental or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any Real Estate that does not materially interfere with the ordinary conduct of the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(m)     any Lien arising by reason of deposits with or giving of any form of security to any Governmental Authority for any purpose at any time as required by Applicable Law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Borrower or any Restricted Subsidiary to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(n)     rights reserved to or vested in any Governmental Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of Applicable Law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(o)     Liens arising under any obligations or duties affecting any of the property, the Borrower or any Restricted Subsidiary to any Governmental Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(p)     rights reserved to or vested in any Governmental Authority to use, control or regulate any property of such Person, which do not materially impair the use of such property for the purposes for which it is held;

(q)     any obligations or duties, affecting the property of the Borrower or any Restricted Subsidiary, to any Governmental Authority with respect to any franchise, grant, license or permit;

(r)     a set-off or netting rights granted by the Borrower or any Restricted Subsidiary pursuant to any Hedging Agreements solely in respect of amounts owing under such agreements;

(s)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 10.5; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreement;

(t)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(u)     Liens on cash and Cash Equivalents that are earmarked to be used to satisfy or discharge Indebtedness; *provided* that (i) such cash and/or Cash Equivalents are

59

deposited into an account from which payment is to be made, directly or indirectly, to the Person or Persons holding the Indebtedness that is to be satisfied or discharged, (ii) such Liens extend solely to the account in which such cash and/or Cash Equivalents are deposited and are solely in favor of the Person or Persons holding the Indebtedness (or any agent or trustee for such Person or Persons) that is to be satisfied or discharged, and (iii) the satisfaction or discharge of such Indebtedness is expressly permitted hereunder;

(v)   with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by Applicable Laws;

(w)   Liens on Stock of an Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary;

(x)   Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) or attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, and (iii) in favor of banking or other financial institutions or other electronic payment service providers arising as a matter of law or customary contract encumbering deposits, including deposits in "pooled deposit" or "sweep" accounts (including the right of set-off) and which are within the general parameters customary in the banking or finance industry;

(y)   Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business permitted or not prohibited by this Agreement;

(z)   Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 10.5;

(aa)  any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Borrower or any Restricted Subsidiary;

(bb)  Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(cc)  Liens (i) on any cash earnest money deposits or cash advances made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted under this Agreement, (ii) on other cash

60

advances in favor of the seller of any property to be acquired in an Investment or other acquisition permitted hereunder to be applied against the purchase price for such Investment or other acquisition, (iii) consisting of an agreement to Dispose of any property pursuant to a Disposition permitted hereunder (or reasonably expected to be so permitted by the Borrower at the time such Lien was granted) and (iv) on cash advances in favor of the purchaser of any property to be disposed of in a Disposition permitted hereunder to secure indemnity, fees and other seller obligations;

(dd)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(ee)    Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods in the ordinary course of business or consistent with past practice;

(ff)    any restrictions on any Stock or Stock Equivalents or other joint venture interests of the Borrower or any Restricted Subsidiary providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such Stock or Stock Equivalents or interest of such Person, if a security interest or other Lien is created on such Stock or Stock Equivalents or interest as a result thereof and other similar Liens; and

(gg)    Liens securing Indebtedness or other obligations (i) of the Borrower or any Restricted Subsidiary in favor of a Credit Party and (ii) of any other Restricted Subsidiary that is not a Credit Party in favor of any other Restricted Subsidiary that is not a Credit Party.

"**Permitted Holders**" means, collectively, (i) the Management Stockholders (including any Management Stockholders holding Stock and Stock Equivalents through an equityholding vehicle), (ii) any Person who is acting solely as an underwriter in connection with a public or private offering of Stock and Stock Equivalents of any Parent Entity or Avaya Holdings, acting in such capacity, (iii) any Person, together with its Affiliates, holding more than 10% of the total Voting Stock of Avaya Holdings on the Closing Date and any of their respective Affiliates and any accounts, funds or partnerships managed, advised, sub-advised, sub-managed by or associated with any of the foregoing or any of their respective Affiliates, (iv) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing, any Permitted Plan or any Person or group that becomes a Permitted Holder specified in the last sentence of this definition are members and any member of such group; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, Persons referred to in subclauses (i) through (iii), collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of Holdings or any Parent Entity held by such group and (v) any Permitted Plan.  Any Person or

group whose acquisition of beneficial ownership constitutes a Permitted Change of Control will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"**Permitted Open Market Purchases**" shall have the meaning provided in Section 13.6(g).

"**Permitted Other Debt**" shall mean, collectively, Permitted Other Loans and Permitted Other Notes.

"**Permitted Other Loans**" shall mean senior secured or unsecured loans (which loans, if secured, may either be secured *pari passu* with the Obligations (without regard to control of remedies) or may be secured by a Lien ranking junior to the Lien securing the Obligations), "mezzanine" loans or subordinated loans, in either case issued by the Borrower or a Guarantor (unless permitted to be incurred by a non-Credit Party under Section 10.1(k)), (a) if such Permitted Other Loans are incurred (and for the avoidance of doubt, not "assumed"), the scheduled final maturity and Weighted Average Life to Maturity of which are no earlier than the Latest Maturity Date and Weighted Average Life to Maturity, respectively, of the Initial Term Loans or, in the case of any Permitted Other Loans that are issued or incurred in exchange for, or which modify, replace, refinance, refund, renew, restructure or extend any other Indebtedness permitted by Section 10.1, no earlier than the scheduled final maturity and Weighted Average Life to Maturity of such exchanged, modified, replaced, refinanced, refunded, renewed, restructured or extended Indebtedness; *provided* that the requirements of the foregoing clause (a) shall not apply to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with such requirements, (b) the covenants (excluding, for the avoidance of doubt, any pricing, fee, prepayment premiums, optional prepayment or redemption terms) and events of default of which, taken as a whole, are not materially more restrictive to the Borrower and the Restricted Subsidiaries than the terms of the Initial Term Loans unless (1) Lenders under the Initial Term Loans also receive the benefit of such more restrictive terms, (2) such terms reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) (it being understood that to the extent that any financial maintenance covenant is included for the benefit of any Permitted Other Loans, such financial maintenance covenant shall be added for the benefit of any Term Loans outstanding hereunder at the time of incurrence of such Permitted Other Loans (except for any financial maintenance covenants applicable only to periods after the Latest Maturity Date, as determined at the time of issuance or incurrence of such Permitted Other Loans)) or (3) any such provisions apply after the Latest Maturity Date as determined at the time of issuance or incurrence of such Permitted Other Loans, (c) unless permitted to be incurred by a non-Credit Party under Section 10.1(k), of which no Subsidiary of the Borrower (other than a Guarantor) is an obligor and (d) if secured, unless permitted to be incurred by a non-Credit Party under Section 10.1(k), are not secured by any assets other than all or any portion of the Collateral.

"**Permitted Other Notes**" shall mean senior secured or unsecured notes (which notes, if secured, may either be secured *pari passu* with the Obligations (without regard to control of remedies) or may be secured by a Lien ranking junior to the Lien securing the Obligations), mezzanine notes or subordinated notes, in either case issued by the Borrower or a Guarantor (unless permitted to be incurred by a non-Credit Party under Section 10.1(k)), (a) if such Permitted Other Notes are incurred (and for the avoidance of doubt, not "assumed"), the terms of which do

62

not provide for any scheduled repayment, mandatory redemption or sinking fund obligations (other than customary scheduled principal amortization payments, customary offers to repurchase upon a change of control, asset sale or casualty or condemnation event, customary acceleration rights after an event of default, and AHYDO Catch-Up Payments) prior to, at the time of incurrence, the Latest Maturity Date of the Initial Term Loans or, in the case of any Permitted Other Notes that are issued or incurred in exchange for, or which modify, replace, refinance, refund, renew or extend any other Indebtedness permitted by Section 10.1, prior to the scheduled final maturity date of such exchanged, modified, replaced, refinanced, refunded, renewed or extended Indebtedness (other than customary scheduled principal amortization payments, customary offers to repurchase upon a change of control, asset sale or casualty or condemnation event, customary acceleration rights after an event of default, and AHYDO Catch-Up Payments); *provided* that the requirements of the foregoing clause (a) shall not apply to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with such requirements, (b) the covenants (excluding, for the avoidance of doubt, any pricing, fee, prepayment premiums, optional prepayment or redemption terms) and events of default of which, taken as a whole, are not materially more restrictive to the Borrower and the Restricted Subsidiaries than the terms of the Initial Term Loans unless (1) Lenders under the Initial Term Loans also receive the benefit of such more restrictive terms, (2) such terms reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) (it being understood that to the extent that any financial maintenance covenant is included for the benefit of any Permitted Other Notes, such financial maintenance covenant shall be added for the benefit of any Term Loans outstanding hereunder at the time of incurrence of such Permitted Other Notes (except for any financial maintenance covenants applicable only to periods after the Latest Maturity Date, as determined at the time of issuance or incurrence of such Permitted Other Notes)) or (3) any such provisions apply after the Latest Maturity Date at the time of issuance or incurrence of such Permitted Other Notes, (c) unless permitted to be incurred by a non-Credit Party under Section 10.1(k), of which no Subsidiary of the Borrower (other than a Guarantor) is an obligor and (d) if secured, unless permitted to be incurred by a non-Credit Party under Section 10.1(k), are not secured by any assets other than all or any portion of the Collateral.

"**Permitted Plan**" means any employee benefits plan of Holdings or any of its Affiliates and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan.

"**Permitted Receivables Financing**" shall mean any of one or more receivables financing programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities and other customary forms of support, in each case made in connection with such facilities) to the Borrower and the Restricted Subsidiaries (other than a Receivables Entity) providing for the sale, conveyance, or contribution to capital of Receivables Facility Assets by Participating Receivables Grantors in transactions purporting to be sales of Receivables Facility Assets to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Entity that in turn funds such purchase by the direct or indirect sale, transfer, conveyance, pledge, or grant of participation or other interest in such Receivables Facility Assets to a Person that is not a Restricted Subsidiary.

63

"**Permitted Reorganization**" shall mean re-organizations and other activities related to tax planning and re-organization, excluding transactions described in Section 10.4(g), so long as, after giving effect thereto, the security interest of the Secured Parties in the Collateral or the value of the Guarantees, taken as a whole, is not materially impaired (as determined by the Borrower in good faith).

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"**Petition Date**" shall have the meaning provided in the Recitals to this Agreement.

"**Plan**" shall have the meaning provided in the Recitals to this Agreement.

"**Platform**" shall have the meaning provided in Section 13.17(c).

"**Post-Transaction Period**" shall mean, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the eighth full consecutive fiscal quarter immediately following the date on which such Specified Transaction is consummated.

"**Premium Trigger Events**" shall have the meaning provided in Section 4.1(a).

"**Prepayment Event**" shall mean any Asset Sale Prepayment Event, Recovery Prepayment Event, Debt Incurrence Prepayment Event or New Debt Incurrence Prepayment Event.

"**Prepayment Premium**" shall have the meaning provided in Section 4.1(a).

"**Previous Holdings**" shall have the definition provided in the definition of "Holdings".

"**Pro Forma Adjustment**" shall mean, for any Test Period that includes all or any part of a fiscal quarter included in any Post-Transaction Period, with respect to the Acquired EBITDA of the applicable Pro Forma Entity or the Consolidated EBITDA of the Borrower, the pro forma increase or decrease in such Acquired EBITDA or such Consolidated EBITDA (including as the result of any "run-rate" synergies, operating expense reductions and improvements and cost savings), as the case may be, projected by the Borrower in good faith as a result of (a) actions taken or with respect to which substantial steps have been taken or are expected to be taken, prior to or during such Post-Transaction Period for the purposes of realizing cost savings or (b) any additional costs incurred prior to or during such Post-Transaction Period, in each case in connection with the combination of the operations of such Pro Forma Entity with the operations of the Borrower and the Restricted Subsidiaries; *provided* that (A) at the election of the Borrower, such Pro Forma Adjustment shall not be required to be determined for any Pro Forma Entity to the extent the aggregate consideration paid in connection with such acquisition was less than $50,000,000 or the aggregate Pro Forma Adjustment would be less than $50,000,000 and (B) so long as such actions are taken, or to be taken, prior to or during such Post-Transaction Period or such costs are incurred prior to or during such Post-Transaction Period, as applicable, it may be assumed, for purposes of projecting such pro forma increase or decrease to such Acquired

EBITDA or such Consolidated EBITDA, as the case may be, that the applicable amount of such "run rate" synergies, operating expense reductions and improvements and cost savings and other adjustments will be realizable during the entirety of such Test Period, or the applicable amount of such additional "run rate" synergies, operating expense reductions and improvements and cost savings and other adjustments, as applicable, will be incurred during the entirety of such Test Period; *provided*, *further*, that any such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, shall be without duplication for "run rate" synergies, operating expense reductions and improvements and cost savings and other adjustments or additional costs already included in such Acquired EBITDA or such Consolidated EBITDA, as the case may be, for such Test Period.

"**Pro Forma Basis**" and "**Pro Forma Effect**" shall mean, with respect to compliance with any test or covenant hereunder, that (A) to the extent applicable, the Pro Forma Adjustment shall have been made and (B) all Specified Transactions and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable period of measurement in such test or covenant:  (a) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, (i) in the case of a Disposition of all or substantially all Stock in any Subsidiary of the Borrower or any division, product line, or facility used for operations of the Borrower or any Subsidiary of the Borrower, shall be excluded, and (ii) in the case of a Permitted Acquisition or Investment described in the definition of "Specified Transaction", shall be included, (b) any retirement or repayment of Indebtedness, and (c) any incurrence or assumption of Indebtedness by the Borrower or any Restricted Subsidiary in connection therewith (it being agreed that (x) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness as at the relevant date of determination, (y) interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by an Authorized Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP and (z) interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate as the Borrower or any applicable Restricted Subsidiary may designate); *provided* that, without limiting the application of the Pro Forma Adjustment pursuant to (A) above (but without duplication thereof), the foregoing pro forma adjustments may be applied to any such test or covenant solely to the extent that such adjustments are consistent with the definition of Consolidated EBITDA and give effect to events (including operating expense reductions) that are (i) (x) directly attributable to such transaction and (y) reasonably identifiable and factually supportable in the good faith judgment of the Borrower or (ii) otherwise consistent with the definition of Pro Forma Adjustment.

"**Pro Forma Entity**" shall have the meaning provided in the definition of the term "Acquired EBITDA".

"**Prohibited Transaction**" shall have the meaning assigned to such term in Section 406 of ERISA or Section 4975(c) of the Code.

"**Projections**" shall have the meaning provided in Section 9.1(g).

65

"**Public Lender**" shall have the meaning provided in Section 13.17(e).

"**Public Reporting Entity**" shall mean an entity that (i) complies with the reporting obligations under U.S. securities laws, (ii) is designated by the Borrower as a "Public Reporting Entity" and (iii) whose consolidated financial results include the financial results of the Borrower and its consolidated subsidiaries and customary reconciliations to eliminate the financial results of entities other than the Borrower and its consolidated subsidiaries.

"**Qualified Marketmaker**" shall mean a Person that (i) holds itself out to the market as standing ready in the ordinary course of its business to purchase debt of the Borrower from customers and sell debt of the Borrower to customers or enter into long and short positions in debt of the Borrower, in its capacity as a dealer or market maker in such debt, and (ii) is in fact regularly in the business of making a market in debt of or equity in issuers or borrowers.

"**Qualified Securitization Financing**" shall mean any Securitization Facility (and any guarantee of such Securitization Facility), that meets the following conditions: (i) the Borrower shall have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the Restricted Subsidiaries; (ii) all sales or contribution of Securitization Assets and related assets by the Borrower or any Restricted Subsidiary to the Securitization Subsidiary or any other Person are made at fair market value (as determined in good faith by the Borrower); (iii) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Borrower) and may include Standard Securitization Undertakings; and (iv) the obligations under such Securitization Facility are nonrecourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Borrower or any Restricted Subsidiary (other than a Securitization Subsidiary).

"**Ratio Test Cap**" shall mean (i) $100,000,000, *minus* (ii) the aggregate amount of all Indebtedness incurred in reliance on clauses (3)(x)(B)(II), (3)(y)(B)(II), and (3)(z)(B)(II) of the definition of "Maximum Incremental Facilities Amount", *minus* (iii) the aggregate amount of all Indebtedness incurred in reliance on Section 10.1(k)(i)(B)(2)(II), *minus* (iv) without duplication, the aggregate amount of all Refinancing Indebtedness incurred in respect of Indebtedness described in the foregoing clauses (ii) and (iii) (excluding any Refinancing Increased Amount with respect thereto).

"**Real Estate**" shall mean any interest in land, buildings and improvements owned, leased or otherwise held by any Credit Party, but excluding all operating fixtures and equipment.

"**Receivables Entity**" shall mean any Person formed solely for the purpose of (i) facilitating or entering into one or more Permitted Receivables Financings, and (ii) in each case, engaging in activities reasonably related or incidental thereto.

"**Receivables Facility Assets**" shall mean currently existing and hereafter arising or originated Accounts, Payment Intangibles and Chattel Paper (as each such term is defined in the UCC) owed or payable to any Participating Receivables Grantor, and to the extent related to or supporting any Accounts, Chattel Paper or Payment Intangibles, or constituting a receivable, all

66

General Intangibles (as each such term is defined in the UCC) and other forms of obligations and receivables owed or payable to any Participating Receivables Grantor, including the right to payment of any interest, finance charges, late payment fees or other charges with respect thereto (the foregoing, collectively, being "**receivables**"), all of such Participating Receivables Grantor's rights as an unpaid vendor (including rights in any goods the sale of which gave rise to any receivables), all security interests or liens and property subject to such security interests or liens from time to time purporting to secure payment of any receivables or other items described in this definition, all guarantees, letters of credit, security agreements, insurance and other agreements or arrangements from time to time supporting or securing payment of any receivables or other items described in this definition, all customer deposits with respect thereto, all rights under any contracts giving rise to or evidencing any receivables or other items described in this definition, and all documents, books, records and information (including computer programs, tapes, disks, data processing software and related property and rights) relating to any receivables or other items described in this definition or to any obligor with respect thereto and any other assets customarily transferred together with receivables in connection with a non-recourse accounts receivable factoring arrangement and which are sold, conveyed assigned or otherwise transferred or pledge in connection with a Permitted Receivables Financing, and all proceeds of the foregoing.

"**Receivables Indebtedness**" shall mean, at any time, with respect to any receivables, securitization or similar facility (including any Permitted Receivables Financing or any Qualified Securitization Financing but excluding any account receivable factoring facility entered into incurred in the ordinary course of business), the aggregate principal, or stated amount, of the "indebtedness", fractional undivided interests (which stated amount may be described as a "net investment" or similar term reflecting the amount invested in such undivided interest) or other securities incurred or issued pursuant to such receivables, securitization or similar facility, at such time, in each case outstanding at such time.

"**Recovery Event**" shall mean (a) any damage to, destruction of or other casualty or loss involving any property or asset or (b) any seizure, condemnation, confiscation or taking (or transfer under threat of condemnation) under the power of eminent domain of, or any requisition of title or use of or relating to, or any similar event in respect of, any property or asset.

"**Recovery Prepayment Event**" shall mean the receipt of Net Cash Proceeds with respect to any settlement or payment in connection with any Recovery Event in respect of any property or asset of the Borrower or any Restricted Subsidiary; *provided* that the term "Recovery Prepayment Event" shall not include any Asset Sale Prepayment Event.

"**Redemption Notice**" shall have the meaning provided in Section 10.7(a).

"**Refinanced Debt**" shall have the meaning provided in Section 2.15(b).

"**Refinancing Amendment**" shall have the meaning provided in Section 2.15(b)(vii).

"**Refinancing Commitments**" shall have the meaning provided in Section 2.15(b).

"**Refinancing Event**" shall have the meaning provided in Section 2.18(b)(ii).

67

"**Refinancing Facility**" shall mean any new Class of Term Loans or Commitments or increases to existing Classes of Term Loans or Commitments established pursuant to Section 2.15(b).

"**Refinancing Facility Closing Date**" shall have the meaning provided in Section 2.15(b)(iv).

"**Refinancing Increased Amount**" shall have the meaning provided in the definition of Refinancing Indebtedness.

"**Refinancing Indebtedness**" shall mean, with respect to any Person, any modification, refinancing, refunding, renewal, replacement, exchange or extension of any Indebtedness of such Person (including in respect of any previously incurred Refinancing Indebtedness); *provided* that (a) unless incurred by utilizing another basket under Section 10.1, the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, replaced, exchanged or extended except by an amount (the "**Refinancing Increased Amount**") equal to unpaid accrued interest and premium thereon (including tender premiums) plus other reasonable amounts paid, and fees and expenses (including upfront fees and original issue discount) reasonably incurred, in connection with such modification, refinancing, refunding, renewal, replacement, exchange or extension plus an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Refinancing Indebtedness in respect of Indebtedness permitted pursuant to Section 10.1(h) or (i) or with respect to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with the requirements in this clause (b), such modification, refinancing, refunding, renewal, replacement, exchange or extension has a scheduled final maturity date equal to or later than the scheduled final maturity date of, and, with respect to term loans or notes, has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended (except by virtue of amortization or prepayment of such Indebtedness prior to the time of incurrence of such Refinancing Indebtedness), (c) with respect to a Refinancing Indebtedness in respect of Junior Indebtedness, (i) at the time thereof, no Event of Default shall have occurred and be continuing, (ii) if such Junior Indebtedness is subordinated to the Obligations in right of payment, the Refinancing Indebtedness is subordinated to the Obligations and the applicable Guarantee at least to the same extent as (and on terms that are at least as favorable to the Secured Parties as those contained in) such Junior Indebtedness so refinanced, (iii) if such Junior Indebtedness is unsecured, the Refinancing Indebtedness is unsecured, (iv) if such Indebtedness is subordinated to the Obligations with respect to lien priority, the Refinancing Indebtedness is subordinated to the Obligations with respect to lien priority and (v) unless incurred by utilizing another basket under Section 10.1, such modification, refinancing, refunding, renewal, replacement, exchange or extension is incurred by the Persons who are the obligors of the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended, (d) if the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended was subject to any intercreditor agreement (including any Applicable Intercreditor Agreement), to the extent the Refinancing Indebtedness is secured by any Collateral, the holders thereof (or their representative on their behalf) shall become party to each Applicable Intercreditor Agreement, (e) in the case of any Refinancing Indebtedness in respect of the ABL Credit Agreement, Liens on

68

any Collateral securing such Refinancing Indebtedness (i) that are Term Priority Collateral shall rank junior in priority to the Liens on the Term Priority Collateral securing the Obligations and (ii) are subject to the ABL Intercreditor Agreement (or another intercreditor agreement containing terms that are at least as favorable to the Secured Parties as those contained in the ABL Intercreditor Agreement) and (f) in the case of a Refinancing Indebtedness of any Indebtedness permitted pursuant to Section 10.1(c), (k), (v) or (w), such Indebtedness meets the requirements of the definition of Permitted Other Loans or Permitted Other Notes, as applicable.

"**Refinancing Term Lender**" shall have the meaning provided in Section 2.15(b)(iii).

"**Refinancing Term Loan**" shall have the meaning provided in Section 2.15(b)(ii).

"**Refinancing Term Loan Repayment Amount**" shall have the meaning provided in Section 2.5(b).

"**Refinancing Term Loan Request**" shall have the meaning provided in Section 2.15(b)(i).

"**Register**" shall have the meaning provided in Section 13.6(b)(iii).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Reinvestment Period**" shall mean 15 months following the date of receipt of Net Cash Proceeds of an Asset Sale Prepayment Event or Recovery Prepayment Event.

"**Rejection Notice**" shall have the meaning provided in Section 5.2(f).

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates (or, for purposes of clauses (A) and (B) of the last proviso of Section 13.5 and the penultimate paragraph of Section 13.5, such Person's controlled Affiliates) and the partners, managers, members, directors, officers, employees, agents (including sub-agents and co-agents), representatives, trustees, attorneys, attorneys-in-fact, and advisors of such Person and of such Person's Affiliates, and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"**Repayment Amount**" shall mean an Initial Term Loan Repayment Amount, an Extended Term Loan Repayment Amount with respect to any Extension Series, an Incremental Term Loan Repayment Amount and a Refinancing Term Loan Repayment Amount scheduled to be repaid on any date.

"**Reportable Event**" shall mean an event described in Section 4043 of ERISA and the regulations thereunder, other than any event as to which the thirty day notice period has been waived.

"**Required Lenders**" shall mean, at any date, Non-Defaulting Lenders having or holding a majority of the sum of (a) the outstanding principal amount of the Term Loans in the aggregate at such date and (b) the outstanding amount of the unfunded Commitments in the aggregate at such date; *provided* that any Commitments or Term Loans held or deemed held by any Lender Claimant in their capacity as Lender Claimant shall be excluded for purposes of making a determination of Required Lenders; *provided* further that, at any time there are two or more Non-Defaulting Lenders who are not Affiliates of one another, Required Lenders shall require at least two Non-Defaulting Lenders who are not Affiliates of one another.

"**Resolution Authority**" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority

"**Restoration Certification**" shall mean, with respect to any Recovery Prepayment Event, a certification made by an Authorized Officer of the Borrower or any Restricted Subsidiary, as applicable, to the Administrative Agent prior to the end of the Reinvestment Period certifying that (a) the Borrower or such Restricted Subsidiary intends to use the proceeds received in connection with such Recovery Prepayment Event (x) to repair, restore, refurbish or replace the property or assets in respect of which such Recovery Prepayment Event occurred or (y) or to invest in assets used or useful in a Similar Business, (b) the approximate costs of completion of such repair, restoration, refurbishment or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) fifteen months after the date on which cash proceeds with respect to such Recovery Prepayment Event were received and (y) 180 days after delivery of such Restoration Certification.

"**Restricted Foreign Subsidiary**" shall mean a Foreign Subsidiary that is a Restricted Subsidiary.

"**Restricted Payment**" shall mean, with respect to the Borrower or any Restricted Subsidiary, any dividend or return any capital to its stockholders or any other distribution, payment or delivery of property or cash to its stockholders on account of such Stock and Stock Equivalents, or redemption, retirement, purchase or other acquisition, directly or indirectly, for consideration, any shares of any class of its Stock or Stock Equivalents or set aside any funds for any of the foregoing purposes, other than dividends payable solely in its Stock or Stock Equivalents (other than Disqualified Stock).

"**Restricted Subsidiary**" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**Restructuring Support Agreement**" shall mean RSA as defined in the Plan.

"**Retained Declined Proceeds**" shall have the meaning provided in Section 5.2(f).

70

"**Returns**" shall mean, with respect to any Investment, any dividend, distribution, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment.

"**Rights Offering**" shall mean "Rights Offering" as defined in the Plan.

"**RO Backstop Agreement**" shall mean "RO Backstop Agreement" as defined in the Plan.

"**RO Backstop Commitment**" shall mean "RO Backstop Commitment" as defined in the Plan.

"**RO Procedures**" shall mean "RO Procedures" as defined in the Plan.

"**S&P**" shall mean Standard & Poor's Financial Services LLC or any successor by merger or consolidation to its business.

"**Sanctions**" shall have the meaning provided in Section 8.19.

"**Sanctions Laws**" shall have the meaning provided in Section 8.19.

"**SEC**" shall mean the Securities and Exchange Commission or any successor thereto.

"**Section 9.1 Financials**" shall mean the financial statements delivered, or required to be delivered, pursuant to Section 9.1(a) or (b), together with the accompanying officer's certificate delivered, or required to be delivered, pursuant to Section 9.1(c).

"**Section 2.15(a) Additional Amendment**" shall have the meaning provided in Section 2.15(a)(iii).

"**Secured Cash Management Agreement**" shall mean any Cash Management Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Cash Management Bank.

"**Secured Hedging Agreement**" shall mean any Hedging Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank.

"**Secured Parties**" shall mean the Administrative Agent, the Collateral Agent, each Lender, each Hedge Bank, each Cash Management Bank and each sub-agent pursuant to Section 12 appointed by the Administrative Agent with respect to matters relating to the Credit Facilities or appointed by the Collateral Agent with respect to matters relating to any Security Document.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securitization Asset**" shall mean (a) any accounts receivable, royalty or other revenue streams and other rights to payment or related assets and the proceeds thereof, in each

71

case, subject to a Securitization Facility and (b) all collateral securing such receivable or asset, all contracts and contract rights, guaranties or other obligations in respect of such receivable or asset, lockbox accounts and records with respect to such account or asset and any other assets customarily transferred (or in respect of which security interests are customarily granted), together with accounts or assets in a securitization financing and which in the case of clause (a) and (b) above are sold, conveyed, assigned or otherwise transferred or pledged in connection with a Qualified Securitization Financing.

"**Securitization Facility**" shall mean any transaction or series of securitization financings that may be entered into by the Borrower or any Restricted Subsidiary pursuant to which the Borrower or any such Restricted Subsidiary may sell, convey or otherwise transfer, or may grant a security interest in, Securitization Assets to either (a) a Person that is not the Borrower or a Restricted Subsidiary or (b) a Securitization Subsidiary that in turn sells such Securitization Assets to a Person that is not the Borrower or a Restricted Subsidiary, or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries.

"**Securitization Repurchase Obligation**" shall mean any obligation of a seller (or any guaranty of such obligation) of (i) Receivables Facility Assets under a Permitted Receivables Financing to repurchase Receivables Facility Assets or (ii) Securitization Assets in a Qualified Securitization Financing to repurchase Securitization Assets, in either case, arising as a result of a breach of a representation, warranty or covenant or otherwise, including, without limitation, as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Securitization Subsidiary**" shall mean any Subsidiary of the Borrower in each case formed for the purpose of, and that solely engages in, one or more Qualified Securitization Financings and other activities reasonably related thereto or another Person formed for the purposes of engaging in a Qualified Securitization Financing in which the Borrower or any Restricted Subsidiary makes an Investment and to which the Borrower or such Restricted Subsidiary transfers Securitization Assets and related assets.

"**Security Agreement**" shall mean the Term Loan Security Agreement, dated as of the Closing Date, in substantially the form attached hereto as Exhibit D (as the same may be amended, restated, amended and restated, supplemented or otherwise modified or replaced from time to time), entered into by the Borrower, the other grantors party thereto and the Collateral Agent for the benefit of the Secured Parties.

"**Security Documents**" shall mean, collectively, (a) the Security Agreement, (b) the Mortgages, (c) all Applicable Intercreditor Agreements and (d) each intellectual property security agreement and each other security agreement or other instrument or document executed and delivered pursuant to Section 9.11 or 9.12 or pursuant to any other such Security Documents.

"**Series**" shall have the meaning provided in Section 2.14(a).

"**Similar Business**" shall mean any business conducted or proposed to be conducted by the Borrower and the Restricted Subsidiaries, taken as a whole, on the Closing Date

72

or any other business activities which are reasonable extensions thereof or otherwise similar, incidental, corollary, complementary, synergistic, reasonably related, or ancillary to any of the foregoing (including non-core incidental businesses acquired in connection with any Permitted Acquisition or permitted Investment), in each case as determined by the Borrower in good faith.

"**SOFR**" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Borrowing**" shall mean, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"**SOFR Loan**" shall mean a Term Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c)(x) of the definition of "ABR".

"**Sold Entity or Business**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Solvent**" shall mean, with respect to any Person, that as of the Closing Date, (i) the present fair saleable value of the property (on a going concern basis) of such Person is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business, (ii) such Person is not engaged in, and are not about to engage in, business contemplated as of the date hereof for which they have unreasonably small capital and (iii) such Person is able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business, and (iv) the fair value of the assets (on a going concern basis) of such Person exceeds, their debts and liabilities, subordinated, contingent or otherwise. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Specified Default**" shall mean any Event of Default under Sections 11.1 or 11.5; provided that for purposes of the definition of Permitted Acquisitions, Section 2.14(a), Section 12.9, Section 13.6(b)(i) and Section 13.6(b)(ii), any such Event of Default under Section 11.5 shall be limited to an Event of Default solely with respect to the Borrower.

"**Specified Representations**" shall mean the representations and warranties made by the Borrower and the Guarantors, set forth in (i) Section 8.1(a) (solely with respect to valid existence), (ii) Section 8.2, (iii) Section 8.3(c) (solely with respect to the Organizational Documents of any Credit Party), (iv) Section 8.5, (v) Section 8.7, (vi) Section 8.16 (which shall be satisfied by the delivery of a solvency certificate substantially in a form reasonably satisfactory to the Administrative Agent and the Required Lenders), (vii) Section 8.17, and (viii) the last sentence of Section 8.19.

"**Specified Transaction**" shall mean, with respect to any period, any Investment, any Permitted Change of Control, any Disposition of assets, incurrence or repayment of Indebtedness, Restricted Payment, Subsidiary designation, the incurrence of any Incremental Facilities or other event that by the terms of this Agreement requires any test or covenant to be calculated on a "Pro Forma Basis".

"**SPV**" shall have the meaning provided in Section 13.6(f).

"**Standard Securitization Undertakings**" shall mean representations, warranties, covenants and indemnities entered into by the Borrower or any Restricted Subsidiary which the Borrower has determined in good faith to be customary in a Securitization Facility, including, without limitation, those relating to the servicing of the assets of a Securitization Subsidiary, it being understood that any Securitization Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"**Stated Maturity**" shall mean, with respect to any installment of principal on any series of Indebtedness, the date on which such payment of principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for payment thereof.

"**Stock**" shall mean shares of capital stock or shares in the capital, as the case may be (whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting, *provided* that any instrument evidencing Indebtedness convertible or exchangeable for Stock shall not be deemed to be Stock unless and until such instrument is so converted or exchanged; *provided*, *further* that, solely with respect to any CFC or CFC Holding Company, Stock shall also include any instrument or security treated as stock for U.S. federal income tax purposes.

"**Stock Equivalents**" shall mean all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable, *provided* that any instrument evidencing Indebtedness convertible or exchangeable for Stock Equivalents shall not be deemed to be Stock Equivalents unless and until such instrument is so converted or exchanged; *provided*, *further* that, solely with respect to any CFC or CFC Holding Company, Stock Equivalent shall also include any instrument or security treated as stock equivalent for U.S. federal income tax purposes.

"**Subscription Contract**" means each customer subscription contract entered into by the Borrower and Subsidiaries and reported within the Borrower's subscription product and support profit centers.

"**Subscription Contract ARR**" means, with respect to each Subscription Contract, an amount equal to (i) the Monthly Booking Value thereof *times* (ii) twelve months.

"**Subsequent Transaction**" shall have the meaning provided in Section 1.11.

74

"**Subsidiary**" of any Person shall mean and include (a) any corporation more than 50% of whose Stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, unlimited company, partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% voting equity interest at the time or is a controlling general partner.  Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"**Subsidiary Guarantor**" shall mean each Guarantor that is a Subsidiary of the Borrower.

"**Successor Borrower**" shall have the meaning provided in Section 10.3(a).

"**Super-Majority Lenders**" shall mean, at any date, Non-Defaulting Lenders having or holding more than 75% of the sum of (a) the outstanding principal amount of the Term Loans in the aggregate at such date and (b) the outstanding amount of the unfunded Commitments in the aggregate at such date; *provided* that any Commitments or Term Loans held or deemed held by any Lender Claimant in their capacity as Lender Claimant shall be excluded for purposes of making a determination of Super-Majority Lenders; *provided* further that, at any time there are two or more Non-Defaulting Lenders who are not Affiliates of one another, Super-Majority Lenders shall require at least two Non-Defaulting Lenders who are not Affiliates of one another.

"**Survey**" shall mean a survey of any Mortgaged Property (and all improvements thereon), including a survey based on aerial photography that is (a) (i) prepared by a licensed surveyor or engineer, (ii) certified by the surveyor (in a manner reasonable in light of the size, type and location of the Real Estate covered thereby) to the Administrative Agent and the Collateral Agent and (iii) sufficient, either alone or in connection with a survey (or "no change") affidavit in form and substance customary in the applicable jurisdiction, for the applicable title company to remove (to the extent permitted by Applicable Law) or amend all standard survey exceptions from the title insurance policy (or commitment) relating to such Mortgaged Property and issue such endorsements or other survey coverage, to the extent available in the applicable jurisdiction, as the Collateral Agent or the Required Lenders may reasonably request or (b) otherwise reasonably acceptable to the Collateral Agent and the Required Lenders, taking into account the size, type and location of the Real Estate covered thereby.

"**Swap Obligation**" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the

amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"**Tax Distribution**" shall have the meaning provided in Section 10.6(d)(i).

"**Term Loan Extension Request**" shall have the meaning provided in Section 2.15(a)(i).

"**Term Loan Increase**" shall have the meaning provided in Section 2.14(a).

"**Term Loans**" shall mean the Initial Term Loans, any Incremental Term Loan, any Refinancing Term Loans or any Extended Term Loans, as applicable.

"**Term Priority Collateral**" shall have the meaning under and as defined in the ABL Intercreditor Agreement.

"**Term SOFR**" shall mean

(a)     for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; *provided*, *however*, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**ABR Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; *provided*, *however*, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark

76

Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"**Term SOFR Adjustment**" shall mean a percentage equal to 0% per annum.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" shall mean the forward-looking term rate based on SOFR.

"**Test Period**" shall mean, for any determination under this Agreement, the four consecutive fiscal quarters of the Borrower then last ended and for which Section 9.1 Financials have been or were required to have been delivered (or, for purposes of any calculation of a financial ratio under this Agreement, for which the financial statements described in Section 9.1(a) or (b) are otherwise available).

"**Transaction Expenses**" shall mean any fees, costs, liabilities or expenses incurred or paid by Avaya Holdings, the Borrower or any of its respective Subsidiaries in connection with the Transactions, this Agreement and the other Credit Documents and the transactions contemplated hereby and thereby including in respect of the commitments, negotiation, documentation and closing (and post-closing actions in connection with the Collateral) of the Credit Facilities.

"**Transactions**" shall mean, collectively, the (i) consummation of the Plan, (ii) the consummation of the transactions contemplated in the Restructuring Support Agreement, (iii) the execution of, and funding (or deemed funding) under, the Credit Documents and the ABL Credit Documents, (iv) the other transactions contemplated by the Plan, and (v) the payment of fees, costs, liabilities and expenses in connection with each of the foregoing and the consummation of any other transaction connected with the foregoing.

"**Transferee**" shall have the meaning provided in Section 13.6(e).

"**Type**" shall mean, as to any Term Loan, its nature as an ABR Loan or a SOFR Loan.

"**UCC**" shall mean the Uniform Commercial Code of the State of New York, or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unclaimed Loans**" shall have the meaning provided in Section 2.18(b)(iii).

"**Unclaimed Loans Termination Date**" shall have the meaning provided in Section 2.18(b)(iii).

"**Unfunded Current Liability**" of any Pension Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("**SFAS 87**")) under the Pension Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the fair market value of the assets allocable thereto.

"**Unknown First Lien Lender Claimant**" shall mean a beneficial holder of an allowed First Lien Claim the identity of which beneficial holder is unknown to the Borrower and/or the Administrative Agent as a result of such beneficial holder's failure to timely deliver (i) the Lender Claimant Onboard Documents and (ii) a properly completed Account Registration Instruction Sheet to and accepted by KCC LLC in accordance with the applicable Notice of Registration Procedures for Class 4 Plan Distributions dated March 29, 2023.

"**Unrestricted Cash**" shall mean, without duplication, all cash and Cash Equivalents included in the cash and Cash Equivalents accounts listed on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries as at such date, excluding any cash and Cash Equivalents with respect to which a Lien (other than any Lien permitted under clause (x) or (bb) of the definition of Permitted Encumbrance) senior to the Lien securing the Obligations is granted for the benefit of other Indebtedness or obligations (but may include cash and Cash Equivalents securing the ABL Obligations along with the Obligations pursuant to the Applicable Intercreditor Agreements).

"**Unrestricted Escrow Subsidiary**" shall have the meaning provided in Section 1.10.

"**Unrestricted Subsidiary**" shall mean (a) any Subsidiary of the Borrower that is formed or acquired after the Closing Date; *provided* that at such time (or promptly thereafter) the Borrower designates such Subsidiary an Unrestricted Subsidiary in a written notice to the Administrative Agent, (b) any Restricted Subsidiary designated as an Unrestricted Subsidiary by the Borrower after the Closing Date in a written notice to the Administrative Agent; *provided* that in each case of clauses (a) and (b), (x) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the net book

78

value of the investment therein and such designation shall be permitted only to the extent permitted under Section 10.5 on the date of such designation and (y) subject to Section 1.10, no Event of Default exists or would result from such designation after giving Pro Forma Effect thereto and (c) each Subsidiary of an Unrestricted Subsidiary.  No Subsidiary may be designated as an Unrestricted Subsidiary if at such time of designation it holds intellectual property that is material to the operation of the business of the Borrower and its Restricted Subsidiaries, taken as a whole. No Subsidiary may be designated as an Unrestricted Subsidiary if, after such designation, it would constitute a "Restricted Subsidiary" under the definitive documentation in respect of any Indebtedness in a principal amount of not less than $100,000,000 (to the extent such concept exists under the definitive documentation in respect of such Indebtedness).  The Borrower may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary, and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if, subject to Section 1.10, no Event of Default exists or would result from such re-designation.

"**U.S. Government Securities Business Day**" shall mean any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S. Lender**" shall have the meaning provided in Section 5.4(h).

"**Voting Stock**" shall mean, with respect to any Person, such Person's Stock or Stock Equivalents having the right to vote for the election of directors or other governing body of such Person under ordinary circumstances; *provided* that for the purpose of the definition of "Excluded Stock and Stock Equivalents" and in each reference to the Voting Stock of any CFC or CFC Holding Company, Voting Stock shall also include any instrument treated as voting stock or stock equivalent for U.S. federal income tax purposes.

"**Weighted Average Life to Maturity**" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then-outstanding principal amount of such Indebtedness; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness (the "**Applicable Indebtedness**"), the effects of any prepayments or amortization made on such Applicable Indebtedness prior to the date of the applicable determination date shall be disregarded.

"**Wholly Owned**" shall mean, with respect to the ownership by a Person of a Subsidiary, that all of the Stock of such Subsidiary (other than directors' qualifying shares or nominee or other similar shares required pursuant to Applicable Law) are owned by such Person or another Wholly Owned Subsidiary of such Person.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"**Write-Down and Conversion Powers**" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"**Yield**" shall mean, with respect to any Initial Term Commitments, Initial Term Loans or any other commitments or loans, on any date of determination, the yield to maturity, in each case, based on the interest rate and any original issue discount or upfront fees (amortized over four years), but excluding any amendment, structuring, underwriting, ticking, arrangement, commitment and other similar fees not payable to all Lenders generally providing such Commitments and/or Term Loans; *provided* that if such other commitment and loans (including Incremental Term Commitments and Incremental Term Loans) include an interest rate floor greater than the applicable interest rate floor under the Initial Term Loans, such differential between interest rate floors shall be equated to the applicable interest rate margin, but only to the extent an increase in the interest rate floor in the Initial Term Loans would cause an increase in the interest rate then in effect thereunder.

1.2     Other Interpretive Provisions

With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)     Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)     The term "including" is by way of example and not limitation.

(e)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)     The words "asset" and "property" shall be construed to have the same meaning and effect and refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(g)     All references to "knowledge" or "awareness" of any Credit Party or a Restricted Subsidiary thereof means the actual knowledge of an Authorized Officer of a Credit Party or such Restricted Subsidiary.

(h)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(i)     Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(j)     Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(k)     For purposes of determining compliance with any one of Sections 9.9, 10.1, 10.2, 10.3, 10.4, 10.5, 10.6, 10.7 and 1.1, (i) in the event that any Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness meets the criteria of more than one of the categories of transactions permitted pursuant to any clause of such Section, such transaction (or portion thereof) at any time and from time to time shall be permitted under one or more of such clauses as determined by the Borrower (and the Borrower shall be entitled to redesignate use of any such clauses from time to time) in its sole discretion at such time; *provided* that (x) all Indebtedness outstanding under the Credit Documents will be deemed at all times to have been incurred in reliance only on the exception in clause (a) of Section 10.1 and (y) all Indebtedness outstanding under the ABL Credit Documents (and any Refinancing Indebtedness thereof) will be deemed at all times to have been incurred in reliance only on the exception in clause (b) of Section 10.1 and (ii) with respect to any Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness or other applicable transaction in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness or other applicable transaction is made (so long as such Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness or other applicable transaction at the time incurred or made was permitted hereunder).

(l)     All references to "in the ordinary course of business" of the Borrower or any Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an

objective that is in the ordinary course of business of the Borrower or such Subsidiary, as applicable, (ii) customary and usual in the industry or industries of the Borrower and its Subsidiaries in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable, or (iii) generally consistent with the past or current practice of the Borrower or such Subsidiary, as applicable, or any similarly situated businesses in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable.

1.3     Accounting Terms

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP.  Notwithstanding anything set forth herein, the financial data, financial ratios and other financial calculations shall not give effect to the impact of Accounting Standards Update 2016-12, Revenue from Contracts with Customers (Topic 606) or similar revenue recognition policies.

(b)     Notwithstanding anything to the contrary herein, (i) for purposes of determining compliance with any test or covenant contained in this Agreement with respect to any period during which any Specified Transaction occurs (or, for purposes of determining compliance with any test or covenant governing the permissibility of any transaction hereunder, during such period and thereafter and on or prior to such date of determination), the Consolidated Total Net Leverage Ratio, the Consolidated First Lien Net Leverage Ratio, and the Consolidated Secured Net Leverage Ratio shall each be calculated with respect to such period and such Specified Transaction on a Pro Forma Basis and (ii) for purposes of determining compliance with any ratio governing the permissibility of any transaction to be consummated on a Pro Forma Basis hereunder, (A) the cash proceeds of any incurrence of debt then being incurred in connection with such transaction shall not be netted from Consolidated Total Debt and (B) Consolidated Total Debt shall be calculated after giving effect to any prepayment of Indebtedness, in each case for purposes of calculating the Consolidated First Lien Net Leverage Ratio, Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable.  If since the beginning of any applicable Test Period, any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of the Restricted Subsidiaries, in each case, since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this definition, then such financial ratio or test (or Consolidated EBITDA or Consolidated Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this definition.

1.4     Rounding

Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

82

1.5     References to Agreements, Laws, Etc.

Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted or not prohibited by any Credit Document and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

1.6     Times of Day

Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

1.7     Timing of Payment or Performance

When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

1.8     Currency Equivalents Generally

In determining whether any Indebtedness, Investment, Lien, Disposition, Restricted Payment or any other amount under a "fixed amount" basket denominated in Dollars may be incurred in a currency other than Dollars, such amount shall be determined based on the currency exchange rate determined at the time of such incurrence (or, in the case of any revolving Indebtedness or any amount committed to be made, at the time it is first committed); provided that no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness, Investment, Lien, Disposition, Restricted Payment or such other amount is incurred or made; *provided*, *further* that for purpose of determining Consolidated Net Income, Consolidated EBITDA, Consolidated Total Debt or any other amount or ratio determined based on Consolidated Net Income, Consolidated EBITDA or Consolidated Total Debt, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the most recently delivered Section 9.1 Financials.

1.9     Classification of Loans and Borrowings

For purposes of this Agreement, Term Loans may be classified and referred to by Class (e.g., an "Initial Term Loan") or by Type (e.g., a "SOFR Loan") or by Class and Type (e.g., a "SOFR Initial Term Loan"). Borrowings also may be classified and referred to by Class (e.g., an "Initial Term Loan Borrowing") or by Type (e.g., a "SOFR Borrowing") or by Class and Type (e.g., a "SOFR Initial Term Loan Borrowing").

1.10    Unrestricted Escrow Subsidiary

Any Indebtedness permitted to be incurred hereunder (including any Incremental Facilities and Refinancing Facilities) may be incurred, at the option of the Borrower, by a newly created and newly designated Unrestricted Subsidiary (an "**Unrestricted Escrow Subsidiary**") with no assets other than the cash proceeds of such incurred Indebtedness *plus*, subject to compliance with Section 10.5, any cash and Cash Equivalents contributed to such Unrestricted Escrow Subsidiary as deposit of interest expenses and fees, additional cash collateral or for other purposes, which Unrestricted Escrow Subsidiary will then merge with and into the Borrower or any of the Restricted Subsidiaries with the Borrower or such Restricted Subsidiary surviving the merger and assuming all obligations of the Unrestricted Escrow Subsidiary.  So long as such Indebtedness would have been permitted to be incurred directly by the Borrower or any Restricted Subsidiary upon the incurrence of such Indebtedness by the Unrestricted Escrow Subsidiary, or, with respect to any Indebtedness incurred in connection with a Limited Condition Transaction, at the option of the Borrower, at the time the LCT Election is made, the creation, designation and re-designation of the Unrestricted Escrow Subsidiary and the merger of the Unrestricted Escrow Subsidiary into the Borrower or any Restricted Subsidiary shall not be subject to any additional condition, including any condition that no Default or Event of Default shall have occurred and be continuing at such time.

1.11    Limited Condition Transactions

In connection with any action being taken in connection with a Limited Condition Transaction, for purposes of (i) determining compliance with any provision of this Agreement which requires the calculation of any financial ratio or test or (ii) testing availability under baskets set forth in this Agreement (including baskets measured as a percentage of Consolidated EBITDA or Consolidated Total Assets), in each case, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Transaction, an "**LCT Election**"; *provided* that such election may be revoked by the Borrower at any time prior to the consummation or abandonment of the Limited Condition Transaction in question), the date of determination of whether any such action is permitted hereunder shall be deemed to be the date the definitive agreement for such Limited Condition Transaction is entered into (the "**LCT Test Date**"), and if, after giving Pro Forma Effect to the Limited Condition Transaction, the Borrower or any of its Restricted Subsidiaries would have been permitted to take such action on the relevant LCT Test Date in compliance with such ratio, test or basket, such ratio, test or basket shall be deemed to have been complied with.  For the avoidance of doubt, if the Borrower has made an LCT Election and, following the LCT Test Date, any of the ratios, tests or baskets for which compliance was determined or tested as of the LCT Test Date would have failed to have been satisfied as a result of fluctuations in any such ratio, test or basket, including due to fluctuations in Consolidated EBITDA, Consolidated Interest Expense or Consolidated Total Assets following the LCT Test Date but at or prior to the consummation of the relevant Limited Condition Transaction, such baskets, tests or ratios will not be deemed to have failed to have been satisfied as a result of such fluctuations.  If the Borrower has made an LCT Election for any Limited Condition Transaction, then in connection with any event or transaction occurring after the relevant LCT Test Date and prior to the earliest of the date on which (i) such Limited Condition Transaction is consummated, (ii) the LCT Election is revoked by the Borrower and (iii) the date that the definitive agreement or date for redemption, repurchase, defeasance, satisfaction and discharge or repayment

84

specified in an irrevocable notice for such Limited Condition Transaction is terminated, expires or passes, as applicable, without consummation of such Limited Condition Transaction (a "**Subsequent Transaction**") in connection with which a ratio, test or basket availability calculation must be made on a Pro Forma Basis or giving Pro Forma Effect to such Subsequent Transaction, for purposes of determining whether such ratio, test or basket availability has been complied with under this Agreement, any such ratio, test or basket shall be required to be satisfied on a Pro Forma Basis assuming such Limited Condition Transaction and other transactions in connection therewith have been consummated.

1.12    Rates

The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to ABR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement) or any relevant adjustments thereto, including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, ABR, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its Related Parties may engage in transactions that affect the calculation of ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

### SECTION 2   Amount and Terms of Credit

2.1    Initial Term Loan Borrowing

Subject to the terms and conditions set forth herein and in accordance with the procedures outlined in the Plan and Section 2.15 of the Existing DIP Agreement, each Lender shall make or be deemed to have made an Initial Term Loan to the Borrower on the Closing Date in an aggregate amount as set forth opposite such Lender's name on the "Aggregate Amount" column on Schedule 1.1(a) consisting of the following:

(a)    an aggregate principal amount of "new money" Initial Term Loans set forth on the "Debt Rights Offering Amount" column on Schedule 1.1(a) opposite the name of each Lender that shall fund, on the Closing Date, such Initial Term Loan pursuant to the Rights Offering;

(b) an aggregate principal amount of "new money" Initial Term Loans set forth on the "RO Backstop Commitment Amount" column on Schedule 1.1(a) opposite the name of each Lender that shall fund, on the Closing Date, such Initial Term Loan pursuant to the RO Backstop Commitment;

(c) an aggregate principal amount of Initial Term Loans set forth on the "DIP Conversion Amount" column on Schedule 1.1(a) opposite the name of each Lender that is a DIP Lender as of the Closing Date and thus shall be deemed to have made an Initial Term Loan by converting its DIP Term Loans to Initial Term Loans in the principal amount of its converted DIP Term Loans;

(d) an aggregate principal amount of Initial Term Loans set forth on the "First Lien Claims Distribution Amount" column on Schedule 1.1(a) opposite the name of each Lender that is a holder of the First Lien Claims (other than B-3 Escrow Claims) and thus shall be deemed to have made an Initial Term Loan in partial satisfaction of each First Lien Claim (other than a B-3 Escrow Claim) as part of the treatment of First Lien Claims under the Plan; and

(e) an aggregate principal amount of Initial Term Loans set forth on the "Holdco Convertible Distribution Amount" column on Schedule 1.1(a) opposite the name of each Lender that is a holder of Holdco Convertible Notes Claims and thus shall be deemed to have made an Initial Term Loan as part of the treatment of the Holdco Convertible Notes Claims under the Plan.

*provided* that, with respect to the Lender Claimants, Initial Term Loans in an aggregate principal amount set forth on Schedule 1.1(a) opposite the Lender Claimants shall be deemed issued and outstanding for the benefit of Lender Claimants on the Closing Date and held in the Lender Claimant Reserve Account to be administered in accordance with Section 2.18.

The Initial Term Loans shall be treated as a single Class of Term Loans for all purposes of this Agreement and any other Credit Documents. The Initial Term Loan prepaid or repaid may not be re-borrowed. For the avoidance of doubt, notwithstanding that, other than pursuant to clauses (a) and (b) above, no cash is exchanged, the Borrower shall owe the principal amount of the Initial Term Loans to the Lenders under, and in accordance with the terms of, this Agreement.

2.2 Minimum Amount of Each Borrowing; Maximum Number of Borrowings

The aggregate principal amount of each Borrowing of Term Loans shall be in a minimum amount of at least the Minimum Borrowing Amount for such Type of Term Loans and in a multiple of $1,000,000 in excess thereof. After giving effect to all Borrowings, all conversions of Term Loans from one Type to the other Type, and all continuations of Term Loans as the same Type, there shall not be more than five (5) Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent.

2.3 Notice of Borrowing; Determination of Class of Term Loans

(a) Each Borrowing shall be made upon the Borrower's irrevocable Notice of Borrowing to the Administrative Agent. Each such Notice of Borrowing must be received by the

86

Administrative Agent (i) not later than 12:00 p.m. at least one (1) U.S. Government Securities Business Day prior to the requested date of any Borrowing of ABR Loans and (ii) not later than 2:00 p.m. three U.S. Government Securities Business Days prior to the requested date of any Borrowing of SOFR Loans; *provided* that the Borrower may deliver new Notices of Borrowing if the conditions to such Borrowing fail to be satisfied on the proposed Borrowing date.  Each notice by the Borrower pursuant to this Section 2.3(a) must be made in the form of a written Notice of Borrowing, appropriately completed and signed by an Authorized Officer of the Borrower.  Each Notice of Borrowing shall specify (1) that the Borrower is requesting a Borrowing, (2) the requested date of the Borrowing (which shall be a Business Day), (3) the principal amount of Term Loans to be borrowed, (4) the Type of Term Loans to be borrowed and (5) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Term Loan in a Notice of Borrowing, then the applicable Term Loans shall be made as ABR Loans.  If the Borrower requests a Borrowing of SOFR Loans in any such Notice of Borrowing, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(b)     Following receipt of a Notice of Borrowing, the Administrative Agent shall promptly notify each Lender of the amount of its *pro rata* share of the Term Loans.  In the case of each Borrowing, each Lender shall make the amount of its Term Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office in Dollars not later than 1:00 p.m. on the Business Day specified in the applicable Notice of Borrowing.   Upon satisfaction of the applicable conditions set forth in Section 6, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for SOFR Loans upon determination of such interest rate.  The determination of the Adjusted Term SOFR by the Administrative Agent shall be conclusive in the absence of manifest error.  At any time that ABR Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the prime rate used in determining the ABR promptly following the public announcement of such change.

2.4     Disbursement of Funds

(a)     No later than 12:00 p.m. on the date specified in each Notice of Borrowing, each Lender will make available its *pro rata* portion, if any, of each Borrowing requested to be made on such date in the manner provided below; *provided* that on the Closing Date, such funds may be made available at such earlier time as may be agreed among the Borrower, the Administrative Agent and the Lenders for the purpose of consummating the Transactions.

(b)     Each Lender shall make available all amounts required under any Borrowing for its applicable Commitments in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will make available to the Borrower, by depositing to an account designated by the Borrower to the Administrative Agent the aggregate of the amounts so made available in Dollars.  Unless the

87

Administrative Agent shall have been notified in writing by any Lender prior to the date of any such Borrowing that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly notify the Borrower in writing and the Borrower shall immediately pay such corresponding amount to the Administrative Agent in Dollars.  The Administrative Agent shall also be entitled to recover from such Lender or the Borrower interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate *per annum* equal to (i) if paid by such Lender, the Overnight Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with Section 2.8, for the Term Loans of the applicable Class.

(c)      Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5      Repayment of Term Loans; Evidence of Debt

(a)      The Borrower shall repay to the Administrative Agent, for the benefit of the Lenders holding Initial Term Loans, on the Initial Term Loan Maturity Date, the then outstanding Initial Term Loans.  The Borrower shall repay to the Administrative Agent, for the benefit of the applicable Lenders, on the other applicable Maturity Dates, the then outstanding other Term Loans.

(b)      The Borrower shall repay to the Administrative Agent, in Dollars, for the benefit of the Lenders of the Initial Term Loans, on the last Business Day of each March, June, September and December commencing on December 29, 2023 (each such Business Day, an "**Initial Term Loan Repayment Date**"), an aggregate principal amount equal to 0.25% of the aggregate principal amount of all Initial Term Loans outstanding on the Closing Date (each such repayment amount, an "**Initial Term Loan Repayment Amount**"), which payments shall be reduced as a result of voluntary prepayments or repurchase of the Initial Term Loans in accordance with this Agreement, including Sections 5.1 and 13.6(g) and further reduced by any prepayments pursuant to Section 5.2 and any other reductions in principal of the Initial Term Loans, including pursuant to Section 2.15, 2.16 or 13.7.

(c)      In the event that any Incremental Term Loans are made, such Incremental Term Loans shall be repaid by the Borrower in the amounts (each, an "**Incremental Term Loan Repayment Amount**") and on the dates as agreed between the Borrower and the relevant Lenders

of such Incremental Term Loans, subject to the requirements set forth in Section 2.14.  In the event that any Extended Term Loans are made, such Extended Term Loans shall, subject to Section 2.15(a), be repaid by the Borrower in the amounts (each, an "**Extended Term Loan Repayment Amount**") and on the dates set forth in the applicable Extension Amendment.  In the event that any Refinancing Term Loans are established, such Refinancing Term Loans shall, subject to Section 2.15(b), be repaid by the Borrower in the amounts (each, a "**Refinancing Term Loan Repayment Amount**") and on the dates set forth in the applicable Refinancing Amendment.

(d)　　Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Term Loan made by such lending office of such Lender from time to time, including the amounts of principal and interest payable and paid to such lending office of such Lender from time to time under this Agreement.

(e)　　The Administrative Agent shall maintain the Register pursuant to Section 13.6(b), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Term Loan made hereunder and, if applicable, the relevant tranche thereof and the Type of each Term Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof, and (iv) any cancellation or retirement of Term Loans as contemplated by Section 13.6(g).

(f)　　The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (d) and (e) of this Section 2.5 shall, to the extent permitted by Applicable Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; *provided*, *however*, that the failure of any Lender or the Administrative Agent to maintain such accounts, such Register or such subaccounts, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Term Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.  For the avoidance of doubt, in the event of any inconsistency between the Register and subaccounts maintained by the Administrative Agent and any Lender's records under clause (d) of this Section, the recordations in the Register and such subaccounts shall govern.

(g)　　The Borrower hereby agrees that, upon request of any Lender at any time and from time to time after the Borrower has made an initial Borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's expense a promissory note substantially in the form of Exhibit B, evidencing the Term Loans owing to such Lender.

(h)　　The Initial Term Loans shall mature and become due and payable on the Initial Term Loan Maturity Date.

2.6　　Conversions and Continuations

(a)　　Subject to the penultimate sentence of this clause (a), (x) the Borrower shall have the option on any Business Day to convert all or a portion equal to at least the Minimum Borrowing Amount (or a whole multiple of, in the case of SOFR Loans, $500,000 in excess

thereof, or in the case of ABR Loans, $100,000 in excess thereof) of the outstanding principal amount of any Term Loans of one Type into a Borrowing or Borrowings of another Type and (y) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any SOFR Loans as SOFR Loans, for an additional Interest Period; *provided* that (i) no partial conversion of SOFR Loans shall reduce the outstanding principal amount of SOFR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount, (ii) ABR Loans may not be converted into SOFR Loans if an Event of Default is in existence on the date of the conversion and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such conversion, (iii) SOFR Loans may not be continued as SOFR Loans for an additional Interest Period if an Event of Default is in existence on the date of the proposed continuation and the Required Lenders have determined in their sole discretion not to permit such continuation, and (iv) Borrowings resulting from conversions pursuant to this Section 2.6 shall be limited in number as provided in Section 2.2.  Each such conversion or continuation shall be effected by the Borrower by giving the Administrative Agent at the Administrative Agent's Office prior to 1:00 p.m. at least (i) one (1) Business Day's in the case of a conversion into ABR Loans or (ii) three (3) U.S. Government Securities Business Days', in the case of a continuation of, or conversion to, SOFR Loans, prior written notice, in each case substantially in the form of Exhibit A (each, a "**Notice of Conversion or Continuation**") specifying (1) whether the Borrower is requesting a conversion of Term Loans from one Type to the other or a continuation of SOFR Loans, (2) the requested date of such conversion or continuation, as applicable (which shall be a Business Day), (3) the principal amount of the Term Loans to be so converted or continued, (4) the Type of Term Loans to be converted into or continued and (5) if such Term Loans are to be converted into, or continued as, SOFR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration).  The Administrative Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Term Loans.

(b)    If any Event of Default is in existence at the time of any proposed continuation of any SOFR Loans and the Required Lenders have determined in their sole discretion not to permit such continuation, such SOFR Loans shall be automatically converted on the last day of the current Interest Period into ABR Loans.  If the Borrower has failed to deliver a timely Notice of Conversion or Continuation to continue any SOFR Loans as provided in clause (a) above, the Borrower shall be deemed to have elected to convert such Borrowing of SOFR Loans into a Borrowing of ABR Loans, effective as of the expiration date of such current Interest Period.  If no timely Notice of Conversion or Continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to ABR Loans.

(c)    Notwithstanding anything to the contrary herein, the Borrower may deliver a Notice of Conversion or Continuation pursuant to which the Borrower elects to irrevocably continue the outstanding principal amount of any Term Loans subject to an interest rate Hedging Agreement as SOFR Loans for each Interest Period until the expiration of the term of such applicable Hedging Agreement.

2.7    Benchmark Replacement Setting for Term Loans

With respect to the Term Loans:

90

(a)      Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Credit Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.7(a)(i) will occur prior to the applicable Benchmark Transition Start Date.

(b)      Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(c)      Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.   The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.7(d) and (y) the commencement of any Benchmark Unavailability Period.   Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.7, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.7.

(d)      Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous

91

definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)      Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

2.8      Interest

(a)      (i) The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable ABR Margin *plus* the ABR, in each case, in effect from time to time; and (ii) the unpaid principal amount of each SOFR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable SOFR Margin *plus* the relevant Adjusted Term SOFR, in each case in effect from time to time.  With respect to each interest payment date with respect to the Initial Term Loans from the Closing Date through and including June 30, 2024, the Borrower shall, by delivering a Cash/PIK Election Notice to the Administrative Agent on or prior to five (5) Business Days prior to each interest payment date (the "**Cash Election Date**"), elect whether interest payments due on such upcoming interest payment date shall be paid in cash (the "**Cash Option**") or paid partially in cash and paid partially in kind and capitalized by adding the amount specified in the definition of Applicable ABR Margin or Applicable SOFR Margin, as applicable, to the outstanding principal amount of such Term Loans (the "**Cash/PIK Option**"); *provided* that if the Borrower fails to deliver a Cash/PIK Election Notice by the Cash Election Date, the Borrower shall be deemed to have elected the Cash/PIK Option for the applicable interest payment date.  Any capitalized amounts shall thereafter bear interest in accordance with this Section.  For the avoidance of doubt, interest on the Initial Term Loans for each interest payment date following June 30, 2024 shall be payable in cash.

(b)      If all or a portion of (i) the principal amount of any Term Loan or (ii) any interest payable thereon or any other amount hereunder shall not be paid when due (whether at the Stated Maturity, by acceleration or otherwise), and a Specified Default shall have occurred and be continuing, then, upon the giving of written notice by the Administrative Agent to the Borrower (except in the case of an Event of Default under Section 11.5, for which no notice is required), such overdue amount (other than any such amount owed to a Defaulting Lender) shall bear interest at a rate (the "**Default Rate**") that is (x) in the case of overdue principal and overdue interest on such principal, the rate that would otherwise be applicable to such principal as if the Borrower had elected the Cash Option *plus* 2% *per annum* or (y) in the case of any other amounts due hereunder, to the extent permitted by Applicable Law, the rate described in Section 2.8(a) for ABR Loans as if the Borrower had elected the Cash Option *plus* 2% *per annum* from the date of such written notice to the date on which such amount is paid in full (after as well as before judgment) (or if an

Event of Default under Section 11.5 shall have occurred and be continuing, from the date of the occurrence of such Event of Default).

(c)     Interest on each Term Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; *provided* that any Term Loan that is repaid on the same date on which it is made shall bear interest for one day.  Except as provided below, interest shall be payable (i) in respect of each ABR Loan, quarterly in arrears on the last Business Day of each March, June, September and December, (ii) in respect of each SOFR Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each Business Day occurring at three-month intervals after the first day of such Interest Period, and (iii) in respect of each Term Loan, (A) on any prepayment; *provided* that interest on ABR Loans shall only become due pursuant to this clause (A) if the aggregate principal amount of the ABR Loans then-outstanding is repaid in full, (B) at maturity (whether by acceleration or otherwise) and (C) after such maturity, on demand.

(d)     All computations of interest hereunder shall be made in accordance with Section 5.5.

(e)     Notwithstanding anything to the contrary set forth in this Agreement, if at the end of any accrual period (as defined in Section 1272(a)(5) of the Code) ending after the fifth (5th) anniversary of the Closing Date, the aggregate amount of accrued but unpaid original issue discount and interest (as determined pursuant to the Code) which would be includible in gross income with respect to such Term Loan for periods before the close of any accrual period (as defined in Section 1272(a)(5) of the Code) ending after the fifth (5th) anniversary of the date on which such Term Loan was issued exceeds the sum of (i) the aggregate amount of interest to be paid under the Term Loan before the close of such accrual period and (ii) the product of (x) the issue price (as defined in Sections 1273(b) and 1274(a) of the Code and the regulations promulgated thereunder) and (y) the yield to maturity (interpreted in accordance with Section 163(i) of the Code (the "**Maximum Amount**")), then interest for such accrual period shall not be deferred and all accrued but unpaid interest and original issue discount (as determined pursuant to the Code) as of the end of such accrual period shall be paid in an amount (which amount, if any, shall, notwithstanding anything in this Agreement to the contrary, be calculated and determined by the Borrower) not less than the amount required to reduce the accrued but unpaid original issue discount at the end of such period to an amount less than the Maximum Amount (the "**AHYDO Interest Payment**").  No partial prepayment of the Term Loans pursuant to any other provision of this Agreement or the other Credit Documents shall alter the obligation of the Borrower to make payments provided for in this Section.  For the avoidance of doubt and notwithstanding anything to the contrary herein, this Section shall be construed so as to require payments to be made in cash and at such times and in such amounts (which amounts, if any, shall be calculated and determined by the Borrower) so as to cause the Term Loans to not be treated as having "significant original issue discount" within the meaning of Section 163(i)(2) pursuant to the Code.  If an AHYDO Interest Payment is required, the Borrower shall provide to the Administrative Agent prior written notice of the amount and date of payment of such AHYDO Interest Payment, not later than 12:00 p.m., five (5) Business Days in advance thereof.

2.9     Interest Periods

At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of SOFR Loans in accordance with Section 2.6(a), the Borrower shall give the Administrative Agent written notice of the Interest Period applicable to such Borrowing, which Interest Period shall, at the option of the Borrower, be one, three or six months; *provided* that the Interest Period may be a period of less than one month that is agreed by the Borrower and the Administrative Agent, so long as for purposes of determining Term SOFR, Term SOFR in respect of such period shall be based on Term SOFR in respect of a one-month tenor.  Notwithstanding foregoing, the initial Interest Period of the Initial Term Loans shall be from the Closing Date to June 30, 2023, and Term SOFR in respect of such Interest Period shall be based on Term SOFR in respect of a three-month tenor.

Notwithstanding anything to the contrary contained above:

(a)     the initial Interest Period for any Borrowing of SOFR Loans shall commence on the date of such Borrowing (or the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)     if any Interest Period relating to a Borrowing of SOFR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)     if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided* that if any Interest Period in respect of a SOFR Loan would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d)     the Borrower shall not be entitled to elect any Interest Period in respect of (i) any SOFR Loan if such Interest Period would extend beyond the applicable Maturity Date of such Term Loan or (ii) the Initial Term Loans such that there would be more than one Interest Period beginning on the fifth anniversary of the Closing Date and ending on the Initial Term Loan Maturity Date.

In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

94

2.10    Increased Costs, Illegality, Etc.

(a)    [Reserved.]

(b)    [Reserved.]

(c)    If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's or its Affiliates' capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent or any Affiliate thereof could have achieved but for such Change in Law (taking into consideration such Lender's or parent's policies with respect to capital adequacy or liquidity), then from time to time, promptly after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any Applicable Law as in effect on the Closing Date.  Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower (with a copy to the Administrative Agent), which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

(d)    Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.10 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

(e)    [Reserved.]

(f)    Subject to Section 2.7, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(i)    the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or

(ii)    the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided written notice of such determination to the Administrative Agent, the Administrative Agent will promptly so notify the Borrower and each Lender.  Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the

95

Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (at the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.11.  Subject to Section 2.7, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to clause (c)(x) of the definition of "ABR" until the Administrative Agent revokes such determination.

2.11    Compensation

If (i) any payment of principal of any SOFR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such SOFR Loan as a result of a payment or conversion pursuant to Section 2.5, 2.6, 2.10, 5.1, 5.2 or 13.7, as a result of acceleration of the maturity of the Term Loans pursuant to Section 11 or for any other reason, (ii) any Borrowing of SOFR Loans is not made as a result of a withdrawn Notice of Borrowing, (iii) any ABR Loan is not converted into a SOFR Loan as a result of a withdrawn Notice of Conversion or Continuation, (iv) any SOFR Loan is not continued as a SOFR Loan as a result of a withdrawn Notice of Conversion or Continuation or (v) any prepayment of principal of any SOFR Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section 5.1 or 5.2, the Borrower shall, after receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount) (with a copy to the Administrative Agent), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such SOFR Loan.  Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.11 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

2.12    Change of Lending Office

Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 5.4 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Term Loans affected by such event; *provided* that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory

disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 5.4.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with such designation.

2.13    Notice of Certain Costs

Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, 2.11 or 5.4 is given by any Lender more than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.10, 2.11 or 5.4, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower.

2.14    Incremental Facilities

(a)    The Borrower may, at any time and from time to time, elect to request the establishment of (x) one or more additional tranches of term loans, which may be of the same Class as any then-existing Term Loans (a "**Term Loan Increase**") or a separate Class of Term Loans (the commitments for additional term loans of the same Class or a separate Class, collectively, the "**Incremental Term Commitments**") or (y) one or more tranches of revolving credit facilities (the "**Incremental Revolving Commitments**", together with the Incremental Term Commitments, the "**Incremental Commitments**"; and the loans thereunder, "**Incremental Loans**"), in an aggregate principal amount not in excess of the then-available Maximum Incremental Facilities Amount at the time of incurrence thereof and not less than $10,000,000 individually (or such lesser amount as (x) may be approved by the Administrative Agent in its reasonable discretion or (y) shall constitute the then-available Maximum Incremental Facilities Amount at such time).  The Borrower may approach any existing Lender or any Additional Lender to provide all or a portion of the Incremental Commitments; *provided* that any Lender offered or approached to provide all or a portion of the Incremental Commitments may elect or decline, in its sole discretion, to provide an Incremental Commitment, and the Borrower shall have no obligation to approach any existing Lender to provide any Incremental Commitment; *provided*, *further*, that the Administrative Agent shall have consented to such Additional Lender's providing of the Incremental Commitments to the extent such consent, if any, would be required under Section 13.6(b) in connection with an assignment of Term Loans or Commitments to such Additional Lender.  In each case, such Incremental Commitments shall become effective as of the date determined by the Borrower (the "**Increased Amount Date**"); *provided* that, (i) (x) other than as described in the immediately succeeding clause (y), no Event of Default shall exist on such Increased Amount Date immediately before or immediately after giving effect to such Incremental Commitments and the borrowing of any Incremental Loans thereunder or (y) if such Incremental Commitment is being provided in connection with a Permitted Acquisition or similar Investment, or in connection with refinancing of any Indebtedness that requires an irrevocable prepayment or redemption notice, then no Specified Default shall exist on such Increased Amount Date, (ii) in connection with any incurrence of Incremental Loans or establishment of Incremental Commitments, there shall be no requirement for the Borrower to bring down the representations

97

and warranties under the Credit Documents unless requested by the lenders providing such Incremental Loans or Incremental Commitments (subject to waiver by such lenders of any such requirement) and (iii) the establishment of Incremental Commitments or the incurrence of Incremental Loans shall be effected pursuant to one or more amendments (each, an "**Incremental Amendment**") to this Agreement executed and delivered by the Borrower and the Administrative Agent, and each of which shall be recorded in the Register and shall be subject to the requirements set forth in Section 5.4(e).  For all purposes of this Agreement, any Incremental Term Loans made on an Increased Amount Date shall be designated (x) a separate series of Term Loans or (y) in the case of a Term Loan Increase, a part of the series of existing Term Loans subject to such increase (such new or existing series of Term Loans, each, a "**Series**").

(b)       The terms and conditions of the Incremental Revolving Commitments shall be reasonably satisfactory to the Administrative Agent; *provided* that (i) such Incremental Revolving Commitments may have a maturity that is shorter than the Maturity Dates of the Term Loans but such maturity shall be longer than the Initial ABL Facility Maturity Date, (ii) the pricing, interest rate margins, discounts, premiums, interest rate floors and fees of such Incremental Revolving Commitments shall be determined by the Borrower and the lender(s) thereunder and shall not be subject to any "most-favored nation" provisions (including under Section 2.14(d)(iv) below), (iii) such Incremental Revolving Commitments may have sub-facilities for letters of credit and swingline loans, (iv) lenders providing such Incremental Revolving Commitments shall be included in the definition of "Required Lenders", (v) if such Incremental Revolving Commitments benefit from a financial covenant, the Term Loans shall not be required to enjoy the same benefit of such financial covenant and they shall cross accelerate (instead of cross default) to a breach of such financial covenant, (vi) customary amendments to the definition of "Maximum Incremental Facilities Amount" may be made to permit any repayment of loans under Incremental Revolving Commitments accompanied with permanent terminations of such Incremental Revolving Commitments to be added to clause (2) of such definition, (vii) no Subsidiary (other than a Guarantor) is an obligor of such Incremental Revolving Commitments and (viii) if secured, such Incremental Revolving Commitments are not secured by any assets other than all or any portion of the Collateral or any Liens other than Liens that are *pari passu* with or junior to the Liens securing the Obligations.

(c)       On any Increased Amount Date on which any Incremental Term Commitments of any Series are effective, subject to the satisfaction (or waiver) of the foregoing applicable terms and conditions, (i) each Lender with an Incremental Term Commitment of any Series shall make a term loan to the Borrower (an "**Incremental Term Loan**") in an amount equal to its Incremental Term Commitment of such Series, and (ii) each Lender of any Series shall become a Lender hereunder with respect to the Incremental Term Commitment of such Series and the Incremental Term Loans of such Series made pursuant thereto.  The Borrower shall use the proceeds, if any, of the Incremental Term Loans for any purpose not prohibited by this Agreement and as agreed by the Borrower and the lender(s) providing such Incremental Term Loans.

(d)       The terms and provisions of any Incremental Term Commitments and the respective related Incremental Term Loans, in each case effected pursuant to a Term Loan Increase shall be substantially identical to the terms and provisions applicable to the Class of Term Loans subject to such increase; *provided* that underwriting, arrangement, structuring, ticking, commitment, original issue discount, upfront or similar fees, and other fees payable in connection

98

therewith that are not generally shared with all relevant lenders providing such Incremental Term Commitments and the respective related Incremental Term Loans, that may be agreed to among the Borrower and the lender(s) providing and/or arranging such Incremental Term Commitments may be paid in connection with such Incremental Term Commitments.  The terms and provisions of any Incremental Term Commitments and the respective related Incremental Term Loans of any Series not effected pursuant to a Term Loan Increase shall be on terms and documentation set forth in the applicable Incremental Amendment as determined by the Borrower; *provided* that:

(i)      the applicable Incremental Term Loan Maturity Date of each Series shall be no earlier than the Latest Maturity Date with respect to the Initial Term Loans, *provided* that the requirements of the foregoing clause (i) shall not apply to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with such requirements;

(ii)      the Weighted Average Life to Maturity of the applicable Incremental Term Loans of each Series shall be no shorter than the Weighted Average Life to Maturity of the Initial Term Loans;

(iii)      the Incremental Term Loans (x) may participate on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis in any voluntary prepayment of any Class of Term Loans hereunder and may participate on a *pro rata* basis or less than pro rata basis (but not on a greater than *pro rata* basis) in any mandatory prepayments of any Class of Term Loans hereunder; *provided* that if such Incremental Term Loans are unsecured or rank junior in right of payment or as to security with the Obligations, such Incremental Term Loans shall participate on a junior basis with respect to mandatory repayments of Term Loans hereunder (except in connection with any refinancing, extension, renewal, replacement, repurchase or retirement thereof permitted by this Agreement), (y) shall not be guaranteed or incurred by any Subsidiary other than a Credit Party hereunder and (z) shall be unsecured or rank *pari passu* or junior in right of security with any Obligations outstanding under this Agreement and, if secured, shall not be secured by any assets other than Collateral (and, unless secured on a *pari passu* basis with the Obligations, shall be subject to a subordination agreement (if payment subordinated) and/or the Applicable Intercreditor Agreement);

(iv)      the pricing, interest rate margins, discounts, premiums, interest rate floors, fees, and amortization schedule (subject to clauses (i) and (ii) above) applicable to any Incremental Term Loans shall be determined by the Borrower and the lender(s) thereunder; *provided*, *however*, that, if the Yield, in respect of any Incremental Term Loans that (w) rank *pari passu* in right of payment and security with the Initial Term Loans, (x) are incurred on or prior to the date that is twelve (12) months after the Closing Date and (y) have a maturity date that is less than ninety (90) days after the Initial Term Loan Maturity Date as of the date of funding thereof, exceeds the Yield in respect of any Initial Term Loans by more than 0.50%, then the Applicable ABR Margin or the Applicable SOFR Margin, as applicable, in respect of such Initial Term Loans shall be adjusted so that the Yield in respect of such Initial Term Loans is equal to the Yield in respect of such Incremental Term Loans *minus* 0.50%; *provided*, *further*, to the extent any change in the Yield of the Initial Term Loans is necessitated by this clause (iv) on the basis of an effective

99

interest rate floor in respect of the Incremental Term Loans, the increased Yield in the Initial Term Loans shall (unless otherwise agreed in writing by the Borrower) have such increase in the Yield effected solely by increases in the interest rate floor(s) applicable to the Initial Term Loans; and

(v)     all other terms of any Incremental Term Loans (other than as described in clauses (i), (ii), (iii) and (iv) above) may differ from the terms of the Initial Term Loans if agreed by the Borrower and the lender(s) providing such Incremental Term Loans.

(e)     The Administrative Agent and the Lenders hereby consent to the consummation of the transactions contemplated by this Section 2.14 and hereby waive the requirements of any provision of this Agreement (including, without limitation, any *pro rata* payment or amendment section) or any other Credit Document that may otherwise prohibit or restrict any such extension or any other transaction contemplated by this Section 2.14.  Each Incremental Amendment may, without the consent of any other Lenders, (x) effect technical and corresponding amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.14 and (y) with respect to the Incremental Revolving Commitments, add provisions solely applicable to such Incremental Revolving Commitments (including provisions relating to extensions and refinancings of Incremental Revolving Commitments).  At the request of the Administrative Agent, the Borrower shall deliver a certificate of an Authorized Officer of the Borrower, certifying that the conditions and requirements with respect to such Incremental Commitments and/or Incremental Loans set forth in this Section 2.14 have been met and such Incremental Amendment is authorized under this Section 2.14 (upon which the Administrative Agent may conclusively rely without further investigation or inquiry).

2.15    Extensions of Term Loans; Refinancing Facilities

(a)     Extensions

(i)     The Borrower may at any time and from time to time request that all or a portion of the Term Loans of any Class (an "**Existing Term Loan Class**") be converted to extend the scheduled maturity date(s) of any payment of principal with respect to all or a portion of any principal amount of such Term Loans (any such Term Loans which have been so converted, "**Extended Term Loans**") and to provide for other terms consistent with this Section 2.15.  In order to establish any Extended Term Loans, the Borrower shall provide a written notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders of the applicable Existing Term Loan Class which such request shall be offered equally to all such Lenders) (a "**Term Loan Extension Request**") setting forth the proposed terms of the Extended Term Loans to be established, which shall either, at the option of the Borrower, (A) reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) or (B) if not consistent with the terms of the applicable Existing Term Loan Class, shall not be materially more restrictive to the Credit Parties (as determined in good faith by the Borrower), when taken as a whole, than the terms of the Term Loans of the Existing Term Loan Class unless (x) the Lenders of the Term Loans of such applicable

Existing Term Loan Class receive the benefit of such more restrictive terms or (y) any such provisions apply after the Latest Maturity Date as determined at the time of incurrence or issuance; *provided*, *however*, that (1) the scheduled final maturity date shall be extended and all or any of the scheduled amortization payments of principal of the Extended Term Loans may be delayed to later dates than the scheduled amortization of principal of the Term Loans of such Existing Term Loan Class (with any such delay resulting in a corresponding adjustment to the scheduled amortization payments reflected in Section 2.5 or in the Extension Amendment, as the case may be, with respect to the Existing Term Loan Class from which such Extended Term Loans were converted, in each case as more particularly set forth in Section 2.15(a)(iii)), (2)(A) pricing, fees, optional prepayment or redemption terms shall be determined in good faith by the Borrower and the interest rates, interest margins, upfront fees, funding discounts, original issue discounts and premiums (including through fixed rate interest) with respect to the Extended Term Loans may be higher or lower than the interest margins and floors for the Term Loans of such Existing Term Loan Class and/or (B) additional fees, premiums or AHYDO Catch-Up Payments may be payable to the Lenders providing such Extended Term Loans in addition to or in lieu of any of the items contemplated by the preceding clause (A), in each case, to the extent provided in the applicable Extension Amendment, (3) the Extended Term Loans may participate on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis in any voluntary prepayment of any Class of Term Loans hereunder and may participate on a *pro rata* basis or less than *pro rata* basis (but not on a greater than *pro rata* basis) in any mandatory prepayments of any Class of Term Loans hereunder; *provided* that if such Extended Term Loans are unsecured or rank junior in right of payment or as to security with the Obligations, such Extended Term Loans shall participate on a junior basis with respect to mandatory repayments of Term Loans hereunder (except in connection with any refinancing, extension, renewal, replacement, repurchase or retirement thereof permitted by this Agreement) and (4) Extended Term Loans may have call protection and prepayment premiums and, subject to clause (3) above, other redemption terms as may be agreed by the Borrower and the Lenders thereof; *provided* that the principal amount of the Extended Term Loans shall not exceed the principal amount of the Term Loans being extended except as otherwise permitted herein; *provided, further*, that the Extended Term Loans shall not be guaranteed or incurred by any Subsidiary other than a Credit Party hereunder and, if secured, shall not be secured by any assets other than Collateral (and, unless secured on a *pari passu* basis with the Obligations, shall be subject to a subordination agreement (if payment subordinated) and/or the Applicable Intercreditor Agreement (if secured)).  No Lender shall have any obligation to agree to have any of its Term Loans of any Existing Term Loan Class converted into Extended Term Loans pursuant to any Term Loan Extension Request.

(ii)     Any Lender (an "**Extending Lender**") wishing to have all or a portion of its Term Loans of the Existing Term Loan Class or Existing Term Loan Classes subject to such Term Loan Extension Request converted into Extended Term Loans shall notify the Administrative Agent in writing (an "**Extension Election**") on or prior to the date specified in such Term Loan Extension Request of the amount of its Term Loans of the Existing Term Loan Class or Existing Term Loan Classes subject to such Term Loan Extension Request that it has elected to convert into Extended Term Loans.  In the event that the aggregate principal amount of Term Loans of the Existing Term Loan Class or

101

Existing Term Loan Classes subject to Extension Elections exceeds the amount of Extended Term Loans requested pursuant to the Term Loan Extension Request, Term Loans of the Existing Term Loan Class or Existing Term Loan Classes subject to Extension Elections shall be converted to Extended Term Loans on a *pro rata* basis based on the amount of Term Loans included in each such Extension Election (with such *pro rata* calculation to be determined by the Borrower).

(iii)    Extended Term Loans shall be established pursuant to an amendment (an "**Extension Amendment**") to this Agreement (which, except to the extent expressly contemplated by the last sentence of this Section 2.15(a)(iii) and notwithstanding anything to the contrary set forth in Section 13.1, shall not require the consent of any Lender other than the Extending Lenders with respect to the Extended Term Loans established thereby) executed by the Credit Parties, the Administrative Agent and the Extending Lenders.  No Extension Amendment shall provide for any Class of Extended Term Loans in an aggregate principal amount that is less than $10,000,000 and the Borrower may condition the effectiveness of any Extension Amendment on an Extension Minimum Condition, which may be waived by the Borrower in its sole discretion.  In addition to any terms and changes required or permitted by Section 2.15(a), each Extension Amendment shall amend the scheduled amortization payments pursuant to Section 2.5 or the applicable Extension Amendment with respect to the Existing Term Loan Class from which the Extended Term Loans were converted to reduce each scheduled Repayment Amount for the Existing Term Loan Class in the same proportion as the amount of Term Loans of the Existing Term Loan Class is to be converted pursuant to such Extension Amendment (it being understood that the amount of any Repayment Amount payable with respect to any individual Term Loan of such Existing Term Loan Class that is not an Extended Term Loan shall not be reduced as a result thereof).  Notwithstanding anything to the contrary in this Section 2.15, and without limiting the generality or applicability of Section 13.1 to any Section 2.15(a) Additional Amendments, any Extension Amendment may provide for additional terms and/or additional amendments other than those referred to or contemplated above (any such additional amendment, a "**Section 2.15(a) Additional Amendment**") to this Agreement and the other Credit Documents; *provided* that such Section 2.15(a) Additional Amendments comply with the requirements of Section 2.15(a) and do not become effective prior to the time that such Section 2.15(a) Additional Amendments have been consented to (including, without limitation, pursuant to (1) consents applicable to holders of Incremental Term Loans provided for in any Incremental Amendment and (2) consents applicable to holders of any Extended Term Loans provided for in any Extension Amendment) by such of the Lenders, Credit Parties and other parties (if any) as may be required in order for such Section 2.15(a) Additional Amendments to become effective in accordance with Section 13.1.  At the request of the Administrative Agent, the Borrower shall deliver a certificate of an Authorized Officer of the Borrower, certifying that the conditions and requirements with respect to such Extended Term Loans set forth in this Section 2.15(a) have been met and such Extension Amendment and/or Section 2.15(a) Additional Amendment is authorized under this Section 2.15(a) (upon which the Administrative Agent may conclusively rely without further investigation or inquiry).

(iv)     Notwithstanding anything to the contrary contained in this Agreement, on any date on which any Existing Term Loan Class is converted to extend the related scheduled maturity date(s) in accordance with paragraph (a) above, in the case of the existing Term Loans of each Extending Lender, the aggregate principal amount of such existing Term Loans in such Existing Term Loan Class shall be deemed reduced by an amount equal to the aggregate principal amount of Extended Term Loans so converted by such Lender on such date.  Any Extended Term Loans shall constitute a separate Class of Term Loans from the Existing Term Loan Class from which they were converted; *provided* that any Extended Term Loans converted from an Existing Term Loan Class may, to the extent provided in the applicable Extension Amendment, be designated as an increase in any then outstanding Class of Term Loans other than the Existing Term Loan Class from which such Extended Term Loans were converted (in which case scheduled amortization with respect thereto shall be proportionally increased).

(v)     The Administrative Agent and the Lenders hereby consent to the consummation of the transactions contemplated by this Section 2.15(a) (including, for the avoidance of doubt, payment of any interest, fees, or premium in respect of any Extended Term Loans on such terms as may be set forth in the relevant Extension Amendment) and hereby waive the requirements of any provision of this Agreement (including, without limitation, any *pro rata* payment or amendment section) or any other Credit Document that may otherwise prohibit or restrict any such extension or any other transaction contemplated by this Section 2.15(a).

(vi)     In the event that the Administrative Agent determines, and the Borrower agrees (acting reasonably), that the allocation of Extended Term Loans of a given Extension Series to a given Lender was incorrectly determined as a result of manifest administrative error in the receipt and processing of an Extension Election timely submitted by such Lender in accordance with the procedures set forth in the applicable Extension Amendment, then the Administrative Agent, the Borrower and such affected Lender may (and hereby are authorized to), in their sole discretion and without the consent of any other Lender, enter into an amendment to this Agreement and the other Credit Documents (each, a "**Corrective Extension Amendment**") within fifteen (15) days following the effective date of such Extension Amendment, as the case may be, which Corrective Extension Amendment shall (A) provide for the conversion and extension of the applicable Term Loans in such amount as is required to cause such Lender to hold Extended Term Loans of the applicable Extension Series into which such other Term Loans were initially converted, as the case may be, in the amount such Lender would have held had such administrative error not occurred and had such Lender received the minimum allocation of the applicable Term Loans or Commitments to which it was entitled under the terms of such Extension Amendment, in the absence of such error, (B) be subject to the satisfaction of such conditions as the Administrative Agent, the Borrower and such Lender may agree (including conditions of the type required to be satisfied for the effectiveness of an Extension Amendment described in Section 2.15(a)), and (C) effect such other amendments of the type (with appropriate reference and nomenclature changes) described in Section 2.15(a) to the extent reasonably necessary to effectuate the purposes of this Section 2.15(a)(vi).

(vii)   No conversion of Term Loans or Commitments pursuant to any Extension Amendment in accordance with this Section 2.15(a) shall constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement.

(b)   Refinancing Facilities.

(i)   The Borrower may, at any time or from time to time after the Closing Date, by written notice to the Administrative Agent (a "**Refinancing Term Loan Request**"), request the establishment of (x) one or more new Classes of Term Loans under this Agreement (any such new Class, "**New Refinancing Commitments**") or (y) increases to one or more existing Classes of Term Loans under this Agreement (any such increase to an existing Class, collectively with New Refinancing Commitments, "**Refinancing Commitments**"), in each case, established in exchange for, or to extend, renew, replace, repurchase, retire or refinance, in whole or in part, as selected by the Borrower, any one or more existing Class or Classes of Term Loans or Commitments (with respect to a particular Refinancing Commitment or Refinancing Term Loan, such existing Term Loans or Commitments, "**Refinanced Debt**"), whereupon the Administrative Agent shall promptly deliver a copy of each such written notice to each of the Lenders.

(ii)   Any Refinancing Term Loans made pursuant to New Refinancing Commitments shall be designated a separate Class of Term Loans, for all purposes of this Agreement unless designated as a part of an existing Class of Term Loans in accordance with this Section 2.15(b).  On any Refinancing Facility Closing Date on which any Refinancing Commitments of any Class are effected, subject to the satisfaction or waiver of the terms and conditions in this Section 2.15(b), (x) each Refinancing Term Lender of such Class shall make a term loan to the Borrower (each, a "**Refinancing Term Loan**") in an amount equal to its Refinancing Commitment of such Class and (y) each Refinancing Term Lender of such Class shall become a Lender hereunder with respect to the Refinancing Commitment of such Class and the Refinancing Term Loans of such Class made pursuant thereto.

(iii)   Each Refinancing Term Loan Request from the Borrower pursuant to this Section 2.15(b) shall set forth the requested amount and proposed terms of the relevant Refinancing Term Loans and identify the Refinanced Debt with respect thereto. Refinancing Term Loans may be made by any existing Lender (but no existing Lender will have an obligation to make any Refinancing Commitment, nor will the Borrower have any obligation to approach any existing Lender to provide any Refinancing Commitment) or by any Additional Lender (each such existing Lender or Additional Lender providing such Commitment or Term Loan, a "**Refinancing Term Lender**"); *provided* that the Administrative Agent shall have consented to such Additional Lender's providing of the Refinancing Commitments to the extent such consent, if any, would be required under Section 13.6(b) in connection with an assignment of Term Loans or Commitments to such Additional Lender.

(iv)   The effectiveness of any Refinancing Amendment, and the Refinancing Commitments thereunder, shall be subject to the satisfaction (or waiver) on

104

the date thereof (each, a "**Refinancing Facility Closing Date**") of each of the following conditions, together with any other conditions set forth in the Refinancing Amendment:

(A)     each Refinancing Commitment shall be in an aggregate principal amount that is not less than $10,000,000 (*provided* that such amount may be less than $10,000,000 if such amount is equal to the entire outstanding principal amount of Refinanced Debt), and,

(B)     the Refinancing Term Loans made pursuant to any increase in any existing Class of Term Loans shall be added to (and form part of) each Borrowing of outstanding Term Loans under the respective Class so incurred on a *pro rata* basis (based on the principal amount of each Borrowing) so that each Lender under such Class will participate proportionately in each then outstanding Borrowing of Term Loans under such Class.

(v)     [Reserved].

(vi)     The terms, provisions and documentation of the Refinancing Term Loans and Refinancing Commitments of any Class shall be as agreed between the Borrower and the applicable Refinancing Term Lenders providing such Refinancing Commitments, and except as otherwise set forth herein, to the extent not identical to (or constituting a part of) any Class of Term Loans existing on the Refinancing Facility Closing Date, shall be consistent with the provisions below, and the other terms and conditions shall either, at the option of the Borrower, (x) reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined by the Borrower) or (y), not be materially more restrictive to the Borrower (as determined by the Borrower), when taken as a whole, than the terms of the Initial Term Loans (except (1) covenants or other provisions applicable only to periods after the Latest Maturity Date (as of the applicable Refinancing Facility Closing Date) and (2) pricing, fees, rate floors, premiums, optional prepayment or redemption terms (which shall be determined by the Borrower) and it being understood there shall be no "MFN" protection unless the Lenders under the Term Loans existing on the Refinancing Facility Closing Date, receive the benefit of such more restrictive terms).  In any event, the Refinancing Term Loans:

(1)     (I) shall rank *pari passu* or junior in right of payment with any Obligations outstanding under this Agreement and (II) shall be unsecured or rank *pari passu* or junior in right of security with any Obligations outstanding under this Agreement and, if secured, shall not be secured by any assets other than the Collateral (and, unless secured on a *pari passu* basis with the Obligations, shall be subject to a subordination agreement (if payment subordinated) and the Applicable Intercreditor Agreements);

(2)     as of the Refinancing Facility Closing Date, shall not have a Maturity Date earlier than the Maturity Date of the Refinanced Debt;

105

(3)     as of the Refinancing Facility Closing Date, such Refinancing Term Loans shall have a Weighted Average Life to Maturity not shorter than the remaining Weighted Average Life to Maturity of the Refinanced Debt on the date of incurrence of such Refinancing Term Loans;

(4)     may provide for the ability to participate on a *pro rata* basis or less than or greater than a *pro rata* basis in any voluntary repayments or prepayments of principal of Term Loans hereunder and on a *pro rata* basis or less than a *pro rata* basis (but not on a greater than *pro rata* basis) in any mandatory repayments or prepayments of principal of Term Loans hereunder; *provided* that if such Refinancing Term Loans are unsecured or rank junior in right of payment or as to security with the Obligations, such Refinancing Term Loans shall participate on a junior basis with respect to mandatory repayments of Term Loans hereunder (except in connection with any refinancing, extension, renewal, replacement, repurchase or retirement thereof permitted by this Agreement);

(5)     unless otherwise permitted hereby, shall not have a greater principal amount than the principal amount of the Refinanced Debt (*plus* the amount of any unused commitments thereunder), *plus* accrued interest, fees, defeasance costs and premium (including call and tender premiums), if any, under the Refinanced Debt, *plus* underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees and similar items) in connection with the refinancing of such Refinanced Debt and the incurrence or issuance of such Refinancing Term Loans; and

(6)     shall not be guaranteed or incurred by any Subsidiary other than a Credit Party hereunder;

(vii)     Commitments in respect of Refinancing Term Loans shall become additional Commitments under this Agreement pursuant to an amendment (a "**Refinancing Amendment**") to this Agreement and, as appropriate, the other Credit Documents, executed by the Borrower, each Refinancing Term Lender providing such Commitments and the Administrative Agent.  The Refinancing Amendment may, without the consent of any other Credit Party, Agent or Lender, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.15(b).  The Borrower will use the proceeds, if any, of the Refinancing Term Loans in exchange for, or to extend, renew, replace, repurchase, retire or refinance, and shall permanently terminate applicable commitments under, substantially concurrently, the applicable Refinanced Debt.  At the request of the Administrative Agent, the Borrower shall deliver a certificate of an Authorized Officer of the Borrower, certifying that the conditions and requirements with respect to such Refinancing Commitments and/or Refinancing Term Loans set forth in this Section 2.15(b) have been met and such

106

Refinancing Amendment is authorized under this Section 2.15(b) (upon which the Administrative Agent may conclusively rely without further investigation or inquiry).

(viii)   The Administrative Agent and the Lenders hereby consent to the consummation of the transactions contemplated by this Section 2.15(b) (including, for the avoidance of doubt, payment of any interest, fees, or premium in respect of any Refinanced Debt on such terms as may be set forth in the relevant Refinancing Amendment) and hereby waive the requirements of any provision of this Agreement (including, without limitation, any *pro rata* payment or amendment section) or any other Credit Document that may otherwise prohibit or restrict any such refinancing or any other transaction contemplated by this Section 2.15.

2.16    Defaulting Lenders

Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then no Defaulting Lender shall be entitled to receive any fee payable under Section 4 or any interest at the Default Rate payable under Section 2.8(b) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee or interest that otherwise would have been required to have been paid to that Defaulting Lender).

2.17    Permitted Debt Exchanges

(a)    Notwithstanding anything to the contrary contained in this Agreement, pursuant to one or more offers (each, a "**Permitted Debt Exchange Offer**") made from time to time by the Borrower to all Lenders (other than any Lender that, in connection with an issuance of Permitted Debt Exchange Instrument that constitutes Permitted Other Note, if requested by the Borrower, is unable to certify that it is either a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an institutional "accredited investor" (as defined in Rule 501 under the Securities Act)) with outstanding Term Loans under one or more Classes of Term Loans (as determined by the Borrower in its sole discretion) on the same terms, the Borrower may from time to time consummate one or more exchanges of Term Loans for Permitted Other Debt (such notes or loans, "**Permitted Debt Exchange Instruments**" and each such exchange, a "**Permitted Debt Exchange**"), so long as the following conditions are satisfied or waived:  (i) no Event of Default shall have occurred and be continuing at the time the offering document in respect of a Permitted Debt Exchange Offer is delivered to the relevant Lenders, (ii) the aggregate principal amount (calculated on the face amount thereof) of Permitted Debt Exchange Instruments issued in exchange for Term Loans shall not exceed the principal amount (calculated on the face amount thereof) of the Term Loans being exchanged *plus* any accrued interest, fees and premium (if any) under the Term Loans exchanged and underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees and similar items) in connection with the exchange of such Term Loans and the issuance of such Permitted Debt Exchange Instruments, (iii) the aggregate principal amount (calculated on the face amount thereof) of all Term Loans exchanged under each applicable Class by the Borrower pursuant to any Permitted Debt Exchange shall automatically be cancelled and retired by the Borrower on the date of the settlement thereof (and, if requested by the Administrative Agent, any applicable exchanging Lender shall execute and deliver to the Administrative Agent an Assignment and Assumption pursuant to which the

respective Lender assigns its interest in the Term Loans being exchanged pursuant to the Permitted Debt Exchange to the Borrower for immediate cancellation or other written evidence of cancellation acceptable to the Administrative Agent), (iv) if the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of a given Class tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof of the applicable Class actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of such Class offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans under the relevant Class tendered by such Lenders ratably up to such maximum based on the respective principal amounts so tendered, or if such Permitted Debt Exchange Offer shall have been made with respect to multiple Classes without specifying a maximum aggregate principal amount offered to be exchanged for each Class, and the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of all Classes tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of all relevant Classes offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans across all Classes subject to such Permitted Debt Exchange Offer tendered by such Lenders ratably up to such maximum amount based on the respective principal amounts so tendered, (v) all documentation in respect of such Permitted Debt Exchange shall be consistent with the foregoing, and all written communications generally directed to the Lenders in connection therewith shall be in form and substance consistent with the foregoing and made in consultation with the Borrower and the Auction Agent, and (vi) any applicable Minimum Tender Condition or Maximum Tender Condition, as the case may be, shall be satisfied or waived by the Borrower.

(b)     With respect to all Permitted Debt Exchanges effected by the Borrower pursuant to this Section 2.17, (i) such Permitted Debt Exchanges (and the cancellation of the exchanged Term Loans in connection therewith) shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 5.1 or 5.2, and (ii) such Permitted Debt Exchange Offer shall be made for not less than $10,000,000 in aggregate principal amount of Term Loans, *provided* that subject to the foregoing clause (ii) the Borrower may at its election specify (A) as a condition (a "**Minimum Tender Condition**") to consummating any such Permitted Debt Exchange that a minimum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's sole discretion) of Term Loans of any or all applicable Classes be tendered and/or (B) as a condition (a "**Maximum Tender Condition**") to consummating any such Permitted Debt Exchange that no more than a maximum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's sole discretion) of Term Loans of any or all applicable Classes will be accepted for exchange.

(c)     In connection with each Permitted Debt Exchange, the Borrower and the Auction Agent shall mutually agree to such procedures as may be necessary or advisable to accomplish the purposes of this Section 2.17 and without conflict with Section 2.17(c); *provided* that the terms of any Permitted Debt Exchange Offer shall provide that the date by which the relevant Lenders are required to indicate their election to participate in such Permitted Debt Exchange shall be not less than a reasonable period (in the discretion of the Borrower and the Auction Agent) of time following the date on which the Permitted Debt Exchange Offer is made.

(d)     The Borrower shall be responsible for compliance with, and hereby agrees to comply with, all applicable securities and other laws in connection with each Permitted Debt Exchange, it being understood and agreed that (x) none of the Auction Agent, the Agents nor any Lender assumes any responsibility in connection with the Borrower's compliance with such laws in connection with any Permitted Debt Exchange and (y) each Lender shall be solely responsible for its compliance with any applicable "insider trading" laws and regulations to which such Lender may be subject under the Securities Exchange Act of 1934, as amended.

2.18    Lender Claimants.

(a)     In order for a Lender Claimant to cease being a Lender Claimant and to be acknowledged as a Lender hereunder, such Lender Claimant shall submit to the Borrower (i)(a) in the case of a Unknown First Lien Lender Claimant, evidence of the First Lien Claims beneficially owned by such Lender Claimant or (b) in the case of a Funded Lender Claimant, evidence that such Lender Claimant is a Funded Lender Claimant pursuant to the definition hereof, (ii) an Administrative Questionnaire, (iii) duly completed IRS tax withholding forms pursuant to this Agreement, (iv) any other documentation and information required by any Agent in connection with its "know your customer" process and (v) a signature page to this Agreement (such items (ii) to (v) collectively, the "**Lender Claimant Onboard Documents**").  Promptly following receipt of such items, if the Borrower determines in good faith that such Lender Claimant is entitled to be a Lender hereunder, the Borrower shall forward the Lender Claimant Onboard Documents to the Administrative Agent, together with a Borrower Direction to Add Lender, which shall specify (A) that the Person submitting such evidence should be added to the Register as a Lender, (B) the original principal amount of Term Loans to be credited to such Lender Claimant, (C) the amount of paid-in-kind interest allocable to such Term Loans and which is to be added to the original principal amount of the Term Loans and (D) the amount of cash held in the Lender Claimant Reserve Account to be paid to such Lender Claimant, if any.  The Borrower shall calculate the original principal amount of Term Loans to be credited to a Lender Claimant pursuant to the Plan. Upon receipt by the Administrative Agent of the Lender Claimant Onboard Documents and based solely on such Borrower Direction to Add Lender, (x) in respect of such Term Loans, such Lender Claimant shall cease to be a Lender Claimant and shall have all rights of a Lender for purposes of this Agreement and all other Credit Documents and (y) the Administrative Agent shall (AA) revise the Register to credit such Term Loans to such Lender Claimant, (BB) increase the principal of such transferred Term Loans with all paid-in-kind interest allocable to such Term Loans and (CC) pay to such Lender Claimant the cash amounts held in the Lender Claimant Reserve Account allocable to such transferred Term Loans.  In no event shall any Agent have any duty, liability or obligation (I) to solicit or request delivery of any information or documents from any Lender Claimant, (II) to review, verify or confirm any information or documents submitted by any Lender Claimant or contained in any direction of the Borrower or (III) with respect to any calculation of amounts due or payable to any Lender Claimant (including the amount of any principal or interest credited to any Lender Claimant).  The Agents shall be entitled to rely, shall be fully protected in relying, and shall not incur any liability for relying, upon any Borrower Direction to Add Lender.

(b)

(i)     Notwithstanding anything in this Agreement to the contrary, neither the Agents, the Borrower nor any other Person shall be liable to any Lender Claimant or to

any other Person for any amount paid to a public official pursuant to applicable abandoned property law, escheat law or similar law.

(ii)   To the extent that (x) all Obligations under this Agreement and the other Credit Documents (other than Obligations owing to any Lender Claimant, any Hedging Obligations in respect of any Secured Hedging Agreement, any Cash Management Obligations in respect of Secured Cash Management Agreements and any Contingent Obligations) are paid in full within one (1) year of the Closing Date and (y) on or after the date described in clause (x), the Borrower deposits in to the Lender Claimant Reserve Account the full amount of all Term Loans (including all paid-in-kind interest allocable to such Term Loans) then outstanding with respect to all Lender Claimants, together with any prepayment premium, if any, and accrued and unpaid interest due on the date of such deposit (the "**Lender Claimant Obligation Amount**", and the occurrence of the events described in clauses (x) and (y), a "**Refinancing Event**"), on the date of such Refinancing Event, the Term Loans allocable to all Lender Claimants shall be deemed paid in full for all purposes under this Agreement; *provided* that until the date that is one (1) year after the Closing Date had such Refinancing Event not occurred (the "**Claim Termination Date**"), the claims of all Lender Claimants with respect to the Lender Claimant Obligation Amount shall survive.  At the written request of the Administrative Agent, the Borrower shall deliver a certificate of an Authorized Officer of the Borrower, certifying the amount of the Lender Claimant Obligation Amount and attaching a reasonably detailed calculation with respect thereto (upon which the Administrative Agent may conclusively rely without further investigation or inquiry).  The procedures set forth in Section 2.18(a) shall continue to apply with respect to Lender Claimants from and after the Refinancing Event until the Claim Termination Date. Any portion of the Term Loans (together with all interest allocable to such Term Loans) remaining unclaimed by Lender Claimants on the Claim Termination Date shall, on the Claim Termination Date, be deemed to have been paid in full and any claims of a Lender Claimant with respect thereto shall then be deemed extinguished.

(iii)   Absent the occurrence of a Refinancing Event, any portion of the Term Loans (including Term Loans resulting from any interest payments payable in kind) (together with all interest allocable to such Term Loans) remaining unclaimed by Lender Claimants on the one (1) year anniversary of the Closing Date (such Term Loans, the "**Unclaimed Loans**" and such date, the "**Unclaimed Loans Termination Date**") shall, on the Unclaimed Loans Termination Date, be deemed to have been paid in full and any claims of a Lender Claimant with respect thereto shall then be deemed extinguished.

(c)   Any cash amounts that are held in the Lender Claimant Reserve Account shall be applied by the Administrative Agent on the Claim Termination Date or the Unclaimed Loans Termination Date, as applicable, after giving effect to the deemed repayment in full of the Term Loans or Unclaimed Loans, as applicable, in accordance with clause (ii) or (iii) of Section 2.18(b), in accordance with Section 2.18(d).

(d)   All amounts paid on the Claim Termination Date or the Unclaimed Loans Termination Date, as applicable, from the Lender Claimant Reserve Account pursuant to clauses (b) and (c) of this Section 2.18 shall be applied in the following order of priority:

110

(i)      to the extent not previously prepaid, to pay all accrued and unpaid interest on the Term Loans as of the date of payment;

(ii)      to the extent not previously prepaid, to pay that portion of the Obligations constituting unpaid principal of the Term Loans then due and payable;

(iii)      to the extent not previously prepaid, to pay any other outstanding Obligations then due and payable; and

(iv)      the balance, if any, following the payment in full of all such Obligations then due and payable, if any, to be retained by the Borrower or as otherwise required by law.

(e)      The Borrower hereby directs the Administrative Agent or an escrow agent selected by the Borrower and reasonably satisfactory to the Administrative Agent to open and maintain a segregated, non-interest bearing account entitled "Lender Claimant Reserve Account" for the purpose of holding funds payable to Lender Claimants in accordance with this Agreement. Funds held in the Lender Claimant Reserve Account shall remain uninvested.

(f)      To the extent that a Refinancing Event occurs prior to the Maturity Date, from the date of such Refinancing Event until the earlier of (i) the date that all Lender Claimants have presented themselves and claimed all amounts contained in the Lender Claimant Reserve Account in accordance with Section 2.18(a) and (ii) the date that the Administrative Agent has applied amounts contained in the Lender Claimant Reserve Account in accordance with Section 2.18(d), all rights, powers, privileges, protections, immunities, and indemnities of the Agents and all remaining obligations of the Borrower and the Agents described under this Agreement (including this Section 2.18) with respect to the Lender Claimants and the Lender Claimant Reserve Account shall continue and survive in full force and effect notwithstanding the fact that all Obligations shall have been paid in full; *provided* that during such period, each Agent may request and rely on the direction of the Borrower for all purposes on the same basis that it is entitled to rely on the direction of the Required Lenders.

## SECTION 3   [Reserved]

## SECTION 4   Fees; Commitments

4.1      Fees

(a)      In the event that, prior to the twelve (12) month anniversary of the Closing Date, (x) the Borrower makes any prepayment or repayment of Initial Term Loans pursuant to Section 5.1 or Section 5.2(a)(ii) or (iii), or (y) any portion of the principal of the Initial Term Loans is accelerated in accordance with Section 11 or applicable law (clauses "(x)" and "(y)" together, the "**Premium Trigger Events**" and, each individually a "**Premium Trigger Event**"), the Borrower shall pay to the Administrative Agent, for the ratable account of each Lender holding Initial Term Loans and the Lender Claimant Reserve Account (in each case as of the date of such prepayment), a prepayment premium of 2.00% of the principal amount of the Initial Term Loans being prepaid (the "**Prepayment Premium**"). For the avoidance of doubt, except to the extent a Premium Trigger Event occurs before the twelve (12) month anniversary of the Closing Date, no

111

prepayment premium shall be due on account of any prepayment or repayment of Initial Term Loans.

(b)  The Borrower agrees to pay directly to the Agents, for the account of the Agents, all fees in the amounts and at the times specified in the Agent Fee Letter in immediately available funds due and payable to the Agents, which fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(c)  Notwithstanding the foregoing, the Borrower shall not be obligated to pay any amounts to any Defaulting Lender pursuant to this Section 4.1 (subject to Section 2.16).

The Prepayment Premium shall be due in view of the impracticability and extreme difficulty of ascertaining the actual amount of damages to the Lenders or profits lost by the Lenders as a result of a Premium Trigger Event, and by mutual agreement of the parties as to a reasonable estimation and calculation of the lost profits or damages of the Lenders as a result thereof.   ANY PREPAYMENT PREMIUM PURSUANT TO SECTION 4.1(A) SHALL BE PRESUMED TO BE EQUAL TO THE LIQUIDATED DAMAGES SUSTAINED BY EACH LENDER AND THE BORROWER AGREE THAT SUCH PREPAYMENT PREMIUM IS REASONABLE UNDER THE CIRCUMSTANCES CURRENTLY EXISTING.   IF THE PREPAYMENT PREMIUM BECOMES DUE AND PAYABLE PURSUANT TO THIS AGREEMENT, THE PREPAYMENT PREMIUM SHALL BE DEEMED TO BE THE PRINCIPAL OF THE INITIAL TERM LOANS UNDER THIS AGREEMENT AND INTEREST SHALL ACCRUE ON THE FULL PRINCIPAL AMOUNT OF SUCH INITIAL TERM LOANS FROM AND AFTER THE OCCURRENCE OF THE APPLICABLE PREMIUM TRIGGER EVENT.   IN THE EVENT THE PREPAYMENT PREMIUM IS DETERMINED NOT TO BE DUE AND PAYABLE BY ORDER OF ANY COURT OF COMPETENT JURISDICTION, INCLUDING, WITHOUT LIMITATION, BY OPERATION OF THE BANKRUPTCY CODE, DESPITE SUCH PREMIUM TRIGGER EVENT HAVING OCCURRED, THE PREPAYMENT PREMIUM SHALL NONETHELESS BE DEEMED TO BE THE PRINCIPAL OF THE INITIAL TERM LOANS UNDER THIS AGREEMENT AND SHALL NONETHELESS CONSTITUTE OBLIGATIONS UNDER THIS AGREEMENT FOR ALL PURPOSES HEREUNDER.   THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE PREPAYMENT PREMIUM IN CONNECTION WITH ANY PREMIUM TRIGGER EVENT, IN EACH CASE, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED UNDER APPLICABLE LAW.   THE BORROWER, THE AGENTS AND THE INITIAL TERM LENDERS ACKNOWLEDGE AND AGREE THAT ANY PREPAYMENT PREMIUM DUE AND PAYABLE IN ACCORDANCE WITH THIS AGREEMENT SHALL NOT CONSTITUTE UNMATURED INTEREST.   THE BORROWER FURTHER ACKNOWLEDGES AND AGREES, AND WAIVES ANY ARGUMENT TO THE CONTRARY, THAT PAYMENT OF THE PREPAYMENT PREMIUM CONSTITUTES A PENALTY OR AN OTHERWISE UNENFORCEABLE OR INVALID OBLIGATION.   THE BORROWER  EXPRESSLY AGREES THAT THE (A) PREPAYMENT PREMIUM IS REASONABLE AND IS THE PRODUCT OF AN ARM'S-LENGTH TRANSACTION BETWEEN SOPHISTICATED BUSINESS PEOPLE, ABLY REPRESENTED BY COUNSEL, (B) PREPAYMENT PREMIUM SHALL BE PAYABLE NOTWITHSTANDING THE THEN PREVAILING MARKET RATES AT THE TIME PAYMENT IS MADE, (C) THERE HAS

112

BEEN A COURSE OF CONDUCT BETWEEN THE LENDERS AND THE BORROWER GIVING SPECIFIC CONSIDERATION IN THIS TRANSACTION FOR SUCH AGREEMENT TO PAY THE PREPAYMENT PREMIUM, (D) THE BORROWER SHALL BE ESTOPPED HEREAFTER FROM CLAIMING DIFFERENTLY THAN AS AGREED TO IN THIS SECTION, (E) ITS AGREEMENT TO PAY THE PREPAYMENT PREMIUM IS A MATERIAL INDUCEMENT TO THE LENDERS TO MAKE THE LOANS AND (F) THE PREPAYMENT PREMIUM REPRESENTS A GOOD FAITH, REASONABLE ESTIMATE AND CALCULATION OF THE LOSSES OR OTHER DAMAGES OF THE LENDERS AND THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ASCERTAIN THE ACTUAL AMOUNT OF DAMAGES TO THE LENDERS.

4.2     Mandatory Termination or Reduction of Commitments

The Initial Term Commitments described in clause (a) of the definition thereof shall terminate upon the occurrence of the Closing Date.

**SECTION 5   Payments**

5.1     Voluntary Prepayments

The Borrower shall have the right to prepay Term Loans, without premium or penalty (other than as provided in Section 4.1(a) with respect to the Initial Term Loans or as otherwise provided with respect to Term Loans incurred after the Closing Date and amounts, if any, required to be paid pursuant to Section 2.11 with respect to prepayments of SOFR Loans made on any date other than the last day of the applicable Interest Period), in whole or in part, from time to time on the following terms and conditions:  (a) the Borrower shall give the Administrative Agent at the Administrative Agent's Office revocable written notice of its intent to make such prepayment, the amount of such prepayment and, in the case of SOFR Loans, the specific Borrowing(s) pursuant to which made, which notice shall be given by the Borrower no later than 1:00 p.m. (x) one Business Day prior to (in the case of ABR Loans) or (y) three U.S. Government Securities Business Days prior to (in the case of SOFR Loans) such prepayment and shall be promptly transmitted by the Administrative Agent to each Lender, (b) each partial prepayment of (i) any SOFR Loans shall be in a minimum amount of $5,000,000 and in multiples of $1,000,000 in excess thereof and (ii) any ABR Loans shall be in a minimum amount of $1,000,000 and in multiples of $100,000 in excess thereof; *provided* that no partial prepayment of SOFR Loans made pursuant to a single Borrowing shall reduce the outstanding SOFR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount for SOFR Loans and (c) any prepayment of SOFR Loans pursuant to this Section 5.1 on any day prior to the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of Section 2.11.  Each prepayment in respect of any Term Loans pursuant to this Section 5.1 shall be (a) applied to the Class or Classes of Term Loans in such manner as the Borrower may determine, (b) applied to reduce Repayment Amounts in such order as the Borrower may determine and (c) applied to reduce the Type of Term Loans in the applicable Class as the Borrower may determine.  In the event that the Borrower does not specify the order in which to apply prepayments of Term Loans to reduce Repayment Amounts or prepayments of Term Loans as between Classes of Term Loans, the Borrower shall be deemed to have elected that such prepayment be applied to reduce the Repayment Amounts in direct order of maturity on a *pro*

*rata* basis with the applicable Class or Classes, if a Class or Classes were specified, or among all Classes of Term Loans then outstanding, if no Class was specified.  If the Borrower does not specify the Type of Term Loans in the applicable Class, the Administrative Agent may make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.  At the Borrower's election (by written notice to the Administrative Agent) in connection with any prepayment pursuant to this Section 5.1, such prepayment shall not be applied to any Term Loan of a Defaulting Lender.

5.2   Mandatory Prepayments

(a)   Prepayment Events.  (i) On each occasion that an Asset Sale Prepayment Event or a Recovery Prepayment Event occurs, the Borrower shall, within ten (10) Business Days after the receipt of Net Cash Proceeds of such Prepayment Event (or, in the case of Deferred Net Cash Proceeds, within three Business Days after the Deferred Net Cash Proceeds Payment Date), prepay (or cause to be prepaid) (subject to Section 11.11 when applicable), in accordance with clauses (c) and (d) below, Term Loans with a principal amount equal to 100% of the Net Cash Proceeds from such Prepayment Event; *provided* that the percentage in this Section 5.2(a)(i) shall be reduced to (A) 50% if the Consolidated First Lien Net Leverage Ratio on the date of such prepayment is less than or equal to 2.80 to 1.00 but greater than 2.30 to 1.00 and (B) 0% if the Consolidated First Lien Net Leverage Ratio on the date of such prepayment is less than or equal to 2.30 to 1.00; *provided*, *further*, that the Borrower may use a portion of such Net Cash Proceeds to prepay or repurchase any Indebtedness (and with such prepaid or repurchased Indebtedness permanently extinguished) to the extent such Indebtedness is secured with a Lien on the Collateral ranking *pari passu* with the Lien securing the Initial Term Loans to the extent such Indebtedness requires the issuer to prepay or make an offer to purchase or prepay such Indebtedness with the proceeds of such Prepayment Event, in each case in an amount not to exceed the product of (x) the amount of such Net Cash Proceeds multiplied by (y) a fraction, the numerator of which is the outstanding principal amount of such Indebtedness and with respect to which such a requirement to prepay or make an offer to purchase or prepay exists and the denominator of which is the sum of the outstanding principal amount of such Indebtedness and the outstanding principal amount of the Term Loans (it being understood that to the extent the holders of such Indebtedness decline to have such Indebtedness repurchased or prepaid, the declined amount shall promptly (and in any event within ten Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof); *provided*, *further*, that (i) no prepayment shall be required pursuant to this Section 5.2(a)(i) in the case of any individual Asset Sale Prepayment Event or Recovery Prepayment Event yielding Net Cash Proceeds of less than $25,000,000 in the aggregate and (ii) Net Cash Proceeds from such Prepayment Events shall only be required to be applied to prepay Term Loans pursuant to this Section to the extent the Net Cash Proceeds from such Prepayment Events exceed $100,000,000 in the aggregate for all such Prepayment Events (other than those yielding Net Cash Proceeds under the threshold specified in clause (i) of this proviso) in any one Fiscal Year, at which time all such Net Cash Proceeds referred to in this clause (ii) with respect to such Fiscal Year shall be applied as a prepayment in accordance with this Section 5.2(a)(i) (and, for the avoidance of doubt, only amounts in excess of such $100,000,000 threshold amount in clause (ii) of this proviso above shall be required to be applied as a prepayment in accordance with this Section 5.2(a)(i)).

114

(ii)     On each occasion that a Debt Incurrence Prepayment Event occurs, the Borrower shall, within ten (10) Business Days after the receipt of the Net Cash Proceeds from the occurrence of such Debt Incurrence Prepayment Event, prepay Term Loans in accordance with clauses (c) and (d) below in a principal amount equal to 100% of the Net Cash Proceeds from such Debt Incurrence Prepayment Event.

(iii)     On each occasion that a New Debt Incurrence Prepayment Event occurs, the Borrower shall, within five (5) Business Days after the receipt of the Net Cash Proceeds from the occurrence of such New Debt Incurrence Prepayment Event, (A) with respect to a New Debt Incurrence Prepayment Event resulting from the incurrence of Indebtedness pursuant to Section 10.1(v)(i), at the Borrower's election as to the allocation of such Net Cash Proceeds as among any and all of the Classes of Term Loans as selected by Borrower and (B) with respect to each other New Debt Incurrence Prepayment Event, prepay the applicable Class or Classes of Term Loans that are the subject of the Refinanced Debt, in each case in a principal amount equal to 100% of the Net Cash Proceeds from such New Debt Incurrence Prepayment Event.

(b)     Excess Cash Flow.  Following the Fiscal Year ending September 30, 2024, not later than ten (10) Business Days after the date on which financial statements are delivered pursuant to Section 9.1(a) (in any case no later than the end of any cure period under Section 11.3(b) applicable to the delivery of such financial statements) for any Fiscal Year (commencing with the first full Fiscal Year completed after the Closing Date), the Borrower shall prepay Term Loans in accordance with clauses (c) and (d) below in a principal amount equal to, as applicable, (i) (A) if the Consolidated First Lien Net Leverage Ratio as of the end of such Fiscal Year is greater than 2.80:1.00, 50% of the Excess Cash Flow for such Fiscal Year, (B) if the Consolidated First Lien Net Leverage Ratio as of the end of such Fiscal Year is equal to or less than 2.80:1.00 and greater than 2.30:1.00, 25% of the Excess Cash Flow for such Fiscal Year or (C) otherwise, 0% of the Excess Cash Flow for such Fiscal Year; *minus* (ii) to the extent any Indebtedness secured with a Lien on the Collateral ranking *pari passu* with the Lien securing the Initial Term Loans also requires the issuer of such Indebtedness to prepay or make an offer to purchase or prepay such Indebtedness with the amount of Excess Cash Flow, the Borrower may reduce the amount calculated pursuant to the provisions above by an amount not to exceed the product of (x) such amount *multiplied by* (y) a fraction, the numerator of which is the outstanding principal amount of such Indebtedness and with respect to which such a requirement to prepay or make an offer to purchase or prepay exists and the denominator of which is the sum of the outstanding principal amount of such Indebtedness and the outstanding principal amount of the Term Loans (it being understood that to the extent the holders of such Indebtedness decline to have such Indebtedness repurchased or prepaid, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof); *minus* (iii) any voluntary prepayments or repurchases of Term Loans or any other Indebtedness secured on a *pari passu* basis with the Initial Term Loans (unless such prepayment or repurchase is funded with other long-term Indebtedness) made during such Fiscal Year or, at the Borrower's option and without duplication, after the end of such Fiscal Year and prior to the time such Excess Cash Flow payment is due on a dollar-for-dollar basis (with the Consolidated First Lien Net Leverage Ratio to be recalculated to give effect to any such after-Fiscal Year end payments); *provided* that (I) if for any Fiscal Year, the amounts calculated pursuant to the provisions above is a negative amount, any such negative amount shall, at the option of the

115

Borrower, be carried forward in future Fiscal Years to reduce the required payments pursuant to this Section 5.2(b) and (II) notwithstanding anything set forth above, any prepayment under this Section 5.2(b) shall be required only if the required prepayment amount calculated pursuant to the provisions above (including giving effect to any credit applied pursuant to clause (I) of this proviso) exceeds $20,000,000, and only the amount in excess thereof shall be applied to make prepayments of the Term Loans.

(c)      Application to Repayment Amounts.  Each prepayment of Term Loans required by Section 5.2(a) (except as provided in Section 5.2(a)(iii)) or Section 5.2(b) shall be allocated to the Term Loans then outstanding (ratably to each Class of Term Loans (or on a less than ratable basis, if agreed to by each Lender providing such Class of Term Loans) based on then remaining principal amounts of the respective Classes of Term Loans then outstanding) until paid in full.  In addition, each such prepayment shall be applied within each Class of Term Loans (i) ratably among the Lenders holding the Term Loans of such Class (unless otherwise agreed by an applicable affected Lender) and (ii) to scheduled amortization payments in respect of such Term Loans in direct forward order of scheduled maturity thereof or as otherwise directed by the Borrower.

(d)      Application to Term Loans.  With respect to each prepayment of Term Loans required pursuant to Section 5.2(a) (other than Section 5.2(a)(iii)) or Section 5.2(b), subject to Section 11.11 in the case of Section 5.2(a)(ii) (when applicable), the Borrower may designate the Types of Term Loans that are to be prepaid and the specific Borrowing(s) pursuant to which made; *provided* that the Borrower pays any amounts, if any, required to be paid pursuant to Section 2.11 with respect to prepayments of SOFR Loans made on any date other than the last day of the applicable Interest Period.  In the absence of a Rejection Notice or a designation by the Borrower as described in the preceding sentence, the Administrative Agent may, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

(e)      [Reserved]

(f)      Rejection Right.  The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to Section 5.2(a) or Section 5.2(b), in each case at least three (3) Business Days prior to the date such prepayment is required to be made (or such shorter period of time as agreed to by the Administrative Agent in its reasonable discretion).  Each such notice shall be revocable and specify the anticipated date of such prepayment and the basis for such repayment and provide a reasonably detailed estimated calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Lender holding Term Loans to be prepaid in accordance with such prepayment notice of the contents of the Borrower's prepayment notice and of such Lender's *pro rata* share of the prepayment.  Each Lender may reject all or a portion of its *pro rata* share of any such prepayment of Term Loans required to be made pursuant to Section 5.2(a)(i) or Section 5.2(b) (such declined amounts, the "**Declined Proceeds**") by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m. one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment.  Each Rejection Notice shall specify the principal amount of the mandatory prepayment of Term Loans to be rejected by such Lender.  If a Lender fails to deliver a Rejection

116

Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such prepayment of Term Loans.  Any Declined Proceeds remaining thereafter shall be retained by the Borrower ("**Retained Declined Proceeds**").

(g)      Foreign Net Cash Proceeds or Excess Cash Flow.  Notwithstanding any other provisions of this Section 5.2, (i) to the extent that the repatriation of any or all of the Net Cash Proceeds from a Recovery Prepayment Event (a "**Foreign Recovery Event**") of, or any Disposition by, a Restricted Foreign Subsidiary giving rise to an Asset Sale Prepayment Event (a "**Foreign Asset Sale**") or (ii) the repatriation of any Excess Cash Flow attributable to a Restricted Foreign Subsidiary ("**Foreign Excess Cash Flow**"), are prohibited or delayed by applicable local law (including financial assistance, corporate benefit, restrictions on upstreaming of cash intra-group and fiduciary and statutory duties of the directors of the relevant subsidiaries) or material agreement (so long as not created in contemplation of such prepayment) or organizational document from being repatriated to the United States or, if the Borrower has determined in good faith that repatriation of any of or all the Net Cash Proceeds of any Foreign Recovery Event or any Foreign Asset Sale or any Foreign Excess Cash Flow would have an material adverse tax consequence to the Borrower and its Restricted Subsidiaries (or any direct or indirect parent company of the Borrower), such portion of the Net Cash Proceeds or the Foreign Excess Cash Flow so affected will not be required to be applied to repay Term Loans, at the times provided in this Section 5.2 but may be retained by the applicable Restricted Foreign Subsidiary for working capital purposes so long, but only so long, (i) as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to promptly take commercially reasonable actions reasonably required by the applicable local law or material agreement to permit such repatriation) or (ii) as the Borrower determines in good faith such material adverse tax consequence to the Borrower and its Restricted Subsidiaries (or any direct or indirect parent company of the Borrower) would be incurred, and once such repatriation is permitted under the applicable local law or such material adverse tax consequence would no longer be incurred as determined by the Borrower in good faith (and in any event not later than ten (10) Business Days after such repatriation is permitted to occur or the Borrower determines in good faith that such material adverse tax consequence would no longer be incurred) applied (net of additional taxes payable or reserved against as a result thereof) apply an amount equal thereto to the repayment of the Term Loans as required pursuant to this Section 5.2.

5.3      Method and Place of Payment

(a)      Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto, as the case may be, not later than 12:00 p.m., in each case, on the date when due and shall be made in immediately available funds at the Administrative Agent's Office or at such other office as the Administrative Agent shall specify for such purpose by written notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds in the Borrower's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account.  All repayments or prepayments of any Term Loans (whether of principal, interest or otherwise) hereunder and all other payments under each Credit Document shall be made in Dollars.  The Administrative Agent

117

will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 12:00 p.m. or, otherwise, on the next Business Day) like funds relating to the payment of principal or interest or fees ratably to the Lenders entitled thereto.

(b)     Any payments under this Agreement that are made later than 12:00 p.m. shall be deemed to have been made on the next succeeding Business Day.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

5.4     Net Payments

(a)     Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; provided that if the Borrower or any Guarantor or the Administrative Agent shall be required by Applicable Law (as determined in the good faith discretion of an applicable withholding agent) to deduct or withhold any Taxes from such payments, then (i) the Borrower or such Guarantor or the Administrative Agent shall make such deductions or withholdings and (ii) the Borrower or such Guarantor or the Administrative Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with Applicable Law.  If such a Tax is an Indemnified Tax, the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after making all such required deductions and withholdings (including such deductions or withholdings applicable to additional sums payable under this Section 5.4), the Administrative Agent, the Collateral Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made. Whenever any Indemnified Taxes are payable by the Borrower or such Guarantor, as promptly as practicable thereafter, the Borrower or Guarantor shall send to the Administrative Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt (or other evidence acceptable to the Administrative Agent or such Lender, as applicable, acting reasonably) received by the Borrower or such Guarantor showing payment thereof.

(b)     The Borrower shall timely pay to the relevant Governmental Authority Other Taxes in accordance with Applicable Law, or at the option of any Agent, timely reimburse it for the payment of any Other Taxes that are paid by such Agent to the relevant Governmental Authority in accordance with Applicable Law.

(c)     The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within fifteen Business Days after written demand therefor, for the full amount of any Indemnified Taxes imposed on the Administrative Agent, the Collateral Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Credit Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 5.4) payable or paid by such Agent or Lender or required to be withheld or deducted from a payment to such Agent or Lender and any reasonable out-of-pocket expenses arising therefrom

or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate setting forth reasonable detail as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)     Each Lender shall severally indemnify each Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified such Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.6 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by such Agent in connection with this Agreement or any Credit Document, and any reasonable expenses arising therefrom or with respect thereof, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by such Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes each Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any Credit Document or otherwise payable by such Agent to the Lender from any other source against any amount due to such Agent under this paragraph (d).

(e)     Any Non-U.S. Lender claiming a basis for an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or under any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Credit Document shall, to the extent it is legally able to do so, deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding or as will permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in this Section 5.4(e), the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.4(f), 5.4(i) and 5.4(j) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(f)     Without limiting the generality of Section 5.4(e), each Non-U.S. Lender with respect to any amounts payable hereunder or under any other Credit Document shall, to the extent it is legally entitled to do so:

(i)     deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and

119

from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two executed copies of (x) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service Form W-8BEN or W-8BEN-E (together with a certificate substantially in the form of Exhibit J-1 representing that such Non-U.S. Lender is not a bank within the meaning of Section 881(c)(3)(A) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, and is not a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Code)), (y) Internal Revenue Service Form W-8BEN, Form W-8-BEN-E or Form W-8ECI, in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. Federal withholding Tax on payments under any Credit Document or (z) to the extent a Non-U.S. Lender is not the beneficial owner with respect to any portion of any sums paid or payable to such Lender under any of the Credit Documents (for example, in the case of a typical participation or where Non-U.S. Lender is a pass through entity) Internal Revenue Service Form W-8IMY and all necessary attachments (including the forms described in clauses (x) and (y) above and in Section 5.4(i), Exhibit J-2, Exhibit J-3 and or other certification documents from each beneficial owner, as applicable); *provided* that if the Non-U.S. Lender is a partnership it may provide Exhibit J-4 on behalf of one or more of its direct or indirect partners that are claiming the portfolio interest exemption; and

(ii)     deliver to the Borrower and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or inaccurate in any respect and after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower or the Administrative Agent.

If in any such case any Change in Law has occurred prior to the date on which any such delivery would otherwise be required that renders any such form inapplicable or would prevent such Non-U.S. Lender from duly completing and delivering any such form with respect to it, such Non-U.S. Lender shall promptly so advise the Borrower and the Administrative Agent.

(g)     If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it had received and retained a refund of an Indemnified Tax or additional sums payable under this Section 5.4 (including an Other Tax) for which a payment has been made by the Borrower pursuant to this Agreement, which refund in the good faith judgment of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, is attributable to such payment made by the Borrower, then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower for such amount (net of all out-of-pocket expenses of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender, the Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion exercised in good faith to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any Taxes imposed on the refund) than it would have been in if the payment had not been required;

120

*provided* that the Borrower, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) by the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority.  A Lender shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim.  None of any Lender, the Administrative Agent or the Collateral Agent shall be obliged to disclose any information regarding its tax affairs that it deems confidential to any Credit Party in connection with this clause (g).

(h)      Subject to the provisions of Section 2.12, each Lender and Agent agrees to use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request to minimize any amount payable by the Borrower or any Guarantor pursuant to this Section 5.4.  The Borrower shall indemnify and hold each Lender and Agent harmless against any out-of-pocket expenses incurred by such Person in connection with any request made by the Borrower pursuant to this Section 5.4(h).  Nothing in this Section 5.4(h) shall obligate any Lender or Agent to take any action that such Person, in its sole judgment, determines may result in a material detriment to such Person.

(i)      Without limiting the generality of Section 5.4(d), with respect to any amounts payable hereunder or under any other Credit Document, each Lender or Agent that is a United States person under Section 7701(a)(30) of the Code (each, a "**U.S. Lender**") shall deliver to the Borrower and the Administrative Agent two United States Internal Revenue Service Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Lender or Agent is exempt from United States backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or inaccurate in any respect, (iii) after the occurrence of a change in such Agent's or Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(j)      If a payment made to any Agent or Lender would be subject to U.S. federal withholding Tax imposed under FATCA if such Agent or Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Agent or Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such other documentation reasonably requested by the Administrative Agent and the Borrower as may be necessary for the Administrative Agent and the Borrower to comply with their obligations under FATCA, to determine whether such Agent or Lender has or has not complied with such Agent's or Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment and deliver to the Borrower and the Administrative Agent two further copies of any such documentation on or before the date that any such documentation expires or becomes obsolete or inaccurate in any respect and after the occurrence of any event requiring a change in the documentation previously delivered by it to the Borrower or the Administrative Agent.  Solely for

purposes of this subsection (j), "FATCA" shall include any amendments made to FATCA after the date of this Agreement and any current or future intergovernmental agreements and any Applicable Law implementing such agreement entered into in connection therewith.

(k)      The agreements in this Section 5.4 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the Commitments and the payment, satisfaction, or discharge of the Term Loans and all other Obligations payable hereunder and under any other Credit Document.

5.5      Computations of Interest and Fees

Except as provided in the next succeeding sentence, interest on SOFR Loans and ABR Loans shall be calculated on the basis of a 360-day year for the actual days elapsed.  Interest on ABR Loans in respect of which the rate of interest is calculated on the basis of the rate of interest in effect for such day as publicly announced from time to time by the Wall Street Journal as the "U.S. prime rate" and interest on overdue interest shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.

5.6      Limit on Rate of Interest

(a)      No Payment Shall Exceed Lawful Rate.  Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect of the Obligations in excess of the amount or rate permitted under or consistent with any Applicable Law.

(b)      Payment at Highest Lawful Rate.  If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of Section 5.6(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with Applicable Laws.

(c)      Adjustment if Any Payment Exceeds Lawful Rate.  If any provision of this Agreement or any of the other Credit Documents would obligate the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any Applicable Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.8.

(d)      Spreading.  In determining whether the interest hereunder is in excess of the amount or rate permitted under or consistent with any Applicable Law, the total amount of interest shall be spread throughout the entire term of this Agreement until its payment in full.

(e)      Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any Applicable Law, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount

122

equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

## SECTION 6   Conditions Precedent to the Closing Date

The initial Borrowing under this Agreement is subject to the satisfaction in all material respects of the conditions set forth below.

### 6.1   Credit Documents

The Administrative Agent shall have received (a) this Agreement, executed and delivered by an Authorized Officer of Holdings and the Borrower and each Lender, (b) the Guarantee, executed and delivered by an Authorized Officer of each Guarantor as of the Closing Date, (c) the Security Agreement, executed and delivered by an Authorized Officer of each grantor party thereto as of the Closing Date and (d) a duly executed Notice of Borrowing delivered pursuant to Section 2.3(a).  The Agents shall have received the Agent Fee Letter, executed and delivered by an Authorized Officer of the Borrower.

### 6.2   Collateral

(a)   All outstanding Stock of the Borrower and all Stock of each Subsidiary of the Borrower directly owned by Holdings, the Borrower or any Subsidiary Guarantor, in each case, as of the Closing Date, shall have been pledged pursuant to the Security Agreement (except that such Credit Parties shall not be required to pledge any Excluded Stock and Stock Equivalents) and the Collateral Agent shall have received all certificates, if any, representing such securities pledged under the Security Agreement, accompanied by instruments of transfer and undated stock powers endorsed in blank.

(b)   All Indebtedness of Holdings, the Borrower and each Subsidiary of the Borrower that is owing to Holdings, the Borrower or a Subsidiary Guarantor shall, to the extent having an aggregate principal amount exceeding $7,000,000 individually be evidenced by one or more promissory notes and shall have been pledged pursuant to the Security Agreement, and the Collateral Agent shall have received all such promissory notes, together with instruments of transfer with respect thereto endorsed in blank.

(c)   All documents and instruments, including Uniform Commercial Code or other applicable personal property financing statements, reasonably requested by the Collateral Agent or the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by any Security Document to be executed on the Closing Date and to perfect such Liens to the extent required by, and with the priority required by, such Security Document shall have been delivered to the Collateral Agent in proper form for filing, registration or recording and none of the Collateral shall be subject to any other pledges, security interests or mortgages, except for Liens permitted hereunder.

(d)   The Borrower shall have delivered to the Collateral Agent a completed Perfection Certificate, executed and delivered by an Authorized Officer of the Borrower, together with all attachments contemplated thereby.

123

Notwithstanding anything set forth above, to the extent any security interest (other than to the extent that a lien on the Collateral may be perfected by the filing of a financing statement under the Uniform Commercial Code or by the delivery of stock or other equity certificates of the Borrower or a Material Subsidiary of the Borrower constituting a Wholly Owned Domestic Subsidiary that is part of the Collateral and such stock or other equity certificates have been received from the Borrower) is not or cannot be provided or perfected on the Closing Date after the Borrower's use of commercially reasonable efforts to do so, or without undue burden or expense, the creation or perfection of such security interest shall not constitute a condition precedent to the availability of the Initial Term Loans on the Closing Date but shall instead be required to be delivered or provided within ninety (90) days after the Closing Date (or such later date as may be reasonably agreed by the Borrower and the Administrative Agent (with respect to Term Priority Collateral) or the ABL Administrative Agent (with respect to ABL Priority Collateral)) pursuant to arrangements to be mutually agreed by the Borrower and the Administrative Agent or the ABL Administrative Agent, as applicable.

6.3     Legal Opinions

The Administrative Agent and the Lenders (or their respective counsel) shall have received the executed customary legal opinion of Kirkland & Ellis LLP, special New York counsel to the Credit Parties.  Holdings, the Borrower, and the other Credit Parties hereby instruct such counsel to deliver such legal opinion.

6.4     Closing Certificates

The Administrative Agent and the Lenders (or their respective counsel) shall have received a certificate of the Credit Parties, dated as of the Closing Date, in respect of the conditions set forth in Sections 6.7, 6.8, 6.11, and 6.12.

6.5     Secretary's Certificate; Authorization of Proceedings of Each Credit Party

The Administrative Agent and the Lenders (or their respective counsel) shall have received, on or prior to the Closing Date, a certificate of each Credit Party, dated the Closing Date and executed by an Authorized Officer of such Credit Party, including (a) a copy of the resolutions of the board of directors, other managers or general partner of each Credit Party (or a duly authorized committee thereof) authorizing (i) the execution, delivery and performance of the Credit Documents referred to in Section 6.1 (and any agreements relating thereto) to which it is a party and (ii) in the case of the Borrower, the extensions of credit contemplated hereunder, (b) true and complete copies of the Organizational Documents of each Credit Party as of the Closing Date, (c) good standing certificates (to the extent such concept exists in the relevant jurisdiction of organization) of the Borrower and the Guarantors and (d) the names, titles, incumbency and signature specimens of those officers of such Credit Party who have been authorized by such resolutions and/or written consents to execute the Credit Documents on behalf of such Credit Party.

6.6     Fees

All fees required to be paid on the Closing Date pursuant to the Agent Fee Letter and reasonable and documented out-of-pocket expenses required to be paid on the Closing Date, in the case of expenses, to the extent invoiced at least three (3) Business Days prior to the Closing

124

Date, shall have been paid, or shall be paid substantially concurrently with, the initial Borrowings hereunder.

6.7   Representations and Warranties

All Specified Representations shall be true and correct in all material respects on the Closing Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, it shall be true and correct in all material respects as of such earlier date); provided, further, that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

6.8   Material Adverse Effect

Since February 14, 2023, there shall not have occurred any circumstances or condition, which individually or in the aggregate, constitutes or is reasonably expected to constitute, a Material Adverse Effect.

6.9   Solvency Certificate

On the Closing Date, the Administrative Agent and the Lenders (or their respective counsel) shall have received a certificate from the chief financial officer of Holdings in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

6.10   Financial Statements

(a)   The Administrative Agent and the Lenders (or their respective counsel) shall have received copies of the unaudited preliminary consolidated balance sheet and the related unaudited preliminary consolidated statements of income and cash flows of the Borrower and its Subsidiaries as of and for (i) the fiscal quarter ended June 30, 2022, (ii) the fiscal year ended September 30, 2022 and (iii) the fiscal quarter ended December 31, 2022, in each case, subject to changes resulting from normal year-end adjustments and the absence of footnotes.

6.11   Plan Consummation

The Plan shall not have been amended, modified or supplemented after February 14, 2023 in any manner or any condition to the effectiveness thereof shall not have been waived that, individually or in the aggregate, would reasonably be expected to adversely affect the interests of the Lenders (taken as a whole and in their capacities as such) in any material respect.  The Confirmation Order shall be in form and substance materially consistent with the Plan and otherwise reasonably satisfactory to the Required Consenting Stakeholders (as defined in the Restructuring Support Agreement) and shall have been entered confirming the Plan. The Confirmation Order shall be in full force and effect and not have been stayed, reversed, or vacated, amended, supplemented, or modified except that such applicable order may be further amended, supplemented or otherwise modified in any manner that would not reasonably be expected to adversely affect the interests of the Lenders (taken as a whole and in their capacities as such) in any material respect.  The Confirmation Order shall have become a final order and authorize the Avaya Debtors and the Credit Parties to execute, deliver and perform all of their obligations under

125

all Credit Documents and shall contain no term or provision that contradicts such authorization. The Avaya Debtors shall be and shall have been in compliance with the Confirmation Order in all material respects.  The Plan shall have become effective in accordance with its terms and all conditions to the effectiveness of the Plan shall have been satisfied or waived without giving effect to any waiver that would reasonably be expected to adversely affect the interests of the Lenders in any material respect unless consented to by the Required Consenting Stakeholders (as defined in the Restructuring Support Agreement), and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Plan shall have been (or concurrently with the Closing Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with Applicable Laws.

6.12    No Default

No Default or Event of Default shall have occurred and be continuing or shall exist at the time of, or would result from, the proposed Borrowing on the Closing Date or the application of the proceeds therefrom.

6.13    Evidence of Insurance

The Lenders (or their respective counsel) shall have received, on or prior to the Closing Date, copies of insurance policies or certificates of insurance of the Credit Parties, together with endorsements, evidencing liability and casualty insurance meeting the requirements set forth in the Credit Documents, including, but not limited to, naming the Collateral Agent as additional insured (in the case of liability insurance) or lender loss payee (in the case of property insurance) on behalf of the Secured Parties.

6.14    Patriot Act

The Administrative Agent shall have received (at least three (3) Business Days prior to the Closing Date) all documentation and other information about the Credit Parties as has been reasonably requested in writing at least five (5) Business Days prior to the Closing Date by the Administrative Agent or the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

For purposes of determining compliance with the conditions specified in Section 6 on the Closing Date, each Lender that has signed or authorized the signing of this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required under this Section 6 to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.  No Lender Claimant shall have any right to object to any document or any other matter required under this Section 6 unless and until such Lender Claimant has been recognized as a Lender in accordance with Section 2.18.

6.15     Letter of Direction

The Administrative Agent and the Lenders shall have received a letter of direction containing funds flow information with respect to the proceeds of the Borrowing (which shall specify any fees, costs or expenses to be netted therefrom as part of the funds flow) to be distributed on the Closing Date.

**SECTION 7   [Reserved]**

**SECTION 8   Representations and Warranties.**

In order to induce the Agents and the Lenders to enter into this Agreement and to induce the Lenders to make, or be deemed to make, the Term Loans, each of Holdings and the Borrower makes the following representations and warranties to the Lenders and the Agents, all of which shall survive the execution and delivery of this Agreement and the making of the Term Loans:

8.1     Corporate Status; Compliance with Laws

Each of Holdings, the Borrower and each Material Subsidiary of the Borrower that is a Restricted Subsidiary (a) is a duly organized and validly existing corporation or other entity in good standing (as applicable) under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact the business in which it is engaged, except as would not reasonably be expected to result in a Material Adverse Effect, (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified would not reasonably be expected to result in a Material Adverse Effect and (c) is in compliance with all Applicable Laws, except to the extent that the failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.

8.2     Corporate Power and Authority

Each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party. Each Credit Party has duly executed and delivered each Credit Document to which it is a party and each such Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law) (*provided* that, with respect to the creation and perfection of security interests with respect to Indebtedness, Stock and Stock Equivalents of Foreign Subsidiaries, only to the extent the creation and perfection of such obligation is governed by the UCC).

127

8.3     No Violation

Neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party nor the compliance with the terms and provisions thereof nor the consummation of the financing transactions contemplated hereby and thereby will (a) contravene any applicable provision of any material Applicable Law (including material Environmental Laws) other than any contravention which would not reasonably be expected to result in a Material Adverse Effect, (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any Lien upon any of the property or assets of Holdings, the Borrower or any Restricted Subsidiary (other than Liens permitted hereunder) pursuant to the terms of any material indenture, loan agreement, lease agreement, mortgage, deed of trust or other material debt agreement or instrument to which Holdings, the Borrower or any Restricted Subsidiary is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "**Contractual Requirement**") other than any such breach, default or Lien that would not reasonably be expected to result in a Material Adverse Effect, or (c) violate any provision of the Organizational Documents of any Credit Party.

8.4     Litigation

Except as set forth on Schedule 8.4, there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened in writing with respect to Holdings, the Borrower or any of the Restricted Subsidiaries that have a reasonable likelihood of adverse determination and such determination would reasonably be expected to result in a Material Adverse Effect.

8.5     Margin Regulations

Neither the making or deemed making of any Term Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board.

8.6     Governmental Approvals

The execution, delivery and performance of the Credit Documents does not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (i) such as have been obtained or made and are in full force and effect, (ii) filings and recordings in respect of the Liens created pursuant to the Security Documents and (iii) such licenses, authorizations, consents, approvals, registrations, filings or other actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

8.7     Investment Company Act

None of the Credit Parties is an "investment company" within the meaning of, and subject to registration under, the Investment Company Act of 1940, as amended.

8.8     True and Complete Disclosure

(a)     None of the written factual information and written data (taken as a whole) heretofore or contemporaneously furnished by or on behalf of Holdings, the Borrower, any of the Subsidiaries of the Borrower or any of their respective authorized representatives to the Administrative Agent, any Lender on or before the Closing Date (including all such information and data contained in the Credit Documents) regarding Holdings, the Borrower and its Restricted Subsidiaries in connection with the Transactions for purposes of or in connection with this Agreement or any transaction contemplated herein contained any untrue statement of any material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time in light of the circumstances under which such information or data was furnished, it being understood and agreed that for purposes of this Section 8.8(a), such factual information and data shall not include projections or estimates (including financial estimates, forecasts and other forward-looking information) and information of a general economic or general industry nature.

(b)     The projections filed with the Bankruptcy Court on February 14, 2023 are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents and the Lenders that such projections, forward-looking statements, estimates and pro forma financial information are not to be viewed as facts or a guarantee of performance, and are subject to material contingencies and assumptions, many of which are beyond the control of the Credit Parties, and that actual results during the period or periods covered by any such projections, forward-looking statements, estimates and pro forma financial information may differ materially from the projected results.

8.9     Financial Condition; Financial Statements

The financial statements described in Section 6.10 present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries, in each case, as of the dates thereof and for such period covered thereby in accordance with GAAP, consistently applied throughout the periods covered thereby, except as otherwise noted therein, and subject, in the case of any unaudited financial statements, to changes resulting from normal year-end adjustments and the absence of footnotes.  There has been no Material Adverse Effect since the Closing Date.

8.10    Tax Matters

Except where the failure of which would not be reasonably expected to have a Material Adverse Effect, (a) each of Holdings, the Borrower and each of the Restricted Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it (after giving effect to all applicable extensions) and has paid all material Taxes payable by it that have become due (whether or not shown on such Tax return), other than those (i) not yet delinquent or (ii) contested in good faith as to which adequate reserves have been provided to the extent required by law and in accordance with GAAP, (b) each of Holdings, the Borrower and each of the Restricted Subsidiaries has provided adequate reserves in accordance with GAAP for the payment of, all federal, state, provincial and foreign Taxes not yet

129

due and payable, and (c) each of Holdings, the Borrower and each of the Restricted Subsidiaries has satisfied all of its Tax withholding obligations.

8.11    Compliance with ERISA

(a)    No ERISA Event has occurred or is reasonably expected to occur; and no Lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Borrower or any ERISA Affiliate been notified in writing that such a Lien will be imposed on the assets of Holdings, the Borrower or any ERISA Affiliate on account of any Pension Plan, except to the extent that a breach of any of the representations, warranties or agreements in this Section 8.11(a) would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect.  No Pension Plan has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.11(a), be reasonably likely to have a Material Adverse Effect.

(b)    All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and Applicable Law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to have a Material Adverse Effect.  All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except to the extent any such events would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.12    Subsidiaries

Schedule 8.12 lists each Subsidiary of Holdings (and the direct and indirect ownership interest of Holdings therein), in each case existing on the Closing Date (after giving effect to the Transactions).

8.13    Intellectual Property

Each of Holdings, the Borrower and the Restricted Subsidiaries has good and marketable title to, or a valid license or right to use, all patents, trademarks, servicemarks, trade names, copyrights and all applications therefor and licenses thereof, and all other intellectual property rights, free and clear of all Liens (other than Liens permitted hereunder), that are necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such title, license or rights would not reasonably be expected to have a Material Adverse Effect.

8.14    Environmental Laws

Except as would not reasonably be expected to have a Material Adverse Effect: (a) Holdings, the Borrower and the Restricted Subsidiaries and all Real Estate are in compliance with all Environmental Laws; (b) Holdings, the Borrower and the Restricted Subsidiaries have, and have timely applied for renewal of, all permits under Environmental Law to construct and operate their facilities as currently constructed; (c) except as set forth on Schedule 8.14, neither Holdings, the Borrower nor any Restricted Subsidiary is subject to any pending or, to the

130

knowledge of the Borrower, threatened Environmental Claim or any other liability under any Environmental Law, including any such Environmental Claim, or, to the knowledge of the Borrower, any other liability under Environmental Law related to, or resulting from the business or operations of any predecessor in interest of any of them; (d) none of Holdings, the Borrower or any Restricted Subsidiary is conducting or financing or, to the knowledge of the Borrower, is required to conduct or finance, any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; (e) to the knowledge of the Borrower, no Hazardous Materials have been released into the environment at, on or under any Real Estate currently owned or leased by Holdings, the Borrower or any Restricted Subsidiary, and (f) neither Holdings, the Borrower nor any Restricted Subsidiary has treated, stored, transported, released, disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or, to the knowledge of the Borrower, formerly owned or leased Real Estate or facility.  Except as provided in this Section 8.14, Holdings, the Borrower and the Restricted Subsidiaries make no other representations or warranties regarding Environmental Laws.

8.15    Properties

Except as set forth on Schedule 8.15, Holdings, the Borrower and the Restricted Subsidiaries have good title to or valid leasehold or easement interests or other license or use rights in all properties that are necessary for the operation of their respective businesses as currently conducted, free and clear of all Liens (other than any Liens permitted under this Agreement) and except where the failure to have such good title, leasehold or easement interests or other license or use rights would not reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, the Borrowers and the Restricted Subsidiaries do not own in fee any Real Estate with a fair market value of $10,000,000 or more.

8.16    Solvency

On the Closing Date, after giving effect to the Transactions, immediately following the making of the Term Loans on such date and after giving effect to the application of the proceeds of such Term Loans, Holdings on a consolidated basis with its Subsidiaries will be Solvent.

8.17    Security Interests

Subject to the qualifications set forth in Section 6.2 and the terms and conditions of any Applicable Intercreditor Agreement then in effect, with respect to each Credit Party, the Security Documents, taken as a whole, are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable first priority security interest (subject to Liens permitted hereunder) in the Collateral described therein, in each case, to the extent required under the Security Documents, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  In the case of (i) the Stock described in the Security Agreement that is in the form of securities represented by stock certificates or otherwise constituting certificated securities within the meaning of Section 8-102(a)(15) of the New York UCC ("**Certificated Securities**"), when certificates representing such Stock are delivered to the Collateral Agent along with instruments of transfer in blank or endorsed to the Collateral Agent,

131

and (ii) all other Collateral constituting personal property described in the Security Agreement, when financing statements, intellectual property security agreements and other required filings, recordings, agreements and actions in appropriate form are executed and delivered, performed, recorded or filed in the appropriate offices, as the case may be, the Collateral Agent, for the benefit of the applicable Secured Parties, shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Credit Parties in all Collateral that may be perfected by filing, recording or registering a financing statement, an intellectual property security agreement or analogous document (to the extent such Liens may be perfected by possession of the Certificated Securities by the Collateral Agent or such filings, agreements or other actions or perfection is otherwise required by the terms of any Credit Document), in each case, to the extent required under the Security Documents, as security for the Obligations, in each case prior and superior in right to any other Lien (except in the case of Liens permitted hereunder).

### 8.18 Labor Matters

Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against Holdings, the Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrower, threatened in writing; and (b) hours worked by and payment made for such work to employees of Holdings, the Borrower and each Restricted Subsidiary have not been in violation of the Fair Labor Standards Act or any other Applicable Law dealing with such matters.

### 8.19 Sanctioned Persons; Anti-Corruption Laws; Patriot Act

None of Holdings, the Borrower or any of its Subsidiaries or any of their respective directors or officers is subject to any economic embargoes or similar sanctions administered or enforced by the U.S. Department of State or the U.S. Department of the Treasury (including the Office of Foreign Assets Control) or any other applicable sanctions authority (collectively, "**Sanctions**", and the associated laws, rules, regulations and orders, collectively, "**Sanctions Laws**").  Each of Holdings, the Borrower and its Subsidiaries and their respective officers and directors is in compliance, in all material respects, with (i) all Sanctions Laws, (ii) the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "**Anti-Corruption Laws**") and (iii) the Patriot Act and any other applicable anti-terrorism and anti-money laundering laws, rules, regulations and orders.  No part of the proceeds of the Term Loans will be used, directly or indirectly, in violation of the Patriot Act, the Anti-Corruption Laws, Sanctions Laws and/or any other anti-terrorism or anti-money laundering laws in any material respect.

### 8.20 Use of Proceeds

The Borrower will use the proceeds of the Term Loans in accordance with Section 9.13 of this Agreement.

### 8.21 Insurance

(a)    The properties of the Credit Parties are insured with financially sound and reputable insurance companies that are not Affiliates of such Persons, in such amounts, with such

132

deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where any Credit Party operates.

(b)     The Credit Parties maintain fully paid flood hazard insurance on all real property that is located in a special flood hazard area in the United States and that constitutes Collateral on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 or as otherwise required by the Collateral Agent or the Required Lenders.

### SECTION 9   Affirmative Covenants

The Borrower hereby covenants and agrees that on the Closing Date (immediately after giving effect to the Transactions) and thereafter, until all Commitments have terminated and the Term Loans, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations), are paid in full:

9.1     Information Covenants

The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)     Annual Financial Statements.  As soon as available and in any event on or before the date that is 120 days after the end of each Fiscal Year (or, solely with respect to the Fiscal Year ended September 30, 2022, the Borrower shall make commercially reasonable efforts to provide within 60 days after the Closing Date), the consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of operations and cash flows for such Fiscal Year, setting forth comparative consolidated figures for the preceding Fiscal Year (commencing with the Fiscal Year ended September 30, 2024), all in reasonable detail and prepared in accordance with GAAP in all material respects and, in each case, except with respect to any such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be qualified as to the scope of audit or as to the status of the Borrower and its consolidated Subsidiaries as a going concern (other than any exception or qualification that is a result of (x) a current maturity date of any Indebtedness or (y) any actual or prospective default of a financial maintenance covenant (including the ABL Financial Covenant)), all of which shall be (i) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its consolidated Subsidiaries (or Holdings or an indirect parent of the Borrower and its consolidated Subsidiaries, as the case may be) in accordance with GAAP in all material respects and (ii) accompanied by a Narrative Report with respect thereto.

(b)     Quarterly Financial Statements.  As soon as available and in any event on or before the date that is 60 days after the end of each of the first three fiscal quarters of any Fiscal Year (or, with respect to the fiscal quarters ended March 31, 2023 and June 30, 2023, 90 days after the end of such fiscal quarters), the consolidated balance sheets of the Borrower and its consolidated Subsidiaries, in each case, as at the end of such quarterly period and the related consolidated statements of operations for such quarterly accounting period and for the elapsed

133

portion of the Fiscal Year ended with the last day of such quarterly period, and the related consolidated statement of cash flows for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly period, and, commencing with the fiscal quarter ended on September 30, 2024, setting forth comparative consolidated figures for the related periods in the prior Fiscal Year or, in the case of such consolidated balance sheet, for the last day of the prior Fiscal Year, all of which shall be (i) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its consolidated Subsidiaries (or Holdings or an indirect parent of the Borrower and its consolidated Subsidiaries, as the case may be) in accordance with GAAP in all material respects (except as set forth in the following proviso), subject to changes resulting from audit, normal year-end audit adjustments and absence of footnotes and (ii) accompanied by a Narrative Report with respect thereto; *provided*, that notwithstanding the foregoing, the financial statements to be delivered pursuant to this clause (b) with respect to the fiscal quarters ended March 31, 2023 and June 30, 2023 shall not be required to reflect "fresh-start" or other reorganization adjustments.

(c)     Officer's Certificates.  Within five (5) Business Days of the delivery of the financial statements provided for in Sections 9.1(a) and (b), a certificate of an Authorized Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth (x) with specification of any change in the identity of the Restricted Subsidiaries and Unrestricted Subsidiaries as at the end of such Fiscal Year or period, as the case may be, from the Restricted Subsidiaries and Unrestricted Subsidiaries, respectively, provided to the Lenders on the Closing Date or the most recent Fiscal Year or period, as the case may be and (y) commencing with the Fiscal Year ended on September 30, 2024, in the case of the financial statements provided for in Section 9.1(a), with customary details, the calculation of the Excess Cash Flow for the most recent Fiscal Year.  Within five (5) Business Days of the delivery of the financial statements provided for in Section 9.1(a), a certificate of an Authorized Officer of the Borrower setting forth (A) in reasonable detail the Available Amount and the Available Equity Amount as at the end of the Fiscal Year to which such financial statements relate and (B) the information required pursuant to Sections I and II of the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or the date of the most recent certificate delivered pursuant to this clause (c)(B), as the case may be.

(d)     Notice of Default; Litigation; ERISA Event.  Promptly after an Authorized Officer of the Borrower or any Restricted Subsidiary obtains knowledge thereof, written notice of (i) the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto, (ii) any litigation, regulatory or governmental proceeding pending against the Borrower or any Restricted Subsidiary that has a reasonable likelihood of adverse determination and such determination would reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect and (iii) the occurrence of any ERISA Event or any ERISA Event that is reasonably expected to occur, that would reasonably be expected to result in a Material Adverse Effect.

(e)     Other Information.  Promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) or registration statements (other than drafts of pre-effective

134

versions of registration statements) with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by Holdings, the Borrower or any Restricted Subsidiary (other than amendments to any registration statement (to the extent such registration statement, in the form it becomes effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statements on Form S-8) and copies of all financial statements, proxy statements, notices and reports that Holdings, the Borrower or any Restricted Subsidiary shall send to the ABL Administrative Agent or lenders under the ABL Credit Agreement or the holders of any publicly issued debt with a principal amount in excess of $300,000,000 of Holdings, the Borrower and/or any Restricted Subsidiary in their capacity as such holders (in each case to the extent not theretofore delivered to the Administrative Agent pursuant to this Agreement).

(f)     Requested Information.    With reasonable promptness, following the reasonable request of the Administrative Agent, such other information (financial or otherwise) as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time; *provided* that, notwithstanding anything to the contrary in this Section 9.1(f), none of Holdings, the Borrower or any of its Restricted Subsidiaries will be required to provide any such other information pursuant to this Section 9.1(f) to the extent that (i) the provision thereof would violate any attorney client privilege (as reasonably determined by counsel (internal or external) to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality binding on the Credit Parties or their respective Affiliates (so long as not entered into in contemplation hereof) or (ii) such information constitutes attorney work product (as reasonably determined by counsel (internal or external) to the Credit Parties).

(g)     Projections.    Within 120 days after the end of each Fiscal Year of the Borrower ended after the Closing Date, a reasonably detailed consolidated budget for the following Fiscal Year as customarily prepared by management of the Borrower for its internal use (including a projected consolidated balance sheet of the Borrower and the Restricted Subsidiaries as of the end of such Fiscal Year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**"), which Projections shall in each case be accompanied by a certificate of an Authorized Officer of the Borrower stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were based on good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time of preparation of such Projections, it being understood that such Projections and assumptions as to future events are not to be viewed as facts or a guarantee of performance, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and its Subsidiaries, and that actual results may vary from such Projections and such differences may be material.

(h)     Reconciliations.    Simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 9.1(a) and (b) above, reconciliations for such consolidated financial statements or other consolidating information reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; *provided* that the Borrower shall be under no obligation to deliver the reconciliations or other information described in this clause (h) if the Consolidated

135

Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Subsidiaries (which Consolidated Total Assets and Consolidated EBITDA shall be calculated in accordance with the definitions of such terms, but determined based on the financial information of the Borrower and its consolidated Subsidiaries, and not the financial information of the Borrower and its Restricted Subsidiaries) do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of the Borrower and its Restricted Subsidiaries by more than 2.5%.

Notwithstanding the foregoing, the obligations in clauses (a), (b), (e) and (g) of this Section 9.1 may be satisfied with respect to financial information of the Borrower and the Restricted Subsidiaries by furnishing (A) the applicable financial statements of Holdings or any direct or indirect parent of Holdings or (B) the Borrower's (or Holdings' or any direct or indirect parent thereof), as applicable, Form 8-K, 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of clauses (A) and (B) of this paragraph, to the extent such information relates to Holdings or a direct or indirect parent of Holdings, such information is accompanied by consolidating or other information that explains in reasonable detail the differences between the information relating to Holdings or such parent, on the one hand, and the information relating to the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other hand (*provided*, *however*, that the Borrower shall be under no obligation to deliver such consolidating or other explanatory information if the Consolidated Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Restricted Subsidiaries do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of Holdings or any direct or indirect parent of Borrower and its consolidated Subsidiaries by more than 2.5%).  Documents required to be delivered pursuant to clauses (a), (b) and (e) of this Section 9.1 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website as notified to the Administrative Agent in writing and provides to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, or filed with the SEC, and available in EDGAR (or any successor) to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

9.2     Books, Records and Inspections

(a)     The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or the Required Lenders (as accompanied by the Administrative Agent) to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the books and records of the Borrower and any such Restricted Subsidiary and discuss the affairs, finances and accounts of the Borrower and of any such Restricted Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or Required Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies

and procedures); *provided* that, excluding any such visits and inspections during the continuation of an Event of Default (i) only the Administrative Agent, whether on its own or in conjunction with the Required Lenders, may exercise rights of the Administrative Agent and the Lenders under this Section 9.2, (ii) the Administrative Agent shall not exercise such rights more than one time in any calendar year and (iii) only one such visit shall be at the Borrower's expense; *provided*, *further*, that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Required Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 9.2, neither the Borrower nor any Restricted Subsidiary will be required under this Section 9.2 to disclose or permit the inspection or discussion of any document, information or other matter to the extent that such action would violate any attorney-client privilege (as reasonably determined by counsel (internal or external) to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality (not created in contemplation thereof) binding on the Credit Parties or their respective Affiliates or constituting attorney work product (as reasonably determined by counsel (internal or external) to the Credit Parties).

(b)        The Borrower will, and will cause each Restricted Subsidiary to, maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity, in all material respects, with GAAP shall be made of all material financial transactions and matters involving the assets of the business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that any Restricted Subsidiary may maintain its individual books and records in conformity with local standards or customs and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

9.3        Maintenance of Insurance

The Borrower will, and will cause each Material Subsidiary that is a Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower, as applicable) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business and the availability of insurance on a cost-effective basis; and will furnish to the Collateral Agent, upon written reasonable request from the Collateral Agent, information presented in reasonable detail as to the insurance so carried, *provided*, *however*, that for so long as no Event of Default has occurred and is continuing, the Collateral Agent shall be entitled to make such request only once in any calendar year. The Collateral Agent and its successors and/or assigns shall be named as lender loss payee or mortgagee and/or additional insured with respect to any insurance providing liability coverage or coverage in respect of any Collateral, and the Borrower will cause each provider of any such insurance to agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to

137

the Collateral Agent, that it will give the Collateral Agent thirty (30) days (or ten (10) days for non-payment or such lesser amount as the Required Lenders may agree to in their sole direction) prior written notice before any such policy or policies shall be altered or cancelled.  With respect to each Mortgaged Property, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), the Borrower shall obtain flood insurance in such total amount as the Collateral Agent may from time to time require and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

9.4     Payment of Taxes

The Borrower will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a material Lien upon any properties of the Borrower or any Restricted Subsidiary; *provided* that neither the Borrower nor any such Restricted Subsidiary shall be required to pay any such tax, assessment, charge, levy or claim (i) that is being contested in good faith and by proper proceedings if it has maintained adequate reserves (in the good faith judgment of management of the Borrower) with respect thereto in accordance with GAAP or (ii) with respect to which the failure to pay would not reasonably be expected to result in a Material Adverse Effect.

9.5     Consolidated Corporate Franchises

The Borrower will do, and will cause each Material Subsidiary that is a Restricted Subsidiary to do, or cause to be done, all things necessary to preserve and keep in full force and effect its existence, corporate rights and authority, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect; *provided*, *however*, that the Borrower and the Restricted Subsidiaries may consummate any transaction otherwise permitted hereby, including under Section 10.2, 10.3, 10.4 or 10.5.

9.6     Compliance with Statutes, Regulations, Etc.

The Borrower will, and will cause each Restricted Subsidiary to, comply with all Applicable Laws applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

9.7     Lender Calls

At the reasonable request of the Administrative Agent, the Borrower shall conduct a conference call that Lenders may attend to discuss the financial condition and results of operations of the Borrower and its Restricted Subsidiaries for the most recently ended measurement period for which financial statements have been delivered pursuant to Section 9.1(a) or (b) (beginning with the fiscal period of the Borrower ended September 30, 2023), at a date and

time to be determined by the Borrower with reasonable advance notice to the Administrative Agent, limited to one conference call per fiscal quarter.

9.8     Maintenance of Properties

The Borrower will, and will cause the Restricted Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition (ordinary wear and tear, casualty and condemnation excepted), except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

9.9     Transactions with Affiliates

The Borrower will conduct, and will cause the Restricted Subsidiaries to conduct, all transactions with any of its or their respective Affiliates (other than (x) any transaction or series of related transactions with an aggregate value that is equal to or less than $25,000,000 or (y) transactions between or among (i) the Borrower and the Restricted Subsidiaries or any Person that becomes a Restricted Subsidiary as a result of such transactions and (ii) the Borrower, the Restricted Subsidiaries and to the extent in the ordinary course or consistent with past practice, Holdings) on terms that are, taken as a whole, not materially less favorable to the Borrower or such Restricted Subsidiary as it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate (as determined in good faith by the Borrower); *provided* that the foregoing restrictions shall not apply to:

(a)     transactions permitted by Section 10 (other than Section 10.6(m) and any provision of Section 10 permitting transactions by reference to Section 9.9),

(b)     the Transactions and the payment of the Transaction Expenses,

(c)     the issuance of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) to the management of the Borrower (or any direct or indirect parent thereof) or any Subsidiary of the Borrower in connection with the Transactions or pursuant to arrangements described in clause (e) of this Section 9.9,

(d)     loans, advances and other transactions between or among the Borrower, any Subsidiary of the Borrower or any joint venture (regardless of the form of legal entity) in which the Borrower or any Subsidiary of the Borrower has invested (and which Subsidiary or joint venture would not be an Affiliate of the Borrower but for the Borrower's or such Subsidiary's Subsidiary ownership of Stock or Stock Equivalents in such joint venture or Subsidiary) to the extent permitted under Section 10,

(e)     (i) employment, consulting and severance arrangements between the Borrower and the Restricted Subsidiaries (or any direct or indirect parent of the Borrower) and their respective officers, employees, directors or consultants in the ordinary course of business (including payments, loans and advances in connection therewith) and (ii) issuances of securities, or other payments, awards or grants in cash, securities or otherwise and other transactions pursuant to any equityholder, employee or director equity plan or stock or other equity option plan or any other management or employee benefit plan or agreement, other compensatory arrangement or any stock or other equity subscription, co-invest or equityholder agreement,

139

(f)      the payment of customary fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, managers, consultants, officers and employees of the Borrower (or, to the extent attributable to the ownership of the Borrower and its Restricted Subsidiaries, any direct or indirect parent thereof) and the Subsidiaries of the Borrower,

(g)      the issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) to Holdings or to any director, officer, employee or consultant,

(h)      any customary transactions with a Receivables Entity effected as part of a Permitted Receivables Financing and any customary transactions with a Securitization Subsidiary effected as part of a Qualified Securitization Financing,

(i)      transactions pursuant to permitted agreements in existence on the Closing Date and, to the extent each such transaction is valued in excess of $25,000,000, set forth on Schedule 9.9 or any amendment, modification, supplement, replacement, extension, renewal or restructuring thereto to the extent such an amendment, modification, supplement, replacement, extension renewal or restructuring (together with any other amendment or supplemental agreements) is not materially adverse, taken as a whole, to the Lenders (in the good faith determination of the Borrower),

(j)      transactions in which Holdings (or any indirect parent of the Borrower), the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of Section 9.9,

(k)      the existence and performance of agreements and transactions with any Unrestricted Subsidiary that were entered into prior to the designation of a Restricted Subsidiary as such Unrestricted Subsidiary to the extent that the transaction was permitted at the time that it was entered into with such Restricted Subsidiary and transactions entered into by an Unrestricted Subsidiary with an Affiliate prior to the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that such transaction was not entered into in contemplation of such designation or redesignation, as applicable,

(l)      Affiliate repurchases of the Term Loans or Commitments to the extent permitted hereunder and the payments and other transactions reasonably related thereto,

(m)      transactions constituting any part of a Permitted Reorganization, and

(n)      transactions related to a Permitted Change of Control, the payment of Permitted Change of Control Costs and the issuance of Stock and Stock Equivalents to the management of Holdings, the Borrower or any of its Restricted Subsidiaries in connection with a Permitted Change of Control.

140

9.10    End of Fiscal Years

The Borrower will, for financial reporting purposes, cause its Fiscal Year to end on September 30 of each year (each a "**Fiscal Year**") and cause its Restricted Subsidiaries to maintain their fiscal years as in effect on the Closing Date; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent change the Fiscal Year or the fiscal years of its Restricted Subsidiaries with the prior written consent of the Administrative Agent and the Required Lenders (not to be unreasonably withheld, conditioned, delayed or denied), in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

9.11    Additional Guarantors and Grantors

Subject to any applicable limitations set forth in the Guarantee, the Security Documents, or any Applicable Intercreditor Agreement and this Agreement (including Section 9.12), the Borrower will cause each direct or indirect Wholly Owned Domestic Subsidiary of the Borrower (excluding any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date and each other Domestic Subsidiary of the Borrower that ceases to constitute an Excluded Subsidiary to, within sixty (60) days from the date of such formation, acquisition or cessation (which in the case of any Subsidiary ceasing to constitute an Excluded Subsidiary pursuant to clause (a) thereof, commencing on the date of delivery of the applicable compliance certificate pursuant to Section 9.1(c)), as applicable (or such longer period as the Required Lenders may agree in their reasonable discretion), execute (A) a supplement to each of the Guarantee and the Security Agreement in order to become a Guarantor under such Guarantee and a grantor/pledgor under the Security Agreement and (B) a joinder to the Intercompany Subordinated Note.

9.12    Further Assurances

(a)    Subject to the applicable limitations set forth in this Agreement (including Section 9.11) and the Security Documents and any Applicable Intercreditor Agreement, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents) that may be required under any Applicable Law, or that the Collateral Agent or Required Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Borrower and the Restricted Subsidiaries.

(b)    Subject to any applicable limitations set forth in the Security Documents (including in any Mortgage), if any assets that are of the nature secured by any Security Documents (including any owned Real Estate or improvements thereto constituting Collateral with a fair market value in excess of $10,000,000) are acquired by the Borrower or any Subsidiary Guarantor after the Closing Date or are held by any Subsidiary on or after the time it becomes a Guarantor pursuant to Section 9.11 (other than assets constituting Collateral under the Security Documents that become subject to the Lien of any Security Document upon acquisition thereof or assets

141

subject to a Lien granted pursuant to Section 10.2(d) or 10.2(g)), the Borrower will promptly notify the Collateral Agent in writing thereof and, if requested by the Collateral Agent or the Required Lenders, will cause such assets to be subjected to a Lien securing the Obligations and will take, and cause the other Credit Parties to take, such actions as shall be necessary or reasonably requested by the Collateral Agent or the Required Lenders, as soon as commercially reasonable but in no event later than one hundred twenty (120) days, unless extended by the Required Lenders in their reasonable discretion, to grant and perfect such Liens consistent with the applicable requirements of the Security Documents, including actions described in paragraph (a) of this Section, all at the expense of the Credit Parties.

(c)     Any Mortgage delivered to the Collateral Agent in accordance with the preceding clause (b) shall be accompanied by those items set forth in clause (d) that are customary for the type of assets covered by such Mortgage.  Any items that are customary for the type of assets covered by such Mortgage may be delivered within a commercially reasonable period of time after the delivery of a Mortgage if they are not reasonably available at the time the Mortgage is delivered.

(d)     With respect to any Mortgaged Property, within 120 days, unless extended by the Required Lenders in their reasonable discretion, the Borrower will deliver, or cause to be delivered, to the Collateral Agent (i) a Mortgage with respect to each Mortgaged Property, executed by an Authorized Officer of each obligor party thereto, (ii) a policy or policies of title insurance insuring the Lien of each such Mortgage as a valid Lien on the Mortgaged Property described therein, free of any other Liens except Permitted Encumbrances or consented to in writing (including via email) by the Collateral Agent and the Required Lenders, together with such endorsements and reinsurance as the Collateral Agent or the Required Lenders may reasonably request, together with evidence reasonably acceptable to the Collateral Agent of payment of all title insurance premiums, search and examination charges, escrow charges and related charges, fees, costs and expenses required for the issuance of the title insurance policies referred to above, (iii) a Survey, to the extent reasonably necessary to satisfy the requirements of clause (ii) above, (iv) all other documents and instruments, including Uniform Commercial Code or other applicable fixture security financing statements, reasonably requested by the Collateral Agent or the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by any such Mortgage and perfect such Liens to the extent required by, and with the priority required by, such Mortgage shall have been delivered to the Collateral Agent in proper form for filing, registration or recording and (v) written opinions of legal counsel in the states in which each such Mortgaged Property is located in customary form and substance.  If any building or other improvement included in any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or as hereafter in effect or successor act thereto), then the Borrower shall, prior to delivery of the Mortgages, deliver or cause to be delivered, (i) a completed Federal Emergency Management Agency Standard Flood Determination with respect to each Mortgaged Property, in each case in form and substance reasonably satisfactory to the Collateral Agent and (ii) evidence of flood insurance with respect to each Mortgaged Property, to the extent and in amounts required by Applicable Laws, in each case in form and substance reasonably satisfactory to the Collateral Agent.

142

(e)      Notwithstanding anything herein to the contrary, if the Borrower and the Required Lenders mutually agree in their reasonable judgment (confirmed in writing to the Borrower and the Collateral Agent) that the cost or other consequences (including adverse tax and accounting consequences) of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Secured Parties thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents.

(f)      Notwithstanding anything herein or in any other Credit Document to the contrary, the Borrower and the Guarantors shall not be required, nor shall the Collateral Agent be authorized, (i) to perfect the above-described pledges, security interests and mortgages by any means other than by (A) filings pursuant to the Uniform Commercial Code in the office of the secretary of state (or similar central filing office) of the relevant State(s), (B) filings in United States government offices with respect to intellectual property as expressly required herein and under the other Credit Documents, (C) delivery to the Collateral Agent, for its possession, of all Collateral consisting of material intercompany notes, stock certificates of the Borrower and its Restricted Subsidiaries or (D) Mortgages required to be delivered pursuant to this Section 9.12, (ii) to enter into any control agreement with respect to any deposit account, securities account or commodities account or contract (other than for which control agreements are required to be obtained or for which the ABL Collateral Agent has obtained control, in each case, to the extent required by the ABL Credit Documents; *provided* that in such case, the ABL Collateral Agent will act as the agent for perfection on behalf of the Secured Parties without causing the Collateral Agent or the Administrative Agent to become a party to such control agreements), (iii) to take any action in any non-U.S. jurisdiction or pursuant to the requirements of the laws of any non-U.S. jurisdiction in order to create any security interests or to perfect any security interests, including with respect to any intellectual property registered outside of the United States (it being understood that there shall be no security agreements or pledge agreements governed by the laws of any non-U.S. jurisdiction), (iv) except as expressly set forth above, to take any other action with respect to any Collateral to perfect through control agreements or to otherwise perfect by "control", (v) to provide any notice to obtain the consent of governmental authorities under the Federal Assignment of Claims Act (or any state equivalent thereof) or (vi) register, apply to register, or escrow any intellectual property or software.

9.13    Use of Proceeds

The Borrower will use the proceeds of the Initial Term Loans to consummate the Plan, for working capital, general corporate purposes, and certain fees and expenses associated with the closing of the Transactions.  The Borrower will use the proceeds of other Term Loans or Commitments for purposes as agreed with the Lenders thereof.

9.14    Maintenance of Ratings

The Borrower will use commercially reasonable efforts to obtain and maintain (but not maintain any specific rating) a public corporate family and/or corporate credit rating, as applicable, and public ratings in respect of the Initial Term Loans provided pursuant to this Agreement, in each case, from each of S&P and Moody's within 90 days after the Closing Date or as soon as reasonably practicable thereafter.

143

9.15    Changes in Business

The Borrower and the Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by the Borrower and the Restricted Subsidiaries, taken as a whole, on the Closing Date and other business activities which are extensions thereof or otherwise similar, incidental, complementary, synergistic, reasonably related or ancillary to any of the foregoing (and non-core incidental businesses acquired in connection with any Permitted Acquisition or permitted Investment), in each case as determined by the Borrower in good faith.

9.16    Post-Closing Obligations

(a)    The Borrower hereby agrees to deliver, or cause to be delivered, to the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, the items described on Schedule 9.16 hereof, if any, on or before the dates specified with respect to such items, or such later dates as may be agreed to by, or as may be waived by, the Required Lenders in their sole discretion.

(b)    All representations and warranties contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above and in Schedule 9.16, rather than as elsewhere provided in the Credit Documents); *provided* that to the extent any representation and warranty would not be true because the foregoing actions were not taken on the Closing Date or, following the Closing Date, prior to the date by which such action is required to be taken by Section 9.16(a), the respective representation and warranty shall be required to be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 9.16 (and Schedule 9.16).

**SECTION 10 Negative Covenants**

The Borrower hereby covenants and agrees that on the Closing Date (immediately after giving effect to the Transactions) and thereafter, until all Commitments and all Term Loans, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreement or Contingent Obligations), are paid in full:

10.1    Limitation on Indebtedness

The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness.  Notwithstanding the foregoing, the limitations set forth in the immediately preceding sentence shall not apply to any of the following:

(a)    Indebtedness arising under the Credit Documents (including any Indebtedness incurred as permitted by Sections 2.14, 2.15 and 13.1);

144

(b)        Indebtedness under the ABL Credit Documents and any Refinancing Indebtedness thereof, in an aggregate principal amount not to exceed the sum of (i) $300,000,000 *plus* (ii) solely in the case of any such Refinancing Indebtedness, the Refinancing Increased Amount with respect thereto;

(c)        [reserved];

(d)        subject to compliance with Section 10.5, Indebtedness of the Borrower or any Restricted Subsidiary owed to the Borrower or any Restricted Subsidiary; *provided* that all such Indebtedness of any Credit Party owed to any Person that is not a Credit Party shall be (x) evidenced by the Intercompany Subordinated Note (*provided* that any Person becoming a Restricted Subsidiary after the Closing Date may enter into the Intercompany Subordinated Note within the time period set forth in Section 9.11) or (y) otherwise be subject to subordination terms substantially identical to the subordination terms set forth in the Intercompany Subordinated Note or otherwise reasonably acceptable to the Collateral Agent and the Required Lenders;

(e)        subject to compliance with Section 10.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness of the Borrower or any other Restricted Subsidiary that is permitted to be incurred under this Agreement and (ii) the Borrower in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement; *provided* that (x) if the Indebtedness being guaranteed under this Section 10.1(e) is subordinated to the Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms (taken as a whole) at least as favorable to the Agents and the Lenders as those contained in the subordination of such Indebtedness and (y) a Restricted Subsidiary that is not a Credit Party may not, by virtue of this Section 10.1(e), guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 10.1;

(f)        Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims and similar obligations);

(g)        Guarantee Obligations (i) incurred in the ordinary course of business in respect of obligations of (or to) suppliers, customers, franchisees, lessors and licensees, (ii) otherwise constituting Investments permitted by Section 10.5 (other than Investments permitted by Section 10.5(l) by reference to Section 10.1 and Section 10.5(q)); *provided* that this clause (ii) shall not be construed to limit the requirements of Section 10.1(d) and (e), or (iii) contemplated by the Plan;

(h)        Indebtedness (including Indebtedness arising under Capital Leases) incurred to finance the purchase price, cost of design, acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of fixed or capital assets or otherwise in respect of Capital Expenditures, so long as such Indebtedness is incurred concurrently with or within 270 days of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of such fixed or capital assets or incurrence of such Capital Expenditure, and any Refinancing Indebtedness thereof, in an aggregate principal amount not to

145

exceed (i) $100,000,000 *plus* the principal amount of Capital Leases outstanding on the Closing Date, in each case at any time outstanding *plus* (ii) solely in the case of any such Refinancing Indebtedness, the Refinancing Increased Amount with respect thereto;

(i)        Indebtedness permitted to remain outstanding under the Plan, and to the extent such Indebtedness exceeds $5,000,000, set forth on Schedule 10.1 and any Refinancing Indebtedness thereof; *provided* that in the case of any Refinancing Indebtedness of any such Indebtedness, each obligor of such Refinancing Indebtedness is an obligor of such Indebtedness;

(j)        Indebtedness in respect of Hedging Agreements; *provided* that such Hedging Agreements are not entered into for speculative purposes (as determined by the Borrower in good faith);

(k)        (i) Permitted Other Debt assumed or incurred for any purpose, including to finance a Permitted Acquisition, other permitted Investments or Capital Expenditures; *provided* that (A) if such Indebtedness is incurred or assumed by a Restricted Subsidiary that is not a Credit Party, such Indebtedness is not guaranteed in any respect by the Borrower or any other Guarantor except as permitted under Section 10.5, (B) the aggregate principal amount of Indebtedness incurred or assumed under this Section 10.1(k)(i) shall not exceed (1) $100,000,000 *plus* (2) additional amounts if, on a Pro Forma Basis after giving effect to the incurrence or assumption of such Indebtedness and the application of proceeds thereof and, if applicable, the Permitted Acquisition, permitted Investment or Capital Expenditure, the Consolidated Total Net Leverage Ratio is not greater than 3.30 to 1.00 or, to the extent incurred or assumed in connection with a Permitted Acquisition or similar Investment, the Consolidated Total Net Leverage Ratio (on a Pro Forma Basis for such transaction and the incurrence or assumption of such Indebtedness) is not greater than (I) 3.30 to 1.00 or (II) if the aggregate principal amount of such Indebtedness does not exceed the then-available Ratio Test Cap at such time, the Consolidated Total Net Leverage Ratio immediately prior to such Permitted Acquisition or similar Investment, and (C) if such Permitted Other Debt incurred (and for the avoidance of doubt, not "assumed") pursuant to this clause (k)(i) constitutes a Permitted Other Loan that ranks *pari passu* with the Initial Term Loans as to right of payment and security with respect to the Collateral, the Initial Term Loans shall be subject to the adjustment (if applicable) set forth in the proviso to Section 2.14(d)(iv) as if such Permitted Other Loan were an Incremental Term Loan incurred hereunder and (ii) any Refinancing Indebtedness in respect of the Indebtedness under clause (i) above; *provided* that Indebtedness incurred or assumed by Restricted Subsidiaries that are not Subsidiary Guarantors under this Section 10.1(k), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 10.1(ee), shall not exceed $100,000,000, in each case at any time outstanding, *provided*, further, that any Permitted Other Debt incurred in reliance on clause (B)(2)(II) above may be reclassified, as the Borrower may elect from time to time, as incurred under clause (B)(2)(I) above, if the Borrower meets the applicable leverage ratio at such time on a Pro Forma Basis;

(l)        Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business or consistent with past practice, including those incurred to secure health, safety and environmental obligations in the ordinary

146

course of business (including in respect of construction or restoration activities) or consistent with past practice;

(m)     additional Indebtedness; *provided* that the aggregate amount of Indebtedness incurred or issued pursuant to this Section 10.1(m) shall not exceed $100,000,000, in each case at any time outstanding;

(n)     Cash Management Obligations and other Indebtedness in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

(o)     (i) Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (ii) Indebtedness in respect of intercompany obligations of the Borrower or any Restricted Subsidiary with the Borrower or any Restricted Subsidiary in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(p)     Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case entered into in connection with a Permitted Change of Control, Permitted Acquisitions, other Investments and the Disposition of any business, assets or Stock or Stock Equivalents permitted hereunder;

(q)     Indebtedness of the Borrower or any Restricted Subsidiary consisting of (i) financing of insurance premiums or (ii) take or pay obligations contained in supply agreements, in each case arising in the ordinary course of business;

(r)     Indebtedness representing deferred compensation, or similar arrangement, to employees, consultants or independent contractors of the Borrower and the Restricted Subsidiaries incurred in the ordinary course of business;

(s)     Indebtedness consisting of promissory notes issued by the Borrower or any Restricted Subsidiary to any present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) to finance the purchase or redemption of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) permitted by Section 10.6(b);

(t)     Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions and Permitted Acquisitions, any other Investment permitted hereunder and any Permitted Change of Control;

(u)     Indebtedness in respect of (i) Permitted Receivables Financings owed by a Receivables Entity or Qualified Securitization Financings owed by a Securitization Subsidiary and

147

(ii) accounts receivable factoring facilities in the ordinary course of business; *provided* that the aggregate amount of Receivables Indebtedness pursuant to this clause (u) shall not exceed $100,000,000 at any time outstanding;

(v)     Indebtedness of Credit Parties in respect of (i) Permitted Other Debt issued or incurred to the extent that the Net Cash Proceeds therefrom are applied to the prepayment of the Term Loans in the manner set forth in Section 5.2(a)(iii)(A); (ii) other Permitted Other Debt (such Indebtedness incurred pursuant to this clause (ii), "**Incremental Equivalent Debt**") in an aggregate principal amount not to exceed the then-available Maximum Incremental Facilities Amount; *provided* that (x) if such Permitted Other Debt incurred pursuant to this clause (ii) is a Permitted Other Loan that ranks *pari passu* with the Initial Term Loans as to right of payment and security, the Initial Term Loans shall be subject to the adjustment (if applicable) set forth in the proviso to Section 2.14(d)(iv) as if such Permitted Other Loan were an Incremental Term Loan incurred hereunder and (y) if such Permitted Other Debt incurred pursuant to this clause (ii) is unsecured or secured on a junior basis to the Obligations, such Permitted Other Debt shall not have a maturity date earlier than 91 days after the Initial Term Loan Maturity Date; and (iii) any Refinancing Indebtedness in respect of Indebtedness incurred pursuant to clauses (i) and (ii) above;

(w)     (i) Indebtedness of Credit Parties in respect of Permitted Debt Exchange Instruments incurred pursuant to a Permitted Debt Exchange in accordance with Section 2.17 and (ii) any Refinancing Indebtedness thereof;

(x)     Indebtedness in an amount not to exceed the Available Equity Amount;

(y)     Indebtedness of any Minority Investments or Indebtedness incurred on behalf thereof or representing guarantees of such Indebtedness of any Minority Investment, in an amount not to exceed $100,000,000 at the time of incurrence or issuance, in each case at any time outstanding;

(z)     intercompany Indebtedness among the Borrower and its Subsidiaries constituting any part of any Permitted Reorganization;

(aa)     to the extent constituting Indebtedness, customer deposits and advance payments (including progress payments) received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(bb)     (i) Indebtedness of the Borrower or any Restricted Subsidiary supported by a letter of credit, in a principal amount not in excess of the stated amount of such letter of credit so long as such letter of credit is otherwise permitted to be incurred pursuant to this Section 10.1 or (ii) obligations in respect of letters of support, guarantees or similar obligations issued, made or incurred for the benefit of the Borrower or any Subsidiary of the Borrower in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than the United States;

(cc)     Indebtedness owing to the seller of any business or assets permitted to be acquired by the Borrower or any Restricted Subsidiary under this Agreement; *provided* that the aggregate amount of Indebtedness permitted under this clause (cc) shall not exceed $100,000,000 outstanding at any time;

148

(dd)     obligations in respect of Disqualified Stock in an amount not to exceed the greater of $25,000,000 and 3% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) outstanding at any time;

(ee)     Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors under this clause (ee), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 10.1(k), shall not exceed $100,000,000, in each case at any time outstanding; and

(ff)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (ee) above.

For the avoidance of doubt, any Indebtedness permitted to be incurred under any clause of this Section 10.1 may be used to modify, refinance, refund, renew, replace, exchange or extend any outstanding Indebtedness, including any such Indebtedness incurred under any other clause of this Section 10.1 and any such Indebtedness with respect to which the incurrence of Refinancing Indebtedness is expressly permitted under this Section 10.1, in each case, subject to the restrictions set forth in Section 10.7.

Accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock will not be deemed to be an incurrence or issuance of Indebtedness or Disqualified Stock for purposes of this covenant.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior lien priority with respect to the same collateral.

10.2     Limitation on Liens

The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of the Borrower or such Restricted Subsidiary, whether now owned or hereafter acquired, except:

(a)     Liens arising under the Security Documents;

(b)     Liens securing Indebtedness permitted to be incurred pursuant to Section 10.1(b), and Hedging Obligations and Cash Management Obligations permitted to be secured on a *pari passu* basis with the ABL Loans under the ABL Credit Documents; *provided* that such Lien over the Collateral shall be subject to the Applicable Intercreditor Agreements reflecting its *pari passu* status as compared with the Liens securing the ABL Loans;

(c)     [reserved];

149

(d) Liens securing Indebtedness permitted pursuant to Section 10.1(h); *provided* that except as otherwise permitted hereby, such Liens attach at all times only to the assets so financed except (1) for accessions to the property financed with the proceeds of such Indebtedness and the proceeds and the products thereof and (2) that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(e) Liens permitted to remain outstanding under the Plan; *provided* that any Lien securing Indebtedness or other obligations in excess of $5,000,000 shall only be permitted to the extent such Lien is listed on Schedule 10.2;

(f) (i) Liens securing Indebtedness permitted to be incurred under clause (B) of the proviso to Section 10.1(k)(i), Section 10.1(v)(i), Section 10.1(v)(ii) or Section 10.1(w)(i); *provided* that (A) the representative of such Indebtedness shall have entered into the Applicable Intercreditor Agreements to the extent secured by the Collateral reflecting its junior or *pari passu* (but not senior) priority status as compared with the Liens securing the Obligations and (B) (I) with respect to Indebtedness incurred in reliance on clause (B) of the proviso to Section 10.1(k)(i) that is secured by Liens on a *pari passu* basis with any Liens securing the Initial Term Loans (without regard to control of remedies), immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated First Lien Net Leverage Ratio is no greater than (I) 3.30 to 1.00 and (II) with respect to Indebtedness incurred in reliance on clause (B) of the proviso to Section 10.1(k)(i) that is secured by Liens that are junior in right of security to the Liens securing the Initial Term Loans, immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated Secured Net Leverage Ratio is no greater than 3.30 to 1.00 and (ii) Liens securing Refinancing Indebtedness permitted to be incurred under Section 10.1(k)(ii), Section 10.1(v)(iii) and Section 10.1(w)(ii);

(g) Liens existing on the assets of any Person that becomes a Restricted Subsidiary (or is a Restricted Subsidiary that survives a merger with such Person or any of its Subsidiaries) pursuant to a Permitted Acquisition or other permitted Investment or the designation of an Unrestricted Subsidiary as a Restricted Subsidiary or existing on assets acquired after the Closing Date, to the extent the Liens on such assets secure Indebtedness permitted by Section 10.1; *provided* that such Liens (i) are not created or incurred in connection with, or in contemplation of, such Person becoming such a Restricted Subsidiary or such assets being acquired and (ii) attach at all times only to the same assets to which such Liens attached and after-acquired property, property that is affixed or incorporated into the property covered by such Lien and accessions thereto and products and proceeds thereof, after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property, and the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment (or assets affixed or appurtenant thereto and additions and accessions) provided by any lender, other equipment financed by such lender, it being understood that such requirement to pledge such after-acquired property shall not be permitted to apply to any such after-acquired property to which such requirement would not have applied but for such acquisition except as otherwise permitted hereunder, and any Refinancing Indebtedness thereof permitted by Section 10.1;

150

(h)      additional Liens on assets of any Restricted Subsidiary that is not a Credit Party securing Indebtedness of such Restricted Subsidiary permitted pursuant to Section 10.1 (or other obligations of such Restricted Subsidiary not constituting Indebtedness);

(i)      additional Liens on assets that do not constitute Collateral prior to the creation of such Liens, so long as the Credit Facilities hereunder are equally and ratably secured thereby and the aggregate amount of Indebtedness secured thereby at any time outstanding does not exceed $160,000,000; *provided* that such Liens are subject to intercreditor arrangements reasonably satisfactory to the Borrower, the Collateral Agent, and the Required Lenders, it being understood and agreed that intercreditor arrangements in substantially the form of the Applicable Intercreditor Agreements are satisfactory;

(j)      additional *pari passu* or junior Liens securing Indebtedness, so long as (i)(x) with respect to Indebtedness that is secured by Liens on a *pari passu* basis with any Liens securing the Initial Term Loans (without regard to control of remedies), immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated First Lien Net Leverage Ratio is no greater than 3.30 to 1.00 and (y) with respect to Indebtedness that is secured by Liens that are junior in right of security to the Liens securing any Initial Term Loans, immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated Secured Net Leverage Ratio is no greater than 3.30 to 1.00 and (ii) the holder(s) of such Liens (or a representative thereof) shall have entered into the Applicable Intercreditor Agreements;

(k)      additional Liens, so long as the aggregate amount of obligations secured thereby at any time outstanding does not exceed $100,000,000 at the time of incurrence or issuance;

(l)      (i) Liens on accounts receivable, other Receivables Facility Assets, or accounts into which collections or proceeds of Receivables Facility Assets are deposited, in each case arising in connection with a Permitted Receivables Financing permitted under Section 10.1(u) and (ii) Liens on Securitization Assets and related assets arising in connection with a Qualified Securitization Financing permitted under Section 10.1(u);

(m)      Permitted Encumbrances; and

(n)      the supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, extension or renewal of any Lien permitted by clause (e), clause (g) and clause (i) of this Section 10.2 upon or in the same assets theretofore subject to such Lien (or upon or in after-acquired property that is affixed or incorporated into the property covered by such Lien and accessions thereto or any proceeds or products thereof) or the Refinancing Indebtedness (without a change in any obligor, except to the extent otherwise permitted hereunder) of the Indebtedness or other obligations secured thereby (including any unused commitments), to the extent such Refinancing Indebtedness is permitted by Section 10.1; *provided* that in the case of any such supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, extension or renewal of any Lien permitted by clause (g) and clause (i) of this Section 10.2, the requirements set forth in the proviso to clause (g) or clause (i), as applicable, shall have been satisfied.

151

10.3    Limitation on Fundamental Changes

The Borrower will not, and will not permit the Restricted Subsidiaries to, consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise consummate the Disposition of, all or substantially all its business units, assets or other properties, except that:

(a)    so long as both before and after giving effect to such transaction, no Event of Default has occurred and is continuing or would result therefrom, any Subsidiary of the Borrower or any other Person may be merged, amalgamated or consolidated with or into the Borrower; *provided* that (A) the Borrower shall be the continuing or surviving company or (B) if the Person formed by or surviving any such merger, amalgamation or consolidation is not the Borrower (such other Person, the "**Successor Borrower**"), (1) the Successor Borrower (if other than the Borrower) shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Borrower (if other than the Borrower) shall expressly assume all the obligations of the Borrower under this Agreement and the other Credit Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Agents and the Required Lenders, (3) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guarantee confirmed that its guarantee thereunder shall apply to any Successor Borrower's obligations under this Agreement, (4) each grantor and each pledgor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement, affirmed that its obligations thereunder shall apply to its Guarantee as reaffirmed pursuant to clause (3), (5) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have affirmed that its obligations under the applicable Mortgage shall apply to its Guarantee as reaffirmed pursuant to clause (3), (6) the Successor Borrower shall have delivered to the Administrative Agent an officer's certificate stating that such merger or consolidation and such supplements preserve the enforceability of this Agreement and the Guarantee and the perfection and priority of the Liens under the applicable Security Documents, and (7) the Successor Borrower shall have provided to each Agent all documentation and information reasonably requested by such Agent that is necessary and is required by United States regulatory authorities to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(b)    so long as no Event of Default has occurred and is continuing, or would result therefrom, any Subsidiary of the Borrower or any other Person (in each case, other than the Borrower) may be merged, amalgamated or consolidated with or into any one or more Subsidiaries of the Borrower; provided that (i) in the case of any merger, amalgamation or consolidation involving one or more Restricted Subsidiaries, (A) a Restricted Subsidiary shall be the continuing or surviving Person or (B) the Borrower shall cause the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Restricted Subsidiary) to become a Restricted Subsidiary, (ii) in the case of any merger, amalgamation or consolidation involving one or more Guarantors, a Guarantor shall be the continuing or surviving Person or the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Guarantor) shall execute a supplement to the Guarantee and the relevant Security Documents each in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders in order

152

to become a Guarantor and pledgor, mortgagor and grantor, as applicable, thereunder for the benefit of the Secured Parties and to acknowledge and agree to the terms of the Intercompany Subordinated Note, and (iii) Borrower shall have delivered to the Administrative Agent an officers' certificate stating that such merger, amalgamation or consolidation and any such supplements to the Guarantee and any Security Document preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the applicable Security Documents to the extent otherwise required;

(c)      any Permitted Reorganization may be consummated;

(d)      any Restricted Subsidiary that is not a Credit Party may sell, lease, transfer or otherwise Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Restricted Subsidiary;

(e)      the Borrower or any Subsidiary of the Borrower may sell, lease, transfer or otherwise Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to any Credit Party; *provided* that the consideration for any such Disposition by any Person other than a Guarantor shall not exceed the fair value of such assets;

(f)      any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Credit Party, any assets or business of such Restricted Subsidiary not otherwise disposed of or transferred in accordance with Section 10.4 or 10.5, or in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Credit Party after giving effect to such liquidation or dissolution;

(g)      the Borrower or any Restricted Subsidiary may change its legal form, so long as (i) no Event of Default has occurred and is continuing or would result therefrom and (ii) the Liens granted pursuant to any Security Documents to which such Person is a party remain perfected and in full force and effect, to the extent otherwise required hereby;

(h)      any merger, consolidation or amalgamation the purpose and only substantive effect of which is to reincorporate or reorganize the Borrower or any Restricted Subsidiary in a jurisdiction in the United States, any state thereof or the District of Columbia, so long as the Liens granted pursuant to the Security Documents to which the Borrower is a party remain perfected and in full force and effect, to the extent otherwise required hereby;

(i)      the Transactions and any transactions as contemplated by the Plan may be consummated;

(j)      the Borrower and the Restricted Subsidiaries may consummate a merger, amalgamation dissolution, liquidation, windup, consolidation or Disposition, constituting, or otherwise resulting in, a transaction permitted by Section 10.4 (other than pursuant to (x) Section 10.4(d) and (y) the Disposition of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries, taken as a whole, to any Person other than the Borrower or any Guarantor), an Investment permitted pursuant to Section 10.5 (other than Section 10.5(l)), and any Restricted Payments permitted pursuant to Section 10.6 (other than Section 10.6(f)); and

153

(k)      any Permitted Change of Control may be consummated.

10.4    Limitation on Disposition

The Borrower will not, and will not permit the Restricted Subsidiaries to make any Disposition, except that:

(a)      the Borrower and the Restricted Subsidiaries may sell, transfer, license or sublicense, or otherwise Dispose of, in the reasonable business judgment of the Borrower or such Restricted Subsidiary, (i) obsolete, negligible, immaterial, worn-out, uneconomical, scrap, used, or surplus or mothballed assets (including any such equipment that has been refurbished in contemplation of such Disposition) or assets no longer used or useful in the business or no longer commercially desirable to maintain, (ii) inventory or goods (or other assets) held for sale in the ordinary course of business, (iii) cash and Cash Equivalents, (iv) immaterial assets (including allowing any registrations or any applications for registration of any intellectual property rights to lapse or go abandoned in the ordinary course of business), and (v) assets for the purposes of charitable contributions or similar gifts to the extent such assets are not material to the ability of the Borrower and the Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b)      the Borrower and the Restricted Subsidiaries may make Dispositions of assets; *provided* that (i) to the extent required, the Net Cash Proceeds thereof received by the Borrower and the Restricted Subsidiaries are promptly applied to the prepayment of Term Loans as provided for in Section 5.2(a)(i), (ii) as of the date of signing of the definitive agreement for such Disposition, no Event of Default shall have occurred and be continuing, (iii) with respect to any Disposition pursuant to this clause (b) for a purchase price in excess of $50,000,000, the Person making such Disposition shall receive fair market value and not less than 75% of such consideration in the form of cash or Cash Equivalents; *provided* that for the purposes of this clause (iii) the following shall be deemed to be cash:  (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto, or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or such Restricted Subsidiary's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the payment in cash of the Obligations (other than intercompany liabilities owing to a Restricted Subsidiary being disposed of) and that are (1) assumed by the transferee (or a third party in connection with such transfer) with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing or indemnified from such liabilities or (2) otherwise cancelled or terminated in connection therewith, (B) any securities, notes or other obligations received by the Person making such Disposition from the purchaser that are converted by such Person into cash or Cash Equivalents or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, (C) consideration consisting of Indebtedness of any Credit Party (other than subordinated Indebtedness) received after the Closing Date from Persons who are not Restricted Subsidiaries (so long as such Indebtedness is not cancelled or forgiven), (D) any Marketable Security and (E) any Designated Non-Cash Consideration received

154

by the Person making such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this Section 10.4(b) that is at that time outstanding, not in excess of $100,000,000 at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value and (iv) any non-cash proceeds received in the form of Real Estate, Indebtedness or Stock and Stock Equivalents are pledged to the Collateral Agent to the extent required under Section 9.11, 9.12 or the Security Agreement;

(c)      (i) the Borrower and the Restricted Subsidiaries may make Dispositions to the Borrower or any other Credit Party, (ii) any Restricted Subsidiary that is not a Credit Party may make Dispositions to the Borrower or any other Restricted Subsidiary of the Borrower; and (iii) any Credit Party may make Dispositions to a non-Credit Party to the extent constituting an Investment permitted under Section 10.5 (other than Section 10.5(l));

(d)      the Borrower and any Restricted Subsidiary may effect any transaction permitted by Sections 10.2, 10.3 (other than Section 10.3(j)), 10.5 (other than Section 10.5(l)) or 10.6 (other than Section 10.6(f));

(e)      the Borrower and any Restricted Subsidiary may lease, sublease, license or sublicense (i) real or personal property (other than intellectual property) in the ordinary course of business or (ii) intellectual property not interfering in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole and not, in each case of (i) and (ii), in connection with any transactions undertaken in furtherance of dividends, payments or exchange of any Indebtedness or financing (other than financing among Borrower and its Restricted Subsidiaries);

(f)      Dispositions of property (including like-kind exchanges) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property (excluding any boot thereon) or (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property, in each case under Section 1031 of the Code or otherwise;

(g)      the Borrower and any other Credit Party may transfer or otherwise Dispose of any intellectual property for fair market value to any Restricted Subsidiary of the Borrower that is not a Credit Party; *provided* that (x) such transfer or Disposition is in the ordinary course of business and not in connection with any transactions undertaken in furtherance of dividends, payments or exchange of any Indebtedness or financing (other than financing among Borrower and its Restricted Subsidiaries) or (y) (i) the transferee shall be (A) a direct or indirect Wholly Owned Restricted Subsidiary or (B) a special purpose entity that does not incur any third-party Indebtedness for borrowed money (for the avoidance of doubt, such entity may have employees managing its intellectual property assets and conducting internal research and development activities) and (ii) the consideration received by the Credit Party from such Disposition shall be in the form of (A) cash and Cash Equivalents, (B) intercompany notes owed to the Credit Party transferor/licensor by the non-Credit Party transferee/licensee, which intercompany notes are pledged to secure the Obligations and/or (C) Stock and Stock Equivalent of the transferee/licensee (or a parent entity of such transferee/licensee so long as such parent entity and any intermediate holding entity otherwise satisfies the requirements set forth in clause (i) above) and the Stock and

155

Stock Equivalents of such transferee/licensee (or the parent entity) are pledged to secure the Obligations (subject to the limitation set forth in the Security Agreement); *provided* that in the case of this clause (ii)(C), the aggregate fair market value of any and all intellectual property so disposed of shall not exceed $100,000,000;

(h)      Dispositions of (i) Investments in joint ventures (regardless of the form of legal entity) to the extent required by, or made pursuant to, customary buy/sell arrangements or put/call arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements or (ii) to joint ventures in connection with the dissolution or termination of a joint venture to the extent required pursuant to joint venture and similar arrangements;

(i)      (i) Dispositions of Receivables Facility Assets in connection with any Permitted Receivables Financing, and any Disposition of Securitization Assets in connection with any Qualified Securitization Financing and (ii) Dispositions in connection with accounts receivable factoring facilities in the ordinary course of business, *provided* that the Indebtedness arising in connection therewith shall not exceed the amount of Indebtedness permitted by Section 10.1(u);

(j)      Dispositions listed on Schedule 10.4 or to consummate the Transactions, including transactions contemplated by the Plan;

(k)      transfers of property subject to a Recovery Event or in connection with any condemnation proceeding upon receipt of the Net Cash Proceeds of such Recovery Event or condemnation proceeding;

(l)      Dispositions or discounts of accounts receivable or notes receivable in connection with the collection or compromise thereof or the conversion of accounts receivable to notes receivable;

(m)      Dispositions (other than to an Unrestricted Subsidiary) of any assets not constituting Collateral in an aggregate amount not to exceed $100,000,000;

(n)      the execution of (or amendment to), settlement of or unwinding of any Hedging Agreement;

(o)      any issuance or sale of Stock or Stock Equivalent in, or Indebtedness or other securities of, any Unrestricted Subsidiary;

(p)      the surrender or waiver of contractual rights and settlement or waiver of contractual or litigation claims;

(q)      Dispositions of any assets (including Stock and Stock Equivalents) acquired in connection with any Permitted Acquisition or other Investment not prohibited hereunder, which assets are not used or useful to the core or principal business of the Borrower and its Restricted Subsidiaries (as determined by the Borrower in good faith); and

156

(r)      other Dispositions (including those of the type otherwise described herein, but excluding any Disposition to an Unrestricted Subsidiary) made for fair market value in an aggregate amount not to exceed $100,000,000;

(s)      the Borrower and any Restricted Subsidiary may (i) terminate or otherwise collapse its cost sharing agreements with the Borrower or any Subsidiary and settle any crossing payments in connection therewith, (ii) convert any intercompany Indebtedness to Stock or any Stock to intercompany Indebtedness, (iii) settle, discount, write off, forgive or cancel any intercompany Indebtedness or other obligation owing by the Borrower or any Restricted Subsidiary or (iv) settle, discount, write off, forgive or cancel any Indebtedness owing by any present or former consultants, managers, directors, officers or employees of Holdings, the Borrower, any direct or indirect parent thereof, or any Subsidiary thereof or any of their successors or assigns;

(t)      any Disposition of property to the extent that (1) such property is exchanged for credit against the purchase price of similar replacement property that is purchased within 270 days thereof or (2) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually purchased within 270 days thereof);

(u)      any Disposition in connection with a Permitted Reorganization;

(v)      any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater fair market value or usefulness to the business of the Borrower and the Restricted Subsidiaries, taken as a whole, as determined in good faith by the Borrower; and

(w)      Dispositions of any asset between or among the Borrower and/or any Restricted Subsidiary as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (v) above; *provided* that after giving effect to any such Disposition, to the extent the assets subject to such Dispositions constituted Collateral, such assets shall remain subject to, or be rejoined to, the Lien of the Security Documents.

Notwithstanding the foregoing, no transfer or other Disposition of any intellectual property by a Credit Party to a Subsidiary that is not a Credit Party may be made except pursuant to Section 10.4(c)(iii) (solely in respect of Investments permitted by the proviso to Section 10.5(w)), (e) or (g).

10.5    Limitation on Investments

The Borrower will not, and will not permit the Restricted Subsidiaries, to make any Investment except:

(a)      extensions of trade credit, asset purchases (including purchases of inventory, supplies, materials and equipment) and the licensing or contribution of intellectual property pursuant to joint marketing arrangements, original equipment manufacturer arrangements or development agreements with other Persons, in each case in the ordinary course of business;

157

(b)　　Investments in cash or Cash Equivalents when such Investments were made;

(c)　　loans and advances to officers, managers, directors, employees, consultants and independent contractors of the Borrower (or any direct or indirect parent thereof) or any Subsidiary of the Borrower (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances), (ii) in connection with such Person's purchase of Stock or Stock Equivalents of Holdings (or any direct or indirect parent thereof; *provided* that, to the extent such loans and advances are made in cash, the amount of such loans and advances used to acquire such Stock or Stock Equivalents shall be contributed to the Borrower in cash) and (iii) for purposes not described in the foregoing clauses (i) and (ii); *provided* that the aggregate principal amount outstanding pursuant to clause (iii) shall not exceed $25,000,000 at any one time outstanding;

(d)　　Investments (i) contemplated by the Plan or to consummate the Transactions and (ii) existing on, or made pursuant to legally binding written commitments in existence on, the Closing Date and, to the extent such Investments exceed $5,000,000, set forth on Schedule 10.5 and any supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, renewal or extension thereof, only to the extent that the amount of any Investment made pursuant to this clause (d)(ii) does not at any time exceed the amount of such Investment set forth on Schedule 10.5 (except by an amount equal to the unpaid accrued interest and premium thereon *plus* any unused commitments *plus* amounts paid in respect of fees, premiums, costs and expenses incurred in connection with such supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, renewal or extension or as otherwise permitted hereunder);

(e)　　any Investment acquired by the Borrower or any Restricted Subsidiary (i) in exchange for any other Investment or accounts receivable held by the Borrower or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization, or recapitalization of, or settlement of delinquent accounts or disputes with or judgments against, the issuer, obligor or borrower of such original Investment or accounts receivable, (ii) as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default or (iii) as a result of the settlement, compromise or resolution of litigation, arbitration or other disputes with Persons who are not Affiliates or in satisfaction or judgments against other Persons;

(f)　　Investments to the extent that payment for such Investments is made with (i) Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) or (ii) the proceeds from the issuance of Stock or Stock Equivalents (other than Disqualified Stock, any sale or issuance to any Subsidiary and any issuance applied pursuant to Section 10.6(a) or Section 10.6(b)(i)) of the Borrower (or any direct or indirect parent thereof); *provided* that such Stock or Stock Equivalents or proceeds of such Stock or Stock Equivalents will not increase the Available Equity Amount;

(g)　　Investments (other than in the form of direct or indirect transfers or Dispositions of intellectual property from a Credit Party to a non-Credit Party) by the Borrower or

158

any Restricted Subsidiary in the Borrower or any Restricted Subsidiary or any Person that will, upon such Investment become a Restricted Subsidiary;

(h)        Investments constituting Permitted Acquisitions;

(i)        Investments constituting (i) Minority Investments and Investments in Unrestricted Subsidiaries and (ii) Investments in joint ventures (regardless of the form of legal entity) or similar Persons that do not constitute Restricted Subsidiaries, in each case valued at the fair market value (determined by the Borrower acting in good faith) of such Investment at the time each such Investment is made, in an aggregate amount at any one time outstanding pursuant to this clause (i) that, at the time each such Investment is made, would not exceed $100,000,000;

(j)        Investments constituting non-cash proceeds received from Dispositions of assets pursuant to Section 10.4;

(k)        Investments made to repurchase or retire Stock or Stock Equivalents of the Borrower or any direct or indirect parent thereof owned by any employee or any stock ownership plan or key employee stock ownership plan of the Borrower (or any direct or indirect parent thereof) in an aggregate amount, when combined with distributions made pursuant to Section 10.6(b), not to exceed the limitations set forth in such Section;

(l)        Investments consisting of or resulting from Indebtedness, Liens, Restricted Payments, fundamental changes and Dispositions permitted by Section 10.1 (other than Sections 10.1(d), 10.1(e) and 10.1(g)(ii)), 10.2, 10.3 (other than Section 10.3(j)), 10.4 (other than Section 10.4(d)), 10.6 (other than Section 10.6(f)), 10.7 or 10.8, as applicable;

(m)        loans and advances to any direct or indirect parent of the Borrower in lieu of, and not in excess of the amount of, Restricted Payments to the extent permitted to be made to such parent in accordance with Section 10.6; *provided* that the aggregate amount of such loans and advances shall reduce the ability of the Borrower and the Restricted Subsidiaries to make Restricted Payments under the applicable clauses of Section 10.6 by such amount;

(n)        Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(o)        Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(p)        advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(q)        Guarantee Obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

159

(r)      Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Closing Date otherwise in accordance with this Section 10.5 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(s)      Investments in Hedging Agreements permitted by Section 10.1;

(t)      Investments in or by a Receivables Entity or a Securitization Subsidiary arising out of, or in connection with, any Permitted Receivables Financing or Qualified Securitization Financing, as applicable; *provided* that any such Investment in a Receivables Entity or a Securitization Subsidiary is in the form of a contribution of additional Receivables Facility Assets or Securitization Assets, as applicable, or as equity;

(u)      Investments consisting of deposits of cash and Cash Equivalents as collateral support permitted under Section 10.2;

(v)      other Investments not to exceed an amount equal to (x) the Available Equity Amount at the time such Investments are made *plus* (y) the Available Amount at the time such Investments are made, *provided* that in respect of any Investments made in reliance of clause (ii) of the definition of "Available Amount", no Event of Default shall have occurred and be continuing or would result therefrom;

(w)      other Investments in an amount at any one time outstanding not to exceed $100,000,000; *provided* that up to $50,000,000 may be made in the form of Disposition of intellectual property by a Credit Party to a Restricted Subsidiary that is not a Credit Party;

(x)      Investments consisting of purchases and acquisitions of assets and services in the ordinary course of business;

(y)      Investments in the ordinary course of business consisting of Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practice;

(z)      Investments made as a part of, or in connection with or to otherwise fund the Transactions;

(aa)     contributions in connection with compensation arrangements to a "rabbi" trust for the benefit of employees, directors, partners, members, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Borrower or any of its Restricted Subsidiaries;

(bb)     Investments relating to pension trusts;

(cc)     Investments in Similar Business in an amount at any one time outstanding not to exceed $100,000,000;

(dd)     Investments in connection with Permitted Reorganizations;

160

(ee)    Investments in deposit accounts, commodities and securities accounts opened in the ordinary course of business;

(ff)    Investments solely to the extent such Investments reflect an increase in the value of Investments otherwise permitted under this Agreement;

(gg)    Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business;

(hh)    Term Loans repurchased by the Borrower or a Restricted Subsidiary pursuant to and in accordance with Section 13.6(g); and

(ii)    other Investments in an unlimited amount, *provided* that the Borrower shall be in compliance on a Pro Forma Basis with a Consolidated Total Net Leverage Ratio not greater than 2.8 to 1.0.

Notwithstanding the foregoing, no Investment consisting of or resulting from any transfer or other Disposition of any intellectual property by a Credit Party to a Subsidiary that is not a Credit Party may be made except pursuant to (i) Section 10.5(l) (solely in respect of Dispositions permitted by Section 10.4(e) or (g)) or (ii) the proviso to Section 10.5(w).

10.6    Limitation on Restricted Payments

The Borrower will not, and will not permit the Restricted Subsidiaries to, declare or pay any Restricted Payments except that:

(a)    the Borrower may (or may make Restricted Payments to permit any direct or indirect parent thereof to) redeem in whole or in part any of its Stock or Stock Equivalents for another class of its (or such parent's) Stock or Stock Equivalents or with proceeds from substantially concurrent equity contributions or issuances of new Stock or Stock Equivalents (other than any Disqualified Stock, any sale or issuance to any Subsidiary and any contribution or issuance applied pursuant to Section 10.5(f)(ii) or Section 10.6(b)(i)); *provided* that (i) such new Stock or Stock Equivalents contain terms and provisions (taken as a whole) at least as advantageous to the Lenders, taken as a whole, in all respects material to their interests as those contained in the Stock or Stock Equivalents redeemed thereby and (ii) the cash proceeds from any such contribution or issuance shall not increase the Available Equity Amount;

(b)    the Borrower may (or may make Restricted Payments to permit any direct or indirect parent thereof to) redeem, acquire, retire or repurchase shares of its (or such parent's) Stock or Stock Equivalents held by any present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any direct or indirect parent thereof) and any Subsidiaries, so long as such repurchase is pursuant to, and in accordance with the terms of, any stock option or stock appreciation rights plan, any management, director and/or employee benefit, stock ownership or option plan, stock subscription plan or agreement, employment termination agreement or any employment agreements or stockholders' or shareholders' agreement; *provided*, *however*, that the

161

aggregate amount of payments made under this Section 10.6(b), when combined with Investments made pursuant to Section 10.5(k), do not exceed in any Fiscal Year $20,000,000 (with unused amounts in any Fiscal Year being carried over to succeeding Fiscal Years subject to a maximum (without giving effect to the following proviso) of $30,000,000 in any Fiscal Year); *provided*, *further*, that such amount in any Fiscal Year may be increased by an amount not to exceed:

(i)     the cash proceeds from the sale of Stock (other than Disqualified Stock, any sale or issuance to any Subsidiary and any contribution or issuance applied pursuant to Section 10.5(f)(ii) or Section 10.6(a)) of the Borrower and, to the extent contributed to the Borrower, Stock of any of the Borrower's direct or indirect parent companies, in each case to present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies) or any Subsidiary of the Borrower that occurs after the Closing Date; *provided* that such Stock or proceeds of such Stock will not increase the Available Equity Amount; *plus*

(ii)     the cash proceeds of key man life insurance policies received by the Borrower or any Restricted Subsidiary after the Closing Date; less

(iii)     the amount of any Restricted Payment previously made with the cash proceeds described in clauses (i) and (ii) above;

and *provided*, *further*, that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies), or any Subsidiary of the Borrower in connection with a repurchase of Stock or Stock Equivalents of the Borrower or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of this Agreement;

(c)     so long as no Specified Default shall have occurred and be continuing or would result therefrom, the Borrower make Restricted Payments; *provided* that the amount of all such Restricted Payments paid from the Closing Date pursuant to this clause (c) shall not exceed an amount equal to (x) the Available Equity Amount at the time such Restricted Payments are paid *plus* (y) the Available Amount at the time such Restricted Payments are paid, *provided* that in respect of any Restricted Payments made in reliance of clause (ii) of the definition of Available Amount, no Event of Default shall have occurred and be continuing or would result therefrom;

(d)     the Borrower and its Restricted Subsidiaries may make Restricted Payments to any direct or indirect parent company of the Borrower (or otherwise as specified below) in amount required for the Borrower, such Restricted Subsidiary or any such direct or indirect parent to pay, in each case without duplication:

(i)     foreign, federal, state and local income Taxes for any taxable period in respect of which a consolidated, combined, unitary or affiliated or similar return that

includes the Borrower and/or any of its Subsidiaries (including if the Borrower or any of its Subsidiaries is disregarded as separate from a member included in such group return) is filed by such direct or indirect parent; *provided* that for purposes of this Section 10.6(d)(i), such Taxes shall be deemed no greater than the amount that the Borrower and its Subsidiaries would be required to pay in respect of foreign, federal, state and local income Taxes if the Borrower were the parent of a standalone consolidated, combined, affiliated, unitary or similar tax group including its Subsidiaries (any such Restricted Payments, "**Tax Distributions**");

(ii)     (A) such parents' general operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties) to the extent such costs and expenses are attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries and (to the extent of cash actually paid by Unrestricted Subsidiaries to the Borrower or its Restricted Subsidiaries for such purposes) Unrestricted Subsidiaries, (B) any indemnification claims made by directors or officers of the Borrower or its Restricted Subsidiaries (or any parent of the foregoing) who are directors or officers of the Borrower or any Restricted Subsidiary (or any parent of the foregoing) on or after the Petition Date to the extent such claims are attributable to the ownership or operation of the Borrower or any Restricted Subsidiary and (to the extent of cash actually paid by Unrestricted Subsidiaries to the Borrower or its Restricted Subsidiaries for such purposes) Unrestricted Subsidiaries, (C) fees and expenses otherwise due and payable by the Borrower (or any parent thereof) or any Restricted Subsidiary and not prohibited to be paid by the Borrower and its Restricted Subsidiaries hereunder or (D) any Permitted Change of Control Costs;

(iii)    franchise and excise Taxes and other fees, Taxes and expenses required to maintain the corporate existence of any direct or indirect parent of the Borrower;

(iv)    to any direct or indirect parent of the Borrower to finance any Investment permitted to be made by the Borrower or any Restricted Subsidiary pursuant to Section 10.5; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment, (B) such parent shall, immediately following the closing thereof, cause (1) all property acquired (whether assets, Stock or Stock Equivalents) to be contributed to the Borrower or such Restricted Subsidiary or (2) the merger, amalgamation or consolidation (to the extent permitted in Section 10.5) of the Person formed or acquired into the Borrower or any Restricted Subsidiary, (C) the Borrower or such Restricted Subsidiary shall comply with Section 9.11, Section 9.12 and the Security Agreement to the extent applicable, (D) the aggregate amount of such Restricted Payments shall reduce the ability of the Borrower and the Restricted Subsidiary to make Investments under the applicable clauses of Section 10.5 by such amount and (E) any property received by the Borrower or the Restricted Subsidiaries in connection with such transaction shall only increase the Available Equity Amount to the extent the fair market value of such property as determined in good faith by the Board of Directors of the Borrower exceeds the aggregate amount of Restricted Payments made pursuant to this clause (iv);

(v)     customary costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering or acquisition or Disposition payable by the Borrower or the Restricted Subsidiaries;

(vi)     customary salary, bonus, severance and other benefits payable to officers, employees or consultants of any direct or indirect parent company of the Borrower to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower, its Restricted Subsidiaries and (to the extent of cash actually paid by Unrestricted Subsidiaries to the Borrower or its Restricted Subsidiaries for such purposes) Unrestricted Subsidiaries;

(vii)     AHYDO Catch-Up Payments with respect to Indebtedness of any direct or indirect parent of the Borrower; *provided* that the Net Cash Proceeds of such Indebtedness have been contributed to the Borrower as a capital contribution; and

(viii)     expenses incurred by any direct or indirect parent of the Borrower in connection with any public offering or other sale of Stock or Stock Equivalents or Indebtedness (i) where the Net Cash Proceeds of such offering or sale are intended to be received by or contributed to the Borrower or a Restricted Subsidiary, (ii) in a pro-rated amount of such expenses in proportion to the amount of such Net Cash Proceeds intended to be so received or contributed or (iii) otherwise on an interim basis prior to completion of such offering so long as any direct or indirect parent of the Borrower shall cause the amount of such expenses to be repaid to the Borrower or the relevant Restricted Subsidiary out of the proceeds of such offering promptly if completed;

(e)     Restricted Payments made to dissenting equityholders in connection with their exercise of appraisal rights or the settlement of any claim or actions with respect thereto in connection with any Permitted Acquisition or similar Investment permitted under Section 10.5 (other than Section 10.5(l));

(f)     Restricted Payments consisting of or resulting from Liens, fundamental changes, Dispositions, Investments or other payments permitted by 10.2, 10.3 (other than Section 10.3(j)), 10.4 (other than Section 10.4(d)), 10.5 (other than Section 10.5(l)), 10.7 or 10.8, as applicable;

(g)     the Borrower may repurchase Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) deemed to occur upon exercise of stock options or warrants if such Stock or Stock Equivalents represents a portion of the exercise price of such options or warrants, and the Borrower may pay Restricted Payments to any direct or indirect parent thereof as and when necessary to enable such parent to effect such repurchases;

(h)     the Borrower may (i) pay cash in lieu of fractional shares in connection with any Restricted Payment, distribution, split, reverse share split, merger, consolidation, amalgamation or other combination thereof or any Permitted Acquisition, and any Restricted Payment to the Borrower's direct or indirect parent in order to effect the same and (ii) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of

fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

(i) the Borrower may make any Restricted Payment within sixty (60) days after the date of declaration thereof or giving irrevocable notice thereof, if at the date of declaration or notice such payment would have complied with the provisions of this Agreement;

(j) so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may make Restricted Payments, so long as the aggregate amount of all such Restricted Payments in any Fiscal Year does not exceed 6% of the market capitalization of the Public Reporting Entity calculated on a trailing twelve month average basis;

(k) the Borrower may make Restricted Payments in an amount equal to withholding or similar Taxes payable or expected to be payable by present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) and any repurchases of Stock or Stock Equivalents in consideration of such payments including deemed repurchases in connection with the exercise of stock options;

(l) so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may (or may make Restricted Payments to permit any direct or indirect parent thereof to) make Restricted Payments in an aggregate amount not to exceed $5 million per fiscal quarter;

(m) the Borrower may make payments described in Section 9.9 (other than Section 9.9(a) and Section 9.9(d) (to the extent expressly permitted by reference to Section 10.6));

(n) the Borrower may make Restricted Payments in connection with the Transactions or contemplated by the Plan;

(o) so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may make Restricted Payments in amounts up to $100,000,000;

(p) so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may make Restricted Payments in an unlimited amount, *provided* that the Borrower shall be in compliance on a Pro Forma Basis with a Consolidated Total Net Leverage Ratio not greater than 2.3 to 1.0;

(q) Restricted Payments in respect of working capital adjustments or purchase price adjustments pursuant to any Permitted Acquisition or other Investment permitted hereunder and to satisfy indemnity and other similar obligations in connection with any Permitted Acquisition or other Investment permitted hereunder;

(r) the distribution, by dividend or otherwise, of shares of Stock or Stock Equivalents of, or Indebtedness owed to the Borrower or a Restricted Subsidiary by, Unrestricted Subsidiaries or the proceeds thereof;

(s)    [reserved];

(t)    each Restricted Subsidiary may make Restricted Payments to the Borrower and other Restricted Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-Wholly Owned Restricted Subsidiary, to the Borrower and any other Restricted Subsidiary, as compared to the other owners of Stock in such Restricted Subsidiary, on a pro rata or more than pro rata basis based on their ownership interests of the relevant class of Stock); and

(u)    any Restricted Payment made in connection with a Permitted Change of Control.

Notwithstanding the foregoing, no Restricted Payment consisting of or resulting from any transfer or other Disposition of any intellectual property by a Credit Party to a Subsidiary that is not a Credit Party may be made except pursuant to Section 10.6(f) solely in respect of Dispositions permitted by Section 10.4(c)(iii) (solely in respect of Investments permitted by the proviso to Section 10.5(w)), (e) or (g).

10.7    Limitations on Debt Prepayments and Amendments

(a)    The Borrower will not, and will not permit the Restricted Subsidiaries to, voluntarily prepay, repurchase or redeem or otherwise defease prior to the schedule maturity thereof any Indebtedness (other than the ABL Obligations) that is subordinated in right of payment or lien to the Obligations with a principal amount in excess of $50,000,000 (the "**Junior Indebtedness**"), except that the Borrower and its Restricted Subsidiaries may (i) make payments of regularly scheduled principal and interest, (ii) make AHYDO Catch-Up Payments; (iii) prepay, repurchase or redeem or otherwise defease Junior Indebtedness in an aggregate principal amount from the Closing Date not in excess of the sum of (1) so long as no Event of Default shall have occurred and be continuing or would result therefrom, (I) $100,000,000 and (II) additional unlimited amounts so long as the Borrower shall be in compliance on a Pro Forma Basis with a Consolidated Total Net Leverage Ratio not greater than 2.3 to 1.0 *plus* (2) the Available Equity Amount at the time of such prepayment, repurchase, redemption or other defeasance *plus* (3) the Available Amount at the time of such prepayment, repurchase, redemption or other defeasance; *provided* that in respect of any prepayments, repurchases or redemptions or defeasances made in reliance of clause (ii) of the definition of Available Amount, no Event of Default shall have occurred and be continuing or would result therefrom; (iv) refinance Junior Indebtedness with any Refinancing Indebtedness, to the extent not required to prepay any Term Loans pursuant to Section 5.2(a); (v) convert, exchange, redeem, repay or prepay such Junior Indebtedness into, for or with, as applicable, Stock or Stock Equivalents of any direct or indirect parent of the Borrower (other than Disqualified Stock except as permitted hereunder); (vi) prepay, repurchase, redeem or otherwise defease Junior Indebtedness within 60 days of the applicable Redemption Notice if, at the date of any payment, redemption, repurchase, retirement, termination or cancellation notice in respect thereof (each, a "**Redemption Notice**"), such payment, redemption, repurchase, retirement, termination or cancellation would have complied with another provision of this Section 10.7(a); *provided* that such payment, redemption, repurchase, retirement, termination or cancellation shall reduce capacity under such other provision; (vii) repay or prepay intercompany subordinated Indebtedness (including under the Intercompany Subordinated Note) owed among the Borrower and/or the Restricted Subsidiaries, in either case unless a Specified Default has

166

occurred and is continuing and the Borrower has received a written notice from the Collateral Agent instructing it not to make or permit any such repayment or prepayment; and (viii) transfer credit positions in connection with intercompany debt restructurings so long as such Indebtedness is permitted by Section 10.1 after giving effect to such transfer.

(b)     The Borrower will not, and will not permit the Restricted Subsidiaries to waive, amend, or modify the definitive documentation in respect of any Junior Indebtedness with a principal amount in excess of $50,000,000, to the extent that any such waiver, amendment or modification, taken as a whole, would be adverse to the Lenders in any material respect; *provided* that this Section 10.7(b) would not prohibit a refinancing or replacement of such Indebtedness with Refinancing Indebtedness so long as (1) such Refinancing Indebtedness is permitted to be incurred under Section 10.1 and (2) the prepayment of such Junior Indebtedness is permitted under Section 10.7(a) above.

10.8     Limitation on Subsidiary Distributions

The Borrower will not, and will not permit any Restricted Subsidiary that is not a Guarantor to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary to (x) (i) pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Stock or Stock Equivalents or with respect to any other interest or participation in, or measured by, its profits or (ii) pay any Indebtedness owed to the Borrower or any Restricted Subsidiary that is a Guarantor, (y) make loans or advances to the Borrower or any Restricted Subsidiary that is Guarantor or (z) sell, lease or transfer any of its properties or assets to the Borrower or any Restricted Subsidiary that is a Guarantor, except (in each case) for such encumbrances or restrictions (A) which the Borrower has reasonably determined in good faith will not materially impair the Borrower's ability to make payments under this Agreement when due or (B) existing under or by reason of:

(a)     contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to this Agreement, the ABL Credit Documents and the related documentation and related Hedging Obligations and Cash Management Obligations;

(b)     purchase money obligations and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (x), (y) or (z) above on the property so acquired, any replacements of such property or assets and additions and accessions thereto, after-acquired property subject to such arrangement, the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment (or assets affixed or appurtenant thereto and additions and accessions) provided by any lender, other equipment (or assets affixed or appurtenant thereto and additions and accessions) financed by such lender (it being understood that such restriction shall not be permitted to apply to any property to which such restriction would not have applied but for such acquisition);

(c)     Applicable Laws or any applicable rule, regulation or order, or any request of any Governmental Authority having regulatory authority over the Borrower or any of its Subsidiaries;

167

(d)      any agreement or other instrument of a Person acquired by or merged or consolidated with or into the Borrower or any Restricted Subsidiary, or of an Unrestricted Subsidiary that is designated a Restricted Subsidiary, or that is assumed in connection with the acquisition of assets from such Person, in each case that is in existence at the time of such transaction (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or designated, any replacements of such property or assets and additions and accessions thereto, after-acquired property subject to such agreement or instrument, the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment (or assets affixed or appurtenant thereto and additions and accessions) provided by any lender, other equipment (or assets affixed or appurtenant thereto and additions and accessions) financed by such lender (it being understood that such encumbrance or restriction shall not be permitted to apply to any property to which such encumbrance or restriction would not have applied but for such acquisition);

(e)      contracts for the sale of assets, including customary restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or Disposition of all or substantially all of the Stock or Stock Equivalents or assets of such Subsidiary and restrictions on transfer of assets subject to Liens permitted hereunder;

(f)      (x) secured Indebtedness otherwise permitted to be incurred pursuant to Sections 10.1 and 10.2 that limit the right of the debtor to Dispose of the assets securing such Indebtedness and (y) restrictions or encumbrances on transfers of assets subject to Liens permitted hereunder (but, with respect to any such Lien, only to the extent that such transfer restrictions apply solely to the assets that are the subject of such Lien);

(g)      restrictions or encumbrances on cash or other deposits or net worth imposed by customers under, or made necessary or advisable by, contracts entered into in the ordinary course of business;

(h)      restrictions or encumbrances imposed by other Indebtedness or Disqualified Stock of Restricted Subsidiaries permitted to be incurred subsequent to the Closing Date pursuant to the provisions of Section 10.1;

(i)      customary provisions in joint venture agreements or arrangements and other similar agreements or arrangements relating solely to such joint venture (including its assets and Subsidiaries) and the Stock or Stock Equivalents issued thereby;

(j)      customary provisions contained in leases, sub-leases, licenses, sub-licenses or similar agreements, in each case, entered into in the ordinary course of business;

(k)      restrictions created in connection with any Permitted Receivables Financing or any Qualified Securitization Financing that, in the good faith determination of the Borrower, are necessary or advisable to effect such Permitted Receivables Financing or Qualified Securitization Financing, as the case may be;

168

(l)     customary restrictions on leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to property interest, rights or the assets subject thereto;

(m)     customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(n)     restrictions contemplated by the Plan or created in connection with the consummation of the Transaction; or

(o)     any encumbrances or restrictions of the type referred to in clauses (x), (y) and (z) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, extensions, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (n) above; *provided* that such amendments, modifications, restatements, renewals, increases, extensions, supplements, refundings, extensions, replacements, restructurings or refinancings (x) are, in the good faith judgment of the Borrower, not materially more restrictive with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, extension, restructuring, supplement, refunding, replacement or refinancing or (y) do not materially impair the Borrower's ability to pay its obligations under the Credit Documents as and when due (as determined in good faith by the Borrower);

*provided* that (x) the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill requirements to) loans or advances made to the Borrower or any Restricted Subsidiary that is a Guarantor to other Indebtedness incurred by the Borrower or any Restricted Subsidiary that is a Guarantor shall not be deemed to constitute such an encumbrance or restriction.

10.9     Amendment of Organizational Documents

The Borrower will not, nor will the Borrower permit any Credit Party to, amend or otherwise modify any of its Organizational Documents in a manner that is materially adverse to the Lenders, except as required by Applicable Laws.

10.10     Permitted Activities

Holdings will not engage in any material operating or business activities; *provided* that the following and any activities incidental thereto shall be permitted in any event:  (i) its ownership of the Stock of the Borrower, including receipt and payment of dividends and payments in respect of Indebtedness and other amounts in respect of Stock, (ii) the maintenance of its legal existence (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance), (iii) the performance of its obligations with respect to the Transactions, the Credit Documents and any other documents governing Indebtedness permitted hereby, (iv) any public offering of its or its direct or indirect parent entity's common equity or any other issuance or sale of its or its direct or indirect parent entity's Stock, (v) financing activities, including the issuance of securities, incurrence of debt, receipt and payment of dividends and distributions, making contributions to the capital of the Borrower and guaranteeing the obligations

169

of the Borrower and the Subsidiaries, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries, (vii) holding any cash or other property (but not operate any property), (viii) making and receiving of any dividends, payments in respect of Indebtedness or Investments permitted hereunder, (ix) providing indemnification to officers and directors, (x) activities relating to any Permitted Reorganization, (xi) activities related to the Plan and the consummation of the Transactions and activities contemplated thereby, (xii) merging, amalgamating or consolidating with or into any direct or indirect parent of Holdings (in compliance with the definition of "Holdings" in this Agreement), (xiii) repurchases of Indebtedness through Permitted Open Market Purchases or Dutch auctions, (xiv) activities incidental to Permitted Acquisitions or similar Investments consummated by the Borrower and the Restricted Subsidiaries, including the formation of acquisition vehicle entities and intercompany loans and/or Investments incidental to such Permitted Acquisitions or similar Investments, (xv) any transaction with the Borrower or any Restricted Subsidiary to the extent expressly permitted under this Section 10, (xvi) making any AHYDO Catch-Up Payments, (xvii) paying any Taxes it is obligated to pay, (xviii) consummation of any Permitted Change of Control and activities incidental to the consummation of such Permitted Change of Control, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Change of Control and (xix) any activities incidental or reasonably related to the foregoing.

### SECTION 11 Events of Default

Upon the occurrence of any of the following specified events (each an "**Event of Default**"):

#### 11.1 Payments

The Borrower shall (a) default in the payment when due of any principal of the Term Loans, (b) default, and such default shall continue for more than five Business Days, in the payment when due of any interest on the Term Loans or (c) default, and such default shall continue for more than ten Business Days, in the payment when due of any Fees or any other amounts owing hereunder or under any other Credit Document; or

#### 11.2 Representations, Etc.

Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be materially untrue on the date as of which made or deemed made, and, to the extent capable of being cured, such incorrect representation and warranty shall remain incorrect in any material respect for a period of thirty days after written notice thereof from the Administrative Agent to the Borrower; or

#### 11.3 Covenants

Any Credit Party shall:

170

(a)     default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.1(d)(i) (*provided* that notice of such default at any time shall timely cure the failure to provide such notice), Section 9.5 (solely with respect to the Borrower) or Section 10; or

(b)     default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in Section 11.1 or 11.2 or clause (a) of this Section 11.3) contained in this Agreement or any other Credit Document and such default shall continue unremedied for a period of at least 30 calendar days after receipt of written notice by the Borrower from the Administrative Agent; or

11.4    Default Under Other Agreements

(a)     The Borrower or any Restricted Subsidiary shall (i) default in any payment with respect to any Indebtedness (other than any Indebtedness described in Section 11.1, Hedging Obligations or Indebtedness under any Permitted Receivables Financing) with a principal amount in excess of $100,000,000 in the aggregate for the Borrower and such Restricted Subsidiaries beyond the period of grace or cure and following all required notices, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than any agreement or condition relating to, or provided in any instrument or agreement, under which such Hedging Obligations or such Permitted Receivables Financing was created) beyond the period of grace or cure and following all required notices, if any, provided in the instrument or agreement under which such Indebtedness was created, if the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its Stated Maturity; or (b) without limiting the provisions of clause (a) above, any such Indebtedness shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment (other than any Hedging Obligations or Indebtedness under any Permitted Receivables Financing) or as a mandatory prepayment, prior to the Stated Maturity thereof; *provided* that clauses (a) and (b) above shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that this Section 11.4 shall not apply to (i) any Indebtedness if the sole remedy of the holder thereof following such event or condition is to elect to convert such Indebtedness into Stock or Stock Equivalents (other than Disqualified Stock) and cash in lieu of fractional shares, (ii) any such default that is remedied by or waived (including in the form of amendment) by the requisite holders of the applicable item of Indebtedness or contested in good faith by the Borrower or the applicable Restricted Subsidiary in either case, prior to acceleration of all the Term Loans pursuant to this Section 11 or (ii) any failure to perform or observe the ABL Financial Covenant unless and until the lenders under the ABL Credit Agreement have affirmatively declared all obligations thereunder to be immediately due and payable and terminated the ABL Obligations and such declaration has not been rescinded; or

171

11.5    Bankruptcy

Except as otherwise permitted under Section 10.3, (i) the Borrower or any Material Subsidiary shall commence a voluntary case, proceeding or action concerning itself under (a) Title 11 of the United States Code entitled "Bankruptcy," or (b) in the case of any Foreign Subsidiary that is a Material Subsidiary, any domestic or foreign law relating to bankruptcy, judicial management, insolvency, reorganization, administration or relief of debtors in effect in its jurisdiction of incorporation, in each case as now or hereafter in effect, or any successor thereto (collectively, the "**Bankruptcy Code**"); (ii) an involuntary case, proceeding or action is commenced against the Borrower or any Material Subsidiary and the petition is not controverted within 60 days after commencement of the case, proceeding or action; (iii) an involuntary case, proceeding or action is commenced against the Borrower or any Material Subsidiary and the petition is not dismissed or stayed within 60 consecutive days after commencement of the case, proceeding or action; (iv) a custodian (as defined in the Bankruptcy Code), judicial manager, receiver, receiver manager, trustee, administrator or similar person is appointed for, or takes charge of, all or substantially all of the property of the Borrower or any Material Subsidiary; (v) the Borrower or any Material Subsidiary commences any other voluntary proceeding or action under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, administration or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or any Material Subsidiary; (vi) there is commenced against the Borrower or any Material Subsidiary any such proceeding or action that remains undismissed or unstayed for a period of 60 consecutive days; (vii) the Borrower or any Material Subsidiary is adjudicated insolvent or bankrupt; (viii) any order of relief or other order approving any such case or proceeding or action is entered; (ix) the Borrower or any Material Subsidiary suffers any appointment of any custodian, receiver, receiver manager, trustee, administrator or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of 60 consecutive days; (x) the Borrower or any Material Subsidiary makes a general assignment for the benefit of creditors; or (xi) any corporate action is taken by the Borrower or any Material Subsidiary for the purpose of authorizing any of the foregoing; or

11.6    ERISA

(a)    The occurrence of any ERISA Event; (b) there could result from any event or events set forth in clause (a) of this Section 11.6 the imposition of a Lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a Lien, security interest or liability; and (c) such ERISA Event, Lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect; or

11.7    Guarantee

Any Guarantee provided by Holdings, the Borrower or any Material Subsidiary or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any such Guarantor thereunder or any other Credit Party shall deny or disaffirm in writing any such Guarantor's obligations under the Guarantee; or

172

11.8     Security Agreement

The Security Agreement or any other material Security Document pursuant to which the assets of any Credit Party are pledged as Collateral or any material provision thereof shall cease to be in full force or effect in respect of a material portion of the Collateral (other than pursuant to the terms hereof or thereof or any defect arising as a result of acts or omissions of the Collateral Agent or any Lender which do not result from a material breach by a Credit Party of its obligations under the Credit Documents) (it being understood that the foregoing exception shall not impose any obligations on the Collateral Agent exculpated under Section 12) or any grantor thereunder or any other Credit Party shall deny or disaffirm in writing such grantor's obligations under the Security Agreement or any other such Security Document; or

11.9     Judgments

One or more final judgments or decrees shall be entered against the Borrower or any Restricted Subsidiary involving a liability requiring the payment of $100,000,000 or more in the aggregate for all such final judgments and decrees for the Borrower and the Restricted Subsidiaries (to the extent not paid or covered by indemnity or insurance provided by a carrier that has not denied coverage) and any such final judgments or decrees shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal within 60 consecutive days after the entry thereof; or

11.10     Change of Control

A Change of Control shall occur; or

11.11     Indemnity Payments to Former Officers

The Credit Parties pay in excess of $10,000,000 on account of an indemnity obligation asserted by any former officers or directors of a Credit Party who were not officers or directors of a Credit Party as of the Petition Date or thereafter.

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent shall, at the written request of the Required Lenders, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of any Agent or any Lender to enforce its claims against the Borrower, except as otherwise specifically provided for in this Agreement (*provided* that, if an Event of Default specified in Section 11.5 shall occur with respect to the Borrower, the result that would occur upon the giving of written notice by the Administrative Agent as specified below shall occur automatically without the giving of any such notice or any other declaration or other act by the Administrative Agent or Lenders):  (i) declare the principal of and any accrued interest and Fees in respect of any or all Term Loans and any or all Obligations owing hereunder and under any other Credit Document to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; (ii) direct the Collateral Agent to enforce any and all Liens and security interests created pursuant to the Security Documents and (iii) enforce any and all of the Administrative Agent's rights under the Guarantee.

173

Notwithstanding anything to the contrary contained herein, any Event of Default under this Agreement or similarly defined term under any other Credit Document, other than any Event of Default which cannot be waived without the written consent of each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist and the Borrower is in compliance with this Agreement and/or such other Credit Document.

11.12   Application of Proceeds

Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default under Section 11.5 shall be applied in accordance with any Applicable Intercreditor Agreement.   In the event that either (x) any Applicable Intercreditor Agreement directs the application with respect to such amount be made with reference to this Agreement or the other Credit Documents or (y) no Applicable Intercreditor Agreement is then in effect that is applicable to such amount, any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral), in each case, following any acceleration of the Obligations under this Agreement or any Event of Default under Section 11.5 shall be applied:

(i)   First, to the payment of all fees, indemnities, expenses, and other amounts payable to the Agents in their capacities as such, including, without limitation, all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization, including compensation to the Administrative Agent, Collateral Agent and their agents and counsel, and all expenses, fees, liabilities and advances made or incurred by the Administrative Agent and Collateral Agent in connection therewith and all amounts for which the Administrative Agent and Collateral Agent is entitled to indemnification pursuant to the provisions of any Credit Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(ii)   Second, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(iii)   Third, without duplication of amounts applied pursuant to clauses (i) and (ii) above, to the indefeasible payment in full in cash, *pro rata*, of interest and other amounts constituting Obligations hereunder (other than principal or premium) and any fees, premiums and scheduled periodic payments due under Secured Hedging Agreement and Secured Cash Management Agreements to the extent constituting Obligations and any interest accrued thereon (excluding any breakage, termination or other payments thereunder), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

174

(iv)     Fourth, to the payment in full in cash, *pro rata*, of principal amount of the Obligations hereunder and any premium thereon and any breakage, termination or other payments under Secured Hedging Agreement or Secured Cash Management Agreements to the extent constituting Obligations; and

(v)     Fifth, the balance, if any, to the person lawfully entitled thereto (including the applicable Credit Party or its successors or assigns) or as a court of competent jurisdiction may direct.

### SECTION 12 The Agents

12.1     Appointment

(a)     Each Secured Party (other than the Administrative Agent) hereby irrevocably designates and appoints the Administrative Agent as the administrative agent of such Secured Party under this Agreement and the other Credit Documents, and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto. The provisions of this Section 12 (other than this Section 12.1 and Sections 12.9, 12.12 and 12.13, in each case, with respect to the Borrower) are solely for the benefit of the Agents and the other Secured Parties, and the Credit Parties shall not have any rights as a third party beneficiary of such provisions. The Agents shall not be agents for the Lender Claimants and shall not have any duties or obligations with respect to the Lender Claimants or the Term Loans attributed to such Lender Claimants (and no Lender Claimant shall have any rights against any Agent, including to direct any Agent), other than (i) maintenance of the Lender Claimant Reserve Account in accordance with Section 2.18 and (ii) the crediting of their Term Loans in accordance with Section 2.18(a).

(b)     The duties of each Agent shall be mechanical and administrative in nature; and each Agent shall not have, by reason of any Credit Document, a fiduciary, principal-agency, or trustee relationship in respect of any Lender or any other Secured Party. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Credit Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only a representative relationship between independent contracting parties.

(c)     The Secured Parties hereby irrevocably designate and appoint the Collateral Agent to act as the collateral agent of such Secured Party with respect to the Collateral, and each of the Secured Parties hereby irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto, including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.

175

Without limiting the generality of the foregoing, the Lenders, and by accepting the benefits of the Security Documents, any other Secured Parties, hereby expressly authorize the Collateral Agent to (i) execute any and all documents with respect to the Collateral (including any release, amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and acknowledge and agree that any such action by the Collateral Agent shall bind the Secured Parties and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Secured Parties in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Secured Party.

12.2    Delegation of Duties

The Administrative Agent and the Collateral Agent may each perform any and all of its duties and execute any of its rights and powers under this Agreement and the other Credit Documents (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents or of exercising any rights and remedies thereunder) by or through any one or more co-agents, sub-agents, or attorneys-in-fact and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties.  The Agents and any such co-agents, sub-agents, and attorneys-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  All provisions of this Section 12 and Section 13 (including Section 13.5) and all other rights, privileges, protections, immunities, and indemnities granted to the Agents hereunder and under the other Credit Documents shall apply to any such co-agents, sub-agents, and attorneys-in-fact, and to the Related Parties of the Agents and any such co-agents, sub-agents, and attorneys-in-fact.  No Agent shall be responsible for the negligence or misconduct of any such co-agents, sub-agents, or attorneys-in-fact selected by it except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such co-agents, sub-agents, and attorneys-in-fact.

12.3    Exculpatory Provisions

(a)    Notwithstanding any provision to the contrary elsewhere in this Agreement or in any other Credit Document, no Agent shall have any duties, responsibilities, or obligations except those expressly set forth herein or in any other Credit Document, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against such Agent.  The permissive rights of each Agent to take any actions permitted by this Agreement or any other Credit Document shall not be construed as an obligation or duty to do so.  Without limiting the generality of the foregoing, each Agent and its Related Parties:

(i)    shall not be subject to any fiduciary or other implied duties or obligations, regardless of whether a Default or Event of Default has occurred and is continuing;

176

(ii)      shall not have any duty to take any discretionary action or exercise any discretionary powers, and shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) as it deems appropriate, *provided* that such Agent shall not be required to take any action that, in its good faith opinion or the opinion of its counsel, may (i) reasonably be expected to expose such Agent to liability or that is contrary to any Credit Document or applicable law or (ii) be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency, reorganization, or relief of debtors; *provided, further,* that if such Agent so requests, it shall first be indemnified and provided with adequate security to its reasonable satisfaction (including reasonable advances as may be requested by such Agent) by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action; *provided, further*, that such Agent may seek clarification or further direction from the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) prior to taking any such directed action and may refrain from acting until such clarification or further direction has been provided;

(iii)      shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, the Credit Parties, or any of their Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Related Parties in any capacity;

(iv)      shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) (and such consent or request and such action or action not taken pursuant thereto shall be binding upon all the Lenders and all other Secured Parties) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment (which shall not include any action taken or omitted to be taken in accordance with clause (i), for which such Agent and its Related Parties shall have no liability);

(v)      shall not be responsible or liable for or have any duty to ascertain or inquire into or monitor (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report, statement, or other document referred to, provided for, or delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the use of proceeds of the Loans, or the occurrence or possible occurrence of any Default or Event of Default, (iv) the execution, validity, enforceability, effectiveness, genuineness, collectibility or sufficiency of this Agreement, any other Credit Document or any other agreement, instrument or document, or the creation, preservation, perfection, maintenance or continuation of perfection, or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, (vi) whether

177

the Collateral exists, is owned by any Credit Party, is cared for, protected, insured, or maintained, or has been encumbered, or meets the eligibility criteria applicable in respect thereof, (vii) the satisfaction of any condition set forth in Section 6 or elsewhere, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or the inspection of the properties, books or records of any Credit Party or any Affiliate thereof, or (viii) the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations.

(b)     Nothing in this Agreement or any other Credit Document shall require any Agent or its Related Parties to expend or risk their own funds or otherwise incur any financial liability in the performance of any duties, obligations or responsibilities or in the exercise of any right, power, authority or discretion hereunder or under the other Credit Documents.

(c)     No Agent shall be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Credit Document, in each case, arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(d)     In no event shall any Agent be responsible or liable for any incidental, special, indirect, punitive or consequential loss or damage of any kind whatsoever (including loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(e)     For the avoidance of doubt, and without limiting the other protections set forth in this Section 12, with respect to any approval, determination, designation, or judgment to be made by any Agent herein or in the other Credit Documents, such Agent shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) make or confirm such approval, determination, designation, or judgment.

(f)     If at any time any Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any Collateral), such Agent is authorized to comply therewith in any manner as it (in good faith) or its legal counsel of its own choosing deems appropriate, and if such Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, such Agent shall not be liable to any of the parties hereto or to any other Person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

(g)     Each Lender confirms to the Administrative Agent, the Collateral Agent, each other Lender and each of their respective Related Parties that it (i) possesses (individually or

178

through its Related Parties) such knowledge and experience in financial and business matters that it is capable, without reliance on the Administrative Agent, the Collateral Agent, any other Lender or any of their respective Related Parties, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Agreement, (y) making Term Loans and other extensions of credit hereunder and under the other Credit Documents and (z) in taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risks and (iii) has determined that entering into this Agreement and making Term Loans and other extensions of credit hereunder and under the other Credit Documents is suitable and appropriate for it.

(h)     Each Lender acknowledges that (i) it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Credit Documents, (ii) that it has, independently and without reliance upon the Administrative Agent, the Collateral Agent, any other Lender or any of their respective Related Parties, made its own appraisal and investigation of all risks associated with, and its own credit analysis and decision to enter into, this Agreement based on such documents and information, as it has deemed appropriate and (iii) it will, independently and without reliance upon the Administrative Agent, the Collateral Agent, any other Lender or any of their respective Related Parties, continue to be solely responsible for making its own appraisal and investigation of all risks arising under or in connection with, and its own credit analysis and decision to take or not take action under, this Agreement and the other Credit Documents based on such documents and information as it shall from time to time deem appropriate, which may include, in each case:

(i)     the financial condition, status and capitalization of the Borrower and each other Credit Party;

(ii)     the legality, validity, effectiveness, adequacy or enforceability of this Agreement and each other Credit Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document;

(iii)     determining compliance or non-compliance with any condition hereunder to the making of a Term Loan and the form and substance of all evidence delivered in connection with establishing the satisfaction of each such condition; and

(iv)     the adequacy, accuracy and/or completeness of any information delivered by the Administrative Agent, the Collateral Agent, any other Lender or by any of their respective Related Parties under or in connection with this Agreement or any other Credit Document, the transactions contemplated hereby and thereby or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document.

12.4    Reliance by Agents

The Administrative Agent and the Collateral Agent shall be entitled to rely, shall be fully protected in relying, and shall not incur any liability for relying, (i) upon any instrument, writing, resolution, notice, consent, request, certificate, affidavit, letter, telecopy, telex, electronic

179

mail, or teletype message, statement, order or other document, communication or instruction (including any electronic message, Internet or intranet website posting or other distribution) believed by it in good faith to be genuine and correct and to have been signed, sent, made, or otherwise authenticated by the proper Person or Persons and (ii) upon advice and statements of legal counsel (including counsel to Holdings and/or the Borrower), independent accountants and other consultants or experts selected by the Administrative Agent or the Collateral Agent. The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing to such Lender hereunder as the owner thereof for all purposes unless such amount is assigned by such Lender in accordance with Section 13.6.

12.5   Notice of Default

Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or the Collateral Agent, as applicable, has received written notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent or the Collateral Agent receives such a notice, it shall give notice thereof to the Lenders, the Administrative Agent or the Collateral Agent, as applicable. The Administrative Agent and the Collateral Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (subject to the protections of Section 12.3); *provided* that unless and until the Administrative Agent or the Collateral Agent, as applicable, shall have received such directions, the Administrative Agent or the Collateral Agent, as applicable, may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as is within its authority to take under this Agreement and otherwise as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Required Lenders or each of the Lenders, as applicable.

12.6   Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders

Each Lender expressly acknowledges that none of the Administrative Agent, the Collateral Agent or any of their Related Parties has made any representations or warranties to it and that no act by the Administrative Agent, the Collateral Agent or any of their Related Parties hereinafter taken, including any review of the affairs of Holdings, the Borrower, any other Guarantor or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent, the Collateral Agent, or their Related Parties to any Lender. Each Lender represents to Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent, or their Related Parties or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Holdings, the Borrower, each other Guarantor and each other Credit Party and made its own decision to make its Term Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent, or their Related Parties or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own

180

credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of Holdings, the Borrower, each other Guarantor and each other Credit Party.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Agents and their Related Parties shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of Holdings, the Borrower, any other Guarantor or any other Credit Party that may come into the possession of the Administrative Agent, the Collateral Agent or any of their Related Parties.  Each Lender agrees that it will not assert any claim against any Agent based on an alleged breach of fiduciary duty by such Agent in connection with this Agreement, the other Credit Documents, or the transactions contemplated hereby or thereby.

12.7    Indemnification

The Lenders agree to indemnify each Agent and its Related Parties in their capacities as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective principal amounts of the outstanding Term Loans in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Term Loans shall have been paid in full, ratably in accordance with their respective principal amounts of the outstanding Term Loans in effect immediately prior to such date), and hold harmless such Agent and its Related Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Term Loans) be imposed on, incurred by or asserted against such Agent or Related Party, including all fees, disbursements and other charges of counsel to the extent required to be reimbursed by the Credit Parties pursuant to Section 13.5, in any way relating to or arising out of the making of the Term Loans, the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent or Related Party under or in connection with any of the foregoing (**SUBJECT TO THE PROVISOS BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON**); *provided* that no Lender shall be liable to any Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction; *provided*, *further*, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 12.7.  In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses or disbursements of any kind whatsoever that may at any time occur, be imposed upon, incurred by or asserted against any Agent or any of its Related Parties in any way relating to or arising out of the making of the Term Loans, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the

181

transactions contemplated hereby or thereby or any action taken or omitted by such Agent or its Related Parties under or in connection with any of the foregoing (including at any time following the payment of the Term Loans), this Section 12.7 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse such Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees and expenses) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided* that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's *pro rata* portion thereof; and *provided*, *further*, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct (as determined by a final and non-appealable judgment of court of competent jurisdiction).  For the avoidance of doubt, each Lender's ratable share of any indemnity or reimbursement obligation owing hereunder shall be calculated solely by reference to the Register and any Obligations owing to Lender Claimants (in their capacities as such) shall not be included in calculating such indemnity or reimbursement obligation.

12.8     Agents in their Individual Capacities

Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with Holdings, the Borrower, any other Guarantor, and any other Credit Party as though such Agent were not an Agent hereunder and under the other Credit Documents.  With respect to any Term Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

12.9     Successor Agents

Each of the Administrative Agent and Collateral Agent may resign at any time by notifying the other Agent, the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld, conditioned, or delayed) so long as no Specified Default has occurred and is continuing, to appoint a successor Agent, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring

182

Agent may on behalf of the Lenders appoint a successor Agent meeting the qualifications set forth above (including receipt of the Borrower's consent, if required); *provided* that if such retiring Agent shall notify the Borrower and the Lenders that no qualifying Person (including as a result of the absence of required consent of the Borrower) has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (x) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Credit Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (y) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders with (except after the occurrence and during the continuation of a Specified Default) the consent of the Borrower (not to be unreasonably withheld, conditioned, or delayed) appoint a successor Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, such successor Agent shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor Agent.  After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Section 12 (including Section 12.7) and Section 13.5 and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder and the other Credit Documents shall continue in effect for the benefit of such retiring Agent, its co-agents, sub-agents and attorneys-in-fact and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

12.10   [Reserved]

12.11   Administrative Agent May File Proofs of Claim

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agents and their respective Related Parties and all other amounts due the Lenders, the Agents and their respective Related Parties under the Credit Documents) allowed in such judicial proceeding; and

183

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their Related Parties, and any other amounts due the Agents and their Related Parties under the Credit Documents (including Sections 4.1, 5.4, and 13.5).

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Secured Party or to authorize the Administrative Agent to vote in respect of the claim of any Secured Party in any such proceeding.

12.12   Intercreditor Agreements

Each of the Collateral Agent and the Administrative Agent is hereby authorized to enter into any Applicable Intercreditor Agreement contemplated hereby, and the parties hereto acknowledge that any such Applicable Intercreditor Agreement to which the Collateral Agent and/or the Administrative Agent is a party are each binding upon them.  Each Secured Party (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of any such Applicable Intercreditor Agreement and (b) hereby authorizes and instructs the Collateral Agent and the Administrative Agent to enter into any such Applicable Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  In addition, each Secured Party hereby authorizes the Collateral Agent and the Administrative Agent to enter into any other intercreditor arrangements to the extent required to give effect to the establishment of intercreditor rights and privileges as contemplated and required by Section 10.2 of this Agreement.

12.13   Security Documents and Guarantee; Agents under Security Documents and Guarantee

(a)      Each Secured Party hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guarantee, the Collateral and the Security Documents, as applicable.  Subject to Section 13.1, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (x) subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Credit Document to the holder of any Lien permitted under clauses (d), (g) and (l) of Section 10.2 or (y) enter into subordination or intercreditor agreements with respect to Indebtedness to the extent the Administrative Agent or the Collateral Agent is otherwise contemplated herein as being a party to such intercreditor or subordination agreement (including the Applicable Intercreditor Agreements).  The Secured Parties hereby irrevocably agree that the Liens granted to the Collateral

184

Agent by the Credit Parties on any Collateral shall be automatically released (i) upon the termination of this Agreement and the payment of all Obligations hereunder (except for Hedging Obligations in respect of any Secured Hedging Agreement, Cash Management Obligations in respect of Secured Cash Management Agreements and Contingent Obligations) (provided that, for all purposes under this Agreement, deposit by the Borrower of the Lender Claimant Obligation Amount, if any, into the Lender Claimant Reserve Account pursuant to Section 2.18 shall be deemed to be payment in full of such amounts) and the termination of all Commitments, (ii) upon the sale or other Disposition of such Collateral (including as part of or in connection with any other sale or other Disposition permitted hereunder) to any Person other than another Credit Party, to the extent such sale or other Disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively, shall be fully protected in relying, and shall not incur any liability for relying, on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Credit Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 13.1), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee, (vi) as required to effect any sale or other Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Security Documents and (vii) if such assets constitute Excluded Collateral.  Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents.  Additionally, the Secured Parties hereby irrevocably agree that the Subsidiary Guarantors shall be automatically released from the Guarantee upon consummation of any transaction resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary or upon becoming an Excluded Subsidiary; *provided* that, without the prior written consent of the Required Lenders, no Subsidiary Guarantor shall be automatically released from its obligations under the Credit Documents solely by reason of such Subsidiary Guarantor becoming an Excluded Subsidiary of the type described in clause (b) of the definition thereof unless either (x) it is no longer a direct or indirect Subsidiary of the Borrower or (y) such Subsidiary Guarantor ceases to be a Wholly Owned Subsidiary as a result of a sale or transfer of Stock made for a bona fide business purpose of the Borrower and its Restricted Subsidiaries and not for the purpose of evading the requirement hereunder to provide a Guarantee. Upon request by any Agent at any time, the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 13.1) shall confirm in writing such Agent's authority to release any Collateral or Guarantee pursuant to this Agreement or any other Credit Document.  The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, and the Administrative Agent and the Collateral Agent agree, at the Borrower's expense, to execute and deliver any instruments, documents, and agreements reasonably requested by the Borrower to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender; *provided*, that (1) no Agent shall be required to execute any document or take any action to evidence such release on terms that, in such Agent's opinion or the opinion of its counsel, could reasonably be expected to expose such Agent to liability or create any obligation

185

or entail any consequence other than the release of such Lien without recourse to, or representation, or warranty by such Agent, and (2) the Credit Parties shall have provided such Agent with such certifications or documents as such Agent shall reasonably request in order to demonstrate that the requested release is permitted under this Section 12.13(a).

(b)  *Right to Realize on Collateral and Enforce Guarantee*.  Anything contained in any of the Credit Documents to the contrary notwithstanding, Holdings, the Borrower, the Agents and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder and under the Guarantee may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent on behalf of the Secured Parties, and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other Disposition, the Collateral Agent or any other Secured Party may be the purchaser or licensor of any or all of such Collateral at any such sale or other Disposition and the Collateral Agent, as collateral agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other Disposition.  For the avoidance of doubt, no Agent shall be required to take title to the Collateral.  No holder of Hedging Obligations under Secured Hedging Agreements or Cash Management Obligations under Secured Cash Management Agreements shall have any rights in connection with the management or release of any Collateral or of the obligations of any Credit Party under this Agreement.  No holder of Hedging Obligations under Secured Hedging Agreements or Cash Management Obligations under Secured Cash Management Agreements that obtains the benefits of any Guarantee or any Collateral by virtue of the provisions hereof or of any other Credit Document shall have any right to notice of any action or to consent to or vote on, direct or object to any action hereunder or under any other Credit Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender or Agent and, in such case, only to the extent expressly provided in the Credit Documents.  Notwithstanding any other provision of this Agreement to the contrary, no Agent shall be responsible or have any liability for or in connection with, or have any duty to ascertain, inquire into, monitor, maintain, update or enforce compliance with the provisions hereof relating to Secured Hedging Agreements and Secured Cash Management Agreements, and no Agent shall be deemed to have notice of any Obligations under any Secured Hedging Agreements and Secured Cash Management Agreements unless such Agent has received written notice thereof, together with such supporting documentation as such Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

12.14   Lender Direction

Each Lender authorizes and directs the Agents to enter into, and agrees to be bound by, this Agreement, the Security Documents, and the other Credit Documents, including, without limitation, each Credit Document to be executed by any Agent.  Each Lender hereby acknowledges

186

and agrees that (x) the foregoing instructed actions constitute an instruction from all the Lenders under this Section 12 and (y) this Section 12 and Section 13.5 and any other rights, privileges, protections, immunities, and indemnities in favor of any Agent hereunder apply to any and all actions taken or not taken by any Agent in accordance with such instruction.  Each Lender agrees that any action taken by any Agent in accordance with the terms of this Agreement or the other Credit Documents relating to the Collateral and the exercise by each Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

12.15   Erroneous Distribution

(a)      If any Agent notifies a Lender or Secured Party, or any other Person (other than any Credit Party or any Affiliate of a Credit Party) who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party, or other recipient, a "**Payment Recipient**") that such Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from such Agent or any of its Related Parties were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of such Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of such Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to such Agent in same day funds at the greater of the (x) a rate determined by such to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error) and (y) a rate determined by such in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of any Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)      Without limiting the immediately preceding clause (a), each Lender or Secured Party (or any Payment Recipient who received such funds on its behalf), hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from any Agent (or any of its Related Parties) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by such Agent (or any of its Related Parties) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by such Agent (or any of its Related Parties), or (z) that such Lender or Secured Party, or other such Payment Recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

187

(i) it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from such Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii) such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly (and, in all events, within one (1) Business Day of its knowledge of such error) notify such Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying such Agent pursuant to this Section 12.15(b).

For the avoidance of doubt, the failure to deliver a notice to such Agent pursuant to this Section 12.15(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 12.15(a) or on whether or not an Erroneous Payment has been made.

(c) Each Lender or Secured Party hereby authorizes the Agents to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Credit Document, or otherwise payable or distributable by any Agent to such Lender or Secured Party from any source, against any amount that such Agent has demanded to be returned under immediately preceding clause (a).

(d) The parties hereto agree that (x) irrespective of whether an Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, such Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender or other Secured Party, to the rights and interests of such Lender or other Secured Party, as the case may be) under the Credit Documents with respect to such amount (the "**Erroneous Payment Subrogation Rights**") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party; *provided* that this Section 12.15(d) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower or any other Credit Party relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by such Agent; *provided*, *further*, that for the avoidance of doubt, the immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by such Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment.

(e) Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, in no event shall the occurrence of an Erroneous Payment (or the existence of any Erroneous Payment Subrogation Rights or other rights of any Agent in respect of an Erroneous Payment) result in such Agent becoming, or being deemed to be, a Lender hereunder or the holder of any Term Loans hereunder.

188

(f)      The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by any Agent from the Borrower or any other Credit Party for the purpose of paying, prepaying, repaying, discharging or otherwise satisfying any Obligations.

(g)      To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by any Agent for the return of any Erroneous Payment received, including, without limitation, waiver of any defense based on "discharge for value" or any similar doctrine.

(h)      Notwithstanding anything to the contrary herein or in any other Credit Document, no Credit Party nor any of their respective Affiliates shall have any obligations or liabilities directly or indirectly arising out of this Section 12.15 in respect of any Erroneous Payment.

12.16   Survival

The agreements in this Section 12 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the Commitments and the payment, satisfaction, or discharge of the Term Loans and all other Obligations payable hereunder and under any other Credit Document.

**SECTION 13 Miscellaneous**

13.1     Amendments, Waivers and Releases

Except as otherwise expressly set forth in the Credit Documents (including Section 2.10(e)), neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 13.1.  The Required Lenders may (with a copy to the Administrative Agent), or, with the written consent of the Required Lenders, the Administrative Agent and/or the Collateral Agent may, from time to time, (a) enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or (b) waive in writing, on such terms and conditions as the Required Lenders or the Administrative Agent and/or Collateral Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; *provided*, *however*, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given; and *provided*, *further*, that no such waiver and no such amendment, supplement or modification shall:

(i)      forgive or reduce any portion of any Term Loan or extend the final scheduled maturity date of any Term Loan or reduce the stated rate, or forgive any portion

189

thereof, or extend the date for the payment of any principal, any interest or Fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates), or extend the final expiration date of any Lender's Commitment, or increase the aggregate amount of the Commitments of any Lender, in each case without the written consent of each Lender directly and adversely affected thereby; *provided* that, in each case for purposes of this clause (i), a waiver of any condition precedent in Section 6 of this Agreement, the waiver of any Default, Event of Default, default interest, mandatory prepayment or reductions, any modification, waiver or amendment to the financial definitions or financial ratios or any component thereof or the waiver of any other covenant shall not constitute an increase of any Commitment of a Lender, a reduction or forgiveness of any portion of any Term Loan or in the interest rates or the fees or premiums or a postponement of any date scheduled for the payment of principal or interest or an extension of the final maturity of any Term Loan, or the scheduled termination date of any Commitment; or

(ii)      (w) reduce the percentages specified in the definition of the term "Required Lenders" without the written consent of each Lender, (x) consent to the assignment or transfer by Holdings or the Borrower of their respective rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to Section 10.3 or as contemplated by the definition of "Holdings"), without the written consent of each Lender directly and adversely affected thereby, (y) alter the order of application set forth in Section 5.2(c) or Section 11.12 or change Section 13.8 or any other provision of any Credit Document requiring pro rata sharing among the Lenders, in each case of this clause (y) without the written consent of each Lender directly and adversely affected thereby, or (z) modify Section 2.15, 2.17, 13.6 or any other provision of any Credit Document to permit Holdings or any of its Subsidiaries to purchase or exchange any of the Obligations other than pursuant to an offer open to all Lenders (except as expressly set forth therein) without the written consent of each Lender; or

(iii)      amend, modify or waive any provision of Section 12 or any other provision that affects the rights or duties of, or any fees or other amounts payable to, the Agents under this Agreement or any other Credit Document without the written consent of the then-current Administrative Agent and Collateral Agent in a manner that directly and adversely affects such Person; *provided* that only the consent of the parties to the Agent Fee Letter shall be required to amend, modify or supplement the terms thereof, or

(iv)      release all or substantially all of the value of the Guarantors under the Guarantee (except as expressly permitted by the Guarantee or this Agreement) or release all or substantially all of the Collateral under the Security Documents (except as expressly permitted by the Security Documents or this Agreement), in either case without the prior written consent of each Lender; or

(v)      except in connection with any "debtor-in-possession" facility, contractually subordinate (x) the Liens on all or substantially all of the Collateral securing any of the Obligations to any other Lien in respect of any other Indebtedness (it being acknowledged, for the avoidance of doubt, any amendment to Section 10.1(b) that increases the amount of Indebtedness that may be incurred thereunder and secured with the

190

priority set forth in the ABL Intercreditor Agreement shall not be construed as subordination of Liens described in this clause (x)) or (y) the Obligations in right of payment to any other Indebtedness, in each case, unless (A) such other Indebtedness is offered ratably to all Lenders pursuant to a bona fide offer held open for at least 5 Business Days and (B) the Super-Majority Lenders have given prior written consent.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon Holdings, the Borrower, the applicable Credit Parties, such Lenders, the Agents and all future holders of the affected Term Loans.  In the case of any waiver, Holdings, the Borrower, the applicable Credit Parties, the Lenders, the Agents shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing, it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  In connection with the foregoing provisions, the Agents may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.

Notwithstanding anything to the contrary herein, (x) no Defaulting Lender shall have any right to approve or disapprove any amendment, modification, supplement, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender (it being understood that any Commitments or Term Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders, except as expressly provided for by this Agreement), and (y) no Lender Claimant (in its capacity as such) shall have any right to approve or disapprove any amendment, modification, supplement, waiver or consent hereunder.

Notwithstanding the foregoing, in addition to any credit extensions and related Incremental Amendment(s) effectuated without the consent of Lenders in accordance with Section 2.14, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Agents, Holdings and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Term Loans and Commitments and the accrued interest and Fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and other definitions related to such new Term Loans and Commitments.  Notwithstanding the foregoing, except as otherwise set forth in clauses (i) through (iv) above, this Agreement may be amended, modified or supplemented with respect to any matter that only affects the Lenders under a particular Class of Term Loans and/or Commitments but not any other Class of Term Loans or Commitments upon the consent of Lenders holding more than 50% of the aggregate amount of Term Loans and Commitments of Term Loans in such Class.

Notwithstanding anything herein to the contrary, the Credit Documents may be amended to (i) add syndication or documentation agents and make customary changes and references related thereto and (ii) if applicable, add or modify "parallel debt" language in any jurisdiction in favor of the Collateral Agent or add sub-agents, in each case under clauses (i) and

(ii), with the consent of only the Borrower and the Administrative Agent, and in the case of clause (ii), the Collateral Agent.

Notwithstanding anything in this Agreement (including, without limitation, this Section 13.1) or any other Credit Document to the contrary, (i) this Agreement and the other Credit Documents may be amended to effect an Incremental Facility, Refinancing Facility or establish any Extension Series pursuant to Section 2.14 or Section 2.15 (and the Administrative Agent and the Borrower may effect such amendments to this Agreement and the other Credit Documents without the consent of any other party as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the terms of any such incremental facility, refinancing facility or extension facility); (ii) no Lender's consent is required to effect any amendment or supplement to any Applicable Intercreditor Agreement permitted under this Agreement that is for the purpose of adding the holders of any Indebtedness as expressly contemplated by the terms of such Applicable Intercreditor Agreement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to such Applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent and the Borrower, are required to effectuate the foregoing); *provided* that no such agreement shall amend, modify or otherwise directly and adversely affect the rights or duties of, or any fees or other amounts payable to, any Agent hereunder or under any other Credit Document without the prior written consent of such Agent; (iii) any provision of this Agreement or any other Credit Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Credit Document) may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent (A) to cure any ambiguity, omission, mistake, defect or inconsistency (as reasonably determined by the Administrative Agent and the Borrower), (B) to effect administrative changes of a technical or immaterial nature (as reasonably determined by the Administrative Agent and the Borrower), (C) to correct incorrect cross-references or similar inaccuracies, (D) to add benefit to all or any Class of Term Loans if adding such benefit is a condition to the incurrence of any Indebtedness permitted to be incurred under the Credit Documents, (E) for the purpose of causing any Incremental Term Loans to be fungible with any other existing Class of Term Loans and (F) to effect technical changes to this Agreement and the other Credit Documents that are required in connection with the consummation of a Permitted Change of Control; *provided* that in the case of clauses (A), (B) and (E) above, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment; (iv) guarantees, collateral documents and related documents executed by the Credit Parties in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with any other Credit Document, entered into, amended, supplemented or waived, without the consent of any other Person, by the applicable Credit Party or Credit Parties and the Administrative Agent or the Collateral Agent in its or their respective sole discretion if applicable, (A) to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, (B) as required by local law or advice of counsel to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with the Applicable Law or (C) to cure ambiguities, omissions, mistakes or defects (as reasonably determined by the Administrative Agent and the Borrower) or to cause such guarantee, collateral security document or other

192

document to be consistent with this Agreement and the other Credit Documents; and (v) the Credit Parties and the Collateral Agent, without the consent of any other Secured Party, shall be permitted to enter into amendments and/or supplements to any Security Documents in order to include customary provisions permitting the Collateral Agent to appoint sub-collateral agents or representatives to act with respect to Collateral matters thereunder in its stead.

Notwithstanding anything in this Agreement or any Security Document to the contrary, the Administrative Agent may, in its sole discretion, grant extensions of time (and direct the Collateral Agent to grant such extensions) for the satisfaction of any of the requirements under Sections 9.11, Section 9.12 or any Security Documents in respect of any particular Collateral or any particular Subsidiary if it determines that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of Holdings, the Borrower and the Restricted Subsidiaries by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Security Document.

13.2    Notices

Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile or other electronic transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or e-mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)    if to Holdings, the Borrower, the Administrative Agent, or the Collateral Agent, to the address, facsimile number, e-mail address or telephone number specified for such Person on Schedule 13.2 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b)    if to any other Lender, to the address, facsimile number, e-mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to Holdings, the Borrower, the Administrative Agent, and the Collateral Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by e-mail, when delivered; *provided* that notices and other communications to the Agents or the Lenders shall not be effective until received during normal business hours on a Business Day for such recipient.

13.3    No Waiver; Cumulative Remedies

No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial

exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

13.4    Survival of Representations and Warranties

All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Term Loans hereunder.

13.5    Payment of Expenses; Indemnification

The Borrower agrees, within thirty (30) days after written demand therefor (including documentation reasonably supporting such request), or, in the case of expenses of the type described in clause (a) below incurred prior to the Closing Date, on the Closing Date, (a) to pay or reimburse the Agents and the Lenders for all their reasonable and documented out-of-pocket costs and expenses incurred (i) in connection with the preparation, execution, delivery and negotiation of this Agreement and the other Credit Documents and any other documents prepared in connection herewith or therewith, the funding of the Term Loans, the creation, perfection and protection of the liens granted or created under any Credit Document (including all search, filing and recording fees) and the consummation of the transactions contemplated by this Agreement and the other Credit Documents to occur on the Closing Date and any other documents prepared in connection herewith or therewith, limited, in the case of legal expenses, to the reasonable and documented fees, disbursements and other expenses of Akin, Paul, Weiss, Ropes & Gray LLP, Debevoise & Plimpton LLP, and to the extent reasonably necessary, one local counsel for the Agents and one local counsel for the Lenders as a whole in each relevant material jurisdiction, excluding in each case allocated costs of in-house counsel and fees and solely to the extent the Borrower has consented to the retention of such other Person, expenses with respect to any other advisor or consultant, and (ii) in connection with ongoing administration, enforcement and preservation of any rights under this Agreement, the other Credit Documents and any such other documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto), including the reasonable and documented out-of-pocket fees, disbursements and other expenses of external counsel for the Agents and, solely in connection with this clause (ii), for any Lender or group of Lenders having or holding at least 30% of the sum of (x) the outstanding amount of the Term Loans in the aggregate at such date and (y) the outstanding amount of the unfunded Commitments in the aggregate at such date, (b) to pay, indemnify, and hold harmless each Lender and each Agent from, any and all recording and filing fees and (c) to pay, indemnify, and hold harmless each Lender and each Agent and their respective Related Parties, from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented out-of-pocket fees, disbursements and other charges of advisors related to the Transactions or, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Credit Documents and any such other documents, including, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental

194

Law (other than by such indemnified person or any of its Related Parties (other than trustees and advisors)) or to any actual or alleged presence, release or threatened release into the environment of Hazardous Materials attributable to the operations of Holdings, the Borrower, any of the Borrower's Subsidiaries or any of the Real Estate (all the foregoing in this clause (c), collectively, the "indemnified liabilities") (**SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON**); *provided* that neither the Borrower nor any other Credit Party shall have any obligation hereunder to any Agent or any Lender or any of their respective Related Parties with respect to indemnified liabilities to the extent they result from (X) with respect to the Lenders and their Related Parties, (A) the gross negligence, bad faith or willful misconduct of such indemnified Person or any of its Related Parties as determined by a final non-appealable judgment of a court of competent jurisdiction, (B) a material breach of the obligations of such indemnified Person or any of its Related Parties under the Credit Documents as determined by a final non-appealable judgment of a court of competent jurisdiction, (C) disputes not involving an act or omission of Holdings, the Borrower or any other Credit Party and that is brought by an indemnified Person against any other indemnified Person, other than any claims against any indemnified Person in its capacity or in fulfilling its role as an Agent or any similar role under the Credit Facilities or (D) any settlement effected without the Borrower's prior written consent, but if settled with the Borrower's prior written consent (not to be unreasonably withheld, delayed, conditioned or denied) or if there is a final non-appealable judgment in any such proceeding, the Borrower will indemnify and hold harmless such indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this Section 13.5, and (Y) with respect to the Agents and their Related Parties, the gross negligence or willful misconduct of such indemnified Person or any of its Related Parties as determined by a final non-appealable judgment of a court of competent jurisdiction.  All amounts payable under this Section 13.5 shall be paid within thirty (30) days of receipt by the Borrower of an invoice relating thereto setting forth such expense in reasonable detail.  The agreements in this Section 13.5 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the Commitments and the payment, satisfaction, or discharge of the Term Loans and all other Obligations payable hereunder and under any other Credit Document.

No Credit Party nor any indemnified Person shall have any liability for any special, punitive, incidental, indirect or consequential damages resulting from this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (except, in the case of the Borrower's obligation hereunder to indemnify and hold harmless the indemnified Person, to the extent of any losses, claims, damages, liabilities and expenses incurred or paid by such indemnified Person to a third party unaffiliated with such indemnified Person).  No indemnified Persons shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent that such damages have resulted from the willful misconduct or gross negligence of any indemnified Person or any of its Related Parties (as determined by a final non-appealable judgment of a court of competent jurisdiction).  This Section 13.5 shall not apply to Taxes.

Each indemnified Person, by its acceptance of the benefits of this Section 13.5, agrees to refund and return any and all amounts paid by the Borrower (or on its behalf) to it if, pursuant to limitations on indemnification set forth in this Section 13.5, such indemnified Person was not entitled to receipt of such amounts.

13.6    Successors and Assigns; Participations and Assignments

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) except as expressly permitted by Section 10.3, neither Holdings nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agents and each Lender (and any attempted assignment or transfer by Holdings or the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 13.6. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in clause (c) of this Section 13.6), to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders and each other Person entitled to indemnification under Section 13.5) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in clause (b)(ii) and (h) below, any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Term Loans at the time owing to it) with the prior written consent (in each case, such consent not to be unreasonably withheld, delayed, conditioned or denied) of:

(A)    the Borrower; *provided* that no consent of the Borrower shall be required for an assignment of Term Loans (1) to a Lender, an Affiliate of a Lender or an Approved Fund or (2) if a Specified Default has occurred and is continuing, to any other assignee; *provided, further*, that consent of the Borrower shall be deemed obtained if the Borrower has not denied its consent to the requesting party within ten (10) Business Days after receipt of written request thereof; and

(B)    the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for any assignment of any Term Loan to (x) a Lender, an Affiliate of a Lender, an Approved Fund or (y) Holdings, the Borrower, a Restricted Subsidiary thereof or an Affiliated Parent Company otherwise in accordance with clause (g) below.

Notwithstanding the foregoing, no such assignment shall be made to (w) a natural person (provided that the prohibition in clause (w) shall not disqualify any natural person from being a Lender Claimant or a Lender on the Closing Date as a result of the deemed making of any Initial Term Loans in partial satisfaction of any First Lien Claims (other than a B-3 Escrow Claim) as part of the treatment of First Lien Claims under the Plan), (x) any investment vehicle established primarily for the benefit of a natural person, (y) a Disqualified Institution (*provided* that the

196

prohibition in clause (y) shall not apply retroactively to disqualify any entity that has previously acquired an assignment or participation interest in the Term Loans to the extent such entity was not a Disqualified Institution at the time of the applicable assignment or participation, as the case may be) or (z) any Affiliated Parent Company, Holdings, or any of its Subsidiaries other than in accordance with Section 10.6(g), and any attempted assignment in violation of clauses (w) - (z) shall be null and void.  For the purposes of this Agreement, the conversion of a Lender Claimant to a Lender pursuant to <u>Section 2.18</u> shall not be deemed an assignment.  For the avoidance of doubt, (i) the Administrative Agent shall have no obligation with respect to, and shall bear no responsibility or liability for, the ascertaining, monitoring, inquiring or enforcing of the list of Persons who are Disqualified Institutions (or any provisions relating thereto) at any time, and shall have, and shall have no liability with respect to or arising out of any assignment or participation of any Term Loans to any Disqualified Institution and (ii) the Administrative Agent may share a list of Persons who are Disqualified Institutions with any Lender upon request.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Term Loans of any Class, the amount of the Commitment or Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent), shall not be less than $1,000,000, unless each of the Borrower and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld, delayed, conditioned or denied); *provided* that no such consent of the Borrower shall be required if a Specified Default has occurred and is continuing; provided, further, that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; *provided* that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Term Loans;

(C)     The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; *provided* that only one such processing and recordation fee shall be payable in connection with simultaneous assignments by or among a Lender and its Affiliates (*i.e.* assignments submitted on a single ClearPar ticket); *provided, further,* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; and

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, the applicable tax forms as

197

required under Section 5.4, and any documentation and information required by any Agent under applicable law or regulation in connection with its "know your customer" process.

(iii)    Subject to acceptance and recording thereof pursuant to clause (b)(v) of this Section 13.6, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 5.4 and 13.5).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 13.6 (other than attempted assignments or transfers in violation of the last paragraph of Section 13.6(b)(i) above, which shall be null and void as provided above).

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower solely with respect to the actions described in this Section 13.6(b)(iv), shall maintain at the Administrative Agent's Office in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  Further, each Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement.  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Holdings, the Borrower, the Collateral Agent and any Lender (solely with respect to its own outstanding Term Loans and Commitments), at any reasonable time and from time to time upon reasonable prior notice to the Administrative Agent.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and all the requested tax forms and "know your customer" documents and information to the extent required hereunder (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) of this Section 13.6 (unless waived by the Administrative Agent) and any written consent to such assignment required by clause (b) of this Section 13.6, the Administrative Agent shall promptly accept such Assignment and Assumption and record the information contained therein in the Register.

198

(c)      (i) Any Lender may, without the consent of Holdings, the Borrower, the Administrative Agent, sell participations to one or more banks or other entities that are not (x) a natural person, (y) any investment vehicle established primarily for the benefit of a natural person or (z) a Disqualified Institution (*provided* that the prohibition in clause (z) shall not apply retroactively to disqualify any entity that has previously acquired an assignment or participation interest in the Term Loans to the extent such entity was not a Disqualified Institution at the time of the applicable assignment or participation, as the case may be) (each, a "**Participant**") (and any such attempted sales to the Persons identified in clauses (x) - (z) above shall be null and void) (provided that the last sentence of Section 13.6(b)(i) shall apply) in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Term Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (C) Holdings, the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, the Administrative Agent shall have no obligation with respect to, and shall bear no responsibility or liability for, the monitoring or enforcing of the list of Disqualified Institutions with respect to the sales of participations at any time.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any consent, amendment, modification, supplement or waiver described in clause (i) or (iv) of the second proviso of the first paragraph of Section 13.1 that directly and adversely affects such Participant. Subject to clause (c)(ii) of this Section 13.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 5.4 to the same extent as if it were a Lender, and provided that such Participant agrees to be subject to the requirements and limitations of those Sections and Sections 2.12 and 13.7(a) as though it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 13.6.  To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of Section 13.8(b) as though it were a Lender; *provided* that such Participant agrees to be subject to Section 13.8(a) as though it were a Lender. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 13.7 with respect to any Participant.

(i)      A Participant shall not be entitled to receive any greater payment under Section 2.10, 2.11 or 5.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(ii)      Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans (or other rights or obligations) held by it (the "**Participant Register**").  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement

199

notwithstanding any notice to the contrary.  No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(d)     Any Lender may, without the consent of Holdings, the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 13.6 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Subject to Section 13.16, the Borrower authorizes each Lender to disclose (other than to any Disqualified Institutions) to any Participant, secured creditor of such Lender or assignee (each, a "**Transferee**"), any prospective Transferee and any prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Term Loans made hereunder any and all financial information in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

(f)     SPV Lender.  Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Term Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Term Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Term Loan, the Granting Lender shall be obligated to make such Term Loan pursuant to the terms hereof.  The making of a Term Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Term Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 13.6, any SPV may (i) with written notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Term Loans to the

200

Granting Lender or to any financial institutions (consented to by the Borrower and the Administrative Agent) other than a Disqualified Institution providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Term Loans and (ii) disclose on a confidential basis any non-public information relating to its Term Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV. This Section 13.6(f) may not be amended without the written consent of the SPV. Notwithstanding anything to the contrary in this Agreement, (x) no SPV shall be entitled to any greater rights under Sections 2.10, 2.11 and 5.4 than its Granting Lender would have been entitled to absent the use of such SPV and (y) each SPV agrees to be subject to the requirements of Sections 2.10, 2.11, and 5.4 as though it were a Lender and has acquired its interest by assignment pursuant to clause (b) of this Section 13.6.

(g)      Notwithstanding anything to the contrary contained herein, (x) any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Parent Company, Holdings, the Borrower or any Subsidiary thereof and (y) any Affiliated Parent Company, Holdings, the Borrower and any Subsidiary may, from time to time, purchase or prepay Term Loans, in each case, on a non *pro rata* basis through (1) Dutch auction procedures open to all applicable Lenders on a *pro rata* basis in accordance with customary procedures to be mutually agreed between the Borrower and the Auction Agent and as set forth in Exhibit K or (2) (x) open market purchases or other purchases by assignment offered ratably to all Lenders (including for cash consideration, in exchange of Indebtedness or any other consideration) or (y) bona fide open market purchases for cash consideration on the secondary market through a third-party that is a Qualified Marketmaker at the prevailing market price ((x) or (y), the "**Permitted Open Market Purchases**"); *provided* that:

(i)      any Term Loans or Commitments acquired by Holdings, the Borrower or any Restricted Subsidiary shall be retired and cancelled immediately upon acquisition thereof;

(ii)      no assignment of Term Loans to Holdings, the Borrower or any Restricted Subsidiary (x) may be purchased with the proceeds of any ABL Loans or (y) may occur while an Event of Default has occurred and is continuing hereunder;

(iii)      in connection with each assignment pursuant to this Section 13.6(g), none of any Affiliated Parent Company, Holdings, the Borrower or any Subsidiary purchasing any Lender's Term Loans shall be required to make a representation that it is not in possession of MNPI with respect to any Public Reporting Entity, Holdings, Borrower and its Subsidiaries or their respective securities, and all parties to such transaction may render customary "big boy" letters to each other (or to the Auction Agent, if applicable);

(iv)      (A) the aggregate outstanding principal amount of the Term Loans of the applicable Class shall be deemed reduced by the full par value of the aggregate principal amount of such Term Loans acquired by, or contributed to, any Affiliated Parent Company, Holdings, the Borrower or such Subsidiary and (B) any scheduled principal repayment installments with respect to the Term Loans of such Class occurring pursuant to Sections 2.5(b) and (c), as applicable, prior to the final maturity date for Term Loans of such Class, shall be reduced *pro rata* by the par value of the aggregate principal amount of

201

Term Loans so purchased or contributed (and subsequently cancelled and retired), with such reduction being applied solely to the remaining Term Loans of the Lenders which sold or contributed such Term Loans;

(v)       no Affiliated Lender shall have any right to (x) attend or participate in (including, in each case, by telephone) any meeting (including "Lender only" meetings) or discussions (or portion thereof) among the Agents or any Lender to which representatives of the Borrower are not then present or invited thereto, (y) receive any information or material prepared by any Agent or any Lender or any communication by or among any Agent and one or more Lenders or any other material which is "Lender only", except to the extent such information or materials have been made available to the Borrower or its representatives (and in any case, other than the right to receive notices of prepayments and other administrative notices in respect of its Term Loans required to be delivered to Lenders pursuant to Section 2) or receive any advice of counsel to any Agent or (z) make any challenge to any Agent's or any other Lender's attorney-client privilege on the basis of its status as a Lender;

(vi)       except with respect to any amendment, modification, waiver, consent or other action (a) that pursuant to Section 13.1 requires the consent of all Lenders, all Lenders directly and adversely affected or specifically such Lender, (b) that alters the applicable Affiliated Lender's *pro rata* share of any payments given to all Lenders, or (c) affects the applicable Affiliated Lender (in its capacity as a Lender) in a manner that is disproportionate to the effect on any Lender in the same Class, the Term Loans held by the applicable Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Lender vote (and, in the case of a plan of reorganization that does not affect the applicable Affiliated Lender in a manner that is adverse to such Affiliated Lender relative to other Lenders, such Affiliated Lender shall be deemed to have voted its interest in the Term Loans in the same proportion as the other Lenders in the same Class) (and shall be deemed to have been voted in the same percentage as all other applicable Lenders voted if necessary to give legal effect to this paragraph) (but, in any event, in connection with any amendment, modification, waiver, consent or other action, shall be entitled to any consent fee, calculated as if all of the applicable Affiliated Lender's Term Loans had voted in favor of any matter for which a consent fee or similar payment is offered); and

(vii)       no such acquisition by an Affiliated Lender shall be permitted if, after giving effect to such acquisition, the aggregate principal amount of Term Loans of any Class held by Affiliated Lenders would exceed 25% of the aggregate principal amount of all Term Loans of such Class outstanding at the time of such purchase; *provided* that to the extent any assignment to an Affiliated Lender would result in the aggregate principal amount of the applicable Term Loans held by Affiliated Lenders exceeding such 25% threshold at the time of such purchase, the purchase of such excess amount will be void *ab initio*.

Each Lender that sells its Term Loans pursuant to this Section 13.6 acknowledges and agrees that (i) Holdings and its Subsidiaries may come into possession of additional information regarding the Term Loans or the Credit Parties at any time after a repurchase has been consummated pursuant

to an auction or open market purchase hereunder that was not known to such Lender at the time such repurchase was consummated and may be information that would have been material to such Lender's decision to enter into an assignment of such Term Loans hereunder ("**Excluded Information**"), (ii) such Lender will independently make its own analysis and determination to enter into an assignment of its Term Loans and to consummate the transactions contemplated by an auction notwithstanding such Lender's lack of knowledge of Excluded Information and (iii) none of the direct or indirect equityholders of Holdings or any of its respective Affiliates, or any other Person, shall have any liability to such Lender with respect to the nondisclosure of the Excluded Information.

This Section 13.6 shall be construed so that all Term Loans are at all times maintained in "registered form" within the meaning of Section 5f.103-1(c) of the United States Treasury Regulations.

13.7    Replacements of Lenders under Certain Circumstances

(a)    The Borrower shall be permitted (x) to replace any Lender with a replacement bank or institution or (y) terminate the Commitment of such Lender, as the case may be, and repay all Obligations of the Borrower due and owing to such Lender relating to the Term Loans and participations held by such Lender as of such termination date if such Lender (a) requests reimbursement for amounts owing pursuant to Section 2.10 or Section 5.4 (or the Borrower is required to pay any Indemnified Taxes or additional amounts to any Agent or Lender or to any Governmental Authority on account of any Agent or Lender pursuant to Section 5.4), (b) [reserved], (c) becomes a Defaulting Lender or (d) refuses to make an Extension Election pursuant to Section 2.15; *provided* that, solely in the case of the foregoing clause (x), (i) no Specified Default shall have occurred and be continuing at the time of such replacement, (ii) the Borrower shall repay (or the replacement bank or institution shall purchase, at par) all Term Loans and other amounts (other than any disputed amounts), pursuant to Section 2.10, 2.11 or 5.4, as the case may be, owing to such replaced Lender prior to the date of replacement, (iii) the replacement bank or institution, if not already a Lender, an Affiliate of a Lender or an Approved Fund, and the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent (solely to the extent such consent would be required under Section 13.6), (iv) the replaced and the replacement Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein unless otherwise agreed) and (v) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, any Agent or any other Lender shall have against the replaced Lender.

(b)    If any Lender (such Lender, a "**Non-Consenting Lender**") has failed to consent to a proposed amendment, modification, supplement, waiver, discharge or termination that pursuant to the terms of Section 13.1 requires the consent of either (i) all of the Lenders of the applicable Class or Classes directly and adversely affected or (ii) all of the Lenders of the applicable Class or Classes, and, in each case, with respect to which the Required Lenders (or Lenders holding the majority of outstanding loans or commitments in respect of the applicable Class or Classes, as applicable) or a majority (in principal amount) of the directly and adversely affected Lenders shall, in each such case, have granted their consent, then so long as no Event of Default then exists, the Borrower shall have the right (unless such Non-Consenting Lender grants

203

such consent) to (x) replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Term Loans and its Commitments hereunder (in respect of any applicable Class only, at the election of the Borrower) to one or more assignees reasonably acceptable to the Administrative Agent (to the extent such consent would be required under Section 13.6) or (y) terminate the Commitment of such Lender (in respect of any applicable Class only, at the election of the Borrower), and in the case of a Lender, repay all Obligations of the Borrower due and owing to such Lender relating to the Term Loans and participations held by such Lender as of such termination date; *provided* that:  (a) all Obligations of the Borrower hereunder owing to such Non-Consenting Lender being replaced (in respect of any applicable Class only, at the election of the Borrower) shall be paid in full to such Non-Consenting Lender concurrently with such assignment, and (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof *plus* accrued and unpaid interest thereon.  In connection with any such assignment, the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 13.6.

(c)     Nothing in this Section 13.7 shall be deemed to prejudice any right or remedy that Holdings or the Borrower may otherwise have at law or at equity.

13.8    Adjustments; Set-off

(a)     Except as contemplated in Section 13.6 or elsewhere herein or in any other Credit Document, if any Lender (a "**Benefited Lender**") shall at any time receive any payment of all or part of its Term Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 11.5, or otherwise), in a greater proportion than any such payment to or Collateral received by any other Lender, if any, in respect of such other Lender's Term Loans, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Term Loan, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; *provided, however*, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by Applicable Law, each Lender shall have the right, without prior notice to Holdings or the Borrower, any such notice being expressly waived by Holdings and the Borrower to the extent permitted by Applicable Law but with the prior written consent of the Administrative Agent, upon any amount becoming due and payable by the Borrower hereunder (whether at the Stated Maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final) (other than payroll, trust, tax, fiduciary, employee health and benefits, pension, 401(k) and petty cash accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly

204

to notify the Borrower and the Administrative Agent in writing after any such set-off and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

13.9    Counterparts; Electronic Execution

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or any other Credit Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

13.10   Severability

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11   INTEGRATION

THIS WRITTEN AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT OF HOLDINGS, THE BORROWER, THE COLLATERAL AGENT, THE ADMINISTRATIVE AGENT AND THE LENDERS WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND (1) THERE ARE NO PROMISES, UNDERTAKINGS, REPRESENTATIONS OR WARRANTIES BY HOLDINGS, THE BORROWER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY LENDER RELATIVE TO SUBJECT MATTER HEREOF NOT EXPRESSLY SET FORTH OR REFERRED TO HEREIN OR IN THE OTHER CREDIT DOCUMENTS, (2) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES AND (3) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

13.12   GOVERNING LAW

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

13.13   Submission to Jurisdiction; Waivers

Each party hereto irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, in each case sitting in New York City in the Borough of Manhattan, and appellate courts from any thereof;

(b)    consents that any such action or proceeding shall be brought in such courts and waives (to the extent permitted by Applicable Law) any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 13.2 or at such other address of which the Administrative Agent shall have been notified in writing pursuant to Section 13.2;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or, in the case of the Administrative Agent, the Collateral Agent and the Lenders, shall limit the right to sue in any other jurisdiction;

(e)    subject to the last paragraph of Section 13.5, waives, to the maximum extent not prohibited by Applicable Law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 13.13 any special, exemplary, punitive or consequential damages; and

(f)    agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

13.14   Acknowledgments

Each of Holdings and the Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)    (i) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between Holdings and the Borrower, on the one hand, and the Administrative Agent, the Lenders and the other Agents on the other hand, and Holdings, the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms,

risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent and the other Agents, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of Holdings, the Borrower, any other Credit Parties or any of their respective Related Parties, stockholders, creditors or employees or any other Person; (iii) neither the Administrative Agent nor any other Agent has assumed or will assume an advisory, agency or fiduciary responsibility in favor of Holdings, the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent has advised or is currently advising Holdings, the Borrower, the other Credit Parties or their respective Affiliates on other matters) and neither the Administrative Agent or other Agent has any obligation to Holdings, the Borrower, the other Credit Parties or their respective Related Parties with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent, each other Agent and each Related Party of the foregoing may be engaged in a broad range of transactions that involve interests that differ from those of Holdings, the Borrower and their respective Affiliates, and neither the Administrative Agent nor any other Agent has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) neither the Administrative Agent nor any other Agent has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and Holdings and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Holdings and the Borrower agree not to claim that the Administrative Agent or any other Agent has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to Holdings, the Borrower or any other Affiliates, in connection with the transactions contemplated hereby or the process leading hereto.

(c)      no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among Holdings and the Borrower, on the one hand, and any Lender, on the other hand.

13.15  WAIVERS OF JURY TRIAL

HOLDINGS, THE BORROWER, EACH AGENT AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE (TO THE EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.16  Confidentiality

The Administrative Agent, each other Agent and each Lender shall hold all non-public information furnished by or on behalf of Holdings, the Borrower or any Subsidiary of the Borrower in connection with such Person's evaluation of whether to become an Agent or Lender hereunder or obtained by such Lender, the Administrative Agent, or such other Agent pursuant to

207

the requirements of this Agreement or in connection with any amendment, supplement, modification or waiver or proposed amendment, supplement, modification or waiver hereto (including any Incremental Amendment, Refinancing Amendment or Extension Amendment) or the other Credit Documents ("**Confidential Information**"), confidential; *provided* that the Administrative Agent, each other Agent and each Lender may make disclosure (a) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by Applicable Law, regulation or compulsory legal process (in which case such Lender, the Administrative Agent or such other Agent shall use commercially reasonable efforts to inform the Borrower promptly thereof to the extent lawfully permitted to do so (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority)), (b) to such Lender's or the Administrative Agent's or such other Agent's attorneys, professional advisors, independent auditors, trustees or Affiliates involved in the Transactions on a "need to know" basis and who are made aware of and agree to comply with the provisions of this Section 13.16, in each case on a confidential basis (with such Lender, the Administrative Agent or such other Agent responsible for such persons' compliance with this Section 13.16), (c) on a confidential basis to any bona fide prospective successor Agent, bona fide prospective Lender, prospective participant or swap counterparty (in each case, other than a Disqualified Institution or a Person who the Borrower has affirmatively denied assignment thereto in accordance with Section 13.6), (d) to the extent requested by any bank regulatory authority having jurisdiction over an Agent or Lender or its Affiliates (including in any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), (e) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Section 13.16 or other confidential or fiduciary obligation owed by the Administrative Agent, such other Agent or such Lender to the Borrower or its Affiliates or (ii) becomes available to the Administrative Agent, such other Agent or such Lender on a non-confidential basis from a source other than Holdings, the Borrower or any Subsidiary or on behalf of Holdings, the Borrower or any Subsidiary that, to the knowledge (after due inquiry) the Administrative Agent, such other Agent or such Lender, is not in violation of any confidentiality obligation owed to the Borrower or its Affiliates, (f) to the extent the Borrower shall have consented to such disclosure in writing (which may include through electronic means), (g) as is necessary in protecting and enforcing the rights of the Administrative Agent, such other Agent or such Lender with respect to this Agreement or any other Credit Document, (h) for purposes of establishing any defense available under Applicable Laws, including, without limitation, establishing a "due diligence" defense, (i) to the extent independently developed by the Administrative Agent, such other Agent or such Lender or any Affiliates thereof without reliance on confidential information, (j) on a confidential basis, to the rating agencies in consultation with the Borrower, (k) on a confidential basis, to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Term Loans or market data collectors, similar services providers to the lending industry and service providers to any Agent in connection with the administration and management of this Agreement and the Credit Documents and (l) to ClearPar® or any other pricing settlement provider. Each Lender, the Administrative Agent and each other Agent agrees that it will not provide to prospective Transferees or to any pledgee referred to in Section 13.6 or to prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Term Loans made hereunder any of the Confidential Information unless such

Person is advised of and agrees to be bound by the provisions of this Section 13.16 or confidentiality provisions at least as restrictive as those set forth in this Section 13.16.

13.17   Direct Website Communications

(a)   Holdings and the Borrower may, at their option, provide to the Administrative Agent any information, documents and other materials that they are obligated to furnish to the Administrative Agent pursuant to the Credit Documents, including, all notices, requests, financial statements, financial and other reports, certificates and other information materials and communications, but excluding any such communication (*provided* that such communications described in clauses (A) - (D) will be delivered pursuant to Section 13.2, including by e-mail) that (A) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or Interest Period relating thereto), (B) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under this Agreement, or (D) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit thereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at an email address separately identified by the Administrative Agent; *provided* that:  (i) upon written request by the Administrative Agent, Holdings or the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) Holdings or the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.  Nothing in this Section 13.17 shall prejudice the right of Holdings, the Borrower, the Administrative Agent, any other Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

(b)   The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Credit Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Credit Documents.  Each Lender agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(c)   Holdings and the Borrower further agree that the Agents may make the Communications available to the Lenders by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the Administrative Agent to be its electronic transmission system (the "**Platform**"), so long as the access to such

209

Platform is limited (i) to the Agents, the Lenders or any bona fide potential Transferee and (ii) remains subject to the confidentiality requirements set forth in Section 13.16.

(d)     THE PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS IN THE PLATFORM AND FROM THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  In no event shall any Agent or their Related Parties (collectively, the "**Agent Parties**" and each an "**Agent Party**") have any liability to any Credit Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Credit Party's or any Agent's transmission of Communications through the internet or the Platform, except to the extent the liability of any Agent Party resulted from such Agent Party's (or any of its Related Parties' (other than trustees or advisors)) gross negligence or willful misconduct (as determined in a final non-appealable judgment of a court of competent jurisdiction).

(e)     The Borrower and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Holdings, the Borrower, the Subsidiaries of the Borrower or their securities) (each, a "**Public Lender**").  The Borrower agrees that (w) at the request of any Agent, Communications that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Communications "PUBLIC," the Borrower shall be deemed to have authorized such Agent and the Lenders to treat such Communications as not containing any information of a type that would constitute material non-public information with respect to Holdings, the Borrower, the Subsidiaries of the Borrower or their securities for purposes of United States federal securities laws (*provided*, *however*, that to the extent such Communications constitute confidential information, they shall be treated as such as set forth in Section 13.16); (y) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information;" and (z) the Agents shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Side Information."

(f)     Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain information of a type that would constitute material non-public information with respect to the Holdings, the Borrower, the Subsidiaries of the Borrower or their securities for purposes of United States Federal or state securities laws.  In the event that any Public

210

Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrower (or any other Credit Party nor their Affiliates) nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Credit Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

(g)     Each of the Lenders, Holdings, and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agents are not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Platform, and that there are confidentiality and other risks associated with such distribution.  Each of the Lenders, Holdings and the Borrower hereby approves distribution of the Communications through the Platform and understands and assumes the risks of such distribution.

(h)     Each of the Lenders, Holdings and the Borrower agrees that the Agents may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Platform in accordance with the Agents' generally applicable document retention procedures and policies.

(i)     Nothing herein shall prejudice the right of any Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

13.18   USA PATRIOT Act

Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.

13.19   Payments Set Aside

To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to any Agent upon demand its applicable share of any amount so recovered from or repaid by such Agent, *plus* interest thereon from the date of such demand to

211

the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

13.20   Judgment Currency

If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Credit Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Credit Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under Applicable Law).

13.21   Cashless Rollovers

Notwithstanding anything to the contrary contained in this Agreement or in any other Credit Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Term Loans by way of an Incremental Amendment, an Extension Amendment, a Refinancing Amendment or any other amendment to this Agreement, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Credit Document that such payment be made "in Dollars", "in immediately available funds", "in cash" or any other similar requirement.

13.22   Acknowledgement and Consent to Bail-In of EEA Financial Institutions

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

212

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

AVAYA INC.
AVAYA HOLDINGS CORP.


By: _____
      Name:
      Title:


AVAYA MANAGEMENT L.P.

By:  Avaya Inc.
Its:  General Partner


By: _____
      Name:
      Title:

AVAYA CALA INC.
AVAYA CLOUD INC.
AVAYA EMEA LTD.
AVAYA FEDERAL SOLUTIONS, INC.
AVAYA HOLDINGS LLC
AVAYA INTEGRATED CABINET SOLUTIONS LLC
AVAYA MANAGEMENT SERVICES INC.
AVAYA WORLD SERVICES INC.
CTINTEGRATIONS, LLC
HYPERQUALITY, INC.
SIERRA ASIA PACIFIC INC.
UBIQUITY SOFTWARE CORPORATION
VPNET TECHNOLOGIES, INC.
HYPERQUALITY II, LLC
INTELLISIST, INC.
CAAS TECHNOLOGIES, LLC
KNOAHSOFT, INC.
SIERRA COMMUNICATION INTERNATIONAL LLC

By: _____
      Name:
      Title:


[*Signature Page to Term Loan Credit Agreement*]

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent and Collateral Agent


By: _____
      Name:  Geoffrey J. Lewis
      Title:   Vice President

[*Signature Page to Term Loan Credit Agreement*]

Lender signature pages are on file with the Administrative Agent

[*Signature Page to Term Loan Credit Agreement*]

**Schedule 1.1(a)**

Initial Term Commitment

(On file with the Administrative Agent)

| Lender | Debt Rights Offering Amount | RO Backstop Commitment Amount | DIP Conversion Amount | First Lien Claims Distribution Amount | Holdco Convertible Distribution Amount | Aggregate Amount |
|---|---|---|---|---|---|---|
| Total | $150,000,000 | | $500,000,000 | $150,000,000 | $10,000,000 | $810,000,000 |

**Exhibit D(ii)-1**

**Redline to Previously Filed Form of Exit Term Loan Facility Documents**

**TERM LOAN CREDIT AGREEMENT**

Dated as of [~~[]~~May 1], 2023
among

**AVAYA HOLDINGS CORP.,**
as Holdings,

**AVAYA ~~INC~~Inc.,**
as the Borrower,

**The Several Lenders
from Time to Time Parties Hereto,**

**WILMINGTON SAVINGS FUND SOCIETY, FSB,**
as Administrative Agent and Collateral Agent,

**TABLE OF CONTENTS**

**Page**

**SECTION 1   DEFINITIONS** ................................................................................ **2**
 1.1  Defined Terms ........................................................................................ 2
 1.2  Other Interpretive Provisions ............................................................... 7~~8~~0
 1.3  Accounting Terms ................................................................................. 8~~0~~2
 1.4  Rounding ............................................................................................... 8~~0~~2
 1.5  References to Agreements, Laws, Etc. ................................................. 8~~0~~3
 1.6  Times of Day ......................................................................................... 8~~1~~3
 1.7  Timing of Payment or Performance ..................................................... 8~~1~~3
 1.8  Currency Equivalents Generally ........................................................... 8~~1~~3
 1.9  Classification of Loans and Borrowings .............................................. 8~~1~~3
 1.10 Unrestricted Escrow Subsidiary ........................................................... 8~~1~~4
 1.11 Limited Condition Transactions ........................................................... 8~~2~~4
 1.12 Rates ..................................................................................................... 8~~3~~5

**SECTION 2   AMOUNT AND TERMS OF CREDIT** ............................................. **8~~3~~5**
 2.1  Initial Term Loan Borrowing ............................................................... 8~~3~~5
 2.2  Minimum Amount of Each Borrowing; Maximum Number of Borrowings ...... 84~~6~~
 2.3  Notice of Borrowing; Determination of Class of Term Loans ............. 84~~6~~
 2.4  Disbursement of Funds ......................................................................... 86~~7~~
 2.5  Repayment of Term Loans; Evidence of Debt ..................................... 86~~8~~
 2.6  Conversions and Continuations ............................................................ 88~~9~~
 2.7  Benchmark Replacement Setting for Term Loans ............................... 8~~9~~0
 2.8  Interest .................................................................................................. 9~~0~~2
 2.9  Interest Periods ..................................................................................... 9~~2~~4
 2.10 Increased Costs, Illegality, Etc. ........................................................... 9~~3~~5
 2.11 Compensation ....................................................................................... 94~~6~~
 2.12 Change of Lending Office ..................................................................... 95~~6~~
 2.13 Notice of Certain Costs ........................................................................ 95~~7~~
 2.14 Incremental Facilities ........................................................................... 95~~7~~
 2.15 Extensions of Term Loans; Refinancing Facilities .............................. 98~~100~~
 2.16 Defaulting Lenders ............................................................................... 105~~7~~
 2.17 Permitted Debt Exchanges ................................................................... 105~~7~~
 2.18 Lender Claimants. ................................................................................. 107~~9~~

**SECTION 3   [RESERVED]** ...................................................................................... **10~~9~~11**

**SECTION 4   FEES; COMMITMENTS** .................................................................... **10~~9~~11**
 4.1  Fees ....................................................................................................... 10~~9~~11
 4.2  Mandatory Termination or Reduction of Commitments ..................... 11~~0~~3

**SECTION 5   PAYMENTS** ........................................................................................ **11~~0~~3**
 5.1  Voluntary Prepayments ........................................................................ 11~~0~~3
 5.2  Mandatory Prepayments ....................................................................... 11~~1~~4

i

5.3     Method and Place of Payment .......................................................... 11~4~7

5.4     Net Payments ................................................................................. 11~5~8

5.5     Computations of Interest and Fees ................................................ 1~19~22

5.6     Limit on Rate of Interest ............................................................... 1~19~22

**SECTION 6     CONDITIONS PRECEDENT TO THE CLOSING DATE** ...... **12~0~3**

6.1     Credit Documents ........................................................................ 12~0~3

6.2     Collateral ..................................................................................... 12~0~3

6.3     Legal Opinions ............................................................................. 12~1~4

6.4     Closing Certificates ..................................................................... 12~1~4

6.5     Secretary's Certificate; Authorization of Proceedings of Each Credit Party ... 12~1~4

6.6     Fees .............................................................................................. 12~2~4

6.7     Representations and Warranties ................................................... 12~2~5

6.8     Material Adverse Effect ............................................................... 12~2~5

6.9     Solvency Certificate .................................................................... 12~2~5

6.10    Financial Statements .................................................................... 12~2~5

6.11    Plan Consummation ..................................................................... 12~2~5

6.12    No Default .................................................................................... 12~3~6

6.13    [Reserved.]Evidence of Insurance ............................................... 12~3~6

6.14    Patriot Act ................................................................................... 12~3~6

6.15    Letter of Direction ....................................................................... 127

**SECTION 7     [RESERVED]** ............................................................... **12~3~7**

**SECTION 8     REPRESENTATIONS AND WARRANTIES.** ................... **12~3~7**

8.1     Corporate Status; Compliance with Laws .................................... 12~4~7

8.2     Corporate Power and Authority ................................................... 12~4~7

8.3     No Violation ................................................................................. 12~4~8

8.4     Litigation ..................................................................................... 12~5~8

8.5     Margin Regulations ...................................................................... 12~5~8

8.6     Governmental Approvals ............................................................. 12~5~8

8.7     Investment Company Act ............................................................. 12~5~8

8.8     True and Complete Disclosure ..................................................... 12~5~9

8.9     Financial Condition; Financial Statements ................................... 12~6~9

8.10    Tax Matters .................................................................................. 12~6~9

8.11    Compliance with ERISA .............................................................. 12~6~30

8.12    Subsidiaries ................................................................................. 12~7~30

8.13    Intellectual Property .................................................................... 12~7~30

8.14    Environmental Laws .................................................................... 12~7~30

8.15    Properties ..................................................................................... 12~7~31

8.16    Solvency ...................................................................................... 12~8~31

8.17    Security Interests ......................................................................... 12~8~31

8.18    Labor Matters .............................................................................. 13~2~8

8.19    Sanctioned Persons; Anti-Corruption Laws; Patriot Act ............. 13~2~9

8.20    Use of Proceeds ........................................................................... 13~2~9

8.21    Insurance ...................................................................................... 132

ii

**SECTION 9   AFFIRMATIVE COVENANTS** .................................................. 1~~29~~33
   9.1    Information Covenants ............................................................ 1~~29~~33
   9.2    Books, Records and Inspections ........................................... 13~~3~~6
   9.3    Maintenance of Insurance ..................................................... 13~~3~~7
   9.4    Payment of Taxes ................................................................. 13~~4~~8
   9.5    Consolidated Corporate Franchises ...................................... 13~~4~~8
   9.6    Compliance with Statutes, Regulations, Etc. ....................... 13~~4~~8
   9.7    Lender Calls ......................................................................... 13~~5~~8
   9.8    Maintenance of Properties .................................................... 13~~5~~9
   9.9    Transactions with Affiliates ................................................. 13~~5~~9
   9.10   End of Fiscal Years .............................................................. 13~~7~~41
   9.11   Additional Guarantors and Grantors ................................... 13~~7~~41
   9.12   Further Assurances ............................................................... 13~~7~~41
   9.13   Use of Proceeds ................................................................... 14~~3~~9
   9.14   Maintenance of Ratings ....................................................... 14~~0~~3
   9.15   Changes in Business ............................................................ 14~~0~~4
   9.16   Post-Closing Obligations .................................................... 144

**SECTION 10  NEGATIVE COVENANTS** ....................................................... 14~~0~~4
   10.1   Limitation on Indebtedness ................................................. 14~~0~~4
   10.2   Limitation on Liens ............................................................. 14~~5~~9
   10.3   Limitation on Fundamental Changes ................................... 14~~8~~52
   10.4   Limitation on Disposition .................................................... 15~~0~~4
   10.5   Limitation on Investments ................................................... 15~~3~~7
   10.6   Limitation on Restricted Payments ...................................... 15~~57~~61
   10.7   Limitations on Debt Prepayments and Amendments ........... 16~~2~~6
   10.8   Limitation on Subsidiary Distributions ............................... 16~~3~~7
   10.9   Amendment of Organizational Documents .......................... 16~~5~~9
   10.10  Permitted Activities ............................................................. 16~~6~~2

**SECTION 11  EVENTS OF DEFAULT** ............................................................ 16~~66~~70
   11.1   Payments .............................................................................. 16~~66~~70
   11.2   Representations, Etc. ............................................................ 16~~6~~70
   11.3   Covenants ............................................................................. 16~~6~~70
   11.4   Default Under Other Agreements ........................................ 16~~6~~71
   11.5   Bankruptcy ........................................................................... 16~~8~~72
   11.6   ERISA .................................................................................. 16~~8~~72
   11.7   Guarantee ............................................................................. 16~~9~~72
   11.8   Security Agreement .............................................................. 16~~9~~73
   11.9   Judgments ............................................................................ 16~~9~~73
   11.10  Change of Control ............................................................... 16~~9~~73
   11.11  Indemnity Payments to Former Officers ............................. 16~~9~~73
   11.12  Application of Proceeds ....................................................... 17~~0~~4

**SECTION 12  THE AGENTS** ........................................................................... 17~~1~~5
   12.1   Appointment ........................................................................ 17~~1~~5

| | | | |
|---|---|---|---|
| 12.2 | Delegation of Duties | | 17~~2~~6 |
| 12.3 | Exculpatory Provisions | | 17~~3~~6 |
| 12.4 | Reliance by Agents | | 17~~6~~9 |
| 12.5 | Notice of Default | | 17~~6~~80 |
| 12.6 | Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders | | 17~~7~~80 |
| 12.7 | Indemnification | | 17~~7~~81 |
| 12.8 | Agents in their Individual Capacities | | 17~~9~~82 |
| 12.9 | Successor Agents | | 17~~9~~82 |
| 12.10 | [Reserved] | | 18~~0~~3 |
| 12.11 | Administrative Agent May File Proofs of Claim | | 18~~0~~3 |
| 12.12 | Intercreditor Agreements | | 18~~0~~4 |
| 12.13 | Security Documents and Guarantee; Agents under Security Documents and Guarantee | | 18~~1~~4 |
| 12.14 | Lender Direction | | 18~~3~~6 |
| 12.15 | Erroneous Distribution | | 18~~3~~7 |
| 12.16 | Survival | | 18~~6~~9 |
| **SECTION 13** | **MISCELLANEOUS** | | **18~~6~~9** |
| 13.1 | Amendments, Waivers and Releases | | 18~~6~~9 |
| 13.2 | Notices | | 18~~8~~93 |
| 13.3 | No Waiver; Cumulative Remedies | | 19~~0~~3 |
| 13.4 | Survival of Representations and Warranties | | 19~~0~~4 |
| 13.5 | Payment of Expenses; Indemnification | | 19~~0~~4 |
| 13.6 | Successors and Assigns; Participations and Assignments | | 19~~2~~6 |
| 13.7 | Replacements of Lenders under Certain Circumstances | | ~~199~~203 |
| 13.8 | Adjustments; Set-off | | 20~~0~~4 |
| 13.9 | Counterparts; Electronic Execution | | 20~~1~~5 |
| 13.10 | Severability | | 20~~1~~5 |
| 13.11 | INTEGRATION | | 20~~1~~5 |
| 13.12 | GOVERNING LAW | | 20~~2~~5 |
| 13.13 | Submission to Jurisdiction; Waivers | | 20~~2~~6 |
| 13.14 | Acknowledgments | | 20~~2~~6 |
| 13.15 | WAIVERS OF JURY TRIAL | | 20~~3~~7 |
| 13.16 | Confidentiality | | 20~~4~~7 |
| 13.17 | Direct Website Communications | | 20~~5~~9 |
| 13.18 | USA PATRIOT Act | | 20~~7~~11 |
| 13.19 | Payments Set Aside | | 20~~7~~11 |
| 13.20 | Judgment Currency | | 20~~8~~12 |
| 13.21 | Cashless Rollovers | | 20~~8~~12 |
| 13.22 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | | 20~~9~~12 |

SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Commitments of Lenders |
| Schedule 1.1(b) | Mortgaged Properties |
| Schedule 8.4 | Litigation |
| Schedule 8.12 | Subsidiaries |
| Schedule 8.14 | Environmental Matters |
| Schedule 8.15 | Property Matters |
| Schedule 9.9 | Closing Date Affiliate Transactions |
| Schedule 10.1 | Closing Date Indebtedness |
| Schedule 10.2 | Closing Date Liens |
| Schedule 10.4 | Scheduled Dispositions |
| Schedule 10.5 | Closing Date Investments |
| Schedule 13.2 | Notice Addresses |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Notice of Borrowing/Notice of Conversion or Continuation |
| Exhibit B | Form of Promissory Note |
| Exhibit C | Form of Guarantee |
| Exhibit D | Form of Security Agreement |
| Exhibit E | Form of Cash/PIK Election Notice |
| Exhibit F | Form of ABL Intercreditor Agreement |
| Exhibit G | Form of First Lien Intercreditor Agreement |
| Exhibit H | Form of Junior Lien Intercreditor Agreement |
| Exhibit I | Form of Assignment and Assumption |
| Exhibit J | 1-4 Form of Non-U.S. Lender Certification |
| Exhibit K | Dutch Auction Procedures |
| Exhibit L | Form of Borrower Direction to Add Lender |

i

TERM LOAN CREDIT AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"), dated as of [    ]May 1, 2023, among AVAYA HOLDINGS CORP., a Delaware corporation ("**Avaya Holdings**"), in its capacity as Holdings, AVAYA INC., a Delaware corporation (to be converted to a limited liability company in the name of Avaya LLC, a Delaware limited liability company) (the "**Borrower**"), the lending institutions from time to time parties hereto (each a "**Lender**" and, collectively, the "**Lenders**") and WILMINGTON SAVINGS FUND SOCIETY, FSB, as Administrative Agent and Collateral Agent.

## RECITALS:

WHEREAS, capitalized terms used and not defined in the preamble and these recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, on February 14, 2023 (the "**Petition Date**"), Holdings, the Borrower and certain of the Borrower's Domestic Subsidiaries (collectively, the "**Avaya Debtors**") filed voluntary petitions for relief under Chapter 11 in the United States Bankruptcy Court for the Southern District of Texas (such court, together with any other court having exclusive jurisdiction over the Case from time to time and any Federal appellate court thereof, the "**Bankruptcy Court**") and commenced cases, jointly administered under Case No. 23-90088 (collectively, the "**Case**"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Avaya Debtors are parties to the certain Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of February 15, 2023 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Existing DIP Agreement**"), by and among the Avaya Debtors, WILMINGTON SAVINGS FUND SOCIETY, FSB, as administrative agent and collateral agent and the lending institutions from time to time parties thereto;

WHEREAS, the Avaya Debtors filed the Joint Prepackaged Plan of Reorganization of Avaya Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code in the Bankruptcy Court on February 14, 2023 [Docket No. 50] (together with all schedules, documents and exhibits contained therein, as amended, supplemented, modified or waived from time to time, the "**Plan**");

WHEREAS, on [ ]March 22, 2023, the Bankruptcy Court entered an order confirming the Plan with respect to the Avaya Debtors (the "**Confirmation Order**") [Docket No. [ ]350];

WHEREAS, in connection with the Case, the Borrower has requested that the Lenders provide a term loan facility on the Closing Date in an aggregate principal amount of $810,000,000, consisting of (i) an aggregate principal amount of $500,000,000 to be converted from DIP Term Loans on the Closing Date to Initial Term Loans hereunder in a like principal amount, (ii) an aggregate principal amount of $300,000,000 of Initial Term Loans issued (x) in partial satisfaction of each First Lien Claim (other than a B-3 Escrow Claim) as part of the

treatment of First Lien Claims under the Plan and/or (y) pursuant to the RO Backstop Commitment and the Rights Offering and (iii) an aggregate principal amount of $10,000,000 of Initial Term Loans issued to certain holders of Holdco Convertible Notes Claims as part of the treatment of Holdco Convertible Notes Claims under the Plan, upon the satisfaction (or waiver) of certain conditions precedent set forth in Section 6 on the terms and subject to the conditions set forth herein; and

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

### SECTION 1   Definitions

1.1      Defined Terms

As used herein, the following terms shall have the meanings specified in this Section 1.1 unless the context otherwise requires:

"**ABL Administrative Agent**" shall mean Citibank, N.A. in its capacity as the administrative agent under the ABL Credit Agreement and/or any successor agent under the ABL Credit Documents.

"**ABL Collateral Agent**" shall mean Citibank, N.A. in its capacity as the collateral agent under the ABL Credit Agreement and/or any successor agent under the ABL Credit Documents.

"**ABL Credit Agreement**" shall mean the ABL Credit Agreement dated as of [ ]May 1, 2023 among Holdings, the Borrower, the other borrowers party thereto, the ABL Administrative Agent and the several banks and other financial institutions from time to time parties thereto, as such agreement may be amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time, in each case to the extent permitted hereunder and under the Applicable Intercreditor Agreements (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Credit Agreement).

"**ABL Collateral Agent**" shall mean Citibank, N.A. in its capacity as the collateral agent under the ABL Credit Agreement and/or any successor agent under the ABL Credit Documents.

"**ABL Credit Documents**" shall mean, collectively, (a) the ABL Credit Agreement and (b) the security documents, intercreditor agreements (including the ABL Intercreditor Agreement and the Junior Lien Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection therewith or such other agreements, in each case to the extent permitted hereunder and under the Applicable Intercreditor Agreements, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time.

2

"**ABL Financial Covenant**" shall mean the financial covenant set forth in Section [10.11] of the ABL Credit Agreement.

"**ABL Intercreditor Agreement**" shall mean the ABL Intercreditor Agreement substantially in the form of Exhibit F, among the Collateral Agent, the ABL Collateral Agent and the representatives for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**ABL Loans**" shall mean "ABL Loans" under and as defined in the ABL Credit Agreement.

"**ABL Obligations**" shall mean "Obligations" under and as defined in the ABL Credit Agreement.

"**ABL Priority Collateral**" shall mean the "ABL Priority Collateral" under and as defined in the ABL Intercreditor Agreement.

"**ABR**" shall mean for any day a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Effective Rate *plus* 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Wall Street Journal as the "U.S. prime rate" and (c) the greater of (x) Adjusted Term SOFR for a one-month tenor in effect on such day plus 1.00% and (y) 2.00%.  If the Administrative Agent is unable to ascertain the Federal Funds Effective Rate due to its inability to obtain sufficient quotations in accordance with the definition thereof, after notice is provided to the Borrower, the ABR shall be determined without regard to clause (a) above until the circumstances giving rise to such inability no longer exist.  Any change in the ABR due to a change in such rate publicly announced by the Wall Street Journal or in the Federal Funds Effective Rate or the Adjusted Term SOFR shall take effect at the opening of business on the day specified in the public announcement of such change or on the effective date of such change in the Federal Funds Effective Rate or the Adjusted Term SOFR, as applicable.

"**ABR Loan**" shall mean each Term Loan bearing interest based on the ABR.

"**ABR Term SOFR Determination Day**" shall have the meaning specified in the definition of "Term SOFR".

"**Acceptable Reinvestment Commitment**" shall mean a binding commitment of the Borrower or any Restricted Subsidiary entered into at any time prior to the end of the Reinvestment Period to reinvest the proceeds of an Asset Sale Prepayment Event or a Recovery Prepayment Event.

"**Acquired EBITDA**" shall mean, with respect to any Acquired Entity or Business or any Converted Restricted Subsidiary (any of the foregoing, a "**Pro Forma Entity**") for any period, the amount for such period of Consolidated EBITDA of such Pro Forma Entity (determined using such definitions as if references to the Borrower and the Restricted Subsidiaries therein were to such Pro Forma Entity and its Restricted Subsidiaries), all as

3

determined on a consolidated basis for such Pro Forma Entity in a manner not inconsistent with GAAP.

"**Acquired Entity or Business**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Additional Lender**" shall mean any Person (other than (x) a natural person, (y) any investment vehicle established primarily for the benefit of a natural person or (z) a Disqualified Institution) that is not an existing Lender and that has agreed to provide Incremental Commitments pursuant to Section 2.14 or Refinancing Commitments pursuant to Section 2.15(b).

"**Adjusted Term SOFR**" shall mean, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"**Administrative Agent**" shall mean WILMINGTON SAVINGS FUND SOCIETY, FSB, as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent pursuant to Section 12.9.

"**Administrative Agent's Office**" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"**Administrative Questionnaire**" shall mean an administrative questionnaire in a form supplied by or acceptable to the Administrative Agent.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities or by contract. The terms "controlling" and "controlled" shall have meanings correlative thereto.

"**Affiliated Lender**" shall mean any Affiliated Parent Company or Subsidiary of Holdings or the Borrower (or any Lender that is a direct or indirect holding company of any Permitted Acquiror) that purchases or acquires Term Loans pursuant to Section 13.6(g).

"**Affiliated Parent Company**" shall mean a direct or indirect parent entity of Holdings and the Borrower that (a) owns, directly or indirectly, 100% of the Stock of the Borrower, and (b) operates as a "passive holding company", subject to customary exceptions of the type described in Section 10.10.

4

"**Agent Fee Letter**" shall mean that certain Agent Fee Letter, dated as of the Closing Date between the Agents and the Borrower, as amended, restated, supplemented, or otherwise modified from time to time.

"**Agent Parties**" shall have the meaning provided in Section 13.17(d).

"**Agents**" shall mean the Administrative Agent and the Collateral Agent.

"**Aggregate Quarterly Subscription Contract ARR Revenue**" means, with respect to each fiscal quarter of the Borrower, (a) the arithmetic average of the sum of (i) the Aggregate Subscription Contract ARR with respect to all Subscription Contracts in effect on the last day of the previous fiscal quarter and (ii) the Aggregate Subscription Contract ARR with respect to all Subscription Contracts in effect on the last day of such fiscal quarter divided by (b) four (4).

"**Aggregate Quarterly Subscription Contract GAAP Revenue**" means, with respect to each fiscal quarter of the Borrower, the revenue generated by all Subscription Contracts during such fiscal quarter as determined pursuant to GAAP, including the provisions of ASC 606, Contracts with Customers.

"**Aggregate Subscription Contract ARR**" means, at any time, the aggregate Subscription Contract ARR for all Subscription Contracts then in effect at such time.

"**Agreement**" shall have the meaning provided in the introductory paragraph hereto.

"**Agreement Currency**" shall have the meaning provided in Section 13.20.

"**AHYDO Catch-Up Payment**" shall mean any payment or redemption of Indebtedness, including any Junior Indebtedness, to avoid the application of Code Section 163(e)(5) thereto or that are necessary to prevent any such Indebtedness from being treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code.

"**AHYDO Interest Payment**" shall have the meaning provided in Section 2.8(e).

"**Akin**" means Akin Gump Strauss Hauer & Feld LLP.

"**Anti-Corruption Laws**" shall have the meaning provided in Section 8.19.

"**Applicable ABR Margin**" shall mean at any date, with respect to each ABR Loan (i) for the Cash Option, 6.50% *per annum* and (ii) for the Cash/PIK Option, 7.50% per annum, consisting of (x) 1.0.50% *per annum* payable in cash (together with ABR) and (y) 76.500% *per annum* payable in kind.

"**Applicable Intercreditor Agreements**" shall mean (a) to the extent executed in connection with the incurrence of any Indebtedness secured by Liens on the Collateral that (i) are intended to rank senior in priority to the Liens on the ABL Priority Collateral securing the Obligations and (ii) are intended to rank junior in priority to the Liens on the Term Priority

5

Collateral securing the Obligations, the ABL Intercreditor Agreement and the Junior Lien Intercreditor Agreement, (b) to the extent executed in connection with the incurrence of any Indebtedness secured by Liens on the Collateral that are intended to rank equal in priority to the Liens on the Collateral securing the Obligations (but without regard to control of remedies), each of the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement, (c) to the extent executed in connection with the incurrence of any Indebtedness secured by Liens on the Collateral which are intended to rank junior in priority to the Liens on the Collateral securing the Obligations and the ABL Obligations, an intercreditor agreement substantially consistent with the form of the Junior Lien Intercreditor Agreement and otherwise in form and substance reasonably acceptable to the Borrower, the Collateral Agent, and the Required Lenders and (d) any other intercreditor agreement entered into to implement the intercreditor arrangements set forth in Section 10.2 in form and substance reasonably acceptable to the Borrower, the Collateral Agent, and the Required Lenders.

"**Applicable Laws**" shall mean, as to any Person, any law (including common law), statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding on such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"**Applicable SOFR Margin**" shall mean at any date, with respect to each SOFR Loan (i) for the Cash Option, 7.50% *per annum* and (ii) for the Cash/PIK Option, 8.50% per annum, consisting of (x) 1.50% *per annum* payable in cash (together with Adjusted Term SOFR) and (y) 7.00% *per annum* payable in kind.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale Prepayment Event**" shall mean any Disposition under and pursuant to Section 10.4(b).

"**Assignment and Assumption**" shall mean (a) an assignment and assumption substantially in the form of Exhibit I, or such other form as may be approved by the Administrative Agent and the Borrower and (b) in the case of any assignment of Term Loans in connection with a Permitted Debt Exchange conducted in accordance with Section 2.17, such form of assignment (if any) as may have been requested by the Administrative Agent in accordance with Section 2.17(a).

"**Auction Agent**" shall mean (a) the Administrative Agent or (b) any other financial institution or advisor designated by Holdings, the Borrower or any Subsidiary thereof (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Permitted Debt Exchange pursuant to Section 2.17 or a Dutch auction pursuant to Section 13.6(g); *provided* that the Borrower shall not designate the Administrative Agent as the Auction

6

Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent).

"**Authorized Officer**" shall mean the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, any Assistant Treasurer, the Controller, any Vice President, with respect to certain limited liability companies or partnerships that do not have officers, any manager, managing member or general partner thereof, any other senior officer of Holdings, the Borrower or any other Credit Party designated as such in writing to the Administrative Agent by Holdings, the Borrower or such other Credit Party, as applicable from time to time, and, with respect to any document delivered on the Closing Date, the Secretary or any Assistant Secretary of any Credit Party.  Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of Holdings, the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.  Notwithstanding the foregoing, the solvency certificate required to be delivered on the Closing Date shall be delivered by the Chief Financial Officer of Holdings.

"**Available Amount**" shall mean, at any time (the "**Available Amount Reference Time**"), an amount equal to (a) the sum, without duplication, of:

(i)  ~~the greater of (x)~~ $24~~0~~00,000,000 ~~and (y) 30% of Consolidated EBITDA for the most recently ended Test Period (calculated~~ on a Pro Forma Basis~~)~~;

(ii)  50% of Cumulative Consolidated Net Income (which amount, if less than zero, shall be deemed to be zero for such period) of the Borrower and the Restricted Subsidiaries for the period from the first day of the first fiscal quarter commencing after the Closing Date until the last day of the then-most recent fiscal quarter or Fiscal Year, as applicable, for which Section 9.1 Financials have been delivered;

(iii)  all cash repayments of principal received by the Borrower or any Restricted Subsidiary from any Minority Investments or Unrestricted Subsidiaries on account of loans made by the Borrower or any Restricted Subsidiary pursuant to Section 10.5(v)(y) to such Minority Investments or Unrestricted Subsidiaries during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time;

(iv)  100% of the aggregate amount received by the Borrower or any Restricted Subsidiary in cash and the fair market value of marketable securities or other property received by the Borrower or any Restricted Subsidiary by means of (A) the sale or other Disposition (other than to the Borrower or a Restricted Subsidiary) of Investments made pursuant to Section 10.5(v)(y) by the Borrower or any Restricted Subsidiary and repurchases and redemptions (other than by the Borrower or any Restricted Subsidiary) of such Investments from the Borrower or any Restricted Subsidiary and repayments of loans or advances, and releases of guarantees constituting such Investments made by the Borrower or any Restricted Subsidiary, in each case, after the Closing Date; and (B) the sale (other than to the Borrower or a Restricted Subsidiary) of the stock or other

7

ownership interest of Minority Investments or any Unrestricted Subsidiary received pursuant to Section 10.5(v)(y), in each case, after the Closing Date;

(v)     in the case of the redesignation of an Unrestricted Subsidiary as, or merger, consolidation or amalgamation of an Unrestricted Subsidiary with or into, a Restricted Subsidiary after the Closing Date, the fair market value of the Investment in such Unrestricted Subsidiary at the time of the redesignation of such Unrestricted Subsidiary as, or merger, consolidation or amalgamation of such Unrestricted Subsidiary with or into, a Restricted Subsidiary;

(vi)     100% of the aggregate Net Cash Proceeds and the fair market value of marketable securities or other property received by the Borrower since immediately after the Closing Date from the issue or sale of Indebtedness or Disqualified Stock of the Borrower or a Restricted Subsidiary that has been converted into or exchanged for Stock or Stock Equivalent of the Borrower or any direct or indirect parent of the Borrower; *provided* that this clause (vi) shall not include the proceeds from (A) Stock or Stock Equivalents or Indebtedness that has been converted or exchanged for Stock or Stock Equivalents of the Borrower sold to a Restricted Subsidiary, as the case may be, (B) Disqualified Stock or Indebtedness that has been converted or exchanged into Disqualified Stock or (C) any contribution or issuance that increases the Available Equity Amount;

(vii)     without duplication of any amounts above, any returns, profits, distributions and similar amounts received on account of the Investments initially made pursuant to Section 10.5(v)(y) (except to the extent increasing Consolidated Net Income); and

(viii)     the aggregate amount of Retained Declined Proceeds retained by the Borrower during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time;

*minus* (b) the sum, without duplication, of:

(i)     the aggregate amount of Investments made pursuant to Section 10.5(v)(y) following the Closing Date and prior to the Available Amount Reference Time;

(ii)     the aggregate amount of Restricted Payments pursuant to Section 10.6(c)(y) following the Closing Date and prior to the Available Amount Reference Time; and

(iii)     the aggregate amount of prepayments, repurchases, redemptions and defeasances made pursuant to Section 10.7(a)(iii)(3) following the Closing Date and prior to the Available Amount Reference Time.

Notwithstanding the foregoing, in making any calculation or other determination under this Agreement involving the Available Amount, if the Available Amount at such time is

8

less than zero, then the Available Amount shall be deemed to be zero for purposes of such calculation or determination.

"**Available Amount Reference Time**" shall have the meaning provided in the definition of "Available Amount".

"**Available Equity Amount**" shall mean, at any time (the "**Available Equity Amount Reference Time**"), an amount equal to, without duplication, (a) the amount of any capital contributions made in cash, marketable securities or other property to, or any proceeds of an equity issuance received by the Borrower during the period from and including the Business Day immediately following the Closing Date through and including the Available Equity Amount Reference Time (in the case of any marketable securities or property, up to its fair market value as determined by the Borrower in good faith), including proceeds from the issuance of Stock or Stock Equivalents of Holdings or any direct or indirect parent of Holdings (to the extent the proceeds of any such issuance are contributed to the Borrower), but excluding all proceeds from the issuance of Disqualified Stock,

*minus* (b) the sum, without duplication, of:

(i) the aggregate amount of Investments made pursuant to Section 10.5(v)(x) following the Closing Date and prior to the Available Equity Amount Reference Time;

(ii) the aggregate amount of Restricted Payments pursuant to Section 10.6(c)(x) following the Closing Date and prior to the Available Equity Amount Reference Time;

(iii) the aggregate amount of prepayments, repurchases, redemptions and defeasances pursuant to Section 10.7(a)(iii)(2) following the Closing Date and prior to the Available Equity Amount Reference Time; and

(iv) the aggregate amount of Indebtedness incurred pursuant to Section 10.1(x) and outstanding at the Available Equity Amount Reference Time;

*provided* that issuances and contributions pursuant to Sections 10.5(f)(ii), 10.6(a) and 10.6(b)(i) shall not increase the Available Equity Amount.

"**Available Equity Amount Reference Time**" shall have the meaning provided in the definition of "Available Equity Amount".

"**Available Tenor**" shall mean, with respect to any Term Loans, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case,

9

as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.7(d).

"**Avaya Debtors**" shall have the meaning provided in the Recitals to this Agreement.

"**B-3 Escrow Claims**" shall mean B-3 Escrow Claims as defined in the Plan.

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" shall mean, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" shall mean title 11 of the United States Code, as heretofore and hereafter amended, and codified in 11 U.S.C. section 101 et seq.

"**Bankruptcy Court**" shall have the meaning provided in the Recitals to this Agreement.

"**Benchmark**" shall mean, initially, the Term SOFR Reference Rate; *provided* that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.7.

"**Benchmark Replacement**" shall mean, with respect to any Benchmark Transition Event, the sum of:  (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; *provided* that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"**Benchmark Replacement Adjustment**" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread

adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Date**" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; *provided* that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available

11

Tenors of such Benchmark (or such component thereof) permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Start Date**" shall mean, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" shall mean, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.7 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.7.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefited Lender**" shall have the meaning provided in Section 13.8(a).

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" shall have the meaning provided in the preamble to this Agreement.

"**Borrower Direction to Add Lender**" shall mean a written direction of the Borrower in accordance with the terms of Section 2.18 and substantially in the form of Exhibit L or such other form as shall be approved by the Administrative Agent (acting reasonably).

"**Borrowing**" shall mean the incurrence of one Class and Type of Term Loan on a given date (or resulting from conversions on a given date), and in the case of SOFR Loans, having the same Interest Period.

"**Broker-Dealer Subsidiary**" shall mean any Subsidiary that is registered as a broker-dealer under the Exchange Act or any other Applicable Law requiring similar registration.

"**Business Day**" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City are authorized by law or other governmental actions to close.

"**Capital Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of the Borrower or the Restricted Subsidiary.

"**Capital Lease**" shall mean, as applied to the Borrower and the Restricted Subsidiaries, any lease of any property (whether real, personal or mixed) by the Borrower or any Restricted Subsidiary as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of the Borrower; *provided*, *however*, that notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any leases that were not capital leases when entered into but are recharacterized as capital leases due to a change in accounting rules that becomes effective after the Closing Date shall for all purposes of this agreement not be treated as Capital Leases.

"**Capitalized Lease Obligations**" shall mean, as applied to the Borrower and the Restricted Subsidiaries at the time any determination is to be made, the amount of the liability in respect of a Capital Lease that would at such time be required to be capitalized and reflected as a liability on the balance sheet (excluding the footnotes thereto) of the Borrower or the Restricted Subsidiary in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such Capital Lease prior to the first date upon which such Capital Lease may be prepaid by the lessee without payment of a penalty; *provided*, *however*, that notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any obligations that were not required to be included on the balance sheet of the Borrower or the Restricted Subsidiary as capital lease obligations when incurred but are recharacterized as capital lease obligations due to a change in accounting rules that becomes effective after the Closing Date shall for all purposes of this Agreement not be treated as Capitalized Lease Obligations.

"**Capitalized Software Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and the Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrower.

13

"**Captive Insurance Subsidiary**" shall mean a Subsidiary of the Borrower established for the purpose of, and to be engaged solely in the business of, insuring the businesses or facilities owned or operated by the Borrower or any of its Subsidiaries or joint ventures or to insure related or unrelated businesses.

"**Case**" shall have the meaning provided in the preamble to this Agreement.

"**Cash Election Date**" shall have the meaning provided in Section 2.8(a).

"**Cash/PIK Election Notice**" shall mean a written notice substantially in the form of Exhibit E.

"**Cash Equivalent**" shall mean:

(a) Dollars and cash in such foreign currencies held by the Borrower or any Restricted Subsidiary from time to time in the ordinary course of business;

(b) securities issued or unconditionally guaranteed by the United States government or any agency or instrumentality thereof, in each case having maturities and/or reset dates of not more than 24 months from the date of acquisition thereof;

(c) securities issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof or any political subdivision of any such state or any public instrumentality thereof having maturities of not more than 24 months from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from another nationally recognized rating service);

(d) commercial paper or variable or fixed rate notes maturing no more than 12 months after the date of creation thereof and, at the time of acquisition, having a rating of at least A-3 or P-3 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(e) time deposits with, or domestic and LIBOR certificates of deposit or bankers' acceptances maturing no more than two years after the date of acquisition thereof issued by, the Administrative Agent (or any Affiliate thereof), any lender under the ABL Credit Agreement, any Lender or any other bank having combined capital and surplus of not less than $500,000,000 in the case of domestic banks and $100,000,000 (or the dollar equivalent thereof) in the case of foreign banks;

(f) repurchase agreements with a term of not more than 90 days for underlying securities of the type described in clauses (b), (c) and (e) above entered into with any bank meeting the qualifications specified in clause (e) above or securities dealers of recognized national standing;

14

(g) marketable short-term money market and similar funds (x) either having assets in excess of $500,000,000 or (y) having a rating of at least A-3 or P-3 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(h) shares of investment companies that are registered under the Investment Company Act of 1940 and substantially all the investments of which are one or more of the types of securities described in clauses (a) through (g) above; and

(i) in the case of Investments by any Restricted Foreign Subsidiary or Investments made in a country outside the United States of America, other customarily utilized high-quality Investments in the country where such Restricted Foreign Subsidiary is located or in which such Investment is made.

"**Cash Management Agreement**" shall mean any agreement or arrangement to provide Cash Management Services.

"**Cash Management Bank**" shall mean any Person that enters into a Cash Management Agreement with the Borrower or any Restricted Subsidiary in its capacity as a provider of Cash Management Services and, in each case, at the time it enters into such Cash Management Agreement or on the Closing Date, is (a) a Lender or an Affiliate of a Lender or (b) any other Person that delivers an accession agreement to the Security Agreement and that is specifically designated by the Borrower as a "Cash Management Bank".

"**Cash Management Obligations**" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank or any other provider of Cash Management Services in connection with, or in respect of, any Cash Management Services or under any Cash Management Agreement.

"**Cash Management Services**" shall mean treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer (including automated clearing house fund transfer services), merchant services (other than those constituting a line of credit) and other cash management services.

"**Cash Option**" shall have the meaning provided in Section 2.8(a).

"**Cash/PIK Option**" shall have the meaning provided in Section 2.8(a).

"**Certificated Securities**" shall have the meaning provided in Section 8.17.

"**CFC**" shall mean a Subsidiary of the Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holding Company**" shall mean a Subsidiary of the Borrower that has no material assets other than (a) the equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in (x) one or more Foreign Subsidiaries that are CFCs or (y) one or more other CFC Holding Companies and (b) cash and

15

Cash Equivalents and other assets being held on a temporary basis incidental to the holding of assets described in clause (a) of this definition.

"**Change in Law**" shall mean (a) the adoption of any Applicable Law after the Closing Date, (b) any change in any Applicable Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any party with any guideline, request, directive or order issued or made after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" shall mean and be deemed to have occurred if (a) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Closing Date), other than one or more Permitted Holders, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 of the Exchange Act as in effect on Closing Date) of more than 50% of the total voting power of the Voting Stock of Avaya Holdings; *provided* that (x) so long as Avaya Holdings is a Subsidiary of any Parent Entity, no Person shall be deemed to be or become a beneficial owner of more than 50% of the total voting power of the Voting Stock of Avaya Holdings unless such Person shall be or become a beneficial owner of more than 50% of the total voting power of the Voting Stock of such Parent Entity (other than a Parent Entity that is a Subsidiary of another Parent Entity) and (y) any Voting Stock of which any Permitted Holder is the beneficial owner shall not in any case be included in any Voting Stock of which any such Person is the beneficial owner; (b) Holdings shall at any time cease to own, directly or indirectly, beneficial ownership of 100% of the Stock and Stock Equivalents of the Borrower. Notwithstanding the foregoing, a Permitted Change of Control shall not constitute a Change of Control.

Notwithstanding the preceding or any provision of Section 13d-3 of the Exchange Act, (i) a Person or group shall not be deemed to beneficially own Voting Stock subject to a stock or asset purchase agreement, merger agreement, option agreement, warrant agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the acquisition of the Voting Stock in connection with the transactions contemplated by such agreement, (ii) if any group includes one or more Permitted Holders, the issued and outstanding Voting Stock of Avaya Holdings owned, directly or indirectly, by any Permitted Holders that are part of such group shall not be treated as being beneficially owned by such group or any other member of such group for purposes of determining whether a Change of Control has occurred, (iii) a Person or group will not be deemed to beneficially own the Voting Stock of another Person as a result of its ownership of Voting Stock or other securities of such other Person's parent entity (or related contractual rights) unless it owns 50% or more of the total voting power of the Voting Stock entitled to vote for the election of directors of such parent entity having a majority of the aggregate votes on the board of directors (or similar body) of such parent entity and (iv) the right to acquire Voting Stock (so long as such Person does not have the

16

right to direct the voting of the Voting Stock subject to such right) or any veto power in connection with the acquisition or disposition of Voting Stock will not cause a party to be a beneficial owner.

"**Claim**" shall have the meaning provided in the definition of "Environmental Claims".

"**Claim Termination Date**" has the meaning specified in Section 2.18(b)(ii).

"**Class**", when used in reference to any Term Loan or Borrowing, shall refer to whether such Term Loan or the Term Loans comprising such Borrowing are Initial Term Loans, Incremental Term Loans, Extended Term Loans or Refinancing Term Loans and, when used in reference to any Commitment, refers to whether such Commitment is an Initial Term Commitment, an Incremental Term Commitment or a Refinancing Commitment.

"~~**Claim**~~" ~~shall have the meaning provided in the definition of "Environmental Claims".~~

"~~**Claim Termination Date**~~" ~~has the meaning specified in Section 2.18(b)(ii).~~

"**Closing Date**" shall mean ~~[ ]~~May 1, 2023, on which the conditions set forth in Section 6 are first satisfied.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.  Section references to the Code are to the Code, as in effect on the Closing Date, and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefore.

"**Collateral**" shall mean all property pledged, mortgaged or purported to be pledged or mortgaged pursuant to the Security Documents (excluding, for the avoidance of doubt, all Excluded Collateral).

"**Collateral Agent**" shall mean WILMINGTON SAVINGS FUND SOCIETY, FSB, in its capacity as collateral agent for the Secured Parties under this Agreement and the other Credit Documents, or any successor collateral agent appointed pursuant hereto.

"**Commitments**" shall mean, with respect to each Lender (to the extent applicable), such Lender's Initial Term Commitments, Incremental Term Commitments or Refinancing Commitments.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"**Communications**" shall have the meaning provided in Section 13.17(a).

17

"**Company Model**" shall mean the model ~~[~~delivered to the <u>financial advisors for the</u> Required Lenders on ~~[ ]~~<u>April 13</u>, 2023~~.]~~[1]

"**Confidential Information**" shall have the meaning provided in Section 13.16.

"**Confirmation Order**" shall have the meaning provided in the Recitals hereto.

"**Conforming Changes**" shall mean, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to, the definition of "ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.11 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"**Consolidated Depreciation and Amortization Expense**" shall mean, with respect to the Borrower and the Restricted Subsidiaries for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees or costs, debt issuance costs, commissions, fees and expenses, capitalized expenditures, Capitalized Software Expenditures, amortization of expenditures relating to software, license and intellectual property payments, amortization of any lease related assets recorded in purchase accounting, customer acquisition costs, unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, amortization of original issue discount resulting from the issuance of Indebtedness at less than par and incentive payments, conversion costs, and contract acquisition costs of the Borrower and the Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

[2][ "**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income for such period, *plus*:

(a)     without duplication and (except in the case of the add-backs set forth in clauses (vii) and (xi) below) to the extent deducted (and not added back) in arriving at

---

[1]     ~~Note to Draft: Alix and Company to confirm.~~

[2]     ~~Note to Draft: EBITDA definition and leverage governors remain under review by the company.~~

18

such Consolidated Net Income, the sum of the following amounts for the Borrower and the Restricted Subsidiaries for such period:

(i)      Fixed Charges (including (x) net losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk and (y) costs of surety bonds in connection with financing activities in each case to the extent included in Consolidated Interest Expense, together with items excluded from Consolidated Interest Expense pursuant to clause (1)(o) - (z) of the definition thereof),

(ii)     provision for taxes based on income or profits or capital gains, including federal, foreign, state, franchise, excise, value-added and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) paid or accrued during such period, including any penalties and interest related to such taxes or arising from any tax examination, to the extent the same were deducted (and not added back) in computing such Consolidated Net Income and the net tax expense associated with any adjustments made pursuant to clauses (a) through (t) of the definition of "Consolidated Net Income",

(iii)    Consolidated Depreciation and Amortization Expense for such period,

(iv)    the amount of any cost, charge, accrual, reserve or expense with respect to any restructuring, business optimization, transformation and/or cost-saving initiatives (whether or not classified as restructuring expense on the consolidated financial statements and adjustments to existing reserves) (including any costs, accruals, payments, fees, charges and expenses related to the Case, the Transactions and the other transactions contemplated by the Plan or in connection with obtaining ratings, consulting or professional fees, tax, structuring, transition) and any costs incurred in connection with acquisitions, investments or dispositions after the Closing Date, non-recurring product and intellectual property development (including travel and out-of-pocket costs, human resources costs (including relocation bonuses), litigation and arbitration costs, charges, fees and expenses (including settlements), management transition costs, advertising costs, losses associated with temporary decreases in work volume and expenses related to maintain underutilized personnel), any severance, retention, signing bonuses, relocation, recruiting and other employee related costs (including (x) management bonus pools and (y) charges or expenses in respect of incentive plans), recruiting costs, costs, charges or expenses incurred in connection with any strategic or cost savings initiatives, one-time charges (including compensation charges), payments made pursuant to the terms of "change in control" agreements that the Borrower or a Subsidiary or a Parent Entity had entered into with employees of the Borrower, a Subsidiary or a Parent Entity, costs in respect of strategic initiatives ~~and curtailments or modifications to pension and post-retirement employment benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments),~~, integration and facilities' or bases' opening costs, losses, costs or cost inefficiencies related to project terminations, facility or property disruptions or shutdowns (including due to work stoppages, natural disasters and epidemics), systems development, establishment and implementation costs, operational and reporting systems, technology initiatives, contract termination costs, future lease commitments and costs related to the closure and/or

19

consolidation of facilities (including severance, rent termination, moving and legal costs) and to exiting lines of business, transition costs, contract terminations, litigation and arbitration fees, costs and charges, expenses, any one time expense relating to enhanced accounting function or other transaction costs, public company costs, costs and expenses in connection with the implementation of fresh start accounting, and costs related to the implementation of operational and reporting systems and technology initiatives,

(v)     any other non-cash charges, expenses or losses, including any non-cash asset retirement costs, non-cash increase in expenses resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments or due to purchase accounting, or any other acquisition, non-cash compensation charges, non-cash expense relating to the vesting of warrants, write-offs or write-downs for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vi)     the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary,

(vii)     the amount of net cost savings projected by the Borrower in good faith to be realizable as a result of specified actions, operational changes and operational initiatives (including, to the extent applicable, resulting from the Transactions) taken or to be taken prior to or during such period, including any "run-rate" synergies, operating expense reductions and improvements and cost savings that are reasonably identifiable and determined in good faith by the Borrower in connection with the Transactions, acquisitions, Dispositions, any Permitted Change of Control, other customary specified transactions or other cost saving initiatives and other initiatives to result from actions which have been taken or with respect to which substantial steps have been taken or are expected to be taken no later than 24 months following the consummation of the Transactions, any such specified actions, operational changes and operational initiatives (which "run-rate" synergies, operating expense reductions and improvements and cost savings shall be added to Consolidated EBITDA until fully realized, shall be subject to certification by management of the Borrower and shall be calculated on a Pro Forma Basis as though such "run-rate" synergies, operating expense reductions and improvements and cost savings had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that no "run-rate" synergies, operating expense reductions and improvements and cost savings shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clause (iv) above with respect to such period; *provided* further that the aggregate amount added back to and in computing Consolidated EBITDA for any measurement period pursuant to this clause (vii) (other than that resulting from the Transactions, any Permitted Acquisitions or similar Investments and other than, for the avoidance of doubt, the adjustments pursuant to

20

clauses (xv) and/or (xvi) below) shall not exceed 35% of Consolidated EB~~TI~~ITDA (determined after giving effect to the adjustments set forth in this clause (vii)),

(viii)   the amount of losses on Dispositions of receivables and related assets in connection with any Permitted Receivables Financing or Qualified Securitization Financing and any losses, costs, fees and expenses in connection with the early repayment, accelerated amortization, repayment, termination or other payoff (including as a result of the exercise of remedies) of any Permitted Receivables Financing or any Qualified Securitization Financing,

(ix)   contract termination costs and any costs, charges or expenses incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement or other equity-based compensation, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Borrower or Net Cash Proceeds of an issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) solely to the extent that such Net Cash Proceeds are excluded from the calculation of the Available Equity Amount,

(x)   [an amount (which, for the avoidance of doubt, if positive, increases Consolidated EBITDA or, if negative, reduces Consolidated EBITDA) equal to, for each fiscal quarter in such period, (x) the Aggregate Quarterly Subscription Contract ARR Revenue for such ~~period~~fiscal quarter minus (y) the Aggregate Quarterly Subscription Contract GAAP Revenue for such ~~period~~fiscal quarter,][3]

(xi)   the proceeds of any business interruption insurance,

(xii)   extraordinary, unusual or non-recurring charges, expenses or losses (including unusual or non-recurring expenses), transaction fees and expenses and consulting and advisory fees, indemnities and expenses, severance, integration costs, costs of strategic initiatives, relocation costs, consolidation and closing costs, facility opening and pre-opening costs, business optimization expenses or costs, transition costs, restructuring costs, signing, retention, recruiting, relocation, signing, stay or completion bonuses and expenses (including payments made to employees who are subject to non-compete agreements), costs in respect of curtailments or modifications to pension and post-retirement employment benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments),

(xiii)   any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets and Investments in debt and equity securities, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP,

(xiv)   cash receipts (or any netting arrangements resulting in increased cash receipts) not added in arriving at Consolidated EBITDA or Consolidated Net Income in

---

[3]   Note to Draft: Under review by company/Alix.

21

any period to the extent the non-cash gains relating to such receipts were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added,

(xv)    adjustments identified in~~, and adjustments of the nature used in~~ connection with~~,~~ the calculation of the "Credit EBITDA Calculation" as set forth in~~,~~ the Company Model,

(xvi)    anticipated run-rate Consolidated EBITDA reasonably expected to be achieved (as determined in good faith by the Borrower) from New Projects (and the achievement of related operating expense reduction and other operating improvements, synergies or cost savings associated therewith) so long as such New Project is then under development or is otherwise in process, less

(b)    without duplication and to the extent included in arriving at such Consolidated Net Income for the Borrower and the Restricted Subsidiaries, the sum of the following amounts for such period:

(i)    non-cash gains increasing Consolidated Net Income for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period),

(ii)    extraordinary, unusual or non-recurring gains,

(iii)    cash expenditures (or any netting arrangements resulting in increased cash expenditures) not deducted in arriving at Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash losses relating to such expenditures were added in the calculation of Consolidated EBITDA pursuant to paragraph (a) above for any previous period and not deducted, and

(iv)    the amount of any minority interest income consisting of Subsidiary losses attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary,

in each case, as determined on a consolidated basis for the Borrower and the Restricted Subsidiaries in accordance with GAAP; *provided* that

(i)    there shall be included in determining Consolidated EBITDA for any period, without duplication, (A) the Acquired EBITDA of any Person or business, or attributable to any property, assets, division or line of business acquired by the Borrower or any Restricted Subsidiary during such period (or any property, assets, division or line of business subject to a letter of intent or purchase agreement at such time) (but not the Acquired EBITDA of any related Person or business or any Acquired EBITDA attributable to any property, assets, division or line of business, in each case to the extent not so acquired) to the extent not subsequently sold, transferred, abandoned or otherwise disposed by the Borrower or such Restricted Subsidiary (each such Person, property, assets, division or line of business acquired and not subsequently so disposed of, an

22

"**Acquired Entity or Business**") and the Acquired EBITDA of any Unrestricted Subsidiary that is converted into a Restricted Subsidiary during such period (each, a "**Converted Restricted Subsidiary**"), in each case based on the actual Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) and (B) an adjustment in respect of each Pro Forma Entity equal to the amount of the Pro Forma Adjustment with respect to such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition), and

(ii)      to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset (other than an Unrestricted Subsidiary) sold, transferred, abandoned or otherwise disposed of, closed or classified as discontinued operations by the Borrower or any Restricted Subsidiary during such period (each such Person, property, business or asset so sold, transferred, abandoned or otherwise disposed of, or closed or so classified, a "**Sold Entity or Business**"), and the Disposed EBITDA of any Restricted Subsidiary that is converted into an Unrestricted Subsidiary during such period (each, a "**Converted Unrestricted Subsidiary**"), in each case based on the actual Disposed EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary for such period (including the portion thereof occurring prior to such sale, transfer or disposition, closure, classification or conversion).

Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated EBITDA under this Agreement for any period that includes the four fiscal quarters as set forth below, the Consolidated EBITDA for such fiscal quarters shall be deemed to be $~~[ ]  for the fiscal quarter ended June 30, 2022, $[ ] for the fiscal quarter ended September 30, 2022, $[ ] for the fiscal quarter ended December 31, 2022 and $[ ]~~167,000,000 for the fiscal quarter ended March 31, 2023~~2.]~~, $136,000,000 for the fiscal quarter ended June 30, 2022, $68,000,000 for the fiscal quarter ended September 30, 2022 and $90,000,000 for the fiscal quarter ended December 31, 2022.

"**Consolidated First Lien Net Leverage Ratio**" shall mean, as of any date of determination, the ratio of (a) the sum, without duplication, of (i) the Consolidated Secured Debt constituting (w) the Obligations, (x) the ABL Obligations, (y) any Indebtedness that is secured by a Lien on the Term Priority Collateral that is *pari passu* with the Lien securing the Obligations and (z) any Indebtedness that is secured by a Lien on the ABL Priority Collateral that is senior to or *pari passu* with the Lien securing the Obligations and (ii) Consolidated Secured Debt of the type described in clause (ii) of the definition thereof, in each case as of the most recent four fiscal quarter period for which financial statements described in Section 9.1(a) or (b) are available  (and excluding, for the avoidance of doubt for both clauses (i) and (ii), any Qualified Securitization Financing, Permitted Receivables Financing, Hedging Obligations and Cash Management Obligations) to (b) Consolidated EBITDA for such four fiscal quarter period.

"**Consolidated Interest Expense**" shall mean, with respect to any period, without duplication, the sum of:

(1)    consolidated interest expense of the Borrower and the Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptances or collateral posting facilities, (c) non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments pursuant to GAAP), (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate Hedging Obligations with respect to Indebtedness, and excluding (o) annual agency fees paid to the administrative agents and collateral agents under this Agreement, the ABL Credit Agreement and the other credit facilities, (p) additional interest with respect to failure to comply with any registration rights agreement owing to holders of any securities, (q) costs associated with obtaining Hedging Obligations, (r) accretion of asset retirement obligations and accretion or accrual of discounted liabilities not constituting Indebtedness, (s) any expense resulting from the discounting of any Indebtedness in connection with the application of fresh start accounting or purchase accounting, (t) penalties and interest relating to taxes (u) amortization of reacquired Indebtedness, deferred financing fees, debt issuance costs, commissions, fees and expenses, (v) any expensing of bridge, commitment and other financing fees, (w) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Permitted Receivables Financing, (x) any prepayment premium or penalty, (y) any interest expense attributable to a parent entity resulting from push-down accounting and (z) any lease, rental or other expenses from operating leases); *plus*

(2)    consolidated capitalized interest of the Borrower and the Restricted Subsidiaries, in each case for such period, whether paid or accrued; *less*

(3)    interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" shall mean, for any period, the net income (loss) of the Borrower and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication, the net after-tax effect of,

(a)    any extraordinary, unusual or nonrecurring losses, gains, fees, costs, charges or expenses for such period,

(b)    Transaction Expenses and Permitted Change of Control Costs,

24

(c)     the cumulative effect of a change in accounting principles and changes as a result of adoption or modification of accounting policies during such period,

(d)     any income (or loss) from disposed, abandoned or discontinued operations and any gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations,

(e)     any gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments other than in the ordinary course of business, as determined in good faith by the Borrower,

(f)     any income (or loss) during such period of any Person that is an Unrestricted Subsidiary, and any income (or loss) during such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; *provided* that the Consolidated Net Income of the Borrower and the Restricted Subsidiaries shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents) by any Unrestricted Subsidiary or such other Person from its income to the Borrower or any Restricted Subsidiary during such period,

(g)     solely for the purpose of determining Available Amount, any income (or loss) during such period of any Restricted Subsidiary (other than any Credit Party) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its net income is not at the date of determination wholly permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its Organizational Documents or any agreement, instrument or Applicable Law applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions (i) has been legally waived or otherwise released, (ii) is imposed pursuant to this Agreement and the other Credit Documents, the ABL Credit Documents, Permitted Debt Exchange Instruments or Permitted Other Debt, (iii) any working capital line permitted by Section 10.2 incurred by a Foreign Subsidiary or (iv) arises pursuant to an agreement or instrument if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the Lenders than the encumbrances and restrictions contained in the Credit Documents (as determined by the Borrower in good faith); *provided* that Consolidated Net Income of the Borrower and the Restricted Subsidiaries will be increased by the amount of dividends or other distributions or other payments actually paid in cash (or to the extent converted into cash) to the Borrower or any Restricted Subsidiary during such period, to the extent not already included therein,

(h)     all adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in the Borrower's consolidated financial statements pursuant to GAAP, resulting from (i) the application of fresh start accounting principles as a result of the Avaya Debtors' emergence from

25

bankruptcy or (ii) the application of purchase accounting in relation to the Transactions or any consummated acquisition, in each case, including the amortization, write-off or write-down of any assets, any deferred revenue and any other amounts and other similar adjustments and, whether consummated before or after the Closing Date,

(i)     any income (or loss) for such period attributable to the early extinguishment of Indebtedness (other than Hedging Obligations, but including, for the avoidance of doubt, debt exchange transactions and the extinguishment of pre-petition indebtedness in connection with the Transactions),

(j)     any unrealized income (or loss) for such period attributable to Hedging Obligations or other derivative instruments,

(k)     any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets and investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP,

(l)     any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and any cash charges associated with the rollover, acceleration or payout of Stock or Stock Equivalents by management of the Borrower or any of its direct or indirect parent companies in connection with the Transactions,

(m)     accruals and reserves established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP (or within 12 months after the Permitted Change of Control Effective Date) or changes as a result of adoption of or modification of accounting policies during such period,

(n)     any accruals, payments, fees, expenses or charges (including rationalization, legal, tax, structuring, and other costs and expenses, but excluding depreciation or amortization expense) related to, or incurred in connection with, the Transactions (including letter of credit fees), the Plan, any offering of Stock or Stock Equivalents (including any equity offering), Investment, acquisition, Disposition, Restricted Payment, recapitalization or the issuance or incurrence of Indebtedness permitted to be incurred by the Borrower and the Restricted Subsidiaries pursuant hereto (including any refinancing transaction or amendment, waiver, or other modification of any debt instrument), any public or private offer of the Stock or Stock Equivalents of any Parent Entity, Holdings, Borrower or Restricted Subsidiary, in each case whether or not consummated, including (A) such fees, expenses or charges related to the negotiation, execution and delivery and other transactions contemplated by this Agreement, the other Credit Documents and any Permitted Receivables Financing, (B) any amendment or other modification of this Agreement and the other Credit Documents, (C) any such transaction consummated prior to the Closing Date and any such transaction undertaken but

26

not completed, (D) any charges or non-recurring merger costs as a result of any such transaction, and (E) earnout obligations paid or accrued during such period with respect to any acquisition or other Investment,

(o)     the amount of management, monitoring, consulting and advisory fees and related indemnities and expenses paid in such period to the extent otherwise permitted pursuant to Section 9.9,

(p)     restructuring-related or other similar charges, fees, costs, commissions and expenses or other charges incurred during such period in connection with this Agreement, the other Credit Documents, the Credit Facilities, the Case, any reorganization plan in connection with the Case, and any and all transactions contemplated by the foregoing, including the write-off of any receivables, the termination or settlement of executory contracts, professional and accounting costs fees and expenses, management incentive, employee retention or similar plans (in each case to the extent such plan is approved by the Bankruptcy Court to the extent required), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization of the Avaya Debtors;

(q)     any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days),

(r)     to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption,

(s)     any net unrealized gain or loss (after any offset) resulting from currency translation gains or losses relating to currency remeasurements of Indebtedness (including any gain or loss resulting from obligations under any Hedging Obligation for currency exchange risk) and any foreign currency translation gains or losses, and

(t)     to the extent non-cash and deducted in calculating net income (or loss), any net pension, post-employment benefit or long-term disability costs, including interest

27

cost, service cost, actuarial expected return on plan assets, amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of unrecognized net obligations (and loss or cost) existing at the date of initial application of FASB Standard 87, 106 and 112 (or their equivalents under the ASC), and any other items of a similar nature and any gain or loss attributable to mark-to-market adjustments in the valuation of pension liabilities, including actuarial gain or loss on pension and post-retirement plans, curtailments and settlements and prior service cost adjustment.

"**Consolidated Secured Debt**" shall mean, as of any date of determination, Consolidated Total Debt at such date which either (i) is secured by a Lien on the Collateral (and other assets of the Borrower or any Restricted Subsidiary pledged to secure the Obligations pursuant to Section 10.2(i)) or (ii) constitutes Capitalized Lease Obligations or purchase money Indebtedness of the Borrower or any Restricted Subsidiary (and excluding, for the avoidance of doubt for both clauses (i) and (ii), any Qualified Securitization Financing, Permitted Receivables Financing, Hedging Obligations and Cash Management Obligations).

"**Consolidated Secured Net Leverage Ratio**" shall mean, as of any date of determination, the ratio of (a) Consolidated Secured Debt as of the most recent four fiscal quarter period for which financial statements described in Section 9.1(a) or (b) are available to (b) Consolidated EBITDA for such four fiscal quarter period.

"**Consolidated Total Assets**" shall mean, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption), after intercompany eliminations, on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries at such date (or, if such date of determination is a date prior to the first date on which such consolidated balance sheet has been (or is required to have been) delivered pursuant to Section 9.1, on the pro forma financial statements delivered pursuant to Section 6.10 (and, in the case of any determination relating to any Specified Transaction, on a Pro Forma Basis including any property or assets being acquired in connection therewith)).

"**Consolidated Total Debt**" shall mean, as of any date of determination, (a) (i) all Indebtedness of the types described in clauses (a) and (b) (solely to the extent such Indebtedness matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the sole option of the Borrower or any Restricted Subsidiary, to a date more than one year from the date of its creation), clause (d) (but, in the case of clause (d), only to the extent of any unreimbursed drawings under any letter of credit which are not cash collateralized or backstopped) and clause (f) of the definition thereof, in each case actually owing by the Borrower and the Restricted Subsidiaries on such date and to the extent appearing on the balance sheet of the Borrower determined on a consolidated basis in accordance with GAAP (*provided* that the amount of any Capitalized Lease Obligations or any such Indebtedness issued at a discount to its face value shall be determined in accordance with GAAP; *provided*, *further*, that the effects of push-down accounting shall be excluded) and (ii) purchase money Indebtedness (and excluding, for the avoidance of doubt, Qualified

28

Securitization Financing, Permitted Receivables Financing, Hedging Obligations and Cash Management Obligations) *minus* (b) the aggregate amount of all Unrestricted Cash.

"**Consolidated Total Net Leverage Ratio**" shall mean, as of any date of determination, the ratio of (a) Consolidated Total Debt as of the most recent four fiscal quarter period for which financial statements described in Section 9.1(a) or (b) are available to (b) Consolidated EBITDA for such four fiscal quarter period.

"**Consolidated Working Capital**" shall mean, at any date, the excess of (i) all amounts (other than Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries on such date over (ii) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries on such date, but excluding, without duplication, (a) the current portion of any funded Indebtedness, (b) all Indebtedness consisting of revolving loans, swing line loans and letter of credit obligations (including such loan or letters of credit under the ABL Credit Agreement), in each case to the extent otherwise included therein, (c) the current portion of interest, (d) the current portion of current and deferred income taxes, (e) the current portion of any Capitalized Lease Obligations, (f) liabilities in respect of unpaid earnouts, and (g) the current portion of any other long-term liabilities, and in the case of both clauses (i) and (ii), excluding the effects of adjustments pursuant to GAAP resulting from the application of fresh start accounting or purchase accounting, as the case may be, in relation to the Transactions, any Permitted Change of Control or any consummated acquisition.

"**Contingent Obligation**" shall mean indemnification Obligations and other similar contingent Obligations for which no claim has been made in writing.

"**Contract Consideration**" shall have the meaning provided in the definition of the term "Excess Cash Flow".

"**Contractual Requirement**" shall have the meaning provided in Section 8.3.

"**Converted Restricted Subsidiary**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Converted Unrestricted Subsidiary**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Corrective Extension Amendment**" shall have the meaning provided in Section 2.15(a)(vi).

"**Credit Documents**" shall mean this Agreement, the Guarantee, the Security Documents, the Agent Fee Letter, any promissory notes issued by the Borrower hereunder, any Incremental Amendment, any Refinancing Amendment, any Extension Amendment and any other document jointly identified by the Borrower and the Administrative Agent (or the Required Lenders) as a "Credit Document", *provided* that, for the avoidance of doubt, Secured Cash

Management Agreements and Secured Hedging Agreements shall not constitute Credit Documents.

"**Credit Facility**" shall mean any category of Commitments and/or Term Loans and other extensions of credit thereunder.

"**Credit Party**" shall mean each of Holdings, the Borrower and each of the Subsidiary Guarantors.

"**Cumulative Consolidated Net Income**" shall mean, for any period, Consolidated Net Income for such period, taken as a single accounting period. Cumulative Consolidated Net Income may be a positive or negative amount.

"**Debt Incurrence Prepayment Event**" shall mean any issuance or incurrence by the Borrower or any of the Restricted Subsidiaries of any Indebtedness (other than as permitted to be issued or incurred under Section 10.1).

"**Declined Proceeds**" shall have the meaning provided in Section 5.2(f).

"**Default**" shall mean any event, act or condition that with notice or lapse of time hereunder, or both, would constitute an Event of Default.

"**Default Rate**" shall have the meaning provided in Section 2.8(b).

"**Defaulting Lender**" shall mean any Lender with respect to which a Lender Default is in effect.

"**Deferred Net Cash Proceeds**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Deferred Net Cash Proceeds Payment Date**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Designated Non-Cash Consideration**" shall mean the fair market value of non-cash consideration received by the Borrower or any Restricted Subsidiary in connection with a Disposition pursuant to Section 10.4(b) that is designated as Designated Non-Cash Consideration pursuant to a certificate of an Authorized Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash or Cash Equivalent within 180 days following the consummation of the applicable Disposition). A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise ~~D~~disposed of in compliance with Section 10.4.

"**DIP Lenders**" shall mean the Lenders as defined in the Existing DIP Agreement.

"**DIP Lender Claimant**" shall mean a DIP Lender that is not a Lender as the result of the Administrative Agent not having received all of its Lender Claimant Onboard Documents.

"**DIP Term Loans**" shall mean the Term Loans as defined in the Existing DIP Agreement.

"**Disposed EBITDA**" shall mean, with respect to any Sold Entity or Business or any Converted Unrestricted Subsidiary for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity or Business or Converted Unrestricted Subsidiary, as applicable, and its respective Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business or Converted Unrestricted Subsidiary, as the case may be.

"**Disposition**" or "**Dispose**" shall mean (i) the conveyance, sale, lease, assignment, transfer or other disposition of any of property, business or assets (including receivables and leasehold interests), whether owned on the Closing Date or hereafter acquired or (ii) the sale to any Person (other than to the Borrower or a Subsidiary Guarantor) any shares owned by it of any Subsidiary's Stock and Stock Equivalents.

"**Disqualified Institutions**" shall mean (a) those banks, financial institutions or other Persons separately identified in writing by the Borrower to the Administrative Agent on or prior to the Closing Date,[4] or any Affiliates of such banks, financial institutions or other persons identified in writing by the Borrower to the Administrative Agent on or prior to the Closing Date, or that are readily identifiable as Affiliates on the basis of their name and (b) competitors identified in writing by the Borrower to the Administrative Agent from time to time (or Affiliates thereof identified in writing by the Borrower to the Administrative Agent or that are readily identifiable as Affiliates on the basis of their name) of the Borrower or any of its Subsidiaries (other than such Affiliate that is a bona fide debt fund or a fixed-income only investment vehicle that is engaged in the making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of business and whose managers have fiduciary duties to the third-party investors in such fund or investment vehicle independent from their duties owed to such competitor); *provided* that no such identification after the date of a relevant assignment shall apply retroactively to disqualify any Person that has previously acquired an assignment or participation of an interest in any of the Credit Facilities with respect to amounts previously acquired.  The Borrower shall provide the list of all Disqualified Institutions set forth in clauses (a) and (b) to the Administrative Agent on or prior to the Closing Date and may update such list from time to time by delivering such updated list to the Administrative Agent.  The Administrative Agent shall be permitted, upon request of any Lender, to make available the list of Disqualified Institutions to such inquiring Lender.

---

[4]      Note to Draft: Company to provide.

31

"**Disqualified Stock**" shall mean, with respect to any Person, any Stock or Stock Equivalents of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Stock or Stock Equivalents that is not Disqualified Stock), other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the prior repayment in full of the Term Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations) and the termination of all Commitments, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the prior repayment in full of the Term Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations) and the termination of all Commitments), in whole or in part, in each case prior to the date that is ninety-one (91) days after the Latest Maturity Date as determined at the time of the issuance; *provided* that if such Stock or Stock Equivalents are issued to any plan for the benefit of employees of the Borrower or any of its Subsidiaries or by any such plan to such employees, such Stock or Stock Equivalents shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower (or any direct or indirect parent company thereof) or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; *provided*, *further*, that any Stock or Stock Equivalents held by any present or former employee, officer, director, manager or consultant, of the Borrower, any of its Subsidiaries or any of its direct or indirect parent companies or any other entity in which the Borrower or any Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower, in each case pursuant to any stockholders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement or otherwise in order to satisfy applicable statutory or regulatory obligations or as a result of the termination, death or disability of such employee, officer, director, manager or consultant shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any of its Subsidiaries.

"**Dollars**" and "**$**" shall mean dollars in lawful currency of the United States of America.

"**Domestic Subsidiary**" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"**EEA Financial Institution**" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

32

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Employee Benefit Plan**" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA), other than a Foreign Plan, that is maintained or contributed to by Holdings, Borrower or any Subsidiary (or, with respect to an employee benefit plan subject to Title IV of ERISA, any ERISA Affiliate).

"**Environmental Claims**" shall mean any and all actions, suits, proceedings, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, violation or potential responsibility or investigation (other than reports prepared by or on behalf of Holdings, the Borrower or any other Subsidiary of Holdings (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of Real Estate) or proceedings in each case relating in any way to any applicable Environmental Law or any permit issued, or any approval given, under any applicable Environmental Law (hereinafter, "**Claims**"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief relating to the presence, release or threatened release into the environment of Hazardous Materials or arising from alleged injury or threat of injury to human health or safety (to the extent relating to human exposure to Hazardous Materials), or to the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"**Environmental Law**" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or, with respect to any post-Closing Date requirements of the Credit Documents, hereafter in effect, and in each case as amended, and any legally binding judicial or administrative interpretation thereof, including any legally binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or to human health or safety (to the extent relating to human exposure to Hazardous Materials), or Hazardous Materials.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.  Section references to ERISA are to ERISA as in effect on the Closing Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Borrower or any Subsidiary of the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for

33

purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (i) the failure of any Employee Benefit Plan to comply with any provisions of ERISA and/or the Code or with the terms of such Employee Benefit Plan; (ii) any Reportable Event; (iii) the existence with respect to any Employee Benefit Plan of a non-exempt Prohibited Transaction; (iv) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (v) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (vi) the occurrence of any event or condition which would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or the incurrence by any Credit Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (vii) the receipt by any Credit Party or any of its ERISA Affiliates from the PBGC or a plan administrator of any written notice to terminate any Pension Plan under Section 4042(a) of ERISA or to appoint a trustee to administer any Pension Plan under Section 4042(b)(1) of ERISA; (viii) the incurrence by any Credit Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan (or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA) or Multiemployer Plan; (ix) the receipt by any Credit Party or any of its ERISA Affiliates of any notice concerning the imposition on it of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA), (x) a determination that any Pension Plan is or is expected to be in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); or (xi) any other event or condition with respect to a Pension Plan or Multiemployer Plan that could result in liability to the Borrower or any Subsidiary.

"**Erroneous Payment**" shall have the meaning provided in Section 12.15.

"**Erroneous Payment Subrogation Rights**" shall have the meaning provided in Section 12.15.

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" shall have the meaning provided in Section 11.

"**Excess Cash Flow**" shall mean, for any period, an amount (which amount shall not be less than zero) equal to the excess of:

(a)      the sum, without duplication, of:

34

(i)      the Consolidated Net Income for such period,

(ii)     an amount equal to the amount of all non-cash charges (including depreciation and amortization) to the extent deducted in arriving at such Consolidated Net Income, but excluding any such non-cash charges representing an accrual or reserve for potential cash items in any future period and excluding amortization of a prepaid cash item that was paid in a prior period,

(iii)    decreases in Consolidated Working Capital for such period (other than any such decreases arising from acquisitions or Dispositions by the Borrower and the Restricted Subsidiaries completed during such period or the application of purchase accounting),

(iv)     an amount equal to the aggregate net non-cash loss on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income, and

(v)      cash receipts in respect of Hedging Agreements during such Fiscal Year to the extent not otherwise included in such Consolidated Net Income; over

(b)      the sum, without duplication, of:

(i)      an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income (but excluding any non-cash credit to the extent representing the reversal of an accrual or reserve described in clause (a)(ii) above) and cash charges included in the definition of Consolidated Net Income (but excluding any cash charges described in clause (q) or (r) of the definition thereof),

(ii)     without duplication of amounts deducted pursuant to clause (xi) below in prior Fiscal Years, the amount of Capital Expenditures or acquisitions of intellectual property and Capitalized Software Expenditures accrued or made in cash during such period, except to the extent that such Capital Expenditures or acquisitions were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(iii)    the aggregate amount of all principal payments of Indebtedness of the Borrower and the Restricted Subsidiaries (including (A) the principal component of payments in respect of Capital Leases, (B) repayments made under Section 2.5(b) and (C) the amount of any mandatory prepayment of Term Loans due to an Asset Sale Prepayment Event to the extent required due to a Disposition that resulted in an increase to such Consolidated Net Income and not in excess of the amount of such increase, but excluding (X) all other prepayments or repurchases of Term Loans or Indebtedness secured on a *pari passu* basis with the Initial Term Loans, and (Y) all prepayments in respect of any revolving credit facility, except, in the case of clause (Y) only, to the extent there is an equivalent permanent reduction in commitments thereunder) made

35

during such period, except to the extent financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(iv)　　an amount equal to the aggregate net non-cash gain on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(v)　　increases in Consolidated Working Capital for such period (other than any such increases arising from acquisitions or Dispositions by the Borrower and the Restricted Subsidiaries completed during such period or the application of purchase accounting),

(vi)　　cash payments by the Borrower and the Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and the Restricted Subsidiaries (other than Indebtedness) to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income unless financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(vii)　　without duplication of amounts deducted pursuant to clause (xi) below in prior Fiscal Years, the amount of Investments made pursuant to Section 10.5(h), (i), (v)(y), (w), (cc) and (ii) during such period unless such Investments were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(viii)　　the amount of Restricted Payments paid during such period pursuant to Sections 10.6(b), (d), (j), (l) and (o) during such period unless such Restricted Payments were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(ix)　　the aggregate amount of expenditures actually made by the Borrower and the Restricted Subsidiaries during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period or are not deducted in calculating Consolidated Net Income unless such expenditures were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(x)　　the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Borrower and the Restricted Subsidiaries during such period that are made in connection with any prepayment of Indebtedness to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income unless any such payments were financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries,

(xi)　　without duplication of amounts deducted from Excess Cash Flow in prior periods, (1) the aggregate consideration required to be paid in cash by Holdings, the Borrower or any of the Restricted Subsidiaries pursuant to binding contracts (the "**Contract Consideration**") entered into prior to or during such period and (2) the

36

~~aggregate amount of cash that is reasonably expected to be paid in respect of planned cash expenditure by Holdings, the Borrower or any of the Restricted Subsidiaries (the "**Planned Expenditures**"), in the case of each of clauses (1) and (2)~~, relating to Permitted Acquisitions, Capital Expenditures, Investments (other than intercompany Investments) or acquisitions of intellectual property to be consummated or made, or planned to be made, during the period of four consecutive fiscal quarters of the Borrower following the end of such period; *provided* that, to the extent the aggregate amount actually utilized to finance such Permitted Acquisitions, Capital Expenditures, Investments or acquisitions of intellectual property during such period (other than any amount financed with the proceeds of long-term Indebtedness of the Borrower and the Restricted Subsidiaries) of four consecutive fiscal quarters is less than the Contract Consideration ~~or Planned Expenditures~~, the amount of such shortfall shall be added to the calculation of Excess Cash Flow at the end of such period of four consecutive fiscal quarters,

(xii)    the amount of cash taxes paid or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, and

(xiii)   cash expenditures in respect of Hedging Agreements during such Fiscal Year to the extent not deducted in arriving at such Consolidated Net Income.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, and rules and regulations promulgated thereunder.

"**Excluded Collateral**" shall mean (i) [reserved], (ii) any vehicles and other assets subject to certificates of title; (iii) letter-of-credit rights to the extent a security interest therein cannot be perfected by a UCC filing (other than supporting obligations); (iv) any property subject to a Lien permitted under Section 10.2 securing a purchase money agreement, Capital Lease or similar arrangement permitted hereunder in each case after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or other Applicable Law, excluding the proceeds and receivables thereof (to the extent not otherwise constituting Excluded Collateral), to the extent, and for so long as, the creation of a security interest therein is prohibited thereby (or otherwise requires consent, *provided* that there shall be no obligation to seek such consent) or creates a right of termination or favor of a third party, in each case, excluding the proceeds and receivables thereof to the extent not otherwise constituting Excluded Collateral; (v) (x) all leasehold interests in Real Estate (and there shall not be any requirement to obtain any landlord or other third party waivers, estoppels, consents or collateral access letters in respect of such leasehold interests) and (y) any parcel of Real Estate located in the United States and the improvements thereto owned in fee by a Credit Party with a fair market value of $10,000,000 or less (at the time of acquisition) (but not any Collateral located thereon) or any parcel of Real Estate and the improvements thereto owned in fee by a Credit Party outside the United States; (vi) any "intent to use" trademark application filed and accepted in the United States Patent and Trademark Office unless and until an amendment to allege use or a statement of use has been filed and accepted by the United States Patent and Trademark Office to the extent, if any, that, and solely during the period, if any, in which the grant of security interest therein could impair the validity or enforceability of such "intent to use"

37

trademark application under federal law; (vii) any charter, permit, franchise, authorization, lease, license or agreement, in each case, only to the extent and for so long as the grant of a security interest therein (or the assets subject thereto) by the applicable Credit Party (x) would violate invalidate such charter, permit, franchise, authorization, lease, license, or agreement or (y) would give any party (other than a Credit Party) to any such charter, permit, franchise, authorization, lease, license or agreement the right to terminate its obligations thereunder or (z) is permitted under such charter, permit, franchise, lease, license or agreement only with consent of the parties thereto (other than consent of a Credit Party) and such necessary consents to such grant of a security interest have not been obtained (it being understood and agreed that no Credit Party or Restricted Subsidiary has any obligation to obtain such consents) other than, in each case referred to in clauses (x) and (y) and (z), as would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction, in each case excluding the proceeds and receivables thereof which are not otherwise Excluded Collateral; (viii) any Commercial Tort Claim (as defined in the Security Agreement) for which no claim has been made or with a value of less than $10,000,000 for which a claim has been made; (ix) any Excluded Stock and Stock Equivalents; (x) any assets with respect to which, the Borrower and the Required Lenders reasonably determine, the cost or other consequences of granting a security interest or obtaining title insurance in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom; (xi) any assets with respect to which granting a security interest in such assets in favor of the Secured Parties under the Security Documents could reasonably be expected to result in a material adverse tax consequence as reasonably determined by the Borrower ~~and~~in good faith (and, in the case of Stock or Stock Equivalents of any Subsidiary, with prompt written notice to the Collateral Agent, which shall make such notice available to the Lenders in accordance with its customary practice, and not objected to by the Collateral Agent at the direction of the Required Lenders~~;~~ within five Business Days of the receipt of such notice by the Collateral Agent; provided that Borrower will not, and will not permit the Restricted Subsidiaries to create or incur any Lien on such Stock or Stock Equivalents to secure any Indebtedness for borrowed money); (xii) any margin stock; (xiii) [reserved]; and (xiv) any assets with respect to which granting a security interest in such assets is prohibited by or would violate law, treaty, rule, or regulation or determination of an arbitrator or a court or other Governmental Authority or which would require obtaining the consent, approval, license or authorization of any Governmental Authority (unless such consent, approval, license or authorization has been received; *provided* that there shall be no obligation to obtain such consent) or create a right of termination in favor of any governmental or regulatory third party, in each case after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or other Applicable Law, excluding the proceeds and receivables thereof (to the extent not otherwise constituting Excluded Collateral); *provided* that with respect to clauses (iv), (vii) and (xiv), such property shall be Excluded Collateral only to the extent and for so long as such prohibition, violation, invalidation or consent right, as applicable, is in effect and in the case of any such agreement or consent, was not created in contemplation thereof or of the creation of a security interest therein.  Notwithstanding anything set forth herein, Excluded Collateral shall not include any assets owned by the Credit Parties that constitute collateral securing the ABL Loans.

"**Excluded Information**" shall have the meaning provided in Section 13.6.

38

"**Excluded Stock and Stock Equivalents**" shall mean (i) any Stock or Stock Equivalents with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the burden or cost of pledging such Stock or Stock Equivalents in favor of the Collateral Agent under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (ii) [reserved] and (B) any Stock or Stock Equivalents of (x) any Foreign Subsidiary that is a CFC or (y) any CFC Holding Company in each case not owned directly by a Credit Party, (iii) any Stock or Stock Equivalents to the extent the pledge thereof would violate any Applicable Law or any Contractual Requirement (including any legally effective requirement to obtain the consent or approval of, or a license from, any Governmental Authority or any other regulatory third party unless such consent, approval or license has been obtained (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary of the Borrower to obtain any such consent, approval or license)), (iv) any Stock or Stock Equivalents of each Subsidiary to the extent that a pledge thereof to secure the Obligations is prohibited by any applicable Organizational Document of such Subsidiary or requires third party consent (other than the consent of a Credit Party), unless consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary to obtain any such consent), in each case after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or other Applicable Law, excluding the proceeds and receivables thereof (to the extent not otherwise constituting Excluded Collateral), (v) Stock or Stock Equivalents of any non-Wholly Owned Subsidiary, (vi) any Stock or Stock Equivalents of any Subsidiary to the extent that the pledge of such Stock or Stock Equivalents could reasonably be expected to result in material adverse tax or accounting consequences to Holdings or any Subsidiary thereof as reasonably determined by the Borrower in good faith, (and, in the case of Stock or Stock Equivalents of any Subsidiary, with prompt written notice to the Collateral Agent, which shall make such notice available to the Lenders in accordance with its customary practice, and not objected to by the Collateral Agent at the direction of the Required Lenders within five Business Days of the receipt of such notice by the Collateral Agent; provided that Borrower will not, and will not permit the Restricted Subsidiaries to create or incur any Lien on such Stock or Stock Equivalents to secure any Indebtedness for borrowed money), (vii) any Stock or Stock Equivalents that are margin stock, (viii) any Stock or Stock Equivalents owned by a CFC, and (ix) any Stock and Stock Equivalents of any Unrestricted Subsidiary or of any Restricted Subsidiary that does not constitute a Material Subsidiary (other than (A) to the extent a perfected security interest therein can be obtained by filing a UCC-1 financing statement or (B) as otherwise agreed to by the Borrower in its sole discretion), any Person not constituting a Subsidiary, any Captive Insurance Subsidiary, any Broker-Dealer Subsidiary, any not-for-profit Subsidiary and any special purpose entity (including any Receivables Entity and any Securitization Subsidiary); *provided* that Excluded Stock and Stock Equivalents shall not include proceeds of the foregoing property to the extent otherwise constituting Collateral.

"**Excluded Subsidiary**" shall mean (a) each Domestic Subsidiary of the Borrower designated by the Borrower for the purpose of this clause (a) from time to time, for so long as any such Domestic Subsidiary does not constitute a Material Subsidiary as of the most recently ended Test Period; *provided* that if such Domestic Subsidiary would constitute a Material Subsidiary as of the end of such Test Period, the Borrower shall cause such Domestic Subsidiary to become a Guarantor pursuant to Section 9.11, (b) each Domestic Subsidiary that is not a Wholly Owned Subsidiary or otherwise constitutes a joint venture (for so long as such

39

Subsidiary remains a non-Wholly Owned Restricted Subsidiary or joint venture), (c) any CFC, (d) each Domestic Subsidiary that is (i) prohibited by any applicable (x) Contractual Requirement, (y) Applicable Law (including without limitation as a result of applicable financial assistance, directors' duties or corporate benefit requirements) or (z) Organizational Document (in the case of clauses (x) and (z), in effect on the Closing Date or any date of acquisition of such Subsidiary (to the extent such prohibition was not entered into in contemplation of the Guarantee)) from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such restriction or any replacement or renewal thereof is in effect), or (ii) required to obtain consent, approval, license or authorization of a Governmental Authority for such guarantee or grant (unless such consent, approval, license or authorization has already been received); *provided* that there shall be no obligation to obtain such consent, (e) each Domestic Subsidiary that is a Subsidiary of a CFC, (f) any other Domestic Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the cost or other consequences (including any material adverse tax consequences) of guaranteeing the Obligations shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (g) each Unrestricted Subsidiary, (h) any Foreign Subsidiary, (i) any special purpose entity, including any Receivables Entity and any Securitization Subsidiary, (j) any Subsidiary to the extent that the guarantee of the Obligations by such Subsidiary could reasonably be expected to result in material adverse tax consequences (as determined by the Borrower in good faith), (k) any Captive Insurance Subsidiary, (l) any non-profit Subsidiary or (m) any Broker-Dealer Subsidiary; *provided* that Excluded Subsidiary shall not include any Domestic Subsidiary of the Borrower to the extent such Domestic Subsidiary guarantees the ABL Loans.

"**Excluded Swap Obligation**" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"**Excluded Taxes**" shall mean, any of the following Taxes imposed on or with respect to any Agent or any Lender or required to be deducted or withheld from a payment to any Agent or Lender, (a) net income Taxes and franchise and excise Taxes (imposed in lieu of net income Taxes) and any branch profits Taxes imposed on such Agent or Lender imposed as a result of such Agent or Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in the jurisdiction imposing such Tax (or any political subdivision thereof), (b) any Taxes imposed on any Agent or any Lender as a result of any current or former connection between such Agent or Lender and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent or Lender having executed, delivered or performed its obligations or received a payment under, or having been a party to or having enforced, this Agreement or any other Credit

Document), (c) any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of any Agent or Lender under the law in effect at the time such Agent or Lender becomes a party to this Agreement (or in the case of any Lender, designates a new lending office other than a new lending office designated at the request of the Borrower pursuant to Section 13.7(a)); *provided* that this clause (c) shall not apply to the extent that the indemnity payments or additional amounts any Lender would be entitled to receive (without regard to this clause (c)) do not exceed the indemnity payment or additional amounts that the person making the assignment, participation or transfer to such Lender (or designation of a new lending office by such Lender) would have been entitled to receive pursuant to Section 5.4 immediately before such assignment, participation, transfer or change in lending office in the absence of such assignment, participation, transfer or change in lending office (it being understood and agreed, for the avoidance of doubt, that any withholding Tax imposed on a Lender as a result of a Change in Law occurring after the time such Lender became a party to this Agreement (or designates a new lending office) shall not be an Excluded Tax under this clause (c)), (d) any Tax to the extent attributable to such Agent's or Lender's failure to comply with Sections 5.4(e), (f) (in the case of any Non-U.S. Lender) or Section 5.4(i) (in the case of a U.S. Lender) or Section 5.4(j) and (e) any Taxes imposed by FATCA.

"**Existing DIP Agreement**" shall have the meaning provided in the Recitals to this Agreement.

"**Existing Term Loan Class**" shall have the meaning provided in Section 2.15(a)(i).

"**Extended Term Loan Repayment Amount**" shall have the meaning provided in Section 2.5(c).

"**Extended Term Loans**" shall have the meaning provided in Section 2.15(a)(i).

"**Extending Lender**" shall have the meaning provided in Section 2.15(a)(iv).

"**Extension Amendment**" shall have the meaning provided in Section 2.15(a)(v).

"**Extension Election**" shall have the meaning provided in Section 2.15(a)(iv).

"**Extension Minimum Condition**" shall mean a condition to consummating any Extension Series that a minimum amount (to be determined and specified in the relevant Term Loan Extension Request, in the Borrower's sole discretion) of any or all applicable Classes be submitted for extension.

"**Extension Series**" shall mean all Extended Term Loans that are established pursuant to the same Extension Amendment (or any subsequent Extension Amendment to the extent such Extension Amendment expressly provides that the Extended Term Loans provided for therein are intended to be a part of any previously established Extension Series) and that provide for the same interest margins, extension fees and amortization schedule.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not

materially more onerous to comply with), any current or future Treasury regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and intergovernmental agreement (together with any Applicable Law implementing such agreement) entered into in connection with any of the foregoing.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the *per annum* rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York; *provided* that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged on such day on such transactions as determined by the Administrative Agent.

"**Fees**" shall mean all amounts payable pursuant to, or referred to in, Section 4.1.

"**First Lien Claims**" shall mean "First Lien Claims" as defined in the Plan.

"**First Lien Intercreditor Agreement**" shall mean an intercreditor agreement substantially in the form attached hereto as Exhibit G or such as form as reasonably agreed between the Borrower, the Collateral Agent, and the Required Lenders.

"**Fiscal Year**" shall have the meaning provided in Section 9.10.

"**Fixed Charges**" shall mean, the sum of, without duplication:

(1)     Consolidated Interest Expense; *plus*

(2)     all cash dividends or cash distributions (other than return of capital) paid (excluding items eliminated in consolidation) on any series of preferred stock during such period; *plus*

(3)     all cash dividends or cash distributions (other than return of capital) paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during such period.

"**Floor**" shall mean a rate of interest equal to 1.00%.

"**Foreign Asset Sale**" shall have the meaning provided in Section 5.2(g).

"**Foreign Excess Cash Flow**" shall have the meaning provided in Section 5.2(g).

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Borrower or any of its Subsidiaries with respect to employees employed outside the United States.

"**Foreign Recovery Event**" shall have the meaning provided in Section 5.2(g).

"**Foreign Subsidiary**" shall mean each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Fund**" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**Funded Lender Claimant**" shall mean a Holder of First Lien Claims, or such Holder's designee that (i) is specified on (a) Item 6 (Registration Information) or Item 8 (Designee Information) of a properly completed Lender Subscription Form delivered to and accepted by KCC LLC or (b) Item 7 (Registration Information) or Item 9 (Designee Information) of a properly completed Noteholder Beneficial Owner Subscription Form delivered to and accepted by KCC LLC, (ii) has funded in cash in full such Holder's allocated portion of the principal amount of "new money" Initial Term Loans prior to the applicable funding deadline for such Holder, or such Holder's designee, in accordance with (and as may be extended in accordance with) the RO Backstop Agreement and the RO Procedures, as applicable and (iii) has not delivered all of such Holder's, or such Holder's designee's, Lender Claimant Onboard Documents to the Administrative Agent.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent in writing that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"**Granting Lender**" shall have the meaning provided in Section 13.6(f).

"**Guarantee**" shall mean the Guarantee made by each Guarantor in favor of the Administrative Agent for the benefit of the Secured Parties, substantially in the form of Exhibit C.

"**Guarantee Obligations**" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase

43

or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; *provided*, *however*, that the term "**Guarantee Obligations**" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Guarantors**" shall mean (a) Holdings, (b) each Domestic Subsidiary (other than an Excluded Subsidiary) that provides the Guarantee on the Closing Date or becomes a party to the Guarantee after the Closing Date pursuant to Section 9.11 or otherwise and (c) the Borrower (other than with respect to its own Obligations).

"**Hazardous Materials**" shall mean (a) any petroleum or petroleum products spilled or released into the environment, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, for which a release into the environment is prohibited, limited or regulated by any Environmental Law.

"**Hedge Bank**" shall mean any Person (other than Holdings, the Borrower or any other Subsidiary of the Borrower) that is (a) a party to any Hedging Agreement and, in each case, at the time it enters into such Hedging Agreement or on the Closing Date, is a Lender or an Affiliate of a Lender or (b) any other Person party to a Hedging Agreement that delivers an accession agreement to the Security Agreement and that is specifically designated by the Borrower as a "Hedge Bank".

"**Hedging Agreements**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms

44

and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedging Obligations**" shall mean, with respect to any Person, the obligations of such Person under Hedging Agreements.

"**Holdco Convertible Notes Claims**" shall mean Holdco Convertible Notes Claims as defined in the Plan.

"**Holdco Convertible Notes Lender Claimant**" shall mean a holder of Holdco Convertible Notes Claims, who is a Settlement Group Releasing Party (as defined in the Plan), that is not a Lender as the result of the Administrative Agent not having received all of its Lender Claimant Onboard Documents.

"**Holder**" shall mean "Holder" as defined in the Plan.

"**Holdings**" shall mean, (a) Avaya Holdings or (b) any other partnership, limited partnership, corporation, limited liability company, or business trust or any successor thereto organized under the laws of the United States or any state thereof or the District of Columbia (the "**New Holdings**") that is a direct or indirect Wholly Owned Subsidiary of Avaya Holdings or that has merged, amalgamated or consolidated with Avaya Holdings (or, in either case, the previous New Holdings, as the case may be) (the "**Previous Holdings**"); provided that (i) such New Holdings owns directly or indirectly 100% of the Stock and Stock Equivalents of the Borrower, (ii) the New Holdings shall expressly assume all the obligations of the Previous Holdings under this Agreement and the other Credit Documents to which it is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Agents and the Required Lenders, (iii) such substitution and any supplements to the Credit Documents shall preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the Security Documents, and New Holdings shall have delivered to the Administrative Agent an officer's certificate to that effect, (iv) all assets of the Previous Holdings are contributed, lent or otherwise made available totransferred to such New Holdings, and (v) New Holdings shall have provided to each Agent all documentation and information reasonably requested by such Agent that is necessary and is required by United States regulatory authorities to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; *provided, further*, that if the foregoing are satisfied, the Previous Holdings shall be automatically released from all of its obligations under the Credit Documents and any reference to "Holdings" in the Credit Documents shall be meant to refer to the "New Holdings". Notwithstanding anything to the contrary contained in this Agreement, Holdings or any New Holdings may change its jurisdiction of organization or location for purposes of the UCC or its identity or type of organization or corporate structure, subject to compliance with the terms and provisions of the Security AgreementDocuments.

"**Increased Amount Date**" shall have the meaning provided in Section 2.14(a).

45

"**Incremental Amendment**" shall have the meaning provided in Section 2.14(a).

"**Incremental Commitments**" shall have the meaning provided in Section 2.14(a).

"**Incremental Equivalent Debt**" shall have the meaning provided in Section 10.1(v)(ii).

"**Incremental Facilities**" shall mean the facilities represented by the Incremental Commitments and the Incremental Loans thereunder.

"**Incremental Loans**" shall have the meaning provided in Section 2.14(a).

"**Incremental Revolving Commitments**" shall have the meaning provided in Section 2.14(a).

"**Incremental Term Commitments**" shall have the meaning provided in Section 2.14(a).

"**Incremental Term Loan**" shall have the meaning provided in Section 2.14(c).

"**Incremental Term Loan Maturity Date**" shall mean, with respect to any tranche of Incremental Term Loans made pursuant to Section 2.14, the final maturity date thereof.

"**Incremental Term Loan Repayment Amount**" shall have the meaning provided in Section 2.5(c).

"**Incremental Term Loan**" shall have the meaning provided in Section 2.14(c).

"**Indebtedness**" of any Person shall mean (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be included as a liability on the balance sheet of such Person, (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) all Indebtedness of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (f) the principal component of all Capitalized Lease Obligations of such Person, (g) the Swap Termination Value of Hedging Obligations of such Person, (h) without duplication, all Guarantee Obligations of such Person, (i) Disqualified Stock of such Person and (j) Receivables Indebtedness of such Person; *provided* that Indebtedness shall not include (i) trade and other ordinary course payables and accrued expenses arising in the ordinary course of business, (ii) deferred or prepaid revenue, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) any Indebtedness defeased by such Person or by any Subsidiary of such Person, (v) contingent obligations incurred in the ordinary course of business and (vi) earnouts or similar obligation until earned, due and payable and not paid for a period of thirty (30) days.

46

For all purposes hereof, (a) the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venture, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness constitutes Indebtedness for borrowed money, obligations in respect of Capitalized Lease Obligations and obligations evidenced by bonds, debentures, notes, loan agreement or other similar instruments, (b) the Indebtedness of the Borrower and the Restricted Subsidiaries shall exclude all intercompany Indebtedness among the Borrower and its Subsidiaries having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (c) the amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid principal amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**indemnified liabilities**" shall have the meaning provided in Section 13.5.

"**Indemnified Taxes**" shall mean (a) all Taxes imposed on or with respect to any payment made on account of any obligation of any Credit Party under any Credit Document other than Excluded Taxes and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Independent Financial Advisor**" shall mean an accounting firm, appraisal firm, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is disinterested with respect to the applicable transaction.

"**Initial ABL** ~~**Facility**~~" ~~shall have the meaning provided~~**Maturity Date**" shall mean the "Initial Maturity Date" under and as defined in the ABL Credit Agreement.

"**Initial Term Commitment**" shall mean (a) in the case of any Lender that is a Lender on the Closing Date, the amount set forth opposite such Lender's name on the "Aggregate Amount" column on Schedule 1.1(a) as such Lender's "Initial Term Commitment" and (b) in the case of any Lender that becomes a Lender after the Closing Date, the amount specified as such Lender's "Commitment" in the Assignment and Acceptance pursuant to which such Lender assumed a portion of the Initial Term Commitments, in each case as the same may be changed from time to time pursuant to the terms hereof.

"**Initial Term Loan Maturity Date**" shall mean ~~[ ]~~August 1, 2028.[5]

"**Initial Term Loan Repayment Amount**" shall have the meaning provided in Section 2.5(b).

"**Initial Term Loan Repayment Date**" shall have the meaning provided in Section 2.5(b).

---

[5] ~~5 ¼ years after Closing Date.~~

"**Initial Term Loans**" shall mean the term loans made or deemed to have been made to Borrower pursuant to Section 2.01, which on the Closing Date shall be as set forth on the "Aggregate Amount" column on Schedule 1.01(a).  The aggregate outstanding principal amount of the Term Loans as of the Closing Date is $810,000,000.

"**Insolvent**" shall mean, with respect to any Multiemployer Plan, the condition that such Multiemployer Plan is insolvent within the meaning of Section 4245 of ERISA.

"**Intercompany Subordinated Note**" shall mean the Intercompany Note, dated as of the Closing Date, executed by Holdings, the Borrower and each Restricted Subsidiary, as supplemented from time to time.

"**Interest Period**" shall mean, with respect to any Term Loan, the interest period applicable thereto, as determined pursuant to Section 2.9.

"**Investment**" shall mean, for any Person:  (a) the acquisition (whether for cash, property, services or securities or otherwise) of Stock, Stock Equivalents, bonds, notes, debentures, partnership, limited liability company membership or other ownership interests or other securities of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale); (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such other Person) (including any partnership or joint venture); (c) the entering into of any Guarantee Obligation with respect to Indebtedness; or (d) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; *provided* that, in the event that any Investment is made by the Borrower or any Restricted Subsidiary in any Person through substantially concurrent interim transfers of any amount through one or more other Restricted Subsidiaries, then such other substantially concurrent interim transfers shall be disregarded for purposes of Section 10.5 (excluding, in the case of the Borrower and the Restricted Subsidiaries, intercompany loans, advances and Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business).  The amount of any Investment outstanding at any time shall be the original cost of such Investment reduced (except in the case of (x) Investments made using the Available Amount pursuant to Section 10.5(v)(y) and (y) Returns which increase the Available Amount pursuant to clauses (a)(iii), (iv), (v) and (vii) of the definition thereof) by any Returns of the Borrower or a Restricted Subsidiary in respect of such Investment (*provided* that, with respect to amounts received other than in the form of cash or Cash Equivalents, such amount shall be equal to the fair market value of such consideration).

"**Judgment Currency**" shall have the meaning provided in Section 13.20.

"**Junior Indebtedness**" shall have the meaning provided in Section 10.7(a).

48

"**Junior Lien Intercreditor Agreement**" shall mean the Junior Lien Intercreditor Agreement substantially in the form of Exhibit H or such other form as reasonably agreed between the Borrower, the Collateral Agent and the Required Lenders.

"**Latest Maturity Date**" shall mean, at any date of determination, the latest Maturity Date applicable to any Class of Term Loans or Commitments hereunder as of such date of determination.

"**LCT Election**" shall have the meaning provided in Section 1.11.

"**LCT Test Date**" shall have the meaning provided in Section 1.11.

"**Lender**" shall have the meaning provided in the preamble to this Agreement.

"**Lender Claimants**" shall mean, collectively, until acknowledged as a Lender in accordance with Section 2.18, a beneficial holder of an allowed First Lien Claim the identity of which beneficial holder is unknown to the Borrower and/or the Administrative Agent(i) each DIP Lender Claimant, (ii) each Holdco Convertible Notes Lender Claimant, (iii) each Unknown First Lien Lender Claimant and (iv) each Funded Lender Claimant.  To the extent a Person is, as of any date of determination, a Lender but also an unknown beneficial holder of allowed First Liena Lender Claimsant for which itthat has not been declared a Lender in accordance with Section 2.18, such Person shall be deemed to be a Lender Claimant solely with respect to (a) in the case of an Unknown First Lien Lender Claimant, its ownership of First Lien Claims and other Obligations for which it is an unknown beneficial holder, (b) in the case of a DIP Lender Claimant, its DIP Term Loans, (c) in the case of a Holdco Convertible Notes Lender Claimant, its ownership of Holdco Convertible Notes Claims and (d) in the case of a Funded Lender Claimant, its allocated portion of the principal amount of "new money" Initial Term Loans which has been funded in cash in full prior to the applicable funding deadline for such Holder of First Lien Claims, or such Holder's designee, in accordance with (and as may be extended in accordance with) the RO Backstop Agreement and the RO Procedures, as applicable, and shall have all rights and obligations of a Lender hereunder with respect to any other Obligations due and owing by the Credit Parties to such Person for which it is a Lender.

"**Lender Claimant Obligation Amount**" has the meaning specified in Section 2.18(b)(ii).

"**Lender Claimant Onboard Documents**" has the meaning specified in Section 2.18(a).

"**Lender Claimant Reserve Account**" means the account to be established by the Administrative Agent or an escrow agent selected by the Borrower and reasonably satisfactory to the Administrative Agent pursuant to Section 2.18.

"**Lender Default**" shall mean (a) the refusal or failure (which has not been cured) of a Lender to make available its portion of any Borrowing that it is required to make hereunder, (b) a Lender having notified the Administrative Agent or the Borrower (provided that the Borrower shall have notified the Administrative Agent) in writing that it does not intend to comply with its funding obligations under this Agreement or has made a public statement to that

effect with respect to its funding obligations under this Agreement, (c) a Lender has failed to confirm in a manner reasonably satisfactory to the Administrative Agent and the Borrower that it will comply with its funding obligations under this Agreement, (d) a Lender being deemed insolvent or becoming the subject of a bankruptcy or insolvency proceeding or has admitted in writing that it is insolvent, *provided* that a Lender Default shall not be in effect with respect to a Lender solely by virtue of the ownership or acquisition of any Stock or Stock Equivalents in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (e) a Lender that has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action.

"**Lender Subscription Form**" shall mean "Lender Subscription Form" as defined in the RO Procedures.

"**Lien**" shall mean any mortgage, pledge, security interest, hypothecation, collateral assignment, lien (statutory or other) or similar encumbrance (including any conditional sale or other title retention agreement or any Capital Lease).

"**Limited Condition Transaction**" shall mean (i) any Permitted Acquisition or other similar Investment whose consummation is not conditioned on the availability of, or on obtaining, third party financing, (ii) any redemption, repurchase, defeasance, satisfaction and discharge or repayment of Indebtedness requiring irrevocable notice in advance of such redemption, repurchase, defeasance, satisfaction and discharge or repayment and (iii) a Permitted Change of Control.

"**Management Stockholders**" means the members of management of Avaya Holdings (or any Parent Entity) or its Subsidiaries who are holders of Stock and Stock Equivalents of Avaya Holdings or of any Parent Entity on the Closing Date.

"**Marketable Security**" means any common stock of a Person which is (or will, upon distribution thereof, be) listed on the NYSE, the American Stock Exchange, NASDAQ, any other national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended, or approved for quotation in any system of automated dissemination of quotations of securities prices in the United States or for which there is a recognized market maker or trading market provided any such security or any Designated Offshore Securities Market (as such term is defined in Rule 902(b) under the Securities Act) that (i) is not subject to a contractual lock up or similar agreement restricting transferability, (ii) may be distributed or resold without volume limitation or other restrictions on transfer under Rule 144 under the Securities Act of 1933, as amended (or any successor provision thereof), including without application of paragraphs (c), (e), (f) and (h) of such Rule 144, and (iii) is not subject to any other prohibitions or material restrictions on transfer under applicable securities laws.

"**Master Agreement**" shall have the meaning provided in the definition of the term "Hedging Agreement".

"**Material Adverse Effect**" shall mean a material adverse effect on (a) the business, assets, operations, properties or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, (b) the ability of the Credit Parties, taken as a whole, to perform their payment obligations under the Credit Facilities, taken as a whole or (c) material rights or remedies (taken as a whole) of the Administrative Agent and the Lenders under the Credit Documents, excluding any matters (i) publicly disclosed prior to February 14, 2023, including in any first day pleadings or declarations, in each case in connection with the Case and the events and conditions related and/or leading up to the Case and the effects thereof and (ii) publicly disclosed prior to February 14, 2023 in the annual report of the Borrower and/or any subsequent quarterly or periodic report of the Borrower.

"**Material Subsidiary**" shall mean, at any date of determination, each Restricted Subsidiary (a) whose total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of the most recent Test Period for which Section 9.1 Financials have been delivered were equal to or greater than 5.0% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (b) whose total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period were equal to or greater than 5.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that at any date of determination, Restricted Subsidiaries that are not Material Subsidiaries shall not, in the aggregate, have (x) total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of such Test Period equal to or greater than 10.0% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (y) total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period equal to or greater than 10.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided,* however, if the Restricted Subsidiary does not meet the conditions in clauses (a) and (b) but meets the condition in clause (x) or (y), then such Restricted Subsidiary (i) shall still constitute a "Material Subsidiary" under Sections 8.1, 9.3, 9.5, 11.5 and 11.7 and (ii) shall not constitute a "Material Subsidiary" under any other section or subsection of this Agreement unless and until the Borrower, on or prior to the next date on which an officer's certificate is due to be delivered pursuant to Section 9.1(c) of this Agreement, designate in writing to the Administrative Agent such Restricted Subsidiary as a "Material Subsidiary". It is agreed and understood that neither Receivables Entity nor Securitization Subsidiary shall be a Material Subsidiary and they shall be excluded from the Consolidated Total Assets and total revenue of the Borrower and its Restricted Subsidiaries.

"**Maturity Date**" shall mean (x) with respect to the Initial Term Loans, the Initial Term Loan Maturity Date and (y) with respect to any other Class of Term Loans, the Incremental Term Loan Maturity Date or other maturity date related to any Extension Series of Extended Term Loans or any maturity date related to any Refinancing Term Loan, as applicable.

51

"**Maximum Amount**" shall have the meaning provided in Section 2.8(e).

"**Maximum Incremental Facilities Amount**" shall mean ~~the sum of~~ (1) ~~the greater of (x)~~ $~~80~~450,000,000 ~~and (y) an amount equal to 100.0% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~ *minus* all Incremental Facilities and Incremental Equivalent Debt incurred in reliance of this clause (1), *plus* (2) all voluntary prepayments or repurchases of the Term Loans, Incremental Equivalent Debt and any Refinancing Indebtedness in respect of any Incremental Equivalent Debt on or prior to such date (in each case except to the extent (i) funded with proceeds of long term Indebtedness or (ii) the prepaid Indebtedness was originally incurred under clause (3) below (or any Refinancing Indebtedness thereof), and in the case of buybacks at discount to par, in the amount of the actual purchase price paid in cash) *minus* all Incremental Facilities and Incremental Equivalent Debt incurred in reliance of this clause (2) *plus* (3) an unlimited amount so long as, in the case of this clause (3) only, such amount at such time could be incurred without causing (x) in the case of Indebtedness secured by Liens on the Collateral that rank *pari passu* with the Liens on the Collateral securing the Initial Term Loans, the Consolidated First Lien Net Leverage Ratio (calculated on a Pro Forma Basis) to exceed (A) 3.30:1.00 or (B) if the proceeds are used to finance any Permitted Acquisition or similar Investments and the aggregate principal amount of such Indebtedness does not exceed the then-available Ratio Test Cap at such time, the higher of (I) 3.30:1.00 and (II) the Consolidated First Lien Net Leverage Ratio immediately prior to the incurrence of such Indebtedness, (y) in the case of Indebtedness secured by Liens on the Collateral that rank junior to the Liens on the Collateral securing the Initial Term Loans, the Consolidated Secured Net Leverage Ratio (calculated on a Pro Forma Basis) to exceed (A) 3.30:1.00 or (B) if the proceeds are used to finance any Permitted Acquisition or similar Investments and the aggregate principal amount of such Indebtedness does not exceed the then-available Ratio Test Cap at such time, the higher of (I) 3.30:1.00 and (II) the Consolidated Secured Net Leverage Ratio immediately prior to the incurrence of such Indebtedness, and (z) in the case of unsecured Indebtedness or Indebtedness secured only by Liens on assets that do not constitute Collateral, the Consolidated Total Net Leverage Ratio (calculated on a Pro Forma Basis) to exceed (A) 3.30:1.00 or (B) if the proceeds are used to finance any Permitted Acquisition or similar Investments and the aggregate principal amount of such Indebtedness does not exceed the then-available Ratio Test Cap at such time, the higher of (I) 3.30:1.00 and (II) the Consolidated Total Net Leverage Ratio immediately prior to the incurrence of such Indebtedness, in each case of clauses 3(x), 3(y) and 3(z) above, after giving effect to any acquisition consummated in connection therewith and all other appropriate Pro Forma Adjustments (including giving effect to the prepayment of Indebtedness in connection therewith), and assuming for purposes of this calculation that cash proceeds of any such Incremental Facility or Incremental Equivalent Debt then being incurred shall not be netted from Consolidated Total Debt Indebtedness for purposes of calculating such Consolidated First Lien Net Leverage Ratio, Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable; *provided*, *however*, that if amounts incurred under this clause (3) are incurred concurrently with the incurrence of Incremental Facilities in reliance on clause (1) and/or clause (2) above or any other Indebtedness incurred hereunder in reliance of a "dollar" basket, the Consolidated First Lien Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or the Consolidated Total Net Leverage Ratio shall be permitted to exceed the Consolidated First Lien Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable, set forth in clause (3) above to the extent of such amounts

incurred in reliance on clause (1) and/or clause (2) or utilizing such other "dollar" basket solely for the purpose of determining whether such concurrently incurred amounts incurred under this clause (3) are permissible (it being understood that (A) if the Consolidated First Lien Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or the Consolidated Total Net Leverage Ratio, as applicable, incurrence test is met, then, at the election of the Borrower, any Incremental Facility or Incremental Equivalent Debt may be incurred under clause (3) above regardless of whether there is capacity under clause (1) and/or clause (2) above or utilizing such other "dollar" basket and (B) any portion of any Incremental Facility or Incremental Equivalent Debt incurred in reliance on clause (1) and/or clause (2) may be reclassified, as the Borrower may elect from time to time, as incurred under clause (3) if the Borrower meets the applicable leverage ratio under clause (3) at such time on a Pro Forma Basis).; *provided,* further, that any Incremental Facility or Incremental Equivalent Debt incurred in reliance on clauses (3)(x)(B)(II), (3)(y)(B)(II) and (3)(z)(B)(II) above may be reclassified, as the Borrower may elect from time to time, as incurred under clauses (3)(x)(B)(I), (3)(y)(B)(I) and (3)(z)(B)(I) above, respectively, if the Borrower meets the applicable leverage ratio at such time on a Pro Forma Basis).

"**Maximum Tender Condition**" shall have the meaning provided in Section 2.17(b).

"**Minimum Borrowing Amount**" shall mean (a) with respect to a Borrowing of SOFR Loans, $5,000,000 (or, if less, the entire remaining Commitments of any applicable Credit Facility at the time of such Borrowing), and (b) with respect to a Borrowing of ABR Loans, $1,000,000 (or, if less, the entire remaining Commitments of any applicable Credit Facility at the time of such Borrowing).

"**Minimum Tender Condition**" shall have the meaning provided in Section 2.17(b).

"**Minority Investment**" shall mean any Person (other than a Subsidiary) in which the Borrower or any Restricted Subsidiary owns Stock or Stock Equivalents, including any joint venture (regardless of form of legal entity).

"**MNPI**" shall mean, with respect to Avaya Holdings and its Subsidiaries, any information other than information that is publicly available or not material with respect to them or their respective securities for purposes of United States federal and state securities laws.

"**Monthly Booking Value**" means, with respect to a Subscription Contract, the total contract value divided by the term of the contract (in number of months).

"**Moody's**" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"**Mortgage**" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in respect of that Mortgaged Property, in a form to be mutually agreed with the Collateral Agent and the Required Lenders.

53

"**Mortgaged Property**" shall mean all Real Estate (i) set forth on Schedule 1.1(b) and (ii) with respect to which a Mortgage is required to be granted pursuant to Section 9.12.

"**Multiemployer Plan**" shall mean a plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA (i) to which any of the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate is then making or has an obligation to make contributions or (ii) with respect to which the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate could incur liability pursuant to Title IV of ERISA.

"**Narrative Report**" shall mean, with respect to the financial statements for which such narrative report is required, a management's discussion and analysis of the financial condition and results of operations of the Borrower and its consolidated Subsidiaries for the applicable period to which such financial statements relate.

"**Net Cash Proceeds**" shall mean,

(1)  with respect to any Asset Sale Prepayment Event or any Recovery Prepayment Event, (a) the gross cash proceeds (including payments from time to time in respect of installment obligations, if applicable, but only as and when received) received by or on behalf of the Borrower or any Restricted Subsidiary in connection therewith, as the case may be, less (b) the sum of:

(i)  the amount, if any, of all taxes (including in connection with any repatriation of funds) paid or estimated by the Borrower in good faith to be payable by the Borrower or any Restricted Subsidiary in connection with such Prepayment Event,

(ii)  the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) associated with the assets that are the subject of such Prepayment Event and (y) retained by the Borrower or any Restricted Subsidiary (including any pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction); *provided* that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Prepayment Event occurring on the date of such reduction,

(iii)  the amount of any Indebtedness (other than Indebtedness hereunder, the ABL Obligations and any other Indebtedness secured by a Lien that ranks *pari passu* with or is subordinated to the Liens securing the Obligations or the ABL Obligations) secured by a Lien on the assets that are the subject of such Prepayment Event, to the extent that the instrument creating or evidencing such Indebtedness requires that such Indebtedness be repaid upon consummation of such Prepayment Event,

(iv)  the amount of any proceeds of such Prepayment Event that the Borrower or any Restricted Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period, has entered into an Acceptable Reinvestment Commitment prior to the last day of the Reinvestment Period to reinvest or, with respect to any Recovery Prepayment Event, provided an Acceptable Reinvestment Commitment or a Restoration

54

Certification prior to the last day of the Reinvestment Period) in the business of the Borrower or any Restricted Subsidiary (subject to Section 9.15), including for the repair, restoration or replacement of an asset or assets subject to such Prepayment Event; *provided* that any portion of such proceeds that has not been so reinvested within such Reinvestment Period (with respect to such Prepayment Event, the "**Deferred Net Cash Proceeds**") shall, unless the Borrower or any Restricted Subsidiary has entered into an Acceptable Reinvestment Commitment or provided a Restoration Certification prior to the last day of such Reinvestment Period to reinvest such proceeds, (x) be deemed to be Net Cash Proceeds of such Prepayment Event occurring on the last day of such Reinvestment Period or, if later, 180 days after the date the Borrower or such Restricted Subsidiary has entered into such Acceptable Reinvestment Commitment or provided such Restoration Certification, as applicable (such last day or 180th day, as applicable, the "**Deferred Net Cash Proceeds Payment Date**"), and (y) be applied to the repayment of Term Loans in accordance with Section 5.2(a)(i),

(v)     in the case of any Asset Sale Prepayment Event, any funded escrow established pursuant to the documents evidencing any such sale or Disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or Disposition; *provided* that the amount of any subsequent reduction of such escrow (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such a Prepayment Event occurring on the date of such reduction solely to the extent that the Borrower and/or any Restricted Subsidiaries receives cash in an amount equal to the amount of such reduction,

(vi)     in the case of any Asset Sale Prepayment Event or Recovery Prepayment Event by a non-Wholly Owned Restricted Subsidiary, the *pro rata* portion of the Net Cash Proceeds thereof (calculated without regard to this clause (vi)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a Wholly Owned Restricted Subsidiary as a result thereof, and

(vii)     reasonable and customary fees, commissions, expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums and recording charges, transfer taxes, deed or mortgage recording taxes and other customary expenses and brokerage, consultant and other customary fees), issuance costs, premiums, discounts and other costs paid by the Borrower or any Restricted Subsidiary, as applicable, in connection with such Prepayment Event, in each case only to the extent not already deducted in arriving at the amount referred to in clause (a) above; and

(2)     with respect to the incurrence or issuance of any Indebtedness or the issuance of any Stock or Stock Equivalent or capital contribution, the excess, if any, of (a) the sum of cash and Cash Equivalents received in connection with such incurrence or issuance over (b) reasonable and customary fees, commissions, expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums and recording charges, transfer taxes, deed or mortgage recording taxes and other customary expenses and brokerage, consultant and other customary

55

fees), issuance costs, premiums, discounts and other costs paid by the Borrower or any Restricted Subsidiary in connection with such incurrence or issuance.

"**New Debt Incurrence Prepayment Event**" shall mean any issuance or incurrence by the Borrower or any Restricted Subsidiary of any Indebtedness permitted to be issued or incurred under Section 10.1(v)(i) and any Refinancing Term Loans.

"**New Holdings**" shall have the meaning provided in the definition of "Holdings".

"**New Project**" shall mean (x) each plant, facility, branch, office, business unit, data center, warehouse or distribution center which is either a new plant, facility, branch, office, business unit, modernization of an existing plant, facility, branch, office, business unit, data center, warehouse or distribution center owned or operated by the Borrower or the Subsidiaries and (y) each creation (in one or a series of related transactions) of a business unit, marketplace, e-commerce platform, channel, product line, division, segment, class offering or service offering or each expansion (in one or a series of related transactions) of business into a new market or consumer base or through a new distribution method or channel, in each case, which is under development or otherwise in process.

"**New Refinancing Commitments**" shall have the meaning provided in Section 2.15(b).

"**Non-Consenting Lender**" shall have the meaning provided in Section 13.7(b).

"**Non-Defaulting Lender**" shall mean and include each Lender other than a Defaulting Lender.

"**Non-U.S. Lender**" shall mean any Lender that is not, for U.S. federal income tax purposes, (a) an individual who is a citizen or resident of the U.S., (b) a corporation, partnership or entity treated as a corporation or partnership created or organized in or under the laws of the U.S., or any political subdivision thereof, (c) an estate whose income is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the U.S. is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of such trust or a trust that has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

"**Noteholder Beneficial Owner Subscription Form**" shall mean "Noteholder Beneficial Owner Subscription Form" as defined in the RO Procedures.

"**Notice of Borrowing**" shall mean a written request of the Borrower in accordance with the terms of Section 2.3 and substantially in the form of Exhibit A or such other form as shall be approved by the Administrative Agent (acting reasonably).

"**Notice of Conversion or Continuation**" shall have the meaning provided in Section 2.6(a).

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with

respect to any Term Loan or under any Secured Cash Management Agreement or Secured Hedging Agreement, in each case, entered into with Holdings, the Borrower or any Restricted Subsidiary, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, premiums, and fees that accrue after the commencement by or against any Credit Party of any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest, premiums, and fees are allowed claims in such proceeding, in each case, other than Excluded Swap Obligations.  Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Credit Documents) (i) include the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, premiums, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document and (ii) exclude, notwithstanding any term or condition in this Agreement or any other Credit Documents, any Excluded Swap Obligations.

"**Organizational Documents**" shall mean, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and, if applicable, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" shall mean any and all present or future stamp, registration, documentary or other similar Taxes arising from any payment made or required to be made under this Agreement or any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document except any such Taxes that are any Taxes imposed on any Agent or any Lender as a result of any current or former connection between such Agent or Lender and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent or Lender having executed, delivered or performed its obligations or received a payment under, or having been a party to or having enforced, this Agreement or any other Credit Document) imposed with respect to an assignment (other than an assignment made pursuant to Section 13.7 or Section 2.12).

"**Overnight Rate**" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Parent Entity**" shall mean any direct or indirect parent of Avaya Holdings.

"**Participant**" shall have the meaning provided in Section 13.6(c)(i).

"**Participant Register**" shall have the meaning provided in Section 13.6(c)(iii).

"**Participating Receivables Grantor**" shall mean the Borrower or any Restricted Subsidiary that is or that becomes a participant or originator in a Permitted Receivables Financing.

"**Patriot Act**" shall have the meaning provided in Section 13.18.

"**Paul, Weiss**" means Paul, Weiss, Rifkind, Wharton & Garrison LLP.

"**Payment Recipient**" shall have the meaning provided in Section 12.15.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Pension Plan**" shall mean any employee pension benefit plan (as defined in Section 3(2) of ERISA, but excluding any Multiemployer Plan) which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by the Borrower, any Subsidiary or ERISA Affiliate or with respect to which the Borrower, any Subsidiary or any ERISA Affiliate could incur liability pursuant to Title IV of ERISA.

"**Perfection Certificate**" shall mean a perfection certificate of the Borrower in any form approved by the Required Lenders (acting reasonably).

"**Periodic Term SOFR Determination Day**" shall have the meaning specified in the definition of "Term SOFR".

"**Permitted Acquiror**" shall mean any Person or group whose acquisition of beneficial ownership constitutes a Permitted Change of Control.

"**Permitted Acquisition**" shall mean the acquisition, by merger or otherwise, by the Borrower or any Restricted Subsidiary of assets (including assets constituting a business unit, line of business or division) or Stock or Stock Equivalents, so long as (a) if such acquisition involves any Stock or Stock Equivalents, such acquisition shall result in the issuer of such Stock or Stock Equivalents and its Subsidiaries becoming a Restricted Subsidiary and a Subsidiary Guarantor, to the extent required by Section 9.11 or designated as an Unrestricted Subsidiary pursuant to the terms hereof, (b) such acquisition shall result in the Collateral Agent, for the benefit of the applicable Secured Parties, being granted a security interest in any Stock, Stock Equivalent or any assets so acquired, to the extent required by Section 9.11, Section 9.12 and/or the Security Agreement, (c) after giving effect to such acquisition, the Borrower and the Restricted Subsidiaries shall be in compliance with Section 9.15 and (d) no Specified Default shall have occurred and be continuing.

"**Permitted Change of Control**" shall mean any transaction or series of transactions that would otherwise constitute a Change of Control, so long as:

58

(a)     the Consolidated Secured Net Leverage Ratio after giving Pro Forma Effect thereto is not greater than 2.05 to 1.00; *provided* that, notwithstanding anything herein to the contrary, when calculating the Consolidated Secured Net Leverage Ratio for purposes of this definition, the Borrower shall be entitled at its option to make such calculations as it would if making calculations of baskets or ratios in connection with a Limited Condition Transaction;

(b)     the Borrower shall have obtained (or obtained a reaffirmation of the) public corporate credit rating and public corporate family rating of the Borrower and public ratings of the Term Loans hereunder, in each case (after giving effect to the Permitted Change of Control and all transactions related thereto) from (x) Moody's and (y) either S&P or Fitch, respectively, of at least B (outlook stable), B2 (outlook stable) and B (outlook stable), as applicable;

(c)     (i) at least fifteen (15) Business Days prior to the Permitted Change of Control Effective Date, the Borrower shall have delivered notice in writing to the Administrative Agent (for prompt further distribution to each Lender) of such Permitted Change of Control and of the identity of the Permitted Acquiror and (ii) not later than three (3) Business Days prior to the Permitted Change of Control Effective Date, the Permitted Acquiror and/or the Borrower, as applicable, shall have provided to each Agent (x) all ~~customary~~ documentation and information applicable to the Permitted Acquiror that shall have been reasonably requested by such Agent in writing at least ten (10) Business Days prior to the Permitted Change of Control Effective Date that is necessary and is required by United States regulatory authorities to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and (y) if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation after giving effect to such Permitted Change of Control, an updated Beneficial Ownership Certification of the Borrower; and

(d)     the Administrative Agent shall have a received an officer's certificate from the Borrower stating that the conditions described in clauses (a) through (c) above have been satisfied.

"**Permitted Change of Control Costs**" means all fees, costs and expenses incurred or payable by Holdings, any Parent Entity, the Borrower or any of its Restricted Subsidiaries in good faith in connection with a Permitted Change of Control.

"**Permitted Change of Control Effective Date**" shall mean the date of consummation of a Permitted Change of Control.

"**Permitted Debt Exchange**" shall have the meaning provided in Section 2.17(a).

"**Permitted Debt Exchange Instruments**" shall have the meaning provided in Section 2.17(a).

"**Permitted Debt Exchange Offer**" shall have the meaning provided in Section 2.17(a).

"**Permitted Encumbrances**" shall mean:

(a)     Liens for taxes, assessments or governmental charges or claims (including Liens imposed by the PBGC or similar Liens) not yet delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP or that are not required to be paid pursuant to Section 9.4;

(b)     Liens in respect of property or assets of the Borrower or any Restricted Subsidiary imposed by Applicable Law, such as carriers', landlords', construction contractors', warehousemen's and mechanics' Liens and other similar Liens, arising in the ordinary course of business, in respect of amounts not more than 60 days overdue and not being contested so long as such Liens arise in the ordinary course of business and do not individually or in the aggregate have a Material Adverse Effect;

(c)     Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 11.9;

(d)     Liens incurred or deposits made in connection with workers' compensation, unemployment insurance, employee benefit and pension liability and other types of social security or similar legislation, or to secure the performance of tenders, statutory obligations, trade contracts (other than for payment of Indebtedness), leases, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, surety, performance and return-of-money bonds and other similar obligations, in each case incurred in the ordinary course of business or otherwise constituting Investments permitted by Section 10.5;

(e)     ground leases or subleases, licenses or sublicenses in respect of Real Estate on which facilities owned or leased by the Borrower or any of the Restricted Subsidiaries are located;

(f)     easements, rights-of-way, licenses, reservations, servitudes, permits, conditions, covenants, rights of others, restrictions (including zoning restrictions), royalty interests and leases, minor defects, exceptions or irregularities in title or survey, encroachments, protrusions and other similar charges or encumbrances (including those to secure health, safety and environmental obligations), which do not interfere in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(g)     with respect to any Mortgaged Property, any exception on the title policy issued and matters shown on the Survey delivered which do not in the aggregate materially adversely affect the value of said property or materially impair its use

60

in the operation of the business of the Borrower or any of the Restricted Subsidiaries;

(h)     any interest or title of a lessor, sublessor, licensor, sublicensor or grantor of an easement or secured by a lessor's, sublessor's, licensor's, sublicensor's interest or grantor of an easement under any lease, sublease, license, sublicense or easement to be entered into by the Borrower or any Restricted Subsidiary as lessee, sublessee, licensee, grantee or sublicensee to the extent permitted or not prohibited by this Agreement;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole or constituting Disposition permitted under Section 10.4;

(k)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Borrower or any Restricted Subsidiary;

(l)     any zoning, land use, environmental or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any Real Estate that does not materially interfere with the ordinary conduct of the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(m)     any Lien arising by reason of deposits with or giving of any form of security to any Governmental Authority for any purpose at any time as required by Applicable Law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Borrower or any Restricted Subsidiary to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(n)     rights reserved to or vested in any Governmental Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of Applicable Law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(o)     Liens arising under any obligations or duties affecting any of the property, the Borrower or any Restricted Subsidiary to any Governmental Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

61

(p)     rights reserved to or vested in any Governmental Authority to use, control or regulate any property of such Person, which do not materially impair the use of such property for the purposes for which it is held;

(q)     any obligations or duties, affecting the property of the Borrower or any Restricted Subsidiary, to any Governmental Authority with respect to any franchise, grant, license or permit;

(r)     a set-off or netting rights granted by the Borrower or any Restricted Subsidiary pursuant to any Hedging Agreements solely in respect of amounts owing under such agreements;

(s)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 10.5; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreement;

(t)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(u)     Liens on cash and Cash Equivalents that are earmarked to be used to satisfy or discharge Indebtedness; *provided* that (i) such cash and/or Cash Equivalents are deposited into an account from which payment is to be made, directly or indirectly, to the Person or Persons holding the Indebtedness that is to be satisfied or discharged, (ii) such Liens extend solely to the account in which such cash and/or Cash Equivalents are deposited and are solely in favor of the Person or Persons holding the Indebtedness (or any agent or trustee for such Person or Persons) that is to be satisfied or discharged, and (iii) the satisfaction or discharge of such Indebtedness is expressly permitted hereunder;

(v)     with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by Applicable Laws;

(w)     Liens on Stock of an Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary;

(x)     Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) or attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, and (iii) in favor of banking or other financial institutions or other electronic payment service providers arising as a matter of law or customary contract encumbering deposits, including deposits in "pooled deposit" or "sweep" accounts (including the right of set-off) and which are within the general parameters customary in the banking or finance industry;

62

(y)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business permitted or not prohibited by this Agreement;

(z)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 10.5;

(aa)    any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Borrower or any Restricted Subsidiary;

(bb)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(cc)    Liens (i) on any cash earnest money deposits or cash advances made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted under this Agreement, (ii) on other cash advances in favor of the seller of any property to be acquired in an Investment or other acquisition permitted hereunder to be applied against the purchase price for such Investment or other acquisition, (iii) consisting of an agreement to Dispose of any property pursuant to a Disposition permitted hereunder (or reasonably expected to be so permitted by the Borrower at the time such Lien was granted) and (iv) on cash advances in favor of the purchaser of any property to be ~~D~~disposed of in a Disposition permitted hereunder to secure indemnity, fees and other seller obligations;

(dd)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(ee)    Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods in the ordinary course of business or consistent with past practice;

(ff)    any restrictions on any Stock or Stock Equivalents or other joint venture interests of the Borrower or any Restricted Subsidiary providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such Stock or Stock

63

Equivalents or interest of such Person, if a security interest or other Lien is created on such Stock or Stock Equivalents or interest as a result thereof and other similar Liens; and

(gg)    Liens securing Indebtedness or other obligations (i) of the Borrower or any Restricted Subsidiary in favor of a Credit Party and (ii) of any other Restricted Subsidiary that is not a Credit Party in favor of any other Restricted Subsidiary that is not a Credit Party.

"**Permitted Holders**" means, collectively, (i) the Management Stockholders (including any Management Stockholders holding Stock and Stock Equivalents through an equityholding vehicle), (ii) any Person who is acting solely as an underwriter in connection with a public or private offering of Stock and Stock Equivalents of any Parent Entity or Avaya Holdings, acting in such capacity, (iii) any Person, together with its Affiliates, holding more than 10% of the total Voting Stock of Avaya Holdings on the Closing Date and any of their respective Affiliates and any accounts, funds or partnerships managed, advised, sub-advised, sub-managed by or associated with any of the foregoing or any of their respective Affiliates, (iv) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing, any Permitted Plan or any Person or group that becomes a Permitted Holder specified in the last sentence of this definition are members and any member of such group; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, Persons referred to in subclauses (i) through (iii), collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of Holdings or any Parent Entity held by such group and (v) any Permitted Plan.  Any Person or group whose acquisition of beneficial ownership constitutes a Permitted Change of Control will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"**Permitted Open Market Purchases**" shall have the meaning provided in Section 13.6(g).

"**Permitted Other Debt**" shall mean, collectively, Permitted Other Loans and Permitted Other Notes.

"**Permitted Other Loans**" shall mean senior secured or unsecured loans (which loans, if secured, may either be secured *pari passu* with the Obligations (without regard to control of remedies) or may be secured by a Lien ranking junior to the Lien securing the Obligations), "mezzanine" loans or subordinated loans, in either case issued by the Borrower or a Guarantor (unless permitted to be incurred by a non-Credit Party under Section 10.1(k)), (a) if such Permitted Other Loans are incurred (and for the avoidance of doubt, not "assumed"), the scheduled final maturity and Weighted Average Life to Maturity of which are no earlier than the Latest Maturity Date and Weighted Average Life to Maturity, respectively, of the Initial Term Loans or, in the case of any Permitted Other Loans that are issued or incurred in exchange for, or which modify, replace, refinance, refund, renew, restructure or extend any other Indebtedness permitted by Section 10.1, no earlier than the scheduled final maturity and Weighted Average Life to Maturity of such exchanged, modified, replaced, refinanced, refunded, renewed, restructured or extended Indebtedness; *provided* that the requirements of the foregoing clause (a) shall not apply to any customary bridge facility so long as the Indebtedness into which such

64

customary bridge facility is to be converted complies with such requirements, (b) the covenants (excluding, for the avoidance of doubt, any pricing, fee, prepayment premiums, optional prepayment or redemption terms) and events of default of which, taken as a whole, are not materially more restrictive to the Borrower and the Restricted Subsidiaries than the terms of the Initial Term Loans unless (1) Lenders under the Initial Term Loans also receive the benefit of such more restrictive terms, (2) such terms reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) (it being understood that to the extent that any financial maintenance covenant is included for the benefit of any Permitted Other Loans, such financial maintenance covenant shall be added for the benefit of any Term Loans outstanding hereunder at the time of incurrence of such Permitted Other Loans (except for any financial maintenance covenants applicable only to periods after the Latest Maturity Date, as determined at the time of issuance or incurrence of such Permitted Other Loans)) or (3) any such provisions apply after the Latest Maturity Date as determined at the time of issuance or incurrence of such Permitted Other Loans, (c) unless permitted to be incurred by a non-Credit Party under Section 10.1(k), of which no Subsidiary of the Borrower (other than a Guarantor) is an obligor and (d) if secured, unless permitted to be incurred by a non-Credit Party under Section 10.1(k), are not secured by any assets other than all or any portion of the Collateral.

"**Permitted Other Notes**" shall mean senior secured or unsecured notes (which notes, if secured, may either be secured *pari passu* with the Obligations (without regard to control of remedies) or may be secured by a Lien ranking junior to the Lien securing the Obligations), mezzanine notes or subordinated notes, in either case issued by the Borrower or a Guarantor (unless permitted to be incurred by a non-Credit Party under Section 10.1(k)), (a) if such Permitted Other Notes are incurred (and for the avoidance of doubt, not "assumed"), the terms of which do not provide for any scheduled repayment, mandatory redemption or sinking fund obligations (other than customary scheduled principal amortization payments, customary offers to repurchase upon a change of control, asset sale or casualty or condemnation event, customary acceleration rights after an event of default, and AHYDO Catch-Up Payments) prior to, at the time of incurrence, the Latest Maturity Date of the Initial Term Loans or, in the case of any Permitted Other Notes that are issued or incurred in exchange for, or which modify, replace, refinance, refund, renew or extend any other Indebtedness permitted by Section 10.1, prior to the scheduled final maturity date of such exchanged, modified, replaced, refinanced, refunded, renewed or extended Indebtedness (other than customary scheduled principal amortization payments, customary offers to repurchase upon a change of control, asset sale or casualty or condemnation event, customary acceleration rights after an event of default, and AHYDO Catch-Up Payments); *provided* that the requirements of the foregoing clause (a) shall not apply to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with such requirements, (b) the covenants (excluding, for the avoidance of doubt, any pricing, fee, prepayment premiums, optional prepayment or redemption terms) and events of default of which, taken as a whole, are not materially more restrictive to the Borrower and the Restricted Subsidiaries than the terms of the Initial Term Loans unless (1) Lenders under the Initial Term Loans also receive the benefit of such more restrictive terms, (2) such terms reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) (it being understood that to the extent that any financial maintenance covenant is included for the benefit of any Permitted Other Notes, such financial maintenance covenant shall be added for the benefit of any Term Loans

65

outstanding hereunder at the time of incurrence of such Permitted Other Notes (except for any financial maintenance covenants applicable only to periods after the Latest Maturity Date, as determined at the time of issuance or incurrence of such Permitted Other Notes)) or (3) any such provisions apply after the Latest Maturity Date at the time of issuance or incurrence of such Permitted Other Notes, (c) unless permitted to be incurred by a non-Credit Party under Section 10.1(k), of which no Subsidiary of the Borrower (other than a Guarantor) is an obligor and (d) if secured, unless permitted to be incurred by a non-Credit Party under Section 10.1(k), are not secured by any assets other than all or any portion of the Collateral.

"**Permitted Plan**" means any employee benefits plan of Holdings or any of its Affiliates and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan.

"**Permitted Receivables Financing**" shall mean any of one or more receivables financing programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities and other customary forms of support, in each case made in connection with such facilities) to the Borrower and the Restricted Subsidiaries (other than a Receivables Entity) providing for the sale, conveyance, or contribution to capital of Receivables Facility Assets by Participating Receivables Grantors in transactions purporting to be sales of Receivables Facility Assets to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Entity that in turn funds such purchase by the direct or indirect sale, transfer, conveyance, pledge, or grant of participation or other interest in such Receivables Facility Assets to a Person that is not a Restricted Subsidiary.

"**Permitted Reorganization**" shall mean re-organizations and other activities related to tax planning and re-organization, excluding transactions described in Section 10.4(g), so long as, after giving effect thereto, the security interest of the Secured Parties in the Collateral or the value of the Guarantees, taken as a whole, is not materially impaired (as determined by the Borrower in good faith).

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"**Petition Date**" shall have the meaning provided in the Recitals to this Agreement.

"**Plan**" shall have the meaning provided in the Recitals to this Agreement.

"**Platform**" shall have the meaning provided in Section 13.17(c).

"**Post-Transaction Period**" shall mean, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the eighth full consecutive fiscal quarter immediately following the date on which such Specified Transaction is consummated.

"**Premium Trigger Events**" shall have the meaning provided in Section 4.1(a).

66

"**Prepayment Event**" shall mean any Asset Sale Prepayment Event, Recovery Prepayment Event, Debt Incurrence Prepayment Event or New Debt Incurrence Prepayment Event.

"**Prepayment Premium**" shall have the meaning provided in Section 4.1(a).

"**Previous Holdings**" shall have the definition provided in the definition of "Holdings".

"**Pro Forma Adjustment**" shall mean, for any Test Period that includes all or any part of a fiscal quarter included in any Post-Transaction Period, with respect to the Acquired EBITDA of the applicable Pro Forma Entity or the Consolidated EBITDA of the Borrower, the pro forma increase or decrease in such Acquired EBITDA or such Consolidated EBITDA (including as the result of any "run-rate" synergies, operating expense reductions and improvements and cost savings), as the case may be, projected by the Borrower in good faith as a result of (a) actions taken or with respect to which substantial steps have been taken or are expected to be taken, prior to or during such Post-Transaction Period for the purposes of realizing cost savings or (b) any additional costs incurred prior to or during such Post-Transaction Period, in each case in connection with the combination of the operations of such Pro Forma Entity with the operations of the Borrower and the Restricted Subsidiaries; *provided* that (A) at the election of the Borrower, such Pro Forma Adjustment shall not be required to be determined for any Pro Forma Entity to the extent the aggregate consideration paid in connection with such acquisition was less than $50,000,000 or the aggregate Pro Forma Adjustment would be less than $50,000,000 and (B) so long as such actions are taken, or to be taken, prior to or during such Post-Transaction Period or such costs are incurred prior to or during such Post-Transaction Period, as applicable, it may be assumed, for purposes of projecting such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, that the applicable amount of such "run rate" synergies, operating expense reductions and improvements and cost savings and other adjustments will be realizable during the entirety of such Test Period, or the applicable amount of such additional "run rate" synergies, operating expense reductions and improvements and cost savings and other adjustments, as applicable, will be incurred during the entirety of such Test Period; *provided*, *further*, that any such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, shall be without duplication for "run rate" synergies, operating expense reductions and improvements and cost savings and other adjustments or additional costs already included in such Acquired EBITDA or such Consolidated EBITDA, as the case may be, for such Test Period.

"**Pro Forma Basis**" and "**Pro Forma Effect**" shall mean, with respect to compliance with any test or covenant hereunder, that (A) to the extent applicable, the Pro Forma Adjustment shall have been made and (B) all Specified Transactions and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable period of measurement in such test or covenant:  (a) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, (i) in the case of a Disposition of all or substantially all Stock in any Subsidiary of the Borrower or any division, product line, or facility used for operations of the Borrower or any Subsidiary of the Borrower, shall be excluded, and (ii) in the case of a Permitted Acquisition or Investment

67

described in the definition of "Specified Transaction", shall be included, (b) any retirement or repayment of Indebtedness, and (c) any incurrence or assumption of Indebtedness by the Borrower or any Restricted Subsidiary in connection therewith (it being agreed that (x) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness as at the relevant date of determination, (y) interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by an Authorized Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP and (z) interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate as the Borrower or any applicable Restricted Subsidiary may designate); *provided* that, without limiting the application of the Pro Forma Adjustment pursuant to (A) above (but without duplication thereof), the foregoing pro forma adjustments may be applied to any such test or covenant solely to the extent that such adjustments are consistent with the definition of Consolidated EBITDA and give effect to events (including operating expense reductions) that are (i) (x) directly attributable to such transaction and (y) reasonably identifiable and factually supportable in the good faith judgment of the Borrower or (ii) otherwise consistent with the definition of Pro Forma Adjustment.

"**Pro Forma Entity**" shall have the meaning provided in the definition of the term "Acquired EBITDA".

"**Prohibited Transaction**" shall have the meaning assigned to such term in Section 406 of ERISA or Section 4975(c) of the Code.

"**Projections**" shall have the meaning provided in Section 9.1(g).

"**Public Lender**" shall have the meaning provided in Section 13.17(e).

"**Public Reporting Entity**" shall mean an entity that (i) complies with the reporting obligations under U.S. securities laws, (ii) is designated by the Borrower as a "Public Reporting Entity" and (iii) whose consolidated financial results include the financial results of the Borrower and its consolidated subsidiaries and customary reconciliations to eliminate the financial results of entities other than the Borrower and its consolidated subsidiaries.

"**Qualified Marketmaker**" shall mean a Person that (i) holds itself out to the market as standing ready in the ordinary course of its business to purchase debt of the Borrower from customers and sell debt of the Borrower to customers or enter into long and short positions in debt of the Borrower, in its capacity as a dealer or market maker in such debt, and (ii) is in fact regularly in the business of making a market in debt of or equity in issuers or borrowers.

"**Qualified Securitization Financing**" shall mean any Securitization Facility (and any guarantee of such Securitization Facility), that meets the following conditions:  (i) the Borrower shall have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate

68

economically fair and reasonable to the Borrower and the Restricted Subsidiaries; (ii) all sales or contribution of Securitization Assets and related assets by the Borrower or any Restricted Subsidiary to the Securitization Subsidiary or any other Person are made at fair market value (as determined in good faith by the Borrower); (iii) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Borrower) and may include Standard Securitization Undertakings; and (iv) the obligations under such Securitization Facility are nonrecourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Borrower or any Restricted Subsidiary (other than a Securitization Subsidiary).

"**Ratio Test Cap**" shall mean (i) $100,000,000, *minus* (ii) the aggregate amount of all Indebtedness incurred in reliance on clauses (3)(x)(B)(II), (3)(y)(B)(II), and (3)(z)(B)(II) of the definition of "Maximum Incremental Facilities Amount", *minus* (iii) the aggregate amount of all Indebtedness incurred in reliance on Section 10.1(k)(i)(B)(2)(II), *minus* (iv) without duplication, the aggregate amount of all Refinancing Indebtedness incurred in respect of Indebtedness described in the foregoing clauses (ii) and (iii) (excluding any Refinancing Increased Amount with respect thereto).

"**Real Estate**" shall mean any interest in land, buildings and improvements owned, leased or otherwise held by any Credit Party, but excluding all operating fixtures and equipment.

"**Receivables Entity**" shall mean any Person formed solely for the purpose of (i) facilitating or entering into one or more Permitted Receivables Financings, and (ii) in each case, engaging in activities reasonably related or incidental thereto.

"**Receivables Facility Assets**" shall mean currently existing and hereafter arising or originated Accounts, Payment Intangibles and Chattel Paper (as each such term is defined in the UCC) owed or payable to any Participating Receivables Grantor, and to the extent related to or supporting any Accounts, Chattel Paper or Payment Intangibles, or constituting a receivable, all General Intangibles (as each such term is defined in the UCC) and other forms of obligations and receivables owed or payable to any Participating Receivables Grantor, including the right to payment of any interest, finance charges, late payment fees or other charges with respect thereto (the foregoing, collectively, being "**receivables**"), all of such Participating Receivables Grantor's rights as an unpaid vendor (including rights in any goods the sale of which gave rise to any receivables), all security interests or liens and property subject to such security interests or liens from time to time purporting to secure payment of any receivables or other items described in this definition, all guarantees, letters of credit, security agreements, insurance and other agreements or arrangements from time to time supporting or securing payment of any receivables or other items described in this definition, all customer deposits with respect thereto, all rights under any contracts giving rise to or evidencing any receivables or other items described in this definition, and all documents, books, records and information (including computer programs, tapes, disks, data processing software and related property and rights) relating to any receivables or other items described in this definition or to any obligor with respect thereto and any other assets customarily transferred together with receivables in connection with a non-recourse accounts receivable factoring arrangement and which are sold, conveyed assigned or otherwise

69

transferred or pledge in connection with a Permitted Receivables Financing, and all proceeds of the foregoing.

"**Receivables Indebtedness**" shall mean, at any time, with respect to any receivables, securitization or similar facility (including any Permitted Receivables Financing or any Qualified Securitization Financing but excluding any account receivable factoring facility entered into incurred in the ordinary course of business), the aggregate principal, or stated amount, of the "indebtedness", fractional undivided interests (which stated amount may be described as a "net investment" or similar term reflecting the amount invested in such undivided interest) or other securities incurred or issued pursuant to such receivables, securitization or similar facility, at such time, in each case outstanding at such time.

"**Recovery Event**" shall mean (a) any damage to, destruction of or other casualty or loss involving any property or asset or (b) any seizure, condemnation, confiscation or taking (or transfer under threat of condemnation) under the power of eminent domain of, or any requisition of title or use of or relating to, or any similar event in respect of, any property or asset.

"**Recovery Prepayment Event**" shall mean the receipt of Net Cash Proceeds with respect to any settlement or payment in connection with any Recovery Event in respect of any property or asset of the Borrower or any Restricted Subsidiary; *provided* that the term "Recovery Prepayment Event" shall not include any Asset Sale Prepayment Event.

"**Redemption Notice**" shall have the meaning provided in Section 10.7(a).

"**Refinanced Debt**" shall have the meaning provided in Section 2.15(b).

"**Refinancing Amendment**" shall have the meaning provided in Section 2.15(b)(vii).

"**Refinancing Commitments**" shall have the meaning provided in Section 2.15(b).

"**Refinancing Event**" shall have the meaning provided in Section 2.18(b)(ii).

"**Refinancing Facility**" shall mean any new Class of Term Loans or Commitments or increases to existing Classes of Term Loans or Commitments established pursuant to Section 2.15(b).

"**Refinancing Facility Closing Date**" shall have the meaning provided in Section 2.15(b)(iv).

"**Refinancing Increased Amount**" shall have the meaning provided in the definition of Refinancing Indebtedness.

"**Refinancing Indebtedness**" shall mean, with respect to any Person, any modification, refinancing, refunding, renewal, replacement, exchange or extension of any Indebtedness of such Person (including in respect of any previously incurred Refinancing

70

Indebtedness); *provided* that (a) unless incurred by utilizing another basket under Section 10.1, the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, replaced, exchanged or extended except by an amount (the "**Refinancing Increased Amount**") equal to unpaid accrued interest and premium thereon (including tender premiums) plus other reasonable amounts paid, and fees and expenses (including upfront fees and original issue discount) reasonably incurred, in connection with such modification, refinancing, refunding, renewal, replacement, exchange or extension plus an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Refinancing Indebtedness in respect of Indebtedness permitted pursuant to Section 10.1(h) or (i) or with respect to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with the requirements in this clause (b), such modification, refinancing, refunding, renewal, replacement, exchange or extension has a scheduled final maturity date equal to or later than the scheduled final maturity date of, and, with respect to term loans or notes, has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended (except by virtue of amortization or prepayment of such Indebtedness prior to the time of incurrence of such Refinancing Indebtedness), (c) with respect to a Refinancing Indebtedness in respect of Junior Indebtedness, (i) at the time thereof, no Event of Default shall have occurred and be continuing, (ii) if such Junior Indebtedness is subordinated to the Obligations in right of payment, the Refinancing Indebtedness is subordinated to the Obligations and the applicable Guarantee at least to the same extent as (and on terms that are at least as favorable to the Secured Parties as those contained in) such Junior Indebtedness so refinanced, (iii) if such Junior Indebtedness is unsecured, the Refinancing Indebtedness is unsecured, (iv) if such Indebtedness is subordinated to the Obligations with respect to lien priority, the Refinancing Indebtedness is subordinated to the Obligations with respect to lien priority and (v) unless incurred by utilizing another basket under Section 10.1, such modification, refinancing, refunding, renewal, replacement, exchange or extension is incurred by the Persons who are the obligors of the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended, (d) if the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended was subject to any intercreditor agreement (including any Applicable Intercreditor Agreement), to the extent the Refinancing Indebtedness is secured by any Collateral, the holders thereof (or their representative on their behalf) shall become party to each Applicable Intercreditor Agreement, (e) in the case of any Refinancing Indebtedness in respect of the ABL Credit Agreement, Liens on any Collateral securing such Refinancing Indebtedness (i) that are Term Priority Collateral shall rank junior in priority to the Liens on the Term Priority Collateral securing the Obligations and (ii) are subject to the ABL Intercreditor Agreement (or another intercreditor agreement containing terms that are at least as favorable to the Secured Parties as those contained in the ABL Intercreditor Agreement) and (f) in the case of a Refinancing Indebtedness of any Indebtedness permitted pursuant to Section 10.1(c), (k), (v) or (w), such Indebtedness meets the requirements of the definition of Permitted Other Loans or Permitted Other Notes, as applicable.

"**Refinancing Term Lender**" shall have the meaning provided in Section 2.15(b)(iii).

71

"**Refinancing Term Loan**" shall have the meaning provided in Section 2.15(b)(ii).

"**Refinancing Term Loan Repayment Amount**" shall have the meaning provided in Section 2.5(b).

"**Refinancing Term Loan Request**" shall have the meaning provided in Section 2.15(b)(i).

"**Register**" shall have the meaning provided in Section 13.6(b)(iii).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Reinvestment Period**" shall mean 15 months following the date of receipt of Net Cash Proceeds of an Asset Sale Prepayment Event or Recovery Prepayment Event.

"**Rejection Notice**" shall have the meaning provided in Section 5.2(f).

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates (or, for purposes of clauses (A) and (B) of the last proviso of Section 13.5 and the penultimate paragraph of Section 13.5, such Person's controlled Affiliates) and the partners, managers, members, directors, officers, employees, agents (including sub-agents and co-agents), representatives, trustees, attorneys, attorneys-in-fact, and advisors of such Person and of such Person's Affiliates, and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"**Repayment Amount**" shall mean an Initial Term Loan Repayment Amount, an Extended Term Loan Repayment Amount with respect to any Extension Series, an Incremental Term Loan Repayment Amount and a Refinancing Term Loan Repayment Amount scheduled to be repaid on any date.

"**Reportable Event**" shall mean an event described in Section 4043 of ERISA and the regulations thereunder, other than any event as to which the thirty day notice period has been waived.

"**Required Lenders**" shall mean, at any date, Non-Defaulting Lenders having or holding a majority of the sum of (a) the outstanding principal amount of the Term Loans in the aggregate at such date and (b) the outstanding amount of the unfunded Commitments in the aggregate at such date; *provided* that any Commitments or Term Loans held or deemed held by any Lender Claimant in their capacity as Lender Claimant shall be excluded for purposes of

72

making a determination of Required Lenders; *provided* further that, at any time there are two or more Non-Defaulting Lenders who are not Affiliates of one another, Required Lenders shall require at least two Non-Defaulting Lenders who are not Affiliates of one another.

"**Resolution Authority**" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority

"**Restoration Certification**" shall mean, with respect to any Recovery Prepayment Event, a certification made by an Authorized Officer of the Borrower or any Restricted Subsidiary, as applicable, to the Administrative Agent prior to the end of the Reinvestment Period certifying that (a) the Borrower or such Restricted Subsidiary intends to use the proceeds received in connection with such Recovery Prepayment Event (x) to repair, restore, refurbish or replace the property or assets in respect of which such Recovery Prepayment Event occurred or (y) or to invest in assets used or useful in a Similar Business, (b) the approximate costs of completion of such repair, restoration, refurbishment or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) fifteen months after the date on which cash proceeds with respect to such Recovery Prepayment Event were received and (y) 180 days after delivery of such Restoration Certification.

"**Restricted Foreign Subsidiary**" shall mean a Foreign Subsidiary that is a Restricted Subsidiary.

"**Restricted Payment**" shall mean, with respect to the Borrower or any Restricted Subsidiary, any dividend or return any capital to its stockholders or any other distribution, payment or delivery of property or cash to its stockholders on account of such Stock and Stock Equivalents, or redemption, retirement, purchase or other acquisition, directly or indirectly, for consideration, any shares of any class of its Stock or Stock Equivalents or set aside any funds for any of the foregoing purposes, other than dividends payable solely in its Stock or Stock Equivalents (other than Disqualified Stock).

"**Restricted Subsidiary**" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**Restructuring Support Agreement**" shall mean RSA as defined in the Plan.

"**Retained Declined Proceeds**" shall have the meaning provided in Section 5.2(f).

"**Returns**" shall mean, with respect to any Investment, any dividend, distribution, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment.

"**Rights Offering**" shall mean "Rights Offering" as defined in the Plan.

"**RO Backstop Agreement**" shall mean "RO Backstop Agreement" as defined in the Plan.

73

"**RO Backstop Commitment**" shall mean "RO Backstop Commitment" as defined in the Plan.

"**RO Procedures**" shall mean "RO Procedures" as defined in the Plan.

"**S&P**" shall mean Standard & Poor's Financial Services LLC or any successor by merger or consolidation to its business.

"**Sanctions**" shall have the meaning provided in Section 8.19.

"**Sanctions Laws**" shall have the meaning provided in Section 8.19.

"**SEC**" shall mean the Securities and Exchange Commission or any successor thereto.

"**Section 9.1 Financials**" shall mean the financial statements delivered, or required to be delivered, pursuant to Section 9.1(a) or (b), together with the accompanying officer's certificate delivered, or required to be delivered, pursuant to Section 9.1(c).

"**Section 2.15(a) Additional Amendment**" shall have the meaning provided in Section 2.15(a)(iii).

"**Secured Cash Management Agreement**" shall mean any Cash Management Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Cash Management Bank.

"**Secured Hedging Agreement**" shall mean any Hedging Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank.

"**Secured Parties**" shall mean the Administrative Agent, the Collateral Agent, each Lender, each Hedge Bank, each Cash Management Bank and each sub-agent pursuant to Section 12 appointed by the Administrative Agent with respect to matters relating to the Credit Facilities or appointed by the Collateral Agent with respect to matters relating to any Security Document.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securitization Asset**" shall mean (a) any accounts receivable, royalty or other revenue streams and other rights to payment or related assets and the proceeds thereof, in each case, subject to a Securitization Facility and (b) all collateral securing such receivable or asset, all contracts and contract rights, guaranties or other obligations in respect of such receivable or asset, lockbox accounts and records with respect to such account or asset and any other assets customarily transferred (or in respect of which security interests are customarily granted), together with accounts or assets in a securitization financing and which in the case of clause (a) and (b) above are sold, conveyed, assigned or otherwise transferred or pledged in connection with a Qualified Securitization Financing.

74

"**Securitization Facility**" shall mean any transaction or series of securitization financings that may be entered into by the Borrower or any Restricted Subsidiary pursuant to which the Borrower or any such Restricted Subsidiary may sell, convey or otherwise transfer, or may grant a security interest in, Securitization Assets to either (a) a Person that is not the Borrower or a Restricted Subsidiary or (b) a Securitization Subsidiary that in turn sells such Securitization Assets to a Person that is not the Borrower or a Restricted Subsidiary, or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries.

"**Securitization Repurchase Obligation**" shall mean any obligation of a seller (or any guaranty of such obligation) of (i) Receivables Facility Assets under a Permitted Receivables Financing to repurchase Receivables Facility Assets or (ii) Securitization Assets in a Qualified Securitization Financing to repurchase Securitization Assets, in either case, arising as a result of a breach of a representation, warranty or covenant or otherwise, including, without limitation, as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Securitization Subsidiary**" shall mean any Subsidiary of the Borrower in each case formed for the purpose of, and that solely engages in, one or more Qualified Securitization Financings and other activities reasonably related thereto or another Person formed for the purposes of engaging in a Qualified Securitization Financing in which the Borrower or any Restricted Subsidiary makes an Investment and to which the Borrower or such Restricted Subsidiary transfers Securitization Assets and related assets.

"**Security Agreement**" shall mean the Term Loan Security Agreement, dated as of the Closing Date, in substantially the form attached hereto as Exhibit D (as the same may be amended, restated, amended and restated, supplemented or otherwise modified or replaced from time to time), entered into by the Borrower, the other grantors party thereto and the Collateral Agent for the benefit of the Secured Parties.

"**Security Documents**" shall mean, collectively, (a) the Security Agreement, (b) the Mortgages, (c) all Applicable Intercreditor Agreements and (d) each intellectual property security agreement and each other security agreement or other instrument or document executed and delivered pursuant to Section 9.11 or 9.12 or pursuant to any other such Security Documents.

"**Series**" shall have the meaning provided in Section 2.14(a).

"**Similar Business**" shall mean any business conducted or proposed to be conducted by the Borrower and the Restricted Subsidiaries, taken as a whole, on the Closing Date or any other business activities which are reasonable extensions thereof or otherwise similar, incidental, corollary, complementary, synergistic, reasonably related, or ancillary to any of the foregoing (including non-core incidental businesses acquired in connection with any Permitted Acquisition or permitted Investment), in each case as determined by the Borrower in good faith.

"**SOFR**" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Borrowing**" shall mean, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"**SOFR Loan**" shall mean a Term Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c)(x) of the definition of "ABR".

"**Sold Entity or Business**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Solvent**" shall mean, with respect to any Person, that as of the Closing Date, (i) the present fair saleable value of the property (on a going concern basis) of such Person is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business, (ii) such Person is not engaged in, and are not about to engage in, business contemplated as of the date hereof for which they have unreasonably small capital and (iii) such Person is able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business, and (iv) the fair value of the assets (on a going concern basis) of such Person exceeds, their debts and liabilities, subordinated, contingent or otherwise.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Specified Default**" shall mean any Event of Default under Sections 11.1 or 11.5; provided that for purposes of the definition of Permitted Acquisitions, Section 2.14(a), Section 12.9, Section 13.6(b)(i) and Section 13.6(b)(ii), any such Event of Default under Section 11.5 shall be limited to an Event of Default solely with respect to the Borrower.

"**Specified Representations**" shall mean the representations and warranties made by the Borrower and the Guarantors, set forth in (i) Section 8.1(a) (solely with respect to valid existence), (ii) Section 8.2, (iii) Section 8.3(c) (solely with respect to the Organizational Documents of any Credit Party), (iv) Section 8.5, (v) Section 8.7, (vi) Section 8.16 (which shall be satisfied by the delivery of a solvency certificate substantially in a form reasonably satisfactory to the Administrative Agent and the Required Lenders), (vii) Section 8.17, and (viii) the last sentence of Section 8.19.

"**Specified Transaction**" shall mean, with respect to any period, any Investment, any Permitted Change of Control, any Disposition of assets, incurrence or repayment of Indebtedness, Restricted Payment, Subsidiary designation, the incurrence of any Incremental Facilities or other event that by the terms of this Agreement requires any test or covenant to be calculated on a "Pro Forma Basis".

"**SPV**" shall have the meaning provided in Section 13.6(f).

"**Standard Securitization Undertakings**" shall mean representations, warranties, covenants and indemnities entered into by the Borrower or any Restricted Subsidiary which the Borrower has determined in good faith to be customary in a Securitization Facility, including, without limitation, those relating to the servicing of the assets of a Securitization Subsidiary, it being understood that any Securitization Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"**Stated Maturity**" shall mean, with respect to any installment of principal on any series of Indebtedness, the date on which such payment of principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for payment thereof.

"**Stock**" shall mean shares of capital stock or shares in the capital, as the case may be (whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting, *provided* that any instrument evidencing Indebtedness convertible or exchangeable for Stock shall not be deemed to be Stock unless and until such instrument is so converted or exchanged; *provided*, *further* that, solely with respect to any CFC or CFC Holding Company, Stock shall also include any instrument or security treated as stock for U.S. federal income tax purposes.

"**Stock Equivalents**" shall mean all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable, *provided* that any instrument evidencing Indebtedness convertible or exchangeable for Stock Equivalents shall not be deemed to be Stock Equivalents unless and until such instrument is so converted or exchanged; *provided*, *further* that, solely with respect to any CFC or CFC Holding Company, Stock Equivalent shall also include any instrument or security treated as stock equivalent for U.S. federal income tax purposes.

"**Subscription Contract**" means each customer subscription contract entered into by the Borrower and ~~its~~ Subsidiaries and reported within the Borrower's subscription product and support profit centers.

"**Subscription Contract ARR**" means, with respect to each Subscription Contract, an amount equal to (i) the Monthly Booking Value thereof *times* (ii) twelve months.

"**Subsequent Transaction**" shall have the meaning provided in Section 1.11.

"**Subsidiary**" of any Person shall mean and include (a) any corporation more than 50% of whose Stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or

indirectly through Subsidiaries and (b) any limited liability company, unlimited company, partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% voting equity interest at the time or is a controlling general partner.  Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"**Subsidiary Guarantor**" shall mean each Guarantor that is a Subsidiary of the Borrower.

"**Successor Borrower**" shall have the meaning provided in Section 10.3(a).

"**Super-Majority Lenders**" shall mean, at any date, Non-Defaulting Lenders having or holding more than 75% of the sum of (a) the outstanding principal amount of the Term Loans in the aggregate at such date and (b) the outstanding amount of the unfunded Commitments in the aggregate at such date; *provided* that any Commitments or Term Loans held or deemed held by any Lender Claimant in their capacity as Lender Claimant shall be excluded for purposes of making a determination of Super-Majority Lenders; *provided* further that, at any time there are two or more Non-Defaulting Lenders who are not Affiliates of one another, Super-Majority Lenders shall require at least two Non-Defaulting Lenders who are not Affiliates of one another.

"**Survey**" shall mean a survey of any Mortgaged Property (and all improvements thereon), including a survey based on aerial photography that is (a) (i) prepared by a licensed surveyor or engineer, (ii) certified by the surveyor (in a manner reasonable in light of the size, type and location of the Real Estate covered thereby) to the Administrative Agent and the Collateral Agent and (iii) sufficient, either alone or in connection with a survey (or "no change") affidavit in form and substance customary in the applicable jurisdiction, for the applicable title company to remove (to the extent permitted by Applicable Law) or amend all standard survey exceptions from the title insurance policy (or commitment) relating to such Mortgaged Property and issue such endorsements or other survey coverage, to the extent available in the applicable jurisdiction, as the Collateral Agent or the Required Lenders may reasonably request or (b) otherwise reasonably acceptable to the Collateral Agent and the Required Lenders, taking into account the size, type and location of the Real Estate covered thereby.

"**Swap Obligation**" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by

78

any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"**Tax Distribution**" shall have the meaning provided in Section 10.6(d)(i).

"**Term Loan ~~Increase~~Extension Request**" shall have the meaning provided in Section 2.1~~4~~5(a)(i).

"**Term Loan ~~Extension Request~~Increase**" shall have the meaning provided in Section 2.1~~5~~4(a)~~(i)~~.

"**Term Loans**" shall mean the Initial Term Loans, any Incremental Term Loan, any Refinancing Term Loans or any Extended Term Loans, as applicable.

"**Term Priority Collateral**" shall have the meaning under and as defined in the ABL Intercreditor Agreement.

"**Term SOFR**" shall mean

(a)     for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; *provided*, *however*, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**ABR Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; *provided*, *however*, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate

has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"**Term SOFR Adjustment**" shall mean a percentage equal to 0% per annum.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" shall mean the forward-looking term rate based on SOFR.

"**Test Period**" shall mean, for any determination under this Agreement, the four consecutive fiscal quarters of the Borrower then last ended and for which Section 9.1 Financials have been or were required to have been delivered (or, for purposes of any calculation of a financial ratio under this Agreement, for which the financial statements described in Section 9.1(a) or (b) are otherwise available).

"**Transaction Expenses**" shall mean any fees, costs, liabilities or expenses incurred or paid by Avaya Holdings, the Borrower or any of its respective Subsidiaries in connection with the Transactions, this Agreement and the other Credit Documents and the transactions contemplated hereby and thereby including in respect of the commitments, negotiation, documentation and closing (and post-closing actions in connection with the Collateral) of the Credit Facilities.

"**Transactions**" shall mean, collectively, the (i) consummation of the Plan, (ii) the consummation of the transactions contemplated in the Restructuring Support Agreement, (iii) the execution of, and funding (or deemed funding) under, the Credit Documents and the ABL Credit Documents, (iv) the other transactions contemplated by the Plan, and (v) the payment of fees, costs, liabilities and expenses in connection with each of the foregoing and the consummation of any other transaction connected with the foregoing.

"**Transferee**" shall have the meaning provided in Section 13.6(e).

"**Type**" shall mean, as to any Term Loan, its nature as an ABR Loan or a SOFR Loan.

"**UCC**" shall mean the Uniform Commercial Code of the State of New York, or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United

80

Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unclaimed Loans**" shall have the meaning provided in Section 2.18(b)(iii).

"**Unclaimed Loans Termination Date**" shall have the meaning provided in Section 2.18(b)(iii).

"**Unfunded Current Liability**" of any Pension Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("**SFAS 87**")) under the Pension Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the fair market value of the assets allocable thereto.

"**Unknown First Lien Lender Claimant**" shall mean a beneficial holder of an allowed First Lien Claim the identity of which beneficial holder is unknown to the Borrower and/or the Administrative Agent as a result of such beneficial holder's failure to timely deliver (i) the Lender Claimant Onboard Documents and (ii) a properly completed Account Registration Instruction Sheet to and accepted by KCC LLC in accordance with the applicable Notice of Registration Procedures for Class 4 Plan Distributions dated March 29, 2023.

"**Unrestricted Cash**" shall mean, without duplication, all cash and Cash Equivalents included in the cash and Cash Equivalents accounts listed on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries as at such date, excluding any cash and Cash Equivalents with respect to which a Lien (other than any Lien permitted under clause (x) or (bb) of the definition of Permitted Encumbrance) senior to the Lien securing the Obligations is granted for the benefit of other Indebtedness or obligations (but may include cash and Cash Equivalents securing the ABL Obligations along with the Obligations pursuant to the Applicable Intercreditor Agreements).

"**Unrestricted Escrow Subsidiary**" shall have the meaning provided in Section 1.10.

"**Unrestricted Subsidiary**" shall mean (a) any Subsidiary of the Borrower that is formed or acquired after the Closing Date; *provided* that at such time (or promptly thereafter) the Borrower designates such Subsidiary an Unrestricted Subsidiary in a written notice to the Administrative Agent, (b) any Restricted Subsidiary designated as an Unrestricted Subsidiary by the Borrower after the Closing Date in a written notice to the Administrative Agent; *provided* that in each case of clauses (a) and (b), (x) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the net book value of the investment therein and such designation shall be permitted only to the extent permitted under Section 10.5 on the date of such designation and (y) subject to Section

1.10, no Event of Default exists or would result from such designation after giving Pro Forma Effect thereto and (c) each Subsidiary of an Unrestricted Subsidiary.  No Subsidiary may be designated as an Unrestricted Subsidiary if, at such time of designation it holds intellectual property that is material to the operation of the business of the Borrower and its Restricted Subsidiaries, taken as a whole.  No Subsidiary may be designated as an Unrestricted Subsidiary if, after such designation, it would constitute a "Restricted Subsidiary" under the definitive documentation in respect of any Indebtedness in a principal amount of not less than $100,000,000 (to the extent such concept exists under the definitive documentation in respect of such Indebtedness).  The Borrower may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary, and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if, subject to Section 1.10, no Event of Default exists or would result from such re-designation.

"**U.S. Government Securities Business Day**" shall mean any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S. Lender**" shall have the meaning provided in Section 5.4(h).

"**Voting Stock**" shall mean, with respect to any Person, such Person's Stock or Stock Equivalents having the right to vote for the election of directors or other governing body of such Person under ordinary circumstances; *provided* that for the purpose of the definition of "Excluded Stock and Stock Equivalents" and in each reference to the Voting Stock of any CFC or CFC Holding Company, Voting Stock shall also include any instrument treated as voting stock or stock equivalent for U.S. federal income tax purposes.

"**Weighted Average Life to Maturity**" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then-outstanding principal amount of such Indebtedness; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness (the "**Applicable Indebtedness**"), the effects of any prepayments or amortization made on such Applicable Indebtedness prior to the date of the applicable determination date shall be disregarded.

"**Wholly Owned**" shall mean, with respect to the ownership by a Person of a Subsidiary, that all of the Stock of such Subsidiary (other than directors' qualifying shares or nominee or other similar shares required pursuant to Applicable Law) are owned by such Person or another Wholly Owned Subsidiary of such Person.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"**Write-Down and Conversion Powers**" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"**Yield**" shall mean, with respect to any Initial Term Commitments, Initial Term Loans or any other commitments or loans, on any date of determination, the yield to maturity, in each case, based on the interest rate and any original issue discount or upfront fees (amortized over four years), but excluding any amendment, structuring, underwriting, ticking, arrangement, commitment and other similar fees not payable to all Lenders generally providing such Commitments and/or Term Loans; *provided* that if such other commitment and loans (including Incremental Term Commitments and Incremental Term Loans) include an interest rate floor greater than the applicable interest rate floor under the Initial Term Loans, such differential between interest rate floors shall be equated to the applicable interest rate margin, but only to the extent an increase in the interest rate floor in the Initial Term Loans would cause an increase in the interest rate then in effect thereunder.

1.2    Other Interpretive Provisions

With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)     The words "asset" and "property" shall be construed to have the same meaning and effect and refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(g)     All references to "knowledge" or "awareness" of any Credit Party or a Restricted Subsidiary thereof means the actual knowledge of an Authorized Officer of a Credit Party or such Restricted Subsidiary.

(h)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(i)     Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(j)     Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(k)     For purposes of determining compliance with any one of Sections 9.9, 10.1, 10.2, 10.3, 10.4, 10.5, 10.6, 10.7 and 1.1, (i) in the event that any Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness meets the criteria of more than one of the categories of transactions permitted pursuant to any clause of such Section, such transaction (or portion thereof) at any time and from time to time shall be permitted under one or more of such clauses as determined by the Borrower (and the Borrower shall be entitled to redesignate use of any such clauses from time to time) in its sole discretion at such time; *provided* that (x) all Indebtedness outstanding under the Credit Documents will be deemed at all times to have been incurred in reliance only on the exception in clause (a) of Section 10.1 and (y) all Indebtedness outstanding under the ABL Credit Documents (and any Refinancing Indebtedness thereof) will be deemed at all times to have been incurred in reliance only on the exception in clause (b) of Section 10.1 and (ii) with respect to any Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness or other applicable transaction in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness or other applicable transaction is made (so long as such Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, Restricted Payment, Affiliate transaction, contractual obligation or prepayment of Junior Indebtedness or other applicable transaction at the time incurred or made was permitted hereunder).

(l)     All references to "in the ordinary course of business" of the Borrower or any Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an

84

objective that is in the ordinary course of business of the Borrower or such Subsidiary, as applicable, (ii) customary and usual in the industry or industries of the Borrower and its Subsidiaries in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable, or (iii) generally consistent with the past or current practice of the Borrower or such Subsidiary, as applicable, or any similarly situated businesses in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable.

1.3     Accounting Terms

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP.  Notwithstanding anything set forth herein, the financial data, financial ratios and other financial calculations shall not give effect to the impact of Accounting Standards Update 2016-12, Revenue from Contracts with Customers (Topic 606) or similar revenue recognition policies [except as otherwise expressly provided].

(b)     Notwithstanding anything to the contrary herein, (i) for purposes of determining compliance with any test or covenant contained in this Agreement with respect to any period during which any Specified Transaction occurs (or, for purposes of determining compliance with any test or covenant governing the permissibility of any transaction hereunder, during such period and thereafter and on or prior to such date of determination), the Consolidated Total Net Leverage Ratio, the Consolidated First Lien Net Leverage Ratio, and the Consolidated Secured Net Leverage Ratio shall each be calculated with respect to such period and such Specified Transaction on a Pro Forma Basis and (ii) for purposes of determining compliance with any ratio governing the permissibility of any transaction to be consummated on a Pro Forma Basis hereunder, (A) the cash proceeds of any incurrence of debt then being incurred in connection with such transaction shall not be netted from Consolidated Total Debt and (B) Consolidated Total Debt shall be calculated after giving effect to any prepayment of Indebtedness, in each case for purposes of calculating the Consolidated First Lien Net Leverage Ratio, Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable.  If since the beginning of any applicable Test Period, any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of the Restricted Subsidiaries, in each case, since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this definition, then such financial ratio or test (or Consolidated EBITDA or Consolidated Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this definition.

1.4     Rounding

Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed

herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5     References to Agreements, Laws, Etc.

Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted or not prohibited by any Credit Document and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

1.6     Times of Day

Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

1.7     Timing of Payment or Performance

When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

1.8     Currency Equivalents Generally

In determining whether any Indebtedness, Investment, Lien, Disposition, Restricted Payment or any other amount under a "fixed amount" basket denominated in Dollars may be incurred in a currency other than Dollars, such amount shall be determined based on the currency exchange rate determined at the time of such incurrence (or, in the case of any revolving Indebtedness or any amount committed to be made, at the time it is first committed); provided that no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness, Investment, Lien, Disposition, Restricted Payment or such other amount is incurred or made; provided, further that for purpose of determining Consolidated Net Income, Consolidated EBITDA, Consolidated Total Debt or any other amount or ratio determined based on Consolidated Net Income, Consolidated EBITDA or Consolidated Total Debt, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the most recently delivered Section 9.1 Financials.

1.9     Classification of Loans and Borrowings

For purposes of this Agreement, Term Loans may be classified and referred to by Class (e.g., an "Initial Term Loan") or by Type (e.g., a "SOFR Loan") or by Class and Type (e.g., a "SOFR Initial Term Loan").  Borrowings also may be classified and referred to by Class (e.g.,

an "Initial Term Loan Borrowing") or by Type (e.g., a "SOFR Borrowing") or by Class and Type (e.g., a "SOFR Initial Term Loan Borrowing").

1.10    Unrestricted Escrow Subsidiary

Any Indebtedness permitted to be incurred hereunder (including any Incremental Facilities and Refinancing Facilities) may be incurred, at the option of the Borrower, by a newly created and newly designated Unrestricted Subsidiary (an "**Unrestricted Escrow Subsidiary**") with no assets other than the cash proceeds of such incurred Indebtedness *plus*, subject to compliance with Section 10.5, any cash and Cash Equivalents contributed to such Unrestricted Escrow Subsidiary as deposit of interest expenses and fees, additional cash collateral or for other purposes, which Unrestricted Escrow Subsidiary will then merge with and into the Borrower or any of the Restricted Subsidiaries with the Borrower or such Restricted Subsidiary surviving the merger and assuming all obligations of the Unrestricted Escrow Subsidiary.  So long as such Indebtedness would have been permitted to be incurred directly by the Borrower or any Restricted Subsidiary upon the incurrence of such Indebtedness by the Unrestricted Escrow Subsidiary, or, with respect to any Indebtedness incurred in connection with a Limited Condition Transaction, at the option of the Borrower, at the time the LCT Election is made, the creation, designation and re-designation of the Unrestricted Escrow Subsidiary and the merger of the Unrestricted Escrow Subsidiary into the Borrower or any Restricted Subsidiary shall not be subject to any additional condition, including any condition that no Default or Event of Default shall have occurred and be continuing at such time.

1.11    Limited Condition Transactions

In connection with any action being taken in connection with a Limited Condition Transaction, for purposes of (i) determining compliance with any provision of this Agreement which requires the calculation of any financial ratio or test or (ii) testing availability under baskets set forth in this Agreement (including baskets measured as a percentage of Consolidated EBITDA or Consolidated Total Assets), in each case, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Transaction, an "**LCT Election**"; *provided* that such election may be revoked by the Borrower at any time prior to the consummation or abandonment of the Limited Condition Transaction in question), the date of determination of whether any such action is permitted hereunder shall be deemed to be the date the definitive agreement for such Limited Condition Transaction is entered into (the "**LCT Test Date**"), and if, after giving Pro Forma Effect to the Limited Condition Transaction, the Borrower or any of its Restricted Subsidiaries would have been permitted to take such action on the relevant LCT Test Date in compliance with such ratio, test or basket, such ratio, test or basket shall be deemed to have been complied with.  For the avoidance of doubt, if the Borrower has made an LCT Election and, following the LCT Test Date, any of the ratios, tests or baskets for which compliance was determined or tested as of the LCT Test Date would have failed to have been satisfied as a result of fluctuations in any such ratio, test or basket, including due to fluctuations in Consolidated EBITDA, Consolidated Interest Expense or Consolidated Total Assets following the LCT Test Date but at or prior to the consummation of the relevant Limited Condition Transaction, such baskets, tests or ratios will not be deemed to have failed to have been satisfied as a result of such fluctuations.  If the Borrower has made an LCT Election for any Limited Condition Transaction, then in connection with any event or

87

transaction occurring after the relevant LCT Test Date and prior to the earliest of the date on which (i) such Limited Condition Transaction is consummated, (ii) the LCT Election is revoked by the Borrower and (iii) the date that the definitive agreement or date for redemption, repurchase, defeasance, satisfaction and discharge or repayment specified in an irrevocable notice for such Limited Condition Transaction is terminated, expires or passes, as applicable, without consummation of such Limited Condition Transaction (a "**Subsequent Transaction**") in connection with which a ratio, test or basket availability calculation must be made on a Pro Forma Basis or giving Pro Forma Effect to such Subsequent Transaction, for purposes of determining whether such ratio, test or basket availability has been complied with under this Agreement, any such ratio, test or basket shall be required to be satisfied on a Pro Forma Basis assuming such Limited Condition Transaction and other transactions in connection therewith have been consummated.

### 1.12   Rates

The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to ABR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement) or any relevant adjustments thereto, including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, ABR, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Administrative Agent and its Related Parties may engage in transactions that affect the calculation of ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

### SECTION 2   Amount and Terms of Credit

### 2.1   Initial Term Loan Borrowing

Subject to the terms and conditions set forth herein and in accordance with the procedures outlined in the Plan and Section 2.15 of the Existing DIP Agreement, each Lender shall make or be deemed to have made an Initial Term Loan to the Borrower on the Closing Date

in an aggregate amount as set forth opposite such Lender's name on the "Aggregate Amount" column on Schedule 1.1(a) consisting of the following:

(a) an aggregate principal amount of "new money" Initial Term Loans set forth on the "Debt Rights Offering Amount" column on Schedule 1.1(a) opposite the name of each Lender that shall fund, on the Closing Date, such Initial Term Loan pursuant to the Rights Offering;

(b) an aggregate principal amount of "new money" Initial Term Loans set forth on the "RO Backstop Commitment Amount" column on Schedule 1.1(a) opposite the name of each Lender that shall fund, on the Closing Date, such Initial Term Loan pursuant to the RO Backstop Commitment;

(c) an aggregate principal amount of Initial Term Loans set forth on the "DIP Conversion Amount" column on Schedule 1.1(a) opposite the name of each Lender that is a DIP Lender as of the Closing Date and thus shall be deemed to have made an Initial Term Loan by converting its DIP Term Loans to Initial Term Loans in the principal amount of its converted DIP Term Loans;

(d) an aggregate principal amount of Initial Term Loans set forth on the "First Lien Claims Distribution Amount" column on Schedule 1.1(a) opposite the name of each Lender that is a holder of the First Lien Claims (other than B-3 Escrow Claims) and thus shall be deemed to have made an Initial Term Loan in partial satisfaction of each First Lien Claim (other than a B-3 Escrow Claim) as part of the treatment of First Lien Claims under the Plan ~~(provided that, with respect to the Lender Claimants, Initial Term Loans in an aggregate principal amount set forth on Schedule 1.1(a) opposite the Lender Claimants shall be deemed issued and outstanding for the benefit of Lender Claimants on the Closing Date and held in the Lender Claimant Reserve Account to be administered in accordance with Section 2.18); and~~ ; and

(e) an aggregate principal amount of Initial Term Loans set forth on the "Holdco Convertible Distribution Amount" column on Schedule 1.1(a) opposite the name of each Lender that is a holder of Holdco Convertible Notes Claims and thus shall be deemed to have made an Initial Term Loan as part of the treatment of the Holdco Convertible Notes Claims under the Plan.

*provided* that, with respect to the Lender Claimants, Initial Term Loans in an aggregate principal amount set forth on Schedule 1.1(a) opposite the Lender Claimants shall be deemed issued and outstanding for the benefit of Lender Claimants on the Closing Date and held in the Lender Claimant Reserve Account to be administered in accordance with Section 2.18.

The Initial Term Loans shall be treated as a single Class of Term Loans for all purposes of this Agreement and any other Credit Documents. The Initial Term Loan prepaid or repaid may not be re-borrowed. For the avoidance of doubt, notwithstanding that, other than pursuant to clauses (a) and (b) above, no cash is exchanged, the Borrower shall owe the principal amount of the Initial Term Loans to the Lenders under, and in accordance with the terms of, this Agreement.

2.2     Minimum Amount of Each Borrowing; Maximum Number of Borrowings

The aggregate principal amount of each Borrowing of Term Loans shall be in a minimum amount of at least the Minimum Borrowing Amount for such Type of Term Loans and in a multiple of $1,000,000 in excess thereof.  After giving effect to all Borrowings, all conversions of Term Loans from one Type to the other Type, and all continuations of Term Loans as the same Type, there shall not be more than five (5) Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent.

2.3     Notice of Borrowing; Determination of Class of Term Loans

(a)     Each Borrowing~~, each conversion of Term Loans from ABR Loans to SOFR Loans or from SOFR Loans to ABR Loans, and each continuation of SOFR Loans,~~ shall be made upon the Borrower's irrevocable ~~n~~Notice of Borrowing to the Administrative Agent. Each such ~~n~~Notice of Borrowing must be received by the Administrative Agent (i) not later than 1~~2~~:00 p.m. at least one (1) U.S. Government Securities Business Day prior to the requested date of any Borrowing of ABR Loans and (ii) not later than 2:00 p.m. three U.S. Government Securities Business Days prior to the requested date of any Borrowing ~~or continuation of SOFR Loans or any conversion of ABR Loans to~~of SOFR Loans; *provided* that the Borrower may deliver new ~~n~~Notices ~~if such~~of Borrowing if the conditions ~~fails to~~to such Borrowing fail to be satisfied on the proposed Borrowing date.  Each notice by the Borrower pursuant to this Section 2.3(a) must be made in the form of a written Notice of Borrowing, appropriately completed and signed by an Authorized Officer of the Borrower.  Each ~~Borrowing of, conversion to or continuation of SOFR Loans shall be in a principal amount of $1,000,000 or a whole multiple of the amount of $500,000 in excess thereof.  Except as otherwise provided hereunder, each Borrowing of or conversion to ABR Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each~~ Notice of Borrowing shall specify (~~i~~1) ~~whether~~that the Borrower is requesting a Borrowing, ~~a conversion of Term Loans from one Type to the other, or a continuation of SOFR Loans,~~ (~~ii~~2) the requested date of the Borrowing~~, conversion or continuation, as the case may be~~ (which shall be a Business Day), (~~iii~~3) the principal amount of Term Loans to be borrowed, ~~converted or continued,~~ (~~iv~~4) the Type of Term Loans to be borrowed ~~or which existing Term Loans are to be converted~~ and (~~v~~5) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Term Loan in a Notice of Borrowing, then the applicable Term Loans shall be made as ABR Loans.  If the Borrower ~~fails to deliver a Notice of Borrowing to continue any SOFR Loans, then the SOFR Loans shall be deemed to have chosen to convert such Term Loan to an ABR Loan.  If the Borrower~~ requests a Borrowing of~~, conversion to, or continuation of~~ SOFR Loans in any such Notice of Borrowing, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(b)     Following receipt of a Notice of Borrowing, the Administrative Agent shall promptly notify each Lender of the amount of its *pro rata* share of the Term Loans~~, and if no timely notice of a conversion or continuation~~ is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to ABR Loans.  In the case of each Borrowing, each Lender shall make the amount of its Term Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office in Dollars not later than 1:00 p.m. on the Business Day specified in the applicable Notice of

Borrowing.   Upon satisfaction of the applicable conditions set forth in Section 6, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)      The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for SOFR Loans upon determination of such interest rate.   The determination of the Adjusted Term SOFR by the Administrative Agent shall be conclusive in the absence of manifest error.   At any time that ABR Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the ~~Administrative Agent's~~ prime rate used in determining the ABR promptly following the public announcement of such change.

2.4      Disbursement of Funds

(a)      No later than 12:00 p.m. on the date specified in each Notice of Borrowing, each Lender will make available its *pro rata* portion, if any, of each Borrowing requested to be made on such date in the manner provided below; *provided* that on the Closing Date, such funds may be made available at such earlier time as may be agreed among the Borrower, the Administrative Agent and the Lenders for the purpose of consummating the Transactions.

(b)      Each Lender shall make available all amounts required under any Borrowing for its applicable Commitments in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will make available to the Borrower, by depositing to an account designated by the Borrower to the Administrative Agent the aggregate of the amounts so made available in Dollars.   Unless the Administrative Agent shall have been notified in writing by any Lender prior to the date of any such Borrowing that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount.   If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender.   If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly notify the Borrower in writing and the Borrower shall immediately pay such corresponding amount to the Administrative Agent in Dollars.   The Administrative Agent shall also be entitled to recover from such Lender or the Borrower interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate *per annum* equal to (i) if paid by such Lender, the Overnight

Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with Section 2.8, for the Term Loans of the applicable Class.

(c)     Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5     Repayment of Term Loans; Evidence of Debt

(a)     The Borrower shall repay to the Administrative Agent, for the benefit of the Lenders holding Initial Term Loans, on the Initial Term Loan Maturity Date, the then outstanding Initial Term Loans.  The Borrower shall repay to the Administrative Agent, for the benefit of the applicable Lenders, on the other applicable Maturity Dates, the then outstanding other Term Loans.

(b)     The Borrower shall repay to the Administrative Agent, in Dollars, for the benefit of the Lenders of the Initial Term Loans, on the last Business Day of each March, June, September and December commencing on December 29, 2023 (each such Business Day, an "**Initial Term Loan Repayment Date**"), an aggregate principal amount equal to 0.25% of the aggregate principal amount of all Initial Term Loans outstanding on the Closing Date (each such repayment amount, an "**Initial Term Loan Repayment Amount**"), which payments shall be reduced as a result of voluntary prepayments or repurchase of the Initial Term Loans in accordance with this Agreement, including Sections 5.1 and 13.6(g) and further reduced by any prepayments pursuant to Section 5.2 and any other reductions in principal of the Initial Term Loans, including pursuant to Section 2.15, 2.16 or 13.7.

(c)     In the event that any Incremental Term Loans are made, such Incremental Term Loans shall be repaid by the Borrower in the amounts (each, an "**Incremental Term Loan Repayment Amount**") and on the dates as agreed between the Borrower and the relevant Lenders of such Incremental Term Loans, subject to the requirements set forth in Section 2.14. In the event that any Extended Term Loans are made, such Extended Term Loans shall, subject to Section 2.15(a), be repaid by the Borrower in the amounts (each, an "**Extended Term Loan Repayment Amount**") and on the dates set forth in the applicable Extension Amendment.  In the event that any Refinancing Term Loans are established, such Refinancing Term Loans shall, subject to Section 2.15(b), be repaid by the Borrower in the amounts (each, a "**Refinancing Term Loan Repayment Amount**") and on the dates set forth in the applicable Refinancing Amendment.

(d)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Term Loan made by such lending office of such Lender from time to time, including the amounts of principal and interest payable and paid to such lending office of such Lender from time to time under this Agreement.

(e)        The Administrative Agent shall maintain the Register pursuant to Section 13.6(b), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Term Loan made hereunder and, if applicable, the relevant tranche thereof and the Type of each Term Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof, and (iv) any cancellation or retirement of Term Loans as contemplated by Section 13.6(g).

(f)        The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (d) and (e) of this Section 2.5 shall, to the extent permitted by Applicable Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; *provided*, *however*, that the failure of any Lender or the Administrative Agent to maintain such accounts, such Register or such subaccounts, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Term Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.  For the avoidance of doubt, in the event of any inconsistency between the Register and subaccounts maintained by the Administrative Agent and any Lender's records under clause (d) of this Section, the recordations in the Register and such subaccounts shall govern.

(g)        The Borrower hereby agrees that, upon request of any Lender at any time and from time to time after the Borrower has made an initial Borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's expense a promissory note substantially in the form of Exhibit B, evidencing the Term Loans owing to such Lender.

(h)        The Initial Term Loans shall mature and become due and payable on the Initial Term Loan Maturity Date.

2.6        Conversions and Continuations

(a)        Subject to the penultimate sentence of this clause (a), (x) the Borrower shall have the option on any Business Day to convert all or a portion equal to at least the Minimum Borrowing Amount (or a whole multiple of, in the case of SOFR Loans, $500,000 in excess thereof, or in the case of ABR Loans, $100,000 in excess thereof) of the outstanding principal amount of any Term Loans of one Type into a Borrowing or Borrowings of another Type and (y) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any SOFR Loans as SOFR Loans, for an additional Interest Period; *provided* that (i) no partial conversion of SOFR Loans shall reduce the outstanding principal amount of SOFR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount, (ii) ABR Loans may not be converted into SOFR Loans if an Event of Default is in existence on the date of the conversion and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such conversion, (iii) SOFR Loans may not be continued as SOFR Loans for an additional Interest Period if an Event of Default is in existence on the date of the proposed continuation and the Required Lenders have determined in their sole discretion not to permit such continuation, and (iv) Borrowings resulting from conversions pursuant to this Section 2.6 shall be limited in number as provided in Section 2.2.  Each such conversion or continuation shall be effected by the Borrower by giving the

93

Administrative Agent at the Administrative Agent's Office prior to 1:00 p.m. at least (i) one (1) Business Day's in the case of a conversion into ABR Loans or (ii) three (3) U.S. Government Securities Business Days', in the case of a continuation of, or conversion to, SOFR Loans, prior written notice, in each case substantially in the form of Exhibit A (each, a "**Notice of Conversion or Continuation**") specifying (1) whether the Borrower is requesting a conversion of Term Loans from one Type to the other or a continuation of SOFR Loans, (2) the requested date of such conversion or continuation, as applicable (which shall be a Business Day), (3) the principal amount of the Term Loans to be so converted or continued, (4) the Type of Term Loans to be converted into or continued and, (5) if such Term Loans are to be converted into, or continued as, SOFR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration). The Administrative Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Term Loans.

(b) If any Event of Default is in existence at the time of any proposed continuation of any SOFR Loans and the Required Lenders have determined in their sole discretion not to permit such continuation, such SOFR Loans shall be automatically converted on the last day of the current Interest Period into ABR Loans. If upon the expiration of any Interest Period in respect of SOFR Loans, the Borrower has failed to elect a new Interest Period to be applicable theretodeliver a timely Notice of Conversion or Continuation to continue any SOFR Loans as provided in clause (a) above, the Borrower shall be deemed to have elected to convert such Borrowing of SOFR Loans into a Borrowing of ABR Loans, effective as of the expiration date of such current Interest Period. If no timely Notice of Conversion or Continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to ABR Loans.

(c) Notwithstanding anything to the contrary herein, the Borrower may deliver a Notice of Conversion or Continuation pursuant to which the Borrower elects to irrevocably continue the outstanding principal amount of any Term Loans subject to an interest rate Hedging Agreement as SOFR Loans for each Interest Period until the expiration of the term of such applicable Hedging Agreement.

2.7 Benchmark Replacement Setting for Term Loans

With respect to the Term Loans:

(a) Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Credit Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required

Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.7(a)(i) will occur prior to the applicable Benchmark Transition Start Date.

(b)    Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(c)    Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.7(d) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.7, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.7.

(d)    Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the

Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

2.8     Interest

(a)     (i) The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable ABR Margin *plus* the ABR, in each case, in effect from time to time; and (ii) the unpaid principal amount of each SOFR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable SOFR Margin *plus* the relevant Adjusted Term SOFR, in each case in effect from time to time.  With respect to each interest payment date with respect to the Initial Term Loans from the Closing Date through and including [ ]⁶June 30, 2024, the Borrower shall, by delivering a Cash/PIK Election Notice to the Administrative Agent on or prior to five (5) Business Days prior to each interest payment date (the "**Cash Election Date**"), elect whether interest payments due on such upcoming interest payment date shall be paid in cash (the "**Cash Option**") or paid partially in cash and paid partially in kind and capitalized by adding ~~such~~the amount specified in the definition of Applicable ABR Margin or Applicable SOFR Margin, as applicable, to the outstanding principal amount of such Term Loans (the "**Cash/PIK Option**"); *provided* that if the Borrower fails to deliver a Cash/PIK Election Notice by the Cash Election Date, the Borrower shall be deemed to have elected the Cash/PIK Option for the applicable interest payment date.  Any capitalized amounts shall thereafter bear interest in accordance with this Section.  For the avoidance of doubt, interest on the Initial Term Loans for each interest payment date following [ ]⁷June 30, 2024 shall be payable in cash.

(b)     If all or a portion of (i) the principal amount of any Term Loan or (ii) any interest payable thereon or any other amount hereunder shall not be paid when due (whether at the Stated Maturity, by acceleration or otherwise), and a Specified Default shall have occurred and be continuing, then, upon the giving of written notice by the Administrative Agent to the Borrower (except in the case of an Event of Default under Section 11.5, for which no notice is required), such overdue amount (other than any such amount owed to a Defaulting Lender) shall bear interest at a rate ~~*per annum*~~ (the "**Default Rate**") that is (x) in the case of overdue principal and overdue interest on such principal, the rate that would otherwise be applicable ~~thereto~~to such principal as if the Borrower had elected the Cash Option *plus* 2% *per annum* or (y) in the case of any ~~overdue interest or~~ other amounts due hereunder, to the extent permitted by Applicable Law, the rate described in Section 2.8(a) for ABR Loans as if the Borrower had elected the Cash Option *plus* 2% *per annum* from the date of such written notice to the date on which such amount is paid in full (after as well as before judgment) (or if an Event of Default under Section

---

⁶ ~~End of the first four full fiscal quarters following the Closing Date.~~

⁷ ~~Same as above.~~

11.5 shall have occurred and be continuing, from the date of the occurrence of such Event of Default).

(c)     Interest on each Term Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; *provided* that any Term Loan that is repaid on the same date on which it is made shall bear interest for one day.  Except as provided below, interest shall be payable (i) in respect of each ABR Loan, quarterly in arrears on the last Business Day of each March, June, September and December, (ii) in respect of each SOFR Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each Business Day occurring at three-month intervals after the first day of such Interest Period, and (iii) in respect of each Term Loan, (A) on any prepayment; *provided* that interest on ABR Loans shall only become due pursuant to this clause (A) if the aggregate principal amount of the ABR Loans then-outstanding is repaid in full, (B) at maturity (whether by acceleration or otherwise) and (C) after such maturity, on demand.

(d)     All computations of interest hereunder shall be made in accordance with Section 5.5.

(e)     Notwithstanding anything to the contrary set forth in this Agreement, if at the end of any accrual period (as defined in Section 1272(a)(5) of the Code) ending after the fifth (5th) anniversary of the Closing Date, the aggregate amount of accrued but unpaid original issue discount and interest (as determined pursuant to the Code) which would be includible in gross income with respect to such Term Loan for periods before the close of any accrual period (as defined in Section 1272(a)(5) of the Code) ending after the fifth (5th) anniversary of the date on which such Term Loan was issued exceeds the sum of (i) the aggregate amount of interest to be paid under the Term Loan before the close of such accrual period and (ii) the product of (x) the issue price (as defined in Sections 1273(b) and 1274(a) of the Code and the regulations promulgated thereunder) and (y) the yield to maturity (interpreted in accordance with Section 163(i) of the Code (the "**Maximum Amount**")), then interest for such accrual period shall not be deferred and all accrued but unpaid interest and original issue discount (as determined pursuant to the Code) as of the end of such accrual period shall be paid in an amount (which amount, if any, shall, notwithstanding anything in this Agreement to the contrary, be calculated and determined by the Borrower) not less than the amount required to reduce the accrued but unpaid original issue discount at the end of such period to an amount less than the Maximum Amount (the "**AHYDO Interest Payment**").  No partial prepayment of the Term Loans pursuant to any other provision of this Agreement or the other Credit Documents shall alter the obligation of the Borrower to make payments provided for in this Section.  For the avoidance of doubt and notwithstanding anything to the contrary herein, this Section shall be construed so as to require payments to be made in cash and at such times and in such amounts (which amounts, if any, shall be calculated and determined by the Borrower) so as to cause the Term Loans to not be treated as having "significant original issue discount" within the meaning of Section 163(i)(2) pursuant to the Code.  If an AHYDO Interest Payment is required, the Borrower shall provide to the Administrative Agent prior written notice of the amount and date of payment of such AHYDO Interest Payment, not later than 12:00 p.m., five (5) Business Days in advance thereof.

97

2.9     Interest Periods

At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of SOFR Loans in accordance with Section 2.6(a), the Borrower shall give the Administrative Agent written notice ~~(or telephonic notice promptly confirmed in writing)~~ of the Interest Period applicable to such Borrowing, which Interest Period shall, at the option of the Borrower, be one, three or six months; *provided* that the Interest Period may be a period of less than one month that is agreed by the Borrower and the Administrative Agent, so long as for purposes of determining Term SOFR, Term SOFR in respect of such period shall be based on Term SOFR in respect of a one-month tenor.  Notwithstanding foregoing, the initial Interest Period of the Initial Term Loans shall be from the Closing Date to ~~[ ]~~[8]<u>June 30, 2023, and Term SOFR in respect of such Interest Period shall be based on Term SOFR in respect of a three-month tenor</u>.

Notwithstanding anything to the contrary contained above:

(a)     the initial Interest Period for any Borrowing of SOFR Loans shall commence on the date of such Borrowing (or the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)     if any Interest Period relating to a Borrowing of SOFR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)     if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided* that if any Interest Period in respect of a SOFR Loan would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; <u>and</u>

~~(d)~~     the Borrower shall not be entitled to elect any Interest Period in respect of <u>(i)</u> any SOFR Loan if such Interest Period would extend beyond the applicable Maturity Date of such Term Loan~~; and~~

~~(e)~~  <u>or (ii)</u> ~~the Borrower shall be not be entitled to elect any Interest Period in respect of~~ the Initial Term Loans such that there would be more than one Interest Period beginning on the fifth anniversary of the Closing Date and ending on the Initial Term Loan Maturity Date.

In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing

---

[8] ~~Day of the first fiscal quarter end.  It is proposed that the initial Interest Period is a partial quarter such that the end of the Cash/PIK Option falls on the same date as the end of the first four full fiscal quarters.~~

such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

2.10   Increased Costs, Illegality, Etc.

(a)   [Reserved.]

(b)   [Reserved.]

(c)   If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's or its Affiliates' capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent or any Affiliate thereof could have achieved but for such Change in Law (taking into consideration such Lender's or parent's policies with respect to capital adequacy or liquidity), then from time to time, promptly after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any Applicable Law as in effect on the Closing Date.  Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower (with a copy to the Administrative Agent), which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

(d)   Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.10 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

(e)   [Reserved.]

(f)   Subject to Section 2.7, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(i)   the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or

(ii)   the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR for any requested Interest Period with respect to a proposed SOFR

99

Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided written notice of such determination to the Administrative Agent, the Administrative Agent will promptly so notify the Borrower and each ~~Term~~ Lender.  Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (at the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.11.  Subject to Section 2.7, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to clause (c)(x) of the definition of "ABR" until the Administrative Agent revokes such determination.

2.11    Compensation

If (i) any payment of principal of any SOFR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such SOFR Loan as a result of a payment or conversion pursuant to Section 2.5, 2.6, 2.10, 5.1, 5.2 or 13.7, as a result of acceleration of the maturity of the Term Loans pursuant to Section 11 or for any other reason, (ii) any Borrowing of SOFR Loans is not made as a result of a withdrawn Notice of Borrowing, (iii) any ABR Loan is not converted into a SOFR Loan as a result of a withdrawn Notice of Conversion or Continuation, (iv) any SOFR Loan is not continued as a SOFR Loan as a result of a withdrawn Notice of Conversion or Continuation or (v) any prepayment of principal of any SOFR Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section 5.1 or 5.2, the Borrower shall, after receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount) (with a copy to the Administrative Agent), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such SOFR Loan.  Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.11 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

100

2.12    Change of Lending Office

Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 5.4 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Term Loans affected by such event; *provided* that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 5.4.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with such designation.

2.13    Notice of Certain Costs

Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, 2.11 or 5.4 is given by any Lender more than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.10, 2.11 or 5.4, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower.

2.14    Incremental Facilities

(a)    The Borrower may, at any time and from time to time, elect to request the establishment of (x) one or more additional tranches of term loans, which may be of the same Class as any then-existing Term Loans (a "**Term Loan Increase**") or a separate Class of Term Loans (the commitments for additional term loans of the same Class or a separate Class, collectively, the "**Incremental Term Commitments**") or (y) one or more tranches of revolving credit facilities (the "**Incremental Revolving Commitments**", together with the Incremental Term Commitments, the "**Incremental Commitments**"; and the loans thereunder, "**Incremental Loans**"), in an aggregate principal amount not in excess of the then-available Maximum Incremental Facilities Amount at the time of incurrence thereof and not less than $10,000,000 individually (or such lesser amount as (x) may be approved by the Administrative Agent in its reasonable discretion or (y) shall constitute the then-available Maximum Incremental Facilities Amount at such time).  The Borrower may approach any existing Lender or any Additional Lender to provide all or a portion of the Incremental Commitments; *provided* that any Lender offered or approached to provide all or a portion of the Incremental Commitments may elect or decline, in its sole discretion, to provide an Incremental Commitment, and the Borrower shall have no obligation to approach any existing Lender to provide any Incremental Commitment; *provided*, *further*, that the Administrative Agent shall have consented to such Additional Lender's providing of the Incremental Commitments to the extent such consent, if any, would be required under Section 13.6(b) in connection with an assignment of Term Loans or Commitments to such Additional Lender.  In each case, such Incremental Commitments shall become effective as of the date determined by the Borrower (the "**Increased Amount Date**"); *provided* that, (i) (x) other than as described in the immediately succeeding clause (y), no Event

101

of Default shall exist on such Increased Amount Date immediately before or immediately after giving effect to such Incremental Commitments and the borrowing of any Incremental Loans thereunder or (y) if such Incremental Commitment is being provided in connection with a Permitted Acquisition or similar Investment, or in connection with refinancing of any Indebtedness that requires an irrevocable prepayment or redemption notice, then no Specified Default shall exist on such Increased Amount Date, (ii) in connection with any incurrence of Incremental Loans or establishment of Incremental Commitments, there shall be no requirement for the Borrower to bring down the representations and warranties under the Credit Documents unless requested by the lenders providing such Incremental Loans or Incremental Commitments (subject to waiver by such lenders of any such requirement) and (iii) the establishment of Incremental Commitments or the incurrence of Incremental Loans shall be effected pursuant to one or more amendments (each, an "**Incremental Amendment**") to this Agreement executed and delivered by the Borrower and the Administrative Agent, and each of which shall be recorded in the Register and shall be subject to the requirements set forth in Section 5.4(e).  For all purposes of this Agreement, any Incremental Term Loans made on an Increased Amount Date shall be designated (x) a separate series of Term Loans or (y) in the case of a Term Loan Increase, a part of the series of existing Term Loans subject to such increase (such new or existing series of Term Loans, each, a "**Series**").

(b)  The terms and conditions of the Incremental Revolving Commitments shall be reasonably satisfactory to the Administrative Agent; *provided* that (i) such Incremental Revolving Commitments may have a maturity that is shorter than the Maturity Dates of the Term Loans but such maturity shall be longer than the ~~maturity date of the~~ Initial ABL Facility Maturity Date, (ii) the pricing, interest rate margins, discounts, premiums, interest rate floors and fees of such Incremental Revolving Commitments shall be determined by the Borrower and the lender(s) thereunder and shall not be subject to any "most-favored nation" provisions (including under Section 2.14(d)(iv) below), (iii) such Incremental Revolving Commitments may have sub-facilities for letters of credit and swingline loans, (iv) lenders providing such Incremental Revolving Commitments shall be included in the definition of "Required Lenders", (v) if such Incremental Revolving Commitments benefit from a financial covenant, the Term Loans shall not be required to enjoy the same benefit of such financial covenant and they shall cross accelerate (instead of cross default) to a breach of such financial covenant, (vi) customary amendments to the definition of "Maximum Incremental Facilities Amount" may be made to permit any repayment of loans under Incremental Revolving Commitments accompanied with permanent terminations of such Incremental Revolving Commitments to be added to clause (2) of such definition, (vii) no Subsidiary (other than a Guarantor) is an obligor of such Incremental Revolving Commitments and (viii) if secured, such Incremental Revolving Commitments are not secured by any assets other than all or any portion of the Collateral or any Liens other than Liens that are *pari passu* with or junior to the Liens securing the Obligations.

(c)  On any Increased Amount Date on which any Incremental Term Commitments of any Series are effective, subject to the satisfaction (or waiver) of the foregoing applicable terms and conditions, (i) each Lender with an Incremental Term Commitment of any Series shall make a term loan to the Borrower (an "**Incremental Term Loan**") in an amount equal to its Incremental Term Commitment of such Series, and (ii) each Lender of any Series shall become a Lender hereunder with respect to the Incremental Term Commitment of such Series and the Incremental Term Loans of such Series made pursuant thereto.  The Borrower

shall use the proceeds, if any, of the Incremental Term Loans for any purpose not prohibited by this Agreement and as agreed by the Borrower and the lender(s) providing such Incremental Term Loans.

(d)     The terms and provisions of any Incremental Term Commitments and the respective related Incremental Term Loans, in each case effected pursuant to a Term Loan Increase shall be substantially identical to the terms and provisions applicable to the Class of Term Loans subject to such increase; *provided* that underwriting, arrangement, structuring, ticking, commitment, original issue discount, upfront or similar fees, and other fees payable in connection therewith that are not generally shared with all relevant lenders providing such Incremental Term Commitments and the respective related Incremental Term Loans, that may be agreed to among the Borrower and the lender(s) providing and/or arranging such Incremental Term Commitments may be paid in connection with such Incremental Term Commitments.  The terms and provisions of any Incremental Term Commitments and the respective related Incremental Term Loans of any Series not effected pursuant to a Term Loan Increase shall be on terms and documentation set forth in the applicable Incremental Amendment as determined by the Borrower; *provided* that:

(i)     the applicable Incremental Term Loan Maturity Date of each Series shall be no earlier than the Latest Maturity Date with respect to the Initial Term Loans, *provided* that the requirements of the foregoing clause (i) shall not apply to any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with such requirements;

(ii)     the Weighted Average Life to Maturity of the applicable Incremental Term Loans of each Series shall be no shorter than the Weighted Average Life to Maturity of the Initial Term Loans;

(iii)     the Incremental Term Loans (x) may participate on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis in any voluntary prepayment of any Class of Term Loans hereunder and may participate on a *pro rata* basis or less than pro rata basis (but not on a greater than *pro rata* basis) in any mandatory prepayments of any Class of Term Loans hereunder; *provided* that if such Incremental Term Loans are unsecured or rank junior in right of payment or as to security with the Obligations, such Incremental Term Loans shall participate on a junior basis with respect to mandatory repayments of Term Loans hereunder (except in connection with any refinancing, extension, renewal, replacement, repurchase or retirement thereof permitted by this Agreement), (y) shall not be guaranteed <u>or incurred</u> by any Subsidiary other than a <s>Guarantor</s><u>Credit Party</u> hereunder and (z) shall be unsecured or rank *pari passu* or junior in right of security with any Obligations outstanding under this Agreement and, if secured, shall not be secured by <u>any</u> assets <s>of the Credit Parties</s> other than Collateral (and, unless secured on a *pari passu* basis with the Obligations, shall be subject to a subordination agreement (if payment subordinated) and/or the Applicable Intercreditor Agreement);

(iv)     the pricing, interest rate margins, discounts, premiums, interest rate floors, fees, and amortization schedule (subject to clauses (i) and (ii) above) applicable to

any Incremental Term Loans shall be determined by the Borrower and the lender(s) thereunder; *provided*, *however*, that, if the Yield, in respect of any Incremental Term Loans that (w) rank *pari passu* in right of payment and security with the Initial Term Loans, (x) are incurred on or prior to the date that is twelve (12) months after the Closing Date and (y) have a maturity date that is less than ~~two years~~ninety (90) days after the Initial Term Loan Maturity Date as of the date of funding thereof, exceeds the Yield in respect of any Initial Term Loans by more than 0.50%, then the Applicable ABR Margin or the Applicable SOFR Margin, as applicable, in respect of such Initial Term Loans shall be adjusted so that the Yield in respect of such Initial Term Loans is equal to the Yield in respect of such Incremental Term Loans *minus* 0.50%; *provided*, *further*, to the extent any change in the Yield of the Initial Term Loans is necessitated by this clause (iv) on the basis of an effective interest rate floor in respect of the Incremental Term Loans, the increased Yield in the Initial Term Loans shall (unless otherwise agreed in writing by the Borrower) have such increase in the Yield effected solely by increases in the interest rate floor(s) applicable to the Initial Term Loans; and

(v)     all other terms of any Incremental Term Loans (other than as described in clauses (i), (ii), (iii) and (iv) above) may differ from the terms of the Initial Term Loans if agreed by the Borrower and the lender(s) providing such Incremental Term Loans.

(e)     The Administrative Agent and the Lenders hereby consent to the consummation of the transactions contemplated by this Section 2.14 and hereby waive the requirements of any provision of this Agreement (including, without limitation, any *pro rata* payment or amendment section) or any other Credit Document that may otherwise prohibit or restrict any such extension or any other transaction contemplated by this Section 2.14.  Each Incremental Amendment may, without the consent of any other Lenders, (x) effect technical and corresponding amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.14 and (y) with respect to the Incremental Revolving Commitments, add provisions solely applicable to such Incremental Revolving Commitments (including provisions relating to extensions and refinancings of Incremental Revolving Commitments).  At the request of the Administrative Agent, the Borrower shall deliver a certificate of an Authorized Officer of the Borrower, certifying that the conditions and requirements with respect to such Incremental Commitments and/or Incremental Loans set forth in this Section 2.14 have been met and such Incremental Amendment is authorized under this Section 2.14 (upon which the ~~the~~ Administrative Agent may conclusively rely without further investigation or inquiry).

2.15   Extensions of Term Loans; Refinancing Facilities

(a)     Extensions

(i)     The Borrower may at any time and from time to time request that all or a portion of the Term Loans of any Class (an "**Existing Term Loan Class**") be converted to extend the scheduled maturity date(s) of any payment of principal with respect to all or a portion of any principal amount of such Term Loans (any such Term

Loans which have been so converted, "**Extended Term Loans**") and to provide for other terms consistent with this Section 2.15.  In order to establish any Extended Term Loans, the Borrower shall provide a written notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders of the applicable Existing Term Loan Class which such request shall be offered equally to all such Lenders) (a "**Term Loan Extension Request**") setting forth the proposed terms of the Extended Term Loans to be established, which shall either, at the option of the Borrower, (A) reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) or (B) if not consistent with the terms of the applicable Existing Term Loan Class, shall not be materially more restrictive to the Credit Parties (as determined in good faith by the Borrower), when taken as a whole, than the terms of the Term Loans of the Existing Term Loan Class unless (x) the Lenders of the Term Loans of such applicable Existing Term Loan Class receive the benefit of such more restrictive terms or (y) any such provisions apply after the Latest Maturity Date as determined at the time of incurrence or issuance; *provided*, *however*, that (1) the scheduled final maturity date shall be extended and all or any of the scheduled amortization payments of principal of the Extended Term Loans may be delayed to later dates than the scheduled amortization of principal of the Term Loans of such Existing Term Loan Class (with any such delay resulting in a corresponding adjustment to the scheduled amortization payments reflected in Section 2.5 or in the Extension Amendment, as the case may be, with respect to the Existing Term Loan Class from which such Extended Term Loans were converted, in each case as more particularly set forth in Section 2.15(a)(iii)), (2)(A) pricing, fees, optional prepayment or redemption terms shall be determined in good faith by the Borrower and the interest rates, interest margins, upfront fees, funding discounts, original issue discounts and premiums (including through fixed rate interest) with respect to the Extended Term Loans may be higher or lower than the interest margins and floors for the Term Loans of such Existing Term Loan Class and/or (B) additional fees, premiums or AHYDO Catch-Up Payments may be payable to the Lenders providing such Extended Term Loans in addition to or in lieu of any of the items contemplated by the preceding clause (A), in each case, to the extent provided in the applicable Extension Amendment, (3) the Extended Term Loans may participate on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis in any voluntary prepayment of any Class of Term Loans hereunder and may participate on a *pro rata* basis or less than *pro rata* basis (but not on a greater than *pro rata* basis) in any mandatory prepayments of any Class of Term Loans hereunder; *provided* that if such Extended Term Loans are unsecured or rank junior in right of payment or as to security with the Obligations, such Extended Term Loans shall participate on a junior basis with respect to mandatory repayments of Term Loans hereunder (except in connection with any refinancing, extension, renewal, replacement, repurchase or retirement thereof permitted by this Agreement) and (4) Extended Term Loans may have call protection and prepayment premiums and, subject to clause (3) above, other redemption terms as may be agreed by the Borrower and the Lenders thereof,; *provided* that the principal amount of the Extended Term Loans shall not exceed the principal amount of the Term Loans being extended except as otherwise permitted herein; *provided, further, that the Extended Term Loans shall not be guaranteed or incurred by any Subsidiary other than a Credit Party hereunder and, if secured, shall not be secured by any assets other than Collateral (and,*

unless secured on a *pari passu* basis with the Obligations, shall be subject to a subordination agreement (if payment subordinated) and/or the Applicable Intercreditor Agreement (if secured)). No Lender shall have any obligation to agree to have any of its Term Loans of any Existing Term Loan Class converted into Extended Term Loans pursuant to any Term Loan Extension Request.

(ii)      Any Lender (an "**Extending Lender**") wishing to have all or a portion of its Term Loans of the Existing Term Loan Class or Existing Term Loan Classes subject to such Term Loan Extension Request converted into Extended Term Loans shall notify the Administrative Agent in writing (an "**Extension Election**") on or prior to the date specified in such Term Loan Extension Request of the amount of its Term Loans of the Existing Term Loan Class or Existing Term Loan Classes subject to such Term Loan Extension Request that it has elected to convert into Extended Term Loans. In the event that the aggregate principal amount of Term Loans of the Existing Term Loan Class or Existing Term Loan Classes subject to Extension Elections exceeds the amount of Extended Term Loans requested pursuant to the Term Loan Extension Request, Term Loans of the Existing Term Loan Class or Existing Term Loan Classes subject to Extension Elections shall be converted to Extended Term Loans on a *pro rata* basis based on the amount of Term Loans included in each such Extension Election (with such *pro rata* calculation to be determined by the Borrower).

(iii)      Extended Term Loans shall be established pursuant to an amendment (an "**Extension Amendment**") to this Agreement (which, except to the extent expressly contemplated by the last sentence of this Section 2.15(a)(iii) and notwithstanding anything to the contrary set forth in Section 13.1, shall not require the consent of any Lender other than the Extending Lenders with respect to the Extended Term Loans established thereby) executed by the Credit Parties, the Administrative Agent and the Extending Lenders. No Extension Amendment shall provide for any Class of Extended Term Loans in an aggregate principal amount that is less than $10,000,000 and the Borrower may condition the effectiveness of any Extension Amendment on an Extension Minimum Condition, which may be waived by the Borrower in its sole discretion. In addition to any terms and changes required or permitted by Section 2.15(a), each Extension Amendment shall amend the scheduled amortization payments pursuant to Section 2.5 or the applicable Extension Amendment with respect to the Existing Term Loan Class from which the Extended Term Loans were converted to reduce each scheduled Repayment Amount for the Existing Term Loan Class in the same proportion as the amount of Term Loans of the Existing Term Loan Class is to be converted pursuant to such Extension Amendment (it being understood that the amount of any Repayment Amount payable with respect to any individual Term Loan of such Existing Term Loan Class that is not an Extended Term Loan shall not be reduced as a result thereof). Notwithstanding anything to the contrary in this Section 2.15, and without limiting the generality or applicability of Section 13.1 to any Section 2.15(a) Additional Amendments, any Extension Amendment may provide for additional terms and/or additional amendments other than those referred to or contemplated above (any such additional amendment, a "**Section 2.15(a) Additional Amendment**") to this Agreement and the other Credit Documents; *provided* that such Section 2.15(a) Additional Amendments comply with the requirements of Section 2.15(a) and do not become

effective prior to the time that such Section 2.15(a) Additional Amendments have been consented to (including, without limitation, pursuant to (1) consents applicable to holders of Incremental Term Loans provided for in any Incremental Amendment and (2) consents applicable to holders of any Extended Term Loans provided for in any Extension Amendment) by such of the Lenders, Credit Parties and other parties (if any) as may be required in order for such Section 2.15(a) Additional Amendments to become effective in accordance with Section 13.1.  At the request of the Administrative Agent, the Borrower shall deliver a certificate of an Authorized Officer of the Borrower, certifying that the conditions and requirements with respect to such Extended Term Loans set forth in this Section 2.15(a) have been met and such Extension Amendment and/or Section 2.15(a) Additional Amendment is authorized under this Section 2.15(a) (upon which the ~~the~~ Administrative Agent may conclusively rely without further investigation or inquiry).

(iv)    Notwithstanding anything to the contrary contained in this Agreement, on any date on which any Existing Term Loan Class is converted to extend the related scheduled maturity date(s) in accordance with paragraph (a) above, in the case of the existing Term Loans of each Extending Lender, the aggregate principal amount of such existing Term Loans in such Existing Term Loan Class shall be deemed reduced by an amount equal to the aggregate principal amount of Extended Term Loans so converted by such Lender on such date.  Any Extended Term Loans shall constitute a separate Class of Term Loans from the Existing Term Loan Class from which they were converted; *provided* that any Extended Term Loans converted from an Existing Term Loan Class may, to the extent provided in the applicable Extension Amendment, be designated as an increase in any then outstanding Class of Term Loans other than the Existing Term Loan Class from which such Extended Term Loans were converted (in which case scheduled amortization with respect thereto shall be proportionally increased).

(v)    The Administrative Agent and the Lenders hereby consent to the consummation of the transactions contemplated by this Section 2.15(a) (including, for the avoidance of doubt, payment of any interest, fees, or premium in respect of any Extended Term Loans on such terms as may be set forth in the relevant Extension Amendment) and hereby waive the requirements of any provision of this Agreement (including, without limitation, any *pro rata* payment or amendment section) or any other Credit Document that may otherwise prohibit or restrict any such extension or any other transaction contemplated by this Section 2.15(a).

(vi)    In the event that the Administrative Agent determines, and the Borrower agrees (acting reasonably), that the allocation of Extended Term Loans of a given Extension Series to a given Lender was incorrectly determined as a result of manifest administrative error in the receipt and processing of an Extension Election timely submitted by such Lender in accordance with the procedures set forth in the applicable Extension Amendment, then the Administrative Agent, the Borrower and such affected Lender may (and hereby are authorized to), in their sole discretion and without the consent of any other Lender, enter into an amendment to this Agreement and the other Credit Documents (each, a "**Corrective Extension Amendment**") within fifteen (15) days following the effective date of such Extension Amendment, as the case may be, which Corrective Extension Amendment shall (A) provide for the conversion and

107

extension of the applicable Term Loans in such amount as is required to cause such Lender to hold Extended Term Loans of the applicable Extension Series into which such other Term Loans were initially converted, as the case may be, in the amount such Lender would have held had such administrative error not occurred and had such Lender received the minimum allocation of the applicable Term Loans or Commitments to which it was entitled under the terms of such Extension Amendment, in the absence of such error, (B) be subject to the satisfaction of such conditions as the Administrative Agent, the Borrower and such Lender may agree (including conditions of the type required to be satisfied for the effectiveness of an Extension Amendment described in Section 2.15(a)), and (C) effect such other amendments of the type (with appropriate reference and nomenclature changes) described in Section 2.15(a) to the extent reasonably necessary to effectuate the purposes of this Section 2.15(a)(vi).

(vii)     No conversion of Term Loans or Commitments pursuant to any Extension Amendment in accordance with this Section 2.15(a) shall constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement.

(b)     Refinancing Facilities.

(i)     The Borrower may, at any time or from time to time after the Closing Date, by written notice to the Administrative Agent (a "**Refinancing Term Loan Request**"), request the establishment of (x) one or more new Classes of Term Loans under this Agreement (any such new Class, "**New Refinancing Commitments**") or (y) increases to one or more existing Classes of Term Loans under this Agreement (any such increase to an existing Class, collectively with New Refinancing Commitments, "**Refinancing Commitments**"), in each case, established in exchange for, or to extend, renew, replace, repurchase, retire or refinance, in whole or in part, as selected by the Borrower, any one or more ~~then~~ existing Class or Classes of Term Loans or Commitments (with respect to a particular Refinancing Commitment or Refinancing Term Loan, such existing Term Loans or Commitments, "**Refinanced Debt**"), whereupon the Administrative Agent shall promptly deliver a copy of each such written notice to each of the Lenders.

(ii)     Any Refinancing Term Loans made pursuant to New Refinancing Commitments shall be designated a separate Class of Term Loans, for all purposes of this Agreement unless designated as a part of an existing Class of Term Loans in accordance with this Section 2.15(b).  On any Refinancing Facility Closing Date on which any Refinancing Commitments of any Class are effected, subject to the satisfaction or waiver of the terms and conditions in this Section 2.15(b), (x) each Refinancing Term Lender of such Class shall make a term loan to the Borrower (each, a "**Refinancing Term Loan**") in an amount equal to its Refinancing Commitment of such Class and (y) each Refinancing Term Lender of such Class shall become a Lender hereunder with respect to the Refinancing Commitment of such Class and the Refinancing Term Loans of such Class made pursuant thereto.

(iii)     Each Refinancing Term Loan Request from the Borrower pursuant to this Section 2.15(b) shall set forth the requested amount and proposed terms of the

108

relevant Refinancing Term Loans and identify the Refinanced Debt with respect thereto. Refinancing Term Loans may be made by any existing Lender (but no existing Lender will have an obligation to make any Refinancing Commitment, nor will the Borrower have any obligation to approach any existing Lender to provide any Refinancing Commitment) or by any Additional Lender (each such existing Lender or Additional Lender providing such Commitment or Term Loan, a "**Refinancing Term Lender**"); *provided* that the Administrative Agent shall have consented to such Additional Lender's providing of the Refinancing Commitments to the extent such consent, if any, would be required under Section 13.6(b) in connection with an assignment of Term Loans or Commitments to such Additional Lender.

(iv)     The effectiveness of any Refinancing Amendment, and the Refinancing Commitments thereunder, shall be subject to the satisfaction (or waiver) on the date thereof (each, a "**Refinancing Facility Closing Date**") of each of the following conditions, together with any other conditions set forth in the Refinancing Amendment:

(A)     each Refinancing Commitment shall be in an aggregate principal amount that is not less than $10,000,000 (*provided* that such amount may be less than $10,000,000 if such amount is equal to the entire outstanding principal amount of Refinanced Debt), and,

(B)     the Refinancing Term Loans made pursuant to any increase in any existing Class of Term Loans shall be added to (and form part of) each Borrowing of outstanding Term Loans under the respective Class so incurred on a *pro rata* basis (based on the principal amount of each Borrowing) so that each Lender under such Class will participate proportionately in each then outstanding Borrowing of Term Loans under such Class.

(v)     [Reserved].

(vi)     The terms, provisions and documentation of the Refinancing Term Loans and Refinancing Commitments of any Class shall be as agreed between the Borrower and the applicable Refinancing Term Lenders providing such Refinancing Commitments, and except as otherwise set forth herein, to the extent not identical to (or constituting a part of) any Class of Term Loans existing on the Refinancing Facility Closing Date, shall be consistent with the provisions below, and the other terms and conditions shall either, at the option of the Borrower, (x) reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined by the Borrower) or (y), not be materially more restrictive to the Borrower (as determined by the Borrower), when taken as a whole, than the terms of the Initial Term Loans (except (1) covenants or other provisions applicable only to periods after the Latest Maturity Date (as of the applicable Refinancing Facility Closing Date) and (2) pricing, fees, rate floors, premiums, optional prepayment or redemption terms (which shall be determined by the Borrower) and it being understood there shall be no "MFN" protection unless the Lenders under the Term Loans existing on the Refinancing Facility Closing Date, receive the benefit of such more restrictive terms).  In any event, the Refinancing Term Loans:

(1)    (I) shall rank *pari passu* or junior in right of payment with any Obligations outstanding under this Agreement and (II) shall be unsecured or rank *pari passu* or junior in right of security with any Obligations outstanding under this Agreement and, if secured, shall not be secured by any assets ~~of the Credit Parties~~ other than the Collateral (and, unless secured on a *pari passu* basis with the Obligations, shall be subject to a subordination agreement (if payment subordinated) and the Applicable Intercreditor Agreements);

(2)    as of the Refinancing Facility Closing Date, shall not have a Maturity Date earlier than the Maturity Date of the Refinanced Debt;

(3)    as of the Refinancing Facility Closing Date, such Refinancing Term Loans shall have a Weighted Average Life to Maturity not shorter than the remaining Weighted Average Life to Maturity of the Refinanced Debt on the date of incurrence of such Refinancing Term Loans;

(4)    may provide for the ability to participate on a *pro rata* basis or less than or greater than a *pro rata* basis in any voluntary repayments or prepayments of principal of Term Loans hereunder and on a *pro rata* basis or less than a *pro rata* basis (but not on a greater than *pro rata* basis) in any mandatory repayments or prepayments of principal of Term Loans hereunder; *provided* that if such Refinancing Term Loans are unsecured or rank junior in right of payment or as to security with the Obligations, such Refinancing Term Loans shall participate on a junior basis with respect to mandatory repayments of Term Loans hereunder (except in connection with any refinancing, extension, renewal, replacement, repurchase or retirement thereof permitted by this Agreement);

(5)    unless otherwise permitted hereby, shall not have a greater principal amount than the principal amount of the Refinanced Debt (*plus* the amount of any unused commitments thereunder), *plus* accrued interest, fees, defeasance costs and premium (including call and tender premiums), if any, under the Refinanced Debt, *plus* underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees and similar items) in connection with the refinancing of such Refinanced Debt and the incurrence or issuance of such Refinancing Term Loans; and

(6)    shall not be guaranteed or incurred by any Subsidiary other than a ~~Guarantor~~Credit Party hereunder;

(vii)    Commitments in respect of Refinancing Term Loans shall become additional Commitments under this Agreement pursuant to an amendment (a

110

"**Refinancing Amendment**") to this Agreement and, as appropriate, the other Credit Documents, executed by the Borrower, each Refinancing Term Lender providing such Commitments and the Administrative Agent.  The Refinancing Amendment may, without the consent of any other Credit Party, Agent or Lender, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.15(b).  The Borrower will use the proceeds, if any, of the Refinancing Term Loans in exchange for, or to extend, renew, replace, repurchase, retire or refinance, and shall permanently terminate applicable commitments under, substantially concurrently, the applicable Refinanced Debt.  At the request of the Administrative Agent, the Borrower shall deliver a certificate of an Authorized Officer of the Borrower, certifying that the conditions and requirements with respect to such Refinancing Commitments and/or Refinancing Term Loans set forth in this Section 2.15(b) have been met and such Refinancing Amendment is authorized under this Section 2.15(b) (upon which the ~~the~~ Administrative Agent may conclusively rely without further investigation or inquiry).

(viii)     The Administrative Agent and the Lenders hereby consent to the consummation of the transactions contemplated by this Section 2.15(b) (including, for the avoidance of doubt, payment of any interest, fees, or premium in respect of any Refinanced Debt on such terms as may be set forth in the relevant Refinancing Amendment) and hereby waive the requirements of any provision of this Agreement (including, without limitation, any *pro rata* payment or amendment section) or any other Credit Document that may otherwise prohibit or restrict any such refinancing or any other transaction contemplated by this Section 2.15.

2.16     Defaulting Lenders

Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then no Defaulting Lender shall be entitled to receive any fee payable under Section 4 or any interest at the Default Rate payable under Section 2.8(b) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee or interest that otherwise would have been required to have been paid to that Defaulting Lender).

2.17     Permitted Debt Exchanges

(a)     Notwithstanding anything to the contrary contained in this Agreement, pursuant to one or more offers (each, a "**Permitted Debt Exchange Offer**") made from time to time by the Borrower to all Lenders (other than any Lender that, in connection with an issuance of Permitted Debt Exchange Instrument that constitutes Permitted Other Note, if requested by the Borrower, is unable to certify that it is either a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an institutional "accredited investor" (as defined in Rule 501 under the Securities Act)) with outstanding Term Loans under one or more Classes of Term Loans (as determined by the Borrower in its sole discretion) on the same terms, the Borrower may from time to time consummate one or more exchanges of Term Loans for Permitted Other Debt (such notes or loans, "**Permitted Debt Exchange Instruments**" and each such exchange, a

"**Permitted Debt Exchange**"), so long as the following conditions are satisfied or waived:  (i) no Event of Default shall have occurred and be continuing at the time the offering document in respect of a Permitted Debt Exchange Offer is delivered to the relevant Lenders, (ii) the aggregate principal amount (calculated on the face amount thereof) of Permitted Debt Exchange Instruments issued in exchange for Term Loans shall not exceed the principal amount (calculated on the face amount thereof) of the Term Loans being exchanged *plus* any accrued interest, fees and premium (if any) under the Term Loans exchanged and underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees and similar items) in connection with the exchange of such Term Loans and the issuance of such Permitted Debt Exchange Instruments, (iii) the aggregate principal amount (calculated on the face amount thereof) of all Term Loans exchanged under each applicable Class by the Borrower pursuant to any Permitted Debt Exchange shall automatically be cancelled and retired by the Borrower on the date of the settlement thereof (and, if requested by the Administrative Agent, any applicable exchanging Lender shall execute and deliver to the Administrative Agent an Assignment and Assumption pursuant to which the respective Lender assigns its interest in the Term Loans being exchanged pursuant to the Permitted Debt Exchange to the Borrower for immediate cancellation or other written evidence of cancellation acceptable to the Administrative Agent), (iv) if the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of a given Class tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof of the applicable Class actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of such Class offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans under the relevant Class tendered by such Lenders ratably up to such maximum based on the respective principal amounts so tendered, or if such Permitted Debt Exchange Offer shall have been made with respect to multiple Classes without specifying a maximum aggregate principal amount offered to be exchanged for each Class, and the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of all Classes tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of all relevant Classes offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans across all Classes subject to such Permitted Debt Exchange Offer tendered by such Lenders ratably up to such maximum amount based on the respective principal amounts so tendered, (v) all documentation in respect of such Permitted Debt Exchange shall be consistent with the foregoing, and all written communications generally directed to the Lenders in connection therewith shall be in form and substance consistent with the foregoing and made in consultation with the Borrower and the Auction Agent, and (vi) any applicable Minimum Tender Condition or Maximum Tender Condition, as the case may be, shall be satisfied or waived by the Borrower.

(b)    With respect to all Permitted Debt Exchanges effected by the Borrower pursuant to this Section 2.17, (i) such Permitted Debt Exchanges (and the cancellation of the exchanged Term Loans in connection therewith) shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 5.1 or 5.2, and (ii) such Permitted Debt Exchange Offer shall be made for not less than $10,000,000 in aggregate principal amount of Term Loans, *provided* that subject to the foregoing clause (ii) the Borrower may at its election

112

specify (A) as a condition (a "**Minimum Tender Condition**") to consummating any such Permitted Debt Exchange that a minimum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's sole discretion) of Term Loans of any or all applicable Classes be tendered and/or (B) as a condition (a "**Maximum Tender Condition**") to consummating any such Permitted Debt Exchange that no more than a maximum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's sole discretion) of Term Loans of any or all applicable Classes will be accepted for exchange.

(c)    In connection with each Permitted Debt Exchange, the Borrower and the Auction Agent shall mutually agree to such procedures as may be necessary or advisable to accomplish the purposes of this Section 2.17 and without conflict with Section 2.17(c); *provided* that the terms of any Permitted Debt Exchange Offer shall provide that the date by which the relevant Lenders are required to indicate their election to participate in such Permitted Debt Exchange shall be not less than a reasonable period (in the discretion of the Borrower and the Auction Agent) of time following the date on which the Permitted Debt Exchange Offer is made.

(d)    The Borrower shall be responsible for compliance with, and hereby agrees to comply with, all applicable securities and other laws in connection with each Permitted Debt Exchange, it being understood and agreed that (x) none of the Auction Agent, the Agents nor any Lender assumes any responsibility in connection with the Borrower's compliance with such laws in connection with any Permitted Debt Exchange and (y) each Lender shall be solely responsible for its compliance with any applicable "insider trading" laws and regulations to which such Lender may be subject under the Securities Exchange Act of 1934, as amended.

2.18    Lender Claimants.

(a)    In order for a Lender Claimant to cease being a Lender Claimant and to be acknowledged as a Lender hereunder, such Lender Claimant shall submit to the Borrower (i)(a) in the case of a Unknown First Lien Lender Claimant, evidence of the First Lien Claims beneficially owned by such Lender Claimant or (b) in the case of a Funded Lender Claimant, evidence that such Lender Claimant is a Funded Lender Claimant pursuant to the definition hereof, (ii) an Administrative Questionnaire, (iii) duly completed IRS tax withholding forms pursuant to this Agreement, (iv) any other documentation and information required by any Agent in connection with its "know your customer" process and (v) a signature page to this Agreement (such items (ii) to (v) collectively, the "**Lender Claimant Onboard Documents**").  Promptly following receipt of such items and, if the Borrower determines in good faith that such Lender Claimant shall cease to be a Lender Claimant and shall be acknowledged as a is entitled to be a Lender hereunder, the Borrower shall forward the items set forth in clauses (a)(ii) through (v)Lender Claimant Onboard Documents to the Administrative Agent, together with a Borrower Direction to Add Lender, which shall specify (A) that the Person submitting such evidence should be added to the Register as a Lender, (B) the original principal amount of Term Loans to be credited to such Lender Claimant, (C) the amount of paid-in-kind interest allocable to such Term Loans and which is to be added to the original principal amount of the Term Loans and (D) the amount of cash held in the Lender Claimant Reserve Account to be paid to such Lender Claimant, if any.  The Borrower shall calculate the original principal amount of Term Loans to be credited to a Lender Claimant pursuant to the Plan.  Upon receipt by the Administrative Agent of the items set forth in clauses (a)(ii) through (v)Lender Claimant Onboard Documents and

113

based solely on such Borrower Direction to Add Lender, (x) in respect of such Term Loans, such Lender Claimant shall cease to be a Lender Claimant and shall have all rights of a Lender for purposes of this Agreement and all other Credit Documents and (y) the Administrative Agent shall (AA) revise the Register to credit such Term Loans to such Lender Claimant, (BB) increase the principal of such transferred Term Loans with all paid-in-kind interest allocable to such Term Loans and (CC) pay to such Lender Claimant the cash amounts held in the Lender Claimant Reserve Account allocable to such transferred Term Loans.  In no event shall any Agent have any duty, liability or obligation (I) to solicit or request delivery of any information or documents from any Lender Claimant, (II) to review, verify or confirm any information or documents submitted by any Lender Claimant or contained in any direction of the Borrower or (III) with respect to any calculation of amounts due or payable to any Lender Claimant (including the amount of any principal or interest credited to any Lender Claimant).  The Agents shall be entitled to rely, shall be fully protected in relying, and shall not incur any liability for relying, upon any Borrower Direction to Add Lender.

(b)

(i)     Notwithstanding anything in this Agreement to the contrary, neither the Agents, the Borrower nor any other Person shall be liable to any Lender Claimant or to any other Person for any amount paid to a public official pursuant to applicable abandoned property law, escheat law or similar ~~L~~law.

(ii)     To the extent that (x) all Obligations under this Agreement and the other Credit Documents (other than Obligations owing to any Lender Claimant, any Hedging Obligations in respect of any Secured Hedging Agreement, any Cash Management Obligations in respect of Secured Cash Management Agreements and any Contingent Obligations) are paid in full within one (1) year of the Closing Date and (y) on or after the date described in clause (x), the Borrower deposits in to the Lender Claimant Reserve Account the full amount of all Term Loans (including all paid-in-kind interest allocable to such Term Loans) then outstanding with respect to all Lender Claimants, together with any prepayment premium, if any, and accrued and unpaid interest due on the date of such deposit (the "**Lender Claimant Obligation Amount**", and the occurrence of the events described in clauses (x) and (y), a "**Refinancing Event**"), on the date of such Refinancing Event, the Term Loans allocable to all Lender Claimants shall be deemed paid in full for all purposes under this Agreement; *provided* that until the date that is one (1) year after the Closing Date had such Refinancing Event not occurred (the "**Claim Termination Date**"), the claims of all Lender Claimants with respect to the Lender Claimant Obligation Amount shall survive.  At the written request of the Administrative Agent, the Borrower shall deliver a certificate of an Authorized Officer of the Borrower, certifying the amount of the Lender Claimant Obligation Amount and attaching a reasonably detailed calculation with respect thereto (upon which the Administrative Agent may conclusively rely without further investigation or inquiry). The procedures set forth in Section 2.18(a) shall continue to apply with respect to Lender Claimants from and after the Refinancing Event until the Claim Termination Date. Any portion of the Term Loans (together with all interest allocable to such Term Loans) remaining unclaimed by Lender Claimants on the Claim Termination Date shall, on the

114

Claim Termination Date, be deemed to have been paid in full and any claims of a Lender Claimant with respect thereto shall then be deemed extinguished.

(iii)    Absent the occurrence of a Refinancing Event, any portion of the Term Loans (including Term Loans resulting from ~~the~~any interest payment~~s~~ payable in kind ~~of interest~~) (together with all interest allocable to such Term Loans) remaining unclaimed by Lender Claimants on the one (1) year anniversary of the Closing Date (such Term Loans, the "**Unclaimed Loans**" and such date, the "**Unclaimed Loans Termination Date**") shall, on the Unclaimed Loans Termination Date, be deemed to have been paid in full and any claims of a Lender Claimant with respect thereto shall then be deemed extinguished.

(c)    Any cash amounts that are held in the Lender Claimant Reserve Account shall be applied by the Administrative Agent on the Claim Termination Date or the Unclaimed Loans Termination Date, as applicable, after giving effect to the deemed repayment in full of the Term Loans or Unclaimed Loans, as applicable, in accordance with clause (ii) or (iii) of ~~Section 2.18(b)~~Section 2.18(b), in accordance with ~~Section 2.18(d)~~Section 2.18(d).

(d)    All amounts paid on the Claim Termination Date or the Unclaimed Loans Termination Date, as applicable, from the Lender Claimant Reserve Account pursuant to clauses ~~(b)~~(b) and ~~(c)~~(c) of this ~~Section 2.18~~Section 2.18 shall be applied in the following order of priority:

(i)    to the extent not previously prepaid, to pay all accrued and unpaid interest on the Term Loans as of the date of payment;

(ii)    to the extent not previously prepaid, to pay that portion of the Obligations constituting unpaid principal of the Term Loans then due and payable;

(iii)    to the extent not previously prepaid, to pay any other outstanding Obligations then due and payable; and

(iv)    the balance, if any, following the payment in full of all such Obligations then due and payable, if any, to be retained by the Borrower or as otherwise required by ~~L~~law.

(e)    The Borrower hereby directs the Administrative Agent or an escrow agent selected by the Borrower and reasonably satisfactory to the Administrative Agent to open and maintain a segregated, non-interest bearing account entitled "Lender Claimant Reserve Account" for the purpose of holding funds payable to Lender Claimants in accordance with this Agreement.  Funds held in the Lender Claimant Reserve Account shall remain uninvested.

(f)    To the extent that a Refinancing Event occurs prior to the Maturity Date, from the date of such Refinancing Event until the earlier of (i) the date that all Lender Claimants have presented themselves and claimed all amounts contained in the Lender Claimant Reserve Account in accordance with ~~Section 2.18(a)~~Section 2.18(a) and (ii) the date that the Administrative Agent has applied amounts contained in the Lender Claimant Reserve Account in accordance with ~~Section 2.18(d)~~Section 2.18(d), all rights, powers, privileges, protections,

115

immunities, and indemnities of the Agents and all remaining obligations of the Borrower and the Agents described under this Agreement (including this ~~Section 2.18~~Section 2.18) with respect to the Lender Claimants and the Lender Claimant Reserve Account shall continue and survive in full force and effect notwithstanding the fact that all Obligations shall have been paid in full; *provided* that during such period, each Agent may request and rely on the direction of the Borrower for all purposes on the same basis that it is entitled to rely on the direction of the Required Lenders.

### SECTION 3   [Reserved]

### SECTION 4   Fees; Commitments

4.1     Fees

(a)     In the event that, prior to the twelve (12) month anniversary of the Closing Date, (x) the Borrower makes any prepayment or repayment of Initial Term Loans pursuant to Section 5.1 or Section 5.2(a)(ii) or (iii), or (y) any portion of the principal of the Initial Term Loans is accelerated in accordance with Section 11 or applicable law (clauses "(x)" and "(y)" together, the "**Premium Trigger Events**" and, each individually a "**Premium Trigger Event**"), the Borrower shall pay to the Administrative Agent, for the ratable account of each Lender~~s~~ holding Initial Term Loans and the Lender Claimant Reserve Account (in each case as of the date of such prepayment), a prepayment premium of 2.00% of the principal amount of the Initial Term Loans being prepaid (the "**Prepayment Premium**").  For the avoidance of doubt, ~~on and after the twelve~~except to the extent a Premium Trigger Event occurs before the twelve (12) month anniversary of the Closing Date, no prepayment premium shall be due on account of any prepayment or repayment of Initial Term Loans.

(b)     The Borrower agrees to pay directly to the Agents, for the account of the Agents, all fees in the amounts and at the times specified in the Agent Fee Letter in immediately available funds due and payable to the Agents, which fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(c)     Notwithstanding the foregoing, the Borrower shall not be obligated to pay any amounts to any Defaulting Lender pursuant to this Section 4.1 (subject to Section 2.16).

The Prepayment Premium shall be due in view of the impracticability and extreme difficulty of ascertaining the actual amount of damages to the Lenders or profits lost by the Lenders as a result of a Premium Trigger Event, and by mutual agreement of the parties as to a reasonable estimation and calculation of the lost profits or damages of the Lenders as a result thereof.  ANY PREPAYMENT PREMIUM PURSUANT TO SECTION 4.1(A) SHALL BE PRESUMED TO BE EQUAL TO THE LIQUIDATED DAMAGES SUSTAINED BY EACH LENDER AND THE BORROWER AGREE THAT SUCH PREPAYMENT PREMIUM IS REASONABLE UNDER THE CIRCUMSTANCES CURRENTLY EXISTING.   IF THE PREPAYMENT PREMIUM BECOMES DUE AND PAYABLE PURSUANT TO THIS AGREEMENT, THE PREPAYMENT PREMIUM SHALL BE DEEMED TO BE THE PRINCIPAL OF THE INITIAL TERM LOANS UNDER THIS AGREEMENT AND INTEREST SHALL ACCRUE ON THE FULL PRINCIPAL AMOUNT OF SUCH INITIAL TERM LOANS FROM AND

AFTER THE OCCURRENCE OF THE APPLICABLE PREMIUM TRIGGER EVENT. IN THE EVENT THE PREPAYMENT PREMIUM IS DETERMINED NOT TO BE DUE AND PAYABLE BY ORDER OF ANY COURT OF COMPETENT JURISDICTION, INCLUDING, WITHOUT LIMITATION, BY OPERATION OF THE BANKRUPTCY CODE, DESPITE SUCH PREMIUM TRIGGER EVENT HAVING OCCURRED, THE PREPAYMENT PREMIUM SHALL NONETHELESS BE DEEMED TO BE THE PRINCIPAL OF THE INITIAL TERM LOANS UNDER THIS AGREEMENT AND SHALL NONETHELESS CONSTITUTE OBLIGATIONS UNDER THIS AGREEMENT FOR ALL PURPOSES HEREUNDER. THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE PREPAYMENT PREMIUM IN CONNECTION WITH ANY PREMIUM TRIGGER EVENT, IN EACH CASE, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED UNDER APPLICABLE LAW. THE BORROWER, THE AGENTS AND THE INITIAL TERM LENDERS ACKNOWLEDGE AND AGREE THAT ANY PREPAYMENT PREMIUM DUE AND PAYABLE IN ACCORDANCE WITH THIS AGREEMENT SHALL NOT CONSTITUTE UNMATURED INTEREST. THE BORROWER FURTHER ACKNOWLEDGES AND AGREES, AND WAIVES ANY ARGUMENT TO THE CONTRARY, THAT PAYMENT OF THE PREPAYMENT PREMIUM CONSTITUTES A PENALTY OR AN OTHERWISE UNENFORCEABLE OR INVALID OBLIGATION. THE BORROWER EXPRESSLY AGREES THAT THE (A) PREPAYMENT PREMIUM IS REASONABLE AND IS THE PRODUCT OF AN ARM'S-LENGTH TRANSACTION BETWEEN SOPHISTICATED BUSINESS PEOPLE, ABLY REPRESENTED BY COUNSEL, (B) PREPAYMENT PREMIUM SHALL BE PAYABLE NOTWITHSTANDING THE THEN PREVAILING MARKET RATES AT THE TIME PAYMENT IS MADE, (C) THERE HAS BEEN A COURSE OF CONDUCT BETWEEN THE LENDERS AND THE BORROWER GIVING SPECIFIC CONSIDERATION IN THIS TRANSACTION FOR SUCH AGREEMENT TO PAY THE PREPAYMENT PREMIUM, (D) THE BORROWER SHALL BE ESTOPPED HEREAFTER FROM CLAIMING DIFFERENTLY THAN AS AGREED TO IN THIS SECTION, (E) ITS AGREEMENT TO PAY THE PREPAYMENT PREMIUM IS A MATERIAL INDUCEMENT TO THE LENDERS TO MAKE THE LOANS AND (F) THE PREPAYMENT PREMIUM REPRESENTS A GOOD FAITH, REASONABLE ESTIMATE AND CALCULATION OF THE LOSSES OR OTHER DAMAGES OF THE LENDERS AND THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ASCERTAIN THE ACTUAL AMOUNT OF DAMAGES TO THE LENDERS.

4.2     Mandatory Termination or Reduction of Commitments

The Initial Term Commitments described in clause (a) of the definition thereof shall terminate upon the occurrence of the Closing Date.

**SECTION 5  Payments**

5.1     Voluntary Prepayments

The Borrower shall have the right to prepay Term Loans, without premium or penalty (other than as provided in Section 4.1(a) with respect to the Initial Term Loans or as

117

otherwise provided with respect to Term Loans incurred after the Closing Date and amounts, if any, required to be paid pursuant to Section 2.11 with respect to prepayments of SOFR Loans made on any date other than the last day of the applicable Interest Period), in whole or in part, from time to time on the following terms and conditions: (a) the Borrower shall give the Administrative Agent at the Administrative Agent's Office revocable written notice of its intent to make such prepayment, the amount of such prepayment and, in the case of SOFR Loans, the specific Borrowing(s) pursuant to which made, which notice shall be given by the Borrower no later than 1:00 p.m. (x) one Business Day prior to (in the case of ABR Loans) or (y) three U.S. Government Securities Business Days prior to (in the case of SOFR Loans) such prepayment and shall be promptly transmitted by the Administrative Agent to each Lender, (b) each partial prepayment of (i) any SOFR Loans shall be in a minimum amount of $5,000,000 and in multiples of $1,000,000 in excess thereof and (ii) any ABR Loans shall be in a minimum amount of $1,000,000 and in multiples of $100,000 in excess thereof; *provided* that no partial prepayment of SOFR Loans made pursuant to a single Borrowing shall reduce the outstanding SOFR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount for SOFR Loans and (c) any prepayment of SOFR Loans pursuant to this Section 5.1 on any day prior to the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of Section 2.11. Each prepayment in respect of any Term Loans pursuant to this Section 5.1 shall be (a) applied to the Class or Classes of Term Loans in such manner as the Borrower may determine, (b) applied to reduce Repayment Amounts in such order as the Borrower may determine and (c) applied to reduce the Type of Term Loans in the applicable Class as the Borrower may determine. In the event that the Borrower does not specify the order in which to apply prepayments of Term Loans to reduce Repayment Amounts or prepayments of Term Loans as between Classes of Term Loans, the Borrower shall be deemed to have elected that such prepayment be applied to reduce the Repayment Amounts in direct order of maturity on a *pro rata* basis with the applicable Class or Classes, if a Class or Classes were specified, or among all Classes of Term Loans then outstanding, if no Class was specified. If the Borrower does not specify the Type of Term Loans in the applicable Class, the Administrative Agent may make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11. At the Borrower's election (by written notice to the Administrative Agent) in connection with any prepayment pursuant to this Section 5.1, such prepayment shall not be applied to any Term Loan of a Defaulting Lender.

5.2    Mandatory Prepayments

(a)    Prepayment Events.  ~~(i)~~(i) On each occasion that an Asset Sale Prepayment Event or a Recovery Prepayment Event occurs, the Borrower shall, within ten (10) Business Days after the receipt of Net Cash Proceeds of such Prepayment Event (or, in the case of Deferred Net Cash Proceeds, within three Business Days after the Deferred Net Cash Proceeds Payment Date), prepay (or cause to be prepaid) (subject to Section 11.11 when applicable), in accordance with clauses (c) and (d) below, Term Loans with a principal amount equal to 100% of the Net Cash Proceeds from such Prepayment Event; *provided* that the percentage in this Section 5.2(a)(i) shall be reduced to (A) 50% if the Consolidated First Lien Net Leverage Ratio on the date of such prepayment is less than or equal to 2.80 to 1.00 but greater than 2.30 to 1.00 and (B) 0% if the Consolidated First Lien Net Leverage Ratio on the date of such prepayment is less than or equal to 2.30 to 1.00; *provided*, *further*, that the Borrower

118

may use a portion of such Net Cash Proceeds to prepay or repurchase any Indebtedness (and with such prepaid or repurchased Indebtedness permanently extinguished) to the extent such Indebtedness is secured with a Lien on the Collateral ranking *pari passu* with the Lien securing the Initial Term Loans to the extent such Indebtedness requires the issuer to prepay or make an offer to purchase or prepay such Indebtedness with the proceeds of such Prepayment Event, in each case in an amount not to exceed the product of (x) the amount of such Net Cash Proceeds multiplied by (y) a fraction, the numerator of which is the outstanding principal amount of such Indebtedness and with respect to which such a requirement to prepay or make an offer to purchase or prepay exists and the denominator of which is the sum of the outstanding principal amount of such Indebtedness and the outstanding principal amount of the Term Loans (it being understood that to the extent the holders of such Indebtedness decline to have such Indebtedness repurchased or prepaid, the declined amount shall promptly (and in any event within ten Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof); *provided*, *further*, that (i) no prepayment shall be required pursuant to this Section 5.2(a)(i) in the case of any individual Asset Sale Prepayment Event or Recovery Prepayment Event yielding Net Cash Proceeds of less than $25,000,000 in the aggregate and (ii) Net Cash Proceeds from such Prepayment Events shall only be required to be applied to prepay Term Loans pursuant to this Section to the extent the Net Cash Proceeds from such Prepayment Events exceed $100,000,000 in the aggregate for all such Prepayment Events (other than those yielding Net Cash Proceeds under the threshold specified in clause (i) of this proviso) in any one Fiscal Year, at which time all such Net Cash Proceeds referred to in this clause (ii) with respect to such Fiscal Year shall be applied as a prepayment in accordance with this Section 5.2(a)(i) (and, for the avoidance of doubt, only amounts in excess of such $100,000,000 threshold amount in clause (ii) of this proviso above shall be required to be applied as a prepayment in accordance with this Section 5.2(a)(i)).

(ii)      On each occasion that a Debt Incurrence Prepayment Event occurs, the Borrower shall, within ten (10) Business Days after the receipt of the Net Cash Proceeds from the occurrence of such Debt Incurrence Prepayment Event, prepay Term Loans in accordance with clauses (c) and (d) below in a principal amount equal to 100% of the Net Cash Proceeds from such Debt Incurrence Prepayment Event.

(iii)      On each occasion that a New Debt Incurrence Prepayment Event occurs, the Borrower shall, within five (5) Business Days after the receipt of the Net Cash Proceeds from the occurrence of such New Debt Incurrence Prepayment Event, (A) with respect to a New Debt Incurrence Prepayment Event resulting from the incurrence of Indebtedness pursuant to Section 10.1(v)(i), at the Borrower's election as to the allocation of such Net Cash Proceeds as among any and all of the Classes of Term Loans as selected by Borrower and (B) with respect to each other New Debt Incurrence Prepayment Event, prepay the applicable Class or Classes of Term Loans that are the subject of the Refinanced Debt, in each case in a principal amount equal to 100% of the Net Cash Proceeds from such New Debt Incurrence Prepayment Event.

119

(b)      Excess Cash Flow.  Following the Fiscal Year ending September 30, [2024][9], not later than ten (10) Business Days after the date on which financial statements are delivered pursuant to Section 9.1(a) (in any case no later than the end of any cure period under Section 11.3(b) applicable to the delivery of such financial statements) for any Fiscal Year (commencing with the first full Fiscal Year completed after the Closing Date), the Borrower shall prepay Term Loans in accordance with clauses (c) and (d) below in a principal amount equal to, as applicable, (i) (A) if the Consolidated First Lien Net Leverage Ratio as of the end of such Fiscal Year is greater than 2.80:1.00, 50% of the Excess Cash Flow for such Fiscal Year, (B) if the Consolidated First Lien Net Leverage Ratio as of the end of such Fiscal Year is equal to or less than 2.80:1.00 and greater than 2.30:1.00, 25% of the Excess Cash Flow for such Fiscal Year or (C) otherwise, 0% of the Excess Cash Flow for such Fiscal Year; *minus* (ii) to the extent any Indebtedness secured with a Lien on the Collateral ranking *pari passu* with the Lien securing the Initial Term Loans also requires the issuer of such Indebtedness to prepay or make an offer to purchase or prepay such Indebtedness with the amount of Excess Cash Flow, the Borrower may reduce the amount calculated pursuant to the provisions above by an amount not to exceed the product of (x) such amount *multiplied by* (y) a fraction, the numerator of which is the outstanding principal amount of such Indebtedness and with respect to which such a requirement to prepay or make an offer to purchase or prepay exists and the denominator of which is the sum of the outstanding principal amount of such Indebtedness and the outstanding principal amount of the Term Loans (it being understood that to the extent the holders of such Indebtedness decline to have such Indebtedness repurchased or prepaid, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof); *minus* (iii) any voluntary prepayments or repurchases of Term Loans or any other Indebtedness secured on a *pari passu* basis with the Initial Term Loans (unless such prepayment or repurchase is funded with other long-term Indebtedness) made during such Fiscal Year or, at the Borrower's option and without duplication, after the end of such Fiscal Year and prior to the time such Excess Cash Flow payment is due on a dollar-for-dollar basis (with the Consolidated First Lien Net Leverage Ratio to be recalculated to give effect to any such after-Fiscal Year end payments); *provided* that (I) if for any Fiscal Year, the amounts calculated pursuant to the provisions above is a negative amount, any such negative amount shall, at the option of the Borrower, be carried forward in future Fiscal Years to reduce the required payments pursuant to this Section 5.2(b) and (II) notwithstanding anything set forth above, any prepayment under this Section 5.2(b) shall be required only if the required prepayment amount calculated pursuant to the provisions above (including giving effect to any credit applied pursuant to clause (I) of this proviso) exceeds $20,000,000, and only the amount in excess thereof shall be applied to make prepayments of the Term Loans.

(c)      Application to Repayment Amounts.  Each prepayment of Term Loans required by Section 5.2(a) (except as provided in Section 5.2(a)(iii)) or Section 5.2(b) shall be allocated to the Term Loans then outstanding (ratably to each Class of Term Loans (or on a less than ratable basis, if agreed to by each Lender providing such Class of Term Loans) based on then remaining principal amounts of the respective Classes of Term Loans then outstanding) until paid in full.  In addition, each such prepayment shall be applied within each Class of Term

---

[9] First full Fiscal Year after the Closing Date.

Loans (i) ratably among the Lenders holding the Term Loans of such Class (unless otherwise agreed by an applicable affected Lender) and (ii) to scheduled amortization payments in respect of such Term Loans in direct forward order of scheduled maturity thereof or as otherwise directed by the Borrower.

(d)        Application to Term Loans.  With respect to each prepayment of Term Loans required pursuant to Section 5.2(a) (other than Section 5.2(a)(iii)) or Section 5.2(b), subject to Section 11.11 in the case of Section 5.2(a)(ii) (when applicable), the Borrower may designate the Types of Term Loans that are to be prepaid and the specific Borrowing(s) pursuant to which made; *provided* that the Borrower pays any amounts, if any, required to be paid pursuant to Section 2.11 with respect to prepayments of SOFR Loans made on any date other than the last day of the applicable Interest Period.  In the absence of a Rejection Notice or a designation by the Borrower as described in the preceding sentence, the Administrative Agent may, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

(e)        [Reserved]

(f)        Rejection Right.  The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to Section 5.2(a) or Section 5.2(b), in each case at least three (3) Business Days prior to the date such prepayment is required to be made (or such shorter period of time as agreed to by the Administrative Agent in its reasonable discretion).  Each such notice shall be revocable and specify the anticipated date of such prepayment and the basis for such repayment and provide a reasonably detailed estimated calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Lender holding Term Loans to be prepaid in accordance with such prepayment notice of the contents of the Borrower's prepayment notice and of such Lender's *pro rata* share of the prepayment.  Each Lender may reject all or a portion of its *pro rata* share of any such prepayment of Term Loans required to be made pursuant to Section 5.2(a)(i) or Section 5.2(b) (such declined amounts, the "**Declined Proceeds**") by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m. one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment.  Each Rejection Notice shall specify the principal amount of the mandatory prepayment of Term Loans to be rejected by such Lender.  If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such prepayment of Term Loans.  Any Declined Proceeds remaining thereafter shall be retained by the Borrower ("**Retained Declined Proceeds**").

(g)        Foreign Net Cash Proceeds or Excess Cash Flow.  Notwithstanding any other provisions of this Section 5.2, (i) to the extent that the repatriation of any or all of the Net Cash Proceeds from a Recovery Prepayment Event (a "**Foreign Recovery Event**") of, or any Disposition by, a Restricted Foreign Subsidiary giving rise to an Asset Sale Prepayment Event (a "**Foreign Asset Sale**") or (ii) the repatriation of any Excess Cash Flow attributable to a Restricted Foreign Subsidiary ("**Foreign Excess Cash Flow**"), are prohibited or delayed by applicable local law (including financial assistance, corporate benefit, restrictions on

upstreaming of cash intra-group and fiduciary and statutory duties of the directors of the relevant subsidiaries) or material agreement (so long as not created in contemplation of such prepayment) or organizational document from being repatriated to the United States or, if the Borrower has determined in good faith that repatriation of any of or all the Net Cash Proceeds of any Foreign Recovery Event or any Foreign Asset Sale or any Foreign Excess Cash Flow would have an material adverse tax consequence to the Borrower and its Restricted Subsidiaries (or any direct or indirect parent company of the Borrower), such portion of the Net Cash Proceeds or the Foreign Excess Cash Flow so affected will not be required to be applied to repay Term Loans, at the times provided in this Section 5.2 but may be retained by the applicable Restricted Foreign Subsidiary for working capital purposes so long, but only so long, (i) as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to promptly take commercially reasonable actions reasonably required by the applicable local law or material agreement to permit such repatriation) or (ii) as the Borrower determines in good faith such material adverse tax consequence to the Borrower and its Restricted Subsidiaries (or any direct or indirect parent company of the Borrower) would be incurred, and once such repatriation is permitted under the applicable local law or such material adverse tax consequence would no longer be incurred as determined by the Borrower in good faith (and in any event not later than ten (10) Business Days after such repatriation is permitted to occur or the Borrower determines in good faith that such material adverse tax consequence would no longer be incurred) applied (net of additional taxes payable or reserved against as a result thereof) apply an amount equal thereto to the repayment of the Term Loans as required pursuant to this Section 5.2.

5.3     Method and Place of Payment

(a)     Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto, as the case may be, not later than 12:00 p.m., in each case, on the date when due and shall be made in immediately available funds at the Administrative Agent's Office or at such other office as the Administrative Agent shall specify for such purpose by written notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds in the Borrower's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account.  All repayments or prepayments of any Term Loans (whether of principal, interest or otherwise) hereunder and all other payments under each Credit Document shall be made in Dollars.  The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 12:00 p.m. or, otherwise, on the next Business Day) like funds relating to the payment of principal or interest or fees ratably to the Lenders entitled thereto.

(b)     Any payments under this Agreement that are made later than 12:00 p.m. shall be deemed to have been made on the next succeeding Business Day.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

5.4     Net Payments

(a)     Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; provided that if the Borrower or any Guarantor or the Administrative Agent shall be required by Applicable Law (as determined in the good faith discretion of an applicable withholding agent) to deduct or withhold any Taxes from such payments, then (i) the Borrower or such Guarantor or the Administrative Agent shall make such deductions or withholdings and (ii) the Borrower or such Guarantor or the Administrative Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with Applicable Law.  If such a Tax is an Indemnified Tax, the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after making all such required deductions and withholdings (including such deductions or withholdings applicable to additional sums payable under this Section 5.4), the Administrative Agent, the Collateral Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made.  Whenever any Indemnified Taxes are payable by the Borrower or such Guarantor, as promptly as practicable thereafter, the Borrower or Guarantor shall send to the Administrative Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt (or other evidence acceptable to the Administrative Agent or such Lender, as applicable, acting reasonably) received by the Borrower or such Guarantor showing payment thereof.

(b)     The Borrower shall timely pay to the relevant Governmental Authority Other Taxes in accordance with Applicable Law, or at the option of any Agent, timely reimburse it for the payment of any Other Taxes that are paid by such Agent to the relevant Governmental Authority in accordance with Applicable Law.

(c)     The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within fifteen Business Days after written demand therefor, for the full amount of any Indemnified Taxes imposed on the Administrative Agent, the Collateral Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Credit Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 5.4) payable or paid by such Agent or Lender or required to be withheld or deducted from a payment to such Agent or Lender and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate setting forth reasonable detail as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)     Each Lender shall severally indemnify each Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified such Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such

123

Lender's failure to comply with the provisions of Section 13.6 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by such Agent in connection with this Agreement or any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by such Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes each Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any Credit Document or otherwise payable by such Agent to the Lender from any other source against any amount due to such Agent under this paragraph (d).

(e)        Any Non-U.S. Lender claiming a basis for an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or under any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Credit Document shall, to the extent it is legally able to do so, deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding or as will permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in this Section 5.4(e), the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.4(f), 5.4(i) and 5.4(j) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(f)        Without limiting the generality of Section 5.4(e), each Non-U.S. Lender with respect to any amounts payable hereunder or under any other Credit Document shall, to the extent it is legally entitled to do so:

(i)        deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two executed copies of (x) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service Form W-8BEN or W-8BEN-E (together with a certificate substantially in the form of Exhibit J-1 representing that such Non-U.S. Lender is not a bank within the meaning of Section 881(c)(3)(A) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, ~~any interest payment received by such Non-U.S. Lender under this Agreement or any other Credit Document is not effectively connected with the conduct of a trade or business in the United States~~ and

124

is not a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Code)), (y) Internal Revenue Service Form W-8BEN, Form W-8-BEN-E or Form W-8ECI, in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. Federal withholding Tax on payments under any Credit Document or (z) to the extent a Non-U.S. Lender is not the beneficial owner with respect to any portion of any sums paid or payable to such Lender under any of the Credit Documents (for example, in the case of a typical participation or where Non-U.S. Lender is a pass through entity) Internal Revenue Service Form W-8IMY and all necessary attachments (including the forms described in clauses (x) and (y) above and in Section 5.4(i), Exhibit J-2, Exhibit J-3 and or other certification documents from each beneficial owner, as applicable); *provided* that if the Non-U.S. Lender is a partnership it may provide Exhibit J-4 on behalf of one or more of its direct or indirect partners that are claiming the portfolio interest exemption; and

(ii)     deliver to the Borrower and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or inaccurate in any respect and after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower or the Administrative Agent.

If in any such case any Change in Law has occurred prior to the date on which any such delivery would otherwise be required that renders any such form inapplicable or would prevent such Non-U.S. Lender from duly completing and delivering any such form with respect to it, such Non-U.S. Lender shall promptly so advise the Borrower and the Administrative Agent.

(g)     If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it had received and retained a refund of an Indemnified Tax or additional sums payable under this Section 5.4 (including an Other Tax) for which a payment has been made by the Borrower pursuant to this Agreement, which refund in the good faith judgment of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, is attributable to such payment made by the Borrower, then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower for such amount (net of all out-of-pocket expenses of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender, the Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion exercised in good faith to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any Taxes imposed on the refund) than it would have been in if the payment had not been required; *provided* that the Borrower, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) by the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority.  A Lender shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim.  None of any Lender, the

125

Administrative Agent or the Collateral Agent shall be obliged to disclose any information regarding its tax affairs that it deems confidential to any Credit Party in connection with this clause (g).

(h)     ~~If the Borrower determines that a reasonable basis exists for contesting a Tax, each Lender or Agent, as the case may be, shall use reasonable efforts, at the Borrower's expense, to cooperate with the Borrower as the Borrower may reasonably request in challenging such Tax.~~ Subject to the provisions of Section 2.12, each Lender and Agent agrees to use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request to minimize any amount payable by the Borrower or any Guarantor pursuant to this Section 5.4. The Borrower shall indemnify and hold each Lender and Agent harmless against any out-of-pocket expenses incurred by such Person in connection with any request made by the Borrower pursuant to this Section 5.4(h).  Nothing in this Section 5.4(h) shall obligate any Lender or Agent to take any action that such Person, in its sole judgment, determines may result in a material detriment to such Person.

(i)     Without limiting the generality of Section 5.4(d), with respect to any amounts payable hereunder or under any other Credit Document, each Lender or Agent that is a United States person under Section 7701(a)(30) of the Code (each, a "**U.S. Lender**") shall deliver to the Borrower and the Administrative Agent two United States Internal Revenue Service Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Lender or Agent is exempt from United States backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or inaccurate in any respect, (iii) after the occurrence of a change in such Agent's or Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(j)     If a payment made to any Agent or Lender would be subject to U.S. federal withholding Tax imposed under FATCA if such Agent or Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Agent or Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such other documentation reasonably requested by the Administrative Agent and the Borrower as may be necessary for the Administrative Agent and the Borrower to comply with their obligations under FATCA, to determine whether such Agent or Lender has or has not complied with such Agent's or Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment and deliver to the Borrower and the Administrative Agent two further copies of any such documentation on or before the date that any such documentation expires or becomes obsolete or inaccurate in any respect and after the occurrence of any event requiring a change in the documentation previously delivered by it to the Borrower or the Administrative Agent.  Solely for purposes of this subsection (j), "FATCA" shall include any amendments made to FATCA after the date of this Agreement and any current

126

or future intergovernmental agreements and any Applicable Law implementing such agreement entered into in connection therewith.

(k) Notwithstanding the foregoing, no Agent or Lender shall demand payment pursuant to this Section 5.4 if it shall not at the time be the general policy or practice of such Lender or Agent to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

(k)    (l) The agreements in this Section 5.4 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the Commitments and the payment, satisfaction, or discharge of the Term Loans and all other Obligations payable hereunder and under any other Credit Document.

5.5    Computations of Interest and Fees

Except as provided in the next succeeding sentence, interest on SOFR Loans and ABR Loans shall be calculated on the basis of a 360-day year for the actual days elapsed. Interest on ABR Loans in respect of which the rate of interest is calculated on the basis of the rate of interest in effect for such day as publicly announced from time to time by the Wall Street Journal as the "U.S. prime rate" and interest on overdue interest shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.

5.6    Limit on Rate of Interest

(a)    No Payment Shall Exceed Lawful Rate.  Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect of the Obligations in excess of the amount or rate permitted under or consistent with any Applicable Law.

(b)    Payment at Highest Lawful Rate.  If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of Section 5.6(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with Applicable Laws.

(c)    Adjustment if Any Payment Exceeds Lawful Rate.  If any provision of this Agreement or any of the other Credit Documents would obligate the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any Applicable Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.8.

(d)    Spreading.  In determining whether the interest hereunder is in excess of the amount or rate permitted under or consistent with any Applicable Law, the total amount of interest shall be spread throughout the entire term of this Agreement until its payment in full.

(e)     Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any Applicable Law, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

## SECTION 6   Conditions Precedent to the Closing Date

The initial Borrowing under this Agreement is subject to the satisfaction in all material respects of the conditions set forth below.

### 6.1     Credit Documents

The Administrative Agent shall have received (a) this Agreement, executed and delivered by an Authorized Officer of Holdings and the Borrower and each Lender, (b) the Guarantee, executed and delivered by an Authorized Officer of each Guarantor as of the Closing Date, (c) the Security Agreement, executed and delivered by an Authorized Officer of each grantor party thereto as of the Closing Date and (d) a duly executed Notice of Borrowing delivered pursuant to Section 2.3(a).  The Agents shall have received the Agent Fee Letter, executed and delivered by an Authorized Officer of the Borrower.

### 6.2     Collateral

(a)     All outstanding Stock of the Borrower and all Stock of each Subsidiary of the Borrower directly owned by Holdings, the Borrower or any Subsidiary Guarantor, in each case, as of the Closing Date, shall have been pledged pursuant to the Security Agreement (except that such Credit Parties shall not be required to pledge any Excluded Stock and Stock Equivalents) and the Collateral Agent shall have received all certificates, if any, representing such securities pledged under the Security Agreement, accompanied by instruments of transfer and undated stock powers endorsed in blank.

(b)     All Indebtedness of Holdings, the Borrower and each Subsidiary of the Borrower that is owing to Holdings, the Borrower or a Subsidiary Guarantor shall, to the extent exceeding $10,000,000 inhaving an aggregate principal amount, exceeding $7,000,000 individually be evidenced by one or more global promissory notes and shall have been pledged pursuant to the Security Agreement, and the Collateral Agent shall have received all such promissory notes, together with instruments of transfer with respect thereto endorsed in blank.

(c)     All documents and instruments, including Uniform Commercial Code or other applicable personal property financing statements, reasonably requested by the Collateral Agent or the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by any Security Document to be executed on the Closing Date and to perfect such Liens to the extent required by, and with the priority required by, such Security Document shall have been delivered to the Collateral Agent in proper form for filing, registration or recording and none of the Collateral shall be subject to any other pledges, security interests or mortgages, except for Liens permitted hereunder.

(d)     The Borrower shall have delivered to the Collateral Agent a completed Perfection Certificate, executed and delivered by an Authorized Officer of the Borrower, together with all attachments contemplated thereby.

Notwithstanding anything set forth above, to the extent any security interest (other than to the extent that a lien on the Collateral may be perfected by the filing of a financing statement under the Uniform Commercial Code or by the delivery of stock or other equity certificates of the Borrower or a Material Subsidiary of the Borrower constituting a Wholly Owned Domestic Subsidiary that is part of the Collateral and such stock or other equity certificates have been received from the Borrower) is not or cannot be provided or perfected on the Closing Date after the Borrower's use of commercially reasonable efforts to do so, or without undue burden or expense, the creation or perfection of such security interest shall not constitute a condition precedent to the availability of the Initial Term Loans on the Closing Date but shall instead be required to be delivered or provided within ninety (90) days after the Closing Date (or such later date as may be reasonably agreed by the Borrower and the Administrative Agent (with respect to Term Priority Collateral) or the ABL Administrative Agent (with respect to ABL Priority Collateral)) pursuant to arrangements to be mutually agreed by the Borrower and the Administrative Agent or the ABL Administrative Agent, as applicable.

6.3     Legal Opinions

The Administrative Agent and the Lenders (or their respective counsel) shall have received the executed customary legal opinion of Kirkland & Ellis LLP, special New York counsel to the Credit Parties.  Holdings, the Borrower, and the other Credit Parties hereby instruct such counsel to deliver such legal opinion.

6.4     Closing Certificates

The Administrative Agent and the Lenders (or their respective counsel) shall have received a certificate of the Credit Parties, dated as of the Closing Date, in respect of the conditions set forth in Sections 6.7, 6.8, 6.11, and 6.12.

6.5     Secretary's Certificate; Authorization of Proceedings of Each Credit Party

The Administrative Agent and the Lenders (or their respective counsel) shall have received, on or prior to the Closing Date, a certificate of each Credit Party, dated the Closing Date and executed by an Authorized Officer of such Credit Party, including (a) a copy of the resolutions of the board of directors, other managers or general partner of each Credit Party (or a duly authorized committee thereof) authorizing (i) the execution, delivery and performance of the Credit Documents referred to in Section 6.1 (and any agreements relating thereto) to which it is a party and (ii) in the case of the Borrower, the extensions of credit contemplated hereunder, (b) true and complete copies of the Organizational Documents of each Credit Party as of the Closing Date, (c) good standing certificates (to the extent such concept exists in the relevant jurisdiction of organization) of the Borrower and the Guarantors and (d) the names, titles, incumbency and signature specimens of those officers of such Credit Party who have been authorized by such resolutions and/or written consents to execute the Credit Documents on behalf of such Credit Party.

6.6     Fees

All fees required to be paid on the Closing Date pursuant to the Agent Fee Letter and reasonable and documented out-of-pocket expenses required to be paid on the Closing Date, in the case of expenses, to the extent invoiced at least three (3) Business Days prior to the Closing Date, shall have been paid, or shall be paid substantially concurrently with, the initial Borrowings hereunder.

6.7     Representations and Warranties

All Specified Representations shall be true and correct in all material respects on the Closing Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, it shall be true and correct in all material respects as of such earlier date).; provided, further, that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

6.8     Material Adverse Effect

Since February 14, 2023, there shall not have occurred any circumstances or condition, which individually or in the aggregate, constitutes or is reasonably expected to constitute, a Material Adverse Effect.

6.9     Solvency Certificate

On the Closing Date, the Administrative Agent and the Lenders (or their respective counsel) shall have received a certificate from the chief financial officer of Holdings in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

6.10     Financial Statements

(a)     [The RequiredAdministrative Agent and the Lenders (or their respective counsel) shall have received copies of the unaudited preliminary consolidated balance sheet and the related unaudited preliminary consolidated statements of income and cash flows of the Borrower and its Subsidiaries as of and for (i) the fiscal quarter ended June 30, 2022, (ii) the fiscal year ended September 30, 2022 and (iii) the fiscal quarter ended December 31, 2022, in each case, subject to changes resulting from normal year-end adjustments and the absence of footnotes.]

6.11     Plan Consummation

The Plan shall not have been amended, modified or supplemented after February 14, 2023 in any manner or any condition to the effectiveness thereof shall not have been waived that, individually or in the aggregate, would reasonably be expected to adversely affect the interests of the Lenders (taken as a whole and in their capacities as such) in any material respect. The Confirmation Order shall be in form and substance materially consistent with the Plan and otherwise reasonably satisfactory to the Required Consenting Stakeholders (as defined in the

130

Restructuring Support Agreement) and shall have been entered confirming the Plan. The Confirmation Order shall be in full force and effect and not have been stayed, reversed, or vacated, amended, supplemented, or modified except that such applicable order may be further amended, supplemented or otherwise modified in any manner that would not reasonably be expected to adversely affect the interests of the Lenders (taken as a whole and in their capacities as such) in any material respect. The Confirmation Order shall have become a final order and authorize the Avaya Debtors and the Credit Parties to execute, deliver and perform all of their obligations under all Credit Documents and shall contain no term or provision that contradicts such authorization. The Avaya Debtors shall be and shall have been in compliance with the Confirmation Order in all material respects. The Plan shall have become effective in accordance with its terms and all conditions to the effectiveness of the Plan shall have been satisfied or waived without giving effect to any waiver that would reasonably be expected to adversely affect the interests of the Lenders in any material respect unless consented to by the Required Consenting Stakeholders (as defined in the Restructuring Support Agreement), and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Plan shall have been (or concurrently with the Closing Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with Applicable Laws.

6.12     No Default

No Default or Event of Default shall have occurred and be continuing or shall exist at the time of, or would result from, the proposed Borrowing on the Closing Date or the application of the proceeds therefrom.

6.13     [Reserved.]Evidence of Insurance

The Lenders (or their respective counsel) shall have received, on or prior to the Closing Date, copies of insurance policies or certificates of insurance of the Credit Parties, together with endorsements, evidencing liability and casualty insurance meeting the requirements set forth in the Credit Documents, including, but not limited to, naming the Collateral Agent as additional insured (in the case of liability insurance) or lender loss payee (in the case of property insurance) on behalf of the Secured Parties.

6.14     Patriot Act

The Administrative Agent shall have received (at least three (3) Business Days prior to the Closing Date) all documentation and other information about the Credit Parties as has been reasonably requested in writing at least 10five (5) Business Days prior to the Closing Date by the Administrative Agent or the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

For purposes of determining compliance with the conditions specified in Section 6 on the Closing Date, each Lender that has signed or authorized the signing of this Agreement and each Lender Claimant, in each case, shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required under this Section 6 to be consented to or approved by or acceptable or satisfactory to a Lender unless the

131

Administrative Agent shall have received written notice from such Lender ~~or Lender Claimant, as applicable,~~ prior to the proposed Closing Date specifying its objection thereto. <u>No Lender Claimant shall have any right to object to any document or any other matter required under this Section 6 unless and until such Lender Claimant has been recognized as a Lender in accordance with Section 2.18.</u>

<u>6.15    Letter of Direction</u>

<u>The Administrative Agent and the Lenders shall have received a letter of direction containing funds flow information with respect to the proceeds of the Borrowing (which shall specify any fees, costs or expenses to be netted therefrom as part of the funds flow) to be distributed on the Closing Date.</u>

**SECTION 7   [Reserved]**

**SECTION 8   Representations and Warranties.**

In order to induce the Agents and the Lenders to enter into this Agreement and to induce the Lenders to make, or be deemed to make, the Term Loans, each of Holdings and the Borrower makes the following representations and warranties to the Lenders and the Agents, all of which shall survive the execution and delivery of this Agreement and the making of the Term Loans:

8.1    Corporate Status; Compliance with Laws

Each of Holdings, the Borrower and each Material Subsidiary of the Borrower that is a Restricted Subsidiary (a) is a duly organized and validly existing corporation or other entity in good standing (as applicable) under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact the business in which it is engaged, except as would not reasonably be expected to result in a Material Adverse Effect, (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified would not reasonably be expected to result in a Material Adverse Effect and (c) is in compliance with all Applicable Laws, except to the extent that the failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.

8.2    Corporate Power and Authority

Each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party. Each Credit Party has duly executed and delivered each Credit Document to which it is a party and each such Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or

132

law) (*provided* that, with respect to the creation and perfection of security interests with respect to Indebtedness, Stock and Stock Equivalents of Foreign Subsidiaries, only to the extent the creation and perfection of such obligation is governed by the UCC).

8.3     No Violation

Neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party nor the compliance with the terms and provisions thereof nor the consummation of the financing transactions contemplated hereby and thereby will (a) contravene any applicable provision of any material Applicable Law (including material Environmental Laws) other than any contravention which would not reasonably be expected to result in a Material Adverse Effect, (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any Lien upon any of the property or assets of Holdings, the Borrower or any Restricted Subsidiary (other than Liens permitted hereunder) pursuant to the terms of any material indenture, loan agreement, lease agreement, mortgage, deed of trust or other material debt agreement or instrument to which Holdings, the Borrower or any Restricted Subsidiary is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "**Contractual Requirement**") other than any such breach, default or Lien that would not reasonably be expected to result in a Material Adverse Effect, or (c) violate any provision of the Organizational Documents of any Credit Party.

8.4     Litigation

Except as set forth on Schedule 8.4, there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened in writing with respect to Holdings, the Borrower or any of the Restricted Subsidiaries that have a reasonable likelihood of adverse determination and such determination would reasonably be expected to result in a Material Adverse Effect.

8.5     Margin Regulations

Neither the making or deemed making of any Term Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board.

8.6     Governmental Approvals

The execution, delivery and performance of the Credit Documents does not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (i) such as have been obtained or made and are in full force and effect, (ii) filings and recordings in respect of the Liens created pursuant to the Security Documents and (iii) such licenses, authorizations, consents, approvals, registrations, filings or other actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

133

8.7      Investment Company Act

None of the Credit Parties is an "investment company" within the meaning of, and subject to registration under, the Investment Company Act of 1940, as amended.

8.8      True and Complete Disclosure

(a)      None of the written factual information and written data (taken as a whole) heretofore or contemporaneously furnished by or on behalf of Holdings, the Borrower, any of the Subsidiaries of the Borrower or any of their respective authorized representatives to the Administrative Agent, any Lender on or before the Closing Date (including all such information and data contained in the Credit Documents) regarding Holdings, the Borrower and its Restricted Subsidiaries in connection with the Transactions for purposes of or in connection with this Agreement or any transaction contemplated herein contained any untrue statement of any material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time in light of the circumstances under which such information or data was furnished, it being understood and agreed that for purposes of this Section 8.8(a), such factual information and data shall not include projections or estimates (including financial estimates, forecasts and other forward-looking information) and information of a general economic or general industry nature.

(b)      The projections filed with the Bankruptcy Court on [-]February 14, 2023 are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents and the Lenders that such projections, forward-looking statements, estimates and pro forma financial information are not to be viewed as facts or a guarantee of performance, and are subject to material contingencies and assumptions, many of which are beyond the control of the Credit Parties, and that actual results during the period or periods covered by any such projections, forward-looking statements, estimates and pro forma financial information may differ materially from the projected results.

8.9      Financial Condition; Financial Statements

The financial statements described in Section 6.10 present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries, in each case, as of the dates thereof and for such period covered thereby in accordance with GAAP, consistently applied throughout the periods covered thereby, except as otherwise noted therein, and subject, in the case of any unaudited financial statements, to changes resulting from normal year-end adjustments and the absence of footnotes.  There has been no Material Adverse Effect since the Closing Date.

8.10    Tax Matters

Except where the failure of which would not be reasonably expected to have a Material Adverse Effect, (a) each of Holdings, the Borrower and each of the Restricted Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it (after giving effect to all applicable extensions) and has paid all material Taxes payable by it that have become due (whether or not shown on such Tax return), other than those (i) not yet delinquent or (ii) contested in good faith as to which adequate

134

reserves have been provided to the extent required by law and in accordance with GAAP, (b) each of Holdings, the Borrower and each of the Restricted Subsidiaries has provided adequate reserves in accordance with GAAP for the payment of, all federal, state, provincial and foreign Taxes not yet due and payable, and (c) each of Holdings, the Borrower and each of the Restricted Subsidiaries has satisfied all of its Tax withholding obligations.

8.11    Compliance with ERISA

(a)     No ERISA Event has occurred or is reasonably expected to occur; and no Lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Borrower or any ERISA Affiliate been notified in writing that such a Lien will be imposed on the assets of Holdings, the Borrower or any ERISA Affiliate on account of any Pension Plan, except to the extent that a breach of any of the representations, warranties or agreements in this Section 8.11(a) would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect.  No Pension Plan has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.11(a), be reasonably likely to have a Material Adverse Effect.

(b)     All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and Applicable Law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to have a Material Adverse Effect.  All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except to the extent any such events would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.12    Subsidiaries

Schedule 8.12 lists each Subsidiary of Holdings (and the direct and indirect ownership interest of Holdings therein), in each case existing on the Closing Date (after giving effect to the Transactions).

8.13    Intellectual Property

Each of Holdings, the Borrower and the Restricted Subsidiaries has good and marketable title to, or a valid license or right to use, all patents, trademarks, servicemarks, trade names, copyrights and all applications therefor and licenses thereof, and all other intellectual property rights, free and clear of all Liens (other than Liens permitted hereunder), that are necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such title, license or rights would not reasonably be expected to have a Material Adverse Effect.

8.14    Environmental Laws

Except as would not reasonably be expected to have a Material Adverse Effect: (a) Holdings, the Borrower and the Restricted Subsidiaries and all Real Estate are in compliance with all Environmental Laws; (b) Holdings, the Borrower and the Restricted Subsidiaries have,

and have timely applied for renewal of, all permits under Environmental Law to construct and operate their facilities as currently constructed; (c) except as set forth on Schedule 8.14, neither Holdings, the Borrower nor any Restricted Subsidiary is subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim or any other liability under any Environmental Law, including any such Environmental Claim, or, to the knowledge of the Borrower, any other liability under Environmental Law related to, or resulting from the business or operations of any predecessor in interest of any of them; (d) none of Holdings, the Borrower or any Restricted Subsidiary is conducting or financing or, to the knowledge of the Borrower, is required to conduct or finance, any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; (e) to the knowledge of the Borrower, no Hazardous Materials have been released into the environment at, on or under any Real Estate currently owned or leased by Holdings, the Borrower or any Restricted Subsidiary, and (f) neither Holdings, the Borrower nor any Restricted Subsidiary has treated, stored, transported, released, disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or, to the knowledge of the Borrower, formerly owned or leased Real Estate or facility.  Except as provided in this Section 8.14, Holdings, the Borrower and the Restricted Subsidiaries make no other representations or warranties regarding Environmental Laws.

8.15    Properties

Except as set forth on Schedule 8.15, Holdings, the Borrower and the Restricted Subsidiaries have good title to or valid leasehold or easement interests or other license or use rights in all properties that are necessary for the operation of their respective businesses as currently conducted, free and clear of all Liens (other than any Liens permitted under this Agreement) and except where the failure to have such good title, leasehold or easement interests or other license or use rights would not reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, the Borrowers and the Restricted Subsidiaries do not own in fee any Real Estate with a fair market value of $10,000,000 or more.

8.16    Solvency

On the Closing Date, after giving effect to the Transactions, immediately following the making of the Term Loans on such date and after giving effect to the application of the proceeds of such Term Loans, Holdings on a consolidated basis with its Subsidiaries will be Solvent.

8.17    Security Interests

Subject to the qualifications set forth in Section 6.2 and the terms and conditions of any Applicable Intercreditor Agreement then in effect, with respect to each Credit Party, the Security Documents, taken as a whole, are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable first priority security interest (subject to Liens permitted hereunder) in the Collateral described therein, in each case, to the extent required under the Security Documents, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a

136

proceeding in equity or at law.  In the case of (i) the Stock described in the Security Agreement that is in the form of securities represented by stock certificates or otherwise constituting certificated securities within the meaning of Section 8-102(a)(15) of the New York UCC ("**Certificated Securities**"), when certificates representing such Stock are delivered to the Collateral Agent along with instruments of transfer in blank or endorsed to the Collateral Agent, and (ii) all other Collateral constituting personal property described in the Security Agreement, when financing statements, intellectual property security agreements and other required filings, recordings, agreements and actions in appropriate form are executed and delivered, performed, recorded or filed in the appropriate offices, as the case may be, the Collateral Agent, for the benefit of the applicable Secured Parties, shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Credit Parties in all Collateral that may be perfected by filing, recording or registering a financing statement, an intellectual property security agreement or analogous document (to the extent such Liens may be perfected by possession of the Certificated Securities by the Collateral Agent or such filings, agreements or other actions or perfection is otherwise required by the terms of any Credit Document), in each case, to the extent required under the Security Documents, as security for the Obligations, in each case prior and superior in right to any other Lien (except in the case of Liens permitted hereunder).

### 8.18    Labor Matters

Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against Holdings, the Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrower, threatened in writing; and (b) hours worked by and payment made for such work to employees of Holdings, the Borrower and each Restricted Subsidiary have not been in violation of the Fair Labor Standards Act or any other Applicable Law dealing with such matters.

### 8.19    Sanctioned Persons; Anti-Corruption Laws; Patriot Act

None of Holdings, the Borrower or any of its Subsidiaries or any of their respective directors or officers is subject to any economic embargoes or similar sanctions administered or enforced by the U.S. Department of State or the U.S. Department of the Treasury (including the Office of Foreign Assets Control) or any other applicable sanctions authority (collectively, "**Sanctions**", and the associated laws, rules, regulations and orders, collectively, "**Sanctions Laws**").  Each of Holdings, the Borrower and its Subsidiaries and their respective officers and directors is in compliance, in all material respects, with (i) all Sanctions Laws, (ii) the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "**Anti-Corruption Laws**") and (iii) the Patriot Act and any other applicable anti-terrorism and anti-money laundering laws, rules, regulations and orders.  No part of the proceeds of the Term Loans will be used, directly or indirectly, in violation of the Patriot Act, the Anti-Corruption Laws, Sanctions Laws and/or any other anti-terrorism or anti-money laundering laws in any material respect.

8.20    Use of Proceeds

The Borrower will use the proceeds of the Term Loans in accordance with Section 9.13 of this Agreement.

8.21    Insurance

(a)    The properties of the Credit Parties are insured with financially sound and reputable insurance companies that are not Affiliates of such Persons, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where any Credit Party operates.

(b)    The Credit Parties maintain fully paid flood hazard insurance on all real property that is located in a special flood hazard area in the United States and that constitutes Collateral on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 or as otherwise required by the Collateral Agent or the Required Lenders.

## SECTION 9   Affirmative Covenants

The Borrower hereby covenants and agrees that on the Closing Date (immediately after giving effect to the Transactions) and thereafter, until all Commitments have terminated and the Term Loans, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations), are paid in full:

9.1    Information Covenants

The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)    Annual Financial Statements.[10]  As soon as available and in any event on or before the date that is 120 days after the end of each Fiscal Year (or, solely with respect to the Fiscal Year ended September 30, 2022, the Borrower shall make commercially reasonable efforts to provide within 60 days after the Closing Date), the consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of operations and cash flows for such Fiscal Year, setting forth comparative consolidated figures for the preceding Fiscal Year (commencing with the Fiscal Year ended September 30, 2024[ ][11]), all in reasonable detail and prepared in accordance with GAAP in all material respects and, in each case, except with respect to any such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be qualified as to the scope of audit or as to the status of the Borrower and its consolidated Subsidiaries as a going concern (other than any exception or qualification that is a result of (x) a current maturity date of any Indebtedness or (y) any actual or prospective default of a financial

---

[10] FY 2023 audited financials to be provided within 120 days after year-end; TBD re FY 2022 audited financials.

[11] Comp against 2023 audited financials TBD.

maintenance covenant (including the ABL Financial Covenant)), all of which shall be (i) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its consolidated Subsidiaries (or Holdings or an indirect parent of the Borrower and its consolidated Subsidiaries, as the case may be) in accordance with GAAP in all material respects and (ii) accompanied by a Narrative Report with respect thereto.

(b)      Quarterly Financial Statements.  As soon as available and in any event on or before the date that is 60 days after the end of each of the first three fiscal quarters of any Fiscal Year (or, with respect to the fiscal quarters ended March 31, 2023 and June 30, 2023, 90 days after the end of such fiscal quarters), the consolidated balance sheets of the Borrower and its consolidated Subsidiaries, in each case, as at the end of such quarterly period and the related consolidated statements of operations for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly period, and the related consolidated statement of cash flows for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly period, and, commencing with the fiscal quarter ended on [September 30, 2024], setting forth comparative consolidated figures for the related periods in the prior Fiscal Year or, in the case of such consolidated balance sheet, for the last day of the prior Fiscal Year, all of which shall be (i) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its consolidated Subsidiaries (or Holdings or an indirect parent of the Borrower and its consolidated Subsidiaries, as the case may be) in accordance with GAAP in all material respects (except as set forth in the following proviso), subject to changes resulting from audit, normal year-end audit adjustments and absence of footnotes and (ii) accompanied by a Narrative Report with respect thereto; *provided*, that notwithstanding the foregoing, the financial statements to be delivered pursuant to this clause (b) with respect to the fiscal quarters ended March 31, 2023 and June 30, 2023 shall not be required to reflect "fresh-start" or other reorganization adjustments.

(c)      Officer's Certificates.  Within five (5) Business Days of the delivery of the financial statements provided for in Sections 9.1(a) and (b), a certificate of an Authorized Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth (x) with specification of any change in the identity of the Restricted Subsidiaries and Unrestricted Subsidiaries as at the end of such Fiscal Year or period, as the case may be, from the Restricted Subsidiaries and Unrestricted Subsidiaries, respectively, provided to the Lenders on the Closing Date or the most recent Fiscal Year or period, as the case may be and (y) commencing with the Fiscal Year ended on September 30, 2024, in the case of the financial statements provided for in Section 9.1(a), with customary details, the calculation of the Excess Cash Flow for the most recent Fiscal Year.  Within five (5) Business Days of the delivery of the financial statements provided for in Section 9.1(a), a certificate of an Authorized Officer of the Borrower setting forth (A) in reasonable detail the Available Amount and the Available Equity Amount as at the end of the Fiscal Year to which such financial statements relate and (B) the information required pursuant to Sections I and II of the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or the date of the most recent certificate delivered pursuant to this clause (c)(B), as the case may be.

139

(d)      Notice of Default; Litigation; ERISA Event.  Promptly after an Authorized Officer of the Borrower or any Restricted Subsidiary obtains knowledge thereof, written notice of (i) the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto, (ii) any litigation, regulatory or governmental proceeding pending against the Borrower or any Restricted Subsidiary that has a reasonable likelihood of adverse determination and such determination would reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect and (iii) the occurrence of any ERISA Event or any ERISA Event that is reasonably expected to occur, that would reasonably be expected to result in a Material Adverse Effect.

(e)      Other Information.  Promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) or registration statements (other than drafts of pre-effective versions of registration statements) with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by Holdings, the Borrower or any Restricted Subsidiary (other than amendments to any registration statement (to the extent such registration statement, in the form it becomes effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statements on Form S-8) and copies of all financial statements, proxy statements, notices and reports that Holdings, the Borrower or any Restricted Subsidiary shall send to the ABL Administrative Agent or lenders under the ABL Credit Agreement or the holders of any publicly issued debt with a principal amount in excess of $300,000,000 of Holdings, the Borrower and/or any Restricted Subsidiary in their capacity as such holders (in each case to the extent not theretofore delivered to the Administrative Agent pursuant to this Agreement).

(f)      Requested Information.  With reasonable promptness, following the reasonable request of the Administrative Agent, such other information (financial or otherwise) as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time; *provided* that, notwithstanding anything to the contrary in this Section 9.1(f), none of Holdings, the Borrower or any of its Restricted Subsidiaries will be required to provide any such other information pursuant to this Section 9.1(f) to the extent that (i) the provision thereof would violate any attorney client privilege (as reasonably determined by counsel (internal or external) to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality binding on the Credit Parties or their respective Affiliates (so long as not entered into in contemplation hereof) or (ii) such information constitutes attorney work product (as reasonably determined by counsel (internal or external) to the Credit Parties).

(g)      Projections.  Within 120 days after the end of each Fiscal Year of the Borrower ended after the Closing Date, a reasonably detailed consolidated budget for the following Fiscal Year as customarily prepared by management of the Borrower for its internal use (including a projected consolidated balance sheet of the Borrower and the Restricted Subsidiaries as of the end of such Fiscal Year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**"), which Projections shall in each case be accompanied by a certificate of an Authorized Officer of the Borrower stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein,

which assumptions were based on good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time of preparation of such Projections, it being understood that such Projections and assumptions as to future events are not to be viewed as facts or a guarantee of performance, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and its Subsidiaries, and that actual results may vary from such Projections and such differences may be material.

(h)    Reconciliations.    Simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 9.1(a) and (b) above, reconciliations for such consolidated financial statements or other consolidating information reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; *provided* that the Borrower shall be under no obligation to deliver the reconciliations or other information described in this clause (h) if the Consolidated Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Subsidiaries (which Consolidated Total Assets and Consolidated EBITDA shall be calculated in accordance with the definitions of such terms, but determined based on the financial information of the Borrower and its consolidated Subsidiaries, and not the financial information of the Borrower and its Restricted Subsidiaries) do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of the Borrower and its Restricted Subsidiaries by more than 2.5%.

Notwithstanding the foregoing, the obligations in clauses (a), (b), (e) and (g) of this Section 9.1 may be satisfied with respect to financial information of the Borrower and the Restricted Subsidiaries by furnishing (A) the applicable financial statements of Holdings or any direct or indirect parent of Holdings or (B) the Borrower's (or Holdings' or any direct or indirect parent thereof), as applicable, Form 8-K, 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of clauses (A) and (B) of this paragraph, to the extent such information relates to Holdings or a direct or indirect parent of Holdings, such information is accompanied by consolidating or other information that explains in reasonable detail the differences between the information relating to Holdings or such parent, on the one hand, and the information relating to the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other hand (*provided*, *however*, that the Borrower shall be under no obligation to deliver such consolidating or other explanatory information if the Consolidated Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Restricted Subsidiaries do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of Holdings or any direct or indirect parent of Borrower and its consolidated Subsidiaries by more than 2.5%).  Documents required to be delivered pursuant to clauses (a), (b) and (e) of this Section 9.1 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website as notified to the Administrative Agent in writing and provides to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, or filed with the SEC, and available in EDGAR (or any successor) to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

141

9.2     Books, Records and Inspections

(a)     The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or the Required Lenders (as accompanied by the Administrative Agent) to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the books and records of the Borrower and any such Restricted Subsidiary and discuss the affairs, finances and accounts of the Borrower and of any such Restricted Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or Required Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); *provided* that, excluding any such visits and inspections during the continuation of an Event of Default (i) only the Administrative Agent, whether on its own or in conjunction with the Required Lenders, may exercise rights of the Administrative Agent and the Lenders under this Section 9.2, (ii) the Administrative Agent shall not exercise such rights more than one time in any calendar year and (iii) only one such visit shall be at the Borrower's expense; *provided*, *further*, that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Required Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 9.2, neither the Borrower nor any Restricted Subsidiary will be required under this Section 9.2 to disclose or permit the inspection or discussion of any document, information or other matter to the extent that such action would violate any attorney-client privilege (as reasonably determined by counsel (internal or external) to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality (not created in contemplation thereof) binding on the Credit Parties or their respective Affiliates or constituting attorney work product (as reasonably determined by counsel (internal or external) to the Credit Parties).

(b)     The Borrower will, and will cause each Restricted Subsidiary to, maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity, in all material respects, with GAAP shall be made of all material financial transactions and matters involving the assets of the business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that any Restricted Subsidiary may maintain its individual books and records in conformity with local standards or customs and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

9.3     Maintenance of Insurance

The Borrower will, and will cause each Material Subsidiary that is a Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith

142

judgment of the management of the Borrower, as applicable) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business and the availability of insurance on a cost-effective basis; and will furnish to the Collateral Agent, upon written reasonable request from the Collateral Agent, information presented in reasonable detail as to the insurance so carried, *provided*, *however*, that for so long as no Event of Default has occurred and is continuing, the Collateral Agent shall be entitled to make such request only once in any calendar year. The Collateral Agent and its successors and/or assigns shall be named as lender loss payee or mortgagee and/or additional insured with respect to any insurance providing liability coverage or coverage in respect of any Collateral, and the Borrower will cause each provider of any such insurance to agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the Collateral Agent, that it will give the Collateral Agent thirty (30) days (or ten (10) days for non-payment or such lesser amount as the Required Lenders may agree to in their sole direction) prior written notice before any such policy or policies shall be altered or cancelled.  With respect to each Mortgaged Property, ~~obtain flood insurance in such total amount as the~~ ~~Required Lenders~~ ~~may from time to time require,~~ if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), the Borrower shall obtain flood insurance in such total amount as the Collateral Agent may from time to time require and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

9.4     Payment of Taxes

The Borrower will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a material Lien upon any properties of the Borrower or any Restricted Subsidiary; *provided* that neither the Borrower nor any such Restricted Subsidiary shall be required to pay any such tax, assessment, charge, levy or claim (i) that is being contested in good faith and by proper proceedings if it has maintained adequate reserves (in the good faith judgment of management of the Borrower) with respect thereto in accordance with GAAP or (ii) with respect to which the failure to pay would not reasonably be expected to result in a Material Adverse Effect.

9.5     Consolidated Corporate Franchises

The Borrower will do, and will cause each Material Subsidiary that is a Restricted Subsidiary to do, or cause to be done, all things necessary to preserve and keep in full force and effect its existence, corporate rights and authority, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect; *provided*, *however*, that the

143

Borrower and the Restricted Subsidiaries may consummate any transaction otherwise permitted hereby, including under Section 10.2, 10.3, 10.4 or 10.5.

9.6     Compliance with Statutes, Regulations, Etc.

The Borrower will, and will cause each Restricted Subsidiary to, comply with all Applicable Laws applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

9.7     Lender Calls

At the reasonable request of the Administrative Agent, the Borrower shall conduct a conference call that Lenders may attend to discuss the financial condition and results of operations of the Borrower and its Restricted Subsidiaries for the most recently ended measurement period for which financial statements have been delivered pursuant to Section 9.1(a) or (b) (beginning with the fiscal period of the Borrower ended [September 30], 2023), at a date and time to be determined by the Borrower with reasonable advance notice to the Administrative Agent, limited to one conference call per fiscal quarter.

9.8     Maintenance of Properties

The Borrower will, and will cause the Restricted Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition (ordinary wear and tear, casualty and condemnation excepted), except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

9.9     Transactions with Affiliates

The Borrower will conduct, and will cause the Restricted Subsidiaries to conduct, all transactions with any of its or their respective Affiliates (other than (x) any transaction or series of related transactions with an aggregate value that is equal to or less than $25,000,000 or (y) transactions between or among (i) the Borrower and the Restricted Subsidiaries or any Person that becomes a Restricted Subsidiary as a result of such transactions and (ii) the Borrower, the Restricted Subsidiaries and to the extent in the ordinary course or consistent with past practice, Holdings) on terms that are, taken as a whole, not materially less favorable to the Borrower or such Restricted Subsidiary as it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate (as determined in good faith by the Borrower); *provided* that the foregoing restrictions shall not apply to:

(a)     transactions permitted by Section 10 (other than Section 10.6(m) and any provision of Section 10 permitting transactions by reference to Section 9.9),

(b)     the Transactions and the payment of the Transaction Expenses,

(c)     the issuance of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) to the management of the Borrower (or any direct or indirect parent

144

thereof) or any Subsidiary of the Borrower in connection with the Transactions or pursuant to arrangements described in clause (e) of this Section 9.9,

(d)     loans, advances and other transactions between or among the Borrower, any Subsidiary of the Borrower or any joint venture (regardless of the form of legal entity) in which the Borrower or any Subsidiary of the Borrower has invested (and which Subsidiary or joint venture would not be an Affiliate of the Borrower but for the Borrower's or such Subsidiary's Subsidiary ownership of Stock or Stock Equivalents in such joint venture or Subsidiary) to the extent permitted under Section 10,

(e)     (i) employment, consulting and severance arrangements between the Borrower and the Restricted Subsidiaries (or any direct or indirect parent of the Borrower) and their respective officers, employees, directors or consultants in the ordinary course of business (including payments, loans and advances in connection therewith) and (ii) issuances of securities, or other payments, awards or grants in cash, securities or otherwise and other transactions pursuant to any equityholder, employee or director equity plan or stock or other equity option plan or any other management or employee benefit plan or agreement, other compensatory arrangement or any stock or other equity subscription, co-invest or equityholder agreement,

(f)     the payment of customary fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, managers, consultants, officers and employees of the Borrower (or, to the extent attributable to the ownership of the Borrower and its Restricted Subsidiaries, any direct or indirect parent thereof) and the Subsidiaries of the Borrower,

(g)     the issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) to Holdings or to any director, officer, employee or consultant,

(h)     any customary transactions with a Receivables Entity effected as part of a Permitted Receivables Financing and any customary transactions with a Securitization Subsidiary effected as part of a Qualified Securitization Financing,

(i)     transactions pursuant to permitted agreements in existence on the Closing Date and, to the extent each such transaction is valued in excess of $25,000,000, set forth on Schedule 9.9 or any amendment, modification, supplement, replacement, extension, renewal or restructuring thereto to the extent such an amendment, modification, supplement, replacement, extension renewal or restructuring (together with any other amendment or supplemental agreements) is not materially adverse, taken as a whole, to the Lenders (in the good faith determination of the Borrower),

(j)     transactions in which Holdings (or any indirect parent of the Borrower), the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of Section 9.9,

145

(k)      the existence and performance of agreements and transactions with any Unrestricted Subsidiary that were entered into prior to the designation of a Restricted Subsidiary as such Unrestricted Subsidiary to the extent that the transaction was permitted at the time that it was entered into with such Restricted Subsidiary and transactions entered into by an Unrestricted Subsidiary with an Affiliate prior to the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that such transaction was not entered into in contemplation of such designation or redesignation, as applicable,

(l)      Affiliate repurchases of the Term Loans or Commitments to the extent permitted hereunder and the payments and other transactions reasonably related thereto,

(m)      transactions constituting any part of a Permitted Reorganization, and

(n)      transactions related to a Permitted Change of Control, the payment of Permitted Change of Control Costs and the issuance of Stock and Stock Equivalents to the management of Holdings, the Borrower or any of its Restricted Subsidiaries in connection with a Permitted Change of Control.

9.10    End of Fiscal Years

The Borrower will, for financial reporting purposes, cause its Fiscal Year to end on September 30 of each year (each a "**Fiscal Year**") and cause its Restricted Subsidiaries to maintain their fiscal years as in effect on the Closing Date; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent change the Fiscal Year or the fiscal years of its Restricted Subsidiaries with the prior written consent of the Administrative Agent and the Required Lenders (not to be unreasonably withheld, conditioned, delayed or denied), in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

9.11    Additional Guarantors and Grantors

Subject to any applicable limitations set forth in the Guarantee, the Security Documents, or any Applicable Intercreditor Agreement and this Agreement (including Section 9.12), the Borrower will cause each direct or indirect Wholly Owned Domestic Subsidiary of the Borrower (excluding any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date and each other Domestic Subsidiary of the Borrower that ceases to constitute an Excluded Subsidiary to, within sixty (60) days from the date of such formation, acquisition or cessation (which in the case of any Subsidiary ceasing to constitute an Excluded Subsidiary pursuant to clause (a) thereof, commencing on the date of delivery of the applicable compliance certificate pursuant to Section 9.1(c)), as applicable (or such longer period as the Required Lenders may agree in their reasonable discretion), execute (A) a supplement to each of the Guarantee and the Security Agreement in order to become a Guarantor under such Guarantee and a grantor/pledgor under the Security Agreement and (B) a joinder to the Intercompany Subordinated Note.

146

9.12    Further Assurances

(a)    Subject to the applicable limitations set forth in this Agreement (including Section 9.11) and the Security Documents and any Applicable Intercreditor Agreement, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents) that may be required under any Applicable Law, or that the Collateral Agent or Required Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Borrower and the Restricted Subsidiaries.

(b)    Subject to any applicable limitations set forth in the Security Documents (including in any Mortgage), if any assets that are of the nature secured by any Security Documents (including any owned Real Estate or improvements thereto constituting Collateral with a fair market value in excess of $10,000,000) are acquired by the Borrower or any Subsidiary Guarantor after the Closing Date or are held by any Subsidiary on or after the time it becomes a Guarantor pursuant to Section 9.11 (other than assets constituting Collateral under the Security Documents that become subject to the Lien of any Security Document upon acquisition thereof or assets subject to a Lien granted pursuant to Section 10.2(d) or 10.2(g)), the Borrower will promptly notify the Collateral Agent in writing thereof and, if requested by the Collateral Agent or the Required Lenders, will cause such assets to be subjected to a Lien securing the Obligations and will take, and cause the other Credit Parties to take, such actions as shall be necessary or reasonably requested by the Collateral Agent or the Required Lenders, as soon as commercially reasonable but in no event later than one hundred twenty (120) days, unless extended by the Required Lenders in their reasonable discretion, to grant and perfect such Liens consistent with the applicable requirements of the Security Documents, including actions described in paragraph (a) of this Section, all at the expense of the Credit Parties.

(c)    Any Mortgage delivered to the Collateral Agent in accordance with the preceding clause (b) shall be accompanied by those items set forth in clause (d) that are customary for the type of assets covered by such Mortgage.  Any items that are customary for the type of assets covered by such Mortgage may be delivered within a commercially reasonable period of time after the delivery of a Mortgage if they are not reasonably available at the time the Mortgage is delivered.

(d)    With respect to any Mortgaged Property, within 120 days, unless extended by the Required Lenders in their reasonable discretion, the Borrower will deliver, or cause to be delivered, to the Collateral Agent (i) a Mortgage with respect to each Mortgaged Property, executed by an Authorized Officer of each obligor party thereto, (ii) a policy or policies of title insurance insuring the Lien of each such Mortgage as a valid Lien on the Mortgaged Property described therein, free of any other Liens except Permitted Encumbrances or consented to in writing (including via email) by the Collateral Agent and the Required Lenders, together with such endorsements and reinsurance as the Collateral Agent or the Required Lenders may reasonably request, together with evidence reasonably acceptable to the Collateral Agent of payment of all title insurance premiums, search and examination charges, escrow charges and related charges, fees, costs and expenses required for the issuance of the title insurance policies

147

referred to above, (iii) a Survey, to the extent reasonably necessary to satisfy the requirements of clause (ii) above, (iv) all other documents and instruments, including Uniform Commercial Code or other applicable fixture security financing statements, reasonably requested by the Collateral Agent or the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by any such Mortgage and perfect such Liens to the extent required by, and with the priority required by, such Mortgage shall have been delivered to the Collateral Agent in proper form for filing, registration or recording and (v) written opinions of legal counsel in the states in which each such Mortgaged Property is located in customary form and substance.  If any building or other improvement included in any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or as hereafter in effect or successor act thereto), then the Borrower shall, prior to delivery of the Mortgages, deliver or cause to be delivered, (i) a completed Federal Emergency Management Agency Standard Flood Determination with respect to each Mortgaged Property, in each case in form and substance reasonably satisfactory to the Collateral Agent and (ii) evidence of flood insurance with respect to each Mortgaged Property, to the extent and in amounts required by Applicable Laws, in each case in form and substance reasonably satisfactory to the Collateral Agent.

(e)     Notwithstanding anything herein to the contrary, if the Borrower and the Required Lenders mutually agree in their reasonable judgment (confirmed in writing to the Borrower and the Collateral Agent) that the cost or other consequences (including adverse tax and accounting consequences) of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Secured Parties thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents.

(f)     Notwithstanding anything herein or in any other Credit Document to the contrary, the Borrower and the Guarantors shall not be required, nor shall the Collateral Agent be authorized, (i) to perfect the above-described pledges, security interests and mortgages by any means other than by (A) filings pursuant to the Uniform Commercial Code in the office of the secretary of state (or similar central filing office) of the relevant State(s), (B) filings in United States government offices with respect to intellectual property as expressly required herein and under the other Credit Documents, (C) delivery to the Collateral Agent, for its possession, of all Collateral consisting of material intercompany notes, stock certificates of the Borrower and its Restricted Subsidiaries or (D) Mortgages required to be delivered pursuant to this Section 9.12, (ii) to enter into any control agreement with respect to any deposit account, securities account or commodities account or contract (other than for which control agreements are required to be obtained or for which the ABL Collateral Agent has obtained control, in each case, to the extent required by the ABL Credit Documents; *provided* that in such case, the ABL Collateral Agent will act as the agent for perfection on behalf of the Secured Parties without causing the Collateral Agent or the Administrative Agent to become a party to such control agreements), (iii) to take any action in any non-U.S. jurisdiction or pursuant to the requirements of the laws of any non-U.S. jurisdiction in order to create any security interests or to perfect any security interests, including with respect to any intellectual property registered outside of the United States (it being understood that there shall be no security agreements or pledge agreements governed by the laws of any non-U.S. jurisdiction), (iv) except as expressly set forth above, to take any other action with respect to any Collateral to perfect through control agreements or to otherwise

148

perfect by "control", (v) to provide any notice to obtain the consent of governmental authorities under the Federal Assignment of Claims Act (or any state equivalent thereof) or (vi) register, apply to register, or escrow any intellectual property or software.

9.13    Use of Proceeds

The Borrower will use the proceeds of the Initial Term Loans to consummate the Plan, for working capital, general corporate purposes, and certain fees and expenses associated with the closing of the Transactions.  The Borrower will use the proceeds of other Term Loans or Commitments for purposes as agreed with the Lenders thereof.

9.14    Maintenance of Ratings

The Borrower will use commercially reasonable efforts to obtain and maintain (but not maintain any specific rating) a public corporate family and/or corporate credit rating, as applicable, and public ratings in respect of the Initial Term Loans provided pursuant to this Agreement, in each case, from each of S&P and Moody's within 390 days after the Closing Date or as soon as reasonably practicable thereafter.

9.15    Changes in Business

The Borrower and the Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by the Borrower and the Restricted Subsidiaries, taken as a whole, on the Closing Date and other business activities which are extensions thereof or otherwise similar, incidental, complementary, synergistic, reasonably related or ancillary to any of the foregoing (and non-core incidental businesses acquired in connection with any Permitted Acquisition or permitted Investment), in each case as determined by the Borrower in good faith.

9.16    Post-Closing Obligations

(a)    The Borrower hereby agrees to deliver, or cause to be delivered, to the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, the items described on Schedule 9.16 hereof, if any, on or before the dates specified with respect to such items, or such later dates as may be agreed to by, or as may be waived by, the Required Lenders in their sole discretion.

(b)    All representations and warranties contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above and in Schedule 9.16, rather than as elsewhere provided in the Credit Documents); *provided* that to the extent any representation and warranty would not be true because the foregoing actions were not taken on the Closing Date or, following the Closing Date, prior to the date by which such action is required to be taken by Section 9.16(a), the respective representation and warranty shall be required to be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and

149

correct in all respects) at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 9.16 (and Schedule 9.16).

**SECTION 10 Negative Covenants**

The Borrower hereby covenants and agrees that on the Closing Date (immediately after giving effect to the Transactions) and thereafter, until all Commitments and all Term Loans, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreement or Contingent Obligations), are paid in full:

10.1    Limitation on Indebtedness

The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness.  Notwithstanding the foregoing, the limitations set forth in the immediately preceding sentence shall not apply to any of the following:

(a)    Indebtedness arising under the Credit Documents (including any Indebtedness incurred as permitted by Sections 2.14, 2.15 and 13.1);

(b)    Indebtedness under the ABL Credit Documents and any Refinancing Indebtedness thereof, in an aggregate principal amount not to exceed the sum of (i) $300,000,000 *plus* (ii) ~~the principal amount of "Incremental Facilities" (as defined in the ABL Credit Agreement) measured at the time of incurrence pursuant to the ABL Credit Agreement as in effect on the Closing Date *plus* (iii)~~ solely in the case of any such Refinancing Indebtedness, the Refinancing Increased Amount with respect thereto;

(c)    [reserved];

(d)    subject to compliance with Section 10.5, Indebtedness of the Borrower or any Restricted Subsidiary owed to the Borrower or any Restricted Subsidiary; *provided* that all such Indebtedness of any Credit Party owed to any Person that is not a Credit Party shall be (x) evidenced by the Intercompany Subordinated Note (*provided* that any Person becoming a Restricted Subsidiary after the Closing Date may enter into the Intercompany Subordinated Note within the time period set forth in Section 9.11) or (y) otherwise be subject to subordination terms substantially identical to the subordination terms set forth in the Intercompany Subordinated Note or otherwise reasonably acceptable to the Collateral Agent and the Required Lenders;

(e)    subject to compliance with Section 10.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness of the Borrower or any other Restricted Subsidiary that is permitted to be incurred under this Agreement and (ii) the Borrower in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement; *provided* that (x) if the Indebtedness being guaranteed under this Section 10.1(e) is subordinated to the Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms (taken as a whole) at least as favorable to the Agents and the Lenders as those contained in the subordination of such Indebtedness and (y) a Restricted Subsidiary that is

150

not a Credit Party may not, by virtue of this Section 10.1(e), guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 10.1;

(f)     Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims and similar obligations);

(g)     Guarantee Obligations (i) incurred in the ordinary course of business in respect of obligations of (or to) suppliers, customers, franchisees, lessors and licensees, (ii) otherwise constituting Investments permitted by Section 10.5 (other than Investments permitted by Section 10.5(l) by reference to Section 10.1 and Section 10.5(q)); *provided* that this clause (ii) shall not be construed to limit the requirements of Section 10.1(d) and (e), or (iii) contemplated by the Plan;

(h)     Indebtedness (including Indebtedness arising under Capital Leases) incurred to finance the purchase price, cost of design, acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of fixed or capital assets or otherwise in respect of Capital Expenditures, so long as such Indebtedness is incurred concurrently with or within 270 days of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of such fixed or capital assets or incurrence of such Capital Expenditure, and any Refinancing Indebtedness thereof, in an aggregate principal amount not to exceed (i) ~~the greater of (x)~~ $16̶00,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) at the time of incurrence or issuance~~ *plus* the principal amount of Capital Leases outstanding on the Closing Date, in each case at any time outstanding *plus* (ii) solely in the case of any such Refinancing Indebtedness, the Refinancing Increased Amount with respect thereto;

(i)     Indebtedness permitted to remain outstanding under the Plan, and to the extent such Indebtedness exceeds $5,000,000, set forth on Schedule 10.1 and any Refinancing Indebtedness thereof; *provided* that in the case of any Refinancing Indebtedness of any such Indebtedness, each obligor of such Refinancing Indebtedness is an obligor of such Indebtedness;

(j)     Indebtedness in respect of Hedging Agreements; *provided* that such Hedging Agreements are not entered into for speculative purposes (as determined by the Borrower in good faith);

(k)     (i) Permitted Other Debt assumed or incurred for any purpose, including to finance a Permitted Acquisition, other permitted Investments or Capital Expenditures; *provided* that (A) if such Indebtedness is incurred or assumed by a Restricted Subsidiary that is not a Credit Party, such Indebtedness is not guaranteed in any respect by the Borrower or any other Guarantor except as permitted under Section 10.5, (B) the aggregate principal amount of Indebtedness incurred or assumed under this Section 10.1(k)(i) shall not exceed (1) ~~the greater of (x)~~ $16̶00,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) at the time of incurrence or issuance~~ *plus* (2) additional

151

amounts if, on a Pro Forma Basis after giving effect to the incurrence or assumption of such Indebtedness and the application of proceeds thereof and, if applicable, the Permitted Acquisition, permitted Investment or Capital Expenditure, the Consolidated Total Net Leverage Ratio is not greater than 3.30 to 1.00 or, to the extent incurred or assumed in connection with a Permitted Acquisition or similar Investment, the Consolidated Total Net Leverage Ratio (on a Pro Forma Basis for such transaction and the incurrence or assumption of such Indebtedness) is not greater than (I) 3.30 to 1.00 or (II) if the aggregate principal amount of such Indebtedness does not exceed the then-available Ratio Test Cap at such time, the Consolidated Total Net Leverage Ratio immediately prior to such Permitted Acquisition or similar Investment, and (C) if such Permitted Other Debt incurred (and for the avoidance of doubt, not "assumed") pursuant to this clause (k)(i) constitutes a Permitted Other Loan that ranks *pari passu* with the Initial Term Loans as to right of payment and security with respect to the Collateral, the Initial Term Loans shall be subject to the adjustment (if applicable) set forth in the proviso to Section 2.14(d)(iv) as if such Permitted Other Loan were an Incremental Term Loan incurred hereunder and (ii) any Refinancing Indebtedness in respect of the Indebtedness under clause (i) above; *provided* that Indebtedness incurred or assumed by Restricted Subsidiaries that are not Subsidiary Guarantors under this Section 10.1(k), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 10.1(ee), shall not exceed ~~the greater of (x)~~ $16~~0~~0,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) at the time of incurrence or issuance~~, in each case at any time outstanding~~;~~, *provided, further, that any Permitted Other Debt incurred in reliance on clause (B)(2)(II) above may be reclassified, as the Borrower may elect from time to time, as incurred under clause (B)(2)(I) above, if the Borrower meets the applicable leverage ratio at such time* on a Pro Forma Basis;

(l)     Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business or consistent with past practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business (including in respect of construction or restoration activities) or consistent with past practice;

(m)     additional Indebtedness; *provided* that the aggregate amount of Indebtedness incurred or issued pursuant to this Section 10.1(m) shall not exceed ~~the greater of (x)~~ $16~~0~~0,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) at the time of incurrence or issuance~~, in each case at any time outstanding;

(n)     Cash Management Obligations and other Indebtedness in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

(o)     (i) Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (ii) Indebtedness in respect of intercompany obligations of the Borrower or any Restricted

152

Subsidiary with the Borrower or any Restricted Subsidiary in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(p)      Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case entered into in connection with a Permitted Change of Control, Permitted Acquisitions, other Investments and the Disposition of any business, assets or Stock or Stock Equivalents permitted hereunder;

(q)      Indebtedness of the Borrower or any Restricted Subsidiary consisting of (i) financing of insurance premiums or (ii) take or pay obligations contained in supply agreements, in each case arising in the ordinary course of business;

(r)      Indebtedness representing deferred compensation, or similar arrangement, to employees, consultants or independent contractors of the Borrower and the Restricted Subsidiaries incurred in the ordinary course of business;

(s)      Indebtedness consisting of promissory notes issued by the Borrower or any Restricted Subsidiary to any present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) to finance the purchase or redemption of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) permitted by Section 10.6(b);

(t)      Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions and Permitted Acquisitions, any other Investment permitted hereunder and any Permitted Change of Control;

(u)      Indebtedness in respect of (i) Permitted Receivables Financings owed by a Receivables Entity or Qualified Securitization Financings owed by a Securitization Subsidiary and (ii) accounts receivable factoring facilities in the ordinary course of business; *provided* that the aggregate amount of Receivables Indebtedness pursuant to this clause (u) shall not exceed $1600,000,000 at any time outstanding;

(v)      Indebtedness of Credit Parties in respect of (i) Permitted Other Debt issued or incurred to the extent that the Net Cash Proceeds therefrom are applied to the prepayment of the Term Loans in the manner set forth in Section 5.2(a)(iii)(A); (ii) other Permitted Other Debt (such Indebtedness incurred pursuant to this clause (ii), "**Incremental Equivalent Debt**") in an aggregate principal amount not to exceed the then-available Maximum Incremental Facilities Amount; *provided* that (x) if such Permitted Other Debt incurred pursuant to this clause (ii) is a Permitted Other Loan that ranks *pari passu* with the Initial Term Loans as to right of payment and security, the Initial Term Loans shall be subject to the adjustment (if applicable) set forth in the proviso to Section 2.14(d)(iv) as if such Permitted Other Loan were an Incremental Term Loan incurred hereunder and (y) if such Permitted Other Debt incurred pursuant to this clause (ii) is unsecured or secured on a junior basis to the Obligations, such

153

Permitted Other Debt shall not have a maturity date earlier than 91 days after the Initial Term Loan Maturity Date; and (iii) any Refinancing Indebtedness in respect of Indebtedness incurred pursuant to clauses (i) and (ii) above;

(w)      (i) Indebtedness of Credit Parties in respect of Permitted Debt Exchange Instruments incurred pursuant to a Permitted Debt Exchange in accordance with Section 2.17 and (ii) any Refinancing Indebtedness thereof;

(x)      Indebtedness in an amount not to exceed the Available Equity Amount;

(y)      Indebtedness of any Minority Investments or Indebtedness incurred on behalf thereof or representing guarantees of such Indebtedness of any Minority Investment, in an amount not to exceed ~~the greater of (x)~~ $16~~0~~0,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~ at the time of incurrence or issuance, in each case at any time outstanding;

(z)      intercompany Indebtedness among the Borrower and its Subsidiaries constituting any part of any Permitted Reorganization;

(aa)      to the extent constituting Indebtedness, customer deposits and advance payments (including progress payments) received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(bb)      (i) Indebtedness of the Borrower or any Restricted Subsidiary supported by a letter of credit, in a principal amount not in excess of the stated amount of such letter of credit so long as such letter of credit is otherwise permitted to be incurred pursuant to this Section 10.1 or (ii) obligations in respect of letters of support, guarantees or similar obligations issued, made or incurred for the benefit of the Borrower or any Subsidiary of the Borrower in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than the United States;

(cc)      Indebtedness owing to the seller of any business or assets permitted to be acquired by the Borrower or any Restricted Subsidiary under this Agreement; *provided* that the aggregate amount of Indebtedness permitted under this clause (cc) shall not exceed ~~the greater of~~ $16~~0~~0,000,000 ~~and 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~ outstanding at any time;

(dd)      obligations in respect of Disqualified Stock in an amount not to exceed the greater of $25,000,000 and 3% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) outstanding at any time;

(ee)      Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors under this clause (ee), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 10.1(k), shall not exceed ~~the greater of (x)~~ $16~~0~~0,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) at the time of incurrence or issuance~~, in each case at any time outstanding; and

154

(ff)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (ee) above.

For the avoidance of doubt, any Indebtedness permitted to be incurred under any clause of this Section 10.1 may be used to modify, refinance, refund, renew, replace, exchange or extend any outstanding Indebtedness, including any such Indebtedness incurred under any other clause of this Section 10.1 and any such Indebtedness with respect to which the incurrence of Refinancing Indebtedness is expressly permitted under this Section 10.1, in each case, subject to the restrictions set forth in Section 10.7.

Accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock will not be deemed to be an incurrence or issuance of Indebtedness or Disqualified Stock for purposes of this covenant.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior lien priority with respect to the same collateral.

10.2    Limitation on Liens

The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of the Borrower or such Restricted Subsidiary, whether now owned or hereafter acquired, except:

(a)     Liens arising under the Security Documents;

(b)     Liens securing Indebtedness permitted to be incurred pursuant to Section 10.1(b), and Hedging Obligations and Cash Management Obligations permitted to be secured on a *pari passu* basis with the ABL Loans under the ABL Credit Documents; *provided* that such Lien over the Collateral shall be subject to the Applicable Intercreditor Agreements reflecting its *pari passu* status as compared with the Liens securing the ABL Loans;

(c)     [reserved];

(d)     Liens securing Indebtedness permitted pursuant to Section 10.1(h); *provided* that except as otherwise permitted hereby, such Liens attach at all times only to the assets so financed except (1) for accessions to the property financed with the proceeds of such Indebtedness and the proceeds and the products thereof and (2) that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

155

(e)     Liens permitted to remain outstanding under the Plan; *provided* that any Lien securing Indebtedness or other obligations in excess of $5,000,000 shall only be permitted to the extent such Lien is listed on Schedule 10.2;

(f)     (i) Liens securing Indebtedness permitted to be incurred under clause (B) of the proviso to Section 10.1(k)(i), Section 10.1(v)(i), Section 10.1(v)(ii) or Section 10.1(w)(i); *provided* that (A) the representative of such Indebtedness shall have entered into the Applicable Intercreditor Agreements to the extent secured by the Collateral reflecting its junior or *pari passu* or junior (but not senior) priority status as compared with the Liens securing the Obligations and (B) (I) with respect to Indebtedness incurred in reliance on clause (B)(2) of the proviso to Section 10.1(k)(i) that is secured by Liens on a *pari passu* basis with any Liens securing the Initial Term Loans (without regard to control of remedies), immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated First Lien Net Leverage Ratio is no greater than (I) 3.30 to 1.00 and (II) with respect to Indebtedness incurred in reliance on clause (B)(2) of the proviso to Section 10.1(k)(i) that is secured by Liens that are junior in right of security to the Liens securing the Initial Term Loans, immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated Secured Net Leverage Ratio is no greater than 3.30 to 1.00 and (ii) Liens securing Refinancing Indebtedness permitted to be incurred under Section 10.1(k)(ii), Section 10.1(v)(iii) and Section 10.1(w)(ii);

(g)     Liens existing on the assets of any Person that becomes a Restricted Subsidiary (or is a Restricted Subsidiary that survives a merger with such Person or any of its Subsidiaries) pursuant to a Permitted Acquisition or other permitted Investment or the designation of an Unrestricted Subsidiary as a Restricted Subsidiary or existing on assets acquired after the Closing Date, to the extent the Liens on such assets secure Indebtedness permitted by Section 10.1; *provided* that such Liens (i) are not created or incurred in connection with, or in contemplation of, such Person becoming such a Restricted Subsidiary or such assets being acquired and (ii) attach at all times only to the same assets to which such Liens attached and after-acquired property, property that is affixed or incorporated into the property covered by such Lien and accessions thereto and products and proceeds thereof, after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property, and the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment (or assets affixed or appurtenant thereto and additions and accessions) provided by any lender, other equipment financed by such lender, it being understood that such requirement to pledge such after-acquired property shall not be permitted to apply to any such after-acquired property to which such requirement would not have applied but for such acquisition except as otherwise permitted hereunder, and any Refinancing Indebtedness thereof permitted by Section 10.1;

(h)     additional Liens on assets of any Restricted Subsidiary that is not a Credit Party securing Indebtedness of such Restricted Subsidiary permitted pursuant to Section 10.1 (or other obligations of such Restricted Subsidiary not constituting Indebtedness);

(i)     additional Liens on assets that do not constitute Collateral prior to the creation of such Liens, so long as the Credit Facilities hereunder are equally and ratably secured

thereby and the aggregate amount of Indebtedness secured thereby at any time outstanding does not exceed $160,000,000; *provided* that such Liens are subject to intercreditor arrangements reasonably satisfactory to the Borrower, the Collateral Agent, and the Required Lenders, it being understood and agreed that intercreditor arrangements in substantially the form of the Applicable Intercreditor Agreements are satisfactory;

(j)     additional *pari passu* or junior Liens securing Indebtedness, so long as (i)(x) with respect to Indebtedness that is secured by Liens on a *pari passu* basis with any Liens securing the Initial Term Loans (without regard to control of remedies), immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated First Lien Net Leverage Ratio is no greater than 3.30 to 1.00 and (y) with respect to Indebtedness that is secured by Liens that are junior in right of security to the Liens securing any Initial Term Loans, immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated Secured Net Leverage Ratio is no greater than 3.30 to 1.00 and (ii) the holder(s) of such Liens (or a representative thereof) shall have entered into the Applicable Intercreditor Agreements;

(k)     additional Liens, so long as the aggregate amount of obligations secured thereby at any time outstanding does not exceed ~~the greater of (x)~~ $1~~6~~00,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~ at the time of incurrence or issuance;

(l)     (i) Liens on accounts receivable, other Receivables Facility Assets, or accounts into which collections or proceeds of Receivables Facility Assets are deposited, in each case arising in connection with a Permitted Receivables Financing permitted under Section 10.1(u) and (ii) Liens on Securitization Assets and related assets arising in connection with a Qualified Securitization Financing permitted under Section 10.1(u);

(m)     Permitted Encumbrances; and

(n)     the supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, extension or renewal of any Lien permitted by clause (e), clause (g) and clause (i) of this Section 10.2 upon or in the same assets theretofore subject to such Lien (or upon or in after-acquired property that is affixed or incorporated into the property covered by such Lien and accessions thereto or any proceeds or products thereof) or the Refinancing Indebtedness (without a change in any obligor, except to the extent otherwise permitted hereunder) of the Indebtedness or other obligations secured thereby (including any unused commitments), to the extent such Refinancing Indebtedness is permitted by Section 10.1; *provided* that in the case of any such supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, extension or renewal of any Lien permitted by clause (g) and clause (i) of this Section 10.2, the requirements set forth in the proviso to clause (g) or clause (i), as applicable, shall have been satisfied.

10.3     Limitation on Fundamental Changes

The Borrower will not, and will not permit the Restricted Subsidiaries to, consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise

consummate the Disposition of, all or substantially all its business units, assets or other properties, except that:

(a)     so long as both before and after giving effect to such transaction, no Event of Default has occurred and is continuing or would result therefrom, any Subsidiary of the Borrower or any other Person may be merged, amalgamated or consolidated with or into the Borrower; *provided* that (A) the Borrower shall be the continuing or surviving company or (B) if the Person formed by or surviving any such merger, amalgamation or consolidation is not the Borrower (such other Person, the "**Successor Borrower**"), (1) the Successor Borrower (if other than the Borrower) shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Borrower (if other than the Borrower) shall expressly assume all the obligations of the Borrower under this Agreement and the other Credit Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Agents and the Required Lenders, (3) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guarantee confirmed that its guarantee thereunder shall apply to any Successor Borrower's obligations under this Agreement, (4) each grantor and each pledgor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement, affirmed that its obligations thereunder shall apply to its Guarantee as reaffirmed pursuant to clause (3), (5) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have affirmed that its obligations under the applicable Mortgage shall apply to its Guarantee as reaffirmed pursuant to clause (3), (6) the Successor Borrower shall have delivered to the Administrative Agent an officer's certificate stating that such merger or consolidation and such supplements preserve the enforceability of this Agreement and the Guarantee and the perfection and priority of the Liens under the applicable Security Documents, and (7) the Successor Borrower shall have provided to each Agent all documentation and information reasonably requested by such Agent that is necessary and is required by United States regulatory authorities to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(b)     so long as no Event of Default has occurred and is continuing, or would result therefrom, any Subsidiary of the Borrower or any other Person (in each case, other than the Borrower) may be merged, amalgamated or consolidated with or into any one or more Subsidiaries of the Borrower; provided that (i) in the case of any merger, amalgamation or consolidation involving one or more Restricted Subsidiaries, (A) a Restricted Subsidiary shall be the continuing or surviving Person or (B) the Borrower shall cause the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Restricted Subsidiary) to become a Restricted Subsidiary, (ii) in the case of any merger, amalgamation or consolidation involving one or more Guarantors, a Guarantor shall be the continuing or surviving Person or the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Guarantor) shall execute a supplement to the Guarantee and the relevant Security Documents each in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders in order to become a Guarantor and pledgor, mortgagor and grantor, as applicable, thereunder for the benefit of the Secured Parties and to acknowledge and agree to the terms of the Intercompany Subordinated Note, and (iii) Borrower shall have delivered to the Administrative Agent an officers' certificate stating that such merger, amalgamation or consolidation and any such supplements to the Guarantee and any Security Document preserve

158

the enforceability of the Guarantee and the perfection and priority of the Liens under the applicable Security Documents to the extent otherwise required;

(c)        any Permitted Reorganization may be consummated;

(d)        any Restricted Subsidiary that is not a Credit Party may sell, lease, transfer or otherwise Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Restricted Subsidiary;

(e)        the Borrower or any Subsidiary of the Borrower may sell, lease, transfer or otherwise Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to any Credit Party; *provided* that the consideration for any such Disposition by any Person other than a Guarantor shall not exceed the fair value of such assets;

(f)        any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Credit Party, any assets or business of such Restricted Subsidiary not otherwise disposed of or transferred in accordance with Section 10.4 or 10.5, or in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Credit Party after giving effect to such liquidation or dissolution;

(g)        the Borrower or any Restricted Subsidiary may change its legal form, so long as (i) no Event of Default has occurred and is continuing or would result therefrom and (ii) the Liens granted pursuant to any Security Documents to which such Person is a party remain perfected and in full force and effect, to the extent otherwise required hereby;

(h)        any merger, consolidation or amalgamation the purpose and only substantive effect of which is to reincorporate or reorganize the Borrower or any Restricted Subsidiary in a jurisdiction in the United States, any state thereof or the District of Columbia, so long as the Liens granted pursuant to the Security Documents to which the Borrower is a party remain perfected and in full force and effect, to the extent otherwise required hereby;

(i)        the Transactions and any transactions as contemplated by the Plan may be consummated;

(j)        the Borrower and the Restricted Subsidiaries may consummate a merger, amalgamation dissolution, liquidation, windup, consolidation or Disposition, constituting, or otherwise resulting in, a transaction permitted by Section 10.4 (other than pursuant to (x) Section 10.4(d) and (y) the Disposition of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries, taken as a whole, to any Person other than the Borrower or any Guarantor), an Investment permitted pursuant to Section 10.5 (other than Section 10.5(l)), and any Restricted Payments permitted pursuant to Section 10.6 (other than Section 10.6(f)); and

(k)        any Permitted Change of Control may be consummated.

159

10.4    Limitation on Disposition

The Borrower will not, and will not permit the Restricted Subsidiaries to make any Disposition, except that:

(a)    the Borrower and the Restricted Subsidiaries may sell, transfer, license or sublicense, or otherwise Dispose of, in the reasonable business judgment of the Borrower or such Restricted Subsidiary, (i) obsolete, negligible, immaterial, worn-out, uneconomical, scrap, used, or surplus or mothballed assets (including any such equipment that has been refurbished in contemplation of such Disposition) or assets no longer used or useful in the business or no longer commercially desirable to maintain, (ii) inventory or goods (or other assets) held for sale in the ordinary course of business, (iii) cash and Cash Equivalents, (iv) immaterial assets (including allowing any registrations or any applications for registration of any intellectual property rights to lapse or go abandoned in the ordinary course of business), and (v) assets for the purposes of charitable contributions or similar gifts to the extent such assets are not material to the ability of the Borrower and the Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b)    the Borrower and the Restricted Subsidiaries may make Dispositions of assets; *provided* that (i) to the extent required, the Net Cash Proceeds thereof received by the Borrower and the Restricted Subsidiaries are promptly applied to the prepayment of Term Loans as provided for in Section 5.2(a)(i), (ii) as of the date of signing of the definitive agreement for such Disposition, no Event of Default shall have occurred and be continuing, (iii) with respect to any Disposition pursuant to this clause (b) for a purchase price in excess of $50,000,000, the Person making such Disposition shall receive fair market value and not less than 75% of such consideration in the form of cash or Cash Equivalents; *provided* that for the purposes of this clause (iii) the following shall be deemed to be cash:  (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto, or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or such Restricted Subsidiary's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the payment in cash of the Obligations (other than intercompany liabilities owing to a Restricted Subsidiary being ~~D~~disposed of) and that are (1) assumed by the transferee (or a third party in connection with such transfer) with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing or indemnified from such liabilities or (2) otherwise cancelled or terminated in connection therewith, (B) any securities, notes or other obligations received by the Person making such Disposition from the purchaser that are converted by such Person into cash or Cash Equivalents or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, (C) consideration consisting of Indebtedness of any Credit Party (other than subordinated Indebtedness) received after the Closing Date from Persons who are not Restricted Subsidiaries (so long as such Indebtedness is not cancelled or forgiven) ~~and~~, (D) any Marketable Security and (E) any Designated Non-Cash Consideration received by the Person making such Disposition having an aggregate fair market value, taken together with all other

160

Designated Non-Cash Consideration received pursuant to this Section 10.4(b) that is at that time outstanding, not in excess of ~~the greater of~~ $1~~6~~00,000,000 ~~and 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~ at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value and (iv) any non-cash proceeds received in the form of Real Estate, Indebtedness or Stock and Stock Equivalents are pledged to the Collateral Agent to the extent required under Section 9.11, 9.12 or the Security Agreement;

(c)    (i) the Borrower and the Restricted Subsidiaries may make Dispositions to the Borrower or any other Credit Party, (ii) any Restricted Subsidiary that is not a Credit Party may make Dispositions to the Borrower or any other Restricted Subsidiary of the Borrower; *provided* ~~that with respect to any such~~ ~~Disposition to an Unrestricted Subsidiary, such Disposition shall be for fair value~~ and (iii) any Credit Party may make Dispositions to a non-Credit Party to the extent constituting an Investment permitted under Section 10.5 (other than Section 10.5(l));

(d)    the Borrower and any Restricted Subsidiary may effect any transaction permitted by Sections 10.2, 10.3 (other than Section 10.3(j)), 10.5 (other than Section 10.5(l)) or 10.6 (other than Section 10.6(f));

(e)    the Borrower and any Restricted Subsidiary may lease, sublease, license or sublicense (i) real or personal property (other than intellectual property) in the ordinary course of business or (ii) intellectual property not interfering in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole~~;~~ and not, in each case of (i) and (ii), in connection with any transactions undertaken in furtherance of dividends, payments or exchange of any Indebtedness or financing (other than financing among Borrower and its Restricted Subsidiaries);

(f)    Dispositions of property (including like-kind exchanges) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property (excluding any boot thereon) or (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property, in each case under Section 1031 of the Code or otherwise;

(g)    the Borrower and any other Credit Party may transfer or otherwise Dispose of any intellectual property for fair market value to any Restricted Subsidiary of the Borrower that is not a Credit Party; *provided* that (x) such transfer or Disposition is in the ordinary course of business and not in connection with any transactions undertaken in furtherance of dividends, payments or exchange of any Indebtedness or financing (other than financing among Borrower and its Restricted Subsidiaries) or (y) (i) the transferee shall be (A) a direct or indirect Wholly Owned Restricted Subsidiary or (B) a special purpose entity that does not incur any third-party Indebtedness for borrowed money (for the avoidance of doubt, such entity may have employees managing its intellectual property assets and conducting internal research and development activities) and (ii) the consideration received by the Credit Party from such Disposition shall be in the form of (A) cash and Cash Equivalents, (B) intercompany notes owed to the Credit Party transferor/licensor by the non-Credit Party transferee/licensee, which intercompany notes are

161

pledged to secure the Obligations and/or (C) Stock and Stock Equivalent of the transferee/licensee (or a parent entity of such transferee/licensee so long as such parent entity and any intermediate holding entity otherwise satisfies the requirements set forth in clause (i) above) and the Stock and Stock Equivalents of such transferee/licensee (or the parent entity) are pledged to secure the Obligations (subject to the limitation set forth in the Security Agreement); *provided* that in the case of this clause (ii)(C), the aggregate fair market value of any and all intellectual property so ~~D~~disposed of shall not exceed $100,000,000;

(h)     Dispositions of (i) Investments in joint ventures (regardless of the form of legal entity) to the extent required by, or made pursuant to, customary buy/sell arrangements or put/call arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements or (ii) to joint ventures in connection with the dissolution or termination of a joint venture to the extent required pursuant to joint venture and similar arrangements;

(i)     (i) Dispositions of Receivables Facility Assets in connection with any Permitted Receivables Financing, and any Disposition of Securitization Assets in connection with any Qualified Securitization Financing and (ii) Dispositions in connection with accounts receivable factoring facilities in the ordinary course of business, *provided* that the Indebtedness arising in connection therewith shall not exceed the amount of Indebtedness permitted by Section 10.1(u);

(j)     Dispositions listed on Schedule 10.4 or to consummate the Transactions, including transactions contemplated by the Plan;

(k)     transfers of property subject to a Recovery Event or in connection with any condemnation proceeding upon receipt of the Net Cash Proceeds of such Recovery Event or condemnation proceeding;

(l)     Dispositions or discounts of accounts receivable or notes receivable in connection with the collection or compromise thereof or the conversion of accounts receivable to notes receivable;

(m)     Dispositions (other than to an Unrestricted Subsidiary) of any assets not constituting Collateral in an aggregate amount not to exceed $1~~6~~00,000,000;

(n)     the execution of (or amendment to), settlement of or unwinding of any Hedging Agreement;

(o)     any issuance or sale of Stock or Stock Equivalent in, or Indebtedness or other securities of, any Unrestricted Subsidiary;

(p)     the surrender or waiver of contractual rights and settlement or waiver of contractual or litigation claims;

(q)     Dispositions of any assets (including Stock and Stock Equivalents) acquired in connection with any Permitted Acquisition or other Investment not prohibited

hereunder, which assets are not used or useful to the core or principal business of the Borrower and its Restricted Subsidiaries (as determined by the Borrower in good faith); and

(r)     other Dispositions (including those of the type otherwise described herein, but excluding any Disposition to an Unrestricted Subsidiary) made for fair market value in an aggregate amount not to exceed the greater of (x) $1600,000,000 and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis);

(s)     the Borrower and any Restricted Subsidiary may (i) terminate or otherwise collapse its cost sharing agreements with the Borrower or any Subsidiary and settle any crossing payments in connection therewith, (ii) convert any intercompany Indebtedness to Stock or any Stock to intercompany Indebtedness, (iii) settle, discount, write off, forgive or cancel any intercompany Indebtedness or other obligation owing by the Borrower or any Restricted Subsidiary or (iv) settle, discount, write off, forgive or cancel any Indebtedness owing by any present or former consultants, managers, directors, officers or employees of Holdings, the Borrower, any direct or indirect parent thereof, or any Subsidiary thereof or any of their successors or assigns;

(t)     any Disposition of property to the extent that (1) such property is exchanged for credit against the purchase price of similar replacement property that is purchased within 270 days thereof or (2) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually purchased within 270 days thereof);

(u)     any Disposition in connection with a Permitted Reorganization;

(v)     any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater fair market value or usefulness to the business of the Borrower and the Restricted Subsidiaries, taken as a whole, as determined in good faith by the Borrower; and

(w)     Dispositions of any asset between or among the Borrower and/or any Restricted Subsidiary as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (v) above; *provided* that after giving effect to any such Disposition, to the extent the assets subject to such Dispositions constituted Collateral, such assets shall remain subject to, or be rejoined to, the Lien of the Security Documents.

Notwithstanding the foregoing, no transfer or other Disposition of any intellectual property by a Credit Party to a Subsidiary that is not a Credit Party may be made except pursuant to Section 10.4(c)(iii) (solely in respect of Investments permitted by the proviso to Section 10.5(w)), (e) or (g).

10.5    Limitation on Investments

The Borrower will not, and will not permit the Restricted Subsidiaries, to make any Investment except:

163

(a)     extensions of trade credit, asset purchases (including purchases of inventory, supplies, materials and equipment) and the licensing or contribution of intellectual property pursuant to joint marketing arrangements, original equipment manufacturer arrangements or development agreements with other Persons, in each case in the ordinary course of business;

(b)     Investments in cash or Cash Equivalents when such Investments were made;

(c)     loans and advances to officers, managers, directors, employees, consultants and independent contractors of the Borrower (or any direct or indirect parent thereof) or any Subsidiary of the Borrower (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances), (ii) in connection with such Person's purchase of Stock or Stock Equivalents of Holdings (or any direct or indirect parent thereof; *provided* that, to the extent such loans and advances are made in cash, the amount of such loans and advances used to acquire such Stock or Stock Equivalents shall be contributed to the Borrower in cash) and (iii) for purposes not described in the foregoing clauses (i) and (ii); *provided* that the aggregate principal amount outstanding pursuant to clause (iii) shall not exceed $25,000,000 at any one time outstanding;

(d)     Investments (i) contemplated by the Plan or to consummate the Transactions and (ii) existing on, or made pursuant to legally binding written commitments in existence on, the Closing Date and, to the extent such Investments exceed $5,000,000, set forth on Schedule 10.5 and any supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, renewal or extension thereof, only to the extent that the amount of any Investment made pursuant to this clause (d)(ii) does not at any time exceed the amount of such Investment set forth on Schedule 10.5 (except by an amount equal to the unpaid accrued interest and premium thereon *plus* any unused commitments *plus* amounts paid in respect of fees, premiums, costs and expenses incurred in connection with such supplement, amendment, amendment and restatement, modification, replacement, refinancing, refunding, restructuring, renewal or extension or as otherwise permitted hereunder);

(e)     any Investment acquired by the Borrower or any Restricted Subsidiary (i) in exchange for any other Investment or accounts receivable held by the Borrower or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization, or recapitalization of, or settlement of delinquent accounts or disputes with or judgments against, the issuer, obligor or borrower of such original Investment or accounts receivable, (ii) as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default or (iii) as a result of the settlement, compromise or resolution of litigation, arbitration or other disputes with Persons who are not Affiliates or in satisfaction or judgments against other Persons;

(f)     Investments to the extent that payment for such Investments is made with (i) Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) or (ii) the proceeds from the issuance of Stock or Stock Equivalents (other than Disqualified Stock, any sale or issuance to any Subsidiary and any issuance applied pursuant to Section 10.6(a) or Section 10.6(b)(i)) of the Borrower (or any direct or indirect parent

164

thereof); *provided* that such Stock or Stock Equivalents or proceeds of such Stock or Stock Equivalents will not increase the Available Equity Amount;

(g)        Investments (other than in the form of direct or indirect transfers or Dispositions of intellectual property from a Credit Party to a non-Credit Party) by the Borrower or any Restricted Subsidiary in the Borrower or any Restricted Subsidiary or any Person that will, upon such Investment become a Restricted Subsidiary;

(h)        Investments constituting Permitted Acquisitions;

(i)        Investments constituting (i) Minority Investments and Investments in Unrestricted Subsidiaries and (ii) Investments in joint ventures (regardless of the form of legal entity) or similar Persons that do not constitute Restricted Subsidiaries, in each case valued at the fair market value (determined by the Borrower acting in good faith) of such Investment at the time each such Investment is made, in an aggregate amount at any one time outstanding pursuant to this clause (i) that, at the time each such Investment is made, would not exceed ~~an amount equal to the greater of (x)~~ $16~~0~~0,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~;

(j)        Investments constituting non-cash proceeds received from Dispositions of assets pursuant to Section 10.4;

(k)        Investments made to repurchase or retire Stock or Stock Equivalents of the Borrower or any direct or indirect parent thereof owned by any employee or any stock ownership plan or key employee stock ownership plan of the Borrower (or any direct or indirect parent thereof) in an aggregate amount, when combined with distributions made pursuant to Section 10.6(b), not to exceed the limitations set forth in such Section;

(l)        Investments consisting of or resulting from Indebtedness, Liens, Restricted Payments, fundamental changes and Dispositions permitted by Section 10.1 (other than Sections 10.1(d), 10.1(e) and 10.1(g)(ii)), 10.2, 10.3 (other than Section 10.3(j)), 10.4 (other than Section 10.4(d)), 10.6 (other than Section 10.6(f)), 10.7 or 10.8, as applicable;

(m)        loans and advances to any direct or indirect parent of the Borrower in lieu of, and not in excess of the amount of, Restricted Payments to the extent permitted to be made to such parent in accordance with Section 10.6; *provided* that the aggregate amount of such loans and advances shall reduce the ability of the Borrower and the Restricted Subsidiaries to make Restricted Payments under the applicable clauses of Section 10.6 by such amount;

(n)        Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(o)        Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

165

(p)      advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(q)      Guarantee Obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(r)      Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Closing Date otherwise in accordance with this Section 10.5 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(s)      Investments in Hedging Agreements permitted by Section 10.1;

(t)      Investments in or by a Receivables Entity or a Securitization Subsidiary arising out of, or in connection with, any Permitted Receivables Financing or Qualified Securitization Financing, as applicable; *provided* that any such Investment in a Receivables Entity or a Securitization Subsidiary is in the form of a contribution of additional Receivables Facility Assets or Securitization Assets, as applicable, or as equity;

(u)      Investments consisting of deposits of cash and Cash Equivalents as collateral support permitted under Section 10.2;

(v)      other Investments not to exceed an amount equal to (x) the Available Equity Amount at the time such Investments are made *plus* (y) the Available Amount at the time such Investments are made, *provided* that in respect of any Investments made in reliance of clause (ii) of the definition of "Available Amount", no Event of Default shall have occurred and be continuing or would result therefrom;

(w)      other Investments in an amount at any one time outstanding not to exceed ~~an amount equal to the greater of (x)~~ $16~~0~~0,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~; *provided* that up to ~~an amount equal to the greater of (i)~~ $8~~5~~0,000,000 ~~and (ii) 10% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~ may be made in the form of Disposition of intellectual property by a Credit Party to a Restricted Subsidiary that is not a Credit Party;

(x)      Investments consisting of purchases and acquisitions of assets and services in the ordinary course of business;

(y)      Investments in the ordinary course of business consisting of Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practice;

(z)      Investments made as a part of, or in connection with or to otherwise fund the Transactions;

(aa)     contributions in connection with compensation arrangements to a "rabbi" trust for the benefit of employees, directors, partners, members, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Borrower or any of its Restricted Subsidiaries;

(bb)     Investments relating to pension trusts;

(cc)     Investments in Similar Business in an amount at any one time outstanding not to exceed an amount equal to the greater of (x) $1600,000,000 and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis);

(dd)     Investments in connection with Permitted Reorganizations;

(ee)     Investments in deposit accounts, commodities and securities accounts opened in the ordinary course of business;

(ff)     Investments solely to the extent such Investments reflect an increase in the value of Investments otherwise permitted under this Agreement;

(gg)     Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business;

(hh)     Term Loans repurchased by the Borrower or a Restricted Subsidiary pursuant to and in accordance with Section 13.6(g); and

(ii)     other Investments in an unlimited amount, *provided* that the Borrower shall be in compliance on a Pro Forma Basis with a Consolidated Total Net Leverage Ratio not greater than 2.8 to 1.0; and.

(jj) Investments made in connection with a Permitted Change of Control.

Notwithstanding the foregoing, no Investment consisting of or resulting from any transfer or other Disposition of any intellectual property by a Credit Party to a Subsidiary that is not a Credit Party may be made except pursuant to (i) Section 10.5(l) (solely in respect of Dispositions permitted by Section 10.4(e) or (g)) or (ii) the proviso to Section 10.5(w).

10.6     Limitation on Restricted Payments

The Borrower will not, and will not permit the Restricted Subsidiaries to, declare or pay any Restricted Payments except that:

(a)      the Borrower may (or may make Restricted Payments to permit any direct or indirect parent thereof to) redeem in whole or in part any of its Stock or Stock Equivalents for another class of its (or such parent's) Stock or Stock Equivalents or with proceeds from

167

substantially concurrent equity contributions or issuances of new Stock or Stock Equivalents (other than any Disqualified Stock, any sale or issuance to any Subsidiary and any contribution or issuance applied pursuant to Section 10.5(f)(ii) or Section 10.6(b)(i)); *provided* that (i) such new Stock or Stock Equivalents contain terms and provisions (taken as a whole) at least as advantageous to the Lenders, taken as a whole, in all respects material to their interests as those contained in the Stock or Stock Equivalents redeemed thereby and (ii) the cash proceeds from any such contribution or issuance shall not increase the Available Equity Amount;

(b)      the Borrower may (or may make Restricted Payments to permit any direct or indirect parent thereof to) redeem, acquire, retire or repurchase shares of its (or such parent's) Stock or Stock Equivalents held by any present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any direct or indirect parent thereof) and any Subsidiaries, so long as such repurchase is pursuant to, and in accordance with the terms of, any stock option or stock appreciation rights plan, any management, director and/or employee benefit, stock ownership or option plan, stock subscription plan or agreement, employment termination agreement or any employment agreements or stockholders' or shareholders' agreement; *provided*, *however*, that the aggregate amount of payments made under this Section 10.6(b), when combined with Investments made pursuant to Section 10.5(k), do not exceed in any Fiscal Year $20,000,000 (with unused amounts in any Fiscal Year being carried over to succeeding Fiscal Years subject to a maximum (without giving effect to the following proviso) of $30,000,000 in any Fiscal Year); *provided*, *further*, that such amount in any Fiscal Year may be increased by an amount not to exceed:

(i)      the cash proceeds from the sale of Stock (other than Disqualified Stock, any sale or issuance to any Subsidiary and any contribution or issuance applied pursuant to Section 10.5(f)(ii) or Section 10.6(a)) of the Borrower and, to the extent contributed to the Borrower, Stock of any of the Borrower's direct or indirect parent companies, in each case to present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies) or any Subsidiary of the Borrower that occurs after the Closing Date; *provided* that such Stock or proceeds of such Stock will not increase the Available Equity Amount; *plus*

(ii)      the cash proceeds of key man life insurance policies received by the Borrower or any Restricted Subsidiary after the Closing Date; less

(iii)      the amount of any Restricted Payment previously made with the cash proceeds described in clauses (i) and (ii) above;

and *provided*, *further*, that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies), or any Subsidiary of the Borrower in

168

connection with a repurchase of Stock or Stock Equivalents of the Borrower or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of this Agreement;

(c)  so long as no Specified Default shall have occurred and be continuing or would result therefrom, the Borrower make Restricted Payments; *provided* that the amount of all such Restricted Payments paid from the Closing Date pursuant to this clause (c) shall not exceed an amount equal to (x) the Available Equity Amount at the time such Restricted Payments are paid *plus* (y) the Available Amount at the time such Restricted Payments are paid, *provided* that in respect of any Restricted Payments made in reliance of clause (ii) of the definition of Available Amount, no Event of Default shall have occurred and be continuing or would result therefrom;

(d)  the Borrower and its Restricted Subsidiaries may make Restricted Payments to any direct or indirect parent company of the Borrower (or otherwise as specified below) in amount required for the Borrower, such Restricted Subsidiary or any such direct or indirect parent to pay, in each case without duplication:

(i)  foreign, federal, state and local income Taxes for any taxable period in respect of which a consolidated, combined, unitary or affiliated or similar return is filed by such direct or indirect parent that includes the Borrower and/or any of its Subsidiaries (or for whichincluding if the Borrower or any of its Subsidiaries is disregarded as separate from a member) included in such group return) is filed by such direct or indirect parent; *provided* that for purposes of this Section 10.6(d)(i), such Taxes shall be deemed to equalno greater than the amount that the Borrower and its Subsidiaries would be required to pay in respect of foreign, federal, state and local income Taxes if the Borrower were the parent of a standalone consolidated, combined, affiliated, unitary or similar tax group including its Subsidiaries (any such Restricted Payments, "**Tax Distributions**");

(ii)  (A) such parents' general operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties) to the extent such costs and expenses are attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries and (to the extent of cash actually paid by Unrestricted Subsidiaries to the Borrower or its Restricted Subsidiaries for such purposes) Unrestricted Subsidiaries, (B) any indemnification claims made by directors or officers of the Borrower or its Restricted Subsidiaries (or any parent of the foregoing) who are directors or officers of the Borrower or any Restricted Subsidiary (or any parent of the foregoing) on or after the Petition Date to the extent such claims are attributable to the ownership or operation of the Borrower or any Restricted Subsidiary and (to the extent of cash actually paid by Unrestricted Subsidiaries to the Borrower or its Restricted Subsidiaries for such purposes) Unrestricted Subsidiaries, (C) fees and expenses otherwise due and payable by the Borrower (or any parent thereof) or any Restricted Subsidiary and not prohibited to be paid by the Borrower and its Restricted Subsidiaries hereunder or (D) any Permitted Change of Control Costs;

169

(iii)     franchise and excise Taxes and other fees, Taxes and expenses required to maintain the corporate existence of any direct or indirect parent of the Borrower;

(iv)     to any direct or indirect parent of the Borrower to finance any Investment permitted to be made by the Borrower or any Restricted Subsidiary pursuant to Section 10.5; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment, (B) such parent shall, immediately following the closing thereof, cause (1) all property acquired (whether assets, Stock or Stock Equivalents) to be contributed to the Borrower or such Restricted Subsidiary or (2) the merger, amalgamation or consolidation (to the extent permitted in Section 10.5) of the Person formed or acquired into the Borrower or any Restricted Subsidiary, (C) the Borrower or such Restricted Subsidiary shall comply with Section 9.11, Section 9.12 and the Security Agreement to the extent applicable, (D) the aggregate amount of such Restricted Payments shall reduce the ability of the Borrower and the Restricted Subsidiary to make Investments under the applicable clauses of Section 10.5 by such amount and (E) any property received by the Borrower or the Restricted Subsidiaries in connection with such transaction shall only increase the Available Equity Amount to the extent the fair market value of such property as determined in good faith by the Board of Directors of the Borrower exceeds the aggregate amount of Restricted Payments made pursuant to this clause (iv);

(v)     customary costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering or acquisition or Disposition payable by the Borrower or the Restricted Subsidiaries;

(vi)     customary salary, bonus, severance and other benefits payable to officers, employees or consultants of any direct or indirect parent company of the Borrower to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower, its Restricted Subsidiaries and (to the extent of cash actually paid by Unrestricted Subsidiaries to the Borrower or its Restricted Subsidiaries for such purposes) Unrestricted Subsidiaries;

(vii)     AHYDO Catch-Up Payments with respect to Indebtedness of any direct or indirect parent of the Borrower; *provided* that the Net Cash Proceeds of such Indebtedness have been contributed to the Borrower as a capital contribution; and

(viii)     expenses incurred by any direct or indirect parent of the Borrower in connection with any public offering or other sale of Stock or Stock Equivalents or Indebtedness (i) where the Net Cash Proceeds of such offering or sale are intended to be received by or contributed to the Borrower or a Restricted Subsidiary, (ii) in a pro-rated amount of such expenses in proportion to the amount of such Net Cash Proceeds intended to be so received or contributed or (iii) otherwise on an interim basis prior to completion of such offering so long as any direct or indirect parent of the Borrower shall cause the amount of such expenses to be repaid to the Borrower or the relevant Restricted Subsidiary out of the proceeds of such offering promptly if completed;

170

(e)     Restricted Payments made to dissenting equityholders in connection with their exercise of appraisal rights or the settlement of any claim or actions with respect thereto in connection with any Permitted Acquisition or similar Investment permitted under Section 10.5 (other than Section 10.5(l));

(f)     Restricted Payments consisting of or resulting from Liens, fundamental changes, Dispositions, Investments or other payments permitted by 10.2, 10.3 (other than Section 10.3(j)), 10.4 (other than Section 10.4(d)), 10.5 (other than Section 10.5(l)), 10.7 or 10.8, as applicable;

(g)     the Borrower may repurchase Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) deemed to occur upon exercise of stock options or warrants if such Stock or Stock Equivalents represents a portion of the exercise price of such options or warrants, and the Borrower may pay Restricted Payments to any direct or indirect parent thereof as and when necessary to enable such parent to effect such repurchases;

(h)     the Borrower may (i) pay cash in lieu of fractional shares in connection with any Restricted Payment, distribution, split, reverse share split, merger, consolidation, amalgamation or other combination thereof or any Permitted Acquisition, and any Restricted Payment to the Borrower's direct or indirect parent in order to effect the same and (ii) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

(i)     the Borrower may make any Restricted Payment within sixty (60) days after the date of declaration thereof or giving irrevocable notice thereof, if at the date of declaration or notice such payment would have complied with the provisions of this Agreement;

(j)     so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may make Restricted Payments, so long as the aggregate amount of all such Restricted Payments in any Fiscal Year does not exceed 6% of the market capitalization of the Public Reporting Entity calculated on a trailing twelve month average basis;

(k)     the Borrower may make Restricted Payments in an amount equal to withholding or similar Taxes payable or expected to be payable by present or former officer, manager, consultant, director or employee (or their respective wealth management vehicles, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) and any repurchases of Stock or Stock Equivalents in consideration of such payments including deemed repurchases in connection with the exercise of stock options;

(l)     so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may (or may make Restricted Payments to permit any direct or indirect parent thereof to) make Restricted Payments in an aggregate amount not to exceed $5 million per fiscal quarter;

171

(m)     the Borrower may make payments described in Section 9.9 (other than Section 9.9(a) and Section 9.9(d) (to the extent expressly permitted by reference to Section 10.6));

(n)     the Borrower may make Restricted Payments in connection with the Transactions or contemplated by the Plan;

(o)     so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may make Restricted Payments in amounts up to ~~the greater of (x)~~ $16~~0~~00,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~;

(p)     so long as no Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may make Restricted Payments in an unlimited amount, *provided* that the Borrower shall be in compliance on a Pro Forma Basis with a Consolidated Total Net Leverage Ratio not greater than 2.3 to 1.0;

(q)     Restricted Payments in respect of working capital adjustments or purchase price adjustments pursuant to any Permitted Acquisition or other Investment permitted hereunder and to satisfy indemnity and other similar obligations in connection with any Permitted Acquisition or other Investment permitted hereunder;

(r)     the distribution, by dividend or otherwise, of shares of Stock or Stock Equivalents of, or Indebtedness owed to the Borrower or a Restricted Subsidiary by, Unrestricted Subsidiaries or the proceeds thereof;

(s)     [reserved];

(t)     each Restricted Subsidiary may make Restricted Payments to the Borrower and other Restricted Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-Wholly Owned Restricted Subsidiary, to the Borrower and any other Restricted Subsidiary, as compared to the other owners of Stock in such Restricted Subsidiary, on a pro rata or more than pro rata basis based on their ownership interests of the relevant class of Stock); and

(u)     any Restricted Payment made in connection with a Permitted Change of Control.

Notwithstanding the foregoing, no Restricted Payment consisting of or resulting from any transfer or other Disposition of any intellectual property by a Credit Party to a Subsidiary that is not a Credit Party may be made except pursuant to Section 10.6(f) solely in respect of Dispositions permitted by Section 10.4(c)(iii) (solely in respect of Investments permitted by the proviso to Section 10.5(w)), (e) or (g).

10.7    Limitations on Debt Prepayments and Amendments

(a)     The Borrower will not, and will not permit the Restricted Subsidiaries to, voluntarily prepay, repurchase or redeem or otherwise defease prior to the schedule maturity

thereof any Indebtedness (other than the ABL Obligations) that is subordinated in right of payment or lien to the Obligations with a principal amount in excess of $50,000,000 (the "**Junior Indebtedness**"), except that the Borrower and its Restricted Subsidiaries may (i) make payments of regularly scheduled principal and interest, (ii) make AHYDO Catch-Up Payments; (iii) prepay, repurchase or redeem or otherwise defease Junior Indebtedness in an aggregate principal amount from the Closing Date not in excess of the sum of (1) so long as no Event of Default shall have occurred and be continuing or would result therefrom, (I) ~~the greater of (x)~~ $16~~0~~0,000,000 ~~and (y) 20% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis)~~ and (II) additional unlimited amounts so long as the Borrower shall be in compliance on a Pro Forma Basis with a Consolidated Total Net Leverage Ratio not greater than 2.3 to 1.0 *plus* (2) the Available Equity Amount at the time of such prepayment, repurchase, redemption or other defeasance *plus* (3) the Available Amount at the time of such prepayment, repurchase, redemption or other defeasance; *provided* that in respect of any prepayments, repurchases or redemptions or defeasances made in reliance of clause (ii) of the definition of Available Amount, no Event of Default shall have occurred and be continuing or would result therefrom; (iv) refinance Junior Indebtedness with any Refinancing Indebtedness, to the extent not required to prepay any Term Loans pursuant to Section 5.2(a); (v) convert, exchange, redeem, repay or prepay such Junior Indebtedness into, for or with, as applicable, Stock or Stock Equivalents of any direct or indirect parent of the Borrower (other than Disqualified Stock except as permitted hereunder); (vi) prepay, repurchase, redeem or otherwise defease Junior Indebtedness within 60 days of the applicable Redemption Notice if, at the date of any payment, redemption, repurchase, retirement, termination or cancellation notice in respect thereof (each, a "**Redemption Notice**"), such payment, redemption, repurchase, retirement, termination or cancellation would have complied with another provision of this Section 10.7(a); *provided* that such payment, redemption, repurchase, retirement, termination or cancellation shall reduce capacity under such other provision; (vii) repay or prepay intercompany subordinated Indebtedness (including under the Intercompany Subordinated Note) owed among the Borrower and/or the Restricted Subsidiaries, in either case unless a Specified Default has occurred and is continuing and the Borrower has received a written notice from the Collateral Agent instructing it not to make or permit any such repayment or prepayment; and (viii) transfer credit positions in connection with intercompany debt restructurings so long as such Indebtedness is permitted by Section 10.1 after giving effect to such transfer.

(b)     The Borrower will not, and will not permit the Restricted Subsidiaries to waive, amend, or modify the definitive documentation in respect of any Junior Indebtedness with a principal amount in excess of $50,000,000, to the extent that any such waiver, amendment or modification, taken as a whole, would be adverse to the Lenders in any material respect; *provided* that this Section 10.7(b) would not prohibit a refinancing or replacement of such Indebtedness with Refinancing Indebtedness so long as (1) such Refinancing Indebtedness is permitted to be incurred under Section 10.1 and (2) the prepayment of such Junior Indebtedness is permitted under Section 10.7(a) above.

10.8     Limitation on Subsidiary Distributions

The Borrower will not, and will not permit any Restricted Subsidiary that is not a Guarantor to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such

Restricted Subsidiary to (x) (i) pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Stock or Stock Equivalents or with respect to any other interest or participation in, or measured by, its profits or (ii) pay any Indebtedness owed to the Borrower or any Restricted Subsidiary that is a Guarantor, (y) make loans or advances to the Borrower or any Restricted Subsidiary that is Guarantor or (z) sell, lease or transfer any of its properties or assets to the Borrower or any Restricted Subsidiary that is a Guarantor, except (in each case) for such encumbrances or restrictions (A) which the Borrower has reasonably determined in good faith will not materially impair the Borrower's ability to make payments under this Agreement when due or (B) existing under or by reason of:

(a) contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to this Agreement, the ABL Credit Documents and the related documentation and related Hedging Obligations and Cash Management Obligations;

(b) purchase money obligations and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (x), (y) or (z) above on the property so acquired, any replacements of such property or assets and additions and accessions thereto, after-acquired property subject to such arrangement, the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment (or assets affixed or appurtenant thereto and additions and accessions) provided by any lender, other equipment (or assets affixed or appurtenant thereto and additions and accessions) financed by such lender (it being understood that such restriction shall not be permitted to apply to any property to which such restriction would not have applied but for such acquisition);

(c) Applicable Laws or any applicable rule, regulation or order, or any request of any Governmental Authority having regulatory authority over the Borrower or any of its Subsidiaries;

(d) any agreement or other instrument of a Person acquired by or merged or consolidated with or into the Borrower or any Restricted Subsidiary, or of an Unrestricted Subsidiary that is designated a Restricted Subsidiary, or that is assumed in connection with the acquisition of assets from such Person, in each case that is in existence at the time of such transaction (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or designated, any replacements of such property or assets and additions and accessions thereto, after-acquired property subject to such agreement or instrument, the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment (or assets affixed or appurtenant thereto and additions and accessions) provided by any lender, other equipment (or assets affixed or appurtenant thereto and additions and accessions) financed by such lender (it being understood that such encumbrance or restriction shall not be permitted to apply to any property to which such encumbrance or restriction would not have applied but for such acquisition);

(e) contracts for the sale of assets, including customary restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for

174

the sale or Disposition of all or substantially all of the Stock or Stock Equivalents or assets of such Subsidiary and restrictions on transfer of assets subject to Liens permitted hereunder;

(f)  (x) secured Indebtedness otherwise permitted to be incurred pursuant to Sections 10.1 and 10.2 that limit the right of the debtor to Dispose of the assets securing such Indebtedness and (y) restrictions or encumbrances on transfers of assets subject to Liens permitted hereunder (but, with respect to any such Lien, only to the extent that such transfer restrictions apply solely to the assets that are the subject of such Lien);

(g)  restrictions or encumbrances on cash or other deposits or net worth imposed by customers under, or made necessary or advisable by, contracts entered into in the ordinary course of business;

(h)  restrictions or encumbrances imposed by other Indebtedness or Disqualified Stock of Restricted Subsidiaries permitted to be incurred subsequent to the Closing Date pursuant to the provisions of Section 10.1;

(i)  customary provisions in joint venture agreements or arrangements and other similar agreements or arrangements relating solely to such joint venture (including its assets and Subsidiaries) and the Stock or Stock Equivalents issued thereby;

(j)  customary provisions contained in leases, sub-leases, licenses, sub-licenses or similar agreements, in each case, entered into in the ordinary course of business;

(k)  restrictions created in connection with any Permitted Receivables Financing or any Qualified Securitization Financing that, in the good faith determination of the Borrower, are necessary or advisable to effect such Permitted Receivables Financing or Qualified Securitization Financing, as the case may be;

(l)  customary restrictions on leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to property interest, rights or the assets subject thereto;

(m)  customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(n)  restrictions contemplated by the Plan or created in connection with the consummation of the Transaction; or

(o)  any encumbrances or restrictions of the type referred to in clauses (x), (y) and (z) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, extensions, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (n) above; *provided* that such amendments, modifications, restatements, renewals, increases, extensions, supplements, refundings, extensions, replacements, restructurings or refinancings (x) are, in the good faith judgment of the Borrower, not materially more restrictive with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, extension, restructuring, supplement, refunding, replacement or refinancing or (y) do

175

not materially impair the Borrower's ability to pay its obligations under the Credit Documents as and when due (as determined in good faith by the Borrower);

*provided* that (x) the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill requirements to) loans or advances made to the Borrower or any Restricted Subsidiary that is a Guarantor to other Indebtedness incurred by the Borrower or any Restricted Subsidiary that is a Guarantor shall not be deemed to constitute such an encumbrance or restriction.

10.9    Amendment of Organizational Documents

The Borrower will not, nor will the Borrower permit any Credit Party to, amend or otherwise modify any of its Organizational Documents in a manner that is materially adverse to the Lenders, except as required by Applicable Laws.

10.10   Permitted Activities

Holdings will not engage in any material operating or business activities; *provided* that the following and any activities incidental thereto shall be permitted in any event: (i) its ownership of the Stock of the Borrower, including receipt and payment of dividends and payments in respect of Indebtedness and other amounts in respect of Stock, (ii) the maintenance of its legal existence (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance), (iii) the performance of its obligations with respect to the Transactions, the Credit Documents and any other documents governing Indebtedness permitted hereby, (iv) any public offering of its or its direct or indirect parent entity's common equity or any other issuance or sale of its or its direct or indirect parent entity's Stock, (v) financing activities, including the issuance of securities, incurrence of debt, receipt and payment of dividends and distributions, making contributions to the capital of the Borrower and guaranteeing the obligations of the Borrower and the Subsidiaries, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries, (vii) holding any cash or other property (but not operate any property), (viii) making and receiving of any dividends, payments in respect of Indebtedness or Investments permitted hereunder, (ix) providing indemnification to officers and directors, (x) activities relating to any Permitted Reorganization, (xi) activities related to the Plan and the consummation of the Transactions and activities contemplated thereby, (xii) merging, amalgamating or consolidating with or into any direct or indirect parent of Holdings (in compliance with the definition of "Holdings" in this Agreement), (xiii) repurchases of Indebtedness through Permitted ~~o~~Open ~~m~~Market ~~p~~Purchases ~~and~~or Dutch auctions, (xiv) activities incidental to Permitted Acquisitions or similar Investments consummated by the Borrower and the Restricted Subsidiaries, including the formation of acquisition vehicle entities and intercompany loans and/or Investments incidental to such Permitted Acquisitions or similar Investments, (xv) any transaction with the Borrower or any Restricted Subsidiary to the extent expressly permitted under this Section 10, (xvi) making any AHYDO Catch-Up Payments, (xvii) paying any Taxes it is obligated to pay, (xviii) consummation of any Permitted Change of Control and activities

176

incidental to the consummation of such Permitted Change of Control, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Change of Control and (xix) any activities incidental or reasonably related to the foregoing.

### SECTION 11 Events of Default

Upon the occurrence of any of the following specified events (each an "**Event of Default**"):

11.1    Payments

The Borrower shall (a) default in the payment when due of any principal of the Term Loans, (b) default, and such default shall continue for more than five Business Days, in the payment when due of any interest on the Term Loans or (c) default, and such default shall continue for more than ten Business Days, in the payment when due of any Fees or any other amounts owing hereunder or under any other Credit Document; or

11.2    Representations, Etc.

Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be materially untrue on the date as of which made or deemed made, and, to the extent capable of being cured, such incorrect representation and warranty shall remain incorrect in any material respect for a period of thirty days after written notice thereof from the Administrative Agent to the Borrower; or

11.3    Covenants

Any Credit Party shall:

(a)      default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.1(d)(i) (*provided* that notice of such default at any time shall timely cure the failure to provide such notice), Section 9.5 (solely with respect to the Borrower) or Section 10; or

(b)      default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in Section 11.1 or 11.2 or clause (a) of this Section 11.3) contained in this Agreement or any other Credit Document and such default shall continue unremedied for a period of at least 30 calendar days after receipt of written notice by the Borrower from the Administrative Agent; or

11.4    Default Under Other Agreements

(a)      The Borrower or any Restricted Subsidiary shall (i) default in any payment with respect to any Indebtedness (other than any Indebtedness described in Section 11.1, Hedging Obligations or Indebtedness under any Permitted Receivables Financing) with a principal amount in excess of $100,000,000 in the aggregate for the Borrower and such

177

Restricted Subsidiaries beyond the period of grace or cure and following all required notices, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than any agreement or condition relating to, or provided in any instrument or agreement, under which such Hedging Obligations or such Permitted Receivables Financing was created) beyond the period of grace or cure and following all required notices, if any, provided in the instrument or agreement under which such Indebtedness was created, if the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its Stated Maturity; or (b) without limiting the provisions of clause (a) above, any such Indebtedness shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment (other than any Hedging Obligations or Indebtedness under any Permitted Receivables Financing) or as a mandatory prepayment, prior to the Stated Maturity thereof; *provided* that clauses (a) and (b) above shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that this Section 11.4 shall not apply to (i) any Indebtedness if the sole remedy of the holder thereof following such event or condition is to elect to convert such Indebtedness into Stock or Stock Equivalents (other than Disqualified Stock) and cash in lieu of fractional shares, (ii) any such default that is remedied by or waived (including in the form of amendment) by the requisite holders of the applicable item of Indebtedness or contested in good faith by the Borrower or the applicable Restricted Subsidiary in either case, prior to acceleration of all the Term Loans pursuant to this Section 11 or (ii) any failure to perform or observe the ABL Financial Covenant unless and until the lenders under the ABL Credit Agreement have affirmatively declared all obligations thereunder to be immediately due and payable and terminated the ABL Obligations and such declaration has not been rescinded; or

11.5    Bankruptcy

Except as otherwise permitted under Section 10.3, (i) the Borrower or any Material Subsidiary shall commence a voluntary case, proceeding or action concerning itself under (a) Title 11 of the United States Code entitled "Bankruptcy," or (b) in the case of any Foreign Subsidiary that is a Material Subsidiary, any domestic or foreign law relating to bankruptcy, judicial management, insolvency, reorganization, administration or relief of debtors in effect in its jurisdiction of incorporation, in each case as now or hereafter in effect, or any successor thereto (collectively, the "**Bankruptcy Code**"); (ii) an involuntary case, proceeding or action is commenced against the Borrower or any Material Subsidiary and the petition is not controverted within 60 days after commencement of the case, proceeding or action; (iii) an involuntary case, proceeding or action is commenced against the Borrower or any Material Subsidiary and the petition is not dismissed or stayed within 60 consecutive days after commencement of the case, proceeding or action; (iv) a custodian (as defined in the Bankruptcy Code), judicial manager, receiver, receiver manager, trustee, administrator or similar person is appointed for, or takes charge of, all or substantially all of the property of the Borrower or any

Material Subsidiary; (v) the Borrower or any Material Subsidiary commences any other voluntary proceeding or action under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, administration or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or any Material Subsidiary; (vi) there is commenced against the Borrower or any Material Subsidiary any such proceeding or action that remains undismissed or unstayed for a period of 60 consecutive days; (vii) the Borrower or any Material Subsidiary is adjudicated insolvent or bankrupt; (viii) any order of relief or other order approving any such case or proceeding or action is entered; (ix) the Borrower or any Material Subsidiary suffers any appointment of any custodian, receiver, receiver manager, trustee, administrator or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of 60 consecutive days; (x) the Borrower or any Material Subsidiary makes a general assignment for the benefit of creditors; or (xi) any corporate action is taken by the Borrower or any Material Subsidiary for the purpose of authorizing any of the foregoing; or

11.6     ERISA

(a)     The occurrence of any ERISA Event; (b) there could result from any event or events set forth in clause (a) of this Section 11.6 the imposition of a Lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a Lien, security interest or liability; and (c) such ERISA Event, Lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect; or

11.7     Guarantee

Any Guarantee provided by Holdings, the Borrower or any Material Subsidiary or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any such Guarantor thereunder or any other Credit Party shall deny or disaffirm in writing any such Guarantor's obligations under the Guarantee; or

11.8     Security Agreement

The Security Agreement or any other material Security Document pursuant to which the assets of any Credit Party are pledged as Collateral or any material provision thereof shall cease to be in full force or effect in respect of a material portion of the Collateral (other than pursuant to the terms hereof or thereof or any defect arising as a result of acts or omissions of the Collateral Agent or any Lender which do not result from a material breach by a Credit Party of its obligations under the Credit Documents) (it being understood that the foregoing exception shall not impose any obligations on the Collateral Agent exculpated under Section 12) or any grantor thereunder or any other Credit Party shall deny or disaffirm in writing such grantor's obligations under the Security Agreement or any other such Security Document; or

11.9     Judgments

One or more final judgments or decrees shall be entered against the Borrower or any Restricted Subsidiary involving a liability requiring the payment of $100,000,000 or more in the aggregate for all such final judgments and decrees for the Borrower and the Restricted Subsidiaries (to the extent not paid or covered by indemnity or insurance provided by a carrier

that has not denied coverage) and any such final judgments or decrees shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal within 60 consecutive days after the entry thereof; or

11.10   Change of Control

A Change of Control shall occur; or

11.11   Indemnity Payments to Former Officers

The Credit Parties pay in excess of $~~10 million~~10,000,000 on account of an indemnity obligation asserted by any former officers or directors of a Credit Party who were not officers or directors of a Credit Party as of the Petition Date or thereafter.

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent shall, at the written request of the Required Lenders, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of any Agent or any Lender to enforce its claims against the Borrower, except as otherwise specifically provided for in this Agreement (*provided* that, if an Event of Default specified in Section 11.5 shall occur with respect to the Borrower, the result that would occur upon the giving of written notice by the Administrative Agent as specified below shall occur automatically without the giving of any such notice or any other declaration or other act by the Administrative Agent or Lenders):  (i) declare the principal of and any accrued interest and Fees in respect of any or all Term Loans and any or all Obligations owing hereunder and under any other Credit Document to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; (ii) direct the Collateral Agent to enforce any and all Liens and security interests created pursuant to the Security Documents and (iii) enforce any and all of the Administrative Agent's rights under the Guarantee.

Notwithstanding anything to the contrary contained herein, any Event of Default under this Agreement or similarly defined term under any other Credit Document, other than any Event of Default which cannot be waived without the written consent of each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist and the Borrower is in compliance with this Agreement and/or such other Credit Document.

11.12   Application of Proceeds

Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default under Section 11.5 shall be applied in accordance with any Applicable Intercreditor Agreement.  In the event that either (x) any Applicable Intercreditor Agreement directs the application with respect to such amount be made with reference to this Agreement or the other Credit Documents or (y) no Applicable Intercreditor Agreement is then in effect that is applicable to such amount, any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of

180

any Collateral), in each case, following any acceleration of the Obligations under this Agreement or any Event of Default under Section 11.5 shall be applied:

(i)     First, to the payment of all fees, indemnities, expenses, and other amounts payable to the Agents in their capacities as such, including, without limitation, all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization, including compensation to the Administrative Agent, Collateral Agent and their agents and counsel, and all expenses, fees, liabilities and advances made or incurred by the Administrative Agent and Collateral Agent in connection therewith and all amounts for which the Administrative Agent and Collateral Agent is entitled to indemnification pursuant to the provisions of any Credit Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(ii)    Second, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(iii)   Third, without duplication of amounts applied pursuant to clauses (i) and (ii) above, to the indefeasible payment in full in cash, *pro rata*, of interest and other amounts constituting Obligations hereunder (other than principal or premium) and any fees, premiums and scheduled periodic payments due under Secured Hedging Agreement and Secured Cash Management Agreements to the extent constituting Obligations and any interest accrued thereon (excluding any breakage, termination or other payments thereunder), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(iv)    Fourth, to the payment in full in cash, *pro rata*, of principal amount of the Obligations hereunder and any premium thereon and any breakage, termination or other payments under Secured Hedging Agreement or Secured Cash Management Agreements to the extent constituting Obligations; and

(v)     Fifth, the balance, if any, to the person lawfully entitled thereto (including the applicable Credit Party or its successors or assigns) or as a court of competent jurisdiction may direct.

### SECTION 12 The Agents[12]

12.1    Appointment

(a)     Each Secured Party (other than the Administrative Agent) hereby irrevocably designates and appoints the Administrative Agent as the administrative agent of such Secured Party under this Agreement and the other Credit Documents, and irrevocably authorizes

---

[12]     Note to Draft: Agency provisions subject to review by WSFS and the company.

181

the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  The provisions of this Section 12 (other than this Section 12.1 and Sections ~~12.2,~~ 12.9, 12.12 and 12.13, in each case, with respect to the Borrower) are solely for the benefit of the Agents and the other Secured Parties, and the Credit Parties shall not have any rights as a third party beneficiary of such provisions.  The Agents shall not be agents for the Lender Claimants and shall not have any duties or obligations with respect to the Lender Claimants or the Term Loans attributed to such Lender Claimants (and no Lender Claimant shall have any rights against any Agent, including to direct any Agent), other than (i) maintenance of the Lender Claimant Reserve Account in accordance with Section 2.18 and (ii) the crediting of their Term Loans in accordance with Section 2.18(a).

(b)     The duties of each Agent shall be mechanical and administrative in nature; and each Agent shall not have, by reason of any Credit Document, a fiduciary, principal-agency, or trustee relationship in respect of any Lender or any other Secured Party.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Credit Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom and is intended to create or reflect only a representative relationship between independent contracting parties.

(c)     The Secured Parties hereby irrevocably designate and appoint the Collateral Agent to act as the collateral agent of such Secured Party with respect to the Collateral, and each of the Secured Parties hereby irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto, including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Lenders, and by accepting the benefits of the Security Documents, any other Secured Parties, hereby expressly authorize the Collateral Agent to (i) execute any and all documents with respect to the Collateral (including any release, amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and acknowledge and agree that any such action by the Collateral Agent shall bind the Secured Parties and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Secured Parties in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Secured Party.

12.2    Delegation of Duties

The Administrative Agent and the Collateral Agent may each perform any and all of its duties and execute any of its rights and powers under this Agreement and the other Credit

Documents (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents or of exercising any rights and remedies thereunder) by or through any one or more co-agents, sub-agents, or attorneys-in-fact and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties.  The Agents and any such co-agents, sub-agents, and attorneys-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  ~~Except as otherwise expressly set forth in this Agreement, all~~All provisions of this Section 12 and Section 13 (including Section 13.5) and all other rights, privileges, protections, immunities, and indemnities granted to the Agents hereunder and under the other Credit Documents shall apply to any such co-agents, sub-agents, and attorneys-in-fact, and to the Related Parties of the Agents and any such co-agents, sub-agents, and attorneys-in-fact.  No Agent shall be responsible for the negligence or misconduct of any such co-agents, sub-agents, or attorneys-in-fact selected by it except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such co-agents, sub-agents, and attorneys-in-fact.

12.3     Exculpatory Provisions

(a)     Notwithstanding any provision to the contrary elsewhere in this Agreement or in any other Credit Document, no Agent shall have any duties, responsibilities, or obligations except those expressly set forth herein or in any other Credit Document, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against such Agent.  The permissive rights of each Agent to take any actions permitted by this Agreement or any other Credit Document shall not be construed as an obligation or duty to do so.  Without limiting the generality of the foregoing, each Agent and its Related Parties:

(i)     shall not be subject to any fiduciary or other implied duties or obligations, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)     shall not have any duty to take any discretionary action or exercise any discretionary powers, and shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) as it deems appropriate, *provided* that such Agent shall not be required to take any action that, in its good faith opinion or the opinion of its counsel, may (i) reasonably be expected to expose such Agent to liability or that is contrary to any Credit Document or applicable law or (ii) be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency, reorganization, or relief of debtors; *provided, further,* that if such Agent so requests, it shall first be indemnified and provided with adequate security to its reasonable satisfaction (including reasonable advances as may be requested by such Agent) by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action; *provided, further*, that such Agent may seek clarification or further direction from the

183

Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) prior to taking any such directed action and may refrain from acting until such clarification or further direction has been provided;

(iii)     shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, the Credit Parties, or any of their Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Related Parties in any capacity;

(iv)     shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) (and such consent or request and such action or action not taken pursuant thereto shall be binding upon all the Lenders and all other Secured Parties) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment (which shall not include any action taken or omitted to be taken in accordance with clause (i), for which such Agent and its Related Parties shall have no liability);

(v)     shall not be responsible or liable for or have any duty to ascertain or inquire into or monitor (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report, statement, or other document referred to, provided for, or delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the use of proceeds of the Loans, or the occurrence or possible occurrence of any Default or Event of Default, (iv) the execution, validity, enforceability, effectiveness, genuineness, collectibility or sufficiency of this Agreement, any other Credit Document or any other agreement, instrument or document, or the creation, preservation, perfection, maintenance or continuation of perfection, or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, (vi) whether the Collateral exists, is owned by any Credit Party, is cared for, protected, insured, or maintained, or has been encumbered, or meets the eligibility criteria applicable in respect thereof, (vii) the satisfaction of any condition set forth in Section 6 or ~~7 or~~ elsewhere, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or the inspection of the properties, books or records of any Credit Party or any Affiliate thereof, or (viii) the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations.

(b)     Nothing in this Agreement or any other Credit Document shall require any Agent or its Related Parties to expend or risk their own funds or otherwise incur any financial liability in the performance of any duties, obligations or responsibilities or in the exercise of any right, power, authority or discretion hereunder or under the other Credit Documents.

184

(c)      No Agent shall be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Credit Document, in each case, arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(d)      In no event shall any Agent be responsible or liable for any incidental, special, indirect, punitive or consequential loss or damage of any kind whatsoever (including loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(e)      For the avoidance of doubt, and without limiting the other protections set forth in this Section 12, with respect to any approval, determination, designation, or judgment to be made by any Agent herein or in the other Credit Documents, such Agent shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) make or confirm such approval, determination, designation, or judgment.

(f)      If at any time any Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any Collateral), such Agent is authorized to comply therewith in any manner as it (in good faith) or its legal counsel of its own choosing deems appropriate, and if such Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, such Agent shall not be liable to any of the parties hereto or to any other Person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

(g)      Each Lender confirms to the Administrative Agent, the Collateral Agent, each other Lender and each of their respective Related Parties that it (i) possesses (individually or through its Related Parties) such knowledge and experience in financial and business matters that it is capable, without reliance on the Administrative Agent, the Collateral Agent, any other Lender or any of their respective Related Parties, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Agreement, (y) making Term Loans and other extensions of credit hereunder and under the other Credit Documents and (z) in taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risks and (iii) has determined that entering into this Agreement and making Term Loans and other extensions of credit hereunder and under the other Credit Documents is suitable and appropriate for it.

(h)      Each Lender acknowledges that (i) it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Credit Documents, (ii) that it has, independently and without reliance

185

upon the Administrative Agent, the Collateral Agent, any other Lender or any of their respective Related Parties, made its own appraisal and investigation of all risks associated with, and its own credit analysis and decision to enter into, this Agreement based on such documents and information, as it has deemed appropriate and (iii) it will, independently and without reliance upon the Administrative Agent, the Collateral Agent, any other Lender or any of their respective Related Parties, continue to be solely responsible for making its own appraisal and investigation of all risks arising under or in connection with, and its own credit analysis and decision to take or not take action under, this Agreement and the other Credit Documents based on such documents and information as it shall from time to time deem appropriate, which may include, in each case:

(i)     the financial condition, status and capitalization of the Borrower and each other Credit Party;

(ii)     the legality, validity, effectiveness, adequacy or enforceability of this Agreement and each other Credit Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document;

(iii)     determining compliance or non-compliance with any condition hereunder to the making of a Term Loan and the form and substance of all evidence delivered in connection with establishing the satisfaction of each such condition; and

(iv)     the adequacy, accuracy and/or completeness of any information delivered by the Administrative Agent, the Collateral Agent, any other Lender or by any of their respective Related Parties under or in connection with this Agreement or any other Credit Document, the transactions contemplated hereby and thereby or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document.

12.4    Reliance by Agents

The Administrative Agent and the Collateral Agent shall be entitled to rely, shall be fully protected in relying, and shall not incur any liability for relying, (i) upon any instrument, writing, resolution, notice, consent, request, certificate, affidavit, letter, telecopy, telex, electronic mail, or teletype message, statement, order or other document, communication or instruction (including any electronic message, Internet or intranet website posting or other distribution) believed by it in good faith to be genuine and correct and to have been signed, sent, made, or otherwise authenticated by the proper Person or Persons and (ii) upon advice and statements of legal counsel (including counsel to Holdings and/or the Borrower), independent accountants and other consultants or experts selected by the Administrative Agent or the Collateral Agent ~~and shall be entitled to rely, shall be fully protected in relying, upon advice and statements of such counsel, accountants, consultants, or experts~~. The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing to such Lender hereunder as the owner thereof for all purposes unless such amount is assigned by such Lender in accordance with Section 13.6.

12.5     Notice of Default

Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or the Collateral Agent, as applicable, has received written notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent or the Collateral Agent receives such a notice, it shall give notice thereof to the Lenders, the Administrative Agent or the Collateral Agent, as applicable.   The Administrative Agent and the Collateral Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (subject to the protections of Section 12.3); *provided* that unless and until the Administrative Agent or the Collateral Agent, as applicable, shall have received such directions, the Administrative Agent or the Collateral Agent, as applicable, may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as is within its authority to take under this Agreement and otherwise as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Required Lenders or each of the Lenders, as applicable.

12.6     Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders

Each Lender expressly acknowledges that none of the Administrative Agent, the Collateral Agent or any of their Related Parties has made any representations or warranties to it and that no act by the Administrative Agent ~~or~~, the Collateral Agent <u>or any of their Related Parties</u> hereinafter taken, including any review of the affairs of Holdings, the Borrower, any other Guarantor or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent, the Collateral Agent<u>, or their Related Parties</u> to any Lender.  Each Lender represents to Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent<u>, or their Related Parties</u> or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Holdings, the Borrower, each other Guarantor and each other Credit Party and made its own decision to make its Term Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent<u>, or their Related Parties</u> or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of Holdings, the Borrower, each other Guarantor and each other Credit Party.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Agents <u>and their Related Parties</u> shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of Holdings, the Borrower, any other Guarantor or any other Credit Party that may come into the possession of the Administrative Agent, the Collateral Agent or any of their

Related Parties.  Each Lender agrees that it will not assert any claim against any Agent based on an alleged breach of fiduciary duty by such Agent in connection with this Agreement, the other Credit Documents, or the transactions contemplated hereby or thereby.

12.7    Indemnification

The Lenders agree to indemnify each Agent and its Related Parties in their capacities as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective principal amounts of the outstanding Term Loans in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Term Loans shall have been paid in full, ratably in accordance with their respective principal amounts of the outstanding Term Loans in effect immediately prior to such date), and hold harmless such Agent and its Related Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Term Loans) be imposed on, incurred by or asserted against such Agent or Related Party, including all fees, disbursements and other charges of counsel to the extent required to be reimbursed by the Credit Parties pursuant to Section 13.5, in any way relating to or arising out of the making of the Term Loans, the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent or Related Party under or in connection with any of the foregoing (**SUBJECT TO THE PROVISOS BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON**); *provided* that no Lender shall be liable to any Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction; *provided*, *further*, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 12.7.  In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses or disbursements of any kind whatsoever that may at any time occur, be imposed upon, incurred by or asserted against any Agent or any of its Related Parties in any way relating to or arising out of the making of the Term Loans, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent or its Related Parties under or in connection with any of the foregoing (including at any time following the payment of the Term Loans), this Section 12.7 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse such Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees and expenses) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any

document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided* that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's *pro rata* portion thereof; and *provided*, *further*, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct (as determined by a final and non-appealable judgment of court of competent jurisdiction). For the avoidance of doubt, each Lender's ratable share of any indemnity or reimbursement obligation owing hereunder shall be calculated solely by reference to the Register and any Obligations owing to Lender Claimants (in their capacities as such) shall not be included in calculating such indemnity or reimbursement obligation.

12.8    Agents in their Individual Capacities

Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with Holdings, the Borrower, any other Guarantor, and any other Credit Party as though such Agent were not an Agent hereunder and under the other Credit Documents. With respect to any Term Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

12.9    Successor Agents

Each of the Administrative Agent and Collateral Agent may resign at any time by notifying the other Agent, the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld, conditioned, or delayed) so long as no Specified Default has occurred and is continuing, to appoint a successor Agent, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders appoint a successor Agent meeting the qualifications set forth above (including receipt of the Borrower's consent, if required); *provided* that if such retiring Agent shall notify the Borrower and the Lenders that no qualifying Person (including as a result of the absence of required consent of the Borrower) has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (x) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Credit Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a

189

successor Collateral Agent is appointed) and (y) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders with (except after the occurrence and during the continuation of a Specified Default) the consent of the Borrower (not to be unreasonably withheld, conditioned, or delayed) appoint a successor Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, ~~and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents,~~ such successor Agent shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor Agent.  After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Section 12 (including Section 12.7) and Section 13.5 and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder and the other Credit Documents shall continue in effect for the benefit of such retiring Agent, its co-agents, sub-agents and attorneys-in-fact and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

12.10   [Reserved]

12.11   Administrative Agent May File Proofs of Claim

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agents and their respective Related Parties and all other amounts due the Lenders, the Agents and their respective Related Parties under the Credit Documents) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

190

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their Related Parties, and any other amounts due the Agents and their Related Parties under the Credit Documents (including Sections 4.1, 5.4, and 13.5).

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Secured Party or to authorize the Administrative Agent to vote in respect of the claim of any Secured Party in any such proceeding.

12.12   Intercreditor Agreements

Each of the Collateral Agent and the Administrative Agent is hereby authorized to enter into any Applicable Intercreditor Agreement contemplated hereby, and the parties hereto acknowledge that any such Applicable Intercreditor Agreement to which the Collateral Agent and/or the Administrative Agent is a party are each binding upon them.  Each Secured Party (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of any such Applicable Intercreditor Agreement and (b) hereby authorizes and instructs the Collateral Agent and the Administrative Agent to enter into any such Applicable Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  In addition, each Secured Party hereby authorizes the Collateral Agent and the Administrative Agent to enter into any other intercreditor arrangements to the extent required to give effect to the establishment of intercreditor rights and privileges as contemplated and required by Section 10.2 of this Agreement.

12.13   Security Documents and Guarantee; Agents under Security Documents and Guarantee

(a)      Each Secured Party hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guarantee, the Collateral and the Security Documents, as applicable.  Subject to Section 13.1, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (x) subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Credit Document to the holder of any Lien permitted under clauses (d), (g) and (l) of Section 10.2 or (y) enter into subordination or intercreditor agreements with respect to Indebtedness to the extent the Administrative Agent or the Collateral Agent is otherwise contemplated herein as being a party to such intercreditor or subordination agreement (including the Applicable Intercreditor Agreements).  The Secured Parties hereby irrevocably agree that the Liens granted to the Collateral Agent by the Credit Parties on any Collateral shall be automatically released (i) upon the termination of this Agreement and the payment of all Obligations hereunder (except for Hedging Obligations in respect of any Secured Hedging

191

Agreement, Cash Management Obligations in respect of Secured Cash Management Agreements and Contingent Obligations) (provided that, for all purposes under this Agreement, deposit by the Borrower of the Lender Claimant Obligation Amount, if any, into the Lender Claimant Reserve Account pursuant to Section 2.18 shall be deemed to be payment in full of such amounts) and the termination of all Commitments, (ii) upon the sale or other Disposition of such Collateral (including as part of or in connection with any other sale or other Disposition permitted hereunder) to any Person other than another Credit Party, to the extent such sale or other Disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively, shall be fully protected in relying, and shall not incur any liability for relying, on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Credit Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 13.1), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee, (vi) as required to effect any sale or other Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Security Documents and (vii) if such assets constitute Excluded Collateral.  Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents.  Additionally, the Secured Parties hereby irrevocably agree that the Subsidiary Guarantors shall be automatically released from the Guarantee upon consummation of any transaction resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary or upon becoming an Excluded Subsidiary; *provided* that, without the prior written consent of the Required Lenders, no Subsidiary Guarantor shall be automatically released from its obligations under the Credit Documents solely by reason of such Subsidiary Guarantor becoming an Excluded Subsidiary of the type described in clause (b) of the definition thereof unless either (x) it is no longer a direct or indirect Subsidiary of the Borrower or (y) such Subsidiary Guarantor ceases to be a Wholly Owned Subsidiary as a result of a sale or transfer of Stock made for a bona fide business purpose of the Borrower and its Restricted Subsidiaries and not for the purpose of evading the requirement hereunder to provide a Guarantee.  Upon request by any Agent at any time, the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 13.1) shall confirm in writing such Agent's authority to release any Collateral or Guarantee pursuant to this Agreement or any other Credit Document.  The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, and the Administrative Agent and the Collateral Agent agree, at the Borrower's expense, to execute and deliver any instruments, documents, and agreements reasonably requested by the Borrower to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender; *provided*, that (1) no Agent shall be required to execute any document or take any action to evidence such release on terms that, in such Agent's opinion or the opinion of its counsel, could reasonably be expected to expose such Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse to, or representation, or warranty by such

192

Agent, and (2) the Credit Parties shall have provided such Agent with such certifications or documents as such Agent shall reasonably request in order to demonstrate that the requested release is permitted under this Section 12.13(a).

(b)     *Right to Realize on Collateral and Enforce Guarantee*.    Anything contained in any of the Credit Documents to the contrary notwithstanding, Holdings, the Borrower, the Agents and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder and under the Guarantee may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent on behalf of the Secured Parties, and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other Disposition, the Collateral Agent or any other Secured Party may be the purchaser or licensor of any or all of such Collateral at any such sale or other Disposition and the Collateral Agent, as collateral agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other Disposition.  For the avoidance of doubt, no Agent shall be required to take title to the Collateral.  No holder of Hedging Obligations under Secured Hedging Agreements or Cash Management Obligations under Secured Cash Management Agreements shall have any rights in connection with the management or release of any Collateral or of the obligations of any Credit Party under this Agreement.  No holder of Hedging Obligations under Secured Hedging Agreements or Cash Management Obligations under Secured Cash Management Agreements that obtains the benefits of any Guarantee or any Collateral by virtue of the provisions hereof or of any other Credit Document shall have any right to notice of any action or to consent to or vote on, direct or object to any action hereunder or under any other Credit Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender or Agent and, in such case, only to the extent expressly provided in the Credit Documents.  Notwithstanding any other provision of this Agreement to the contrary, no Agent shall be responsible or have any liability for or in connection with, or have any duty to ascertain, inquire into, monitor, maintain, update or enforce compliance with the provisions hereof relating to Secured Hedging Agreements and Secured Cash Management Agreements, and no Agent shall be deemed to have notice of any Obligations under any Secured Hedging Agreements and Secured Cash Management Agreements unless such Agent has received written notice thereof, together with such supporting documentation as such Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

12.14   Lender Direction

Each Lender authorizes and directs the Agents to enter into, and agrees to be bound by, this Agreement, the Security Documents, and the other Credit Documents, including, without limitation, each Credit Document to be executed by any Agent.  Each Lender hereby acknowledges and agrees that (x) the foregoing instructed actions constitute an instruction from

all the Lenders under this Section 12 and (y) this Section 12 and Section 13.5 and any other rights, privileges, protections, immunities, and indemnities in favor of any Agent hereunder apply to any and all actions taken or not taken by any Agent in accordance with such instruction. Each Lender agrees that any action taken by any Agent in accordance with the terms of this Agreement or the other Credit Documents relating to the Collateral and the exercise by each Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

12.15   Erroneous Distribution

(a)      If any Agent notifies a Lender or Secured Party, or any other Person (other than any Credit Party or any Affiliate of a Credit Party) who has received funds on behalf of a Lender or Secured Party (any such Lender or, Secured Party, or other recipient, a "**Payment Recipient**") that such Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from such Agent or any of its Related Parties were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of such Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of such Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to such Agent in same day funds at the greater of the (x) a rate determined by such to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error) and (y) a rate determined by such in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of any Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)      Without limiting the immediately preceding clause (a), each Lender or Secured Party (or any Payment Recipient who received such funds on its behalf), hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from any Agent (or any of its Related Parties) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by such Agent (or any of its Related Parties) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by such Agent (or any of its Related Parties), or (z) that such Lender or Secured Party, or other such Payment Recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

194

(i)       it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from such Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)      such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly (and, in all events, within one (1) Business Day of its knowledge of such error) notify such Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying such Agent pursuant to this Section 12.15(b).

For the avoidance of doubt, the failure to deliver a notice to such Agent pursuant to this Section 12.15(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 12.15(a) or on whether or not an Erroneous Payment has been made.

(c)       Each Lender or Secured Party hereby authorizes the Agents to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Credit Document, or otherwise payable or distributable by any Agent to such Lender or Secured Party from any source, against any amount ~~due to any~~that such Agent has demanded to be returned under immediately preceding clause (a)~~, Section 12.7, or any other indemnity obligations from such Lender to any Agent under the Credit Documents~~.

(d)       The parties hereto agree that (x) irrespective of whether an Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, such Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender or other Secured Party, to the rights and interests of such Lender or other Secured Party, as the case may be) under the Credit Documents with respect to such amount (the "**Erroneous Payment Subrogation Rights**") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party; *provided* that this Section 12.1~~4~~5(d) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower or any other Credit P~~A~~arty relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by such Agent; *provided*, *further*, that for the avoidance of doubt, the immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by such Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment.

(e)       Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, in no event shall the occurrence of an Erroneous Payment (or the existence of any Erroneous Payment Subrogation Rights or other rights of any Agent in respect of an

195

Erroneous Payment) result in such Agent becoming, or being deemed to be, a Lender hereunder or the holder of any Term Loans hereunder.

(f)     The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by any Agent from the Borrower or any other Credit Party for the purpose of ~~m~~paking ~~such Erroneous Payment~~, prepaying, repaying, discharging or otherwise satisfying any Obligations.

(g)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by any Agent for the return of any Erroneous Payment received, including, without limitation, waiver of any defense based on "discharge for value" or any similar doctrine.

(h)     Notwithstanding anything to the contrary herein or in any other Credit Document, no Credit Party nor any of their respective Affiliates shall have any obligations or liabilities directly or indirectly arising out of this Section 12.15 in respect of any Erroneous Payment.

12.16   Survival

The agreements in this Section 12 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the Commitments and the payment, satisfaction, or discharge of the Term Loans and all other Obligations payable hereunder and under any other Credit Document.

**SECTION 13 Miscellaneous**

13.1     Amendments, Waivers and Releases

Except as otherwise expressly set forth in the Credit Documents (including Section 2.10(e)), neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 13.1.  The Required Lenders may (with a copy to the Administrative Agent), or, with the written consent of the Required Lenders, the Administrative Agent and/or the Collateral Agent may, from time to time, (a) enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or (b) waive in writing, on such terms and conditions as the Required Lenders or the Administrative Agent and/or Collateral Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; *provided*, *however*, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance

196

and for the specific purpose for which given; and *provided*, *further*, that no such waiver and no such amendment, supplement or modification shall:

(i)      forgive or reduce any portion of any Term Loan or extend the final scheduled maturity date of any Term Loan or reduce the stated rate, or forgive any portion thereof, or extend the date for the payment of any principal, any interest or Fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates), or extend the final expiration date of any Lender's Commitment, or increase the aggregate amount of the Commitments of any Lender, in each case without the written consent of each Lender directly and adversely affected thereby; *provided* that, in each case for purposes of this clause (i), a waiver of any condition precedent in Section 6 of this Agreement, the waiver of any Default, Event of Default, default interest, mandatory prepayment or reductions, any modification, waiver or amendment to the financial definitions or financial ratios or any component thereof or the waiver of any other covenant shall not constitute an increase of any Commitment of a Lender, a reduction or forgiveness of any portion of any Term Loan or in the interest rates or the fees or premiums or a postponement of any date scheduled for the payment of principal or interest or an extension of the final maturity of any Term Loan, or the scheduled termination date of any Commitment; or

(ii)      (~~x~~w) reduce the percentages specified in the definition of the term "Required Lenders" without the written consent of each Lender, ~~or~~ (~~y~~x) consent to the assignment or transfer by Holdings or the Borrower of their respective rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to Section 10.3 or as contemplated by the definition of "Holdings"), without the written consent of each Lender directly and adversely affected thereby, (y) alter the order of application set forth in Section 5.2(c) ~~during the continuance of an Event of Default~~ or Section 11.1~~1~~2 or change Section 13.8 or any other provision of any Credit Document requiring pro rata sharing among the Lenders, in each case of this clause (y) without the written consent of each Lender directly and adversely affected thereby, or (z) modify Section 2.15, 2.17, 13.6 or any other provision of any Credit Document to permit Holdings or any of its Subsidiaries to purchase or exchange any of the Obligations other than pursuant to an offer open to all Lenders (except as expressly set forth therein) without the written consent of each Lender; or

(iii)      amend, modify or waive any provision of Section 12 or any other provision that affects the rights or duties of, or any fees or other amounts payable to, the Agents under this Agreement or any other Credit Document without the written consent of the then-current Administrative Agent and Collateral Agent in a manner that directly and adversely affects such Person; *provided* that only the consent of the parties to the Agent Fee Letter shall be required to amend, modify or supplement the terms thereof, or

(iv)      release all or substantially all of the value of the Guarantors under the Guarantee (except as expressly permitted by the Guarantee or this Agreement) or release all or substantially all of the Collateral under the Security Documents (except as

197

expressly permitted by the Security Documents or this Agreement), in either case without the prior written consent of each Lender.; or

(v)    except in connection with any "debtor-in-possession" facility, contractually subordinate (x) the Liens on all or substantially all of the Collateral securing any of the Obligations to any other Lien in respect of any other Indebtedness (it being acknowledged, for the avoidance of doubt, any amendment to Section 10.1(b) that increases the amount of Indebtedness that may be incurred thereunder and secured with the priority set forth in the ABL Intercreditor Agreement shall not be construed as subordination of Liens described in this clause (x)) or (y) the Obligations in right of payment to any other Indebtedness, in each case, unless (A) such other Indebtedness is offered ratably to all Lenders pursuant to a bona fide offer held open for at least 5 Business Days and (B) the Super-Majority Lenders have given prior written consent.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon Holdings, the Borrower, the applicable Credit Parties, such Lenders, the Agents and all future holders of the affected Term Loans.  In the case of any waiver, Holdings, the Borrower, the applicable Credit Parties, the Lenders, the Agents shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing, it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  In connection with the foregoing provisions, the Agents may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.

Notwithstanding anything to the contrary herein, (x) no Defaulting Lender shall have any right to approve or disapprove any amendment, modification, supplement, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender (it being understood that any Commitments or Term Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders, except as expressly provided for by this Agreement), and (y) no Lender Claimant (in its capacity as such) shall have any right to approve or disapprove any amendment, modification, supplement, waiver or consent hereunder.

Notwithstanding the foregoing, in addition to any credit extensions and related Incremental Amendment(s) effectuated without the consent of Lenders in accordance with Section 2.14, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Agents, Holdings and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Term Loans and Commitments and the accrued interest and Fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and other definitions related to such new Term Loans and Commitments. Notwithstanding the foregoing, except as otherwise set forth in clauses (i) through (iv) above, this Agreement may be amended, modified or supplemented with respect to any matter that only

198

affects the Lenders under a particular Class of Term Loans and/or Commitments but not any other Class of Term Loans or Commitments upon the consent of Lenders holding more than 50% of the aggregate amount of Term Loans and Commitments of Term Loans in such Class.

Notwithstanding anything herein to the contrary, the Credit Documents may be amended to (i) add syndication or documentation agents and make customary changes and references related thereto and (ii) if applicable, add or modify "parallel debt" language in any jurisdiction in favor of the Collateral Agent or add sub-agents, in each case under clauses (i) and (ii), with the consent of only the Borrower and the Administrative Agent, and in the case of clause (ii), the Collateral Agent.

Notwithstanding anything in this Agreement (including, without limitation, this Section 13.1) or any other Credit Document to the contrary, (i) this Agreement and the other Credit Documents may be amended to effect an Incremental Facility, Refinancing Facility or establish any Extension Series pursuant to Section 2.14 or Section 2.15 (and the Administrative Agent and the Borrower may effect such amendments to this Agreement and the other Credit Documents without the consent of any other party as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the terms of any such incremental facility, refinancing facility or extension facility); (ii) no Lender's consent is required to effect any amendment or supplement to any Applicable Intercreditor Agreement permitted under this Agreement that is for the purpose of adding the holders of any Indebtedness as expressly contemplated by the terms of such Applicable Intercreditor Agreement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to such Applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent and the Borrower, are required to effectuate the foregoing); *provided* that no such agreement shall amend, modify or otherwise directly and adversely affect the rights or duties of, or any fees or other amounts payable to, any Agent hereunder or under any other Credit Document without the prior written consent of such Agent; (iii) any provision of this Agreement or any other Credit Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Credit Document) may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent (A) to cure any ambiguity, omission, mistake, defect or inconsistency (as reasonably determined by the Administrative Agent and the Borrower), (B) to effect administrative changes of a technical or immaterial nature (as reasonably determined by the Administrative Agent and the Borrower), (C) to correct incorrect cross-references or similar inaccuracies, (D) to add benefit to all or any Class of Term Loans if adding such benefit is a condition to the incurrence of any Indebtedness permitted to be incurred under the Credit Documents, (E) for the purpose of causing any Incremental Term Loans to be fungible with any other existing Class of Term Loans and (F) to effect technical changes to this Agreement and the other Credit Documents that are required in connection with the consummation of a Permitted Change of Control; *provided* that in the case of clauses (A), (B) and (E) above, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment; (iv) guarantees, collateral documents and related documents executed by the Credit Parties in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with any other Credit Document, entered into, amended,

199

supplemented or waived, without the consent of any other Person, by the applicable Credit Party or Credit Parties and the Administrative Agent or the Collateral Agent in its or their respective sole discretion if applicable, (A) to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, (B) as required by local law or advice of counsel to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with the Applicable Law or (C) to cure ambiguities, omissions, mistakes or defects (as reasonably determined by the Administrative Agent and the Borrower) or to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Credit Documents; and (v) the Credit Parties and the Collateral Agent, without the consent of any other Secured Party, shall be permitted to enter into amendments and/or supplements to any Security Documents in order to include customary provisions permitting the Collateral Agent to appoint sub-collateral agents or representatives to act with respect to Collateral matters thereunder in its stead.

Notwithstanding anything in this Agreement or any Security Document to the contrary, the Administrative Agent may, in its sole discretion, grant extensions of time (and direct the Collateral Agent to grant such extensions) for the satisfaction of any of the requirements under Sections 9.11, Section 9.12 or any Security Documents in respect of any particular Collateral or any particular Subsidiary if it determines that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of Holdings, the Borrower and the Restricted Subsidiaries by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Security Document.

13.2    Notices

Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile or other electronic transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or e-mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)    if to Holdings, the Borrower, the Administrative Agent, or the Collateral Agent, to the address, facsimile number, e-mail address or telephone number specified for such Person on Schedule 13.2 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b)    if to any other Lender, to the address, facsimile number, e-mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to Holdings, the Borrower, the Administrative Agent, and the Collateral Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail,

200

three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by e-mail, when delivered; *provided* that notices and other communications to the Agents or the Lenders shall not be effective until received during normal business hours on a Business Day for such recipient.

### 13.3   No Waiver; Cumulative Remedies

No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

### 13.4   Survival of Representations and Warranties

All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Term Loans hereunder.

### 13.5   Payment of Expenses; Indemnification

The Borrower agrees, within thirty (30) days after written demand therefor (including documentation reasonably supporting such request), or, in the case of expenses of the type described in clause (a) below incurred prior to the Closing Date, on the Closing Date, (a) to pay or reimburse the Agents and the Lenders for all their reasonable and documented out-of-pocket costs and expenses incurred (i) in connection with the preparation, execution, delivery and negotiation of this Agreement and the other Credit Documents and any other documents prepared in connection herewith or therewith, the funding of the Term Loans, the creation, perfection and protection of the liens granted or created under any Credit Document (including all search, filing and recording fees) and the consummation of the transactions contemplated by this Agreement and the other Credit Documents to occur on the Closing Date and any other documents prepared in connection herewith or therewith, limited, in the case of legal expenses, to the reasonable and documented fees, disbursements and other expenses of Akin, Paul, Weiss, Ropes & Gray LLP, Debevoise & Plimpton LLP, and to the extent reasonably necessary, one local counsel for the Agents and one local counsel for the Lenders as a whole in each relevant material jurisdiction, excluding in each case allocated costs of in-house counsel and fees and solely to the extent the Borrower has consented to the retention of such other Person, expenses with respect to any other advisor or consultant, and (ii) in connection with ongoing administration, enforcement and preservation of any rights under this Agreement, the other Credit Documents and any such other documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto), including the reasonable and documented out-of-pocket fees, disbursements and other expenses of external counsel for the Agents and, solely in connection with this clause (ii), for any Lender or group of Lenders having or holding at least 30% of the sum of (x) the outstanding

201

amount of the Term Loans in the aggregate at such date and (y) the outstanding amount of the unfunded Commitments in the aggregate at such date, (b) to pay, indemnify, and hold harmless each Lender and each Agent from, any and all recording and filing fees and (c) to pay, indemnify, and hold harmless each Lender and each Agent and their respective Related Parties, from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented out-of-pocket fees, disbursements and other charges of ~~A~~advisors related to the Transactions or, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Credit Documents and any such other documents, including, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law (other than by such indemnified person or any of its Related Parties (other than trustees and advisors)) or to any actual or alleged presence, release or threatened release into the environment of Hazardous Materials attributable to the operations of Holdings, the Borrower, any of the Borrower's Subsidiaries or any of the Real Estate (all the foregoing in this clause (c), collectively, the "indemnified liabilities") (**SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON**); *provided* that neither the Borrower nor any other Credit Party shall have any obligation hereunder to any Agent or any Lender or any of their respective Related Parties with respect to indemnified liabilities to the extent they result from (X) with respect to the Lenders and their Related Parties, (A) the gross negligence, bad faith or willful misconduct of such indemnified Person or any of its Related Parties as determined by a final non-appealable judgment of a court of competent jurisdiction, (B) a material breach of the obligations of such indemnified Person or any of its Related Parties under the Credit Documents as determined by a final non-appealable judgment of a court of competent jurisdiction, (C) disputes not involving an act or omission of Holdings, the Borrower or any other Credit Party and that is brought by an indemnified Person against any other indemnified Person, other than any claims against any indemnified Person in its capacity or in fulfilling its role as an Agent or any similar role under the Credit Facilities or (D) any settlement effected without the Borrower's prior written consent, but if settled with the Borrower's prior written consent (not to be unreasonably withheld, delayed, conditioned or denied) or if there is a final non-appealable judgment in any such proceeding, the Borrower will indemnify and hold harmless such indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this Section 13.5, and (Y) with respect to the Agents and their Related Parties, the gross negligence or willful misconduct of such indemnified Person or any of its Related Parties as determined by a final non-appealable judgment of a court of competent jurisdiction.  All amounts payable under this Section 13.5 shall be paid within thirty (30) days of receipt by the Borrower of an invoice relating thereto setting forth such expense in reasonable detail.  The agreements in this Section 13.5 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the Commitments and the payment, satisfaction, or discharge of the Term Loans and all other Obligations payable hereunder and under any other Credit Document.

No Credit Party nor any indemnified Person shall have any liability for any special, punitive, incidental, indirect or consequential damages resulting from this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith

(whether before or after the Closing Date) (except, in the case of the Borrower's obligation hereunder to indemnify and hold harmless the indemnified Person, to the extent of any losses, claims, damages, liabilities and expenses incurred or paid by such indemnified Person to a third party unaffiliated with such indemnified Person). No indemnified Persons shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent that such damages have resulted from the willful misconduct or gross negligence of any indemnified Person or any of its Related Parties (as determined by a final non-appealable judgment of a court of competent jurisdiction). This Section 13.5 shall not apply to Taxes.

Each indemnified Person, by its acceptance of the benefits of this Section 13.5, agrees to refund and return any and all amounts paid by the Borrower (or on its behalf) to it if, pursuant to limitations on indemnification set forth in this Section 13.5, such indemnified Person was not entitled to receipt of such amounts.

13.6     Successors and Assigns; Participations and Assignments

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) except as expressly permitted by Section 10.3, neither Holdings nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agents and each Lender (and any attempted assignment or transfer by Holdings or the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 13.6. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in clause (c) of this Section 13.6), to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders and each other Person entitled to indemnification under Section 13.5) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in clause (b)(ii) and (h) below, any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Term Loans at the time owing to it) with the prior written consent (in each case, such consent not to be unreasonably withheld, delayed, conditioned or denied) of:

(A)     the Borrower; *provided* that no consent of the Borrower shall be required for an assignment of Term Loans (1) to a Lender, an Affiliate of a Lender or an Approved Fund or (2) if a Specified Default has occurred and is continuing, to any other assignee; *provided, further*, that consent of the Borrower shall be deemed obtained if the Borrower has not denied its consent to the requesting party within ten (10) Business Days after receipt of written request thereof; and

203

(B)      the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for any assignment of any Term Loan to (x) a Lender, an Affiliate of a Lender, an Approved Fund or (y) Holdings, the Borrower, a Restricted Subsidiary thereof or an Affiliated Parent Company otherwise in accordance with clause (g) below.

Notwithstanding the foregoing, no such assignment shall be made to (xw) a natural person (provided that the prohibition in clause (xw) shall not disqualify any natural person from being a Lender Claimant or a Lender on the Closing Date as a result of the deemed making of any Initial Term Loans in partial satisfaction of any First Lien Claims (other than a B-3 Escrow Claim) as part of the treatment of First Lien Claims under the Plan), (yx) any investment vehicle established primarily for the benefit of a natural person or, (zy) a Disqualified Institution (*provided* that the prohibition in clause (zy) shall not apply retroactively to disqualify any entity that has previously acquired an assignment or participation interest in the Term Loans to the extent such entity was not a Disqualified Institution at the time of the applicable assignment or participation, as the case may be) or (z) any Affiliated Parent Company, Holdings, or any of its Subsidiaries other than in accordance with Section 10.6(g), and any attempted assignment in violation of clauses (xw) - (z) shall be null and void.  For the purposes of this Agreement, the conversion of a Lender Claimant to a Lender pursuant to Section 2.18 shall not be deemed an assignment.  For the avoidance of doubt, (i) the Administrative Agent shall have no obligation with respect to, and shall bear no responsibility or liability for, the ascertaining, monitoring, inquiring or enforcing of the list of Persons who are Disqualified Institutions (or any provisions relating thereto) at any time, and shall have, and shall have no liability with respect to or arising out of any assignment or participation of any Term Loans to any Disqualified Institution and (ii) the Administrative Agent may share a list of Persons who are Disqualified Institutions with any Lender upon request.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Term Loans of any Class, the amount of the Commitment or Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent), shall not be less than $1,000,000, unless each of the Borrower and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld, delayed, conditioned or denied); *provided* that no such consent of the Borrower shall be required if a Specified Default has occurred and is continuing; provided, further, that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; *provided* that this clause shall not be construed to prohibit the

204

assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Term Loans;

(C)     The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; *provided* that only one such processing and recordation fee shall be payable in connection with simultaneous assignments by or among a Lender and its Affiliates (*i.e.* assignments submitted on a single ClearPar ticket); *provided, further,* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; and

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, the applicable tax forms as required under Section 5.4, and any documentation and information required by any Agent under applicable law or regulation in connection with its "know your customer" process.

(iii)     Subject to acceptance and recording thereof pursuant to clause (b)(v) of this Section 13.6, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 5.4 and 13.5).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 13.6 (other than attempted assignments or transfers in violation of the last paragraph of Section 13.6(b)(i) above, which shall be null and void as provided above).

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower solely with respect to the actions described in this Section 13.6(b)(iv), shall maintain at the Administrative Agent's Office in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  Further, each Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement.  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for

205

inspection by Holdings, the Borrower, the Collateral Agent and any Lender (solely with respect to its own outstanding Term Loans and Commitments), at any reasonable time and from time to time upon reasonable prior notice to the Administrative Agent.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and all the requested tax forms and "know your customer" documents and information to the extent required hereunder (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) of this Section 13.6 (unless waived by the Administrative Agent) and any written consent to such assignment required by clause (b) of this Section 13.6, the Administrative Agent shall promptly accept such Assignment and Assumption and record the information contained therein in the Register.

(c)     (i) Any Lender may, without the consent of Holdings, the Borrower, the Administrative Agent, sell participations to one or more banks or other entities that are not (x) a natural person, (y) any investment vehicle established primarily for the benefit of a natural person or (z) a Disqualified Institution (*provided* that the prohibition in clause (z) shall not apply retroactively to disqualify any entity that has previously acquired an assignment or participation interest in the Term Loans to the extent such entity was not a Disqualified Institution at the time of the applicable assignment or participation, as the case may be) (each, a "**Participant**") (and any such attempted sales to the Persons identified in clauses (x) - (z) above shall be null and void) (provided that the last sentence of Section 13.6(b)(i) shall apply) in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Term Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (C) Holdings, the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, the Administrative Agent shall have no obligation with respect to, and shall bear no responsibility or liability for, the monitoring or enforcing of the list of Disqualified Institutions with respect to the sales of participations at any time. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any consent, amendment, modification, supplement or waiver described in clause (i) or (iv) of the second proviso of the first paragraph of Section 13.1 that directly and adversely affects such Participant. Subject to clause (c)(ii) of this Section 13.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 5.4 to the same extent as if it were a Lender, and provided that such Participant agrees to be subject to the requirements and limitations of those Sections and Sections 2.12 and 13.7(a) as though it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 13.6. To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of Section 13.8(b) as though it were a Lender; *provided* that such Participant agrees to be subject to Section 13.8(a) as though it were a Lender. Each Lender that sells a participation agrees, at the

Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 13.7 with respect to any Participant.

(i)     A Participant shall not be entitled to receive any greater payment under Section 2.10, 2.11 or 5.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(ii)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans (or other rights or obligations) held by it (the "**Participant Register**").  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(d)     Any Lender may, without the consent of Holdings, the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 13.6 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Subject to Section 13.16, the Borrower authorizes each Lender to disclose (other than to any Disqualified Institutions) to any Participant, secured creditor of such Lender or assignee (each, a "**Transferee**"), any prospective Transferee and any prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Term Loans made hereunder any and all financial information in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

(f)     SPV Lender.  Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Term Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this

207

Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Term Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Term Loan, the Granting Lender shall be obligated to make such Term Loan pursuant to the terms hereof.  The making of a Term Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Term Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 13.6, any SPV may (i) with written notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Term Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and the Administrative Agent) other than a Disqualified Institution providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Term Loans and (ii) disclose on a confidential basis any non-public information relating to its Term Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.  This Section 13.6(f) may not be amended without the written consent of the SPV.  Notwithstanding anything to the contrary in this Agreement, (x) no SPV shall be entitled to any greater rights under Sections 2.10, 2.11 and 5.4 than its Granting Lender would have been entitled to absent the use of such SPV and (y) each SPV agrees to be subject to the requirements of Sections 2.10, 2.11, and 5.4 as though it were a Lender and has acquired its interest by assignment pursuant to clause (b) of this Section 13.6.

(g)      Notwithstanding anything to the contrary contained herein, (x) any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Parent Company, Holdings, the Borrower or any Subsidiary thereof and (y) any Affiliated Parent Company, Holdings, the Borrower and any Subsidiary may, from time to time, purchase or prepay Term Loans, in each case, on a non *pro rata* basis through (1) Dutch auction procedures open to all applicable Lenders on a *pro rata* basis in accordance with customary procedures to be mutually agreed between the Borrower and the Auction Agent and as set forth in Exhibit K or (2) (x) open market purchases or other purchases by assignment offered ratably to all Lenders (including for cash consideration, in exchange of Indebtedness or any other consideration) or (y) bona fide open market purchases for cash consideration on the secondary market through a third-party that is a Qualified Marketmaker at the prevailing market price ((x) or (y), the "**Permitted Open Market Purchases**"); *provided* that:

(i)      any Term Loans or Commitments acquired by Holdings, the Borrower or any Restricted Subsidiary shall be retired and cancelled immediately upon acquisition thereof;

208

(ii)     no assignment of Term Loans to Holdings, the Borrower or any Restricted Subsidiary (x) may be purchased with the proceeds of any ABL Loans or (y) may occur while an Event of Default has occurred and is continuing hereunder;

(iii)     in connection with each assignment pursuant to this Section 13.6(g), none of any Affiliated Parent Company, Holdings, the Borrower or any Subsidiary purchasing any Lender's Term Loans shall be required to make a representation that it is not in possession of MNPI with respect to any Public Reporting Entity, Holdings, Borrower and its Subsidiaries or their respective securities, and all parties to such transaction may render customary "big boy" letters to each other (or to the Auction Agent, if applicable);

(iv)     (A) the aggregate outstanding principal amount of the Term Loans of the applicable Class shall be deemed reduced by the full par value of the aggregate principal amount of such Term Loans acquired by, or contributed to, any Affiliated Parent Company, Holdings, the Borrower or such Subsidiary and (B) any scheduled principal repayment installments with respect to the Term Loans of such Class occurring pursuant to Sections 2.5(b) and (c), as applicable, prior to the final maturity date for Term Loans of such Class, shall be reduced *pro rata* by the par value of the aggregate principal amount of Term Loans so purchased or contributed (and subsequently cancelled and retired), with such reduction being applied solely to the remaining Term Loans of the Lenders which sold or contributed such Term Loans;

(v)     no Affiliated Lender shall have any right to (x) attend or participate in (including, in each case, by telephone) any meeting (including "Lender only" meetings) or discussions (or portion thereof) among the Agents or any Lender to which representatives of the Borrower are not then present or invited thereto, (y) receive any information or material prepared by any Agent or any Lender or any communication by or among any Agent and one or more Lenders or any other material which is "Lender only", except to the extent such information or materials have been made available to the Borrower or its representatives (and in any case, other than the right to receive notices of prepayments and other administrative notices in respect of its Term Loans required to be delivered to Lenders pursuant to Section 2) or receive any advice of counsel to any Agent or (z) make any challenge to any Agent's or any other Lender's attorney-client privilege on the basis of its status as a Lender;

(vi)     except with respect to any amendment, modification, waiver, consent or other action (a) that pursuant to Section 13.1 requires the consent of all Lenders, all Lenders directly and adversely affected or specifically such Lender, (b) that alters the applicable Affiliated Lender's *pro rata* share of any payments given to all Lenders, or (c) affects the applicable Affiliated Lender (in its capacity as a Lender) in a manner that is disproportionate to the effect on any Lender in the same Class, the Term Loans held by the applicable Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Lender vote (and, in the case of a plan of reorganization that does not affect the applicable Affiliated Lender in a manner that is adverse to such Affiliated Lender relative to other Lenders, such Affiliated Lender shall be deemed to have voted its interest in the Term Loans in the same proportion as the

209

other Lenders in the same Class) (and shall be deemed to have been voted in the same percentage as all other applicable Lenders voted if necessary to give legal effect to this paragraph) (but, in any event, in connection with any amendment, modification, waiver, consent or other action, shall be entitled to any consent fee, calculated as if all of the applicable Affiliated Lender's Term Loans had voted in favor of any matter for which a consent fee or similar payment is offered); and

(vii)    no such acquisition by an Affiliated Lender shall be permitted if, after giving effect to such acquisition, the aggregate principal amount of Term Loans of any Class held by Affiliated Lenders would exceed 25% of the aggregate principal amount of all Term Loans of such Class outstanding at the time of such purchase; *provided* that to the extent any assignment to an Affiliated Lender would result in the aggregate principal amount of the applicable Term Loans held by Affiliated Lenders exceeding such 25% threshold at the time of such purchase, the purchase of such excess amount will be void *ab initio*.

Each Lender that sells its Term Loans pursuant to this Section 13.6 acknowledges and agrees that (i) Holdings and its Subsidiaries may come into possession of additional information regarding the Term Loans or the Credit Parties at any time after a repurchase has been consummated pursuant to an auction or open market purchase hereunder that was not known to such Lender at the time such repurchase was consummated and may be information that would have been material to such Lender's decision to enter into an assignment of such Term Loans hereunder ("**Excluded Information**"), (ii) such Lender will independently make its own analysis and determination to enter into an assignment of its Term Loans and to consummate the transactions contemplated by an auction notwithstanding such Lender's lack of knowledge of Excluded Information and (iii) none of the direct or indirect equityholders of Holdings or any of its respective Affiliates, or any other Person, shall have any liability to such Lender with respect to the nondisclosure of the Excluded Information.

This Section 13.6 shall be construed so that all Term Loans are at all times maintained in "registered form" within the meaning of Section 5f.103-1(c) of the United States Treasury Regulations.

13.7    Replacements of Lenders under Certain Circumstances

(a)    The Borrower shall be permitted (x) to replace any Lender with a replacement bank or institution or (y) terminate the Commitment of such Lender, as the case may be, and repay all Obligations of the Borrower due and owing to such Lender relating to the Term Loans and participations held by such Lender as of such termination date if such Lender (a) requests reimbursement for amounts owing pursuant to Section 2.10 or Section 5.4 (or the Borrower is required to pay any Indemnified Taxes or additional amounts to any Agent or Lender or to any Governmental Authority on account of any Agent or Lender pursuant to Section 5.4), (b) [reserved], (c) becomes a Defaulting Lender or (d) refuses to make an Extension Election pursuant to Section 2.15; *provided* that, solely in the case of the foregoing clause (x), (i) no Specified Default shall have occurred and be continuing at the time of such replacement, (ii) the Borrower shall repay (or the replacement bank or institution shall purchase, at par) all Term Loans and other amounts (other than any disputed amounts), pursuant to Section 2.10, 2.11 or

5.4, as the case may be, owing to such replaced Lender prior to the date of replacement, (iii) the replacement bank or institution, if not already a Lender, an Affiliate of a Lender or an Approved Fund, and the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent (solely to the extent such consent would be required under Section 13.6), (iv) the replaced and the replacement Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein unless otherwise agreed) and (v) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, any Agent or any other Lender shall have against the replaced Lender.

(b)    If any Lender (such Lender, a "**Non-Consenting Lender**") has failed to consent to a proposed amendment, modification, supplement, waiver, discharge or termination that pursuant to the terms of Section 13.1 requires the consent of either (i) all of the Lenders of the applicable Class or Classes directly and adversely affected or (ii) all of the Lenders of the applicable Class or Classes, and, in each case, with respect to which the Required Lenders (or Lenders holding the majority of outstanding loans or commitments in respect of the applicable Class or Classes, as applicable) or a majority (in principal amount) of the directly and adversely affected Lenders shall, in each such case, have granted their consent, then so long as no Event of Default then exists, the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to (x) replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Term Loans and its Commitments hereunder (in respect of any applicable Class only, at the election of the Borrower) to one or more assignees reasonably acceptable to the Administrative Agent (to the extent such consent would be required under Section 13.6) or (y) terminate the Commitment of such Lender (in respect of any applicable Class only, at the election of the Borrower), and in the case of a Lender, repay all Obligations of the Borrower due and owing to such Lender relating to the Term Loans and participations held by such Lender as of such termination date; *provided* that:  (a) all Obligations of the Borrower hereunder owing to such Non-Consenting Lender being replaced (in respect of any applicable Class only, at the election of the Borrower) shall be paid in full to such Non-Consenting Lender concurrently with such assignment, and (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof *plus* accrued and unpaid interest thereon.  In connection with any such assignment, the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 13.6.

(c)    Nothing in this Section 13.7 shall be deemed to prejudice any right or remedy that Holdings or the Borrower may otherwise have at law or at equity.

13.8    Adjustments; Set-off

(a)    Except as contemplated in Section 13.6 or elsewhere herein or in any other Credit Document, if any Lender (a "**Benefited Lender**") shall at any time receive any payment of all or part of its Term Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 11.5, or otherwise), in a greater proportion than any such payment to or Collateral received by any other Lender, if any, in respect of such other Lender's Term Loans, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders a

211

participating interest in such portion of each such other Lender's Term Loan, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; *provided, however*, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)      After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by Applicable Law, each Lender shall have the right, without prior notice to Holdings or the Borrower, any such notice being expressly waived by Holdings and the Borrower to the extent permitted by Applicable Law but with the prior written consent of the Administrative Agent, upon any amount becoming due and payable by the Borrower hereunder (whether at the Stated Maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final) (other than payroll, trust, tax, fiduciary, employee health and benefits, pension, 401(k) and petty cash accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent in writing after any such set-off and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

13.9    Counterparts; Electronic Execution

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or any other Credit Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

13.10   Severability

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11   INTEGRATION

THIS WRITTEN AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT OF HOLDINGS, THE BORROWER, THE COLLATERAL AGENT, THE ADMINISTRATIVE AGENT AND THE LENDERS WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND (1) THERE ARE NO PROMISES, UNDERTAKINGS, REPRESENTATIONS OR WARRANTIES BY HOLDINGS, THE BORROWER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY LENDER RELATIVE TO SUBJECT MATTER HEREOF NOT EXPRESSLY SET FORTH OR REFERRED TO HEREIN OR IN THE OTHER CREDIT DOCUMENTS, (2) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES AND (3) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

13.12   GOVERNING LAW

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

13.13   Submission to Jurisdiction; Waivers

Each party hereto irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, in each case sitting in New York City in the Borough of Manhattan, and appellate courts from any thereof;

(b)      consents that any such action or proceeding shall be brought in such courts and waives (to the extent permitted by Applicable Law) any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 13.2 or at such other address of which the Administrative Agent shall have been notified in writing pursuant to Section 13.2;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or, in the case of the Administrative Agent, the Collateral Agent and the Lenders, shall limit the right to sue in any other jurisdiction;

213

(e)      subject to the last paragraph of Section 13.5, waives, to the maximum extent not prohibited by Applicable Law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 13.13 any special, exemplary, punitive or consequential damages; and

(f)      agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

13.14   Acknowledgments

Each of Holdings and the Borrower hereby acknowledges that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)      (i) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between Holdings and the Borrower, on the one hand, and the Administrative Agent, the Lenders and the other Agents on the other hand, and Holdings, the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent and the other Agents, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of Holdings, the Borrower, any other Credit Parties or any of their respective Related Parties, stockholders, creditors or employees or any other Person; (iii) neither the Administrative Agent nor any other Agent has assumed or will assume an advisory, agency or fiduciary responsibility in favor of Holdings, the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent has advised or is currently advising Holdings, the Borrower, the other Credit Parties or their respective Affiliates on other matters) and neither the Administrative Agent or other Agent has any obligation to Holdings, the Borrower, the other Credit Parties or their respective Related Parties with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent, each other Agent and each Related Party of the foregoing may be engaged in a broad range of transactions that involve interests that differ from those of Holdings, the Borrower and their respective Affiliates, and neither the Administrative Agent nor any other Agent has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) neither the Administrative Agent nor any other Agent has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and Holdings and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Holdings and the Borrower agree not to claim that the Administrative

214

Agent or any other Agent has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to Holdings, the Borrower or any other Affiliates, in connection with the transactions contemplated hereby or the process leading hereto.

(c)     no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among Holdings and the Borrower, on the one hand, and any Lender, on the other hand.

13.15   WAIVERS OF JURY TRIAL

HOLDINGS, THE BORROWER, EACH AGENT AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE (TO THE EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.16   Confidentiality

The Administrative Agent, each other Agent and each Lender shall hold all non-public information furnished by or on behalf of Holdings, the Borrower or any Subsidiary of the Borrower in connection with such Person's evaluation of whether to become an Agent or Lender hereunder or obtained by such Lender, the Administrative Agent, or such other Agent pursuant to the requirements of this Agreement or in connection with any amendment, supplement, modification or waiver or proposed amendment, supplement, modification or waiver hereto (including any Incremental Amendment, Refinancing Amendment or Extension Amendment) or the other Credit Documents ("**Confidential Information**"), confidential; *provided* that the Administrative Agent, each other Agent and each Lender may make disclosure (a) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by Applicable Law, regulation or compulsory legal process (in which case such Lender, the Administrative Agent or such other Agent shall use commercially reasonable efforts to inform the Borrower promptly thereof to the extent lawfully permitted to do so (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority)), (b) to such Lender's or the Administrative Agent's or such other Agent's attorneys, professional advisors, independent auditors, trustees or Affiliates involved in the Transactions on a "need to know" basis and who are made aware of and agree to comply with the provisions of this Section 13.16, in each case on a confidential basis (with such Lender, the Administrative Agent or such other Agent responsible for such persons' compliance with this Section 13.16), (c) on a confidential basis to any bona fide prospective successor Agent, bona fide prospective Lender, prospective participant or swap counterparty (in each case, other than a Disqualified Institution or a Person who the Borrower has affirmatively denied assignment thereto in accordance with Section 13.6), (d) to the extent requested by any bank regulatory authority having jurisdiction over an Agent or Lender or its Affiliates (including in any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), (e) to the extent such information:  (i) becomes publicly available other than as a result of a breach of this Section 13.16 or other confidential or fiduciary obligation

215

owed by the Administrative Agent, such other Agent or such Lender to the Borrower or its Affiliates or (ii) becomes available to the Administrative Agent, such other Agent or such Lender on a non-confidential basis from a source other than Holdings, the Borrower or any Subsidiary or on behalf of Holdings, the Borrower or any Subsidiary that, to the knowledge (after due inquiry) the Administrative Agent, such other Agent or such Lender, is not in violation of any confidentiality obligation owed to the Borrower or its Affiliates, (f) to the extent the Borrower shall have consented to such disclosure in writing (which may include through electronic means), (g) as is necessary in protecting and enforcing the rights of the Administrative Agent, such other Agent or such Lender with respect to this Agreement or any other Credit Document, (h) for purposes of establishing any defense available under Applicable Laws, including, without limitation, establishing a "due diligence" defense, (i) to the extent independently developed by the Administrative Agent, such other Agent or such Lender or any Affiliates thereof without reliance on confidential information, (j) on a confidential basis, to the rating agencies in consultation with the Borrower, (k) on a confidential basis, to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Term Loans or market data collectors, similar services providers to the lending industry and service providers to any Agent in connection with the administration and management of this Agreement and the Credit Documents and (l) to ClearPar® or any other pricing settlement provider.  Each Lender, the Administrative Agent and each other Agent agrees that it will not provide to prospective Transferees or to any pledgee referred to in Section 13.6 or to prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Term Loans made hereunder any of the Confidential Information unless such Person is advised of and agrees to be bound by the provisions of this Section 13.16 or confidentiality provisions at least as restrictive as those set forth in this Section 13.16.

13.17   Direct Website Communications

(a)     Holdings and the Borrower may, at their option, provide to the Administrative Agent any information, documents and other materials that they are obligated to furnish to the Administrative Agent pursuant to the Credit Documents, including, all notices, requests, financial statements, financial and other reports, certificates and other information materials and communications, but excluding any such communication (*provided* that such communications described in clauses (A) - (D) will be delivered pursuant to Section 13.2, including by e-mail) that (A) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or Interest Period relating thereto), (B) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under this Agreement, or (D) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit thereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at an email address separately identified by the Administrative Agent; *provided* that:  (i) upon written request by the Administrative Agent, Holdings or the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) Holdings or the Borrower

216

shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.  Nothing in this Section 13.17 shall prejudice the right of Holdings, the Borrower, the Administrative Agent, any other Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

(b)     The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Credit Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Credit Documents.  Each Lender agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(c)     Holdings and the Borrower further agree that the Agents may make the Communications available to the Lenders by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the Administrative Agent to be its electronic transmission system (the "**Platform**"), so long as the access to such Platform is limited (i) to the Agents, the Lenders or any bona fide potential Transferee and (ii) remains subject to the confidentiality requirements set forth in Section 13.16.

(d)     THE PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS IN THE PLATFORM AND FROM THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  In no event shall any Agent or their Related Parties (collectively, the "**Agent Parties**" and each an "**Agent Party**") have any liability to any Credit Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Credit Party's or any Agent's transmission of Communications through the internet or the Platform, except to the extent the liability of any Agent Party resulted from such Agent Party's (or any of its Related Parties' (other than trustees or advisors)) gross negligence or willful misconduct (as determined in a final non-appealable judgment of a court of competent jurisdiction).

(e)     The Borrower and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Holdings, the Borrower, the Subsidiaries of the Borrower or their

securities) (each, a "**Public Lender**").  The Borrower agrees that (w) at the request of any Agent, Communications that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Communications "PUBLIC," the Borrower shall be deemed to have authorized such Agent and the Lenders to treat such Communications as not containing any information of a type that would constitute material non-public information with respect to Holdings, the Borrower, the Subsidiaries of the Borrower or their securities for purposes of United States federal securities laws (*provided*, *however*, that to the extent such Communications constitute confidential information, they shall be treated as such as set forth in Section 13.16); (y) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information;" and (z) the Agents shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Side Information."

(f)　　　Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain information of a type that would constitute material non-public information with respect to the Holdings, the Borrower, the Subsidiaries of the Borrower or their securities for purposes of United States Federal or state securities laws.  In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrower (or any other Credit Party nor their Affiliates) nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Credit Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

(g)　　　Each of the Lenders, Holdings, and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agents are not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Platform, and that there are confidentiality and other risks associated with such distribution.  Each of the Lenders, Holdings and the Borrower hereby approves distribution of the Communications through the Platform and understands and assumes the risks of such distribution.

(h)　　　Each of the Lenders, Holdings and the Borrower agrees that the Agents may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Platform in accordance with the Agents' generally applicable document retention procedures and policies.

218

(i)      Nothing herein shall prejudice the right of any Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

13.18   USA PATRIOT Act

Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.

13.19   Payments Set Aside

To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to any Agent upon demand its applicable share of any amount so recovered from or repaid by such Agent, _plus_ interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

13.20   Judgment Currency

If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Credit Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Credit Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative

219

Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under Applicable Law).

13.21   Cashless Rollovers

Notwithstanding anything to the contrary contained in this Agreement or in any other Credit Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Term Loans by way of an Incremental Amendment, an Extension Amendment, a Refinancing Amendment or any other amendment to this Agreement, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Credit Document that such payment be made "in Dollars", "in immediately available funds", "in cash" or any other similar requirement.

13.22   Acknowledgement and Consent to Bail-In of EEA Financial Institutions

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

AVAYA INC.
AVAYA HOLDINGS CORP.


By: _____
      Name:
      Title:


AVAYA MANAGEMENT L.P.

By:  Avaya, Inc.
Its:  General Partner


By: _____
      Name:
      Title:

AVAYA CALA INC.
AVAYA CLOUD INC.
AVAYA EMEA LTD.
AVAYA FEDERAL SOLUTIONS, INC.
AVAYA HOLDINGS LLC
AVAYA INTEGRATED CABINET SOLUTIONS LLC
AVAYA MANAGEMENT SERVICES INC.
AVAYA WORLD SERVICES INC.
[CTINTEGRATIONS, LLC]
HYPERQUALITY, INC.
SIERRA ASIA PACIFIC INC.
UBIQUITY SOFTWARE CORPORATION
VPNET TECHNOLOGIES, INC.
HYPERQUALITY II, LLC
INTELLISIST, INC.
CAAS TECHNOLOGIES, LLC
KNOAHSOFT, INC.
SIERRA COMMUNICATION INTERNATIONAL LLC

By: _____
      Name:


[*Signature Page to Term Loan Credit Agreement*]

WILMINGTON SAVINGS FUND SOCIETY,
FSB, as Administrative Agent and Collateral Agent


By: _____
     Name:  Geoffrey J. Lewis
     Title:   Vice President


[*Signature Page to Term Loan Credit Agreement*]

[ ], as a Lender signature pages are on file with the Administrative Agent

By: _____
    Name:
    Title:

[*Signature Page to Term Loan Credit Agreement*]
133239372_4
133239372_6

**Schedule 1.1(a)**

Initial Term Commitment

(On file with the Administrative Agent)

| Lender | Debt Rights Offering Amount | RO Backstop Commitment Amount | DIP Conversion Amount | First Lien Claims Distribution Amount | Holdco Convertible Distribution Amount | Aggregate Amount |
|---|---|---|---|---|---|---|
| [Lender X] | | | | | | |
| [Lender Y] | | | | | | |
| [Lender Z] | | | | | | |
| | | | | | | |
| Lender Claimants | | | | $[  ] | | $[  ] |
| **Total** | **$150,000,000** | | **$500,000,000** | **$150,000,000** | **$10,000,000** | **$810,000,000** |

*[Link-to-previous setting changed from on in original to off in modified.].*
133239372_4
133239372_6

## Exhibit E

### Description of Transaction Steps

Certain documents, or portions thereof, contained in this **Exhibit E** and the First Amended Plan Supplement remain subject to continued review by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Required Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the First Amended Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this First Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Effective Date, the Debtors will file a redline of such document with the Bankruptcy Court.

In accordance with Article IV.C of the Plan, the Debtors intend to implement and effectuate the following Restructuring Transactions.

This Draft Description of Transactions Steps is intended only as a draft summary of the Restructuring Transactions and represents a simplified and illustrative set of steps.  For the avoidance of doubt, this **Exhibit E** reflects the Debtors' current intentions with respect to the Restructuring Transactions and the post-Effective Date organizational structure of the Reorganized Debtors.  Nothing in this **Exhibit E** shall be viewed as the final version of the Restructuring Transactions, nor shall it limit or modify, in any way, any section of the First Amended Plan Supplement or any related provisions in the Confirmation Order, or any authority or discretion granted to the Debtors and/or Reorganized Debtors thereby.  The Debtors and their advisors will continue to review the Restructuring Transactions from a legal, operational, and tax perspective.

1.  Prior to the emergence date, but before Step 2, Avaya UK will contribute (i) a receivable with respect to a certain intercompany note owed by Avaya International Sales Ltd to Aurix Limited ("Aurix"), and (ii) a loan payable and trade payable owed by Aurix, in each case, in exchange for additional shares of Aurix.

2.  Prior to the emergence date, Avaya (Gibraltar) Investments Ltd will sell 50% of the stock of Avaya International Enterprises Ltd ("AIEL") to Aurix in exchange for an intercompany note equal to the fair market value of the AIEL stock transferred.

3.  Prior to the emergence date, the Debtors will conduct the Rights Offering and, to the extent applicable, cash subscriptions are placed into escrow.  For U.S. federal income tax purposes, the Rights are treated as being transferred to Avaya Inc. as part of Step 5 and distributed to Holders of Claims (along with other consideration) pursuant to the Plan as part of Step 6.[1]

4.  As the first step on the emergence date, cash from the Rights Offering is released to Avaya Holdings Corp.

5.  Immediately after Step 4 and immediately prior to and in anticipation of Step 6, Avaya Holdings Corp. contributes (a) the newly issued RO Common Shares, RO Backstop Shares, DIP Commitment Shares, and RO Premium Shares, (b) the New Equity Interests to be distributed to each Holder of a First Lien Claim pursuant to Article III.B.4(c) of the Plan ("HoldCo Stock"), and (c) cash raised in the Rights Offering to Avaya Inc. as prepayment for the assets of Avaya Inc. received for federal income tax purposes as a result of the Avaya Inc Conversion in Step 8.

6.  Immediately after Step 5, Avaya Inc. transfers consideration under the Plan to Holders of Claims in satisfaction of the Debtors' obligations under the Plan, including (a) distributing the RO Common Shares, RO Backstop Shares, and RO Premium Shares to the participants in the Rights Offering and the Backstop Parties, and the DIP Commitment Shares to the DIP Commitment Parties, as the case may be; (b) the HoldCo Stock; and (c) issuing the Exit Term Loans.

7.  Immediately after Step 6, remaining third party liabilities that are not being reinstated are cancelled pursuant to the Plan for no further consideration.

8.  Immediately after Step 7, and as part of a single "plan of reorganization" for U.S. federal income tax purposes with Steps 3, 4, 5, 6, and 7 Avaya Inc. converts to a Delaware LLC, Avaya LLC, that is disregarded from its parent, Avaya Holding Corp., for United States federal income tax purposes (the "Avaya Inc Conversion").

9.  At any time on the effective date, various administrative expenses, professional fees, and similar are paid.

10. Intercompany Claims and Interests are Reinstated unless otherwise provided for in the Debtors' books and records which may, for the avoidance of doubt, provide for treatment with respect to such items that is retroactive.

---

[1]  The transfer of the Rights is consistent with the parties' view that the Rights Offering is treated as an option to buy equity of Avaya Holdings Corp for U.S. federal income tax purposes.

**Exhibit E-1**

**Redline to Previously Filed Draft Description of Transaction Steps**

1. Prior to the emergence date, but before Step 2, Avaya UK will contribute (i) a receivable with respect to a certain intercompany note owed by Avaya International Sales Ltd to Aurix Limited ("Aurix"), and (ii) a loan payable and trade payable owed by Aurix, in each case, in exchange for additional shares of Aurix.[1]

2. Prior to the emergence date, Avaya (Gibraltar) Investments Ltd will sell 50% of the stock of Avaya International Enterprises Ltd ("AIEL") to Aurix in exchange for an intercompany note equal to the fair market value of the AIEL stock transferred.

3. Prior to the emergence date, the Debtors will conduct the Rights Offering and, to the extent applicable, cash subscriptions are placed into escrow.  For U.S. federal income tax purposes, the Rights are treated as being transferred to Avaya Inc. as part of Step 5 and distributed to Holders of Claims (along with other consideration) pursuant to the Plan as part of Step 6.[21]

4. As the first step on the emergence date, cash from the Rights Offering is released to Avaya Holdings Corp.

5. Immediately after Step 4 and immediately prior to and in anticipation of Step 6, Avaya Holdings Corp. contributes (a) the newly issued RO cCommon stockShares, RO Backstop Shares, DIP Commitment Shares, and RO Premium Shares, (b) the New Equity Interests to be distributed to each Holder of a First Lien Claim pursuant to Article III.B.4(c) of the Plan ("HoldCo Stock"), and (c) cash raised in the Rights Offering to Avaya Inc. as prepayment for the assets of Avaya Inc. received for federal income tax purposes as a result of the Avaya Inc Conversion in Step 8.

6. Immediately after Step 5, Avaya Inc. transfers consideration under the Plan to Holders of Claims in satisfaction of the Debtors' obligations under the Plan.  Simultaneously, (a) Avaya Holdings Corp. issues, including (a) distributing the RO Common Shares, RO Backstop Shares, and RO Premium Shares to the participants in the Rights Offering and the Backstop Parties, and the DIP Commitment Shares to the DIP Commitment Parties, as the case may be; and (b) Avaya Inc. issues the ROthe HoldCo Stock; and (c) issuing the Exit Term Loans to the participants in the Rights Offering.

7. Immediately after Step 6, remaining third party liabilities that are not being reinstated are cancelled pursuant to the Plan for no further consideration.

8. Immediately after Step 7, and as part of a single "plan of reorganization" for U.S. federal income tax purposes with Steps 3, 4, 5 and, 6, and 7 Avaya Inc. converts to a Delaware LLC, Avaya LLC, that is disregarded from its parent, Avaya Holding Corp., for United States federal income tax purposes (the "Avaya Inc Conversion").

9. At any time on the effective date, various administrative expenses, professional fees, and similar are paid.

---

[1] Alternatively, or in conjunction with, this step, the Debtors may choose to cause approximately 10% of the stock of AIEL (defined below) to be distributed and contributed, as the case may be, to Aurix, prior to Step 2.

[21] The transfer of the Rights is consistent with the parties' view that the Rights Offering is treated as an option to buy equity of Avaya Holdings Corp for U.S. federal income tax purposes.

[1]

10. Intercompany Claims and Interests are Reinstated unless otherwise provided for in the Debtors' books and records which may, for the avoidance of doubt, provide for treatment with respect to such items that is retroactive.

## **Exhibit F**

### **Schedule of Rejected Executory Contracts and Unexpired Leases**

Certain documents, or portions thereof, contained in this **Exhibit F** and the First Amended Plan Supplement remain subject to continued review by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Required Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the First Amended Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this First Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Effective Date, the Debtors will file a redline of such document with the Bankruptcy Court.

Article V.A of the Plan provides that each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List in the Plan Supplement.

| Contract Counterparty | Contract Description[1] | Legal Entity |
|---|---|---|
| **10 - 30 SOUTH WACKER, L.L.C.** | | |
| | OFFICE LEASE AGREEMENT, DATED MARCH 20, 2014, AS AMENDED DATED AUGUST 16, 2017 | Avaya Inc. |
| **ANTHROMED LLC** | | |
| | SUBLEASE DATED NOVEMBER 23, 2022 | Avaya Inc. |
| **BRI 1875 MERIDIAN, LLC** | | |
| | OFFICE LEASE, DATED NOVEMBER 11, 2015, AS AMENDED DATED MARCH 2, 2018 | Avaya Inc. |
| **HORNG GOW CONSTRUCTION CO., LTD.** | | |
| | A LEASE AGREEMENT OF FEDERAL ENTERPRISE BUILDING DATED 2021 | Sierra Asia Pacific Inc. |
| **MOBERLY PROPERTIES, LLC** | | |
| | OFFICE LEASE AGREEMENT, DATED MAY 1, 2013, AS AMENDED DATED FEBRUARY 19, 2018 AND DECEMBER 22, 2020 | Avaya Inc. |
| **QLK, LLC** | | |
| | SUBLEASE DATED JULY 14, 2021 | Avaya Inc. |
| **U.S REIF EURUS AUSTIN, LLC DBA GREAT HILLS CORPORATE CENTER** | | |
| | LEASE AGREEMENT, DATED MARCH 10, 2021, AS AMENDED DATED MAY 26, 2021 | CT Integrations, LLC |

---

[1] For the avoidance of doubt, the Debtors' rejection of these agreements is also a rejection of any amendments, addendums, supplements, or alterations of any kind related thereto.

## Exhibit F-1

**Redline to Previously Filed Draft Schedule
of Rejected Executory Contracts and Unexpired Leases**

| Contract Counterparty | Contract Description[1] | Legal Entity |
|---|---|---|
| 10 - 30 SOUTH WACKER, L.L.C. | | |
| | OFFICE LEASE AGREEMENT, DATED MARCH 20, 2014, AS AMENDED DATED AUGUST 16, 2017 | Avaya Inc. |
| ANTHROMED LLC | | |
| | SUBLEASE DATED NOVEMBER 23, 2022 | Avaya Inc. |
| BRI 1875 MERIDIAN, LLC | | |
| | OFFICE LEASE, DATED NOVEMBER 11, 2015, AS AMENDED DATED MARCH 2, 2018 | Avaya Inc. |
| HORNG GOW CONSTRUCTION CO., LTD. | | |
| | A LEASE AGREEMENT OF FEDERAL ENTERPRISE BUILDING DATED 2021 | Sierra Asia Pacific Inc. |
| MOBERLY PROPERTIES, LLC | | |
| | OFFICE LEASE AGREEMENT, DATED MAY 1, 2013, AS AMENDED DATED FEBRUARY 19, 2018 AND DECEMBER 22, 2020 | Avaya Inc. |
| ~~MOUNT KEMBLE CORPORATE CENTER LLC~~ | ~~OFFICE LEASE, DATED APRIL 14, 2016, AS AMENDED DATED MAY 25, 2016, OCTOBER 28, 2016, FEBRUARY 5, 2019, AND APRIL 6, 2021~~ | ~~Avaya Inc.~~ |
| QLK, LLC | | |
| | SUBLEASE DATED JULY 14, 2021 | Avaya Inc. |
| ~~SREH 2014 LLC~~ | ~~OFFICE LEASE DATED JUNE 28, 2012, AS AMENDED DATED JANUARY 18, 2013, APRIL 2, 2014, OCTOBER 16, 2014, AND JUNE 23, 2020~~ | ~~Intellisist, Inc., d/b/a Spoken Communications~~ |
| U.S REIF EURUS AUSTIN, LLC DBA GREAT HILLS CORPORATE CENTER | | |
| | LEASE AGREEMENT, DATED MARCH 10, 2021, AS AMENDED DATED MAY 26, 2021 | CT Integrations, LLC |

---

[1]   For the avoidance of doubt, the Debtors' rejection of these agreements is also a rejection of any amendments, addendums, supplements, or alterations of any kind related thereto.~~"~~